# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

ASYLUM SEEKER ADVOCACY PROJECT,

       Plaintiff,

   v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES,

JOSEPH B. EDLOW, in his official capacity
as Director of United States Citizenship and
Immigration Services,

EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, and

SIRCE E. OWEN, in his official capacity as
Acting Director of the Executive Office for
Immigration Review,

       Defendants.

Civil Action No. 1:25-cv-03299-SAG

**Hearing Requested**

**Decision Requested By October 27, 2025**

**Plaintiff's Memorandum Of Law In Support Of Motion For A Temporary Restraining
Order, Preliminary Injunction, And/Or Preliminary Relief Under 5 U.S.C. § 705**

## Table of Contents

                                                                                        **Page**

Introduction ......................................................................................................... 1

Background ......................................................................................................... 4

    I.      In early July 2025, Congress imposes a new annual asylum fee for "each
            calendar year" that an application "remains pending." .......................... 4

    II.     In late July 2025, USCIS and EOIR announce that they will impose the
            annual asylum fee retroactively. .............................................................. 5

    III.    On September 23, EOIR creates a payment mechanism for the new *initial*
            asylum fee, but fails to provide one for the new *annual* asylum fee,
            triggering mass panic among asylum applicants. ................................... 7

    IV.   On or around October 2, USCIS posts an update on its website indicating
            that it created a payment mechanism for the annual asylum fee and has
            begun sending notices to applicants who will be required to pay within 30
            days. ........................................................................................................... 8

    V.     ASAP members face confusion and suffer economic injury. ................ 9

Legal Standard ................................................................................................. 10

Argument ......................................................................................................... 11

    I.      ASAP is likely to succeed on the merits. .............................................. 11

         A.    ASAP has standing. .................................................................. 11

         B.    ASAP is likely to prevail on its argument that USCIS's and
               EOIR's retroactive application of Section 1808 exceeds their
               statutory authority (Counts I and II). ...................................... 12

             1.     Section 1808 does not impose any annual asylum fees on
                     applicants who filed their applications on or before July 4,
                     2025 ...................................................................................... 12

             2.     Section 1808 does not impose fees on applicants based on
                     the time their applications were pending prior to July 4,
                       2025 ...................................................................................... 18

         C.    ASAP is likely to prevail on its argument that the USCIS Federal
               Register Notice and EOIR Memo are arbitrary and capricious
                (Count III). ................................................................................ 20

         D.    ASAP is likely to prevail on its claim that EOIR is unreasonably
                delaying agency action providing applicants a method to pay the
                fee (Count IV). ......................................................................... 22

    II.     The remaining factors weigh decisively in favor of preliminary relief. ............. 25

         A.    Irreparable harm ...................................................................... 25

          1.     Economic hardship and unrecoverable fees.................................. 25

          2.     Risk of adverse immigration consequences ................................ 26

    B.     Balance of the equities and public interest ............................................. 28

Conclusion ............................................................................................................................. 29

## Table of Authorities

**Page(s)**

### Cases

*Am. Fed'n of State, County & Mun. Emps., AFL-CIO v. SSA,*
778 F. Supp. 3d 685 (D. Md. 2025) .................................................................................26, 28

*Am. Fed'n of Teachers v. DOE,*
779 F. Supp. 3d 584 (D. Md. 2025) .................................................................................30

*Arias Gudino v. Lowe,*
785 F. Supp. 3d 27 (M.D. Pa. 2025) ...............................................................................27

*Ass'n of Am. Railroads v. Hudson,*
144 F.4th 582 (4th Cir. 2025) ..........................................................................................11

*Benitez v. Wilkinson,*
987 F.3d 46 (1st Cir. 2021) ..............................................................................................21

*Biden v. Texas,*
597 U.S. 785 (2022) .........................................................................................................14

*Blades of Green, Inc. v. Go Green Lawn & Pest, LLC,*
2022 WL 326473 (D. Md. Feb. 3, 2022) .........................................................................30

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) .........................................................................................................12

*Cabrera v. U.S. Dep't of Lab.,*
2025 WL 2092026 (D.D.C. July 25, 2025).......................................................................30

*Casa de Maryland, Inc. v. Wolf,*
486 F. Supp. 3d 928 (D. Md. 2020) .............................................................................11, 27

*City of Columbus v. Kennedy,*
2025 WL 2426382 (D. Md. Aug. 22, 2025) ...........................................................10, 11, 26

*ClearOne Advantage, LLC v. Kersen,*
710 F. Supp. 3d 425 (D. Md. 2024) .................................................................................10

*Cortez v. Sessions,*
318 F. Supp. 3d 1134 (N.D. Cal. 2018) ...........................................................................27

*Ctr. for Biological Diversity v. EPA,*
141 F.4th 153 (D.C. Cir. 2025).........................................................................................12

*DeNaples v. OCC,*
706 F.3d 481 (D.C. Cir. 2013)..........................................................................................21

*Dep't of Homeland Sec. v. Regents of the Univ. of California,*
591 U.S. 1 (2020)..............................................................................................................22

*Devitri v. Cronen*,
 289 F. Supp. 3d 287 (D. Mass. 2018) ................................................................27

*Doe 1 v. Jaddou*,
 2025 WL 327368 (D. Md. Jan. 29, 2025) ...........................................................29

*El Pollo Rico, LLC v. Wings & Pollo, LLC*,
 2022 WL 2916168 (D. Md. July 25, 2022)..........................................................29

*FERC v. Powhatan Energy Fund, LLC*,
 949 F.3d 891 (4th Cir. 2020) .............................................................................22

*Girouard v. United States*,
 328 U.S. 61 (1946)..............................................................................................16

*Gonzalez v. Cuccinelli*,
 985 F.3d 357 (4th Cir. 2021) .......................................................................23, 24

*Hicks v. Frame*,
 145 F.4th 408 (4th Cir. 2025) ............................................................................19

*INS v. St. Cyr*,
 533 U.S. 289 (2001).......................................................................................13, 17

*Jaghoori v. Holder*,
 772 F.3d 764 (4th Cir. 2014) ......................................................13, 14, 16, 17, 19

*Jahangiri v. Blinken*,
 2024 WL 1656269 (D. Md. Apr. 17, 2024) .............................................23, 24, 25

*Jimenez-Cedillo v. Sessions*,
 885 F.3d 292 (4th Cir. 2018) .............................................................................21

*K Mart Corp. v. Cartier, Inc.*,
 486 U.S. 281 (1988).......................................................................................14, 15

*Landgraf v. USI Film Prods.*,
 511 U.S. 244 (1994)...............................................................1, 12, 13, 14, 16, 17, 20

*League of Women Voters of N.C. v. North Carolina*,
 769 F.3d 224 (4th Cir. 2014) .............................................................................10

*Lee v. Christian Coal. of Am., Inc.*,
 160 F. Supp. 2d 14 (D.D.C. 2001) .....................................................................26

*Lindh v. Murphy*,
 521 U.S. 320 (1997).............................................................................................12

*Lovo v. Miller*,
 107 F.4th 199 (4th Cir. 2024) .......................................................................22, 23

*Lyons v. PNC Bank, N.A.*,
 2021 WL 50918 (D. Md. Jan. 6, 2021) ...............................................................14

*Martin v. Hadix,*
    527 U.S. 343 (1999)................................................................13, 17, 20

*Miller v. Callahan,*
    964 F. Supp. 939 (D. Md. 1997)................................................................17

*Mississippi v. JXN Water,*
    134 F.4th 312 (5th Cir. 2025) ................................................................21

*Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship,*
    918 F.3d 353 (4th Cir. 2019) ................................................................26

*Murthy v. Missouri,*
    603 U.S. 43 (2024)................................................................11

*Nielsen v. Stepping Stones Assocs., L.P.,*
    930 F. Supp. 910 (S.D.N.Y. 1996) ................................................................16

*Nken v. Holder,*
    556 U.S. 418 (2009)................................................................28

*Norton v. S. Utah Wilderness All. ("SUWA"),*
    542 U.S. 55 (2004)................................................................22, 23

*Old Dominion Power Co. v. Donovan,*
    772 F.2d 92 (4th Cir. 1985) ................................................................21

*Ramos v. Thornburgh,*
    732 F. Supp. 696 (E.D. Tex. 1989) ................................................................27

