# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT MARYLAND

ASYLUM SEEKER ADVOCACY
PROJECT,

     *Plaintiff*,

       *v.*

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et. al*;

     *Defendants*.

No. 1:25-cv-03299-SAG

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 3

    A.    Statutory Background ................................................................................ 3

    B.    Factual Background ................................................................................... 4

LEGAL STANDARD ..................................................................................................... 7

ARGUMENT ................................................................................................................. 8

I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ............................. 8

    A.    Plaintiff Lacks Associational Standing to Sue on Behalf of Its Members ............. 8

    B.    Section 1808 imposes an annual asylum fee for applications pending in Fiscal Year 2025. ................................................................................... 10

        1.    Section 1808 expressly prescribes that the annual asylum fee requirement applies for applications pending in FY 2025. ..................... 12

        2.    Section 1808 is not impermissibly retroactive. ........................................ 16

            a.    Section 1808's FY 2025 annual asylum fee requirement is procedural. ............................................................................... 17

            b.    Section 1808's FY 2025 annual fee requirement is prospective. ............................................................................ 18

            c.    Section 1808's AAF does not upset familiar considerations of fair notice, reasonable reliance, and settled expectations. ....... 20

    C.    Neither EOIR nor USCIS Acted Arbitrarily or Capriciously in Setting Effective Dates ..................................................................................... 21

    D.    EOIR Has Not Unreasonably Delayed in Providing a Method of Payment ................................................................................................ 22

II.    PLAINTIFF'S MEMBERS WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF ...................................................................................... 23

III.    NEITHER THE EQUITIES NOR THE PUBLIC INTEREST WEIGH IN FAVOR OF PRELIMINARY RELIEF ...................................................................................... 27

IV.    IF THE COURT CHOOSES TO GRANT PRELIMINARY RELIEF, SUCH RELIEF MUST BE NARROWLY TAILORED TO PLAINTIFF AND ITS MEMBERS ............................................. 28

V.    IF THE COURT CHOOSES TO GRANT PRELIMINARY RELIEF, IT SHOULD REQUIRE PLAINTIFF TO POST SUFFICIENT BOND AND SHOULD ENTER A STAY ............................. 29

CONCLUSION ..................................................................................................................... 30

# TABLE OF AUTHORITIES

**Cases**

*Adepegba v. Hammons*,
  103 F.3d 383 (5th Cir.1996) ........................................................................................ 18

*Altizer v. Deeds*,
  191 F.3d 540 (4th Cir. 1999) ....................................................................................... 18

*Barry v. McDonough*,
  101 F.4th 1348 (Fed. Cir. 2024) .................................................................................. 13

*Batterton v. Francis*,
  423 U.S. 416 ................................................................................................................. 21

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ..................................................................................................... 25

*Brown v. Angelone*,
  150 F.3d 370 (4th Cir. 1998) ....................................................................................... 18

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................................... 28

*Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*,
  982 F.3d 258 (4th Cir. 2020) ....................................................................................... 16

*CASA de Md., Inc. v. Trump*,
  971 F.3d 220 (4th Cir. 2020) ....................................................................................... 28

*Casa de Md., Inc. v. Wolf*,
  486 F. Supp. 3d 928 (D. Md. 2020) ................................................................... 8, 28, 29

*Chenault v. U.S. Postal Serv.*,
  37 F.3d 535 (9th Cir.1994) ........................................................................................... 17

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ....................................................................................................... 8

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ....................................................................................................... 8

*Dayton Area Chamber of Comm. v. Kennedy*,
  147 F.4th 626 (6th Cir. 2025) ...................................................................................... 10

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ........................................................................... 24

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) ........................................................................... 24

*Duncan v. Walker*,
    533 U.S. 167 (2001) ........................................................................................ 13

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ........................................................................................ 22

*FERC v. Powhatan Energy Fund, LLC*,
    949 F.3d 891 (4th Cir. 2020) ........................................................................... 23

*Fernandez-Vargas v. Gonzales*,
    548 U.S. 30 (2006) ..................................................................................... 11, 15

*Foster v. United States*,
    303 U.S. 118 (1938) ........................................................................................ 15

*Frontier-Kemper Constructors, Inc. v. Dir., Off. of Workers' Comp. Programs, United States Dep't of Lab.*,
    876 F.3d 683 (4th Cir. 2017) ........................................................................... 18

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
    559 U.S. 280 (2010) ........................................................................................ 12

*Gustafson v. Alloyd Co.*,
    513 U.S. 561 (1995) ........................................................................................ 12

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
    174 F.3d 411 (4th Cir. 1999) ........................................................................... 30

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005) .......................................................................................... 13

*Immigrant Defs. L. Ctr. v. Noem*,
    145 F.4th 972 (9th Cir. 2025) .......................................................................... 29

*In re CF & I Fabricators of Utah, Inc.*,
    150 F.3d 1233 (10th Cir. 1998) ....................................................................... 19

*INS v. St. Cyr*,
    533 U.S. 289 (2001) ..................................................................................... 11, 19

*Jaghoori v. Holder*,
  772 F.3d 764 (4th Cir. 2014) ............................................................ 11, 17, 19

*Knox Creek Coal Co Coal Corp. v. Sec'y of Lab., Mine Safety & Health Admin.,*
  811 F.3d 148 (4th Cir. 2016) ...................................................................... 16

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ................................................................ 11, 16, 17, 18

*League of Women Voters of U.S. v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ........................................................................ 27

*Lee v. Christian Coal. of Am., Inc.*,
  160 F. Supp. 2d 14 (D.D.C. 2001) ......................................................... 25, 26

*Lindh v. Murphy*,
  521 U.S. 320 (1997) .............................................................................. 11, 12

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) ............................................................................... 16,21

*Lujan v. Def. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 9

*Martin v. Hadix*,
  527 U.S. 343 (1999) .............................................................................. 11, 20

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) ................................................................... 23

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) .................................................................................... 7, 9

*Miller v. Callahan*,
  964 F. Supp. 939 (D.Md. 1997) ................................................................... 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................... 22

*Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*,
  915 F.3d 197 (4th Cir. 2019) ....................................................................... 24

*Nicoletti v. Bayless*,
  No. 24-6012, 2025 WL 80294 (4th Cir. Jan. 13, 2025) ................................ 16

v

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................. 8, 27

*NLRB v. Wayne Transp.*,
   776 F.2d 745 (7th Cir. 1985) .................................................................................. 21

*Perez v. Cuccinelli*,
   949 F.3d 865 (4th Cir. 2020) .................................................................................. 16

*Pulsifer v. United States*,
   601 U.S. 124 (2024) .......................................................................................... 13, 14

*Rendon v. U.S. Att'y Gen.*,
   972 F.3d 1252 (11th Cir. 2020) ......................................................................... 11, 19

*Republic Nat'l Bank of Miami v. United States*,
   506 U.S. 80 (1992) ................................................................................................. 16

*Sampson v. Murray*,
   415 U.S. 61 (1974) ............................................................................................ 24, 28

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ............................................................................................... 16

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ............................................................................................... 10

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ............................................................................................... 28

*Sw. Airlines Co. v. Saxon*,
   596 U.S. 450 (2022) ............................................................................................... 13

*Sunshine State Regional Center, Inc. v. Director, USCIS*,
   143 F.4th 1331 (11th Cir. 2025) ............................................................................ 19

*Trump v. CASA, Inc.*,
   606 U.S. 831 (2025) ............................................................................................... 28

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ................................................................................................. 13

*United States v. Minor*,
   228 F.3d 352 (4th Cir. 2000) .................................................................................. 25

*United States v. St. Louis, S.F. & T.R. Co.*,
   270 U.S. 1 (1926) ................................................................................. 12

