# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### NORTHERN DIVISION

ASYLUM SEEKER ADVOCACY PROJECT,

        Plaintiff,

   v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.*,

        Defendants.

Civil Action No. 1:25-cv-03299-SAG

**Hearing Requested**

**Decision Requested By October 29, 2025**

**Plaintiff's Reply In Support Of Motion For A Temporary Restraining Order, Preliminary Injunction, And/Or Preliminary Relief Under 5 U.S.C. § 705**

**Table of Contents**

**Page**

Introduction ................................................................................................................ 1

Argument ..................................................................................................................... 2

    I.     ASAP is likely to succeed on the merits. ............................................. 2

         A.    ASAP has standing because this lawsuit is germane to ASAP's purpose. ...................................................................................... 2

         B.    The government's interpretation of Section 1808 is impermissibly retroactive. ................................................................. 3

         C.    ASAP is likely to prevail on its claim that the USCIS Federal Register Notice and EOIR Memo are arbitrary and capricious. ............... 9

         D.    Despite EOIR's declaration, ASAP is likely to prevail on its unreasonable-delay claim in light of continuing and irreparable harm. .................................................................................. 9

    II.    The remaining factors weigh decisively in favor of preliminary relief. ............. 10

         A.    Irreparable harm ............................................................. 10

         B.    Balance of the equities and public interest ............................ 13

    III.   The Court should reject the government's attempt to limit preliminary relief under 5 U.S.C. § 705 to ASAP and its members. ....................... 14

    IV.   The Court should reject the government's request for a bond. ..................... 14

    V.    The Court should reject the government's request for a stay pending appeal. ......................................................................... 15

Conclusion .............................................................................................................. 15

# Table of Authorities

**Page(s)**

## Cases

*Altizer v. Deeds*,
191 F.3d 540 (4th Cir. 1999) ........................................................................5, 6

*Am. Fed'n of Tchrs. v. DOE*,
2025 WL 2374697 (D. Md. Aug. 14, 2025) ...............................................14

*Ass'n of Am. Publishers, Inc. v. Frosh*,
586 F. Supp. 3d 379 (D. Md. 2022) ...........................................................12

*Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006)...........................................................................2

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988).........................................................................................7

*Brown v. Angelone*,
150 F.3d 370 (4th Cir. 1998) ..........................................................................6

*Casa de Maryland, Inc. v. Wolf*,
486 F. Supp. 3d 928 (D. Md. 2020) ...............................................................2

*Church v. Att'y Gen. of Com. of Va.*,
125 F.3d 210 (4th Cir. 1997) ...................................................................5, 6, 8

*City & County of San Francisco v. Trump*,
783 F. Supp. 3d 1148 (N.D. Cal. 2025) ......................................................15

*City of Columbus v. Kennedy*,
2025 WL 2426382 (D. Md. Aug. 22, 2025) ...............................................14

*Frontier-Kemper Constructors, Inc. v. DOL*,
876 F.3d 683 (4th Cir. 2017) ..........................................................................8

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) ........................................................................15

*Hughes v. Heyl & Patterson, Inc.*,
647 F.2d 452 (4th Cir. 1981) ..........................................................................7

*Huisha-Huisha v. Mayorkas*,
560 F. Supp. 3d 146 (D.D.C. 2021) .............................................................15

*HW Premium CBD, LLC v. Reynolds*,
742 F. Supp. 3d 885 (S.D. Iowa 2024) .......................................................11

*Immigrant Legal Res. Ctr. v. Wolf*,
491 F. Supp. 3d 520 (N.D. Cal. 2020) ........................................................15

*In re CF & I Fabricators of Utah, Inc.*,
  150 F.3d 1233 (10th Cir. 1998) ........................................................................9

*Inova Alexandria Hosp. v. Shalala*,
  244 F.3d 342 (4th Cir. 2001) ...........................................................................9

*INS v. St. Cyr*,
  533 U.S. 289 (2001) ................................................................................3, 4, 8

*Jaghoori v. Holder*,
  772 F.3d 764 (4th Cir. 2014) .....................................................................3, 4, 6

*Kravitz v. DOC*,
  366 F. Supp. 3d 681 (D. Md. 2019) ...................................................................2

*Lakeview Tech., Inc. v. Robinson*,
  446 F.3d 655 (7th Cir. 2006) ..........................................................................11

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ........................................................................................8

*Martin v. Hadix*,
  527 U.S. 343 (1999) .....................................................................................6, 7

*Maryland v. Corp. for Nat'l & Cmty. Serv.*,
  785 F. Supp. 3d 68 (D. Md. 2025) ..................................................................15

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
  145 S. Ct. 2658 (2025) ..................................................................................11

