IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

ASYLUM SEEKER ADVOCACY PROJECT,          )
                                         )
          Plaintiff,                     )
     vs.                                 ) CIVIL NO.:
                                         ) 1:25-cv-03299-SAG
UNITED STATES CITIZENSHIP AND            )
IMMIGRATION SERVICES, et al.,            )
                                         )
          Defendants.                    )
_____ )

                              Baltimore, Maryland
                              October 28, 2025
                              2:30 p.m.

              TRANSCRIPT OF PROCEEDINGS
                  **MOTIONS HEARING**
     BEFORE THE HONORABLE STEPHANIE A. GALLAGHER
                  Courtroom 7C


For the Plaintiff:

     MATT GREGORY, Esquire
     SUSAN M. PELLETIER, Esquire
     ANDREW G. BARRON, Esquire
     Gibson, Dunn & Crutcher LLP
     1700 M Street, NW
     Washington, DC 20036


For the Defendants:

     ZAREEN IQBAL, Esquire
     CESAR AZRAK, Esquire
     U.S. Department of Justice, Civil Division
     1100 L Street, NW
     Washington, DC 20005



     (Computer-aided transcription of stenotype notes)

*Patricia G. Mitchell, RMR, CRR   Federal Official Court Reporter*
*101 W. Lombard Street, Fourth Floor*
*Baltimore, MD 21201*

P R O C E E D I N G S

(2:25 p.m.)

THE COURT:  Good afternoon.  Please be seated, everyone.  We are here in Asylum Seeker Advocacy Project versus USCIS.  It is case number SAG-25-3299.  Counsel, would you please identify yourselves for the record.

MR. GREGORY:  Matt Gregory for the plaintiff.

MS. PELLETIER:  Susan Pelletier for the plaintiff.

MR. BARRON:  Andrew Barron for the plaintiff.

THE COURT:  Good afternoon to you.

MS. IQBAL:  Zareen Iqbal for defendants.

MR. AZRAK:  Cesar Azrak for defendants.

THE COURT:  Good afternoon to you as well.

We are here for a motions hearing on the motion for a temporary restraining order and preliminary injunction that has been filed.  Because we have somewhat limited time for the hearing, I thought it would be helpful if I share some initial thoughts on my review of the motions rather than just opening the floor and letting you address from the beginning.

Obviously the posture of this case has shifted somewhat from when the case was originally filed because of changes that were made by the government agencies.  There now, as far as I understand, appears to be a way for the people to pay the fees, and there appears to be some more uniformity with respect to the structure and terms of when payments are

owed.

Plaintiffs have pointed out a very legitimate residual problem that seems to exist with respect to communication of those changes both to persons who owe the fees and, perhaps even more importantly, to judges and officers who are making decisions about removal and have suggested that there are potentially erroneous decisions being made based on whether people have or have not paid fees, so I am going to want to hear clearly about that.

With respect to things to focus on from the plaintiff's perspective, so far I am less persuaded by the retroactivity arguments and the arguments relating to whether Congressional intent here is clear with respect to fiscal year 2025 and whether the decisions that are currently being made to enforce the fees are truly agency decisions or whether they're implementing the clear intent of Congress in the statute.

Those are sort of the areas that are my primary areas of concern that I wish to hear from the parties on today.  So I'm happy to at this point turn it over to plaintiffs.

MR. GREGORY:  Thank you, Your Honor.  Matt Gregory for the plaintiff.  I'll start where Your Honor left off with the statutory issue, if I may.  You mentioned the for-fiscal-year-2025 language and so that's the main textual hook that the Government has pointed to here, of course.  We have two responses at least.

One is that language is sort of imported from all of the other fee provisions which follow the same structure as this one. There are fees throughout the One Big Beautiful Bill Act for immigration, and they follow the same structure where you have subsection (a) or sometimes it's (b)(1), (c)(1), depending on the numbering. But there's a subsection that tells you when the fee applies and when you pay it, and then there's a separate provision. That's subsection (b) here which tells you what the amount of the fee is. Those provisions are agnostic about whether a fee is actually required for any particular applicant or when it's due.

Here, when you look to subsection (a), it tells you two points in time to decide when a fee is due. One, you look to when the applicant filed his or her application and then you count forward 365 days to whether there's been a full calendar year. Nothing in that subsection (a) tells you the statute applies retroactively, and to my knowledge the Government isn't arguing that any of the other fees in this statute apply retroactively.

Even if you can point to a textual hook, as they've done here and as Your Honor mentioned, it's not enough to say the statute could be read to require a fee to be collected in fiscal year 2025. That has to be the only way to read the statute. The *Lindh* case in the Supreme Court talks about this. Your Honor mentioned it. This is the -- excuse me,

Your Honor... the *Lyons* case.

Congress can use very clear language; it can say "shall apply to all pending applications regardless of when they are filed," things of that nature.  This is a very strong presumption against retroactivity because unless you're convinced that Congress considered the question, affirmatively decided to apply a fee retroactively, then it simply does not.

Here you have basically a copy and paste of a baseline amount of a fee that is used throughout the statute.  Every other fee, as the Government has pointed out, can be collected in fiscal year 2025 but that's not because of subsection (b); it's because of the specific conduct that triggers the fee for those other statutory provisions.  For example, filing an asylum application, 1802, or in the parole fee when you are paroled into the United States.  That's what triggers the payment of the fee, not the language about the amount of the fee in subsection (b).

THE COURT:  I guess what I'm not understanding is how -- if Congress didn't intend it to apply that the way the Government is alleging it should be applied, why would the language "for fiscal year 2025" be in there at all?

MR. GREGORY:  Because throughout all of these provisions, if you read the statute in context, Congress wanted most of these fees to have an inflation adjustment, and they throughout used fiscal year 2025, the amount of the fee

for that year, to set the baseline.  The purpose of that provision is to tell you what the fee is when it applies on its own terms.

What's unique about Section 1808 is that it can't be applied in fiscal year 2025 unless you apply it retroactively. There's no indication Congress wanted any of this to apply to retroactive conduct, and the strong presumption is that they need to make an affirmative choice that you can tell they considered it, not just they adopted language that could be read to require it.

THE COURT:  All right.

MR. GREGORY:  So I would like to talk more about the presumption against retroactivity, but I want to be respectful of Your Honor's time.  If you look at the *Martin* case, similar case to ours, you have a fee that's being applied, a new fee regime being applied to preenactment conduct.  The Supreme Court says, no, you cannot do that unless you get a very clear statement from Congress along the lines of what I mentioned, "the fee shall apply to all proceedings, applications," something of that nature.

If you look at the Fourth Circuit's decision in the *Jaghoori* case, same thing, very strong presumption; the fact that it can be applied prospectively potentially is not enough to save it from the presumption against retroactivity.

THE COURT:  Your view is that the language "remains

pending" isn't clear enough to get us over the hump in terms of them expressly stating what they mean?

MR. GREGORY:  It's remains pending is the present tense, so we have two retroactivity arguments.  One is what I call the broader argument which is that no applicant who filed before July 4th, 2025, should ever have to pay the fee.  We also have what I call the narrower argument.  We think we win on both but really you need to rule for us on either one of these for this motion.

Under the narrower argument, you would start counting the time on July 5th, so it's 365 days from the date of enactment is the earliest anyone would owe the fee which would get you to July 2026.

We think that "remains pending" in the present tense is a clear indicator this statute, you have to struggle to read it to require two applications that were pending before the date of enactment and to count the time that they were pending before the date of enactment.

THE COURT:  Well, again, though, your argument sort of assumes that the (b)(1) for fiscal year 2025 is solely in there to set a baseline then to allow for calculation.  So under your theory, Congress never intended for anyone to collect anything in fiscal year 2025 under this provision, and it's simply putting this in here to set a baseline but didn't make that expressly clear.

MR. GREGORY:  Certainly in the other fee provisions, it did.  There's a parallelism with Section 1802 and Section 1808.  1802 sets the initial fee, same structure, has a fee of $100 for fiscal year 2025 as a baseline, and then you adjust for inflation.  They use the same structure in 1808 for the annual fee.  Under our interpretation, that's 365 days later.  This ensures that the annual fee and the initial fee are always the same amount.  If they hadn't done it that way, they might not have resulted.  That's we think why they put it here.  They were using the same inflation adjustment they use everywhere else in the statute.

The fact that they said for 2025 doesn't tell you unambiguously with the clarity required by the presumption against retroactivity that they intended to effectively punish applicants who have in some cases been waiting a decade for their asylum application to be decided, this is entirely without their control.  At minimum, you would think Congress would give them the full 365 days that it gave everybody else.

THE COURT:  Get new filers?

MR. GREGORY:  New filers.  So if I file on July 5th, I pay the initial fee and then 365 days later, I pay the annual fee.  Under our narrower retroactivity argument, that would effectively be the same thing for someone who had an application pending because otherwise you have to consider the time their application was pending before enactment which was

clearly retroactive, and you don't have a clear enough statement from Congress that they intended that result.

THE COURT:  How do you respond to their argument that it's not -- for example, your example of someone who's been pending for 12 years already -- let me say understanding in all of this that it is not the asylum applicant's choice that it be pending for a long time.  I'm sure they would all rather have it decided quickly rather than sit in limbo for lengthy periods of time.  But if you have someone who's been pending for 12 years, this provision -- I think everyone is in agreement -- doesn't impose 12 years' worth of fees, right? The question is just do they now owe a fee to sort of continue in the system?

MR. GREGORY:  I certainly agree with that.  It's not actually clear with me why the Government agrees with that because under their interpretation, you should owe this for each calendar year your application has been pending. Obviously that would be an extreme result and one Congress could not have intended, but they're forced to kind of come up with this different interpretation that's nowhere in the text where if your application was still pending on September 30th, which is a date that appears nowhere in the statute, then you owe it.  But if it was decided on September 15th, then you don't.  The fact that they have to struggle like this to come up with an interpretation that fits retroactive application

shows that Congress didn't clearly apply it retroactively.

I point to cases like again *Jaghoori*, *Church* and *Altizer* in the Fourth Circuit, very similar facts. You have a new fee regime that's being applied to an ongoing proceeding, and the Fourth Circuit said no. Even if -- I think in that case the statute applied to all proceedings, that's not enough. You need more to overcome the presumption against retroactivity.

My colleague is pointing out to me even under USCIS's and EOIR's interpretation, they are not collecting any fees in fiscal year 2025. So the earliest USCIS will collect any fees under their interpretation would be October 31st unless somebody paid early. And EOIR, it's not clear to me whether they have even started sending notices out or not -- I hope to learn that today -- but it would be at some point 30 days from a few days ago when they rolled out the payment mechanism.

So under nobody's interpretation is a fee going to be collected in fiscal year 2025 here which, again, shows that Congress didn't require them to sort of rush all this together in a few months and collect these fees on short notice. This is a statute meant to apply in the long term and has a structure where you pay an initial fee when you file your application, you get notice from the agency, you have a touchpoint with the agency which is lacking for most of these people, and then you count 365 days forward.

All of these notices problems that we're talking about

flow from this fundamental problem. When I file my initial fee today, I at least get notice at that time that I will owe it again in a year. But we're talking about people who in some cases have had no contact with the agency for years because they're just waiting for their application to be decided. To my knowledge, this would be the only provision in all of the immigration fees that Congress adopted that wouldn't require that sort of touchpoint with the agency first.

THE COURT: Okay. All right. Do you have more points to make on retroactivity? I did have a couple of questions, I wanted to get clarification from you on what you were proposing with respect to -- what your argument is with respect to what this Court should be doing with respect to sort of this notice problem.

MR. GREGORY: The only thing I want to point out on retroactivity, Your Honor, other provisions of the One Big Beautiful Bill Act use very different language when they apply retroactively. For example, there was a subsection -- this is subsection 70302(f)(1)(C) that's titled Election for Retroactive Application. Congress clearly know how to do this when it wanted to, and this is a very roundabout way to just import the same language, copy and paste from other provisions for inflation adjustment to affirmatively decide to apply this fee retroactively, not just to people who filed their

applications before July 4th but to all of the time that their applications were pending before July 4th as well.

But I'm happy to answer Your Honor's questions if you'd like to move on.

THE COURT:  Sure.  No, I didn't want to interrupt that portion of your argument to move on, but I do want to hear from you on this issue of the problems with the public confusion and the confusion in communicating to the decision-makers.

MR. GREGORY:  Yeah.  I think my colleague, Ms. Pelletier, will speak to this on irreparable harm but in terms of our legal claims, the arbitrary and capricious claim and the unreasonable delay claim, this is a core problem that again flows from this threshold legal mistake in applying the fee retroactively.  Just at Gibson Dunn, among our pro bono clients, we have more than a dozen people who had the notice sent to the wrong address.  It was sent to the original attorney that represented them, not the new attorney.  Again, these cases linger for years and years and years, so often there will be a change.

We're very concerned that, even assuming people can come up with $100 to pay, a lot of people don't know that they're supposed to pay this fee, and the agency hasn't actually provided them the notice it has committed to.  Again, this problem would not have occurred if they had rolled it out the

way we think the statute requires where you pay the initial fee and at least you get that touchpoint notice that you need to pay a fee a year later.

On the delay claim, I think the Government has argued that it's moot because of these new statements.  We checked the website at 2:00 today; the website still has the July policy for EOIR.  They haven't actually updated it.  Maybe they've done it since then, I don't know.

We're aware of cases -- we pointed out one in our reply brief where people are still having their application dismissed, and they're being ordered removed for nonpayment of the fee.

THE COURT:  Okay.  Let me ask this.  If I end up disagreeing with you on the retroactivity, is there a claim left that you have with respect to these notice provisions?

MR. GREGORY:  Yes, Your Honor, so we have two claims.  The APA claim is that this was arbitrary and capricious when they adopted inconsistent positions in July and created all of this confusion that has now resulted.  And you base your review of that decision on the reasoning at the time they issued the memo and the Federal Register Notice; that's under *Chenery*.  So the fact they tried to fix it later, that's not enough to save those.

THE COURT:  It would matter for injunctive relief, right?  So if it's been fixed...

MR. GREGORY:  Well, I think then we would have a debate about the mootness exception for voluntary cessation. To my knowledge, it's only been fixed to the extent you believe the declaration they filed in this court in direct response to our litigation, hasn't actually been updated or promulgated in the real world.  Now if they rescinded the memo, maybe we would have a different case, but they have not done that yet.

THE COURT:  The memo from July about how --

MR. GREGORY:  The memo from July and the Federal Register Notice from July.  So under the APA, the remedy there would be to vacate those, and they'd have to adopt the new policy in a reasonable manner.

THE COURT:  Okay.  But in terms of the payment mechanism, that exists?

MR. GREGORY:  The payment mechanism exists.  I think it was either late the night before we filed our reply brief or that morning, there was a payment mechanism added to the website.  Of course, you also need a meaningful opportunity to pay the fee.  That's part of this claim too, this is our unreasonable delay claim.  I don't know if they've started sending notice out.  I don't know if they're going to be able to do it in a better manner than USCIS has done where, as I said, we're aware of many, many instances where systematically it's being sent to the wrong address.  That's still part of

this claim.

Again, voluntary cessation prevents that claim from becoming moot.  And I can't see any harm to the Government in Your Honor issuing an order that requires them to do what they promised to do in a declaration they filed in this very case.

