## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

ASYLUM SEEKER ADVOCACY PROJECT,

        Plaintiff,

  v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.*, and

PAMELA BONDI, in her official capacity
as Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

        Defendants.

Civil Action No. 1:25-cv-03299-SAG

### First Amended Complaint

Plaintiff the Asylum Seeker Advocacy Project ("ASAP") files this First Amended Complaint under Federal Rule of Civil Procedure 15. No Defendant has filed a responsive pleading or responsive motion under Rule 12(b), (e), or (f), so Plaintiff "may amend its pleading once as a matter of course." Fed. R. Civ. P. 15(a)(1); *see also* Fed. R. Civ. P. 15 Advisory Comm. Notes (2023) (explaining that "the right to amend continues without interruption until 21 days after the earlier of the events described in Rule 15(a)(1)(B)").

Plaintiff alleges as follows:

## I. Introduction

1.     On July 4, 2025, the President signed into law the One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 ("OBBBA" or "the Act"). As relevant here, the Act creates new requirements that asylum applicants pay an initial asylum fee at the time they file their application

for asylum, and an annual asylum fee for each calendar year their applications remain pending in the backlog.  Pub. L. No. 119-21, §§ 100002(a), 100009(a), 139 Stat. at 371 (codified at 8 U.S.C. §§ 1802(a), 1808(a)).

2.     Defendants United States Citizenship and Immigration Services ("USCIS"), a component of the Department of Homeland Security, and the Executive Office for Immigration Review ("EOIR"), which operates within the Department of Justice and is overseen by the Attorney General, are tasked with operationalizing this new statutory requirement.  Both agencies have failed to do so in a lawful or coherent manner.  These failures have caused significant confusion among and a strain on asylum seekers and the attorneys and organizations that support them.  And they threaten to deprive individuals of full and fair consideration of their claims for asylum and other forms of immigration relief.

3.     Both USCIS and EOIR are improperly attempting to impose the new annual asylum fee retroactively in two ways.  The agencies are retroactively imposing the annual asylum fee by: (1) requiring asylum seekers whose applications were already pending on July 4, 2025 to pay the annual asylum fee; and (2) counting the time the applications were pending prior to July 4 to determine whether the applications have been pending for a "calendar year."  USCIS's and EOIR's imposition of annual asylum fees on applications that were pending as of July 4, 2025 violates the fundamental rule that a statute cannot "operate retroactively . . . absent clear congressional intent favoring such a result."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994).

4.     To make matters worse, the agencies failed to implement these supposedly mandated fees in a rational or coherent manner, resulting in massive confusion and uncertainty for asylum seekers.  For reasons that remain unclear, EOIR and USCIS initially chose different dates to begin imposing the annual asylum fee.  According to an EOIR memorandum published July 17,

2025 ("July 17 EOIR Memo"), the first annual asylum fees were due on July 5, 2025, for applicants who applied for asylum a year or more before that date. But according to USCIS's initial instructions in the Federal Register ("USCIS Federal Register Notice"), the first annual asylum fees would not be due until September 30, 2025 (at the earliest) for individuals with asylum applications filed on or before October 1, 2024.

5.     USCIS later stated that it "began sending notices" on October 1 to asylum seekers "who are required to pay the new Annual Asylum Fee," and that if applicants received a notice, they "should pay the fee within 30 days." On or about October 2, USCIS made available on its website a portal for applicants to pay the annual asylum fee. This new development came after USCIS's prior ambiguous suggestion of a September 30 deadline, which prompted mass panic among asylum seekers who received advice that they had to pay the $100 fee by that date.

6.     For applicants who are purportedly required to pay the annual asylum fee to EOIR, EOIR failed to make available *any* mechanism through which fees could be paid, while maintaining that the fees were already due, until around October 23, 2025. Further, both agencies failed to provide clear notice and guidance to applicants as to how (and whether) their annual asylum fees are due to be paid. This state of affairs confounded applicants, their attorneys, and immigration judges alike.

7.     Troublingly, ASAP received reports that some immigration judges at EOIR required applicants to have paid the annual asylum fee, and in at least one case even rejected an asylum application and ordered an asylum seeker removed for non-payment of the annual asylum fee, even before the agency had provided a way to pay the fee. EOIR later conceded that at least 10 asylum applications were dismissed for failure to pay the annual asylum fee during this time period.

8.      The annual asylum fee imposes economic hardship on asylum seekers, many of whom have limited means.  That problem is magnified by USCIS's and EOIR's retroactive application of the statute, which purports to require asylum seekers to come up with the funds on short (or no) notice.

9.      Again, this harm was compounded by the agencies' lack of clear guidance, which led some families to attempt to pay EOIR the *initial* asylum fee required by OBBBA for new applications in lieu of any mechanism to pay the *annual* fee.  Despite representations from EOIR that these payments will be counted, it is still unclear how these payments—made as desperate attempts to comply with the agencies' unclear expectations—will be treated in practice.

10.     On October 30, 2025, this Court issued a stay of USCIS's Federal Register Notice and EOIR's July 17 Memorandum under 5 U.S.C. § 705.  As a result of this stay, asylum applicants at neither USCIS nor EOIR were required to pay the annual asylum fee for the remainder of 2025.  During this time period, Plaintiff is unaware of any adverse immigration consequences inflicted on asylum applicants as a result of failure to pay the annual asylum fee.  But this is no longer the case.

11.     On January 2, 2026, EOIR issued a policy memorandum rescinding its prior July 17 Memorandum, re-implementing the annual asylum fee, and instructing immigration judges to use a new standardized template order to enforce that requirement.[1]  EOIR did so without prior notice to Plaintiff or the Court, and the agency immediately began reimplementing the fee notwithstanding the Court's Section 705 stay.

---

[1] *See* Daren Margolin, Exec. Off. for Immigr. Rev., U.S. Dep't of Just., Policy Memorandum 26-01, *To Rescind and Cancel Policy Memorandum 25-36 (Amended)* (Jan. 2, 2026), https://www.justice.gov/eoir/media/1422321/dl?inline (the "January 2 EOIR Memo").

12.     EOIR's January 2 Memorandum is itself arbitrary and capricious, as it continues to create confusion as to when fees are due, how notice is provided, how much time applicants have to pay once receiving notice, and whether applicants must prove their compliance beyond paying the fee.

13.     USCIS's and EOIR's policies for implementing the annual asylum fee remain inconsistent in material ways that result in confusion, a lack of fair and adequate notice to asylum seekers, and risk of adverse consequences in bona fide asylum cases.  For instance, the agencies have adopted divergent policies about: (1) how much notice an applicant will receive before their annual asylum fee is due, with USCIS providing 30 days and EOIR providing no standard—leading at least one immigration judge (so far) to demand payment within just two days of purporting to provide notice; (2) whether the agency tracks fee deadlines in a way that is visible to applicants; and (3) whether the agency maintains records confirming payment, such that applicants do not have to independently prove compliance to avoid adverse immigration consequences, among other differences.

14.     EOIR has also introduced an additional, independent legal violation in its new standardized template order to enforce the annual asylum fee, conditioning access to withholding of removal and protection under the Convention Against Torture ("CAT") on payment of asylum fees, even though those forms of protection are not discretionary and Congress has authorized no fee for seeking them.  Form I-589 is used to apply for four forms of relief: (1) asylum, (2) withholding of removal under the Immigration and Nationality Act ("INA") ("INA withholding"), (3) withholding of removal under the CAT, and (4) deferral of removal under the CAT (together with withholding of removal under the CAT, "CAT protection").

15.    Many other crucial questions also remain unanswered.  For example, do applicants who initially filed with EOIR but then later filed with USCIS have to pay the annual asylum fee twice?  What should applicants do if they paid the annual asylum fee to USCIS and their case was later transferred to EOIR?  How can applicants who have been detained pay the fee without access to the internet or their bank accounts?  If applicants pay the annual asylum fee to EOIR and then later get an order from an immigration judge with a deadline to pay the same fee, what should they do?  Will payment of the annual asylum fee to EOIR be sufficient to satisfy a deadline set by the immigration judge, or will applicants need to take additional steps to prove their payment?

