# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## NORTHERN DIVISION

| | |
|---|---|
| ASYLUM SEEKER ADVOCACY PROJECT,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES CITIZENSHIP AND<br>IMMIGRATION SERVICES, *et al.*,<br><br>    Defendants. | Civil Action No. 1:25-cv-03299-SAG<br><br>**Hearing Requested**<br><br>**Decision Requested By January 30, 2026** |

**Plaintiff's Consolidated Memorandum of Law in Support of Motion for a Temporary Restraining Order, Preliminary Injunction, and/or Preliminary Relief Under 5 U.S.C. § 705, and in Opposition to the Government's Motion to Lift the Stay (ECF 71)**

**Table of Contents**

**Page**

Introduction ................................................................................................................. 1

Background .................................................................................................................. 3

     I.     Congress directed USCIS and EOIR to implement the annual asylum fee. .......... 3

     II.    ASAP sued, and both agencies committed to providing asylum seekers with thirty days' notice when their fees were due. ................................................. 4

     III.   EOIR tries again with a new policy that fails to afford thirty days' notice. .......... 5

     IV.   ASAP members face confusion and suffer economic injury. ............................... 8

Legal Standard ........................................................................................................... 10

Argument .................................................................................................................... 11

     I.     ASAP is likely to succeed on the merits. ............................................................ 11

          A.    ASAP is likely to prevail on its argument that the EOIR Memo is arbitrary and capricious .......................................................................... 11

          B.    ASAP is likely to prevail on its argument that EOIR's retroactive application of Section 1808 exceeds its statutory authority (Counts One and Two). ......................................................................................... 19

          C.    EOIR's January 2 memo is final agency action. .................................... 19

     II.    The remaining factors weigh decisively in favor of preliminary relief. .............. 22

          A.    Irreparable harm ..................................................................................... 22

          B.    Balance of the equities and public interest ............................................. 25

     III.   The Court Should Deny Defendants' Motion to Lift the Stay ........................... 25

Conclusion ................................................................................................................. 26

## Introduction

The government has not fixed the problem that led this Court to stay EOIR's and USCIS's prior policies implementing the annual asylum fee, and in several ways has made the problem worse. This Court held that EOIR and USCIS acted arbitrarily and capriciously by inconsistently implementing the same annual asylum fee that Congress required them to operationalize. On January 2, EOIR adopted a new policy memorandum directing immigration judges to begin reimposing the fee, but explicitly refused to reconcile its policy with USCIS. *See* ECF 71-1. For example, EOIR refused to ensure that applicants receive written notice and at least 30 days to pay the fee, instead urging immigration judges to choose their own ad hoc, case-specific deadlines that could give (and already have given) asylum seekers as little as two days to pay. During the first round of briefing before this Court, a central concern was whether asylum applicants would get notice of their deadline to pay the annual asylum fee with adequate time to pull together money and actually pay the fee. Back then, the EOIR Director swore under oath and government lawyers represented to this Court that EOIR would adopt policies to ensure that applicants would have thirty days to pay the fee from the date they received notice that the fee was due. These representations have proven untrue. The January 2 memo, moreover, sets no standard for who should receive those notices—failing to give even the elementary direction that immigration judges should not send the form to people who have already paid the annual asylum fee to EOIR or USCIS, or else providing an internal way for judges to verify prior payment.

Immigration judges have implemented EOIR's January 2 policy as one might expect. They have issued varying deadlines to asylum applicants, including some deadlines as short as two days. For some applicants, it could take several days (or weeks) for them to even receive the notice by mail, meaning they may lose their statutory right to asylum without any notice that they are required to pay the annual asylum fee. In at least one case, by the time electronic notice was received,

the applicant had a *single* day to pay.  Meanwhile, asylum applicants who have already paid their asylum fees are still receiving notices telling them they must pay or potentially face removal.

This variation from case to case is unlawfully arbitrary.  And especially because these varying EOIR deadlines conflict with USCIS's guidance, they have injected even more confusion into the agencies' already bewildering and chaotic attempts to implement the annual asylum fee.  EOIR's policy also traps asylum seekers who live paycheck to paycheck and may not be able to muster the fee on a few days' notice.  EOIR's stubborn refusal to provide adequate notice will result in the denial of asylum claims and other adverse consequences.

And all of this is for no good reason.  EOIR's principal justification for not standardizing the timing and manner of notice is the patently wrong claim that it lacks the authority to do so.  EOIR's alternative argument about the desirability of tailoring the deadline to individual cases fails to address why there should not be *at minimum* the thirty-day floor that USCIS adopted and EOIR previously promised.  EOIR has also wholly failed to acknowledge the serious harms inflicted by its new policy.  This is textbook arbitrary-and-capricious behavior, and the policy should be stayed until EOIR corrects it.

EOIR's new policy is also breeding confusion and irreparably harming asylum seekers' rights in another way: the January 2 memo instructs immigration judges to use a template order that wrongly suggests that applicants who fail to pay the annual asylum fee by the ad hoc deadline imposed by an immigration judge will abandon their *non-asylum* claims, specifically requests for withholding of removal under the Immigration and Nationality Act ("INA withholding") and protection under the Convention Against Torture ("CAT").[1]  There is no lawful basis for imposing

---

[1] As used herein, the term "CAT protection" encompasses both withholding of removal under CAT and deferral of removal under CAT.

asylum fees on those distinct requests for relief.  Yet immigration judges have already made this mistake repeatedly in connection with the *initial* asylum fee, and EOIR is now inducing them to do so systematically for the annual asylum fee.  This part of EOIR's new policy should be stayed too.

## Background

### I.    Congress directed USCIS and EOIR to implement the annual asylum fee.

On July 4, 2025, the President signed the One Big Beautiful Bill Act (OBBBA) into law. The statute provides:

> In addition to any other fee authorized by law, for each calendar year that an alien's application for asylum remains pending, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee, equal to the amount specified in subsection (b), by such alien.

8 U.S.C. § 1808(a).  The statute separately imposes an initial asylum fee, also inflation-adjusted, on all new asylum seekers.  8 U.S.C. § 1802.

