1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

```
ASYLUM SEEKER ADVOCACY PROJECT,      )
                                     )
        Plaintiff,                   )
     vs.                             ) CIVIL NO.:
                                     ) 1:25-cv-03299-SAG
UNITED STATES CITIZENSHIP AND        )
IMMIGRATION SERVICES, et al.,        )
                                     )
        Defendants.                  )
_____)
```

Baltimore, Maryland
January 28, 2026
11:00 a.m.

TRANSCRIPT OF PROCEEDINGS
**MOTIONS HEARING**
BEFORE THE HONORABLE STEPHANIE A. GALLAGHER
Courtroom 7C

For the Plaintiff:

        MATT GREGORY, Esquire
        SUSAN M. PELLETIER, Esquire
        ANDREW G. BARRON, Esquire
          Gibson, Dunn & Crutcher LLP
          1700 M Street, NW
          Washington, DC 20036

        JESSICA HANSON, Esquire
        CONCHITA CRUZ, Esquire
          Asylum Seeker Advocacy Project
          228 Park Avenue South
          New York, NY 10003-1502

For the Defendants:

        ELIZABETH HEDGES, Esquire
          U.S. Department of Justice, Civil Division
          950 Pennsylvania Ave, NW
          Washington, DC 20530

        (Computer-aided transcription of stenotype notes)

P R O C E E D I N G S

(11:00 a.m.)

THE COURT:  Good morning, everyone.  Please be seated.

We're here in Asylum Seeker Advocacy Project versus United States Citizenship and Immigration Services.  It is case number SAG-25-3299.  We are here for a motions hearing.  Counsel, please identify yourselves for the record.

MR. GREGORY:  Matt Gregory for ASAP.

MS. PELLETIER:  Susan Pelletier for ASAP.

MR. BARRON:  Andrew Barron for ASAP.

MS. CRUZ:  Conchita Cruz for ASAP.

MS. HANSON:  Jessica Hanson for ASAP.

THE COURT:  Good morning to you.

Counsel for defendant?

MS. HEDGES:  Yes, Your Honor.  Elizabeth Hedges for the defendants.

THE COURT:  All right.  Thank you-all for coming in in the somewhat treacherous weather conditions, but I'm glad we can have the hearing this morning.  I'm happy to hear from the parties generally.  I would say the issues of associational standing and retroactivity having been dealt with in the prior memo and me not seeing any compelling reasons to alter my analysis, I don't think we need to spend a lot of time today on either of those arguments.  But I would

like to hear from everyone on everything else, and I'm happy
to -- we have technically two motions pending, so I don't know
if the parties have a feeling as to who should go first?

MR. GREGORY:  I don't have a preference.

MS. HEDGES:  I'm happy to go first, Your Honor,
since one of the motions is ours.

THE COURT:  Sure.

MS. HEDGES:  Would you prefer that I stand at the
podium or sit here?

THE COURT:  However you're more comfortable.  As
long as you're speaking directly into a microphone so that I
can hear you, wherever you're more comfortable is fine.

MS. HEDGES:  Apologize for that.  Thank you, Your
Honor.  So I'm Elizabeth Hedges here on behalf of the
Government.  I'd like to start by addressing the reasons why,
in our view, the Court should lift the stay that remains in
place as to USCIS.  As I said in my brief, our understanding
based on the Court's ECF No. 70 order on the plaintiff's
motion to clarify a couple of weeks ago, that stay is not in
place anymore as to EOIR because it only applied to PM 25-36
which is no longer in effect.  Therefore for a brief moment,
I'm going to address why the stay that remains in place as to
USCIS should be lifted.

THE COURT:  Let me ask one procedural question.  If
I were to stay the new January 2nd EOIR memo, is that the

document that rescinds the first order?  Hypothetically, if I were to stay the second order, would the first order be back in effect for EOIR and then also stayed by virtue of my stay?

MS. HEDGES:  Your Honor, my understanding is that our position is not that it would spring back into effect automatically.  PM 26-01, which is the January 2nd memorandum, did rescind 25-36.  Now we're not taking the position in our briefing that PM 25-36 springs back into effect as a result of a stay.  As I'm about to discuss, EOIR took steps, extensively considered the factors that this Court raised in her prior order in October to reconfigure how they're addressing this interpretive issue, and therefore they have done that and they have set this policy out.

So we are not taking the position that it would spring back into effect.  However, I would ask the Court, if the Court is inclined to grant a new stay or injunction, that we be given the opportunity -- just that I be given the opportunity to make 100 percent sure with my client that that's not their position.

THE COURT:  Okay.  So you cannot today say you're 100 percent sure that that's not their position?

MS. HEDGES:  I can tell you for sure that that's not a position that we're taking, but before I bind us to not potentially going back to some other policy that we would understand to be consistent with the law, I would just ask

that I be given the chance to make sure with them.  But I can represent to you that we are not taking the position that a stay of the new PM would automatically result in the old PM coming back into effect, if that makes sense.  I'm sorry I can't be more definitive but that.

THE COURT:  All right.

MS. HEDGES:  So, Your Honor, as to USCIS and the stay this Court entered in October, the only theory on which the Court found a likelihood of success in plaintiff's motion at the time was the arbitrary and capricious theory, based on the Court's finding that the agencies had conflicting interpretations of the statute.  The situation is totally different now because, as we explained in our briefing, PM 26-01 brings EOIR's policy into material alignment with USCIS's policy.  The specifics of that we detail on pages 5 through 8 of our motion to lift the stay.  I don't want to beat that ad nauseam because it is in my briefing, but I do want to explain why there's no legal basis to keep the stay in effect.

So PM 26-01 provides notice to applicants.  It requires that a written order be issued from an IJ setting a deadline and that that deadline be passed before EOIR expects payment of the annual asylum fee.  That was a large part of the concern that the Court raised in the past which is that USCIS was issuing basically prior written notice before people would

be subject to paying the AAF, and EOIR wasn't.

Now EOIR has taken the position not only will they issue a written order -- sorry, not only will they recommend through PM 26-01 that IJs always issue a written order before requiring payment of the fee, they've also done away with the suggestion that was in the prior PM about also providing oral notice because this Court had flagged its understanding that that might lead to some confusion.  Now it's clear from PM 26-01 that written notice is required before EOIR will expect payment of the fee.

THE COURT:  Let me ask this because there was representation made by EOIR, I think by Mr. Margolin who's the same person who issued the new memo 26-01, that EOIR would be adopting a 30-day notice provision.  That representation was made in connection with the briefing last go-round here in court.  What happened?  Obviously EOIR is now in a different posture than they were at the time.

MS. HEDGES:  Right, Your Honor.  So my understanding -- and I think I'm talking about the same declaration that Your Honor is from Director Margolin -- is that was in the context of the 2025 fee that was being addressed.  And also I would point out, it remains the case, as it was at the time, that what EOIR says in a policy memorandum doesn't bind IJs in a particular case.  And the reason for that is because of governing regulations that have

the force of law as to EOIR.  Even though, as EOIR is saying in the current PM, there are certain expectations as to what EOIR expects and recommends as best practices.  That wouldn't have been a binding requirement at any point because those same regulatory provisions were in effect at the time as well.

So what I'm saying and what the PM is saying is that there is a written notice requirement before payment will be expected.  However, as to a deadline across the board, IJs, just by force of the regulations that govern how they do their work, are going to be able to set deadlines in a particular case.  And there are good reasons for that, setting aside the fact that regulatory provisions preserve that independence for the IJs.  Some of the reasons for that are that IJs are just closer to, necessarily, the individuals who are before them. Not all applicants for asylum are similarly situated.

And I think this is a mistake in premise of the argumentation in the plaintiff's brief.  They say it's arbitrary to treat similarly situated people differently.  But I haven't seen a showing in their papers or declarations that the people that they allege are being treated differently are, in fact, similarly situated.

THE COURT:  What would be an example of a person who had to have just 48 or 24 hours' notice versus someone who received a 30-day notice period?

MS. HEDGES:  I'll give you an example, Your Honor.

Our top line point would be that the statute doesn't require any particular level of notice.  It just says the fee will be required.  But, for example, some asylum seekers may be people who do not speak English or who have a lot of difficulty speaking English.  However, other asylum seekers may be very highly educated individuals who speak English fluently, who have rigorous jobs that require them to understand and speak English fluently, and so to paint with a broad brush and just say these individuals are all unable to comply with a deadline on a given timeline because it's less than 30 days is not realistic.

The other point I would make is, as Your Honor is aware and as has been the case for several months, EOIR has an online method to pay this fee for everyone.  We all know, because we all use the internet I would assume, that it does not take long to comply with doing something -- completing a transaction online.  So it's --

THE COURT:  But we also know from using the internet that internet systems go down frequently or there's technological difficulties and things like that.  I guess my question was more the flip side which was what would be the reason why an immigration judge would believe it had to set such a short notice period of 24 or 48 hours for a particular individual?  Why does that have to be in their toolkit in terms of dealing with individualized applicant situations?

MS. HEDGES:  Your Honor, that's in their toolkit just by virtue of the fact that they have decisional independence and that the director can't direct them how to rule in particular cases.  As far as the rationality of it goes, again, the instances the plaintiff has brought to the Court's attention of allegedly people being subject to shorter notice periods, there's not enough detail provided in those declarations to know what's going on.  What we do know is that the IJs in those cases know what's going on and that they're presented with the facts and circumstances of the individual in front of them.

The other thing I would point out is that in the event someone believes -- so I guess two things.  First of all, again, I'm sure the plaintiff will correct me if I missed something, but I didn't see anywhere in their papers that said someone had actually missed one of these deadlines.  It's also my understanding that roughly at least 80,000 people have already paid this fee through the portal right now.  That number was as of late last week and it's probably even higher now.  As of the time the most recent PM was issued, I think it was over 30,000.  So the point is people are able to do this, and I haven't seen an example of someone not being able to do it.

The other thing I would say is that IJs, like I said, they have the person in front of them.  If we were presented

with more detail in these declarations, we could engage with the detail over whether someone allegedly had an issue paying the fee.  Instead what we're being told, my understanding is, some individuals believe that this is a short notice period, and yet we're being shown by plaintiff's own declarations that they are aware of the notice period.  And ASAP on its own website links to the publicly available EOIR payment portal.

So this is not something that's hidden.  This is not something that ASAP's members, who are the relevant people here for purposes of standing and everything else, this is not something hidden from them and something they're unable to do.  So I would be happy to address if the plaintiff brought to our attention specific examples of someone who was not able to pay the fee, I'd be happy to address that.

The other thing I'll say is, again, let's assume someone out there who is a member of ASAP does somehow miss a deadline or is -- in their view they believe they were wrongly required to pay the AAF twice; let's say something like that happens.  They have multiple avenues of potential recourse that do not involve a blanket stay.  They can go to the IJ for reconsideration.  Before that even happens, they can go to the IJ and just present proof of payment, so both USCIS and EOIR, you can get proof of payment right after you pay the fee.  There's nothing stopping people from bringing that to the attention of the IJ.  If the IJ rules against them, they can

seek reconsideration or they can file a motion to reopen.

If that doesn't work, they can appeal to the BIA. The BIA can adjudicate challenges to an order of removal. If that doesn't work, they can go to the federal court of appeals which has authority to adjudicate challenges to final orders of removal --

THE COURT: Are there fees associated with a reconsideration motion? I know there was a discussion, I believe, in plaintiff's filings about fees for appealing to the BIA and obviously circuit court. Are there any fees associated with reconsideration?

MS. HEDGES: Your Honor, I don't have that number off the top of my head. I would not be surprised. This kind of goes to one of my broader points is that, as a general matter, IJs have authority to set deadlines for applications and motions including fees. So the short answer is I don't know the exact answer. I can get it to Your Honor if you'd like.

Even if there's a fee associated with it, that doesn't -- appellate proceedings always cost money. So the fact that there is some additional cost potentially associated with exhausting your options, that's inherent in the system of any adjudicatory process in exhausting your options. It doesn't mean that there's not an adequate recourse.

So it just goes to my point that even if we were in a

world -- which, again, I haven't seen yet -- that someone was subject to an adverse outcome because they actually failed to pay the fee, they're not without recourse. What's happening here is that instead, the plaintiff is seeking a blanket stay that would freeze this policy as to everyone which goes far beyond what would be required even on plaintiff's theory of their own harm.

THE COURT: Let me ask this, I want to go back briefly to the inconsistent notice periods between USCIS and EOIR. In PM 26-1 Director Margolin talks about how for FY 2025, EOIR received over 40,000 asylum applications referred from USCIS. So if for those people, if they received from USCIS a 30-day notice period and then were referred to EOIR, it is, you would concede, conceivable that an EOIR judge would look at it and say, "Okay, you have two days to pay" at that point? And what governs that person's deadline from there?

MS. HEDGES: So, Your Honor, if an adjudication is before EOIR, it's my understanding once that application or removal proceeding is within the jurisdiction of an immigration judge, the immigration judge has jurisdiction to set deadlines and so forth.

Now, again, I don't think I've seen an allegation that this happened to someone where they believed they complied, but then they suffered an adverse outcome because EOIR expected something different. I'm not saying plaintiffs

aren't alleging that there's confusion or that people switch between systems. It does happen that cases get referred from one agency to another. What I'm saying is this is not an imminent threat of irreparable harm of the sort that would be required to justify preliminary relief in this posture.

So if EOIR -- and again, if EOIR -- an immigration judge within EOIR has adjudicatory responsibility over a case, a written order will issue that has a deadline. If that individual for whatever reason is unable to pay, they have recourse. They can present -- if they've already paid, they can present proof of payment.

We have in the record examples from the plaintiff of their members allegedly already doing this, submitting proof of payment. This is not unusual for how adjudications work. If someone has an issue they believe has already been resolved, they can bring proof of that. So I don't believe that this is the insurmountable obstacle that the plaintiff seems to be arguing.

Now I want to touch on a few things just to clarify. Again, I want to reiterate -- and we say this in our brief so I don't want to spend too much time on it. The Court identified five specific areas of alleged discrepancy between EOIR and USCIS. All of those have been addressed. I think the large one -- one of the large ones was this issue of: Is there prior written notice? I've already addressed that. One

of the other large ones was:  At what point in time will the agency treat the fee as being payable?  I don't think plaintiffs dispute that that's been resolved either.  And the other issues have also been resolved.

So there's no reason to keep that stay in place as to USCIS.  Then we need to -- Your Honor needs to decide does there need to be a new stay.  I would point out that what the plaintiff is asking for here goes far beyond a stay of an agency policy.  The plaintiff is asking for an injunction that would prevent EOIR and USCIS from enforcing a federally -- a Congressionally-enacted statute, a budget bill that has a provision in it designed to help remediate budget shortfalls related to the asylum system.  That's what they're asking for.  I'd be happy to see them ask for less because I think that's totally inappropriate in an APA case.  But if this Court were to take them up on that and purport to require that just because of these alleged continued discrepancies, neither agency could enforce the statute, not only would it put my clients in a very difficult position, but we would argue that's far beyond the scope of what this APA action should allow for.

As to the rest of their relief, they're asking for both policies to be stayed because of almost exclusively alleged problems with what they believe PM 26-01 does.  Again, I've said this before but it is pretty critical:  PM 26-01 doesn't

control deadlines in an individual case.

THE COURT:  Let me ask this.  What they're currently asking for -- well, I guess you're right.  It's enjoining the Justice Department defendants and anyone acting from authority taking any action, so they're essentially asking for a new stay to be imposed on USCIS.

MS. HEDGES:  That's my -- that's just me reading their order, Your Honor.  I think this Court and your order on the 13th of this month addressed a similar question, and you have a line in your letter order that says "nor can this Court enjoin defendants from requiring asylum applicants to pay the annual asylum fee without a legal basis to do so."

My point is the plaintiff still hasn't provided a legal basis to do so.  Now they say that was different because Your Honor was pointing out that they hadn't amended their complaint and now they have.  I understand that they've amended their complaint, but there's a broader issue which is, again, they're asking for something that goes beyond the scope of this APA action and goes straight to enjoining enforcement of the statute.  Something that is clear from the PM and from the governing regulations for EOIR is that just because a policy is stayed does not mean that the statute doesn't remain in effect.

This kind of leads into one of my irreparable harm points which is that the plaintiff is alleging that their members

shouldn't be subject to this fee for the time being. Well, by statute they're going to be subject to the fee at some point. So paying the fee is not an irreparable harm. As to whether accidentally being required to pay it more than once is an irreparable harm, as I said, there's recourse for that. Setting aside the points we made in our briefing about how financial harm is generally not irreparable. So that would be my point on that.

So I want to just quickly touch on some things. I'll be happy to revisit any of this later if Your Honor has more questions. On the standing, I just had two points I wanted to reiterate. I won't touch on associational standing because, as Your Honor recognizes, that's been resolved and the briefing is the same. We stand on it, but the briefing is the same as it was before.

But on the separate issue we raised of whether the plaintiff has standing to challenge PM 26-01, I want to be clear this is not a final agency action argument; this is a standing argument. So I'm not saying that PM 26-01 or any PM is not necessarily final action. The reason we address it as standing is because the plaintiff hasn't shown that its members are allegedly being harmed by this memo PM 26-01 as opposed to the statute. And it's kind of what I was saying before which is this fee applies regardless of the memo.

THE COURT: I guess the issue is, though, this memo

has had legal effect; right? The immigration judges were not imposing the fee. Now they're imposing the fee as a result of the direction being given in the memo, and the memo rescinded the prior order. The memo has had some legal effect. I guess I'm confused about how this would be a standing question versus a question that's more properly considered in, you know, have you shown imminent irreparable harm coming from this memo itself?

MS. HEDGES: Your Honor, I think it certainly goes to both. If Your Honor preferred to analyze it and find that there were no irreparable harm for that reason, that would be an outcome that would I think also be correct.

But what I would say about Your Honor's point about the IJs not having issued orders before, first of all, I don't think the record is clear on that. So the plaintiff, I believe what they allege is they're not aware of any IJs submitting orders that required the fee. As Your Honor is aware, there were a few weeks -- a couple of weeks in between the issuance of PM 26-01 and this motion which give the plaintiff time to find some examples where they've allegedly been harmed. But in between October when Your Honor's prior order issued and January 2nd, I don't think the record is clear that no IJ was doing it. I'm not able to stand in front of Your Honor and tell you one way or the other whether they were.

But even if they weren't, just the fact that some of them or all of them may have been acting in an excess of caution sort of thing or if they were simply uncertain about the effect of the Court's order, that doesn't change whether the PM itself has legal effect.  So the PM does not -- on its face doesn't require the IJs to do anything.

And the previous one didn't either.  But I think the current one makes that more clear.  So I don't think that that is the kind of legal effect that we're talking about.  And, again, if an individual asylum applicant believes that they've been wrongly subjected to an application of PM 26-01, they have ways to raise that with the IJ.

So that's all I'll say about that.  Again, I think the points that we made about standing as to the PM also go to irreparable harm, so I think the Court could analyze them under that as well.

On the cause of action, I'll just briefly touch on it to clarify what we mean.  I think, as I've said, the plaintiffs have a remedy that includes going to federal appeals court. So they have an adequate remedy in court separate and apart from an APA cause of action.  That's why we're saying that under, I believe, § 704 of the APA, they don't have a cause of action here in front of this Court.

The cases that the plaintiff cites, *Hawkes* and *Bacardi* are the primary ones, involve vastly different situations.

*Hawkes* involved basically civil penalties of up to $37,000 a day for violating the Equal Protection Act by not getting a permit before discharging certain materials.  And the Court kind of made the point that applying for the permit through the normal process would itself be extraordinarily costly, to the tune of $100,000 or more, and was kind of talking about the specific context of where the party who was challenging the agency action was challenging a particular agency determination as to that party's right to a permit.

Here is totally different because the plaintiff, again, is making a blanket facial reinforcement challenge to something that has not as yet been applied in any individual case in a way that would not have an adequate remedy in court.

So I'm not going to belabor the doctrinal points, but I will just say there's distinctions between what we're citing and what the plaintiff is citing.  I'm happy to address it more at length.  I don't want to belabor it too much.  But that's kind of our point on the cause of action.

They also argue that -- I say "they," the plaintiff argues that adequate remedy through appellate procedures isn't adequate because they can't get the relief that they want.  But just because you can't get the exact relief that you're seeking in an APA case doesn't mean you don't have an adequate remedy.

Again, I think my understanding is primarily what

plaintiff's members are concerned about is either being removed because they didn't pay the fee or being required to pay the fee under circumstances that they don't think are appropriate.  Again -- and I've said this several times -- but they have other remedies for that.

THE COURT:  Let me ask you, while we're talking about this, about the issue with the template order that's been raised.  I don't know if you're getting to that.

MS. HEDGES:  I can address it, Your Honor.  What's your specific question?

THE COURT:  I just wanted to make sure we were going to address it; how the template order plays in with the memo and whether the language in the template order is problematic with respect to what it permits the IJs to do.

MS. HEDGES:  Right.  So this is plaintiff's -- I believe the sole theory to which this specifically relates is the CAT theory, Convention Against Torture or withholding of removal.

THE COURT:  Right.

MS. HEDGES:  This is a new theory that the plaintiffs are bringing.  Couple of things.  First of all, as we said in our briefing, if you look at that template order -- I think it's just a page -- the top paragraph makes clear at least twice that it applies to people who are applying for asylum.  And then after setting that context, it says the

language about it checks this box if your Form I-589 has been pending.  So I understand the form can be used to apply for multiple types of asylum.  My understanding -- I don't have a specific number -- my understanding is that the percentage of people who don't apply for asylum but do apply for CAT or withholding of removal is small and, at best, is a proportion of the whole.

As a general matter -- we're all familiar with this -- people seek multiple forms of relief and I'm not faulting them for that.  If you are seeking asylum and you don't pay the fee, that's when you potentially have adverse consequences --

THE COURT:  As to your asylum application though.

MS. HEDGES:  As to your asylum application.  I want to be clear we did not take a position in the briefing as to the effect of the One Big Beautiful Bill Act asylum fee provision on CAT or withholding.  Our position for the purpose of this motion is that the form is clear.  And we understand that that is sufficient to deal with plaintiff's motion in this area.

THE COURT:  Wait, when you say "the form is clear," what form -- you're talking about the template order?

MS. HEDGES:  I apologize, Your Honor.  That is what I mean.  The template order is clear that it's telling people that if they have an asylum application pending, they need to pay the fee.  So that's --

THE COURT:  Well, that's not the part that's causing the issue.  I don't think anyone would argue that it's clear that if your asylum application is pending, you have to pay the fee.  The question is what happens if you don't timely pay the fee because the language in the template order says "failure to timely pay the fee may result in a finding that you have abandoned or withdrawn your application and may result in its denial or dismissal."  So the issue is, is that just your application for asylum?  Or is that also your application for withholding of removal or CAT protection?

