**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | |
|---|---|
| ASYLUM SEEKER ADVOCACY PROJECT, <br><br> Plaintiff, <br><br> v. <br><br> EXECUTIVE OFFICE FOR IMMIGRATION REVIEW, *et al.*, <br><br> Defendants. | Civil Action No. 1:25-cv-03299-SAG <br><br> **Hearing Requested** |

**Memorandum in Support of Plaintiff's Motion for Summary Judgment and
Opposition to Defendants' Motion to Dismiss (ECF 99)**

**Table of Contents**

Introduction ............................................................................................................... 1

Background ................................................................................................................ 3

    I.      Congress directs USCIS and EOIR to implement the annual asylum fee. ............. 3

    II.     ASAP sues and obtains a stay of Defendants' acts implementing the
           annual fee. ........................................................................................................... 4

    III.    EOIR represents to the Court and ASAP that it will ensure that
           nonpayment of the asylum fee will *not* affect applications for CAT
           protection and INA withholding. ........................................................................ 5

    IV.    EOIR again implements the annual asylum fee and issues a template order
           stating that applicants for CAT protection and INA withholding *are*
           required to pay OBBBA's new fees for asylum applicants. .................................. 5

    V.      In a preliminary posture, the Court allows USCIS and EOIR to require the
           annual fee while this case is litigated on the merits. ............................................ 8

    VI.    USCIS issues an interim final rule further implementing the annual asylum
           fee and implementing other provisions unrelated to the annual asylum fee. .......... 9

    VII.   EOIR's policies cause harm to ASAP members. .................................................. 10

Legal Standards ........................................................................................................ 12

Argument ................................................................................................................. 12

    I.      The Court should grant ASAP summary judgment on Counts 1–3 and 5. ........... 12

          A.     EOIR's January 2 Memo is arbitrary and capricious in failing to
                ensure meaningful and adequate notice before adverse
                consequences attach for nonpayment. (Count 3). ...................................... 13

               1.     The January 2 Memo rests on a legal error concerning the
                      Director's authority to impose procedural rules on the
                      agency's adjudications. .................................................................. 13

               2.     EOIR's alternative explanations are arbitrary and
                      capricious. .................................................................................... 15

                    a.     EOIR failed to adequately consider the severe
                           hardship that would result from its policy. ....................... 15

                    b.     EOIR was aware that immigration judges would fail
                           to provide adequate notice. ............................................... 18

c.    EOIR's suggestion that applicants could simply file a motion to reconsider or appeal their case to the BIA underscores its failure to grapple with the problems its policy causes. ............................................... 20

d.    EOIR failed to consider the obvious alternative of a minimum notice period. ................................................... 22

B.    EOIR's January 2 Memo is arbitrary and capricious in failing to provide clarity to applicants on how to comply. (Count 3) ..................... 23

C.    EOIR's policies apply asylum fees to withholding of removal and CAT claims in excess of statutory authority. (Count 5) ........................... 26

1.    EOIR's position is unlawful............................................................ 27

2.    The merits of this claim are ripe for review................................. 29

3.    In considering this claim, the Court can (and should) consider the government's November 10, 2025 representation to ASAP in connection with this litigation........... 30

D.    ASAP is entitled to summary judgment on Counts 1 and 2. ................... 32

E.    In the alternative, ASAP is entitled to summary judgment on Count 4.................................................................................................. 33

II.    The proper remedy is to vacate EOIR's policies, issue a permanent injunction, and enter a declaratory judgment......................................................... 34

A.    The Court should vacate EOIR's policies................................................. 34

B.    The Court should enter a permanent injunction....................................... 34

C.    The Court should enter a declaratory judgment....................................... 39

III.   The Court should deny the government's motion to dismiss. ............................. 39

A.    ASAP has standing. .................................................................................. 39

B.    ASAP has a cause of action under the APA. ........................................... 40

1.    ASAP challenges final agency action. ........................................... 40

2.    ASAP members lack an adequate alternative remedy. ................. 42

C.    Title 8 does not foreclose this action. ...................................................... 42

D.    The government's reliance on *Twombly* is misplaced. ............................. 44

Conclusion ................................................................................................................. 45

# Table of Authorities

## Cases

*Afr. Cmtys. Together v. Lyons*,
799 F. Supp. 3d 362 (S.D.N.Y. 2025), *modified*, 2026 WL 1382944 (S.D.N.Y.
May 18, 2026)................................................................................................................14

*Al Otro Lado v. EOIR*,
138 F.4th 1102 (9th Cir. 2025) ......................................................................................38

*Am. Bioscience, Inc. v. Thompson*,
269 F.3d 1077 (D.C. Cir. 2001)................................................................................12, 44

*Amica Ctr. for Immigr. Rts. v. EOIR*,
2026 WL 662494 (D.D.C. Mar. 8, 2026).......................................................................21

*Appalachian Power Co. v. EPA*,
208 F.3d 1015 (D.C. Cir. 2000)......................................................................................41

*Arizmendi-Medina v. Garland*,
69 F.4th 1043 (9th Cir. 2023) ........................................................................................20

*Ass'n of Flight Attendants v. Huerta*,
785 F.3d 710 (D.C. Cir. 2015)........................................................................................41

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).......................................................................................................44

*Biden v. Texas*,
597 U.S. 785 (2022)..................................................................................................32, 43

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011)......................................................................................18

*CASA, Inc. v. Noem*,
2025 WL 3514378 (D. Md. Dec. 8, 2025)......................................................................31

*Centro Legal de la Raza v. EOIR*,
524 F. Supp. 3d 919 (N.D. Cal. 2021) .....................................................................15, 29

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).......................................................................................................30

*Cortez v. Sessions*,
318 F. Supp. 3d 1134 (N.D. Cal. 2018) ...................................................................21, 36

*Delaware Valley Regional Center v. DHS*,
106 F.4th 1195 (D.C. Cir. 2024).....................................................................................41

*DHS v. Regents of the Univ. of California*,
591 U.S. 1 (2020)..................................................................................15, 18, 22, 42, 43

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006)................................................................................................35

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016)............................................................................................14, 22

*Ergon-W. Va., Inc. v. EPA*,
  980 F.3d 403 (4th Cir. 2020) .................................................................................34

*Family Plan. Ass'n of Me. v. HHS*,
  803 F. Supp. 3d 195 (D. Me. 2025) .......................................................................38

*Freza v. Att'y Gen.*,
  49 F.4th 293 (3d Cir. 2022) ...................................................................................20

*Matter of Garcia Martinez*,
  29 I. & N. Dec. 169 (B.I.A. 2025) .........................................................................12

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995)...............................................................................28

*Goldberg v. Kelly*,
  397 U.S. 254 (1970)...............................................................................................16

*Golden & Zimmerman, LLC v. Domenech*,
  599 F.3d 426 (4th Cir. 2010) .................................................................................41

*Goose Creek Physical Med., LLC v. Becerra*,
  2024 WL 942918 (D.S.C. Mar. 5, 2024) ...............................................................30

*Hernandez Lara v. Barr*,
  962 F.3d 45 (1st Cir. 2020)....................................................................................20

*Hicks v. Frame*,
  145 F.4th 408 (4th Cir. 2025) ................................................................................33

*Immigrant Defs. L. Ctr. v. Noem*,
  145 F.4th 972 (9th Cir. 2025) ................................................................................44

*INS v. St. Cyr*,
  533 U.S. 289 (2001)...............................................................................................32

*INS v. Stevic*,
  467 U.S. 407 (1984)...............................................................................................27

*Int'l Bhd. of Elec. Workers v. NLRB*,
  814 F.2d 697 (D.C. Cir. 1987)...............................................................................15

*J.O.P. v. DHS*,
  338 F.R.D. 33 (D. Md. 2020)................................................................................16

*Jaghoori v. Holder*,
  772 F.3d 764 (4th Cir. 2014) ............................................................................32, 33

iv

*Jian Tao Lin v. Holder*,
  611 F.3d 228 (4th Cir. 2010) ..................................................................................27

*Johnson v. Sessions*,
  2017 WL 1207537 (D. Md. Apr. 3, 2017) ...............................................................45

*Khalil v. President*,
  164 F.4th 259 (3d Cir. 2026) ..................................................................................43

*Khouzam v. Att'y Gen.*,
  549 F.3d 235 (3d Cir. 2008) ...................................................................................27

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) ..........................................................................................32, 33

*Las Americas Immigrant Advocacy Center v. DHS*,
  783 F. Supp. 3d 200 (D.D.C. 2025) .......................................................................18

*Lee v. Christian Coal. of Am., Inc.*,
  160 F. Supp. 2d 14 (D.D.C. 2001) .........................................................................36

*Legend Night Club v. Miller*,
  637 F.3d 291 (4th Cir. 2011) ..................................................................................37

*Make the Rd. New York v. Noem*,
  2025 WL 3563313 (D.C. Cir. Nov. 22, 2025) ........................................................44

*Marshall County Health Care Auth. v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ........................................................................44, 45

*Maryland v. Department of Agriculture*,
  770 F. Supp. 3d 779 (D. Md. 2025) .......................................................................36

*Mathews v. Eldridge*,
  424 U.S. 319 (1976) ................................................................................................16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..................................................................................................12

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
  339 U.S. 306 (1950) ................................................................................................16

*Mullin v. Al Otro Lado*,
  No. 25-5 (U.S. Nov. 17, 2025) ................................................................................38

*Munyuh v. Garland*,
  11 F.4th 750 (9th Cir. 2021) ...................................................................................20

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ..................................................................................................40

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................37

*O.A. v. Trump*,
   404 F. Supp. 3d 109 (D.D.C. 2019) ...................................................................................43

*Ostrzenski v. Seigel*,
   177 F.3d 245 (4th Cir. 1999) ..........................................................................................45

*Otsuka Pharm. Co. v. Burwell*,
   2015 WL 1579127 (D. Md. Apr. 8, 2015) ...................................................................30, 31

*Pino-Porras v. Att'y Gen.*,
   2025 WL 1752491 (3d Cir. June 25, 2025) .....................................................................20

*Portland Cement Ass'n v. EPA*,
   665 F.3d 177 (D.C. Cir. 2011) ........................................................................................25

*Prill v. NLRB*,
   755 F.2d 941 (D.C. Cir. 1985) ........................................................................................15

*Ramirez v. ICE*,
   568 F. Supp. 3d 10 (D.D.C. 2021) ..................................................................................34

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
   525 U.S. 471 (1999) ........................................................................................................43

*Rodriguez v. Bostock*,
   802 F. Supp. 3d 1297 (W.D. Wash. 2025) ......................................................................19

*Roe v. DOD*,
   947 F.3d 207 (4th Cir. 2020) ..........................................................................................20

*Sierra Club v. DOT*,
   125 F.4th 1170 (D.C. Cir. 2025) .....................................................................................18

*Spirit Airlines, Inc. v. DOT*,
   997 F.3d 1247 (D.C. Cir. 2021) ......................................................................................22

*Suri v. Trump*,
   2025 WL 1806692 (4th Cir. July 1, 2025) ......................................................................43

*Teva Pharms. USA, Inc. v. FDA*,
   441 F.3d 1 (D.C. Cir. 2006) ............................................................................................15

*Texas v. DHS*,
   123 F.4th 186 (5th Cir. 2024) .........................................................................................38

*Texas v. United States*,
   126 F.4th 392 (5th Cir. 2025) .........................................................................................44

*Util. Solid Waste Activities Group v. EPA*,
   901 F.3d 414 (D.C. Cir. 2018) ........................................................................................19

*Zinermon v. Burch*,
   494 U.S. 113 (1990) ........................................................................................................15

vi

*Zuh v. Mukasey,*
     547 F.3d 504 (4th Cir. 2008) ...............................................................................................19

## Statutes

5 U.S.C. § 703...............................................................................................................34, 39

5 U.S.C. § 704........................................................................................................................40

5 U.S.C. § 706........................................................................................................................30

5 U.S.C. § 706(2) ..............................................................................................................12, 34

8 U.S.C. §§ 1221–1232.........................................................................................................38

8 U.S.C. § 1231(b)(3) ...........................................................................................................27

8 U.S.C. § 1252(b)...........................................................................................................42, 43