*Rendon v. U.S. Att'y Gen.,*
    972 F.3d 1252 (11th Cir. 2020) ................................................................13

*Sierra Club v. Nat'l Marine Fisheries Serv.,*
    2024 WL 3860211 (D. Md. Aug. 19, 2024) ................................................................21

*South Carolina v. United States,*
    907 F.3d 742 (4th Cir. 2018) ................................................................25

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ................................................................28

*TRAC v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ................................................................23

*Trump v. CASA, Inc.,*
    606 U.S. 831 (2025)................................................................30

*Trump v. IRAP,*
    582 U.S. 571 (2017)................................................................25

*United Food & Com. Workers Union Loc. 751 v. Brown Group, Inc.,*
    517 U.S. 544 (1996)................................................................11

*Vartelas v. Holder*,
    566 U.S. 257 (2012) ..................................................................................13

*Velasquez-Garcia v. Holder*,
    760 F.3d 571 (7th Cir. 2014) ...................................................................13

*Winter v. NRDC*,
    555 U.S. 7 (2008) .............................................................................10, 25

*Zaragoza v. Garland*,
    52 F.4th 1006 (7th Cir. 2022) .............................................................17, 18

## Statutes

5 U.S.C. § 705 ..............................................................................................3, 11, 30

5 U.S.C. § 706 ........................................................................................................22

8 U.S.C. § 1158 ................................................................................................4, 5, 6

8 U.S.C. § 1802 ..............................................................................................5, 14, 19

8 U.S.C. § 1803 ......................................................................................................15

8 U.S.C. § 1806 ......................................................................................................15

8 U.S.C. § 1808 ..................................................1, 4, 5, 14, 15, 16, 19, 22

8 U.S.C. § 1811 ......................................................................................................15

8 U.S.C. § 1812 ......................................................................................................15

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025)...........................1

## Other Authorities

Off. of Inspector Gen., U.S. Dep't of Homeland Sec., *Final Report: USCIS Faces
    Challenges Meeting Statutory Timelines and Reducing Its Backlog of
    Affirmative Asylum Claims* 6 (2024) ............................................................6

U.S. Board of Governors of the Federal Reserve System, *Report on the Economic
    Well-Being of U.S. Households in 2023 - May 2024* .......................................9

U.S. Dep't of Health & Human Services, Office of Human Services Policy, *The
    Fiscal Impact of Refugees and Asylees Over 15 Years: Over $123 Billion in
    Net Benefit from 2005 to 2019* ...................................................................9

## Administrative Actions

Policy Memorandum 602-0187, *Issuance of Notices to Appear (NTAs) in Cases
    Involving Inadmissible and Deportable Aliens*, USCIS (Feb. 28, 2025)...................5

Executive Office of Immigration Review, Memorandum of Acting Director Sirce
　　Owen, Statutory Fees Under the One Big Beautiful Bill Act, PM 25-36 (July
　　17, 2025) ....................................................................................6, 7, 14, 15, 20, 22, 23, 24, 28

*USCIS Immigration Fees Required by HR-1 Reconciliation Bill*, 90 Fed. Reg.
　　34,511 (July 22, 2025) ...............................................................................6, 7, 14, 15, 21, 22

## Introduction

The One Big Beautiful Bill Act ("OBBBA" or "the Act") created a new requirement that asylum seekers pay a $100 fee at the time they submit their application for asylum, and a $100 annual asylum fee for "each calendar year" that their applications remain pending.  Pub. L. No. 119-21, §§ 100002, 100009, 139 Stat. 72, 371 (2025) (codified at 8 U.S.C. §§ 1802, 1808).  Defendants United States Citizenship and Immigration Services ("USCIS") and Executive Office for Immigration Review ("EOIR") are responsible for implementing the new annual asylum fee.  But both agencies have failed to do so in a lawful or coherent manner, causing mass confusion and immediate harm to asylum seekers.

Rather than applying the annual asylum fee *prospectively*, as the statute requires, USCIS and EOIR are impermissibly applying it *retroactively*—both to applicants who filed asylum applications before the statute's enactment and by counting pre-enactment time toward the first "calendar year."  This violates the fundamental rule that a statute cannot "operate retroactively . . . absent clear congressional intent favoring such a result."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).  The agencies' erroneous interpretations have imposed immediate and unlawful payment obligations on thousands of applicants—many of whom live below the poverty line—without clear guidance, adequate notice, or, in EOIR's case, any functioning mechanism to pay.

The resulting confusion became increasingly urgent in late September as misinformation proliferated in the absence of clear or consistent agency guidance or an available payment mechanism, leading many asylum seekers to incorrectly believe that they faced a September 30, 2025 payment deadline.  Over the last week, thousands of members of Plaintiff Asylum Seeker Advocacy Project ("ASAP") contacted the organization with concerns, uncertain how or when to pay.  The confusion was based on USCIS's earlier statements suggesting that September 30 would be the first date payments would be due at that agency.  The confusion deepened further due to EOIR's

belated September 23 rollout of an online payment process for *initial* asylum fees only—the agency failed to provide a similar payment for the annual fee, even though that agency had previously suggested that many applicants were already required to pay. Many asylum seekers, desperate to show compliance but with no way to pay the annual fee, then paid the *initial* asylum fee on the agency's website, hoping that would satisfy EOIR, but without any way of knowing whether the agency would credit their attempted payments.

Congress gave USCIS and EOIR ample time to develop a clear, lawful system before any annual asylum fee became due—which is no earlier than July 2026. Instead, by implementing OBBBA retroactively and inconsistently, the agencies placed asylum seekers in the untenable position of trying to determine how to pay an unexpected fee on short notice, without clear instructions, and at risk of potential deportation if they guess wrong. In EOIR's case, applicants *still* lack any mechanism to actually pay the annual asylum fee despite the agency claiming that for some applicants it has been due for three months.

The stakes could not be higher for asylum seekers, who face the risk that their applications will be rejected for nonpayment and that, as a result, they could be detained and removed from the United States to countries where they face persecution. Troublingly, ASAP has received reports that some immigration judges at EOIR are already requiring applicants to pay the annual asylum fee, and that in at least one case an immigration judge even rejected an asylum application and ordered an asylum seeker removed for non-payment, despite the agency providing no way to pay.

This lawsuit raises three main claims challenging USCIS's and EOIR's unlawful application of the annual asylum fee. *First*, USCIS and EOIR are unlawfully imposing the fee retroactively, without express authorization from Congress. *Second*, USCIS's and EOIR's decisions were

arbitrary and capricious because, among other reasons, the agencies are imposing the fee in divergent ways. *Third*, to the extent any asylum seekers are currently required to pay the fee, EOIR is unreasonably delaying agency action that provides a mechanism and necessary instructions on how applicants can pay the fee.

USCIS's and EOIR's actions are inflicting immediate and irreparable harm on asylum seekers, including ASAP's members. The equities and public interest alike strongly favor relief to ensure lawful, orderly implementation of the OBBBA, and to prevent further chaos and confusion among those seeking refuge in the United States. Accordingly, this motion seeks urgent preliminary relief to prevent further harm.

The Court should enter a stay under the Administration Procedure Act, 5 U.S.C. § 705, and a temporary restraining order or preliminary injunction that: (1) forbids USCIS and EOIR from imposing the annual asylum fee retroactively; and (2) orders both agencies to reinstate the applications of any ASAP members whose applications have been rejected for nonpayment. In the alternative, and to the extent any applicant is currently required to pay the fee, the Court should (3) bar EOIR from taking any adverse action against an asylum applicant for failure to pay the annual asylum fee until the agency has provided a functioning mechanism to collect the fee and a reasonable opportunity for applicants to pay.

ASAP respectfully requests that the Court schedule oral argument and rule on this motion by October 27, 2025. A USCIS webpage updated on or around October 2, 2025 states that the agency began sending notices to individuals with pending applications on October 1 that required them to pay the annual asylum fee within 30 days. Ex. B. A decision by October 27 will therefore provide needed clarity before some applicants' payments would be due under USCIS's deadline. To ensure that the Court is able to reach a decision by that date, ASAP requests that the Court

order the government to file its opposition brief by October 15, and ASAP to file its reply brief by October 21.