*Vartelas v. Holder*,
   566 U.S. 257 (2012) ............................................................................. 19

*Washington v. Reno*,
   35 F.3d 1093 (6th Cir. 1994) ............................................................... 27

*Wayman v. Southard*,
   23 U.S. 1 (1825) ................................................................................... 21

*White Tail Park, Inc. v. Stroube*,
   413 F.3d 451 (4th Cir. 2005) ............................................................ 9, 10

*Williams v. State Univ. of N.Y.*,
   635 F. Supp. 1243 (E.D.N.Y. 1986) ..................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) .............................................................................. 8, 26

*Wis. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018) ............................................................................. 13

*Zaragoza v. Garland*,
   52 F.4th 1006 (7th Cir. 2022) ............................................................. 21

**Statutes**

5 U.S.C. § 555 ........................................................................................... 22

5 U.S.C. § 705 ........................................................................... 4, 7, 28, 29

5 U.S.C. § 706 ........................................................................................... 23

8 U.S.C. § 1802 ......................................................................................... 1, 3

8 U.S.C. § 1808 ................................................................................. *passim*

8 U.S.C. § 1101 et seq. .............................................................................. 16

8 U.S.C. § 1158 ......................................................................................... 4, 5

Pub. L. No. 119-21,139 Stat. 72, 371 (2025) (codified at 8 U.S.C. §§ 1802 and 1808)...... 1, 3, 4, 5

**Rules**

Federal Rule of Civil Procedure 65(c) ........................................................................... 29

**Regulations**

8 C.F.R. § 208.2 ................................................................................................................. 4

90 Fed. Reg. 34,511 (July 22, 2025) ...................................................................... 5, 6, 12

90 Fed. Reg. 48,317 (Oct. 16, 2025) .............................................................................. 15

**Other Authorities**

ASAP, Questions and Answers For Asylum Seekers,
    https://asaptogether.org/en/faqs/ .......................................................................... 7

H.R. Rep. No. 79-1980 (1946) ....................................................................................... 28

H.R. Rep No. 119-106, Book 1 (2025) ..................................................................... 1, 5, 15

Lawyers for Movement, National Immigration Project, Comparison Chart of Immigration-
    Related H.R.1 The So-Called One Big Beautiful Bill Act,
    https://nipnlg.org/sites/default/files/2025-07/Final-Fee-Increases-HR1.pdf ........................ 20

OBBBA Summary, H.R. 1, 119-21 (July 4, 2025) ......................................................... 17

Updates to the EOIR Payment Portal," DOJ EOIR Notice (Sep. 23, 2025)
    https://www.justice.gov/eoir/media/1414551/dl?inline ........................................................ 6

## INTRODUCTION

On July 4, 2025, Congress enacted the One Big Beautiful Bill Act ("OBBBA" or "statute"), which created new immigration fees and, in some cases, increased existing ones, for Fiscal Year 2025 ("FY 2025") and future fiscal years. For the very first time, Congress imposed an initial asylum application fee and an annual asylum fee requirement ("AAF"). Pub. L. No. 119-21, §§ 100002, 100009, 139 Stat. 72, 371 (2025) (codified at 8 U.S.C. §§ 1802 and 1808, respectively). In explaining its decision, Congress made clear that these new asylum fees were long overdue and necessary to recover the growing costs of adjudicating the millions of pending asylum applications before both the United States Citizenship and Immigration Services ("USCIS"), a component agency of the U.S. Department of Homeland Security, and the Executive Office of Immigration Review ("EOIR").[1]

Shortly after the statute's enactment, the two organizations responsible for adjudicating asylum applications, USCIS and EOIR, respectively issued public notice of each's intent to implement the new AAF for applications pending in FY 2025—in accordance with the statute's express language and purpose. While USCIS publicly announced that it would impose the FY 2025 AAF for all applications pending for the entirety of FY 2025 (from October 1, 2024 to September 30, 2025) (Ex. 2), EOIR announced that a fee would be imposed for all applications pending for more than one year as of a date after enactment (July 4, 2025) (Ex. 1). Although the two organizations' positions initially differed, unlike USCIS, EOIR did not state when payment would actually become due and has not issued any individual payment notices—as it worked to develop a fee implementation process in coordination with USCIS. Furthermore, as of this filing,

---

[1] H.R. Rep No. 119-106, Book 1, at 130-135 (2025).

EOIR has revised its position to reflect USCIS's and is taking steps to finalize its FY 2025 AAF notice and payment process.

Seizing on this initial discrepancy between the two organizations' implementation approaches, Plaintiff filed a complaint on behalf of its asylum-seeking members, alleging the following: (1) USCIS and EOIR unlawfully applied 8 U.S.C. §1808's ("Section 1808") annual asylum fee retroactively, by imposing fees on applications filed before July 4, 2025 and separately, by counting the time an application remained pending prior to July 4, 2025 (representing Counts I and II); (2) USCIS and EOIR acted arbitrarily and capriciously in violation of the Administrative Procedures Act, in imposing the FY 2025 AAF, retroactively (Count III); and (3) EOIR unlawfully withheld and unreasonably delayed providing applicants with a clear payment mechanism and necessary instructions on how to pay the fee, to the extent payment is required (Count IV).

Plaintiff also seeks extraordinary preliminary relief in the form of preliminary injunction and temporary restraining order and/or a nationwide stay pursuant to Section 705 of the APA—enjoining USCIS and EOIR from implementing the statutorily mandated AAF for FY 2025 and ordering EOIR to reinstate any applications rejected or denied for non-payment of the FY 2025 AAF, despite Plaintiff not providing any proof or factual allegations of such. In lieu of that, it requests the Court order EOIR halt from imposing its FY 2025 AAF until it provides clear instructions and a payment mechanism.

This Court should deny Plaintiff's request for any preliminary relief for the following reasons. As threshold matter, Plaintiff has failed to establish it possesses the requisite associational standing for bringing these claims on its members' behalf. Furthermore, despite Plaintiff's claims, Section 1808 expressly requires that the AAF be applied to applications pending in FY 2025, but the AAF is otherwise not impermissibly retroactive, because it is both procedural and prospective.

Plaintiff also fails in its argument that the government's implementation of the FY 2025 AAF is arbitrary and capricious. In light of EOIR's decision to adopt USCIS's procedure, there is no longer any inconsistency between the agencies' respective positions, and as the record shows, USCIS's position is well-reasoned. Finally, there was no unreasonable delay here in EOIR's implementation of the FY 2025 AAF, as the record shows several steps were required to finalize EOIR's process, including coordination with USCIS. Regardless, Plaintiff's request is now moot, given EOIR intends to implement the FY 2025 AAF in accordance with USCIS's procedure.

## BACKGROUND

### A.    Statutory Background

The One Big Beautiful Bill Act ("OBBBA" or "Act"), enacted on July 4, 2025, created a new requirement that asylum seekers pay an initial fee at the time they submit their application for asylum, and an annual asylum fee ("AAF") for "each calendar year" that their applications remain pending. Pub. L. No. 119-21, §§ 100002, 100009, 139 Stat. 72, 371 (2025) (codified at 8 U.S.C. §§ 1802, 1808). Section 1802(b), in relevant sum, imposes the initial fee as follows:

"During fiscal year 2025, the amount specified in this section shall be the greater of—

(1) $100; or

(2) such amount as the Secretary or the Attorney General, as applicable, may establish, by rule." 8 U.S.C. § 1802(b).

For the AAF, Section 1808(a) provides, in relevant sum:

"In addition to any other fee authorized by law, for each calendar year that an alien's application for asylum remains pending, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee, equal to the amount specified in subsection (b), by such alien. Section 1808(b)(1), in turn, determines the "amount specified" for the fee:

For fiscal year 2025, the amount specified in [Section 1808] shall be the greater of—

(A)    $100; or

(B)    such amount as the Secretary of Homeland Security may establish, by rule. *Id.* § 1808(a).