*Nken v. Holder*,
  556 U.S. 418 (2009) ......................................................................................15

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ..........................................................................15

*Porter v. Clarke*,
  852 F.3d 358 (4th Cir. 2017) ..........................................................................10

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ..........................................................................................9

*Sunshine State Reg'l Ctr., Inc. v. USCIS*,
  143 F.4th 1331 (11th Cir. 2025) ....................................................................8, 9

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ......................................................................................14

*VanDerStok v. Garland*,
  625 F. Supp. 3d 570 (N.D. Tex. 2022) ............................................................12

*Vartelas v. Holder*,
  566 U.S. 257 (2012) .....................................................................................3, 6

*Ward v. Dixie Nat. Life Ins. Co.*,
  595 F.3d 164 (4th Cir. 2010) ...................................................................................5

*Winter v. NRDC*,
  555 U.S. 7 (2008) ...................................................................................................11

## Statutes

5 U.S.C. § 705 ............................................................................................................1, 14

8 U.S.C. § 1804 ...............................................................................................................4

8 U.S.C. § 1806 ...............................................................................................................4

8 U.S.C. § 1808 ............................................................................................................1, 3

OBBBA § 70302 ..............................................................................................................3

OBBBA § 70322 ..............................................................................................................3

OBBBA § 70509 ..............................................................................................................3

OBBBA § 70521 ..............................................................................................................3

OBBBA § 71104 ..............................................................................................................3

## Other Authorities

H.R. Rep No. 119-106, Book 1 (2025) ...........................................................................5

## Introduction

This case turns on a question that will immediately impact thousands of ASAP's members and many other asylum seekers around the country:  Did Congress clearly and unequivocally impose the annual asylum fee in 8 U.S.C. § 1808 retroactively on individuals with asylum applications pending on or before July 4, 2025?  The answer is no.  ASAP seeks preliminary relief to address the massive confusion and ongoing, irreparable harm to its members due to USCIS's and EOIR's chaotic rollout of the fee stems from their unlawful interpretation to the contrary.

In response to ASAP's motion for preliminary relief, EOIR claims it has "revised its position" and that it will *delay* requiring applicants to pay the fee until the agency provides a payment mechanism and individualized notice.  Within the last 24 hours, EOIR appears to have added a payment option to its online payment portal.  But so far, EOIR has still not announced its new policy anywhere except its filings in this Court and it is unclear whether EOIR is communicating that policy to applicants or immigration judges.  In fact, the day after the government filed its opposition brief, an immigration judge ordered another asylum seeker to be removed for non-payment of the annual asylum fee.  Reddy Suppl. Decl. ¶ 12 & Ex. K.  Nor does EOIR's purported new policy solve the problems at USCIS, which claims that for many applicants, the fee is due in just a few days.  USCIS is failing to provide adequate notice to those applicants in a timely manner, creating an urgent risk that many will miss USCIS's purported deadline.

The Court should preserve the status quo by entering preliminary relief by October 29 to provide clarity and prevent asylum seekers from potentially missing USCIS's deadline.  Alternatively, ASAP respectfully asks that the Court enter a temporary restraining order by that date and rule on any longer-term relief 14 or 28 days later.  *See* Fed. R. Civ. P. 65(b); 5 U.S.C. § 705.[1]

_____

[1] ASAP's motion initially requested a decision by October 27.  ASAP now respectfully requests a

## Argument

**I.     ASAP is likely to succeed on the merits.**

**A.     ASAP has standing because this lawsuit is germane to ASAP's purpose.**

The government claims that ASAP lacks associational standing because ASAP's "organizational purpose is [not] germane to the retroactivity of asylum fees." Opp. 10.[2] This argument is baseless. "[A]n interest is 'germane' to an organization's purpose if the lawsuit would 'reasonably tend to further the general interests that individual members sought to vindicate in joining the association and … bears a reasonable connection to the association's knowledge and experience.'" *Kravitz v. DOC*, 366 F. Supp. 3d 681, 741 (D. Md. 2019) (citation omitted). Germaneness is a "modest" limitation, meant to prevent an organization from litigating "issues as to which [it] … enjoy[s] little expertise and about which few of [its] members demonstrably care." *Bldg. & Constr. Trades Council v. Downtown Dev., Inc.*, 448 F.3d 138, 149 (2d Cir. 2006) (citation omitted).

Here, ASAP has deep expertise in developing resources to guide its members through the U.S. asylum system. Reddy Decl. ¶¶ 14–16; Reddy Suppl. Decl. ¶¶ 4–9. Thousands of ASAP's members have clearly communicated their concerns about the fee and voted to bring this lawsuit. Reddy Suppl. Decl. ¶¶ 6, 8. Indeed, ASAP's stated organizational purposes include litigation and advocacy to "build a more functional immigration system" and defend the rights of asylum seekers. Reddy Decl. ¶¶ 9, 18. The Court has already recognized that ASAP has standing to challenge federal rules that apply to asylum seekers. *Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 935, 947–48 (D. Md. 2020). ASAP therefore easily satisfies the germaneness requirement.