THE COURT:  And that's the language that you proposed on page 10 of your reply saying "the Court should enter a preliminary order forbidding EOIR from imposing any adverse consequences for failure to pay the fee until it's provided adequate notice and a meaningful opportunity to pay"?

MR. GREGORY:  Correct, Your Honor.

THE COURT:  All right.

MR. GREGORY:  If I may, can I come back to the statutory argument really quickly?

THE COURT:  Sure.

MR. GREGORY:  I just want to point out the sort of harsh choice that this is putting the asylum applicants to.  The Government has pointed out that you can avoid paying this fee.  That's true in a lot of the Supreme Court's and the Fourth Circuit's retroactivity cases.  It was true in *Vartelas* where if you just didn't travel out of the United States, you wouldn't be subject to the fee.  Here the consequences are extremely harsh.  You either have to comply with what we think is an unlawful fee, or you have to withdraw an asylum

application that you may have built a whole life here, you may be sent back to a country where you face persecution. This is an extremely harsh choice to put applicants to.

People also made irrevocable decisions in addition to just coming here and seeking asylum. As we pointed out in our reply brief, some people filed multiple applications on the understanding that there would not be a fee that would apply going forward and it's impossible to undo those now. For one thing, you can't get the attorney fees back that they paid in reliance on the prior regime. It's also not clear they can even withdraw those applications now without also withdrawing their request for withholding of removal and CAT relief which are on the same form that the government requires them to use when they apply for asylum.

So I understand Your Honor is skeptical with some of the statutory arguments, but I do want to make clear this is a pretty extreme choice for Congress to make. It puts people in a very untenable, difficult position, and we just don't see the clarity in the statute that Congress actually wanted that result, and we think the Supreme Court and Fourth Circuit case law is very clear they would have had to do more than they did to impose the fee retroactively.

THE COURT: Okay. All right, thank you.

MR. GREGORY: Thank you, Your Honor.

THE COURT: Did you say one of your colleagues

wanted to be heard also?

MR. GREGORY: My colleague, Susan Pelletier, will talk about irreparable harm.

THE COURT: Sure.

MS. PELLETIER: Thank you, Your Honor. The remaining injunction factors, in addition to likelihood of success, clearly favor our client. Absent preliminary relief from this Court, ASAP members face three types of irreparable harm. I'll list them now and I'd like to briefly touch on each of them. The first two harms are economic unrecoverable payment of the annual asylum fee and extreme economic hardship following payment. The third harm encompasses the immigration consequences of abandoning an asylum claim, and all three of these stem from two facts that we established in our briefs and declarations.

First, that for many asylum seekers, coming up with $100 on short notice is going to be very difficult, if not impossible. And the second is that the agencies, as we've discussed, are systematically failing to provide effective notice to individuals that the agencies believe that that payment is due.

Because of the exigencies on the ground, I'd like to first turn to the immigration consequences. The agencies have represented that nonpayment within the time period allowed could result in an individual's asylum claim being denied.

Denial of an asylum claim can, in turn, result in the individual's permanent loss of ability to apply for asylum because of the one-year statute of limitations period that applies to those applications, and it can also result in removal to the applicant's home country where they fled persecution.  So it's not an exaggeration to say that the consequences here really are life and death.

This obviously is not fanciful as we submitted in the Exhibit K to the supplemental Reddy declaration, we are aware of at least two instances where the immigration court has already denied and ordered someone removed for failure to pay the annual asylum fee.  This is a fee that, even under the Government's own representation, is not yet due and was impossible to pay at the time, including, as my colleague said, after the Government submitted the declaration in this case saying that it had changed its policy.  So the notice issues here both flow, as Your Honor said, to the applicants and to the Government's own employees.

The Government argues that this harm doesn't count because it flows from the fact that an individual would not have paid the annual asylum fee, and the Government characterizes that as a violation of law.  We think that that's wrong for two reasons.  The first is that in assessing irreparable harm, Your Honor can take into account the consequences of failing to comply with an unlawful government

10/28/2025 Motions Hearing                              19

demand.  That's very clearly spelled out in the *VanDerStok* case that we cite as well as the *Frosh* case out of this court.

It also misunderstands the situation for asylum applicants right now, many of whom cannot pay, they cannot come up with the money; it is not a decision not to pay.  Or they have not received notice in the way that's required for them to actually be able to do so.  And that is true even for individuals who have received the actual notice from USCIS. As we've mentioned, that's not true of everyone who may be -- the agency believes it sent notice to, but the notices themselves don't make clear when the 30-day period expires. Is it from the time that the agency sent the notice, is it from the time that the applicant received the notice?  It's very unclear.

So there are many instances in which someone would be treated as having not paid and, under the government's view, violated the law despite having tried to do so.

THE COURT:  Let me ask this because you're somewhat addressing with respect to the proposal that you made on page 10 forbidding EOIR from imposing any adverse consequences for failure to pay the annual fee until it has provided adequate notice and a meaningful opportunity to pay, you are addressing somewhat, I guess, at least one issue that adequate notice would require is a firm deadline for making the payment.

MS. PELLETIER:  Exactly --

THE COURT:  Obviously, presumably also it would be notice sent to an address that the person actually can receive it.  When you say meaningful opportunity to pay, again, understanding that some people might have financial circumstances that are different from others, are you meaning anything other than clear instructions for how to make the payment?

MS. PELLETIER:  Well, Your Honor, I think it depends on the basis for the relief.  I think if the Court is deciding we are likely to succeed on our retroactivity claims, the order should, of course, bar any requirement that individuals who filed their applications before the date of enactment have to pay the fee or that they have to do so before the anniversary date of enactment next summer.  But if the Court is focused on the notice issue, it would be yes, that they receive actual notice with sufficient time to pay; ideally also because of this issue with the notice going to the wrong addresses, people would be able to log into the system and see when their payment is due under the agency's determination.  I think that would be an important step in the right direction.

And, of course, also for the agencies to notify the public about their interpretation of the statute and including informing immigration judges and others who are involved in the immigration process, that they should not be treating

these fees as having been due before individuals are given that opportunity.

THE COURT:  Okay.  Now is there a way -- if a applicant logs on at this point, does it tell them when their fee is due or no?

MS. PELLETIER:  It does not.  For USCIS, for many people, they'll log on and even though they may have applied more than a year ago, it says their fee is not yet due at this time and they're unable to pay it.  For others, they will log in having not received notice and it suggests that they are able to pay, but it doesn't tell them when.  It's just that they are able to enter their A-number and it looks like they are able to make a payment, so there is no actual date that is clear.

It's not clear what information the agency has on its side about when those notices went out or when those notices are due.  We don't have that information.  For EOIR, anyone can pay the fee when they log on.  It doesn't seem to have this mechanism where it's blocking someone who doesn't yet have a fee due, but, again, we don't know if any of those notices have gone out and applicants don't have a way of knowing, and it seems neither do immigration judges.

THE COURT:  Okay.

MS. PELLETIER:  Just briefly, I would turn to the economic harms and why those are cognizable.  The Government's

own cases acknowledge the economic harm can be irreparable and that's true in two circumstances, both of which are present here. One is when there's a likelihood that money paid out will not be collectible at the end of litigation, and that's true here for both legal and practical reasons. As a doctrinal matter, it is far from clear that refunds would be available at the end of this litigation. Even if they were available, it could be cost prohibitive and logistically impossible to get those to the millions of people that have would have paid the annual fee during the period that litigation was pending.

The second is whether or not money can be returned at the end of litigation. Irreparable harm can stem from the severe economic consequences that asylum seekers will face in the immediate aftermath of paying. We have submitted evidence showing that for many asylum seekers, coming up with $100 on short notice will force them to make very hard choices between feeding their families, keeping the heat on. And courts have treated harms like that, even if money is recoverable at the end of litigation, as creating irreparable harm, warranting preliminary relief.

I'll just turn very quickly to the balance of the equities in the public interest. Those also clearly favor ASAP and its members. As the Court recently explained in the Department of Education case, the public has an interest in

the government following the law.  Here that applies not just to following the dictates of the One Big Beautiful Bill Act but also the long-standing policy of the country to offer asylum to those who need this country's protection.  For over 75 years, this country has allowed people to apply for asylum, and the full and fair adjudication of their claims is really critical to that public interest.

Allowing the government to dismiss or deny asylum claims based on a failure to pay a fee that Congress did not meaningfully impose on them or because they have not received notice would greatly undermine that public interest.  It also does not serve the public to subject large groups of people to economic hardship.  By contrast, the government has not shown that it will experience any immediate harms if it is delayed in collecting these fees.  If it prevails in this litigation, it can issue the notice that is required to give people a meaningful opportunity to pay and then collect the fees at that point.

I would just reiterate that if someone is to withdraw an application because they cannot afford to pay the fee, they would likely be foreclosed from seeking asylum going forward, and that would be true even if at the end of this litigation, it turns out that the fees were not required.

THE COURT:  Okay.  All right, thank you.
Ms. Iqbal.

MS. IQBAL:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. IQBAL:  Your Honor, so I'll first address the retroactivity arguments here.  I first want to make clear and confirm that the government is not applying the annual asylum fee retroactively here.  It's not a retroactive filing fee. It's not being applied effective any date prior to OBBBA's enactment.  The fee is assigned prospectively effective October 31st, 2025, for the period pending of FY 2025 from October 1st, 2024, to September 30th, 2025.

In this way, it is very much akin to a property tax.  It is a fee that is necessary for the continuation of the person's application, but it is not being applied retroactively.

THE COURT:  Wait, I want to make sure I understand what you're saying.  You said it's being applied beginning October 31st, 2025, so you agree with plaintiff's position that it is not being collected in fiscal year 2025?

MS. IQBAL:  It's being assigned effective October 31st, 2025, so it's not being necessarily collected during the fiscal year, but it is a fee that applies for the fiscal year 2025.  So the way that the USCIS calculated it is they applied it to all applications pending between October 1st, 2024, to September 30th, 2025.  Then they applied the fee, assigned prospectively and -- excuse me, effective October 31st,

2025.

THE COURT:  So -- but if I'm an applicant and I decide to withdraw today, I'm going to withdraw my asylum application, I don't owe the fee even though it's for -- my application was pending that whole period October 1st, 2024, through September 30th, 2025?

MS. IQBAL:  No, Your Honor.  The idea here is to provide notice that the fee will become due within 30 days and that gives the applicant the opportunity to withdraw, to pay or not pay or to pursue a different avenue potentially of a legal immigration status.

THE COURT:  All right.

MS. IQBAL:  Your Honor, so the plaintiffs here are alleging it's impermissibly retroactive because this fee counts time accrued, counts time pre OBBBA's enactment.  Your Honor, simply because a new fee or tax is based on time that's previously accrued or that has some sort of retrospective reach does not mean it's impermissibly retroactive.  I would submit to Your Honor here the language in the statute is explicit that it was Congress's intent that this fee, the annual asylum fee be applied to both current and future annual -- excuse me, asylum applicants.

Your Honor --

THE COURT:  What language do you rely on for that?

MS. IQBAL:  Your Honor, I would point the Court's

attention to "for FY 2025."  It's very clear.  I understand that the plaintiffs have tried to make a distinction between "for" and "during."  Your Honor, it's the Government's position really that these are interchangeable, but I would also direct the Court's attention to the other immigration fees that are listed under this particular section.  As plaintiff has mentioned, there are several other immigration fees that have been issued or increased.  They use the same exact language for 2025.  They say for that initial amount, it's for 2025, "for FY 2025."

Your Honor, if "for FY 2025" was intended to merely indicate a baseline amount to calculate further or subsequent years, that would mean that it was Congress's intent to collect no fees for 2025, despite the fact that there were three months pending, for any of the dozen or so fees that use that language there, including the annual asylum fee.  Which cannot be the case when you factor in Congress's intent as it is expressed in the House Committee Report, the Judiciary Committee Report that we submitted and cited.

Your Honor, in addition to the "for 2025" as plaintiffs pointed to as well, it clearly states that the -- there is a fee for pending applications.  Your Honor, that explicitly indicates that it is intended to apply to current applications, those that are presently pending.

Your Honor, so I would also submit to you in the House

Committee Report, the judiciary committee there in the same section cited the Congressional Budget Office's estimate here. So the CBO provided an estimate for every single new fee.  For the annual asylum fee, the CBO estimated that enacting the provision specific to the annual asylum fee would increase revenue and decrease the deficit by 1.1 billion over the 2025 to 2034 period.  In order for that to be true, it would require that fees be collected for pending applications during the 2025 period.  So the CBO even understood it to intend -- understood the section to include current pending applications.

Your Honor, I understand the plaintiffs pointed to other sections in OBBBA, there are two other sections where the Congress has used the language "retroactive" explicitly.  In both those sections it actually, in fact, requires that something be applied to a specific date.  That is why Congress used that.  In the first section it had to do with Medicare enrollment, someone who had been mistakenly disenrolled.  The requirement there is that it has to be effective a particular date, but there is no such particular date here.  That's the reason why we submit to you that that language is not necessary.  That pending applications, the statute's use of those to that term is sufficient to show that it was Congress's intent that it applied to current applications.

Your Honor, with respect to -- we submit to the Court,

again, the Court does not have to go any further than *Landgraf* factor number 1. Again, I want to emphasize here the fee is being applied prospectively, so I would also add I think the plaintiffs here have also alleged that the implementation of this fee is retrospective or retroactive because it attaches legal consequences to an applicant's prior decision to seek asylum. Again, this is not a fee that is being applied to the initial application. In this way it differentiates from *St. Cyr*, from *Jaghoori*, from even *Church*.

In the case of *Church*, which plaintiff heavily relies upon, in that instance the plaintiff there is being made to pay a fee, a retroactive fee, a fee that was required at the point of filing. This is not a prospective fee in any way.

Plaintiff also points to *Martin v. Hadix*. *Martin v. Hadix* is also instructive in that in that particular instance, there were two fees that were being applied there -- excuse me, there were two changes in salary, in attorney's fees that were being applied. One was prospective, one had to deal with post-monitoring advice an attorney would give, post-judgment advice. One had to deal with sort of the services that were already provided.

Plaintiff is correct that the Court there did indicate that the statute was not explicit in requiring that that particular fee be applied retroactively, but it also stated that the prospective fee was not impermissibly retroactive.

The reason why it stated so -- and even though the plaintiff attorney made argument in that case that had the attorney known, they had reasonable expectations there that their fees would remain the same there, so they made the same argument.

The Court rejected that argument in that particular case because the Court stated that you can withdraw your representation.  There's a choice there for your being required to continue.  You're not being required to continue and to absorb the loss in the limited pay.  So --

THE COURT:  Part of the difficulty here, though, is that these applicants, they don't want their application still to be pending; right?  For many of them, they wanted their application to be decided years ago.  So this is sort of imposing a fee on people for pending for a long period of time when they don't want to be pending at all.  They would like to have a decision.

MS. IQBAL:  I understand that, Your Honor. Congress's intent is clear that the reason, the purpose for this fee is that asylum applicants have never had to pay any fees, not for the initial application, nor for any kind of adjudication services.  As a result of that, as Congress has indicated in its Judiciary Committee Report for the bill, as a result of that, U.S. citizens have been footing the bill or other lawful immigrants, legal immigrants who go through the process who pay fees have also been footing that bill.