16.    The fear and confusion caused by USCIS's and EOIR's refusal to provide clear instructions or roll out payment mechanisms in a timely manner is in part a consequence of the agencies' unlawful decision to impose the fees retroactively.  Congress gave the agencies plenty of time to provide asylum seekers with notice of the annual asylum fee before it would become due and to provide a method of and clear instructions for payment—under the statute, the first fees should not be due until one "calendar year" *after* July 4, 2025, at the earliest.  Instead of following the statute and taking the time they needed to coordinate and consider important factors like those mentioned, the agencies have placed asylum seekers in the untenable position of trying to determine how to pay and prove payment of retroactive fees without adequate notice, and without any clear guidance or instructions that would give them the chance to comply and avoid the risk that their applications will be dismissed.

17.    This lawsuit challenges: (1) USCIS's and EOIR's unlawful decision to impose the annual asylum fee retroactively; (2) USCIS's and EOIR's arbitrary and capricious decisions to impose the fee retroactively; (3) USCIS's and EOIR's arbitrary and capricious implementation of the annual asylum fee in an incoherent and divergent manner; and (4) EOIR's arbitrary and

capricious actions resulting in immigration courts erroneously rejecting applications for withholding of removal and protection under the CAT for failure to pay initial or annual asylum fees.

## II.    Parties

18.    Plaintiff ASAP is a national voluntary membership organization of asylum seekers from 175 countries who are now living in the United States.  ASAP is a nonprofit organization headquartered in New York, New York.

19.    ASAP provides members with legal and community support, including time-sensitive updates, legal resources, and opportunities for members to work together for nationwide systemic reform based on the priorities identified by its membership.

20.    Asylum seekers apply to join ASAP by filling out a voluntary online membership form.  ASAP issues each member a digital membership card and member ID that they can use to identify themselves to ASAP and access the full range of member benefits.  Although ASAP members must be at least 14 years old, the benefits of ASAP membership also extend to the children of ASAP members as derivatives of their parents' membership.  ASAP's members do not pay any fees or costs for their membership.

21.    While some ASAP members have already won asylum or have lawful permanent residency, thousands of ASAP members have pending applications for asylum, INA withholding, and CAT protection.  Members regularly report they have been waiting for more than five years for their asylum application to be adjudicated.  When members miss the one-year filing deadline for asylum, they are still eligible to apply for INA withholding or CAT protection.

22.    Defendant United States Citizenship and Immigration Services is a federal agency within the Department of Homeland Security.  USCIS headquarters are located at 5900 Capital Gateway Drive, Camp Springs, Maryland 20746.

23.     Defendant Joseph B. Edlow is the Director of USCIS.  ASAP brings claims against Director Edlow solely in his official capacity.

24.     Defendant Executive Office for Immigration Review is a federal agency within the Department of Justice.  EOIR's headquarters are located at 5107 Leesburg Pike, Falls Church, Virginia 22041.

25.     Defendant Daren Margolin is the Director of EOIR.  ASAP brings claims against Director Margolin solely in his official capacity.

26.     Defendant Pamela Bondi is the Attorney General of the United States.  ASAP brings claims against Attorney General Bondi solely in her official capacity.

## III.    Jurisdiction and Venue

27.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*  This Court therefore has subject-matter jurisdiction under 28 U.S.C. § 1331.

28.     ASAP has associational standing because its members have standing to sue in their own right.  *See, e.g.*, *United Food & Com. Workers Union Loc. 751 v. Brown Group, Inc.*, 517 U.S. 544, 552–53 (1996).  Thousands of ASAP members will be forced to pay fees or risk denial, dismissal, abandonment, and/or further delays of their asylum applications solely because of USCIS's and EOIR's retroactive application of the annual asylum fee and their arbitrary and capricious implementation of the annual asylum fee.  Further, thousands of ASAP members will be forced to pay the initial asylum fee and annual asylum fees or risk rejection, denial, dismissal, or abandonment of their claims for withholding of removal or protection under the CAT, forms of relief which are not lawfully subject to any fees.  ASAP members' interests are directly related to ASAP's organizational purpose in helping them navigate the asylum system and achieve successful outcomes.  And this lawsuit does not require the participation of ASAP's individual

members because ASAP seeks only declaratory and injunctive relief under the APA and the case raises pure questions of law.

29.    Below are descriptions of some of the ASAP members with pending asylum applications before EOIR and USCIS.  These are just examples.  ASAP has thousands of members who may be harmed by the agencies' unlawful implementation of the annual asylum fee and EOIR's policies applying the initial and annual asylum fees to applications for withholding and CAT protection.  Thousands of ASAP members have already expressed stress or confusion about how and when to pay asylum fees.[2]

30.    The following are some of the ASAP members with asylum applications pending before EOIR:

31.    **Jon** is an ASAP member from Russia living in New Jersey.  Jon applied for asylum and INA withholding before EOIR in 2022.  Jon has not paid the annual asylum fee with EOIR and is confused about what he is supposed to do.  Jon first learned about the fee from some colleagues who are also asylum seekers.  He has been very worried because he does not have extra income to pay a fee, and he has not received any notification or instruction from the government on when he is supposed to pay.

32.    **Michelle** is an ASAP member from Honduras who lives in Texas.  She entered the United States in 2021 and applied for asylum and INA withholding with EOIR in 2022.  Her asylum application was denied, and she is now in the process of appealing her case, though she does not know how long the appeal will take.  She learned through the news about the new annual asylum fee but has not paid the fee.  She has not received any notice or instruction to pay it. Michelle is already having trouble making ends meet and worries she will not be able to pay the

_____

[2] The ASAP members identified in this Complaint are using pseudonyms.

annual asylum fee.  She worries that failure to pay could lead to greater fines or even a deportation order.

33.    **Greg** is an ASAP member from Russia living in California.  Greg came to the United States in 2023 and applied for asylum and INA withholding with EOIR thereafter.  Greg has not paid the fee because he is confused about when to pay the fee.  Greg feels confused by the lack of guidance.  He is also concerned that the lack of guidance about when to pay the fee and the lack of an option to pay the fee in person will make him susceptible to online scammers.

34.    **Natalia** is a Colombian ASAP member, now living in Georgia.  She arrived in the United States in 2023, and she applied for asylum, withholding of removal, and protection under the CAT with EOIR shortly thereafter.  Natalia has not yet paid the annual asylum fee because she is not sure whether she needs to pay and has not received instructions about when to pay.  She is very concerned about the annual asylum fee because it conditions access to the fundamental right to asylum on having sufficient money.

35.    Under EOIR's retroactive interpretation of the Act, each of these ASAP members is required to pay the annual asylum fee despite the expectation at the time of filing their application for asylum that their applications would not be subject to an annual fee.  The ASAP members identified above had not received any notice from EOIR concerning how to pay the fee at the time of filing the First Amended Complaint.

36.    The following are some of the ASAP members with asylum applications pending before USCIS:

37.    **Mark Anthony** is an ASAP member from Nigeria who lives in Pennsylvania.  He came to the United States in 2019 and applied for asylum and INA withholding with USCIS in 2020. Mark Anthony learned about the new annual asylum fee through news reports.  He paid the

fee because he was concerned about how it could affect his case if he did not pay—e.g., whether it could lead to collections proceedings, create complications for his asylum case, or result in him being ordered removed.

38.     **Mustafa** is an asylum seeker and ASAP member from Turkey.  Mustafa lives in California and applied for asylum and INA withholding with USCIS in 2022.  He first learned of the fee on September 22, 2025, from a YouTube video posted by an attorney.  Mustafa worries that the lack of guidance will increase online scams, which makes him anxious. On October 16, 2025, Mustafa received a text message from USCIS, which prompted him to check his online account. Upon checking his USCIS online account, he found an alert telling him his annual asylum fee was due in 30 days; however, he did not understand what day the 30 days runs from.  Mustafa is confused and sad that applicants like himself could be deported for not paying the fee when it is unclear when the deadline is.  Mustafa is also concerned about affording the payment each year. As of the date of this filing, he has not paid the fee with USCIS because he understands the requirement is paused.