The agencies tasked with implementing the annual asylum fee are USCIS (a component of the Department of Homeland Security) and EOIR (a component of the Justice Department).  *See* 8 U.S.C. § 1808(a).  This reflects that there are two ways to apply for asylum: affirmatively with USCIS, or defensively before an immigration judge at EOIR.  Applicants seek asylum defensively if they are in removal proceedings; otherwise they must apply to USCIS.[2]

Over the summer, the agencies tried but failed to coherently implement the statute.  On July 17, 2025, EOIR released a policy memorandum purporting to "implement[] the statutorily

---

[2] *See generally* Policy Memorandum 602-0187, *Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Deportable Aliens*, USCIS (Feb. 28, 2025), https://www.uscis.gov/sites/default/files/document/policy-alerts/NTA_Policy_FI-NAL_2.28.25_FINAL.pdf (USCIS, Immigration and Customs Enforcement, and Customs and Border Protection have concurrent authority to commence removal proceedings).

mandated immigration fees and fee waiver changes established by" the Act.[3]  EOIR determined

that certain individuals who filed for asylum before the enactment of the statute owed their annual

fee as early as July 5—the "date after the date of enactment of OBBBA."  *Id.* at 2.  EOIR also

warned that "[f]ilings that do not comply with the statutory fee requirement shall be rejected."  *Id.*

at 3.  By contrast, when USCIS published a notice in the Federal Register five days later that

purported "to provide the information needed for the public to comply with the new law," it sug-

gested that asylum fees would not be due until September 30 at the earliest.  90 Fed. Reg. 34511,

34511, 34515 (July 22, 2025).

## II.    ASAP sued, and both agencies committed to providing asylum seekers with thirty days' notice when their fees were due.

ASAP, a membership organization of asylum seekers living in the United States, filed suit

in October 2025 to challenge USCIS's and EOIR's implementation of the asylum fee.  ECF 1.

ASAP sought and obtained preliminary relief.  The Court did not agree with ASAP's retroactivity

arguments, instead interpreting the statute to require fees for all pending applications.  ECF 54 at

8–12.  But the Court agreed that the agencies implemented the policy "arbitrarily and capri-

ciously."  *Id.* at 14.  Because "an individual may be subject to both agencies' policies," the Court

reasoned, and because "[n]o one should face 'multiple and perhaps conflicting interpretations of

the same requirement' when disobedience may result in significant penalties," there was a "com-

pelling need for interpretive uniformity."  *Id.* at 14–15 (quoting *DeNaples v. OCC*, 706 F.3d 481,

488 (D.C. Cir. 2013)).  But the two agencies' policies were "inconsistent" and meant that an asy-

lum seeker whose case was transferred between the two agencies might "be subject to denial of

---

[3]  *See* EOIR, Memorandum of Acting Director S. Owen, PM 25–36 (July 17, 2025), https://www.justice.gov/eoir/media/1408356/dl?inline.

his asylum application" without "receiv[ing] individual notice that his fee is due." *Id.* at 15. Because the inconsistent policies were resulting in some asylum seekers (including ASAP members) having their claims denied, the agencies' actions were causing irreparable harm. *Id.* at 16–17. Nor was it in the public interest for this unlawful policy to persist. *Id.* at 17–18. For these reasons, the Court "[t]emporarily stay[ed]" "the USCIS Federal Register Notice and the EOIR July 17 Memo" under 5 U.S.C. § 705, pending the agencies' "reconcil[ing] [their] policies." *Id.* at 18–19.

During the litigation, the government repeatedly stressed that it would give asylum applicants 30 days' notice that their fee was due before taking adverse actions against their asylum claim. EOIR's director swore in a declaration that "[o]nce EOIR issues FY 2025 [fee] billing notices owed, payments must be made by the alien no later than 30 days later to be considered timely." ECF 44-1 at 2 ¶ 8. As the government's counsel put it, "EOIR's declaration makes clear that no one will have to pay until notice is issued, and they'll have 30 days from the point in which that notice is issued to pay." Oct. 28, 2025 Hr'g Tr. 38:12–14. These representations were a significant step toward harmonizing EOIR's policy with USCIS's policy, which instructed applicants to "pay this fee within 30 days," or non-payment would "negatively affect [their] application." ECF 45-7.

### III.    EOIR tries again with a new policy that fails to afford thirty days' notice.

On January 2, 2026, EOIR again tried to implement the annual fee through another policy memorandum. The January 2 memorandum rescinds the July memo that this Court had stayed. *See* Jan. 2 Memo, ECF 71-1 at 6. The memo directs that, notwithstanding the Court's stay, "EOIR adjudicators [are] obligated to" assess the annual asylum fee. *Id.* at 6 & n.12. The memo also states that "EOIR has elected to acquiesce to USCIS's position and will waive the [annual asylum fee] for any asylum application that was pending for one year or more between July 5, 2025, and September 30, 2025, and was administratively final . . . as of September 30, 2025." *Id.* at 2. Next,

it explains that "EOIR will not expect payment … until an Immigration Judge has issued an order setting a deadline for payment and that deadline has passed." *Id.* at 4.

The memo then points to a "template order" which it "encourage[s]" immigration judges "to use" for that purpose. Jan. 2 Memo, ECF 71-1 at 4. The template's contents became clear when, shortly after EOIR issued the January 2 memorandum, immigration judges began issuing identically worded and formatted orders directing asylum seekers to pay their annual fee. *See*, *e.g.*, ECF 64-4, ECF 64-7. Each form order states that "[f]ailure to timely pay the fee may result in a finding that you have abandoned or withdrawn your application and may result in its denial or dismissal." *Id.* Each also acknowledges that asylum form previously filed by the recipient is Form I-589, "Application for Asylum *and for Withholding of Removal*." *Id.* (emphasis added). This reflects that there is only one immigration form, I-589, to apply for four types of immigration relief: asylum, INA withholding, and the two forms of CAT protection.[4] But even though only asylum claims carry the annual fee, each template order warns that the *entire* "application" may be dismissed for failure to pay a fee, without saying that only asylum claims would be affected. ECF 64-4, ECF 64-7.[5]

In substance, the form orders issued by different immigration judges across the country differ in only one way: the filled-in date by which the payment is due. For example, one order

---

[4] *See* Form I-589, https://www.uscis.gov/sites/default/files/document/forms/i-589.pdf. Applicants automatically apply for INA withholding when they apply for asylum, and can indicate if they also wish to apply for CAT protection, which includes both withholding of removal under CAT and deferral of removal under CAT. *See also* Form I-589 Instructions, https://www.uscis.gov/sites/default/files/document/forms/i-589instr.pdf ("Your asylum application is also considered to be an application for withholding of removal under section 241(b) (3) of the INA, as amended. It may also be considered an application for withholding of removal under the Convention Against Torture…. If asylum is not granted, you may still be eligible for withholding of removal.").