MS. HEDGES:  So I think my answer there would be similar to what I was saying before about whether people believe their form -- application for asylum has been wrongly denied which is that if someone believes that they are one of the people who has applied for asylum and CAT protection or has just applied for CAT protection or has just applied for withholding in some other way, and they believe they have been wrongly denied, there are avenues to raise that within that proceeding.

THE COURT:  I'm not sure I understand your answer. Someone who has not applied for asylum at all which, as you said, seems to be a very small number of people, they would have a fairly clear-cut argument that they didn't have to pay the fee.

The question is whether this order fairly describes the

nuance of what can appropriately be denied or dismissed as a result of failure to pay the fee; right?  The issue is denial or dismissal of the asylum claim seems appropriate but may not be appropriate as to the withholding of removal or CAT protection because the One Big Beautiful Bill did not address those things.

MS. HEDGES:  Your Honor, I don't think plaintiffs have established they would be likely to succeed on any such argument.  My understanding of their argument was that they're saying this template order wrongly -- misleads people as to what's going to happen or wrongly induces IJs to dismiss the wrong types of applications.

What I'm saying is the template order makes clear that it applies to applications for asylum.  I think that that answers the claim.  Again, what I will say is I'm not in a position today to bind my clients as to one step further, would the One Big Beautiful Bill Act ever be properly construed to apply to those other of types claims?  I don't understand that to be necessary even for this Court to resolve.  However, if the Court wants to resolve that, I would request the opportunity for supplemental briefing on that because, again, I don't think it's properly teed up by the briefing on this motion that the plaintiffs brought.

THE COURT:  I suspect you're going to tell me you don't know, but do you know whether anyone has had withholding

and CAT -- their application for withholding of removal or CAT protection denied for failure to pay the annual asylum fee?

MS. HEDGES:  Your Honor, I am not personally aware. I understand the plaintiff may have identified individuals that they believe that happened to.  I would point out -- this isn't a criticism, but the plaintiff has provided these declarations with identifying information blacked out.  So we are not in a position to verify any individual -- what the status is because the A numbers are blocked out.  We'd be happy to confer with the other side to get those under seal or in some fashion that doesn't involve public disclosure and protects those individuals so that we could look into it.

Kind of separate and apart but related, before this hearing I mentioned to the other side that I'd be happy to talk to them about any given individual, including the two that were raised this morning.

THE COURT:  Okay.

MS. HEDGES:  Having said all of that, that's why I'm not able to tell Your Honor definitively, yes, I've seen evidence of this because apart from the allegations, I haven't, but I understand the plaintiffs may be alleging that.

THE COURT:  Okay.

MS. HEDGES:  But again, our position is that they have ways to raise those issues, and not only do they have

ways to raise those issues, they have multiple steps along the way before anyone were to actually get removed.  The Supreme Court has said that removal is not categorically irreparable.  But even if removal were irreparable as to some people, there are multiple things that need to happen before that actually would occur to any individual, assuming that they were willing to pursue their reconsideration and appeal rights.

So, again, a few more points and I think I will have finished what I affirmatively planned to say.  So on the arbitrary and capricious point, I would just reiterate the statute does not require any given notice period, and so the question is whether what EOIR is doing is consistent with the statute.  And we submit that it is because the statute says that this fee is required and EOIR, consistent with its regulations, has issued guidance.  But at the end of the day, it's the IJs who are applying this fee, and that's consistent with the statute.

The other thing I will say --

THE COURT:  One more thing I want to address with you.  So your view, I just want to be clear, is that no implementing action needs to be taken to comply with the statute's language that says the Secretary of Homeland Security and Attorney General shall require payment.  In your view, if this memo is stayed, it doesn't matter because this One Big Beautiful Bill Act does not require any formal agency

action before the immigration judges can just start imposing the fee.

MS. HEDGES:  Your Honor, it's not our position that it wouldn't matter.  We think these PMs are very important, and we think the Federal Register notice of USCIS is very important because it sets out the expectations.  And in this case, PM 26-01 is specifically designed to address this Court's prior concerns.  So we do think it's important in helping to communicate the agency's understanding.

But it is our position, to the other piece of your question, that the text of the statute doesn't require that the agencies undergo any particular additional rule making or policy making.  It just says "shall require."  So that's what they're doing.

Yes, there's no particular process they have to go through to put it in effect.  It just says shall require, and this is how it's playing out.  Each agency -- and I perhaps should have said this earlier, I think it's probably self-evident -- but each agency operates very differently and adjudicates these issues in very different context and has different governing regulations and statutes.  So it's not a sign of inconsistency in the relevant sense for arbitrary and capricious for them to be issuing either a policy memorandum or a Federal Register notice that explains in different terms some of these issues.

What is relevant is that they come out to a consistent position on the issues that this Court identified.

THE COURT:  And as far as we know right now, USCIS is not imposing these fees still?

MS. HEDGES:  That is my understanding, Your Honor. And, again, I think part of the reason why is probably because they are subject to different -- they just operate differently.  They have different regulations.  They don't have the same regulations that apply to IJs under EOIR.  And also the fact that Your Honor in your order a couple of weeks ago explicitly pointed out that the PM is not stayed and told the plaintiffs they could amend their complaint, and now here we are.

But Your Honor did not lift the stay as to USCIS.  So I think to the extent there's uncertainty about what's currently stayed, there's a lot more uncertainty as to USCIS.  The short answer is that's my understanding; that USCIS is not currently separately requiring the fee.

THE COURT:  Okay.

MS. HEDGES:  But it should be able to because, again, the issues have been resolved.  USCIS has considered the important aspect of the problem that the Court identified previously in terms of consistency.  EOIR has addressed the aspect of the problem.  But even if --

THE COURT:  Let me clarify something.  To be clear,

I will readily concede the issues were more on EOIR's end than USCIS's in terms of the inconsistencies; has USCIS taken any action other than staying implementation in response to?

MS. HEDGES:  Not that I'm aware, Your Honor.  As PM 26-01 says, EOIR brought its policy into material alignment with USCIS.  So I don't think -- I don't think USCIS took additional action.

THE COURT:  Okay.

MS. HEDGES:  But, again, it's a statute and the agency should be able to implement it where, almost across the board, the plaintiff is raising issues with EOIR.

The other thing -- I was going to say this and I forgot. USCIS, I think one of the two or three things that plaintiffs mention in their brief is that USCIS hasn't made clear -- their 30-day notice period they haven't made clear as of which date it runs from.  Now, again, because I think they're not currently requiring the fee, I wouldn't necessarily expect plaintiffs to know this, but I'm happy to put in the record if it's not there already -- I believe the most recent version of the notice form that USCIS has prepared does make clear that the 30 days runs from the date of the notice, and it makes very clear what the deadline is.

I'm happy to put -- if there's any doubt in the Court's mind based on that allegation, I'm happy to supplement the record today with that if it's not there already.

THE COURT:  Okay.

MS. HEDGES:  Again, the reason why maybe it's not is because USCIS, I think, is not sending these forms out because of the stay.

Just a few more things, Your Honor.  I apologize.  I just wanted to make sure I didn't miss anything.

I think the other thing I'll say again on EOIR, just to flesh out something I was talking about earlier with respect to the inability of the director to set a deadline in every case, is that I think -- let's assume that a new PM or an order of this court were to purport to set a uniform deadline. Because EOIR's regs preserve that decisional independence, I think it would just risk more of the same confusion that the plaintiff is alleging because IJs, again, have the authority. Even in the other examples that the plaintiff cites of situations with template orders or default deadlines, most of those, the IJ still has the authority to issue a separate order and deviate from the deadline because of what they see before them in the individual case.

Even the practice manual that the plaintiff cites which, again, that also doesn't have the force of law, that sets some default deadlines, but it says as to most of them -- the ones that aren't set by statute or reg, it says "except as the IJ shall determine" or some language to that effect.

I could give Your Honor specific examples if you'd

like.

THE COURT:  I don't know if I need specific examples, but it sounds like you're conceding that there are examples, although I understand your argument that it's not binding, where the agency at least does make suggestions, default deadlines, template orders which we know because we have one here.  The IJ may be able to preserve independence, but there's also suggestion to try to achieve some degree of hopefully uniformity.

MS. HEDGES:  So, Your Honor -- yeah, I think maybe I was unclear on this.  I think my response to that is not that -- again, we wouldn't agree that any of these PMs are binding.  But I think the point I was trying to make about confusion is that even if we were to assume that -- that EOIR tried to issue a new PM that said, "Here's the expectation, we want a default of 30 days' notice," that is not sufficient because IJs have decisional independence and the director doesn't have authority to direct them in particular cases; that isn't sufficient to ensure that IJs are not able to deviate from that in a particular case.

And, you know, it kind of goes both ways because IJs can also, of course, extend deadlines.

THE COURT:  Right.

MS. HEDGES:  So the point is not that EOIR is unable to set in a policy memorandum to say this is a best practice.

It said some best practices in response to Your Honor's previous order, but it also walked back some things it had thought were best practice like the oral notice.  EOIR thought that the oral notice would be helpful to people.  I understand this Court largely seems to have disagreed --

THE COURT:  I'm not sure it was an entirely accurate characterization of what I was saying but understood that they changed their policy to try to comport with it.

MS. HEDGES:  That's all I meant, Your Honor.  So I guess my point is even at the time, so even when that oral notice was recommended, I don't think that was in any way interpreted to be binding by IJs either because it was the same situation it was in a PM.

From EOIR's perspective, having these policy memoranda, kind of the more they say in some ways someone could latch on to it and say, well, this is inconsistent with something, and this is setting an expectation that isn't being followed.  So that's all I'm saying.  Of course, our top line point is that the PM isn't binding, so if this Court purported to enter an order that would seek to change that against the backdrop of all these regulations I've been talking about, I think that would put them in a very difficult position.  I haven't heard from the plaintiff any legal reason why that's an appropriate remedy here.

If I may, I think I'm going to sit down for now, but I

would like the opportunity to address anything that comes up.

THE COURT:  Okay.

MS. HEDGES:  Thank you.

THE COURT:  Thank you.

All right, Mr. Gregory.

MR. GREGORY:  Thank you, Your Honor.  I'll address the merits questions in the case, and my colleague, Ms. Pelletier, will address irreparable harm and any questions you have about the relief or the other things in the backup brief.

THE COURT:  Okay.

MR. GREGORY:  Your Honor, I was going to start with the 30-day notice, but I actually think it's Government's position on CAT and withholding claims is pretty remarkable and new, so I'll start there.  The statute clearly does not apply to an INA withholding or CAT protection claim; it applies only to asylum claims.  Your Honor asked if we have examples of people who had had those other forms of relief dismissed.  We do.  All of the examples we gave you in October where an application was dismissed for nonpayment, those all included INA withholding and CAT protection claims.  So we know this is a real problem, and they knew it when they adopted the January 2nd memo and started using this template order.

THE COURT:  Were those initial fees, though, or annual fees?

MR. GREGORY:  Both but the examples we gave you that involved the annual fee -- I think there were six that we had at the time?  All of those included INA withholding -- excuse me, INA and CAT protection.

THE COURT:  Okay.

MR. GREGORY:  So this is a real problem.  I find it very remarkable the Government doesn't seem to know what its position is on this issue given its importance to these applicants.  For many applicants, especially people who can't pay the fee, this is their only ticket to stay in the country and avoid an order of removal.  They need to know from the agency whether they are expected to pay if all they have is an INA withholding or CAT protection claim or if they've included all three but can't cover the fee for their asylum claim.  This order suggested it'll all be dismissed.  The Government told you today they don't know what should happen in that case, if I understand my friend correctly.

THE COURT:  Are any of your examples people who did not have asylum but had CAT and withholding?

MR. GREGORY:  No, Your Honor.  I believe they all did involve asylum.  We have a declaration, I believe it's the Bah Declaration on the record for this motion which explains why for some people because of the $100 fee, they will have to

pursue only their INA withholding and CAT protection claims. Some people do, in fact, for other reasons seek only those forms of relief. For example, I think the deadline for applying for asylum can pass and you can still seek those other forms.

Everyone uses the Form I-589 and the form is called an Application for Asylum so it's going to lead to more dismissals under the Government's new theory if they don't clean this up. I think they're not even willing to tell you that's wrong. Whereas before I think we had all understood the Government's position to be correctly under the statute that it only applies to an application for asylum.

So if Your Honor has questions about template order, I'm happy to address them, but I do think that is even more important now than it was before.

THE COURT: I do have some questions about the template order and how your -- I'm not sure if this goes to merit issues or harm. So you're not separately challenging the template order; you're challenging the memo that makes reference to the order.

MR. GREGORY: I think -- so when an agency uses this sort of informal document as opposed to a final rule, I think we're challenging the agency action they took on January 2nd which included both. The memo refers to the template order --

THE COURT: Do we know when that template order was

put in place?  Did that come in on January 2nd or has that been around longer?

MR. GREGORY:  Well, it's internal at the agency.  We saw it when immigration judges started using it.  Of course, at this stage of the case, we don't have an administration record, so this is something the Government is uniquely in a position to tell us.  Clearly they were packaged together because the one references the other.

THE COURT:  I guess my question is do we know whether the template order was in place and being used prior to January 2nd?

MR. GREGORY:  I don't believe this is the order they were using before October.  Yeah, my colleagues are confirming that it was not the order they were using before.  I'm sure they will correct me if I'm getting that wrong.

This was -- the reason this is a new issue in this case -- so I think my friend mentioned that this was an issue before -- is because we hadn't seen it before.  We hadn't seen the agency itself suggesting that immigration judges should make this mistake.  Before, they were just doing it on their own.  So the problem is significantly worse now that the agency is suggesting that they should do it in the template order, and after today I think it's even significantly worse than it was yesterday because the agency is now saying we're not even going to say the statute doesn't impose a fee on

those applications which reverses their prior position.

THE COURT:  Okay.

MR. GREGORY:  With that, Your Honor, unless you have questions about the template order, I'll turn to the 30-day notice issue.

THE COURT:  I do still want to focus in on the template order for a moment.  The memo encourages use of the template order.  It doesn't require use of the template order. Does that make a difference with respect to whether my action can extend to this template order?  Because I will tell you I have some concern with respect to a template order -- a memo may be final agency action; I'm not sure a template order is final agency action.  I'm not clear if you're alleging that or making an independent claim or your concern is simply the statement in the memo that that recommends use of the template order.

MR. GREGORY:  I hear you, Your Honor.  Having litigated a lot of these cases, agencies do unusual things and it looks unusual.  Sometimes I've had cases where courts have struck down press releases, things like that, when an agency tries to avoid APA review by adopting policies through a memo or a template order.

One thing under the case law that you look to -- this is the *Appalachian Power* case in the DC circuit we cited, there's others -- look at how the agency is applying it in the real

world.  Every order we have seen so far -- of course, we've only seen some and it's early -- has used the template order. We have an example -- this is in the record in the McShiras Declaration, ECF 82-3.  The IJ recessed a hearing so he could review the memo, comes back and rejects an argument the government attorneys were making and says, "No, I have to give notice."  IJs clearly understand what they are being told to do from the memo and the template order, and everything they've done in the real world suggests that.

Under *Hawkes*, this is a pragmatic inquiry when you're asking whether the APA entitles someone to review.  I'll briefly touch on standing because my friend mentioned it. Standing is an even easier bar.  So they have now forfeited any argument that this stuff is not final agency action.  They are making the standing argument.  Standing is is there a real-world harm imposed on someone by an agency's action.  The question whether it has a technical legal effect or a practical legal effect, the *Genesis* case in the Fourth Circuit is clear that is not a question of Article III's jurisdiction. In that case it was mootness but it's the same principle. That is a question of whether you have a cause of action under the APA.  Again, I think they forfeited this point but under *Hawkes, Genesis,* the other cases we've cited as we've discussed today, it's clear that in the real world, this is final that has binding effect.

THE COURT:  On the standing point, how do you respond to their argument that -- again, if this goes into harm, you can defer it until your colleague comes.  But how do you respond to their argument that the IJs have statutory authority to continue imposing this charge regardless of the existence or stayed or not stayed status of these memos?

MR. GREGORY:  I'm happy to address it.  It's simply wrong.  Their own regulations say that immigration judges do not collect fees.  This is 8 C.F.R. 1003.24.  The statute directs them to do it.  Of course, that's how both USCIS and EOIR understand the statute to operate.  That's why they've issued the Federal Register notice and these memos, and it's how immigration judges are applying it in practice.

I do want to touch on this point that we are somehow trying to enjoin a statute or the Court doesn't have power to stop a statute.  There are two statutes in this case.  There is 8 USC § 1808 which does require the agencies to impose a fee.  There's also the Administration Procedure Act which says when they implement their statutory authority, they have to do so in a reasonable way; they have to reasonably explain their decisions; they have to consider obvious and important problems.  All the things on which you granted relief the first time.  That's not a separation of powers problem.  That is exactly how every Administration Procedure Act case works.

Agencies can only act if they have statutory authority or statutory mandate, so it's not unusual at all for an agency's implementation of a statute to be frustrated by APA relief. I understand they don't like it, but that's what § 706 and -- here because we're preliminary -- 705 tell you to do.

THE COURT: So your view is that regardless of whether you read 8 USC 1808 to require the agencies to take some further action to implement by way of notice or Federal Register or memo, or however they were going to do it, that the APA requires them to take action?

MR. GREGORY: No, the APA requires them to take action that is reasonable and reasonably explained and otherwise complies with the standards in the Administration Procedure Act. The statute requires them to take action to collect the fee.

Again, you can imagine a different statute where the applicants are required to pay a fee. This statute requires the agencies to collect one, and then everyone understood until this round of briefing -- both agencies, immigration judges, the Government's counsel when we were here the first time -- that that required action by the agencies themselves, not immigration judges doing this ad hoc. Again, I cited you the regulation. Their immigration judges don't collect fees.

THE COURT: I guess maybe my question was not asked

the right way.  When you say the APA requires that the action be reasonable or reasonably explained, do I understand your argument to be that if I were to stay 26-01, and immigration judges were to then continue trying to collect the fee in the absence of this -- continue to issue orders pursuant to the template order trying to collect these fees, that it would be an APA violation because their actions would not be reasonable and reasonably explained since essentially we'd be left with no explanation?

MR. GREGORY:  I think I'm lowering my skis here and this may be something Ms. Pelletier can address.  I can give you my quick answer which is we are not challenging individual immigration proceedings.  That is not part of this case.  We are challenging a generally applicable policy that the agency is applying in those proceedings.

THE COURT:  Understood.  I'll raise the question again with her.  I guess what I was trying to understand is your response to their contention -- whether your response to their contention that they can continue to collect fees in the absence of these memos, where that's coming from.

But is this a question that's better addressed to you when you make your argument?

MS. PELLETIER:  I'm happy to address it.  If I'm understanding Your Honor correctly, you're asking that to the extent the current PM is stayed, if the immigration judges

were to continue to take action, that would be something that we would think was within the scope of this Court's authority to award relief because it itself would be agency action. I think that the position that -- maybe this is sort of in between the two merits and harm -- but I think the position that IJs can do this on an ad hoc basis is part of the policy that you would be staying, so it's a little bit difficult to understand where the government thinks that IJs would be getting that authority.

I think that's why we're seeking an injunction beyond just the stay is to ensure that this Court's stay has the effect that it should have which is to require the agency to implement the statute in a lawful manner, rather than repeatedly either issuing a new PM that continues not to comply with Your Honor's order, or having sort of a sub silentio policy of doing this without issuing a formal PM, but that is still final agency action because it is still leading to legal consequences being enforced in immigration proceedings.

THE COURT: I guess maybe my question is, from your perspective, where do you think that the requirement of some sort of agency action, whether it be a memo or a notice or regulations or however they do it, where does that come from? That's what I'm trying to get at.

MR. GREGORY: Thank you, Your Honor. I appreciate

the question.  It comes from § 1808 and then it's also in the agency's regulations which say that immigration judges do not collect fees.  Now they sometimes will want proof that a fee has been made, as my friend pointed out.  Sometimes they will set deadlines to provide proof that a payment has been made.  But the immigration judges themselves are not tasked with collecting fees, and this statute does not task them otherwise which is how everyone has always understood it; to require agency action by EOIR, by USCIS, or another agency operationalizing this in a generally applicable way.

THE COURT:  Okay.  So your view is that the language of 1808 which says "the Secretary of Department of Homeland Security and the Attorney General shall require payment," that's where the obligation comes in for them to operationalize it by issuing some sort of guidance or description of how they're going to go about doing that.

MR. GREGORY:  Correct.  To be clear, the January 2nd memo does this.  I don't think we're saying it didn't comply with that part of the statutory mandate.  It just does so in an arbitrary and capricious manner which is where the APA kicks in.  Hopefully, that, clarified, Your Honor --

THE COURT:  It did, thank you.  Okay.

MR. GREGORY:  So I would like to move on to the 30-day notice issue.

THE COURT:  Sure.

MR. GREGORY:  When we were here in October, everyone understood that the agency was going to harmonize its policy with USCIS and that they were going to do so including by providing 30 days' notice.  That wasn't the only thing, but that was an important one that they said in their brief, they said at the hearing, they said in the director's declaration.  Clearly notice -- same-day notice is like no notice at all.  As of last night, we've seen at least one example of that.  We've cited you several examples of two days notice.

Under the APA, the question is not whether we can identify all of these examples.  Under the APA, you review the memo on administrative record which here includes everything that came before in this litigation because the memo is directly responding to it.  They knew this would be a problem.  They knew some people could not pay on one or two days' notice.  They knew that people were confused by the fact that USCIS was giving them 30 days' notice, and they adopted a policy that refuses for arbitrary reasons to follow through on commitments they made in October.

I'm not saying they are not permitted to change their mind.  They are.  But they have to explain that in a reasonable way, and they simply haven't done that here.  This didn't need to be hard for them.  They could have done this in November, December, January.  They could have said:  We're going to harmonize with USCIS, we're going to give people at

least 30 days' notice, we are not going to suggest that people's CAT protection, INA withholding claim should be dismissed.  I don't know that we would be here in an emergency posture.  We could be getting on with the case, we could move towards a merits resolution.

Unfortunately, they have changed their mind but they've done it for reasons that are completely arbitrary and leave us back where we were in October.  It's great to say you're requiring notice in the abstract.  In the real world, if I get a bill in the mail today that says I have to pay today, there's a very real and obvious chance I'm going to miss that deadline.  And the consequences for people here are removal.  At best, they have a long -- in the words of the Supreme Court in *Hawkes*, a long, arduous, expensive path to the BIA where maybe/ maybe not they'll get relief.  They may get deported if they try to seek relief from a federal court of appeals.