8 U.S.C. § 1252(b)(3)(B).......................................................................................................21

8 U.S.C. § 1252(b)(9) ...........................................................................................................43

8 U.S.C. § 1802........................................................................................................................3

8 U.S.C. § 1802(a)..................................................................................................................27

8 U.S.C. § 1808(a) ...................................................................................3, 27, 33, 34, 38, 41

8 U.S.C. § 1808(b)(2) ...........................................................................................................32

Pub. L. No. 119-21, §§ 100002(a), 100009(a), 139 Stat. 72........................................27

## Regulations

8 C.F.R. § 1003.0(b)(1)(i).....................................................................................................13

8 C.F.R. § 1003.1(h) .............................................................................................................14

8 C.F.R. § 1003.23(b)(1)(v)..................................................................................................21

8 C.F.R. § 1208.18.................................................................................................................27

90 Fed. Reg. 34511 (July 22, 2025).......................................................................................4

90 Fed. Reg. 52693 (Nov. 21, 2025)...................................................................................25

91 Fed. Reg. 2561 (Jan. 21, 2026) ...................................................................................3, 25

91 Fed. Reg. 5267 (Feb. 6, 2026) ........................................................................................21

91 Fed. Reg. 22952 (Apr. 29, 2026) ......................................................................................9

**Other Authorities**

EOIR, Dep't of Just., *Types of Appeals, Motions, and Required Fees*,
https://www.justice.gov/eoir/types-appeals-motions-and-required-fees ................................12

Federal Reserve System, *Economic Well-Being of U.S. Households in 2023*
(2024), https://perma.cc/4VXD-KDQV......................................................................................10

Nicholas Nehamas, *How Trump Purged Immigration Judges to Speed Up
Deportations*, N.Y. TIMES (Apr. 9, 2026),
https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-
judges-purge.html ....................................................................................................................14

Robin Ghertner, et al., Health & Hum. Servs., *The Fiscal Impact of Refugees and
Asylees Over 15 Years: Over $123 Billion in Net Benefit from 2005 to 2019*
(2024),
https://aspe.hhs.gov/sites/default/files/documents/ea6442054785081eb121fa5
137cf837d/aspe-brief-refugee-fiscal-impact-study.pdf ...........................................................10

**Introduction**

Congress created the initial and annual asylum fees and delegated the implementation of the fees to the Executive Office for Immigration Review ("EOIR") and its sister agency, U.S. Citizenship and Immigration Services ("USCIS"). This case does not challenge Congress's authority or the existence of the fees. Instead, this case is about whether EOIR, its Director, and the Attorney General implemented Congress's mandate lawfully. They did not.

The Administrative Procedure Act ("APA") requires reasoned decisionmaking: agencies must consider important aspects of the problem, remain within statutory bounds, and explain their choices in light of foreseeable consequences. EOIR failed to satisfy those obligations.

*First*, EOIR failed to consider the consequences its policy would impose upon asylum applicants for nonpayment of the annual asylum fee—despite stakes that could not be higher. At EOIR, the consequence of nonpayment is asylum seekers' removal from the United States to the country from which they fled persecution. *See, e.g.*, IJ Orders, ECF 45-5. EOIR delegated unfettered discretion around notice to immigration judges without considering how that discretion would be exercised. It did so despite a known pattern of due process violations, resulting in deadlines as short as one day or less after an applicant was provided notice. The agency neither acknowledged this risk nor adopted safeguards to prevent it, despite prior judicial reversals for similar failures. Failing to calibrate the agency's policy to these serious harms, where the ultimate consequence might be life-or-death for asylum seekers, is a textbook failure to consider an important aspect of the problem in violation of the APA.

*Second*, EOIR failed to provide applicants clear guidance on how to comply with the fee requirements and avoid severe adverse consequences, leaving applicants unable to discern their obligations. EOIR also failed to account for USCIS's concurrent implementation of the same

1

statutory fee regime governing the same applicants, producing multiple discrepancies and ambiguities that exacerbated applicant confusion and leave applicants exposed to severe or unknown consequences.

*Third*, EOIR's policy applies the initial and annual asylum fees to withholding of removal and Convention Against Torture ("CAT") claims that Congress never subjected to any fee. In doing so, EOIR exceeded its statutory authority. EOIR's policy is independently arbitrary and capricious. The agency initially represented to the Court and ASAP that it would clarify that withholding and CAT claims are *not* subject to the statutory asylum fees. EOIR's position on this issue changed during the pendency of this case. Despite the obvious flip-flop, EOIR has not even attempted to explain why it reversed itself and adopted the opposite position in its template order and the January 2 Memorandum that encouraged immigration judges to use it.

*Fourth*, EOIR unlawfully applied its fee regime retroactively in two ways: (1) by demanding annual asylum fees from individuals who applied for asylum before the law creating those fees, the One Big Beautiful Bill Act ("OBBBA"), was passed on July 4, 2025; and (2) by counting days prior to OBBBA's passage toward the 365-day period that triggers an obligation to pay the annual asylum fee.

Defendants' motion to dismiss ("MTD") lacks merit. For the most part, Defendants rehash arguments that this Court has already rejected. And their other scattershot jurisdictional arguments fare no better.

For these reasons and those that follow, the Court should grant summary judgment to ASAP and deny Defendants' motion to dismiss.

2

**Background**

**I.     Congress directs USCIS and EOIR to implement the annual asylum fee.**

On July 4, 2025, the President signed the One Big Beautiful Bill Act ("OBBBA" or "Act"), which required the Secretary of Homeland Security and the Attorney General to impose new fees on asylum applicants.  The statute provides that "for each calendar year that [a noncitizen's] application for asylum remains pending, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee."  8 U.S.C. § 1808(a).  That reference to two department heads reflects the two paths to asylum: affirmatively with USCIS, a component of the Department of Homeland Security ("DHS"), or defensively before an immigration judge at EOIR, part of the Department of Justice.  The fee was initially set at a baseline of $100 (unless the Secretary says otherwise), adjusted each year for inflation, which has already occurred for FY 2026.  *Id.* § 1808(b); *see also* 91 Fed. Reg. 2561 (Jan. 21, 2026) (inflation adjustment).  The statute also requires the Secretary and the Attorney General to impose an initial asylum fee on all new applications for asylum.  8 U.S.C. § 1802.

The agencies moved quickly to implement the new fees.  On July 9, 2025, the Chief Immigration Judge, in an internal EOIR email, instructed that once EOIR's payment system was operational, all immigration judges "shall" provide 30 days' notice to applicants to submit proof of payment of new asylum fees before deeming applications abandoned.  *See* Reddy 6th Suppl. Decl. ¶¶ 18–19 & Ex. 3 (attaching email produced via FOIA request).  And on July 17, 2025, EOIR issued a policy memorandum purporting to "implement[] the statutorily mandated immigration fees and fee waiver changes established by" the Act.  Appx-000019.[1]  EOIR announced that it would apply the fee to any asylum application that had been "pending for more than one year as

---

[1] Citations to the Administrative Record refer to pagination in Plaintiff's Appendix of Materials from the Certified Administrative Record.  *See* Barron Decl. Ex. A.

of a date after the date of enactment" of the statute. *Id.* Under that approach, every applicant who had filed on or before July 4, 2024 was required to pay the fee as of July 5, 2025, and fees for later-filed applications would come due in the months that followed. Five days later, USCIS published a Notice in the Federal Register intended "to provide the information needed for the public to comply with the new law." 90 Fed. Reg. 34511, 34511 (July 22, 2025). But USCIS took a materially different view of when the payments first came due: USCIS said annual fees would first be due only "at the end of fiscal year 2025"—September 30, 2025—for applications pending since October 1, 2024, and on the one-year anniversary for later-filed applications. *Id.* at 34515. Under USCIS's interpretation, no one would be required to pay the fee until October 1 or later. Under EOIR's interpretation, many applicants had already missed the deadline to pay the fee.

## II.    ASAP sues and obtains a stay of Defendants' acts implementing the annual fee.

ASAP, a national membership organization of asylum seekers currently living in the United States, filed this lawsuit in October 2025 to challenge USCIS's and EOIR's implementation of the asylum fee. Compl., ECF 1; Reddy Decl., ECF 29-2 ¶¶ 4–6.

ASAP obtained preliminary relief staying USCIS's and EOIR's implementation of the annual asylum fee. Mem. Op., ECF 54. The Court disagreed with ASAP's statutory arguments that: (1) the fee did not apply retroactively to individuals who had sought asylum before July 5, 2025, and (2) pre–July 5 time should not count toward the one-year clock. *Id.* at 8–12. But the Court agreed with ASAP's argument that the agencies had acted arbitrarily and capriciously by adopting "multiple and perhaps conflicting interpretations of the same requirement." *Id.* at 14–15 (citation and quotation marks omitted). The Court therefore stayed USCIS's Federal Register Notice and EOIR's July 17 Memo pending the agencies' "reconcil[ing] [their] policies." *Id.* at 18–19.

**III.    EOIR represents to the Court and ASAP that it will ensure that nonpayment of the asylum fee will *not* affect applications for CAT protection and INA withholding.**

During the litigation surrounding the Court's stay, EOIR represented multiple times that applicants would not lose their CAT or INA withholding claims for failing to pay the annual asylum fee.  In October, EOIR's counsel told the Court that "the nonpayment of the annual asylum fee would not impact someone's application for the[] other avenues."  October 28 Hr'g Tr. 41:14–25.  Two weeks later, EOIR's counsel represented to ASAP in an email that "EOIR intends to also post public notice, which will clarify that *asylum* fees are not required for applications for CAT/withholding of removal under INA."  Barron Decl. Ex. B (November 10, 2025 email from EOIR counsel).

**IV.    EOIR again implements the annual asylum fee and issues a template order stating that applicants for CAT protection and INA withholding *are* required to pay OBBBA's new fees for asylum applicants.**

On January 2, 2026, EOIR issued a new policy memorandum that rescinded the July 17 Memo this Court had stayed and directed immigration judges to resume imposing the fee.  *See* Jan. 2 Memo, ECF 71-1 at 6.[2]  The January 2 Memo stated that "EOIR has elected to acquiesce to USCIS's position and will waive the [annual fee] for any asylum application that was pending for one year or more between July 5, 2025, and September 30, 2025, and was administratively final … as of September 30, 2025."  *Id.* at 2.  EOIR further stated that it "will not expect payment … until an Immigration Judge has issued an order setting a deadline for payment and that deadline has passed."  *Id.* at 4.  Yet after adopting these policies and directing immigration judges to comply with them, the January 2 Memo purported to deny its own significance.  EOIR argued that both its new memo and the prior, stayed memo were superfluous because Section 1808 itself imposed a

---

[2] Citations to docket entries refer to pagination at the bottom of the page rather than ECF pagination.

self-executing payment obligation that was immediately enforceable by immigration judges. *Id.* at 1–2, 6 n.12. Under that theory, everyone had been wrong for months: the Court, the parties, EOIR's own lawyers, and the immigration judges who complied with EOIR's directives.

The January 2 Memo also referred immigration judges to a "template order" that EOIR "encourage[d]" immigration judges to use to supply the notice required by the Memo. ECF 71-1 at 4. The template order instructs applicants and immigration judges that "[f]ailure to timely pay the fee may result in a finding that you have abandoned or withdrawn your application and may result in its denial or dismissal." *See* Margolin Jan. 29 Decl., ECF 85-1 at 4–5; *see also* ECF 122 (stipulating that ECF 85-1 is an exemplar template order). The order also references Form I-589— "Application for Asylum and for Withholding of Removal"—the single form used to seek four different forms of relief: asylum, INA withholding, and two forms of protection under CAT. *Id.* Applicants who use the form to seek asylum often seek additional relief under the INA and CAT, and applicants who seek *only* those other forms of relief must use the same form.[3] Although Sections 1802 and 1808 authorize fees only for asylum applications, the template order instructs applicants and immigration judges that the entire "application" may be denied or dismissed for non-payment of the asylum fee. *Id.* ASAP has reviewed more than a dozen orders from immigration judges since January 2 notifying asylum seekers of their obligation to pay the annual asylum fee, and all have used the template order. *See* Reddy 5th Suppl. Decl. ¶ 7, ECF 83-1.