**Background**

I.    **In early July 2025, Congress imposes a new annual asylum fee for "each calendar year" that an application "remains pending."**

Congress passed and the President signed the first specific "refugee" act, the Displaced Persons Act of 1948, in the aftermath of World War II, giving millions of displaced Europeans a safe home. In the Refugee Act of 1980, Congress eventually created a statutory right to apply for asylum. 8 U.S.C. § 1158(a)(1).

Historically, the government did not require asylum seekers to pay any fees to apply for asylum, let alone annual fees, while they awaited the government's decision on their applications. That changed on July 4, 2025, when the President signed OBBBA into law. As relevant here, OBBBA creates a new requirement, codified at 8 U.S.C. § 1808(a), requiring asylum applicants to pay an annual fee.

Section 1808 provides as follows:

> In addition to any other fee authorized by law, for each calendar year that an alien's appli-cation for asylum remains pending, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee, equal to the amount specified in subsection (b), by such alien.

8 U.S.C. § 1808(a). Section 1808(b), in turn, determines the "amount specified" for the fee:

> For fiscal year 2025, the amount specified in [Section 1808] shall be the greater of—
>
> (A) $100; or
>
> (B) such amount as the Secretary of Homeland Security may establish, by rule.

8 U.S.C. § 1808(b)(1). Subsection (b)(2) then provides for "[a]nnual adjustments for inflation," and states that "[d]uring fiscal year 2026, and during each subsequent fiscal year," the amount

4

equals the amount required "for the most recently concluded fiscal year" plus an inflation adjustment.

The annual asylum fee is one of many new statutory fees that apply to asylum seekers and other immigrants. Also among those is a new *initial* asylum fee, codified at 8 U.S.C. § 1802, requiring asylum seekers to pay a fee at the time they file their applications. For the initial asylum fee, like the annual asylum fee, Congress set a baseline fee of $100, plus an annual inflation adjustment. 8 U.S.C. § 1802(b)–(c). In later years, the initial asylum fee equals the sum of the prior year's fee and an inflation adjustment. *Id.* § 1802(c).

## II.    In late July 2025, USCIS and EOIR announce that they will impose the annual asylum fee retroactively.

USCIS and EOIR are the relevant agencies tasked with operationalizing the annual asylum fee (and other fees imposed by OBBBA). *See* 8 U.S.C. § 1808(a). This lawsuit challenges USCIS's and EOIR's decisions purporting to implement the annual asylum fee retroactively.

There are two ways to apply for asylum: affirmatively with USCIS, or defensively before an immigration judge at EOIR. Decl. ¶¶ 23–24.[1] Applicants seek asylum defensively before immigration judges if they are in removal proceedings, which are initiated when the government files a Notice to Appear with an immigration court.[2] If an applicant does not have removal proceedings pending, generally the applicant must file an asylum application with USCIS. 8 U.S.C. § 1158(a)(2)(B).

Congress requires asylum applications to be adjudicated within 180 days of filing, barring

---

[1] All cites to "Decl. __" refer to the Declaration of Swapna C. Reddy ("Decl.") filed contemporaneously with this motion. Cites to "Ex. __" are exhibits to the same Declaration.

[2] *See generally* Policy Memorandum 602-0187, *Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens*, USCIS (Feb. 28, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_FI-NAL_2.28.25_FINAL.pdf (USCIS, Immigration and Customs Enforcement, and Customs and Border Protection have concurrent authority to commence removal proceedings).

exceptional circumstances.  8 U.S.C. § 1158(d)(5)(A)(iii).  But in reality, both USCIS and EOIR often take many years to adjudicate an asylum application.  Many ASAP members have been waiting for a decision in their case for five years or more.  Decl. ¶ 8.  Indeed, a recent report on the asylum backlog at USCIS reported that over 97% of asylum cases at USCIS were not adjudicated within 180 days.[3]  The backlog has only grown since that report.

On July 17, 2025, EOIR issued a policy memorandum (the "EOIR Memo") purporting to "implement[] the statutorily mandated immigration fees and fee waiver changes established by" the Act.[4]  As relevant here, EOIR determined that asylum seekers who filed their applications before the enactment of Section 1808 must pay annual asylum fees as early as July 5, 2025—the "date after the date of enactment of OBBBA."  *Id.* at 2.  EOIR also warned that "[f]ilings that do not comply with the statutory fee requirement shall be rejected."  *Id.* at 3.[5]

On July 22, USCIS published a notice in the Federal Register that purported "to provide the information needed for the public to comply with the new law."  90 Fed. Reg. 34,511, 34,511 (July 22, 2025) ("USCIS Federal Register Notice").  The USCIS Federal Register Notice suggested that any asylum applicant with a pending application whose application has been pending since October 1, 2024 or earlier would be required to pay the annual asylum fee as early as September 30, 2025.  90 Fed. Reg. at 34,515.

Both agencies' interpretations would require applicants to pay the annual asylum fee even

---

[3] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., *Final Report: USCIS Faces Challenges Meeting Statutory Timelines and Reducing Its Backlog of Affirmative Asylum Claims* 6 (2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-07/OIG-24-36-Jul24.pdf.

[4] *See* EOIR, Memorandum of Acting Director S. Owen, PM 25–36 (July 17, 2025), https://www.justice.gov/eoir/media/1408356/dl?inline.

[5] The EOIR Memo states that immigration courts "will implement temporary measures until the new asylum fees are fully integrated into existing payment systems," EOIR Memo 3 n.7, but ASAP is aware of at least one case where an immigration judge refused to do so and ordered an applicant removed for failing to pay the fee, Decl. ¶ 48.

if they applied for asylum before Section 1808 was enacted.  Similarly, both agencies count the *time* that applications were pending prior to Section 1808's enactment in determining when applicants must pay the fee.

But the agencies did not agree on the date that the first payments would become due.  According to EOIR, some applicants were required to pay the fee as early as July 5, 2025.  EOIR Memo at 2.  According to USCIS, however, no applicant would be required to pay the annual asylum fee until September 30, 2025, at the earliest.  90 Fed. Reg. at 34,515.  (USCIS later clarified that no applicant would be required to pay until 30 days after receiving individualized notice from the agency, but the damage had already been done: misinformation about a "September 30 deadline" both with USCIS and EOIR had spread rampantly online.  Decl. ¶¶ 51–54.)

### III.    On September 23, EOIR creates a payment mechanism for the new *initial* asylum fee, but fails to provide one for the new *annual* asylum fee, triggering mass panic among asylum applicants.

Despite interpreting Section 1808 to impose the annual asylum fee retroactively such that, for many applicants, fees were due either immediately or imminently, EOIR failed to provide applicants clear instructions on how they should make the payments.  On September 23, 2025, EOIR finally established an option on its online payment portal allowing applicants to pay the *initial* asylum fee required by Section 1802.  When applicants pay the initial asylum fee, they are directed to a web landing page informing them that they will be required to pay the annual asylum fee "within 30 days of the anniversary due date" of their application. Ex. G.  This page tells applicants that "[p]ayment of this fee can be made at https://epay.eoir.justice.gov/index," but that link directs applicants to EOIR's payment portal, which still does *not* provide applicants any way to pay the annual asylum fee.  *Id.*  EOIR has not explained why it provided a payment method for the *initial* asylum fee but not the annual asylum fee, even though the agency claims that applicants were required to pay both fees beginning in July.  Indeed, as of the filing of this motion, EOIR still has

not provided applicants before EOIR any way to pay the annual asylum fee at all.  Decl. ¶ 42.

After EOIR's September 23 release of a payment option for the *initial* asylum fee, and with USCIS's suggested deadline of payments by September 30 looming, many asylum seekers began receiving urgent messages and social-media reports suggesting that their applications could be denied if they did not find a way to pay.  Decl. ¶ 51; Ex. F.  In the resulting panic, many asylum applicants attempted to pay the annual asylum fee to EOIR through the portal's option for paying the initial asylum fee, even though it is unclear whether those payments will be credited.  Decl. ¶¶ 45, 61, 70; Ex. F.

## IV.    On or around October 2, USCIS posts an update on its website indicating that it created a payment mechanism for the annual asylum fee and has begun sending notices to applicants who will be required to pay within 30 days.