Subsection (b)(2) then provides for "[a]nnual adjustments for inflation," and states that "[d]uring fiscal year 2026, and during each subsequent fiscal year," the amount equals the amount required "for the most recently concluded fiscal year" plus an inflation adjustment." *Id.* § 1808(b)(2).

Also, the Immigration and Nationality Act ("INA") (codified at Title 8, USC, Aliens and Nationality, §§ 1101-1178), directs the Attorney General to impose asylum fees:

> The Attorney General shall impose fees for the consideration of an application for asylum, for employment authorization under this section, and for adjustment of status under section 1159(b) of this title. Nothing in this paragraph may be construed to limit the authority of the Attorney General to set additional adjudication and naturalization fees in accordance with section 1356(m) of this title. 8 U.S.C. § 1158(d)(3).

**B.    Factual Background**

As noted above, the OBBBA created a new initial and annual fee requirement for asylum applications. Pub. L. No. 119-21, §§ 100002, 100009. The USCIS and EOIR are responsible for implementing the new annual asylum fee. There are two ways to apply for asylum: affirmatively with USCIS, or defensively before an immigration judge at EOIR. Pl.'s Mot. for a TRO, Prelim. Inj., Prelim. Relief Under 5 U.S.C. § 705, ECF No. 29-1 ("Br."), ECF 29-1; Decl. of Swapna C. Reddy, Co-Executive Director of the Asylum Seeker Advocacy Project, ¶¶ 23–24, ECF No. 29-2 ("Reddy Decl."). Applicants seek asylum defensively before EOIR immigration judges, if they are in removal proceedings. If the applicant is not in removal proceedings, generally the applicant must file an asylum application with USCIS. 8 C.F.R. § 208.2.

The law requires asylum applications to be adjudicated within 180 days of filing, barring exceptional circumstances. 8 U.S.C. § 1158(d)(5)(A)(iii). However, asylum applications often take a few years to adjudicate, both by USCIS and EOIR, due to the substantial number of pending applications and new filings every year. As the HR-1 (OBBBA) Judiciary Committee's report on immigration fees noted, "The combined asylum backlog from EOIR and USCIS stands at more than 3 million pending applications." H.R. Rep No. 119-106, Book 1, at 859 & nn.130-135 (2025).

On July 17, 2025, EOIR issued a policy memorandum (the "EOIR Memo"), stating the following, "Because the statute imposes the annual asylum fee beginning in fiscal year 2025, *see* OBBBA § 100009(b)(1), that fee applies to any asylum application pending for more than one year as of a date after the date of enactment of OBBBA." (*see* Ex. 1). In that notice, EOIR acknowledged that the OBBBA did not affect the validity of EOIR's fee waiver request form, Form EOIR-26A. Furthermore, it stated that that OBBBA would not affect where fees are payable, and that "until the new asylum fees are fully integrated into existing payment systems, the Immigration Courts will implement temporary measures—*e.g.* possibly authorizing provisional acceptance of an application pending the subsequent submission of the fee—to ensure that aliens have an avenue to pay the required fees and submit applications." *Id*. at 3 n.7.

On July 22, USCIS published a notice in the Federal Register, "USCIS Immigration Fees Required by HR-1 Reconciliation Bill," 2025-13738 (90 Fed. Reg. 34,511) (July 22, 2025) (See Ex. 2), stating that Section 1808 imposes a FY 2025 annual fee requirement ("AAF") and explaining how USCIS would assess the fee in line with Section 1808:

> To effectuate the FY 2025 fee, DHS will require that any alien who filed a Form I-589, Application for Asylum and for Withholding of Removal, with USCIS before or on the beginning of fiscal year 2025, October 1, 2024, and whose application is still pending with USCIS at the end of fiscal year 2025, on September 30, 2025, must pay the FY 2025 amount specified by statute. *Id.* at 34,514.

It further explained:

> DHS determined that the fee applies to a Form I-589 pending as of October 1, 2024 or submitted thereafter because language in HR-1 is clear and unambiguous that the AAF applies during fiscal year 2025, which runs from October 1, 2024 through September 30, 2025, and to each fiscal year thereafter. Subsection (b)(1) of section 100009(b) provides for an initial amount that "shall" be applied for fiscal year (FY) 2025. Subsection (a) applies a fee for "each calendar year that an alien's application for asylum remains pending." Because HR-1 states that the AAF will be applicable in FY 2025, it necessarily applies the provision to the start of FY 2025. To apply the law only to applications filed after the date of enactment in July 2025 or later would result in no fee collections in FY 2025 because no such application would be pending for a calendar year (*i.e.* twelve months) during that time frame. *Id.* at 34,515.

Regarding how payment would be collected, the notice stated the following:

> For the first time the AAF is due under this notice, asylum applicants need not monitor the time their application has been pending and if the AAF applies to them. USCIS will provide personal, individual notice to each asylum applicant with an application pending with USCIS from whom the AAF is required, the amount of the fee, when the fee must be paid, how the fee must be paid, and the consequences of failure to pay. USCIS will require that AAF be paid using an online fee payment process. USCIS will provide guidance for future years' AAF payments in subsequent issuances. *Id.*

On September 23, EOIR created a payment mechanism for the new initial asylum fee, but not for the AAF.[2] On or around October 1, USCIS posted an update on its website, indicating that it created a payment mechanism for the AAF and had begun sending notices to applicants who will be required to pay within 30 days. USCIS began sending FY 2025 AAF payment notices on October 1, 2025. As of the date of this filing, EOIR has revised its FY 2025 AAF implementation policy and process to reflect USCIS's such that it too will impose fees for applications pending from October 1, 2024 to September 30, 2025. Furthermore, no payment notices will be sent until EOIR has established an online AAF payment mechanism, and applicants will have 30 days from the date of the notice to pay. *See* Decl. of Daren K. Margolin, Ex. 3.

---

[2] "Updates to the EOIR Payment Portal," DOJ EOIR Notice (Sep. 23, 2025) https://www.justice.gov/eoir/media/1414551/dl?inline.

On October 3, 2025, Plaintiff ASAP filed a complaint against Defendants with this Court, alleging that (1) USCIS and EOIR unlawfully applied Section 1808's annual asylum fee retroactively; (2) USCIS and EOIR acted arbitrarily and capriciously in imposing the FY 2025 AAF, retroactively; and (3) EOIR unlawfully withheld and unreasonably delayed providing applicants with a clear mechanism and necessary instructions on how to pay the fee, to the extent payment is required. Plaintiff states that it is a national voluntary membership organization of asylum seekers from 175 countries who are now living in the United States, and that it "provides members with legal and community support, including time-sensitive updates, legal resources, and opportunities for members to work together for nationwide systemic reform based on the priorities identified by its membership." ASAP further states that its mission is "to build a more welcoming United States." Reddy Decl. ¶¶ 4, 9. ASAP's website states that "the Asylum Seeker Advocacy Project (ASAP) aims to provide factual information about current immigration laws."[3]

On October 7, 2025, Plaintiff filed a Motion for a Temporary Restraining Order, Preliminary Injunction, And/Or Preliminary Relief Under 5 U.S.C. § 705 (Br., ECF No. 29-1) in this matter. On October 14, 2025, upon joint request of the Parties, this Court ordered Defendants to respond to this Motion by October 20, 2025, and Plaintiff to file its reply by October 23, 2025.

**LEGAL STANDARD**

"[A] preliminary injunction is an extraordinary and drastic remedy." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (citation omitted). An injunction is "never awarded as of right," *id.* at 690, and "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *id.* at 972. To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer

---

[3] ASAP, Questions and Answers For Asylum Seekers, https://asaptogether.org/en/faqs/ (last visited Oct. 20, 2025).