---

decision by October 29, in light of the parties' joint proposed briefing schedule, which added two days to briefing compared to ASAP's initial proposal.

[2] The government does not dispute that the other elements of associational standing are satisfied here. *See* Mot. 11–12 (discussing the other two elements).

**B.      The government's interpretation of Section 1808 is impermissibly retroactive.**

*No clear statement.*  The parties agree that Section 1808 must contain "express, unambiguous, and unequivocal" language to satisfy *Landgraf*'s clear-statement rule.  *See* Opp. 11 (quoting *Jaghoori v. Holder*, 772 F.3d 764, 770 (4th Cir. 2014)).  The government claims that the phrase "[f]or fiscal year 2025" in Section 1808(b) provides this clear statement.  8 U.S.C. § 1808(b)(1).  But the fiscal year determines the *amount* of the payment under subsection (b), and fiscal year 2025 sets the baseline for inflation-adjusted payments in future years.  Mot. 15.  Subsection (a) determines *when* the annual asylum fee is due, provides that the fee is due "for each *calendar* year that an alien's application for asylum *remains* pending," *id.* § 1808(a) (emphases added), and says nothing about whether the fee must be collected during fiscal year 2025.[3]

Moreover, the government does not appear to dispute that the annual asylum fee is the *only* immigration fee created by the OBBBA that the government is interpreting to be retroactive.  Mot. 15.  And "other sections" of the OBBBA *do* "indicate unambiguously [Congress's] intention to apply specific provisions retroactively."  *INS v. St. Cyr*, 533 U.S. 289, 318–19 & n.43 (2001); *see also Vartelas v. Holder*, 566 U.S. 257, 267 (2012) (similar).  For example, Congress required States to re-enroll some individuals in medical-assistance plans "retroactive to the date of disen-rollment."  OBBBA § 71104(2), 139 Stat. at 294.  And Congress provided an "[e]lection for retroactive application by certain small businesses" for a tax deduction.  *Id.* § 70302(f), 139 Stat. at 194.  In Section 1808, however, Congress did not expressly impose the annual asylum fee retro-actively with the "unmistakable clarity" it used in those other provisions.  *St. Cyr*, 533 U.S. at 318.[4]

---

[3] Congress also may have expected the fiscal year 2025 fee would apply to applications that were filed in fiscal year 2025 *after* the passage of the OBBBA.  For example, an asylum applicant who filed her application on July 7, 2025 would owe the fiscal year 2025 fee in fiscal year 2026, on July 7.  Indeed, USCIS itself began to charge the fiscal year 2025 fee in fiscal year 2026.

[4] Numerous other OBBBA provisions include similar express statements.  *See, e.g.*, *id.* § 70322(a)(3), 139 Stat. at 204; *id.* § 70509(b), 139 Stat. at 252; *id.* § 70521(g), 139 Stat. at 278.

The government does not dispute that Congress could have said "during fiscal year 2025" instead of "[f]or fiscal year 2025" in Section 1808(b)(1) if it wanted to require the annual asylum fee to be collected in fiscal year 2025.  Mot. 15–16.  Instead, the government points out that Congress also used the phrase "for fiscal year 2025" in provisions determining the amount of the immigration parole fee in Section 1804 and the visa integrity fee in Section 1806, and says that those fees could be charged in fiscal year 2025.  Opp. 14–15.  But there are key differences in both provisions demonstrating that the parole and visa integrity fees can be collected in fiscal year 2025 based on *other* language in the statutes, not the use of fiscal year 2025 as a baseline for determining the amount of the payment.  In particular, the triggering event for those fees is being "paroled into the United States," 8 U.S.C. § 1804(a), or the "issuance" of the visa, *id.* § 1806(a)(1)—both events that, at the time of the OBBBA's enactment in July 2025, could still occur in fiscal year 2025.

Under Sections 1802(a) and 1808(a) on the other hand, the triggering events are the date an asylum seeker *originally* filed her application and then the *time* the application "remains pending."  Thus, imposing an annual asylum fee on an asylum seeker's application filed on or before July 4, 2025—or counting the time her application was pending prior to that date—gives Section 1808 impermissible retroactive effect.  *See Jaghoori*, 772 F.3d at 773 (explaining that the "target" and "object" of the statute are relevant to determining whether it is being applied retroactively).