The point and the purpose of the statute and the purpose of this specific annual asylum fee was to remedy that.  There are currently 3.4 [sic] estimated pending applications.  The goal here for Congress was to ensure there was some sort of cost recruitment as a result of having to adjudicate this ongoing millions, millions of asylum applications.

The principle there, as Congress also stated in the same report, has always been the same principle that U.S. citizens shouldn't have to foot the bill for any kind of immigration processing.  This is not the first time that Congress has -- rather, the government has attempted to issue an asylum fee. In 2020 USCIS or DHS attempted to issue an initial application fee for about $50.  At that point and currently as well, the authority to do so was within the purview of the USCIS and DHS under the Immigration and Nationality Act.

So that authority to issue a fee, whether it's for that initial application, whether it's for adjudication -- later adjudication, that authority has always existed.  This is no different from that existing authority.

If anything, Your Honor, the OBBBA has actually taken away some of that discretion and it is now requiring, requiring USCIS to impose a fee, an asylum fee here.

THE COURT:  Let me ask for clarification on a point where it appeared from plaintiffs was some question.  If someone's application has been pending for 12 years, are they

going to owe 12 years' worth of this fee, or are they going to owe one year worth of this fee --

MS. IQBAL: No, Your Honor. It's not retroactive again in that way where it's applying to cumulatively over the period of time that a person's application has been pending. So it's only for 2025 which is the first year it is being collected. It will only be for those applications that were pending for the full fiscal year of 2025.

THE COURT: Pending for full fiscal year. So if somebody filed in April, they will not owe for fiscal year 2025?

MS. IQBAL: Yes, ma'am. The application would have had to be pending between October 1st, 2024, and September 30th, 2025.

THE COURT: So they would have had to file on or before October 1st, 2024?

MS. IQBAL: Yes, ma'am.

THE COURT: If you're somebody who did file on April 1st, 2025, when will you owe a fee?

MS. IQBAL: According to USCIS and now EOIR's policy, that in any subsequent year, it will be based on the calendar date that you filed.

THE COURT: Okay. So if I filed on April 1st, 2025, I would get my notice April 1st, 2026? Or I'd get my notice --

MS. IQBAL:  Earlier.

THE COURT: -- March and then I would owe it by April 1st, 2026?

MS. IQBAL:  Yes, Your Honor.  That's my understanding how the process will proceed going forward.

THE COURT:  But obviously notices are still -- can you give me some sense of what's happening now because it seems like people aren't getting notices or may not have gotten notices.

MS. IQBAL:  Yes, Your Honor.  Obviously we've been in contact with both USCIS about this and EOIR, and since that time -- since the plaintiff's filing, EOIR has adopted a revised policy that is consistent with USCIS.  Given the change in the policy and, of course, the lapse in appropriations -- EOIR is not entirely fee funded so it does rely upon appropriations money, they don't have all of the relevant staff.  They have limited IT capabilities so they're doing what they can to correct -- sorry...  So they are in the midst of doing what they can to sort of correct based on the consistency now and so both organizations are coordinating.

EOIR has different capabilities in terms of payment mechanisms in terms of sort of IT than USCIS does.  Obviously with the change in policy having just occurred, it will need a reasonable amount of time to be able to issue notices.  Again, with the lapse in appropriations, it's making things a little

bit more difficult.  So --

THE COURT:  Wouldn't they be able to just put something up on the website that says: Nobody owes fees right now, fees will be imposed once we're back in office and can send notices?

MS. IQBAL:  Your Honor, we have followed up with them about that, and they are working on trying to put together some sort of public notice.  They need to be able to do something that's consistent with policy as well.  And also we have discussed with them the issue of ensuring that immigration judges and staff are aware of the shift in policy, and so they are also working on communicating that to judges as well.

They have also reviewed the documentation that was provided about individuals who have already faced some sort of deportation or deported -- I believe the initial copies that were filed were redacted so we didn't have the specifics.  It was a little bit difficult for EOIR to determine who specific to identify the individuals who had been negatively affected.  But EOIR has indicated -- although it's not in the declaration, EOIR has since indicated that if they can -- if ASAP can provide information about those individuals who have been affected, they can work to try to take corrective action with a specific court.

THE COURT:  I assume plaintiffs are willing to do

that?

MR. GREGORY:  I'll have to talk to my client, Your Honor.  I think these individuals did not give us permission to share their name, so I think it's a threshold question that we would have to cover.  I certainly appreciate the offer, and that's a question we'll have to take back.

THE COURT:  All right.

MS. IQBAL:  That will be the same obviously for anyone who has since faced any kind of negative consequences as a result of the initial policy.  So the agency is willing to take corrective action there.

THE COURT:  Let me ask this then.  Based on what you're saying now, the sort of language that plaintiffs have suggested on page 10 of their reply for an order forbidding EOIR from imposing any adverse consequences for failure to pay the annual asylum fee until it has provided adequate notice and a meaningful opportunity to pay, is there disagreement with that?  Could that be done as some sort of consent order?  Would we be able -- rather than an injunction.  It sounds to me from what you are representing here in court that EOIR recognizes the problem with the current posture and is willing to go as far as to take corrective action.

Would there be any problem with entering that sort of agreement until EOIR can get its ducks in a row when the shutdown ends and things can be put in place?

MS. IQBAL:  Your Honor, EOIR is already taking steps to correct and will be issuing notices as soon as it has the capability.  The Government can provide updates to the Court if that's what you're seeking.  Rather than entering some sort of agreement here, if Your Honor would request that we submit updates to provide you with --

THE COURT:  The problem is that updates don't solve really the problem because to the extent that there was some sort of agreement that could be disseminated publicly to plaintiff's members, to others even without EOIR being able to add messages to its website, whatever, they would have some sort of assurance that nobody was going to face adverse consequences for failure to pay this fee until the mechanisms are in place to do that.  Providing updates to the Court doesn't provide that sort of assurance to the public at large who is faced with trying to pay this fee as to what the current status is, particularly with the circumstance that we have with respect to what is in the record in front of the public in terms of the memos that have been enacted and things of that nature.

I take your point that EOIR, with the shutdown, is somewhat limited perhaps in what it can do, but I'm concerned with public messaging here and getting information to people who need it who are probably very concerned about their obligations to pay these fees when they have -- presumably if

they try to call, they're not getting people on the phone if people aren't there because of the shutdown; the systems online don't seem to be working.  So we have a large number of people here who are probably very concerned about the situation who are unable at this point to get reassurance.

MS. IQBAL:  Your Honor, I understand the concerns here.  Both EOIR and USCIS appreciate those concerns as well and I think they're working as quickly as possible to do that, particularly with respect to public notice so that they can alleviate that confusion.

I think with respect to some sort of joint status report, I think I would have to go back and speak with the client about that because they are under certain constraints, so being able to agree with respect to particularly the frequency with which the steps would need to be taken if there -- we're happy to discuss further with the plaintiff here after we've had some time with the client and to see if we can come up with something so that we can maybe perhaps submit some sort of joint status report where we are.

THE COURT:  I think it would be more than a status report.  Again, it would need to be some sort of an agreement that adverse consequences were not going to be imposed for a failure to pay the fee until there has been reasonable notice of when this fee is due because that's where my concern lies is these judges or decision-makers who are taking action

against people for failure to pay when people are in this sort of limbo situation where, because of the shutdown or otherwise, they can't get accurate information about what is owed and when.

MS. IQBAL:  Yes, Your Honor, understood.  If Your Honor would permit, if we can then be given some time to consult with the clients here and then have an opportunity to speak with plaintiff about coming up potentially with an agreement.  If plaintiffs -- plaintiff is in agreement with that.  We would still need to discuss with the client first.

THE COURT:  Okay.  Are you able to reach someone with the client this afternoon?

MS. IQBAL:  Yes, we do have people on standby.  Your Honor is just seeking right now just consent or agreement on our part to enter into an agreement but for the parties to negotiate that agreement themselves; correct?

THE COURT:  Yes, I suppose so, but I think the starting point would be what plaintiffs have on page 10 of their reply which, you know, they were asking me to enter a preliminary order forbidding EOIR from imposing any adverse consequences for failure to pay the fee until it has provided adequate notice and a meaningful opportunity to pay.

What I was hearing from you was sort of some agreement that EOIR understands the problem and is trying to do that, even going as far as to be willing to consider corrective

action for people who have faced an adverse consequence for failure to pay the fee at this point.  So it sounded to me like a potential opportunity for the parties to reach some agreed resolution of at least some portion of the claim, understanding that this does not go as far as what plaintiffs are asking the Court to do.

MS. IQBAL:  Yes, Your Honor, understood.  Your Honor, so currently -- I see on page number 10 what they are requesting here.  Obviously, there is meaningful opportunity to pay at this point based on what plaintiff has requested so there is a payment mechanism.  So with respect to adequate notice, EOIR's declaration makes clear that no one will have to pay until notice is issued, and they'll have 30 days from the point in which that notice is issued to pay.

So really the last point at issue here is really whether or not there's something the agency can do to ensure that those who have already faced adverse consequences will have that corrected --

THE COURT:  Well, yes and no.  Obviously -- you submitted an opposition saying that certain things had been put in place, and then it sounds like even after that, at least one person faced adverse consequences for failure to pay when those measures had been put in place already, and it apparently wasn't adequately communicated.  So I'm not necessarily confident that we're only talking about correcting

things that have already happened because I don't know what has or has not been communicated to decision-makers, whether decision-makers understand what has or has not been communicated.

So I'm not necessarily confident that -- and we have the problem that plaintiffs raised earlier with respect to adequate notice as well.  Because if notice is being sent to someone's attorney who has closed up shop or has passed away and the client doesn't receive that notice, that doesn't seem to constitute adequate notice in this circumstance either.

So we have potential ongoing issues past what may already have happened to date, and the question is whether there can be an agreement that adverse consequences for failure to pay will not be imposed until adequate notice has been provided. That might, in a certain circumstance, go somewhat further than whether it's just been stuck in the mail because, again, it might be mailed to a 15-year-old address.

MS. IQBAL:  Yes.  Your Honor, I can't really speak to the mailing aspect of this.  If plaintiffs can provide more information about that, we can discuss, I'm happy to address that with EOIR -- or rather USCIS because the only organization that has issued any notices at this point is USCIS.

But we can reach out to some representatives from EOIR and we can ask whether or not -- it may be possible that they

are taking action, as we speak, as to prevention.  Your Honor, obviously the main focus here is concern that no one else face any adverse consequences as a result of having followed the previous policy.  We can get in touch with people from EOIR and see whether or not there is something they can take more immediate action with respect to communication to the judges and staff.

If Your Honor will permit, if we can reach out to them and if it's possible by the end of this afternoon, we can get a response to the Court.

THE COURT:  Okay.  I think that will be helpful one way or the other.  I do want to ask a couple of other things.

What about the memo that was originally issued?  Again, I understand that we've gotten information in this litigation that EOIR is changing its position in terms of when payments are due and things like that.  Is anything formal being done to rescind the memo and any other guidance that was initially put in the public record?

MS. IQBAL:  Yes, Your Honor.  They're working on reissuing -- preparing and reissuing a new policy memo. Again, EOIR has -- there's different steps there.  They have different levels of review, and they don't have all the staff at this point.  But I can try to get a better response about when they might be reissuing a policy memo when the expectation is that they might start sending out some notices

and also about whether they're going to -- or how immediately they're going to send out communication to the rest of staff regarding the change in policy.

But the memo itself, that will take a little bit more time.  I think what they're working on in particular right now is issuing public notice, trying to find a different form.  Whether it is, like you mentioned, a message on a website, something so at least the public can be notified regarding the change.

THE COURT:  Okay.  What is EOIR's position with respect to whether a failure to pay the asylum fee would render a person ineligible for withholding removal or CAT relief as well?

MS. IQBAL:  Your Honor, EOIR has explained that the annual asylum fee, while the persons use the same form to apply for these different avenues of relief, although they're using the same form, the nonpayment of the annual asylum fee would not impact someone's application for these other avenues that you listed, whether it's CAT or otherwise.

THE COURT:  Okay.  Are we sure that the immigration judges are getting guidance on that as well?

MS. IQBAL:  Yes, Your Honor.  So the -- the process for CAT or these other avenues has not changed.  The application remains the same, the process remains the same.  Unless there has been a change in OBBBA -- and I don't think

that's the case with respect to any fees, I don't know that offhand -- but that process will remain the same.  The AAF does not impact that process.

THE COURT:  Okay.  All right.  I think that covers most of the questions I had for you.  Were there other points that you wanted to make?

MS. IQBAL:  Your Honor, I would just emphasize again where concerns retrospective affect or retroactivity, really the circumstances here are indistinguishable in that unlike in *St. Cyr, Jaghoori* and *Church*, there is nothing being retroactively applied to past conduct here.  There is no retroactivity here.  This is a prospective fee.  If somebody wants to continue the process, they pay the fee.  I likened this previously to sort of like a property tax which the government issues all the time.  I also referenced the *Sunshine* case.  While I realize it's Eleventh Circuit, it's really more akin to something in the *Sunshine* case here where if someone seeks to continue, they must pay a fee.  The *Sunshine* case is an annual integrity fee.

Your Honor, so again, I would draw that significant distinction, especially when you're assessing *Landgraf*'s factor number 2.  That factor really states very explicitly is that if a statute attaches new legal consequences to events completed before its enactment.  Here it's distinguishable to all the other cases that the plaintiffs have referenced.

There's not a single case that talks about pending applications or a time that accrues for -- that a prospective fee being applied to time that accrues.  Simply that's because it is not generally considered retrospective under law.

THE COURT:  Okay.  I forgot to ask -- we focused a lot on likelihood of success.  Do you wish to address the irreparable harm or public interest factors?

MS. IQBAL:  Your Honor, again, we just reiterate our arguments here that with respect to a $100 fee, typically that is not generally considered a fee -- in the monetary loss not considered necessarily irreparable harm.  It doesn't amount to necessarily irreparable harm here.  Also I would point to -- I understand that there's concern here that there may not be refunds so can't speculate as to one way or another whether or not a refund might be possible.  You know, I can't say with certainty, rather.  The EOIR has stated that it has -- in its declaration, that it's willing to credit fees in different -- in the event that something was misapplied, is willing to do.

So there is a possibility that the $100, if paid erroneously or whatever the case, can be credited in other ways.  I do understand that asylum seekers also generally have multiple applications ongoing, family visa and things -- and then these fees, employment documentation fees, authorization fees.  So there are ways in which to credit potentially in the event that the $100 -- the Court rules that the $100 is

erroneous.  That's it, Your Honor.

THE COURT:  All right, thank you.

MR. GREGORY:  Thank you, Your Honor.  I guess the first thing I'd like to say is obviously we are always happy to talk with the Department of Justice about a potential agreement, we welcome that.  We need an order from the Court.  These fees at USCIS are due on -- is it Friday potentially? -- and people are at risk of removal or deportation.  Several days ago, they issued this declaration.  It still has not been implemented in the real world at EOIR.

My friend mentioned the shutdown.  Immigration judges are still hearing cases.  People are still at risk of this.  So while I would love to reach an agreement, I don't think that's realistic in the time that we need an order from the Court.  I would just like to point out Your Honor has the option of issuing a temporary restraining order or something of that nature to buy time for us to reach agreement with the Government.