39.     **Richard** is an ASAP member from Venezuela who lives in Florida.  He arrived in the United States in 2017 and applied for asylum, withholding of removal, and protection under the CAT with USCIS that same year.  Richard is very worried about the annual asylum fee.  He paid the annual asylum fee to USCIS on October 9, 2025 through the USCIS Questionnaire.  When Richard later returned to the USCIS Questionnaire and re-entered his information, he saw the following message: "At this time, the Annual Asylum Fee payment is not due for this case. USCIS will issue a notice the first time the Annual Asylum Fee is due."  This message implied that Richard had not yet paid the Annual Asylum Fee for the first time, even though he had.  Richard received a receipt from USCIS by mail on October 21, 2025.  Richard feels confused as to why the USCIS

questionnaire now says USCIS will issue him a notice the first time the fee is due because he already paid it and received his receipt. It makes him think that USCIS will not honor his payment and he will have to pay the fee again and prioritize it over other bills.

40. **Syed** is an asylum seeker and ASAP member from India who now lives in California. Syed applied for asylum and INA withholding in 2024 with USCIS. Syed found out about the fee from the ASAP member newsletter. He paid the fee on October 22, 2025 because he was concerned about what could happen to his asylum application if he did not pay on time.

41. **Alba** is an ASAP member from Honduras, now living in Texas. Alba applied for asylum and INA withholding with EOIR upon entering the United States. Her case was dismissed at EOIR, and she was instructed to apply for asylum with USCIS if she wanted to continue her case. She applied for asylum in 2024 with USCIS. She received notice from USCIS that her annual asylum fee was due and she paid it on November 10, 2025. It was difficult for her to pay the fee, but she was concerned about what would happen to her case if she did not pay the fee.

42. **Jeff** is an ASAP member and asylum seeker from Kenya. Jeff has been waiting in the USCIS asylum backlog for over ten years. In addition to asylum, Jeff also applied for withholding of removal and CAT protection. Jeff is very concerned about the fee because his family is in a difficult financial situation. Jeff paid the annual asylum fee for the first time in October 2025 out of fear. While payment of the fee caused his family economic hardship, Jeff is worried about what could happen to his long-pending asylum claim and to his family if he does not pay. Jeff has a family to feed, and this recurring fee adds yet another financial burden on his shoulders.

43. **Aaron** is an ASAP member from Haiti, living in Maryland. He came to the United States 2021 and applied for asylum and INA withholding with USCIS that same year. His case

remains pending.  Aaron has not paid the annual asylum fee with USCIS.  Aaron feels confused, stressed, and frustrated about the new annual asylum fee.  Aaron and his wife are having a lot of trouble making ends meet, and he worries he cannot afford to pay the annual asylum fee.  As of the date of this filing, he has not received any notice from USCIS about the annual asylum fee or been given a deadline to pay, but it now says he is able to pay when he enters his information in the USCIS Questionnaire.

44.    Under USCIS's and EOIR's retroactive interpretation of the Act, each of these ASAP members would be required to pay the annual asylum fee despite their expectations at the time of filing their applications that applying for asylum was free and that their applications would not be subject to annual fees.

45.    Whether their applications are before USCIS or EOIR, each of these ASAP members have also experienced confusion, worry, and stress given the lack of adequate notice and instructions for how to pay the fee, and even if they have paid it once, they will be subject to it again each year and so are concerned about the annual asylum fee as an ongoing cost.  Moreover, as of November 28, 2025, USCIS has paused adjudication of all asylum applications, meaning that each of these ASAP members with pending asylum cases at USCIS expects their cases will not be adjudicated any time soon.

46.    ASAP members before EOIR are seeking withholding of removal or CAT protection in addition to asylum, and would be subject to EOIR's unlawful policy authorizing denial or rejection of those claims for failure to pay the initial or annual asylum fee.  Further, ASAP members before USCIS applied for withholding of removal and CAT protection, and EOIR could grant those claims if their cases are transferred from USCIS to EOIR.  In that case, they too

would be subject to EOIR's unlawful policy authorizing denial or rejection of withholding and CAT claims for failure to pay the annual asylum fee.

47.    Venue is proper under 28 U.S.C. § 1391(e)(1) because this is an action against agencies of the United States and USCIS is headquartered in Camp Springs, Maryland.  Venue is proper for the other federal defendants because at least one defendant in the action resides in this District.

IV.    **Factual Allegations**

A.    **Legal Background on Asylum, Withholding of Removal under the INA, and Protection Under the Convention Against Torture.**

48.    The United States has long been a safe haven for individuals from around the world fleeing persecution, granting asylum, withholding of removal under the Immigration and Nationality Act ("INA"), and protection under the Convention Against Torture ("CAT") through distinct statutory and treaty-based frameworks.

49.    Congress passed and the President signed the first specific "refugee" act, the Displaced Persons Act of 1948, in the aftermath of World War II and gave millions of displaced Europeans a safe home.  Over the ensuing decades, Congress expanded asylum opportunities for refugees from around the world.  The Immigration and Nationality Act ("INA") of 1965 provided a pathway to admission for refugees from the Eastern Hemisphere.

50.    In the Refugee Act of 1980, Congress eliminated the geographical and ideological limitations on the definition of "refugee" in the INA, created a statutory right to apply for asylum, and increased the number of refugees who could be admitted to the United States on an annual basis.  8 U.S.C. § 1158(a)(1).

51.    Withholding of removal under the INA and protection under the CAT are governed by different regulatory provisions and have different requirements than asylum.  *See, e.g.*, *Lizama*

*v. Holder*, 629 F.3d 440, 444–50 (4th Cir. 2011) (analyzing petitioner's claims for asylum, withholding of removal under the INA, and CAT protection separately).

52.    Withholding of removal under the INA, 8 U.S.C. § 1231(b)(3), codifies the non-refoulement principle by prohibiting removal to a country where an applicant's life or freedom would be threatened on account of a protected ground.  Protection under the CAT, implemented through federal regulations, 8 C.F.R. § 1208.16(c), fulfills U.S. treaty obligations under the United Nations Convention Against Torture, requiring that no person be returned to a country where they are more likely than not to be tortured.  Protection under the CAT can be granted either in the form of withholding of removal or in the form of deferral of removal.

53.    Withholding of removal and CAT are mandatory once the applicable standard is met—the federal government lacks discretion on whether to grant relief in these cases.

54.    Noncitizens use the same form, Form I-589, to apply for asylum, withholding of removal under the INA, and CAT protection.[3]

55.    Generally, applicants must file their asylum applications with either USCIS or EOIR within one year of arrival in the United States or forfeit their ability to apply.  8 U.S.C. § 1158(a)(2)(B).

56.    There are two ways to apply for asylum: affirmatively with USCIS, or defensively before an immigration judge at EOIR.  Asylum applicants can, and frequently do, apply simultaneously for asylum, withholding of removal and CAT protection, or some combination of these forms of relief.

_____

[3] *See I-589, Application for Asylum and for Withholding of Removal*, U.S. Citizenship & Immigr. Servs., www.uscis.gov/i-589.

57.     Applicants seek asylum defensively before immigration judges if they are in removal proceedings, which are initiated when the government files a Notice to Appear with the immigration court.[4]  If an applicant does not have removal proceedings pending, generally the applicant must file an asylum application with USCIS before the one-year deadline lapses to preserve their eligibility.  8 U.S.C. § 1158(a)(2)(B).

58.     A person's asylum application can be pending before only one agency at a time, but there are some circumstances in which a person's asylum case may be moved between USCIS and EOIR.

59.     Congress requires asylum applications to be adjudicated within 180 days of filing, barring exceptional circumstances.  8 U.S.C. § 1158(d)(5)(A)(iii).  But in reality, both USCIS and EOIR often take many years to adjudicate an asylum application.