[5] Note that all redactions in exhibits submitted with this motion contain information that could be used to identify individual asylum applicants and are redacted for the same reasons identified in ECF 47.

issued on January 5 set a payment deadline of January 26—while a different order issued that same day demanded payment by January 13, just eight days later.  ECF 64-4, ECF 64-7.  Other asylum seekers have been given deadlines as short as two days.  *See, e.g.*, Nice Suppl. Decl. ¶¶ 6–7.  And in practice, applicants often have even less time to pay than that because they do not always receive the order on the day it is issued.  For example, many receive it only by mail, which can take days or weeks to arrive, if it ever does.  *See, e.g.*, Reddy 3rd Suppl. Decl. ¶¶ 15–16; Nice Suppl. Decl. ¶ 12.  And even those who receive electronic notices will not see the order until EOIR uploads it to an online portal.  Nice Suppl. Decl. ¶¶ 6–7; Heilbrun Decl. (ECF 64-2) ¶¶ 2–3; Karmali Decl. (ECF 64-5) ¶¶ 2–3.  ASAP has identified one applicant who was officially given two days to pay, but had only one day in reality due to EOIR's delay in uploading the order to its portal.  Nice Suppl. Decl. ¶¶ 6–7 & Exs. 1–2.

The variation and rushed deadlines persist because, contrary to EOIR's promises to this Court that it would guarantee applicants thirty days' notice, the January 2 memorandum refuses to require any minimum amount of notice and effectively encourages immigration judges to issue much shorter deadlines.  The memo argues (for the first time) that EOIR lacks the power to set a uniform deadline because the EOIR Director cannot "dictate to Immigration Judges how to rule in particular cases."  ECF 71-1 at 5; *see also id.* at 3 (arguing that "EOIR Immigration Judges possess decisional independence established by regulation" (citing 8 C.F.R. §§ 1003.0(c), 1003.9(c), 1003.10(b))).  The memo also argues that, given variations between cases, "Immigration Judges are in the best position to determine on a case-by-case basis what an appropriate deadline is."  *Id.* at 5.  But the memo fails to explain why deadlines as short as one or two days—for applications that have necessarily been pending for at least a year, and often much longer—would ever be reasonable or provide applicants with adequate notice.

The memo further argued—also for the first time—that both it and the July memo were superfluous and unnecessary. According to the memo, OBBBA imposed a self-executing obligation to pay asylum fees immediately enforceable by immigration judges. ECF 71-1 at 1–2, 6 n.12. To the extent that every party to this litigation had thought otherwise (including EOIR and its counsel), the memo assumes that they have all been wrong for the last four months.

Two weeks after EOIR released the January 2 memo, the government moved to lift this Court's October 30 stay on the ground that the memo cures the flaws the Court previously identified in USCIS's and EOIR's policies. ECF 71. Contemporaneously with the filing of this motion for a preliminary injunction and stay, and pursuant to this Court's instruction, ECF 70, ASAP has filed an amended complaint as of right that includes challenges to EOIR's updated policy.

## IV. ASAP members face confusion and suffer economic injury.

ASAP is a national voluntary membership organization of asylum seekers from 175 countries now living in the United States. Reddy Decl., ECF 29-2, ¶¶ 4–6. For many ASAP members, being forced to pay a $100 fee on an annual basis—and particularly on short notice—would impose substantial hardship. *Id.* ¶ 61; Reddy 3rd Suppl. Decl. ¶ 13. Over the last two weeks, several members and their attorneys have communicated their confusion about the new annual asylum fee to ASAP. Reddy 3rd Suppl. Decl. ¶¶ 9–14.

Even if they are not confused, the practical effect of EOIR's new policy is that many ASAP members will have untenably short notice to pay their asylum fees. The tight deadlines (as little as two days) set by some judges, compounded by EOIR's delays in disseminating the orders, mean that some asylum applicants have had as little as one or two days to pay. *See supra* at 6–7. But ASAP members have reported that the $100 fee will be difficult to pay on less than 30 days' notice due to their financial limitations, much less one day. *See* ECF 29-2 ¶ 61; Reddy 3rd Suppl. Decl. ¶¶ 13. According to a 2024 Federal Reserve study, 18% of adults in the United States "said the

largest emergency expense they could handle … was under $100."[6]  Asylum seekers are substantially overrepresented among that group: the median annual household income of an individual who has been granted lawful refugee or asylee status and has lived in the United States for 0–4 years is around $30,000, with over a third of individuals in this category living below the federal poverty line.[7]  Many ASAP members are impoverished and already face daily financial tradeoffs to cover basic needs like food and clothing.  ECF 29-2 ¶¶ 61, 70.  Coming up with $100 over any interval would be hard enough, but with only a few days' notice, asylum applicants with no money to spare could learn of the fee's deadline before a single bimonthly pay period elapses.  For the numerous asylum seekers whose families live paycheck to paycheck, this can make it impossible for them to find the money, or else require them to forego necessities.  *Id.*; Reddy 3rd Suppl. Decl. ¶ 13.

These economic hardships are compounded by EOIR's unclear instructions and failure to align its policy with USCIS's.  Not only is EOIR's policy silent on which asylum seekers should receive an order to pay (and when they should receive it); the policy does not even give judges a mechanism to determine whether an asylum applicant has already paid the fee before ordering a payment deadline.  The result is that immigration judges have issued confusing and inappropriate orders.  For example, an asylum applicant whose case was transferred from USCIS to EOIR was confused about whether their prior payment to USCIS would be recognized by EOIR.  Reddy 3rd

---

[6] U.S. Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2023-May 2024* (May 28, 2024), https://www.federalreserve.gov/publications/2024-economic-well-being-of-us-households-in-2023-expenses.htm.

[7] U.S. Dep't of Health & Human Services, Office of Human Services Policy, *The Fiscal Impact of Refugees and Asylees Over 15 Years: Over $123 Billion in Net Benefit from 2005 to 2019* at 4 (2024), https://aspe.hhs.gov/sites/default/files/documents/ea6442054785081eb121fa5137cf837d/aspe-brief-refugee-fiscal-impact-study.pdf.