They've offered even still today no good reason why they can't set a minimum default deadline.  Even in the examples my friend gave about someone who I suppose has counsel, speaks English, is rich, why does the agency need $100 from an asylum applicant tomorrow?  This is the federal government we're talking about.  We're talking about a population of people who we know from statistics are way less likely than the average person to be able to afford a $100 bill on a 24-hour turnaround.

Again, the fact that in some situations people are able to pay does not explain why they couldn't wait 30 days or those people couldn't pay early. Even the need -- theoretical still because we haven't heard any actual examples -- where a shorter deadline makes sense in an individual case. They could easily have said you have permission to deviate in extraordinary circumstances, et cetera. You can obviously extend deadlines. Courts do that all the time. Nobody thinks that setting standard default deadlines interferes with an adjudicator's power in the same way that the Federal Rules of Civil Procedure do not intrude on Your Honor's power. Because you still get to control the proceeding, you still get to make the decision. We're talking about having reasonable rules of the road so that people know what they're supposed to do and have an actual chance to comply with the agency's policy.

THE COURT: I want to explore a little bit the 30 days. I take it we're talking about 30 days because that's what USCIS did?

MR. GREGORY: Correct, Your Honor. We're not pulling 30 days out of a hat. This is the obvious alternative and it's also the obvious way to ensure that people who go online, for example, and say "What is my deadline to pay?" will receive the right answer. If you view that today, you're going to see USCIS's answer. You're not going to see anything from EOIR.

THE COURT:  I guess the question -- if EOIR were to set a 35-day notice period, we'd still be inconsistent; you-all might not be here, at least not on an emergency basis because presumably you'd be satisfied with a longer period, but I want to hone in on a little bit about what the harm is from an inconsistency.

MR. GREGORY:  So the main harm -- there's several. From the inconsistency itself, setting apart the harms of just very short notice.  The fact that I think I have 30 days to pay makes me far more likely to miss a short deadline.  An example I just gave you, Your Honor, if someone told me "You're going to get a bill any day now -- might be tomorrow, might be six months from now; it's going to require you to pay $100.  If you don't pay, you might be removed from the country," I'm going to be watching my mail very carefully. I'm going to talk to my mailman, he's going to be my best friend.

If you tell me I have 30 days, I'm still going to pay attention, but I'm not going to be worried about missing it because I was out of town that day or because the mailman lost it.

So that is a harm that is uniquely caused by the inconsistency.  I don't want to forget about the very real harm -- even if they were consistently two days, one-day notice, people would still miss the deadline.  But the

inconsistency itself is introducing confusion that will lead people to miss the deadlines.

THE COURT:  Won't there still be some confusion? For example, if someone gets a USCIS notice saying you have 30 days to pay; then within those, say, five days later, they're transferred to EOIR, they get a new notice.  Even if that new notice is 30 days, it seems like because of the transfers between agencies, there's still going to be some confusion whether the 30 days restarts, whether it's still running from the original deadline.

MR. GREGORY:  I think Your Honor is correct that -- look, this is ultimately the agency's job to adopt a reasonable and reasonably explained policy so we're engaged in hypotheticals now.  But, sure, I think there are other areas of confusion in immigration courts.  I don't think that's any secret.  This one is easily solvable and they haven't given you any explanation for why they haven't solved it.

THE COURT:  What if, taking their point -- and I understand you may disagree with it -- that the agency can potentially set -- although they're not doing it here -- could potentially set default deadlines but can't mandate deadlines that have to be followed.  If they were to set a default deadline of 30 days and an immigration judge were to still issue an order saying, I find this guy should only be entitled to two days to pay...

MR. GREGORY:  Again, we're talking about generally applicable policies to what we challenge under the APA, so we would not be challenging anyone's individual case.  But I think our position is it should be 30 days.  30 days is necessary because USCIS says that's a minimum.  Now, of course, the world would be in a much better place today if they adopted the policy Your Honor just mentioned.  I don't think that fully solves the problem, but it certainly is an obvious solution that they didn't consider in the January 2nd memo.

Again, we're not here to craft a policy that complies with the *State Farm* standard for them; that is their obligation to do in the first instance.  If you look at the DACA case from the Supreme Court which we cite in our brief, same scenario.  The court says there are multiple ways agencies can implement their statutory authority in reasonable ways; it is not a court's task to do that for them.  Even if they may be able to do something very similar or slightly different on remand, they have to do it, and your job as a court is to enforce the APA and hold them to that standard.

THE COURT:  That seems a little inconsistent with what you're asking for in your remedies which does seem to involve me dictating to them how they should go about satisfying the requirements here.

MR. GREGORY:  Well, I don't think we're asking you

to tell them what policy to set.  I think we're asking you to tell them that they need to adopt one that satisfies *State Farm* before they can implement the statute.

THE COURT:  Well, you are specifically asking for me to afford them at least 30 days' notice to pay the fee.  This kind of goes along with my other question:  What if USCIS were to shorten their notice period to 14 days?

MR. GREGORY:  I understand, Your Honor.  Again, I think my colleague, Ms. Pelletier, can handle some of the questions about relief.  We're in a preliminary posture here.  We're trying to give them ways because they've said they want to be able to not go to the merits first and implement the policy while we get to summary judgment.  I think if they adopted the policy Your Honor mentioned, I don't know that we would say that necessarily satisfies *State Farm* or makes the case go away.  It certainly improves the world substantially.

And I think to the extent they want instruction for Your Honor of how can we implement the statute -- in their words -- as this case is progressing, those are the sorts of things you can tell them.  I think you told them that in October.  In October we were all talking about 30 days' notice.  The reason it doesn't come up in the opinion is because they had committed multiple times that notice didn't just mean a technicality; notice meant 30 days like USCIS is giving.

THE COURT:  Okay.

MR. GREGORY:  Your Honor, if you have any other questions -- let me skim my notes and make sure I didn't miss anything important here.

Thank you, Your Honor.  I think my colleague, Ms. Pelletier, would like to talk though.

THE COURT:  All right, Ms. Pelletier.

MS. PELLETIER:  Thank you, Your Honor.  This Court already decided that ASAP members face irreparable harm from the risk that a lack of adequate notice and confusion created by the agencies will cause them to miss their deadline and potentially face denial of their asylum claims and removal from this country.  Nothing in the intervening three months has changed those facts or that reality.

The same is true of this Court's conclusion with respect to the balance of the equities and the public interest.  This Court correctly decided that there is no public interest in the government unlawfully implementing a statute in an unlawful way and that the government is not meaningfully prejudiced by a temporary delay in collecting these fees, and indeed the government could have corrected these harms and be collecting these fees lawfully had it just done what it told the Court it was going to do in October.

And the same is true with respect to the scope of relief here.  This Court already correctly determined that under the APA and § 705, staying the order in full and not limiting it

to ASAP's members or identified individuals as appropriate, that remains true today.

I'm happy to answer the Court's questions about any of the other arguments that the Government raises, but I don't think any of them change the soundness of this Court's decision on those issues.

THE COURT:  I do want to delve into some of these things a little bit differently because I think they've been argued somewhat differently --

MS. PELLETIER:  Sure.

THE COURT: -- and different points have been raised that perhaps weren't focused on as much before.

Starting with irreparable injury -- and I think we have already talked a little bit about the injury here and whether the injury is caused by the memo or caused by the statute and how that plays in.  In terms of irreparability, obviously there is I think a more forceful argument being made now about the fact that these really aren't irreparable; there are ways for people to address this on reconsideration or appeal.

First of all, do you know the answer to my question on reconsideration and whether there's fees associated with asking the immigration judge for reconsideration?

MS. PELLETIER:  There are.  There's at least $1,000 fee for each of the different avenues that are identified. There is a possibility for a fee waiver that an individual can

apply for, but our understanding is that practically that's not something that can be expected for someone to receive. The BIA takes the position that it shouldn't be a matter of course and should be narrowly construed.  It's not something someone has an entitlement to.  It's within the discretion of the court is my understanding.

So under BIA precedent, it is a very narrow group of people who will be able to receive that.  There's --

THE COURT:  There's a $1,000 fee for the reconsideration at the immigration judge level as well?

MS. PELLETIER:  I think it's slightly above $1,000. We can confirm; it's on the EOIR website, I believe.  But for an individual who is not able to come up with $100, obviously coming up with $1,000 to appeal or seek reconsideration is not really realistic.

Also the appeal process through BIA is not simple, so frequently people are going to need counsel.  Again, that's an expense that for many of these individuals is not going to be feasible.

So when we're talking about irreparable harm and the adequacy of an alternative path to relief, this is a functional inquiry, and the fact that something is not practically available is very relevant.  I think the appeal or reconsideration process also is not practically an avenue to adequate relief here because it's not clear from the

Government's briefing what they think the standard is that would be applied for someone to seek relief from an unduly short deadline that an IJ imposes which causes them to miss their payment deadline according to the court.

The agency has not adopted a regulation or a policy that ensures someone gets adequate notice which is what we're challenging.  So it's not clear what the BIA would be enforcing as the problem with the IJ's decision.  That's not an opportunity for someone to bring an APA-type challenge to the agency's broader arbitrary policy of not having a minimum amount of notice that ensures people are actually notified and have a meaningful opportunity to pay.

So it is possible that someone would be able to obtain relief on that or another theory, but even if they were able to do so, it would be many months or potentially even years down the line.  During that time, there are irreparable harms that could happen as well and that are, in fact, likely.  An individual could be detained during that period.  We cited cases in our briefing indicating that detention for even one day is an irreparable harm.  During a court of appeals' appeal, someone could be removed from the country during that period, and of course that would be to a place where they are fleeing persecution by virtue of them seeking asylum relief; that is a real possibility they could face physical harm which is an irreparable injury --

THE COURT:  Let me ask, I know this has happened relatively recently so you may not have this yet in terms of concrete examples with respect to either the detention or removal?  I take it we're not there yet.

MS. PELLETIER:  We're not there yet.  My understanding is that the Government does take the position that someone seeking asylum can be detained so it is --

THE COURT:  Yes, we have seen that.

MS. PELLETIER:  Yes.  So I don't think that's an unrealistic possibility.  I think that's a very realistic possibility and someone has to seek a stay of removal in the court of appeals.  It's not automatic to ensure they're not removed.  In this case that's particularly concerning because they would not have had any person ever consider their asylum claim on the merits before it got to that stage.  They wouldn't have had a full and fair hearing.  It may be that they have a very obvious and credible asylum claim and yet are going to be removed.

That same is true on a motion for reconsideration.  There's no automatic stay of removal, so someone could be removed from the country during that period too.

So this really just is not an adequate form of relief.  When we're talking about irreparable harm, we're typically looking at what is the relief that's available at the end of this litigation.  If there was a perfect form of relief

through another mechanism where the person wouldn't be injured in the interim, I think that would come into play as well, but that simply isn't the case which is why we have brought this challenge under the APA standard to the agency's implementation as a whole in order to prevent these irreparable injuries, rather than letting them go into effect and hope that they're corrected through some other process at a later stage.

THE COURT: Okay.

MS. PELLETIER: I did want to make a few points in response to the Government's arguments. The first one was that the request for an injunction in addition to the stay is actually within the scope of the relief that's afforded by 705. This Court has authority to protect sort of the effect of the stay to ensure that this case can actually be adjudicated on the merits. And I think that it's really necessary here given the position that the Government has taken in the memo that a stay of the PM would not stop the arbitrary and capricious implementation of an annual asylum fee regardless of what this Court does with respect to the PM.

In the language that Your Honor cited in the initial order in this case, you discussed the scope of 705 relief, and it does encompass this ability to ensure that we can reach the merits; we're not back here in a month on another emergency motion based on a new policy that continues not to actually

adequately address the problems with the agency's implementation.

THE COURT:  I guess the problem, though, is not allowing them the opportunity to try.  I'm a little bit uncertain that I would have the authority to essentially -- how I read the proposals that you make in 73-1 which is your motion, you're asking me to prescribe particular things that the template order is supposed to contain and then also enjoin the Justice Department defendants and anyone with delegated authority from taking any action to enforce the fee requirement against any member of ASAP, unless they obtain leave of court.

I'm not sure I feel comfortable that I have the authority to do something that broadly.  Why should I be preventing them -- if I find some deficiency with 26-01 -- from trying again to issue guidance that can appropriately implement this order?

MS. PELLETIER:  Your Honor, I think we would expect that the Government would come back with that new policy that they think addresses Your Honor's concerns about the existing policy and the USCIS memo as well.  To the extent that Your Honor is satisfied that it is, in fact, a lawful implementation, we wouldn't take the position that they couldn't implement it, and Your Honor could lift the stay or lift the injunction at that point.  And this really is just an

extraordinary --

THE COURT:  This goes back to the reason that I denied your preliminary relief before.  I would be making a ruling based on whether I find that 26-01 violates the APA.  I don't see how that gives me authority to sort of preemptively impose a review process for other final agency action or agency action that might be taken; right?

I understand that it's jumping through the hoops of filing an amended complaint, and coming back to argue it again poses a litigation cost to both plaintiffs and the court and everyone else, but I'm not sure that I see where my authority would be to enjoin them from taking any action before they've done it.

MS. PELLETIER:  So I think, Your Honor, what we're asking is for there not to be enforcement of the fee against someone until there's a lawful agency implementation in effect.  Because, of course, enforcement of the fee is implementation.  It is an agency action.  The statute, as my colleague explained, doesn't impose this requirement on individuals to pay.  It's the agency's action that does so. So what we're asking is for an injunction of that action until there is policy that lawfully implements the statute and requires individuals to pay.

And I think that 705 relief is unique because it allows this Court to protect its ability to actually reach the merits

of the agency's approach, and it's more expansive than simply setting aside the PM itself. Our position is that 705 relief is permitted to go that far and that it is appropriate for it to go that far because of the unique position that we're in in this case where the Government is taking the view that a stay of the PM would not limit their ability to continue to enforce the fee irrespective of the fact that the actual implementation had been stayed.

So I think that's what's putting us in this situation. It's very different from a situation where they would first have to take a full action and justify, consistent with this Court's order, why their new policy is lawful. They are saying that that's not what they're going to do if this Court stays the order so that's why we're in this position.

I think a sort of helpful analogy is that in some cases where the agency has not taken action that it's required to take, so a 702 posture, courts say once you're ready with your policy, come back and I will make sure that it's lawful consistent with my order. That's something that we've seen in those cases. So this isn't something that the APA scope of relief doesn't allow. It allows courts to sort of protect this ability for them to actually get to an outcome in the case, and we won't be back here on this Whac-A-Mole posture of them either constantly issuing new memos or doing the same thing without issuing a specific policy that we can point

to.

THE COURT:  Okay.  All right.  Thank you.

MR. GREGORY:  Your Honor, can I briefly address why we think the USCIS stay should not be lifted?  I don't think we got to that.

THE COURT:  Sure.

MR. GREGORY:  I'll be quick, subject to any questions you have.  So my friend gave us news today, which could be helpful news, that they have fixed the problem with the notice that they had before.  We have not seen that yet so I think the suggestion that it gets put into the record is a good one, and I think we'd like an opportunity to look --

THE COURT:  Why don't we try to do that after the hearing, and you can both let me know whether that has resolved, at least that aspect of the problem.

MR. GREGORY:  Now I will say just because I don't want others in my firm to kill me for inviting emergency briefing, I don't think there's any emergency at USCIS that requires the stay to be lifted by tomorrow, so this could be an issue where maybe we give it a little bit more time.

THE COURT:  Actually that was a question I had for you.  Why the January 30th requested decision date?  Other than I know it's a TRO so you'd like a relatively quick decision.  I didn't see anything in the record that...

MR. GREGORY:  Frankly, Your Honor, we wanted to give

you time to reach a decision, and we wanted to give ourselves and the Government adequate time to get some briefs in.  But people are getting same-day notices yesterday so this is urgent.  You're right, there's not a magic cliff on January 30th.  I think the cliff -- may have already gone over it, but every day is another day that people are going to be getting these orders, and people are going to be ordered removed because they get a same-day notice that's lost in the mail or they just can't pay or they don't see it in time.  So this is a real problem, especially now that they've taken a new position on CAT protection and INA withholding.

THE COURT:  Understood.  But January 30th you concede is not -- there's nothing that's going to happen on January 30th that I need --

MR. GREGORY:  It's not like the clock strikes midnight, people turn into pumpkins.

THE COURT:  Okay.

MR. GREGORY:  The reasons I think we think the stay should stay in place at USCIS, first of all, if you stay the EOIR memo, you should maintain the stays as to both agencies to prevent this sort of confusion we've talked about before and give them -- both agencies a chance to align their policies.  There's no urgency at USCIS for the additional reason that the USCIS, as I understand it, has a pause on adjudicating asylum applications.  So that's a separate

policy -- if it's not an issue in this case, we're not challenging it, but there's no need for them to be collecting the fee in the near term because they're not adjudicating these applications anyway.

Finally I'll add we had identified another problem with USCIS that to my knowledge has not been addressed yet which is they were systematically sending the notices to the wrong address.  For example, to the first attorney somebody had when they had changed attorneys or where someone had filed a change of address form and it was being sent to the old address.  This was occurring very frequently in October when USCIS was first sending notices out.  Maybe my friend will tell us they solved that problem too, but I haven't heard anything to suggest --

THE COURT:  When you say systematically sending to the wrong address, is that a function they're sending it to the address they have and it turns out to be wrong?  Or is it they're intentionally or somehow doing something that's creating this problem?

MR. GREGORY:  I'm not ascribing intent, just to be clear.  I'm sure this is normal sort of snafus that happen to agencies, but it's a real problem for people because they don't get the notices.

THE COURT:  Understood.  I'm trying to figure out why are things going to the wrong address.  Is it because they

don't have updated addresses or is there something else going on?

MR. GREGORY:  The example we saw repeatedly -- this is in the record from the first round -- is you've either changed attorneys or the attorney has changed addresses and they did file the form.  So their address is current with the agency but for reasons that only they know, was regularly being sent to that original address and people not getting it.  This happened for our clients -- one of our clients at Gibson Dunn too, and our client ASAP saw this throughout this pool of applicants.  The other --

THE COURT:  So the agency perhaps was not updating essentially the caption or the docket?  Someone was filing something saying I moved firms or I got a new lawyer, and it wasn't being updated in the system so the notice would go to the new person or place.

MR. GREGORY:  I don't want to speculate on what happened because I don't think we ever learned why, we just knew that it was.  One potential reason I suppose is if you go back -- this is a fee triggered by the date you filed your initial application.  Maybe they pulled the initial paperwork and didn't bother to look further down.  Whatever it is, I don't know it's been fixed.  We would definitely want to make sure that that independent problem has been resolved, see this new notice.  And if you do stay the EOIR memo, we think the

stay should remain in place to USCIS too.

Thank you.

THE COURT:  Okay, thank you.  Ms. Hedges.

MS. HEDGES:  Yes, Your Honor, if I may respond to some of the points.  I'll just pick up where Mr. Gregory left off.

With USCIS notice, point one, we'll put that into the record the new example of the template notice.

Point two, as to I think the other thing that they flagged in their brief with respect to what Mr. Gregory was just discussing about notices being mailed to the wrong place allegedly, I don't think that has anything to do with the Federal Register notice of USCIS.  Again, I think it's ECF 45-1 or something from months ago that they're citing in their brief for that.  If they allege this is a continuing issue, I am more than happy on behalf of my client to meet with Mr. Gregory and try and resolve that.  I don't think it has anything to do with the USCIS Federal Register notice and is not part of what plaintiffs are seeking relief on --

THE COURT:  Let me suggest this.  One way or the other, I'll look at it and make my ruling, but it certainly would never hurt for counsel to have that discussion and see if there's ways to better the system regardless of what my ruling turns out to be.

MS. HEDGES:  Happy to, Your Honor.

The other thing I would say is that in terms of -- I heard a couple of times from my friends on the other side this notion of:  What's the urgency, why can't the stay remain in place, why does the Government have to impose this fee?  Just to take a step back here, this legislation was enacted against the backdrop of a very expensive, very backlogged asylum-seeker system.  As we're all intimately aware, the government has limited resources to process these things.  The government -- other statutes in the past have given authority to impose fees of this nature, and Congress decided last summer to impose an annual asylum fee.  It is urgent when the implementation of a federal budget statute is being held up so that's what I'd say on that.

With respect to the scope of relief, a few points that I didn't get to address before.  I think it's telling that the plaintiff is saying they're not purporting to challenge results in individual cases but then here today is asking this Court to enter an order that would control or potentially could purport to control in individual cases.  I think I've mostly said what I want to say on that, but again I think this Court is well aware of what the plaintiffs are asking for in their proposed order which would enjoin the enforcement of federal statute and is beyond the scope of what the APA allows this Court to do.

As to the more incremental pieces of the plaintiff's

request for relief that don't go that far, I think that we are not necessarily in the same world of facially enjoining a federal statute, but I did hear the plaintiff say they are asking for an injunction.  So that means, you know, we do think the Court, as we requested in our papers, should set a bond and should give us a stay to determine what our appellate options are there.  So I would just stand on my briefs as to that.  They did make clear they are asking for an injunction.

But even if the Court enters an APA stay, again, an APA stay would only operate as to an agency action.  Plaintiffs expressly disclaim challenging any individual case here.  To the extent anyone has an issue in an individual case, they can raise it for the reasons I mentioned earlier and through the methods I mentioned earlier.

I do think also another thing on scope of relief that I want to push back on is I heard the plaintiff say they're not trying to tell the Court -- paraphrasing of course -- they're not trying to tell the Court exactly what to tell us about how to write our policy, but that's how I understand the plaintiff to be asking us to act.  The statute, again, doesn't require a particular notice period.  EOIR has already taken steps to bring its policy into alignment with USCIS's policy, and therefore anything more than that requiring EOIR to go back to the drawing board or keeping the stay in place as to USCIS is, in effect, dictating their policy in a way that is not found

in the statute.

THE COURT:  How do you respond to the argument that they made that the administrative record I'll be considering is the entirety of what's happening, including the litigation that we did have this declaration suggesting that there was going to be 30 days' notice adopted?  I guess I'm still a bit flummoxed, even taking the new position that the director can't dictate what an immigration judge can do, about why that completely fell by the wayside, and there was not at least a recommended default deadline notice period of 30 days.

MS. HEDGES:  Your Honor, I don't know all of the ins and outs of it.  My understanding of what was said at the time was that it was in the context of the 2025 fiscal year.  Again, I wasn't here so I don't know all of the ins and outs, and I'm not going to purport to.  I don't hear any basis in what the plaintiff has presented today for why that should affect the merits of their legal claim.

THE COURT:  Well, if we assume for a moment that it was a more broad-based representation that EOIR was willing to adjust to the same notice period that USCIS had put in place, and then if there has not been any explanation provided for the agency's change in position from that to "we can't tell judges what to do," I think that they would say this is arbitrary and capricious because you haven't explained that sort of change in position that was taken in the litigation

earlier.