As relevant here, these orders vary in only one respect: the payment deadline. EOIR designed the template to leave that date blank, and the January 2 Memo pointedly refused to impose

---

[3] *See* Form I-589, https://www.uscis.gov/sites/default/files/document/forms/i-589.pdf. Applicants automatically apply for INA withholding when they file Form I-589 to apply for asylum and can indicate on the form if they also wish to apply for CAT protection. *See* Form I-589 Instructions, https://www.uscis.gov/sites/default/files/document/forms/i-589instr.pdf.

or even suggest any minimum notice period.  Under EOIR's policy, an immigration judge can require an applicant to pay the next day or even the same day the applicant receives "notice" that the fee is due, on pain of dismissal of the applicant's request for asylum relief—as well as the applicant's requests for INA withholding or CAT protection, which are not subject to any fee.

EOIR tried to justify that choice by claiming that EOIR lacked the power to set a minimum notice period because the EOIR Director cannot "dictate to Immigration Judges how to rule in particular cases."  ECF 71-1 at 5.  EOIR also asserted that "Immigration Judges are in the best position to determine on a case-by-case basis what an appropriate deadline is."  *Id.* at 5.  But it never explained how deadlines as short as one or two days could ever be "appropriate."  *Id.*  EOIR later admitted it does in fact have authority to "[i]ssue operational instructions and policy, including procedural instructions regarding the implementation of new statutory or regulatory authorities."  Defs.' Opp. to TRO, PI, and Stay, ECF 81 at 14 (quoting 8 C.F.R. §§ 1003.0(b)(1)(i), (c)).  The EOIR Policy Manual itself concedes that the agency has that exact authority.[4]

Immigration judges followed EOIR's instructions and began setting widely different deadlines—including exceptionally short deadlines—with no rhyme or reason.  On January 5, 2026, one judge gave an ASAP member a January 26 deadline to pay (21 days' notice), while another ordered payment by January 13 (8 days' notice).  Karmali Decl. Ex. 2, ECF 64-7; Heilbrun Decl. Ex. 2, ECF 64-4.  Other ASAP members received deadlines as short as one or two days.  *See, e.g.*, Nice Suppl. Decl. ¶¶ 6–7, ECF 73-8; Heilbrun Decl., ECF 64-2 ¶¶ 2–3; ECF 83-1 ¶ 6.  And these nominal deadlines often overstate the time applicants actually have to pay, because asylum seekers often do not receive the order on the day it is issued.  Some receive notice only by mail, which can

---

[4] *See* EOIR Policy Manual, Part I, ch. 1.1(a), https://www.justice.gov/eoir/policy-manual-eoir/part-I/chapter-1-1 ("The EOIR Director and the heads of EOIR's three adjudicatory components possess authority, inter alia, to issue operating instructions and policy guidance.").

take days or weeks to arrive, if it arrives at all. *See, e.g.*, Reddy 3d Suppl. Decl., ECF 73-4 ¶¶ 15–16; ECF 73-8 ¶ 12. Others receive notice electronically, but only after EOIR uploads the order to its online portal. ECF 73-8 ¶¶ 6–7 & Exs. 1–2; ECF 64-2 ¶¶ 2–3; Karmali Decl., ECF 64-5 ¶¶ 2–3. ASAP has identified one applicant who was nominally given two days to pay, but because of EOIR's delay in uploading the order, had only one day in reality; and another who was nominally given *one* day to pay, but did not receive notice until the same day the payment was due. ECF 73-8 ¶¶ 6–7 & Exs. 1–2; ECF 83-1 ¶ 5. Further, it appears that EOIR is not providing individualized notice of the annual asylum fee to applicants with cases before the Board of Immigration Appeals ("BIA"), and it has offered no guidance regarding when or how these applicants must pay the annual asylum fee or demonstrate proof of payment to the BIA. Méndez Decl. ¶¶ 9–10 & Ex. 1.

Even if applicants are able to pay the fee on time, it is unclear whether, when, or how they are required to provide proof of payment to an immigration judge, which has led to additional confusion. *See, e.g.*, McShiras Decl., ECF 82-3 ¶¶ 13–14 (immigration judge paused applicant's asylum hearing for nonpayment of the annual asylum fee, even though the applicant had paid, because the applicant did not know he needed to bring proof of payment to court); Nice Suppl. Decl., ECF 73-8 ¶ 11 (after client paid, attorney was unsure whether or how to show compliance).

## V.    In a preliminary posture, the Court allows USCIS and EOIR to require the annual fee while this case is litigated on the merits.

Shortly after EOIR issued the January 2 Memo, ASAP amended its complaint and moved for a preliminary injunction to restrain EOIR's implementation of the asylum fee; meanwhile, the government moved to lift the Court's previous stay. ECF 71; ECF 73.

The Court denied ASAP's motion and lifted the stay, while resolving several threshold issues in ASAP's favor. The Court held that ASAP has standing, challenges final agency action, and has a cause of action under the APA. Mem. Op., ECF 94 at 5–8.

On the merits, the Court again rejected ASAP's statutory retroactivity arguments.  ECF 94 at 8.  As to EOIR's failure to adopt a minimum notice period, the Court held that EOIR's stated legal rationale—that it lacked authority to set a minimum notice period—was wrong, but the Court sustained the policy on EOIR's alternative ground that flexibility was preferable given the varying circumstances of applicants.  *Id.* at 12–13.  The Court acknowledged that setting a minimum floor "seem[ed] like an obvious alternative" with the benefit of hindsight, but concluded that the record at the preliminary stage did not yet establish that EOIR should have anticipated immigration judges would impose unreasonable deadlines.  *Id.* at 14.

As to the template order, the Court declined to grant preliminary relief solely because ASAP could not yet demonstrate irreparable harm, reasoning that the record contained no example post-January 2, 2026 of an immigration judge relying on the template order to dismiss withholding or CAT claims.  ECF 94 at 14–16.

**VI.    USCIS issues an interim final rule further implementing the annual asylum fee and implementing other provisions unrelated to the annual asylum fee.**

On April 29, 2026, USCIS issued an interim final rule ("IFR") establishing consequences for nonpayment of the annual asylum fee, including immediate "rejection" of a pending asylum application and immediate cancellation of work authorization for applicants who do not pay the fee within 30 days' notice.  USCIS Immigration Fees and Related Procedures Required by H.R.1 Reconciliation Bill, 91 Fed. Reg. 22952 (Apr. 29, 2026).  The IFR also contains provisions related to the duration of work authorization for Temporary Protected Status designees, and implements a fee for Form I-94, Arrival or Departure Record.  In light of the IFR, which materially changed USCIS's posture and introduced several new issues not previously before the Court, ASAP voluntarily dismissed its action against Defendants USCIS and Director Edlow without prejudice on May 22, 2026 pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i).  Notice, ECF 114.

**VII.    EOIR's policies cause harm to ASAP members.**

For many ASAP members, being forced to pay a $100 fee (now $102 after an inflation adjustment) on an annual basis—especially on short notice that comes unpredictably—imposes real hardship.  ECF 29-2 ¶¶ 61, 70–72; ECF 45-15 ¶ 10.  ASAP members report that $100 can be difficult to assemble quickly given the significant financial challenges that they face on a daily basis.  *See* ECF 29-2 ¶¶ 61, 70–72; ECF 45-15 ¶ 10.  That is consistent with a 2024 Federal Reserve study finding that 18% of adults in the United States "said the largest emergency expense they could handle . . . was under $100."[5]  Asylum seekers are especially vulnerable to that kind of strain: the median annual household income of recently arrived asylees or refugees is roughly $30,000, and more than one-third live below the federal poverty line.[6]  Many ASAP members are indigent and already make daily tradeoffs to pay for food, clothing, and other basic needs.  ECF 29-2 ¶¶ 61, 70.  Raising $100 on any timetable is hard.  Raising it on only a few days' notice can be impossible.  For the many asylum seekers living paycheck to paycheck, the deadline may arrive before even a single biweekly pay period passes, leaving them no way to pay except by forgoing essentials.  *Id.* ¶¶ 61, 70, 72; ECF 73-4 ¶ 13.  Regardless of indigence, ASAP members have expressed their view that unpredictable and short- or same-day notice to pay these fees is unfair and unreasonable, causes unnecessary stress and anxiety, and increases the risk that even if they have the funds available they will be unable to pay the fee in time to avoid adverse immigration consequences.  *See* Reddy 6th Suppl. Decl. ¶¶ 14–17; Reddy 4th Suppl. Decl., ECF 82-1 ¶¶ 6–8; ECF 73-4 ¶¶ 11–14.

---

[5] U.S. Board of Governors of the Federal Reserve System, *Economic Well-Being of U.S. Households in 2023* 33 (2024), https://perma.cc/4VXD-KDQV.

[6] Robin Ghertner, et al., U.S. Dep't of Health & Hum. Servs., *The Fiscal Impact of Refugees and Asylees Over 15 Years: Over $123 Billion in Net Benefit from 2005 to 2019* 4 (2024), https://aspe.hhs.gov/sites/default/files/documents/ea6442054785081eb121fa5137cf837d/aspe-brief-refugee-fiscal-impact-study.pdf.

The consequences of nonpayment are existential.  EOIR has warned that "[f]ailure to timely pay the fee may result in a finding that [an applicant] ha[s] abandoned or withdrawn [the] application and may result in its denial or dismissal." ECF 85-1 at 4.  If ASAP members' cases are rejected for nonpayment of the annual asylum fee, they may lose the chance to present their asylum claims at all, including applicants who have already waited years for a merits decision. ECF 29-2 ¶¶ 8, 62–65.

ASAP's members who are unable to pay the fee by the deadline imposed by an immigration judge are also likely to lose meritorious INA withholding and CAT claims because of EOIR's template order.  At the preliminary-injunction stage, the Court noted the absence of an example of this having occurred under the January 2 Memo.  That is no longer true: ASAP has now identified multiple cases in which an immigration judge rejected non-asylum claims because the applicant did not pay the asylum fee after using EOIR's flawed template order.  *See* Reddy 6th Suppl. Decl. ¶¶ 15–16; *see also, e.g.*, Hasty Decl. ¶¶ 4–7, 11–13 & Ex. 1 (client family ordered removed for nonpayment of annual asylum fee despite asserting INA withholding and CAT claims).  And if applicants are removed because their non-asylum claims are wrongly dismissed, they may be returned to a country where they face persecution, torture, or death.

For applicants who are ordered removed due to an immigration judge's mistake—for example, a failure to provide adequate notice, or rejecting INA withholding or CAT claims for nonpayment of the annual asylum fee—an applicant may have no meaningful remedy at the agency. To this day, applicants do not know whether they should file an appeal, a motion to reopen, a motion to reconsider, or all three.  *See, e.g.*, Hasty Decl. ¶ 14 (given significant risk of detention, attorney chose to file only a BIA appeal and forgo a motion to reconsider); Reddy 6th Suppl. Decl. ¶ 16 (attorney first filed motion to reopen but, not having received a decision on that motion before

11

the deadline to appeal to the BIA, then also filed a BIA appeal).  And applicants who try to avail themselves of these remedies must pay $1,000 or more in additional fees.[7]

## Legal Standards

Summary judgment is the usual vehicle for resolving an APA case.  "When a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001).  Under the APA, a reviewing court must "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (C).

Agency action is arbitrary and capricious when the agency has "entirely failed to consider an important aspect of the problem," offered a rationale "counter to the evidence before the agency," or relied on "factors which Congress has not intended it to consider."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  An agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.*

## Argument

### I.  The Court should grant ASAP summary judgment on Counts 1–3 and 5.

The Court should grant summary judgment to ASAP on Counts One, Two, Three, and Five. Because this Court has already determined (correctly) that the challenged policies constitute final

---

[7] *See* EOIR, Dep't of Just., *Types of Appeals, Motions, and Required Fees*, https://www.justice.gov/eoir/types-appeals-motions-and-required-fees.  Although there is a process to apply for a fee waiver alongside a motion to reopen or appeal, the BIA has recently taken steps to limit access. *See Matter of Garcia Martinez*, 29 I. & N. Dec. 169, 171 (B.I.A. 2025) (non-detained respondents with private counsel are "presumed to have the ability to pay any requisite filing fee").

agency action, ECF 94 at 6–7, the alternative basis for relief in Count Four is not necessary to the Court's disposition of this motion. Plaintiff nonetheless preserves Count Four and, in the alternative, requests summary judgment on it.