Until very recently, USCIS had not provided a payment method either.  According to a USCIS update published on the agency's website last week, the agency "began sending notices" on October 1 to asylum applicants "who are required to pay the new Annual Asylum Fee."  Ex. B. In the same update, USCIS stated that if applicants receive a notice, they "should pay the fee within 30 days."  *Id.*  Thus, based on USCIS's most recent interpretation, no applicant is required to pay the annual asylum fee until October 31, at the earliest, and even then, only if they received an individualized notice on October 1.  On or around October 2, 2025, USCIS posted to its website a form for asylum applicants to pay the annual asylum fee for applications pending with USCIS, Ex. A, but as of the date of this filing, many applicants whose applications have been pending at USCIS for more than a year have not received any individualized notice yet, and those applicants appear to be unable to pay the fee through USCIS's website.  These applicants have consistently received an error message stating simply that "At this time, the Annual Asylum Fee payment is not due for this case."  Decl. ¶ 37 & Ex. C.

## V.    ASAP members face confusion and suffer economic injury.

ASAP is a national voluntary membership organization of asylum seekers from 175 countries now living in the United States.  Decl. ¶¶ 4–6.  For many ASAP members, being forced to pay a $100 fee on an annual basis—and particularly on short notice—would impose substantial hardship.  *Id.* ¶ 61.  Over the past week, thousands of members have communicated concerns about the new annual asylum fee to ASAP.  *Id.* ¶ 57.

Many ASAP members who applied before July 5, 2025, have reported that the $100 fee will be difficult to pay due to their financial limitations, particularly on such short notice.  Decl. ¶ 61.  Asylum applicants cannot lawfully obtain employment without a work permit (also known as an Employment Authorization Document, or EAD), which takes many months to obtain and also carries a fee.  *Id.*  As a point of comparison, the median annual household income of an individual who has been *granted* lawful refugee or asylee status and has lived in the United States for 0–4 years is around $30,000, with over a third of individuals in this category living below the federal poverty line.[6]  Indeed, according to 2024 Federal Reserve study, 18% of adults in the United States "said the largest emergency expense they could handle … was under $100."[7]  Many asylum applicants fit in that category.  ASAP members already face daily tradeoffs to cover basic needs like food and clothing.  Decl. ¶ 61.

These economic hardships are compounded by EOIR's failure to provide a payment mechanism and clear instructions regarding how to pay the new annual asylum fees.  This has resulted

---

[6] U.S. Dep't of Health & Human Services, Office of Human Services Policy, *The Fiscal Impact of Refugees and Asylees Over 15 Years: Over $123 Billion in Net Benefit from 2005 to 2019* at 4 (2024), https://aspe.hhs.gov/sites/default/files/documents/ea6442054785081eb121fa5137cf837d/aspe-brief-refugee-fiscal-impact-study.pdf.

[7] U.S. Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2023-May 2024* (May 28, 2024), https://www.federalreserve.gov/publications/2024-economic-well-being-of-us-households-in-2023-expenses.htm.

in significant confusion and emotional distress among ASAP members.  Decl. ¶ 65.  For example,

one of ASAP's members, an asylum seeker with an asylum application pending with EOIR, re-

sorted to using her family's grocery money to attempt to pay the annual asylum fee with EOIR

using the "initial filing fee" option.  *Id.* ¶ 70.

 If the government determines that asylum seekers are not in compliance with the annual

asylum fee, they may experience severe immigration consequences, including potential deporta-

tion.  EOIR has stated that if it determines that an applicant does not timely pay the annual asylum

fee, this "will likely result in pretermission of the asylum application and an order of removal."

Decl. ¶ 62.  This EOIR statement appears in the on-screen receipt for payment of the initial asylum

application fee to EOIR.  *Id.*  If ASAP members' cases are rejected due to nonpayment of the

annual asylum fee, they may lose the chance to present their asylum case and to have the facts of

their case even considered, despite waiting years.  *Id.* ¶ 64.  And if they are ordered removed, they

may be forcibly returned to a country where they face persecution, torture, or worse.  *Id.*

### Legal Standard

 "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v.*

*NRDC*, 555 U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224,

236 (4th Cir. 2014).  "The standards for granting a TRO and granting a preliminary injunction are

the same."  *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024).

 Likewise, "Section 705 of the APA permits a court to 'issue all necessary and appropriate

process to postpone the effective date of an agency action or to preserve status or rights pending

conclusion of review proceedings' where 'required and to the extent necessary to prevent irrepa-

rable injury.'"  *City of Columbus v. Kennedy*, 2025 WL 2426382, at *5 (D. Md. Aug. 22, 2025)

(quoting 5 U.S.C. § 705), *appeal pending*, No. 25-2012 (4th Cir.). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Id.* (citation omitted).

## Argument

### I.    ASAP is likely to succeed on the merits.

ASAP is likely to succeed on the merits of its claims. *First*, USCIS and EOIR are imposing the annual asylum fee retroactively in excess of the agencies' statutory authority. *Second*, the USCIS Federal Register Notice and EOIR Memo are arbitrary and capricious. *Third*, EOIR has unreasonably delayed agency action by failing to provide a mechanism for asylum seekers to pay the annual asylum fee (to the extent they are required to pay).

### A.    ASAP has standing.

"At the preliminary injunction stage … the plaintiff must make a 'clear showing' that she is 'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Here, ASAP has associational standing, which requires an organization to demonstrate that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted, nor the relief requested requires the participation of individual members in the lawsuit. *See United Food & Com. Workers Union Loc. 751 v. Brown Group, Inc*., 517 U.S. 544, 553 (1996).

Each element is satisfied here. Many ASAP members are already required to pay annual asylum fees (or will imminently be required to pay) solely due to USCIS's and EOIR's retroactive interpretations of the statute. Decl. ¶ 66. Further, the interests ASAP seeks to protect are germane to its purpose, and this lawsuit does not require the participation of individual members. *See Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 948 (D. Md. 2020) (discussing ASAP's associational standing in another case); *Ass'n of Am. R.Rs. v. Hudson,* 144 F.4th 582, 590 (4th Cir. 2025) ("[A]n action seeking prospective declaratory and injunctive relief … is indeed the very 'type of

relief for which associational standing was originally recognized.'" (citation omitted)).

**B.    ASAP is likely to prevail on its argument that USCIS's and EOIR's retroactive application of Section 1808 exceeds their statutory authority (Counts I and II).**

USCIS's and EOIR's interpretations of Section 1808's annual asylum fee requirement are impermissibly retroactive in two independent ways.  First, and more broadly, USCIS and EOIR purport to require asylum seekers whose applications were already pending on July 4, 2025, to pay the annual asylum fee even though no such requirement existed when they filed.  Second, even assuming the requirement could apply to applicants who sought asylum on or before July 4, 2025, both agencies impermissibly count the *time* an asylum application was pending on or before July 4 of this year in determining whether it has been pending for a full year.  Although the latter issue is narrower than the former, the most immediate and urgent consequences of the agencies' interpretation result from the agencies' determinations that some applicants are already required to pay the annual asylum fee based on the time their applications were pending before July 4, 2025.  ASAP is likely to succeed on both retroactivity arguments.

**1.    Section 1808 does not impose any annual asylum fees on applicants who filed their applications on or before July 4, 2025.**

A statute cannot have retroactive effect "in the absence of clear congressional intent" to that effect.  *Landgraf*, 511 U.S. at 283.  Thus, "[r]etroactivity principles bar agencies from imposing new obligations on past actions without clear statutory authority."  *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 193 (D.C. Cir. 2025) (per curiam).  "[T]he absence of any express authorization for retroactive" application of a new rule "weighs heavily against" retroactivity.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 214 (1988).