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The standard for a stay under Section 705—which applies only to APA claims—is the same as the standard for a preliminary injunction. *Casa de Md., Inc. v. Wolf*, 486 F. Supp. 3d 928, 950 (D. Md. 2020) ("The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." (citation omitted)).

## ARGUMENT

### I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

Plaintiff cannot meet the high burden required for preliminary relief in this case. As a threshold matter, Plaintiff cannot succeed in obtaining any of the relief it seeks, because it lacks standing to bring its claims. But even if Plaintiff does have standing, it is unlikely to succeed on the merits.

### A.    Plaintiff Lacks Associational Standing to Sue on Behalf of Its Members

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006)). One element of this limitation is that a plaintiff must have standing to sue, a requirement that is "built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Id.* A plaintiff "must support [each element of standing] with the manner and degree of evidence

8

required at the successive stages of the litigation." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560-61 (1992). (cleaned up).

Here, Plaintiff is an organization, not an individual—meaning that it has two paths to standing: either *organizational* standing, in which it seeks "redress for an injury suffered by the organization itself"; or *associational* standing, in which it acts solely "on behalf of its members." *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458 (4th Cir. 2005). Plaintiff invokes only the latter. Accordingly, it bears the burden of making a "clear showing," *Mazurek*, 520 U.S. at 972, of three elements: that "(1) its members would otherwise have standing to sue as individuals; (2) the interests at stake are germane to the group's purpose; and (3) neither the claim made nor the relief requested requires the participation of individual members in the suit." *White Tail Park,* 413 F.3d at 458.

Despite its apparently cursory assumption that it has satisfied those elements, Plaintiff makes no showing that its members' interest in not paying the annual asylum fee is "germane to the group's purpose." *Id.* Instead, Plaintiff submits, alongside its motion for preliminary relief, a declaration containing merely two pages of "[b]ackground on ASAP," none of which identifies an organizational purpose relevant to the lawfulness of asylum fees. Reddy Decl. 2–3. Instead, the declaration explains simply that "ASAP is a national voluntary membership organization of asylum seekers," the "mission" of which is "to build a more welcoming United States." *Id.* ¶¶ 4, 9. And as part of its work, ASAP "provides … asylum seekers with legal information and support" and "regularly disseminates information and legal resources" to its members regarding such issues as "how to navigate the immigration system," "apply for asylum," and "apply for a work permit." *Id.* ¶¶ 9, 14.

But "build[ing] a more welcoming United States" *id.* ¶ 9, is hardly a mission germane to the issue of executive branch agencies' implementation of asylum fees that are mandated by statute. The "interests at stake," *White Tail Park*, 413 F.3d at 458, are those of individual asylum applicants who wish not to part with $100; the primary work of ASAP, by contrast, is, on its own telling, to disseminate information to its members about immigration law. The relationship between those interests is simply too remote to trigger the application of associational standing here. If so tenuous a relationship could satisfy the germaneness requirement of associational standing, that standing test would be utterly toothless. After all, there would be no limiting principle to such a test: ASAP would have standing to challenge any statute or regulation of any impact to the immigration system merely because it is interested in a "more welcoming United States" Reddy Decl. ¶ 9, and the dissemination of immigration-related information. *Cf. Dayton Area Chamber of Comm. v. Kennedy*, 147 F.4th 626, 633–34 (6th Cir. 2025) (interests of organization dedicated to improving "business climate" not sufficiently germane to lawsuit alleging government action "making it more difficult for [organization's members] to operate their businesses").

The Article III case-or-controversy requirement—which standing law exists to vindicate, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–38 (2016)—cannot be reduced to so low a bar. And because Plaintiff fails to make a "clear showing" that its organizational purpose is germane to the retroactivity of asylum fees, it fails to meet its burden establishing standing at this stage.

## B.    Section 1808 imposes an annual asylum fee for applications pending in Fiscal Year 2025.[4]

Plaintiff asserts that Defendants' interpretation of Section's 1808's annual asylum fee

---

[4] Defendants address Count I and Count II of Plaintiff's motion together, because the two claims are inextricably intertwined.

requirement for FY 2025 is impermissibly retroactive in two ways. First, it alleges that it is impermissibly retroactive because no such fee requirement existed when the affected applicants first filed. Second, Plaintiff alleges that Defendants impermissibly count the time an asylum application was pending on or before July 4, 2025, in determining whether it has been pending for a full year. *See* Br. 20. Despite Plaintiff's assertions to the contrary, Section 1808 expressly requires payment of an annual asylum fee for applications pending in FY 2025. Furthermore, the FY 2025 annual fee requirement is not impermissibly retroactive, because it is purely procedural and otherwise prospective.

Courts assess statutory retroactivity using the two-step test from *Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994). *See Rendon v. U.S. Att'y Gen.*, 972 F.3d 1252, 1258 (11th Cir. 2020). First, courts look to "whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280; see also *Jaghoori v. Holder*, 772 F.3d 764, 770 (4th Cir. 2014) ("The prescriptive language in the statute must be express, unambiguous, and unequivocal."). In the absence of language as helpful as that, "[courts try] to draw a comparably firm conclusion about the temporal reach specifically intended by applying 'our normal rules of construction,'" *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (quoting *Lindh v. Murphy*, 521 U.S. 320, 326 (1997)). If that effort fails, courts consider whether the statute would have a "retroactive effect" in that "it would impair rights a party possessed when [it] acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. If the answer is yes, courts then apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question owing to the "absen[ce of] a clear indication from Congress that it intended such a result." *INS v. St. Cyr*, 533 U.S. 289, 316 (2001); see *Martin v. Hadix*, 527 U.S. 343, 352 (1999) (quoting *Landgraf*, 511 U.S. at 280).

1. **Section 1808 expressly prescribes that the annual asylum fee requirement applies for applications pending in FY 2025.**

With respect to the first prong, Section 1808 expressly prescribes an annual fee requirement for applications pending in FY 2025. To reiterate, Section 1808 became effective on July 5, 2025, *during fiscal year 2025*, and Section 1808(b)(1) clearly states that there is an initial annual fee "*[f]or fiscal 2025.*" (emphasis added). Furthermore, and as Plaintiff itself acknowledges, Section 1808(a) discusses collection of the annual fee in *the present tense*, stating that a fee is due "for each calendar year that an alien's application for asylum remains pending." Contrary to Plaintiff's assertion, the term 'remains pending' does not mean that an annual fee will only be assessed for those applications pending one year *after the date of enactment*. The language imposes no such temporal restriction. Instead, the term 'remains pending' simply and plainly refers to any application still ongoing one year *after the date of its filing*, which for FY 2025 would necessarily include applications pending prior to the statute's enactment. As USCIS explained in its Federal Register Notice issued on July 22, 2025, "HR-1 states that the [annual asylum fee] will be applicable in FY 2025. To apply the law only to applications filed after the date of enactment in July 2025 or later would result in no fee collections in FY 2025 because no such application would be pending for a calendar year (*i.e.* twelve months) during that time frame." 90 Fed. Reg. at 34,515.

If any doubt lingers as to the statute's clarity on this point, the court must then look to "normal rules of [statutory] construction," to determine the statute's temporal reach. *Murphy*, 521 U.S. at 326. A statute is not given retroactive effect "unless such construction is required by explicit language *or by necessary implication*." *United States v. St. Louis, S.F. & T.R. Co.*, 270 U.S. 1, 3 (1926) (emphasis added); *see also Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)) ("The court interprets 'statutes, not isolated provisions." (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 568 (1995)).