Ultimately, the government resorts to requesting *Skidmore* deference and pointing to legislative history.  Opp. 15–16.  But even under the now-abrogated *Chevron* regime, *Landgraf*'s clear-statement rule has always trumped an agency's request for deference—any ambiguities must be resolved *against* the government, not in its favor.  *See St. Cyr*, 533 U.S. at 320 n.45.  Legislative history does not change the analysis.  The clear-statement rule requires unequivocal evidence "that is obvious from the statute's text."  *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 174 (4th Cir.

2010).  In any event, the cited House committee report states merely that the asylum-related fees and other immigration fees in a prior draft of the OBBBA would raise money.  H.R. Rep No. 119-106, Book 1, at 858 (2025).  That is still true if the statute applies only prospectively.

*Retroactive effect.*  The agencies' interpretation of Section 1808 has impermissibly retroactive effect in two independent ways:  (1) by imposing annual asylum fees on applicants who filed their applications on or before July 4, 2025; and (2) by imposing fees on applicants based on the time their applications were pending prior to July 4, 2025.  Mot. 12–20.[5]

*1.*  In response, the government wrongly argues that the fees are "procedural."  Opp. 17–18.  In cases interpreting the temporal scope of fees imposed by the Prison Litigation Reform Act ("PLRA"), the Fourth Circuit "specifically held that the imposition of a new … fee requirement was *not* simply a procedural alteration" because the new fee "would require the prisoner to pay a filing fee that he was not required to pay when he filed his appeal."  *Altizer v. Deeds*, 191 F.3d 540, 546 (4th Cir. 1999) (emphasis added) (citing *Church v. Att'y Gen. of Com. of Va.*, 125 F.3d 210, 213 (4th Cir. 1997)).  Under *Altizer* and *Church*, the government's interpretation of Section 1808 is similarly retroactive because it "would impose upon" asylum seekers "new and unanticipated obligations" that did not exist when they filed their applications (or during the time their applications were pending prior to July 4, 2025).  *Church*, 125 F.3d at 213.

The government (Opp. 18) incorrectly cites a footnote in *Altizer* for the proposition that filing fees *are* "matters of procedure" under Fourth Circuit precedent; that footnote quoted a Fifth Circuit opinion that *Altizer* recognized was *inconsistent with* Fourth Circuit precedent in *Church*.

---

[5] The agencies' counting of the pre-enactment *time* an application was pending is an independent retroactivity problem that the government barely acknowledges in its brief.

*Altizer*, 191 F.3d at 546 (in next sentence after footnote, explaining that "[p]rior to hearing arguments in this case, however, a panel of this Court decided *Church*").

In any event, there is nothing "talismanic about identifying a rule as procedural if its application results in genuinely retroactive effects." *Brown v. Angelone*, 150 F.3d 370, 373 (4th Cir. 1998). In *Martin v. Hadix*, 527 U.S. 343 (1999), the Supreme Court rejected a similar argument that the statutory cap on attorney fees under the PLRA could apply retroactively, explaining that "[w]hen determining whether a new statute operates retroactively, it is not enough to attach a label (*e.g.*, 'procedural,' 'collateral') to [a] statute." *Id.* at 359.

**2.** Next, the government argues that USCIS and EOIR are applying Section 1808 only prospectively because asylum seekers "can make the choice to withdraw their application in advance of the payment deadline." Opp. 19. But that is "no answer" at all. *Vartelas*, 566 U.S. at 268. Even if an asylum seeker can theoretically avoid the fee by withdrawing her application, that would result in unacceptably "harsh" and "devasting" consequences, *id.*, including the risk of deportation, Reddy Decl. ¶¶ 62–64. Further, it is unclear whether an asylum seeker can even withdraw her asylum application without simultaneously withdrawing her request for withholding of removal and protection under the Convention Against Torture (CAT), neither of which is subject to the annual asylum fee. *See* Nice Decl. ¶ 11.

In *Church*, the Fourth Circuit rejected a similar argument that a prisoner could "remedy any disruption to settled expectations by either accepting liability for filing fees or withdrawing his appeal." 125 F.3d at 214 (quotation marks and alterations omitted). "[R]equiring the prisoner to make the choice" would "improperly impair rights he possessed when he acted and impose new duties with respect to transactions already completed." *Id.* (quotation marks and alterations omitted); *see also Jaghoori*, 772 F.3d at 773 (similar); *Vartelas*, 566 U.S. at 268 (similar). Here, the

connection between the annual asylum fee and any post-enactment conduct by asylum seekers is even more attenuated—the agencies are imposing the fees due to their own extreme delays.