I also want to point out -- you mentioned on page 10 of our brief a couple times so I pulled it up and looked at it. I want to make clear that relief is available for Count 3. That's our arbitrary and capricious claim 2 which goes against both agencies.  So the unreasonable delay claim we brought only against EOIR because of lack of a payment mechanism.  But Count 3 allows you to provide the same relief under Section

705 which gives the Court ample authority to stay an agency action to the extent necessary to preserve the status quo while the case is litigated.

So we would ask that if you adopt the remedy on page 10 -- again, we think you should hold the fee is not retroactive, period, but if you're not going to go there, we'd ask you to apply that both to USCIS and EOIR.

I want to make a few points about --

THE COURT:  I want to go back to -- because we had a lot of talk about EOIR this morning and a little bit less about USCIS except that some of the notices are not reaching the recipients because they're going to the wrong place.  Are the notices, when they are going to the right place, providing accurate deadlines, or are we still in the same boat where they don't really know when it's due?

MR. GREGORY:  I think no.  I think the notices don't include actual deadlines for the fees nor does the website.  Of course, this is a big problem.  Not only are you getting the notice in some instances very late because it went to your old attorney or got stuck in the mail, but you might think you have 30 days based on the agency representations when, in fact, you just got this two weeks after they sent it; the agency thinks your fee is due October 31st.  So this is a real problem the agencies have yet to address.

THE COURT:  When you're saying fees are due on

Friday, where is that coming from?

MR. GREGORY:  Because USCIS started sending the notices, according to their website, on October 1st and they said it's due 30 days later.  If I want to be conservative and think what's the worst case scenario here, it's 30 days after they sent the notice in the mail -- although I don't think they've been clear about that, not 30 days after somebody received it.  Again, for many of these people, even if they are received, they are receiving it a couple weeks later.

THE COURT:  Do you have any insight from the Government's perspective as to when fees are due?

MS. IQBAL:  The original USCIS notice indicated that the payment would be due within 30 days of receipt of notice. I have to double-check, but I think that between the USCIS's July Federal Register Notice and then the notice itself, it should be understood that it would be due by October 31st, so I think that was made clear.

If there has been some issues with mailing, I expect like in any case where a federal -- a fee is owed or due to a federal agency, that that individual -- if they believe themselves that they owe the fee and they haven't received any sort of notice, that they can still contact USCIS --

THE COURT:  Who is there or not there based on the shutdown?

MS. IQBAL:  USCIS is largely fee-funded so they --

EOIR isn't.  But USCIS is largely fee-funded so there should be staff that's reachable there.

THE COURT:  All right.  Can we get some clarification by the end of the day today about what is going on at USCIS?  Is it USCIS's intent to start enforcing these October 1st notices on October 31st, or is there some consideration being built in for when applicants receive the notice?  I don't think having something in the Federal Register is sufficient notice in these circumstances for an asylum applicant to have notice of when a fee would be due. So I'm more concerned about what is contained in the notice that was actually sent to the asylum applicants.

MS. IQBAL:  Yes, Your Honor.  We'll seek clarification for that as well.

THE COURT:  Okay.

MS. PELLETIER:  Your Honor, I would just share that our client has said that when people have tried to get clarity on this issue from USCIS, they have not been able to do so, on the due date of their specific deadline based on notice or not having received notice.  So it's not the case that someone can just call and get an answer at this point.

THE COURT:  Based on the fact that no one is there answering the phone?  Or based on the fact that when they get someone on the phone, they're not able to provide adequate responses?

MS. PELLETIER:  I'm not sure, but I know that this has been an issue where people have been trying to get this information and haven't been able to.

THE COURT:  Okay, all right.

MR. GREGORY:  Your Honor, all of these issues, again, are why we need an order by October 31st to prevent people from potentially having their application dismissed and then being deported for nonpayment of the fee which it seems like everyone here agrees should not be happening.  The Government itself seems to agree.  I think getting some sort of agreed resolution would be great, but we really need an order before that date.

So on the people that we've identified that have reached out to us that we know of who were ordered dismissed or deported because of nonpayment of the fee, we obviously don't know every immigration court, everything that's going on out there, so although my client is happy to be a vehicle to help the government resolve this issue, again, I think we need an order from the Court because the agency has the unique ability to determine who this has happened to.

I want to point out a couple other things in response to my friend's comments.  The revised policy at EOIR -- I want to put that in quotations -- is still not on the website.  I understand there's a shutdown but I don't understand why it would take that long.  They've made other updates to the

website in the meantime, including putting out the payment portal.  If I go there today, I'm going to see that July EOIR memo still.  You're not going to know whether the agency is going to send you notice or whether your fee is not currently due or when it will be due once they send notice.  None of that information is there.

We shouldn't be doing this in this courtroom.  People shouldn't be having to scribble notes and report what was said by DOJ attorneys.  This should be something the agency proactively goes out and does.  Again, this is why we need an order.

I do want to come back to retroactivity, if Your Honor will just bear with me on a few points there.  First, my friend said it's not retroactive because it's applied in 2025.  That's exactly what was going on in *Jaghoori*, *Vartelas,* other cases where there was some sort of post-enactment conduct that triggered the consequences of a statute.  The Supreme Court, Fourth Circuit said the fact that you can avoid it because it's actually happening to you in the future year doesn't mean it's not retroactive.

My friend mentioned they're collecting the fee on October 31st, 2025; I just want to be clear that's not fiscal year 2025.  Fiscal year 2025 ended on September 30th.  So, again, even under their interpretation, they're not collecting the fee in fiscal year 2025.

Another potential interpretation of that language in the statute could well be that Congress expected that if you filed an application, say, July 10th, August 1st of 2025, the fee that you owe would be for fiscal year 2025 because part of the time that was accruing was in fiscal year 2025.  So you would pay it, under our narrow interpretation, in July 2026, 365 calendar days later, but you would pay the fiscal year 2025 fee because that is a substantial amount of the time that your application remained pending.

These other fees, my colleague mentioned the government wouldn't collect any of them in fiscal year 2025 under our interpretation; that's simply not true.  All of them under -- of their own force apply prospectively to something that happens in fiscal year 2025.  For example, I go to the agency and I file my initial application or the government reaches out to me and paroles me into the United States.  That's subsection (a) again.  It's not the for-fiscal-year-2025 language.  But Congress is collecting all of those fees, under our interpretation, in fiscal year 2025.

She pointed out that this statute is intended to raise money from the immigration process.  That's undoubtedly true but that's not enough to overcome the presumption against retroactivity.  If you read the *Landgraf* decision, the court rejects that very argument.  Every statue could accomplish its purpose more fully -- is the quote in *Landgraf* -- if it

applied retroactively, but we assume as a background rule, Congress does not intend statutes to apply that way. Legislative history, I would submit, is also clearly off the table because this has to be in the text of the statute for it to matter under *Landgraf*.

I mentioned *Jaghoori* and *Vartelas*. My friend brought up *Martin*. Look, *Martin* is on all fours here on the narrower version of our retroactivity argument. It's just not the case that in *Martin* the attorney fees would not have been collected prospectively. In that case, the attorneys were requesting fees that would be paid after the statute was enacted. Congress said because you're counting, in my colleague's words, the time from before the statute, then it's retroactive. That's on all fours here, it's controlling precedent, certainly controls over the Eleventh Circuit's decision that my friend cited.

The last point that I'll address is the fact that the agency had authority to issue some immigration fees by rule before the statute was enacted. I'll just say that favors us. Agencies, even more so than Congress, cannot apply rules retroactively. So if they hadn't done so, you'd have no reason to expect an agency would try to impose a fee on you for time that your application had already been pending or for your initial decision to file an application.

I think my colleague, Ms. Pelletier, had a couple of

additional points.

THE COURT:  Sure.

MS. PELLETIER:  I was just going to note that Exhibit M from our rely brief is a copy of the USCIS notice. So if that would be helpful for Your Honor to review, I'd point you there.

THE COURT:  Good.

MS. PELLETIER:  We would just follow up on the exchange you had with our colleague about the withholding of removal and the CAT relief.  We certainly agree with them that the annual asylum fee and its payment or nonpayment shouldn't affect that, but we'd just note that the immigration judge in the examples that we provided did, in fact, treat it as cause to deny both of those claims as well, so it is extremely important that any notice would go to both of those issues.

THE COURT:  Okay.  At this point, I guess -- and I'll look at Exhibit M, I didn't bring it into the courtroom with me.  But that notice, I assume, at this point does not address what would happen to someone's CAT or withholding applications?

MS. PELLETIER:  No.  It just says that if you do not pay this fee, it may negatively affect your application including, but not limited to, a delay in processing so it's pretty vague.

THE COURT:  Okay.  All right.  I appreciate

everyone's presentations today; this was helpful.  I am going to take this under advisement, although I know there is some urgency to it.  I will look to get that additional information that we discussed today from the Government, hopefully by the end of the day today.

I certainly welcome the parties to have further discussion about a number of these issues including, but not limited to, once you've consulted with the appropriate parties, whether information can be provided about the persons who have already suffered some consequences for failure to pay the fees.  It seems like that would be something that potentially could be addressed in this way.  But even in terms of further steps that can be taken to try to effectuate some of this.

So I'm going to take this under advisement and look to get the additional information, and I will try to get a decision to the parties shortly.

MR. GREGORY:  Thank you, Your Honor.

MS. IQBAL:  Thank you.

THE COURT:  Thank you-all.

THE CLERK:  All rise.  This Court stands in recess.

(Proceedings concluded at 3:36 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia G. Mitchell, Registered Merit Reporter, Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 29th day of October 2025.


_____
Patricia G. Mitchell, RMR, CRR
Federal Official Reporter

**< Dates > .**

**29th day of October 2025.** 54:10 .

**April 1st, 2025,** 31:18, 31:23 .

**April 1st, 2026** 31:24, 32:2 .

**April,** 31:10 .

**July** 13:6, 13:18, 14:9, 14:10, 46:15, 49:2 .

**July 10th, August 1st of 2025,** 50:3 .

**July 2026** 7:13 .

**July 2026, 365** 50:6 .

**July 4th** 12:1, 12:2 .

**July 4th, 2025,** 7:6 .

**July 5th,** 7:11, 8:20 .

**March** 32:2 .

**October** 45:23 .

**October 1st** 46:3, 47:6 .

**October 1st, 2024** 31:16 .

**October 1st, 2024,** 24:10, 24:23, 25:5, 31:13 .

**October 28, 2025** 1:18 .

**October 31st** 10:11, 48:6 .

**October 31st,** 46:16, 47:6 .

**October 31st, 2025** 49:21 .

**October 31st, 2025** 24:25 .

**October 31st, 2025,** 24:9, 24:17, 24:19 .

**September** 49:23 .

**September 15th,** 9:23 .

**September 30th,** 9:21 .

**September 30th, 2025** 25:6 .

**September 30th, 2025** 31:13 .

**September 30th, 2025.** 24:10, 24:24 .

**$100** 8:4, 12:22, 17:16, 22:16, 43:9, 43:19, 43:25 .

**$50** 30:13 .

.

.

**< 0 > .**

**00** 13:6 .

.

.

**< 1 > .**

**1** 28:2 .

**1.1** 27:6 .

**10** 15:8, 19:21, 34:14, 37:18, 38:8, 44:19, 45:5 .

**1100** 1:44 .

**12** 9:5, 9:10, 9:11, 30:25, 31:1 .

**15-year-old** 39:17 .

**1700** 1:35 .

**1802** 5:14, 8:2, 8:3 .

**1808** 6:4, 8:3, 8:5 .

**1:** 1:9 .

.

.

**< 2 > .**

**2** 1:19, 2:2, 13:6, 42:22, 44:22 .

**20005** 1:45 .

**20036** 1:36 .

**2020** 30:12 .

**2025.** 26:1, 26:10 .

**2034** 27:7 .

**25** 2:2 .

**28** 54:5 .

.

.

**< 3 > .**

**3** 44:21, 44:25, 53:21 .

**3.4** 30:3 .

**30** 1:19, 10:14, 25:8, 38:13, 45:21, 46:4, 46:5, 46:7, 46:13 .

**30-day** 19:12 .

**30th** 49:23 .

**31st** 45:23 .

**36** 53:21 .

**365** 4:15, 7:11, 8:6, 8:18, 8:21, 10:24 .

.

.

**< 5 > .**

**5-cv-03299-sag** 1:9 .

.

.

**< 7 > .**

**70302(f)(1)(c** 11:20 .

**705** 45:1 .

**75** 23:5 .

**753** 54:5 .

**7C** 1:24 .

**[sic]** 30:3 .

.

.

**< A > .**

**A-number** 21:12 .

**A.** 1:23 .

**AAF** 42:2 .

**abandoning** 17:13 .

**ability** 18:2, 48:19 .

**able** 14:22, 19:8, 20:19, 21:11, 21:12, 21:13, 32:24, 33:2, 33:8, 34:19, 35:10, 36:14, 37:11, 47:18, 47:24, 48:3 .

**above-entitled** 54:7 .

**Absent** 17:7 .

**absorb** 29:9 .

**accomplish** 50:24 .

**According** 31:20, 46:3 .

**account** 18:24 .

**accrued** 25:15, 25:17 .

**accrues** 43:2, 43:3 .

**accruing** 50:5 .

**accurate** 37:3, 45:14 .

**acknowledge** 22:1 .

**Act** 4:3, 11:18, 23:2, 30:15 .

**action** 33:23, 34:11, 34:22, 36:25, 38:1, 40:1, 40:6, 45:2 .

**actual** 19:9, 20:17, 21:13, 45:17 .

**actually** 4:10, 9:15, 12:23, 13:7, 14:5, 16:19, 19:8, 20:3, 27:15, 30:20, 47:12, 49:19 .

**add** 28:3, 35:11 .

**added** 14:18 .

**addition** 16:4, 17:6, 26:20 .

**additional** 52:1, 53:3, 53:15 .

**address** 2:19, 12:17, 14:25, 20:3, 24:3, 39:17, 39:20, 43:6, 45:24, 51:17, 52:19 .

**addressed** 53:12 .

**addresses** 20:19 .

**addressing** 19:20, 19:23 .

**adequate** 15:11, 19:22, 19:24, 34:16, 37:22, 38:11, 39:7, 39:10, 39:14, 47:24 .

**adequately** 38:24 .

**adjudicate** 30:5 .

**adjudication** 23:6, 29:21, 30:17, 30:18 .

**adjust** 8:4 .

**adjustment** 5:24, 8:10, 11:24 .

**adopt** 14:12, 45:4 .

**adopted** 6:9, 11:7, 13:18, 32:12 .

**adverse** 15:10, 19:21, 34:15, 35:12, 36:22, 37:20, 38:1, 38:17, 38:22, 39:13, 40:3 .

**advice** 28:19, 28:20 .

**advisement** 53:2, 53:14 .

**Advocacy** 1:5, 2:4 .

**affect** 42:8, 52:12, 52:22 .

**affected** 33:19, 33:23 .

**affirmative** 6:8 .

**affirmatively** 5:6, 11:24 .

**afford** 23:20 .

**aftermath** 22:15 .

**afternoon** 2:3, 2:10, 2:13, 24:1, 24:2, 37:12, 40:9 .

**Agencies** 2:22, 17:18, 17:20, 17:23, 20:22, 44:23, 45:24, 51:20 .

**agency** 3:15, 10:22, 10:23, 11:4, 11:8, 12:23, 19:11, 19:13, 20:20, 21:15, 34:10, 38:16, 45:1, 45:21, 45:23, 46:20, 48:19, 49:3, 49:9, 50:14, 51:18, 51:22 .