60.     Indeed, the most recent Office of the Inspector General Report on the asylum backlog at USCIS reported that over 97% of asylum cases at USCIS were not adjudicated within the 180-day period required.[5]  The backlog has only grown since that report.

---

[4] *See generally* U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., Policy Memorandum 602-0187, *Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens* (Feb. 28, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_FINAL_2.28.25_FINAL.pdf (explaining that USCIS, Immigration and Customs Enforcement ("ICE"), and Customs and Border Protection ("CBP") have concurrent authority to issue Notices to Appear and file them with an immigration court to commence removal proceedings).

[5] Off. of Inspector Gen., U.S. Dep't of Homeland Sec., *Final Report: USCIS Faces Challenges Meeting Statutory Timelines and Reducing Its Backlog of Affirmative Asylum Claims* 6 (2024), https://www.oig.dhs.gov/sites/default/files/assets/2024-07/OIG-24-36-Jul24.pdf.

61.    USCIS itself has acknowledged a "massive backlog" of asylum applications, *see Hasnat v. Rubio*, No. 24-02175, 2025 WL 675221, at \*4 (D. Md. Mar. 3, 2025), with a recent report confirming a backlog of more than one million asylum applications at USCIS alone.[6]

62.    Asylum backlogs at USCIS will continue to grow following the indefinite pause on USCIS processing of any asylum applications as of November 28, 2025.[7]  USCIS has directed all personnel to "[p]lace a hold on all Forms I-589 (Application for Asylum and for Withholding of Removal), regardless of the alien's country of nationality."[8]

63.    Similarly, as of the end of September 2025, EOIR had a growing backlog of 2,295,156 asylum applications filed by immigrants who are waiting for asylum hearings or decisions in immigration court.[9]

64.    The growing backlogs in asylum adjudications have caused lengthy delays, significant burdens, and uncertainty for asylum seekers with long-pending applications.[10]

65.    As of the filing of this First Amended Complaint, ASAP has thousands of members whose asylum applications have been pending for more than a year.  In fact, ASAP members have

---

[6] *See, e.g.*, Citizenship & Immigr. Servs. Ombudsman, U.S. Dep't of Homeland Sec., *Annual Report 2024* (2024), https://www.dhs.gov/sites/default/files/2024-07/24_0628_cisomb_2024-annual-report.pdf.

[7] *See* KaMaria Braye, *Federal government's asylum pause adding backlog pressure, leaves thousands in limbo*, 5 ABC KSTP (Jan. 13, 2026), https://kstp.com/kstp-news/top-news/federal-governments-asylum-pause-adding-backlog-pressure-leaves-thousands-in-limbo/.

[8] *See* USCIS Policy Memorandum (Dec. 2, 2025), *Hold and Review of all Pending Asylum Applications and all USCIS Benefit Applications Filed by Aliens from High-Risk Countries*, https://www.uscis.gov/sites/default/files/document/policy-alerts/PM-602-0192-PendingApplicationsHighRiskCountries-20251202.pdf.

[9] *See Immigration Court Quick Facts*, TRAC Reports (last accessed Jan. 15, 2026), https://tracreports.org/immigration/quickfacts/eoir.html#eoir_asylumbl.

[10] *See, e.g.*, Ayelet Parness, *Asylum Backlog Presents Anguish, Uncertainty for Seekers*, HIAS (Apr. 4, 2024), https://hias.org/news/asylum-backlog-presents-anguish-uncertainty-seekers/.

long raised the issue of asylum backlogs to ASAP as one of the biggest issues facing asylum seekers. As a result, ASAP has made advocacy for ending asylum backlogs one of the organization's top policy priorities.

66. Historically, the government did not require asylum applicants to pay any fees to apply for asylum, let alone annual fees while they awaited a decision on their applications.

67. Asylum applicants generally cannot be deported while their asylum claims are pending. Moreover, an asylum seeker is eligible for work authorization while they await adjudication of their asylum application. But asylum seekers must wait for 150 days after their asylum application is continuously pending with USCIS or EOIR before submitting their first application for an employment authorization document, and an additional 30 days before they can receive their work permit. *See* 8 C.F.R. §§ 208.7(a)(1), 274a.12(c)(8). Interruptions in the pendency of an asylum claim can delay an applicant's ability to receive work authorization.

**B. The One Big Beautiful Bill Act Introduces a Requirement to Impose the Initial and Annual Asylum Fees, and USCIS and EOIR Quickly Release Documents Interpreting and Implementing the Act.**

68. On July 4, 2025, President Trump signed into law the One Big Beautiful Bill Act ("OBBBA" or "the Act"). Among many other things, the Act mandates the requirement of new statutory fees for various immigration-related benefits, including applications for asylum. As relevant here, the Act directs that the Attorney General and Secretary of the Department of Homeland Security require a fee to apply for asylum in the first instance, as well as an annual asylum fee for applications that remain pending for a calendar year or more.

69. For the initial asylum fee, the Act provides that "the Secretary of Homeland Security or the Attorney General . . . shall require the payment of" the initial asylum fee "at the time such application is filed." 8 U.S.C. § 1802(a). Subsection (b) pegs the amount of the fee to inflation, providing that in "fiscal year 2025," the fee must be the greater of $100 or "such amount

as the Secretary or the Attorney General" establishes "by rule." *Id.* § 1802(b).  In later years, the fee equals the sum of the prior year's fee and an inflation adjustment.  *Id.* § 1802(c).

70.    For the annual asylum fee, the Act similarly provides that "for each calendar year that an alien's application remains pending, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee, equal to the amount specified in subsection (b)."  8 U.S.C. § 1808(a).

71.    Subsection (b), in turn, provides the "Amount specified" for the annual asylum fee and, like the initial asylum fee, pegs the minimum amount of the annual asylum fee to inflation, again using fiscal year 2025 as the baseline to calculate the amount:  "For fiscal year 2025, the amount specified in this section shall be the greater of . . . $100" or "such amount as the Secretary of Homeland Security may establish, by rule."  8 U.S.C. § 1808(b)(1).  For fiscal year 2026 and subsequent years, "the amount specified in this section shall be equal to the sum of" the prior fiscal year's fee plus an inflation adjustment.  *Id.* § 1808(b)(2).

72.    The Act imposes no fees (either initial or annual) on applications for withholding of removal or CAT protection.  Rather, the Act specifically limits its new initial and annual fees to asylum applications.  *See* Pub. L. No. 119-21, § 100002(a), 139 Stat. at 364; Pub. L. No. 119-21, § 100009(a), 139 Stat. at 371.

73.    Within a few weeks of the enactment of the Act, both EOIR and USCIS issued documents to implement the Act's new requirements.

74.    EOIR initially announced its interpretation of OBBBA's new asylum fee requirements in a policy memorandum on July 17, 2025.[11]  The July 17 EOIR Memo purported to

---

[11] *See* Sirce E. Owen, Exec. Off. for Immigr. Rev., U.S. Dep't of Just., Policy Memorandum 25-36 (Amended), *Statutory Fees Under the One Big Beautiful Bill Act* (July 17, 2025), https://www.justice.gov/eoir/media/1408356/dl?inline (the "July 17 EOIR Memo").

"implement[] the statutorily mandated immigration fees and fee waiver changes established by" the Act.  July 17 EOIR Memo at 1.

75.    EOIR stated that "an asylum application filed on July 7, 2024, that was still pending as of July 7, 2025, would be subject to the fee."  *Id.* at 2 n.4.  EOIR further determined that asylum applicants who applied for asylum in prior years before the enactment of OBBBA must pay annual asylum fees as early as July 5, 2025—the "date after the date of enactment of OBBBA."  *Id.* at 2.  EOIR also warned that "[f]ilings that do not comply with the statutory fee requirement shall be rejected."  *Id.* at 3.  USCIS announced its position in a notice published in the Federal Register on July 22, 2025.  *See* USCIS Immigration Fees Required by HR-1 Reconciliation Bill, 90 Fed. Reg. 34511, 34511 (July 22, 2025) ("USCIS Federal Register Notice").