Suppl. Decl. ¶ 10.  Other asylum applicants who paid the fee before any order had been issued later received orders from immigration judges with a deadline to pay the fee, leading to confusion and concern about whether a second payment was necessary.  Nice Suppl. Decl. ¶¶ 6–11; Rubenstein Decl. ¶¶ 3–7.  Absent guidance from EOIR, attorneys have been unsure whether they must proactively notify the court or provide proof of payment after paying the annual asylum fee to avoid adverse consequences, and are concerned that immigration judges have no independent way to confirm payment.  *See* Nice Suppl. Decl. ¶ 11; Rubenstein Decl. ¶¶ 3–7.

The consequences of not paying the asylum fee because of financial inability or confusion are existential.  EOIR has stated that "[f]ailure to timely pay the fee may result in a finding that [an applicant] ha[s] abandoned or withdrawn [the] application and may result in its denial or dismissal."  ECF 64-4 at 2.  If ASAP members' cases are rejected due to nonpayment of the annual asylum fee, they may lose the chance to present their asylum case and to have the facts of their case even considered, despite waiting years.  ECF 29-2 ¶¶ 62–65.  And if they are ordered removed as a result, they may be forcibly returned to a country where they face persecution, torture, or murder.  *Id.*

## Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. NRDC*, 555 U.S. 7, 20 (2008); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 238 (4th Cir. 2014) (similar).  "The standards for granting a TRO and granting a preliminary injunction are the same."  *ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 431 (D. Md. 2024).

Likewise, "Section 705 of the APA permits a court to 'issue all necessary and appropriate

process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of review proceedings' where 'required and to the extent necessary to prevent irreparable injury.'" *City of Columbus v. Kennedy*, 796 F. Supp. 3d 123, 139 (D. Md. 2025) (quoting 5 U.S.C. § 705), *appeal pending*, No. 25-2012 (4th Cir.). "The factors governing issuance of a preliminary injunction also govern issuance of a § 705 stay." *Id.* (citation omitted).

## Argument

### I.     ASAP is likely to succeed on the merits.

ASAP is likely to succeed on the merits of its claims. EOIR's implementation of the annual asylum fee remains arbitrary and capricious. The agency still has failed to correct the flaws from the last go-around because EOIR still has not harmonized its notice requirements with USCIS's. EOIR has also injected new uncertainty and unpredictability into the annual asylum fee requirement by refusing to set any minimum notice period at all. Moreover, EOIR's new policy invites immigration judges to hold—in plain violation of the statute—that failing to pay an asylum fee can affect eligibility for other forms of relief too, INA withholding and CAT protection.

### A.     ASAP is likely to prevail on its argument that the EOIR Memo is arbitrary and capricious.

The EOIR Memo is arbitrary and capricious in multiple ways. This Court has already explained why USCIS's and EOIR's policies implementing the annual fee should generally be uniform: it would be "arbitrary and capricious" to subject asylum seekers to "inconsistency between the two agencies' policies" in ways that breed confusion and affect their rights. ECF 54 at 14. That inconsistency persists. Asylum seekers still face different deadlines to pay their filing fees depending on what agency they are before. EOIR's policy is also arbitrary and capricious standing alone because it fails to set any minimum notice period during which asylum seekers must pay their fee, instead allowing individual immigration judges to impose deadlines as short as

11

two days (or, potentially, even shorter deadlines). Further, EOIR has apparently not provided immigration judges a way to check whether an applicant has paid the fee, putting applicants at risk of adverse consequences even if they have, in fact, paid. EOIR's implementation of its policy also wrongly and arbitrarily suggests to immigration judges that the failure to pay an asylum fee is a ground to deny applicants other forms of immigration relief.

      **1. Inconsistent notice.** EOIR has not fixed the problem that led this Court to stay its previous attempt to implement the annual asylum fee. USCIS is of the view that asylum applicants should have 30 days to pay their annual fee after being notified it is due. *See supra* at 5; *see also* ECF 45-7. But notwithstanding EOIR's repeated promises to match this time window, on January 2, the agency abruptly went the other way. EOIR now provides no standard minimum notice period. This is arbitrary and capricious because the "need for interpretive uniformity" remains as compelling as ever. *See* ECF 54 at 15 (quoting *DeNaples*, 706 F.3d at 488). As the Court has previously explained, "some individuals have their asylum applications transferred between USCIS and EOIR." *Id.* These asylum seekers will now hear different messages from different agencies about their deadline to pay their fees. *Cf. Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) (noting that "[s]udden and unexplained" change in policy or "change that does not take account of legitimate reliance on prior interpretations" may be "arbitrary [or] capricious"). And with some applicants having less than a week in some cases to pay the fee, the time required to receive mailed notice means that confusion cannot realistically be resolved—and applicants may even receive notice after the deadline has already passed. Reddy 3rd Suppl. Decl. ¶¶ 15–16 (many pro se applicants receive notices by mail); Nice Suppl. Decl. ¶¶ 6–7 (delayed electronic order gave applicant only one day notice); *id.* ¶ 12 (concerns about receiving mailed notices in time to pay).

There are no differences between USCIS and EOIR that justify these different policies. Tellingly, although the January 2 memo (newly) asserts "significant differences between USCIS and EOIR" concerning the previous discrepancy condemned by this Court—"different policy positions regarding collection of the [annual asylum fee] for FY 2025"—it conspicuously fails to muster any reason why the 30 days' notice afforded by USCIS would not fit the structure and aims of EOIR or why there is something unique at EOIR that warrants providing some applicants with only one or two days to pay the fee, which is virtually no notice at all. *See* ECF 71-1 at 3–4.

The January 2 memo is also arbitrary and capricious because it has "entirely failed to consider an important aspect of the problem," ECF 54 at 14 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)): ensuring that asylum seekers whose cases were transferred from USCIS or who paid the initial asylum fee before EOIR set up a portal to accept the annual asylum fee do not have to double pay. This Court has explained that it would be intolerable for "[an] individual … [to] be subject to denial of his asylum application and removal under EOIR's policy, even though he had complied with USCIS's policy." *Id.* at 15. Individuals who complied with USCIS's policy by *paying the fee* unquestionably should not have their asylum applications denied, even if they are now before EOIR. But the January 2 memo invites just that. It gives no guidance to immigration judges that before issuing the template order they should inquire whether an applicant has already paid the fee or how to find out that information. Predictably, asylum seekers who have already paid their fees (because they were previously before USCIS, or because they already paid EOIR) are receiving documents "order[ing]" them "to pay $100" that they do not owe. *See* Nice Suppl. Decl. ¶¶ 6–10 (applicant who paid through initial asylum fee payment system in order to pay annual asylum fee in Oct. 2025 had one day after receiving notice to pay annual asylum fee again in Jan. 2026); Rubenstein Decl. ¶¶ 3–5

(applicant received order to pay annual asylum fee three weeks after they paid it, resulting in confusion); Reddy 3rd Suppl. Decl. ¶ 10 (ASAP member whose case was transferred to EOIR after having paid annual asylum fee to USCIS expressed confusion). The memo's failure to consider and address this problem is arbitrary and capricious.