MS. HEDGES:  I think I understand your question a little bit better now.  As to the explanation, I think I mentioned earlier there is a concern with creating confusion and because it's not binding -- I don't think it's ever been our litigation position that the PM was binding.  And because it's not binding and continues not to be binding, the fact that, let's say, EOIR were to go out and say "best practice, do 30 days," could still result in confusion for similar reasons that the plaintiff is alleging with respect to the alleged differences between USCIS and EOIR.  Which is that someone could have an understanding based on their reading of a PM that their deadline is going to be X, and then they could get an order in an individual case that says their deadline is Y.

So, again, these alleged discrepancies stem from regulations that predate this litigation and from the statute itself which doesn't set a minimum notice period.  Hopefully that was responsive to Your Honor's question.

THE COURT:  It may be.  I still don't think it is a very satisfactory answer in terms of why it would have been represented it was going to go one way, and then it just completely seems to have fallen by the wayside.  I'm not talking about binding versus nonbinding.  I'm talking about 30 days.  Why we moved from, "Okay, we'll align with USCIS and go

with 30 days" at least in terms of the default -- again, I'm not talking about binding versus nonbinding -- to "Oh, no, we can't do anything at all," and now we have judges giving two days or 24 hours.

MS. HEDGES:  Understood, Your Honor.  I think I'm responding a little bit to -- I just want to make sure no one is overreading what was said at the time.  I thought there was a suggestion that we had said at the time that the PM was binding, and I just want to --

THE COURT:  I don't think -- I don't have it in front of me right now, to be honest, but my recollection is not that it was a binding -- I don't know if plaintiffs have it right now?

MR. GREGORY:  Your Honor, I think they treated it as binding, but I don't think we -- I'm not arguing that they expressly conceded or anything like that.  I think everyone assumed, in our view correctly, that it was a binding policy.

THE COURT:  It certainly said 30 days.  It just didn't specify whether binding or nonbinding.

MR. GREGORY:  I can read from the brief.  They said unequivocally applicants, quote, "will have 30 days from the date of notice to pay."  They didn't say may have, they didn't say we will recommend or suggest.  They said applicants will have 30 days from the date of notice to pay, and they cited

the director's declaration.

MS. HEDGES:  Right and, again, Your Honor, my understanding of that declaration is that it was in the context of talking about the fiscal year 2025 fee.  I think that -- I don't want to get too bogged down because to the extent that anything was imprecise or appears to be inconsistent, I'm not saying -- I regret anything that would confuse the parties or the Court here.  So I'm not --

THE COURT:  Well, it's more than that; it just may be part of the record.  Do you have the actual declaration, Mr. Gregory, or the brief?

MS. HEDGES:  It's 44-1, Your Honor.

THE COURT:  I don't have it in front of me here. Denis, can you print it for me?  44-1.  I wanted someone to read me what it says in the declaration.

MS. HEDGES:  I have it, Your Honor.  It's 44-1. Okay.  I believe the paragraph in question is 10 and it says: "No alien for whom the AAF was due prior to the integration of that fee into EOIR's" -- sorry -- exists -- "prior to the integration of that fee into EOIR's existing electronic payment system will be required to pay the AAF until 30 days after the AAF billing notices have been mailed out."

Now I think -- and plaintiff can correct me if they're looking at a different paragraph, but that paragraph says "those for whom the AAF was due prior to the integration of

that fee into EOIR's existing electronic payment system."

And as Your Honor is aware, EOIR has since aligned its position with USCIS in the sense that it's not requiring payment before the mechanism was available.

MR. GREGORY:  Your Honor, if I may, there's also paragraph 8 which says, quote, "Once EOIR issues FY 2025 AAF billing notices owed, payments must be made by the alien no later than 30 days later to be considered timely."

There's a couple things here.  One, it doesn't include this equivocation about payment mechanisms which, of course, wasn't in briefs or the statements or arguments by counsel. It does include the "no later than" language so I think you could read it to say maybe less.  But I don't think anyone read it that way.  I don't think it's what they told you on October 28th or 29th or any of the representations made to us or the Court before the hearing.

I understand my friend wasn't here at the time, not blaming her for that.  I'm just saying I think everyone understood pretty clearly that they meant 30 days after the notice issued, and they weren't saying 30 days but maybe two, or 30 days but only if you're in this category but not if you're in this other category.

MS. HEDGES:  Just two quick things.  Your Honor has the declaration and can review it.  First, I certainly wouldn't want the government to be held to something that was

perceived and that's the language -- that's the language that I would use to describe what our -- what the plaintiff described as an implicit position in their brief.  I don't want to get too bogged down in it because --

THE COURT:  You read the language --

MS. HEDGES:  No -- I'm sorry, Your Honor.  To be clear, we read the language of the declaration.  I'm now talking about what everyone, quote/unquote, understood at the time.

THE COURT:  I mean, he read the brief, the language that was in the brief, the Government's brief.

MS. HEDGES:  Right and again --

MR. GREGORY:  I can read the transcript too, Your Honor, but this was repeated several times.

MS. HEDGES:  So I think my point, Your Honor, and again -- I'm not one to run away from what our position actually was at the time.  But because I wasn't there at the time, I'm not going to commit to the entire context.  What I will say is I don't want to get too bogged down in it because to Your Honor's legal concern, which is about has any alleged change been explained, I've given Your Honor several explanations just today.  We've also explained in our brief some of the issues -- setting aside the governing regs, some of the issues with purporting to require a certain deadline.

So I could go on further but I think we have certainly

done that, and even without my argumentation, the PM goes through explanations of why it is making the recommendations it's making.  So I want to push back very strongly as a legal matter against the notion that any alleged new position or change in position hasn't been adequately explained.

Just a couple other quick things, Your Honor.  So I do think that as to irreparable harm -- something I forgot to say earlier -- so there was also discussion in the briefing in the fall about a potential to credit overpayments against fees that aliens owe.  My understanding from my client is that still remains on the table.

So, in other words, if someone says "I was asked to pay this fee after I already paid it," and they have proof of that, it remains a potential option short of reopening a reconsideration for them to have that credited to them, and that would have to obviously be raised in the individual case and could be addressed.

THE COURT:  So they don't have to pay $1,000 to get that looked at?

MS. HEDGES:  I don't think so, Your Honor.  I'm not disputing that a fee applies to reconsideration, I was looking it up on the internet as the plaintiff's counsel was talking about it.  I'm not disputing that a fee applies to reconsideration.  What I'm saying is that that's not the only avenue to raise these issues.  Of course, the other avenue

short of that would be just raising it in your hearing in front of the IJ -- in the alien's hearing in front of the IJ. So that's an option that remains on the table that I want to make sure the record is clear.

The other thing I think to remember about irreparable harm is we need to be thinking about irreparable harm that would occur in the absence of the relief that the plaintiff is requesting. Again, as they've admitted, we haven't yet gotten to the point where there is a detention or there is a removal that's happened because of this alleged arbitrary and capricious action. And I think for the purposes of preliminary relief, they need to make that showing that it's very likely -- the standard is they need to make a strong showing of the likelihood that they're going to be irreparably harmed absent the preliminary relief that they're asking for.

I just want to make sure I'm not leaving anything on the table, Your Honor.

I just want to reiterate and make this clear. I know the plaintiff is saying the reason CAT or withholding on the template wasn't part of their earlier complaint was because it wasn't part of the set of issues that was in front of them. That's fine, I understand that. My point is I don't think the Court -- I didn't understand the Court to require my clients to take a definitive position on the interpretation of the

statute as to those fees for resolution of the motion today.

If the Court believes that that's necessary, I need to confer with my clients, and we're happy to brief that and --

THE COURT:  I would like to see that because I do think it would be helpful in my consideration of the issues here.  I don't know how long briefing we're talking about.  If it's a matter of checking in and saying, hey, are we taking this position or not...

MS. HEDGES:  I think the piece, Your Honor, that would take a little bit of time would just be to get both of my clients' position and make sure that I'm representing it correctly, and then we would, of course, want the opportunity to explain why we don't think whatever their position is justifies preliminary relief.

I think I heard -- and I don't want to misquote plaintiff so I apologize if I am -- but I think I heard something to the effect of that we're taking a new position today.  I'm not taking a new position.  What I'm asking the Court for is that we be given the opportunity -- if the Court believes it's important to have our position on that interpretive issue, that we be given the opportunity to brief that.

THE COURT:  I think it's fair that you should leave this hearing with the notion you're going to try to gather that information.  Whether or not it turns out to be material to how I rule in this case I don't know, but I would like to

get that information.

MS. HEDGES:  Understood, Your Honor.  I'll communicate that to them.

Also on a factual point, Your Honor was asking about whether the template order was available before PM 26-01.  I do understand that it was.  So my understanding -- I don't know how many cases it was entered in, but my understanding is the template itself was available roughly a couple of weeks before PM 26-01, and if it's helpful, I can put something in the record on that.  But that's something that I recently learned.

I think on standing I've made my point.  It's not the same thing as the final action.  I'll just rest on my briefs as to that.

As to the point that 8 C.F.R. 1003.24 says IJs don't collect fees, I don't think that moves the needle one way or the other.  The point is the statute says that the attorney general or the secretary shall require this fee.  That's the basis for the fee.  The IJs, even if they don't collect fees, the IJs clearly have authority to set deadlines for people to pay the fees in the individual case --

THE COURT:  I think what they'd say is the secretary and the AG at that point have done nothing to require the payment.  They haven't -- nobody has put anything in place to require the payment.  The statute doesn't say "IJS shall start

ordering this fee."  It says "The secretary and the AG shall require a payment."

MS. HEDGES:  Right, but they have, Your Honor, because -- the fact that it's subject to litigation doesn't mean they haven't done anything.  Even if EOIR hadn't issued a PM, that's not the agency not doing anything to implement the statute.  The statute doesn't require that it implement the statute by issuing any particular policy or guidance.

THE COURT:  But if I were to stay the 26-01 -- again, that hasn't happened yet -- but if I were to stay that, what would they have done?  That would be stayed.  There would be nothing that they've done to require payment.  Nothing operational that they've done to require payment if it were to be stayed.

MS. HEDGES:  If Your Honor is suggesting that that would then feed into the agency-action-unlawfully-withheld piece of this, I don't think that it does because if our client were to be subject to an injunction and had to comply with that, that wouldn't be arbitrary and capricious action.

But if your point was that it kind of shows that agency action is necessary, I don't think that it does.  I think we've been pretty clear that the statute requires this fee to be collected regardless of whether a PM remains in effect or regardless of whether the Federal Register notice remains in effect.  The statutory obligation is separate and apart from

that.

If the Court were to go beyond staying a policy and purport to enjoin the operation of a statute, I think we would just be in an entirely different world with respect to scope of relief. There would be a lot of problems Your Honor has already kind of discussed with the plaintiff's counsel about that. So, you know, I don't think I need to belabor that would be highly improper from our perspective.

I think that's kind of our fundamental point, the statute imposes the fee. So the fee is due annually regardless of what either agency does. The question is how are people notified of that, and in what way is it collected and so forth and so on. Those are things the statute doesn't explicitly address. So the statute is kind of divorced from the theory of irreparable harm that the plaintiffs have.

The other thing, I think this is the last thing I have to say. Just the allegation that some -- that we, being the Government, knew that some individuals wouldn't be able to pay the fee. Again, I haven't seen anything in the record that anyone's been unable to pay the fee. I understand that having to pay a fee is a financial cost. I'm not disputing that. But I haven't seen in the record and the allegations of irreparable harm that someone is unable to pay the fee. Even if they were, for all of the reasons I've discussed, there are many ways of recourse that don't involve staying a federal

statute.

So with that, Your Honor, I'm going to rest on my briefs with respect to the agency action unlawfully withheld.  Just make sure I didn't miss anything.

With respect to the retroactivity as well, with respect to the equities in public interest, and other than what I've already said here today with respect to tailoring relief.  Relief should be tailored, if any, to the plaintiff and its members.  There are ways to do that that are short of purporting to issue an order that would apply to everyone who's potentially an asylum seeker.  It should be tailored to the plaintiff and its members.

THE COURT:  How would one do an APA stay that's tailored to the plaintiff members?

MS. HEDGES:  For example, Your Honor, I think they actually cite an example of a case in their brief where there was a mechanism for members of the benefited group to come forward -- in the -- what's the word I'm looking for?  In the process of claiming the relief, of proving that they were, in fact, a member of that group to which the relief applied, that they were a member of the plaintiff organization.  So I think that sort of proves our point that this Court could issue an order that said:  If you're a member of ASAP, you get this relief.  We're not asking for anyone to be identified publicly as a member of ASAP.

Our point is that people who have no relationship to this case because they aren't a member of ASAP shouldn't get the benefit of any relief that is given to ASAP.

THE COURT:  All right.

MS. HEDGES:  With that, Your Honor, we would just ask that our motion to lift the stay as to USCIS be granted and that the plaintiff's motion be denied.  Thank you.

THE COURT:  Okay.

MR. GREGORY:  Thank you, Your Honor.

THE COURT:  Brief response.

MR. GREGORY:  I'll be brief.  On the merits issue of arbitrary and capricious, I just want to point out my friend said -- pointed to various explanations she gave, quote, just today.  Under *Chenery* -- and you can look at the DACA case which applies this in a similar context -- where an agency keeps offering new explanations, those are off the table.  You review the agency action based on the reasons they gave at the time it was issued.  As we've explained and discussed, those reasons were arbitrary and capricious, and nothing they said today is part of the record for Your Honor's consideration of that legal question.  That's all I have to say about the merits.

I do want to talk more about CAT withholding.  My friend said that the Government has not changed positions.  I'm going to quote to you from page 41 of the transcript from the first

time, starts line 14.  EOIR -- this is Ms. Iqbal:  "EOIR has explained that the annual asylum fee, while the persons use the same form to apply for these different avenues of relief, although they're using the same form" -- quote -- "the nonpayment of the annual asylum fee would not impact someone's application for these other avenues that you listed, whether it's CAT or otherwise."

That was unequivocal.  If they've changed their position or if they don't know their position, I think they need to tell not just us and the Court, but I think they need to tell the world that pretty soon because until today, I think everyone had understood -- because that's what the statute says -- that the fee is not collectible for people who are seeking INA withholding and CAT protection, even if you use the form which everyone does because the same form is used for all of these various types of relief.

I'd just like to point out they've had since July.  This statute was enacted in July.  The fact that they can't answer really quickly such a fundamental statutory question that impacts so many people is concerning, and it suggests that they're not ready to hit the road with their implementation of the statute if they can't answer a question like that.  I understand they say there's urgency because they're collecting money.  It shouldn't be this hard.  They should know the answer to that question.  They should have been able to comply

and follow the reasoning in your October decision.  I don't know why it's taking them so long, but that's not because of this litigation.  It's because the government, for whatever reason, is not adopting a reasonable policy to implement the statute.

Unless Your Honor has any questions, I'll sit down.  I think my colleague may have just a quick one.

THE COURT:  Oh, okay.

MS. PELLETIER:  I'll be very, very brief.

Your Honor, just to respond to the point about there not being examples in the record where under the new PM, people have been unable to pay, I just want to put in context that we've had very little time to collect those examples.  ASAP is not in touch with every single one of the two million people that currently have asylum claims pending before EOIR, and the fact that 80,000 people have paid doesn't undermine the fact that there are a lot of people who still are at severe risk for adverse consequences coming from the lack of notice and the confusion that's created by the agency's approach.

As Your Honor found in the first round of this dispute, a 705 stay does not need to be limited to ASAP's members. Nothing in *Casa*, nothing in any other decision upsets the statutory scope of this Court's ability to award relief in staying the agency's implementation.

I just want to very quickly reiterate why we think an

injunction is appropriate beyond the stay.  I think because of some of these things that have come up in argument, it really explains why that sort of broader relief is necessary.  I think that equivocation about whether or not the prior PM is going to spring back.  Obviously if the Court retains the stay from earlier, that wouldn't be a problem.  But I think we just -- the Government hasn't committed to taking action only through a valid lawful approach that is consistent with whatever this Court decides, and I think that really is very important here because even if we were to come back on another emergency motion in a month, people will be affected in the interim.

That is the core issue with the irreparable harm that's happening here.  This isn't a regulation where there's a long period where we have a chance to challenge it before it starts affecting people, and therefore we can wait and see what they come up with and challenge it again.  It's going to start affecting people before we even find out because we're, again, not in touch with every single person every day.  So while ASAP is doing its best to find out what's going on on the ground, really only the government can control that and knows what is happening.

It's not uncommon in APA cases for injunctive relief to be appropriate.  It is not the same as a stay, but it is not beyond the scope of the relief, as we discussed before.  I

think that's everything, unless Your Honor has any questions.

THE COURT:  No, thank you.  This has been very helpful.  I'm going to take this under advisement.  I'm aware that there's some urgency to it.  While I do not promise the 30th, I promise to get it out quickly.  Some of these issues that we've talked about potential follow-up information on, obviously it would be welcomed to collect as much information as we can and to get it to me as soon as possible.  Of course, as I mentioned on the one issue and I would encourage on other issues as well, conferring amongst counsel and seeing if there are easy ways to get some of this resolved in a way that benefits everybody would certainly be advisable.

MR. GREGORY:  Your Honor, may I make one request?

THE COURT:  Sure.

MR. GREGORY:  If you are going to wait for the Government to file a notice -- I think this was mostly as to USCIS but also as to their legal position at EOIR, I think given the urgency, I think you should impose a deadline.  I don't want to have sharp elbows here, but I also want to make sure we're not waiting two, three days for something that they should be able to do pretty quickly and give us a chance to respond to and still give Your Honor time to reach a decision.

THE COURT:  Anything anybody wants me to take into

consideration if I'm going to rule on this should be filed, I'll say, no later than midnight on the 29th to the 30th.  So midnight of tomorrow, which is, I guess, technically midnight on the 30th and then again -- if someone files something and the other side believes they need time to respond, they should file something on the 30th relatively early, saying I need a day to respond to it, and we'll take that into account.

            MR. GREGORY:  Understood, Your Honor.  Thank you.

            THE COURT:  Thank you-all.

            THE CLERK:  All rise.  This Court stands in recess.

        (Proceedings concluded at 12:53 p.m.)


            CERTIFICATE OF OFFICIAL REPORTER

            I, Patricia G. Mitchell, Registered Merit Reporter, Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

            Dated this 29th day of January 2026.

_Patricia G. Mitchell_
_____
            Patricia G. Mitchell, RMR, CRR
            Federal Official Reporter

**< Dates >.**

**1003.24.** 38:9 .

**29th day of January 2026.** 84:22 .

**January** 60:3 .

**January 28, 2026** 1:18 .

**January 2nd** 35:11 .

**January 2nd** 3:25, 4:6, 32:24, 34:23, 35:1, 42:17, 48:9 .

**January 2nd,** 17:22 .

**January 30th** 59:21, 60:11, 60:13 .

**November, December,** 43:24 .

**October** 4:11, 17:21, 32:20, 43:19, 49:20, 50:21, 61:10 .

**October 28th** 70:13 .

**October decision.** 80:24 .

**October,** 5:8, 43:1 .

**$1** 51:22, 52:8, 52:10, 52:13, 72:16 .

**$100** 19:6, 33:25, 44:20, 44:24, 46:14, 52:12 .

**$37** 19:1 .

.

.

**< 0 >.**

**00** 1:19, 2:2 .

**000** 9:17, 9:21, 12:11, 19:1, 19:6, 51:22, 52:8, 52:10, 52:13, 72:16, 81:14 .

.

.

**< 1 >.**

**10** 69:15 .

**100** 4:18, 4:21 .

**10003-1502** 1:40 .

**1003.24** 75:13 .

**11** 1:19, 2:2 .

**12** 84:9 .

**13th** 15:9 .

**14** 49:6, 79:24 .

**1700** 1:33 .

**1808** 38:17, 39:7, 42:1, 42:12 .

**1:** 1:9 .

.

.

**< 2 >.**

**20036** 1:34 .

**2025** 6:21, 12:11, 66:12, 69:2, 70:4 .

**20530** 1:47 .

**228** 1:39 .

**24** 7:23, 8:23, 68:2 .

**24-hour** 44:24 .

**25-36** 3:20, 4:7, 4:8 .

**26-01** 4:6, 5:14, 5:20, 6:4, 6:9, 6:13, 14:24, 14:25, 16:17, 16:19, 16:22, 17:19, 18:11, 26:7, 28:5, 40:3, 56:14, 57:3, 75:3, 75:7, 76:7 .

**26-1** 12:10 .

**28** 84:17 .

**29th** 70:13, 83:25 .

.

.

**< 3 >.**

**30-day** 6:14, 7:24, 12:13, 28:15, 32:14, 36:4, 42:24 .

**30th** 60:4, 83:4, 83:25, 84:2, 84:4 .

**35-day** 46:2 .

.

.

**< 4 >.**

**40** 12:11 .

**41** 79:23 .

**44-1** 69:10, 69:12, 69:14 .

**45-1** 63:13 .

**48** 7:23, 8:23 .

.

.

**< 5 >.**

**5** 5:15 .

**5-cv-03299-sag** 1:9 .

**53** 84:9 .

.

.

**< 7 >.**

**70** 3:18 .

**702** 58:16 .

**704** 18:22 .

**705** 39:5, 50:24, 55:13, 55:21, 57:23, 58:1, 81:19 .

**706** 39:4 .

**73-1** 56:5 .

**753** 84:17 .

**7C** 1:24 .

.

.

**< 8 >.**

**8** 5:16, 38:9, 38:17, 39:7, 70:4, 75:13 .

**80** 9:17, 81:14 .

**82-3** 37:4 .

.

**< 9 >.**

**950** 1:46 .

.

.

**< A >.**

**A.** 1:23 .

**a.m.** 1:19, 2:2 .

**AAF** 6:1, 10:18, 69:16, 69:19, 69:20, 69:23, 70:4 .

**abandoned** 22:7 .

**ability** 55:22, 57:24, 58:5, 58:21, 81:21 .

**able** 7:10, 9:21, 9:22, 10:13, 17:23, 24:19, 27:20, 28:10, 30:7, 30:19, 44:24, 45:1, 48:17, 49:11, 52:7, 52:12, 53:12, 53:13, 77:16, 80:23, 83:20 .