### A. EOIR's January 2 Memo is arbitrary and capricious in failing to ensure meaningful and adequate notice before adverse consequences attach for nonpayment. (Count 3)

EOIR's implementation of the annual asylum fee is arbitrary and capricious in refusing to ensure that applicants have adequate notice before they face adverse immigration consequences as a result of nonpayment. EOIR's decision was premised on a legal error—the agency incorrectly believed its regulations prevented it from adopting a generally applicable policy ensuring that applicants receive adequate notice. In addition, the agency failed to adequately consider: (1) the severe consequences its policy imposed or what procedural protections those consequences demanded; (2) evidence that immigration judges would implement the policy in a way that deprives applicants of adequate notice; (3) the government's contemporaneous plan to gut the availability of appellate review at the BIA; and (4) the obvious alternative of a minimum notice period. Each failure independently renders the January 2 Memo arbitrary and capricious.

### 1. The January 2 Memo rests on a legal error concerning the Director's authority to impose procedural rules on the agency's adjudications.

EOIR's decision rested primarily on the debunked legal premise that it lacked the power to set a uniform minimum notice deadline for payment of the annual asylum fee. ECF 71-1 at 3–5. As this Court previously explained, "[t]he Memo misconstrues the law in reaching this conclusion." ECF 94 at 12–13. The regulatory text refutes EOIR's position on its face. Section 1003.0(b)(1)(i) expressly authorizes EOIR's Director to issue "procedural instructions regarding the implementation of new statutory or regulatory authorities." 8 C.F.R. § 1003.0(b)(1)(i). A minimum notice period is exactly that. EOIR cited Section 1003.0(c) for the proposition that the

13

EOIR Director cannot "direct[] any adjudicator to rule a particular way." ECF 71-1 at 1. But that means only that EOIR Director may not "direct an Immigration Judge to rule in a particular way in a particular case." *Afr. Cmtys. Together v. Lyons*, 799 F. Supp. 3d 362, 377 (S.D.N.Y. 2025), *modified*, 2026 WL 1382944 (S.D.N.Y. May 18, 2026). A notice floor is not a directed substantive result in a particular case—it is a procedural guardrail.

Moreover, none of the agency's rules forbid EOIR from adopting *general policies* applicable to *all adjudications*. EOIR has acknowledged that it has this authority. *See supra* at 7 & n.4. And the January 2 Memo demonstrates EOIR itself understood the distinction, as the Memo *did* exercise the Director's authority to waive the fee for certain applicants and require immigration judges to provide at least nominal notice before requiring applicants to pay, while simultaneously disclaiming authority to set a minimum notice period. *See* ECF 94 at 12–13. That inconsistency is unexplained and arbitrary. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("[A]n unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." (cleaned up)).

EOIR's invocation of immigration judges' "decisional independence," ECF 71-1 at 3, as a constraint on its authority is also false as a legal matter and inconsistent with agency practice. The Attorney General retains authority to direct that cases be referred to him and to decide those cases. 8 C.F.R. § 1003.1(h). Immigration judges are employees of the Department of Justice, appointed by and serving at the pleasure of the Attorney General. In the last two years, the Attorney General has repeatedly fired or forced out immigration judges amid broader efforts to implement the administration's immigration enforcement priorities.[8]

---

[8] *See* Nicholas Nehamas, *How Trump Purged Immigration Judges to Speed Up Deportations*, N.Y. TIMES (Apr. 9, 2026), https://www.nytimes.com/2026/04/09/us/politics/trump-miller-immigration-judges-purge.html.

14

EOIR's legal error is reason enough to vacate the January 2 Memo.  An agency decision cannot stand where it rests on a legal mistake.  *Prill v. NLRB*, 755 F.2d 941, 947 (D.C. Cir. 1985); *Teva Pharms. USA, Inc. v. FDA*, 441 F.3d 1, 5 (D.C. Cir. 2006).  Although EOIR asserts that it would have made the same decision anyway, that is not an independent basis for its decision when it formed that judgment against the background that this was the only policy lawfully available.  *Cf. Int'l Bhd. of Elec. Workers v. NLRB*, 814 F.2d 697, 708 (D.C. Cir. 1987) ("When the Board bases a decision on a standard that it unjustifiably believes was mandated by Congress, the Board's decision must not be enforced, even though the Board might be able to adopt the very same standard in the exercise of its discretion."); *see also* ECF 73-1 at 15–16; ECF 82 at 6–7.

### 2.    EOIR's alternative explanations are arbitrary and capricious.

In any event, EOIR's alternative, policy-based justifications were themselves arbitrary.  By allowing immigration judges to demand payment on arbitrarily short notice—as little as one day— EOIR failed to adequately consider "important aspect[s] of the problem," *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (citation omitted), including the needless hardship caused by ultra-short deadlines and the certainty that many applicants would be deprived of their right to adequate notice under the Due Process Clause.  *See Zinermon v. Burch*, 494 U.S. 113, 139 (1990) (procedures that "predictabl[y]" deprive people of their rights violate due process); *Centro Legal de la Raza v. EOIR*, 524 F. Supp. 3d 919, 929 (N.D. Cal. 2021) (EOIR failed to consider that its rule would "foreclose noncitizens from seeking humanitarian relief to which they may be entitled and will result in the deportation of noncitizens who have meritorious claims for relief").

### a.    EOIR failed to adequately consider the severe hardship that would result from its policy.

In refusing to impose a minimum notice period, EOIR failed to adequately consider the severe consequences for asylum applicants—including the risk of erroneous removal orders—and

15

the likelihood that immigration judges would deprive applicants of their basic rights under the Due Process Clause. A removal order is indisputably a severe consequence that warrants heightened procedural protections for asylum applicants. *See J.O.P. v. DHS*, 338 F.R.D. 33, 61 (D. Md. 2020) (removal can be irreparable harm). And the Due Process Clause requires agencies to adopt procedural protections commensurate with the stakes of a proceeding. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 262–66 (1970).

Adequate notice is "[a]n elementary and fundamental requirement of due process." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). One-day and two-day deadlines are inconsistent with that requirement. It can take a week for a mailed order to reach an applicant, leaving less time to respond than has already elapsed. ECF 73-8 at ¶ 12. Even if applicants receive notice in time, many ASAP members live in poverty; a $100 demand on a two-day timetable may be impossible to meet, or may require forgoing food and other necessities. ECF 29-2 ¶¶ 61, 68, 70–72, 74. They may also lack access to the internet, bank accounts, or credit cards needed for online payment. Many applicants at EOIR are detained and often lack access to funds or online payment mechanisms that would be necessary to pay the fee on extremely short notice—and EOIR requires applicants to pay the fee online, which is impossible for detained applicants in most detention centers. Those applicants must try to contact someone outside of the detention center and give that person detailed instructions about how to pay on their behalf, which takes time—assuming they can reach someone outside the detention center who can pay for them. Barriers like these make compliance with short deadlines unrealistic, not to mention obstacles to obtaining proof of payment to demonstrate compliance. The predictable result is that applicants will lose their asylum claims not on the merits but because EOIR's procedures gave them no meaningful chance to comply with the fee requirement.

16

These problems are particularly acute—and unreasonable to ignore—given the scale of the affected population and the consequences for those applicants. There are currently 2.4 *million* asylum seekers with applications pending at EOIR alone. Appx-000011. EOIR failed to conduct any analysis of what proportion of that population is detained, unrepresented, or otherwise at heightened risk of missing a deadline if they receive only a few days' notice to pay the fee. EOIR similarly failed to consider whether its policy would ensure adequate protections and guidance for those applicants who are unable to pay on short notice. And even for applicants who are able to make the payment on time, EOIR failed to consider the unnecessary hardship that ultra-short deadlines impose on asylum applicants who will struggle to come up with a $100 fee in just a few days.

Nowhere in the January 2 Memo—which was issued *after* ASAP and this Court had already documented that removal orders were issuing for nonpayment, ECF 54 at 16—did EOIR offer any explanation of how one-day or two-day payment windows serve a legitimate government interest that outweighs the risk of severe and unreasonable consequences for applicants. To justify that failure, the government cites only the January 2 Memo's generic invocation of flexibility. ECF 99, MTD at 9. But that does not explain why the need for flexibility justified forgoing any minimum notice period altogether rather than adopting a reasonable minimum notice period with flexibility for judges to grant case-specific extensions. The January 2 Memo never considered the problem of unreasonably *short* notice, which is akin to no meaningful notice at all.

Indeed, given these problems, EOIR promised in October 2025 that fees would not be due until thirty days after it sent notice to applicants. Margolin Decl., ECF 44-1 at ¶ 8. It was "clear," EOIR's counsel represented, "that no one will have to pay until notice is issued, and they'll have 30 days … to pay." Oct. 28, 2025 Hr'g Tr. 38:12–14. Further, a July 9, 2025 email from the Chief Immigration Judge to all Assistant Chief Immigration Judges and EOIR Court Administrators had

17

stated that immigration judges "shall" provide applicants notice and then 30 days to pay the new asylum fees. *See* Reddy 6th Suppl. Decl. ¶ 18 & Ex. 3. Given the representations made in this litigation and EOIR's own correspondence regarding a 30-day notice period for asylum fees, a minimum payment period was certainly "within the ambit of [EOIR's] existing policy." *Regents*, 591 U.S. at 30 (alteration marks omitted). Yet the January 2 Memo abandoned that commitment without explanation.

> **b.    EOIR was aware that immigration judges would fail to provide adequate notice.**

At the preliminary-injunction stage, the Court concluded that the record was insufficient to show awareness of the risk. ECF 94 at 14. The merits record resolves that question and shows that EOIR had every reason to anticipate the harm that its policy would impose.

To begin, the relevant question is not whether EOIR knew for sure that immigration judges would issue unreasonable payment orders; it is whether EOIR needed to consider the *possibility* that they might. Ignoring even a low-probability risk is arbitrary where, as here, the potential consequences are severe. *Sierra Club v. DOT*, 125 F.4th 1170, 1183 (D.C. Cir. 2025).

A recent case about asylum procedure illustrates the point. In *Las Americas Immigrant Advocacy Center v. DHS*, 783 F. Supp. 3d 200, 224–27 (D.D.C. 2025), the court held that an asylum-screening process was arbitrary and capricious because it lacked sufficient guardrails to ensure consistent outcomes, thereby risking different treatment for similarly situated applicants. There, the plaintiffs identified a concrete example of inconsistent results, but the court emphasized that the deeper problem was structural: such outcomes were "unsurprising" given the absence of meaningful safeguards. *Id.* at 226. Cases outside the immigration context confirm the same prin-ciple. Agency action can be arbitrary where the agency ignores foreseeable risks or fails to seri-ously evaluate likely harms. *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011) ("there

[was] good reason to believe" a policy might cause harm, yet the agency "duck[ed] serious evaluation of the costs that *could* be imposed" (emphasis added)); *see also Util. Solid Waste Activities Group v. EPA*, 901 F.3d 414, 427 (D.C. Cir. 2018) (agency failed to adequately consider probabilistic risk that carcinogenic chemicals would leak).

Regardless, here EOIR had every reason to know that the same sorts of problems were certain to occur in the context of the annual asylum fee. EOIR's own first attempt to implement the fee exposed the risk: before this Court's stay order, immigration judges had imposed fees without any notice, and in one case ordered an applicant removed for nonpayment days after EOIR told this Court that no fees were yet due. *See* ECF 45-1 at 4; ECF 54 at 15. In some cases, immigration judges ordered asylum seekers removed before there was even a way to pay the fee. ECF 45-1 at ¶ 12. And even for applicants able to pay the fee, payment on short notice caused substantial hardship, ECF 45-15 ¶ 10; ECF 29-2 ¶¶ 61, 71, sometimes requiring applicants to cut back on basic necessities such as food and clothing, ECF 29-2 ¶¶ 61, 70, 72. Some panicked and paid the annual asylum fee through the only means available at the time: the portal to pay the initial asylum fee. ECF 29-2 ¶¶ 44–45, 61, 70. EOIR knew all this when it issued the January 2 Memo because it was part of the record in this pending litigation.