*Landgraf*'s "clear-statement rule," *Lindh v. Murphy*, 521 U.S. 320, 325 (1997), requires "'clear, strong, and imperative' language" that is "so clear and positive as to leave no room to doubt that such was the intention of the legislature," *Landgraf*, 511 U.S. at 271–72 (quotation

marks omitted) (citing cases); *see Jaghoori v. Holder*, 772 F.3d 764, 770 (4th Cir. 2014) ("The prescriptive language in the statute must be express, unambiguous, and unequivocal."). The clear-statement rule "allocates to Congress," not agencies or courts, "responsibility for fundamental policy judgments concerning the proper temporal reach of statutes." *Landgraf*, 511 U.S. at 272–73. This presumption is particularly strong in the immigration context, where courts have repeatedly refused to apply immigration laws retroactively in recognition of the severe consequences of falling out of status and being at risk of deportation. *See INS v. St. Cyr*, 533 U.S. 289, 314–26 (2001) (refusing to apply immigration law retroactively that would have barred certain immigrants with criminal convictions from discretionary deportation relief).[8]

With this particularly strong presumption against retroactivity in mind, to determine whether any particular application of a statute is impermissibly retroactive, courts apply the two-step test announced in *Landgraf*. *Jaghoori*, 772 F.3d at 770. First, the court asks "'whether Congress has expressly prescribed the statute's proper reach.'" *Id.* (quoting *Landgraf*, 511 U.S. at 280). Then, if "Congress did not speak with the requisite clarity," the court asks "'whether the new statute would have retroactive effect'" if applied to particular conduct. *Id.* (quoting *Landgraf*, 511 U.S. at 280). "If so, then 'in keeping with [the] traditional presumption against retroactivity, [the court] presume[s] that the statute does not apply to that conduct.'" *Id.* (quoting *Martin v. Hadix*, 527 U.S. 343, 352 (1999)).

---

[8] *See also, e.g.*, *Vartelas v. Holder*, 566 U.S. 257, 260–61 (2012) (refusing to apply immigration law retroactively that established lawful permanent residents convicted of a crime who traveled abroad could be subject to removal proceedings); *Velasquez-Garcia v. Holder*, 760 F.3d 571, 579 (7th Cir. 2014) ("In the immigration context, the reluctance to impose rules retroactively is 'buttressed by the longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien.'" (quoting *St. Cyr*, 533 U.S at 320)); *Rendon v. U.S. Att'y Gen.*, 972 F.3d 1252, 1258 (11th Cir. 2020).

**No clear statement.**  Here, Section 1808 lacks an "express, unambiguous, and unequivo-cal" statement authorizing any retroactive application of the annual asylum fee.  *Jaghoori*, 772 F.3d at 770.  If Congress intended for Section 1808 to apply retroactively to asylum seekers who had already filed their applications, "it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022).  Congress could have stated, for example, that the annual asylum fee "shall apply to all [applications] pending on or commenced after the date of enactment of this Act."  *Lyons v. PNC Bank, N.A.*, 2021 WL 50918, at *6 (D. Md. Jan. 6, 2021) (Gallagher, J.) (quoting *Landgraf*, 511 U.S. at 259–60), *rev'd in part on other grounds*, 26 F.4th 180 (4th Cir. 2022).  Or it could have stated, "The annual asylum fee shall apply to all pending applications regardless of when they were filed."  Or, Congress could have simply said, "*This section shall have retroactive effect*."  But Congress did not do so—and that is "telling."  *Lyons*, 2021 WL 50918, at *6.

Statutory context and structure confirm that Section 1808 does not impose fees on asylum seekers who submitted their applications prior to enactment.  *See K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").  Section 1802 establishes a new *initial* asylum fee payable "at the time such application is filed," which both agencies concede is not retroactive.[9]  8 U.S.C. § 1802(a).  Section 1808 then provides for an annual asylum fee that will be due one year later if an application "remains pend-ing."  *Id.* § 1808(a).  Because the *annual* asylum fee's payment date is based off the initial filing

---

[9] USCIS acknowledges that the initial asylum fee does *not* apply retroactively.  *See* 90 Fed. Reg. at 34,514 ("[T]he fee applies to asylum applications filed on or after the date of publication of this Notice.").  And EOIR does not purport to apply the initial asylum fee retroactively.  *See generally* EOIR Memo.

of an asylum application, it follows that just as Section 1802 does not apply retroactively, Section 1808 similarly does not apply retroactively.

Numerous other provisions follow the same structure. *See, e.g.*, 8 U.S.C. §§ 1803 (EAD fees); 1806 (visa integrity fees); 1811 (EAD renewal for individuals granted temporary protected status); 1812 (status adjustment fees). Neither USCIS nor EOIR contends that any of these fees applies retroactively. It would be puzzling for Congress to single out Section 1808—and only Section 1808—to apply retroactively, especially without any express statement to that effect. *See K Mart Corp.*, 486 U.S. at 291.

The agencies' main argument for imposing the annual asylum fee—and only the annual asylum fee—retroactively is that Congress set the annual asylum fee at $100 for fiscal year 2025 and there would be "no fee collections in FY 2025" unless some asylum seekers pay an annual fee in fiscal year 2025. 90 Fed. Reg. at 34,515; EOIR Memo at 2 (similar). According to USCIS, the statute makes the annual fee "applicable in FY 2025," and because fiscal year 2025 ended on September 30, 2025, the only way to ensure *some* asylum applicants pay the fee in fiscal year 2025 "requires applying the fee to applications pending with USCIS before enactment." 90 Fed. Reg. at 34,515.

That argument wrongly conflates an asylum seeker's payment *date*—which is based on "each calendar year" her application "remains pending" after filing an initial asylum application post-OBBBA's enactment—with the payment *amount*, which is based on the fiscal year in which the payment is due. The amount for any given year is pegged to a baseline of $100 "for fiscal year 2025." 8 U.S.C. § 1808(b)(1). "*During* fiscal year 2026, and *during* each subsequent fiscal year," the amount is equal to the amount for the previous year plus an inflation adjustment. *Id.* § 1808(b)(2) (emphases added). If Congress wanted to make the annual asylum fee retroactive

such that it would apply "during" fiscal year 2025, it could have easily said so by using the word "during" in subsection (b)(1). Instead, it used the word "during" only in setting the amount of the fee "[d]uring fiscal year 2026" and thereafter.

Setting the fee at $100 "for" fiscal year 2025 serves an obvious and necessary role: it provides the baseline number for calculating the amount that asylum seekers who apply for asylum under the new statutory fee regime will owe in *future* years after they file their initial applications, pay the initial fee, and then have their applications "remain[] pending" for at least one full calendar year. 8 U.S.C. § 1808(a). That Congress used fiscal year 2025 to set a reference value for those future payments says nothing—and certainly nothing clear enough to overcome the presumption against retroactivity—about whether asylum applicants with applications pending before the statute's enactment must now begin paying a new annual asylum fee in fiscal year 2025 and each year thereafter until their applications are adjudicated. *Cf. Nielsen v. Stepping Stones Assocs., L.P.*, 930 F. Supp. 910, 911 (S.D.N.Y. 1996) (when Congress applies statute to a fiscal year but "does not state on what date [the application] becomes effective," "the most plausible interpretation of that language" is that the application begins on "the date of the Act's approval"). At best, the statute is silent on that issue, and "silence alone" cannot provide a clear indication of Congress's intent. *Girouard v. United States*, 328 U.S. 61, 69 (1946); *see also Jaghoori*, 772 F.3d at 769 ("[A] statute that is ambiguous with respect to retroactive application is ... unambiguously prospective." (quoting *St. Cyr*, 533 U.S. at 320 n.45)).

**Retroactive effect.** Because Section 1808 does not apply retroactively to asylum applications pending prior to July 4, 2025, USCIS's and EOIR's interpretations are unlawful if they "attach[] new legal consequences to events completed before [the statute's] enactment." *Landgraf*, 511 U.S. at 269–70. Principles of fair notice, reasonable reliance, and settled expectations are

16

important to determining whether a statute is being applied retroactively. *Id.* at 270. Ultimately, the analysis "demands a commonsense, functional judgment." *Jaghoori*, 772 F.3d at 771 (quoting *St. Cyr*, 533 U.S. at 321)).[10]

Here, both agencies are indisputably attaching new legal consequences to asylum applications that were filed on or before July 4, 2025. Until that date, applying for asylum was free and imposed no ongoing financial obligation. By interpreting Section 1808 to impose a new annual duty to pay for each year an application remains pending, even for those who applied before enactment, the agencies have imposed a new "obligation" or "disability" on past conduct—namely, the submission of an asylum application. *See Landgraf*, 511 U.S. at 269–70 (citation omitted).

Nor do applicants somehow subject themselves to the annual asylum fee based on any conduct that occurs "after … enactment." *Jaghoori*, 772 F.3d at 772–73. Applications remain pending due not to the asylum seeker's own conduct, but instead due to the agencies' lengthy and well-documented delays. And even if an asylum seeker's *inaction* after Section 1808's enactment could somehow be construed as post-enactment conduct, that still would not suffice.