In applying common statutory construction principles, the canon against surplusage commands that statutes be read in a way that, "if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." See *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001). Here, the statute's construction necessarily implies that Section 1808's annual fee requirement temporally applies to applications pending in FY 2025. Contrary to Plaintiff's assertion, Section 1808's FY 2025 fee amount is not intended to serve as a mere baseline for calculating the FY 2026 fee. Nothing in the statute says as much. Indeed, such an interpretation would clash with the Title X, Subpart I ("Immigration Fees") as a whole, whereby a FY 2025 is assessed for every new immigration fee enacted.

Plaintiff also alleges that if Congress intended the annual fee to be retroactive, it would have used the term 'during' under Subsection (b)(1) ("Initial amount.—*For* fiscal year 2025…"), as it does under Subsection (b)(2) ("Annual adjustments for inflation.—*During* fiscal year 2026, and during each subsequent fiscal year…"). The meaningful-variation canon directs that when a statute uses one term in one place and a distinct term elsewhere, the difference matters—that is, the distinct words have different meanings. *See Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 457–58 (2022). However, this canon is "mostly applied to terms with some heft and distinctiveness, whose use drafters are likely to keep track of and standardize." *Pulsifer v. United States*, 601 U.S. 124, 149 (2024); See also *IBP, Inc. v. Alvarez*, 546 U.S. 21, 33–34 (2005); *see also Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 279 (2018) (holding that "money remuneration" must mean something different from "all remuneration" when used in "companion" statutes (emphasis deleted). Here, the ubiquitous nature of the terms "for" and "during," as well as their lack of heft and distinctiveness, undermine any meaningful variation between the two terms. *Pulsifer*, 601 U.S. at 148; *See also Barry v. McDonough*, 101 F.4th 1348, 1356 (Fed. Cir. 2024) ("The words "for

13

each" lack the "heft and distinctiveness" to warrant the application of the meaningful-variation canon in this circumstance." (quoting *Pulsifer*, 601 U.S. at 148)).

If any meaning is to be assigned to Subsection (1)(b)'s use of the term "for" instead of "during," it is one that favors retrospective reach. Under Title X, Subpart A ("Immigration Fees"), the term "*during* FY 2025" is applied only in instances where a fee is due at filing and/or where there is no past conduct or pending application to consider. In other words, these fees must apply prospectively. For instance, the Employment Authorization Document ("EAD") Fee under Section 1803 is an initial fee due at the time of filing. By indicating that the initial amount applies "during 2025," Congress expressed it clear intent that the fee be assessed prospectively for the remainder of FY 2025, effective upon OBBBA's enactment. It is the same for the Temporary Protected Status (initial or one-time) fee (Section 1803(c)(2)), and even the initial Asylum fee (Section 1802(b)), which all also direct that the fee apply "during fiscal year 2025".

Contrary to Plaintiff's assertion, where the statute states there is an initial amount "for FY 2025," there is a FY 2025 fee requirement, and the government has been consistent in applying this interpretation. Where 'during FY 2025' applies to necessarily prospective applications, for FY 2025' requires retrospective reach, referring to events occurring during the well-defined period of October 1, 2024 to September 30, 2025. Here, that event is the pendency of an asylum application. In all instances *where a pending FY 2025 application is possible*, the provision states, "for fiscal year 2025," and in every instance that 'for fiscal year 2025' is used, a fee has either been issued effective FY 2025 or based on the application's FY 2025 pendency. For the annual asylum fee requirement, USCIS (and now EOIR) have assessed fees for applications pending the duration of FY 2025. As another example, the immigrant parole fee (Section 1804(c)), *which is due upon grant of parole*, also applies to applications that were pending during FY 2025 (*See* Immigration Parole

14

Fee Required by HR-1 Reconciliation Bill, 90 Fed. Reg. 48,317 (Oct. 16, 2025), same as for the visa integrity fee (Section 1806(a)(2)).

Furthermore, it could not have been Congress's intent to require some fees during FY 2025 and others during FY 2026, where no apparent rationale for such difference exists. "Courts should construe laws in harmony with the legislative intent and seek to carry out legislative purpose." *Foster v. United States*, 303 U.S. 118, 120 (1938). The OBBBA creates new immigration fees and increases existing immigration fees upwards of 900%, clearly demonstrating Congress's strong desire and urgent need to increase funding for USCIS and EOIR—which both are predominantly fee funded.[5] In fact, in its legislative committee report, where it explains its reasons for the increase in immigration fees, Congress specifically decries how USCIS and EOIR are unable to recover costs for processing their enormous backlog of asylum applications due to the lack of asylum application fees. If the Court were to apply Plaintiff's rationale that the term "for FY 2025" merely signifies Congress's intent to provide a baseline amount, *it would have to also accept that it was Congress's intent to forgo collection of several different fees for all of FY 2025, despite there being three months left in the fiscal year*. *See Gonzales*, 548 U.S. at 40 (In considering legislative intent, "the point of the statute's revision, however, was obviously to expand the scope of the reinstatement authority and invest it with something closer to finality, and it would make no sense to infer that Congress meant to except the broad class of persons who had departed before the time of enactment but who might return illegally at some point in the future."). Foregoing any such fees, including for the hundreds of thousands of pending asylum applications during FY 2025, would undoubtedly conflict with Congress's stated goal of urgently remedying USCIS's and EOIR's significant funding shortfalls.

---

[5] H.R. Rep No. 119-106, Book 1, at 130-135 (2025).

Finally, in accordance with *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), the government's interpretation, as stated in its policy statement, is entitled to deference "to the extent that it has the 'power to persuade.'" *Knox Creek Coal Co Coal Corp. v. Sec'y of Lab., Mine Safety & Health Admin.,* 811 F.3d 148, 160 (4th Cir. 2016) (quoting *Skidmore*, 323 U.S. at 140).[6] Thus, "the weight that courts afford an agency's interpretation depends upon the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Nicoletti v. Bayless*, No. 24-6012, 2025 WL 80294, at *2 (4th Cir. Jan. 13, 2025) (quoting *Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 982 F.3d 258, 264 (4th Cir. 2020) (cleaned up); *see also Perez v. Cuccinelli*, 949 F.3d 865, 877 (4th Cir. 2020)). The record clearly shows that USCIS's (and now EOIR's) determination that Section 1808 includes a fee requirement for FY 2025 was based on a thorough and well-reasoned assessment of the statute and other relevant law, including the Immigration and Nationality Act (8 U.S.C. § 1101 *et seq.*) and *Landgraf*, as well as the agencies' expertise in the appropriate implementation of immigration fees. *See* Ex. 2. For the above reasons, *Landgraf*'s first prong is met.

## 2.  Section 1808 is not impermissibly retroactive.

A statute is impermissibly retroactive, if it "impairs rights a party possessed when [it] acted, increases a party's liability for past conduct, or imposes new duties with respect to transactions already completed." *Landgraf*, 511 U.S. at 280. Importantly, a statute does not operate "retrospectively" merely because it is applied in a case arising from conduct antedating the statute's enactment, see *Republic Nat'l Bank of Miami v. United States,* 506 U.S. 80, 100 (1992) (Thomas,

---

[6] The Supreme Court's decision in *Loper Bright* v. *Raimondo* does not 603 U.S. 369, 393-94 (2024); *see id.* at 476 (Kagan, J., dissenting) ("[T]he majority makes clear that what is usually called *Skidmore* deference continues to apply. Under that decision, agency interpretations constitute a body of experience and informed judgment that may be entitled to respect." (cleaned up)).

J., concurring in part and concurring in judgment), or upsets expectations based in prior law. *Landgraf*, 511 U.S. at 269 n.24. Rather, the court must ask whether the new provision attaches *new legal consequences to events completed before its enactment in a way that offends familiar considerations of fair notice, reasonable reliance, and settled expectations. Id*; *see also Jaghoori*, 772 F.3d at 770 (citation omitted).