Requiring asylum seekers to choose between paying the retroactive fee or withdrawing their applications would also impose a "manifest injustice." *Martin*, 527 U.S. at 360; *see also Hughes v. Heyl & Patterson, Inc.*, 647 F.2d 452, 454 (4th Cir. 1981) ("manifest injustice" would result from "application of the" amended statute "to a claim filed prior to the enactment of the amendments"); Mot. 17–18.[6]  The problem is exacerbated by the fact that many applicants have been forced to wait years for a decision on their asylum applications due to no fault of their own. The government claims there is no manifest injustice here because a $100 annual fee is not "exorbitant" or similar to "being denied disability benefits."  Opp. 20.  But some asylum seekers cannot easily afford the fee, which for some has required them to forgo necessities such as groceries.  ECF 29-2 ¶¶ 61, 70.  And many asylum seekers have made decisions that cannot now be undone—for example, some families filed multiple applications and incurred additional attorney fees on the assumption that there would be no annual fee; because of the government's interpretation they now face annual fees of several hundred dollars.  *See* Nice Decl. ¶¶ 7–10.

The government argues that asylum seekers lacked any settled expectation that they would not be subject to an annual fee because 8 U.S.C. § 1158(d)(3) (pre-OBBBA) provided that the agencies could impose asylum-related fees.  Opp. 20.  But unlike Congress, agencies generally lack *any* authority to adopt retroactive rules.  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).  Thus, the absence of any rule imposing an annual fee prior to July 4, 2025 *confirmed*

---

[6] To the extent the manifest-injustice factors the government cites in its brief apply here (Opp. 20–21), the factors each favor ASAP:  (1) this is a case of first impression; (2) Section 1808 imposes an annual asylum fee for the first time in this Nation's history; (3) asylum seekers relied on the former rule; (4) the burdens placed on asylum seekers are high; and (5) there is no clear statutory interest in applying the statute retroactively.

that the agencies could not impose fees on applications filed before that date.

*3.* The government relies on retroactivity cases that are plainly inapposite, especially given that whether any particular application of a statute has retroactive effect depends on statute- and context-specific facts—i.e., "a commonsense, functional judgment." *St. Cyr*, 533 U.S. at 321. For example, the government points to a "new property tax" that *Landgraf* deemed "uncontroversially prospective." Opp. 18 (quoting 511 U.S. at 269 n.24). Unlike a new property tax, which governments routinely charge, and one can reasonably expect to incur when purchasing a home, the agencies' interpretation of Section 1808 has impermissible retroactive effect because it imposes an unprecedented and unforeseeable fee that attaches consequences to an applicant's *prior decision* to seek asylum. *See Church*, 125 F.3d at 212 ("[I]f we require Church to now pay a filing fee that he was not required to pay when he filed his appeal, we 'impair [a] right [he] possessed when he acted.'" (quoting *Landgraf*, 511 U.S. at 280)).[7]

Nor is the annual asylum fee similar to the benefits an employer owed to a coal miner in *Frontier-Kemper Constructors, Inc. v. DOL*, 876 F.3d 683 (4th Cir. 2017). There, "the conduct giving rise to [the petitioner's] liability occurred when it employed [the coal miner] in 2005," a "choice" the employer made long after the statute was amended in 1977. *Id.* at 689.

Finally, the government's out-of-circuit cases are either inapposite or inconsistent with Fourth Circuit precedent (or both). For example, in *Sunshine State Regional Center, Inc. v. USCIS*, 143 F.4th 1331 (11th Cir. 2025), the statute at issue imposed annual fees on "designated regional centers" (not EB-5 visa applicants themselves) that pooled investors' capital through an "immigrant investor" visa program. 143 F.4th at 1334. The Eleventh Circuit held that the fee was being

---

[7] Also unlike a new property tax, USCIS and EOIR are giving impermissible retroactive effect to the *time* asylum seekers' applications were pending before Section 1808 was enacted.

applied prospectively only because "[a] prospective fee for continued participation in the regional-center program is not a new duty with respect to a transaction already completed." *Id.* at 1346–47. Even assuming that holding could be reconciled with Supreme Court and Fourth Circuit precedent, an asylum seeker's inaction in waiting for the *government* to act on a pending application is nothing like a designated center's decision to continue participating in a government program.[8]

> C.    **ASAP is likely to prevail on its claim that the USCIS Federal Register Notice and EOIR Memo are arbitrary and capricious.**

ASAP is also likely to succeed on the merits of its arbitrary-and-capricious claim. Mot. 20–22. The government concedes that the USCIS Federal Register Notice and EOIR Memo "differed" in their conflicting interpretations of Section 1808, Opp. 1, and that neither agency provided a reasoned explanation why, *see* Opp. 21–22. EOIR's new position, which is currently stated only in the EOIR Director's declaration filed on the docket in this case, ECF 44-1, does not solve the flaws in the agencies' initial decisions in July. Opp. 21. Agency actions must be assessed based on the agencies' reasons at the time the actions were taken. *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