**agnostic** 4:10 .

**ago** 10:15, 21:8, 29:13, 44:9 .

**agree** 9:14, 24:17, 36:14, 48:10, 52:10 .

**agreed** 38:4, 48:11 .

**agreement** 9:11, 34:24, 35:5, 35:9, 36:21, 37:9, 37:14, 37:15, 37:16, 37:23, 39:13, 44:6, 44:13, 44:17 .

**agrees** 9:15, 48:9 .

**akin** 24:11, 42:17 .

**al** 1:11 .

**alleged** 28:4 .

**alleging** 5:20, 25:14 .

**alleviate** 36:10 .

**allow** 7:21 .

**allowed** 17:24, 23:5 .

**Allowing** 23:8 .

**allows** 44:25 .

**already** 9:5, 18:11, 28:21, 33:15, 35:1, 38:17, 38:23, 39:1, 39:11, 51:23, 53:9 .

**although** 33:20, 41:16, 46:6, 48:17, 53:2 .

Altizer 10:2 .
among 12:15 .
amount 4:9, 5:9, 5:16, 5:25, 8:8, 26:9, 26:12, 32:24, 43:11, 50:8 .
ample 45:1 .
Andrew 1:33, 2:9 .
anniversary 20:15 .
annual 8:6, 8:7, 8:22, 17:11, 18:12, 18:21, 19:22, 22:10, 24:5, 25:21, 25:22, 26:16, 27:4, 27:5, 30:2, 34:16, 41:15, 41:17, 42:19, 52:11 .
answer 12:3, 47:21 .
answering 47:23 .
APA 13:17, 14:11 .
apparently 38:24 .
appeared 30:24 .
appears 2:23, 2:24, 9:22 .
applicant 4:11, 4:14, 7:5, 9:6, 18:5, 19:14, 21:4, 25:2, 25:9, 28:6, 47:10 .
applicants 8:15, 15:18, 16:3, 18:17, 19:5, 21:21, 25:22, 29:11, 29:19, 47:7, 47:12 .
applications 5:3, 6:19, 7:16, 12:1, 12:2, 16:6, 16:11, 18:4, 20:13, 24:23, 26:22, 26:24, 27:8, 27:11, 27:22, 27:24, 30:3, 30:6, 31:7, 43:2, 43:22, 52:20 .
applied 5:20, 6:5, 6:15, 6:16, 6:23, 10:4, 10:6, 21:7, 24:7, 24:13, 24:16, 24:22, 24:24, 25:21, 27:16, 27:24, 28:3, 28:7, 28:16, 28:18, 28:24, 42:11, 43:3, 49:14, 51:1 .
applies 4:7, 4:17, 6:2, 18:4, 23:1, 24:21 .
apply 4:18, 5:3, 5:7, 5:19, 6:5, 6:6, 6:19, 10:1, 10:20, 11:18, 11:24, 16:7, 16:14, 18:2, 23:5, 26:23, 41:16, 45:7, 50:13, 51:2, 51:20 .
applying 12:14, 24:5, 31:4 .
appreciate 34:5, 36:7, 52:25 .
appropriate 53:8 .
appropriations 32:15, 32:16, 32:25 .

arbitrary 12:12, 13:17, 44:22 .
areas 3:17 .
argued 13:4 .
argues 18:19 .
arguing 4:18 .
argument 7:5, 7:7, 7:10, 7:19, 8:22, 9:3, 11:13, 12:6, 15:15, 29:2, 29:4, 29:5, 50:24, 51:8 .
arguments 3:12, 7:4, 16:16, 24:4, 43:9 .
ASAP 17:8, 22:24, 33:22 .
aspect 39:19 .
assessing 18:23, 42:21 .
assigned 24:8, 24:19, 24:24 .
assume 33:25, 51:1, 52:18 .
assumes 7:20 .
assuming 12:21 .
assurance 35:12, 35:15 .
attaches 28:5, 42:23 .
attempted 30:11, 30:12 .
attention 26:1, 26:5 .
attorney 12:18, 16:9, 28:17, 28:19, 29:2, 39:8, 45:20, 51:9 .
attorneys 49:9, 51:10 .
authority 30:14, 30:16, 30:18, 30:19, 45:1, 51:18 .
authorization 43:23 .
available 22:7, 22:8, 44:21 .
avenue 25:10 .
avenues 41:16, 41:18, 41:23 .
avoid 15:19, 49:18 .
aware 13:9, 14:24, 18:9, 33:11 .
away 30:21, 39:8 .
Azrak 1:42, 2:12 .

.
.
< B > .
b)(1 4:5, 7:20 .
back 15:14, 16:2, 16:9, 33:4, 34:6, 36:12, 45:9, 49:12 .
background 51:1 .
balance 22:22 .
Baltimore 1:17 .
bar 20:12 .
Barron 1:33, 2:9 .

base 13:20 .
Based 3:7, 23:9, 25:16, 31:21, 32:19, 34:12, 38:10, 45:21, 46:23, 47:19, 47:22, 47:23 .
baseline 5:8, 6:1, 7:21, 7:24, 8:4, 26:12 .
basically 5:8 .
basis 20:10 .
bear 49:13 .
Beautiful 4:3, 11:18, 23:2 .
become 25:8 .
becoming 15:3 .
beginning 2:19, 24:16 .
believe 14:4, 17:20, 33:16, 46:20 .
believes 19:11 .
better 14:23, 40:23 .
Big 4:3, 11:17, 23:2, 45:18 .
Bill 4:3, 11:18, 23:2, 29:22, 29:23, 29:25, 30:9 .
billion 27:6 .
bit 33:1, 33:18, 41:4, 45:10 .
blocking 21:19 .
boat 45:14 .
bono 12:15 .
brief 13:10, 14:17, 16:6, 44:20, 52:4 .
briefly 17:9, 21:24 .
briefs 17:14 .
bring 52:17 .
broader 7:5 .
brought 44:23, 51:6 .
Budget 27:2 .
built 16:1, 47:7 .
buy 44:17 .
.
.
< C > .
c)(1 4:5 .
C. 54:5 .
calculate 26:12 .
calculated 24:22 .
calculation 7:21 .
calendar 4:15, 9:17, 31:22, 50:7 .
call 7:5, 7:7, 36:1, 47:21 .
capabilities 32:17, 32:21 .
capability 35:3 .
capricious 12:12, 13:18,

44:22 .
cases 8:15, 10:2, 11:4, 12:19, 13:9, 15:21, 22:1, 42:25, 44:12, 49:16 .
CAT 16:12, 41:12, 41:19, 41:23, 52:10, 52:19 .
cause 52:13 .
CBO 27:3, 27:4, 27:9 .
certain 36:13, 38:20, 39:15 .
Certainly 8:1, 9:14, 34:5, 51:15, 52:10, 53:6 .
certainty 43:16 .
CERTIFICATE 54:1 .
Certified 54:3 .
certify 54:4 .
Cesar 1:42, 2:12 .
cessation 14:2, 15:2 .
change 12:20, 32:14, 32:23, 41:3, 41:9, 41:25 .
changed 18:16, 41:23 .
changes 2:21, 3:4, 28:17 .
changing 40:15 .
characterizes 18:22 .
checked 13:5 .
Chenery 13:22 .
choice 6:8, 9:6, 15:18, 16:3, 16:17, 29:7 .
choices 22:17 .
Church 10:2, 28:9, 28:10, 42:10 .
Circuit 6:21, 10:3, 10:5, 15:21, 16:20, 42:16, 49:18, 51:15 .
circumstance 35:17, 39:10, 39:15 .
circumstances 20:6, 22:2, 42:9, 47:9 .
cite 19:2 .
cited 26:19, 27:2, 51:16 .
citizens 29:23, 30:8 .
CITIZENSHIP 1:10 .
Civil 1:8, 1:43 .
claim 12:12, 12:13, 13:4, 13:14, 13:17, 14:20, 14:21, 15:1, 15:2, 17:13, 17:25, 18:1, 38:4, 44:22, 44:23 .
claims 12:12, 13:17, 20:11, 23:6, 23:8, 52:14 .
clarification 11:12, 30:23, 47:4, 47:14 .

clarity 8:13, 16:19, 47:17 .

clear 3:13, 3:16, 5:2, 6:17, 7:1, 7:15, 7:25, 9:1, 9:15, 10:12, 16:10, 16:16, 16:21, 19:12, 20:7, 21:14, 21:15, 22:6, 24:4, 26:1, 29:18, 38:12, 44:21, 46:7, 46:17, 49:22 .

clearly 3:9, 9:1, 10:1, 11:21, 17:7, 19:1, 22:23, 26:21, 51:3 .

CLERK 53:20 .

client 17:7, 34:2, 36:12, 36:17, 37:10, 37:12, 39:9, 47:17, 48:17 .

clients 12:16, 37:7 .

closed 39:8 .

cognizable 21:25 .

colleague 10:8, 12:10, 17:2, 18:14, 50:10, 51:12, 51:25, 52:9 .

colleagues 16:25 .

collect 7:23, 10:10, 10:19, 23:17, 26:14, 50:11 .

collected 4:22, 5:10, 10:17, 24:18, 24:20, 27:8, 31:7, 51:9 .

collectible 22:4 .

collecting 10:9, 23:15, 49:21, 49:24, 50:18 .

coming 16:5, 17:16, 22:16, 37:8, 46:1 .

comments 48:22 .

committed 12:24 .

Committee 26:18, 26:19, 27:1, 29:22 .

communicated 38:24, 39:2, 39:4 .

communicating 12:8, 33:12 .

communication 3:3, 40:6, 41:2 .

completed 42:24 .

comply 15:24, 18:25 .

Computer-aided 1:50 .

concern 3:18, 36:24, 40:2, 43:13 .

concerned 12:21, 35:22, 35:24, 36:4, 47:11 .

concerns 36:6, 36:7, 42:8 .

concluded 53:21 .

conduct 5:12, 6:7, 6:16, 42:11, 49:16 .

Conference 54:9 .

confident 38:25, 39:5 .

confirm 24:5 .

conformance 54:8 .

confusion 12:8, 13:19, 36:10 .

Congressional 3:12, 27:2 .

consent 34:18, 37:14 .

consequence 38:1 .

consequences 15:10, 15:23, 17:13, 17:23, 18:7, 18:25, 19:21, 22:14, 28:6, 34:9, 34:15, 35:13, 36:22, 37:21, 38:17, 38:22, 39:13, 40:3, 42:23, 49:17, 53:10 .

conservative 46:4 .

consider 8:24, 37:25 .

consideration 47:7 .

considered 5:6, 6:9, 43:4, 43:10, 43:11 .

consistency 32:20 .

consistent 32:13, 33:9 .

constitute 39:10 .

constraints 36:13 .

consult 37:7 .

consulted 53:8 .

contact 11:4, 32:11, 46:22 .

contained 47:11 .

context 5:23 .

continuation 24:12 .

continue 9:12, 29:8, 42:13, 42:18 .

contrast 23:13 .

control 8:17 .

controlling 51:14 .

controls 51:15 .

convinced 5:6 .

coordinating 32:20 .

copies 33:16 .

copy 5:8, 11:23, 52:4 .

core 12:13 .

Correct 15:12, 28:22, 32:18, 32:19, 35:2, 37:16, 54:6 .

corrected 38:18 .

correcting 38:25 .

corrective 33:23, 34:11, 34:22, 37:25 .

cost 22:8, 30:5 .

Counsel 2:5 .

Count 4:15, 7:17, 10:24, 18:19, 44:21, 44:25 .

counting 7:10, 51:12 .

country 16:2, 18:5, 23:3, 23:4, 23:5 .

counts 25:15 .

couple 11:11, 40:12, 44:20, 46:9, 48:21, 51:25 .

course 3:24, 14:19, 20:12, 20:22, 32:14, 45:18 .

Courtroom 1:24, 49:7, 52:17 .

courts 22:18 .

cover 34:5 .

covers 42:4 .

created 13:19 .

creating 22:20 .

credit 43:17, 43:24 .

credited 43:20 .

critical 23:7 .

CRR 54:16 .

Crutcher 1:34 .

cumulatively 31:4 .

current 25:21, 26:23, 27:10, 27:24, 34:21, 35:17 .

currently 3:14, 30:3, 30:13, 38:8, 49:4 .

Cyr 28:9, 42:10 .

.

.

< D > .

date 7:11, 7:16, 7:18, 9:22, 20:13, 20:15, 21:13, 24:7, 27:16, 27:20, 31:22, 39:12, 47:19, 48:12 .

Dated 54:10 .

day 47:4, 53:5 .

days 4:15, 7:11, 8:6, 8:18, 8:21, 10:14, 10:15, 10:24, 25:8, 38:13, 44:9, 45:21, 46:4, 46:5, 46:7, 46:13, 50:7 .

DC 1:36, 1:45 .

deadline 19:25, 47:19 .

deadlines 45:14, 45:17 .

deal 28:18, 28:20 .

death 18:7 .

debate 14:2 .

decade 8:15 .

decide 4:13, 11:24, 25:3 .

decided 5:7, 8:16, 9:8, 9:23, 11:6, 29:13 .

deciding 20:10 .

decision 6:21, 13:20, 19:6, 28:6, 29:16, 50:23, 51:16, 51:24, 53:15 .

decision-makers 12:9, 36:25, 39:2, 39:3 .

decisions 3:6, 3:7, 3:14, 3:15, 16:4 .

declaration 14:4, 15:5, 18:9, 18:15, 33:21, 38:12, 43:17, 44:9 .

declarations 17:15 .

decrease 27:6 .

Defendants 1:13, 1:39, 2:11, 2:12 .

deficit 27:6 .

delay 12:13, 13:4, 14:21, 44:23, 52:23 .

delayed 23:14 .

demand 19:1 .

Denial 18:1 .

denied 17:25, 18:11 .

deny 23:8, 52:14 .

Department 1:43, 22:25, 44:5 .

depending 4:6 .

depends 20:9 .

deportation 33:16, 44:8 .

deported 33:16, 48:8, 48:15 .

despite 19:18, 26:14 .

determination 20:20 .

determine 33:18, 48:20 .

DHS 30:12, 30:14 .

dictates 23:2 .

different 9:20, 11:18, 14:7, 20:6, 25:10, 30:19, 32:21, 40:21, 40:22, 41:6, 41:16, 43:17 .

differentiates 28:8 .

difficult 16:18, 17:17, 33:1, 33:18 .

difficulty 29:10 .

direct 14:4, 26:5 .

direction 20:21 .

disagreeing 13:14 .

disagreement 34:17 .

discretion 30:21 .

discuss 36:16, 37:10, 39:20 .

discussed 17:19, 33:10, 53:4 .

discussion 53:6 .

disenrolled 27:18 .
dismiss 23:8 .
dismissed 13:11, 48:7, 48:14 .
disseminated 35:9 .
distinction 26:2, 42:21 .
distinguishable 42:24 .
District 1:1, 1:2, 54:4 .
Division 1:3, 1:43 .
doctrinal 22:6 .
documentation 33:14, 43:23 .
doing 11:14, 32:18, 32:19, 49:7 .
DOJ 49:9 .
done 4:20, 8:8, 13:8, 14:8, 14:23, 34:18, 40:16, 51:21 .
double-check 46:14 .
dozen 12:16, 26:15 .
draw 42:20 .
ducks 34:24 .
due 4:11, 4:13, 17:21, 18:13, 20:20, 21:1, 21:5, 21:8, 21:17, 21:20, 25:8, 36:24, 40:16, 44:7, 45:15, 45:23, 45:25, 46:4, 46:11, 46:13, 46:16, 46:19, 47:10, 47:19, 49:5 .
Dunn 1:34, 12:15 .
during 22:10, 24:20, 27:8 .
during. 26:3 .
.
.