76.    Under the USCIS Federal Register Notice, any asylum applicant with a pending application whose application has been pending since October 1, 2024 or earlier would have been required to pay the annual asylum fee as early as September 30, 2025.  90 Fed. Reg. at 34515.  For applicants with applications pending on October 2, 2024 or later, the USCIS notice would require them to pay the annual fee on the one-year anniversary of the date they filed their applications (and on the same date each year thereafter while their applications remain pending).  *Id.*

77.    On or about October 2, 2025, USCIS stated on its website that "On Oct. 1, 2025, we began sending notices" to asylum seekers "who are required to pay the new Annual Asylum Fee," that "[i]f you receive a notice, you should pay the fee within 30 days," and that "[i]f you do not pay this fee, it may negatively affect your application, including, but not limited to, a delay in

processing."[12]  It remains unclear from what date the 30-day USCIS deadline runs—from the date

applicants receive the notice, the date of the notice itself, or some other date.

78.     Unlike the July 17 EOIR Memo, which required applicants to pay the annual

asylum fee as early as July 5, 2025, the USCIS Federal Register Notice provided that no applicant

was required to pay the annual asylum fee until September 30, 2025, at the earliest.  Later, on or

around October 2, USCIS stated that no applicant was required to pay the fee until 30 days after

receiving notice from the agency, which the agency says it "began" providing on October 1.

79.     Neither the EOIR Memo nor the USCIS Federal Register Notice attempted to

reconcile these conflicting applications of the statute.  In fact, neither document referenced the

other.  EOIR's and USCIS's conflicting guidance left applicants confused about what OBBBA

requires and when the agencies believed annual asylum fees might be due.

80.     The conflicting guidance and lack of coordination demonstrate that EOIR's and

USCIS's implementation of the annual asylum fee is arbitrary and capricious.

81.     Moreover, both EOIR and USCIS impermissibly imposed the annual asylum fee

retroactively, in two distinct ways.  First, both agencies would require asylum seekers to pay the

annual asylum fee even if they filed their applications on or before July 4, 2025, when the statute

implementing the fees was enacted.  Second, both agencies count the *time* an asylum seeker's

application was pending before July 4, 2025 to determine whether the application "remains

pending" for a full "calendar year."  *See* 8 U.S.C. § 1808(a).

82.     The USCIS Federal Register Notice acknowledges that it is applying the annual

asylum fees "retroactive[ly]."  90 Fed. Reg. at 34515.  Citing the Supreme Court's decision in

---

[12] *I-589, Application for Asylum and for Withholding of Removal*, U.S. Citizenship & Immigr.
Servs., https://www.uscis.gov/i-589 (accessed Oct. 3, 2025).

*Landgraf*, USCIS claims that the Act "contains a clear expression of intent" that "requires" USCIS to "apply[] the fee to applications pending with USCIS before enactment of [OBBBA]." *Id.* USCIS asserts that because the Act assigns a $100 fee to fiscal year 2025, "it necessarily applies the provision to the start of FY 2025"—that is, applications that were filed "on or before October 1, 2024 that remain pending for the entirety of fiscal year 2025." *Id.* Otherwise, according to USCIS, "[t]o apply the law only to applications filed after the date of enactment in July 2025 or later would result in no fee collections in FY 2025 because no such application would be pending for a calendar year (*i.e.*, twelve months) during that time frame." *Id.* USCIS also maintains that its retroactive interpretation is not "impermissibly retroactive because it merely applies changes in procedural rules required by statute." *Id.* (citing *Landgraf*, 511 U.S. at 275).

83.    USCIS's interpretation of the Act is wrong. Nothing in the statute authorizes—let alone clearly authorizes—the agencies to either: (1) impose the annual asylum fee on asylum seekers who filed their applications on or before July 4, 2025; or (2) count the time an application was pending prior to July 4, 2025 in determining whether the application "remains pending" for a full "calendar year."

84.    Contrary to USCIS's assertion, nothing in the statute's text requires the government to collect the $100 annual asylum fee in FY 2025. Even if no FY 2025 fee is collected, Congress's decision to set the FY 2025 fee at $100 serves an essential and obvious role because it is the baseline number used to calculate the fee for FY 2026 and future years. That Congress set a reference value says nothing—and certainly not enough to overcome the presumption against retroactivity—about whether Congress intended the annual asylum fees to apply retroactively.

85.    USCIS's attempt to minimize imposing the annual asylum fees retroactively by characterizing it as simply a "procedural" change is also wrong. The Supreme Court has made

clear that "[w]hen determining whether a new statute operates retroactively, it is not enough to attach a label . . . [the court] must ask whether the statute operates retroactively." *Martin v. Hadix*, 527 U.S. 343, 359 (1999).  Here, the USCIS Notice and the EOIR Memo "attach[] new legal consequences to events completed before its enactment"—namely, USCIS and EOIR will require asylum seekers to pay annual fees for applications filed on or before July 4, 2025.  *See id.* at 357–58 (quoting *Landgraf*, 511 U.S. at 270); *see also Landgraf*, 511 U.S. at 275 n.29 ("Nor do we suggest that concerns about retroactivity have no application to procedural rules.").

86.     The July 17 EOIR Memo, for example, determined that asylum applicants who applied for asylum in prior years before OBBBA's enactment must pay annual asylum fees as early as July 5, 2025—the "date after the date of enactment of OBBBA."  *See* EOIR Memo at 2. In other words, EOIR purported to require applicants to pay annual asylum fees calculated by counting the time that their application was pending *before* the Act became law to determine whether their applications have remained pending for a "calendar year."  *Id.*

87.     The USCIS Federal Register Notice similarly required applicants with cases pending since October 1, 2024, or earlier to pay the annual fee in 2025, 90 Fed. Reg. at 34515; the agency later clarified that these applicants would be required to pay "within 30 days" after receiving individualized notice from the agency, which the agency said it "began" sending on October 1, 2025.  Applicants who filed after October 2, 2024, would be required to pay their first annual asylum fee based on the one-year anniversary of their filing date—and on that date each year thereafter—again counting pre-enactment time against them.  *Id.*

88.     Thus, the USCIS Federal Register Notice and July 17 EOIR Memo have impermissible retroactive effect in two distinct ways.  First, both agencies attach new legal consequences to asylum seekers' requests for asylum even though those requests were filed before

OBBBA's enactment.    Second, both agencies attach new legal consequences to the *time* applications remained pending before OBBBA's enactment.

### C.    The Lack of Clarity Regarding Payment Requirements Created Confusion and Penalized Asylum Applicants.

89.    Remarkably, both USCIS and EOIR claimed that some applicants were required to pay the annual asylum fee, despite failing to articulate to asylum applicants a clear plan for collecting the fee.

90.    EOIR even failed to create a payment mechanism for the annual asylum fee until October 23, 2025.  This bureaucratic Catch-22 placed asylum seekers in an untenable dilemma: their applications were at risk of dismissal or rejection for non-payment of a fee that EOIR had provided no way to pay.

91.    As one news story reported, "asylum seekers in New York were flooded with messages—some from their lawyers—telling them to pay a $100 fee to the Trump administration by [Tuesday, September 30, 2025] or risk deportation."[13]   As quoted in the news story, a spokesperson for the American Immigration Lawyers Association stated at that time that "[t]here is still no way to pay the annual fee for pending applications," and "so many practitioners are still concerned about applications being dismissed if there is no mechanism set up to pay that fee . . . . There are very real consequences for asylum seekers navigating this completely unnecessary bureaucratic mess."  One asylum seeker stated, "I have no idea what to do," noting that "[p]eople say that the site isn't even finished.  We hear a lot of things.  In the end, you don't know what's true or not."  A legal aid attorney said she'd heard reports of *notarios*, non-lawyers who represent themselves as qualified to offer advice on immigration matters, "using this confusion to spread

---

[13] Liv Veazey, *Asylum-Seekers in Panic Over Trump's Unclear $100 Fee*, The City (Sept. 29, 2025), https://www.thecity.nyc/2025/09/29/asylum-seekers-immigration-trump-100-dollar-fee/.

widespread fear amongst noncitizens and charge them exorbitant amounts to purportedly help them pay these fees."