Even setting aside its failure to harmonize with USCIS, EOIR's policy would be unlawful standing on its own. "An agency must provide adequate explanation before it treats similarly situated parties differently." *Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994). And the "premise[] that all similarly situated applicants should be treated alike" is especially "consistent with the interest in uniformity in immigration laws." *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 82 (D.D.C. 2020). At root, the "[g]overnment is at its most arbitrary when it treats similarly situated people differently." *Etelson v. Off. of Pers. Mgmt.*, 684 F.2d 918, 926 (D.C. Cir. 1982). EOIR's continued insistence on doing so here is unlawful. Yet EOIR's policy is already resulting in asylum applicants receiving vastly different treatment—including notice periods as little as two days (with others getting several weeks)—without rhyme or reason. This "ad hocery" is "the core concern underlying the prohibition of arbitrary or capricious agency action." *Pac. Nw. Newspaper Guild, Loc. 82 v. N.L.R.B.*, 877 F.2d 998, 1003 (D.C. Cir. 1989).

In subjecting asylum seekers to the vagaries of each immigration judge's view of how much notice is needed, EOIR is causing serious harm that it has not acknowledged, much less grappled with. EOIR's policy will, for no good reason, hinder many asylum seekers from paying their fee on time. As EOIR well knew by January 2, many of these individuals are impoverished or in detention. *See* ECF 29-2 ¶ 61. They cannot necessarily come up with $100 instantaneously.

*Id.*; Reddy 3rd Suppl. Decl. ¶ 13.[8]  Yet EOIR's implementation of the annual fee gives applicants no time to plan in advance.  Unlike with USCIS, there is no way for asylum applicants at EOIR to proactively check whether their fee is due.[9]  Instead, the EOIR memo provides that fees need not be paid until an immigration judge issues an order demanding payment.  ECF 71-1 at 4.  So under EOIR's policy, orders to pay will come out of the blue and can demand payment within an extremely tight window.  This will result in asylum applicants missing their deadlines for no good reason.

EOIR's policy also invites immigration judges to set deadlines that are unreasonably short.  It can take over a week for an asylum applicant to receive notice of an immigration judge's order (assuming the notice is not lost in the mail).  Reddy 3d Suppl. Decl. ¶¶ 15–16; ECF 45-1 ¶ 17; Nice Suppl. Decl. ¶ 12.  But some of the orders have given applicants just days to pay, and under the EOIR memo judges could routinely set one-day notice periods.  Within these short timeframes, some applicants may not even receive a single biweekly paycheck.  Despite these obvious logistical problems, EOIR did not even attempt to explain why such a short deadline would ever be warranted.

EOIR's excuse for not setting a uniform notice period rests on a false legal premise.  The EOIR memo maintains that due to regulations guaranteeing immigration judges' decisional independence, EOIR simply lacks the power to direct those judges how to administer the annual fee.

---

[8] This information was presented to EOIR in this very lawsuit.  *See, e.g.*, ECF 29-2 ¶¶ 61, 66–74 (explaining and identifying examples of ASAP members' difficulties with paying $100 fee on short notice); ECF 29-1 at 9 & n.6 (citing U.S. Department of Health and Human Services study finding that the median annual household income of an individual who has recently been granted lawful refugee or asylee status and residing in the United States for 0–4 years was around $30,000).

[9] ECF 45-1 ¶ 32 ("It appears that anyone with a case at EOIR can pay any type of fee on the EOIR payment portal even if they do not owe that type of fee."); Nice Suppl. Decl. ¶ 13 (applicants cannot proactively check if their fee is due to EOIR).

That is nonsense.  The regulations cited in the memo forbid the Director or Chief Immigration Judge from "direct[ing] the result of an adjudication."  8 C.F.R. §§ 1003.0(c), 1003.9(c).  This means only that they may not "direct an Immigration Judge to rule in a particular way in a particular case."  *Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362, 377 (S.D.N.Y. 2025).  None of the rules forbids the Director from adopting *general policies* applicable to *all adjudications*.

To the contrary, Section 1003.0(c) specifies that the prohibition against "direct[ing] the result of an adjudication" does not limit "the authority of the Director under paragraph (a) or (b) of this section"—which give the Director the power to "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities."  *See* 8 C.F.R. § 1003.0(b)(1)(i), (c).  What is more, the "independent judgment and discretion" that the regulations otherwise grant to immigration judges is expressly subject to agency "regulations."  8 C.F.R. § 1003.10(b).  The suggestion that EOIR cannot set a uniform minimum notice period is therefore without basis.  Premising a policy decision on such a legal error independently "renders" EOIR's policy "arbitrary and capricious": the policy "may not stand if the agency has misconceived the law."  *Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); *see also, e.g.*, *Prill v. NLRB*, 755 F.2d 941, 947–48 (D.C. Cir. 1985) ("[a]n agency decision cannot be sustained … where it is based not on the agency's own judgment but on an erroneous view of the law").

Nor is EOIR's policy rescued by the memo's other perfunctory rationale.  The memo argues that no fixed deadline is proper because immigration judges need discretion to apply different deadlines depending on the applicant's personal circumstances.  *See* ECF 71-1 at 5.  The need for some flexibility may be a reason to afford immigration judges the discretion to *extend* the payment deadline for case-specific reasons.  But it is not a credible excuse for failing to set a minimum

default deadline ensuring that all applicants receive adequate notice. A default minimum notice period coupled with authority for an adjudicator to extend it is an obvious, extraordinarily common way to establish filing deadlines in judicial and administrative proceedings. *See*, *e.g.*, 37 C.F.R. § 1.378 (allowing the Director of the U.S. Patent and Trademark Office to accept "delayed payment" of a patent maintenance fee); Fed. R. Bankr. P. 1006 (requiring bankruptcy petitions to be "accompanied by the filing fee," but allowing the bankruptcy court to "extend the time to pay an installment" of that fee); 28 U.S.C. § 2107(c) (allowing federal district courts to "extend the time for appeal upon a showing of excusable neglect or good cause"). So the need for flexibility is far from a sufficient explanation for EOIR's free-for-all in which some applicants get just a few days (maybe less) to pay the fee.