**above** 52:10 .

**above-entitled** 84:19 .

**absence** 40:5, 40:20, 73:5 .

**absent** 73:13 .

**abstract** 44:9 .

**accidentally** 16:4 .

**according** 53:3 .

**account** 84:5 .

**accurate** 31:6 .

**achieve** 30:8 .

**across** 7:8, 28:10 .

**Act** 19:2, 21:15, 23:17, 25:25, 38:18, 38:24, 39:1, 39:14, 65:19 .

**acting** 15:4, 18:2 .

**actions** 40:7 .

**actual** 45:4, 45:15, 58:6, 69:8 .

**Actually** 9:16, 12:2, 25:2, 25:5, 32:14, 53:10, 55:12, 55:14, 55:24, 57:24, 58:21, 59:20, 71:15, 78:14 .

**ad** 5:17, 39:22, 41:6 .

**add** 61:4 .

**addition** 55:11 .

**additional** 11:21, 26:12, 28:7, 60:22 .

**address** 3:22, 10:12, 10:14, 16:20, 19:16, 20:9, 20:12, 23:5, 25:19, 26:7, 32:1, 32:7, 32:9, 34:14, 38:7, 40:11, 40:23, 51:18, 55:25, 59:2, 61:7, 61:9, 61:15, 61:16, 61:24, 62:5, 62:7, 64:14, 77:12 .

**addressed** 6:22, 13:23, 13:25, 15:9, 27:23, 40:21, 61:5, 72:15 .

**addresses** 56:19, 61:25, 62:4 .

**addressing** 3:15, 4:11 .

**adequacy** 52:20 .

**adequate** 11:24, 18:20, 19:13, 19:20, 19:21, 19:23, 50:8, 52:24, 53:5, 54:21, 60:1 .

**adequately** 55:25, 72:3 .

**adjudicate** 11:3, 11:5 .

**adjudicated** 55:15 .

**adjudicates** 26:20 .

**adjudicating** 60:24, 61:2 .

**adjudication** 12:17 .

**adjudications** 13:14 .

**adjudicator** 45:10 .

**adjudicatory** 11:23, 13:7 .

**adjust** 66:19 .

**Administration** 35:5, 38:18, 38:24, 39:13 .

**administrative** 43:12, 66:2 .

**admitted** 73:6 .

**adopt** 47:12, 49:1 .

**adopted** 32:24, 43:17, 48:7, 49:13, 53:4, 66:5 .

**adopting** 6:14, 36:21, 81:2 .

**adverse** 12:2, 12:24, 21:11, 81:16 .

**advisable** 83:11 .

**advisement** 83:2 .

**Advocacy** 1:5, 1:38, 2:5 .

**affect** 66:16 .

**affected** 82:9 .

**affecting** 82:14, 82:16 .

**affirmatively** 25:9 .

**afford** 44:24, 49:4 .

**afforded** 55:12 .

**AG** 75:21, 75:24 .

**Agencies** 5:11, 26:12, 36:18, 38:17, 39:1, 39:7, 39:18, 39:19, 39:21, 47:8, 48:15, 50:9, 60:19, 60:21, 61:21 .

**agency-action-unlawfully-withhe ld** 76:14 .

**ago** 3:19, 27:11, 63:13 .

**agree** 30:12 .

**al** 1:11 .

**alien** 69:16, 70:5, 72:25 .

**aliens** 72:8 .

**align** 60:21, 67:23 .

**aligned** 69:25 .

**alignment** 5:14, 28:5, 65:21 .

**allegation** 12:22, 28:24, 77:15 .

**allegations** 24:20, 77:20 .

**allege** 7:20, 17:16, 63:14 .

**alleged** 13:22, 14:17, 14:23, 67:9, 67:14, 71:18, 72:2, 73:8 .

**allegedly** 9:6, 10:2, 13:13, 16:22, 17:20, 63:11 .

**alleging** 13:1, 15:25, 24:21, 29:14, 36:13, 67:9 .

**allow** 14:21, 58:20 .

**allowing** 56:3 .

**allows** 57:23, 58:20, 64:22 .

**almost** 14:23, 28:10 .

**already** 9:18, 13:10, 13:13, 13:15, 13:25, 28:19, 28:25, 50:7, 50:23, 51:13, 60:4, 65:20, 72:11, 77:4, 78:5 .

**alter** 2:24 .

**alternative** 45:20, 52:20 .

**although** 30:4, 47:20, 80:2 .

**amend** 27:12 .

**amended** 15:15, 15:17, 57:8 .

**amongst** 83:9 .

**amount** 53:10 .

**analogy** 58:14 .

**analysis** 2:24 .

**analyze** 17:10, 18:15 .

**Andrew** 1:31, 2:11 .

**annual** 5:23, 15:12, 24:2, 33:2, 33:4, 55:18, 64:10, 79:25, 80:3 .

**annually** 77:8 .

**answer** 11:16, 11:17, 22:11, 22:20, 27:17, 40:12, 45:23, 45:24, 51:2, 51:19, 67:19, 80:16, 80:20, 80:23 .

**answers** 23:14 .

**anybody** 83:23 .

**anyway** 61:3 .

**APA** 14:15, 14:20, 15:19, 18:21, 18:22, 19:23, 36:21, 37:11, 37:22, 39:3, 39:10, 39:11, 40:1, 40:7, 42:20, 43:10, 43:11, 48:2, 48:19, 50:24, 55:3, 57:3, 58:19, 64:22, 65:8, 78:11, 82:21 .

**Apa-type** 53:8 .

**apart** 18:20, 24:13, 24:20, 46:8, 76:23 .

**Apologize** 3:13, 21:22, 29:5, 74:14 .

**Appalachian** 36:24 .

**appeal** 11:2, 25:7, 51:18, 52:13, 52:15, 52:22, 53:20 .

**appealing** 11:9 .

**appeals** 11:4, 18:19, 44:16, 53:19, 54:11 .

**appears** 69:4 .

**appellate** 11:20, 19:20, 65:5 .

**applicable** 40:14, 42:10, 48:2 .

**applicant** 8:25, 18:10, 44:21 .

**applicants** 5:20, 7:15, 15:11, 33:11, 39:17, 62:10, 68:20, 68:22 .

**Application** 12:18, 18:11, 21:12, 21:13, 21:24, 22:3, 22:7, 22:9, 22:10, 22:13, 24:1, 32:21, 34:7, 34:12, 62:20, 80:4 .

**applications** 11:15, 12:11, 23:12, 23:14, 36:1, 60:24, 61:3 .

**applied** 3:20, 19:12, 22:15, 22:16, 22:21, 53:1, 78:18 .

**applies** 16:24, 20:24, 23:14, 32:18, 34:12, 72:19, 72:21, 79:13 .

**apply** 21:2, 21:5, 23:17, 27:9, 32:17, 51:25, 78:8, 80:1 .

**applying** 19:4, 20:24, 25:16, 34:4, 36:25, 38:13, 40:15 .

**appreciate** 41:25 .

**approach** 57:25, 81:17, 82:6 .

**appropriate** 20:4, 23:3, 23:4, 31:23, 50:25, 58:2, 81:24, 82:22 .

**appropriately** 23:1, 56:15 .

**arbitrary** 5:10, 7:18, 25:10, 26:22, 42:20, 43:18, 44:7, 53:9, 55:18, 66:23, 73:8, 76:17, 79:10, 79:17 .

**arduous** 44:14 .

**area** 21:19 .

**areas** 13:22, 47:14 .

**argue** 14:19, 19:19, 22:2, 57:8 .

**argued** 51:8 .

**argues** 19:20 .

**arguing** 13:18, 68:13 .

**argument** 16:18, 16:19, 22:23, 23:9, 30:4, 37:5, 37:14, 37:15, 38:2, 38:4, 40:3, 40:22, 51:16, 66:1, 81:25 .

**argumentation** 7:17, 71:24 .

**arguments** 2:25, 51:3, 55:10, 70:9 .

**around** 35:2 .

**Article** 37:19 .

**ASAP** 2:9, 2:10, 2:11, 2:12, 2:13, 10:6, 10:9, 10:16, 50:7, 50:25, 56:10, 62:9, 78:21, 78:23, 78:25, 79:1, 81:11, 81:19, 82:18 .

**ascribing** 61:19 .

**aside** 7:11, 16:6, 58:1, 71:21 .

**aspect** 27:22, 27:24, 59:14 .

**associated** 11:7, 11:11, 11:19, 11:21, 51:20 .

**associational** 2:22, 16:12 .

**assume** 8:15, 10:15, 29:10, 30:14, 66:17 .

**assumed** 68:15 .

**assuming** 25:6 .

**asylum-seeker** 64:6 .

**attention** 9:6, 10:13, 10:25, 46:19 .

**Attorney** 25:23, 42:13, 61:7, 62:4, 75:15 .

**attorneys** 37:6, 61:8, 62:4 .

**authority** 11:5, 11:15, 15:4, 29:14, 29:17, 30:18, 38:5, 38:19, 39:1, 41:2, 41:9, 48:15, 55:13, 56:4, 56:9, 56:12, 57:4, 57:10,

64:8, 75:18 .

**automatic** 54:11, 54:19 .

**automatically** 4:6, 5:3 .

**available** 10:7, 52:22, 54:23, 70:2, 75:3, 75:6 .

**Ave** 1:46 .

**Avenue** 1:39, 52:23, 72:23 .

**avenues** 10:19, 22:18, 51:23, 80:1, 80:4 .

**average** 44:23 .

**avoid** 33:13, 36:21 .

**award** 41:3, 81:21 .

**aware** 8:12, 10:6, 17:16, 17:18, 24:3, 28:4, 64:6, 64:20, 69:25, 83:2 .

**away** 6:5, 49:15, 71:14 .

.

.

**< B > .**

**Bacardi** 18:24 .

**back** 4:2, 4:5, 4:8, 4:15, 4:24, 5:4, 12:8, 31:2, 37:5, 44:8, 55:23, 56:18, 57:1, 57:8, 58:17, 58:22, 62:19, 64:4, 65:15, 65:22, 72:1, 82:3, 82:8 .

**backdrop** 31:20, 64:5 .

**backlogged** 64:5 .

**backup** 32:10 .

**Bah** 33:24 .

**balance** 50:14 .

**Baltimore** 1:17 .

**bar** 37:13 .

**Barron** 1:31, 2:11 .

**based** 3:18, 5:10, 28:24, 55:24, 57:3, 67:11, 79:15 .

**basically** 5:25, 19:1 .

**basis** 5:18, 15:12, 15:14, 41:6, 46:3, 66:14, 75:17 .

**beat** 5:17 .

**Beautiful** 21:15, 23:5, 23:17, 25:25 .

**behalf** 3:14, 63:15 .

**belabor** 19:14, 19:17, 77:5 .

**believe** 8:22, 10:4, 10:17, 11:9, 13:15, 13:16, 14:24, 17:16, 18:22, 20:16, 22:13, 22:17, 24:5, 28:19, 33:22, 33:23, 35:12, 52:11, 69:15 .

**believed** 12:23 .

**believes** 9:13, 18:10, 22:14,

73:25, 74:17, 84:3 .
**benefit** 79:1 .
**benefited** 78:15 .
**benefits** 83:11 .
**best** 7:3, 21:6, 30:25, 31:1, 31:3,
44:13, 46:16, 67:7,
82:18 .
**better** 40:21, 48:6, 63:22,
67:2 .
**beyond** 12:6, 14:8, 14:20, 15:18,
41:10, 64:22, 76:25, 81:24,
82:23 .
**BIA** 11:2, 11:3, 11:10, 44:14, 52:2,
52:6, 52:15, 53:6 .
**Big** 21:15, 23:5, 23:17,
25:25 .
**Bill** 14:11, 21:15, 23:5, 23:17,
25:25, 44:10, 44:24,
46:12 .
**billing** 69:20, 70:5 .
**bind** 4:23, 6:24, 23:16 .
**binding** 7:4, 30:5, 30:13, 31:12,
31:19, 37:25, 67:4, 67:5, 67:6,
67:22, 67:25, 68:7, 68:10,
68:13, 68:15, 68:18 .
**bit** 41:7, 45:16, 46:5, 51:7, 51:13,
56:3, 59:19, 66:5, 67:2, 68:4,
74:8 .
**blacked** 24:7 .
**blaming** 70:16 .
**blanket** 10:20, 12:4, 19:11 .
**blocked** 24:9 .
**board** 7:8, 28:11, 65:23 .
**bogged** 69:3, 71:2, 71:17 .
**bond** 65:5 .
**bother** 62:21 .
**box** 21:1 .
**Brief** 3:17, 3:21, 7:17, 13:20,
28:14, 32:11, 43:5, 48:13,
63:9, 63:14, 68:19, 69:9, 71:1,
71:8, 71:9, 71:20, 74:1, 74:19,
78:14, 79:8, 79:9, 81:7 .
**briefing** 4:8, 5:13, 5:17, 6:15,
16:6, 16:14, 20:22, 21:14,
23:21, 23:22, 39:19, 52:25,
53:18, 59:17, 72:6, 74:4 .
**briefly** 12:9, 18:17, 37:12,
59:2 .
**briefs** 60:1, 65:6, 70:9, 75:11,
77:25 .

**bring** 13:16, 53:8, 65:21 .
**bringing** 10:24, 20:21 .
**brings** 5:14 .
**broad** 8:8 .
**broad-based** 66:18 .
**broader** 11:14, 15:17, 53:9,
82:1 .
**broadly** 56:13 .
**brought** 9:5, 10:12, 23:23, 28:5,
55:2 .
**brush** 8:8 .
**budget** 14:11, 14:12, 64:11 .
.
.
**< C >** .
**C.** 84:17 .
**called** 34:6 .
**capricious** 5:10, 25:10, 26:23,
42:20, 55:18, 66:23, 73:9,
76:17, 79:10, 79:17 .
**caption** 62:12 .
**carefully** 46:15 .
**Casa** 81:20 .
**cases** 9:4, 9:9, 13:2, 18:24, 30:18,
36:18, 36:19, 37:23, 53:18,
58:14, 58:19, 64:16, 64:18,
75:5, 82:21 .
**CAT** 20:17, 21:5, 21:16, 22:10,
22:15, 22:16, 23:4, 24:1,
32:15, 32:17, 32:22, 33:6,
33:15, 33:21, 34:1, 44:2,
60:10, 73:18, 79:21, 80:5,
80:12 .
**categorically** 25:3 .
**category** 70:19, 70:20 .
**cause** 18:17, 18:21, 18:22, 19:18,
37:21, 50:9 .
**caused** 46:22, 51:14 .
**causes** 53:2 .
**causing** 22:1 .
**caution** 18:2 .
**certain** 7:2, 19:3, 71:22 .
**certainly** 17:9, 48:8, 49:15, 63:20,
68:17, 70:22, 71:23,
83:11 .
**CERTIFICATE** 84:13 .
**Certified** 84:15 .
**certify** 84:17 .
**cetera** 45:7 .
**challenge** 16:17, 19:11, 48:2,

53:8, 55:3, 64:15, 82:13,
82:15 .
**challenges** 11:3, 11:5 .
**challenging** 19:7, 19:8, 34:18,
34:19, 34:23, 40:12, 40:14,
48:3, 53:6, 61:1, 65:10 .
**chance** 5:1, 44:11, 45:15, 60:21,
82:13, 83:20 .
**change** 18:4, 31:20, 43:20, 51:4,
61:8, 66:21, 66:24, 71:19,
72:3 .
**changed** 31:8, 44:6, 50:12, 61:8,
62:4, 79:22, 80:6 .
**characterization** 31:7 .
**charge** 38:5 .
**checking** 74:5 .
**checks** 21:1 .
**Chenery** 79:12 .
**Circuit** 11:10, 36:24, 37:18 .
**circumstances** 9:10, 20:3,
45:7 .
**cite** 48:13, 78:14 .
**cited** 36:24, 37:23, 39:22, 43:9,
53:17, 55:20, 68:23 .
**cites** 18:24, 29:15, 29:20 .
**citing** 19:15, 19:16, 63:13 .
**Citizenship** 1:10, 2:6 .
**Civil** 1:8, 1:45, 19:1, 45:11 .
**claim** 23:3, 23:15, 32:17, 33:15,
33:16, 36:14, 44:2, 54:14,
54:16, 66:16 .
**claiming** 78:17 .
**claims** 23:18, 32:15, 32:18, 32:22,
34:1, 50:10, 81:13 .
**clarified** 42:21 .
**clarify** 3:19, 13:19, 18:18,
27:25 .
**clean** 34:9 .
**clear-cut** 22:23 .
**Clearly** 32:16, 35:7, 37:7, 43:7,
70:17, 75:18 .
**CLERK** 84:8 .
**client** 4:18, 62:9, 63:15, 72:8,
76:16 .
**clients** 14:19, 23:16, 62:8, 73:22,
74:1, 74:9 .
**cliff** 60:3, 60:4 .
**clock** 60:14 .
**closer** 7:14 .
**colleague** 32:8, 38:3, 49:8, 50:3,

57:18, 81:5 .
**colleagues** 35:13 .
**collect** 38:9, 39:15, 39:18, 39:23,
40:4, 40:6, 40:19, 42:3, 75:14,
75:17, 81:11, 83:6 .
**collected** 76:21, 77:10 .
**collectible** 80:11 .
**collecting** 42:7, 50:18, 50:20,
61:1, 80:21 .
**comes** 32:1, 37:5, 38:3, 42:1,
42:14 .
**comfortable** 3:10, 3:12,
56:12 .
**coming** 2:18, 5:4, 17:7, 40:20,
52:13, 57:8, 81:16 .
**commit** 71:16 .
**commitments** 43:19 .
**committed** 49:22, 82:5 .
**communicate** 26:9, 75:1 .
**compelling** 2:23 .
**complaint** 15:16, 15:17, 27:12,
57:8, 73:19 .
**completely** 44:7, 66:8,
67:21 .
**completing** 8:16 .
**complied** 12:23 .
**complies** 39:13, 48:10 .
**comply** 8:9, 8:16, 25:21, 41:15,
42:18, 45:15, 76:16,
80:23 .
**comport** 31:8 .
**Computer-aided** 1:50 .
**concede** 12:14, 28:1, 60:12 .
**conceded** 68:14 .
**conceding** 30:3 .
**conceivable** 12:14 .
**concern** 5:24, 36:11, 36:14, 67:3,
71:18 .
**concerned** 20:1 .
**concerning** 54:12, 80:18 .
**concerns** 26:8, 56:19 .
**Conchita** 1:37, 2:12 .
**concluded** 84:9 .
**conclusion** 50:13 .
**concrete** 54:2 .
**conditions** 2:19 .
**confer** 24:10, 74:1 .
**Conference** 84:21 .
**conferring** 83:9 .
**confirm** 52:11 .

**confirming** 35:13 .
**conflicting** 5:11 .
**conformance** 84:20 .
**confuse** 69:6 .
**confused** 17:5, 43:16 .
**confusion** 6:8, 13:1, 29:13, 30:14, 47:1, 47:3, 47:8, 47:15, 50:8, 60:20, 67:3, 67:8, 81:17 .
**Congress** 64:9 .
**Congressionally-enacted** 14:11 .
**connection** 6:15 .
**consequences** 21:11, 41:18, 44:12, 81:16 .
**consider** 38:21, 48:9, 54:13 .
**consideration** 74:3, 79:18, 83:24 .
**considered** 4:10, 17:6, 27:21, 70:6 .
**considering** 66:2 .
**consistency** 27:23 .
**consistent** 4:25, 25:12, 25:14, 25:16, 27:1, 58:10, 58:18, 82:6 .
**consistently** 46:24 .
**constantly** 58:23 .
**construed** 23:17, 52:3 .
**contain** 56:7 .
**contention** 40:18, 40:19 .
**context** 6:21, 19:7, 20:25, 26:20, 66:12, 69:2, 71:16, 79:13, 81:10 .
**continue** 38:5, 40:4, 40:5, 40:19, 41:1, 58:5 .
**continued** 14:17 .
**continues** 41:14, 55:24, 67:6 .
**continuing** 63:14 .
**control** 15:1, 45:12, 64:17, 64:18, 82:19 .
**Convention** 20:17 .
**core** 82:11 .
**Correct** 9:14, 17:12, 35:15, 42:17, 45:19, 47:11, 69:21, 84:18 .
**corrected** 50:19, 55:6 .
**correctly** 33:19, 34:11, 40:24, 50:15, 50:23, 68:15, 74:10 .
**cost** 11:20, 11:21, 57:9,

77:19 .
**costly** 19:5 .
**Counsel** 2:8, 2:15, 39:20, 44:19, 52:16, 63:21, 70:9, 72:20, 77:4, 83:9 .
**country** 33:12, 46:15, 50:11, 53:20, 54:20 .
**Couple** 3:19, 17:18, 20:21, 27:10, 64:1, 70:7, 72:4, 75:6 .
**course** 30:22, 31:18, 35:4, 37:1, 38:10, 48:5, 52:3, 53:21, 57:16, 65:16, 70:8, 72:23, 74:10, 83:7 .
**Courtroom** 1:24 .
**Courts** 36:19, 45:8, 47:15, 58:16, 58:20 .
**cover** 33:16 .
**craft** 48:10 .
**created** 50:8, 81:17 .
**creating** 61:18, 67:3 .
**credible** 54:16 .
**credit** 72:7 .
**credited** 72:13 .
**critical** 14:25 .
**criticism** 24:6 .
**CRR** 84:26 .
**Crutcher** 1:32 .
**Cruz** 1:37, 2:12 .
**current** 7:2, 18:8, 40:25, 62:5 .
**currently** 15:2, 27:15, 27:17, 28:17, 81:13 .
.
.
**< D >** .
**DACA** 48:13, 79:12 .
**date** 28:16, 28:21, 59:21, 62:19, 68:21, 68:23 .
**Dated** 84:22 .
**day** 19:2, 25:15, 46:12, 46:20, 53:19, 60:5, 82:17, 84:5 .
**DC** 1:34, 1:47, 36:24 .
**deadline** 5:21, 5:22, 7:8, 8:9, 10:16, 12:16, 13:8, 28:22, 29:9, 29:11, 29:18, 34:3, 44:12, 44:18, 45:5, 45:22, 46:10, 46:25, 47:10, 47:23, 50:9, 53:2, 53:3, 66:9, 67:12, 67:13, 71:22, 83:17 .
**deadlines** 7:10, 9:16, 11:15,

12:21, 15:1, 29:16, 29:22, 30:6, 30:22, 42:5, 45:8, 45:9, 47:2, 47:21, 75:18 .
**deal** 21:18 .
**dealing** 8:25 .
**dealt** 2:22 .
**decide** 14:6 .
**decided** 50:7, 50:15, 64:9 .
**decides** 82:7 .
**decision** 45:13, 51:5, 53:7, 59:21, 59:23, 59:25, 81:20, 83:22 .
**decisional** 9:2, 29:12, 30:17 .
**decisions** 38:21 .
**Declaration** 6:20, 33:23, 33:24, 37:4, 43:6, 66:4, 68:24, 69:1, 69:8, 69:13, 70:22, 71:5 .
**declarations** 7:19, 9:8, 10:1, 10:5, 24:7 .
**default** 29:16, 29:22, 30:6, 30:16, 44:18, 45:9, 47:21, 47:22, 66:9, 67:24 .
**defendant** 2:15 .
**Defendants** 1:13, 1:42, 2:17, 15:4, 15:11, 56:8 .
**defer** 38:3 .
**deficiency** 56:14 .
**definitely** 62:22 .
**definitive** 5:5, 73:23 .
**definitively** 24:19 .
**degree** 30:8 .
**delay** 50:18 .
**delegated** 56:8 .
**delve** 51:6 .
**denial** 22:8, 23:2, 50:10 .
**denied** 22:14, 22:18, 23:1, 24:2, 57:2, 79:5 .
**Denis** 69:12 .
**Department** 1:45, 15:4, 42:12, 56:8 .
**deported** 44:15 .
**describe** 70:25 .
**described** 71:1 .
**describes** 22:25 .
**description** 42:16 .
**designed** 14:12, 26:7 .
**detail** 5:15, 9:7, 10:1, 10:2 .
**detained** 53:17, 54:6 .
**detention** 53:18, 54:2, 73:7 .
**determination** 19:9 .