If that were not enough, outside the context of the annual asylum fee, EOIR knows well that in the absence of generally applicable procedural safeguards some immigration judges will impose obligations on applicants that are unreasonable or raise constitutional concerns. *See, e.g.*, *Zuh v. Mukasey*, 547 F.3d 504, 513 (4th Cir. 2008) (discussing the empirical evidence of "immigration judges … failing to adjudicate asylum cases consistently"); *Rodriguez v. Bostock*, 802 F. Supp. 3d 1297, 1307 (W.D. Wash. 2025) (documenting wide variation in outcomes of bond hear-

ings between different regions). Federal courts have repeatedly reversed EOIR actions where immigration judges imposed inadequate notice or compressed deadlines. In one case, an immigration judge told an asylum seeker for the first time at a hearing that his application "was not just due that day, but that *morning*"—which the Ninth Circuit held was a denial of a fair hearing. *Arizmendi-Medina v. Garland*, 69 F.4th 1043, 1050 (9th Cir. 2023). In another, an immigration judge proceeded with a hearing "less than 24 hours" after the asylum seeker's first meeting with counsel, which was "an abuse of discretion and a violation of [his] due process and statutory right[s]." *Freza v. Att'y Gen.*, 49 F.4th 293, 299–300 (3d Cir. 2022). Similar examples abound.[9] The Department of Justice was a party to all these cases, which are at minimum critical "background information." *Roe v. DOD*, 947 F.3d 207, 221 (4th Cir. 2020).

           c.        **EOIR's suggestion that applicants could simply file a motion to reconsider or appeal their case to the BIA underscores its failure to grapple with the problems its policy causes.**

EOIR suggested that applicants who lack a meaningful opportunity to pay the fee and suffer adverse consequences might be able to file a motion to reopen or reconsider with the immigration judge or an appeal with the BIA. ECF 71-1 at 5 n.11; *see also* ECF 94 at 13. These hypothetical options do not justify the January 2 Memo for several reasons.

*First*, EOIR failed to provide adequate guidance to applicants in this predicament. Applicants do not know whether they should file an appeal, a motion to reopen, a motion to reconsider,

---

[9] *See, e.g.*, *Pino-Porras v. Att'y Gen.*, 2025 WL 1752491, at *3 (3d Cir. June 25, 2025) (reversing immigration judge who insisted on proceeding even though the asylum seeker "had only learned of the hearing the day before and had been unable to contact his counsel"); *Munyuh v. Garland*, 11 F.4th 750, 763 (9th Cir. 2021) (immigration judge demanded that asylum seeker immediately produce affiants' ID cards without giving "adequate notice that she was required to present" it); *Hernandez Lara v. Barr*, 962 F.3d 45, 55 (1st Cir. 2020) (immigration judge gave applicant "only fourteen business days to find a lawyer after she understood that she needed a new one").

or all of the above if their applications are denied when they lacked adequate notice. *Supra* at 11–12.

*Second*, appeal or reconsideration may be practically impossible for many applicants, as the process is complex, and minimum fees for each motion are over $1,000—10 times the amount of the annual asylum fee itself. *Supra* at 12 & n.7. Even if some applicants were able to prevail, delayed adjudication of their asylum claims is itself an irreparable harm, particularly for detained applicants or those at risk of detention, *see Cortez v. Sessions*, 318 F. Supp. 3d 1134, 1139 (N.D. Cal. 2018), deportation, *see* 8 U.S.C. § 1252(b)(3)(B); 8 C.F.R. § 1003.23(b)(1)(v), and the concomitant delay in potential family reunification and U.S. citizenship after winning asylum.

*Third*, the Department of Justice—EOIR's parent agency—recently issued an interim final rule radically restricting the availability of appellate review at the BIA ("the BIA rule"). 91 Fed. Reg. 5267 (Feb. 6, 2026). Among other things, the BIA rule made summary dismissal the default for all appeals, reduced the filing deadline to 10 days, and permitted dismissal before transcripts were even created. *Id.* at 5270. A district court set aside key provisions of the BIA rule, holding that "the overwhelming majority of BIA appeals will receive no meaningful consideration" and that the BIA rule therefore could not be adopted without notice-and-comment rulemaking. *See generally Amica Ctr. for Immigr. Rts. v. EOIR*, 2026 WL 662494, at *25 (D.D.C. Mar. 8, 2026). EOIR appealed this ruling and indicated its intent to issue a final rule adopting the same changes. *See Amica Ctr.*, No. 1:26-cv-00696, ECF 45 (stipulation to stay case pending final rule); ECF 48 (notice of appeal).

The BIA rule is relevant to the arbitrariness of EOIR's asylum fee policies because it exposes the internal incoherence of the government's position in the January 2 Memo and this litigation. EOIR claims that applicants who are wrongly ordered removed due to nonpayment have

21

an adequate remedy: appeal to the BIA.  ECF 71-1 at 5 n.11.  Meanwhile, the Department of Justice was—and continues to be—preparing a policy designed to make BIA review unavailable to the vast majority of applicants.  That contradiction renders the agency's decisionmaking arbitrary and capricious.  *See Encino Motorcars*, 579 U.S. at 221.  Relatedly, the BIA rule further demonstrates that EOIR, in designing its policies for implementing the annual asylum fee, failed to consider how those policies would interact with the broader immigration system in which they operate.

> d.     **EOIR failed to consider the obvious alternative of a minimum notice period.**

An agency's duty "to consider responsible alternatives … and to give a reasoned explanation for its rejection of such alternatives … goes to the heart of reasoned decisionmaking; it is not limited to rulemaking."  *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).  For example, *Regents* involved an informal memorandum and the Supreme Court confirmed that ordinary principles of reasoned decisionmaking apply outside the context of notice-and-comment rulemaking.  *Regents*, 591 U.S. at 9, 30.  Here, EOIR's policy has life-altering consequences for asylum applicants.  Its decision to skip rulemaking does not make its action any less important to those the agency regulates nor does it excuse the agency's failure to consider known and obvious alternatives that could have avoided the unnecessary and harmful consequences of its policy.

If EOIR wanted to preserve immigration judges' flexibility instead of imposing a one-size-fits-all notice period, it should have considered the commonplace solution of setting a *minimum* notice period—something the Court previously agreed "seems like an obvious alternative."  ECF 94 at 14; *see* ECF 73-1 at 17 (citing other examples of minimum deadlines in federal law); ECF 82 at 8 n.4 (citing other examples of deadlines set by EOIR).  And EOIR *did* in fact consider this alternative—and promised to adopt it—just a few months before it issued the January 2 Memo,

22

where the agency failed even to consider this alternative or provide a reasonable explanation of why this was no longer an option. *Supra* at 5, 18.

B. **EOIR's January 2 Memo is arbitrary and capricious in failing to provide clarity to applicants on how to comply. (Count 3)**

More broadly, the January 2 Memo is arbitrary and capricious because: (1) an applicant can timely pay the fee to EOIR yet still face a removal order for noncompliance; (2) EOIR has failed to explain what additional steps beyond paying the fee, if any, applicants are required to take to demonstrate compliance; and (3) EOIR has still failed to account for its sister agency's concurrent implementation of the same fee. ASAP raised problems like these repeatedly prior to the January 2 Memo, yet EOIR failed to do anything to address them. *See, e.g.*, ECF 29-2 ¶ 56 (highlighting numerous questions asked by ASAP members regarding compliance and what happens with fees if a case moves between agencies while pending).

*First*, the January 2 Memo effectively created a de facto rule under which payment alone is insufficient to avoid adverse immigration consequences. EOIR failed to explain what constitutes compliance and provided no guidance regarding whether payment through the agency's online payment portal alone satisfies an applicant's obligations, or whether applicants must take additional steps to demonstrate payment to an immigration judge. In the absence of EOIR considering these basic questions, immigration judges have placed the burden on applicants to prove payment. Reddy 6th Suppl. Decl. ¶ 4. In practice, this means that an applicant can pay the fee to EOIR yet still face a removal order for noncompliance—a result that is arbitrary and capricious.

*Second*, EOIR failed to provide clear instructions about whether or how applicants should demonstrate payment to an immigration judge. In practice, applicants may print receipt confirmation screens and bring them to hearings, but EOIR's policy does not instruct applicants to do so.

*Id.* ¶¶ 5–7, 10.  Instead, EOIR instructs applicants to include the receipt with an application, motion, or appeal, but for most individuals paying the annual asylum fee, there is no forthcoming application, motion or appeal to submit.  *Id.* ¶¶ 7–8.  The January 2 Memo leaves most asylum applicants in the dark about an actionable next step.  EOIR nowhere addressed what would happen if an applicant did not provide such documentation to an immigration judge, lacked access to a printer, or reasonably assumed that EOIR would use its own records to determine payment status.

*Third*, the January 2 Memo still fails to align EOIR's implementation of the asylum fees required by the OBBBA with USCIS's implementation of the same fees.  ECF 73-1 at 14–16.  Last September, ASAP members and other asylum seekers with cases pending at EOIR expressed confusion and fear of missing a September 30 deadline advertised by USCIS.  ECF 29-2 ¶ 51.  With USCIS's deadline approaching, asylum applicants with cases pending at EOIR are being set up to once again incorrectly assume their fee is due by September 30.

Further, some asylum applicants have their claims transferred between USCIS and EOIR, whether because USCIS dismissed, denied, or referred a claim to EOIR, or because EOIR dismissed proceedings and the applicant re-filed with USCIS.  *See* ECF 54 at 15; ECF 29-2 ¶¶ 26, 56.[10]  Asylum applicants then hear different messages from the two agencies about to whom, when, and in what amount they must pay their fees.  The administrative record for the January 2 Memo does not include a single document demonstrating that EOIR took these differences into consideration or took any steps to alleviate the predictable and harmful consequences that would result from EOIR's failure to coordinate with USCIS.

---

[10] In their motion to dismiss, Defendants ignore the second transfer-of-jurisdiction posture.  *See* MTD at 17–18 (focusing only on asylum claim transfers from USCIS to EOIR).

Moreover, EOIR failed to adopt any policy to ensure that applicants who paid the annual fee to USCIS will not be double-charged by EOIR.  For an applicant whose case is transferred from USCIS to EOIR, it is unclear whether a payment of the annual asylum fee already made to USCIS will be honored by EOIR, whether the applicant must pay a second time, or whether (and how) an applicant must demonstrate compliance to EOIR.  And if the agencies fail to coordinate the timing of their annual inflation adjustments, like they did for the FY 2026 adjustment, applicants whose cases are transferred during a period of discrepancy between USCIS and EOIR as to the amount of the fee could face further barriers to compliance.[11]

Nor were these EOIR's only failures to account for USCIS's concurrent implementation of the same statute or to provide applicants clear guidance on compliance.  From the beginning, EOIR's July 17 Memo required payment before any mechanism to pay existed, while USCIS did not.  The agencies adopted conflicting interpretations of when the first annual asylum fee payments were due after the OBBBA's enactment.  EOIR corrected that discrepancy only after this litigation forced it to.  *See* MTD 13–14; ECF 94 at 16 n.3.  That background is relevant to this motion because EOIR's failure to account for the practical mechanics of collecting the new fee—and for USCIS's concurrent implementation of the same statutory mandate—bears on whether EOIR considered an important aspect of the problem before requiring payment.  "It is not absurd to require that an agency's right hand take account of what its left hand is doing." *Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187–88 (D.C. Cir. 2011) (EPA acted arbitrarily by failing to account for the effect of its own closely related, contemporaneous rulemaking).

---

[11] *Compare* Inflation Adjustment for EOIR OBBBA Fees; Fiscal Year 2026, 91 Fed. Reg. 2561, 2562–63 (Jan. 21, 2026) (EOIR notice of annual inflation adjustment to the annual asylum fee effective February 1, 2026), *with* Inflation Adjustment to HR–1 Immigration Fees, 90 Fed. Reg. 52693, 52694–95 (Nov. 21, 2025) (USCIS notice of annual inflation adjustment to the annual asylum fee effective January 1, 2026).