Moreover, USCIS's and EOIR's retroactive imposition of an unexpected annual fee, non-payment of which risks serious adverse immigration consequences, undermines applicants' reasonable reliance and expectations, *see Landgraf*, 511 U.S. at 270, and causes "manifest injustice" on hundreds of thousands of asylum seekers, *Zaragoza v. Garland*, 52 F.4th 1006, 1023 (7th Cir. 2022); *see also Martin*, 527 U.S. at 360 (no retroactivity problem where, unlike here, application of statute created "no manifest injustice"); *Miller v. Callahan*, 964 F. Supp. 939, 950 (D. Md.

---

[10] ASAP does not need to show whether its members relied on the regulatory landscape prior to Section 1808's enactment, because "subjective reliance is not an essential element of retroactive effect." *Jaghoori*, 772 F.3d at 772.

1997) (rejecting the retroactive application of a statute because it "would work a manifest injustice"). Asylum seekers who exercised their statutory right to apply for asylum before Section 1808's enactment did so with no notice or expectation that the government's prolonged delays would later require them to shoulder an open-ended annual financial commitment. Moreover, the burden imposed on applicants is significant: they cannot opt out or hasten adjudication of their applications, and withdrawing their applications could lead to family separation, loss of lawful status, or deportation to countries where their lives may be at risk. Decl. ¶ 64. And applying for asylum was historically free until recently, so applicants could not have reasonably anticipated USCIS and EOIR's "abrupt departure from well-established practice." *Zaragoza*, 52 F.4th at 1023; *see id.* (reliance interests play a "significant role" in determining whether retroactive application of a law imposes a "manifest injustice").

### 2. Section 1808 does not impose fees on applicants based on the time their applications were pending prior to July 4, 2025.

USCIS's and EOIR's applications of the annual asylum fee are also impermissibly retroactive for a narrower reason—the agencies are counting the *time* an asylum application was pending before Section 1808's enactment in determining whether an application has been pending for a full year.[11] This second type of retroactivity created the immediate and practical harms asylum seekers are currently facing because it requires them to pay the annual asylum fee immediately (or in the near term) even though their applications have not been pending for a full "calendar year" (i.e., 365 days) after the statute's enactment.

*No clear statement.* As explained above, under *Landgraf*'s first step a statute cannot apply

---

[11] If the Court holds that Section 1808 does not permit USCIS and EOIR to require asylum seekers whose applications were already pending on July 4, 2025, ever to pay the annual asylum fee, then it need not reach ASAP's second retroactivity argument.

retroactively absent an "express, unambiguous, and unequivocal" statement indicating that Congress considered and intended that result. *Jaghoori*, 772 F.3d at 770; *supra* at 12–13. Here, Section 1808 lacks an "express, unambiguous, and unequivocal" statement imposing annual asylum fees based on the time an application was pending prior to the statute's enactment. *Jaghoori*, 772 F.3d at 770.

To the contrary, the statute says simply and plainly that USCIS and EOIR "shall require the payment of a fee" "for each calendar year that an alien's application for asylum *remains* pending." 8 U.S.C. § 1808(a) (emphasis added). The phrase "remains pending" is in the present tense and indicates that the fee accrues only for time that applications remain pending *after* the statute's enactment. If Congress had intended to charge asylum seekers for the time their applications were pending prior to the date of enactment, it would have at a minimum also included the past tense or otherwise clearly indicated that the statute applies retroactively. *See Hicks v. Frame*, 145 F.4th 408, 419 (4th Cir. 2025) ("[W]e look to Congress' choice of verb tense to ascertain a statute's temporal reach. And a statute's undeviating use of the present tense is a striking indicator of its prospective orientation." (quotation marks, citation, and alterations omitted)).

As shown above, that interpretation is consistent with the overall structure and design of OBBBA's new asylum fees. *Supra* at 14–16. The statute assumes that an applicant pays an initial asylum fee at the time she files her application, 8 U.S.C. § 1802, and then pays an annual asylum fee for "each calendar year" that the application "remains pending," *id.* § 1808(a). None of the other fees imposed by OBBBA is retroactive, so it would make little sense to treat Section 1808 differently. And at minimum, Congress has not spoken with the requisite clarity required to overcome the presumption against retroactivity. *Supra* at 14–16.

19

*Retroactive effect.*  Because Section 1808 does not apply retroactively to the time an application was pending prior to July 4, 2025, USCIS's and EOIR's interpretations are unlawful if they "attach[] new legal consequences to events completed before [the statute's] enactment." *Landgraf*, 511 U.S. at 269–70; *supra* at 16–17.

Here, both agencies are attaching new legal consequences to the time asylum seekers' applications were pending before July 4, 2025.  For example, according to EOIR, an applicant who filed for asylum on or before July 7, 2024 was required to pay the annual asylum fee on July 7, 2025, attaching new legal consequences to the 362 days her application was pending prior to the statute's enactment.  EOIR Memo at 2 n.4.  According to USCIS, an applicant who filed for asylum on or before October 1, 2024 was required to pay the fee as of September 30, 2025, attaching new legal consequences to the nine months her application was pending before the statute's enactment. 90 Fed. Reg. at 34,515.

USCIS's and EOIR's interpretation runs headlong into *Martin*.  There, the Supreme Court held that it was impermissibly retroactive to apply a statutory limit on attorneys' hourly fees to work performed before the statute's enactment.  527 U.S. at 358.  As the Supreme Court explained, using the statutory cap to calculate attorneys' fees for pre-enactment work would disrupt the "reasonable expectation" of attorneys who "worked in reasonable reliance" under the pre-enactment rate.  *Id.*  Thus, that approach was impermissibly retroactive because it "would 'attac[h] new legal consequences' to completed conduct" by "alter[ing] the fee arrangement *post hoc*."  *Id.* (citation omitted; alteration in original).  So, too, here.

### C.    ASAP is likely to prevail on its argument that the USCIS Federal Register Notice and EOIR Memo are arbitrary and capricious (Count III).

ASAP is also likely to succeed on the merits of its claim that USCIS and EOIR acted arbi-

trarily and capriciously by failing to coordinate with each other and adopting inconsistent inter-pretations of Section 1808 without reasoned explanation.[12]  "Unexplained inconsistencies" are "the hallmark" of arbitrary-and-capricious agency action.  *Sierra Club v. Nat'l Marine Fisheries Serv.*, 2024 WL 3860211, at *12 (D. Md. Aug. 19, 2024) (quotation marks omitted); *see also Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 298 (4th Cir. 2018).  An agency acts arbitrarily and capriciously when it fails "to consider the position of its sister agency" and explain any "inconsistency" between another agency's interpretation of the same statutory language.  *Benitez v. Wilkinson*, 987 F.3d 46, 49, 55 (1st Cir. 2021).  The logic behind this principle is obvious: "No one should face multiple and perhaps conflicting interpretations of the same requirement," especially where, as here, "dis-obedience may result in" serious consequences.  *DeNaples v. OCC*, 706 F.3d 481, 488 (D.C. Cir. 2013) (quotation marks and citation omitted); *see also Old Dominion Power Co. v. Donovan*, 772 F.2d 92, 99 (4th Cir. 1985) (observing that agencies' "conflicting [safety] standards … can only lead to danger").

Here, USCIS and EOIR have subjected asylum applicants to "conflicting interpretations of the same requirement," *DeNaples*, 706 F.3d at 488, by adopting different positions concerning when the annual asylum fee is due.  *Supra* at 7.  It defies "common sense" that Congress would have intended Section 1808 to "appl[y]" differently "across agencies."  *Mississippi v. JXN Water*, 134 F.4th 312, 322 (5th Cir. 2025).  Neither agency even acknowledged the other agency's incon-sistent position or attempted to explain how asylum applicants are to navigate these conflicting

---

[12] USCIS's interpretation is also *internally* inconsistent.  USCIS claims that the clock starts run-ning at the start of fiscal year 2025.  *See* 90 Fed. Reg. at 34,515 (Section 1808 "necessarily applies the [annual asylum fee] provision to the start of FY 2025.").  But if the clock starts running on October 1, 2024, then the calendar-year anniversary would fall on October 1, 2025—which is part of fiscal year 2026.  Thus, USCIS's own logic "would result in no fee collections in FY 2025," which the agency claims is required.  *Id.*

payment schemes. The predictable chaos that the agencies' decisions have generated risks severe consequences: if applicants guess wrong or follow the wrong agency's interpretation of Section 1808, the agencies have threatened that their applications "shall be rejected," EOIR Memo at 3, or "den[ied]," 90 Fed. Reg. at 34,512. The arbitrariness of USCIS's and EOIR's conflicting approaches is compounded by their failure to provide adequate instructions regarding how and when to pay at the time they announced that the fee would apply retroactively, and EOIR's failure to provide a functioning payment mechanism. Decl. ¶¶ 53–56; *see Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (failure to consider an obvious alternative that would alleviate adverse effects is arbitrary and capricious).