### a. Section 1808's FY 2025 annual asylum fee requirement is procedural.

As demonstrated above, Section 1808 clearly expresses its temporal reach as applying to FY 2025, but it is not otherwise impermissibly retroactive because it merely applies changes in procedural rules required by statute. As *Landgraf* makes clear, the general presumption against retrospective application of statutes remains unless the new statute simply affects procedure or matters secondary to the principal cause of action. *See Landgraf*, 511 U.S. at 274-78; *see also Chenault v. U.S. Postal Serv*., 37 F.3d 535, 538 (9th Cir.1994) ("*Landgraf* created a scheme whereby courts must scrutinize each provision of a given statute to ascertain whether it is substantive or procedural . . . if a provision is substantive, a presumption against retroactive application attaches.").

To confirm, OBBBA is a reconciliation bill, whose stated purpose is to reduce taxes, reduce or increase spending for various federal programs, and increase the statutory debt limit. OBBBA Summary, H.R. 1, 119-21 (July 4, 2025). The OBBBA did not grant the government any new authority with respect to the collection of asylum application fees. This authority already existed under Section 208(d)(3) of the INA (2024) (providing that the government may impose fees for the consideration of an application for asylum). Section 1808's FY 2025 AAF requirement therefore is not substantive, but procedural, as it merely amends the process by which fees will be collected. It neither grants nor strips a substantive right. See *Landgraf*, 511 U.S. at 280–81 (right

to a jury trial is procedural but new right to compensatory and punitive damages is substantive);
*Brown v. Angelone*, 150 F.3d 370, 373 (4th Cir. 1998) ("when application of a new limitation
period would wholly eliminate claims for substantive rights or remedial actions considered timely
under the old law, the application is "impermissibly retroactive."); and *Altizer v. Deeds*, 191 F.3d
540, 546 n.11 (4th Cir. 1999) ("Although section 1915(g) [which allows qualifying individuals to
pay the filing fee in installments over time] attaches consequences to past actions, we find that
these consequences are matters of procedure. Section 1915(g) does not affect a prisoner's
substantive rights, and it does not block his or her access to the courts.") quoting *Adepegba v.
Hammons,* 103 F.3d 383, 386 (5th Cir.1996)).

      **b.** **Section 1808's FY 2025 annual fee requirement is prospective.**

      While it is true that assessing an annual asylum fee for FY 2025 requires retrospective
reach (i.e. counting the time an application was pending prior to the statute's enactment), that alone
does not render such reach impermissible for the purpose of assigning a prospective fee. *Landgraf,*
511 U.S. at 269 n.24, (describing "a new property tax" as prospective even if it "may upset the
reasonable expectations that prompted those affected to acquire property" before its enactment).
To confirm, the government (USCIS and now EOIR) is in the process of assessing an annual
asylum fee for applications pending for the duration of FY 2025 (from October 1, 2024 to
September 30, 2025), but that fee did not become due until a few months after the OBBBA's
enactment. See Ex. 2 and 3. Only if an application was pending for the full FY 2025 is a fee
assessed, effective October 1, 2025, with payment due within 30 days of receipt of notice. As the
Fourth Circuit previously held, "a statute has no retroactive effect where the conduct being
regulated begins before a statutory change occurs and continues after that change has taken effect."
*Frontier-Kemper Constructors, Inc. v. Dir., Off. of Workers' Comp. Programs, United States Dep't*

*of Lab.,* 876 F.3d 683, 689 (4th Cir. 2017), *as amended* (Dec. 12, 2017).

Contrary to Plaintiff's assertion, the Section 1808 FY 2025 AAF requirement does not attach new legal consequences to events completed before its enactment. *Jaghoori*, 772 F.3d at 770. An asylum seeker can make the choice to withdraw their application in advance of the payment deadline and therefore not pay the fee. In other words, the annual asylum fee is a maintenance fee that is required to continue the application process, subject to a decision made by the affected applicant subsequent to OBBBA's enactment. It is not a penalty or disability assigned to past conduct (i.e. the filing of an initial application), as was the case in *Vartelas v. Holder*, 566 U.S. 257, 260–61 (2012), *St. Cyr*, 533 U.S. at 316, and *Jaghoori* 772 F.3d at 770 —where retroactive effect was applied to the immigrant's past criminal conduct. Again, the FY 2025 annual fee is assigned not because an application was filed (i.e. the past conduct Plaintiff alleges), but because the application continued to accrue post enactment, to September 30, 2025.

The case of *Sunshine State Regional Center, Inc. v. Director, USCIS*, 143 F.4th 1331, 1346 (11th Cir. 2025), is particularly instructive here. In that case, the newly passed EB-5 Reform and Integrity Act of 2022 ("Act") required regional centers in the EB-5 "immigrant investor" visa program to pay an annual Integrity Fund Fee going forward. The court held that USCIS did not impermissibly apply the Act's fee requirement retroactively by assessing the fee against a regional center, whose designation predated Act's enactment, even if the Act was ambiguous as to fee's temporal parameters. The fee was not a new duty with respect to any transaction already completed, but rather, a condition of already-designated regional centers' *continued participation in the program*. *Id.* at 1346-47; *see also In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233, 1237 (10th Cir. 1998) (declaring "not retroactive" a statute imposing prospective fees on debtors who had already entered bankruptcy). Like the fee in *Sunshine State Reg'l Ctr.*, the FY 2025 annual

asylum fee is prospective.

      **c.   Section 1808's AAF does not upset familiar considerations of fair notice, reasonable reliance, and settled expectations.**

Finally, Plaintiff alleges that their members were not provided fair notice of Section 1808's annual fee requirement and that the new fee undermines their reasonable reliance and expectations. Br. However, asylum seekers did have notice that they could be subject to such fees. Section 208(d)(3) of the INA, up until OBBBA's enactment, stated that the agencies may impose fees "for the consideration of" asylum applications and that the Attorney General may impose fees in installments or over a period of time. Furthermore, Subsection 208(d)(5)(B) states that "The Attorney General may provide by regulation for any other conditions or limitations on the consideration of an application for asylum not inconsistent with this chapter." Plaintiff, as a self-proclaimed purveyor of immigration information, had knowledge that any of its members with previously filed and pending asylum applications could be subject to a fee for the government's "consideration" of such applications. Also, prior to OBBBA's enactment, nearly every other immigration application required a fee at filing or at issue.[7]

Furthermore, implementation of the $100 FY 2025 fee does not create a "manifest injustice," as Plaintiff also alleges. Applicants are not being denied disability benefits (*Miller v. Callahan*, 964 F. Supp. 939, 950 (D.Md. 1997), or being made to pay exorbitant attorney's fees, *Martin*, 527 U.S. at 360, and regardless, Plaintiff fails to address the required factors for showing manifest injustice.

        "The 'manifest injustice' inquiry turns on several factors: (1) Whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well-established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of burden which a retroactive

---

[7] Lawyers for Movement, National Immigration Project, Comparison Chart of Immigration-Related H.R.1 The So-Called One Big Beautiful Bill Act, https://nipnlg.org/sites/default/files/2025-07/Final-Fee-Increases-HR1.pdf.

order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard." *Zaragoza v. Garland*, 52 F.4th 1006, 1023 (7th Cir. 2022) (quoting *NLRB v. Wayne Transp.*, 776 F.2d 745, 751 n.8 (7th Cir. 1985)).

For the above reasons, Section 1808's FY 2025 AAF is not impermissibly retroactive, and there is no manifest injustice.