> D.    **Despite EOIR's declaration, ASAP is likely to prevail on its unreasonable-delay claim in light of continuing and irreparable harm.**

In ASAP's opening brief, it argued in the alternative that EOIR was unreasonably delaying agency action by failing to provide applicants a method to pay the annual asylum fee. Mot. 22–25. In response, EOIR has now declared that it will "add an AAF dropdown to the EOIR [p]ayment portal" so applicants can pay the fee electronically. ECF 44-1 ¶ 7. According to EOIR, it will also send applicants notice "of any fees due," no one will "be required to pay the AAF until 30 days

---

[8] *In re CF & I Fabricators of Utah, Inc.*, 150 F.3d 1233 (10th Cir. 1998), is also inapposite. There, the statute said expressly that the bankruptcy fees applied to "all cases," including "pending" cases. *Id.* at 1236–37. No similar clear statement exists in Section 1808.

after [those] AAF billing notices have been mailed out," and any advance payments "will be applied" to an applicant's "owed fees, as appropriate, once the AAF billing notices are issued." *Id.* ¶¶ 7, 10–11. As of this morning (or late last night), EOIR has now added the dropdown to the EOIR payment portal. Reddy Suppl. Decl. ¶ 11.

But so far, the agency's new policy has been announced only in its declaration to this Court. Outside of this case, EOIR has still failed to communicate its new policy to the public—for example, as of the date of this filing, EOIR has failed to update its instructions to applicants on its website or any other public-facing materials concerning the annual asylum fee (other than the new dropdown in the payment portal). It is also unclear whether EOIR has communicated its new policy to the agency's immigration judges, one of whom this week ordered an asylum seeker to be removed for non-payment (at least the second such example). Reddy Suppl. Decl. ¶ 12 & Ex. K. Moreover, "voluntary compliance" moots a claim only if "it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Porter v. Clarke*, 852 F.3d 358, 364 (4th Cir. 2017) (quotation marks omitted). That is not the case here.

Accordingly, if the Court does not bar USCIS and EOIR from imposing the fees retroactively, the Court should enter a preliminary order forbidding EOIR from imposing any adverse consequences for failure to pay the annual asylum fee until it has provided adequate notice and a meaningful opportunity to pay. EOIR cannot reasonably object to such an order, since it has already represented to the Court that it intends to take those steps on its own.

## II.    The remaining factors weigh decisively in favor of preliminary relief.

### A.    Irreparable harm

The government argues that asylum seekers are not irreparably harmed by an erroneous demand that they pay $100 per application, on short notice, because they *might* be able to obtain a refund. Opp. 24–25. That is wrong and ignores other serious, irreparable harms caused by

USCIS's and EOIR's retroactive application of Section 1808.

*Economic hardship.* As an initial matter, courts are not categorically barred from entering preliminary relief simply because the relief involves money. *See Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) ("[W]hile the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped' and are thus 'irrevocably expended.'"). The question, as always, is simply whether the plaintiff faces a form of harm that is unlikely to be completely remedied by the relief available at the end of the suit.

The government suggests that asylum seekers who pay the annual asylum fee *might* get a refund if ASAP prevails on the merits. Opp. 24–25. But a court can find irreparable harm so long as there is a meaningful risk—not necessarily a certainty—that plaintiffs will be unable to recover monetary relief if they prevail. *See Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) (the "[a]bility to *calculate* damages does not make that remedy adequate," in light of risk that "plaintiff [would be unable to] *collect* the award"). "A plaintiff is not required to establish with absolute certainty that irreparable harm will occur, but it must show that 'irreparable injury is *likely* in absence of an injunction.'" *HW Premium CBD, LLC v. Reynolds*, 742 F. Supp. 3d 885, 893 (S.D. Iowa 2024) (emphasis added) (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)).

Here, the government never actually contends that a refund *will* be available to asylum seekers at the conclusion of this litigation. *See* Op. 24–25. The government's wiggle words carefully preserve its ability to argue on the merits, after hundreds of thousands of asylum seekers pay the annual asylum fee, that the Court *cannot* order the government to refund the money. The government routinely argues that orders requiring agencies to pay money are inappropriate in APA suits and has obtained relief from orders on that basis. *See, e.g.*, Application to Stay Judgments at 20, *Am. Pub. Health Ass'n v. Nat. Health Inst.*, 145 S. Ct. 2658 (2025) (No. 25A103).