< E >.
Earlier 32:1, 39:6 .
earliest 7:12, 10:10 .
early 10:12 .
economic 17:10, 17:11, 21:25, 22:1, 22:14, 23:13 .
Education 22:25 .
effective 17:19, 24:7, 24:8, 24:19, 24:25, 27:19 .
effectively 8:14, 8:23 .
effectuate 53:13 .
either 7:8, 14:17, 15:24, 39:10 .
Election 11:20 .
Eleventh 42:16, 51:15 .
emphasize 28:2, 42:7 .
employees 18:18 .

employment 43:23 .
enacted 35:19, 51:11, 51:19 .
enacting 27:4 .
enactment 7:11, 7:17, 7:18, 8:25, 20:13, 20:15, 24:8, 25:15, 42:24 .
encompasses 17:12 .
end 13:13, 22:4, 22:7, 22:13, 22:20, 23:22, 40:9, 47:4, 53:5 .
ended 49:23 .
ends 34:25 .
enforce 3:14 .
enforcing 47:5 .
enough 4:21, 6:23, 7:1, 9:1, 10:6, 13:23, 50:22 .
enrollment 27:18 .
ensure 30:4, 38:16 .
ensures 8:7 .
ensuring 33:10 .
enter 15:9, 21:12, 37:15, 37:19 .
entering 34:23, 35:4 .
entirely 8:16, 32:15 .
equities 22:23 .
erroneous 3:7, 44:1 .
erroneously 43:20 .
especially 42:21 .
Esquire 1:31, 1:32, 1:33, 1:41, 1:42 .
established 17:14 .
estimate 27:2, 27:3 .
estimated 27:4, 30:3 .
et 1:11 .
event 43:18, 43:25 .
events 42:23 .
everybody 8:18 .
everyone 2:4, 9:10, 19:10, 48:9, 53:1 .
everything 48:16 .
everywhere 8:11 .
evidence 22:15 .
exact 26:9 .
Exactly 20:1, 49:15 .
exaggeration 18:6 .
example 5:13, 9:4, 11:19, 50:14 .
examples 52:13 .
except 45:11 .
exception 14:2 .

exchange 52:9 .
excuse 4:25, 24:25, 25:22, 28:16 .
Exhibit 18:9, 52:4, 52:17 .
exigencies 17:22 .
exist 3:3 .
existed 30:18 .
existing 30:19 .
exists 14:15, 14:16 .
expect 46:18, 51:22 .
expectation 40:25 .
expectations 29:3 .
expected 50:2 .
experience 23:14 .
expires 19:12 .
explained 22:24, 41:14 .
explicit 25:20, 28:23 .
explicitly 26:22, 27:14, 42:22 .
expressed 26:18 .
expressly 7:2, 7:25 .
extent 14:3, 35:8, 45:2 .
extreme 9:18, 16:17, 17:11 .
extremely 15:24, 16:3, 52:14 .
.
.

< F >.
face 16:2, 17:8, 22:14, 35:12, 40:2 .
faced 33:15, 34:9, 35:16, 38:1, 38:17, 38:22 .
fact 6:22, 8:12, 9:24, 13:22, 18:20, 26:14, 27:15, 45:22, 47:22, 47:23, 49:18, 51:17, 52:13 .
factor 26:17, 28:2, 42:22 .
factors 17:6, 43:7 .
facts 10:3, 17:14 .
failing 17:19, 18:25 .
failure 15:10, 18:11, 19:22, 23:9, 34:15, 35:13, 36:23, 37:1, 37:21, 38:2, 38:22, 39:13, 41:11, 53:10 .
fair 23:6 .
families 22:18 .
family 43:22 .
fanciful 18:8 .
far 2:22, 3:11, 22:6, 34:22, 37:25, 38:5 .

favor 17:7, 22:23 .
favors 51:19 .
Federal 13:21, 14:10, 46:15, 46:19, 46:20, 47:8, 54:17 .
fee-funded 46:25, 47:1 .
feeding 22:18 .
few 10:15, 10:19, 45:8, 49:13 .
file 8:20, 10:21, 11:1, 31:15, 31:18, 50:15, 51:24 .
filed 2:16, 2:21, 4:14, 5:4, 7:5, 11:25, 14:4, 14:17, 15:5, 16:6, 20:13, 31:10, 31:22, 31:23, 33:17, 50:2 .
filers 8:19, 8:20 .
filing 5:13, 24:6, 28:13, 32:12 .
financial 20:5 .
find 41:6 .
firm 19:25 .
First 11:9, 17:10, 17:16, 17:23, 18:23, 24:3, 24:4, 27:17, 30:10, 31:6, 37:10, 44:4, 49:13 .
Fiscal 3:13, 4:23, 5:11, 5:21, 5:25, 6:5, 7:20, 7:23, 8:4, 10:10, 10:17, 24:18, 24:21, 31:8, 31:9, 31:10, 49:22, 49:23, 49:25, 50:4, 50:5, 50:7, 50:11, 50:14, 50:19 .
fits 9:25 .
fix 13:22 .
fixed 13:25, 14:3 .
fled 18:5 .
floor 2:19 .
flow 11:1, 18:17 .
flows 12:14, 18:20 .
focus 3:10, 40:2 .
focused 20:16, 43:5 .
follow 4:2, 4:4, 52:8 .
followed 33:6, 40:3 .
following 17:12, 23:1, 23:2 .
foot 30:9 .
footing 29:23, 29:25 .
for-fiscal-year-2025 3:23, 50:17 .
forbidding 15:9, 19:21, 34:14, 37:20 .
force 22:17, 50:13 .

**forced** 9:19 .
**foreclosed** 23:21 .
**foregoing** 54:5 .
**forgot** 43:5 .
**form** 16:13, 41:6, 41:15, 41:17 .
**formal** 40:16 .
**format** 54:8 .
**forward** 4:15, 10:24, 16:8, 23:21, 32:5 .
**fours** 51:7, 51:14 .
**Fourth** 6:21, 10:3, 10:5, 15:21, 16:20, 49:18 .
**frequency** 36:14 .
**Friday** 44:7, 46:1 .
**friend** 44:11, 48:22, 49:14, 49:21, 51:6, 51:16 .
**front** 35:18 .
**Frosh** 19:2 .
**full** 4:15, 8:18, 23:6, 31:8, 31:9 .
**fully** 50:25 .
**fundamental** 11:1 .
**funded** 32:15 .
**future** 25:21, 49:19 .
**FY** 24:9, 26:1, 26:10, 26:11 .

.
.

**< G >.**
**G.** 1:33, 54:2, 54:16 .
**GALLAGHER** 1:23 .
**gave** 8:18 .
**generally** 43:4, 43:10, 43:21 .
**getting** 32:8, 35:23, 36:1, 41:21, 45:18, 48:10 .
**Gibson** 1:34, 12:15 .
**give** 8:18, 23:16, 28:19, 32:7, 34:3 .
**Given** 21:1, 32:13, 37:6 .
**gives** 25:9, 45:1 .
**goal** 30:4 .
**gotten** 32:9, 40:14 .
**great** 48:11 .
**greatly** 23:11 .
**GREGORY** 1:31, 2:7, 3:20, 5:22, 6:12, 7:3, 8:1, 8:20, 9:14, 11:16, 12:10, 13:16, 14:1, 14:10, 14:16, 15:12, 15:14, 15:17, 16:24, 17:2, 34:2, 44:3, 45:16, 46:2, 48:5, 53:17 .

**ground** 17:22 .
**groups** 23:12 .
**guess** 5:18, 19:24, 44:3, 52:16 .
**guidance** 40:17, 41:21 .

.
.

**< H >.**
**Hadix** 28:14, 28:15 .
**happen** 52:19 .
**happened** 39:1, 39:12, 48:20 .
**happening** 32:7, 48:9, 49:19 .
**happens** 50:14 .
**happy** 3:19, 12:3, 36:16, 39:20, 44:4, 48:17 .
**hard** 22:17 .
**hardship** 17:11, 23:13 .
**harm** 12:11, 15:3, 17:3, 17:9, 17:12, 18:19, 18:24, 22:1, 22:13, 22:20, 43:7, 43:11, 43:12 .
**harms** 17:10, 21:25, 22:19, 23:14 .
**harsh** 15:18, 15:24, 16:3 .
**hear** 3:9, 3:18, 12:7 .
**heard** 17:1 .
**HEARING** 1:22, 2:14, 2:17, 37:23, 44:12 .
**heat** 22:18 .
**heavily** 28:10 .
**held** 54:7 .
**help** 48:17 .
**helpful** 2:17, 40:11, 52:5, 53:1 .
**hereby** 54:4 .
**history** 51:3 .
**hold** 45:5 .
**home** 18:5 .
**HONORABLE** 1:23 .
**hook** 3:24, 4:20 .
**hope** 10:13 .
**hopefully** 53:4 .
**House** 26:18, 26:25 .
**hump** 7:1 .

.
.

**< I >.**
**idea** 25:7 .

**ideally** 20:17 .
**identified** 48:13 .
**identify** 2:6, 33:19 .
**immediate** 22:15, 23:14, 40:6 .
**immediately** 41:1 .
**immigrants** 29:24 .
**Immigration** 1:11, 4:4, 11:7, 17:12, 17:23, 18:10, 20:24, 20:25, 21:22, 25:11, 26:5, 26:7, 30:9, 30:15, 33:11, 41:20, 44:11, 48:16, 50:21, 51:18, 52:12 .
**impact** 41:18, 42:3 .
**impermissibly** 25:14, 25:18, 28:25 .
**implementation** 28:4 .
**implemented** 44:10 .
**implementing** 3:16 .
**import** 11:23 .
**important** 20:21, 52:15 .
**importantly** 3:5 .
**imported** 4:1 .
**impose** 9:11, 16:22, 23:10, 30:22, 51:22 .
**imposed** 33:4, 36:22, 39:14 .
**imposing** 15:9, 19:21, 29:14, 34:15, 37:20 .
**impossible** 16:8, 17:18, 18:14, 22:9 .
**include** 27:10, 45:17 .
**including** 18:14, 20:23, 26:16, 49:1, 52:23, 53:7 .
**inconsistent** 13:18 .
**increase** 27:5 .
**increased** 26:8 .
**indicate** 26:12, 28:22 .
**indicated** 29:22, 33:20, 33:21, 46:12 .
**indicates** 26:23 .
**indication** 6:6 .
**indicator** 7:15 .
**indistinguishable** 42:9 .
**individual** 17:25, 18:2, 18:20, 46:20 .
**individuals** 17:20, 19:9, 20:12, 21:1, 33:15, 33:19, 33:22, 34:3 .
**ineligible** 41:12 .
**inflation** 5:24, 8:5, 8:10,

11:24 .
**information** 21:15, 21:17, 33:22, 35:23, 37:3, 39:20, 40:14, 48:3, 49:6, 53:3, 53:9, 53:15 .
**informing** 20:24 .
**initial** 2:17, 8:3, 8:7, 8:21, 10:21, 11:1, 13:1, 26:9, 28:8, 29:20, 30:12, 30:17, 33:16, 34:10, 50:15, 51:24 .
**initially** 40:17 .
**injunction** 2:15, 17:6, 34:19 .
**injunctive** 13:24 .
**insight** 46:10 .
**instance** 28:11, 28:15 .
**instances** 14:24, 18:10, 19:16, 45:19 .
**instructions** 20:7 .
**instructive** 28:15 .
**integrity** 42:19 .
**intend** 5:19, 27:9, 51:2 .
**intended** 7:22, 8:14, 9:2, 9:19, 26:11, 26:23, 50:20 .
**intent** 3:13, 3:16, 25:20, 26:13, 26:17, 27:24, 29:18, 47:5 .
**interchangeable** 26:4 .
**interest** 22:23, 22:25, 23:7, 23:11, 43:7 .
**interpretation** 8:6, 9:16, 9:20, 9:25, 10:9, 10:11, 10:16, 20:23, 49:24, 50:1, 50:6, 50:12, 50:19 .
**interrupt** 12:5 .
**involved** 20:24 .
**Irreparable** 12:11, 17:3, 17:8, 18:24, 22:1, 22:13, 22:20, 43:7, 43:11, 43:12 .
**irrevocable** 16:4 .
**issue** 3:22, 12:7, 19:24, 20:16, 20:18, 23:16, 30:11, 30:12, 30:16, 32:24, 33:10, 38:15, 47:18, 48:2, 48:18, 51:18 .
**issued** 13:21, 26:8, 38:13, 38:14, 39:22, 40:13, 44:9 .
**issues** 18:17, 39:11, 42:15, 46:18, 48:5, 52:15, 53:7 .
**issuing** 15:4, 35:2, 41:6, 44:16 .

itself 41:4, 46:15, 48:10 .

< J > .
Jaghoori 6:22, 10:2, 28:9, 42:10, 49:15, 51:6 .
joint 36:11, 36:19 .
judge 52:12 .
judges 3:5, 20:24, 21:22, 33:11, 33:12, 36:25, 40:6, 41:21, 44:11 .
Judicial 54:8 .
Judiciary 26:18, 27:1, 29:22 .
July 14:11 .
Justice 1:43, 44:5 .

< K > .
keeping 22:18 .
kind 9:19, 29:20, 30:9, 34:9 .
knowing 21:22 .
knowledge 4:17, 11:6, 14:3 .
known 29:3 .

< L > .
lack 44:24 .
lacking 10:23 .
Landgraf 28:1, 42:21, 50:23, 50:25, 51:5 .
language 3:23, 4:1, 5:2, 5:16, 5:21, 6:9, 6:25, 11:18, 11:23, 15:7, 25:19, 25:24, 26:9, 26:16, 27:14, 27:21, 34:13, 50:1, 50:18 .
lapse 32:14, 32:25 .
large 23:12, 35:15, 36:3 .
largely 46:25, 47:1 .
last 38:15, 51:17 .
late 14:17, 45:19 .
later 8:6, 8:21, 13:3, 13:22, 30:17, 46:4, 46:9, 50:7 .
law 16:21, 18:22, 19:18, 23:1, 43:4 .
lawful 29:24 .
learn 10:14 .
least 3:25, 11:2, 13:2, 18:10, 19:24, 38:4, 38:22, 41:8 .
left 3:21, 13:15 .
legal 12:12, 12:14, 22:5, 25:11, 28:6, 29:24, 42:23 .
Legislative 51:3 .
legitimate 3:2 .
lengthy 9:9 .
less 3:11, 45:10 .
letting 2:19 .
levels 40:22 .
lies 36:24 .
life 16:1, 18:7 .
likelihood 17:6, 22:3, 43:6 .
likely 20:11, 23:21 .
likened 42:13 .
limbo 9:8, 37:2 .
limitations 18:3 .
limited 2:16, 29:9, 32:17, 35:22, 52:23, 53:7 .
Lindh 4:24 .
lines 6:18 .
linger 12:19 .
list 17:9 .
listed 26:6, 41:19 .
litigated 45:3 .
litigation 14:5, 22:4, 22:7, 22:11, 22:13, 22:20, 23:15, 23:22, 40:14 .
little 32:25, 33:18, 41:4, 45:10 .
LLP 1:34 .
log 20:19, 21:7, 21:9, 21:18 .
logistically 22:8 .
logs 21:4 .
long 9:7, 10:20, 29:14, 48:25 .
long-standing 23:3 .
Look 4:12, 4:13, 6:14, 6:21, 51:7, 52:17, 53:3, 53:14 .
looked 44:20 .
looks 21:12 .
loss 18:2, 29:9, 43:10 .
lot 12:22, 15:20, 43:6, 45:10 .
love 44:13 .
Lyons 5:1 .