92.    EOIR experienced similar problems with the initial asylum fee required for new applications.  One news source reported that "[o]fficials are adjusting on the fly" to the Act's new fee requirements, and in one court appearance, "[n]either the clerk nor the U.S. Department of Homeland Security attorney representing the government at the family's hearing knew which agency was accepting the checks."[14]  According to the news source, the immigration judge at that hearing informed the family, "I can't tell you who to pay" because "[immigration judges] haven't been told where the money is to be sent."

93.    Once EOIR provided a mechanism for new applicants to pay the *initial* asylum fee, asylum applicants and their attorneys attempted to use EOIR's payment method for initial asylum applications, sending the immigration court $100 for the annual asylum fee through the mechanism for paying the initial fee and hoping that will suffice.  Many asylum seekers with applications pending before EOIR believed they needed to pay the annual asylum fee to EOIR by September 30, 2025, based on USCIS's instruction that this was the first date on which annual asylum fees might become due, and attempted to pay by submitting an *initial* asylum fee payment through the EOIR portal.

94.    Some asylum seekers went without groceries so they could come up with the money to pay EOIR annual asylum fees through the online mechanism for paying the initial asylum fee. Despite representations from EOIR, including sworn statements by Director Margolin to the effect, it has yet to be seen in practice whether EOIR will even credit payments made in this manner.

---

[14] Andrew Hazzard, *New fees for immigration paperwork creates confusion in court, challenges for applicants*, Sahan J. (July 14, 2025), https://sahanjournal.com/news/immigration-court-new-fees-asylum-big-beautiful-bill/.

95.     At the time, ASAP received reports from both asylum seekers (including ASAP members) and their attorneys that some immigration judges in EOIR proceedings were requiring asylum applicants to pay the annual asylum fee before adjudicating their asylum claims.  EOIR has since admitted that "approximately 10" applicants for asylum had their applications denied for failure to pay the annual asylum fee before EOIR set up a payment mechanism.  January 2 EOIR Memo at 5 n.11.  That is despite the fact that the government failed to provide applicants with notice and instructions on how to pay, and even though the asylum application also contained claims for withholding of removal and protection under the CAT, which were not subject to the annual asylum fee.

**D.     The Court Stays the USCIS Federal Register Notice and July 17 EOIR Memo, and EOIR Issues a January 2, 2026 Memo Re-Implementing the Annual Asylum Fee.**

96.     On October 30, 2025, this Court granted a stay pursuant to 5 U.S.C. § 705, temporarily enjoining USCIS's Federal Register Notice and EOIR's July 17 Memo.  The Court held that ASAP was likely to succeed on its claim that the agencies had arbitrarily adopted divergent and inconsistent implementation schemes in circumstances "presenting a 'compelling need for interpretive uniformity[.]'"

97.     The Court stated that it "will entertain promptly a motion to lift the stay once [EOIR and USCIS] have implemented uniform policies providing asylum applicants with fair notice of the applicable fee deadline, the mechanism for payment, and the adverse consequences that might result from nonpayment."

98.     To ASAP's knowledge, USCIS is abiding by this Court's stay and is not currently enforcing the annual asylum fee.[15]  But USCIS has not rescinded or revised its underlying interpretation of the Act.

99.     In response to this Court's October 30, 2025 Memorandum Opinion and Order staying EOIR's July 17 Memo, EOIR initially instructed immigration judges to stop requiring payment of the annual asylum fee, and to ASAP's knowledge immigration judges followed this instruction from approximately October 30, 2025 until January 2, 2026.

100.    On January 2, 2026, while this Court's stay remained in place, and without notifying Plaintiff or the Court, EOIR issued a new policy memorandum that rescinded and cancelled the July 17 Memo and directed immigration judges to require annual asylum fee payments.  *See* January 2 EOIR Memo.  The January 2 Memo concedes that it continues to implement the annual asylum fee retroactively.  *Id.* at 2.

101.    At the same time, EOIR announced that it had created a template order referenced in the January 2 EOIR Memo for the purpose of requiring the annual asylum fee ("Template Order") and instructed immigration judges to use the Template Order for that purpose.  *See* January 2 EOIR Memo at 4.

102.    Immigration judges are now implementing EOIR's January 2 Memo and appear to be systematically using the Template Order to require annual asylum fee payments.

103.    The January 2 EOIR Memo claimed for the first time that the July 17 EOIR Memo "merely summarized the relevant statutory text of the OBBBA" and as such "had no independent

---

[15] *See* Press Release, U.S. Citizenship & Immigr. Servs., Court Order on Annual Asylum Fee Notices (Nov. 7, 2025), https://www.uscis.gov/newsroom/alerts/court-order-on-annual-asylum-fee-notices (last accessed Jan. 13, 2026) ("USCIS strongly disagrees with the Court's order but will follow its terms pending possible further judicial review.").

legal effect." January 2 EOIR Memo at 1.  The January 2 Memo also stated that "even if the instant [policy memorandum] is enjoined or stayed, EOIR adjudicators will remain obligated to apply the relevant provisions of the OBBBA, including the [annual asylum fee], unless those provisions are themselves enjoined or invalidated."  *Id.* at 6 n.12.

104.    Defendants EOIR and the Attorney General appear to be incorrectly interpreting the OBBBA to supply individual immigration judges with independent authority to impose the asylum fees addressed in the statute (and to ignore this Court's orders).  But the statute provides that "the *Secretary of Homeland Security or the Attorney General, as applicable*, shall *require* the payment of a fee . . . by any alien who files an application for asylum under section 1158 of this title at the time such application is filed."  8 U.S.C. § 1802(a) (emphases added).

105.    OBBBA further provides that, "In addition to any other fee authorized by law, for each calendar year that an alien's application for asylum remains pending, *the Secretary of Homeland Security or the Attorney General, as applicable*, shall require the payment of a fee, equal to the amount specified in subsection (b), by such alien." 8 U.S.C. § 1808(a) (emphasis added).

106.    Accordingly, the OBBBA mandates that the Department of Homeland Security (in practice, USCIS) and the Attorney General (in practice, EOIR) take affirmative action to operationalize and require both the initial and annual asylum fee requirements.  Absent such implementing action, there exists no requirement for applicants to pay the fees for immigration judges to enforce.

107.    EOIR's January 2 Memorandum constitutes final agency action implementing Section 1808 because it sets forth EOIR's operative interpretation of the statute and guidelines for

implementing the annual asylum fee.  On cue, immigration judges began following EOIR's directive and issuing orders requiring applicants to pay the fee.

108.    EOIR's public EOIR Payment Portal Frequently Asked Questions (FAQ) dated January 2026 also confirms that any applicant "who had an asylum application pending for one year or more on or after October 1, 2025, must pay an Annual Asylum Fee (AAF)."[16]

**E.    EOIR's January 2 Memo Is Causing Confusion, Lack of Adequate Notice, and Risk of Adverse Immigration Consequences for Asylum Seekers.**

109.    EOIR's unilateral re-implementation of the fee has resulted in significant confusion regarding whether the annual asylum fee is currently due, when payment is required, and whether this Court's stay remains operative.  This confusion is exacerbated by the fact that the January 2 EOIR Memo is itself arbitrary and capricious, even when considered separate from the USCIS Federal Register Notice.

110.    Immigration attorneys have expressed surprise, concern, and confusion that their clients are being required to pay a fee that the attorneys understood to be stayed by this Court.

111.    For asylum applicants who are not represented by counsel, the risk of confusion is even greater.  On January 6, 2026, for instance, an attorney observed a Master Calendar Hearing where the immigration judge ordered numerous *pro se* asylum applicants to pay the annual asylum fee. The attorney observer was concerned that the lack of details about the fee requirement could lead to noncitizens being confused and potentially failing to pay the annual asylum fee in time to avoid adverse immigration consequences.