Nor has EOIR even attempted to explain why it would ever be necessary to afford less than the 30 days' notice promised by USCIS. EOIR's failure to discuss the obvious alternative of setting a harmonized 30-day minimum deadline (while allowing some discretion to deviate from that deadline for just cause) was arbitrary and capricious, especially given the inconsistency with USCIS's policy. *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 816 n.41 (D.C. Cir. 1983) (agencies must "consider[] obvious and potentially viable alternatives").

**2. Incorrect treatment of non-asylum claims.** EOIR's implementation of the statute is also arbitrary and capricious because EOIR is wrongly suggesting to immigration judges and asylum seekers that failing to pay the asylum fee should defeat even an applicant's non-asylum claims. Asylum, INA withholding, and CAT protection under the Convention Against Torture are "separate types of immigration relief." *Jian Tao Lin v. Holder*, 611 F.3d 228, 232 n.2 (4th Cir. 2010). The initial and annual asylum fees apply only to asylum claims. 8 U.S.C. § 1808. There is no

17

plausible contrary interpretation of the statute, as the government's lawyers in this case have conceded.  *See* Oct. 28, 2025 Hr'g Tr. 41:10–19 (Government counsel representing that nonpayment of the annual asylum fee "would not impact" applications for CAT protection or other forms of relief).

Inexplicably, EOIR's new policy invites immigration judges to use a template order that says the opposite.  The agency's template order, which EOIR instructed immigration judges to use in the January 2 memo, states that after someone's "Form I-589, *Application* for Asylum and for Withholding of Removal, has been pending for 365 days," a "[f]ailure to timely pay the fee may result in a finding that you have abandoned or withdrawn your *application* and may result in *its* denial or dismissal."  ECF 64-4, 64-7 (emphases added); *see also* Mot. to Lift Stay at 3 (describing the reference to the template order in the January 2 memo as one of the "guidelines" for immigration judges).  This mistaken instruction is bound to cause immigration judges to issue mistaken rulings.  Some immigration courts have already rejected Form I-589 applications that included *no* asylum claim—seeking only withholding of removal and protection under the Convention Against Torture—for failure to pay the *initial* asylum fee.  *See* ECF 64-9 ¶¶ 3–6; *see also* Torres Decl. ¶¶ 4–5 (Form I-589s rejected for failure to pay initial asylum fee although they requested asylum, INA withholding, and CAT protection).  EOIR's statement doubling down on this mistake will exacerbate immigration judges' demonstrated confusion on this issue despite the severe and blatantly unlawful consequences for applicants.

It is independently arbitrary and capricious for EOIR to supply immigration judges with incorrect legal instructions which will be in turn be relayed to the asylum seekers who receive the template orders.  They, too, will be misled as to the lawful consequences of failing to pay by the deadline.  And there is obviously no countervailing benefit to issuing orders that threaten unlawful

consequences of non-payment.  "When sanctions are drastic. . . 'elementary fairness compels clarity.'"  *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995) (quoting *Radio Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968)).  Supplying a template order that misleads applicants as to whether their applications for INA withholding or CAT protection are subject to the initial or annual asylum fee is therefore arbitrary and capricious.

B.  **ASAP is likely to prevail on its argument that EOIR's retroactive application of Section 1808 exceeds its statutory authority (Counts One and Two).**

As ASAP previously argued, EOIR's interpretation of Section 1808's annual asylum fee requirement is impermissibly retroactive in two independent ways that warrant preliminary relief.  ECF 29-1 at 20–28.  EOIR wrongly purports to require asylum seekers whose applications were already pending on July 4, 2025 to pay the annual asylum fee, even though no such requirement existed when they filed.  *Id.* at 20–26.  And EOIR improperly counts the time an asylum application was pending on or before July 4 in determining whether it has been pending for a full year.  *Id.* at 26–28.  ASAP acknowledges that the Court rejected those arguments previously, and incorporates them in this brief solely for purposes of issue preservation in the event of an appeal.

C.  **EOIR's January 2 memo is final agency action.**

The January 2 memo, including the template order form incorporated within it, is a final agency action that ASAP may challenge under the Administrative Procedure Act.  Agency action is final when it: (1) "mark[s] the consummation of the agency's decisionmaking process" rather than "be[ing] of a merely tentative or interlocutory nature," and (2) is an action "by which rights or obligations have been determined, or from which legal consequences will flow."  *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).  The January 2 Memo meets both conditions.

*First*, nothing about the memo is tentative or interlocutory.  The memo represents EOIR's

considered view on how the OBBBA's requirement to impose an annual asylum fee should be implemented.  Even though EOIR could theoretically reconsider its position, "[t]hat possibility … is a common characteristic of agency action, and does not make an otherwise definitive decision nonfinal."  *Hawkes*, 578 U.S. at 598.

*Second*, the memo has "direct and appreciable legal consequences," *Hawkes*, 578 U.S. at 598, not least of which is that EOIR can now demand the annual asylum fee only because it issued the memo.  The OBBBA does not of its own force require asylum applicants to pay the annual fee: It does not say that an asylum *applicant* "shall" pay a fee in a specified amount or use similar language making clear that the fee is self-executing.  Nor does it specify the consequence for not paying the fee.  The statute instead provides that the *Secretary of Homeland Security* (who has delegated her authority to USCIS) or *the Attorney General* (who has delegated her authority to implement the statute to EOIR) "shall require the payment of a fee."  8 U.S.C. § 1808.  That is why within two weeks of the statute's enactment, USCIS and EOIR both issued documents imposing the asylum fee and explaining (albeit incompletely and arbitrarily) how the agencies planned to implement the fee.  EOIR's July 17 memorandum has since been stayed and rescinded, and the January 2 memorandum represents EOIR's newest attempt to implement the statute.  Only because the memo has been issued are the annual asylum fees even possibly due.  Only because it has been issued may nonpayment possibly result in adverse consequences for asylum applicants.  Legal consequences therefore flow from the memo.