**determine** 29:24, 65:5 .
**determined** 50:23 .
**deviate** 29:18, 30:20, 45:6 .
**dictate** 66:7 .
**dictating** 48:22, 65:24 .
**difference** 36:9 .
**differences** 67:10 .
**different** 5:13, 6:16, 12:25, 15:14, 18:25, 19:10, 26:20, 26:21, 26:24, 27:7, 27:8, 39:16, 48:18, 51:10, 51:23, 58:9, 69:22, 77:2, 80:1 .
**differently** 7:18, 7:20, 26:19, 27:8, 51:7, 51:8 .
**difficult** 14:19, 31:22, 41:7 .
**difficulties** 8:20 .
**difficulty** 8:4 .
**direct** 9:3, 30:18 .
**direction** 17:3 .
**directly** 3:11, 43:14 .
**Director** 6:20, 9:3, 12:10, 29:9, 30:17, 43:6, 66:6, 68:24 .
**directs** 38:10 .
**disagree** 47:19 .
**disagreed** 31:5 .
**discharging** 19:3 .
**disclaim** 65:10 .
**disclosure** 24:11 .
**discrepancies** 14:17, 67:14 .
**discrepancy** 13:22 .
**discretion** 52:4 .
**discuss** 4:9 .
**discussed** 37:24, 55:21, 77:4, 77:22, 79:16, 82:23 .
**discussing** 63:10 .
**discussion** 11:8, 63:21, 72:6 .
**dismiss** 23:11 .
**dismissal** 23:3 .
**dismissal.** 22:8 .
**dismissals** 34:8 .
**dismissed** 23:1, 32:20, 32:21, 33:17, 44:3 .
**dispute** 14:3, 81:18 .
**disputing** 72:19, 72:21, 77:19 .
**distinctions** 19:15 .
**District** 1:1, 1:2, 84:16 .
**Division** 1:3, 1:45 .
**divorced** 77:12 .

**docket** 62:12 .
**doctrinal** 19:14 .
**document** 4:1, 34:22 .
**doing** 8:16, 13:13, 17:23, 25:12, 26:14, 35:20, 39:22, 41:16, 42:16, 47:20, 58:23, 61:17, 76:4, 82:18 .
**done** 4:12, 6:5, 37:9, 43:22, 43:23, 44:7, 50:20, 57:12, 71:24, 75:21, 76:3, 76:9, 76:10, 76:11 .
**doubt** 28:23 .
**down** 8:19, 31:25, 36:20, 53:15, 62:21, 69:3, 71:2, 71:17, 81:4 .
**drawing** 65:23 .
**due** 69:16, 69:23, 77:8 .
**Dunn** 1:32, 62:9 .
**During** 53:15, 53:17, 53:19, 53:20, 54:20 .

.
.

**< E >** .
**earlier** 26:18, 29:8, 65:12, 65:13, 66:25, 67:3, 72:6, 73:19, 82:4 .
**early** 37:2, 45:3, 84:4 .
**easier** 37:13 .
**easily** 45:6, 47:16 .
**easy** 83:10 .
**ECF** 3:18, 37:4, 63:12 .
**educated** 8:6 .
**effect** 3:21, 4:3, 4:5, 4:8, 4:15, 5:4, 5:19, 7:5, 15:23, 17:1, 17:4, 18:4, 18:5, 18:9, 21:15, 26:16, 29:24, 37:17, 37:18, 37:25, 41:12, 55:5, 55:13, 57:16, 65:24, 74:15, 76:21, 76:23 .
**either** 2:25, 14:3, 18:7, 20:1, 26:23, 31:12, 41:14, 54:2, 58:23, 62:3, 77:9 .
**elbows** 83:18 .
**electronic** 69:18, 69:24 .
**Elizabeth** 1:44, 2:16, 3:14 .
**emergency** 44:3, 46:3, 55:23, 59:16, 59:17, 82:9 .
**enacted** 64:4, 80:16 .
**encompass** 55:22 .
**encourage** 83:8 .

**encourages** 36:7 .
**end** 25:15, 28:1, 54:23 .
**enforce** 14:18, 48:19, 56:9, 58:5 .
**enforced** 41:18 .
**enforcement** 15:19, 57:14, 57:16, 64:21 .
**enforcing** 14:10, 53:7 .
**engage** 10:1 .
**engaged** 47:13 .
**English** 8:4, 8:5, 8:6, 8:8, 44:20 .
**enjoin** 15:11, 38:15, 56:7, 57:11, 64:21, 77:1 .
**enjoining** 15:3, 15:19, 65:1 .
**enough** 9:7 .
**ensure** 30:19, 41:11, 45:21, 54:11, 55:14, 55:22 .
**ensures** 53:5, 53:10 .
**enter** 31:19, 64:17 .
**entered** 5:8, 75:5 .
**enters** 65:8 .
**entire** 71:16 .
**entirely** 31:6, 77:2 .
**entirety** 66:3 .
**entitled** 47:24 .
**entitlement** 52:4 .
**entitles** 37:11 .
**Equal** 19:2 .
**equities** 50:14, 78:4 .
**equivocation** 70:8, 82:2 .
**especially** 33:11, 60:9 .
**Esquire** 1:29, 1:30, 1:31, 1:36, 1:37, 1:44 .
**essentially** 15:5, 40:8, 56:4, 62:12 .
**established** 23:8 .
**et** 1:11, 45:7 .
**event** 9:12 .
**everybody** 83:11 .
**Everyone** 2:3, 3:1, 8:14, 12:5, 34:6, 39:18, 42:8, 43:1, 57:10, 68:14, 70:16, 71:6, 78:8, 80:10, 80:13 .
**everything** 3:1, 10:10, 37:8, 43:12, 82:24 .
**evidence** 24:20 .
**exact** 11:17, 19:22 .
**exactly** 38:24, 65:17 .
**example** 7:22, 7:25, 8:3, 9:22,

34:3, 37:3, 43:8, 45:22, 46:11, 47:4, 61:7, 62:2, 63:7, 78:13, 78:14 .
**examples** 10:13, 13:12, 17:20, 29:15, 29:25, 30:3, 30:4, 32:19, 32:20, 33:3, 33:20, 43:9, 43:11, 44:18, 45:4, 54:2, 81:9, 81:11 .
**except** 29:23 .
**excess** 18:2 .
**exclusively** 14:23 .
**excuse** 33:5 .
**exhausting** 11:22, 11:23 .
**existence** 38:6 .
**existing** 56:19, 69:18, 69:24 .
**exists** 69:17 .
**expansive** 57:25 .
**expect** 6:9, 28:17, 56:17 .
**expectation** 30:15, 31:17 .
**expectations** 7:2, 26:6 .
**expected** 7:8, 12:25, 33:14, 52:1 .
**expects** 5:22, 7:3 .
**expense** 52:17 .
**expensive** 44:14, 64:5 .
**explain** 5:18, 38:20, 43:21, 45:2, 74:11 .
**explained** 5:13, 39:12, 40:2, 40:8, 47:13, 57:18, 66:23, 71:19, 71:20, 72:3, 79:16, 79:25 .
**explains** 26:24, 33:24, 82:1 .
**explanation** 40:9, 47:17, 66:20, 67:2 .
**explanations** 71:20, 71:25, 79:11, 79:14 .
**explicitly** 27:11, 77:11 .
**explore** 45:16 .
**expressly** 65:10, 68:14 .
**extend** 30:22, 36:10, 45:8 .
**extensively** 4:9 .
**extent** 27:15, 40:25, 49:16, 56:20, 65:11, 69:4 .
**extraordinarily** 19:5 .
**extraordinary** 45:7, 56:25 .

.
.

**< F >** .
**face** 18:5, 50:7, 50:10, 53:23 .

**facial** 19:11 .
**facially** 65:1 .
**fact** 7:12, 7:21, 9:2, 11:20, 18:1, 27:10, 34:2, 43:16, 45:1, 46:9, 51:17, 52:21, 53:16, 56:21, 58:6, 67:6, 76:2, 78:18, 80:16, 81:14 .
**factors** 4:10 .
**facts** 9:10, 50:12 .
**factual** 75:2 .
**failed** 12:2 .
**failure** 22:6, 23:2, 24:2 .
**fair** 54:15, 74:20 .
**fairly** 22:23, 22:25 .
**fall** 72:7 .
**fallen** 67:21 .
**familiar** 21:8 .
**far** 9:4, 12:5, 14:8, 14:20, 27:3, 37:1, 46:10, 58:2, 58:3, 64:25 .
**Farm** 48:11, 49:2, 49:14 .
**fashion** 24:11 .
**faulting** 21:9 .
**feasible** 52:18 .
**Federal** 11:4, 18:19, 26:5, 26:24, 38:12, 39:8, 44:16, 44:21, 45:10, 63:12, 63:17, 64:11, 64:22, 65:2, 76:22, 77:23, 84:27 .
**federally** 14:10 .
**fee.** 75:24 .
**feed** 76:14 .
**feel** 56:12 .
**feeling** 3:3 .
**fees** 11:7, 11:9, 11:10, 11:16, 27:4, 33:1, 33:2, 38:9, 39:24, 40:6, 40:19, 42:3, 42:7, 50:18, 50:20, 51:20, 64:9, 72:7, 73:24, 75:14, 75:17, 75:19 .
**fell** 66:8 .
**few** 13:19, 17:18, 25:8, 29:5, 55:9, 64:13 .
**figure** 61:23 .
**file** 11:1, 62:5, 83:15, 84:4 .
**filed** 61:8, 62:19, 83:24 .
**files** 84:2 .
**filing** 57:8, 62:12 .
**filings** 11:9 .
**final** 11:5, 16:18, 16:20, 34:22,

36:12, 36:13, 37:14, 37:25, 41:17, 57:5, 75:11 .
**Finally** 61:4 .
**financial** 16:7, 77:19 .
**find** 17:10, 17:20, 33:8, 47:24, 56:14, 57:3, 82:16, 82:18 .
**finding** 5:11, 22:6 .
**fine** 3:12, 73:21 .
**finished** 25:9 .
**firm** 59:16 .
**firms** 62:13 .
**First** 3:3, 3:5, 4:1, 4:2, 9:13, 17:14, 20:21, 38:23, 39:20, 48:12, 49:11, 51:19, 55:10, 58:9, 60:18, 61:7, 61:11, 62:3, 70:22, 79:23, 81:18 .
**fiscal** 66:12, 69:2 .
**five** 13:22, 47:5 .
**fixed** 59:8, 62:22 .
**flagged** 6:7, 63:9 .
**fleeing** 53:22 .
**flesh** 29:8 .
**flip** 8:21 .
**fluently** 8:6, 8:8 .
**flummoxed** 66:6 .
**focus** 36:6 .
**focused** 51:11 .
**follow** 43:18, 80:24 .
**follow-up** 83:5 .
**followed** 31:17, 47:22 .
**force** 7:1, 7:9, 29:21 .
**forceful** 51:16 .
**foregoing** 84:17 .
**forfeited** 37:13, 37:22 .
**forget** 46:23 .
**forgot** 28:12, 72:5 .
**Form** 21:1, 21:2, 21:17, 21:20, 21:21, 22:13, 28:20, 34:6, 54:21, 54:24, 61:9, 62:5, 80:1, 80:2, 80:13 .
**formal** 25:25, 41:16 .
**format** 84:20 .
**forms** 21:9, 29:3, 32:19, 34:3, 34:5 .
**forth** 12:21, 77:10 .
**forward** 78:16 .
**found** 5:9, 65:24, 81:18 .
**Fourth** 37:18 .
**Frankly** 59:24 .

**freeze** 12:5 .
**frequently** 8:19, 52:16, 61:10 .
**friend** 33:19, 35:17, 37:12, 42:4, 44:19, 46:17, 59:7, 61:11, 70:15, 79:10, 79:21 .
**friends** 64:1 .
**front** 9:11, 9:25, 17:23, 18:23, 68:9, 69:11, 72:25, 73:20 .
**frustrated** 39:3 .
**full** 50:24, 54:15, 58:10 .
**fully** 48:8 .
**function** 61:15 .
**functional** 52:21 .
**fundamental** 77:7, 80:17 .
**FY** 12:10, 70:4 .

.

.

**< G >.**
**G.** 1:31, 84:14, 84:26 .
**GALLAGHER** 1:23 .
**gather** 74:21 .
**gave** 32:20, 33:3, 44:19, 46:11, 59:7, 79:11, 79:15 .
**General** 11:14, 21:8, 25:23, 42:13, 75:16 .
**generally** 2:21, 16:7, 40:14, 42:10, 48:1 .
**Genesis** 37:18, 37:23 .
**gets** 47:4, 53:5, 59:10 .
**getting** 19:2, 20:8, 35:15, 41:9, 44:4, 60:2, 60:5, 62:7 .
**Gibson** 1:32, 62:8 .
**give** 7:25, 17:19, 29:25, 37:6, 40:11, 43:25, 49:10, 59:19, 59:24, 59:25, 60:21, 65:5, 83:20, 83:21 .
**given** 4:17, 5:1, 8:10, 17:3, 24:15, 25:11, 33:10, 47:16, 55:16, 64:8, 71:19, 74:17, 74:19, 79:1, 83:17 .
**gives** 57:4 .
**giving** 43:17, 49:23, 68:1 .
**glad** 2:19 .
**go-round** 6:15 .
**gotten** 73:6 .
**govern** 7:9 .
**governing** 6:25, 15:21, 26:21, 71:21 .

**governs** 12:16 .
**grant** 4:16 .
**granted** 38:22, 79:4 .
**great** 44:8 .
**ground** 82:19 .
**group** 52:6, 78:15, 78:18 .
**guess** 8:20, 9:13, 15:3, 16:25, 17:4, 31:10, 35:9, 39:25, 40:17, 41:20, 46:1, 56:2, 66:5, 84:1 .
**guidance** 25:15, 42:15, 56:15, 76:6 .
**guy** 47:24 .

.

.

**< H >.**
**handle** 49:8 .
**Hanson** 1:36, 2:13 .
**happen** 13:2, 23:11, 25:5, 33:18, 53:16, 60:12, 61:20 .
**happened** 6:16, 12:23, 24:5, 53:25, 62:8, 62:17, 73:8, 76:8 .
**happening** 12:3, 66:3, 82:12, 82:20 .
**happens** 10:18, 10:21, 22:4 .
**Happy** 2:20, 3:1, 3:5, 10:12, 10:14, 14:14, 16:10, 19:16, 24:10, 24:14, 28:18, 28:23, 28:24, 34:14, 38:7, 40:23, 51:2, 63:15, 63:24, 74:1 .
**hard** 43:23, 80:22 .
**harm** 12:7, 13:4, 15:24, 16:3, 16:5, 16:7, 17:7, 17:11, 18:15, 32:9, 34:18, 37:16, 38:3, 41:5, 46:5, 46:7, 46:22, 46:24, 50:7, 52:19, 53:19, 53:23, 54:22, 72:5, 73:4, 77:13, 77:21, 82:11 .
**harmed** 16:22, 17:21, 73:13 .
**harmonize** 43:2, 43:25 .
**harms** 46:8, 50:19, 53:15 .
**hat** 45:20 .
**Hawkes** 18:24, 19:1, 37:10, 37:23, 44:14 .
**head** 11:13 .
**hear** 2:20, 3:1, 3:12, 36:17, 65:2, 66:14 .
**heard** 31:22, 45:4, 61:12, 64:1, 65:15, 74:13, 74:14 .

**HEARING** 1:22, 2:7, 2:20, 24:14, 37:4, 43:6, 54:15, 59:13, 70:14, 72:24, 72:25, 74:21 .
**held** 64:11, 70:23, 84:19 .
**help** 14:12 .
**helpful** 31:4, 58:14, 59:8, 74:3, 75:7, 83:2 .
**helping** 26:9 .
**hereby** 84:16 .
**hidden** 10:8, 10:11 .
**higher** 9:19 .
**highly** 8:6, 77:6 .
**hit** 80:19 .
**hoc** 39:22, 41:6 .
**hold** 48:19 .
**Homeland** 25:22, 42:12 .
**hone** 46:5 .
**honest** 68:9 .
**HONORABLE** 1:23 .
**hoops** 57:7 .
**hope** 55:6 .
**Hopefully** 30:9, 42:21, 67:16 .
**hours** 7:23, 8:23, 68:2 .
**hurt** 63:21 .
**Hypothetically** 4:1 .
**hypotheticals** 47:14 .

.

.

**< I >.**
**I-589** 21:1, 34:6 .
**identified** 13:22, 24:4, 27:2, 27:22, 50:25, 51:23, 61:4, 78:22 .
**identify** 2:8, 43:11 .
**identifying** 24:7 .
**III** 37:19 .
**IJ** 5:21, 10:20, 10:22, 10:25, 17:23, 18:12, 29:17, 29:23, 30:7, 37:4, 53:2, 53:7, 72:25 .
**IJS** 6:4, 6:24, 7:8, 7:13, 9:9, 9:24, 11:15, 17:14, 17:16, 18:6, 20:14, 23:11, 25:16, 27:9, 29:14, 30:17, 30:19, 30:21, 31:12, 37:7, 38:4, 41:6, 41:8, 75:13, 75:17, 75:18, 75:23 .
**imagine** 39:16 .
**Immigration** 1:11, 2:6, 8:22,

12:20, 13:6, 17:1, 26:1, 35:4, 35:19, 38:8, 38:13, 39:19, 39:22, 39:23, 40:3, 40:13, 40:25, 41:18, 42:2, 42:6, 47:15, 47:23, 51:21, 52:9, 66:7 .

**imminent** 13:4, 17:7 .

**impact** 80:3 .

**impacts** 80:18 .

**implement** 28:10, 38:19, 39:8, 41:13, 48:15, 49:2, 49:11, 49:17, 56:15, 56:23, 76:4, 76:5, 81:2 .

**implementation** 28:3, 39:3, 55:4, 55:18, 56:1, 56:22, 57:15, 57:17, 58:7, 64:11, 80:19, 81:22 .

**implementing** 25:21, 50:16 .

**implements** 57:21 .

**implicit** 71:1 .

**importance** 33:10 .

**important** 26:4, 26:6, 26:8, 27:22, 34:15, 38:21, 43:5, 50:2, 74:18, 82:8 .

**impose** 35:25, 38:17, 57:5, 57:18, 64:3, 64:9, 64:10, 83:17 .

**imposed** 15:6, 37:16 .

**imposes** 53:2, 77:8 .

**imposing** 17:2, 26:1, 27:4, 38:5 .

**imprecise** 69:4 .

**improper** 77:6 .

**improves** 49:15 .

**in.** 42:21, 51:15, 60:1 .

**INA** 32:17, 32:22, 33:5, 33:6, 33:15, 34:1, 44:2, 60:10, 80:12 .

**inability** 29:9 .

**inappropriate** 14:15 .

**inclined** 4:16 .

**include** 70:7, 70:10 .

**included** 32:22, 33:5, 33:15, 34:24 .

**includes** 18:19, 43:12 .

**including** 11:16, 24:15, 43:3, 66:3 .

**inconsistencies** 28:2 .

**inconsistency** 26:22, 46:6, 46:8, 46:23, 47:1 .

**inconsistent** 12:9, 31:16, 46:2,

48:20, 69:5 .

**incremental** 64:24 .

**independence** 7:12, 9:3, 29:12, 30:7, 30:17 .

**independent** 36:14, 62:23 .

**indicating** 53:18 .

**individual** 8:24, 9:10, 13:9, 15:1, 18:10, 19:12, 24:8, 24:15, 25:6, 29:19, 40:12, 45:5, 48:3, 51:24, 52:12, 53:17, 64:16, 64:18, 65:10, 65:11, 67:13, 72:14, 75:19 .

**individualized** 8:25 .

**individuals** 7:14, 8:6, 8:9, 10:4, 24:4, 24:12, 50:25, 52:17, 57:19, 57:22, 77:16 .

**induces** 23:11 .

**informal** 34:22 .

**information** 24:7, 74:22, 74:24, 83:5, 83:6 .

**inherent** 11:22 .

**initial** 33:1, 55:20, 62:20 .

**injunction** 4:16, 14:9, 41:10, 55:11, 56:24, 57:20, 65:3, 65:7, 76:16, 81:24 .

**injunctive** 82:21 .

**injured** 54:25 .

**injuries** 55:5 .

**injury** 51:12, 51:13, 51:14, 53:24 .

**inquiry** 37:10, 52:21 .

**ins** 66:10, 66:13 .

**instance** 48:12 .

**instances** 9:5 .

**Instead** 10:3, 12:4 .

**instruction** 49:16 .

**insurmountable** 13:17 .

**integration** 69:16, 69:18, 69:23 .

**intent** 61:19 .

**intentionally** 61:17 .

**interest** 50:14, 50:15, 78:4 .

**interferes** 45:9 .

**interim** 55:1, 82:10 .

**internal** 35:3 .

**internet** 8:15, 8:18, 8:19, 72:20 .

**interpretation** 73:23 .

**interpretations** 5:12 .

**interpreted** 31:12 .

**interpretive** 4:12, 74:18 .

**intervening** 50:11 .

**intimately** 64:6 .

**introducing** 47:1 .

**intrude** 45:11 .

**inviting** 59:16 .

**involve** 10:20, 18:25, 24:11, 33:23, 48:22, 77:23 .

**involved** 19:1, 33:4 .

**Iqbal** 79:24 .

**irreparability** 51:15 .

**irreparable** 13:4, 15:24, 16:3, 16:5, 16:7, 17:7, 17:11, 18:15, 25:3, 25:4, 32:9, 50:7, 51:12, 51:17, 52:19, 53:15, 53:19, 53:24, 54:22, 55:5, 72:5, 73:3, 73:4, 77:13, 77:21, 82:11 .