All of these problems are magnified for the many asylum seekers who appear before immigration judges without a lawyer, who speak limited English, or who have no reliable way to reconcile what different government sources have told them at different times. For that population, confusion is more than an inconvenience. It likely means asylum seekers will miss their deadline, have their claims denied, and face removal. And that confusion may not be dispelled in the short time windows EOIR's policy allows immigration judges to impose on applicants who have been ordered to pay the annual asylum fee.

These practical problems were straightforward and obvious consequences of requiring asylum seekers to comply with EOIR's implementation of the annual asylum fee without clear guidance or procedural safeguards. EOIR should have taken all of this into account and addressed and clarified these issues before subjecting applicants to the risk of a removal order if they guess wrong as to how the agency expects them to comply with the January 2 Memo's requirements.

### C.     EOIR's policies apply asylum fees to withholding of removal and CAT claims in excess of statutory authority. (Count 5)

EOIR's template order instructs immigration judges and applicants alike that failure to pay the asylum fees required by the OBBBA—*i.e.*, the initial and annual fees—may result in dismissal of an applicant's entire Form I-589, including INA withholding and CAT claims for which Congress did not authorize EOIR to impose any fee. The January 2 Memo, which promotes use of the template order, applies the annual asylum fee across all Form I-589 applications without acknowledging that Form I-589 encompasses several legally distinct forms of relief, only one of which is subject to the asylum fees imposed by the OBBBA. *See* ECF 71-1 at 2. That position exceeds EOIR's statutory authority and has already produced unlawful removal orders.

26

### 1.    EOIR's position is unlawful.

Asylum, INA withholding, and CAT protections are "separate types of immigration relief." *Jian Tao Lin v. Holder*, 611 F.3d 228, 232 n.2 (4th Cir. 2010). Withholding of removal is a distinct, mandatory protection arising under its own statutory provision. *INS v. Stevic*, 467 U.S. 407, 421–22 (1984); 8 U.S.C. § 1231(b)(3). CAT protection is similarly mandatory and similarly distinct. 8 C.F.R. § 1208.18; *Khouzam v. Att'y Gen.*, 549 F.3d 235, 243–44 (3d Cir. 2008).

The statute is clear that nonpayment of an asylum fee affects *only* asylum claims. The initial asylum fee applies when a noncitizen "files an application *for asylum under section 1158*." 8 U.S.C. § 1802(a) (emphasis added). The annual asylum fee similarly applies to a noncitizen's "application *for asylum*." 8 U.S.C. § 1808(a) (emphasis added). And Congress knew how to impose fees on other forms of relief when it chose to—for example, the OBBBA separately addresses adjustment-of-status fees, cancellation-of-removal fees, and temporary-protected-status fees. Pub. L. No. 119-21, §§ 100002(a), 100009(a), 139 Stat. 72.

In October 2025, EOIR conceded what the statute makes clear and represented that going forward EOIR's policy would "clarify that asylum fees are *not* required for applications for CAT/withholding under removal under [the] INA." *See* October 28 Hr'g Tr. 41:10–13 (emphasis added). A couple of weeks later, EOIR's counsel confirmed that EOIR intended to "post public notice, which will clarify that *asylum* fees are not required for applications for CAT/withholding of removal under [the] INA." Barron Decl. Ex. B (emphasis in original).

For reasons that remain unexplained, in the January 2 Memo and the template order EOIR reversed its position. The January 2 Memo sets out the fee framework without acknowledging that Form I-589 encompasses these distinct forms of relief, only one of which is subject to the asylum fees. Then, EOIR directed immigration judges to a template order stating that once a person's "Form I-589, Application for Asylum *and for Withholding of Removal*, has been pending for 365

27

days," a "[f]ailure to timely pay the fee may result in a finding that you have abandoned or withdrawn your *application* and may result in *its* denial or dismissal." ECF 85-1 at 4–5 (emphases added).[12] That position exceeds EOIR's statutory authority because it directs immigration judges to dismiss non-asylum claims for failure to pay the annual asylum fee.

Independently, it is arbitrary and capricious for EOIR to furnish immigration judges and asylum applicants with incorrect legal instructions, particularly when those legal instructions risk existential consequences for vulnerable individuals. "When sanctions are drastic … elementary fairness compels clarity." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1329, 1334 (D.C. Cir. 1995) (finding due process violation when agency "struggle[d] to provide a definitive reading of the regulatory requirements"). And thus far EOIR has failed to offer any argument for why the instructions in the template order are correct; instead, it has purported not to take *any* position on the statutory consequences of nonpayment for INA withholding and CAT claims. ECF 87.

In protesting that the template order is clear (which so far is EOIR's only substantive response in defense of the template order), EOIR refuses to discuss the sentence that is misleading. EOIR defends the "order's reference to Form I-589" and its statement that "all aliens with an asylum application" must pay the fee. MTD 23–24. But EOIR ignores that: (1) applicants seeking withholding or CAT protection are *required* to use Form I-589 to apply for those other forms of relief; and (2) the order separately states that the consequence for nonpayment will be "denial or dismissal" of the entire "application"—not just asylum claims. ECF 85-1. Nor is it any answer that immigration judges "may alter the template" to "communicate with greater specificity." MTD 25. The problem is not a lack of specificity or clarity; it is that the template order tells immigration

---

[12] EOIR's payment receipts for the initial and annual asylum fees also appear to reflect acceptance of the respondent's applications for both asylum and withholding of removal. *See* Hasty Decl. Exs. 2 (initial asylum fee receipt), 3 (annual asylum fee receipt).

judges and applicants that nonpayment of asylum fees will result in the denial of an applicant's entire Form I-589 application, including INA withholding and CAT claims, and therefore misrepresents the lawful consequences of nonpayment.

Moreover, by the time EOIR issued the January 2 Memo, it was indisputably aware of the risk that immigration judges would inappropriately reject INA withholding and CAT claims for nonpayment of the annual asylum fee. This Court's opinion in October 2025 specifically noted immigration judges' denials of withholding and CAT claims for nonpayment. ECF 54 at 16. As explained above, EOIR's counsel even acknowledged the problem and promised that the agency would fix it. *See supra* at 5; Barron Decl. Ex. B. In other words, EOIR knew that immigration judges were imposing consequences for nonpayment that were not authorized by Congress, was told about it by this Court, represented to ASAP and the Court that the agency would fix the problem, and then reversed itself and chose to make the problem worse, without explanation. That is not reasoned decisionmaking. *Centro Legal*, 524 F. Supp. 3d at 929.

### 2. The merits of this claim are ripe for review.

The merits of this claim are also ripe for review on summary judgment. The Court previously reserved judgment on the merits of ASAP's challenge to the template order because there was not yet evidence "of an immigration judge denying [non-asylum] claims for failure to pay the" asylum fee, ECF 94 at 15–16, which the Court reasoned meant that ASAP could not show irreparable harm at the preliminary-injunction stage. But for purposes of summary judgment, ASAP does not need to show irreparable harm to prevail. The order's inconsistency with the statute is reason enough to hold that EOIR's policy is unlawful and to vacate the policy.

In any event, since the Court's decision denying preliminary relief, ASAP identified multiple cases where an immigration judge denied the applicant's claims for withholding of removal and CAT protection as abandoned after the applicant allegedly failed to pay the annual asylum fee.

Reddy 6th Suppl. Decl. ¶ 16; *see also* Hasty Decl. ¶¶ 4, 6, 13 & Ex. 1.  Thus, the consequences of the legally erroneous template order are not hypothetical; EOIR's instructions to immigration judges are already causing the wrongful denial of non-asylum claims.

> **3.    In considering this claim, the Court can (and should) consider the government's November 10, 2025 representation to ASAP in connection with this litigation.**

In considering ASAP's challenge to EOIR's application of the asylum fees to INA withholding and CAT protection claims, the Court can consider the November 10, 2025 email in which EOIR's counsel represented to ASAP that EOIR intended to publicize the opposite interpretation (though the Court need not do so to hold that EOIR's January 2 Memo and template order are unlawful).  *Supra* at 5; Barron Decl. Ex. B.  Counsel's email is properly before the Court for two reasons: (1) it is part of the administrative record; and (2) even if it were not, in circumstances like these courts can consider extra-record evidence that bears directly on the agency's conduct.

*a.*  The APA requires judicial review on "the whole record."  5 U.S.C. § 706.  The whole record is "the full administrative record that was before the [agency] at the time [it] made [its] decision."  *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).  And it is well-established by "district courts in the Fourth Circuit" that the "whole administrative record includes pertinent but unfavorable information, and an agency may not exclude information on the ground that it did not 'rely' on that information in its final decision."  *Goose Creek Physical Med., LLC v. Becerra*, 2024 WL 942918, at *4 (D.S.C. Mar. 5, 2024) (quotation marks omitted).  Where an agency "exclude[s] documents, either purposefully or inadvertently, that were plainly relevant" to its decision, the ordinary presumption that the agency properly compiled the record gives way. *Otsuka Pharm. Co. v. Burwell*, 2015 WL 1579127, at *3 (D. Md. Apr. 8, 2015).

Here, EOIR issued the January 2 Memo as a direct response to this litigation—EOIR explicitly referenced this case and EOIR's prior litigation strategy. *See* ECF 71-1 at 1–2 & n.5. Accordingly, both the filings in this case and EOIR's communications to ASAP about EOIR's policies are "plainly relevant" to the agency's decision. *Otsuka*, 2015 WL 1579127, at *3. An administrative record that includes the January 2 Memo but excludes key communications that preceded it presents a misleading and one-sided picture of the agency's decisionmaking process.

*b.* Even if the email were not part of the administrative record, "consideration of extra-record evidence is appropriate in some APA cases." *CASA, Inc. v. Noem*, 2025 WL 3514378, at *15 (D. Md. Dec. 8, 2025). For example, a court can review extra-record evidence where additional information would "provide helpful context," "assist the court in determining whether the agency failed to consider relevant factors," or "where the record's integrity has been impugned." *Id.* (quotation marks omitted).

Here, the email supplies essential context for EOIR's decision by confirming that EOIR changed its mind. That goes to the heart of what EOIR considered (or failed to consider) before it adopted the January 2 Memo and the template order. And the certified record is suspect because it lacks any acknowledgment of EOIR's change in position or explanation for why EOIR abandoned its prior acknowledgment that the OBBBA's asylum fees are inapplicable to INA withholding and CAT claims. At minimum, the email is the kind of contemporaneous agency communication that courts can consider in evaluating APA challenges where the agency's own filings leave a conspicuous gap. *CASA*, 2025 WL 3514378, at *16 (granting discovery of extra-record evidence "because the administrative records alone d[id] not 'address the complete scope' of [the plaintiff's] APA claims").

31

### D.    ASAP is entitled to summary judgment on Counts 1 and 2.

EOIR is also improperly assessing the asylum fee retroactively—both by requiring payments from applicants whose cases were pending on July 4, 2025, and by counting pre-July 4 time toward the point at which a fee becomes due. *See* Am. Compl. ¶¶ 128–34; ECF 29-1 at 20–28. A statute does not apply retroactively unless Congress makes that result clear. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 283 (1994). When "Congress has [not] expressly prescribed [a] statute's proper reach," a court "presume[s] that the statute does not apply" retroactively. *Jaghoori v. Holder*, 772 F.3d 764, 770 (4th Cir. 2014) (citation omitted). This rule has special force in immigration cases, where retroactive changes can expose individuals to severe consequences including removal. *See INS v. St. Cyr*, 533 U.S. 289, 314–26 (2001).

Under this framework, asylum seekers who applied before July 5, 2025 do not owe the annual fee. Nothing in Section 1808 says the law reaches those individuals. If Congress wanted that outcome, "it could have said so in words far simpler than those that it wrote." *Biden v. Texas*, 597 U.S. 785, 798 (2022). Instead, Congress indicated the opposite: It simultaneously imposed an initial filing fee that even the government agrees does not apply retroactively, plus, with similar statutory language, an annual fee that is due every year on the anniversary of when the initial fee was due. *See* 8 U.S.C. §§ 1802(a), 1808(a). The close link between the two fees is strong evidence that the annual fee does not apply retroactively.