### D. ASAP is likely to prevail on its claim that EOIR is unreasonably delaying agency action providing applicants a method to pay the fee (Count IV).

Under the APA, courts "shall … compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "[T]he APA creates a private cause of action for a party aggrieved by [an] agency's unreasonable delay to compel such action." *FERC v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 903 (4th Cir. 2020). The sole prerequisite for an APA failure-to-act claim is satisfied here: EOIR has "failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All. ("SUWA")*, 542 U.S. 55, 64 (2004). "To assess whether an agency is bound to act, [courts] first look to the text of the relevant statutes and regulations." *Lovo v. Miller*, 107 F.4th 199, 211 (4th Cir. 2024); *see also id.* at 212 ("an agency can be bound to act by its regulations").

Here, Section 1808 provides that "for each calendar year that an alien's application for asylum remains pending, … the Attorney General . . . *shall* require the payment of a fee, equal to the amount specified in subsection (b)." 8 U.S.C. § 1808(a) (emphasis added). The EOIR Memo,

in turn, states that "*[e]ffective immediately*, EOIR is implementing the statutorily mandated immigration fees … established by OBBBA" and that EOIR "*will* implement temporary measures … to ensure that aliens have an avenue to pay the required fees."  EOIR Memo at 1, 3 n.7 (emphases added).  "Those uses of mandatory language provided no room for agency discretion," and thus EOIR was required to promptly provide a payment mechanism for the annual asylum fee—especially because, in EOIR's view, those fees became due *three months ago*.  *Lovo*, 107 F.4th at 211.  Thus, to the extent it is EOIR's position (be it unlawful) that any applicants are currently required to pay the annual asylum fee, EOIR is required to provide them a way to pay, and its failure to do so violates the APA.  *SUWA*, 542 U.S. at 64.

The Fourth Circuit has endorsed the six-factor test articulated in *TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984), to determine whether a mandatory agency action "has been unreasonably delayed." *Gonzalez v. Cuccinelli*, 985 F.3d 357, 375 (4th Cir. 2021).  Here, the *TRAC* factors overwhelmingly demonstrate that EOIR's failure to provide a payment mechanism is unlawful to the extent any applicants are currently required to pay the fee.

The first two *TRAC* factors provide that "the time agencies take to make decisions must be governed by a rule of reason" and "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed … that statutory scheme may supply content for this rule of reason."  *Gonzalez*, 985 F.3d at 375; *Jahangiri v. Blinken*, 2024 WL 1656269, at *8 (D. Md. Apr. 17, 2024) ("Courts generally consider the first and second *TRAC* factors together.").  Here, if EOIR is correct that Congress required it to begin collecting fees as early as July 5, 2025, it is patently unreasonable that, three months later, EOIR has still failed to provide a mechanism to pay and appears to have penalized at least one applicant for nonpayment.  Decl. ¶ 48.

The third *TRAC* factor provides that "delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake." *Gonzalez*, 985 F.3d at 375. Here, EOIR's delay in setting up a payment mechanism while simultaneously requiring payment directly impacts the health and welfare of asylum seekers. In EOIR's own words, "[f]ilings that do not comply with the statutory fee requirements shall be rejected." EOIR Memo at 3. The rejection or dismissal of an asylum application for non-payment of the annual asylum fee could have severe consequences, including, for example, removal to the country that persecuted the asylum seeker, potential loss of employment authorization, and loss of an applicant's ability to apply for asylum. Decl. ¶ 64.

The fourth *TRAC* factor provides that "the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority." *Gonzalez*, 985 F.3d at 375. Here, EOIR has already created a mechanism on its payment portal for asylum seekers to pay the *initial* asylum application fee required by Section 1802, and EOIR could similarly add a mechanism for asylum seekers to pay the annual asylum fee. Ex. D. EOIR's failure to do the same thing for the annual asylum fee is unreasonable.

The fifth *TRAC* factor considers "the nature and extent of the interests prejudiced by delay." *Gonzalez*, 985 F.3d at 375. This factor strongly favors ASAP for the same reasons as the third factor—EOIR's delay is causing massive confusion for asylum seekers and threatens them with the risk of severe consequences, potentially including removal. *Supra* at 9–10; *Jahangiri*, 2024 WL 1656269, at *11 (*TRAC*'s fifth factor often "run[s] together" with the third factor).[13]

Because the *TRAC* factors overwhelmingly favor ASAP, relief is likely warranted under

---

[13] The sixth and final *TRAC* factor is neutral because ASAP does not allege that EOIR's inaction is a result of bad faith. *Jahangiri*, 2024 WL 1656269, at *12.

the APA.  "[A] determination of appropriate injunctive relief" for a failure-to-act claim "requires an exercise of the trial court's broad discretion," and the "precise relief" should "be tailored to the circumstances."  *South Carolina v. United States*, 907 F.3d 742, 762 (4th Cir. 2018).  At this preliminary stage of the case, the Court has even greater flexibility, since the appropriate scope of preliminary relief is "often dependent as much on the equities of a given case as the substance of the legal issues."  *Trump v. IRAP*, 582 U.S. 571, 579 (2017).  Here, the appropriate relief is a preliminary order forbidding EOIR from imposing any adverse consequences on an applicant for failure to pay the fee until the agency has provided a way to pay.[14]

## II.    The remaining factors weigh decisively in favor of preliminary relief.

The remaining preliminary-injunction factors—irreparable harm, balance of the equities, and the public interest—all favor granting relief here.

### A.    Irreparable harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis omitted).  Here, ASAP and its members would be irreparably harmed absent urgent injunctive relief in at least two ways.

### 1.    Economic hardship and unrecoverable fees

USCIS's and EOIR's actions cause irreparable harm by forcing many asylum applicants to pay a fee that would not otherwise be due, and which they may not be able to recover in the event the Court declares the agency's imposition of that fee unlawful.  Many ASAP members have limited financial means to pay $100 on short notice.  *See* Decl. ¶ 61.  That injury is compounded by the status quo at EOIR, where the agency has still failed to provide any mechanism to pay the

---

[14] If the Court rules for ASAP on either of its retroactivity arguments, no payments of the annual asylum fee will be due until July 2026, at the earliest, so the Court would not need to reach Count IV for purposes of this motion for preliminary relief.

annual asylum fee.  Since September 23, 2025, when EOIR provided a mechanism for paying the *initial* fee but failed to provide one for the *annual* fee, many asylum applicants have attempted to pay the annual fee through the *initial* fee payment portal, which may not even be credited by EOIR. *Id.* ¶¶ 45, 61, 70.  The retroactive application of the annual asylum fee has left ASAP members scrambling, with some making difficult tradeoffs such as going without groceries or cutting back on essentials like clothing to pay the annual asylum fee through EOIR's *initial* asylum fee payment mechanism.  *Id.* ¶ 61.

These economic consequences alone are irreparable harm that warrant preliminary relief. *See Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31–32 (D.D.C. 2001) (finding irreparable, economic harm when plaintiff stated she would not be able to pay utility bills and rent).  In addition, "economic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation."  *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019).  Accordingly, "[a] plaintiff may also establish irreparable harm when its costs are unrecoverable due to the government's sovereign immunity."  *Am. Fed'n of State, County & Mun. Emps., AFL-CIO v. SSA*, 778 F. Supp. 3d 685, 760 (D. Md. 2025), *appeal pending*, No. 25-1411 (4th Cir.).  Here, if the Court ultimately rules that USCIS's and EOIR's payment schemes are unlawful, it is far from clear whether applicants will be able to obtain refunds either from the agency or through litigation.  *See Kennedy*, 2025 WL 2426382, at *30 (economic injury was irreparable where money damages were "likely not available" due to sovereign immunity).