### C.    Neither EOIR nor USCIS Acted Arbitrarily or Capriciously in Setting Effective Dates

Plaintiff alleges that USCIS and EOIR acted arbitrarily and capriciously by not coordinating with each other and adopting inconsistent interpretations of Section 1808. Br. EOIR has since revised its position to reflect USCIS's and will implement the FY 2025 AAF in the same manner as USCIS. *See* Ex. 3. Accordingly, any inconsistency between the agencies' respective positions has been resolved. While there is no longer any discrepancy in procedures, Defendants maintain they did not act arbitrarily and capriciously in applying separate procedures for collecting the FY 2025 fee. Because the AAF is procedural, as previously explained, agencies have significant discretion in its implementation. Indeed, Congress categorized fees as part of the "asylum procedure" described in Section 208(d)(3) of the INA and granted executive branch agencies significant discretion to implement asylum-related fees and other procedural aspects of asylum processing. See INA Section 208(d)(5)(B). *See also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95 (2024) ("In a case involving an agency…the statute's meaning may well be that the agency is authorized to exercise a degree of discretion…For example, some statutes 'expressly delegate[ ]' to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to 'fill up the details' of a statutory scheme" (quoting *Batterton v. Francis*, 423 U.S. 416, 425 and *Wayman v. Southard*, 23 U.S. 1, 43 (1825))). EOIR

otherwise provided reasoned explanation for its initial assessment of this new procedural requirement.[8]

Separately, USCIS's (and now EOIR's) FY 2025 AAF implementation method is not arbitrary and capricious. Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Rather, the Court must ensure "that the agency has acted within a zone of reasonableness." *Id.* As described in detail above, USCIS's decision to implement the FY 2025 AAF for applications pending the duration of FY 2025 is both well-reasoned and reasonable and is consistent with how USCIS is implementing other FY 2025 fees under OBBBA.

### D.    EOIR Has Not Unreasonably Delayed in Providing a Method of Payment

As mentioned above, as of this filing, EOIR is taking steps to implement its revised policy, in line with USCIS's. Ex. 3. That said, EOIR did not unlawfully withhold or unreasonably delay implementation of the FY 2025 AAF. The Administrative Procedure Act "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time,' 5 U.S.C. § 555(b), and authorizes a reviewing court to 'compel agency action

---

[8] While there no longer exists any inconsistency between the two agencies' positions, Defendants maintain that EOIR's original interpretation was not arbitrary or capricious and preserve their right to further defend any challenges to its legality.

unlawfully withheld or unreasonably delayed,' *id.* § 706(1)." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003). Where an agency "fails[s] to take a *discrete* agency action that it is *required to take*," the APA creates a private cause of action for a party aggrieved by that agency's unreasonable delay to compel such action. *FERC v. Powhatan Energy Fund, LLC*, 949 F.3d 891, 903 (4th Cir. 2020).

While Section 1808 compels fee collection ("shall collect"), it does not require prompt or immediate assessment of such fees, unlike in *FERC*, where the statute required that FERC "promptly assess [a] penalty, by order." *Id.* at 903. Furthermore, Section 208(d)(5)(B) of the INA expressly grants the Attorney General significant discretion in the manner of implementation. Also, there can be no reasonable expectation that EOIR would implement the FY 2025 AAF "immediately," given the need to coordinate with USCIS both legally and operationally, and the scope of the undertaking. Indeed, EOIR's July 17, 2025 policy memorandum indicates the various additional steps EOIR must take before operationalizing any fee, including updating the adjoining regulations and implementing a pay mechanism. See also Ex. 3. Also, USCIS only began issuing payment notices on October 1, 2025. And despite Plaintiff's assertions, EOIR's July 17, 2025 policy memorandum does not state that the FY 2025 AAF will come due on July 4, 2025. It merely explains the method by which the fee will be assessed. As EOIR confirms, as of the date of this filing, it has not issued any payment notices. *Id.* Plaintiffs have provided no concrete evidence that any applicant has been penalized for non-payment of the AAF. Br. 23. Furthermore, EOIR reaffirms that no payment is due until after an individual payment notice is issued. *Id.*

## II.    PLAINTIFF'S MEMBERS WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

Apart from the lack of any likelihood of success, Plaintiff also has failed to demonstrate that it's members will suffer irreparable harm if the Court does not enter the requested preliminary

injunction. To show irreparable injury, a plaintiff must make a "clear showing" that it will suffer harm that is "'neither remote nor speculative, but actual and imminent.'" *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In addition, harm is irreparable only when it "cannot be fully rectified by the final judgment after trial." *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, Owned by Sandra Townes Powell*, 915 F.3d 197, 216 (4th Cir. 2019). "'Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction] are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date weighs heavily against a claim of irreparable harm.'" *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)) (cleaned up). Accordingly, "the temporary loss of income … does not usually constitute irreparable injury." *Sampson*, 415 U.S. at 90. But here, the *only* cognizable injury Plaintiff identifies is the loss of $100 by each of its affected members. That alone suffices to defeat Plaintiff's motion. In the face of that black-letter law, Plaintiff blithely insists that the alleged "economic consequences alone are irreparable harm that warrant preliminary relief" because "it is far from clear whether applicants will be able to obtain refunds either from the agency or through litigation." Br. 26. That argument is wrong twice over. *First*, it misstates the governing legal test: the operative question is whether Plaintiff has met its burden of showing that its members are likely to suffer irreparable harm, not whether it is "clear" that asylum applicants "will be able to obtain refunds." The burden, in other words, is not on Defendants to assure the availability of refunds, but rather on Plaintiff to show the likely *unavailability* of refunds. *Second*, and as a legal matter, Plaintiff fails to demonstrate that refunds will not be available. Its only argument to that effect is that sovereign immunity might inhibit the ability of asylum applicants to recover their fees if those fees are found to have been unlawfully

imposed. *Id.* But to the contrary, sovereign immunity does not prevent the entry of judgment against the Government requiring it to set aside unlawful agency action, even when the inevitable "by-product" of that judgment is the reimbursement of funds. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988); *see also id.* at 893 ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'" triggering sovereign immunity); *United States v. Minor*, 228 F.3d 352, 355 (4th Cir. 2000) (payment of money constitutes equitable relief where award is not for "damages in substitution for a loss"). Here, Plaintiff simply has not carried its burden of showing that if asylum applicants are required to pay the annual fee during the pendency of this case, they will have no recourse to recover their funds should they ultimately prevail.

Nevertheless, Plaintiff argues that despite the monetary nature of the alleged injury, that harm is nonetheless irreparable because the "limited financial means" of asylum seekers sometimes requires "making difficult tradeoffs" regarding personal or family budgets. Br. 25–26. But Plaintiff cites no meaningful authority to support its view that an exception applies in this case to the general rule that monetary injury is not irreparable. In fact, the *only* case it cites for that proposition—from an out-of-circuit district court—went out of its way to emphasize the extreme circumstances warranting an exception in that case. *See* Br. 26 (citing *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31–32 (D.D.C. 2001)). There, the court acknowledged an exception to the governing rule when "the plaintiff is so poor that he would be harmed in the interim by the loss," noting other caselaw explaining that "the plaintiff must quite literally find himself being forced into the streets or facing the spectre of bankruptcy before a court can enter a finding of irreparable harm." *Lee*, 160 F. Supp. 2d at 31 (citing *Williams v. State Univ. of N.Y.*, 635 F. Supp. 1243, 1248 (E.D.N.Y. 1986)). With that high bar in mind, the court noted that even

financial harm would qualify as irreparable harm in that case because the plaintiffs had lost their jobs as a result of the challenged action, and would "have great difficulty finding other work to avoid insolvency, eviction, and even to obtain food." *Id.* at 32. Plaintiff comes nowhere close to demonstrating that the $100 payment at issue here resembles the loss of employment that featured in *Lee*, nor that the payment threatens its members with insolvency, eviction, or starvation.