In addition, the temporary loss of the $100 fee has significant and immediate financial consequences for many ASAP members that cannot be adequately remedied by a later refund. Mot. 25–26. The government's brief dismisses the likelihood of those consequences, Opp. 24–25, but ignores the evidence ASAP submitted showing that many members are facing difficult choices because the government's position requires them to pay the annual asylum fee on short notice, Mot. 9, 25–26; Reddy Decl. ¶¶ 61–62. These immediate consequences constitute irreparable harm regardless of whether asylum seekers can seek a refund at the end of this case. And for some families, the cost of the annual asylum fee is much higher if they filed individual asylum applications for multiple family members. Nice Decl. ¶¶ 7–10.

**Risk of adverse immigration consequences.** Asylum seekers also face the prospect of severe immigration consequences if they are unable to pay the annual asylum fee (or if they never receive notice that the fee is due). Mot. 26–28; Nice Decl. ¶¶ 13–15. This exact consequence befell an asylum seeker in an EOIR proceeding earlier this year, when an immigration judge ordered an applicant be removed for failure to pay the fee—even though at the time of the proceeding, EOIR had not provided any way to pay. Reddy Suppl. Decl. ¶ 12 & Ex. K. And it happened again to another applicant the day after the government filed its opposition brief. *Id.*

The government admits that non-payment will "predictably" result in consequences like these but says this would be applicants' fault for violating the law. Opp. 26. Of course, the reason for preliminary relief is that ASAP is likely to prevail on its argument that *USCIS and EOIR* are violating the law by imposing the fee retroactively. When a person "faces substantial threat of irreparable harm, … it is no answer to say that [they] may avoid the harm by complying with an unlawful agency rule." *VanDerStok v. Garland*, 625 F. Supp. 3d 570, 584 (N.D. Tex. 2022); *see also Ass'n of Am. Publishers, Inc. v. Frosh*, 586 F. Supp. 3d 379, 395–96 (D. Md. 2022).

12

Moreover, significant confusion and uncertainty continue to plague USCIS's and EOIR's implementation of the annual asylum fee. *See* Nice Decl. ¶¶ 5–6, 11–16. At EOIR, despite the purported new policy described in its declaration, the agency has still not announced its changed approach on its website or made clear that it has communicated its new policy to immigration judges. *Supra* at 1. At USCIS, where the agency has begun collecting the fee, the agency has yet to make it clear how and when applicants should expect to receive their notice; has not provided clarity about the date the annual asylum fee would be due or how to show proof of payment; and in some cases is failing to provide applicants individualized notice at a current address. *See* Reddy Suppl. Decl. ¶¶ 10, 16–18; Nice Decl. ¶¶ 13–15. Even applicants who can easily afford the fee could miss USCIS's deadline through no fault of their own. This state of affairs is causing significant stress and concern among asylum seekers who are scared of potentially missing an ambiguously defined 30-day payment window and the extreme consequences that could follow if their applications are dismissed for non-payment. Reddy Suppl. Decl. ¶ 22 & Ex. P (Politico article discussing confusion among asylum seekers).

### B.    Balance of the equities and public interest

The government argues that the balance of the equities and public interest weigh against granting the requested relief because it "would disrupt the agencies' efforts to abide by the clear terms of the OBBBA." Opp. 27. That is wrong for at least two reasons.

*First*, as shown above, Section 1808 does not apply retroactively. *Supra* at 3–9. Thus, preliminary relief would *prevent* the agencies from exceeding their authority under the statute. As the government concedes, Opp. 27, "the public undoubtedly has an interest in seeing its government institutions follow the law." *Am. Fed'n of Tchrs. v. DOE*, 779 F. Supp. 3d 584, 622 (D. Md. 2025) (Gallagher, J.) (quotation marks omitted). *Second*, preliminary relief will prevent the confusion, fear, and dysfunction precipitated by USCIS's and EOIR's attempts to impose Section

1808 retroactively.  *See* Mot. 29; Reddy Suppl. Decl. ¶¶ 12–26; Nice Decl. ¶¶ 5–16; *supra* at 13.

Putting a stop to that dysfunction is in the interest of the public, asylum seekers, and even the

agencies themselves.  USCIS is struggling to provide adequate notice for those fees it says are due

in just days.  EOIR implemented a mechanism to collect the annual asylum fee only this morning

(or late last night), but still does not appear to be providing adequate notice to applicants.

## III.  The Court should reject the government's attempt to limit preliminary relief under 5 U.S.C. § 705 to ASAP and its members.