< M > .
M. 1:32 .
ma'am 31:12, 31:17 .
mail 39:16, 45:20, 46:6 .
mailed 39:17 .
mailing 39:19, 46:18 .

main 3:23, 40:2 .
manner 14:13, 14:23 .
Martin 6:14, 28:14, 51:7, 51:9 .
Maryland 1:2, 1:17, 54:4 .
Matt 1:31, 2:7, 3:20 .
matter 13:24, 22:6, 51:5, 54:7 .
mean 7:2, 25:18, 26:13, 49:19 .
meaning 20:6 .
meaningful 14:19, 15:11, 19:23, 20:4, 23:17, 34:17, 37:22, 38:9 .
meaningfully 23:10 .
meant 10:20 .
meantime 49:1 .
measures 38:23 .
mechanism 10:15, 14:15, 14:16, 14:18, 21:19, 38:11, 44:24 .
mechanisms 32:22, 35:13 .
Medicare 27:17 .
members 17:8, 22:24, 35:10 .
memo 13:21, 14:7, 14:9, 14:10, 40:13, 40:17, 40:20, 40:24, 41:4, 49:3 .
memos 35:19 .
mentioned 3:22, 4:21, 4:25, 6:18, 19:10, 26:7, 41:7, 44:11, 44:19, 49:21, 50:10, 51:6 .
merely 26:11 .
Merit 54:2 .
message 41:7 .
messages 35:11 .
messaging 35:23 .
midst 32:19 .
millions 22:9, 30:6 .
minimum 8:17 .
misapplied 43:18 .
mistake 12:14 .
mistakenly 27:18 .
misunderstands 19:4 .
Mitchell 54:2, 54:16 .
monetary 43:10 .
money 19:6, 22:3, 22:12, 22:19, 32:16, 50:21 .
months 10:19, 26:15 .
moot 13:5, 15:3 .

mootness 14:2 .
morning 14:18, 45:10 .
motion 2:14, 7:9 .
MOTIONS 1:22, 2:14, 2:18 .
move 12:4, 12:6 .
multiple 16:6, 43:22 .

< N > .
name 34:4 .
narrow 50:6 .
narrower 7:7, 7:10, 8:22, 51:7 .
Nationality 30:15 .
nature 5:4, 6:20, 35:20, 44:17 .
necessarily 24:20, 38:25, 39:5, 43:11, 43:12 .
necessary 24:12, 27:22, 45:2 .
need 6:8, 7:8, 10:7, 13:2, 14:19, 23:4, 32:23, 33:8, 35:24, 36:15, 36:21, 37:10, 44:6, 44:14, 48:6, 48:11, 48:18, 49:10 .
negative 34:9 .
negatively 33:19, 52:22 .
negotiate 37:16 .
neither 21:22 .
New 6:15, 8:19, 8:20, 10:3, 12:18, 13:5, 14:12, 25:16, 27:3, 40:20, 42:23 .
next 20:15 .
night 14:17 .
No. 1:8, 10:5, 38:19, 45:16, 52:21 .
Nobody 10:16, 33:3, 35:12 .
None 49:5 .
nonpayment 13:11, 17:24, 41:17, 48:8, 48:15, 52:11 .
nor 29:20, 45:17 .
NORTHERN 1:3 .
note 52:3, 52:12 .
notes 1:50, 49:8 .
Nothing 4:16, 42:10 .
notices 10:13, 10:25, 19:11, 21:16, 21:21, 32:6, 32:8, 32:9, 32:24, 33:5, 35:2, 39:22, 40:25, 45:11, 45:13, 45:16, 46:3, 47:6 .

notified 41:8 .

notify 20:22 .

nowhere 9:20, 9:22 .

number 2:5, 28:2, 36:3, 38:8, 42:22, 53:7 .

numbering 4:6 .

NW 1:35, 1:44 .

.

.

**< O > .**

OBBBA 24:7, 25:15, 27:13, 30:20, 41:25 .

obligations 35:25 .

Obviously 2:20, 9:18, 18:8, 20:2, 32:6, 32:10, 32:22, 34:8, 38:9, 38:19, 40:2, 44:4, 48:15 .

occurred 12:25, 32:23 .

offer 23:3, 34:5 .

offhand 42:2 .

Office 27:2, 33:4 .

officers 3:5 .

Official 54:1, 54:17 .

often 12:19 .

Okay 11:10, 13:13, 14:14, 16:23, 21:3, 21:23, 23:24, 31:23, 37:11, 40:11, 41:10, 41:20, 42:4, 43:5, 47:15, 48:4, 52:16, 52:25 .

old 45:20 .

once 33:4, 49:5, 53:8 .

One 4:1, 4:3, 4:13, 7:4, 7:8, 9:18, 11:17, 13:9, 16:8, 16:25, 19:24, 22:3, 23:2, 28:18, 28:20, 31:2, 38:12, 38:22, 40:2, 40:11, 43:14, 47:22 .

one-year 18:3 .

ongoing 10:4, 30:6, 39:11, 43:22 .

online 36:3 .

opening 2:18 .

opportunity 14:19, 15:11, 19:23, 20:4, 21:2, 23:17, 25:9, 34:17, 37:7, 37:22, 38:3, 38:9 .

opposition 38:20 .

option 44:15 .

order 2:15, 15:4, 15:9, 20:12, 27:7, 34:14, 34:18, 37:20, 44:6, 44:14, 44:16, 48:6, 48:12, 48:19, 49:11 .

ordered 13:11, 18:11, 48:14 .

organization 39:22 .

organizations 32:20 .

original 12:17, 46:12 .

originally 2:21, 40:13 .

others 20:6, 20:24, 21:9, 35:10 .

otherwise 8:24, 37:3, 41:19 .

overcome 10:7, 50:22 .

owe 3:4, 7:12, 9:12, 9:16, 9:23, 11:2, 25:4, 31:1, 31:2, 31:10, 31:19, 32:2, 46:21, 50:4 .

owed 3:1, 37:4, 46:19 .

owes 33:3 .

own 6:3, 18:13, 18:18, 22:1, 50:13 .

.

.

**< P > .**

p.m. 1:19, 2:2, 53:21 .

page 15:8, 19:20, 34:14, 37:18, 38:8, 44:19, 45:4, 54:7 .

paid 3:8, 10:12, 16:9, 18:21, 19:17, 22:3, 22:10, 43:19, 51:11 .

parallelism 8:2 .

parole 5:14 .

paroled 5:15 .

paroles 50:16 .

Part 14:20, 14:25, 29:10, 37:15, 50:4 .

particular 4:11, 26:6, 27:19, 27:20, 28:15, 28:24, 29:5, 41:5 .

particularly 35:17, 36:9, 36:14 .

parties 3:18, 37:15, 38:3, 53:6, 53:8, 53:16 .

passed 39:8 .

past 39:11, 42:11 .

paste 5:8, 11:23 .

Patricia 54:2, 54:16 .

paying 15:19, 22:15 .

payment 5:16, 10:15, 14:14, 14:16, 14:18, 17:11, 17:12, 17:21, 19:25, 20:8, 20:20, 21:13, 32:21, 38:11, 44:24, 46:13, 49:1, 52:11 .

payments 2:25, 40:15 .

PELLETIER 1:32, 2:8, 12:11, 17:2,

17:5, 20:1, 20:9, 21:6, 21:24, 47:16, 48:1, 51:25, 52:3, 52:8, 52:21 .

perhaps 3:4, 35:22, 36:18 .

period 17:24, 18:3, 19:12, 22:10, 24:9, 25:5, 27:7, 27:9, 29:14, 31:5, 45:6 .

periods 9:9 .

permanent 18:2 .

permission 34:3 .

permit 37:6, 40:8 .

persecution 16:2, 18:6 .

person 20:3, 24:13, 31:5, 38:22, 41:12 .

persons 3:4, 41:15, 53:9 .

perspective 3:11, 46:11 .

persuaded 3:11 .

phone 36:1, 47:23, 47:24 .

place 34:25, 35:14, 38:21, 38:23, 45:12, 45:13 .

Plaintiff 1:7, 1:29, 2:7, 2:8, 2:9, 3:10, 3:21, 24:17, 26:7, 28:10, 28:11, 28:14, 28:22, 29:1, 32:12, 35:10, 36:16, 37:8, 37:9, 38:10 .

Plaintiffs 3:2, 3:19, 25:13, 26:2, 26:20, 27:12, 28:4, 30:24, 33:25, 34:13, 37:9, 37:18, 38:5, 39:6, 39:19, 42:25 .

Please 2:3, 2:6 .

pointed 3:2, 3:24, 5:10, 13:9, 15:19, 16:5, 26:21, 27:12, 50:20 .

pointing 10:8 .

points 4:13, 11:11, 28:14, 42:5, 45:8, 49:13, 52:1 .

policy 13:7, 14:13, 18:16, 23:3, 31:21, 32:13, 32:14, 32:23, 33:9, 33:11, 34:10, 40:4, 40:20, 40:24, 41:3, 48:22 .

portal 49:2 .

portion 12:6, 38:4 .

position 16:18, 24:17, 26:4, 40:15, 41:10 .

positions 13:18 .

possibility 43:19 .

possible 36:8, 39:25, 40:9, 43:15 .

post-enactment 49:16 .

post-judgment 28:19 .

post-monitoring 28:19 .

posture 2:20, 34:21 .

potential 38:3, 39:11, 44:5, 50:1 .

potentially 3:7, 6:23, 25:10, 37:8, 43:24, 44:7, 48:7, 53:11 .

practical 22:5 .

pre 25:15 .

precedent 51:15 .

preenactment 6:16 .

preliminary 2:15, 15:9, 17:7, 22:21, 37:20 .

preparing 40:20 .

present 7:3, 7:14, 22:2 .

presentations 53:1 .

presently 26:24 .

preserve 45:2 .

presumably 20:2, 35:25 .

presumption 5:5, 6:7, 6:13, 6:22, 6:24, 8:13, 10:7, 50:22 .

pretty 16:17, 52:24 .

prevails 23:15 .

prevent 48:6 .

prevention 40:1 .

prevents 15:2 .

previous 40:4 .

previously 25:17, 42:14 .

primary 3:17 .

principle 30:7, 30:8 .

prior 16:10, 24:7, 28:6 .

pro 12:15 .

proactively 49:10 .

probably 35:24, 36:4 .

problem 3:3, 11:1, 11:15, 12:13, 12:25, 34:21, 34:23, 35:7, 35:8, 37:24, 39:6, 45:18, 45:24 .

problems 10:25, 12:7 .

proceed 32:5 .

proceeding 10:4 .

Proceedings 1:21, 6:19, 10:6, 53:21, 54:6 .

process 20:25, 29:25, 32:5, 41:22, 41:24, 42:2, 42:3, 42:13, 50:21 .

processing 30:10, 52:23 .

prohibitive 22:8 .

Project 1:5, 2:4 .

promised 15:5 .

promulgated 14:6 .
property 24:11, 42:14 .
proposal 19:20 .
proposed 15:8 .
proposing 11:13 .
prospective 28:13, 28:18, 28:25, 42:12, 43:2 .
prospectively 6:23, 24:8, 24:25, 28:3, 50:13, 51:10 .
protection 23:4 .
provide 17:19, 25:8, 33:22, 35:3, 35:6, 35:15, 39:19, 44:25, 47:24 .
provided 12:24, 15:11, 19:22, 27:3, 28:21, 33:15, 34:16, 37:21, 39:14, 52:13, 53:9 .
Providing 35:14, 45:13 .
provision 4:8, 6:2, 7:23, 9:10, 11:6, 27:5 .
provisions 4:2, 4:10, 5:13, 5:23, 8:1, 11:17, 11:23, 13:15 .
public 12:7, 20:23, 22:23, 22:25, 23:7, 23:11, 23:12, 33:8, 35:15, 35:19, 35:23, 36:9, 40:18, 41:6, 41:8, 43:7 .
publicly 35:9 .
pulled 44:20 .
punish 8:14 .
purpose 6:1, 29:18, 30:1, 50:25 .
pursuant 54:5 .
pursue 25:10 .
purview 30:14 .
put 8:9, 16:3, 33:2, 33:7, 34:25, 38:21, 38:23, 40:18, 48:23 .
puts 16:17 .
putting 7:24, 15:18, 49:1 .

.

.

< Q >.

question 5:6, 9:12, 30:24, 34:4, 34:6, 39:12 .
questions 11:12, 12:3, 42:5 .
quickly 9:8, 15:15, 22:22, 36:8 .
quo 45:2 .
quotations 48:23 .
quote 50:25 .

.

.