112.    EOIR is imposing the annual asylum fee inconsistently across cases and is not providing at least 30 days' notice to all applicants, despite having previously committed to the

---

[16] Exec. Off. for Immigr. Rev., *EOIR Payment Portal Frequently Asked Questions (FAQ)* at 1 (Jan. 2026), https://perma.cc/N36X-JEJ4.

Court the agency would do so.  Immigration judges are ordering applicants to pay the fee on a case-by-case basis, resulting in a lack of clear notice and wide variation in deadlines.

113.    For instance, one practitioner received an electronic order from an immigration judge on January 6, 2026 requiring her client to pay the annual asylum fee by January 13.  Another practitioner received an electronic notice on January 6, 2026 requiring her client to pay the annual asylum fee by January 26.

114.    EOIR is not giving applicants sufficient time to pay the annual asylum fee.  In some cases, the deadlines set by immigration judges provide applicants significantly less than the 30 days' notice, making it difficult for applicants to come up with the funds to pay the annual asylum fee in time.  At least one applicant received an order requiring her to pay the annual asylum fee in just two days (and the applicant in reality had only one day of notice because of EOIR's delay in uploading the order to its online portal).  For the many applicants who will receive notice of the payment requirement by mail rather than electronically, several days of the notice period would likely have already passed by the time the notice even arrives.

115.    EOIR's arbitrary and capricious reimposition of the annual asylum fee again raises the specter of the deportations of bona fide asylum seekers and applicants seeking withholding of removal or protection under the CAT.  In the template order, the payment deadline for the annual asylum fee is buried in a paragraph near the bottom of the order, which states that "[f]ailure to timely pay the fee may result in a finding that you have abandoned or withdrawn your application and may result in its denial or dismissal."  EOIR has encouraged immigration judges to use the template order.  *See* January 2 EOIR Memo at 4 .

116.    EOIR claims that "well-established procedural remedies" are available to individuals who have their asylum (or withholding of removal or CAT) claims denied or deemed

abandoned due to failure to pay the fee, January 2 EOIR Memo at 5 n.11.  However, these remedies are burdensome and expensive—requiring applicants to pay hundreds, if not thousands, of dollars in additional fees and legal costs.  In practice, pursuing a BIA appeal or a motion to reconsider almost always requires the assistance of an attorney.  Many applicants for protection cannot afford an attorney or the new and additional appeal fees that are required to access those purported remedies.  *See* Pub. L. No. 119-21, §§ 100013(d), 139 Stat. at 377 (codified at 8 U.S.C. § 1812(d)) (new $1,010 fee for appeals to the BIA).  This is all the more reason why ensuring adequate notice and sufficient time to pay the annual asylum fee is critical.

117.    These harms are concrete and irreparable.  By circumventing the Court's 5 U.S.C. § 705 stay and resuming implementation of the annual asylum fee without clear notice or uniform procedures, EOIR has predictably exposed applicants to denial or removal for nonpayment under ad hoc deadlines that cannot be meaningfully anticipated or met.

118.    These failures predictably subject asylum applicants to immigration enforcement, detention, and deportation based solely on nonpayment of a fee they were not clearly or timely notified of or could not reasonably pay in time.

119.    USCIS's and EOIR's annual asylum fee policies also continue to diverge in material ways that directly affect applicants' ability to understand when the annual asylum fee is due, how to determine whether it is owed, and how to comply without risking denial or abandonment of their claims.  These are not minor administrative differences; they go to core questions of notice, timing, and clarity that the agencies must address reasonably and consistently to operationalize Section 1808 in a non-arbitrary manner.

**F.    EOIR's Arbitrary and Capricious Policies Have Resulted In The Rejection of Withholding of Removal and CAT Claims for Failure to Pay Asylum Fees.**

120.    The January 2 EOIR Memo acknowledges in passing that applications for asylum will be denied if the annual asylum fee is not paid, *see* January 2 EOIR Memo at 5, and encourages immigration judges to use the template order for implementing the annual asylum fee, *id.* at 4. Immigration judges have already begun using the template order.

121.    The template order suggests that failure to timely pay the annual asylum fee will result in abandonment or denial of an applicant's entire Form I-589 application, without clarifying that any accompanying withholding of removal or CAT claims—which are not subject to annual (or initial) asylum fees under the One Big Beautiful Bill Act—would remain pending.

122.    ASAP's understanding is that immigration courts have already wrongfully rejected initial Form I-589 applications that included claims for withholding of removal and protection under the CAT absent payment of the *initial* asylum fee, even though the applicants were not seeking asylum, or were seeking all three forms of relief – asylum, withholding of removal, and protection under the CAT.

123.    Taken together, the January 2 EOIR Memo's failure to address whether asylum fees apply to withholding and CAT claims, EOIR's template order treating the entire Form I-589 as abandoned or denied for nonpayment of the annual asylum fee, and reports that immigration courts are refusing to accept I-589 applications seeking withholding and CAT without payment of the initial asylum fee, indicate that EOIR has adopted an incorrect and unlawful policy imposing the initial and annual asylum fees to withholding of removal and CAT claims.

124.    EOIR has no authority to impose initial or annual asylum fees on applications for withholding of removal or CAT protection or to reject such applications on the basis of non-

payment of asylum fees, even where these forms of relief are requested through the same Form I-589 filing in which an applicant seeks asylum.

125.     EOIR's policies purporting to enforce an asylum fee requirement for withholding and CAT claims: create confusion; risk wrongful rejection of withholding of removal and CAT applications, which EOIR is legally obligated to accept and adjudicate; and cause significant harm to applicants who may face removal to countries where they may face persecution or torture if their claims are not heard.

**Count One (All Defendants)**

**Impermissible Retroactivity as to Applications Filed On or Before July 4, 2025**

128.     ASAP incorporates by reference the allegations of the preceding paragraphs.

129.     Under the APA, courts must "hold unlawful and set aside agency action . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

130.     A statute may not "operate retroactively . . . absent clear congressional intent favoring such a result." *See Landgraf*, 511 U.S. at 280; *see also, e.g.*, *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 214 (1988) ("[T]he absence of any express authorization for retroactive [rulemaking in the statute] weighs heavily against the Secretary's position.").

131.     Here, USCIS and EOIR are both imposing annual asylum fees retroactively to applications that were pending as of July 4, 2025, without clear authorization from Congress. These asylum seekers should never have to pay an annual asylum fee.  Thus, each agency is exceeding the scope of its statutory authority.

**Count Two (All Defendants)**

**Impermissible Retroactivity as to Time Applications Were Pending Before July 4, 2025**

132.     ASAP incorporates by reference the allegations of the preceding paragraphs.

133.    In the alternative, and even assuming the Act imposed annual asylum fees on asylum seekers who filed their applications on or before July 4, 2025, Congress did not clearly provide that the *time* an application "remains pending" includes time prior to OBBBA's enactment. Rather, the earliest any applicant may be charged the annual asylum fee is one calendar year from OBBBA's enactment—on or after July 5, 2026—which is one "calendar year" later.

134.    Despite the lack of clear authorization from Congress, USCIS and EOIR each purport to count the days an asylum application was pending prior to the date of OBBBA's enactment as part of the calendar year that triggers the annual asylum fee payment requirement. Thus, each agency is exceeding the scope of its statutory authority.

### Count Three (All Defendants)

### Arbitrary and Capricious Decisionmaking

135.    ASAP incorporates by reference the allegations of the preceding paragraphs.

136.    Under the APA, courts must "hold unlawful and set aside" arbitrary and capricious agency action.  5 U.S.C. § 706(2)(A).

137.    Defendants share authority to implement and enforce the provisions of OBBBA imposing annual asylum fees.

138.    The USCIS Federal Register Notice, July 17 EOIR Memo, and January 2 EOIR Memo, and USCIS's and EOIR's implementation of the annual asylum fee more generally, are each arbitrary and capricious on their own.  In addition, the agencies' policies are arbitrary and capricious because they adopted inconsistent and conflicting implementations of the Act as to how much notice an applicant will receive before their annual asylum fee is due and how the agency confirms payment before taking adverse action, among others.