The memo's rote incantations that it is not binding, ECF 71-1 at 2, 4–6 & n.12, do not defeat finality.  *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000) ("boil-erplate" language in a guidance document does not render an otherwise final action not final).  And the memo's barebones legal analysis is wrong.  In asserting that the statute is self-executing, the

memo does not even try to grapple with the statutory text saying that the executive branch is charged with operationalizing the fee and "requir[ing]" payment. *See* OBBBA § 100009(a). Nor does the memo explain the change in tune from EOIR's previous implicit position that agency action was necessary to implement the statute.

Even setting aside the boilerplate language, the memo cannot help but acknowledge its own legal force because EOIR is, in reality, instructing immigration judges to impose the fee pursuant to EOIR's generally applicable decisions on how the fee should be implemented. The memo states that EOIR "will not expect payment … until an Immigration Judge has issued an order" and that EOIR "will waive the [fee] for any asylum application that was pending" between July 5 and September 30. ECF 71-1 at 4. These statements define the circumstances under which asylum seekers have fee obligations. If the memo (and EOIR) truly could not create rights or obligations, statements like these would be non sequiturs.

EOIR's immigration judges certainly understand that the memo has legal consequences. The "way in which [an] agency subsequently treats the challenged action" is some of the most significant evidence in "assessing whether a particular agency action qualifies as final." *Sw. Airlines Co. v. DOT*, 832 F.3d 270, 275 (D.C. Cir. 2016). To ASAP's knowledge, from October 30 when this Court stayed the July memo to January 2, not one immigration judge demanded payment. Reddy 3rd Suppl. Decl. ¶ 6. But since the January 2 memorandum was circulated to immigration judges, they have issued a flurry of orders demanding payment.

Moreover, even "absent an enforcement action," "an agency order 'that gives notice of how the agency interprets the relevant statute' is a final agency action." *Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262 (4th Cir. 2022) (quoting *Hawkes*, 578 U.S. at 599–600) (cleaned up).

When the agency both announces its final interpretation of a statute it is charged with implementing *and* that announcement results in concrete enforcement affecting rights in the real world, its action is plainly final for purposes of judicial review.

If the Court were to conclude that the January 2 memo is not final agency action and does not itself impose the annual asylum fee, the agency's approach would still be subject to this Court's review and would warrant relief. The APA provides for courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Where an agency ignores a statutory command that it take "discrete" action, "section 706(1) is a source of injunctive relief to remedy an arbitrary or capricious delay or denial of agency action." *Int'l Lab. Mgmt. Corp. v. Perez*, 2014 WL 1668131, at *9 (M.D.N.C. Apr. 25, 2014). Declining to adopt a coherent and reasoned annual asylum fee requirement in the face of Congress's clear command that the Attorney General "shall" do so would plainly satisfy this standard. *See, e.g.*, *In re Pub. Emps. for Env't Resp.*, 957 F.3d 267, 276 (D.C. Cir. 2020); *South Carolina v. United States*, 907 F.3d 742, 755 (4th Cir. 2018).

## II. The remaining factors weigh decisively in favor of preliminary relief.

The remaining preliminary-injunction factors—irreparable harm, balance of the equities, and the public interest—all favor granting relief here.

### A. Irreparable harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). Here, ASAP and its members would be irreparably harmed absent urgent injunctive relief in several ways.

As an initial matter, EOIR's actions are causing irreparable economic harm. Many ASAP members have limited financial means to pay $100 (which they might not really owe) on short notice. *See, e.g.*, ECF 29-2 ¶¶ 69–70; Reddy 3rd Suppl. Decl. ¶ 13. The agencies' confusing and

inconsistent implementation of the annual asylum fee has therefore left ASAP members scrambling. Some have had to make difficult tradeoffs, such as going without groceries or cutting back on paying essential bills to pay the annual asylum fee on such short notice. ECF 29-2 ¶ 70; Reddy 3rd Suppl. Decl. ¶ 13. These economic consequences alone are irreparable harm that warrant preliminary relief. *See Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31–32 (D.D.C. 2001) (finding irreparable, economic harm when plaintiff stated she would not be able to pay utility bills and rent). "[E]conomic damages may constitute irreparable harm where no remedy is available at the conclusion of litigation." *Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). Accordingly, a plaintiff may establish irreparable harm where damages may be unavailable at the conclusion of litigation due to obstacles such as sovereign immunity. *See Maryland v. Department of Agriculture*, 770 F. Supp. 3d 779, 813 (D. Md. 2025). Here, if the Court ultimately rules that EOIR's payment schemes are unlawful, it is far from clear whether applicants who suffered economic harm because, for example, they had to incur late fees on other bills, will ever be able to recover from EOIR or through litigation. *See Kennedy*, 796 F. Supp. 3d. at 171–72 (economic injury was irreparable where money damages were "likely not available" due to sovereign immunity).

The situation is even more dire for ASAP members who will be unable to pay the fee by the deadline because they are confused or cannot come up with the money. This Court has already recognized examples in which confusion over when and how to pay the annual asylum fee irreparably harmed applicants. ECF 54 at 16 (citing examples of individuals who "had their asylum, withholding of removal, and CAT relief applications denied for failure to pay the [annual asylum fee]"). If ASAP members do not pay the annual asylum fee—because the agencies have failed to provide consistent and clear instructions on when to pay—their asylum applications are at risk of

rejection by the agencies, which could in turn result in their detention or deportation. The risk that asylum applications will be dismissed, denied, or otherwise rejected thus constitutes irreparable harm warranting preliminary relief.

In addition, "threatened removal satisfies the irreparable injury requirement." *Arias Gudino v. Lowe*, 785 F. Supp. 3d 27, 46 (M.D. Pa. 2025). Once removed from the United States, applicants face a significant threat of political persecution, torture or other forms of physical harm, wrongful imprisonment, or worse. ECF 29-2 ¶¶ 62–64. Automatic denial of applications for INA withholding and CAT protection based on failure to pay a fee that does not even apply to those applications, and without even considering the merits of those claims, causes a particularly high risk of removal to face serious harm. Removal can also separate applicants from their families in the United States, cost them their jobs, and permanently prevent their return. *Id.* Courts have recognized irreparable injury from the threat of removal where noncitizens may face harm in their countries of origin or experience "separation from family and homes, uncertainty about legal status, and difficulties with building a new life, such as healthcare and employment." *See, e.g.*, *Arias Gudino*, 785 F. Supp. 3d at 46; *Devitri v. Cronen*, 289 F. Supp. 3d 287, 297 (D. Mass. 2018).