**irreparably** 73:12 .

**irrespective** 58:6 .

**issuance** 17:19 .

**issued** 5:21, 6:13, 9:20, 17:14, 17:22, 25:15, 38:12, 70:18, 76:3, 79:16 .

**issues** 2:21, 14:4, 24:25, 25:1, 26:20, 26:25, 27:2, 27:21, 28:1, 28:11, 34:18, 51:5, 70:4, 71:21, 71:22, 72:23, 73:20, 74:3, 83:4, 83:9 .

**issuing** 5:25, 26:23, 41:14, 41:16, 42:15, 58:23, 58:24, 76:6 .

**it'll** 33:17 .

**itself** 17:8, 18:5, 19:5, 35:19, 41:3, 46:8, 47:1, 58:1, 67:16, 75:6 .

.

.

**< J >** .

**January** 43:24 .

**Jessica** 1:36, 2:13 .

**job** 47:12, 48:18 .

**jobs** 8:7 .

**judge** 8:22, 12:14, 12:20, 13:6, 47:23, 51:21, 52:9, 66:7 .

**judges** 17:1, 26:1, 35:4, 35:19, 38:8, 38:13, 39:20, 39:22, 39:23, 40:4, 40:25, 42:2, 42:6, 66:22, 68:1 .

**judgment** 49:12 .

**Judicial** 84:21 .

**July** 80:15, 80:16 .

**jumping** 57:7 .

**jurisdiction** 12:19, 12:20, 37:19 .

**Justice** 1:45, 15:4, 56:8 .

**justifies** 74:12 .

**justify** 13:5, 58:10 .

.

.

**< K >** .

**keep** 5:18, 14:5 .

**keeping** 65:23 .

**keeps** 79:14 .

**kicks** 42:21 .

**kill** 59:16 .

**Kind** 11:13, 15:24, 16:23, 18:9, 19:4, 19:6, 19:18, 24:13, 30:21, 31:15, 49:5, 76:18, 77:4, 77:7, 77:12 .

**knowledge** 61:5 .

**knows** 82:19 .

.

.

**< L >** .

**lack** 50:8, 81:16 .

**language** 20:13, 21:1, 22:5, 25:22, 29:24, 42:11, 55:20, 70:10, 70:24, 71:3, 71:5, 71:8 .

**large** 5:23, 13:24, 14:1 .

**largely** 31:5 .

**last** 6:15, 9:19, 43:8, 64:9, 77:14 .

**latch** 31:15 .

**late** 9:19 .

**later** 16:10, 47:5, 55:7, 70:6, 70:10, 83:25 .

**law** 4:25, 7:1, 29:21, 36:23 .

**lawful** 41:13, 56:21, 57:15, 58:11, 58:17, 82:6 .

**lawfully** 50:20, 57:21 .

**lawyer** 62:13 .

**lead** 6:8, 34:7, 47:1 .

**leading** 41:17 .

**leads** 15:24 .

**learned** 62:17, 75:9 .

**least** 9:17, 20:24, 30:5, 43:8, 44:1, 46:3, 49:4, 51:22, 59:14, 66:8, 67:24 .

**leave** 44:7, 56:11, 74:20 .

leaving 73:15 .
left 40:8, 63:4 .
legal 5:18, 15:12, 15:13, 17:1,
    17:4, 18:5, 18:9, 31:23, 37:17,
    37:18, 41:18, 66:16, 71:18,
    72:1, 79:19, 83:16 .
legislation 64:4 .
length 19:17 .
less 8:10, 14:14, 44:23,
    70:11 .
letter 15:10 .
letting 55:5 .
level 8:2, 52:9 .
lift 3:16, 5:16, 27:14, 56:23, 56:24,
    79:4 .
lifted 3:23, 59:3, 59:18 .
likelihood 5:9, 73:12 .
likely 23:8, 44:23, 46:10, 53:16,
    73:11 .
limit 58:5 .
limited 64:7, 81:19 .
limiting 50:24 .
line 8:1, 15:10, 31:18, 53:15,
    79:24 .
links 10:7 .
listed 80:4 .
litigated 36:18 .
litigation 43:13, 54:24, 57:9, 66:3,
    66:24, 67:5, 67:15, 76:2,
    81:1 .
little 41:7, 45:16, 46:5, 48:20,
    51:7, 51:13, 56:3, 59:19, 67:2,
    68:4, 74:8, 81:11 .
LLP 1:32 .
long 3:11, 8:16, 44:13, 44:14,
    74:4, 80:25, 82:12 .
longer 3:21, 35:2, 46:4 .
look 12:15, 20:22, 24:12, 36:23,
    36:25, 47:12, 48:12, 59:11,
    62:21, 63:20, 79:12 .
looked 72:17 .
looking 54:23, 69:22, 72:19,
    78:16 .
looks 36:19 .
lost 46:20, 60:7 .
lot 2:25, 8:4, 27:16, 36:18, 77:3,
    81:15 .
lowering 40:10 .
.
.

< M > .
M. 1:30 .
magic 60:3 .
mail 44:10, 46:15, 60:7 .
mailed 63:10, 69:20 .
mailman 46:16, 46:20 .
main 46:7 .
maintain 60:19 .
mandate 39:2, 42:19, 47:21 .
manner 41:13, 42:20 .
manual 29:20 .
Margolin 6:12, 6:20, 12:10 .
Maryland 1:2, 1:17, 84:16 .
material 5:14, 28:5, 74:22 .
materials 19:3 .
Matt 1:29, 2:9 .
matter 11:15, 21:8, 25:24, 26:4,
    52:2, 72:2, 74:5, 84:19 .
maybe/ 44:15 .
Mcshiras 37:3 .
mean 11:24, 15:22, 18:18, 19:23,
    21:23, 49:22, 71:8, 76:3 .
meaningful 53:11 .
meaningfully 50:17 .
means 65:3 .
meant 31:9, 49:23, 70:17 .
mechanism 54:25, 70:2,
    78:15 .
mechanisms 70:8 .
meet 63:15 .
member 10:16, 56:10, 78:18,
    78:19, 78:21, 78:23,
    78:25 .
members 10:9, 13:13, 15:25,
    16:22, 20:1, 50:7, 50:25, 78:7,
    78:10, 78:12, 78:15,
    81:19 .
memoranda 31:14 .
memorandum 4:6, 6:24, 26:23,
    30:25 .
memos 38:6, 38:12, 40:20,
    58:23 .
mention 28:14 .
mentioned 24:14, 35:17, 37:12,
    48:7, 49:13, 65:12, 65:13,
    67:3, 83:8 .
Merit 34:18, 84:14 .
merits 32:8, 41:5, 44:5, 49:11,
    54:14, 55:15, 55:23, 57:24,
    66:16, 79:9, 79:20 .

method 8:14 .
methods 65:13 .
microphone 3:11 .
midnight 60:15, 83:25, 84:1 .
million 81:12 .
mind 28:24, 43:21, 44:6 .
minimum 44:18, 48:5, 53:9,
    67:16 .
misleads 23:10 .
misquote 74:13 .
missed 9:14, 9:16 .
missing 46:19 .
mistake 7:16, 35:20 .
Mitchell 84:14, 84:26 .
moment 3:21, 36:7, 66:17 .
money 11:20, 80:22 .
month 15:9, 55:23, 82:9 .
months 8:13, 46:13, 50:11, 53:14,
    63:13 .
mootness 37:20 .
morning 2:3, 2:14, 2:20,
    24:16 .
mostly 64:19, 83:15 .
motion 3:19, 5:9, 5:16, 11:1, 11:8,
    17:19, 21:17, 21:18, 23:22,
    33:24, 54:18, 55:24, 56:6,
    73:24, 79:4, 79:5, 82:9 .
MOTIONS 1:22, 2:7, 3:2, 3:6,
    11:16 .
move 42:23, 44:4 .
moved 62:13, 67:23 .
moves 75:14 .
multiple 10:19, 21:3, 21:9, 25:1,
    25:5, 48:14, 49:22 .
.
.
< N > .
narrow 52:6 .
narrowly 52:3 .
nature 64:9 .
nauseam 5:17 .
near 61:2 .
necessarily 7:14, 16:20, 28:17,
    49:14, 65:1 .
necessary 23:19, 48:5, 55:16,
    73:25, 76:19, 82:1 .
need 2:24, 14:6, 14:7, 21:24, 25:5,
    30:2, 33:13, 43:23, 44:20,
    45:3, 49:1, 52:16, 60:13, 61:1,
    73:4, 73:10, 73:11, 73:25,

77:5, 80:7, 80:8, 81:19, 84:3,
    84:4 .
needle 75:14 .
needs 14:6, 25:21 .
neither 14:17 .
New 1:40, 3:25, 4:16, 5:3, 6:13,
    14:7, 15:5, 20:20, 29:10,
    30:15, 32:16, 34:8, 35:16,
    41:14, 47:6, 55:24, 56:18,
    58:11, 58:23, 60:9, 62:13,
    62:15, 62:24, 63:7, 66:6, 72:2,
    74:15, 74:16, 79:14,
    81:9 .
news 59:7, 59:8 .
night 43:8 .
No. 1:8, 3:18 .
Nobody 45:8, 75:22 .
nonbinding 67:22, 67:25,
    68:18 .
nonpayment 32:21, 80:3 .
nor 15:10 .
normal 19:5, 61:20 .
NORTHERN 1:3 .
notes 1:50, 50:1 .
Nothing 10:24, 50:11, 60:12,
    75:21, 76:10, 79:17,
    81:20 .
notice. 37:7 .
notices 60:2, 61:6, 61:11, 61:22,
    63:10, 69:20, 70:5 .
notified 53:10, 77:10 .
notion 64:2, 72:2, 74:21 .
nuance 23:1 .
number 2:7, 9:19, 11:12, 21:4,
    22:22 .
numbers 24:9 .
NW 1:33, 1:46 .
NY 1:40 .
.
.
< O > .
obligation 42:14, 48:12,
    76:23 .
obstacle 13:17 .
obtain 53:12, 56:10 .
obvious 38:21, 44:11, 45:20,
    45:21, 48:8, 54:16 .
Obviously 6:16, 11:10, 45:7,
    51:15, 52:12, 72:14, 82:3,
    83:6 .

occur 25:6, 73:5 .
occurring 61:10 .
October 35:13, 44:8, 49:19 .
offered 44:17 .
offering 79:14 .
Official 84:13, 84:27 .
Okay 4:20, 12:15, 24:17, 24:23,
    27:19, 28:8, 29:1, 32:3, 32:12,
    33:7, 36:2, 42:11, 42:22,
    49:24, 55:8, 59:1, 60:16, 63:2,
    67:23, 69:15, 79:6, 81:6 .
old 5:3, 61:9 .
Once 12:18, 16:4, 58:16,
    70:4 .
one-day 46:24 .
ones 13:24, 14:1, 18:25,
    29:22 .
online 8:14, 8:17, 45:22 .
operate 27:7, 38:11, 65:9 .
operates 26:19 .
operation 77:1 .
operational 76:11 .
operationalize 42:15 .
operationalizing 42:10 .
opinion 49:21 .
opportunity 4:17, 4:18, 23:20,
    32:1, 53:8, 53:11, 56:3, 59:11,
    74:10, 74:17, 74:19 .
opposed 16:23, 34:22 .
option 72:12, 73:1 .
options 11:22, 11:23, 65:6 .
oral 6:6, 31:3, 31:4, 31:10 .
ordered 60:6 .
ordering 75:24 .
orders 11:5, 17:14, 17:17, 29:16,
    30:6, 40:5, 60:6 .
organization 78:19 .
original 47:10, 62:7 .
others 36:25, 59:16 .
otherwise 39:13, 42:7 .
otherwise. 80:5 .
ourselves 59:25 .
out. 69:20 .
outcome 12:2, 12:24, 17:12,
    58:21 .
outs 66:11, 66:13 .
overpayments 72:7 .
overreading 68:5 .
owe 72:8 .
owed 70:5 .

own 10:5, 10:6, 12:7, 35:21,
    38:8 .

.
.
< P > .
p.m. 84:9 .
packaged 35:7 .
page 20:23, 79:23, 84:20 .
pages 5:15 .
paid 9:18, 13:10, 72:11,
    81:14 .
paint 8:8 .
papers 7:19, 9:15, 65:4 .
paperwork 62:20 .
paragraph 20:23, 69:15, 69:22,
    70:4 .
paraphrasing 65:16 .
Park 1:39 .
part 5:23, 22:1, 27:6, 40:13, 41:6,
    42:19, 63:18, 69:8, 73:19,
    73:20, 79:18 .
particular 6:24, 7:10, 8:2, 8:23,
    9:4, 19:8, 26:12, 26:15, 30:18,
    30:20, 56:6, 65:20, 76:6 .
particularly 54:12 .
parties 2:21, 3:3, 69:6 .
party 19:7, 19:9 .
pass 34:4 .
passed 5:22 .
past 5:24, 64:8 .
path 44:14, 52:20 .
Patricia 84:14, 84:26 .
pause 60:23 .
pay. 68:21 .
payable 14:2 .
paying 6:1, 10:2, 16:3 .
payment 5:22, 6:5, 6:10, 7:7, 10:7,
    10:22, 10:23, 13:11, 13:14,
    25:23, 42:5, 42:13, 53:3,
    69:19, 69:24, 70:2, 70:8,
    75:22, 75:23, 76:10,
    76:11 .
payment. 75:25 .
payments 70:5 .
PELLETIER 1:30, 2:10, 32:9,
    40:11, 40:23, 49:8, 50:4, 50:5,
    50:6, 51:9, 51:22, 52:10, 54:4,
    54:8, 55:9, 56:17, 57:13,
    81:7 .
penalties 19:1 .

pending 3:2, 21:2, 21:24, 22:3,
    81:13 .
Pennsylvania 1:46 .
perceived 70:24 .
percent 4:18, 4:21 .
percentage 21:4 .
perfect 54:24 .
perhaps 26:17, 51:11, 62:11 .
period 7:24, 8:23, 10:4, 10:6,
    12:13, 25:11, 28:15, 46:2,
    46:4, 49:6, 53:17, 53:21,
    54:20, 65:20, 66:9, 66:19,
    67:16, 82:13 .
periods 9:7, 12:9 .
permission 45:6 .
permit 19:3, 19:4, 19:9 .
permits 20:14 .
permitted 43:20, 58:2 .
persecution 53:22 .
person 6:13, 7:22, 9:25, 12:16,
    44:24, 54:13, 54:25, 62:15,
    82:17 .
personally 24:3 .
persons 79:25 .
perspective 31:14, 41:21,
    77:6 .
physical 53:23 .
pick 63:4 .
piece 26:10, 74:7, 76:15 .
pieces 64:24 .
place 3:17, 3:20, 3:22, 14:5, 35:1,
    35:10, 48:6, 53:21, 60:18,
    62:15, 62:25, 63:10, 64:3,
    65:23, 66:19, 75:22 .
Plaintiffs 12:25, 14:3, 18:18,
    20:21, 23:7, 23:23, 24:21,
    27:12, 28:13, 28:18, 57:9,
    63:18, 64:20, 65:9, 68:10,
    77:13 .
planned 25:9 .
play 55:1 .
playing 26:17 .
plays 20:12, 51:15 .
Please 2:3, 2:8 .
Pms 26:4, 30:12 .
podium 3:9 .
pointed 27:11, 42:4, 79:11 .
pointing 15:15 .
points 11:14, 15:24, 16:6, 16:11,
    18:14, 19:14, 25:8, 51:10,

55:9, 63:4, 64:13 .
policies 14:23, 36:21, 48:2,
    60:22 .
pool 62:9 .
population 44:22 .
portal 9:18, 10:7 .
poses 57:9 .
positions 79:22 .
possibility 51:24, 53:23, 54:9,
    54:10 .
possible 53:12, 83:7 .
posture 6:17, 13:5, 44:4, 49:9,
    58:16, 58:22 .
potential 10:19, 62:18, 72:7,
    72:12, 83:5 .
potentially 4:24, 11:21, 21:11,
    47:20, 47:21, 50:10, 53:14,
    64:17, 78:9 .
Power 36:24, 38:15, 45:10,
    45:11 .
powers 38:23 .
practical 37:18 .
practically 51:25, 52:22,
    52:23 .
practice 29:20, 30:25, 31:3, 38:13,
    67:7 .
practices 7:3, 31:1 .
pragmatic 37:10 .
precedent 52:6 .
predate 67:15 .
preemptively 57:4 .
prefer 3:8 .
preference 3:4 .
preferred 17:10 .
prejudiced 50:18 .
preliminary 13:5, 39:5, 49:9, 57:2,
    73:10, 73:13, 74:12 .
premise 7:16 .
prepared 28:20 .
prescribe 56:6 .
present 10:22, 13:10, 13:11 .
presented 9:10, 9:25, 66:15 .
preserve 7:12, 29:12, 30:7 .
press 36:20 .
presumably 46:4 .
pretty 14:25, 32:15, 70:17, 76:20,
    80:9, 83:20 .
prevent 14:10, 55:4, 60:20 .
preventing 56:13 .
previous 18:7, 31:2 .

**previously** 27:23 .
**primarily** 19:25 .
**primary** 18:25 .
**principle** 37:20 .
**print** 69:12 .
**prior** 2:23, 4:10, 5:25, 6:6, 13:25, 17:4, 17:21, 26:8, 35:10, 36:1, 69:16, 69:17, 69:23, 82:2 .
**probably** 9:19, 26:18, 27:6 .
**problem** 27:22, 27:24, 32:23, 33:8, 35:21, 38:23, 43:14, 48:8, 53:7, 56:2, 59:8, 59:14, 60:9, 61:4, 61:12, 61:18, 61:21, 62:23, 82:4 .
**problematic** 20:13 .
**problems** 14:24, 38:22, 55:25, 77:3 .
**procedural** 3:24 .
**Procedure** 38:18, 38:24, 39:14, 45:11 .
**procedures** 19:20 .
**proceeding** 12:19, 22:19, 45:12 .
**Proceedings** 1:21, 11:20, 40:13, 40:15, 41:19, 84:9, 84:19 .
**process** 11:23, 19:5, 26:15, 52:15, 52:23, 55:6, 57:5, 64:7, 78:17 .
**progressing** 49:18 .
**Project** 1:5, 1:38, 2:5 .
**promise** 83:3, 83:4 .
**proof** 10:22, 10:23, 13:11, 13:13, 13:16, 42:3, 42:5, 72:11 .
**properly** 17:6, 23:17, 23:22 .
**proportion** 21:6 .
**proposals** 56:5 .
**proposed** 64:21 .
**protect** 55:13, 57:24, 58:20 .
**Protection** 19:2, 22:10, 22:15, 22:16, 23:5, 24:2, 32:17, 32:22, 33:6, 33:15, 34:1, 44:2, 60:10, 80:12 .
**protects** 24:12 .
**proves** 78:20 .
**provide** 42:5 .
**provided** 9:7, 15:13, 24:6, 66:20 .
**provides** 5:20 .

**providing** 6:6, 43:4 .
**proving** 78:17 .
**provision** 6:14, 14:12, 21:16 .
**provisions** 7:5, 7:12 .
**public** 24:11, 50:14, 50:15, 78:4 .
**publicly** 10:7, 78:22 .
**pulled** 62:20 .
**pulling** 45:20 .
**pumpkins** 60:15 .
**purport** 14:16, 29:11, 64:18, 66:14, 77:1 .
**purported** 31:19 .
**purporting** 64:15, 71:22, 78:8 .
**purpose** 21:16 .
**purposes** 10:10, 73:9 .
**pursuant** 40:5, 84:17 .
**pursue** 25:7, 34:1 .
**push** 65:15, 72:1 .
**put** 14:18, 26:16, 28:18, 28:23, 31:22, 35:1, 59:10, 63:6, 66:19, 75:7, 75:22, 81:10 .
**putting** 58:8 .

.

.

**< Q >.**

**questions** 16:11, 32:8, 32:9, 34:13, 34:16, 36:4, 49:9, 50:1, 51:2, 59:7, 81:4, 82:25 .
**quick** 40:12, 59:6, 59:22, 70:21, 72:4, 81:5 .
**quickly** 16:9, 80:17, 81:23, 83:4, 83:20 .
**quote** 68:20, 70:4, 79:11, 79:23, 80:2 .
**quote/unquote** 71:6 .

.

.

**< R >.**

**R.** 38:9, 75:13 .
**raise** 18:12, 22:18, 24:25, 25:1, 40:16, 65:12, 72:23 .
**raised** 4:10, 5:24, 16:16, 20:8, 24:16, 51:10, 72:14 .
**raises** 51:3 .
**raising** 28:11, 72:24 .
**rather** 41:13, 55:5 .
**rationality** 9:4 .

**reach** 55:22, 57:24, 59:25, 83:21 .
**read** 39:7, 56:5, 68:19, 69:13, 70:11, 70:12, 71:3, 71:5, 71:8, 71:11 .
**readily** 28:1 .
**reading** 15:7, 67:11 .
**ready** 58:16, 80:19 .
**real** 32:23, 33:8, 36:25, 37:9, 37:24, 44:9, 44:11, 46:23, 53:23, 60:9, 61:21 .
**real-world** 37:16 .
**realistic** 8:11, 52:14, 54:9 .
**reality** 50:12 .
**really** 51:17, 52:14, 54:21, 55:15, 56:24, 80:17, 81:25, 82:7, 82:19 .
**Realtime** 84:15 .
**reason** 6:25, 8:22, 13:9, 14:5, 16:20, 17:11, 27:6, 29:2, 31:23, 35:16, 44:17, 49:20, 57:1, 60:23, 62:18, 73:18, 81:2 .
**reasonable** 38:20, 39:12, 40:2, 40:7, 43:22, 45:13, 47:13, 48:15, 81:2 .
**reasonably** 38:20, 39:12, 40:2, 40:8, 47:13 .
**reasoning** 80:24 .
**reasons** 2:24, 3:15, 7:11, 7:13, 34:2, 43:18, 44:7, 60:17, 62:6, 65:12, 67:8, 77:22, 79:15, 79:17 .
**receive** 45:23, 52:1, 52:7 .
**received** 7:24, 12:11, 12:12 .
**recent** 9:20, 28:19 .
**recently** 54:1, 75:8 .
**recess** 84:8 .
**recessed** 37:4 .
**recognizes** 16:13 .
**recollection** 68:9 .
**recommend** 6:3, 68:22 .
**recommendations** 71:25 .
**recommended** 31:11, 66:9 .
**recommends** 7:3, 36:15 .
**reconfigure** 4:11 .
**reconsideration** 10:21, 11:1, 11:8, 11:11, 25:7, 51:18, 51:20, 51:21, 52:9, 52:13, 52:23, 54:18, 72:13, 72:19,

72:22 .
**record** 2:8, 13:12, 17:15, 17:22, 28:18, 28:25, 33:24, 35:6, 37:3, 43:12, 59:10, 59:23, 62:3, 63:7, 66:2, 69:8, 73:2, 75:8, 77:17, 77:20, 79:18, 81:9 .
**recourse** 10:19, 11:24, 12:3, 13:10, 16:5, 77:23 .
**reference** 34:20 .
**references** 35:8 .
**referred** 12:11, 12:13, 13:2 .
**refers** 34:24 .
**refuses** 43:18 .
**reg** 29:23 .
**regardless** 16:24, 38:5, 39:6, 55:19, 63:22, 76:21, 76:22, 77:8 .
**Register** 26:5, 26:24, 38:12, 39:9, 63:12, 63:17, 76:22 .
**Registered** 84:14 .
**regret** 69:5 .
**regs** 29:12, 71:21 .
**regularly** 62:6 .
**regulation** 39:23, 53:4, 82:12 .
**regulations** 6:25, 7:9, 15:21, 25:15, 26:21, 27:8, 27:9, 31:21, 38:8, 41:23, 42:2, 67:15, 84:20 .
**regulatory** 7:5, 7:12 .
**reinforcement** 19:11 .
**reiterate** 13:20, 16:12, 25:10, 73:17, 81:23 .
**rejects** 37:5 .
**related** 14:13, 24:13 .
**relates** 20:16 .
**relationship** 78:24 .
**relatively** 54:1, 59:22, 84:4 .
**releases** 36:20 .
**relevant** 10:9, 26:22, 27:1, 52:22 .
**remain** 15:22, 62:25, 64:2 .
**remains** 3:16, 3:22, 6:22, 51:1, 72:9, 72:12, 73:1, 76:21, 76:22 .
**remand** 48:18 .
**remarkable** 32:15, 33:9 .
**remediate** 14:12 .
**remedies** 20:5, 48:21 .