EOIR's counterargument mistakes a technical provision setting the baseline for inflation adjustments with a statement about retroactivity. EOIR argues that Congress defined an annual fee for fiscal year 2025 of $100, yet there would be "no fee collections in FY 2025" unless some asylum seekers who applied before 2025 owed the fee. ECF 43 at 12. But Congress specified a fee "for" 2025 only to establish the baseline level of the fee that would then be adjusted for inflation in the future years when it is due. *See* 8 U.S.C. § 1808(b)(2).

32

Despite this lack of clear authorization, EOIR is applying the fee retroactively. Before July 4, 2025, filing for asylum did not trigger any recurring annual payment obligation. Under the agencies' view, that earlier act of filing now carries a new duty to pay annual fees, backed by potential immigration consequences for nonpayment. That is what *Landgraf* forbids without a clear statement: attaching "new legal consequences to events completed before [the statute's] enactment." 511 U.S. at 269–70. The problem is acute because applicants cannot force the government to adjudicate their cases promptly—lengthy, years-long delays are common and applicants have no control over the agency's delays. And withdrawing an asylum application may expose them to loss of status, family separation, or removal. *See supra* at 11. Imposing the fee also upsets reliance interests of applicants who filed for asylum when there was no fee requirement. Given the lack of clear statutory authority, that is impermissible. *See Landgraf*, 511 U.S. at 269–70.

Separately, EOIR incorrectly counts the time an asylum application was pending before July 5 when measuring how long an application was pending for purposes of assessing the annual fee and determining the annual due date going forward. Section 1808 authorizes a fee only for each calendar year that an application "*remains* pending." 8 U.S.C. § 1808(a) (emphasis added). The statute's present-tense wording is forward-looking. *See Hicks v. Frame*, 145 F.4th 408, 419 (4th Cir. 2025) ("[A] statute's undeviating use of the present tense is a striking indicator of its prospective orientation." (quotation marks, citation, and alteration marks omitted)). Congress did not say that fees accrue during the time an application *had been* pending before enactment. And at minimum, it did not say so "unequivocal[ly]." *Jaghoori*, 772 F.3d at 770.

**E.      In the alternative, ASAP is entitled to summary judgment on Count 4.**

Count Four need not occupy the Court long. This Court has already recognized that the challenged policies constitute final agency action, ECF 94 at 6–7, which renders Count Four's alternative pleading unnecessary. But if EOIR is correct that EOIR's January 2 Memo was not

final—and therefore not subject to APA review—the consequence is not that it escapes scrutiny. It is that EOIR has failed to do what the statute commands. The OBBBA directs that the Attorney General "shall require the payment of" the annual asylum fee. 8 U.S.C. § 1808(a). If the January 2 Memo is a legal nullity, then EOIR and the Attorney General have unlawfully withheld the agency action that the statute requires, and this Court should direct them to take it. Defendants cannot dodge APA review by taking action that would be arbitrary, capricious, or unlawful and simply refusing to finalize the policy while imposing real-world harm on asylum applicants.

**II.     The proper remedy is to vacate EOIR's policies, issue a permanent injunction, and enter a declaratory judgment.**

**A.     The Court should vacate EOIR's policies.**

If ASAP prevails on any APA claim, the proper remedy is vacatur of the challenged policies. The APA directs reviewing courts to "hold unlawful and set aside" agency action that is contrary to law or arbitrary and capricious. 5 U.S.C. § 706(2). The Fourth Circuit accordingly treats vacatur as the ordinary remedy for APA error. *See Ergon-W. Va., Inc. v. EPA*, 980 F.3d 403, 422 (4th Cir. 2020). Thus, if the Court concludes that ASAP prevails on any of its APA theories, it should vacate EOIR's policies that embody the unlawful actions.

**B.     The Court should enter a permanent injunction.**

The Court should also enter permanent injunctive relief. "[T]he APA explicitly contemplates that injunctive relief may be proper when an APA violation is identified." *Ramirez v. ICE*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021); *see* 5 U.S.C. § 703. Injunctive relief is necessary here because EOIR's policies have already caused harm in the form of adverse immigration consequences that vacatur alone cannot remedy. Injunctive relief is also necessary because EOIR has repeatedly insisted—wrongly—that the asylum fee is self-executing and that immigration judges may continue to impose it even if this Court vacates the policies implementing it. *See supra* at 5–

6. EOIR even criticized immigration judges for pausing their enforcement of the fee after this Court stayed the July 17 Memo, admonishing them that this Court's order had "no practical impact." ECF 71-1 at 5.

To remedy harms that EOIR's policies have caused to date and avoid a game of whack-a-mole where the government continues to impose the fee unlawfully despite vacatur, the Court should enter targeted permanent relief as follows:

- If ASAP prevails on Count One, Defendants should be barred from imposing the annual asylum fee—whether by ordering payment or penalizing nonpayment—on ASAP members who applied before July 4, 2025.

- If ASAP prevails on Count Two, Defendants should be barred from imposing the fee on ASAP members based on time an application was pending before July 4, 2025.

- If ASAP prevails on Count Three, Defendants should be barred from:

   - imposing the fee or imposing adverse consequences for nonpayment on ASAP members unless and until EOIR implements the fee in a manner that complies with the APA;

   - imposing adverse consequences on ASAP members who have timely paid the annual asylum fee to USCIS or EOIR through any method of payment.

- If ASAP prevails on Count Five, Defendants should be barred from requiring ASAP members to pay the initial asylum fee or annual asylum fee for INA withholding or CAT protection claims or from imposing adverse consequences on their INA withholding or CAT claims for nonpayment of the initial or annual asylum fee.

- If ASAP prevails on any of its claims, Defendants should be ordered to reinstate the status quo ante for any ASAP members who received wrongful removal orders.

Permanent injunctive relief is appropriate when a plaintiff shows irreparable injury, the inadequacy of remedies at law, that the balance of hardships warrants equitable relief, and that the public interest would not be disserved. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Each requirement is satisfied here.

35

EOIR's unlawful fee regime causes irreparable injury. Many ASAP members live on the financial margins. A $100 demand on a few days' notice means skipping groceries, delaying rent or utilities, or going without other essentials. *See* ECF 73-1 at 24–25; ECF 82 at 10–12; *see Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 31–32 (D.D.C. 2001) (finding irreparable economic harm when plaintiff stated she would not be able to pay utility bills and rent). For applicants who cannot pay—or who miss a deadline because the notice was too short—the consequences are graver still: denial of asylum, detention, separation from family, and removal to countries where they face persecution, torture, or death. *See* ECF 73-1 at 25–26. And even some applicants who *did* pay may still face adverse immigration consequences under EOIR's policy. *See* ECF 29-2 ¶ 56; ECF 73-8 ¶ 11; ECF 82-3 ¶ 14. Simply put, "removal constitutes irreparable harm." ECF 54 at 16. So does immigration detention. *See Cortez*, 318 F. Supp. 3d at 1139. And though the Court previously held that EOIR's legally flawed template order had not yet resulted in irreparable harm, there is now evidence that the template order already has and will continue to cause such harm absent relief. *See supra* at 11.

No legal remedy can adequately address these irreparable harms. Defendants themselves have taken the position that this suit cannot yield a monetary remedy for unlawfully exacted asylum fees. MTD 27. And as for Count Three, it is even less likely that asylum applicants who, for example, had to incur late fees on other bills to pay their asylum fee on unreasonably short notice will be able to recover those damages from the government. *See Maryland v. Department of Agriculture*, 770 F. Supp. 3d 779, 813 (D. Md. 2025) (a plaintiff may establish irreparable harm when damages are unavailable because of obstacles such as sovereign immunity). And in any event, money would not repair the loss of asylum or delays in the adjudication of an asylum application, restore time spent in detention, revive an INA withholding or CAT claim denied without a merits

36

adjudication, or compensate an applicant who had to go without food or other necessities to comply with an unlawful fee demand. *See* ECF 73-1 at 23–25; ECF 82 at 10–12.

The balance of hardships and the public interest also favor permanent relief. These factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The public has no legitimate interest in the continued enforcement of an unlawful policy; to the contrary, the public interest favors requiring the government to act within the law. *See Legend Night Club v. Miller*, 637 F.3d 291, 302–03 (4th Cir. 2011). The government suffers no cognizable hardship from being required to comply with the APA and administer the asylum-fee provisions lawfully. *See* ECF 73-1 at 25. Moreover, before its unexplained reversal in January, EOIR promised more than once that asylum applicants would get 30 days' notice before any adverse action for nonpayment and that EOIR would ensure that applicants would not lose their applications for CAT protection and INA withholding for failure to pay the annual asylum fee. *See supra* at 5, 18. Similarly, EOIR committed that applicants who timely pay the fee will not suffer adverse consequences.[13] The government cannot claim harm from being held to those representations.

Defendants' remaining arguments against injunctive relief fail. *First*, ASAP is not asking this Court to enjoin a federal statute. *See* MTD 25–27; ECF 81 at 20–22. ASAP seeks ordinary relief that the APA authorizes: an injunction against Defendants' *unlawful implementation* of a statute. Under the injunction that ASAP seeks, Defendants would be free to implement the fee— so long as they do so in a manner that complies with the APA.

---

[13] *See* ECF 44-1 ¶ 11 ("To the extent that any aliens have made anticipatory or advance payments to EOIR for the AAF, those payments will be applied to the alien's owed fees, as appropriate, once the AAF billing notices are issued."); Oct. 28 Hr'g Tr. 43:8-21 (Ms. Iqbal: "[EOIR is] willing to credit fees . . . [s]o there is a possibility that the $100, if paid erroneously or whatever the case, can be credited in other ways.").

Nor would that relief violate the separation of powers.  It would vindicate another federal statute: the APA.  Defendants cite no authority suggesting that an injunction preventing agency officials from implementing a statute in a manner that violates the APA, as here, is improper.  Their lone case, *Family Plan. Ass'n of Me. v. HHS*, 803 F. Supp. 3d 195 (D. Me. 2025), is irrelevant. There, the court declined to enjoin enforcement of a statute after it rejected the argument that the statute was unconstitutional.  *Id.* at 207.  Here, ASAP has not asked the Court to hold Section 1808 unconstitutional or otherwise prevent Defendants from implementing it in a lawful manner.

*Second*, Section 1252(f)(1) is inapposite.  *See* MTD 25–26.  Section 1252(f)(1) bars lower courts from "enjoin[ing] or restrain[ing] the operation" of 8 U.S.C. §§ 1221–1232—provisions that concern the removal process—except within individual proceedings.  To determine whether Section 1252(f)(1) forecloses an injunction against government action, courts ask whether the challenged action derives its authority from one of those covered provisions.  *See, e.g.*, *Texas v. DHS*, 123 F.4th 186, 209–10 (5th Cir. 2024).  ASAP does not seek to enjoin any of the provisions listed in Section 1252(f)(1).  ASAP seeks to enjoin Defendants' unlawful implementation of 8 U.S.C. § 1808—a provision that does not appear in Section 1252(f)(1)'s list.

The fact that enjoining Defendants' fee implementation might incidentally affect the outcome of some removal proceedings does not change the result: "Section 1252(f)(1) does not prohibit an injunction simply because of collateral effects on a covered provision."  *Al Otro Lado v. EOIR*, 138 F.4th 1102, 1125 (9th Cir. 2025).  Thus, an injunction "prohibit[ing] the application of" a rule "concern[ing] asylum eligibility" is proper "[e]ven though asylum eligibility may change the outcome of a removal proceeding under [Sections 1221–1232]."  *Id.* at 1126.[14]

---

[14] The Supreme Court granted certiorari in *Al Otro Lado*, but not on this issue.  *See Mullin v. Al Otro Lado*, No. 25-5 (U.S. Nov. 17, 2025).  The government did not seek review of the Ninth Circuit's Section 1252(f)(1) holding.

**C.      The Court should enter a declaratory judgment.**

The APA expressly authorizes declaratory relief.  5 U.S.C. § 703.  Here, declaratory relief is warranted for many of the same reasons as an injunction—Defendants have insisted that the annual asylum fee is self-executing and that immigration judges may continue to impose it regardless of the Court's decision.  *Supra* at 5–6, 35.  Declaratory relief would make clear that EOIR is wrong and help ensure that the Court's order has its intended effect in the real world.