### 2.    Risk of adverse immigration consequences

Conversely, if ASAP members do not pay the annual asylum fee—either because the agencies' interpretation is unlawful or because the agencies have failed to provide clear instructions on how and when to pay—their asylum applications are at risk of rejection by the agencies, which

could in turn result in their detention or deportation. Asylum applicants could ultimately lose the ability to ever seek asylum in the United States and the ability to work legally. Decl. ¶ 64. On the other hand, applicants who can continue to pursue their cases may win asylum and ultimately U.S. citizenship. *Id.* The risk that asylum applications will be dismissed, denied, or otherwise rejected thus constitutes irreparable harm warranting preliminary relief. *Casa*, 486 F. Supp. 3d at 968 ("The hardship [to noncitizens] from being unable to work to support themselves and their dependents … is beyond question." (citation omitted)); *see also Ramos v. Thornburgh*, 732 F. Supp. 696, 699–70 (E.D. Tex. 1989).

In addition, "threatened removal satisfies the irreparable injury requirement." *Arias Gudino v. Lowe*, 785 F. Supp. 3d 27, 46 (M.D. Pa. 2025). Once removed from the United States to their country of origin, applicants face a significant threat of political persecution, torture or other forms of physical harm, wrongful imprisonment, or worse. Decl. ¶ 64. Removal can also separate applicants from their families in the United States, cost them their jobs, and permanently prevent their return. *Id.* Courts have recognized irreparable injury from the threat of removal where noncitizens may face harm in their countries of origin or permanently lose their chance to seek legal status. *See, e.g.*, *Arias*, 785 F. Supp. 3d at 46; *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018). The risk of detention is also an irreparable harm. Even one day in detention is an irreparable injury, and eventual release does not remedy the injury. *Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1139 (N.D. Cal. 2018) (noncitizen "suffer[ed] potentially irreparable harm every day that he remain[ed] in custody").

Here, the risk that asylum seekers will have their applications denied for nonpayment of the annual asylum fee—or even face detention or removal—is far from theoretical. Based on the government's own representations, denial could be imminent for at least some applicants who,

according to EOIR, are already in default on payments that the agency says were due in July. *Supra* at 6.  EOIR has expressly stated that "[f]ilings that do not comply with the statutory fee requirement shall be rejected," EOIR Memo at 2, and that failure to pay this fee "will likely result in pretermission of the asylum application and an order of removal," Ex. G.  Many ASAP members accordingly live in fear of removal for nonpayment of a fee that they are unsure how to pay because EOIR has failed to provide a payment mechanism.  Decl. ¶¶ 53–56.

The EOIR Memo states that "until the new asylum fees are fully integrated into existing payment systems, the Immigration Courts will implement temporary measures—e.g. possibly authorizing provisional acceptance of an application pending the subsequent submission of the fee—to ensure that aliens have an avenue to pay the required fees and submit applications."  EOIR Memo 3 n.7.  But the immigration courts have not done so in a consistent manner.  Decl. ¶¶ 47–48.  ASAP has received reports that at least one individual has already had his asylum application denied by an EOIR immigration judge for failure to pay the annual fee and was then ordered to be removed as a result—even though EOIR had still not provided any way to pay the fee.  *Id.* ¶ 48.  Given the volume of asylum applicants, the lengthy backlog, and the mass confusion among applicants, attorneys, advocates, and immigration judges alike, experiences like this are likely to occur with greater frequency in the coming weeks and months absent preliminary injunctive relief.

### B.    Balance of the equities and public interest

The third and fourth preliminary-injunction factors also weigh heavily in favor of preliminary relief.  Where the government is a party, these factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  It is in the public interest to protect the "separation of powers by curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016).  Put differently, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Am. Fed'n of State, County & Mun. Emps., AFL-*

*CIO*, 778 F. Supp. 3d at 760 (quotation marks omitted).  Moreover, "it is in the public interest to prevent confusion."  *El Pollo Rico, LLC v. Wings & Pollo, LLC*, 2022 WL 2916168, at *3 (D. Md. July 25, 2022).

Here, granting ASAP's requested relief is in the public interest because it will restrain unlawful agency action and provide thousands of asylum seekers much-needed clarity about their obligations (or lack thereof) under Section 1808.  The public plainly has an interest in addressing the widespread confusion and panic caused by the agencies' unlawful actions and preventing scams by unscrupulous individuals taking advantage of asylum seekers' vulnerable position.  Decl. ¶¶ 51–56; Ex. F.  This public interest is especially strong here because "it is the historic policy of the United States … to provide a permanent and systematic procedure for the admission to this country of refugees[.]"  *Doe 1 v. Jaddou*, 2025 WL 327368, at *4 (D. Md. Jan. 29, 2025) (quotation marks omitted).

On the other hand, the government is not prejudiced by temporarily waiting to impose annual asylum fees until the Court adjudicates the merits of this case.[15]  In the event the government prevails on the merits, it can simply provide asylum seekers notice and a reasonable opportunity to pay at the conclusion of this litigation.

## Conclusion

For these reasons, the Court should enter a stay under 5 U.S.C. § 705 and a temporary restraining order or preliminary injunction that: (1) forbids USCIS and EOIR from requiring asylum seekers who filed their applications prior to July 4, 2025 to pay the annual asylum fee; and (2) orders USCIS and EOIR to reinstate the applications of any ASAP members who filed applications for asylum on or before July 4, 2025 if their applications have been denied or otherwise rejected

---

[15] As of the date of this filing, EOIR has not even started systematically collecting the annual asylum fee due to its failure to roll out a payment mechanism.

for non-payment of the annual asylum fee.  In the alternative, and to the extent any applicant is currently required to pay the fee, the Court should (3) forbid EOIR from imposing that requirement until the agency has provided applicants clear instructions on how to pay, a mechanism to do so, and reasonable notice and opportunity to comply.

Under 5 U.S.C. § 705, this requested relief should apply to USCIS's and EOIR's actions concerning the annual asylum fee generally, not just as to ASAP and its members (other than reinstatement of any rejected applications).  *See Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action.").  "[J]ust as vacatur under § 706 is not a party-specific remedy, neither is a stay under § 705" as "[b]oth provisions specify what courts are authorized to do with respect to *agency actions*, not parties."  *Cabrera v. U.S. Dep't of Lab.*, 2025 WL 2092026, at *8 (D.D.C. July 25, 2025).  At bare minimum, however, the Court should grant preliminary equitable relief to ASAP and its members.

No bond is necessary under Federal Rule of Civil Procedure 65(c) because Plaintiff seeks preliminary relief under 5 U.S.C. § 705, which is not subject to any bond requirement, as well as other preliminary equitable relief that poses no significant risk of monetary harm to the government.  *See Am. Fed'n of Teachers v. DOE*, 779 F. Supp. 3d 584, 623 n.14 (D. Md. 2025) (Gallagher, J.) ("The APA has no bond requirement.").  Alternatively, to the extent the Court believes a bond is necessary, ASAP requests that the Court require a nominal bond.  *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, 2022 WL 326473, at *10 (D. Md. Feb. 3, 2022) (Gallagher, J.) ("[I]f the Court concludes that the risk of harms to an enjoined party is slight or remote then a nominal bond may suffice.").

DATED:  October 7, 2025

Respectfully submitted,

*/s/ Andrew G. Barron*

Matt Gregory*
Susan M. Pelletier**
Hayley N. Lawrence*
Andrew G. Barron (D. Md. Bar 30311)
T. Hunter Mason*
Rachel E. Schwab (D. Md. Bar 31646)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone:     (202) 955-8500
Facsimile:     (202) 831-6088
mgregory@gibsondunn.com
spelletier@gibsondunn.com
hlawrence@gibsondunn.com
abarron@gibsondunn.com
hmason@gibsondunn.com
rschwab@gibsondunn.com


Conchita Cruz*
Jessica Hanson*
Leidy Perez*
Marcela X. Johnson*
Juan E. Bedoya*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S. #84810
New York, NY 10003-1502
Telephone:     (646) 647-6779
conchita.cruz@asylumadvocacy.org
jessica.hanson@asylumadvocacy.org
leidy.perez@asylumadvocacy.org
marcela.johnson@asylumadvocacy.org
juan.bedoya@asylumadvocacy.org

*Counsel for Plaintiff*

*Application for admission *pro hac vice* pending

**Application for admission *pro hac vice* forthcoming