Finally, Plaintiff attempts to satisfy the irreparable-harm requirement by arguing that if asylum applicants do *not* pay the fee, they risk suffering irreparable harm in the form of adverse immigration consequences. Br. 26–28. But that argument gets the state of affairs backwards. What Plaintiff seeks is a preliminary injunction *against* the payment of the required fee pending the outcome of this litigation, so in the *absence* of preliminary relief, asylum applicants are presumed to continue complying with federal law by paying the annual fee, thereby sparing them the parade of horribles recited by Plaintiff in the event of non-payment. To repeat the governing test: the injunction sought is only available if a plaintiff shows that "he is likely to suffer irreparable harm *in the absence of preliminary relief.*" *Winter*, 555 U.S. at 20 (emphasis added). Absent an injunction, no adverse immigration-related consequences would occur as a result of the Government's challenged conduct. Rather, such adverse immigration consequences would result only (and predictably) from a violation of law by asylum applicants themselves—namely, a violation of the statute requiring payment of the annual fee, which, unless and until this Court holds otherwise, remains governing law. In fact, the only potential irreparable harm would be to Defendants in the event that the Court grants the present motion, because there would be no incentive to pay the AAF for those who owe the fee but have their asylum applications adjudicated during the pendency of this litigation.

### III.    NEITHER THE EQUITIES NOR THE PUBLIC INTEREST WEIGH IN FAVOR OF PRELIMINARY RELIEF

Finally, preliminary relief is inappropriate in this case because the balance of the equities and the public interest tip in Defendants' favor.  When, as here, the Government is the party opposing preliminary relief, those two factors merge.  *Nken*, 556 U.S. at 435.  And as courts have repeatedly acknowledged, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).  Here, granting the preliminary injunction that Plaintiff seeks would disrupt the agencies' efforts to abide by the clear terms of the OBBBA: that an annual asylum fee be collected for fiscal year 2025 wherever an asylum application has been pending for over a year, despite the OBBBA's passage with fewer than three months remaining in that fiscal year.  In response, Plaintiff argues that, to the contrary, preliminary relief is necessary because it will "provide thousands of asylum seekers much-needed clarity about their obligations (or lack thereof) under Section 1808." Br. 29.  But on Plaintiffs' own telling, both USCIS and EOIR have *already* clearly indicated that § 1808 is appropriately understood to apply to those applications that reached a year of pendency in FY 2025, and each has published an explanation of the manner in which it will administer the annual fee for those applications within its jurisdiction.  *Id*. at 5–7.  That each agency would process the applications before it differently is no indictment of the "clarity" of those processes.  Accordingly, Plaintiff fails to show that the balance of the equities or the public interest weigh in favor of preliminary relief.

## IV.    IF THE COURT CHOOSES TO GRANT PRELIMINARY RELIEF, SUCH RELIEF MUST BE NARROWLY TAILORED TO PLAINTIFF AND ITS MEMBERS

If the Court chooses to grant Plaintiff preliminary relief, it should narrowly tailor any relief to Plaintiff and its members.  Here, Plaintiff seeks "a stay under the Administration Procedure Act [sic], 5 U.S.C. § 705, and a … preliminary injunction."  Br.  3.  But both kinds of relief are subject to the same equitable principles.  That's because § 705 was designed "to reflect existing law . . . and not to fashion new rules of intervention for District Courts."  *Sampson*, 415 U.S. at 68 n.15.  And when a court crafts equitable relief, it is bound by "the rule that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*."  *Trump v. CASA, Inc.*, 606 U.S. 831, 862(2025) (Thomas, J., concurring) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)).

Accordingly, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court.*"  *Id.* at 852.  In keeping with that longstanding principle, the House Report that accompanied the APA explained, at the time of the statute's passage in 1946, that relief under § 705 should "normally, if not always, be limited the parties complainant."  H.R. Rep. No. 79-1980, at 277 (1946).  More broadly, the Supreme Court has recently instructed that "[w]hen interpreting a statute that authorizes federal courts to grant" preliminary relief, courts "do not lightly assume that Congress has intended to depart from established principles" of equity.  *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (citation omitted).  For that reason, this very district has previously limited § 705 relief to the "plaintiffs who have demonstrated … standing at this stage" rather than authorizing nationwide vacatur of agency action, *Wolf*, 486 F. Supp. 3d at 970–72 (D. Md. 2020) (citing *CASA de Md., Inc. v. Trump*, 971 F.3d 220 (4th Cir. 2020)), and noted the Fourth Circuit's "stinging and lengthy rebuke" of another court for granting

nationwide vacatur of agency action, *id.* at 971[9]; *see also Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 995–96 (9th Cir. 2025) (applying traditional limitations on equitable relief to § 705 stay).

The plain language of § 705 requires the Court to consider relief that merely "preserve[s] status or rights pending conclusion of the review proceedings" and is tailored "to the extent necessary to prevent irreparable injury." In limiting such relief "to the extent necessary to prevent irreparable injury," 5 U.S.C. § 705, the statue directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Accordingly, if the Court chooses to grant preliminary relief, it makes no difference whether such relief is couched as a preliminary injunction or a § 705 stay; rather than vacating the retroactive fee-collection efforts of USCIS and EOIR altogether, any preliminary relief granted must be cabined to the parties presently before the Court.

## V.     IF THE COURT CHOOSES TO GRANT PRELIMINARY RELIEF, IT SHOULD REQUIRE PLAINTIFF TO POST SUFFICIENT BOND AND SHOULD ENTER A STAY.

Finally, to the extent the Court issues any injunctive relief, Defendants respectfully request the requirement of a reasonable bond, considering the financial damages and other costs that a preliminary injunction will cost Defendants. Under Federal Rule of Civil Procedure 65(c), courts may grant preliminary relief "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained" by Defendants in the event that they are "found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). To that end, the Fourth Circuit has directed that "[i]n fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for

---

[9] After the Fourth Circuit published that opinion, the full Court granted *en banc* rehearing of the case. But before rehearing could take place, a new presidential administration took office and sought dismissal of the appeal, which the Court granted. *See* Order, *CASA de Md., Inc. v. Biden*, No. 19-2222 (4th Cir. March 11, 2021).

reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp*., 174 F.3d 411, 421 n.3 (4th Cir. 1999).  For that reason, "[t]he amount of the bond … ordinarily depends on the gravity of the potential harm to the enjoined party." *Id*.    Here, Plaintiff seeks to enjoin the requirement that each of the asylum applicants who filed before the passage of the OBBBA, and have maintained that application for over a year, pay a $100 fee—an injunction of enormous financial worth. The loss of such a significant sum throughout the pendency of this case is precisely the harm that Rule 65(c) exists to cure.  Accordingly, the Court should require Plaintiff to post bond before obtaining any injunction against Defendants prohibiting the collection of the annual asylum fee for the pendency of this case.

Defendants also request that the Court stay any injunction pending appeal or, at minimum, enter a seven-day administrative stay, to allow the Solicitor General to determine whether to authorize an appeal and seek emergency appellate relief.

## CONCLUSION

The Court should deny Plaintiff's motion for preliminary relief.


October 20, 2025                    Respectfully submitted,

                                   BRETT A. SHUMATE
                                   Assistant Attorney General

                                   BRAD ROSENBERG
                                   Special Counsel

                                   */s/ Zareen Iqbal*
                                   Zareen Iqbal
                                   NY Bar No. 5481940
                                   Cesar Azrak
                                   Trial Attorneys
                                   United States Department of Justice

Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Phone: (202) 353-5639
Fax: (202) 616-8351
zareen.iqbal2@usdoj.gov

*Counsel for Defendants*