The government contends that "equitable principles" require this Court to "narrowly tailor

any relief to Plaintiff and its members."  Opp. 28.  But ASAP seeks preliminary relief under 5

U.S.C. § 705, and "APA suits are not suits in equity.  The APA is a direct statutory grant of federal

court jurisdiction over cases arising from final agency actions."  *Am. Fed'n of Tchrs. v. DOE*, 2025

WL 2374697, at *32 (D. Md. Aug. 14, 2025).  Accordingly, "[n]othing in *Trump v. CASA* alters

the availability or form of APA relief," and the Court may "'preliminarily set[] aside … an agency

rule under the APA' as 'the functional equivalent of a universal injunction.'"  *Id.* (quoting *Trump

v. CASA, Inc.*, 606 U.S. 831, 873 (2025) (Kavanaugh, J., concurring)); *see also City of Columbus

v. Kennedy*, 2025 WL 2426382, at *33 (D. Md. Aug. 22, 2025) (staying agency action under Sec-

tion 705).[9]  If the Court limits the scope of preliminary relief, however, it should stay USCIS's and

EOIR's retroactive application of Section 1808 at least as to all ASAP members.

## IV.  The Court should reject the government's request for a bond.

In requesting a bond under Rule 65(c), Opp. 29–30, the government ignores 5 U.S.C. § 705.

*See* Mot. 30.  "The APA has no bond requirement."  *Am. Fed'n of Teachers*, 779 F. Supp. 3d at

623 n.14.  Even if Rule 65(c) applied, the Court should use its broad discretion to waive the bond

---

[9] The relevant portion of the government's cited case, *Casa de Maryland*, predates the Supreme Court's decision in *CASA* and misunderstands the APA on this issue.  *See City of Columbus*, 2025 WL 2426382, at *34 n.26 (distinguishing *Casa de Maryland* on this point).

requirement or require no more than a nominal bond. *See Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013). Courts routinely waive bond or set a nominal bond where the risk of harm to the defendant is "remote." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). Preliminarily enjoining likely unlawful agency action poses only a remote risk of harm, *see Maryland v. Corp. for Nat'l & Cmty. Serv.*, 785 F. Supp. 3d 68, 125 (D. Md. 2025), and the temporary inability to collect fees does not constitute "damages" justifying a bond. *City & County of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1203 (N.D. Cal. 2025).[10]

## V.    The Court should reject the government's request for a stay pending appeal.

If the Court grants ASAP's motion, the Court should reject the government's cursory request for a stay pending appeal or an administrative stay and order briefing on that request so ASAP can adequately respond. The government offers no explanation for why a stay is warranted. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (party seeking stay must show it "will be irreparably injured absent a stay"). And according to USCIS, annual fees start coming due as early as October 31. *See* Opp. 6. Even an administrative stay would deny relief to thousands of applicants who the government admits face harsh consequences if they fail to pay. Opp. 26; *supra* at 10–13.

### Conclusion

For these reasons and those explained in ASAP's opening brief, the Court should grant ASAP's requested preliminary relief. *See* Mot. 29–30 (describing the specific relief sought).

---

[10] Courts also routinely waive bond to protect the rights of noncitizens. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 177 (D.D.C. 2021), *remanded on other grounds*, 27 F.4th 718 (D.C. Cir. 2022); *Immigrant Legal Res. Ctr. v. Wolf*, 491 F. Supp. 3d 520, 548 (N.D. Cal. 2020).

DATED:  October 23, 2025                 Respectfully submitted,

                                         */s/ Andrew G. Barron*
                                         Matt Gregory*
                                         Susan M. Pelletier*
                                         Hayley N. Lawrence*
                                         Andrew G. Barron (D. Md. Bar 30311)
                                         T. Hunter Mason*
                                         Rachel E. Schwab (D. Md. Bar 31646)
                                         GIBSON, DUNN & CRUTCHER LLP
                                         1700 M Street, N.W.
                                         Washington, D.C. 20036
                                         Telephone:     (202) 955-8500
                                         Facsimile:     (202) 831-6088
                                         mgregory@gibsondunn.com
                                         spelletier@gibsondunn.com
                                         hlawrence@gibsondunn.com
                                         abarron@gibsondunn.com
                                         hmason@gibsondunn.com
                                         rschwab@gibsondunn.com


                                         Conchita Cruz*
                                         Jessica Hanson*†
                                         Leidy Perez*
                                         Marcela X. Johnson*
                                         Juan E. Bedoya*
                                         ASYLUM SEEKER ADVOCACY PROJECT
                                         228 Park Ave. S. #84810
                                         New York, NY 10003-1502
                                         Telephone:     (646) 647-6779
                                         conchita.cruz@asylumadvocacy.org
                                         jessica.hanson@asylumadvocacy.org
                                         leidy.perez@asylumadvocacy.org
                                         marcela.johnson@asylumadvocacy.org
                                         juan.bedoya@asylumadvocacy.org

                                         *Counsel for Plaintiff*

                                         *Admitted *pro hac vice*
                                         †Admission pending