< R >.

raise 50:20 .
raised 39:6 .
Rather 2:18, 9:8, 30:11, 34:19, 35:4, 39:21, 43:16 .
reach 25:18, 37:11, 38:3, 39:24, 40:8, 44:13, 44:17 .
reachable 47:2 .
reached 48:13 .
reaches 50:15 .
reaching 45:11 .
read 4:22, 4:23, 5:23, 6:10, 7:15, 50:23 .
real 14:6, 44:10, 45:23 .
realistic 44:14 .
realize 42:16 .
really 7:8, 15:15, 18:7, 23:6, 26:4, 35:8, 38:15, 39:18, 42:8, 42:17, 42:22, 45:15, 48:11 .
Realtime 54:3 .
reason 27:21, 29:1, 29:18, 51:22 .
reasonable 14:13, 29:3, 32:24, 36:23 .
reasoning 13:20 .
reasons 18:23, 22:5 .
reassurance 36:5 .
receipt 46:13 .
receive 20:3, 20:17, 39:9, 47:7 .
received 19:7, 19:9, 19:14, 21:10, 23:10, 46:8, 46:9, 46:21, 47:20 .
receiving 46:9 .
recently 22:24 .
recess 53:20 .
recipients 45:12 .
recognizes 34:21 .
record 2:6, 35:18, 40:18 .
recoverable 22:19 .
recruitment 30:5 .
redacted 33:17 .
Reddy 18:9 .
referenced 42:15, 42:25 .
refund 43:15 .
refunds 22:6, 43:14 .
regarding 41:3, 41:8 .

regardless 5:3 .
regime 6:16, 10:4, 16:10 .
Register 13:21, 14:11, 46:15, 47:9 .
Registered 54:2 .
regulations 54:8 .
reissuing 40:20, 40:24 .
reiterate 23:19, 43:8 .
rejected 29:5 .
rejects 50:24 .
relating 3:12 .
relevant 32:17 .
reliance 16:10 .
relief 13:24, 16:12, 17:7, 20:10, 22:21, 41:13, 41:16, 44:21, 44:25, 52:10 .
relies 28:10 .
rely 25:24, 32:16, 52:4 .
remain 29:4, 42:2 .
remained 50:9 .
remaining 17:6 .
remains 6:25, 7:3, 7:14, 41:24 .
remedy 14:11, 30:2, 45:4 .
removal 3:6, 16:12, 18:5, 41:12, 44:8, 52:10 .
removed 13:11, 18:11 .
render 41:12 .
reply 13:9, 14:17, 15:8, 16:6, 34:14, 37:19 .
Report 26:18, 26:19, 27:1, 29:22, 30:8, 36:11, 36:19, 36:21, 49:8 .
Reporter 54:1, 54:2, 54:3, 54:17 .
representation 18:13, 29:7 .
representations 45:21 .
representatives 39:24 .
represented 12:18, 17:24 .
representing 34:20 .
request 16:12, 35:5 .
requested 38:10 .
requesting 38:9, 51:10 .
require 4:22, 6:10, 7:16, 10:18, 11:8, 19:25, 27:8 .
required 4:11, 8:13, 19:7, 23:16, 23:23, 28:12, 29:8 .
requirement 20:12, 27:19 .
requires 13:1, 15:4, 16:13, 27:15 .

requiring 28:23, 30:21, 30:22 .
rescind 40:17 .
rescinded 14:6 .
residual 3:2 .
resolution 38:4, 48:11 .
resolve 48:18 .
respect 2:25, 3:3, 3:10, 3:13, 11:13, 11:14, 13:15, 19:20, 27:25, 35:18, 36:9, 36:11, 36:14, 38:11, 39:6, 40:6, 41:11, 42:1, 43:9 .
respectful 6:13 .
respond 9:3 .
response 14:5, 40:10, 40:23, 48:21 .
responses 3:25, 47:25 .
rest 41:2 .
restraining 2:15, 44:16 .
result 9:2, 9:18, 16:20, 17:25, 18:1, 18:4, 29:21, 29:23, 30:5, 34:10, 40:3 .
resulted 8:9, 13:19 .
Retroactive 6:7, 9:1, 9:25, 11:21, 24:6, 25:14, 25:18, 27:14, 28:5, 28:12, 28:25, 31:3, 45:6, 49:14, 49:20, 51:14 .
retroactively 4:17, 4:19, 5:7, 6:5, 10:1, 11:19, 11:25, 12:15, 16:22, 24:6, 24:14, 28:24, 42:11, 51:1, 51:21 .
retroactivity 3:11, 5:5, 6:13, 6:24, 7:4, 8:14, 8:22, 10:7, 11:11, 11:17, 13:14, 15:21, 20:11, 24:4, 42:8, 42:12, 49:12, 50:23, 51:8 .
retrospective 25:17, 28:5, 42:8, 43:4 .
returned 22:12 .
revenue 27:6 .
review 2:18, 13:20, 40:22, 52:5 .
reviewed 33:14 .
revised 32:13, 48:22 .
rise 53:20 .
risk 44:8, 44:12 .
RMR 54:16 .
rolled 10:15, 12:25 .
roundabout 11:22 .
row 34:24 .

rule 7:8, 51:1, 51:18 .
rules 43:25, 51:20 .
rush 10:18 .

.

.

< S > .

SAG-25-3299 2:5 .
salary 28:17 .
save 6:24, 13:23 .
saying 15:8, 18:16, 24:16, 34:13, 38:20, 45:25 .
says 6:17, 21:8, 33:3, 52:21 .
scenario 46:5 .
scribble 49:8 .
seated 2:3 .
second 17:18, 22:12 .
Section 6:4, 8:2, 26:6, 27:2, 27:10, 27:17, 44:25 .
sections 27:13, 27:15 .
seek 28:6, 47:13 .
Seeker 1:5, 2:4 .
seekers 17:16, 22:14, 22:16, 43:21 .
seeking 16:5, 23:21, 35:4, 37:14 .
seeks 42:18 .
seem 21:18, 36:3, 39:9 .
seems 3:3, 21:22, 32:8, 48:8, 48:10, 53:11 .
send 33:5, 41:2, 49:4, 49:5 .
sending 10:13, 14:22, 40:25, 46:2 .
sense 32:7 .
sent 12:17, 14:25, 16:2, 19:11, 19:13, 20:3, 39:7, 45:22, 46:6, 47:12 .
separate 4:8 .
serve 23:12 .
SERVICES 1:11, 28:20, 29:21 .
set 6:1, 7:21, 7:24 .
sets 8:3 .
Several 26:7, 44:8 .
severe 22:13 .
shall 5:2, 6:19 .
share 2:17, 34:4, 47:16 .
shift 33:11 .
shifted 2:20 .
shop 39:8 .
short 10:19, 17:17, 22:17 .

shortly 53:16 .
shouldn't 30:9, 49:7, 49:8, 52:11 .
show 27:23 .
showing 22:16 .
shown 23:13 .
shows 10:1, 10:17 .
shutdown 34:25, 35:21, 36:2, 37:2, 44:11, 46:24, 48:24 .
side 21:16 .
significant 42:20 .
similar 6:14, 10:3 .
Simply 5:7, 7:24, 25:16, 43:3, 50:12 .
single 27:3, 43:1 .
sit 9:8 .
situation 19:4, 36:5, 37:2 .
skeptical 16:15 .
solely 7:20 .
solve 35:7 .
somebody 10:12, 31:10, 31:18, 42:12, 46:7 .
someone 8:23, 9:4, 9:9, 18:11, 19:16, 21:19, 23:19, 27:18, 30:25, 37:11, 39:8, 41:18, 42:18, 47:20, 47:24, 52:19 .
sometimes 4:5 .
somewhat 2:16, 2:20, 19:19, 19:24, 35:22, 39:15 .
soon 35:2 .
sorry 32:18 .
sounded 38:2 .
sounds 34:19, 38:21 .
specific 5:12, 27:5, 27:16, 30:2, 33:18, 33:24, 47:19 .
specifics 33:17 .
speculate 43:14 .
spelled 19:1 .
St. 28:9, 42:10 .
staff 32:17, 33:11, 40:7, 40:22, 41:2, 47:2 .
standby 37:13 .
stands 53:20 .
start 3:21, 7:10, 40:25, 47:5 .
started 10:13, 14:21, 46:2 .
starting 37:18 .
stated 28:24, 29:1, 29:6, 30:7, 43:16 .

statement 6:18, 9:2 .
statements 13:5 .
States 1:1, 1:10, 5:15, 15:22, 26:21, 42:22, 50:16, 54:3, 54:9 .
stating 7:2 .
statue 50:24 .
status 25:11, 35:17, 36:11, 36:19, 36:20, 45:2 .
statute 3:16, 4:16, 4:18, 4:22, 4:24, 5:9, 5:23, 7:15, 8:11, 9:22, 10:6, 10:20, 13:1, 16:19, 18:3, 20:23, 25:19, 27:22, 28:23, 30:1, 42:23, 49:17, 50:2, 50:20, 51:4, 51:11, 51:13, 51:19 .
statutes 51:2 .
statutory 3:22, 5:13, 15:15, 16:16 .
stay 45:1 .
stem 17:14, 22:13 .
stenographically-reported 54:6 .
stenotype 1:50 .
step 20:21 .
STEPHANIE 1:23 .
steps 35:1, 36:15, 40:21, 53:12 .
Street 1:35, 1:44 .
strong 5:4, 6:7, 6:22 .
structure 2:25, 4:2, 4:4, 8:3, 8:5, 10:21 .
struggle 7:15, 9:24 .
stuck 39:16, 45:20 .
subject 15:23, 23:12 .
submit 25:19, 26:25, 27:21, 27:25, 35:5, 36:18, 51:3 .
submitted 18:8, 18:15, 22:15, 26:19, 38:20 .
subsection 4:5, 4:6, 4:8, 4:12, 4:16, 5:11, 5:17, 11:19, 11:20, 50:17 .
subsequent 26:12, 31:21 .
substantial 50:8 .
succeed 20:11 .
success 17:7, 43:6 .
suffered 53:10 .
sufficient 20:17, 27:23, 47:9 .
suggested 3:6, 34:14 .
suggests 21:10 .

summer 20:15 .
Sunshine 42:16, 42:17, 42:19 .
supplemental 18:9 .
suppose 37:17 .
supposed 12:23 .
Supreme 4:24, 6:16, 15:20, 16:20, 49:17 .
Susan 1:32, 2:8, 17:2 .
system 9:13, 20:19 .
systematically 14:24, 17:19 .
systems 36:2 .

.

.

< T > .

table 51:4 .
talks 4:24, 43:1 .
tax 24:11, 25:16, 42:14 .
tells 4:7, 4:9, 4:12, 4:16 .
temporary 2:15, 44:16 .
tense 7:4, 7:14 .
term 10:20, 27:23 .
terms 2:25, 6:3, 7:1, 12:12, 14:14, 32:21, 32:22, 35:19, 40:15, 53:12 .
text 9:20, 51:4 .
textual 3:23, 4:20 .
themselves 19:12, 37:16, 46:21 .
theory 7:22 .
they'll 21:7, 38:13 .
They've 4:20, 13:8, 14:21, 46:7, 48:25 .
thinks 45:23 .
third 17:12 .
though 7:19, 21:7, 25:4, 29:1, 29:10 .
thoughts 2:18 .
three 17:8, 17:13, 26:15 .
threshold 12:14, 34:4 .
throughout 4:3, 5:9, 5:22, 5:25 .
titled 11:20 .
today 3:18, 10:14, 11:2, 13:6, 25:3, 47:4, 49:2, 53:1, 53:4, 53:5 .
together 10:18, 33:8 .
touch 17:9, 40:4 .
touchpoint 10:23, 11:8, 13:2 .

**TRANSCRIPT** 1:21, 54:6, 54:7 .
**transcription** 1:50 .
**travel** 15:22 .
**treat** 52:13 .
**treated** 19:17, 22:19 .
**treating** 20:25 .
**tried** 13:22, 19:18, 26:2, 47:17 .
**triggered** 49:17 .
**triggers** 5:12, 5:15 .
**true** 15:20, 15:21, 19:8, 19:10, 22:2, 22:5, 23:22, 27:7, 50:12, 50:21, 54:5 .
**truly** 3:15 .
**try** 33:23, 36:1, 40:23, 51:22, 53:13, 53:15 .
**trying** 33:7, 35:16, 37:24, 41:6, 48:2 .
**turn** 3:19, 17:23, 18:1, 21:24, 22:22 .
**turns** 23:23 .
**two** 3:25, 4:12, 7:4, 7:16, 13:16, 17:10, 17:14, 18:10, 18:23, 22:2, 27:13, 28:16, 28:17, 45:22 .
**types** 17:8 .
**typically** 43:9 .

**< U >** .
**U.S.** 1:43, 29:23, 30:8 .
**unable** 21:9, 36:5 .
**unambiguously** 8:13 .
**unclear** 19:15 .
**undermine** 23:11 .
**understand** 2:23, 16:15, 24:15, 26:1, 27:12, 29:17, 36:6, 39:3, 40:14, 43:13, 43:21, 48:24 .
**understanding** 5:18, 9:5, 16:7, 20:5, 32:5, 38:5 .
**understands** 37:24 .
**understood** 27:9, 27:10, 37:5, 38:7, 46:16 .
**undo** 16:8 .
**undoubtedly** 50:21 .
**uniformity** 2:24 .
**unique** 6:4, 48:19 .
**United** 1:1, 1:10, 5:15, 15:22,

50:16, 54:3, 54:9 .
**unlawful** 15:25, 18:25 .
**Unless** 5:5, 6:5, 6:17, 10:11, 41:25 .
**unlike** 42:9 .
**unreasonable** 12:13, 14:21, 44:23 .
**unrecoverable** 17:10 .
**untenable** 16:18 .
**until** 15:10, 19:22, 34:16, 34:24, 35:13, 36:23, 37:21, 38:13, 39:14 .
**updated** 13:7, 14:5 .
**updates** 35:3, 35:6, 35:7, 35:14, 48:25 .
**urgency** 53:3 .
**USCIS** 2:5, 10:8, 10:10, 14:23, 19:9, 21:6, 24:22, 30:12, 30:14, 30:22, 31:20, 32:11, 32:13, 32:22, 36:7, 39:21, 39:23, 44:7, 45:7, 45:11, 46:2, 46:12, 46:14, 46:22, 46:25, 47:1, 47:5, 47:18, 52:4 .
**using** 8:10, 41:17 .

.
.
**< V >** .
**v.** 28:14 .
**vacate** 14:12 .
**vague** 52:24 .
**Vanderstok** 19:1 .
**Vartelas** 15:21, 49:15, 51:6 .
**vehicle** 48:17 .
**version** 51:8 .
**versus** 2:5 .
**view** 6:25, 19:17 .
**violated** 19:18 .
**violation** 18:22 .
**visa** 43:22 .
**voluntary** 14:2, 15:2 .
**vs** 1:8 .
.
.
**< W >** .
**Wait** 24:15 .
**waiting** 8:15, 11:5 .
**wanted** 5:24, 6:6, 11:12, 11:22, 16:19, 17:1, 29:12, 42:6 .
**wants** 42:13 .
**warranting** 22:20 .

**Washington** 1:36, 1:45 .
**ways** 43:21, 43:24 .
**website** 13:6, 14:19, 33:3, 35:11, 41:7, 45:17, 46:3, 48:23, 49:1 .
**weeks** 45:22, 46:9 .
**welcome** 44:6, 53:6 .
**whatever** 35:11, 43:20 .
**Whether** 3:7, 3:12, 3:14, 3:15, 4:10, 4:15, 10:12, 22:12, 30:16, 30:17, 38:15, 39:2, 39:12, 39:16, 39:25, 40:5, 41:1, 41:7, 41:11, 41:19, 43:14, 49:3, 49:4, 53:8 .
**whole** 16:1, 25:5 .
**whom** 19:5 .
**willing** 33:25, 34:10, 34:21, 37:25, 43:17, 43:18 .
**win** 7:7 .
**wish** 3:18, 43:6 .
**withdraw** 15:25, 16:11, 23:19, 25:3, 25:9, 29:6 .
**withdrawing** 16:11 .
**withholding** 16:12, 41:12, 52:9, 52:19 .
**within** 17:24, 25:8, 30:14, 46:13 .
**without** 8:17, 16:11, 35:10 .
**words** 51:13 .
**work** 33:23 .
**working** 33:7, 33:12, 36:3, 36:8, 40:19, 41:5 .
**world** 14:6, 44:10 .
**worst** 46:5 .
**worth** 9:11, 31:1, 31:2 .
.
.
**< Y >** .
**years** 9:5, 9:10, 9:11, 11:4, 12:19, 23:5, 26:13, 29:13, 30:25, 31:1 .
**you-all** 53:19 .
**yourselves** 2:6 .
.
.
**< Z >** .
**Zareen** 1:41, 2:11 .