139.    Neither agency adequately acknowledged or considered the other agency's position, the confusion that their conflicting positions would engender, or the need to harmonize their approaches on key issues (such as ensuring applicants will receive adequate notice).

140.    Both agencies imposed annual asylum fees on applicants with pending asylum applications without providing an adequate process for applicants to pay the fees before the first fees became due.

141.    Neither agency acknowledged how applications for asylum will be treated for purposes of annual asylum fees if jurisdiction over the applications is transferred between agencies during the pendency of the asylum claim.

142.    For these reasons, among others, the USCIS Federal Register Notice, July 17 EOIR Memo, and the January 2 EOIR Memo, both agencies' implementation of the annual asylum fee more generally, are arbitrary and capricious.

## Count Four (All Defendants, In The Alternative)

### Agency Action Unlawfully Withheld or Unreasonably Delayed, Or Taken Without Observance of Procedure Required By Law, Or Taken In Excess of Statutory Authority

143.    ASAP incorporates by reference the allegations of the preceding paragraphs.

144.    Under the APA, courts shall "compel agency action unlawfully withheld or unreasonably delayed" and shall "hold unlawful and set aside agency action" taken "in excess of statutory jurisdiction, authority, or limitations" or "without observance of procedure required by law." 5 U.S.C. §§ 706(1), 706(2)(C)–(D).

145.    OBBBA provides that "the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee . . . by any alien who files an application for asylum under section 1158 of this title at the time such application is filed." 8 U.S.C. § 1802(a).

146.    OBBBA further provides that "In addition to any other fee authorized by law, for each calendar year that an alien's application for asylum remains pending, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee, equal to the amount specified in subsection (b), by such alien."  8 U.S.C. § 1808(a).

147.    Accordingly, OBBBA mandates that the Department of Homeland Security Attorney General take lawful, affirmative agency action to operationalize and require the initial and annual asylum fee requirements.

148.    Absent such lawful, final agency action by officials with lawful delegated authority—here USCIS and EOIR—to operationalize and require the fee, the agencies' employees (including immigration judges) lack authority to enforce or attempt to impose the statutory fees themselves on an ad hoc basis.

149.    To the extent Defendants are currently requiring, threatening to require, or authorizing the collection of initial or annual asylum fees—including retroactively—such requirements necessarily rest on final agency action because they purport to interpret and implement the OBBBA.

150.    The agency actions identified in this First Amended Complaint constitute final agency action, and they are unlawful because they are arbitrary and capricious and impermissibly authorize the imposition of fees—including retroactive fees—without a lawful basis.

151.    In the alternative, if the agency actions challenged in this lawsuit do not constitute final agency action, then Defendants (a) have unlawfully withheld or unreasonably delayed the agency action necessary to lawfully implement OBBBA's asylum fee provisions, or (b) are enforcing the OBBBA in the absence of required agency action to lawfully implement the asylum fees, in excess of statutory authority.

152.    In any case, Defendants' conduct violates the APA because asylum applicants are being subjected to asylum fee requirements in the absence of lawful agency action authorizing such requirements.

153.    ASAP and its members are therefore entitled to relief under the APA and other applicable law.

### Count Five (EOIR and Attorney General)

### Unlawful Agency Action (Requiring Initial and Annual Asylum Fee for Withholding and CAT Applications)

154.    ASAP incorporates by reference the allegations of the preceding paragraphs.

155.    Under the Administrative Procedure Act, courts must "hold unlawful and set aside" arbitrary and capricious agency action, 5 U.S.C. § 706(2)(A), as well as agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C).

156.    OBBBA imposes initial and annual fees on asylum applications but does not impose such fees on applications for INA withholding or protection under the CAT.

157.    EOIR's policies failed to take into account an important aspect of the problem: because Form I-589 is shared between asylum, INA withholding, and CAT applications, any asylum fee policy that does not distinguish among these four forms of relief will cause confusing and conflicting results, leading to the fee being unlawfully applied to fee-exempt INA withholding and CAT claims.

158.    For these reasons, EOIR's policies resulting in immigration courts and individual adjudicators rejecting, denying, or deeming abandoned I-589 applications if the initial or annual asylum fees are not paid, including applications for INA withholding and CAT protection, are arbitrary and capricious.

159.    ASAP and its members are therefore entitled to relief under the APA and other applicable law.

## Prayer For Relief

160.    ASAP respectfully requests entry of an order and judgment:

    a.    Declaring that the policies described in the USCIS Federal Register Notice, July 17 EOIR Memo, January 2 EOIR Memo, and EOIR's template order are unlawful;

    b.    Staying, pursuant to 5 U.S.C. § 705, USCIS's Federal Register Notice, EOIR's July 17 Memo, EOIR's January 2 Memo; and EOIR's template order;

    c.    Vacating and setting aside, pursuant to 5 U.S.C. § 706, USCIS's Federal Register Notice, EOIR's July 17 Memo, EOIR's January 2 Memo; and EOIR's template order;

    d.    Enjoining Defendants from requiring payment of the annual asylum fee from ASAP members, or from penalizing ASAP members for nonpayment of the annual asylum fee, unless and until Defendants have adopted consistent policies that provide fair and adequate individualized notice and a meaningful opportunity to pay, including a minimum of 30 days notice;

    e.    Declaring that OBBBA does not authorize the retroactive imposition of annual asylum fees for asylum applications that were filed on or before July 4, 2025;

    f.    Enjoining Defendants from imposing annual asylum fees for asylum applications that were filed on or before July 4, 2025;

g.  Declaring that Defendants lack statutory authority to reject, deny, dismiss, or deem abandoned any claims for INA withholding or CAT protection for nonpayment of the initial or annual asylum fee;

h.  Enjoining Defendants from rejecting, denying, dismissing, or deeming abandoned any claims for INA withholding or CAT protection for nonpayment of the initial or annual asylum fee;

i.  Ordering Defendants to reinstate to the status quo ante asylum applications that were pending as of July 4, 2025, and were then dismissed or otherwise rejected for failure to pay an annual asylum fee;

j.  Ordering EOIR to make appropriate efforts to reimburse or credit asylum seekers for any attempts to pay the annual fee made through the EOIR's initial fee portal, by mail, or through other means;

k.  Entering any other necessary preliminary relief;

l.  Awarding ASAP its reasonable costs, including attorney fees, incurred in bringing this action under 28 U.S.C. § 2412 or other applicable law; and

m.  Granting such other and further relief as this Court deems just and proper.

DATED:  January 17, 2026                       Respectfully submitted,

                                               */s/ Andrew G. Barron*

                                               Matt Gregory*
                                               Susan M. Pelletier*
                                               Eric Brooks**
                                               Andrew G. Barron (D. Md. Bar 30311)
                                               T. Hunter Mason*
                                               Rachel E. Schwab (D. Md. Bar 31646)
                                               GIBSON, DUNN & CRUTCHER LLP
                                               1700 M Street, N.W.
                                               Washington, D.C. 20036
                                               Telephone:    (202) 955-8500

Facsimile:     (202) 831-6088
mgregory@gibsondunn.com
spelletier@gibsondunn.com
ebrooks2@gibsondunn.com
abarron@gibsondunn.com
hmason@gibsondunn.com
rschwab@gibsondunn.com

Conchita Cruz*
Jessica Hanson (D. Md. Bar 31903)
Leidy Perez*
Marcela X. Johnson*
Juan E. Bedoya*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S. #84810
New York, NY 10003-1502
Telephone:     (646) 647-6779
conchita.cruz@asaptogether.org
jess.hanson@asaptogether.org
leidy.perez@asaptogether.org
marcela.johnson@asaptogether.org
juan.bedoya@asaptogether.org

*Counsel for Plaintiff*

*Admitted *pro hac vice*
**Pro hac vice* application forthcoming