The risk of detention is also an irreparable harm. Even one day in detention is an irreparable injury, and eventual release does not remedy the injury. *See Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1139 (N.D. Cal. 2018) (noncitizen "suffer[ed] potentially irreparable harm every day that he remain[ed] in custody").

Independently, members face irreparable harm from EOIR's legally flawed instruction that failure to pay the annual asylum fee "may" lead to abandonment, withdrawal, denial, or dismissal of a Form I-589 application, without clearly explaining what those terms mean in practice or how they would apply to related protection claims. EOIR's misleading instruction will inevitably lead

24

immigration judges to dismiss, or applicants to abandon, meritorious claims for INA withholding or CAT protection, leading to removal and all its attendant harms.

### B.    Balance of the equities and public interest

The third and fourth preliminary-injunction factors also weigh heavily in favor of relief. When the government is the opposing party, these factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).  It is in the public interest to protect the "separation of powers by curtailing unlawful executive action." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547 (2016).  Moreover, "it is in the public interest to prevent confusion." *El Pollo Rico, LLC v. Wings & Pollo, LLC*, 2022 WL 2916168, at *3 (D. Md. July 25, 2022).

Here, granting ASAP's requested relief is in the public interest because it will restrain unlawful agency action and provide thousands of asylum seekers much-needed clarity about their obligations under Section 1808.  The public plainly has an interest in addressing the widespread confusion and panic caused by the agencies' unlawful actions and preventing scams by unscrupulous individuals taking advantage of asylum seekers' vulnerable position.  This public interest is especially strong here because "it is the historic policy of the United States … to provide a permanent and systematic procedure for the admission to this country of refugees[.]" *Doe 1 v. Jaddou*, 2025 WL 327368, at *4 (D. Md. Jan. 29, 2025) (quotation marks omitted).

On the other side of the ledger, the government is not prejudiced by temporarily waiting to impose annual asylum fees until the Court adjudicates the merits of this case.  In the event the government prevails on the merits, it can simply provide asylum seekers notice and a reasonable opportunity to pay at the conclusion of this litigation.

### III.    The Court Should Deny Defendants' Motion to Lift the Stay

For largely the same reasons, the Court should deny the government's motion to lift the

stay of the USCIS Federal Register Notice and EOIR July 17 memo.  For the reasons explained above, the agencies' policies remain inconsistent.  Accordingly, the January 2 memo should be stayed (and the USCIS Federal Register Notice should remain stayed).

EOIR's July 17 memo should remain stayed as well.  If the Court agrees with ASAP and stays the January 2 memo, the government will likely take the position that the July 17 memo springs back into effect.  But this Court has already found—and Defendants have not asked the Court to reconsider—that the July 17 memo and USCIS notice are likely arbitrary and capricious.

### Conclusion

For these reasons, the Court should enter a stay under 5 U.S.C. § 705 and a temporary restraining order or preliminary injunction that:

(1) stays the January 2, 2026 EOIR memorandum under 5 U.S.C. § 705, including the template order referred to in the memo;

(2) enjoins the Justice Department Defendants from making available to immigration judges a template order demanding payment of the annual asylum fee unless the template order (a) affords asylum seekers at least 30 days' notice to pay the fee; and (b) does not state that failure to pay the fee will have adverse effects on the asylum seeker's application without stating that INA withholding and CAT protection claims are unaffected; and

(3) enjoins the Justice Department Defendants (Attorney General Bondi, Director Margolin, and EOIR) and anyone acting with authority delegated by them from taking any action to enforce the annual asylum fee requirement under 8 U.S.C. § 1808 against any ASAP member, until those Defendants obtain leave from the Court to lift the stay of the January 2, 2026 memorandum and issue a new written policy implementing the fee requirement consistent with the Court's opinion.

The latter relief—enjoining all of the Justice Department Defendants from enforcing the

annual asylum fee until they adopt a lawful policy—is necessary to protect this Court's jurisdiction and ensure meaningful relief. EOIR already has preemptively threatened to ignore (and direct other Justice Department components to ignore) any prospective order by this Court staying the January 2 memo. Ex. 1 at 6 n.12. This threat is grounded in the view that the memo has no legally binding effect. *Id.* That view is erroneous because, as explained above, the memorandum is a final agency action necessary under Section 1808 to implement the annual asylum fee. *Supra* at 19–22. The requested injunction would ensure compliance with the Court's stay and the statute.

No bond is necessary under Federal Rule of Civil Procedure 65(c) because Plaintiff seeks preliminary relief under 5 U.S.C. § 705, which is not subject to any bond requirement, ECF 54 at 18–19, as well as other preliminary equitable relief that poses no significant risk of monetary harm to the government.

The Court should deny Defendants' motion to lift the stay (ECF 71).

Plaintiff respectfully proposes the following schedule to resolve the pending matters before the Court: Defendants' opposition to the TRO and reply in support of Defendants' motion to lift the stay, ECF 71, would be due on Thursday, January 22; Plaintiff's reply in support of the TRO would be due on Monday, January 26. Subject to the Court's preferences, the Court may wish to hold a hearing on both motions on Tuesday, Wednesday, or Thursday, January 27–29. Plaintiff respectfully requests a decision by January 30.

DATED:  January 17, 2026

Respectfully submitted,

/s/ Andrew G. Barron

Matt Gregory*
Susan M. Pelletier*
Eric Brooks**
Andrew G. Barron (D. Md. Bar 30311)
T. Hunter Mason*
Rachel E. Schwab (D. Md. Bar 31646)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone:    (202) 955-8500
Facsimile:    (202) 831-6088
mgregory@gibsondunn.com
spelletier@gibsondunn.com
ebrooks2@gibsondunn.com
abarron@gibsondunn.com
hmason@gibsondunn.com
rschwab@gibsondunn.com

Conchita Cruz*
Jessica Hanson (D. Md. Bar 31903)
Leidy Perez*
Marcela X. Johnson*
Juan E. Bedoya*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S. #84810
New York, NY 10003-1502
Telephone:    (646) 647-6779
conchita.cruz@asaptogether.org
jess.hanson@asaptogether.org
leidy.perez@asaptogether.org
marcela.johnson@asaptogether.org
juan.bedoya@asaptogether.org

Counsel for Plaintiff

*Admitted pro hac vice
**Pro hac vice application forthcoming