**remedy** 18:19, 18:20, 19:13, 19:20, 19:24, 31:24 .
**remember** 73:3 .
**removal** 11:3, 11:6, 12:19, 20:18, 21:6, 22:10, 23:4, 24:1, 25:3, 25:4, 33:13, 44:12, 50:10, 54:3, 54:10, 54:19, 73:7 .
**removed** 20:2, 25:2, 46:14, 53:20, 54:12, 54:17, 54:20, 60:6 .
**reopen** 11:1 .
**reopening** 72:12 .
**repeated** 71:12 .
**repeatedly** 41:14, 62:2 .
**Reporter** 84:13, 84:14, 84:15, 84:27 .
**represent** 5:2 .
**representation** 6:12, 6:14, 66:18 .
**representations** 70:13 .
**represented** 67:20 .
**representing** 74:9 .
**request** 23:20, 55:11, 64:25, 83:12 .
**requested** 59:21, 65:4 .
**requesting** 73:6 .
**require** 8:1, 8:7, 14:16, 18:6, 25:11, 25:23, 25:25, 26:11, 26:16, 36:8, 38:17, 39:7, 41:12, 42:8, 42:13, 46:13, 65:19, 71:22, 73:22, 75:16, 75:21, 75:23, 75:25, 76:5, 76:10, 76:11 .
**require.** 26:13 .
**required** 6:9, 8:3, 10:17, 12:6, 13:5, 16:4, 17:17, 20:2, 25:14, 39:17, 39:21, 58:15, 69:19 .
**requirement** 7:4, 7:7, 41:21, 56:10, 57:18 .
**requirements** 48:23 .
**requires** 5:20, 39:10, 39:11, 39:14, 39:17, 40:1, 57:22, 59:18, 76:20 .
**requiring** 6:5, 15:11, 27:18, 28:17, 44:9, 65:22, 70:1 .
**rescind** 4:7 .
**rescinded** 17:3 .
**rescinds** 4:1 .
**resolution** 44:5, 73:24 .

**resolve** 23:19, 23:20, 63:16 .
**resolved** 13:16, 14:3, 14:4, 16:13, 27:21, 59:14, 62:23, 83:10 .
**resources** 64:7 .
**respect** 20:14, 29:8, 36:9, 36:11, 50:13, 50:22, 54:2, 55:19, 63:9, 64:13, 67:9, 77:2, 78:1, 78:3, 78:5 .
**respond** 38:2, 38:4, 63:3, 66:1, 81:8, 83:21, 84:3, 84:5 .
**responding** 43:14, 68:4 .
**response** 28:3, 30:11, 31:1, 40:18, 55:10, 79:8 .
**responsibility** 13:7 .
**responsive** 67:17 .
**rest** 14:22, 75:11, 77:25 .
**restarts** 47:9 .
**result** 4:8, 5:3, 17:2, 22:6, 22:8, 23:2, 67:8 .
**results** 64:16 .
**retains** 82:3 .
**retroactivity** 2:22, 78:3 .
**reverses** 36:1 .
**review** 36:21, 37:5, 37:11, 43:11, 57:5, 70:22, 79:15 .
**revisit** 16:10 .
**rich** 44:20 .
**rights** 25:7 .
**rigorous** 8:7 .
**rise** 84:8 .
**risk** 29:13, 50:8, 81:15 .
**RMR** 84:26 .
**road** 45:14, 80:19 .
**roughly** 9:17, 75:6 .
**round** 39:19, 62:3, 81:18 .
**rule** 9:4, 26:12, 34:22, 74:23, 83:24 .
**Rules** 10:25, 45:10, 45:13 .
**ruling** 57:3, 63:20, 63:23 .
**run** 71:14 .
**running** 47:9 .
**runs** 28:16, 28:21 .
        .
        .
**< S >.**
**SAG-25-3299** 2:7 .
**same-day** 43:7, 60:2, 60:7 .
**satisfactory** 67:19 .
**satisfied** 46:4, 56:21 .

**satisfies** 49:1, 49:14 .
**satisfying** 48:23 .
**saw** 35:4, 62:2, 62:9 .
**saying** 7:1, 7:6, 12:25, 13:3, 16:19, 16:23, 18:21, 22:12, 23:10, 23:13, 31:7, 31:18, 35:24, 42:18, 43:20, 47:4, 47:24, 58:12, 62:13, 64:15, 69:5, 70:16, 70:18, 72:22, 73:18, 74:5, 84:4 .
**says** 6:23, 8:2, 15:10, 20:25, 22:5, 25:13, 25:22, 26:13, 26:16, 28:5, 29:22, 29:23, 37:6, 38:18, 42:12, 44:10, 48:5, 48:14, 67:13, 69:13, 69:15, 69:22, 70:4, 72:10, 75:13, 75:15, 75:24, 80:11 .
**scenario** 48:14 .
**scope** 14:20, 15:18, 41:2, 50:22, 55:12, 55:21, 58:19, 64:13, 64:22, 65:14, 77:2, 81:21, 82:23 .
**seal** 24:10 .
**seated** 2:4 .
**second** 4:2 .
**secret** 47:16 .
**Secretary** 25:22, 42:12, 75:16, 75:20, 75:24 .
**Security** 25:23, 42:13 .
**seeing** 2:23, 83:9 .
**seek** 11:1, 21:9, 31:20, 34:2, 34:4, 44:16, 52:13, 53:1, 54:10 .
**Seeker** 1:5, 1:38, 2:5, 78:9 .
**seekers** 8:3, 8:5 .
**seeking** 12:4, 19:23, 21:10, 41:10, 53:22, 54:6, 63:18, 80:12 .
**seem** 33:9, 48:21 .
**seems** 13:18, 22:22, 23:3, 31:5, 47:7, 48:20, 67:21 .
**seen** 7:19, 9:22, 12:1, 12:22, 24:19, 35:18, 37:1, 37:2, 43:8, 54:7, 58:18, 59:9, 77:17, 77:20 .
**self-evident** 26:19 .
**sending** 29:3, 61:6, 61:11, 61:14, 61:15 .
**sense** 5:4, 26:22, 45:5, 70:1 .
**sent** 61:9, 62:7 .

**separate** 16:16, 18:20, 24:13, 29:17, 60:24, 76:23 .
**separately** 27:18, 34:18 .
**separation** 38:23 .
**Services** 1:11, 2:6 .
**set** 4:13, 7:10, 8:22, 11:15, 12:21, 29:9, 29:11, 29:23, 30:25, 42:5, 44:18, 46:2, 47:20, 47:21, 47:22, 48:25, 65:4, 67:16, 73:20, 75:18 .
**sets** 26:6, 29:21 .
**Setting** 5:21, 7:11, 16:6, 20:25, 31:17, 45:9, 46:8, 58:1, 71:21 .
**several** 8:13, 20:4, 43:9, 46:7, 71:12, 71:19 .
**severe** 81:15 .
**shall** 25:23, 26:13, 26:16, 29:24, 42:13, 75:16, 75:23, 75:24 .
**sharp** 83:18 .
**short** 8:23, 10:4, 11:16, 27:16, 46:9, 46:10, 53:2, 72:12, 72:24, 78:7 .
**shorten** 49:6 .
**shorter** 9:6, 45:5 .
**shortfalls** 14:12 .
**shouldn't** 16:1, 52:2, 78:25, 80:22 .
**showing** 7:19, 73:10, 73:12 .
**shown** 10:5, 16:21, 17:7 .
**shows** 76:18 .
**side** 8:21, 24:10, 24:14, 64:1, 84:3 .
**sign** 26:22 .
**significantly** 35:21, 35:23 .
**silentio** 41:16 .
**similar** 15:9, 22:12, 48:17, 67:8, 79:13 .
**similarly** 7:15, 7:18, 7:21 .
**simple** 52:15 .
**simply** 18:3, 36:14, 38:7, 43:22, 55:2, 57:25 .
**single** 81:12, 82:17 .
**sit** 3:9, 31:25, 81:4 .
**situated** 7:15, 7:18, 7:21 .
**situation** 5:12, 31:13, 58:8, 58:9 .
**situations** 8:25, 18:25, 29:16, 45:1 .

**six** 33:4, 46:13 .
**skim** 50:1 .
**skis** 40:10 .
**slightly** 48:17, 52:10 .
**small** 21:6, 22:22 .
**snafus** 61:20 .
**so.** 15:12 .
**sole** 20:16 .
**solution** 48:9 .
**solvable** 47:16 .
**solved** 47:17, 61:12 .
**solves** 48:8 .
**somebody** 61:7 .
**somehow** 10:16, 38:14,
    61:17 .
**Sometimes** 36:19, 42:3,
    42:4 .
**somewhat** 2:19, 51:8 .
**soon** 80:9, 83:7 .
**sorry** 5:4, 6:3, 69:17, 71:4 .
**sort** 13:4, 18:3, 34:22, 41:4, 41:15,
    41:22, 42:15, 55:13, 57:4,
    58:14, 58:20, 60:20, 61:20,
    66:24, 78:20, 82:1 .
**sorts** 49:18 .
**soundness** 51:4 .
**sounds** 30:3 .
**South** 1:39 .
**speaking** 3:11, 8:5 .
**speaks** 44:19 .
**specific** 10:13, 13:22, 19:7, 20:10,
    21:4, 29:25, 30:2, 58:24 .
**specifically** 20:16, 26:7,
    49:3 .
**specifics** 5:15 .
**specify** 68:18 .
**speculate** 62:16 .
**spend** 2:24, 13:21 .
**spring** 4:5, 4:14, 82:3 .
**springs** 4:8 .
**stage** 35:5, 54:14, 55:7 .
**stand** 3:8, 16:14, 17:23,
    65:6 .
**standard** 45:9, 48:11, 48:19,
    52:25, 55:3, 73:11 .
**standards** 39:13 .
**Standing** 2:22, 10:10, 16:11,
    16:12, 16:17, 16:19, 16:21,
    17:5, 18:14, 37:12, 37:13,
    37:15, 38:1, 75:10 .

**stands** 84:8 .
**start** 3:15, 26:1, 32:13, 32:16,
    75:23, 82:15 .
**started** 32:24, 35:4 .
**Starting** 51:12 .
**starts** 79:24, 82:13 .
**State** 48:11, 49:1, 49:14 .
**statement** 36:15 .
**statements** 70:9 .
**States** 1:1, 1:10, 2:6, 84:15,
    84:21 .
**statistics** 44:23 .
**status** 24:9, 38:6 .
**statutes** 26:21, 38:16, 64:8 .
**statutory** 38:4, 38:19, 39:1, 39:2,
    42:19, 48:15, 76:23, 80:17,
    81:21 .
**stayed** 4:3, 14:23, 15:22, 25:24,
    27:11, 27:16, 38:6, 40:25,
    58:7, 76:9, 76:12 .
**staying** 28:3, 41:7, 50:24, 76:25,
    77:23, 81:22 .
**stays** 58:13, 60:19 .
**stem** 67:14 .
**stenographically-reported**
    84:18 .
**stenotype** 1:50 .
**step** 23:16, 64:4 .
**STEPHANIE** 1:23 .
**steps** 4:9, 25:1, 65:20 .
**stop** 38:16, 55:17 .
**stopping** 10:24 .
**straight** 15:19 .
**Street** 1:33 .
**strikes** 60:14 .
**strong** 73:11 .
**strongly** 72:1 .
**struck** 36:20 .
**stuff** 37:14 .
**sub** 41:15 .
**subject** 6:1, 9:6, 12:2, 16:1, 16:2,
    27:7, 59:6, 76:2, 76:16 .
**subjected** 18:11 .
**submit** 25:13 .
**submitting** 13:13, 17:17 .
**substantially** 49:15 .
**succeed** 23:8 .
**success** 5:9 .
**suffered** 12:24 .
**sufficient** 21:18, 30:16,

30:19 .
**suggest** 44:1, 61:13, 63:19,
    68:22 .
**suggested** 33:17 .
**suggesting** 35:19, 35:22, 66:4,
    76:13 .
**suggestion** 6:6, 30:8, 59:10,
    68:6 .
**suggestions** 30:5 .
**suggests** 37:9, 80:18 .
**summary** 49:12 .
**summer** 64:10 .
**supplement** 28:24 .
**supplemental** 23:21 .
**suppose** 44:19, 62:18 .
**supposed** 45:14, 56:7 .
**Supreme** 25:2, 44:13, 48:13 .
**surprised** 11:13 .
**Susan** 1:30, 2:10 .
**suspect** 23:24 .
**switch** 13:1 .
**system** 11:22, 14:13, 62:14,
    63:22, 64:6, 69:19 .
**system.** 69:24 .
**systematically** 61:6, 61:14 .
**systems** 8:19, 13:2 .

.

.

**< T >.**
**table** 72:9, 73:1, 73:16,
    79:14 .
**tailored** 78:6, 78:9, 78:12 .
**tailoring** 78:5 .
**talked** 51:13, 60:20, 83:5 .
**talks** 12:10 .
**task** 42:7, 48:16 .
**tasked** 42:6 .
**technical** 37:17 .
**technicality** 49:23 .
**technically** 3:2, 84:1 .
**technological** 8:20 .
**teed** 23:22 .
**temporary** 50:18 .
**term** 61:2 .
**terms** 8:25, 26:24, 27:23, 28:2,
    51:15, 54:1, 63:25, 67:19,
    67:24 .
**text** 26:11 .
**themselves** 39:21, 42:6 .
**theoretical** 45:3 .

**theory** 5:8, 5:10, 12:6, 20:16,
    20:17, 20:20, 34:8, 53:13,
    77:12 .
**they'll** 44:15 .
**They've** 6:5, 13:10, 15:16, 17:20,
    18:10, 33:15, 37:9, 38:11,
    44:6, 44:17, 49:10, 51:7,
    57:11, 60:9, 73:6, 76:10, 76:11,
    80:6, 80:15 .
**thinking** 73:4 .
**thinks** 41:8, 45:8 .
**though** 7:1, 16:25, 21:12, 33:1,
    50:4, 56:2 .
**threat** 13:4 .
**three** 28:13, 33:16, 50:11,
    83:19 .
**throughout** 62:9 .
**ticket** 33:12 .
**timeline** 8:10 .
**timely** 22:4, 22:6 .
**timely.** 70:6 .
**today** 2:25, 4:20, 23:16, 28:25,
    33:18, 35:23, 37:24, 44:10,
    44:17, 45:23, 48:6, 51:1, 59:7,
    64:16, 66:15, 71:20, 73:24,
    74:15, 78:5, 79:12, 79:18,
    80:9 .
**together** 35:7 .
**tomorrow** 44:21, 46:12, 59:18,
    84:1 .
**took** 4:9, 28:6, 34:23 .
**toolkit** 8:24, 9:1 .
**top** 8:1, 11:13, 20:23, 31:18 .
**Torture** 20:17 .
**totally** 5:12, 14:15, 19:10 .
**touch** 13:19, 16:9, 16:12, 18:17,
    37:12, 38:14, 81:12,
    82:17 .
**towards** 44:5 .
**town** 46:20 .
**transaction** 8:17 .
**TRANSCRIPT** 1:21, 71:11, 79:23,
    84:18, 84:20 .
**transcription** 1:50 .
**transferred** 47:6 .
**transfers** 47:7 .
**treacherous** 2:19 .
**treat** 7:18, 14:2 .
**treated** 7:20, 68:12 .
**tried** 30:15 .

tries 36:21 .
triggered 62:19 .
TRO 59:22 .
true 50:13, 50:22, 51:1, 54:18, 84:18 .
try 30:8, 31:8, 44:16, 56:3, 59:12, 63:16, 74:21 .
trying 30:13, 38:15, 40:4, 40:6, 40:17, 41:24, 49:10, 56:14, 61:23, 65:16, 65:17 .
tune 19:6 .
turn 36:4, 60:15 .
turnaround 44:25 .
turns 61:16, 63:23, 74:22 .
twice 10:18, 20:24 .
two 3:2, 9:13, 12:15, 16:11, 24:15, 28:13, 38:16, 41:5, 43:9, 43:15, 46:24, 47:25, 63:8, 68:1, 70:18, 70:21, 81:12, 83:19 .
types 21:3, 23:12, 23:18, 80:14 .
typically 54:22 .

< U > .
U.S. 1:45 .
ultimately 47:12 .
unable 8:9, 10:11, 13:9, 30:24, 77:18, 77:21, 81:10 .
uncertain 18:3, 56:4 .
uncertainty 27:15, 27:16 .
unclear 30:11 .
uncommon 82:21 .
undergo 26:12 .
undermine 81:14 .
understand 4:25, 8:7, 15:16, 21:2, 21:17, 22:20, 23:18, 24:4, 24:21, 30:4, 31:4, 33:19, 37:7, 38:11, 39:4, 40:2, 40:17, 41:8, 47:19, 49:7, 57:7, 60:23, 65:18, 67:1, 70:15, 73:21, 73:22, 75:4, 77:18, 80:21 .
understanding 3:17, 4:4, 6:7, 6:19, 9:17, 10:3, 12:18, 19:25, 21:3, 21:4, 23:9, 26:9, 27:5, 27:17, 40:24, 51:25, 52:5, 54:5, 66:11, 67:11, 69:1, 72:8, 75:4, 75:5 .

Understood 31:7, 34:10, 39:18, 40:16, 42:8, 43:2, 60:11, 61:23, 68:3, 70:17, 71:6, 74:25, 80:10, 84:6 .
unduly 53:1 .
unequivocal 80:6 .
unequivocally 68:20 .
Unfortunately 44:6 .
uniform 29:11 .
uniformity 30:9 .
unique 57:23, 58:3 .
uniquely 35:6, 46:22 .
United 1:1, 1:10, 2:6, 84:15, 84:21 .
unlawful 50:17 .
unlawfully 50:16, 78:1 .
Unless 36:3, 56:10, 81:4, 82:24 .
unrealistic 54:9 .
until 38:3, 39:19, 57:15, 57:20, 69:19, 80:9 .
unusual 13:14, 36:18, 36:19, 39:2 .
updated 61:25, 62:14 .
updating 62:11 .
upsets 81:20 .
urgency 60:22, 64:2, 80:21, 83:3, 83:17 .
urgent 60:3, 64:10 .
USC 38:17, 39:7 .
uses 34:6, 34:21 .
using 8:18, 32:24, 35:4, 35:13, 35:14, 80:2 .

< V > .
valid 82:6 .
various 79:11, 80:14 .
vastly 18:25 .
verify 24:8 .
version 28:19 .
versus 2:5, 7:23, 17:6, 67:22, 67:25 .
view 3:16, 10:17, 25:20, 25:24, 39:6, 42:11, 45:23, 58:4, 68:15 .
violates 57:3 .
violating 19:2 .
violation 40:7 .
virtue 4:3, 9:2, 53:22 .

vs 1:8 .

< W > .
Wait 21:20, 45:2, 82:14, 83:14 .
waiting 83:19 .
waiver 51:24 .
walked 31:2 .
wanted 16:11, 20:11, 29:6, 59:24, 59:25, 69:12 .
wants 23:20, 83:23 .
Washington 1:34, 1:47 .
watching 46:15 .
ways 18:12, 24:25, 25:1, 30:21, 31:15, 48:14, 48:16, 49:10, 51:17, 63:22, 77:23, 78:7, 83:10 .
wayside 66:8, 67:21 .
weather 2:19 .
website 10:7, 52:11 .
week 9:19 .
weeks 3:19, 17:18, 27:10, 75:6 .
welcomed 83:6 .
Whac-a-mole 58:22 .
Whatever 13:9, 62:21, 74:11, 81:1, 82:7 .
Whereas 34:10 .
wherever 3:12 .
whole 21:7, 55:4 .
whom 69:16, 69:23 .
willing 25:6, 34:9, 66:18 .
withdrawn 22:7 .
withheld 78:1 .
withholding 20:17, 21:6, 21:16, 22:10, 22:17, 23:4, 23:25, 24:1, 32:15, 32:17, 32:22, 33:5, 33:15, 33:21, 34:1, 44:2, 60:10, 73:18, 79:21, 80:12 .
within 12:19, 13:7, 22:18, 41:2, 47:5, 52:4, 55:12 .
without 12:3, 15:12, 41:16, 58:24, 71:24 .
word 78:16 .
words 44:13, 49:17, 72:10 .
work 7:10, 11:2, 11:4, 13:14 .
works 38:25 .
world 12:1, 37:1, 37:9, 37:24,

44:9, 48:6, 49:15, 65:1, 77:2, 80:9 .
worried 46:19 .
worse 35:21, 35:23 .
write 65:18 .
written 5:21, 5:25, 6:3, 6:4, 6:9, 7:7, 13:8, 13:25 .
wrongly 10:17, 18:11, 22:13, 22:18, 23:10, 23:11 .

< Y > .
Y. 67:13 .
year 66:12, 69:2 .
years 53:14 .
yesterday 35:24, 60:2 .
York 1:40 .
you-all 2:18, 46:3, 84:7 .
yourselves 2:8 .