Specifically, the Court should declare that:  (1) the annual asylum fee does not apply retroactively to any applicant who sought asylum before July 4, 2025 or the time that their applications were pending before that date; (2) Section 1808 is not self-executing and Defendants lack authority to require applicants to pay the annual asylum fee or impose consequences for nonpayment until EOIR adopts a new policy implementing the fee in a manner that complies with the APA; (3) Defendants lack authority to impose adverse consequences on applicants who timely paid the fee to USCIS or EOIR through any method of payment; (4) the initial and annual asylum fees do not apply to claims for INA withholding or CAT protection; (5) Defendants lack authority to deny claims for INA withholding or CAT protection based on nonpayment of the annual asylum fee; and (6) any applicant who received a wrongful removal order as a result of EOIR's policies is entitled to relief.

**III.      The Court should deny the government's motion to dismiss.**

The government's motion to dismiss should be denied.  The motion rests on a scattershot set of jurisdictional objections this Court has largely rejected, and none of which has merit.

**A.      ASAP has standing.**

As the Court has already held, ASAP has standing.  *See* ECF 82 at 2.  ASAP's members are subject to the fee implemented by the January 2 Memo and template order and are injured by EOIR's implementation, including by the financial hardship of having to come up with $100 with

little or no notice, the risk they will miss the deadline and lose their statutory right to asylum, the risk that nonpayment will wrongly deprive them of their right to seek INA withholding or CAT protection, and the unnecessary anxiety and confusion these risks impose. *Id.*; *supra* at 11. Those injuries would disappear if the January 2 Memo and template order were vacated and their enforcement enjoined. ASAP therefore has standing. *See Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

The government's argument is that the January 2 Memo and template order have no legal effect. *See* MTD 8 n.5, 11–13. As ASAP explained before, that is a final-action argument, not a standing argument. *See* ECF 82 at 3.[15]

### B.      ASAP has a cause of action under the APA.

Defendants' next argument, that ASAP lacks a cause of action under the APA, fails for the reason this Court already has given. *See* ECF 94 at 6–8. Namely, ASAP challenges final agency action "for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

### 1.      ASAP challenges final agency action.

This Court has already held that EOIR's January 2 Memo constitutes final agency action. ECF 94 at 6–7. The same reasoning applies to the template order. The government disputes only whether these actions have legal effect—ignoring both this Court's prior holding and the template order's real-world consequences.

The January 2 Memo has legal effect because it "expressly disclaims entitlement to payment" for certain applicants, "states that EOIR will not require payment … until an immigration judge issues an order setting a deadline," and thereby "functions not merely as setting internal

---

[15] The government also reincorporates its associational-standing argument, another argument this Court already rejected—twice. MTD 14–15; *see* ECF 54 at 7–8; ECF 94 at 5–6. The government does not explain why the Court should reconsider its earlier (correct) decisions.

policies but rather expressly benefits certain applicants by dictating EOIR's position." ECF 94 at 7. The government does not engage with this reasoning.

The template order also has binding legal effect. EOIR drafted it, distributed it to immigration judges throughout the country, and tied fee collection to its issuance. Immigration judges are using it systematically to impose payment deadlines—and multiple immigration judges have relied on it to deny an applicant's asylum, withholding, and CAT claims as abandoned for nonpayment. When "an agency acts as if a document issued at headquarters is controlling in the field … [and] bases enforcement actions on the policies or interpretations formulated in the document," that document is "for all practical purposes 'binding.'" *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021 (D.C. Cir. 2000). The template order's boilerplate disclaimer cannot overcome its real-world effect. ECF 94 at 7 (quoting *Appalachian Power*, 208 F.3d at 1023).

The January 2 Memo also has legal effect because without it, the annual asylum fee is unenforceable at EOIR. Section 1808 directs the Attorney General to "require the payment of a fee" but does not make the fee self-executing or specify consequences for nonpayment. 8 U.S.C. § 1808(a). EOIR's implementing documents supply the necessary operational details. That is why immigration judges did not require payment after the Court entered a stay in October 2025—and why they began doing so again immediately after the January 2 Memo issued. ECF 94 at 7.

The government's reliance on cases involving truly non-binding agency communications is misplaced. The cases it cites involve statements that "tread[ed] no new ground," *Delaware Valley Regional Center v. DHS*, 106 F.4th 1195, 1206 (D.C. Cir. 2024), imposed "no obligation[] or prohibition," *Ass'n of Flight Attendants v. Huerta*, 785 F.3d 710, 716 (D.C. Cir. 2015), or merely summarized existing law, *Golden & Zimmerman, LLC v. Domenech*, 599 F.3d 426, 429 (4th Cir.

41

2010).  The January 2 Memo and template order create new obligations, specify consequences for nonpayment, and are being enforced in immigration courts across the country.

### 2.    ASAP members lack an adequate alternative remedy.

ASAP members also lack an adequate alternative remedy.  The government says they have one because if they fail to pay the fee and lose their claims, they can appeal.  MTD 7–8.  This Court correctly rejected that argument because the proposed remedy "would require applicants to risk the serious penalty of removal."  ECF 94 at 8 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 153 (1967)).  The government does not engage with that reasoning.

Indeed, the government's argument has gotten even weaker since the Court's prior ruling.  As discussed above, the same agency pointing to BIA appeals as an adequate alternative remedy recently issued an interim final rule making summary dismissal the default for those appeals and compressing filing deadlines from 30 days to 10.  *Supra* at 21.

### C.    Title 8 does not foreclose this action.

The government invokes four statutory provisions in Title 8 that it says foreclose ASAP's claims against the Justice Department defendants—Sections 1252(b)(9), 1252(f)(1), 1252(a)(4), and 1252(a)(5).  None bars this suit.

***Section 1252(b)(9).***  Section 1252(b)(9) does not apply.  Section 1252(b) applies only "[w]ith respect to review of an order of removal."  Paragraph (9)—which provides that "[j]udicial review of all questions of law and fact arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section"—therefore similarly applies only to review of an order of removal.  8 U.S.C. § 1252(b).  The Supreme Court has confirmed that the provision "is certainly not a bar where, as here, the parties are not challenging any removal proceeding."  *Regents*, 591

42

U.S. at 19.[16] The Fourth Circuit recently held the same: "On [its] face," Section 1252(b) "appl[ies] only to challenges to an 'order of removal'" and therefore the provision "do[es]n't apply" when "[t]here is no such order." *Suri v. Trump*, 2025 WL 1806692, at *8–9 (4th Cir. July 1, 2025).

Here, ASAP challenges no removal order and its claims do not arise from any "action taken or proceeding brought to remove an alien." 8 U.S.C. § 1252(b)(9). ASAP challenges broadly applicable agency policies implementing the annual asylum fee. Courts have consistently declined to apply Section 1252(b)(9) to facial APA challenges like this one. *See Regents*, 591 U.S. at 9, 19; *O.A. v. Trump*, 404 F. Supp. 3d 109, 132 (D.D.C. 2019).

The government's reliance on *Khalil v. President*, 164 F.4th 259 (3d Cir. 2026), is misplaced. That case involved an individual's detention arising from a removal proceeding. Further, the Third Circuit expressly acknowledged it was departing from the Fourth Circuit's approach in *Suri*. *Id.* at 279. And in any event, *Khalil* would not help the government even under the Third Circuit's broader reading because ASAP's suit involves no individual removal proceeding at all.

***Section 1252(f)(1).*** Section 1252(f)(1) does not help Defendants either. That provision is not a basis to dismiss *any* claim because, at most, it limits one potential remedy—an injunction. Section 1252(f)(1) does not "concern[] subject matter jurisdiction." *Biden v. Texas*, 597 U.S. 785, 801 (2022). "By its plain terms, and even by its title, [it] is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999). Here, for every count, ASAP seeks, in addition to an injunction, vacatur under the APA and declaratory

---

[16] Defendants' effort to distinguish *Regents* fails. *See* MTD 5–6. Defendants argue that this case, unlike *Regents*, involves "the process by which removability will be determined." MTD 5–6. But *Regents* itself was a programmatic APA challenge to DACA, a policy about who the government would seek to remove. 591 U.S. at 9–10. The Court drew a line between *individual* removal proceedings and broad policy challenges, hence why the bar "certainly" does not apply when "the parties are not challenging any removal proceedings." *Id.* at 19.

relief.  *See* Am. Compl. ¶ 160; *supra* at 34–39.  "Section 1252(f)(1) is inapplicable to vacatur because … vacatur is different from injunctive relief."  *Texas v. United States*, 126 F.4th 392, 419 n.40 (5th Cir. 2025); *accord Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 990 (9th Cir. 2025) (same); *Make the Rd. New York v. Noem*, 2025 WL 3563313, at *17 (D.C. Cir. Nov. 22, 2025) (Section 1252(f)(1) is inapplicable to requests for vacatur or "declaratory judgments" (quotation marks omitted)).  Moreover, as discussed, Section 1252(f)(1) is not a basis to dismiss even the injunctive claims in this case.  *See supra* at 38.

*Sections 1252(a)(4) and (a)(5).*  The government briefly invokes two more provisions— Section 1252(a)(4) and (a)(5).  Section 1252(a)(4) provides that "a petition for review filed with an appropriate court of appeals … shall be the sole and exclusive means for judicial review of any cause or claim under" CAT.  Section 1252(a)(5) similarly provides that "a petition for review" shall also be "the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of [the Immigration and Nationality Act]."  *See* MTD 3.  Here, ASAP brings no claim under CAT and seeks review of no removal order.

### D.    The government's reliance on *Twombly* is misplaced.

On the merits, the government devotes much of its motion to arguing that ASAP's complaint fails to satisfy the *Twombly* pleading standard, which in APA cases is beside the point.  *See* MTD 15–25.  *Twombly* addresses the sufficiency of a complaint's "factual allegations."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  But "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal" and "[t]he entire case on review is a question of law."  *Am. Bioscience, Inc.*, 269 F.3d at 1083.  "As a result, the sufficiency of the complaint is the question on the merits, and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment."  *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 & n.5 (D.C. Cir. 1993).  In "challenges under

the APA," "[d]ismissal … under the *Twombly-Iqbal* standard … [is] inappropriate." *Johnson v. Sessions*, 2017 WL 1207537, at \*8 (D. Md. Apr. 3, 2017).

Given that an administrative record has been certified, the Court should resolve this case under the ordinary APA standard. *See Marshall County*, 988 F.2d at 1226 n.5 ("It is probably the better practice for a district court always to convert [APA cases] to summary judgment.").[17]

## Conclusion

For these reasons, the Court should grant summary judgment to ASAP. The Court should vacate EOIR's January 2 Memo and template order. To remedy harms EOIR's policies have already inflicted and ensure that Defendants do not disregard the vacatur, as they have already threatened, the Court should enter permanent injunctive and declaratory relief as detailed above. *See supra* at 34–39. The Court should also deny the government's motion to dismiss.

---

[17] If the Court is inclined to dismiss the case under the *Twombly* standard, then ASAP is entitled to and respectfully requests an opportunity to amend its Complaint to add additional allegations in support of its claims. *See Ostrzenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir. 1999).

DATED: June 8, 2026

Respectfully submitted,
*/s/ Andrew G. Barron*

Matt Gregory*
Susan M. Pelletier*
Eric Brooks*
Andrew G. Barron (D. Md. Bar 30311)
Rachel E. Schwab (D. Md. Bar 31646)
GIBSON, DUNN & CRUTCHER, LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 831-6088
mgregory@gibsondunn.com
spelletier@gibsondunn.com
ebrooks2@gibsondunn.com
abarron@gibsondunn.com
rschwab@gibsondunn.com

Conchita Cruz*
Jessica Hanson (D. Md. Bar 31903)
Leidy Perez*
Marcela X. Johnson*
Juan E. Bedoya*
ASYLUM SEEKER ADVOCACY PROJECT
228 Park Ave. S. #84810
New York, NY 10003-1502
Telephone: (646) 647-6779
conchita.cruz@asaptogether.org
jess.hanson@asaptogether.org
leidy.perez@asaptogether.org
marcela.johnson@asaptogether.org
juan.bedoya@asaptogether.org

*Counsel for Plaintiff*

*Admitted pro hac vice

46