# Barron Declaration

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

ASYLUM SEEKER ADVOCACY PROJECT,

Plaintiff,

v.

EXECUTIVE OFFICE FOR IMMIGRATION
REVIEW, *et al.*,

Defendants.

Civil Action No. 1:25-cv-03299-SAG

**Index for Appendix of Materials from the Certified Administrative Record**

| Description | Date | Page |
|---|---|---|
| Certification of EOIR Administrative Record | March 8, 2026 | Appx-000001 |
| EOIR, Policy Memorandum 21-10, *Fees*, https://www.justice.gov/eoir/media/1387741/dl?inline [https://perma.cc/3QRB-ZZYJ] | December 18, 2020 | Appx-000002 |
| EOIR, Policy Memorandum 25-12, *Cancellation of Policy Memorandum 21-24 and Reinstatement of Policy Memorandum 21-10*, https://www.justice.gov/eoir/media/1387736/dl?inline [https://perma.cc/53KC-GXKJ] | January 30, 2025 | Appx-000005 |
| EOIR, Policy Memorandum 25-35, *Statutory Fees Under the One Big Beautiful Bill Act*, https://www.justice.gov/eoir/media/1407326/dl?inline [https://perma.cc/X242-TEBK] | July 9, 2025 | Appx-000007 |
| *EOIR Workload and Adjudication Statistics*, *Total Asylum Applications*, https://www.justice.gov/eoir/media/1344871/dl?inline [https://perma.cc/KS5A-FG8E] | November 18, 2025[1] | Appx-000011 |

---

[1] When Defendants certified the Administrative Record for the Executive Office for Immigration Review ("EOIR"), Defendants provided an index listing the dates for certain documents which do not appear on the face of the documents themselves. Where relevant, Plaintiff lists the dates Defendants used in their respective index.

i

| Description | Date | Page |
|---|---|---|
| *USCIS Data Library*, *All USCIS Application and Petition Form Types (Fiscal Year 2024, Quarter 4)*, [https://perma.cc/CSS5-GFPD] | December 18, 2024 | Appx-000012 |
| EOIR, Policy Memorandum 25-35, *Statutory Fees Under the One Big Beautiful Bill Act*, https://www.justice.gov/eoir/media/1407326/dl?inline [https://perma.cc/X242-TEBK] | July 9, 2025 | Appx-000015 |
| EOIR, Policy Memorandum 25-36 (Amended), *Statutory Fees Under the One Big Beautiful Bill Act*, https://www.justice.gov/eoir/media/1408356/dl?inline [https://perma.cc/Z2PK-Y7NN][2] | July 17, 2025 | Appx-000019 |
| E-mail from Matthew Kelly, Deputy Dir., Off. of Admin., EOIR, to Gregory Radics, Acting Chief, Emp./Lab. Rel. Unit, Off. of Gen. Coun., EOIR, and Mike Tennyson, Acting Assistant Dir., Off. of Admin, EOIR (Nov. 24, 2025, at 13:03 ET) (Email addresses redacted) | November 24, 2025 | Appx-000023 |
| Certification of USCIS Administrative Record | March 5, 2026 | Appx-000024 |
| USCIS Immigration Fees Required by HR-1 Reconciliation Bill, 90 Fed. Reg. 34511 | July 22, 2025 | Appx-000026 |
| U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements, 89 Fed. Reg. 6194 | January 31, 2024 | Appx-000032 |
| DHS, *Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States* | February 11, 2022 | Appx-000239 |

---

[2] When Defendants certified the Administrative Record for EOIR, Defendants provided an index of materials in which the title of Policy Memorandum 25-36 includes the notation "(Amended)," and the URL and permalink provided for this document link to the Amended version of EOIR Policy Memorandum 25-36. However, the document in the Certified Administrative Record for EOIR is not the amended version of EOIR Policy Memorandum 25-36. Plaintiffs include the same document at Appx-000019 that appears in the Certified Administrative Record for EOIR.

| Description | Date | Page |
|---|---|---|
| USCIS, *American Baptist Churches v. Thornburgh (ABC) Settlement Agreement* | Last reviewed/updated September 3, 2009 | Appx-000248 |
| USCIS, Policy Memorandum 602-0114, *Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees* | November 23, 2016 | Appx-000251 |
| USCIS, *Filing Fees*, https://www.uscis.gov/forms/filing-fees | Last updated May 28, 2025 | Appx-000262 |
| USCIS, Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records | January 20, 2025 | Appx-000268 |
| USCIS, Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant | January 20, 2025 | Appx-000282 |
| USCIS, Form I-589, Application for Asylum and for Withholding of Removal | January 20, 2025 | Appx-000301 |
| USCIS, Form I-765, Application for Employment Authorization | January 20, 2025 | Appx-000313 |
| USCIS, Form I-821, Application for Temporary Protected Status | January 20, 2025 | Appx-000320 |
| USCIS, *G-1055, Fee Schedule* | Last updated May 28, 2025 | Appx-000333 |
| USCIS, *G-1055, Fee Schedule* | Last updated July 11, 2025 | Appx-000334 |
| USCIS, Policy Memorandum 602-0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)* | November 15, 2013 | Appx-000336 |
| The Ms. L, Family Reunification Task Force (FRFT) Settlement Agreement | October 16, 2023 | Appx-000345 |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ASYLUM SEEKER ADVOCACY PROJECT,

*Plaintiff*,

*v.*

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et. al*;

*Defendants*.

No. 1:25-cv-03299-SAG

## CERTIFICATION OF ADMINISTRATIVE RECORD

My name is Jamee E. Comans. I am employed with the U.S. Department of Justice ("DOJ"), as the Assistant Director (Acting), Office of Policy, in the Executive Office for Immigration Review. I am responsible for the management and supervision of the Office of Policy. I was appointed to this position on October 5, 2025. I am the custodian of Policy Memorandum (PM) 25-36, *Statutory Fees Under the One Big Beautiful Bill Act* (July 17, 2025), PM 26-01, *Annual Asylum Fee: To Rescind and Cancel Policy Memorandum 25-36* (Jan. 2, 2026), and a copy of the administrative record for PM 25-36 and PM 26-01 for DOJ. I certify that, to the best of my knowledge, information, and belief, the attached index was developed by the personnel who developed PM 25-36 and PM 26-01, contains all nonprivileged documents considered by DOJ, and that these documents constitute the administrative record the agency considered in issuing PM 25-36 and PM 26-01.

Executed this 8th day of March 2026, in Canton, MS.

JAMEE
COMANS

Digitally signed by JAMEE
COMANS
Date: 2026.03.08 21:34:35
-05'00'

Jamee E. Comans
Assistant Director (Acting)



OOD
PM 21-10

Effective: December 18, 2020

To:   All of EOIR
From: James R. McHenry III, Director
Date: December 18, 2020

JAMES
MCHENRY

Digitally signed by JAMES
MCHENRY
Date: 2020.12.18
12:15:20 -05'00'

**FEES**

| | |
|---|---|
| PURPOSE: | Memorialize and update Executive Office for Immigration Review policy regarding biennial fee reviews, fees, and fee waivers |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | Operating Policies and Procedures Memorandum 06-01 |

This Policy Memorandum (PM) supersedes and replaces Operating Policies and Procedures Memoranda (OPPM) 06-01, *Fee Waiver Form.*

## I.    Background

EOIR is authorized by statute, Immigration and Nationality Act (INA) § 286(m), to charge fees for adjudication services "set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." Further, "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.*

Office of Management and Budget (OMB) Circular No. A-25 Revised[1] provides guidance to executive branch agencies regarding the scope and types of activities that may be covered by user fees and how to set such fees. Covering all Federal activities, including agency programs, that convey special benefits to recipients beyond those that the general public receives, it instructs agencies to review user charges for such activities biennially. *See* Circular No. A-25 Revised at sec. 8(e).  A Federal statute also directs an "agency Chief Financial Officer" to "review, on a biennial basis, the fees, royalties, rents, and other charges imposed by the agency for services and things of value it provides, and make recommendations on revising those charges to reflect costs incurred by it in providing those services and things of value." 31 U.S.C. § 902(a)(8).

---

[1] Circular No. A-25 was published in 1959. Circular No. A-25 Revised rescinded and replaced Circular No. A-25 and its accompanying Transmittal Memoranda 1 and 2. *See* OMB Circular A-25, "User Charges," 58 Fed. Reg. 38142, 38144 (July 15, 1993).

EOIR previously fell out of compliance with Circular No. A-25 Revised and 31 U.S.C. § 902(a)(8) regarding the review of its fees on a biennial basis and, until recently, had neither reviewed nor updated its fees in over 30 years.[2] To ensure adherence to the principles of OMB Circular No. A-25 Revised and 31 U.S.C. § 902(a)(8), it is now established EOIR policy to review its fees on a biennial basis. The Office of Policy, in coordination with the relevant components, will be responsible for coordinating these reviews and recommending any appropriate updates.

## II.     Fees and Fee Waivers

EOIR fees are implemented through regulations. INA § 286(j); 8 C.F.R. § 1103.7. The amount of the relevant fee is established specifically by regulation. *See* 8 C.F.R. § 1103.7(b)(1) (fees for appeals to the Board of Immigration Appeals (Board)), (b)(2) (fees for motions to reopen and reconsider), (b)(4)(i) (fees for application forms published by EOIR), and (b)(4)(ii) (fees for application forms published by the Department of Homeland Security (DHS)).[3]

Fees for certain Board appeals and motions are payable online through the EOIR Payment Portal, https://epay.eoir.justice.gov/index. All other fees are payable to DHS. 8 C.F.R. § 1103.7(a)(3).

The availability of fee waivers is also established by regulation. 8 C.F.R. § 1103.7(c). No fee waiver may be granted with respect to the fee prescribed for a DHS form or action that is identified as non-waivable in DHS regulations. *Id.*

The fee waiver request form for the Board is EOIR Form 26A, https://www.justice.gov/eoir/page/file/1237856/download. There is no specific fee waiver request form for applications submitted at the immigration court level.

Although the regulations do not require a written ruling on a fee waiver request, the best practice, consistent with former OPPM 06-01, is for Immigration Judges (IJs) and Appellate Immigration Judges (AIJs) to commit such decisions to writing. IJs and AIJs are also encouraged to rule on fee waiver requests expeditiously to ensure there is no confusion by the parties regarding whether a submitted application has been accepted as filed.

Each fee waiver request is assessed on its own merits, and EOIR has no policy directing the automatic grant or denial of a fee waiver request. IJs and AIJs retain independent judgment and discretion in assessing fee waiver requests. 8 C.F.R. §§ 1003.1(d)(1)(ii), 1003.10(b).

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case.

---

[2] On December 18, 2020, EOIR published a final rule altering its fees for the first time since 1986. *See Executive Office for Immigration Review; Fee Review*, 85 *Fed. Reg.* 82750 (Dec. 18, 2020).

[3] EOIR publishes application forms EOIR-40, EOIR-42A, and EOIR-42B, in addition to various appeal forms used by the Board, and it sets the fees for those forms by regulation. 8 C.F.R. § 1103.7(b)(1)-(4)(i). All other application forms adjudicated by EOIR—*e.g.* I-191, I-485, I-589, I-601, I-751, I-881—are published by DHS, and DHS sets the fees, if any, for those forms. 8 C.F.R. § 1103.7(b)(4)(ii).

000353

**Appx-000003**

Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

000354

**Appx-000004**



OOD
PM 25-12
Effective: January 30, 2025

To:    All of EOIR
From:  Sirce E. Owen, Acting Director
Date:  January 30, 2025

SIRCE
OWEN

Digitally signed
by SIRCE OWEN
Date: 2025.01.30
16:48:15 -05'00'

## CANCELLATION OF POLICY MEMORANDUM 21-24 AND REINSTATEMENT OF POLICY MEMORANDUM 21-10

| | |
|---|---|
| PURPOSE: | Rescind and Cancel Policy Memorandum 21-24 and Reinstate Policy Memorandum 21-10 |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | Policy Memorandum 21-24 |

On June 7, 2021, EOIR issued Policy Memorandum (PM) 21-24, rescinding PM 21-10, *Fees*. The rescission was putatively done to be "consistent" with a partial injunction[1] granted regarding a then-recent EOIR rulemaking and a pair of Executive Orders (EOs). However, PM 21-10 itself neither set nor changed any fees and the rulemaking subsequently subject to a partial injunction was referenced only in passing in a footnote; rather, the point of PM 21-10 was to reiterate the applicable law regarding EOIR fees and EOIR's commitment to adhering to that law. Moreover, the injunction applied only to some—but not all—of the fee increases in the rulemaking, and neither Office of Management and Budget (OMB) Circular No. A-25 Revised, nor 31 U.S.C. § 902(a)(a)(8) was enjoined.[2] In short, the basis[3] for PM 21-24 was dubious, at best, and now that the EOs underlying PM 21-24 have been revoked, there appears to be no further reason to retain it.

Furthermore, PM 21-10 made clear that EOIR's policy was to follow the law, namely 31 U.S.C. § 902(a)(8) and OMB Circular No. A-25 Revised, which mandate a review of EOIR fees on a

---

[1] The partial injunction remains in effect currently, though the underlying case is on appeal. The instant PM has no bearing on, should not be construed as conflicting with, and does not alter any EOIR obligations pursuant to that injunction while it remains in effect. *See* PM 21-14, *Rulemakings and Federal Court Orders* (Jan. 14, 2021); *accord* PM 25-02, *EOIR's Policy Values* at 4-5 (noting that "all EOIR policies are read to be congruent with applicable law, including statutes, regulations, binding case law, and any applicable court orders, and no policy should be construed as being inconsistent with any such source of law").

[2] PM 21-10 was rescinded over four months after the injunction was issued, and its rescission was not required by that injunction.

[3] PM 21-24 was issued by an Acting Director, the validity of whose detail to that position—and, thus, the validity of actions taken during that detail—has been called into question for other reasons. *See* PM 25-04, *Cancellation of Policy Memorandum 21-16* at 2 n.7.

1

biennial basis. Consequently, its rescission left the incorrect and inappropriate impression that EOIR was not required to follow binding statutory law—*i.e.* 31 U.S.C. § 902(a)(8)—and could, in essence, pick and choose which laws it wished to follow.[4] That is unequivocally not the case. It is the policy of EOIR that all employees and contractors are required to follow all applicable laws, even if they personally disagree with them. To the extent PM 21-24—and any other PM or Director's Memorandum issued between February 1, 2021, and January 20, 2025—asserted, either implicitly or explicitly, that EOIR was free to ignore relevant statutes and other laws at its discretion or whim, that was grievously inaccurate.

Accordingly, PM 21-24 is rescinded and cancelled, and PM 21-10 is reinstated.

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

---

[4] EOIR acknowledges that it—with the tacit or express complicity of both the Department of Justice and OMB—has knowingly and willfully failed to adhere to 31 U.S.C. § 902(a)(8) and Circular No. A-25 Revised for most of the past forty years, except for the period between 2017 and 2020. However, a past practice of willfully ignoring an applicable law does not give EOIR a license to ignore any law it wishes in perpetuity.

000356

**Appx-000006**



OOD

PM 25-35

Effective: July 9, 2025

To: All of EOIR
From: Sirce E. Owen, Acting Director
Date: July 9, 2025

SIRCE OWEN
Digitally signed
by SIRCE OWEN
Date: 2025.07.09
08:57:50 -04'00'

## STATUTORY FEES UNDER THE ONE BIG BEAUTIFUL BILL ACT

| | |
|---|---|
| PURPOSE: | Update and supplement EOIR policy regarding fees |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | None |

This Policy Memorandum (PM) updates and supplements PM 21-10, *Fees*.

### I.  Background

On December 18, 2020, EOIR issued PM 21-10, *Fees*, which noted EOIR's statutory authority to set fees to ensure full cost recovery and committed EOIR to reviewing its fees on at least a biennial basis.  PM 21-10 also provided guidance on the adjudication of fee waivers.[1]

More recently, on Friday, July 4, 2025, President Donald J. Trump signed the One Big Beautiful Bill Act ("OBBBA") (H.R.1), which, *inter alia*, introduced or increased numerous immigration-related fees relevant to EOIR and amended the availability of fee waivers in certain instances. Effective immediately, EOIR is implementing the statutorily mandated immigration fees and fee waiver changes established by OBBBA.  To the extent EOIR's current regulations regarding fees and availability of fee waivers are inconsistent with OBBBA, the regulations are superseded by the statute.[2]  *See, e.g.*, *Farrell v. United States*, 313 F.3d 1214, 1219 (9th Cir. 2002) ("It is well-settled that when a regulation conflicts with a subsequently enacted statute, the statute controls and voids the regulation.").

### II.  Key Provisions of OBBBA

First, OBBBA implemented or increased fees for various applications for relief and protection from removal adjudicated in EOIR proceedings, increased fees for appeals before the Board of Immigration Appeals (Board), and increased fees for various types of motions before EOIR.  Of

---

[1] PM 21-10 was rescinded on June 7, 2021, and then reinstated on January 30, 2025.  *See* PM 25-12, *Cancellation of Policy Memorandum 21-24 and Reinstatement of Policy Memorandum 21-10* (Jan. 30, 2025).

[2] EOIR will conduct a future rulemaking to conform its regulations to OBBBA.

000357

1

note, OBBBA introduces a new fee requirement for initial asylum applications and further requires annual fees for every calendar year that an asylum application remains pending.[3]

Importantly, OBBBA does not affect where fees are payable. Fees continue to be payable as noted in PM 21-10 and 8 C.F.R. § 1103.7(a). Moreover, until EOIR updates the fee amounts in its regulations at 8 C.F.R. § 1103.7(b), Immigration Court and Board staff should apply the statutory minimum fee amounts established in OBBBA, which are contained in Section III of this PM below.

Second, OBBBA prohibits certain fees from being waived or reduced. Specifically, pursuant to provisions of OBBBA, the following fees shall not be waived:

- initial asylum application fee (sec. 100002(e));
- annual asylum fee (sec. 100009(d));
- Temporary Protected Status fee (sec. 100006).[4]

OBBBA does not affect the validity of EOIR's fee waiver request form, Form EOIR-26A. Further, the guidance contained in PM 21-10 regarding practices for the adjudication of fee waiver requests remains valid.[5] The Board may also provide further guidance on the adjudication of fee waivers through the issuance of precedential decisions.

Third, OBBBA explicitly authorizes the DHS Secretary and the Attorney General to increase the noted fees by regulation above the amounts provided in OBBBA. Thus, consistent with PM 21-10, EOIR will continue to review its fees on at least a biennial basis, if not more frequently, to determine whether any further fee adjustments are warranted.

Fourth, OBBBA fees are subject to an annual inflation adjustment beginning in fiscal year 2026. Accordingly, EOIR will annually review, implement, and communicate any inflation-based updates needed to comply with OBBBA.

Lastly, Immigration Court and Board staff must ensure that all filings include either the proper fees, proof of payment of the proper fees, or an appropriate and complete fee waiver request form where applicable. Filings that do not comply with the statutory fee requirement shall be rejected.[6]

---

[3] Under OBBBA, motions to reopen based on an underlying asylum application are also now subject to a fee.

[4] OBBBA does not alter EOIR's rule that "[n]o [fee] waiver may be granted with respect to the fee prescribed for a Department of Homeland Security form or action that is identified as non-waivable in regulations of the Department of Homeland Security." 8 C.F.R. § 1103.7(c). Thus, in certain circumstances EOIR may not waive fees for a Form I-485 or a Form I-601. *See* 8 C.F.R. §§ 106.3(a)(3)(iv)(C), (D).

[5] Adjudicators should be mindful of potential fraud or misrepresentations on fee waiver applications, particularly from aliens who have employment authorization and have lived in the United States for many years. Instances of suspected fraud should be referred to EOIR's Anti-Fraud Program.

[6] Until the new asylum fees are fully integrated into existing payment systems, the Immigration Courts will implement temporary measures—*e.g.* possibly authorizing provisional acceptance of an application pending the subsequent submission of the fee—to ensure that aliens have an avenue to pay the required fees and submit applications. All other fees should remain payable through existing payment structures at EOIR or the Department of Homeland Security.

000358

Appx-000008

### III.  EOIR Fees under OBBBA

*Applications for Relief or Protection from Removal*

| Name & Form | Fee Amount |
| --- | --- |
| Adjustment of Status (Form I-485) | $1,500 |
| Asylum (Form I-589) | $100 |
| Annual Asylum Fee | $100 (annually every calendar year that the asylum application is pending) |
| Cancellation of Removal for Certain Permanent Residents (Form EOIR-42A) | $600 |
| Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents (Form EOIR-42B) | $1,500 |
| Suspension of Deportation (Form I-881) | $600 |
| Temporary Protected Status ("TPS") (Form I-821) | $500 |
| Waiver of Inadmissibility (Form I-601) | $1,050 |

*Board Appeals*

| Name & Form | Fee Amount |
| --- | --- |
| Appeal from an IJ decision (Form EOIR-26) | $900, except for bond appeals, which have no fee |
| Appeal from a decision of a DHS officer (Form EOIR-29) | $900 |
| Appeal in a practitioner discipline case (Form EOIR-45) | $1,325 |

000359

Appx-000009

*Motions to Reopen or Reconsider Filed by Aliens*

| Name | Fee Amount |
|---|---|
| Motion to reopen | $900, except no fee if:<br><br>• motions to reopen an in absentia removal order filed in accordance with INA § 240(b)(5)(C)(ii)[7]; or<br>• motions to reopen an in absentia deportation order filed in accordance with former INA § 242B(c)(3)(B) (prior to April 1, 1997) |
| Motion to reconsider | $900 |

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

---

[7] A motion to reopen an in absentia order filed pursuant to INA § 240(b)(5)(C)(i) does require a fee.

000360

4

Appx-000010

# EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
# ADJUDICATION STATISTICS

## Total Asylum Applications[1]



| Fiscal Year | Affirmative Filed | Defensive Filed | Total Filed | Remain Pending[2] |
|---|---|---|---|---|
| 2016 | 12,678 | 70,824 | 83,502 | 410,896 |
| 2017 | 22,017 | 124,505 | 146,522 | 522,968 |
| 2018 | 48,669 | 117,687 | 166,356 | 619,115 |
| 2019 | 61,729 | 155,634 | 217,363 | 782,330 |
| 2020 | 39,563 | 159,408 | 198,971 | 865,508 |
| 2021 | 22,939 | 66,794 | 89,733 | 953,130 |
| 2022 | 23,437 | 243,097 | 266,534 | 1,252,041 |
| 2023 | 12,782 | 500,171 | 512,953 | 1,763,637 |
| 2024 | 11,732 | 898,144 | 909,876 | 2,489,556 |
| 2025 | 40,932 | 833,174 | 874,106 | 2,453,230 |
| 2026 (First Quarter) | 18,770 | 54,316 | 73,086 | 2,403,889 |

Data Generated: January 26, 2026
[1] Total (affirmative and defensive) asylum applications filed and total asylum applications pending in removal, deportation, exclusion, and asylum-only proceedings.
[2] These are the number of pending applications at the end of the Fiscal Year as of the time this data was generated.

**Number of Service-wide Forms**
**By Quarter, Form Status, and Processing Time**
**July 1, 2024 - September 30, 2024**

U.S. Citizenship and Immigration Services

| Category and Form Number | Description | 4th Quarter | | | | | | Fiscal Year - To Date | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Forms Received[1] | Approved[2] | Denied[3] | Total Completions[4] | Pending[5] | Processing Time[6] | Forms Received | Approved | Denied | Total Completions | Pending |
| **TOTAL** | | 3,339,578 | 2,909,621 | 328,526 | 3,265,193 | 9,474,182 | N/A | 12,938,465 | 11,173,641 | 1,227,964 | 12,554,248 | 9,474,182 |
| **Family Based** | | | | | | | | | | | | |
| I-129F | Petition for Alien Fiancé(e) | 10,966 | 6,665 | 3,337 | 10,002 | 23,920 | 5.6 | 43,158 | 56,382 | 12,000 | 68,382 | 23,920 |
| I-130 | Petition for Alien Relative | 229,978 | 186,535 | 25,593 | 212,128 | 2,194,373 | 13.5 | 981,202 | 711,767 | 104,782 | 816,549 | 2,194,373 |
| I-600[7] | Petition to Classify Orphan as an Immediate Relative | 160 | 107 | 48 | 155 | 582 | 6.2 | 690 | 689 | 195 | 884 | 582 |
| I-601A | Application for Provisional Unlawful Presence Waiver | 5,807 | 20,551 | 2,514 | 23,065 | 103,605 | 36.9 | 34,449 | 67,198 | 8,357 | 75,555 | 103,605 |
| I-751 | Petition to Remove Conditions on Residence | 14,910 | 33,469 | 1,330 | 34,799 | 216,280 | 22.0 | 95,180 | 116,444 | 5,595 | 122,039 | 216,280 |
| I-800[8] | Petition to Classify Convention Adoptee as an Immedi | 561 | 476 | 52 | 528 | 515 | 1.6 | 2,310 | 2,260 | 158 | 2,418 | 515 |
| **Employment Based** | | | | | | | | | | | | |
| I-129 | Petition for a Nonimmigrant Worker | 142,999 | 156,384 | 23,320 | 179,704 | 99,966 | 2.3 | 585,863 | 546,088 | 78,245 | 624,333 | 99,966 |
| I-140 | Immigrant Petition for Alien Workers | 57,144 | 38,388 | 5,951 | 44,339 | 108,043 | 7.8 | 226,663 | 160,592 | 20,829 | 181,421 | 108,043 |
| I-526[9] | Immigrant Petition by Alien Investor (Legacy) | - | 903 | 388 | 1,291 | 3,744 | 57.5 | - | 4,305 | 1,591 | 5,896 | 3,744 |
| I-526 | Immigrant Petition by Standalone Investor | 43 | 14 | 14 | 28 | 377 | N/A | 281 | 55 | 20 | 75 | 377 |
| I-526E | Immigrant Petition by Regional Center Investor | 1,038 | 382 | 11 | 393 | 5,850 | N/A | 4,567 | 1,025 | 19 | 1,044 | 5,850 |
| I-765 | Application for Employment Authorization (Asylum) | 457,141 | 371,098 | 48,519 | 419,617 | 283,096 | 0.4 | 1,638,816 | 1,442,478 | 203,278 | 1,645,756 | 283,096 |
| I-765 | Application for Employment Authorization (Adjustme | 150,757 | 181,802 | 20,556 | 202,358 | 154,513 | 3.6 | 739,855 | 711,529 | 127,238 | 838,767 | 154,513 |
| I-765 | Application for Employment Authorization (DACA) | 52,704 | 71,868 | 1,113 | 72,981 | 117,977 | 1.8 | 268,250 | 291,112 | 3,464 | 294,576 | 117,977 |
| I-765 | Application for Employment Authorization (All Other) | 529,741 | 583,362 | 36,059 | 619,421 | 624,931 | 1.5 | 2,137,062 | 2,133,976 | 131,626 | 2,265,602 | 624,931 |
| I-829 | Petition by Investor to Remove Conditions on Perman | 2,008 | 1,532 | 72 | 1,604 | 7,758 | 39.2 | 4,152 | 6,089 | 313 | 6,402 | 7,758 |
| I-924[10] | Application For Regional Center Designation Under th | - | D | D | 13 | D | 112.0 | - | D | H | 29 | D |
| I-956[11] | Application for Regional Center Designation | D | H | D | 58 | 128 | 7.6 | 166 | 256 | 23 | 279 | 128 |
| I-956F | Application for Approval of Investment in a Commerci | 32 | 94 | 25 | 119 | 150 | 6.0 | 241 | 257 | 50 | 307 | 150 |
| I-956G | Regional Center Annual Statement | D | - | - | - | 530 | N/A | 501 | - | - | - | 530 |
| I-956H | Bona Fides of Person Involved in Regional Center Prog | 504 | D | - | D | 5,957 | N/A | 2,786 | D | - | D | 5,957 |
| I-956K | Registration for Direct and Third-Party Promoters | 295 | 92 | - | 92 | 1,104 | N/A | 930 | H | D | 93 | 1,104 |
| **Humanitarian** | | | | | | | | | | | | |
| I-589[12] | Application for Asylum and for Withholding of Remov | 99,232 | 2,608 | 2,182 | 26,800 | 1,344,743 | N/A | 419,825 | 16,932 | 4,600 | 126,660 | 1,344,743 |
| Legalization[13] | Legalization/SAW | D | D | H | 15 | 110 | N/A | 58 | D | H | 61 | 110 |
| I-730 | Refugee/Asylee Relative Petition | 6,656 | 3,634 | 303 | 3,937 | 33,967 | 8.5 | 27,936 | 11,259 | 976 | 12,235 | 33,967 |
| I-817 | Application for Family Unity Benefits | 41 | H | D | 37 | 83 | 3.9 | 168 | 248 | 38 | 286 | 83 |
| I-821 | Application for Temporary Protected Status | 441,433 | 202,466 | 6,916 | 209,382 | 585,873 | 5.6 | 1,034,334 | 878,273 | 22,535 | 900,808 | 585,873 |
| I-821D | Consideration of Deferred Action for Childhood Arriva | 51,813 | 71,774 | 683 | 72,457 | 119,291 | 1.9 | 264,535 | 289,686 | 1,856 | 291,542 | 119,291 |
| I-870[14] | Record of Determination/Credible Fear Worksheet | 4,186 | 1,721 | 1,330 | 7,040 | 5,586 | N/A | 146,304 | 68,906 | 55,586 | 166,893 | 5,586 |
| I-881[15] | App. for Susp. of Deport. or Spec. Rule Cancel. of Rem | 39 | D | D | D | 812 | N/A | 180 | H | D | 24 | 812 |
| I-899[16] | Record of Determination/Reasonable Fear Worksheet | 2,533 | 519 | 1,153 | 2,433 | 235 | N/A | 15,401 | 4,490 | 6,444 | 14,916 | 235 |
| I-914[17] | Application for T Nonimmigrant Status | 7,715 | 2,002 | 343 | 2,345 | 31,648 | 16.5 | 23,754 | 6,178 | 988 | 7,166 | 31,648 |
| I-918[18] | Petition for U Nonimmigrant Status | 18,164 | 1,055 | 2,260 | 3,315 | 396,963 | 43.1 | 70,941 | 17,839 | 7,058 | 24,897 | 396,963 |
| I-929 | Petition for Qualifying Family Member of a U-1 Nonim | 289 | 140 | 38 | 178 | 2,466 | 30.4 | 1,192 | 740 | 157 | 897 | 2,466 |
| **Lawful Permanent Residence** | | | | | | | | | | | | |
| I-485 | Application to Register Permanent Residence or Adjus | 120,643 | 119,802 | 14,035 | 133,837 | 515,225 | 7.7 | 473,464 | 412,475 | 47,496 | 459,971 | 515,225 |
| I-485[19] | Application to Register Permanent Residence or Adjus | 27,686 | 32,418 | 4,800 | 37,218 | 173,752 | 6.9 | 129,814 | 119,028 | 13,485 | 132,513 | 173,752 |
| I-485 | Application to Register Permanent Residence or Adjus | 16,169 | 16,857 | 564 | 17,421 | 80,954 | 13.2 | 67,865 | 41,540 | 2,204 | 43,744 | 80,954 |
| I-485 | Application to Register Permanent Residence or Adjus | 13,636 | 7,441 | 398 | 7,839 | 44,601 | 12.9 | 39,915 | 18,105 | 1,842 | 19,947 | 44,601 |
| I-485 | Application to Register Permanent Residence or Adjus | 34,414 | 30,705 | 740 | 31,445 | 144,620 | 6.0 | 210,498 | 160,054 | 3,727 | 163,781 | 144,620 |
| I-485 | Application to Register Permanent Residence or Adjus | 6,131 | 5,961 | 781 | 6,742 | 48,801 | 7.2 | 32,433 | 27,520 | 3,408 | 30,928 | 48,801 |

001879

Appx-000012

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Citizenship and Nationality** | | | | | | | | | | | | |
| N-336 | Req. for a Hearing on a Decision in Natz. Proceedings | 1,067 | 788 | 546 | 1,334 | 3,340 | N/A | 4,670 | 3,337 | 2,396 | 5,733 | 3,340 |
| N-400[20] | Application for Naturalization (Military) | 4,828 | 4,870 | 401 | 5,271 | 7,454 | 4.7 | 17,934 | 16,253 | 1,719 | 17,972 | 7,454 |
| N-400[20] | Application for Naturalization | 271,180 | 200,398 | 20,105 | 220,503 | 507,412 | 4.7 | 976,192 | 800,896 | 84,695 | 885,591 | 507,412 |
| N-565 | Application for Replacement Naturalization/Citizenshi | 9,055 | 8,823 | 929 | 9,752 | 18,102 | 5.8 | 33,489 | 25,408 | 3,227 | 28,635 | 18,102 |
| N-600[21] | Application for Certificate of Citizenship | 17,932 | 16,386 | 1,255 | 17,641 | 42,458 | 4.4 | 70,267 | 74,888 | 5,310 | 80,198 | 42,458 |
| N-648 | Medical Certification for Disability Exceptions | 17,558 | 18,027 | - | 18,027 | 1,048 | N/A | 79,250 | 81,041 | - | 81,041 | 1,048 |
| **Other** | | | | | | | | | | | | |
| I-90 | Application to Replace Permanent Resident Card | 192,920 | 233,454 | 7,717 | 241,171 | 293,335 | 1.3 | 739,000 | 875,182 | 35,248 | 910,430 | 293,335 |
| I-102 | Application for Replacement/Initial Nonimmigrant Arr | 909 | 584 | 257 | 841 | 1,240 | 2.9 | 3,855 | 3,391 | 1,268 | 4,659 | 1,240 |
| I-131 | Application for Travel Document | 20,366 | 19,925 | 1,630 | 21,555 | 81,039 | 14.0 | 73,269 | 73,102 | 7,752 | 80,854 | 81,039 |
| I-131 | Application for Travel Document (Advance Parole) | 129,215 | 146,174 | 70,278 | 216,452 | 302,552 | 5.8 | 584,932 | 465,751 | 145,444 | 611,195 | 302,552 |
| I-131 | Application for Travel Document (Parole-in-Place) | 4,515 | 2,872 | 521 | 3,393 | 10,423 | 3.9 | 16,493 | 12,018 | 1,967 | 13,985 | 10,423 |
| I-131[22] | Application for Travel Document (Humanitarian Parol | 4,573 | 1,055 | 2,158 | 3,498 | 42,083 | N/A | 13,520 | 7,071 | 5,837 | 14,038 | 42,083 |
| I-193 | Application for Waiver of Passport and/or Visa | - | D | D | D | 295 | 93.0 | D | 46 | 20 | 66 | 295 |
| I-360 | Petition for Amerasian, Widow(er), or Special Immigra | 37,574 | 20,292 | 1,612 | 21,904 | 181,482 | 2.8 | 143,712 | 86,023 | 5,832 | 91,855 | 181,482 |
| I-539 | Application To Extend/Change Nonimmigrant Status | 69,414 | 57,022 | 6,116 | 63,138 | 63,713 | 2.6 | 253,876 | 224,524 | 26,462 | 250,986 | 63,713 |
| I-824 | Application for Action on an Approved Application or | 5,667 | 13,218 | 1,515 | 14,733 | 17,486 | 6.5 | 32,848 | 43,090 | 4,132 | 47,222 | 17,486 |
| Waivers[23] | Waivers | 35,120 | 8,776 | 3,040 | 11,816 | 396,966 | 9.1 | 129,954 | 42,507 | 10,877 | 53,384 | 396,966 |
| I-290B | Notice of Appeal or Motion | 9,186 | 4,437 | 4,995 | 9,432 | 20,618 | 2.8 | 35,069 | 14,286 | 15,537 | 29,823 | 20,618 |
| **Supplemental Processing** | | | | | | | | | | | | |
| DS-230 (IV)[24] | Immigrant Visas | 134,973 | N/A | N/A | 139,555 | 90,687 | N/A | 524,606 | N/A | N/A | 535,832 | 90,687 |
| EOIR Adjustment[24] | EOIR Adjustment | 3,355 | N/A | N/A | 2,327 | 6,542 | N/A | 13,683 | N/A | N/A | 13,043 | 6,542 |

**Table Key:**

N/A  Not available

D  Disclosure standards not met

H  Replaces the value from which one could deduce the value of D

- Represents zero or rounds to 0.0

**References:**

[1] Forms Received are the number of new applications or petitions received and entered into a case-tracking system during the reporting period.

[2] The number of applications or petitions approved during the reporting period.

[3] The number of applications or petitions that were denied during the reporting period. Outcomes included in this count will vary by benefit type as not all benefit types have all of these outcomes in every reporting period.

[4] Total Completions on the 'Total - All Forms' line are approvals plus denials with three exceptions: N-648 does not break down Approvals and Denials, only Completions; and I-589 and I-131 (Humanitarian Parole) include administratively closed cases in Completions, which are not reported under the Approvals or Denials.

[5] The number of applications or petitions awaiting a decision as of the end of the reporting period. Some actions taken on cases are not reflected in this report such as administrative closures and transfers between offices; thus the total pending counts cannot be calculated using data from previous reporting periods.

[6] Processing times are defined as the number of months it took for an application, petition, or request to be processed from receipt to completion in a given time period. The number of months presented is the median which is the time it took to complete 50% of all the cases processed in the quarter.

[7] Includes I-600A, Application for Advance Processing of an Orphan Petition.

[8] Includes I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country.

[9] This refers to all I-526 form editions that predate Edition 06/01/22.

[10] Form I-924 has been decommissioned. Applicants now use Form I-956 to request or amend USCIS designation as a regional center and Form I-956F to request Approval of an Investment in a Commercial Enterprise. Applicants now use Form I-956G to submit the regional center's annual statement. I-924 approvals may continue to include certain regional center reaffirmations and I-924 denials may continue to include certain regional center terminations.

[11] I-956 approvals may include certain regional center reaffirmations and I-956 denials may include certain regional center terminations.

[12] Data are for affirmatively filed I-589 asylum applications and do not include defensive asylum claims before a DOJ EOIR immigration court. For affirmative I-589s, the "denial" column includes cases where USCIS found the applicant not eligible on the merits of the claim and referred the applicant to an immigration judge. Previous reports did not include referrals in the denied counts. Administratively closed cases are not included in approvals or denials but are included in the total number of completions.

[13] Includes the following applications for persons applying for benefits under the Immigration Reform and Control Act of 1986:  Forms I-687, I-700. I-698, I-690, I-694, and I-695.

[14] Credible fear cases approved indicate fear established. Credible fear cases denied indicate fear not established.  Administratively closed cases are not included in approvals or denials, but are included in total number of completions.

[15] NACARA cases approved indicate a grant of suspension of deportation or special rule cancellation of removal and adjustment of status. Denied indicates USCIS found the applicant not eligible on the merits of the claim and referred the applicant to an immigration judge. Administratively closed and dismissed cases are not included in approvals or denials, but are included in total number of completions.

[16] Reasonable fear cases approved indicate fear established. Reasonable fear cases denied indicate fear not established. Administratively closed cases are not included in approvals or denials, but are included in total number of completions.

001880

[17] Includes I-914A, Application for Family Member of T-1 Recipient.

[18] Includes I-918A, Petition for Qualifying Family Member of U-1 Recipient. Processing times shown are from initial filing to Bona Fide Determination (BFD) Review.

[19] Starting in Fiscal Year 2023, special immigrants adjusting status in the 4th employment-based preference category are included in "Employment" unlike previous reporting periods.

[20] Processing Times shown are for all N-400 Applications for Naturalization.

[21] Includes N-600K, Application for Citizenship and Issuance of Certificate Under Section 322.

[22] This report reflects data for requests filed for individuals outside of the United States requesting parole into the United States based on urgent humanitarian or significant public benefit reasons and individuals inside the United States requesting re-parole.

[23] Includes the following applications filed to waive exclusionary grounds:  Forms I-191, I-192, I-212, I-601, I-602, and I-612.

[24] Immigrant Visa and EOIR Adjustment are not included in the "Total - All Forms" line.

**Notes:**

1) Some applications or petitions approved, denied, or pending a decision may have been received in previous reporting periods.

2) The report reflects the most up-to-date estimate available at the time the database is queried.

3) Forms received, completed (approved and denied), and pending counts may differ from counts reported in previously published reports due to processing delays and the time at which the data are queried, system updates, and post-adjudicative outcomes.

4) Completed are the number of applications or petitions approved or denied. Some benefit types include other outcomes, such as administrative closures, in the total number of completed cases. As such, approvals and denials will not sum to the total number of completions for all benefit types.

5) Forms where a processing time is unavailable are shown with an N/A. Processing times may be unavailable for a variety of reasons such as forms pending a processing times calculation or forms where times cannot be calculated.

6) Summing the six I-485 types and the four I-765 types results in the overall totals for each form for the reporting period.

7) Credible Fear and Reasonable Fear screenings (and their respective forms I-870 and I-899) do not confer an immigration benefit, rather they are intended to identify individuals with viable protection claims, which are then referred to the Immigration Courts for adjudication.
Asylum Officers do not adjudicate the actual asylum applications during the screening process.

8) For the I-131 (humanitarian parole), approvals are defined as conditional approval of the request for parole contingent upon successful completion of identity verification and any additional medical and security checks as required.
A request for humanitarian parole may be counted as closed for a number of reasons, including if the beneficiary withdraws the request or if USCIS has notified the petitioner that the case is eligible for further parole processing and is awaiting notification from the petitioner that the parole
beneficiary is in a location with a U.S. embassy or consulate.

9) The majority of the I-730 completions are captured in CLAIMS3 and included in this data. The I-730 processing times are based on completions made at the Texas and Nebraska Service Centers only.

10) For a complete list of USCIS forms and descriptions, visit https://www.uscis.gov/forms

**Source:**

All data (except I-589, I-870, I-899, I-881 and I-131 Humanitarian) - Department of Homeland Security, U.S. Citizenship and Immigration Services, Office of Performance and Quality

I-589, I-870, I-899, I-881, I-131 (Humanitarian Parole) data were provided by the Refugee, Asylum and International Operations (RAIO) Directorate

PASEXEC, ELIS, CLAIMS3, queried 11/2024, TRK #15822

001881

**Appx-000014**



OOD

PM 25-35

Effective: July 9, 2025

To: All of EOIR
From: Sirce E. Owen, Acting Director
Date: July 9, 2025

SIRCE OWEN  Digitally signed by SIRCE OWEN Date: 2025.07.09 08:57:50 -04'00'

## STATUTORY FEES UNDER THE ONE BIG BEAUTIFUL BILL ACT

| | |
|---|---|
| PURPOSE: | Update and supplement EOIR policy regarding fees |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | None |

This Policy Memorandum (PM) updates and supplements PM 21-10, *Fees*.

### I.   Background

On December 18, 2020, EOIR issued PM 21-10, *Fees*, which noted EOIR's statutory authority to set fees to ensure full cost recovery and committed EOIR to reviewing its fees on at least a biennial basis.  PM 21-10 also provided guidance on the adjudication of fee waivers.[1]

More recently, on Friday, July 4, 2025, President Donald J. Trump signed the One Big Beautiful Bill Act ("OBBBA") (H.R.1), which, *inter alia*, introduced or increased numerous immigration-related fees relevant to EOIR and amended the availability of fee waivers in certain instances. Effective immediately, EOIR is implementing the statutorily mandated immigration fees and fee waiver changes established by OBBBA.  To the extent EOIR's current regulations regarding fees and availability of fee waivers are inconsistent with OBBBA, the regulations are superseded by the statute.[2]  *See, e.g., Farrell v. United States*, 313 F.3d 1214, 1219 (9th Cir. 2002) ("It is well-settled that when a regulation conflicts with a subsequently enacted statute, the statute controls and voids the regulation.").

### II.   Key Provisions of OBBBA

First, OBBBA implemented or increased fees for various applications for relief and protection from removal adjudicated in EOIR proceedings, increased fees for appeals before the Board of Immigration Appeals (Board), and increased fees for various types of motions before EOIR.  Of

---

[1] PM 21-10 was rescinded on June 7, 2021, and then reinstated on January 30, 2025. *See* PM 25-12, *Cancellation of Policy Memorandum 21-24 and Reinstatement of Policy Memorandum 21-10* (Jan. 30, 2025).

[2] EOIR will conduct a future rulemaking to conform its regulations to OBBBA.

001882

Appx-000015

note, OBBBA introduces a new fee requirement for initial asylum applications and further requires annual fees for every calendar year that an asylum application remains pending.[3]

Importantly, OBBBA does not affect where fees are payable. Fees continue to be payable as noted in PM 21-10 and 8 C.F.R. § 1103.7(a). Moreover, until EOIR updates the fee amounts in its regulations at 8 C.F.R. § 1103.7(b), Immigration Court and Board staff should apply the statutory minimum fee amounts established in OBBBA, which are contained in Section III of this PM below.

Second, OBBBA prohibits certain fees from being waived or reduced. Specifically, pursuant to provisions of OBBBA, the following fees shall not be waived:

- initial asylum application fee (sec. 100002(e));
- annual asylum fee (sec. 100009(d));
- Temporary Protected Status fee (sec. 100006).[4]

OBBBA does not affect the validity of EOIR's fee waiver request form, Form EOIR-26A. Further, the guidance contained in PM 21-10 regarding practices for the adjudication of fee waiver requests remains valid.[5] The Board may also provide further guidance on the adjudication of fee waivers through the issuance of precedential decisions.

Third, OBBBA explicitly authorizes the DHS Secretary and the Attorney General to increase the noted fees by regulation above the amounts provided in OBBBA. Thus, consistent with PM 21-10, EOIR will continue to review its fees on at least a biennial basis, if not more frequently, to determine whether any further fee adjustments are warranted.

Fourth, OBBBA fees are subject to an annual inflation adjustment beginning in fiscal year 2026. Accordingly, EOIR will annually review, implement, and communicate any inflation-based updates needed to comply with OBBBA.

Lastly, Immigration Court and Board staff must ensure that all filings include either the proper fees, proof of payment of the proper fees, or an appropriate and complete fee waiver request form where applicable. Filings that do not comply with the statutory fee requirement shall be rejected.[6]

---

[3] Under OBBBA, motions to reopen based on an underlying asylum application are also now subject to a fee.

[4] OBBBA does not alter EOIR's rule that "[n]o [fee] waiver may be granted with respect to the fee prescribed for a Department of Homeland Security form or action that is identified as non-waivable in regulations of the Department of Homeland Security." 8 C.F.R. § 1103.7(c). Thus, in certain circumstances EOIR may not waive fees for a Form I-485 or a Form I-601. *See* 8 C.F.R. §§ 106.3(a)(3)(iv)(C), (D).

[5] Adjudicators should be mindful of potential fraud or misrepresentations on fee waiver applications, particularly from aliens who have employment authorization and have lived in the United States for many years. Instances of suspected fraud should be referred to EOIR's Anti-Fraud Program.

[6] Until the new asylum fees are fully integrated into existing payment systems, the Immigration Courts will implement temporary measures—*e.g.* possibly authorizing provisional acceptance of an application pending the subsequent submission of the fee—to ensure that aliens have an avenue to pay the required fees and submit applications. All other fees should remain payable through existing payment structures at EOIR or the Department of Homeland Security.

001883

Appx-000016

### III.   EOIR Fees under OBBBA

*Applications for Relief or Protection from Removal*

| Name & Form | Fee Amount |
| --- | --- |
| Adjustment of Status (Form I-485) | $1,500 |
| Asylum (Form I-589) | $100 |
| Annual Asylum Fee | $100 (annually every calendar year that the asylum application is pending) |
| Cancellation of Removal for Certain Permanent Residents (Form EOIR-42A) | $600 |
| Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents (Form EOIR-42B) | $1,500 |
| Suspension of Deportation (Form I-881) | $600 |
| Temporary Protected Status ("TPS") (Form I-821) | $500 |
| Waiver of Inadmissibility (Form I-601) | $1,050 |

*Board Appeals*

| Name & Form | Fee Amount |
| --- | --- |
| Appeal from an IJ decision (Form EOIR-26) | $900, except for bond appeals, which have no fee |
| Appeal from a decision of a DHS officer (Form EOIR-29) | $900 |
| Appeal in a practitioner discipline case (Form EOIR-45) | $1,325 |

001884

3

**Appx-000017**

*Motions to Reopen or Reconsider Filed by Aliens*

| Name | Fee Amount |
|---|---|
| Motion to reopen | $900, except no fee if:<br><br>• motions to reopen an in absentia removal order filed in accordance with INA § 240(b)(5)(C)(ii)[7]; or<br>• motions to reopen an in absentia deportation order filed in accordance with former INA § 242B(c)(3)(B) (prior to April 1, 1997) |
| Motion to reconsider | $900 |

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

---

[7] A motion to reopen an in absentia order filed pursuant to INA § 240(b)(5)(C)(i) does require a fee.

001885

4

**Appx-000018**



OOD

PM 25-36

Effective: July 17, 2025

To: All of EOIR
From: Sirce E. Owen, Acting Director
Date: July 17, 2025

SIRCE OWEN    Digitally signed by SIRCE OWEN Date: 2025.07.17 16:33:37 -04'00'

## STATUTORY FEES UNDER THE ONE BIG BEAUTIFUL BILL ACT

| | |
|---|---|
| PURPOSE: | Update and supplement EOIR policy regarding fees |
| OWNER: | Office of the Director |
| AUTHORITY: | 8 C.F.R. § 1003.0(b) |
| CANCELLATION: | Policy Memorandum 25-35, *Statutory Fees Under the One Big Beautiful Bill Act* |

This Policy Memorandum (PM) supersedes and replaces PM 25-35 in order to clarify certain points for adjudicators.

### I.  Background

On December 18, 2020, EOIR issued PM 21-10, *Fees*, which noted EOIR's statutory authority to set fees to ensure full cost recovery and committed EOIR to reviewing its fees on at least a biennial basis.  PM 21-10 also provided guidance on the adjudication of fee waivers.[1]

More recently, on Friday, July 4, 2025, President Donald J. Trump signed the One Big Beautiful Bill Act ("OBBBA") (H.R.1), which, *inter alia*, introduced or increased numerous immigration-related fees relevant to EOIR and amended the availability of fee waivers in certain instances. Effective immediately, EOIR is implementing the statutorily mandated immigration fees and fee waiver changes established by OBBBA.  To the extent EOIR's current regulations regarding fees and availability of fee waivers are inconsistent with OBBBA, the regulations are superseded by the statute.[2]  *See, e.g., Farrell v. United States*, 313 F.3d 1214, 1219 (9th Cir. 2002) ("It is well-settled that when a regulation conflicts with a subsequently enacted statute, the statute controls and voids the regulation.").

### II.  Key Provisions of OBBBA

First, OBBBA implemented or increased fees for various applications for relief and protection

---

[1] PM 21-10 was rescinded on June 7, 2021, and then reinstated on January 30, 2025. *See* PM 25-12, *Cancellation of Policy Memorandum 21-24 and Reinstatement of Policy Memorandum 21-10* (Jan. 30, 2025).
[2] EOIR will conduct a future rulemaking to conform its regulations to OBBBA.

001886

Appx-000019

from removal adjudicated in EOIR proceedings, increased fees for appeals before the Board of Immigration Appeals (Board), and increased fees for various types of motions before EOIR. Importantly, the fees imposed by OBBBA are "[i]n *addition* to any other fees authorized by law." *See*, *e.g.*, OBBBA § 100013(a)(1) (emphasis added). Thus, for applications adjudicated by EOIR, the fees imposed by OBBBA are in addition to the existing fees established by regulation. *See* 8 C.F.R. § 1103.7. The fee amounts contained in this PM reflect the current, accurate fee amounts.

OBBBA also introduced a new fee requirement for initial asylum applications and further requires annual fees for every calendar year that an asylum application remains pending.[3] Because the statute imposes the annual asylum fee beginning in fiscal year 2025, *see* OBBBA § 100009(b)(1), that fee applies to any asylum application pending for more than one year as of a date after the date of enactment of OBBBA.[4]

OBBBA does not affect where fees are payable. Fees continue to be payable as noted in PM 21-10 and 8 C.F.R. § 1103.7(a). Moreover, until EOIR updates the fee amounts in its regulations at 8 C.F.R. § 1103.7(b), Immigration Court and Board staff should apply the fee amounts as reflective of the changes made by OBBBA, which are contained in Section III of this PM below.

Second, OBBBA prohibits certain fees from being waived or reduced. Specifically, pursuant to provisions of OBBBA, the following fees shall not be waived or reduced:

- initial asylum application fee (sec. 100002(e));
- annual asylum fee (sec. 100009(d));
- Temporary Protected Status fee (sec. 100006).[5]

OBBBA does not affect the validity of EOIR's fee waiver request form, Form EOIR-26A. Further, the guidance contained in PM 21-10 regarding practices for the adjudication of fee waiver requests remains valid.[6] The Board may also provide further guidance on the adjudication of fee waivers through the issuance of precedential decisions.

Third, OBBBA explicitly authorizes the DHS Secretary and the Attorney General to increase the noted fees by regulation above the amounts provided in OBBBA. Thus, consistent with PM 21-10, EOIR will continue to review its fees on at least a biennial basis, if not more frequently, to determine whether any further fee adjustments are warranted.

---

[3] Under OBBBA, motions to reopen based on an underlying asylum application are also now subject to a fee.
[4] For example, an asylum application filed on July 7, 2024, that was still pending as of July 7, 2025, would be subject to the fee.
[5] OBBBA does not alter EOIR's rule that "[n]o [fee] waiver may be granted with respect to the fee prescribed for a Department of Homeland Security form or action that is identified as non-waivable in regulations of the Department of Homeland Security." 8 C.F.R. § 1103.7(c). Thus, in certain circumstances EOIR may not waive fees for a Form I-485 or a Form I-601. *See* 8 C.F.R. §§ 106.3(a)(3)(iv)(C), (D).
[6] Adjudicators should be mindful of potential fraud or misrepresentations on fee waiver applications, particularly from aliens who have employment authorization and have lived in the United States for many years. Instances of suspected fraud should be referred to EOIR's Anti-Fraud Program.

001887

Appx-000020

Fourth, OBBBA fees are subject to an annual inflation adjustment beginning in fiscal year 2026. Accordingly, EOIR will annually review, implement, and communicate any inflation-based updates needed to comply with OBBBA.

Lastly, Immigration Court and Board staff must ensure that all filings include either the proper fees, proof of payment of the proper fees, or an appropriate and complete fee waiver request form where applicable.  Filings that do not comply with the statutory fee requirement shall be rejected.[7]

## III.   EOIR Fees under OBBBA

*Applications for Relief or Protection from Removal*

| Name & Form | Fee Amount |
| --- | --- |
| Adjustment of Status (Form I-485) | $2,940 |
| Asylum (Form I-589) | $100 |
| Annual Asylum Fee | $100 (annually every calendar year that the asylum application is pending) |
| Cancellation of Removal for Certain Permanent Residents (Form EOIR-42A) | $700 |
| Cancellation of Removal and Adjustment of Status for Certain Nonpermanent Residents (Form EOIR-42B) | $1,600 |
| Suspension of Deportation (Form I-881) | $700 |
| Temporary Protected Status ("TPS") (Form I-821) | $500 |
| Waiver of Inadmissibility (Form I-601) | $2,100 |

---

[7] Until the new asylum fees are fully integrated into existing payment systems, the Immigration Courts will implement temporary measures—*e.g.* possibly authorizing provisional acceptance of an application pending the subsequent submission of the fee—to ensure that aliens have an avenue to pay the required fees and submit applications.  All other fees should remain payable through existing payment structures at EOIR or the Department of Homeland Security.

001888

Appx-000021

*Board Appeals*

| Name & Form | Fee Amount |
|---|---|
| Appeal from an IJ decision (Form EOIR-26) | $1,010, except for bond appeals, which have no fee |
| Appeal from a decision of a DHS officer (Form EOIR-29) | $1,010 |
| Appeal in a practitioner discipline case (Form EOIR-45) | $2,000 |

*Motions to Reopen or Reconsider Filed by Aliens*

| Name | Fee Amount |
|---|---|
| Motion to reopen | $1,045, except no fee if:<br><br>• motions to reopen an in absentia removal order filed in accordance with INA § 240(b)(5)(C)(ii)[8]; or<br>• motions to reopen an in absentia deportation order filed in accordance with former INA § 242B(c)(3)(B) (prior to April 1, 1997) |
| Motion to reconsider | $1,010 |

This PM is not intended to, does not, and may not be relied upon to create, any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing herein should be construed as mandating a particular outcome in any specific case. Nothing in this PM limits an adjudicator's independent judgment and discretion in adjudicating cases or an adjudicator's authority under applicable law.

Please contact your supervisor if you have any questions.

---

[8] A motion to reopen an in absentia order filed pursuant to INA § 240(b)(5)(C)(i) *does* require a fee.

001889

Appx-000022

**From:** Kelly, Matthew (EOIR) < ███████████████████ >
**Sent:** Monday, November 24, 2025 1:03 PM
**To:** Radics, Gregory (EOIR) < ███████████████████ >
**Cc:** Tennyson, Mike (EOIR) < ███████████████████ >
**Subject:** RE: AAF

Good afternoon Greg,

"Total AAF payments to EOIR is 35,502.  This data is as of 11/9/25 and may change as refund requests and or disputed payments arise."

Thanks,

Matt

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

ASYLUM SEEKER ADVOCACY PROJECT,

    *Plaintiff,*

    *v.*

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES, *et al.,*

    *Defendants*.

No. 1:25-cv-03299-SAG

## CERTIFICATION

I, Samantha Deshommes, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am aware that this declaration will be filed in the above-captioned civil action with the United States District Court for the District of Maryland.

2. I am the Chief Regulatory Officer at U.S. Citizenship and Immigration Services ("USCIS"), which is a component of the U.S. Department of Homeland Security. I have held this position since September 25, 2022.

3. The statements contained in this declaration are based upon my personal knowledge, belief, and upon information provided to me in my official capacity.

4. The documents provided for the record relate to the decision-making process to publish the notice entitled, "USCIS Immigration Fees Required by HR–1 Reconciliation Bill," 90 Fed. Reg. 34,511 (Jul. 22, 2025) ("HR-1 Fee Notice").

1

**Appx-000024**

5.  To the best of my knowledge and belief on the date of this certification, these documents constitute the true and correct administrative record the agency considered in issuing the HR-1 Fee Notice.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on March 5, 2026.

SAMANTHA L DESHOMMES
Digitally signed by SAMANTHA L DESHOMMES
Date: 2026.03.05 15:42:59 -05'00'

Samantha Deshommes
Chief Regulatory Officer
U.S. Citizenship and Immigration Services
Department of Homeland Security

2

during the import process, the record is routed for manual examination, investigation, and resolution to determine whether it is truly a duplicate record.

2. DHS/FEMA—SBA Duplication of Benefits Automated Match Process:

a. Both DHS/FEMA and SBA will act as the recipient (*i.e.*, matching) agency. SBA will extract and provide to DHS/FEMA data from its Disaster Loans Case Files system of records, accessed via the Disaster Lending System. DHS/FEMA will match the data SBA provides to records in its Disaster Recovery Assistance Files system of records, accessed through the Individual Assistance System, via the DHS/FEMA Registration Identification number. SBA will issue a data call to DHS/FEMA requesting that DHS/FEMA return any records for which the Individual Assistance System found a match. For each match found, DHS/FEMA sends all applicant information that DHS/FEMA collects during the registration process to SBA so that SBA may match these records with its registrant data in the Disaster Lending System. SBA's Disaster Lending System manual process triggers an automated interface to query the Individual Assistance System, using the DHS/FEMA Registration Identification number as the unique identifier.

b. DHS/FEMA will return the following fields for the matching DHS/FEMA record, if any: DHS/FEMA Disaster number; DHS/Registration Identification number; applicant and if applicable, co-applicant name; damaged dwelling address, phone number, Social Security number, damaged property data, insurance policy information, contact address (if different from damaged dwelling address), flood zone and flood insurance data, DHS/FEMA Housing Assistance and Other Needs Assistance data, program, award level, eligibility, inspection data, verification of ownership and occupancy, and approval or rejection data. DHS/FEMA will return no result when the DHS/FEMA Registration Identification number is not matched.

c. For each matching record received from DHS/FEMA, SBA determines whether DHS/FEMA assistance duplicates SBA loan assistance. If SBA loan officers determine that there is a duplication of benefits, the duplicated amount is deducted from the eligible SBA loan amount.

3. DHS/FEMA—SBA Status Update Automated Match Process:

a. DHS/FEMA will act as the recipient (*i.e.*, matching) agency. DHS/FEMA will match records from its Disaster Recovery Assistance Files system of records to the records extracted and provided by SBA from its Disaster Loans Case Files system of records. The purpose of this process is to update DHS/FEMA applicant information with the status of SBA loan determinations. The records provided by SBA will be automatically imported into DHS/FEMA's Individual Assistance System to update the status of existing applicant records. Controls on the SBA export of data are in place to ensure that DHS/FEMA only receives unique and valid referral records.

b. In response to Presidential Individual Assistance Declarations with a DHS/FEMA Disaster number, the SBA will provide to DHS/FEMA information and data, including but not limited to the following: personal information about SBA applicants, including name, damaged dwelling address, and Social Security number; application data; loss to personal property data; loss mitigation data; SBA loan data; and SBA event data. DHS/FEMA will conduct the match using DHS/FEMA Disaster number and DHS/FEMA Registration Identification number.

c. Loan data for matched records will be recorded and displayed in the Individual Assistance System.

**Systems of Records**

DHS/FEMA—008 Disaster Recovery Assistance Files (89 FR 73104, September 9, 2024) covers records from DHS/FEMA's Disaster Recovery Assistance Files system of records. These records are matched against the records that SBA provides from its SBA–20 Disaster Loans Case Files, 86 FR 64979 (November 19, 2021) system of records.

SBA–20 Disaster Loans Case Files (86 FR 64979, November 19, 2021). SBA uses its Disaster Lending System to access records from its Disaster Loan Case Files system of records and match them to the records that DHS/FEMA provides from its Disaster Recovery Assistance Files system of records.

**Roman Jankowski,**

*Chief Privacy Officer, U.S. Department of Homeland Security.*

[FR Doc. 2025–13709 Filed 7–18–25; 4:15 pm]

**BILLING CODE 9110–9L–P**

---

**DEPARTMENT OF HOMELAND SECURITY**

[CIS No. 2829–25]

**USCIS Immigration Fees Required by HR–1 Reconciliation Bill**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security.

**ACTION:** Notice of immigration fees.

**SUMMARY:** U.S. Citizenship and Immigration Services (USCIS) is announcing a series of fees to be collected by USCIS. Recently enacted legislation that provided for reconciliation pursuant to Title II of House Concurrent Resolution 14, titled HR–1, establishes specific fees for various immigration-related forms, benefits, statuses, petitions, applications, and requests administered by multiple government agencies. This notice announces the new fees that are administered by USCIS, a component of the U.S. Department of Homeland Security (DHS), to whom those fees apply, when the new fees take effect, instructions on their payment, when and if the fees may be waived, and consequences of the failure to pay. This notice is intended to provide the information needed for the public to comply with the new law.

**DATES:** Unless specified otherwise in this notice, the fees announced in this notice must be submitted for any immigration benefit requests postmarked on or after July 22, 2025. Any form postmarked on or after August 21, 2025 without the proper filing fee will be rejected.

**FOR FURTHER INFORMATION CONTACT:** Office of Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Drive, Camp Springs, MD 20746, telephone (240) 721–3000 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

**Table of Abbreviations**

AAF—Annual Asylum Fee
CPI–U—Consumer Price Index for All Urban Consumers
DHS—Department of Homeland Security
EAD—Employment Authorization Document
FY—Fiscal Year
HR–1—One Big Beautiful Bill Act
IMMVI—Immigrant Military Members and Veterans Initiative
INA—Immigration and Nationality Act
PIP—Parole in Place
SIJ—Special Immigrant Juvenile
TPS—Temporary Protected Status
USCIS—U.S. Citizenship and Immigration Services

**I. Background and Authority**

*A. H.R.1—One Big Beautiful Bill Act*

On July 4, 2025, the President signed into law H.R.1—One Big Beautiful Bill Act, Public Law 119–21, 139 Stat. 72 (''HR–1''). HR–1 was a comprehensive legislative package that changed many laws and added new laws that touch many areas of the United States government. Among those changes, the

HR-1 FRN 2025 AR-000001

Appx-000026

law established several new provisions and fees to the Immigration and Nationality Act (INA). *See* HR–1, Title X, Subtitle A, Part I, Sections 100001 through 1000018.

The new fees are provided as minimum amounts for Fiscal Year (FY) 2025, authorize the relevant agency to adjust them as determined necessary using rulemaking, and are required to be adjusted annually based on the Consumer Price Index for All Urban Consumers (CPI–U). In most cases, fee waivers or reductions are prohibited for the additional fees under HR–1. The funds collected from these fees are allocated to relevant agencies or the U.S. Treasury. USCIS will reject or deny any immigration benefit requests that are submitted without all of the fees required, including the new fees announced in this notice, as provided in 8 CFR 103.2(a)(7)(ii)(D).

*B. DHS Fee Setting Authority, USCIS Fees, and HR–1 Fees*

INA sec. 286(m), 8 U.S.C. 1356(m), authorizes the Secretary of Homeland Security to set fees for adjudication by regulation "at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants" and "that will recover any additional costs associated with the administration of the fees collected." DHS codified new fees and related

regulations as authorized by INA sec. 286(m) on January 31, 2024, effective April 1, 2024. *U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements,* Final Rule, 89 FR 6194 (Jan. 31, 2024) (USCIS Fee Rule).

Unless otherwise described in this notice regarding a specific fee, the new fees in HR–1 are required in addition to any other fee authorized by law and by the heads of relevant departments.[1] That means that the fees in HR–1 do not supersede or replace those promulgated by the USCIS Fee Rule, rather they will be charged "in addition" to current fees.[2] USCIS fees are generally codified in 8 CFR part 106 and any other fees authorized by law as referred to in this notice refers to part 106 unless otherwise noted.

USCIS acknowledges that the portion of the HR–1 fees that USCIS retains will be in addition to the revenue it receives from the fees that DHS determined in the USCIS Fee Rule were needed to recover the full costs of operating USCIS. Regardless, the HR–1 text "in addition to any other fee authorized by law" is clear. Furthermore, to interpret HR–1 as providing for replacement of the USCIS fees DHS codified in 8 CFR part 106 would result in USCIS being unable to fund its operations. If HR–1 fees replaced the fees that USCIS retains to recover its operating costs with new

fees that must partly or wholly go to the Treasury, USCIS would be required to maintain our current production and service levels with a large reduction in revenue. USCIS will soon conduct a total cost recovery fee study consistent with the CFO Act, 31 U.S.C. 901–03 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees). However, USCIS has no basis to believe that Congress intended HR–1 to result in USCIS not being fully funded until promulgation of the next USCIS fee rule.

**II. New Immigration Fees**

This notice announces certain new fees promulgated by HR–1, when collection of the fees will begin and, when necessary, how the fees are to be paid.[3]

The new immigration fees imposed by HR–1 are in addition to any other fees already authorized by law and regulations, as shown in Table 1.

The DHS fee and HR–1 fees must be submitted separately. If the requestor is eligible for a fee waiver for the DHS fee, he or she may submit Form I–912, Request for Fee Waiver, or a written fee waiver request, along with HR–1 fee as listed in Table 1.[4] The annual pending asylum application fee must be submitted online.

*A. Summary of New Fees*

### TABLE 1—USCIS IMMIGRATION BENEFIT REQUEST WITH ADDITIONAL FEES FROM HR–1

| Benefit category | Form | Current filing fee [5] | Immigration fee type | HR–1 FY 2025 fee | Combined fees |
|---|---|---|---|---|---|
| Asylum | I–589 [6] | $0 | Asylum Fee (Initial fee for aliens filing an application for asylum). | $100 No Fee Waiver Available. | $100 |
|  | I–589 (Pending) | N/A | Annual Pending Asylum Application Fee. | $100 (annual for every calendar year that the asylum application is pending); payable online only. No Fee Waiver Available. | 100 |
| EADs | I–765 [7]—Initial for (c)(8) Asylum Applicant. | $0 | Initial Asylum Applicant EAD | $550 No Fee Waiver Available. | 550 |
|  | I–765—Initial (c)(8) Applying under Special *American Baptist Churches* v. *Thornburgh* [8] (ABC) Procedures. | Paper Filing: $520 Fee Waiver Available. | Initial Asylum Applicant EAD | $550 No Fee waiver Available. | 1,070 |
|  |  | Online Filing: $470 Fee Waiver Available. | Initial Asylum Applicant EAD. | $550 No Fee waiver Available. | 1,020 |

[1] *See* Sec. 100002(a) ("In addition to any other fee authorized by law, the Secretary of Homeland Security or the Attorney General, as applicable, shall require the payment of a fee, equal to the amount specified in this section, by any alien who files an application for asylum under section 208 (8 U.S.C. 1158) at the time such application is filed."); *see also* Sec. 100003(a)(1) (initial application for employment authorization under section 208(d)(2)); Sec. 100003(b)(1) (initial application for employment authorization filed by any alien paroled into the United States); Sec. 100003(c)(1) (initial application for employment authorization under section 244(a)(1)(B)); Sec. 100005(a) (any alien, parent, or legal guardian of an

alien applying for special immigrant juvenile status under section 101(a)(27)(J)); Sec. 100009(a) (for each calendar year that an alien's asylum application remains pending); Sec. 100010(a) (any parolee who seeks a renewal or extension of employment authorization based on a grant of parole); Sec. 100011(a) (any alien who has applied for asylum for each renewal or extension of employment authorization); Sec. 100012(a) (renewal or extension of employment authorization based on a grant of temporary protected status).

[2] One exception is at section 100006 of Title X governing the Temporary Protected Status application fee. This provision replaces the $50 registration fee amount specified at INA sec.

244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B) with the new registration fee amount of $500. See 8 CFR 106.2(a)(50)(i).

[3] As explained later in this notice, USCIS does not list all the new fees required by HR–1 in this notice because (1) the law contains restrictions on collection of the fees that require additional study and planning before they can be implemented, or (2) the fee is administered by another DHS component or federal agency.

[4] For information on how to submit fees, see USCIS, Filing Fees, *https://www.uscis.gov/forms/filing-fees* (Last Reviewed/Updated: May 28, 2025). USCIS will update the I–912 as appreciate to account for the changes in HR–1.

TABLE 1—USCIS IMMIGRATION BENEFIT REQUEST WITH ADDITIONAL FEES FROM HR–1—Continued

| Benefit category | Form | Current filing fee [5] | Immigration fee type | HR–1 FY 2025 fee | Combined fees |
|---|---|---|---|---|---|
| | I–765—Renewal for (c)(8) Asylum Applicant. | Paper Filing: $520 ................. Fee Waiver Available. | Renewal or Extension of Asylum Applicant EAD. | $275 ........................................ No Fee Waiver Available. | 795 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Renewal or Extension of Asylum Applicant EAD. | $275 ........................................ No Fee Waiver Available. | 745 |
| | I–765—Initial for (a)(4) Paroled Refugee. | $0 ........................................... | Initial Parole EAD—Valid for 1 year. | $550 ........................................ No Fee Waiver Available. | 550 |
| | I–765—Initial (c)(11) for 212(d)(5)(A) Parole. | Paper Filing: $520 ................. Fee Waiver Available. | Initial Parole EAD—Valid for 1 year. | $550 ........................................ No Fee Waiver Available. | 1,070 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Initial Parole EAD—Valid for 1 year. | $550 ........................................ No Fee Waiver Available. | 1,020 |
| | | IMMVI current or former service members, special processes for paroled Ukrainians: $0. | Initial Parole EAD—Valid for 1 year. | $550 ........................................ No Fee Waiver Available. | 550 |
| | I–765—Initial (c)(34) Paroled Spouse of (b)(37) Entrepreneur. | Paper Filing: $520 ................. Fee Waiver Available. | Initial Parole EAD—Valid for 1 year. | $550 ........................................ No Fee Waiver Available. | 1,070 |
| | I–765—Renewal (a)(4) Paroled Refugee. | $0 ........................................... | Initial Parole EAD—Valid for 1 year. | $275 ........................................ No Fee Waiver Available. | 275 |
| | I–765—(c)(11) Renewal for 212(d)(5)(A) Parole. | Paper Filing: $520 ................. Fee Waiver Available. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ........................................ No Fee Waiver Available. | 795 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ........................................ No Fee Waiver Available. | 745 |
| | | IMMVI [9] current or former U.S. armed forces: $0. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ........................................ No Fee Waiver Available. | 275 |
| | I–765—Renewal (c)(34) Paroled spouse of (b)(37) Entrepreneur. | Paper Filing: $520 ................. Fee Waiver Available. | Renewal or Extension of Parole EAD—Valid for 1 year. | $275 ........................................ No Fee Waiver Available. | 795 |
| | I–765—Initial (a)(12) or (c)(19) TPS. | Paper Filing: $520 ................. Fee Waiver Available. | Initial TPS EAD—Valid for 1 year or the duration of the TPS designation whichever is shorter. | $550 ........................................ No Fee Waiver Available. | 1,070 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Initial TPS EAD—Valid for 1 year or the duration of the TPS designation whichever is shorter. | $550 ........................................ No Fee Waiver Available. | 1,020 |
| | I–765—Renewal (a)(12) or (c)(19) TPS. | Paper Filing: $520 ................. Fee Waiver Available. | Renewal or Extension of TPS EAD—Valid for 1 year. | $275 ........................................ No Fee Waiver Available. | 795 |
| | | Online Filing: $470 ................. Fee Waiver Available. | Renewal or Extension of TPS EAD—Valid for 1 year. | $275 ........................................ No Fee Waiver Available. | 745 |
| | I–131 [10]—Employment Authorization Upon Issuance of New Period of Parole. | Paper Filing: $1,150 .............. Fee Waiver Available. | EAD upon new period of Parole (Re-parole). | $275 [11] ........................................ No Fee Waiver Available. | 1,425 |
| | | Online Filing: $1,050 .............. Fee Waiver Available. | EAD upon new period of Parole (Re-parole). | $275 ........................................ No Fee Waiver Available. | 1,325 |
| | | Military PIP [12] for family of service members: $520. Fee Waiver Available. | EAD upon new period of Parole (Re-parole). | $275 ........................................ No Fee Waiver Available. | 795 |
| | | IMMVI, FRTF, [13] Military PIP for current or former service members: $0. | EAD upon new period of Parole (Re-parole). | $275 ........................................ No Fee Waiver Available. | 275 |
| TPS ................. | I–821 [14]—Initial TPS Registration. | $50 + $30 (biometrics fee) ..... Fee Waivable. [15] | TPS Fee ................................ | $500 ........................................ No Fee Waiver Available. | 530 |
| SIJs ................. | I–360 [16] .................................... | $0 ........................................... | Special Immigrant Juvenile Fee. | $250 ........................................ No Fee Waiver Available. [17] | 250 |

*B. Description of the New Fees*

1. Asylum Fee

HR–1 created a new fee for any alien who files an application for asylum

[5] For additional information on fees, including fee waivers, see Form G–1055, Fee Schedule, *https://www.uscis.gov/g-1055*.

[6] Form I–589, Application for Asylum and for Withholding of Removal.

[7] Form I–765, Application for Employment Authorization.

[8] *See American Baptist Churches* v. *Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991). *See also, USCIS, American Baptist Churches* v. *Thornburgh (ABC) Settlement Agreement, https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/american-baptist-churches-v-thornburgh-abc-settlement-agreement* (last visited July 9, 2025).

[9] Parole for Immigrant Military Members and Veterans Initiative (IMMVI).

[10] Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records. Part 9 of Form I–131 currently permits certain aliens to request an EAD upon approval of a new period of parole (re-parole).

[11] As explained below, USCIS will temporarily charge the $275 for requests for initial EADs and renewal or extension EADs.

[12] Military Parole in Place (Military PIP).

[13] Parole for members of the Family Reunification Task Force (FRFT) settlement agreement.

[14] Form I–821, Application for Temporary Protected Status.

[15] HR–1 increased the base application fee for an initial Form I–821 from $50 to $500, which is no longer eligible for a fee waiver. See Sec. 100006. However, the $30 biometrics fee remains eligible for fee waiver. See 8 CFR 106.2(a)(50)(iii), 8 CFR 106.3(a)(3)(i)(E).

under section 208 (8 U.S.C. 1158) at the time such application is filed. Sec. 100002(a). The asylum fee cannot be

[16] Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant.

[17] Section II.D. of this notice contains an explanation of fee waivers as they apply to HR–1 fees. Sec. 100005 establishing the SIJ fee does not include an explicit "no fee waiver" provision. However, USCIS' general authority to grant waivers is based on the discretionary language of INA 286(m), 8 U.S.C. 1356(m), which states that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." In contrast, the language of Sec. 100005(a) is mandatory ("the Secretary of Homeland Security shall require the payment of a fee"). Therefore, no fee waiver is available.

34514    **Federal Register** / Vol. 90, No. 138 / Tuesday, July 22, 2025 / Notices

waived or reduced. Id.(e). The initial asylum fee amount is set at $100 for FY 2025. Id. Because Sec. 100002 imposes this asylum application fee "at the time such application is filed," the fee applies to asylum applications filed on or after the date of publication of this Notice. Any Form I–589, Application for Asylum and for Withholding of Removal, submitted to USCIS must include the new fee or it will be rejected as provided in the **DATES** section of this notice.

2. Employment Authorization Document Fees

HR–1 created new EAD fees in addition to other existing fees for EADs. Sec. 100003. The fees apply to specific groups of applicants and vary by initial, renewal, or extension for those groups.

a. Asylum EAD

HR–1 created a fee for individuals filing an initial application for employment authorization based on a pending asylum application under section 208(d)(2) (8 U.S.C. 1158(d)(2)), which is $550 for FY 2025. Sec. 100003(a). The fee is due when the initial employment authorization application is filed. Id. The asylum EAD fee cannot be waived or reduced. Id. (a)(5).

In addition to the initial EAD application fee, HR–1 created an additional fee for renewals and extensions of employment authorization for asylum applicants. Sec. 100011. The fee is $275 for FY 2025. HR–1 renewal or extension fee cannot be waived or reduced, though USCIS may waive the pre-existing regulatory fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

b. Parolee EAD Fees

HR–1 requires a fee "by any alien paroled into the United States for any initial application for employment authorization at the time such initial application is filed." Sec. 100003(b)(1). This additional fee is $550 for FY 2025. Each initial employment authorization shall be valid for a period of 1 year or for the duration of the individual's parole, whichever is shorter. Id. The fee is due when the initial employment authorization application is filed. Id. The HR–1 parole EAD fee cannot be waived or reduced. Sec. 100003(b)(5). However, USCIS may waive the pre-existing regulatory fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

In addition to the initial EAD application fee, HR–1 created an additional fee for renewals and extensions of employment authorization "based on a grant of parole." Sec. 100010(a). The fee that is effective for

FY 2025 is $275. The HR–1 fee cannot be waived or reduced, though USCIS may waive the pre-existing regulatory fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

Sec. 100003(b)(1) states that these fees apply to "any alien paroled" into the United States. This language, on its face, would seem to encompass all those who were paroled into the United States at any point in time, regardless of the category under which they are seeking to qualify for employment authorization, rather than only those who are applying for employment authorization based on being "an alien paroled into the United States . . . pursuant to section 212(d)(5) of the Act". See 8 CFR 274a.12(c)(11). Such a reading does not align with the remainder of the statutory text which sets a validity period for the employment authorization of 1 year or the "duration of the alien's parole, whichever is shorter", sec. 100003(b)(1), and which states that the renewal or extension is "based on a grant of parole", sec. 100010(a). In addition, applying this fee to any alien who was paroled into the United States rather than only those seeking to qualify for employment authorization on that basis would create the perverse effect of applying the fee to asylum applicants who were initially paroled into the United States, even though asylum applicants already have a $550 initial employment authorization application fee designated in the prior paragraph, sec. 100003(a)(1), and even if they were not granted parole for any significant duration. In order to give effect to the parolee employment authorization provisions in the context of the whole statutory text, the fees in sections 100003(b) and 100010 must be read to apply to those paroled into the United States pursuant to INA 212(d)(5)(A) and who are seeking authorization for employment on that basis under category (c)(11).

If an alien requests an EAD under category (c)(11), based upon approval of a new period of parole (re-parole) by filing Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, USCIS will initially impose the lower $275 HR–1 fee. USCIS recognizes that a parolee may have been granted parole, opted to not request an EAD for that initial period of parole, and is now requesting an initial EAD for an additional period of parole being requested. However, the current Form I–131 and Form I–765 do not distinguish initial EAD requests from renewal or extension EAD requests. USCIS will presume that an EAD requested for re-

parole, renewal, or extension of parole will be for a renewal EAD regardless of whether the alien has no current or previous EAD and we will only require a $275 fee under HR–1.

c. Temporary Protected Status (TPS) EAD Fees

The additional fee for an alien who files an initial EAD application under TPS is $550. Sec. 100003(c). Each initial employment authorization for TPS registrants who are subject to this fee will be valid for a period of 1 year or for the duration of the alien's TPS, whichever is shorter. Id. The HR–1 TPS EAD fee cannot be waived or reduced. Sec. 100003(c)(5). However, USCIS may continue to waive the preexisting regulatory TPS EAD fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

In addition to the initial EAD application fee, HR–1 created an additional fee for renewals and extensions of employment authorization for aliens granted TPS. Sec. 100012. The renewal or extension period for employment authorization shall be approved for a period of no more than 1 year, or for the duration of the designation of TPS, whichever is shorter. Sec. 100012(a). The FY 2025 fee is $275. The HR–1 renewal or extension fee cannot be waived or reduced. Sec. 100012(d). However, USCIS may continue to waive the preexisting regulatory TPS EAD fee. See 8 CFR 106.2(a)(44) and 8 CFR 106.3(a)(3)(ii)(F).

3. Temporary Protected Status Fee

HR–1 amended Section 244(c)(1)(B) of the INA (8 U.S.C. 1254a(c)(1)(B)) to raise the maximum cost to register for temporary protected status using Form I–821, Application for Temporary Protected Status, from $50 to $500. Sec 100006. Because DHS has set the fee for first-time Form I–821 applicants as "$50 or the maximum permitted by section 244(c)(1)(B) of the Act" in 8 CFR 106.2(a)(50)(i),[18] the resulting fee is $500, not including the $30 biometric services fee. See 8 CFR 106.2(a)(50)(iii). The HR–1 TPS fee cannot be waived or reduced. Sec. 100006. Aliens filing Form I–821 may continue to request a waiver of the biometrics fee. See 8 CFR 106.2(a)(50)(iii), 8 CFR 106.3(a)(3)(i)(E).

4. Special Immigrant Juvenile Fee

HR–1 created a new fee for any alien who files a Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant for Special Immigrant Juvenile (SIJ) status under section

---

[18] By regulation at 8 CFR 106.2(a)(50)(i). DHS has exercised its discretionary authority to impose the maximum fee permitted by section 244(c)(1)(B).

101(a)(27)(J), 8 U.S.C. 1101(a)(27)(J). Sec. 100005. The FY 2025 HR–1 fee is $250. The language of HR–1 prohibits fee waivers or exemptions for this fee.[19] There is no separate authority permitting fee waivers for Form I–360. Cf. 8 CFR 106.3(a)(3).

5. Annual Asylum Fee (AAF)

HR–1 requires all aliens with a pending asylum application to pay an annual fee for each calendar year that the alien's application remains pending, in addition to any other fee. Sec. 100009. The first AAF is $100 for FY 2025. Sec. 100009(b). DHS interprets the term "remains pending" to mean any application filed with USCIS or DOJ and that remains pending with any federal government agency, court, or entity with jurisdiction over asylum claims as intended by Sec. 100009(b) of HR–1. This notice provides notice and information about how USCIS will administer the fee required from asylum applicants with applications pending more than one year with USCIS.

To effectuate the FY 2025 fee, DHS will require that any alien who filed a Form I–589, Application for Asylum and for Withholding of Removal, with USCIS before or on the beginning of fiscal year 2025, October 1, 2024, and whose application is still pending with USCIS at the end of fiscal year 2025, on September 30, 2025, must pay the FY 2025 amount specified by statute.[20] Such aliens must also pay the AAF as of September 30 in each subsequent year that the application remains pending with USCIS. For applications pending for more than a year prior to October 1, 2024, DHS has determined that HR–1 does not require any additional AAF for years that the application was pending prior to FY 2025. Any alien who filed or files a Form I–589 after October 1, 2024, that remains pending with USCIS for 365 days must pay the AAF as of the one-year anniversary of his or her filing date and each year thereafter that the application remains pending on such day of the calendar year.

DHS determined that the fee applies to a Form I–589 pending as of October 1, 2024 or submitted thereafter because language in HR–1 is clear and

unambiguous that the AAF applies during fiscal year 2025, which runs from October 1, 2024 through September 30, 2025, and to each fiscal year thereafter. Subsection (b)(1) of section 100009(b) provides for an initial amount that "shall" be applied for fiscal year (FY) 2025. Subsection (a) applies a fee for "each calendar year that an alien's application for asylum remains pending." Because HR–1 states that the AAF will be applicable in FY 2025, it necessarily applies the provision to the start of FY 2025. To apply the law only to applications filed after the date of enactment in July 2025 or later would result in no fee collections in FY 2025 because no such application would be pending for a calendar year (*i.e.* twelve months) during that time frame. Therefore, section 100009(b) requires applying the fee to applications pending with USCIS before enactment of HR–1. As such, Section 100009 contains a clear expression of intent to apply the AAF to applications filed on or before October 1, 2024 that remain pending for the entirety of fiscal year 2025. DHS is not retroactively applying the AAF to applications pending for one-year periods during fiscal years prior to 2025. *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 264 (1994). Requiring the 2025 AAF with respect to pending asylum applications filed as of October 1, 2024, the first day of FY 2025, is not impermissibly retroactive because it merely applies changes in procedural rules required by statute. Id. at 275; see also INA 208(d)(3) (2024) (listing "fees" under the "asylum procedure" subsection and providing that the government may impose fees for the consideration of an application for asylum).

For the first time the AAF is due under this notice, asylum applicants need not monitor the time their application has been pending and if the AAF applies to them. USCIS will provide personal, individual notice to each asylum applicant with an application pending with USCIS from whom the AAF is required, the amount of the fee, when the fee must be paid, how the fee must be paid, and the consequences of failure to pay. USCIS will require that AAF be paid using an online fee payment process. USCIS will provide guidance for future years' AAF payments in subsequent issuances.

*C. Consumer Price Index for All Urban Consumers (CPI–U) Updates*

In FY 2026 and each subsequent fiscal year, DHS will adjust the fee by inflation by using the Consumer Price Index for all Urban Consumers (CPI–U) for the month of July. See secs.

100002(c), 10003(a)(3), 100003(b)(3) 100003(c)(3), 10004(d), 10005(c), 10006, 10009(b)(2), 100010(b)(2), 100012(b)(2). The Department of Homeland Security (DHS) will round the adjusted fee to the next lowest multiple of $10. secs. 100002(c), 100003(a)(3), 100003(b)(3) 100003(c)(3), 100004(d), 100005(c), 100006, 100010(b)(2), 100012(b)(2), or the nearest dollar. Sec. 100009(b)(2). USCIS will deposit and retain a portion of the revenue from some of these fees in the Immigration Examinations Fee Account (IEFA).[21] The remaining revenue will be deposited with the general fund of the Treasury.[22]

*D. Fee Waivers and Exemptions*

Fees, fee exemptions, and fee waivers [23] in 8 CFR part 106 have not changed. Fees imposed by HR–1 cannot be waived or reduced.[24] Therefore the fees required by HR–1 for an immigration benefit request must be paid with each request submitted. However, a request may be submitted for one of the benefits covered by HR–1 and if the benefit is eligible for a DHS fee waiver, may still be accompanied by a USCIS Form I–912, Request for a Fee Waiver, under 8 CFR 106.3(a) in lieu of the fee required by 8 CFR 106.2(a). If the fee waiver is approved, the application will be accepted without the USCIS regulatory fee. However, even if a waiver under 8 CFR 106.3(a) of the fee required by 8 CFR 106.2(a) is requested, and even if the applicant is eligible and approved for the waiver, the fee required by HR–1 and announced in this notice must be paid for each request.

In addition, INA section 245(l)(7), 8 U.S.C. 1255(l)(7),[25] requires DHS to

---

[19] Sec. 100005 states that "the Secretary of Homeland Security shall require the payment of a fee, equal to the amount specified in this section . . . ." USCIS authority to waive fees in its fee schedule rests in the language of 8 U.S.C. 1356(m), which grants the Secretary of Homeland Security discretion in setting fees. The new SIJ fee, however, is mandatory.

[20] USCIS collects certain fees on behalf of EOIR. Administrative processes such as whether USCIS will collect the AAF or any other HR–1 fees on behalf of EOIR are beyond the scope of this notice.

[21] Secs. 100002 (50% to USCIS), 100003 (25% to USCIS), 100010 (25% to USCIS), 100011 (25% to USCIS), 100012 (25% to USCIS).

[22] Secs. 100002 (50% to the Treasury), 100003 (75% to Treasury), 100010 (75% to Treasury), 100011(75% to Treasury), 100012 (75% to Treasury); Secs. 100004–06, 100009 (100% to Treasury).

[23] See Form G–1055, Fee Schedule, *https:// www.uscis.gov/g-1055* (last reviewed/updated July 11, 2025).

[24] See Sec. 100002(e) (asylum fee); Sec. 100003 (initial employment authorization document fees); Sec. 100006 (temporary protected status fee); Sec. 100009(d) (annual asylum fee); Sec. 100010(d) (fees for renewal and extension of employment authorization for parolees); Sec. 100011(d) (fees for renewal or extension of employment authorization for asylum applicants); Sec. 100012(d) (fees for renewal and extension of employment authorization for temporary protected status).

[25] "The Secretary of Homeland Security shall permit aliens to apply for a waiver of any fees associated with filing an application for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U),

Continued

allow a request for waiver of the fees required for certain immigration benefit requests. However, where the new specific language in HR–1 states that the fees "shall not be waived or reduced" DHS interprets HR–1 as superseding section 245(l)(7), 1255(l)(7), for purposes of the new fees imposed by HR–1. Although a waiver of the USCIS fee under 8 CFR 106.3(a)(3)(iii) of the fee required by 8 CFR 106.2(a) may be requested, USCIS will not waive such a fee required by HR–1 and a request for such may not be submitted.

*E. HR–1 Fees Not in the Notice*

This notice does not announce all of the fees required or authorized by HR–1. DHS will announce the collection of any fees not covered in this notice in a future action. USCIS is not announcing certain fees required by HR–1 in this notice as follows:

• The IMMIGRATION PAROLE FEE required by section 100004 (parole fee) of HR–1. HR–1 contains multiple exceptions to the requirement for the parole fee and DHS must interpret how the exceptions should be applied. DHS will announce the parole fee in a future publication.

• The VISA INTEGRITY FEE required by section 100007 of HR–1 for any alien issued a nonimmigrant visa at the time of such issuance. The VISA INTEGRITY FEE requires cross-agency coordination before implementing; the fee will be implemented in a future publication.

• The FORM I–94 FEE required by section 100008 of HR–1 is required from any alien who submits an application for a Form I–94 Arrival/Departure Record. DHS will be issuing guidance on the Form I–94 fee requirements in a future publication.

• The ELECTRONIC SYSTEM FOR TRAVEL AUTHORIZATION (ESTA) fee required by section 100014 of HR–1. These are not USCIS administered fees.

• The ELECTRONIC VISA UPDATE SYSTEM FEE required by section 100015 (Visa update fee) and the FEE FOR ALIENS ORDERED REMOVED IN ABSENTIA (in absentia fee) required by section 100016 are not USCIS administered fees.

DHS will continue to work toward implementation of the remaining fees applicable to USCIS, specifically: (1) fees related to Form I–131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, and (2) Form I–102, Application for Replacement/Initial Nonimmigrant Arrival-Departure Document.

_____

1105a, 1229b(b)(2), and 1254a(a)(3) of this title (as in effect on March 31, 1997)."

## III. Effective Date and Implementation

DHS recognizes that HR–1 became effective upon Presidential signature on July 4, 2025, and we are working to implement the statutory mandates as soon as practicable. This notice explains how we will collect the required fees. While that work is ongoing, and in an effort to implement the plain terms of HR–1 as quickly as possible, USCIS will begin collecting the filing fees for fiscal year 2025 for any immigration benefit requests postmarked on or after July 22, 2025. In addition, DHS has balanced the impact on the public of imposing HR–1 fees and the timeliness of complying with the statutory mandates. Because of the time needed by DHS and USCIS to issue guidance on and operationalize the required fees, and for the public to adapt their immigration benefit requests that are in process to the changes, requests postmarked on or after August 21, 2025 without the proper filing fee will be rejected. DHS has determined that the policy required by this Notice is the most equitable path forward in order to effectuate HR–1 as expeditiously as practicable. The HR–1 fees are required by law, but for additional clarity, DHS may codify these fees in 8 CFR part 106 in a future rule.

## IV. Paperwork Reduction Act

This notice is not subject to the Paperwork Reduction Act, 44 U.S.C. 3501–3521 (PRA). The PRA does not preclude the imposition of a penalty on an entity for failing to comply with a collection of information that is imposed on the entity by statute. See 5 CFR 1320.6(e).

**Angelica Alfonso-Royals,**
*Acting Director, United States Citizenship and Immigration Services.*
[FR Doc. 2025–13738 Filed 7–18–25; 4:15 pm]
**BILLING CODE 9111–97–P**

---

## DEPARTMENT OF THE INTERIOR

### Bureau of Reclamation

[RR040U2000, XXXR4081G3, RX.05940913.FY19400]

### Public Meeting of the Glen Canyon Dam Adaptive Management Work Group

**AGENCY:** Bureau of Reclamation, Interior.
**ACTION:** Notice of public meeting.

---

**SUMMARY:** In accordance with the Federal Advisory Committee Act of 1972, the Bureau of Reclamation (Reclamation) is publishing this notice to announce that a Federal Advisory

Committee meeting of the Glen Canyon Dam Adaptive Management Work Group (AMWG) will take place. The meeting is open to the public.

**DATES:** The meeting will be held on Wednesday, August 20, 2025, beginning at 9:30 a.m. to approximately 4:30 p.m. PDT (Arizona); and Thursday, August 21, 2025, from 8:30 a.m. to approximately 3:30 p.m. PDT (Arizona).

**ADDRESSES:** The meeting will be held in person at Little America, 2515 E Butler Ave., Flagstaff, AZ 86004. The meeting can also be accessed virtually on Wednesday, August 20, 2025, at *https://events.gcc.teams.microsoft.com/event/9b12f616-e09b-487c-962b-30b3d0d2877f@0693b5ba-4b18-4d7b-9341-f32f400a5494;* and on Thursday, August 21, 2025, at *https://events.gcc.teams.microsoft.com/event/c0b7de6e-2jfa-4cee-a063-29ed2ce5d8e3@0693b5ba-4b18-4d7b-9341-f32f400a5494.*

**FOR FURTHER INFORMATION CONTACT:** Mr. William Stewart, Bureau of Reclamation, telephone (385) 622–2179, email at *wstewart@usbr.gov*. Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** The Glen Canyon Dam Adaptive Management Program (GCDAMP) was implemented as a result of the Record of Decision on the Operation of Glen Canyon Dam Final Environmental Impact Statement to comply with consultation requirements of the Grand Canyon Protection Act (Pub. L. 102–575) of 1992. The AMWG makes recommendations to the Secretary of the Interior concerning Glen Canyon Dam operations and other management actions to protect resources downstream of Glen Canyon Dam, consistent with the Grand Canyon Protection Act. The AMWG meets two to three times a year.

*Agenda:* The AMWG will meet to receive updates on: (1) current basin hydrology and water year 2025 operations; (2) experiments considered for implementation in 2026; (3) the status of threatened and endangered species; (4) long-term funding considerations; (5) recommendations for the 2026 Triennial Work Plan and Budget. The AMWG will also discuss other administrative and resource issues pertaining to the GCDAMP. To view a copy of the agenda and documents

HR-1 FRN 2025 AR-000006

**Appx-000031**

## DEPARTMENT OF HOMELAND SECURITY

**8 CFR Parts 103, 106, 204, 212, 214, 240, 244, 245, 245a, 264, and 274a**

[CIS No. 2687–21; DHS Docket No. USCIS 2021–0010]

**RIN 1615–AC68**

### U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements

**AGENCY:** U.S. Citizenship and Immigration Services (USCIS), Department of Homeland Security (DHS).

**ACTION:** Final rule.

**SUMMARY:** This final rule adjusts certain immigration and naturalization benefit request fees charged by USCIS. This rule also provides additional fee exemptions for certain humanitarian categories and makes changes to certain other immigration benefit request requirements. USCIS conducted a comprehensive biennial fee review and determined that current fees do not recover the full cost of providing adjudication and naturalization services. DHS is adjusting the fee schedule to fully recover costs and maintain adequate service. This final rule also responds to public comments received on the USCIS proposed fee schedule published on January 4, 2023.

**DATES:** This final rule is effective April 1, 2024. Any benefit request postmarked on or after this date must be accompanied with the fees established by this final rule.

*Public Engagement date:* DHS will hold a virtual public engagement session during which USCIS will discuss the changes made in this final rule. The session will be held at 2 p,m. Eastern on Feb. 22, 2024. Register for the engagement here: *https:// public.govdelivery.com/accounts/ USDHSCIS/subscriber/new?topic_ id=USDHSCIS_1081.*

USCIS will allot time during the session to answer questions submitted in advance. Please email questions to *public.engagement@uscis.dhs.gov* by 4 p.m. Eastern on Thursday, Feb. 8, 2024, and use "Fee Rule Webinar" in the subject link. Please note that USCIS cannot answer case-specific inquiries during the session.

**ADDRESSES:** *Docket:* To view comments on the proposed rule that preceded this rule, search for docket number USCIS 2021–0010 on the Federal eRulemaking Portal at *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Carol Cribbs, Deputy Chief Financial Officer, U.S. Citizenship and Immigration Services, Department of Homeland Security, 5900 Capital Gateway Dr., Camp Springs, MD 20746; telephone 240–721–3000 (this is not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

### Table of Contents

I. Executive Summary
  A. Purpose of the Regulatory Action
  B. Legal Authority
  C. Changes From the Proposed Rule
  D. Summary of Final Fees
  E. Summary of Costs and Benefits
  F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking
II. Background
  A. History
  B. Authority and Guidance
  C. Changes From the Proposed Rule
  D. Corrections
  E. Status of Previous USCIS Fee Regulations
  F. Severability
III. Related Rulemakings and Policies
  A. New Processes
  B. Effects of Temporary Programs or Discretionary Programs and Processes
  C. Lawful Pathways Rule
  D. Premium Processing—Emergency Stopgap USCIS Stabilization Act
  E. Premium Processing Inflation Adjustment
  F. EB–5 Reform and Integrity Act of 2022 and Related Rules
  G. Modernizing H–1B Requirements, Providing Flexibility in the F–1 Program, and Program Improvements Affecting Other Nonimmigrant Workers
  H. Citizenship and Naturalization and Other Related Flexibilities
  I. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)
IV. Response to Public Comments on the Proposed Rule
  A. Summary of Comments on the Proposed Rule
  B. General Feedback on the Proposed Rule
  C. Basis for the Fee Review
  D. FY 2022/2023 IEFA Fee Review
  E. Fee Waivers
  F. Fee Exemptions
  G. Fee Changes by Benefit Category
  H. Statutory and Regulatory Requirements
  I. Out of Scope
V. Statutory and Regulatory Requirements
  A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review) and Executive Order 14094 (Modernizing Regulatory Review)
  B. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis (FRFA)
  C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)
  D. Unfunded Mandates Reform Act
  E. Executive Order 12132 (Federalism)
  F. Executive Order 12988 (Civil Justice Reform)
  G. Executive Order 13175 (Consultation and Coordination With Tribal Governments)
  H. Family Assessment
  I. National Environmental Policy Act (NEPA)
  J. Paperwork Reduction Act

### List of Acronyms and Abbreviations

AAO  Administrative Appeals Office
ABC  Activity-Based Costing
ACWIA  American Competitiveness and Workforce Improvement Act
APA  Administrative Procedure Act
APD  Advance Parole Documents
ASVVP  Administrative Site Visit and Verification Program
BFD  Bona Fide Determination
CAA  Cuban Adjustment Act of 1966
CBP  U.S. Customs and Border Protection
CFO  Chief Financial Officer
CFR  Code of Federal Regulations
CIS  The Office of the Citizenship and Immigration Services
COVID  Coronavirus Disease
CPI–U  Consumer Price Index for All Urban Consumers
DACA  Deferred Action for Childhood Arrivals
DHS  Department of Homeland Security
DOD  Department of Defense
DOJ  Department of Justice
DOL  Department of Labor
DOS  Department of State
EAD  Employment Authorization Document
EB–5  Employment-Based Immigrant Visa, Fifth Preference
EIN  Employer Identification Number
E.O.  Executive Order
EOIR  Executive Office for Immigration Review
FDNS  Fraud Detection and National Security Directorate
FOIA  Freedom of Information Act
FPG  Federal Poverty Guidelines
FR  Federal Register
FRFA  Final Regulatory Flexibility Analysis
FTE  Full-Time Equivalent
FY  Fiscal Year
GAO  Government Accountability Office
HHS  Department of Health and Human Services
HRIFA  Haitian Refugee Immigration Fairness Act
ICE  U.S. Immigration and Customs Enforcement
IEFA  Immigration Examinations Fee Account
IFR  Interim final rule
INA  Immigration and Nationality Act of 1952
INS  Immigration and Naturalization Service
IPO  Immigrant Investor Program Office
IRS  Internal Revenue Service
ISAF  International Security Assistance Forces
IT  information technology
IOAA  Independent Offices Appropriations Act
LPR  Lawful Permanent Resident
NACARA  Nicaraguan Adjustment and Central American Relief Act
NAICS  North American Industry Classification System
NARA  National Archives and Records Administration

NEPA   National Environmental Policy Act
NOID   Notice of Intent to Deny
NPRM   Notice of Proposed Rulemaking
NRC   National Records Centers
OAW   Operation Allies Welcome
OIG   DHS Office of the Inspector General
OIRA   Office of Information and Regulatory Affairs
OMB   Office of Management and Budget
OPT   Optional Practical Training
PRA   Paperwork Reduction Act of 1995
PRC   Permanent Resident Card or Green Card [1]
Pub. L.   Public Law
RFA   Regulatory Flexibility Act
RFE   Requests for Evidence
RIA   Regulatory Impact Analysis
SBA   Small Business Administration
SEA   Small Entity Analysis
Secretary   Secretary of Homeland Security
SIJ   Special Immigrant Juvenile
SNAP   Supplemental Nutrition Assistance Program
SSI   Supplemental Security Income
SSN   Social Security number
Stat.   U.S. Statutes at Large
STEM   Science, Technology, Engineering, and Mathematics
TPS   Temporary Protected Status
TVPRA   William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008
UMRA   Unfunded Mandates Reform Act of 1995
U.S.C.   United States Code
USCIS   U.S. Citizenship and Immigration Services
USDA   U.S. Department of Agriculture
VAWA   Violence Against Women Act
VTVPA   Victims of Trafficking and Violence Protection Act of 2000

# I. Executive Summary

## A. Purpose of the Regulatory Action

DHS is adjusting the fee schedule for U.S. Citizenship and Immigration Services (USCIS) immigration benefit requests.[2] As stated in the proposed rule, USCIS is primarily funded by fees charged to applicants and petitioners for

---

[1] DHS uses the informal term "Green Card" interchangeably with or to refer to a Permanent Resident Card, USCIS Form I–551. See, *e.g.,* Green Card, at *https://www.uscis.gov/green-card* (last viewed Dec. 5, 2023).

[2] DHS uses the term "benefit request" throughout this rule as defined in 8 CFR 1.2 to mean any application, petition, motion, appeal, or other request relating to an immigration or naturalization benefit. The term benefit request applies regardless of if the title of the request uses the term petition (*e.g.,* Petition for Nonimmigrant Worker), application (*e.g.,* Application for Naturalization) or request (*e.g.,* Request for Fee Waiver). Accordingly, "requestor" is a synonym for applicant or petitioner. Immigration benefit request or benefit request is also used even if USCIS approval of the request does not result in an immigration benefit, status, visa, or classification, such as requests related to inadmissibility waivers and the USCIS genealogy program. Using the term benefit request reduces the ambiguity and confusion resulting from the repetitive use of application, petition, applicant, and petitioner, and improves readability without substantive legal effect. 76 FR 53764, 53767 (Aug. 11, 2011).

immigration and naturalization benefit requests. Fees collected from individuals and entities filing immigration benefit requests are deposited into the Immigration Examinations Fee Account (IEFA). These fee collections fund the cost of fairly and efficiently adjudicating immigration benefit requests, including those provided without charge to refugee, asylum, and certain other applicants or petitioners. The focus of this fee review is the fees that DHS has established and is authorized by INA section 286(m), 8 U.S.C 1356(m), to establish or change, collect, and deposit into the IEFA, which comprised approximately 96 percent of USCIS' total FY 2021 enacted spending authority; this fee review does not focus on fees that USCIS is required to collect but cannot change. Most of these fees have not changed since 2016 despite increased costs of federal salaries and inflation costs for other goods and services. This rule also revises the genealogy program fees established under INA section 286(t), 8 U.S.C. 1356(t), and those funds are also deposited into the IEFA. Premium processing funds established under INA section 286(u), 8 U.S.C. 1356(u) are also IEFA fees, but premium processing fees do not change in this rule.

In accordance with the requirements and principles of the Chief Financial Officers Act of 1990 (CFO Act), codified at 31 U.S.C. 901–03, and Office of Management and Budget (OMB) Circular A–25, USCIS conducted a comprehensive fee review for the Fiscal Year (FY) 2022/2023 biennial period, refined its cost accounting process, and determined that current fees do not recover the full costs of services provided. DHS determined that adjusting USCIS' fee schedule is necessary to fully recover costs and maintain adequate service. This final rule also increases the populations that are exempt from certain fees and clarifies filing requirements for nonimmigrant workers, requests for premium processing, and other administrative requirements.

## B. Legal Authority

DHS's authority is in several statutory provisions. Section 102 of the Homeland Security Act of 2002,[3] 6 U.S.C. 112, and section 103 of the Immigration and Nationality Act of 1952 (INA), 8 U.S.C. 1103, charge the Secretary with the administration and enforcement of the immigration and naturalization laws of the United States.

---

[3] Public Law 107–296, 116 Stat. 2135, 2142–44 (Nov. 25, 2002).

Specific authority for establishing multiple USCIS fees is found in INA sec. 286, 8 U.S.C. 1356, and more specifically section 286(m), 1356(m) (authorizing DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants and other immigrants").[4]

## C. Changes From the Proposed Rule

As explained more fully in part II.C. of this preamble, DHS is making several changes in this final rule based on comments received on the proposed rule or in exercising its authority to establish fees, provide fee exemptions, allow fee waivers, provide lower fees, or shift the costs of benefits and services based on adequately funding USCIS, balancing beneficiary-pays and ability-to-pay principles, burdening requestors and USCIS, considering humanitarian concerns, and other policy objectives as supported by data. The changes are as follows:

### 1. Reduced Costs and Fees

DHS proposed to recover $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements. *See* 88 FR 402, 428 (Jan. 4, 2023). In this final rule, USCIS revises the FY 2022/2023 cost projection to approximately $4,424.0 million. DHS removes approximately $726.7 million of average annual estimated costs by transferring costs to premium processing revenue, reducing the work to be funded by the Asylum Program Fee, and considering the budget effects of improved efficiency measures.

### 2. Changes in the Asylum Program Fee

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, or Form I–140, Immigrant Petition for Alien Worker. 88 FR 451. In the final rule, DHS exempts the Asylum Program Fee for nonprofit petitioners and reduces it by half for small employers. *See* 8 CFR 106.2(c)(13). The fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE

---

[4] The longstanding interpretation of DHS is that the "including" clause in INA sec. 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* INA sec. 286(m), 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

**6196**    **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

employees); and $600 for all other filers of Forms I–129 and I–140. *See* 8 CFR 106.1(f) and 106.2(c)(13).

### 3. Changes to Employment-Based Immigrant Visa, Fifth Preference (EB–5) Fees

DHS has updated the USCIS volume forecasts for the EB–5 workload based on more recent and reliable information than what was available while drafting the proposed rule. Increasing the fee-paying receipt forecasts for these workloads conversely increased the estimated revenue generated by EB–5 fees. DHS also revised the USCIS budget to reflect these changes.

### 4. Changes to H–1B Registration Fees

DHS also revises the USCIS volume forecasts for H–1B registration workload, to 424,400, based on more recent information than was available while drafting the proposed rule, such as the total registrations for the FY 2023 cap year. The proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). This change increases the estimated revenue generated by the H–1B registration fees in the final rule.

### 5. Online Filing Fees

The proposed rule provided lower fees for some online requests based on estimated costs for online and paper filing. *See* 88 FR 402, 489–491. The fee differences between paper and online filing ranged from $10 to $110. *Id.* This final rule provides a $50 discount for forms filed online with USCIS. *See* 8 CFR 106.1(g). The discount is not applied in limited circumstances, such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. *See, e.g.,* 8 CFR 106.2(a)(50)(iv).

### 6. Adjust Fees for Forms Filed by Individuals by Inflation

The proposed rule included a wide range of proposed fees. In this final rule, (a) DHS holds several fees to the rate of inflation since the previous fee increase in 2016, and (b) if the proposed fee was less than the current fee adjusted for inflation, then DHS sets the fee in this rule at the level proposed. Except for certain employment-based benefit request fees, if proposed fees were less than the rate of inflation, then DHS finalizes the proposed fee or a lower fee. A comparison of current, proposed, and final fees can be found in Table 1.

### 7. Fee Exemptions and Fee Waivers

The proposed rule included new fee exemptions and proposed to codify existing fee exemptions. *See* 88 FR 402,

459–481 (Jan. 4, 2023). This final rule expands fee exemptions for humanitarian filings. *See* section II.C.; 8 CFR 106.3(b). The final rule also codifies the 2011 Fee Waiver Policy [5] criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the Federal Poverty Guidelines (FPG), or extreme financial hardship. *See* 8 CFR 106.3(a)(1).

DHS proposed 8 CFR 106.3(a)(2) to require that a request for a fee waiver be submitted on the form prescribed by USCIS in accordance with the instructions on the form. In the final rule, USCIS will maintain the status quo of accepting either Form I–912, Request for Fee Waiver, or a written request, and revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020).

DHS also decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because the child's eligibility for these means-tested benefits is dependent on household income.

### 8. Procedural Changes To Address Effects of Fee Exemptions and Discounts

DHS is making five procedural changes in the final rule to address issues that it has experienced with fee-exempt and low-fee filings. First, the final rule provides that a duplicate filing that is materially identical to a pending immigration benefit request will be rejected. *See* 8 CFR 103.2(a)(7)(iv). Second, in the final rule DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may deny the request. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*). Third, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.* Fourth, the first sentence of proposed 8 CFR 106.1(c)(2), stated, "If the benefit request was approved, the approval may be revoked upon notice." DHS is revising the first sentence to read, "If the benefit request was approved, the approval may be revoked upon notice, rescinded, or canceled subject to statutory and regulatory

[5] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, "Fee Waiver Guidelines as Established by the final rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26" (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf.*

requirements applicable to the immigration benefit request." Reference to applicable statutes and regulations is also added to the last sentence of section 106.1(c)(2). Finally, this final rule provides that USCIS may forward an appeal for which the fee is waived or exempt for adjudication without requiring a review by the official who made the unfavorable decision. 8 CFR 103.3(a)(2)(ii).

### 9. Adjustment of Status (Form I–485) and Family-Based Fees

In this final rule, DHS provides that Form I–485, Application to Register Permanent Residence or Adjust Status, applicants will pay half of the regular Form I–765, Application for Employment Authorization, fee when it is filed with a Form I–485 for which the fee is paid if the adjustment application is pending. *See* 8 CFR 106.2(a)(44)(i). DHS had proposed requiring the full fee for Form I–765, and Form I–131, Application for Travel Document, when filed with Form I–485. *See* 88 FR 402, 491. DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(i).

The proposed rule also would have ($1,540). *See* 88 FR 402, 494 (Jan. 4, 2023). In the final rule, DHS provides that, when filing with parents, children will pay a lesser fee of $950 for Form I–485. *See* 8 CFR 106.2(a)(20)(ii).

### 10. Adoption Forms

In the final rule, DHS is providing additional fee exemptions for adoptive families. *See* 8 CFR 106.2(a)(32) and (48). Specifically, DHS will also provide fee exemptions for second extensions, second change of country requests, and duplicate approval notices for both the orphan and the Hague process. These would all be requested using Supplement 3 for either the orphan (Form I–600/I–600A) or Hague (Form I–800A) process. This is in addition to the exemptions that DHS already provides for the Supplement 3 for first extensions and first change of country requests. The final rule also provides that Forms N–600, Application for Certificate of Citizenship, and N–600K, Application for Citizenship and Issuance of Certificate under Section 322, are fee exempt for certain adoptees. *See* 8 CFR 106.2(b)(7)(ii) and (8).

### 11. Naturalization and Citizenship Fees

This final rule expands eligibility for paying half of the regular fee for Form N–400, Application for Naturalization. An applicant with household income at or below 400 percent of Federal Poverty Guidelines (FPG) may pay half price for

their Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii).

12. Additional Changes

In the final rule:

• DHS deletes proposed 8 CFR 106.3(a)(5), "Fees under the Freedom of Information Act (FOIA)," because it is unnecessary. DHS FOIA regulations at 6 CFR 5.11(k) address the waiver of fees under FOIA, 5 U.S.C. 552(a)(4)(A)(iii).

• Removes the fee exemption for Form I–601, Application for Waiver of Grounds of Inadmissibility, for applicants seeking cancellation of removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2), since they cannot use a waiver of inadmissibility to establish eligibility for this type of relief from removal. *Matter of Y–N–P–,* 26 I&N Dec. 10 (BIA 2012); *cf.* proposed 8 CFR 106.3(b)(8)(i).

• Provides a 30-day advance public notification requirement before a payment method will be changed. 8 CFR 106.1(b).

• Provides that an inflation only rule must adjust all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute).

*D. Summary of Final Fees*

The fees established in this rule are summarized in the Final Fee(s) column in Table 1. Table 1 compares the current fees to the fees established in this rule. In addition, the new fees and exemptions are incorporated into the Form G–1055, Fee Schedule, as part of the docket for this rulemaking.

The Current Fee(s) column in Table 1 represents the current fees in effect rather than the enjoined fees from the 2020 fee rule.[6] Throughout this final rule, the phrase "current fees" refers to the fees in effect and not the enjoined fees.

In some cases, the current or final fees may be the sum of several fees. For example, several immigration benefit requests require an additional biometric services fee under the current fee structure. The table includes rows with

---

[6] USCIS provides filing fee information on the All Forms page at *https://www.uscis.gov/forms/all-forms.* You can use the Fee Calculator to determine the exact filing and biometric services fees for any form processed at a USCIS Lockbox facility. *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Fee Calculator, *https://www.uscis.gov/feecalculator.* For a complete list of all USCIS fees, see Form G–1055, Fee Schedule, available from *https://www.uscis.gov/g-1055.*

and without the additional biometric services fee added to the Current Fee(s) column. In this final rule, DHS would eliminate the additional biometric services fee in most cases by including the costs in the underlying immigration benefit request fee. As such, the Final Fees(s) column does not include an additional biometric services fee in most cases.

Some other benefit requests are listed several times because in some cases DHS proposes distinct fees based on filing methods, online or paper. DHS will require fees for Form I–131, Application for Travel Document, and Form I–765, Application for Employment Authorization, when filed with Form I–485, Application to Register Permanent Residence or Adjust Status, in most cases. As such, Table 1 includes rows that compare the current fee for Form I–485 to various combinations of the final fees for Forms I–485, I–131, and I–765.

The table excludes statutory fees that DHS cannot adjust or can only adjust for inflation. Instead, the table focuses on the IEFA non-premium fees that DHS is changing in this rule.

**BILLING CODE 9111–97–P**

**6198**    **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-90 Application to Replace Permanent Resident Card (online filing) | $455 | $455 | $415 | -$40 | -9% |
| I-90 Application to Replace Permanent Resident Card (online filing) (with biometric services) | $540 | $455 | $415 | -$125 | -23% |
| I-90 Application to Replace Permanent Resident Card (paper filing) | $455 | $465 | $465 | $10 | 2% |
| I-90 Application to Replace Permanent Resident Card (paper filing) (with biometric services) | $540 | $465 | $465 | -$75 | -14% |
| I-102 Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | $445 | $680 | $560 | $115 | 26% |
| I-129 Petition for a Nonimmigrant worker[7] | $460 | N/A | N/A | N/A | N/A |
| I-129 H-1 Classifications | $460 | $780 | $780 | $320 | 70% |
| I-129 H-1 Classifications (small employers and nonprofits)[8] | $460 | $780 | $460 | $0 | 0% |
| I-129 H-2A - Named Beneficiaries | $460 | $1,090 | $1,090 | $630 | 137% |
| I-129 H-2A - Named Beneficiaries (small employers and nonprofits) | $460 | $1,090 | $545 | $85 | 18% |
| I-129 H-2A - Unnamed Beneficiaries | $460 | $530 | $530 | $70 | 15% |
| I-129 H-2A - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $530 | $460 | $0 | 0% |
| I-129 H-2B - Named Beneficiaries | $460 | $1,080 | $1,080 | $620 | 135% |
| I-129 H-2B - Named Beneficiaries (small employers and nonprofits) | $460 | $1,080 | $540 | $80 | 17% |
| I-129 H-2B - Unnamed Beneficiaries | $460 | $580 | $580 | $120 | 26% |
| I-129 H-2B - Unnamed Beneficiaries (small employers and nonprofits) | $460 | $580 | $460 | $0 | 0% |
| I-129 Petition for L Nonimmigrant workers | $460 | $1,385 | $1,385 | $925 | 201% |
| I-129 Petition for L Nonimmigrant workers (small employers and nonprofits) | $460 | $1,385 | $695 | $235 | 51% |

[7] The Form I-129 fees in this table are for the underlying form. Certain additional fees may be required by other regulations or statutes depending on factors such as the size of the business and the classification of the nonimmigrant beneficiary. *See* 8 CFR 106.2(c).

[8] The H-1B Registration Process Fee must be paid before this form is filed and fee is paid.

HR-1 FRN 2025 AR-000011

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-129 Petition for O Nonimmigrant workers | $460 | $1,055 | $1,055 | $595 | 129% |
| I-129 Petition for O Nonimmigrant workers (small employers and nonprofits) | $460 | $1,055 | $530 | $70 | 15% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications[9] | $460 | $1,015 | $1,015 | $555 | 121% |
| I-129CW CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (with biometric services)[10] | $545 | $1,015 | $1,015 | $470 | 85% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits)[11] | $460 | $1,015 | $510 | $50 | 11% |
| I-129CW Petition for a CNMI-Only Nonimmigrant Transitional Worker and I-129 Petition for Nonimmigrant Worker: E, H-3, P, Q, R, or TN Classifications (small employers and nonprofits) (with biometric services)[12] | $545 | $1,015 | $510 | -$35 | -6% |
| I-129F Petition for Alien Fiancé(e) | $535 | $720 | $675 | $140 | 26% |
| I-130 Petition for Alien Relative (online filing) | $535 | $710 | $625 | $90 | 17% |
| I-130 Petition for Alien Relative (paper filing) | $535 | $820 | $675 | $140 | 26% |
| I-131 Application for Travel Document | $575 | $630 | $630 | $55 | 10% |
| I-131 Application for Travel Document (with biometric services) | $660 | $630 | $630 | -$30 | -5% |
| I-131 Refugee Travel Document for an individual age 16 or older | $135 | $165 | $165 | $30 | 22% |

[9] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[10] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[11] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

[12] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

**6200**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-131 Refugee Travel Document for an individual age 16 or older (with biometric services) | $220 | $165 | $165 | -$55 | -25% |
| I-131 Refugee Travel Document for a child under the age of 16 | $105 | $135 | $135 | $30 | 29% |
| I-131 Refugee Travel Document for a child under the age of 16 (with biometric services) | $190 | $135 | $135 | -$55 | -29% |
| I-131A Application for Travel Document (Carrier Documentation) | $575 | $575 | $575 | $0 | 0% |
| I-140 Immigrant Petition for Alien Workers[13] | $700 | $715 | $715 | $15 | 2% |
| I-191 Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA) | $930 | $930 | $930 | $0 | 0% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (CBP) | $585 | $1,100 | $1,100 | $515 | 88% |
| I-192 Application for Advance Permission to Enter as Nonimmigrant (USCIS) | $930 | $1,100 | $1,100 | $170 | 18% |
| I-193 Application for Waiver of Passport and/or Visa | $585 | $695 | $695 | $110 | 19% |
| I-212 Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal | $930 | $1,395 | $1,175 | $245 | 26% |
| I-290B Notice of Appeal or Motion | $675 | $800 | $800 | $125 | 19% |
| I-360 Petition for Amerasian, Widow(er), or Special Immigrant | $435 | $515 | $515 | $80 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status | $1,140 | $1,540 | $1,440 | $300 | 26% |
| I-485 Application to Register Permanent Residence or Adjust Status (with biometric services) | $1,225 | $1,540 | $1,440 | $215 | 18% |
| I-485 Application to Register Permanent Residence or Adjust Status (under the age of 14 in certain conditions) | $750 | $1,540 | $950 | $200 | 27% |
| I-526/526E Immigrant Petition by Standalone/Regional Center | $3,675 | $11,160 | $11,160 | $7,485 | 204% |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) | $370 | $525 | $420 | $50 | 14% |

---

[13] Other fees such as the CNMI Education Fund fee and Asylum Program Fee are also required.

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-539 Application to Extend/Change Nonimmigrant Status (online filing) (with biometric services) | $455 | $525 | $420 | -$35 | -8% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) | $370 | $620 | $470 | $100 | 27% |
| I-539 Application to Extend/Change Nonimmigrant Status (paper filing) (with biometric services) | $455 | $620 | $470 | $15 | 3% |
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition | $775 | $920 | $920 | $145 | 19% |
| I-600 Petition to Classify Orphan as an Immediate Relative and I-600A Application for Advance Processing of an Orphan Petition (with biometric services for one adult) | $860 | $920 | $920 | $60 | 7% |
| I-600A/I-600 Supplement 3 Request for Action on Approved Form I-600A/I-600[14] | N/A | $455 | $455 | $455 | N/A |
| I-601 Application for Waiver of Grounds of Inadmissibility | $930 | $1,050 | $1,050 | $120 | 13% |
| I-601A Provisional Unlawful Presence Waiver | $630 | $1,105 | $795 | $165 | 26% |
| I-601A Provisional Unlawful Presence Waiver (with biometric services) | $715 | $1,105 | $795 | $80 | 11% |
| I-612 Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | $930 | $1,100 | $1,100 | $170 | 18% |
| I-687 Application for Status as a Temporary Resident | $1,130 | $1,240 | $1,240 | $110 | 10% |
| I-687 Application for Status as a Temporary Resident (with biometric services) | $1,215 | $1,240 | $1,240 | $25 | 2% |
| I-690 Application for Waiver of Grounds of Inadmissibility Under Sections 245A or 210 of the Immigration and Nationality Act | $715 | $985 | $905 | $190 | 27% |
| I-694 Notice of Appeal of Decision | $890 | $1,155 | $1,125 | $235 | 26% |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | $1,670 | $1,670 | $1,670 | $0 | 0% |

---

[14] This form is being created by this rule and did not previously exist.

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-698 Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) (with biometric services) | $1,755 | $1,670 | $1,670 | -$85 | -5% |
| I-751 Petition to Remove Conditions on Residence | $595 | $1,195 | $750 | $155 | 26% |
| I-751 Petition to Remove Conditions on Residence (with biometric services) | $680 | $1,195 | $750 | $70 | 10% |
| I-765 Application for Employment Authorization (online filing) | $410 | $555 | $470 | $60 | 15% |
| I-765 Application for Employment Authorization (online filing) (with biometric services) | $495 | $555 | $470 | -$25 | -5% |
| I-765 Application for Employment Authorization (paper filing) | $410 | $650 | $520 | $110 | 27% |
| I-765 Application for Employment Authorization (paper filing) (with biometric services) | $495 | $650 | $520 | $25 | 5% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 | $925 | $920 | $145 | 19% |
| I-800 Petition to Classify Convention Adoptee as an Immediate Relative and Form I-800A, Application for Determination of Suitability to Adopt a Child from a Convention Country (with biometric services) | $860 | $925 | $920 | $60 | 7% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A | $385 | $455 | $455 | $70 | 18% |
| I-800A Supplement 3, Request for Action on Approved Form I-800A (with biometric services) | $470 | $455 | $455 | -$15 | -3% |
| I-817 Application for Family Unity Benefits | $600 | $875 | $760 | $160 | 27% |
| I-817 Application for Family Unity Benefits (with biometric services) | $685 | $875 | $760 | $75 | 11% |
| I-824 Application for Action on an Approved Application or Petition | $465 | $675 | $590 | $125 | 27% |
| I-829 Petition by Investor to Remove Conditions | $3,750 | $9,525 | $9,525 | $5,775 | 154% |
| I-829 Petition by Investor to Remove Conditions (with biometric services) | $3,835 | $9,525 | $9,525 | $5,690 | 148% |

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) | $285 | $340 | $340 | $55 | 19% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for an individual adjudicated by DHS) (with biometric services) | $370 | $340 | $340 | -$30 | -8% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) | $570 | $340 | $340 | -$230 | -40% |
| I-881 Application for Suspension of Deportation or Special Rule Cancellation of Removal (for a family adjudicated by DHS) (with biometric services for two people) | $740 | $340 | $340 | -$315 | -48% |
| I-910 Application for Civil Surgeon Designation | $785 | $1,230 | $990 | $205 | 26% |
| I-929 Petition for Qualifying Family Member of a U-1 Nonimmigrant | $230 | $275 | $0 | -$230 | -100% |
| I-941 Application for Entrepreneur Parole | $1,200 | $1,200 | $1,200 | $0 | 0% |
| I-941 Application for Entrepreneur Parole (with biometric services) | $1,285 | $1,200 | $1,200 | -$85 | -7% |
| I-956 Application for Regional Center Designation | $17,795 | $47,695 | $47,695 | $29,900 | 168% |
| I-956F Application for Approval of an Investment in a Commercial Enterprise | $17,795 | $47,695 | $47,695 | $29,900 | 168% |
| I-956G Regional Center Annual Statement | $3,035 | $4,470 | $4,470 | $1,435 | 47% |
| N-300 Application to File Declaration of Intention | $270 | $320 | $320 | $50 | 19% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (online filing) | $700 | $830 | $780 | $80 | 11% |
| N-336 Request for Hearing on a Decision in Naturalization Proceedings Under Section 336 (paper filing) | $700 | $830 | $830 | $130 | 19% |
| N-400 Application for Naturalization (online filing) | $640 | $760 | $710 | $70 | 11% |

HR-1 FRN 2025 AR-000016

Appx-000041

| Table 1: Non-Statutory IEFA Immigration Benefit Request Fees | | | | | |
|---|---|---|---|---|---|
| Immigration Benefit Request | Current Fee(s) | NPRM Fee(s) | Final Fee(s) | Current to Final Difference | |
| N-400 Application for Naturalization (online filing) (with biometric services) | $725 | $760 | $710 | -$15 | -2% |
| N-400 Application for Naturalization (paper filing) | $640 | $760 | $760 | $120 | 19% |
| N-400 Application for Naturalization (paper filing) (with biometric services) | $725 | $760 | $760 | $35 | 5% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) | $320 | $380 | $380 | $60 | 19% |
| N-400 Application for Naturalization (applicants with household income below 400 percent of the FPG) (with biometric services) | $405 | $380 | $380 | -$25 | -6% |
| N-470 Application to Preserve Residence for Naturalization Purposes | $355 | $420 | $420 | $65 | 18% |
| N-565 Application for Replacement Naturalization/Citizenship Document (online filing) | $555 | $555 | $505 | -$50 | -9% |
| N-565 Application for Replacement Naturalization/Citizenship Document (paper filing) | $555 | $555 | $555 | $0 | 0% |
| N-600 Application for Certificate of Citizenship (online filing) | $1,170 | $1,385 | $1,335 | $165 | 14% |
| N-600 Application for Certificate of Citizenship (paper filing) | $1,170 | $1,385 | $1,385 | $215 | 18% |
| N-600K Application for Citizenship and Issuance of Certificate (online filing) | $1,170 | $1,385 | $1,335 | $165 | 14% |
| N-600K Application for Citizenship and Issuance of Certificate (paper filing) | $1,170 | $1,385 | $1,385 | $215 | 18% |
| USCIS Immigrant Fee | $220 | $235 | $235 | $15 | 7% |
| H-1B Registration Process Fee | $10 | $215 | $215 | $205 | 2,050 % |
| Biometric Services | $85 | $30 | $30 | -$55 | -65% |
| G-1041 Genealogy Index Search Request (online filing) | $65 | $100 | $30 | -$35 | -54% |
| G-1041 Genealogy Index Search Request (paper filing) | $65 | $120 | $80 | $15 | 23% |
| G-1041A Genealogy Records Request (online filing) | $65 | $240 | $30 | -$35 | -54% |
| G-1041A Genealogy Records Request (paper filing) | $65 | $260 | $80 | $15 | 23% |
| G-1566 Request for Certificate of Non-Existence | $0 | $330 | $330 | $330 | N/A |

BILLING CODE 9111–97–C

*E. Summary of Costs and Benefits*

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, will result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2024 through FY 2033), DHS estimates the annualized net costs to the public will be $157,005,952 discounted at 3 and 7 percent. Estimated total net costs over 10 years will be $1,339,292,617 discounted at 3-percent and $1,102,744,106 discounted at 7-percent.

The changes in the final rule will also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include reduced fee processing errors, increased efficiency in the adjudicative process, the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

Fee increases will result in annualized transfer payments from applicants/petitioners to USCIS of approximately $887,571,832 discounted at 3 and 7 percent. The total 10-year transfer payments from applicants/petitioners to USCIS will be $7,571,167,759 at a 3-percent discount rate and $6,233,933,135 at a 7-percent discount rate.

Reduced fees and expanded fee exemptions will result in annualized transfer payments from USCIS to applicants/petitioners of approximately $241,346,879 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners will be $2,058,737,832 at a 3-percent discount rate and $1,695,119,484 at a 7-percent discount rate. The annualized transfer payments from the Department of Defense (DOD) to USCIS for Form N–400 filed by military members will be approximately $197,260 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DOD to USCIS will be $1,682,668 at a 3-percent discount rate and $1,385,472 at a 7-percent discount rate.

Adding annualized transfer payments from fee paying applicants/petitioners to USCIS ($887,571,832) and transfer payments from DoD to USCIS ($197,260), then subtracting transfer payments from USCIS to applicants/petitioners ($241,346,879) yields estimated net transfer payments to USCIS of $646,422,213 at both 3 and 7-percent discount rates, an approximation of additional annual revenue to USCIS from this rule.

*F. Effect of the COVID–19 Pandemic on the USCIS Fee Review and Rulemaking*

DHS acknowledges the broad effects of the Coronavirus Disease (COVID–19) international pandemic on the United States broadly and the populations affected by this rule. Multiple commenters on the proposed rule wrote that increasing USCIS fees at this time would exacerbate the negative economic impacts that the United States has experienced from the COVID–19 pandemic.

DHS realizes the effects of COVID–19, and USCIS, specifically, is still dealing with the effects of COVID–19 on its workforce and processing backlog. COVID–19 affected the demand for immigration benefits and USCIS services, and, as all employers did, USCIS was required to adjust its workplaces to mitigate the impacts of the disease. DHS has procedures in place to deal with emergency situations as they arise but is no longer providing special accommodations associated with the pandemic.[15] USCIS considered the effects of COVID–19 on its workload volumes, revenue, or costs, along with all available data, when it conducted its fee review. DHS will also consider these effects in future fee rules. However, no changes were made in the fees and regulations codified in this final rule to address the effects of COVID–19. Further, Census data indicates that impacts of COVID–19 showed a dip in estimated sales, revenue, and value of shipments in 2020 followed by a recovery through the fourth quarter of 2021.[16] CDC ended the public health emergency due to the COVID–19 pandemic on May 11, 2023.[17] Although there may be some lingering economic impacts from COVID–19, DHS does not believe these would have an impact on the number of filings by requestors. DHS notes that for certain forms and categories fee waivers may be available for people with financial hardship. *See* 8 CFR 106.3(a); Table 4B.

**II. Background**

*A. History*

On January 4, 2023, DHS published a proposed rule in the **Federal Register** (docket USCIS–2021–0010) at 88 FR 402. DHS published a correction on January 9, 2023, at 88 FR 1172.[18] On February 24, 2023, DHS extended the comment period an additional 5 days, to March 13, 2023, for a total comment period of 68 days. *See* 88 FR 11825. USCIS also held a public engagement event on January 11, 2023, and a software demonstration on March 1, 2023, to provide additional avenues for the interested public to hear about and provide feedback on the proposed fee rule.[19] In this final rule, DHS will refer to the initial proposed rule, correction, and extension collectively as the proposed rule.

*B. Authority and Guidance*

DHS publishes this final rule under the Immigration and Nationality Act ("INA"), which establishes the Immigration Examinations Fee Account ("IEFA") for the receipt of fees it charges. INA section 286(m), 8 U.S.C. 1356(m). The INA allows DHS to set "fees for providing adjudication and naturalization services . . . at a level that will ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants." *Id.* The INA further provides that "[s]uch fees may also be set at a level that will recover any additional costs associated with the administration of the fees collected." *Id.* DHS also issues this final rule consistent with the Chief Financial Officer Act, 31 U.S.C. 901–03903 (requiring each agency's Chief Financial Officer (CFO) to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees).

This final rule is also consistent with non-statutory guidance on fees, the budget process, and Federal accounting principles.[20] DHS uses Office of

---

[15] *See* USCIS, Immigration Relief in Emergencies or Unforeseen Circumstances available at *https://www.uscis.gov/newsroom/immigration-relief-in-emergencies-or-unforeseen-circumstances* (last reviewed/updated Aug. 16, 2023); USCIS, USCIS Announces End of COVID-Related Flexibilities available at *https://www.uscis.gov/newsroom/alerts/uscis-announces-end-of-covid-related-flexibilities* (last reviewed/updated Mar. 23, 2023).

[16] *See https://www.regulations.gov/comment/USCIS-2021-0010-0706* and *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[17] *See* CDC, COVID–19 End of Public Health Emergency, available at *https://www.cdc.gov/coronavirus/2019-ncov/your-health/end-of-phe.html* (last updated May 5, 2023).

[18] The document corrected two typographical errors in Table 1 of the proposed rule.

[19] *https://www.regulations.gov/comment/USCIS-2021-0010-0706* and *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[20] *See* 58 FR 38142 (July 15, 1993) (revising Federal policy guidance regarding fees assessed by
Continued

**6206** **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

Management and Budget (OMB) Circular A–25 as general policy guidance for determining user fees for immigration benefit requests, with exceptions as outlined in this section. DHS also follows the annual guidance in OMB Circular A–11 if it requests appropriations to offset a portion of Immigration Examinations Fee Account (IEFA) costs.[21]

Finally, this final rule accounts for, and is consistent with, congressional appropriations for specific USCIS programs. In the proposed rule, DHS outlined the effects of appropriations for FY 2021 and FY 2022.[22] As explained in the proposed rule, Congress provided USCIS additional appropriations for very specific purposes in FY 2022.[23] Shortly before publication of the proposed rule, Congress passed a full year appropriation bill for FY 2023. Together, the total FY 2023 appropriations for USCIS were approximately $268.0 million. Congress appropriated USCIS approximately $243.0 million for E-Verify and refugee processing in FY 2023.[24] Approximately $133.4 million of the $243.0 million was for refugee processing, and the remainder was for E-Verify. In addition, Congress appropriated $25 million for the Citizenship and Integration Grant Program, which is available until September 30, 2024, the end of FY 2024. *Id.* This means that USCIS received $5 million more than in FY 2022, and it has 2 years to spend the full $25 million. Because USCIS anticipated appropriated funds for citizenship grants in both FY 2022 and FY 2023, the $20 million in FY 2022 and the $25 million in FY 2023 for citizenship grants are not part of the FY 2022/2023 IEFA fee review budget. For several years, USCIS had the authority to spend

no more than $10 million for citizenship grants.[25] Until recently, grant program funding came from the IEFA fee revenue or a mix of appropriations and fee revenue.[26] If USCIS does not receive appropriations for citizenship grants for FY 2024, then it could use any remaining amount from the $25 million appropriation in the Consolidated Appropriations Act, 2023.

In these cases, appropriation laws for FY 2022 and FY 2023 provide that the funds are only to be used for the specified purposes, and DHS is not required to reduce any current IEFA fee.[27] As explained in the proposed rule, these appropriations do not overlap with the fee review budget, which will fund immigration adjudication and naturalization services for future incoming receipts. USCIS cannot and does not presume congressional appropriations, especially given the lack of appropriations in the past. If this fee rule does not account for the possibility of no congressional funding in future years and Congress fails to fund a program, either the program cannot continue or USCIS will be forced to reallocate resources assigned to another part of the agency for this purpose. As such, DHS makes no changes to the final rule based on the appropriations for FY 2022 and FY 2023.

*C. Changes From the Proposed Rule*

This final rule adopts, with appropriate changes, the regulatory text in the proposed rule published in the **Federal Register** on January 4, 2023. *See* U.S. Citizenship and Immigration Services Fee Schedule and Changes to Certain Other Immigration Benefit Request Requirements; Proposed rule, 88 FR 402. DHS is making several changes in this final rule based on

comments received on the proposed rule or as required by the effects of those changes. As explained throughout this preamble, DHS exercises its discretionary authority to establish fees, provide fee exemptions, allow fee waivers, provide lower fees, or shift the costs of benefits and services based on numerous factors, including adequately funding USCIS operations, balancing beneficiary-pays and ability-to-pay principles, burdening requestors and USCIS, considering humanitarian concerns, and other policy objectives as supported by data. This final rule also relies on the justifications articulated in the proposed rule, except as modified and explained throughout this rule in response to public comments, intervening developments, and new information. As stated in the proposed rule, DHS is not repeating the amendatory instructions and regulatory text for ministerial, procedural, or otherwise non-substantive changes adopted from the 2020 fee rule. 88 FR 421. A description of each change is as follows:

1. Reduced Costs and Fees

DHS has revised the USCIS budget underlying the final rule. In the proposed rule, USCIS projected that its IEFA non-premium cost projections must increase by 36.4 percent from $3,776.3 million in FY 2021 to an average of $5,150.7 million in FY 2022/2023 to fulfill USCIS' operational requirements. *See* 88 FR 402, 428 (Jan. 4, 2023). In this final rule, USCIS revises the FY 2022/2023 cost projection to approximately $4,424.0 million, a $726.7 million or 14.1 percent decrease compared to the proposed rule. *See* Table 2 of this preamble.

Federal agencies for Government services); Federal Accounting Standards Advisory Board Handbook, Version 17 (06/18), "Statement of Federal Financial Accounting Standards 4: Managerial Cost Accounting Standards and Concepts," SFFAS 4, available at *http://files.fasab.gov/pdffiles/ handbook_sffas_4.pdf* (generally describing cost accounting concepts and standards, and defining "full cost" to mean the sum of direct and indirect costs that contribute to the output, including the costs of supporting services provided by other segments and entities.); *id.* at 49–66 (July 31, 1995); OMB Circular A–11, "Preparation, Submission, and Execution of the Budget," section 20.7(d), (g) (June 29, 2018), available at *https://www.whitehouse.gov/ wp-content/uploads/2018/06/a11.pdf* (June 29, 2018) (providing guidance on the FY 2020 budget and instructions on budget execution, offsetting collections, and user fees).

[21] OMB Circulars A–25 and A–11 provide nonbinding internal executive branch direction for the development of fee schedules under IOAA and appropriations requests, respectively. *See* 5 CFR

1310.1. Although DHS is not required to strictly adhere to these OMB circulars in setting USCIS fees, DHS understands they reflect best practices and used the activity-based costing (ABC) methodology supported in Circulars A–25 and A–11 to develop the proposed fee schedule.

[22] *See* 88 FR 402, 415–417 (Jan. 4, 2023); *see also* Consolidated Appropriations Act, 2021 (Dec. 27, 2020), Public Law 116–260, at div. F, tit. IV; Consolidated Appropriations Act, 2022, Public Law 117–103 (Mar. 15, 2022) ("Pub. L. 117–103") at div. F. tit. 4; Extending Government Funding and Delivering Emergency Assistance Act, 2022, Public Law 117–43 (Sept. 30, 2021) ("Pub. L. 117–43") at div. C. title V, sec. 2501.

[23] *See* 88 FR 402, 415–416 (Jan. 4, 2023); *see also* Public Law 117–103.

[24] *See* Consolidated Appropriations Act, 2023, Public Law 117–328, div. F, tit. IV (Dec. 29, 2022).

[25] Congress provided $10 million for citizenship and integration grants in FY 2019 (Pub. L. 116–6), FY 2020 (Pub. L. 116–93), and FY 2021 (Pub. L. 116–260).

[26] USCIS received $2.5 million for the immigrant integration grants program in FY 2013 (Pub. L. 113–6) and FY 2014 (Pub. L. 113–76). USCIS did not receive appropriations for the immigrant integration grants program in FY 2015, FY 2016, FY 2017, and FY 2018.

[27] Public Law 117–43, at section 132, states, "That such amounts shall be in addition to any other funds made available for such purposes, and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m))." Likewise, Public Law 117–43, at section 2501, states "That such amounts made available for such purposes and shall not be construed to require any reduction of any fee described in section 286(m) of the Immigration and Nationality Act (8 U.S.C. 1356(m))." Similar wording is in Public Law 117–328 in div F. tit. IV. USCIS has a long history of funding citizenship and integration grants from IEFA revenue, appropriations, or a mix of both.

| Table 2: FY 2022/2023 Proposed vs. Final FY 2022/2023 Fee Review Cost Projections (Dollars in Thousands) | | | | | |
|---|---|---|---|---|---|
| Type | Proposed Rule Average | Final Rule Average | Difference | Change | Percent of Total Change |
| Payroll | $3,347,853 | $3,186,683 | ($161,170) | -4.8% | 22% |
| Non-Payroll | $1,802,854 | $1,237,348 | ($565,506) | -31.4% | 78% |
| **Total** | **$5,150,707** | **$4,424,031** | **($726,676)** | **-14.1%** | **100%** |

DHS is authorized by INA section 286(m), 8 U.S.C. 1356(m), to set USCIS fees at a level to recover "the full costs" of providing "all" "adjudication and naturalization services," and "the administration of the fees collected." This necessarily includes support costs, and USCIS' current budget forecasts a deficit based on fully funding all of its operations. DHS must make up that difference either by cutting costs, curtailing operations, or increasing revenue. DHS examined USCIS recent budget history, service levels, and immigration trends to forecast its costs, revenue, and operational metrics in order to determine whether USCIS fees would generate sufficient revenue to fund anticipated operating costs. This increase in funding ensures that USCIS can meet its operational needs during the biennial period.

| Table 3: IEFA Non-Premium Cost and Revenue (at FY 2021 Levels) Dollars in Millions | | | |
|---|---|---|---|
| Point of Comparison | FY 2022 | FY 2023 | FY 2022/2023 Average |
| Non-Premium Revenue with Current Fees | $3,280.3 | $3,284.8 | $3,282.5 |
| Non-Premium Cost Projection | $4,422.0 | $4,426.1 | $4,424.0 |
| **Difference** | $1,141.7 | $1,141.3 | $1,141.5 |

Reducing the budget allows DHS to finalize some fees that are lower than in the proposed rule and offer additional fee exemptions in response to public comments requesting lower fees. In this final rule, DHS removes approximately $726.7 million of average annual estimated costs by making the following changes:

• Transferring costs to Premium Processing revenue;

• Reducing the estimated marginal costs of the Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers Interim Final Rule to be funded;[28] and

• Including efficiency estimates based on improved efficiency measures.

DHS revises the estimated cost and revenue differential to $1,141.5 million in this final rule. *See* Table 3 of this preamble. DHS issues this final rule to adjust USCIS' fee schedule to recover the full cost of providing immigration adjudication and naturalization services.

a. Transferring Costs to Premium Processing Revenue

DHS has historically excluded premium processing revenue and costs from its IEFA fee reviews and rulemakings to ensure that premium processing funds are available for infrastructure investments largely related to information technology, to provide staff for backlog reduction, and to ensure that non-premium fees were set at a level sufficient to cover the base operating costs of USCIS. This was done because the INA, as amended by the District of Columbia Appropriations Act of 2001 provided that premium processing revenue shall be used to fund the cost of offering premium service, as well as the cost of infrastructure improvements in adjudications and customer service processes. *See* 87 FR 1832. In the proposed rule at 88 FR 420, USCIS outlined its planned uses of premium processing revenue to provide premium processing service, improve information technology infrastructure, and reduce backlogs. Therefore, revenue from premium processing, the costs for USCIS to provide premium processing service, the costs to improve information technology infrastructure, and the costs directed at reducing the backlog were not considered in the proposed fees.

On October 1, 2020, the Continuing Appropriations Act, which included the USCIS Stabilization Act, was signed into law, codifying new section 286(u)(3)(A) of the INA, 8 U.S.C. 1356(u)(3)(A). Among other things, the USCIS Stabilization Act established new premium processing fees and expanded the permissible uses of revenue from the collection of premium processing fees, including improvements to adjudication process infrastructure, responses to adjudication demands, and to otherwise offset the cost of providing adjudication and naturalization services. Then, on March 30, 2022, DHS published a final rule, Implementation of the Emergency Stopgap USCIS Stabilization Act,

---

[28] 87 FR 18078 (Mar. 29, 2022).

HR-1 FRN 2025 AR-000020

Appx-000045

**6208**   **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

implementing part of the authority provided under the USCIS Stabilization Act to offer premium processing for those benefit requests made eligible for premium processing by section 4102(b) of that law. *See* 87 FR 18227 (premium processing rule).

On December 28, 2023, DHS published a final rule, Adjustment to Premium Processing Fees, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023 according to the Consumer Price Index for All Urban Consumers (CPI–U). 88 FR 89539 (Dec. 28, 2023). The adjustment increases premium processing fees from $1,500 to $1,685, from $1,750 to $1,965, and from $2,500 to $2,805. 8 CFR 106.4.

The proposed rule did not include changes directly resulting from the USCIS Stabilization Act or premium processing rule, as DHS was still in the early stages of implementation. It stated that DHS would consider including premium processing revenue and costs in the final rule., as appropriate, as DHS would have more information about the revenue collected from premium processing services by the time DHS publishes a final rule. *See* 88 FR 402, 419 (Jan. 4, 2023). As a result of additional information gathered over the passage of time since the proposed rule and the December 28, 2023 Adjustment to Premium Processing Fees final rule, 88 FR 89539, in this final rule, DHS has transferred $129.8 million in costs to premium processing to account for future premium processing revenue projections.

b. Reducing the Work To Be Funded by the Asylum Program Fee.

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–140, Immigrant Petition for Alien Worker. 88 FR 451. DHS has begun implementation of the Procedures for Credible Fear Screening and Consideration of Asylum, Withholding of Removal, and CAT Protection Claims by Asylum Officers (Asylum Processing IFR) (87 FR 18078 Mar. 29, 2022) rulemaking, but full implementation of the IFR is delayed while DHS resolves litigation around the Circumvention of Lawful Pathways rule. *See* 88 FR 31314 (May 16, 2023). Therefore, DHS needs to generate less revenue from the Asylum Program Fee than we estimated was needed in the proposed rule. Accordingly, we have provided a lower fee in this final rule for certain small employers and nonprofits in response to comments requesting lower fees for

these groups. Businesses with 25 or fewer full-time equivalent employees will pay a $300 Asylum Program Fee instead of $600, and half of the full fee for Form I–129. Nonprofits will pay $0. How DHS determined which businesses would receive such relief from the full fee is discussed later in this section. DHS estimates the revised Asylum Program Fee will generate approximately $313 million in revenue, compared to the $425 million that was estimated in the proposed rule from charging $600 with no exemptions or discounts.

DHS recognizes that reducing the USCIS budget due to the lower projected revenue from the Asylum Program Fee risks a revenue shortfall if the Asylum Processing IFR is fully implemented and the associated costs incurred. However, DHS's Asylum Processing IFR workload is somewhat flexible because DOJ can share some— though not all—of the workload. On the other hand, if the Asylum Processing IFR is not fully implemented, USCIS still has a significant need for the revenue. Although the amount of the fee was based on the costs of the Asylum Processing IFR, it was proposed ". . . to fund part of the costs of administering the entire asylum program . . ." 88 FR 849. USCIS Asylum Division expense estimates are over $400 million a year before adding the costs of the Asylum Processing IFR, and USCIS is regularly adding new asylum offices and capabilities. Thus, DHS projects that the total costs of the asylum program will exceed the revenue from the new fee even before any new capacity is added to implement the Asylum Processing IFR.

Further, DHS notes that USCIS cannot direct the revenue from the Asylum Program Fee precisely to the marginal costs that result from the implementation of the Asylum Processing IFR, as the Asylum Program Fee, like other fees, will be deposited into the general IEFA and not an account specific to the IFR or to the asylum program. In addition, if Asylum Division expenses are greatly reduced or funded by a Congressional appropriation, and USCIS determines the Asylum Program Fee is not needed, USCIS can pause collection of the Asylum Program Fee using the authority in 8 CFR 106.3(c). The costs for administering the asylum program not funded by the revenue collected from the Asylum Program Fee will continue to be funded by other fees.

c. Including Processing Efficiency Estimates Based on Improved Efficiency Measures

USCIS is making progress reducing backlogs and processing times. For example, USCIS committed to new cycle time goals in March 2022.[29] These goals are internal metrics that guide the backlog reduction efforts of the USCIS workforce and affect how long it takes the agency to process cases. As cycle times improve, processing times will follow, and requestors will receive decisions on their cases more quickly. USCIS has continued to increase capacity, improve technology, and expand staffing to achieve these goals.

2. Changes in the Asylum Program Fee

DHS proposed a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, or Form I–140, Immigrant Petition for Alien Worker. *See* 88 FR 402, 451 (Jan. 4, 2023). As explained in the proposed rule, DHS determined that the Asylum Program Fee is an effective way to shift some costs to requests that are generally submitted by petitioners who have more ability to pay, as opposed to shifting those costs to all other fee payers. *See* 88 FR 402, 451–454 (Jan. 4, 2023). DHS arrived at the amount of the Asylum Program Fee by calculating the amount that would need to be added to the fees for Form I–129, Petition for a Nonimmigrant Worker, Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and Form I–140, Immigrant Petition for Alien Worker, to collect the Asylum Processing IFR estimated annual costs. *Id.* The Asylum Program Fee adds a fee, only for Form I–129, I–129CW, and Form I–140 petitioners, in order to maintain lower fees for other immigration benefit requestors than if these asylum costs were spread among all other fee payers. The proposed rule provided examples of alternative Form I–485, Application to Register Permanent Residence or Adjust Status, and I–765, Application for Employment Authorization, proposed fees if those applications were burdened with the Asylum Processing IFR estimated annual costs. *Id* at 452. The proposed fees for Forms I–485, I–765, and others were lower with the shift of asylum program costs to employers through the new fee. If Forms I–129, I–129CW, and I–140 recover more of those

[29] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders" (Mar. 29, 2022), *https://www.uscis.gov/ newsroom/news-releases/uscis-announces-new- actions-to-reduce-backlogs-expand-premium- processing-and-provide-relief-to-work.*

costs, then that means other forms need not recover as much, resulting in lower proposed fees for Forms I–485, I–765, and others that recovered more than full cost in the proposed rule. DHS stands by this approach to lower fees for other immigration benefit requestors less able to pay by limiting the Asylum Program Fee to Forms I–129, I–129CW, and I–140.

DHS summarizes and responds to the comments on the Asylum Program Fee in more detail in section IV.G.2.a. of this preamble. After considering public comments, in the final rule, DHS exercises its discretionary authority to establish fees, balancing the beneficiary-pays and ability-to-pay principles, and to address the negative effects that commenters stated would result, by exempting the Asylum Program Fee for nonprofit petitioners and reducing it by half for small employers. *See* 8 CFR 106.2(c)(13).[30] The fee will be $0 for nonprofits; $300 for small employers (defined as firms or individuals having 25 or fewer FTE employees); and $600 for all other filers of Forms I–129, I–129CW, and I–140. *See* 8 CFR 106.1(f) and 106.2(c)(13).

3. Defining Small Employer

DHS did not propose to provide any fee exemptions or discounts based on employer size. Many commenters, however, wrote that the proposed new fees for employment-based immigration benefit requests could make it difficult for small companies to pay the fees or it may hinder their ability to hire the workers they need. Balancing the need to shift the costs of services, adequately fund USCIS operations, and balance the beneficiary-pays and ability-to-pay principles, DHS determined that a discount based on the size of the business is consistent with the ability-to-pay principle that was articulated in the proposed rule. *See* 88 FR 402,424–26 (Jan. 4, 2023).

The final rule defines "small employer" as having 25 or fewer full-time equivalent (FTE). *See* 8 CFR 106.1(f). When determining which employers should be considered small, DHS considered what definition could be administered to provide the relief requested by commenters without adding costs to USCIS, additional burden to petitioners, or causing delays in intake and processing of the submitted requests. The volume of

forms submitted to USCIS requires that benefit request intake be automated to the extent possible, including the analysis of whether the correct fee has been paid based on if the petitioner meets the criteria for the fee they have submitted with their request. DHS also considered other exemptions provided for the same or similar forms and how the term "small employer" is defined in other contexts. DHS reviewed INA section 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B), which provides that the ACWIA fee is reduced by half for any employer with not more than 25 FTE employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer). Because the ACWIA fee and the Asylum Program fee are both applied to the Form I–129, DHS decided that using a consistent definition was preferable. DHS also determined that defining small employer as 25 or fewer full time equivalent employees was appropriate because: (1) it is consistent with what Congress has provided in statute that it considers small with regard to the applicability of certain fees for employment-based petitions submitted to USCIS; (2) DHS has a long history of administering the ACWIA fee, and (3) determining if the petitioner is eligible for the fee discount requires minimal additional evidence.[31] This definition will be applied to the fee discount and exemption for the Asylum Program Fee and the discount for the Form I–129 fee (discussed later in this section).

4. Defining Nonprofit

DHS did not propose any relief from any fee in the proposed rule for nonprofit entities. Many commenters, however, wrote that the proposed new fees for nonprofits could make it difficult for the nonprofits to pay the fees or it may hinder their ability to hire the workers they need. DHS agrees that the type of organizations that qualify as a nonprofit generally provide a service to the public.[32] Nonprofit organizations may include religious, educational, or charitable organizations and may not be

required to pay federal taxes.[33] DHS understands that organizations that do not pursue monetary gain or profit must use funds for USCIS fees that they would otherwise use in pursuit of public and private service. Therefore, balancing the need to shift the costs of services, adequately funding USCIS operations, and the beneficiary-pays and ability-to-pay principles, DHS determined that a discount for nonprofits is consistent with the ability-to-pay principle that was articulated in the proposed rule. *See* 88 FR 402,424–26 (Jan. 4, 2023). DHS acknowledges that allowing this discount for certain large non-profits, such as universities and hospitals, may seem inconsistent with the ability-to-pay principle. However, DHS notes that this treatment is consistent with their tax-exempt status and believes that the public service performed by these entities further justifies the fee discount.

DHS determined that the most appropriate definition for nonprofit is the definition in the Internal Revenue Code (IRC), specifically 26 U.S.C. 501(c)(3) (2023). 8 CFR 106.1(f)(2). As with the definition of small employer, DHS considered costs to USCIS, burden on petitioners, and intake and processing requirements. DHS also considered how the term nonprofit is defined in other contexts. Commenters that requested relief for nonprofits did not suggest an alternative definition for nonprofit than that used for Federal income tax purposes or as provided for the ACWIA fee reduction in 8 CFR 214.2(h)(19)(iv). The INA provides for a reduced ACWIA fee if a petitioner is "a primary or secondary education institution, an institution of higher education, as defined in section 1001(a) of title 20, a nonprofit entity related to or affiliated with any such institution, a nonprofit entity which engages in established curriculum-related clinical training of students registered at any such institution, a nonprofit research organization, or a governmental research organization." INA section 214(c)(9)(A), 8 U.S.C. 1184(c)(9)(A). The INA does *not* define "nonprofit" in terms of the IRC and the definitions of "institution of higher education" and "government research organization" in 8 CFR 214.2(h)(19)(iv)(B) are not tied to the IRC.

For ease of administration, DHS will not require that the petitioner nonprofit

---

[30] DHS recognizes that many small employers and nonprofits submit USCIS Form I–907, Request for Premium Processing, with their Form I–129. Because premium processing is an optional request for faster processing and not required to obtain an immigration benefit, DHS makes no changes to premium processing fees for those groups.

[31] As noted in the Paperwork Burden Act section of this final rule, and in the final form instructions for Forms I–129 and 140 provided in the docket, DHS will require that petitioners submit the first page of their most recent IRS Form 941, Employer's QUARTERLY Federal Tax Return. We will determine at intake if the petitioner has submitted the lower fee or no fee based on the number indicated in Part 1, question 1, Number of employees who received wages, tips, or other compensation for the pay period.

[32] *See* U.S. Department of the Treasury, U.S. Internal Revenue Service, Exempt Organization Types, *https://www.irs.gov/charities-non-profits/ exempt-organization-types* (Page Last Reviewed or Updated: 05–Dec–2023).

[33] Nonprofits may be required to pay certain other taxes. *See,* U.S. Department of the Treasury, U.S. Internal Revenue Service, Federal Tax Obligations of Non-Profit Corporations at *https://www.irs.gov/ charities-non-profits/federal-tax-obligations-of-non-profit-corporations.* (Page Last Reviewed or Updated: 05–Dec–2023).

status be limited to research or educational purposes, as in 8 CFR 214.2(h)(19)(iv)(B). DHS has decided that eligibility for fee reductions and fee exemptions for nonprofits provided in this final rule will be limited to nonprofit organizations approved by the Internal Revenue Service as a nonprofit entity under section 501(c)(3) of the IRC or as a government research organization, and that USCIS will not impose the burden on petitioners of demonstrating an educational or research purpose. This approach will ensure that the primary types of organizations eligible for the ACWIA fee reduction in the INA—educational institutions, nonprofit research organizations, and governmental research organizations—will also be eligible for the fee reductions and exemptions under this rule, as will other nonprofit entities with a charitable purpose under section 501(c)(3).

DHS considered including but will not include entities organized under 501(c)(4) and 501(c)(6) of the IRC in the definition of nonprofit in this rule. Tax-exempt organizations under section 501(c)(4) include social welfare organizations and local associations of employees, while tax-exempt organizations under 501(c)(6) include business leagues, chambers of commerce, real estate boards, boards of trade, and professional football leagues. *See* 26 U.S.C. 501(c)(4) & (6). Both types

of entities, unlike public charities under 501(c)(3), may engage in lobbying activities. Although 8 CFR 214.2(h)(19)(iv)(A) includes nonprofit or tax-exempt organizations under 501(c)(3), 501(c)(4), and 501(c)(6) for purposes of the ACWIA fee reduction, this eligibility is further cabined by 8 CFR 214.2(h)(19)(iv)(B), requiring that such entities have been "approved as a tax-exempt organization *for research or educational purposes* by the Internal Revenue Service" (emphasis added). As a practical matter, DHS experience indicates that few 501(c)(4) or 501(c)(6) entities are likely to be organized for research or educational purposes *and* meet the definition of "affiliated or related nonprofit entity" under 8 CFR 214.2(h)(19)(iii), which requires a close tie to an institution of higher education. Therefore, DHS has determined that in defining eligibility for nonprofit fee reductions and exemptions under this rule, it is appropriate to include 501(c)(3) entities while excluding 501(c)(4) and 501(c)(6) entities. This definition will be applied to the fee discount and exemption for the Asylum Program Fee and the discount for the Form I–129 fee (discussed later in this section).

5. Changes to EB–5 Volume Forecasts

DHS has updated the USCIS volume forecasts for the EB–5 workload based on more recent and reliable information

than what was available while drafting the proposed rule. Increasing the fee-paying receipt forecasts for these workloads conversely increased the estimated revenue generated by EB–5 fees. DHS also revised the USCIS budget to reflect these changes.

For the proposed rule, DHS estimated the EB–5 workload based on statistical modeling, immigration receipt data, and internal assessments, like other workload forecasts. 88 FR 402, 432–438. The proposed rule discussed that EB–5 receipts decreased from FY 2016 to FY 2020. 88 FR 402, 509–510. At the time of the proposed rule, DHS had very limited information upon which to base estimates of the new workload required by the EB–5 Reform and Integrity Act of 2022. *See id.* at 557. In this final rule, DHS updated the EB–5 workload estimates to account for the effect of the EB–5 Reform and Integrity Act of 2022. USCIS believes these estimates better represent the EB–5 filing receipts it can expect. Increasing the volume forecasts for EB–5 also increases the amount of revenue generated by the EB–5 workload for the final rule budget. As explained elsewhere, DHS has revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. Increasing the fee-paying receipt forecasts for these workloads increases the estimated revenue generated by the EB–5 fees in the final rule. 88 FR 72870.

HR-1 FRN 2025 AR-000023

Appx-000048

| Table 4: EB-5 Workload Forecast | | | |
|---|---|---|---|
| Immigration Benefit Request | Proposed Rule Average Annual Projected Receipts | Final Rule Average Annual Projected Receipts | Difference |
| I-526 Immigrant Petition by Alien Investor | 3,900 | 4,050 | 150 |
| I-829 Petition by Investor to Remove Conditions on Permanent Resident Status | 3,250 | 4,500 | 1,250 |
| I-956 Application for Regional Center Designation | 62 | 400 | 338 |
| I-956F Application for Approval of Investment in a Commercial Enterprise | N/A | 600 | 600 |
| I-956G Regional Center Annual Statement | 728 | 875 | 147 |
| I-956H Bona Fides of Persons Involved with Regional Center Program | N/A | 2,000 | 2,000 |
| I-956K Registration for Direct and Third-Party Promoters | N/A | 500 | 500 |
| EB-5 Receipts Forecast | 7,940 | 12,925 | 9,435 |

**6. Changes to H–1B Registration Fee Volume Forecasts**

DHS also revises the USCIS volume forecasts for H–1B registration workload, to 424,400, based on more recent information than was available while drafting the proposed rule, such as the total registrations for the FY 2023 cap year. The proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). The forecast for the proposed rule is close to the 274,237 total registrations in the FY 2021 cap year.[34] However, after the proposed rule was published, a total of 780,884 petitioners registered for an FY 2024 cap-subject H–1B employee. This final rule forecast of 424,400, based on more recent data, is closer to the total registrations for the FY 2023 cap year. Increasing the fee-paying receipt forecasts for these workloads increases the estimated revenue generated by the H–1B registration fees in the final rule. 88 FR 72870.

**7. Online Filing Fees**

The proposed rule provided lower fees for some online requests based on estimated costs for online and paper filing. 88 FR 402, 489–491. The fee differences between paper and online filing ranged from $10 to $110. *Id.* This final rule provides a $50 discount for forms filed online with USCIS. 8 CFR 106.1(g). The discount is not applied in limited circumstances, such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. *See, e.g.,* 8 CFR 106.2(a)(50)(iv).

As described in the proposed rule and supporting documentation, the cost savings USCIS experiences from online filing differs from form to form depending on many factors. Many commenters wrote that USIS was penalizing those who still filed on paper by making paper filing more expensive. The commenters misunderstand the policy goal of the online discount because DHS is not increasing the fee for paper filings by shifting costs for online filing to the fee for paper requests as a form of penalty or deterrent. If the online discount was not provided, paper form fees would not decrease accordingly. DHS wants to incentivize online filing, but we proposed fees

based on the costs savings calculated in the ABC model.

In response to comments, DHS reevaluated the difference between online and paper fees. In the proposed rule, the proposed fee differences ranged from $0 to $110. In this final rule, DHS again has determined that online filing provides costs savings to USCIS and requestors, increases flexibility and efficiency in adjudications, and those benefits should be reflected in lower fees. However, in the final rule DHS takes the expected savings from online filing and divides it among all online filed forms by establishing that the fees for online filing will be $50 less than for the same request filed on paper.[35] Furthermore, DHS believes that the $50 reduced cost can be reasonably anticipated to be consistent for future USCIS online filing capabilities and has decided to provide that online filing fees will be $50 less than the paper filing fee as additional forms are made available for online filing, unless otherwise noted. *See* 8 CFR 106.1(g). DHS emphasizes it establishes the $50 difference because

[34] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, H–1B Electronic Registration Process, *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.*

[35] DHS applies this discount to USCIS online filings only and does not apply this provision to fees set in this rule for immigration benefit requests that are submitted to either USCIS or CBP when the request is submitted to and fee collected by CBP online. *See, e.g.,* 8 CFR 106.2(a)(13)—(15).

USCIS experiences moderately reduced costs from online filing. Additionally, applying a uniform $50 reduced cost for online filing to all forms will make the reduced fee easier for USCIS to administer and be less confusing to the public when calculating the fee. Although DHS believes that it should encourage online filing as a matter of sound policy, contrary to the suggestions of some commenters, DHS is not increasing the fee for paper filings by shifting costs for online filing to the fee for paper requests as a form of penalty or deterrent. For applicants who experience a lack of access to computers or the internet, paper filing will generally remain an option.[36]

### 8. Adjust Fees for Forms Filed by Individuals by Inflation

The proposed rule included a wide range of proposed fees. Consistent with past fee rules, DHS used its discretion to limit some proposed fee increases that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. 88 FR 402, 450–451. The proposed rule also included a provision to adjust fees by inflation in the future. 88 FR 402, 516.

DHS received many comments about the method that USCIS used to calculate how its costs should be dispersed among the requests for which fees are charged. Some commenters wrote that DHS should limit the increase in USCIS fees by the amount of inflation. DHS analyzed the suggestion and determined that from December 2016 (the month FY 2016/2017 fee rule went into effect) to June 2023,[37] the CPI–U increased by 26.37 percent.[38] Using the CPI–U as the measure for cost and fee increases is consistent with statutes that authorize DHS to adjust USCIS fees. *See, e.g.* section 286(u)(3)(C) of the INA, 8 U.S.C.

[36] USCIS Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, must be filed online, but no fee is required. See, *https://www.uscis.gov/i-134a,* last Reviewed/Updated: 08/11/2023.

[37] DHS used June 2023 as the end date for the period of inflation to be consistent with the 2023 premium processing fee inflation adjustments. 88 FR 89539. DHS acknowledges that inflation will likely change from the June 2023 CPI–U before the fees in this rule take effect. The time and effort required to calculate the fees for this rule, draft comment responses, prepare supporting documents, perform the regulatory impact analysis, small entity impact analysis, and clear the rule through the necessary channels requires that a reasonable endpoint be selected on which to base the required calculations and move the final rule forward without continuous updates.

[38] DHS calculated this by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent.

1356(u)(3)(C) (providing that DHS may adjust the premium fees based on the change in the CPI–U). DHS then calculated what the fees would be if adjusted by 26.37 percent, rounded to the nearest $5 increment, consistent with other fees (and reducing online filing fees by $50 as explained earlier). After considering the amount of the increase, as well as the impacts of the applicable fees on individual filers, DHS determined (1) that the additional revenue that would be generated by increasing the subject forms by inflation would be appropriate for expected revenue from those requests in the final rule, (2) increasing the fees by only inflation as suggested in public comments balanced the need to recover increased USCIS costs with the impacts of the fees on individuals and families, and (3) to the extent that an inflation adjustment did not recover the relative costs of the applicable requests, either other fees could be increased to make up the unrecovered costs using the ability to pay principle or USCIS could reduce its budget. In the final rule, except for certain employment-based benefit request fees, DHS finalized the fees at either the proposed fee level or the current fee adjusted for inflation, whichever was lower. A comparison of current, proposed, and final fees can be found in Table 1.

Some of the proposed fees set to increase less than inflation are the fees for Form N–400, Application for Naturalization, certain adoption-related forms (*e.g.,* Form I–600, Petition to Classify Orphan as an Immediate Relative and Form I–800, Petition to Classify Convention Adoptee as an Immediate Relative), and other immigration benefit requests where DHS limited the proposed fee increase to 18 percent increase (not including biometrics fees), as described in the proposed rule. *See* 88 FR 402, 450–451, 486–487 (Jan. 4, 2023).

This final rule additionally holds several fees to the rate of inflation since the previous fee increase in 2016. For example, DHS adjusts the paper filing fees for Forms I–130, I–485, I–539, and I–751 by inflation.

DHS notes that an increase of a straight 26.37 percent based solely on inflation deviates from the ABC model that OMB Circular A–25 recommends, and the method generally used by DHS in past USCIS fee rules. However, as stated in past fee rules, the proposed rule, and in responses to comments in this rule, DHS is not strictly bound by A–25; nor is it limited to setting fees based on the costs of the service under 31 U.S.C. 9701. For public policy reasons, DHS may use and has used its

discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. 81 FR 73308 (the 2016 final rule noted that the Application for Naturalization fee has not changed in nearly a decade and was being set at less than it would be if the 2007 fee were simply adjusted for inflation). DHS believes that this combination of limiting certain fee increases for policy reasons, setting fees using the ABC model, and adjusting fees by inflation, in addition to being responsive to public comments, provides a logical, reasonable, and balanced approach. For the proposed rule, and consistent with past fee rules, DHS used its discretion to limit some proposed fee increases that would be overly burdensome on applicants, petitioners, and requestors if set at activity-based costing (ABC) model output levels. 88 FR 402, 450–451. DHS is doing the same in the final rule.

### 9. Fee Exemptions and Fee Waivers

The proposed rule included new fee exemptions and proposed to codify existing fee exemptions. *See* 88 FR 402, 459–481 (Jan. 4, 2023). This final rule expands fee exemptions for humanitarian filings and adoptions. *See* Tables 5B, 7; 8 CFR 106.3(b). Many commenters requested that DHS provide more fee exemptions for humanitarian related benefit requests. In response to the public comments, DHS reexamined the fees for victim-based or humanitarian requests and other categories and decided to provide more related fee exemptions. Normally, expanding fee waivers or exemptions may increase fees, as explained in the proposed rule. 88 FR 402, 450–451. However, in this final rule, DHS revised the USCIS budget to accommodate the revenue generated by the fees and fee-paying receipts. As such, DHS is implementing these fee exemptions without increasing fees for other benefit requests.

#### a. No New Fee Waivers

DHS acknowledges the importance of ensuring that individuals who cannot afford filing fees have access to fee waivers. DHS has primarily sought to ease the burden of fee increases by significantly expanding the number of forms that are now fee exempt. *See* 8 CFR 106.3(b). DHS believes it has provided fee waivers for the appropriate forms and categories by emphasizing humanitarian, victim-based, and citizenship-related benefits while changing some fee waivers to fee exemptions. Additional fee waivers

HR-1 FRN 2025 AR-000025

Appx-000050

would require USCIS to increase fees for other forms and requestors to compensate for fewer requests paying fees. DHS has sought to balance the need for the fee waivers and the need to ensure sufficient revenue and does not believe additional fee waivers are appropriate.

b. New Fee Exemptions

Many commenters requested that DHS provide more fee exemptions and free services for humanitarian-related benefit requests. In response to the public comments, DHS reexamined the fees for victim-based or humanitarian requests and other categories and decided to provide fee exemptions for several additional forms. A summary of the current and new exemptions is provided below in Table 5A and 5B. The adoption related fee exemptions are in Table 7. Balancing beneficiary-pays and ability-to-pay and the funding needs of USCIS, DHS has determined that these additional fee exemptions are warranted for the following reasons.

Victims of Severe Form Of Trafficking (T Nonimmigrants)

In the proposed rule, DHS offered a fee exemption for T nonimmigrant status ("T visa") applicants, T nonimmigrants, and their derivatives for Form I–290B, Notice of Appeal or Motion, only if filed for any benefit request filed before adjusting status or for Form I–485, Application to Register Permanent Residence or Adjust Status. In this final rule, DHS expands the exemption for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also exempts the fee for Form I–824, Application for Action on an Approved Application or Petition, for this population in this final rule. As stated in the proposed rule, the T visa program is historically underused and the annual statutory cap of 5,000 has never been reached. *See* 88 FR 460. DHS aims to further encourage participation of eligible victims of trafficking in the T visa program by expanding fee exemptions as provided in this final rule. DHS believes that these expanded fee exemptions advance the humanitarian goals of the T visa program by reducing barriers for this particularly vulnerable population while meeting the agency's funding needs because of the relatively low receipts and cost transfer for these forms.[39] Also, providing these fee

exemptions helps to ensure parity of access to immigration relief for T visa applicants, T nonimmigrants, and their derivatives with similarly situated humanitarian categories of requestors. Finally, these additional exemptions will help account for the trauma and financial difficulties that T nonimmigrants may endure long after escaping their traffickers.

Victims of Qualifying Criminal Activity (U Nonimmigrants)

DHS provided fee exemptions in the proposed rule for U nonimmigrant status ("U visa") petitioners and U nonimmigrants filing Form I–192, Form I–193, Form I–290B, and Form I–539 in limited circumstances. DHS expands these fee exemptions in this final rule such that Form I–192, Form I–193, and Form I–539 are fee exempt when filed by a U visa petitioner or U nonimmigrant at any time, and Form I–290B is also fee exempt if filed for ancillary forms associated with Form I–485. DHS also expands the fee exemption for Form I–765 to include initial, renewal, and replacement requests. Furthermore, DHS provides additional fee exemptions for Form I–131, Form I–485, Form I–601, Form I–824 and Form I–929 for this population. Providing these fee exemptions helps to ensure parity of access to immigration relief for U nonimmigrants with similarly situated humanitarian categories of requestors. These additional fee exemptions are provided in this final rule for the reasons stated in Section IV.F of this preamble where DHS responds to the public comments provided on the fees proposed for U nonimmigrants.

VAWA Form I–360 Self-Petitioners and Derivatives

DHS offered fee exemptions in the proposed rule for VAWA self-petitioners and derivatives filing Forms I–131, I–212 and I–601 depending on whether Forms I–360 and I–485 are filed concurrently or currently pending adjudication. Additionally, exemptions were proposed for Forms I–290B and I–485 when the Form I–485 is filed concurrently with the Form I–360, and for initial filers of I–765 for VAWA self-petitioners and derivatives. For the reasons stated in Section IV.F of this preamble in response to the public comments provided on VAWA self-petitioners, this final rule expands fee exemptions to include when Form I–360

and Form I–485 are filed separately and for some ancillary forms, when the I–485 is not pending. DHS also expands the fee exemption for Form I–290B filed by VAWA self-petitioners to include any benefit request filed before adjusting status or for Form I–485 and associated ancillary forms. Additionally, this final rule provides VAWA self-petitioners fee exemptions for Form I–601A, Form I–824, and Form I–765 renewal and replacement requests. Providing these fee exemptions helps to improve parity of access to immigration relief for VAWA self-petitioners with similarly situated humanitarian categories of requestors. On balance, the reduction of barriers to immigration relief for VAWA self-petitioners when compared with the relatively low transfer payment from the government to other benefit requestors supports DHS's decision to provide these fee exemptions.[40]

Conditional Permanent Residents filing an application for a waiver of the joint filing requirement based on battery or extreme cruelty.

For conditional permanent residents (CPRs) seeking a waiver of the Form I–751 joint-filing requirement based on battery or extreme cruelty, DHS provides an additional fee exemption in this final rule. DHS believes that CPRs filing under this exception are similarly situated to other VAWA requestors, for whom DHS has created new fee exemptions in the proposed rule and final rule. As the proposed rule noted with regards to VAWA self-petitioners, *see* 88 FR 402, 461 (Jan. 4, 2023), abused CPRs may still be living with their abuser or have recently fled their abusive relationship when filing Form I–751. Abusers often maintain control over financial resources to further the abuse, and victims may have to choose between staying in an abusive relationship and poverty and homelessness. *Id.* Therefore, CPRs who are victims of abuse may lack financial resources or access to their finances. DHS acknowledges that the proposed rule stated that it could not provide this fee exemption because Form I–751 petitioners can seek a joint-filing waiver on multiple grounds at once. *Id.* at 462. Upon reconsideration, however, DHS sees no reason that providing the fee exemption for CPRs who also request

---

[39] From FY 2018 through FY 2022, T nonimmigrants filed a five-year annual average of 311 Forms I–290B and a five-year annual average of 4 Forms I–824. *See* RIA, Table 47. Based on these annual average receipts, the transfer payment from

the government to benefit requestors is calculated to be $171,672 for Form I–290B and $2,242 for Form I–824. *See* RIA, Table 48. This represents 0.09% and 0.001%, respectively, of the grand total transfer payments. *See* RIA, Table 48.

[40] From FY 2018 through FY 2022, VAWA self-petitioners filed an annual average of 1,273 Forms I–290B and an annual average of 314 Forms I–824. *See* RIA, Table 47. Based on these annual average receipts, the transfer payment from the government to benefit requestors is calculated to be $1,550,128 for Form I–290B and $36,769 for Form I–824. *See* RIA, Table 48. This represents 0.09% and 0.001%, respectively, of the grand total transfer payments. *See* RIA, Table 48.

HR-1 FRN 2025 AR-000026

Appx-000051

multiple waivers would be infeasible operationally. DHS further notes that CPRs requesting abuse waivers are a relatively small population, *id.;* RIA Table 47; so even without the budget reductions described earlier, this additional fee exemption would have minimal effect on USCIS revenue and other fees.

Abused Spouses and Children Adjusting Status Under CAA and HRIFA

In the proposed rule, DHS proposed a fee exemption for abused spouses and children adjusting status under CAA and HRIFA for Form I–290B only if filed for any benefit request filed before adjusting status or for Form I–485. In this final rule, DHS expands this exemption for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also exempts the fee for Form I–824 for this population. DHS has determined that these new exemptions are warranted because these applicants can face many of the ongoing financial obstacles as other VAWA requestors, as discussed earlier. These additional fee exemptions, which DHS has extended to one or most of the categories listed in Table 5B, improve the parity of fee exemptions amongst humanitarian and protection-based immigration categories. Given the very low number of applicants for these two populations (*see* 88 FR 402, 462, Jan. 4, 2023), DHS anticipates that these additional fee exemptions will have a negligible impact on its budget.

Abused Spouses and Children Seeking Benefits Under NACARA and Abused Spouses and Children of LPRs or U.S. Citizens Under INA sec. 240A(b)(2)

For abused spouses and children seeking benefits under NACARA as well as abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2), DHS proposed fee exemptions for Form I–765 initial requests submitted under 8 CFR 274A.12(c)(10). In this final rule, DHS expands these fee exemptions to include Form I–I–765 renewal and replacement requests, as well as Form I–824 for both categories of requestors. DHS determined that these new exemptions are warranted because abused NACARA applicants may face many of the ongoing financial obstacles as other VAWA requestors, as discussed previously. These additional fee exemptions, which DHS has extended to one or most of the categories listed in Table 5B, improve the parity of fee exemptions amongst humanitarian and protection-based immigration categories.

Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries.

DHS proposed fee exemptions in the proposed rule for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries filing Form I–290B for any benefit request filed before adjusting status or Form I–485 and Form I–765 initial requests. In this final rule, DHS expands these fee exemptions for this category of requestors to include Form I–290B if filed for ancillary forms associated with Form I–485 and Form I–765 replacement and renewal requests. DHS also exempts the fee for Form I–824 for this population. DHS echoes the reasoning provided in the proposed rule as to why this population merits additional fee exemptions. *See* 88 FR 463. DHS believes that it is an inefficient use of USCIS resources to adjudicate individual fee waiver requests for this group when such requests will likely be granted. DHS also believes that the time saved in the adjudication process for these individuals will demonstrate the agency's "full and prompt cooperation, resources, and support" for this population as directed by the President.[41] Also, DHS experience indicates that many in the OAW population move often, and have experienced challenges in securing employment authorization documents (EADs) that have resulted in USCIS receiving many EADs back as undeliverable (for example, needing to relocate after being resettled in the United States, or not having their initial EAD properly transferred to their new address), which would have required them to submit additional requests such as Form I–765 with the fee to request a replacement EAD. DHS acknowledges that these challenges faced by this population result from circumstances beyond their control, and therefore provides expanded fee exemptions to improve their access to immigration benefits for which they are eligible.

Special Immigrant Juveniles (SIJs)

In the proposed rule, DHS proposed a fee exemption Form I–290B filed by SIJs for any benefit request filed before adjusting status or for Form I–485. In this final rule, DHS expands this fee exemption to include Form I–290B if filed for ancillary forms associated with Form I–485. DHS also provides a fee exemption for SIJs filing Form I–601A and Form I–824. Notwithstanding that SIJs adjust status in the United States and do not generally need to use Form I–601A, some individuals in this category do file the form. Given the very small number of receipts, DHS provides a fee exemption for SIJs filing Form I–601A. DHS believes that these expanded fee exemptions align with the reasoning for exempting fees for this population given in the proposed rule (*see* 88 FR 463) and improves the parity of fee exemptions among similarly situated humanitarian and protection-based immigration categories.

Current and Former U.S. Armed Forces Service Members, Including Persons Who Served Honorably on Active Duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)

For current and former U.S. Armed Forces service members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K), 8 U.S.C. 1101(a)(27)(K), DHS proposed a fee exemption for Form I–765 initial requests for the service member in the proposed rule. DHS expands this fee exemption in the final rule to include Form I–765 renewal and replacement requests for the service member. DHS provides these additional fee exemptions in furtherance of our commitment to reduce barriers and improve access to immigration benefits for individuals who served in the U.S. Armed Forces, as described in the proposed rule.[42] DHS also believes that providing a fee exemption for this population for Form I–765 renewal and replacement requests improves parity with similarly situated immigration categories like special immigrant Afghan and Iraqi translators and interpreters.

1. Summary Tables of Fee Exemption Changes in the Final Rule

Tables 5A, 5B, and 5C compare fee exemptions and fee waiver eligibility at three points in time: those currently in effect, those provided in the proposed

---

[41] *See* Memorandum on the Designation of the Department of Homeland Security as Lead Federal Department for Facilitating the Entry of Vulnerable Afghans into the United States, Aug. 29, 2021.

[42] *See* 88 FR 465 (noting DHS's involvement in the initiative to support service members, veterans, and their immediate family members in recognition of their commitment and sacrifice).

rule, and those provided in this final rule. These tables include fee exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and other immigration categories for which DHS is providing additional fee exemptions and waivers. These tables do not include all USCIS benefit requests or groups for which DHS currently provides or will provide a fee exemption or waiver in this rule or by policy.[43]

• Table 5A illustrates the fee exemptions and fee waiver eligibility existing before the effective date of this final rule ("current").

• Table 5B lists forms eligible for fee waivers as provided in the proposed rule, additional fee exemptions

provided in the proposed rule, and additional fee exemptions provided in this final rule.

• Table 5C summarizes the available fee exemptions and fee waiver eligibility as of the effective date of this final rule, which includes currently available fee exemptions and the additional fee exemptions provided in the proposed rule.

**BILLING CODE 9111–97–P**

---

[43] For all other fee exemptions and fee waiver eligibility, *see* 8 CFR 106.2, 106.3.

**6216**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **Victims of severe form of trafficking (T nonimmigrants)[45]** | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(16) fee exempt for principals only)[46] | • Form I-90<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B[47]<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity (U nonimmigrants)[48]** | • Form I-918<br>• Form I-918, Supplement A<br>• Form I-918, Supplement B<br>• Form I-765 (initial 8 CFR 274a.12(a)(19) fee exempt for principals only and (c)(14) fee exempt for principals and derivatives)[49] | • Form I-90<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765<br>• Form I-929<br>• Form N-300 |

[44] "Current" refers to fee exemptions and forms eligible for fee waiver in effect before the effective date of this final rule.

[45] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

[46] No initial fee for principals who receive an EAD incident to status.

[47] In general, USCIS may waive the fee for Form I-290B, Notice of Appeal or Motion, under 8 CFR 103.7(c) if the noncitizen shows an inability to pay and (1) the appeal or motion is from a denial of an immigration benefit request for which no fee was required, or (2) the fee for the underlying application or petition could have been waived.

[48] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[49] There is no initial fee for principals who receive an EAD incident to status. *See* Form G-1055, Fee Schedule, available at *https://www.uscis.gov/g-1055*. There is also no fee associated with initial (c)(14) EADs issued based on a bona fide determination for principals and derivatives when the Form I-765 is filed. USCIS, "USCIS Policy Manual," Vol. 3, "Humanitarian Protection and Parole," Part C, "Victims of Crimes," Chp. 5, "Bona Fide Determination Process," available at *https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5* (last visited Oct. 27, 2023).

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| | | • Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[50] | • Form I-360<br>• Form I-765 (initial category (c)(31) generally fee exempt for principals only)[51] | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[52] | None | • Form I-90<br>• Form I-751<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[50] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA secs. 101(a)(51), 204(a); 8 U.S.C. 1101(a)(51), 1154(a).

[51] Currently, VAWA self-petitioners may check a box on Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant, requesting a category (c)(31) EAD upon approval of the self-petition. This EAD is currently fee exempt. If the self-petitioner does not check this box, they must file a Form I-765 to request employment authorization under 8 CFR 274a.12(c)(14) designation or under 8 CFR 274a.12(c)(9) if applicable. The self-petitioner may also file a Form I-765 to request a category (c)(31) EAD if not initially requested on the Form I-360. All self-petitioners and derivatives filing a renewal or replacement request must file a Form I-765 with a fee or fee waiver request.

[52] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

HR-1 FRN 2025 AR-000030

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| **Abused spouses and children adjusting status under CAA and HRIFA**[53] | None | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA)**[54] | None | • Form I-90<br>• Form I-601<br>• Form I-765<br>• Form I-881<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[55] | None | • Form I-90<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[53] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[54] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765, Application for Employment Authorization, for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[55] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| Category | Current Fee Exemptions | Current Fee Waiver Eligibility |
| **Abused Spouses of A, E-3, G, and H Nonimmigrants[56]** | • Form I-765V[57] | Not Applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the International Security Assistance Forces (ISAF) and their derivative beneficiaries** | • Form I-130 (for certain Special Immigrant Afghans)[58]<br>• Form I-290B (if filed to appeal Form I-360)<br>• Form I-360<br>• Form I-485 (for certain Special Immigrant Afghans)[59]<br>• Form I-765 (initial filing for certain Afghans)[60]<br>• Form I-601 (for certain Special Immigrant Afghans)[61]<br>• Form I-824 (for certain Special Immigrant Afghans)[62] | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B<br>• Form I-485<br>• Form I-601<br>• Form I-765<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-360 | • Form I-90<br>• Form I-131<br>• Form I-290B<br>• Form I-485 |

[56] *See* INA sec. 106; 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E-3, G, and H Nonimmigrants can file under another eligible category, the applicant may be eligible for a fee waiver.

[57] The fee exemption for Form I-765V, Application for Employment Authorization for Abused Nonimmigrant Spouse, for this category includes all initial, renewal, and replacement EADs.

[58] Filed with USCIS in the United States on behalf of any Afghan national (beneficiary) with a visa immediately available. Available through September 30, 2023.

[59] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021, and applying to adjust status to permanent residence based on classification as Afghan special immigrants. Available through September 30, 2023.

[60] Afghan nationals and their derivative beneficiaries who were paroled into the United States on or after July 30, 2021 (eligibility category (c)(11)). Available through September 30, 2023.

[61] Afghan nationals and their derivative beneficiaries paroled into the United States on or after July 30, 2021, who file Form I-601, Application for Waiver of Grounds of Inadmissibility, associated with Form I-485, Application to Register Permanent Residence or Adjust Status, if filing as an Afghan Special Immigrant or any Afghan national with an approved Form I-130, Petition for Alien Relative, with a visa immediately available. Available through September 30, 2023.

[62] Filed for an Afghan holding a Special Immigrant Visa.

HR-1 FRN 2025 AR-000032

**6220**    **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
| | | • Form I-601 <br> • Form I-765 <br> • Form N-300 <br> • Form N-336 <br> • Form N-400 <br> • Form N-470 <br> • Form N-565 <br> • Form N-600 <br> • Form N-600K |
| **TPS**[63] | • Form I-765 (initial TPS applicant, under 14 and over 65 who is requesting an initial EAD.)[64] <br> • Form I-821 (no fee for re-registration) | • Biometrics Fee <br> • Form I-131 <br> • Form I-290B <br> • Form I-601 <br> • Form I-765 <br> • Form I-821 |
| **Asylees** | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.) <br> • Form I-589 <br> • Form I-602 <br> • Form I-730 <br> • Form I-765 (initial request by asylees and initial request by asylum applicants with a pending Form I-589) | • Form I-90 <br> • Form I-290B <br> • Form I-485 <br> • Form I-765 (renewal request) <br> • Form N-300 <br> • Form N-336 <br> • Form N-400 <br> • Form N-470 <br> • Form N-565 <br> • Form N-600 <br> • Form N-600K |
| **Refugees** | • Form I-590 <br> • Form I-485 <br> • Form I-602 <br> • Form I-730 <br> • Form I-765 (initial request) | • Form I-90 <br> • Form I-290B <br> • Form I-765 <br> • Form N-300 <br> • Form N-336 <br> • Form N-400 |

[63] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants for and recipients of TPS.

[64] Note the fee exemption for Form I-765 initial EAD requests filed by initial TPS applicants under age 14 and over age 65 is removed by this rule.

HR-1 FRN 2025 AR-000033

| Table 5A: Current[44] Forms Eligible for Fee Waivers and Fee Exemptions | | |
|---|---|---|
| **Category** | **Current Fee Exemptions** | **Current Fee Waiver Eligibility** |
|  |  | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)[65]** | • Form N-400 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-336 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-600<br>• Form I-131 (for service members filing concurrently with an N-400) | • Form I-90<br>• Form N-300<br>• Form N-470<br>• Form N-565<br>• Form N-600K<br>• Form I-765 |

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| **Victims of severe form of trafficking (T** | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and | • Form I-90<br>• Form I-290B[71]<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470 |

[65] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

[66] This table includes exemptions and fee waivers that are required under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7) and other categories of immigrants for which DHS is proposing additional fee exemptions. This table includes only those exemptions that DHS is required to provide under this statute, and it does not include all USCIS benefit requests or groups for which DHS currently provides or is proposing to provide an exemption in this rule or by policy. See regulatory text for all other fee exemptions and fee waivers.

[67] This column lists the additional fee exemptions that were provided in the proposed rule. all of which are maintained in the final rule. In addition, DHS will maintain all the current fee exemptions.

[68] This column lists the forms eligible for fee waivers from the proposed rule. The final rule exempts the fee for some of these forms, and the rest remain as fee waivers. There are no additional fee waivers in the final rule.

[71] Fee waivable for other forms including naturalization and citizenship related forms.

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| nonimmigrants)[69] | adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[70] | associated ancillary forms)<br>• Form I-824 | • Form N-565<br>• Form N-600<br>• Form N-600K |
| **Victims of qualifying criminal activity** (U nonimmigrants)[72] | • Form I-192 (only if filed before Form I-485 is filed)<br>• Form I-193 (only if filed before Form I-485 is filed)<br>• Form I-290B (only if filed before Form I-485 is filed)<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial 8 CFR 274a.12(a)(20) and initial (c)(14) fee exempt for principals and derivatives only if filed before Form I-485) | • Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-539<br>• Form I-601<br>• Form I-765[73] (initial, renewal, and replacement request)<br>• Form I-824<br>• Form I-929 | • Form I-90<br>• Form I-131<br>• Form I-192 (only if filed with or after Form I-485 is filed)<br>• Form I-193 (only if filed with or after Form I-485 is filed)<br>• Form I-290B (only if filed with or after Form I-485 is filed)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-929<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-** | • Form I-131 (only when Form I-360 and Form I-485 are | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any | • Form I-90<br>• Form I-131<br>• Form I-212<br>• Form I-290B |

---

[69] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of a severe form of trafficking in persons).

[70] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[72] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[73] The proposed fee exemption for U nonimmigrants or applicants for U not filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

**Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66]**

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| petitioners and derivatives[74] | concurrently filed or pending)<br>• Form I-212 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-290B (if filed with a standalone Form I-360, then fee exempt if filed to motion or appeal Form I-360)<br>• Form I-290B (if Form I-360 and Form I-485 are concurrently filed, then fee exempt if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485 (only if filed concurrently with Form I-360)<br>• Form I-601 (only when Form I-360 and Form I-485 are concurrently filed or pending)<br>• Form I-765 (initial 8 CFR 274a.12(c)(9), initial 8 CFR 274a.12 (c)(14), and initial category | benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-601A[76]<br>• Form I-765 (renewal, and replacement request)<br>• Form I-824 | • Form I-485<br>• Form I-601<br>• Form I-765 (renewal and replacement requests)<br>• Form I-824<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[74] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 204(a), 8 U.S.C. 1101(a)(51), 1154(a).

[76] Note that while it is theoretically possible for a VAWA self-petitioner to use Form I-601A, Application for Provisional Unlawful Presence Waiver, it would be highly unlikely. Form I-601A is used by noncitizens pursuing consular processing, usually because they are ineligible for adjustment of status since they have not been "inspected and admitted or paroled" or are subject to the adjustment bars of INA sec. 245(c), 8 U.S.C. 1255(c). However, Congress has provided exceptions to both statutory provisions for VAWA applicants, and so they typically choose to adjust status.

HR-1 FRN 2025 AR-000036

Appx-000061

6224    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

**Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66]**

| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|---|---|---|---|
| | (c)(31) fee exempt for principals and derivatives)[75] | | |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty[77]** | • Form I-290B (only when filed for Form I-751) | • Form I-751 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children adjusting status under CAA and HRIFA[78]** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children seeking benefits under NACARA[79]** | • Form I-765 (submitted under 8 CFR 274a.12(c)(10) initial request)<br>• Form I-881<br>• Form I-601 | Form I-765 (renewal and replacement request)<br>Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[75] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[77] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D), 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[78] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication of adjustment of status.

[79] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication of adjustment of status.

HR-1 FRN 2025 AR-000037

Appx-000062

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| **Category** | **Proposed Additional Fee Exemptions, Proposed Rule[67]** | **Additional Fee Exemptions, Final Rule** | **Proposed Fee Waivers, Proposed Rule[68]** |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)[80]** | • Form I-601[81]<br>• Form I-765 (initial 8 CFR 274a.12(c)(10) only) | • Form I-765 (renewal, and replacement request)<br>• Form I-824 | • Form I-90<br>• Form I-765 (renewal and replacement requests)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial) | • Form I-765 (renewal, and replacement request)<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485)<br>• Form I-485<br>• Form I-601 | • Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600 |

[80] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

[81] This proposed fee exemption has been removed from the final rule.

HR-1 FRN 2025 AR-000038

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
|  | • Form I-765 (initial, renewal, and replacement). | • Form I-601A[82]<br>• Form I-824 | • Form N-600K |
| TPS[83] | Not applicable | none | • Biometrics Fee<br>• Form I-90<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| Asylees | Not Applicable | none | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Refugees | • Form I-765 (renewal and replacement request)<br>• Form I-131<br>• Form I-131A | none | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| Current and former U.S. Armed Forces service | • Form I-131<br>• Form I-360<br>• Form I-485 | • Form I-765 (renewal, and replacement | • Form I-90<br>• Form N-300<br>• Form N-470 |

[82] Although SIJs do not need to use Form I-601A, some do file the form. Form I-601A is typically used by noncitizens pursuing consular processing, usually because they are ineligible for adjustment of status since they have not been "inspected and admitted or paroled" or are subject to the adjustment bars of INA sec. 245(c), 8 U.S.C. 1255(c). However, Congress has provided exceptions to both statutory provisions as well as certain inadmissibility grounds for SIJs, and as a result, SIJs adjust status in the United States and do not file Form I-601A.

[83] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants and recipients of TPS.

HR-1 FRN 2025 AR-000039

Appx-000064

| Table 5B: Additional Categories of Requestors and Related Forms Eligible for Fee Waivers and Fee Exemptions[66] | | | |
|---|---|---|---|
| Category | Proposed Additional Fee Exemptions, Proposed Rule[67] | Additional Fee Exemptions, Final Rule | Proposed Fee Waivers, Proposed Rule[68] |
| members, including persons who served honorably on active duty in the U.S. Armed Forces filing under INA sec. 101(a)(27)(K)[84] | • Form I-765 (initial request for service member) | request for service members) | • Form N-565<br>• Form N-600K |

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| Category | Fee Exemptions | Fee Waiver Eligibility |
| Victims of severe form of trafficking (T nonimmigrants)[85] | • Form I-914<br>• Form I-914, Supplement A<br>• Form I-914, Supplement B<br>• Form I-131<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-539<br>• Form I-601 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[84] These applicants are eligible for naturalization under INA sec. 328, 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329, 8 U.S.C. 1440.

[85] *See* INA sec. 101(a)(15)(T); 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status for victims of severe forms of trafficking in persons).

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765 (initial, renewal and replacement requests)[86]<br>• Form I-824 | |
| **Victims of qualifying criminal activity** (U nonimmigrants)[87] | • Form I-131<br>• Form I-918<br>• Form I-918, Supplement A<br>• Form I-918, Supplement B<br>• Form I-192<br>• Form I-193<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-539 (only if filed before Form I-485 is filed)<br>• Form I-765 (initial, renewal, and replacement request)[88]<br>• Form I-929<br>• Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form I-290B<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **VAWA Form I-360 self-petitioners and derivatives**[89] | • Form I-360<br>• Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400 |

[86] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[87] *See* INA sec. 101(a)(15)(U); 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status for victims of qualifying criminal activity).

[88] The proposed fee exemption for T nonimmigrants filing Form I-765 includes all initial, renewal, and replacement EADs filed at the nonimmigrant and adjustment of status stages.

[89] This category includes VAWA self-petitioners and derivatives as defined in INA sec. 101(a)(51)(A) and (B) and those otherwise self-petitioning for immigrant classification under INA sec. 204(a)(1). *See* INA sec. 101(a)(51), 204(a); 8 U.S.C. 1101(a)(51), 1154(a).

Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations     **6229**

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
|  | filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601<br>• Form I-601A<br>• Form I-765 (initial, renewal, and replacement request) (8 CFR 274a.12(c)(9), 8 CFR 274a.12 (c)(14), and (c)(31) fee exempt for principals and derivatives)[90]<br>• Form I-824 | • Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **CPRs filing a waiver of the joint filing requirement based on battery or extreme cruelty**[91] | • Form I-290B (only when filed for Form I-751)<br>• Form I-751 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children adjusting status under CAA and HRIFA**[92] | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-485<br>• Form I-601 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

[90] Under this proposed rule, the category (c)(31) EAD provided through Form I-360 will continue to be fee exempt. In addition, all Form I-765s filed for an initial 8 CFR 274a.12(c)(9), 8 CFR 274a.12(c)(14), and an initial category (c)(31) EAD will also be fee exempt for both self-petitioners and derivatives.

[91] *See* INA secs. 101(a)(51)(C) and 216(c)(4)(C) and (D); 8 U.S.C. 1101(a)(51)(C) and 1186a(c)(4)(C) and (D).

[92] *See* INA sec. 101(a)(51)(D) and (E), 8 U.S.C. 1101(a)(51)(D) and (E). The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

HR-1 FRN 2025 AR-000042

Appx-000067

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765(initial, renewal, and replacement request)<br>• Form I-824 | |
| **Abused spouses and children seeking benefits under NACARA**[93] | • Form I-765 (initial, renewal, and replacement request) (submitted under 8 CFR 274a.12(c)(10))<br>• Form I-881<br>• Form I-601<br>• Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused spouses and children of LPRs or U.S. citizens under INA sec. 240A(b)(2)**[94] | • Form I-765 (initial, renewal, and replacement request) (8 CFR 274a.12(c)(10))<br>• Form I-824 | • Form I-90<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Abused Spouses of A, E-3, G, and H Nonimmigrants**[95] | • Form I-765V[96] | Not applicable |
| **Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or** | • Form I-131<br>• Form I-212<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600 |

[93] *See* INA sec. 101(a)(51)(F), 8 U.S.C. 1101(a)(51)(F). The proposed fee exemption for Form I-765 for this category includes all initial, renewal, and replacement EADs filed through final adjudication for adjustment of status.

[94] Also includes children of battered spouses and children of an LPR or U.S. citizen and parents of battered children of an LPR or U.S. citizen under INA sec. 240A(b)(4), 8 U.S.C. 1229b(b)(4).

[95] *See* INA sec. 106, 8 U.S.C. 1105a. The proposed fee exemption for Form I-765 for these categories includes all initial, renewal, and replacement EADs. If the abused spouses of A, E-3, G, and H Nonimmigrants can file under another eligible category, the applicant may be eligible for a fee waiver.

[96] The fee exemption for Form I-765V for this category includes all initial, renewal, and replacement EADs.

HR-1 FRN 2025 AR-000043

Appx-000068

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| **on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries** | • Form I-360<br>• Form I-485<br>• Form I-765 (initial, renewal, and replacement request)<br>• Form I-601<br>• Form I-824 | • Form N-600K |
| **SIJs** | • Form I-131<br>• Form I-290B (only if filed for any benefit request filed before adjusting status or for Form I-485 and associated ancillary forms)<br>• Form I-360<br>• Form I-485<br>• Form I-601<br>• Form I-765 (initial, renewal, and replacement request)<br>• Form I-824 | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **TPS**[97] | • Form I-821 (only re-registration) | • Biometrics Fee<br>• Form I-131<br>• Form I-290B<br>• Form I-601<br>• Form I-765<br>• Form I-821 |
| **Asylees** | • Form I-131 (Only if an asylee applying for a Refugee Travel Document or advance parole filed Form I-485 on or after July 30, 2007, paid the Form I-485 application fee required, and Form I-485 is still pending.)<br>• Form I-589<br>• Form I-602<br>• Form I-730 | • Form I-90<br>• Form I-290B<br>• Form I-485<br>• Form I-765 (renewal request)<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |

---

[97] *See* INA secs. 244 and 245(l)(7); 8 U.S.C. 1254a and 1255(l)(7). This category includes applicants for and recipients of TPS.

HR-1 FRN 2025 AR-000044

| Table 5C: Forms Eligible for Fee Waivers and Fee Exemptions, as of Effective Date of this Final Rule | | |
|---|---|---|
| **Category** | **Fee Exemptions** | **Fee Waiver Eligibility** |
| | • Form I-765 (initial request by asylees and initial request by asylum applicants with a pending Form I-589) | |
| **Refugees** | • Form I-131<br>• Form I-131A<br>• Form I-485<br>• Form I-590<br>• Form I-602<br>• Form I-730<br>• Form I-765 (initial, renewal, and replacement request) | • Form I-90<br>• Form I-290B<br>• Form N-300<br>• Form N-336<br>• Form N-400<br>• Form N-470<br>• Form N-565<br>• Form N-600<br>• Form N-600K |
| **Current and former U.S. armed forces service members, including persons who served honorably on active duty in the U.S. armed forces filing under INA sec. 101(a)(27)(K)**[98] | • Form I-131<br>• Form I-360<br>• Form I-485<br>• Form I-765 (initial, renewal, and replacement request for service member)<br>• Form N-336 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-400 (if eligible for naturalization under INA 328 or INA 329)<br>• Form N-600 | • Form I-90<br>• Form N-300<br>• Form N-470<br>• Form N-565<br>• Form N-600K |

BILLING CODE 9111–97–C

c. Codifying Fee Waiver Eligibility Criteria

The proposed rule specified that discretionary waiver of fees requires that a waiver based on inability to pay be consistent with the status or benefit sought, including benefits that require demonstration of the applicant's ability to support himself or herself, or individuals who seek immigration status based on a substantial financial

investment. *See* 88 FR 402, 593 (proposed 8 CFR 106.3(a)(1)(ii)). The final rule removes this regulatory text because it is redundant and unnecessary, as the forms eligible for fee waiver are enumerated at 8 CFR 106.3(a)(3). The final rule codifies that a person demonstrates an inability to pay the fee by establishing at least one of the following criteria:

• Receipt of a means-tested benefit as defined in 8 CFR 106.1(f)(3) at the time of filing;

• Household income at or below 150 percent of the Federal Poverty Guidelines at the time of filing; or

• Extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee.
*See* 8 CFR 106.3(a).

This change codifies the 2011 Fee Waiver Policy criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship.[99] While not a change

---

[98] These applicants are eligible for naturalization under INA sec. 328; 8 U.S.C. 1439. Most military applicants are eligible for naturalization without lawful permanent residence under INA sec. 329; 8 U.S.C. 1440.

[99] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, "Fee Waiver Guidelines as Established by the final rule of the USCIS Fee

to fee waiver eligibility criteria, DHS believes that codifying these criteria in this final rule will provide consistency and transparency that is responsive to the concerns of many commenters.

### d. No Mandatory Use of Form I–912

In the proposed rule, 8 CFR 106.3(a)(2) stated, "*Requesting a fee waiver.* A person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form." In this final rule, USCIS will maintain the status quo of accepting either Form I–912 or a written request. The final rule will revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020), which states, "Requesting a fee waiver. To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request. The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated. There is no appeal of the denial of a fee waiver request."

After considering public comments in response to the proposed requirement to submit Form I–912, DHS agrees with multiple points made by commenters. DHS acknowledges that requiring submission of Form I–912 could create an additional burden on certain requestors. *See* 88 FR 402, 458 (Jan. 4, 2023). Due to the multiple ways of establishing one's inability to pay, *see* 8 CFR 106.3(a)(1), Form I–912 may be complex for some requestors. DHS also recognizes that some requestors, particularly those who are struggling financially, may face difficulty accessing printing and internet services. DHS believes that flexibility is important in dealing with these populations, and allowing requestors to seek fee waivers via written request will improve access to immigration benefits consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021). Because less than one percent of fee waivers are requested by written request instead of Form I–912, continuing to allow written requests will not significantly impact USCIS operations. *See* 88 FR 402, 458 (Jan. 4, 2023). For these reasons, this final rule maintains the current effective regulation that allows requestors to

obtain a fee waiver by written request without filing Form I–912.

### e. Child's Means-Tested Benefit Is Evidence of Parent's Inability To Pay

After considering the comments on the proposed rule DHS has decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. Such benefits would include public housing assistance, Medicaid, SNAP, TANF, and SSI, although DHS is not codifying specific means-tested benefits and will implement those as examples in guidance through the updated Form I–912 instructions. DHS has decided to limit this policy to household spouses and children because other household members' eligibility for certain means-tested benefits may not reflect the financial need of the fee waiver requestor. For example, for SSI purposes an individual's deemed income only includes the income of their spouse and parents with whom they live and their Form I–864 sponsor.[100] USCIS retains the discretion to determine whether any requestor is eligible for a fee waiver, including whether the means-tested benefit qualifies as provided in 8 CFR 106.1(f) and the Form I–912 instructions.

### 10. Procedural Changes To Address Effects of Fee Exemptions and Discounts

DHS is making procedural changes in the final rule to address issues that it has experienced with fee-exempt and low fee-filings. DHS appreciates the concerns of commenters and is making changes to address those concerns by lowering many fees below the amount that was proposed, establishing discounts for small employers and nonprofits, and adding multiple fee exemptions. However, to provide the requested changes, DHS must make some adjustments to codified procedural requirements to mitigate some of the unintended consequences of providing limited discounts and free services and some of the actions for which those changes may provide an incentive.

### a. Duplicate Filings

The final rule provides that a duplicate filing that is materially identical to a pending immigration benefit request may be rejected. *See* 8

CFR 103.2(a)(7)(iv). DHS did not initially propose to prohibit multiple filings of identical requests to deter multiple filings of requests that have no or minimal fee, to reduce backlogs, and to improve processing times.

DHS is concerned that the new fee exemptions listed above will lead to the filing of multiple or simultaneous filing of requests that could create jurisdictional conflicts between DHS offices or individual immigration service officers who adjudicate the same types of requests. For example, filing multiple Forms I–290B, Notice of Appeal or Motion, may lead to the filing of multiple motions, multiple appeals, or the simultaneous filing of motions and appeals that would create jurisdictional conflicts between the Administrative Appeals Office (AAO) and other DHS offices. USCIS must intake the request, process or reject the request, and incur the associated costs for each duplicate, multiple or original request even when no fee is required. Multiple filings increase costs to USCIS to reject or process and it may exacerbate backlogs because free services or those with minimal fees do not provide revenue that can be used to fund new processing capacity. Requesters who file multiple requests consume excessive USCIS resources to the detriment of those who file one legitimate request.

Although it seems self-evident that USCIS can reject a materially identical filing of the exact same form while a previous request for the same benefit for the same person is still pending, that authority is not codified. Historically, USCIS has accepted duplicate filings of certain forms assuming the fee would cover the duplicate adjudication effort, if any. USCIS experience in administering OAW, U4U, the processes for Cubans, Haitians, Nicaraguans, and Venezuelans, and FRP has found that applicants submit multiple parole requests when they are fee exempt (as they are for OAW), as well as multiple Forms I–134A, Online Request to be a Supporter and Declaration of Financial Support, for the same prospective beneficiary. USCIS also receives duplicate Forms I–730, Refugee/Asylee Relative Petition, and Forms I–918, Petition for U Nonimmigrant Status, which do not have a filing fee. For some of these cases USCIS will adjudicate the initial and duplicate petitions on the merits, increasing costs to USCIS. Others are administratively closed, rejected, or consolidated with the duplicate request. All of these actions take time away from processing other requests. DHS is concerned that the reduction of fees for the additional

---

Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26" (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf.*

[100] Soc. Sec. Admin., "Understanding Supplemental Security Income, What Is Income?" (2023), *https://www.ssa.gov/ssi/text-income-ussi.htm* (last visited Aug. 21, 2023).

forms provided in this rule, *see* Table 5B, will in the same way cause applicants to submit multiples of the same request.

This change is necessitated by DHS's decision to provide the additional free services in the fee rule as requested by commenters. As explained above, USCIS experience is that when a full cost recovery fee is charged, duplicate, identical filings are very uncommon, but when the request is free or minimal (such as with the $10 H–1B Registration Fee) they are submitted more frequently. Because this problem results from fee exempt filings, and this rule provides additional fee exemptions as requested by commenters, codifying this restriction as a related change to offset the possible negative effects of the relief is a logical outgrowth of the proposed rule.[101] USCIS already rejects or administratively closes a request that is materially identical to a request that is being adjudicated because a requester generally cannot receive two or more identical immigration statuses, classifications, visas, or benefits. Individuals generally do not have a substantive right to receive multiple issuances of identical immigration benefits, which by their nature are only of value at first issuance (*e.g.,* two green cards or two travel documents). Thus, DHS will only approve document replacement requests under certain circumstances such as when the document is lost, stolen, or destroyed. In addition, after employees have already processed one request and made a decision, requiring the same or another agency employee to process the same request all over again, while a backlog of requesters remain waiting for attention, is not an efficient use of agency resources, especially when the request has no fee. This minor change to USCIS intake procedures is procedural in nature and does not alter the substantive rights of individuals. DHS is codifying this practice to ameliorate unintended consequences that may logically flow from the actions we are taking to provide more fee relief in this rule. These changes are made in the final rule as a procedural change and thus public comment is not required. *See* 5 U.S.C. 553(b)(A). Therefore, DHS is adding new 8 CFR 103.2(a)(7)(iv) to provide that a request that is materially identical to a pending request may be rejected.

---

[101] An agency may make changes that follow logically from or reasonably develop the rules the agency proposed. *See, Air Transport Ass'n of America* v. *C.A.B.,* 732 F.2d 219 (D.C. Cir. 1984).

b. Revocations

The final rule changes to a minor extent the handling of an approved benefit request if an incorrect fee is submitted or if the fee payment instrument is dishonored. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*) and 106.1(c)(2).

DHS is authorized to charge fees and inherent in that authority is the authority to enforce the payment of the fee and sanction failure to pay the fee. Payment of a codified fee is a fundamental eligibility criterion for any immigration benefit request. Failure to pay the correct fee by falsifying or misrepresenting eligibility for a fee waiver, exemption, or discount, as well as a dishonored check, stop payment, credit card dispute, or closed account, renders the requester ineligible for the approved benefit. Without enforcement capability, failure to pay fees would have no ramifications and possibly cause considerable damage to the ability of USCIS to fund its operations. Regarding the fee discounts, DHS foresees the situation where a petitioner may submit a lower fee for which they may not qualify and USCIS may not catch that error at intake. For example, in the five fiscal years preceding the FY 2016/2017 fee rule, an average of 231 petitions per year were submitted with a Request for Premium Processing Service, Form I–907, accompanied by a check that was dishonored by the remitting bank. 81 FR 73292, 73314. For fiscal year 2023, as of July 15, 2023, USCIS received between 30 to 43 dishonored payments per month that were associated with a Form I–129 filing, with approximately 10 of those being dishonored for stop-payment. If a benefit approved under these circumstances is not revoked, petitioners would have the incentive to request premium processing services in order to receive a swift approval, knowing they would not face any consequences once the bank dishonors the premium processing payment. *Id.*

Accordingly, balancing the need to provide relief to those requesters who have less ability to pay with the need to fully fund DHS, in the final rule DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may deny the request. *See* 8 CFR 103.2(a)(7)(ii)(D)(*1*). This change will insulate USCIS against the falsification of fee discount eligibility and the negative revenue impacts that would cause. Further, many of the discounted fee requests will include a request for premium processing and USCIS may approve them in a few days. The alternative to

revocation on notice would be for USCIS to hold each benefit request until the financial instrument used to pay the fee has finally cleared or been rejected. In the interest of administrative efficiency and prompt processing of benefit requests, DHS has rejected that alternative. Thus, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.* Sending a Notice of Intent to Revoke (NOIR) will be more effective than billing for the unpaid fee because the requestor may simply ignore the bill while confident that it would cost USCIS more to attempt collection through litigation or other means. In most cases, the NOIR will be cured by payment of the correct amount.

The first sentence of proposed 8 CFR 106.1(c)(2), stated, "If the benefit request was approved, the approval may be revoked upon notice." DHS is revising 106.1(c)(2) to clarify that if the benefit request was approved, the approval may be revoked upon notice, rescinded, or canceled subject to statutory and regulatory requirements applicable to the immigration benefit request. 8 CFR 106.1(c)(2). DHS does not in all cases have authority to revoke an approval upon notice. For example, DHS cannot administratively revoke naturalization and must use proceedings in a Federal district court following INA section 340(a), 8 U.S.C. 1451(a). Similarly, cancellation under INA section 342, 8 U.S.C. 1453, is the only route to pursue revocation if a certificate of citizenship or naturalization has already been issued. Accordingly, while these authorities already exist in statute and rulemaking is not required to implement them, in the final rule DHS is revising 8 CFR 106.1(c)(2) to explicitly acknowledge that USCIS' right to revoke an approval upon notice in cases where a fee payment is not honored may be subject to statutory limitations.

c. No Initial Field Review for Fee Exempt Form I–290B

When an affected party files an appeal of an initial USCIS decision, the USCIS officer who made the initial decision reviews the appeal case and decides whether the case warrants favorable action. *See* 8 CFR 103.3(a)(2)(ii). During their review, the officer decides whether the case warrants favorable action and if warranted, may reverse the initial unfavorable decision. If the officer determines that favorable action is not warranted, he or she must "promptly" forward the appeal to the AAO. *See* 8 CFR 103.3(a)(2)(iv). DHS did not propose exceptions to 8 CFR

103.3(a)(2)(ii) in the proposed rule. However, as outlined previously in this section, the final rule makes Form I–290B, Notice of Appeal or Motion, fee exempt for several new populations. *See* Table 48, in Section P. Fee Exemptions of RIA. To avoid fee exempt requests consuming excessive USCIS resources, in the case of a fee waived or fee exempt appeal under 8 CFR 106.3, this rule provides that USCIS may forward the appeal for adjudication without requiring a review by the official who made the unfavorable decision. *See* 8 CFR 103.3(a)(2)(ii) (providing that USCIS may forward the appeal for adjudication without a review by the official who made the unfavorable decision).

As stated previously in this section, free services do not provide revenue that can be used to fund new processing capacity. In addition, making an immigration benefit request free may increase the volume of those filings. The review by the official who made the unfavorable decision is a step in the appeal process that costs USCIS time and money and exacerbates backlogs by requiring officers to review already decided cases. To minimize the workload on USCIS officers who are required to review a denied request after appeal that may be caused by free appeals, DHS is eliminating the regulatory requirement to review appeals before forwarding them to the AAO if the appeal was fee exempt or the fee was waived. Elimination of mandatory field review is likely to decrease appeal processing times. Based on the FY 2017 average time for the AAO to receive an appeal from the field, the elimination of mandatory field review could save up to 113 days in processing time, on average, for cases requiring AAO review. This change will expedite the appeals process and provide the affected party a quicker decision. This change is both a logical outgrowth of the proposed rule and a logical extension of changes made in the final rule at the request of commenters. In addition, affected parties would not incur costs from this change because it is a procedural matter of internal agency management. DHS does not anticipate any cost savings for USCIS from this change, as any savings will be offset by a full appellate review at the AAO.

### 11. Adjustment of Status (Form I–485) and Family-Based Fees

### a. Bundling of Fees for Form I–765 and I–131

In this final rule, DHS provides that Form I–485, Application to Register Permanent Residence or Adjust Status,

applicants will pay half of the regular Form I–765, Application for Employment Authorization, fee when it is filed with a Form I–485 for which the fee is paid if the adjustment application is pending. *See* 8 CFR 106.2(a)(44)(i). DHS had proposed requiring the full fee for Form I–765, and Form I–131, Application for Travel Document, when filed with Form I–485. *See* 88 FR 402, 491. Instead, DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(i). Applicants will pay the same fee to renew their Employment Authorization Document (EAD) while their Form I–485 is pending. *Id.* DHS is unbundling the forms to make USCIS processing times more efficient by eliminating Forms I–765 filed for individuals who are not in need of employment authorization or Forms I–131 for individuals who have no intention of traveling outside the United States. Bundling Forms I–765, I–131, and I–485 transfers the cost of fees not paid by these applicants and results in other applicants paying for forms in a bundle they may not need.

Nevertheless, after considering the public comments DHS decided to provide the half price Form I–765 to reduce the burden on low, middle-income, or working-class requesters. DHS acknowledges that many prospective applicants for lawful permanent resident (LPR) status may lack work authorization and therefore struggle to pay the filing fee for Form I–765. An applicant may request a fee waiver for Form I–765. *See* 8 CFR 106.3(a)(3)(ii)(F). In addition, Forms I–131 and I–765 are fee exempt for certain categories of applicants. *See* 8 CFR 106.3(b).

### b. Child Discount for Form I–485

DHS initially proposed that children filing Form I–485 with their parents pay the same fee as adults, $1,540. 88 FR 402, 494 (Jan. 4, 2023). In the final rule, DHS provides that, when filing with parents, children will pay $950 for Form I–485. *See* 8 CFR 106.2(a)(20)(ii). The current $750 fee went into effect in December 2016 and the new $950 fee is based on the increase in the CPI–U (the amount of inflation) between December 2016 and June 2023, like other inflation adjusted fees in this rule. DHS agrees with many of the points made by commenters, including that the increased fee may be burdensome to filers and affect family reunification, and that there may be a cost basis for distinguishing a Form I–485 filed by a child in conjunction with a parent from other Form I–485s. DHS also understands the social benefit of family

immigration and the potential impacts the proposed fee could have on children and families. Therefore, after reviewing the comments, DHS is reducing the fee for applicants under age 14 who file concurrently with a parent to $950. Additionally, children under 14 who have properly filed the Form I–485 with a fee on or after July 30, 2007, and before the effective date of the final rule are not required to pay additional fees for the Form I–765 and Form I–131. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

### 12. Adoption Forms Changes

After considering public comments, in the final rule DHS is providing additional fee exemptions for adoptive families. *See* 8 CFR 106.2(a)(32) and (48). Specifically, DHS will also provide fee exemptions for:

- Second extensions.
- Second change of country requests.
- Duplicate approval notices for both the orphan and the Hague process.

These would all be requested using Supplement 3 for either the orphan (Form I–600/I–600A) or Hague (Form I–800A) process. This is in addition to the exemptions that DHS already provides for the Supplement 3 for first extensions and first change of country requests. Providing a second free extension will provide another 15 months of suitability approval validity at no additional cost to the applicants. DHS recognizes that intercountry adoptions may take an increasing amount of time because of factors outside the control of adoptive families, such as country conditions, and believes this will help reduce related burdens on adoptive families.

The final rule fee for the Supplement 3 for the orphan and Hague process will be $455. Petitioners will pay less under the final rule for most scenarios where they request action on a suitability application for the orphan or Hague process. Therefore, DHS believes the fees and new fee exemptions properly align with the needs of the adoption community while not unnecessarily shifting the USCIS adoption program costs by increasing fees for others.

### 13. Naturalization and Citizenship Fees

### a. Half Fee for Form N–400

In the proposed rule, applicants with household incomes not more than 200 percent of the Federal Poverty Guidelines (FPG) would be eligible for the reduced fee for Form N–400, Application for Naturalization. *See* 88 FR 402, 487–488 (Jan. 4, 2023). However, DHS notes that in recent years only one third of new lawful permanent residents (LPR) naturalized within 6

HR-1 FRN 2025 AR-000048

**6236    Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

years of obtaining LPR status,[102] and stakeholders have identified the fee for Form N–400 as a significant obstacle to naturalization.[103]

In response to public comments and additional stakeholder feedback, and in recognition of the financial gains immigrants obtain with naturalization and the benefits that the United States obtains from new naturalized citizens, this final rule expands eligibility for paying half of the regular fee for Form N–400. An applicant with household income at or below 400 percent of FPG may pay half price for their Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii). DHS believes that this change will provide additional relief to longtime residents who struggle to pay naturalization fees without requiring further fee increases for other forms to offset the cost. The increased income threshold for a reduced naturalization fee will also enable the United States to further benefit from newly naturalized citizens, including their greater civic involvement and tax revenues.[104]

b. Fee Exemption for Adoption Related Form N–600

The final rule provides that Forms N–600, Application for Certificate of Citizenship and N–600K, Application for Citizenship and Issuance of Certificate under Section 322, are fee exempt for certain adoptees. *See* 8 CFR 106.2(b)(7)(ii) and (8).

Multiple commenters asked USCIS to provide Certificates of Citizenship for all children immigrating based on adoption at no additional cost, as the fee would be an unfair burden on adoptive families. Commenters opposed the increase to the filing fees for adoptive families whose children enter the United States on certain types of visas, reasoning that the certificate should be provided at no additional cost, once all the necessary legal steps have been completed, just as it is provided at no cost for adopted children who enter on a different type of visa for children with final adoptions (IR–3 and IH–3 visas). Commenters indicated that if a Certificate of Citizenship is not obtained at the time of adoption, this becomes a further burden for adoptees.

USCIS already provides Certificates of Citizenship to certain adopted children who come to the United States with a final adoption (children with an IR–3 or IH–3 visa)[105] and meet the conditions of INA sec. 320, 8 U.S.C. 1431, without them having to file a Form N–600 and without paying a fee. USCIS can do this because children with an IR–3 or IH–3 visa generally automatically acquire U.S. citizenship upon their admission to the United States as lawful permanent residents and USCIS can make a citizenship determination based on their underlying immigration petition approval (Form I–600 or Form I–800) without any additional evidence. In addition, these children are in visa categories that are only for adopted children who generally automatically acquire citizenship upon admission, and therefore USCIS can easily identify these children based on their visa category. USCIS is not able to provide Certificates of Citizenship without a Form N–600 for other categories of children, because USCIS cannot make a citizenship determination without additional evidence or cannot identify the children based on their visa category. For example, USCIS cannot issue Certificates of Citizenship without a Form N–600 for children immigrating based on adoption who do not have final adoptions (IR–4s and IH–4s) because they do not automatically acquire citizenship upon their admission and need to submit additional evidence of a full and final adoption for a subsequent citizenship determination. USCIS also cannot automatically issue Certificates of Citizenship to adopted children who are issued IR–2 visas, because stepchildren are also issued IR–2 visas but do not automatically acquire U.S. citizenship upon their admission. USCIS cannot automatically determine which children in these visa categories automatically acquire citizenship and which do not, and thus additional evidence submitted with the N–600 application is required. DHS recognizes the unique vulnerability of adopted children and the overall costs that adoptive families face and wishes to reduce the burden on adoptive families. DHS also notes a passport is available to obtain proof of citizenship without filing Form N–600 for adopted children who automatically acquire or derive citizenship. If adoptive families wish to seek a Certificate of

Citizenship, DHS cannot eliminate the requirement to file a Form N–600 for additional categories of adopted children (such as IR–2, IR–4, and IH–4). However, after considering many comments requesting a free N–600 or N–600K for adopted children, DHS will exempt individuals who are the subject of a final adoption for immigration purposes and meet (or met before age 18) the definition of child under section 101(b)(1)(E), (F), or (G) of the INA from Form N–600 filing fees. 8 CFR 106.2(b)(7). This will include adoptees who are over age 18 at the time of filing or adjudication of the N–600, but who met the definition of child under section 101(b)(1)(E), (F), or (G) of the INA before turning 18. DHS will also exempt children who are the subject of a final adoption for immigration purposes and meet the definition of child under section 101(b)(1)(E), (F), or (G) of the Act from Form N–600K filing fees.

DHS realizes that this exemption seems to favor adopted over biological children in allowing the filing without a fee. DHS did not take this perception lightly when considering whether adopted children should be able to file a fee exempt Form N–600/600K. In the end, DHS reasoned that many adoptive families have already paid USCIS fees for the Form I–600A/I–600, Form I–800A/I–800, or Form I–130, Petition for Alien Relative, whereas the Form N–600 fee may be the only USCIS fee that families of biological children would pay if they acquired citizenship under INA 301 or 309. DHS also recognizes that families may also choose to apply for a passport to document their child's citizenship in cases where a biological child automatically acquired citizenship. The exemption fits logically within the structure of this rule, and results in a minimal loss of revenue from adoptee/adopted child Form N–600 and N–600K fees. Thus, DHS has decided to respond favorably to the request of many commenters and exempt certain adoptees from the N–600 fee and adopted children from the N–600K fee. 8 CFR 106.2(b)(7) and (8).

14. Additional Changes

In the final rule DHS:
• Deletes proposed 8 CFR 106.3(a)(5), "Fees under the Freedom of Information Act (FOIA)," because it is unnecessary. DHS FOIA regulations at 6 CFR 5.11(k) address the waiver of fees under FOIA, 5 U.S.C. 552(a)(4)(A)(iii).
• Removes the fee exemption for Form I–601, Application for Waiver of Grounds of Inadmissibility, for applicants seeking cancellation of removal under INA 240A(b)(2), 8 U.S.C. 1229b(b)(2), since they cannot use a

---

[102] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Trends in Naturalization Rates: FY 2018 Update" (Sept. 2021), *https://www.uscis.gov/sites/default/files/document/reports/Trends_In_Naturalization_Rates_FY18_Update_Report.pdf.*

[103] *See, e.g.,* Comment Submitted by CASA, May 19, 2021, *https://www.regulations.gov/comment/USCIS-2021-0004-7122.*

[104] *See* Holly Straut-Eppsteiner, Cong. Research Servs., R43366, "U.S. Naturalization Policy," (May 2021), *https://crsreports.congress.gov/product/pdf/R/R43366.*

[105] See U.S. Citizenship & Immigr. Servs, U.S. Dep't of Homeland Security, "Your New Child's Immigrant Visa," *https://www.uscis.gov/adoption/bringing-your-internationally-adopted-child-to-the-united-states/your-new-childs-immigrant-visa/your-new-childs-immigrant-visa* (last updated Dec. 15, 2021), for visa categories for adopted children.

Appx-000074

waiver of inadmissibility to establish eligibility for this type of relief from removal. *Matter of Y–N–P–,* 26 I&N Dec. 10 (BIA 2012); *cf.* proposed 8 CFR 106.3(b)(8)(i). Therefore, the form is not filed by that population, so the exemptions was not needed making the text superfluous.

• Codifies that USCIS will provide 30-day advance public notification before a currently acceptable payment method will be changed. 8 CFR 106.1(b). Commenters requested that advance notice be provided when a payment method is changed. As explained more fully in the responses to the comments on the subject, DHS is codifying this procedural requirement.

• Revises proposed 8 CFR 106.2(d)(2) to provide that all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute) may be increased by the rate of inflation by final rule. The change is limited only to clarify that all fees not fixed by statute are increased simultaneously. This change is explained more fully in the response to the public comments on this subject.

• Amends 8 CFR 204.5(p)(4)(ii) in this final rule by removing the clause "but not to exceed the period of the alien's authorized admission" so that the provision once again states that "Employment authorization under this paragraph may be granted solely in 1-year increments." The last clause in § 204.5(p)(4)(ii), which is being removed in this final rule, was added in the 2020 Fee Rule in a revision that was intended to remove "8 CFR 103.7(b)(1)" and replace it with "8 CFR 106.2." 85 FR 46922; 84 FR 62364. In neither the 2020 Fee Rule nor in the January 4, 2023, proposed rule did DHS explain why the rule added or retained the last clause, respectively. Although the proposed rule proposed to retain this clause, DHS has determined that the clause is unnecessary and potentially confusing. As explained in the 2016 final rule that created § 204.5(p), the 1-year grant of employment authorization is meant to be a stopgap measure for nonimmigrants facing compelling circumstances and, if granted, provides a period of authorized stay.[106]

### D. Corrections

DHS notes multiple non-substantive errors in the proposed rule as follows:

• The preamble to the proposed rule states, "However, as to Forms *N–565* and N–600K, both the current fees and the proposed fees are less than the estimated cost (fee-paying unit cost) for each naturalization form." 88 FR 402, 485–486 (Jan. 4, 2023) (emphasis added). "However, for Forms *N–565* and N–600K, the proposed fees are below the estimated cost from the ABC model, thus DHS proposes no discount for online filing of the N-forms." *Id.* at 486 (emphasis added). These statements were incorrect as to the Form N–565, Application for Replacement Naturalization/Citizenship Document, because the proposed fee was higher than its fee-paying unit cost. This error is immaterial to the final rule because the current N–565 fee is being increased by the rate of inflation as previously explained.

• DHS proposed to remove text from Form I–485, Supplement A, Supplement A to Form I–485, Adjustment of Status Under Section 245(i), regarding the statutory exemptions to the required INA sec. 245(i) statutory sum when the applicant is an unmarried child under 17 or the spouse or the unmarried child under 21 of an individual with lawful immigration status and who is qualified for and has applied for voluntary departure under the family unity program. *See* 88 FR 402, 494 (Jan. 4, 2023). However, Form I–485, Supplement A, does not contain the language DHS proposed to remove. DHS further stated that it was unnecessary to codify the exemptions from the required INA sec. 245(i) sum into the CFR, but the proposed regulatory text did include the exemptions.

• The proposed regulatory text for 8 CFR 212.19(e) stated: "An alien seeking an initial grant of parole or re-parole will be required to submit biometric information. An alien seeking re-parole may be required to submit biometric information." The second sentence was included in error and has been removed from the final rule.

### E. Status of Previous USCIS Fee Regulations

DHS issued a final rule to adjust the USCIS fee schedule on August 3, 2020, at 85 FR 46788. The rule was scheduled to become effective on October 2, 2020. However, that rule was preliminarily enjoined. *Immigrant Legal Res. Ctr.* v. *Wolf,* 491 F. Supp. 3d 520 (N.D. Cal. 2020); *Nw. Immigrant Rights Project* v. *USCIS,* 496 F. Supp. 3d 31 (D.D.C. 2020). Consequently, USCIS has not implemented the fees set out in the 2020 fee rule and is still using the fees set in the 2016 fee rule unless an intervening rulemaking has codified a different fee.[107] DHS discussed the effects of the injunctions and their relationship to this rule in detail in the proposed rule. *See* 88 FR 402, 420 (Jan. 4, 2023). This preamble discusses substantive changes that refer to the requirements of the regulations that existed before October 2, 2020.[108] Likewise, the regulatory impact analysis (RIA) for this proposed rule analyzes the impacts of the changes between the pre-2020 fee rule regulations that DHS is following under the injunctions and those codified in this rule.[109]

### F. Severability

In the approach that DHS adopts in this final rule, the new fees allow USCIS to recover full cost given projected volumes and all policy considerations. However, if DHS were prohibited from collecting any new fee for any reason, DHS believes this rule is structured so that a stay, injunction or vacatur of a fee set by this rule could be narrowly tailored to remedy the specific harm that a court may determine exists from the specific fee or fees challenged. USCIS would be able to continue operations, perhaps at a reduced level or by shifting resources in the absence of the fee until DHS is able to conduct new rulemaking to re-set fees and correct the deficiencies that resulted in the court order. Operating without one or a few of the new fees would be preferable to an invalidation of all the new fees, which would great disruption and deterioration of USCIS operations.

DHS believes that the provisions in this rule can function independently of each other. For example, the H–1B Registration Fee, Asylum Program Fee, and genealogy fees could be stalled while a new rule is undertaken without affecting all other fees generally. This would reduce USCIS projected revenue, carryover balances and require realignment of the USCIS budget and a reassessment of spending priorities. *See*

---

[106] See Retention of EB–1, EB–2, and EB–3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers Final Rule, 81 FR 82398, 82424–82425) (Nov. 18, 2016).

[107] *See* 86 FR 7493 (Jan. 29, 2021) (announcing that DHS is complying with the terms of the orders, not enforcing the regulatory changes set out in the 2020 rule, and accepting fees that were in place before October 2, 2020).

[108] As explained in the proposed rule, the effects of the injunction of the 2020 fee rule, intervening rules, and the codification but ineffectiveness of the 2020 fee rule may result in the standard of citing to the CFR print edition date being inaccurate because title 8 was amended by a number of rules in and since calendar year 2020. 88 FR 421. Therefore, regulations that existed on October 1, 2020 are followed by that date, and provisions that were codified by the 2020 fee rule are followed by the effective date of the 2020 fee rule, October 2, 2020.

[109] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, FY 2022–2023 Fee Review Regulatory Impact Analysis (Jan. 4, 2023), *https://www.regulations.gov/document/USCIS-2021-0010-0031.*

88 FR 402, 517 (Jan. 4, 2023). However, USCIS constantly assesses its budget and spending to avoid a deterioration in service considering its fees have not been increased since 2016. Additionally, the statutory authority for this rule provides that "fees for providing adjudication and naturalization services may be set at a level that will ensure recovery of the full costs of providing all such services" and does not require that DHS *must* recover full costs. INA section 286(m), 8 U.S.C. 1356(m). Therefore, to protect the goals for which this rule is being proposed, DHS is codifying our intent that the provisions be severable so that, if necessary, the regulations overall can continue to function should a particular provision be stricken. *See* 8 CFR 106.6.

### III. Related Rulemakings and Policies

DHS is engaging in multiple rulemaking actions that are in various stages of development.[110] DHS realizes that policy and regulatory changes can affect staffing needs, costs, fee revenue, and processing times. DHS has considered each of these other rules for peripheral, overlapping, or interrelated effects on this rule, and has analyzed the potential effects of rules that may impact or substantively overlap with this proposal, if any. *See* 88 FR 402, 432 n.78 (Jan. 4, 2023).

DHS has also, to the extent possible, considered the effects, if any, on this rule of all intervening or future legislation and policy changes of which USCIS is aware. Immigration policy changes frequently, and initiatives may come about without being incorporated in a proposed and final rule simply due to the time required for rule development and finalization. DHS, therefore, does not and cannot assert that it knows and has considered every policy change that is planned or that may occur at all levels and agencies of the U.S. Government that may directly or indirectly affect this rule. However, DHS believes that it has examined and considered all relevant aspects of the problems that this rulemaking solves, responded to all substantive public comments, articulated a satisfactory analysis and reasoned explanation for each change and the rule, and not relied on factors which Congress has not intended us to consider. Specific recent and planned DHS rules and major policy changes and their effects on this rule are as follows:

*A. New Processes*

#### 1. Uniting for Ukraine (U4U)

On April 21, 2022, the United States announced a key step toward fulfilling President Biden's commitment to welcome Ukrainians fleeing Russia's invasion.[111] Uniting for Ukraine (U4U) provides a pathway for Ukrainian citizens and their immediate family members who are outside the United States to come to the United States and stay temporarily for a 2-year period of parole. Ukrainians participating in U4U must have a supporter in the United States who agrees to provide them with financial support for the duration of their stay in the United States.

#### 2. Operation Allies Welcome

On August 29, 2021, President Biden directed DHS to lead and coordinate ongoing efforts across the Federal Government to support vulnerable Afghans, including those who worked alongside the U.S. government in Afghanistan for the past 2 decades, as they safely resettle in the United States. USCIS is and has been responsible for large portions of the implementation of Operation Allies Welcome (OAW).[112]

#### 3. Processes for Cubans, Haitians, Nicaraguans, and Venezuelans

Over the last year, DHS has implemented processes through which nationals of designated countries and their immediate family members may request to come to the United States in a safe and orderly way. DHS used emergency processing when implementing Uniting for Ukraine as well as new parole processes for certain Cubans,[113] Haitians,[114] Nicaraguans,[115] and Venezuelans.[116] Under these processes, qualified beneficiaries who are outside the United States and lack U.S. entry documents may be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for urgent humanitarian reasons or significant public benefit.

#### 4. Family Reunification Parole Processes

DHS also used emergency processing when establishing new family reunification parole (FRP) processes for

certain Colombians,[117] Ecuadorians,[118] Salvadorans,[119] Guatemalans,[120] and Hondurans[121] and implementing procedural changes to the previously established Cuban[122] and Haitian[123] Family Reunification Parole processes. These FRP processes are available to certain petitioners who filed an approved Form I–130, Petition for Alien Relative, on behalf of a principal beneficiary who is a national of Colombia, Cuba, El Salvador, Guatemala, Haiti, or Honduras, and their immediate family members. These processes allow an eligible beneficiary to be considered, on a case-by-case basis, for advanced authorization to travel and a temporary period of parole for urgent humanitarian reasons or significant public benefit.

*B. Effects of Temporary or Discretionary Programs and Processes*

As stated elsewhere, and in the proposed rule, Deferred Action for Childhood Arrivals (DACA) and Temporary Protected Status (TPS) country designations are both administrative exercises of discretion that may be granted on a case-by-case basis for certain periods. *See* 88 FR 402, 447 (Jan. 4, 2023). DACA grants are subject to intermittent renewal, extension, or termination at DHS's discretion. TPS country designations must be periodically reviewed and are subject to termination if the conditions for the designation no longer exist. Likewise, OAW, U4U, and processes for Cubans, Haitians, Nicaraguans, and Venezuelans are temporary processes established to address exigent circumstances. The FRP processes require that the petitioner first receive an invitation to be able to initiate the process. The invitation requirement allows DHS to adjust the number of invitations issued based on the resources available to process requests and to achieve desired policy objectives. Given that these processes are temporary by definition or may be paused at the discretion of DHS, USCIS excluded the associated costs and workload from the fee review and did not propose to allocate overhead and other fixed costs to these workloads.[124]

---

[110] *See* Office of Information and Regulatory Affairs, "Fall 2023 Unified Agenda of Regulatory and Deregulatory Actions," *https:// www.reginfo.gov/public/do/eAgendaMain* (last visited December 29, 2023).

[111] *See* USCIS, Uniting for Ukraine, at *https:// www.uscis.gov/ukraine* (last visited Aug. 24, 2023).

[112] *See* U.S. Dep't of Homeland Sec, Operation Allies Welcome, *https://www.dhs.gov/ allieswelcome* (last updated Nov. 27, 2023).

[113] 88 FR 1266 (Jan. 9, 2023); *see also* 88 FR 26329 (Apr. 28, 2023).

[114] 88 FR 1243 (Jan. 9, 2023); *see also* 26 FR 327 (Apr. 28, 2023).

[115] 88 FR 1255 (Jan. 9, 2023).

[116] 87 FR 63507 (Oct. 19, 2023); *see also* 88 FR 1279 (Jan. 9, 2023).

[117] 88 FR 43591 (July 10, 2023).

[118] 88 FR 78762 (Nov. 16, 2023).

[119] 88 FR 43611 (July 10, 2023).

[120] 88 FR 43581 (July 10, 2023).

[121] 88 FR 43601 (July 10, 2023).

[122] 88 FR 54639 (Aug. 11, 2023).

[123] 88 FR 54635 (Aug. 11, 2023).

[124] USCIS has considered the number of immigration benefit requests it will receive from noncitizens from Afghanistan who will stay permanently and safely resettle in the United States over the fee review period.

Excluding these initiatives or processes that are temporary from the fee review mitigates an unnecessary revenue risk, by ensuring that USCIS will have enough revenue to recover full cost regardless of DHS's discretionary decision to continue or terminate these initiatives. This allows DHS to maintain the integrity of its activity-based cost (ABC) model, ensure recovery of full costs, and mitigate revenue risk from unreliable sources. While the operational costs of adjudicating requests associated with these policies are carefully considered on a day-to-day basis, the proposed rule and this final rule exclude from the ABC model the costs and revenue associated with these processes.

*C. Lawful Pathways Rule*

DHS and the U.S. Department of Justice (DOJ) recently published a final rule, Circumvention of Lawful Pathways. *See* 88 FR 31314 (May 16, 2023). Under the final rule, certain noncitizens who cross the southwest land border or adjacent coastal borders without authorization, and without having availed themselves of existing lawful, safe, and orderly pathways are presumed ineligible for asylum unless they meet certain limited exceptions. *See id* at 31449–52. The rule is projected to increase USCIS costs for operating the asylum program. *See* 88 FR 11704 (Feb. 23, 2023). While the costs of this rule were not considered in the proposed rule, DHS believes that USCIS' budget may be sufficient to cover these costs in the near term. Much of the cost for the Circumvention of Lawful Pathways rule will occur beyond the 2-year study cycle for the fee revenue required to be generated by this rule. Future fee rules will use more recent information and estimates, when available.

*D. Premium Processing—Emergency Stopgap USCIS Stabilization Act*

As explained in the proposed rule, on October 1, 2020, the Continuing Appropriations Act, 2021, and Other Extensions Act (Continuing Appropriations Act) was signed into law. Public Law 116–159 (Oct. 1, 2020). The Continuing Appropriations Act included the Emergency Stopgap USCIS Stabilization Act (USCIS Stabilization Act), which allows USCIS to establish and collect additional premium processing fees and to use premium processing funds for expanded purposes. *See* Public Law 116–159, secs. 4101 and 4102, 134 Stat. 739 (Oct. 1, 2020); 8 U.S.C. 1356(u). Then, on March 30, 2022, DHS published a final rule, Implementation of the Emergency Stopgap USCIS Stabilization Act,

implementing part of the authority provided under the USCIS Stabilization Act to offer premium processing for those benefit requests made eligible for premium processing by section 4102(b) of that law. *See* 87 FR 18227 (premium processing rule).

The proposed rule did not include changes directly resulting from the USCIS Stabilization Act or premium processing rule and stated that DHS will consider including premium processing revenue and costs in the final rule. *See* 88 FR 402, 419 (Jan. 4, 2023). In this final rule, DHS has transferred $129.8 million in costs to premium processing because of premium processing revenue projections. *See* section II.B of this preamble.

*E. Premium Processing Inflation Adjustment*

On December 28, 2023, DHS published a final rule, Adjustment to Premium Processing Fees, effective February 26, 2024, that increased premium processing fees charged by USCIS to reflect the amount of inflation from June 2021 through June 2023 according to the Consumer Price Index for All Urban Consumers (CPI–U). 88 FR 89539 (Dec. 28, 2023). The adjustment increases premium processing fees from $1,500 to $1,685, from $1,750 to $1,965, and from $2,500 to $2,805. 8 CFR 106.4. The total projected revenue to be collected from the new premium processing fees established by the final rule premium processing rule is too attenuated to be considered for this rule without placing USCIS at risk of revenue shortfalls if that revenue did not materialize. However, as noted earlier, this final fee rule transfers additional costs to premium processing revenue. Premium revenue will be considered in future fee studies.

*F. EB–5 Reform and Integrity Act of 2022 and Related Rules*

As stated in the proposed rule, on March 15, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, which repealed the Regional Center Pilot Program and authorized a new Regional Center Program.[125] *See* 88 FR 402, 420 (Jan. 4, 2023). (EB–5 stands for Employment-Based Immigrant Visa, Fifth Preference.) The EB–5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB–5 program related immigration benefit requests at a level sufficient to recover

the costs of providing such services, and complete the adjudications within certain time frames. *See* Public Law 117–103, sec. 106(b). DHS has begun the fee study required by the EB–5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages. How the EB–5 Reform and Integrity Act of 2022 and the fee study it requires relate to this rule and the fees it sets are explained in section IV.G.2.b. of this preamble in responses to comments on those fees and related polices.

*G. Modernizing H–1B Requirements, Providing Flexibility in the F–1 Program, and Program Improvements Affecting Other Nonimmigrant Workers*

On October 23, 2023, DHS proposed to amend its regulations governing H–1B specialty occupation workers. 88 FR 72870. The rule proposed to modernize and improve the efficiency of the H–1B program by amending several requirements for the subject nonimmigrant classifications, including to improve the integrity of the H–1B program. *Id.* Specifically, that rule proposes that USCIS would select registrations by unique beneficiary rather than by individual registration to reduce the potential for gaming the H–1B cap system and make it more likely that each beneficiary would have the same chance of being selected, regardless of how many registrations are submitted on their behalf. If that proposal is finalized as proposed, the actual number of H–1B Registrations may not be as high as projected in this rule. For example, the proposed rule forecasted 273,990 H–1B registrations. 88 FR 402, 437 (Jan. 4, 2023). The forecast for the proposed rule was similar to the 274,237 total registrations in the FY 2021 cap year.[126] This final rule revises the H–1B registrations forecast to 424,400 based on more recent data, such as the total registrations for the FY 2023 cap year. The effect of modernizing H–1B requirements may result in a different H–1B registration volume than we forecast here. If that occurs, DHS will address the resulting revenue shortfall in a future fee rule, or in a separate rulemaking that directly addresses the H–1B Registration Fee and the changes made by the Modernizing rule, the H–1B registration process, and the need to recover the costs of USCIS.

---

[125] Div. BB of the Consolidated Appropriations Act, 2022, Public Law 117–103.

[126] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, H–1B Electronic Registration Process, *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-1b-specialty-occupations-and-fashion-models/h-1b-electronic-registration-process.*

HR-1 FRN 2025 AR-000052

**Appx-000077**

*H. Citizenship and Naturalization and Other Related Flexibilities*

DHS expects to soon publish a notice that will propose amendments of its regulations governing citizenship and naturalization.[127] The notice will propose changes to naturalization eligibility regulations and other immigration benefit provisions that affect naturalization and acquisition of citizenship, remove outdated provisions, and amend provisions that are inconsistent with intervening laws. DHS has not incorporated any changes in this final rule because the Citizenship and Naturalization notice has not yet been adopted, and whether USCIS needs to update form fees due to the changes would not be determined until after implementation. Future fee rules will consider the effects of the changes if the notice becomes final.

*I. 9–11 Response and Biometric Entry-Exit Fee for H–1B and L–1 Nonimmigrant Workers (Pub. L. 114–113 Fees)*

Congress requires the submission of an additional fee of $4,000 for certain H–1B petitions and $4,500 for certain L–1A and L–1B petitions in section 402(g) of Div. O of the Consolidated Appropriations Act, 2016 (Pub. L.114–113) enacted December 18, 2015.[128] DHS proposed to republish the regulatory text that existed immediately before the 2020 fee rule. *See* 88 FR 402, 516. DHS did not receive any comments on this proposal. As such, this final rule republishes the proposed text for these fees. *See* 8 CFR 106.2(c)(8) and (9). However, DHS is proposing to address the 9–11 Response and Biometric Entry-Exit Fees for H–1B and L–1 Nonimmigrant Workers language in a separate rulemaking in the future.[129]

---

[127] *See* Office of Info. and Regulatory Affairs, Office of Mgmt. and Budget, Exec. Office of the President, "Fall 2023 Unified Agenda of Planned Regulatory Actions," RIN 1615–AC80, *https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=1615-AC80* (last viewed Jan. 16, 2024).

[128] Section 402(g) of Div. O of Public Law 114–113 added a new section 411 to the Air Transportation Safety and System Stabilization Act, 49 U.S.C. 40101 note. Section 411 provided that the fees collected thereunder would be divided 50/50 between general Treasury and a new "9–11 Response and Biometric Exit Account," until deposits into the latter amounted to $1 billion, at which point further collections would go only to general Treasury. Deposits into the 9–11 account are available to DHS for a biometric entry-exit screening system as described in 8 U.S.C. 1365b.

[129] See Department of Homeland Security, Fall 2023 Regulatory Agenda, *9–11 Response & Biometric Entry-Exit Fees for H–1B and L–1 Visas, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=1651-AB48* (last visited Dec. 20, 2023).

## IV. Response to Public Comments on the Proposed Rule

*A. Summary of Comments on the Proposed Rule*

DHS provided a 65-day comment period following publication of the proposed rule. DHS received 7,973 public comment submissions in docket USCIS–2021–0010 in response to the proposed rule. Of the 7,973 submissions, 5,417 were unique submissions, 2,393 were form letter copies, 113 were duplicate submissions, 45 were not germane to the rule, and 5 contained comments and requests that were entirely outside of the scope of the rule. Most submissions [130] were anonymous or from individuals, schools or universities, advocacy groups, lawyers or law firms, legal assistance providers, community or social organizations, businesses, State and Federal elected officials, research organizations, religious organizations, local governments or tribes, unions, and business or trade associations. Some commenters expressed total support for the proposed rule or supported one or more specific provisions of the proposed rule without recommending changes. Most commenters opposed the rule and expressed unqualified opposition or opposition to one or more provisions without recommending changes. Many commenters provided mixed comments of both support for and opposition to various provisions of the proposed rule, provided general support with suggested revisions, provided general opposition with suggested revisions, or were unclear on whether the comment supported or opposed the proposed rule.

DHS reviewed all the public comments received in response to the proposed rule and addressed relevant comments in this final rule, grouped by subject area.

DHS also received several comments on subjects unrelated to the proposed fees that are outside of the proposed rule's scope. DHS has not individually responded to these comments but has summarized out of scope comments and provided a general response in Section IV.I of this preamble.

*B. General Feedback on the Proposed Rule*

1. General Support for the Proposed Rule

*Comment:* Several commenters expressed general support for the

---

[130] The term "submission" refers to an entire submission letter submitted by a commenter. The term "comments" refers to parts or excerpts of the submission based on subject matter.

proposed rule. Some commenters expressed general support for the rule without providing additional rationale. Commenters expressed support for the rule reasoning that the fee adjustments would:

• Reduce processing times, increase staff, and reduce the backlog or wait times for decisions.

• Decrease fraud.

• Reflect USCIS' adjudication burden and need for sufficient financing to support effective processing of its vital services.

• Reduce USCIS' funding and operational issues that are caused by its status as a fee-funded agency.

A commenter urged USCIS to move forward with the proposed rule and respond forcefully to organizations that fail to acknowledge USCIS management has improved efficiencies despite lacking sufficient funds to sustain operations. The commenter stated that USCIS is capable of increasing efficiencies in a short period but said that it needs more congressional funding. Another commenter suggested that USCIS further increase its fees.

*Response:* DHS appreciates these commenters' support for the proposed rule and did not make any changes in this final rule based on them.

2. General Opposition to the Proposed Rule

Many commenters stated their general opposition to the proposed fees, the magnitude of the fee adjustments, charging fees in general, and specific proposed policy changes in the proposed rule. DHS summarizes and responds to these public comments in the following sections:

a. Immigration Policy Concerns

*Comment:* Many commenters opposed the proposed fee adjustments based on the burdens they would create. Commenters stated that the proposed fees would:

• Be a financial obstacle or prohibitively expensive, discourage people from immigrating to the United States, and be detrimental for the United States and immigrant communities.

• Encourage illegal immigration by creating significant barriers to and discouraging legal immigration.

• Strain resources with which immigrants can integrate into the United States.

*Response:* DHS's fee rule is not intended to reduce or limit immigration. These fee adjustments reflect DHS's best effort to balance access, affordability, equity, and benefits to the national interest while providing USCIS with the funding necessary to maintain adequate

HR-1 FRN 2025 AR-000053

**Appx-000078**

services. Recognizing that fees impose a burden on fee-paying requestors and their communities, DHS is shifting its fee-setting approach away from sole emphasis on the beneficiary-pays principle toward the historical balance between the beneficiary-pays and ability-to-pay principles. *See* 88 FR 402, 424–26 (Jan. 4, 2023). Nonetheless, USCIS filing fees are necessary to provide the resources required to perform the work associated with such filings. When fees do not fully recover costs, USCIS cannot maintain sufficient capacity to process requests. Inadequate fees may cause significant delays in immigration request processing which can burden requestors, as well as their families, communities, and employers.

In this final rule, USCIS has made multiple adjustments to its budget to limit the extent of fee increases. Ordinarily, any decrease in the fee adjustments would require a decrease in USCIS' budget and a commensurate decrease in service levels. Rather than decrease service levels, in this final rule USCIS has shifted a portion of its budget from IEFA non-premium revenue to the IEFA premium processing revenue, in addition to current levels of premium processing in the overall USCIS budget. USCIS has also revised staffing estimates based on improved efficiency measures, which allowed a further reduction to the budget. Through these adjustments, DHS seeks to recover the full cost of the services provided by USCIS.

This final rule limits fee increases for several forms, including the Form I–130, Petition for Alien Relative, Form I–485, Application to Register Permanent Residence or Adjust Status, and Form I–765, Application for Employment Authorization, to an inflation-based increase. *See* Table 1. For reasons explained earlier in section II.C. of this preamble, the final rule also creates lower fees for certain small employers and nonprofits. Businesses with 25 or fewer employees will pay a $300 Asylum Program Fee instead of the $600 fee that larger businesses will pay, and nonprofits will pay no Asylum Program Fee. *See* 8 CFR 106.2(c)(13). In addition, many categories of Form I–129, Petition for Nonimmigrant Worker, now allow for half-price fees for businesses with 25 or fewer employees and nonprofits. *See* 8 CFR 106.2(a)(3)(ix); Table 1. The final rule also expands the number of forms that qualify for fee exemptions. *See* 8 CFR 106.3(b); Table 5B. Regarding integration concerns, the final rule increases the household income threshold to 400 percent of the FPG to enable more naturalization applicants to qualify for a reduced fee for Form N–

400, Application for Naturalization. *See* 8 CFR 106.2(b)(3)(ii). These changes do not represent a change in fee policy or requirements. They are a continuation of the discretion that DHS typically exercises in setting USCIS fees. *See, e.g.,* 81 FR 73292, 73296–73297 (Oct. 24, 2016); 75 FR 58962, 58969–58970 (Sept. 24, 2010).

In addition to these changes in the final rule, DHS reiterates the steps it has taken to mitigate the burden of fee increases on fee-paying requestors. DHS has maintained some current fees and limited the increases for many others to levels at or below inflation. *See* Table 1. DHS includes a separate Asylum Program Fee to mitigate the scope of fee increases for individual requestors. *See* 8 CFR 106.2(c)(13); *see also* 88 FR 402, 451–454 (Jan. 4, 2023). For humanitarian immigration categories, DHS has expanded the availability of fee exemptions and waivers to ensure that the most vulnerable applicants are able to access protection-based relief. *See* 8 CFR 106.3; Table 5B; preamble sections IV.E. and IV.F. DHS is mindful that departures from the standard USCIS fee-setting methodology result in lower fees for some and higher fees for others. However, it believes that these fees balance access, affordability, equity, and benefits to the national interest while providing USCIS adequate funding.

DHS disagrees that the proposed fee increases are likely to incentivize irregular migration because the financial costs and other risks of irregular migration tend to be higher than USCIS fees,[131] and the economic benefits of lawful migration outweigh USCIS fees.[132] DHS believes that the consequences of not pursuing full cost recovery (processing delays, backlogs, and otherwise inadequate services) may be more likely to discourage lawful migration, since wait times may tend to have a stronger influence than financial costs on one's decision to pursue unlawful pathways of migration.[133] DHS

[131] *See, e.g.,* U.N. Office on Drugs & Crime, "Smuggling of Migrants: The Harsh Search for a Better Life," *https://www.unodc.org/toc/en/crimes/migrant-smuggling.html#:~:text=The%20fees%20charged%20for%20smuggling,pay%20as%20much%20as%20%2410%2C000.* (last visited Sept. 5, 2023) (noting smuggling fees ranging from $2,000–$10,000 depending on point of origin).

[132] *See, e.g.,* California Immigrant Data Portal, "Median Hourly Wage," available at *https://immigrantdataca.org/indicators/median-hourly-wage* (last visited Sept. 7, 2023) (noting that "the median hourly wage for naturalized immigrants was $24, compared to $19 for lawful residents, and $13 for undocumented immigrants").

[133] *See, e.g.,* David J. Bier, "'Why Don't They Just Get in Line?' Barriers to Legal Immigration," Testimony, CATO Institute, Apr. 28, 2021, *https://www.cato.org/testimony/why-dont-they-just-get-line-barriers-legal-immigration* (identifying wait times as a primary driver of unlawful migration).

further notes that it focuses fee exemptions and waivers on humanitarian and protection-based immigration forms, where requestors are at a greater risk of pursuing irregular forms of migration. *See* 8 CFR 106.3; Table 5B.

*Comment:* Other commenters stated that the proposed rule would:
- Undermine U.S. national values.
- Be anti-immigrant, "tantamount to a threat to American democracy," unfair, or unethical.
- Unduly place the burden of funding USCIS on immigrants.
- Isolate the United States internationally, reflect poorly on Americans, harm U.S. relations with other countries, and lead to other countries increasing their fees.

*Response:* DHS strongly disagrees that this fee rule represents a departure from U.S. values or is anti-immigrant, unfair, or unethical. DHS recognizes that increased fees create burdens for fee-paying requestors and their communities. However, it would not be more fair, ethical, pro-immigrant, or consistent with U.S. values to maintain current fee levels if this results in decreases in USCIS productivity. Because DHS does not receive congressional appropriations for the great majority of its operations, DHS must charge fees for the services it provides to ensure that those seeking to live and work in the United States can efficiently receive their benefits. Since 1990, the INA has specified that the government may set immigration adjudication and naturalization fees at a level that will ensure full cost recovery,[134] and past fee rules have consistently followed this approach.[135] By shifting its fee-setting approach away from the beneficiary-pays principle toward the historical balance of ability-to-pay and beneficiary-pays principles, DHS has sought to reduce barriers and promote accessibility to immigration benefits. *See* 88 FR 402, 424–25 (Jan. 4, 2023). As noted in the prior response, DHS has limited the increases in many forms and instituted new fee waivers and exemptions to reduce financial barriers to U.S. immigration benefits.

DHS does not believe that this final fee schedule poses significant consequences for foreign relations. Commenters failed to cite any examples of other countries raising immigration fees or otherwise retaliating in response

[134] *See* Departments of Commerce, Justice, and State, The Judiciary, and Related Agencies Appropriations Act, 1991, Public Law 101–515, 104 Stat 2101 (1990).

[135] *See* 72 FR 4888, 4896 (Feb. 1, 2007); 75 FR 33446, 33472 (June 11, 2010); 81 FR 26904, 26905 (May 4, 2016); 88 FR 62280, 62282 (Nov. 14, 2019).

HR-1 FRN 2025 AR-000054

**Appx-000079**

to fee increases by USCIS or the former Immigration and Naturalization Services (INS). DHS notes that other countries regularly charge fees for visas and other immigration benefits,[136] and only one foreign government entity submitted a comment on the proposed rule.[137] Unlike nonimmigrant visa fees set by the U.S. Department of State (DOS), the principle of reciprocity does not factor into USCIS fees. *Cf.* INA sec. 281, 8 U.S.C. 1351; 9 FAM 403.8.

*Comment:* A commenter stated USCIS should terminate "unlawful" special parole programs, as the creation of these unauthorized and unappropriated programs diverts agency resources from legitimate visa programs, resulting in fee increases and increased delays for many benefit requestors. The commenter stated that DHS should return to interpreting parole authority on a case-by-case basis to enhance DHS's ability to focus its resources on processing immigration benefits Congress has authorized and increase access to such benefits without unreasonable delays.

*Response:* DHS disagrees that the parole programs identified by this commenter are unlawful and believes that the legal authority for those programs has been adequately presented in their respective rules.[138] As stated earlier, the special parole processes mentioned by the commenter are necessary to address urgent humanitarian events and aid in the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage and reduce irregular migration that could have worsened without timely action by the United States. *See, e.g.,* 88 FR 1243 (Jan. 9, 2023); *see also* 88 FR 26327 (Apr. 28, 2023). DHS acknowledges that, apart from International Entrepreneur Parole, the special parole processes require the use of limited USCIS budget resources. However, the case-by-case parole into the United States of noncitizens under special parole processes aids in the United States' effort to deter irregular migration from those countries by providing lawful, safe, orderly pathways to travel to the United States. *Id.* Also, unlike many noncitizens who irregularly migrate, noncitizens who are paroled into the

United States through these processes are immediately eligible to apply for employment authorization throughout the duration of their parole period, allowing them to support themselves and contribute to the U.S. economy through labor, taxes, consumption of goods, and payment of rent and utilities in their new U.S. communities.[139]

As stated in the proposed rule, DHS excluded Form I–941, Application for Entrepreneur Parole, from this rule. *See* 88 FR 402, 424 n.47. The fee for Form I–941 will remain at $1,200, the level previously set to recover its anticipated processing costs to DHS and will not impact fees or processing times for other immigration benefit requests. 82 FR 5238, 5280 (Jan. 17, 2017).

b. Impact on Specific Benefit Categories

*Comment:* Multiple commenters stated that the proposed fees would be discriminatory, disproportionately burdensome, or otherwise harmful toward the following immigration categories:
• Undocumented individuals.
• Applicants pursuing legal residency and citizenship.
• Nonimmigrants such as foreign artists.
• Family-based immigration. Commenters stated that the proposed rules would be a hindrance to family unity, and would have a large impact on families and U.S. citizens sponsoring immigrant relatives, children, partners, fiancées, or spouses.
• Vulnerable and humanitarian immigrants, including refugees, survivors, and victims of crime escaping violence.

*Response:* DHS recognizes the burden that immigration fees may pose for certain requestors. Nonetheless, USCIS filing fees are necessary to provide the resources required to do the work associated with such filings. When fees do not fully recover costs USCIS cannot maintain sufficient capacity to process requests. Inadequate fees may cause significant delays or other lapses in immigration request processing, which can result in additional burdens to requestors.

In general, the fees in this final rule are set to ensure full cost recovery for

USCIS. With limited exceptions, as noted in the proposed rule and this final rule, DHS establishes its fees at the level estimated to represent the full cost of providing adjudication and naturalization services, including the cost of relevant overhead and similar services provided at no or reduced charge to asylum applicants or other immigrants. This approach is consistent with DHS's legal authorities. *See* INA sec. 286(m), 8 U.S.C. 1356(m). In this final rule, USCIS reduced the fee review budget, as explained earlier in section II.C of this preamble.

In certain instances, DHS establishes fees that do not represent the estimated full cost of adjudication in the proposed rule. *See* 88 FR 402, 450–451. In many cases, this is a result of DHS's refocus on balancing the beneficiary-pays principle with the ability-to-pay principle, whereby DHS has reduced or limited fee increases where a full cost increase would be particularly burdensome for requestors. By limiting many of the final fees to an inflation-based adjustment of the current fee, DHS addresses some of these comments.

Regarding individuals seeking to naturalize or obtain proof of citizenship, DHS has maintained the fees for common forms like Form N–400, Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), and Form N–600, Application for Certificate of Citizenship, at levels below full cost recovery (*See* Table 1; 88 FR 402, 486 (Table 14), Jan. 4, 2023), and expanded the availability of reduced fee N–400s, *see* 8 CFR 106.2(b)(3)(ii). Regarding family-based residency, DHS has limited the increase for common family-based forms such as Form I–130 and Forms I–129F, Petition for Alien Fiancé(e), to levels at or below inflation. *See* Table 1. Regarding artists and other employment-based nonimmigrants, the final rule limits the fee increase for Form I–129s to a level below inflation for many small-employer and nonprofit petitioners, *see* Table 1, eliminates the Asylum Program fee for nonprofit petitioners, and halves the Asylum Program fee for small-employer petitioners, *see* 8 CFR 106.2(c)(13).

In addition, this final rule expands fee exemptions and fee waivers for certain humanitarian categories including survivors, victims of crime, and refugees. *See* 8 CFR 106.3; Table 5B; *see also* 88 FR 402, 459–482 (Jan. 4, 2023). The new exemptions created by this rule include exemptions for T and U nonimmigrants, VAWA self-petitioners, Special Immigrant Juveniles (SIJs), and other benefit requestors. 8 CFR 106.3(b). Also, the Director of USCIS may,

---

[136] *See* Duncan Madden, "The World's Most Expensive Passports and Visas," Forbes, July 10, 2023, available at *https://www.forbes.com/sites/duncanmadden/2023/07/10/travel-expenses-the-cheapest-and-most-expensive-passports-and-visas/?sh=5e5de6ff6f1e* (last visited Sept. 5, 2023).

[137] *See Regulations.gov,* Comment Submitted by ARTS, *https://www.regulations.gov/comment/USCIS-2021-0010-7354.*

[138] *See* 88 FR 21694 (Apr. 11, 2023); 88 FR 1266 (Jan. 9, 2023); 88 FR 1243 (Jan. 9, 2023); 88 FR 1255 (Jan. 9, 2023); 88 FR 1279 (Jan. 9, 2023).

[139] *See generally, e.g.,* National Academies of Sciences, Engineering, and Medicine, "The Economic and Fiscal Consequences of Immigration," (2017), *https://nap.nationalacademies.org/catalog/23550/the-economic-and-fiscal-consequences-of-immigration;* Chair Cecilia Rouse et al., The White House Blog: "The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants," (Sept. 17, 2021) *https://www.whitehouse.gov/cea/blog/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/.*

HR-1 FRN 2025 AR-000055

**Appx-000080**

consistent with applicable law, authorize additional fee exemptions when in the public interest, such as when necessary to address incidents such as an earthquake, hurricane, or other natural disasters affecting localized populations. *See* 8 CFR 106.3(c).

c. Impact on Specific Demographic Characteristics

*Comment:* Several commenters wrote that certain proposed fees are discriminatory, disproportionately burdensome, or otherwise harmful to people based on:

• Race, ethnicity, skin color, national origin, country of birth, or country of citizenship.

• Gender.

• Sexual orientation or gender identity.

• Age.

• Disability.

• Language.

*Response:* DHS did not design this fee schedule with any intent to deter requests from or discriminate against any group of people. The final fees are set to ensure full cost recovery while accounting for filers' ability to pay, irrespective of their membership in one of the groups identified by the commenters. As stated in the proposed rule, where DHS has determined that a fee in this rule may inequitably impact those who may be less able to afford it, DHS sets the fees below the ABC model output. *See* 88 FR 402, 426 (Jan. 4, 2023). In addition, we codify the fee waiver eligibility guidance that took effect in 2010 and expand fee exemptions for vulnerable or low-income populations, as described elsewhere in this preamble.

*Comment:* Some commenters wrote that the proposed fees would be particularly burdensome for low-income or economically disadvantaged people. Several commenters stated that, due to low wages of many immigrants, higher fees would create a high burden for benefit requestors and contribute to their economic insecurity, forcing them to choose between applications and other necessities. Commenters stated that the proposed fees would create hardship for some applicants and their families, threaten immigrants' ability to pay for rent, food, and necessities, and potentially cause some to go into debt. Commenters also stated that, to pay fees, low-income applicants may become victims of predatory loan schemes that offer high interest loans. An advocacy group expressed concern that increased fees could cause immigrants to remain or become uninsured.

*Response:* DHS is aware of the potential impact of fee increases on low-income and economically disadvantaged individuals and is sympathetic to these concerns. As discussed in the proposed rule and consistent with past practice, USCIS has limited fee adjustments for certain benefit requests. DHS recognizes that immigration application fees may be burdensome for these filers, and that those who choose to finance application fees through debt may be responsible for additional interest. With these types of concerns in mind, DHS has shifted its fee-setting approach away from the beneficiary-pays principle that guided the 2019/2020 fee rule and more toward the ability-to-pay principle. *See* 88 FR 402, 424–26 (Jan. 4, 2023). To keep many common forms affordable, DHS has kept their fees at or below full cost recovery or the rate of inflation. *See* Table 1. The rule codifies USCIS' guidance on fee waivers for individuals who are unable to pay. *See* 8 CFR 106.3(a). It also expands the number of forms that are eligible for fee exemptions and waivers, *see* Table 5B, and includes several policy adjustments designed to make fee waivers more readily accessible. *See* 88 FR 402, 458 (Jan. 4, 2023). For naturalization applicants who do not meet the requirements for a full fee waiver, DHS has made N–400 fee reductions more available by increasing the income threshold to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). DHS focuses fee exemptions on vulnerable populations and waiver availability on those with an inability to pay. *See* 8 CFR 106.3; Table 5B. DHS recognizes that that there are many forms for which fee exemptions or fee waivers are not available but notes that it is limited by congressional expectation that many immigrants and nonimmigrants would possess means of self-support. *See* INA sec. 212(a)(4), 8 U.S.C. 1182(a)(4). DHS believes that this rule substantially mitigates many of commenters' concerns while ensuring that USCIS can recover full costs and fund its ongoing operations. DHS also recognizes that the immigration process can be complex, and that benefit requestors may still risk becoming victims of scams or fraud. We encourage requestors to use the information on the USCIS website to avoid becoming victims of common scams, fraud, or misconduct.[140]

---

[140] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Scams, Fraud, and Misconduct," available *at https://www.uscis.gov/ scams-fraud-and-misconduct/scams-fraud-and-misconduct* (last visited Sept. 25, 2023).

d. Impact Based on Geography

*Comment:* Several commenters stated that the proposed rule and certain form fees would have a disproportionate effect on benefit requestors and communities in various parts of the country, including:

• Rural areas or small towns, where individuals may lack access to technology.

• High cost-of-living areas, where individuals are forced to choose between meeting basic needs and pursuing immigration benefits.

• Particular states and cities that have large immigrant populations or high poverty rates, where immigrants have less access to technology, or where nonprofits may be burdened by COVID–19 and recent natural disasters.

*Response:* DHS recognizes that certain individuals may experience more difficulty paying filing fees partly due to the area of the country in which they live and that this may have secondary effects on their communities. This rule is in no way intended to limit access to immigration benefits based on geography. Like past rules, this fee rule generally does not factor requestors' geographic locations in setting fees. Geography is only one of many factors that affect an individual's ability to pay, and geography may impact on individual's ability to pay differently depending on their profession, family, and other factors. For example, individuals living in high-cost areas may also benefit from higher wages, whereas individuals living in low-cost areas may face more limited job prospects. DHS considers it more effective to accommodate filers' ability to pay in the manners described earlier in this preamble. See section IV.E.3.a. of this preamble for a discussion of using the U.S. Department of Housing and Urban Development's (HUD) Mean Family Income (MFI), which accounts for the costs of living in different parts of the country, to determine eligibility for fee waivers.

e. Impact on Economy/Employers

*Comment:* Some commenters stated that raising immigration fees would:

• Hamper U.S. population growth and the country's ability to innovate in technology and culture.

• Deter workers.

• Have negative effects on the labor market by discouraging employers from hiring foreign workers.

• Create problems for retail, agriculture, construction, manufacturing, hospitality, and the labor pool in general.

*Response:* DHS disagrees that these fees will negatively affect the labor

HR-1 FRN 2025 AR-000056

market or other sectors described in the comment. With previous fee increases in 2010 and 2016, DHS has continued to see a steady increase in filing and has not seen a reduction in filing based on fee increases. It is possible that USCIS observes no price response to past fee increases because the value of immigration benefits is greater than the fees USCIS assesses to recover costs. DHS has no data that would indicate the fees would limit employers' ability to hire foreign workers or negatively impact the labor market. In fact, H–1B receipts have grown by over 225,000 from FY 2010 through FY 2022. Growing demand in the period immediately after the 2010 and 2016 fee increases reveals that, in setting fees at levels to recover only USCIS costs, all applicants enjoyed some cost savings or surplus relative to what the immigration benefit was truly worth to them. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA. While DHS appreciates that an increase in prices for immigration benefits affects some individuals' choices to pursue or not pursue those benefits, DHS notes that demand may also decrease due to declines in service quality when USCIS programs are not properly funded. Lastly, DHS reiterates that this final rule lowers the Asylum Program Fee and certain Form I–129 fees for small employers and nonprofits. *See* 8 CFR 106.2(a)(3)(ix), (c)(13); Table 1. These changes further mitigate any risk that these fees will negatively impact the labor market or other sectors of the economy.

*Comment:* Multiple commenters stated that the proposed fees are disproportionately burdensome, or otherwise harmful to the following types of petitioners:

• Smaller and midsized businesses and organizations, by further increasing labor costs associated with hiring immigrants.
  • Nonprofits.
  • Religious organizations.

*Response:* DHS recognizes that the impacts that increased fees can have on smaller and midsized firms, as well as nonprofit and religious institutions. *See* Small Entity Analysis. However, DHS notes that these organizations are also impacted by delayed processing times, backlogs, and other lapses in service that result if USCIS' operations are not adequately funded. Mindful of the difficulties that smaller and midsized firms and nonprofits (including religious institutions) may face, DHS has discounted the proposed fee increases of the requests that many such entities submit in this final rule, as

discussed in section II.C of this preamble. For small-employer and nonprofit petitioners, this final rule limits the fee increases for Form I–129. *See* 8 CFR 106.2(a)(3); Table 1. In addition, the final rule reduces the Asylum Program Fee by $300 for small employers and eliminates the Asylum Program Fee for nonprofit petitioners. *See* 8 CFR 106.2(c)(13).

*Comment:* Commenters also stated that the proposed fees would be harmful to nonprofit legal service providers and other organizations that serve immigrant communities. A commenter specified that the increased fees would result in case-handling delays for their immigration clients, which will divert resources from other casework and advocacy priorities.

*Response:* DHS recognizes the value of legal service providers and other groups that assist individuals in navigating its regulations and forms, and that fee increases can impact their ability to serve their clients. However, DHS believes that inadequate funding for USCIS (resulting in processing delays, backlogs, and otherwise inadequate service) would also impact these organizations' ability to deliver timely and effective legal services for their clients. As discussed earlier in this rule, the final rule contains several provisions that make immigration fees more affordable to the immigrant communities (often indigent and disadvantaged) that nonprofits serve.

*Comment:* Multiple commenters stated that the proposed rules would exacerbate the negative economic effects of:

• The COVID–19 pandemic (*e.g.,* job loss, inability to pay rent, labor shortages).
  • Inflation.
  • The war in Ukraine.

*Response:* DHS acknowledges that the last few years have been difficult on immigrant communities due to the COVID–19 pandemic, inflation, and various international crises including the war in Ukraine. However, these events have impacted USCIS' financial stability as well.[141] Without increased fees to adequately fund services, USCIS will inevitably experience decreases in the quality of its services, and it will be in a substantially worse position to manage future crises of these sorts when

they arise. DHS notes that, during the COVID pandemic, USCIS implemented many policy changes to accommodate requestors.[142] Also, the fee increases in this final rule will help fund USCIS' Uniting for Ukraine program, as well as other zero-fee or fee-exempt programs that address international, humanitarian crises, including refugee and asylum processing and DHS's FRP processes. Applicants continue to have fee waivers available for specific forms where they can demonstrate an inability to pay. *See* 8 CFR 106.3(a).

*Comment:* A commenter stated that the increased fees further enhance the control that corporations and employers have over foreign workers, as any worker would require their employer's assistance to be able to afford the fees.

*Response:* USCIS disagrees with the comment's premise that the beneficiary's ability to pay is a relevant factor in determining the appropriate fee for most employment-based visa petitions. In general, for employment-based petitions such as Form I–129 and some Form I–140s, it is the employing petitioner's decision whether to file a petition on any beneficiary's behalf, and the petitioner is generally expected to pay the fees associated with the filing of the petition. In some instances, the petitioning employer is required to pay certain fees and/or is precluded from charging the beneficiary certain fees.[143] To the degree that the commenter is concerned that employers may place abusive conditions on their decision to file employment-based visa petitions, DHS encourages foreign workers to report any illegal practices. DHS and USCIS are committed to helping protect the rights of foreign workers in the United States.[144]

---

[141] 88 FR 402, 426–429 (Jan. 4, 2023); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Uniting for Ukraine," *https://www.uscis.gov/ukraine* (last updated Sept. 20, 2023); U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "I–134A, Online Request to be a Supporter and Declaration of Financial Support," *https://www.uscis.gov/i-134a* (last updated Nov. 15, 2023) ($0 filing fee).

[142] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Response to COVID–19," *https://www.uscis.gov/archive/uscis-response-to-covid-19* (last updated Mar. 6, 2023).

[143] For example, employers are prohibited from charging job placement fees as a condition of employment for H–2 nonimmigrants, and H–2B beneficiaries are not permitted to pay any H–2B filing or Fraud Prevention and Detection fees. *See* 8 CFR 214.2(h)(5)(xi)(A), (6)(i)(B)–(D). Also, in some contexts, the employer is not authorized to deduct certain employer-related expenses, such as those related to preparation and filing of the Form I–129 petition, from the beneficiary's compensation. *See, e.g.,* 20 CFR 655.731(c)(9) (prohibiting H–1B petitioning employers from making certain wage deductions, such as deductions for employer-related fees associated with the preparation and filing of an H–1B petition). Finally, some fees are required by statute to be paid by the petitioning employer. *See* section 214(c)(9) of the INA, 8 U.S.C. 1184(c)(9) (imposing a fee on certain employers filing H–1B petitions).

[144] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Report Labor Abuses," *https://www.uscis.gov/working-in-the-united-states/information-for-employers-and-*

HR-1 FRN 2025 AR-000057

Appx-000082

f. Other General/Mixed Feedback on the Rule

*Comment:* Multiple commenters expressed concerns regarding the timing of the rule. Some commenters suggested delaying the increase given the current economic situation. One commenter asked how the proposal would affect current immigration benefit requests. Another suggested that the fees only apply to those who have not yet initiated any immigration process to accommodate individuals currently affected by USCIS' backlog. Other commenters stated DHS should give 4 to 6 months' notice before the new fees go into effect.

*Response:* DHS declines to delay effectiveness of this rule beyond the 60 days announced in the proposed rule. Because the proposed rule was published on January 4, 2023, DHS believes that interested parties will have received adequate notice of the forthcoming changes before their effective date. The new fees apply to any immigration benefit request postmarked on or after the effective date of this rule and do not affect any benefit requests that have already been submitted.[145] USCIS may accept the prior fee for benefit requests postmarked before the new fees take effect.

While the fees in this final rule generally affect customers who apply on or after the effective date, there are some special circumstances for Forms I–485, Application to Register Permanent Residence or Adjust Status, I–765, Application for Employment Authorization, and I–131, Application for Travel Document, as explained in the proposed rule. *See* 88 FR 402, 492 (Jan. 4, 2023). Specifically, individuals who filed a Form I–485 after July 30, 2007, (the FY 2008/2009 fee rule) and before this final rule takes effect will continue to be able to file Form I–765 and Form I–131 without additional fees while their Form I–485 is pending. *See* 8 CFR 106.2(a)(7)(iv), (44)(iv)(A). Those who filed Form I–485 before the FY 2008/2009 fee rule, or on or after the

effective date of this final rule, would pay separate fees for the interim benefits. The final rule implements a reduced fee of $260 for those applicants that must pay a fee for Form I–765 while their adjustment of status application is pending. *See* 8 CFR 106.2(a)(44)(i). Applicants for Form I–131 will pay the full fee of $630. *See* 8 CFR 106.2(a)(7)(iii).

DHS disagrees with the commenter's recommendation to apply the new fees only to those who have not initiated any immigration processes before the rule's effective date. While DHS appreciates the commenter's concerns regarding backlogs, the commenter's proposal could apply indefinitely for individuals who choose to delay certain steps in the immigration process, such as adjusting from nonimmigrant to LPR status or filing for naturalization. Furthermore, DHS calculated the fees assuming that they would generally apply to all forms filed after the rule's effective date, so the commenter's proposal would require further fee increases to account for the numerous filers who would continue to pay the prior fees.

As for upcoming filing periods for petitions that are subject to annual numerical limitations, the 60-day effective date of this rule should provide a sufficient period for petitioners to adjust to the new fees and form versions. The H–1B cap petition filing period generally begins on April 1 of each year. USCIS has not announced the specific H–1B registration dates for FY 2025, but it is expected to be a roughly 14-day period in early- to mid-March. Neither date is affected by this rule.

*C. Basis for the Fee Review*

DHS received comments on the legal authority or rationale of the rule, the need for it, and its general approach, which we address in the following subsections.

*Comment:* Regarding full cost recovery and use of the "ability to pay" and "beneficiary pays" principles, commenters stated:

• The proposed rule violates 8 U.S.C. 1356(m) by waiving fees for some beneficiaries and shifting the cost of those services to other beneficiaries.

• Only Congress, not DHS, has the legal authority to create waivers and exemptions.

• Congress did not authorize USCIS to raise fees by 40 percent, update fees based on inflation, or shift the cost of programs.

• Federal law and policy do not require USCIS to recover full costs through fees, and these costs should not be the only basis for determining fees.

• A commenter disagreed with the suppression of fees for benefits not explicitly exempted by law, and suggested adjusting fees based on the actual cost of the service and providing only those exemptions and waivers that are statutorily mandated.

• USCIS has arbitrarily decided which applicants bear the fee burden.

• USCIS suppresses fees for certain immigration benefits based on political preference.

However, other commenters stated:

• USCIS must consider the public good that arises from applicants receiving immigration benefits and whether they are affordable for applicants when setting fees.

• Disregarding the ability-to-pay considerations would be "arbitrary and capricious" under the Administrative Procedure Act (APA).

Other commenters wrote that USCIS' proposed ability-to-pay model violates the CFO Act, 31 U.S.C. 9701(b), which requires fees charged by agencies to be uniform and based on actual costs. They stated that adjusting fees based on ability-to-pay violates the statute. They stated that DHS lacks the legal discretion to provide discounts and shift costs except when explicitly directed by Congress.

Other comments on the fee-setting approach supported USCIS' proposal to shift away from the beneficiary-pays principle toward an ability-to-pay principle balanced with a beneficiary-pays approach. Some stated that USCIS should further shift funding toward immigration services for lower income applicants who do not qualify for fee waivers or exemptions but nevertheless are unable to afford fee increases. Others stated that USCIS did not strike an appropriate balance between ability-to-pay and the beneficiary-pays principles. Some commenters stated USCIS should rely even more heavily on the beneficiary-pays model. For example, one stated that fees should be based on the cost of the provided service, and costs for subsidized services should be spread across all fee-paying beneficiaries.

*Response:* As stated in the proposed rule, DHS is permitted but not required by law to recover all USCIS operating costs through fees. DHS has broad discretion to set USCIS fees to recover costs, and we generally adhere to longstanding guidance in setting fees. The U.S. Government Accountability Office (GAO) guidance for federal user fees, like USCIS immigration benefit request fees, states that agencies must balance efficiency, equity, revenue

---

*employees/report-labor-abuses* (last updated Mar. 13, 2023).

[145] USCIS permits FedEx, UPS, DHL and USPS to deliver paper benefit requests. Generally, USCIS records the receipt date as the actual date it physically receives a request at the correct filing location. 8 CFR 103.2(a)(7). However, when USCIS issues new fees, it generally considers the postmark on the package as the date the request was filed or submitted. The shipping date printed on the shipping label will be considered the postmark date. If there is no shipping date on the label, USCIS considers the date you printed the label to be the postmark date. If the label does not have a shipping date or print date, USCIS will assume that the postmark date is 10 days before it received the package.

adequacy, and administrative burden.[146] When discussing equity, GAO explains two different ways to ensure everyone pays their fair share. *Id.* As described by the GAO, under the beneficiary-pays principle, the beneficiaries of a service pay for the cost of providing that service. *Id.* Under the ability-to-pay principle, those who are more capable of bearing the burden of fees pay more for the service than those with less ability to pay. *Id.* A GAO audit of the 2007 fee rule found that the rule clearly described the trade-off between these two principles.[147]

In prior years, USCIS fees have given significant weight to the ability-to-pay principle. IEFA fee exemptions, fee waivers, and reduced fees for low-income households adhere to this principle. Applicants, petitioners, and requestors who pay a fee cover the cost of processing requests that are fee exempt, fee-waived, or fee-reduced. For example, if only 50 percent of a benefit request workload is fee-paying, then those who pay the fee will pay twice as much as they would if everyone paid the fee. By paying twice as much, they pay for their benefit request and the cost of the same benefit request that someone else did not pay for. *See* 84 FR 62280, 62298 (Nov. 14, 2019). As we noted in the proposed rule, DHS appreciates that application of the ability-to-pay principle in immigration benefit fees may appear arbitrary because it results in certain fee payers funding the costs of USCIS-administered programs to which they receive no direct benefit. 88 FR 453. However, DHS determined that the fees did not result in a significant impact on a substantial number of small entities who file a request with USCIS. *Id.*

The final rule reverses some aspects of the 2020 fee rule. *See* 88 FR 402, 424–426 (Jan. 4, 2023). One change is a return to focusing fee-setting away from the beneficiary-pays principle back toward the historical balance between the beneficiary-pays and ability-to-pay principles. *See* 88 FR 402, 425 (Jan. 4, 2023). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for the service than those with less ability to pay. IEFA fee exemptions, fee waivers, and reduced fees for low-income households adhere to this principle. Requestors who pay a fee

cover the cost of processing requests that are fee exempt, waived, or reduced. This approach is consistent with previous fee rules, comments on the 2020 fee rule, current injunctions, Executive Order (E.O.) 14012,[148] and public feedback. *See* 88 FR 402, 425–426 (Jan. 4, 2023).

DHS is not publishing this rule or setting USCIS fees under the authority of 31 U.S.C. 9701(b).[149] While the Independent Offices Appropriations Act (IOAA), codified at 31 U.S.C. 9701, grants broad authority to Federal agencies to assess user fees, the fees collected under that law are deposited in the general fund of the U.S. Treasury and are not directly available to the agency. USCIS fees are not required to be tied to the costs or value of services provided, and the revenue from the IEFA fees are available to USCIS until expended and are not deposited in the general fund of the U.S. Treasury. As explained in the proposed rule, "In that regard, in INA sec. 286(m), 8 U.S.C. 1356(m), Congress imposed on DHS an additional obligation—to recover the full cost of USCIS operations—over and above the advice in OMB Circular A–25 concerning the direct correlation or connection between costs and fees." 88 FR 402, 418 (Jan. 4, 2023). In 2010 DHS also stated in a fee rule that, "Additional values are considered in setting IEFA fees that could not be considered in setting fees under the IOAA." 75 FR 33449 (June 11, 2010) (internal cites omitted). The 2016 USCIS fee schedule proposed rule also described DHS latitude to set USCIS fees and such fees not being limited to the costs of the service. *See* 81 FR 26906–26907.

As for DHS using the ability-to-pay or beneficiary-pays principles in setting USCIS fees, INA sec. 286(m), 8 U.S.C. 1356(m), does not prescribe a precise framework, methodology, or philosophy for DHS to follow in setting USCIS fees, except to recover costs. DHS endeavors to set fees in a manner that is rational, fair, and based on the recommendations of fee setting experts. To that end, DHS generally adheres to OMB Circular A–25 and has followed the Activity-Based Costing (ABC) method. DHS has also considered the recommendations of the GAO, as described earlier.

DHS is authorized to recover the full cost of immigration adjudication and naturalization services, including similar services provided without charge to asylum applicants or other immigrants, through IEFA fees. *See* INA sec. 286(m), 8 U.S.C. 1356(m). There is a long history of using the ability-to-pay principle in USCIS fee-setting, as explained in the proposed rule. *See* 88 FR 402, 424–426 (Jan. 4, 2023). Other fee rules did not always use the term ability-to-pay but it has been a part of DHS and fee rules for a long time. For example, USCIS grants fee waivers based on demonstrated inability to pay, which is based on the ability-to-pay principle. *See* 8 CFR 103.7(c) (Oct. 1, 2020). In this final rule, DHS provides more fee exemptions, increases the income level for the reduced fee for Form N–400, Application for Naturalization, provides discounts for Form I–129, Petition for Nonimmigrant Worker, fees and the Asylum Program Fee, and exempts nonprofits from the Asylum Program Fee, all based on the ability-to-pay principle. *See new* 8 CFR 106.1(f), 106.2(a)(3), and 106(c)(13). Nothing in the DHS fee setting statute precludes DHS from providing discounts and shifting costs in such a manner.

*Comment:* DHS summarizes comments regarding the funding for the Fraud Detection and National Security Directorate (FDNS) as follows:
• General support for USCIS improving service levels and deterring fraud for nonimmigrant benefits.
• FDNS funding violates fiscal law principles and the APA.
• FDNS activities were delegated to Immigration and Customs Enforcement (ICE) and funded by specific congressional appropriations.
• Revenue should be used solely for adjudications and not for investigation functions more appropriate for ICE and U.S. Customs and Border Protection (CBP).
• Appropriated funding for ICE has increased by 150 percent while funding for immigration services has only increased modestly.
• While Congress gave USCIS limited investigative responsibilities when it created FDNS, its mission has expanded without statutory authority.
• Moving enforcement functions out of USCIS and into ICE and CBP would allow USCIS to redirect FDNS expenses into its core adjudicatory functions, improving efficiency, and reducing proposed fee increases.
• FDNS could be more efficient, for example, by curtailing frivolous referrals.

---

[146] *See* GAO, "Federal User Fees: A Design Guide" (May 29, 2008), *https://www.gao.gov/products/GAO-08-386SP*, at 7–12.

[147] *See* GAO, "Federal User Fees: Additional Analyses and Timely Reviews Could Improve Immigration and Naturalization User Fee Design and USCIS Operations" (Jan. 2009), *https://www.gao.gov/assets/gao-09-180.pdf*, at 12–15.

[148] Restoring Faith in Our Legal Immigration Systems and Strengthening Integration and Inclusion Efforts for New Americans, 86 FR 8277 (Feb. 5, 2021).

[149] The statute cited by the commenters also permits discounts and shifting costs based on considerations of public policy or interests served and other relevant facts and does not require that fees charged by agencies be uniform and not deviate from actual costs. *See* 31 U.S.C. 9701(b)(2)(C)–(D).

HR-1 FRN 2025 AR-000059

Appx-000084

• Most FDNS cases and investigations involve already adjudicated petitions, resulting in adjudicating H–1B petitions again.

• Requested clarification of whether administrative site visits that arise from premium processing cases are paid out of the general budget or the premium processing budget.

*Response:* USCIS appreciates the general support from the commenters who favored improving service levels and deterring fraud for nonimmigrant benefits. USCIS manages three fee accounts: (1) The IEFA (which includes premium processing revenues); (2) The Fraud Prevention and Detection Account, INA secs. 214(c)(12)–(13), 286(v), 8 U.S.C. 1184(c)(12)–(13), 1356(v); and (3) The H–1B Nonimmigrant Petitioner Account, INA secs. 214(c)(9), (11), 286(s), 8 U.S.C. 1184(c)(9), (11), 1356(s). The Fraud Prevention and Detection Account and the H–1B Nonimmigrant Petitioner Account are funded by statutorily set fees and divided among USCIS (for fraud detection and prevention), the National Science Foundation, and the Department of Labor (DOL). DHS does not have authority to adjust fees for these accounts; therefore, DHS cannot increase the fees to meet changing needs or costs. DHS interprets 8 U.S.C. 1356(v)(2)(B) as providing supplemental funding to cover activities related to fraud prevention and detection and not prescribing that only those funds may be used for that purpose. FDNS is funded from both the IEFA and the Fraud Prevention and Detection Account. The fees deposited in the Fraud Prevention and Detection Account that are fixed by statute are insufficient to cover the full costs of FDNS.

DHS disagrees that ensuring a petitioner is compliant with the terms and conditions of their petition through site visits or other FDNS workload is frivolous, a second adjudication, or duplicated by other DHS components. FDNS's work does not fall into "intelligence" and/or "investigations" work that the INA assigned to ICE. The Homeland Security Act of 2002 granted the Secretary of Homeland Security the authority to administer and enforce provisions of the INA, as amended, INA sec 101, 8 U.S.C. 1101 *et seq.* The Secretary, in Homeland Security Delegation No. 0150.1, delegated certain authorities to USCIS. One of many authorities delegated to USCIS in administering and enforcing immigration laws was the authority to "investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged

fraud with respect to applications or determinations within the USCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable." FDNS's activities fall squarely within this delegation. FDNS was established in 2004 in response to a congressional recommendation to establish an organization "responsible for developing, implementing, directing, and overseeing the joint USCIS-Immigration and Customs Enforcement (ICE) anti-fraud initiative and conducting law enforcement/background checks on every applicant, beneficiary, and petitioner before granting immigration benefits." [150] FDNS fulfills the USCIS mission of enhancing both national security and the integrity of the legal immigration system by: (1) identifying threats to national security and public safety posed by those seeking immigration benefits; (2) detecting, pursuing, and deterring immigration benefit fraud; (3) identifying and removing systemic vulnerabilities in the process of the legal immigration system; and (4) acting as USCIS' primary conduit for information sharing and collaboration with other governmental agencies. FDNS also oversees a strategy to promote a balanced operation that distinguishes USCIS' administrative authority, responsibility, and jurisdiction from ICE's criminal investigative authority. The Secretary, in Homeland Security Delegation No. 0150.1, delegated several relevant authorities to USCIS, including the following:

• Authority under section 103(a)(1) of the INA, as amended, 8 U.S.C. 1103(a)(1), to administer the immigration laws (as defined in section 101(a)(17) of the INA).

• Authority to investigate alleged civil and criminal violations of the immigration laws, including but not limited to alleged fraud with respect to applications or determinations within the BCIS and make recommendations for prosecutions, or other appropriate action when deemed advisable.

• Authority to register and fingerprint aliens in the United States, and exercise other functions relating to registration and change of address, as provided by sections 262–266 of the INA, 8 U.S.C. 1302–06.

• Authority to place noncitizens in removal proceeding by issuance of a Notice to Appear, and to cancel such

Notice before jurisdiction vests with the Executive Office for Immigration Review of the Department of Justice (EOIR).

• Authority to approve bonds issued under the immigration laws, to determine whether such bonds have been breached, and take appropriate action to protect the interests of the United States with respect to such bonds.

• Authority to interrogate noncitizens and issue subpoenas, administer oaths, take and consider evidence, and fingerprint and photograph noncitizens under section 287(a), (b), and (f) of the INA, 8 U.S.C. 1357, and under section 235(d) of the INA, 8 U.S.C. 1225(d).

• Authority under the immigration laws, including but not limited to section 310 and 341 of the INA (8 U.S.C. 1421 and 1452), to grant applications for naturalization and certificates of citizenship (and revoke such naturalization), including administration of oaths, issuance of certificates, provision of citizenship materials and services to public schools to prepare naturalization candidates, supervision of courts designated under section 310 of the INA to administer oaths, and any other rights and responsibilities relating to the naturalization or citizenship of noncitizens.

• Authority under the immigration laws, including but not limited to sections 204 and 214 of the INA (8 U.S.C. 1154 and 1184), to accept and adjudicate nonimmigrant and immigrant visa petitions (whether family based, employment-based, or other), including collection of appropriate fees, conduct of interviews, and appellate review of the BCIS decisions that do not fall within the jurisdiction of EOIR.

• Authority to investigate suspected fraud by Regional Center and related entities and to take other actions to ensure the integrity of the Immigrant Investor (EB–5) Program.

• Authority under immigration laws to extend and change nonimmigrant status and to adjust the status of noncitizens to lawful residents (on a temporary or permanent basis) and to revoke such status, including determination of admissibility of noncitizens, authority to grant waivers of inadmissibility and permission to reapply for entry, and authority to conduct interviews (or waive interviews) regarding an alien's eligibility for an immigration benefit.

In 2017, the Secretary, in Homeland Security Delegation No. 15002, delegated the following certain law enforcement authorities to USCIS:

---

[150] *See* Conference Report to accompany H.R. 4567 [Report 108–774], "Making Appropriations for the Department of Homeland Security for the Fiscal Year Ending September 30, 2005," p. 74, *available at http://www.gpo.gov/fdsys/pkg/CRPT-108hrpt774/pdf/CRPT-108hrpt774.pdf.*

• In matters under the jurisdiction of USCIS, to protect the national security and public safety, to conduct law enforcement activities, including accessing internet and publicly available social media content using a fictitious account or identity, provided that such activities shall only be conducted by properly trained and authorized officers, and in a manner consistent with the Reservations set forth in DHS Delegation Number 0150.1 and consistent with the Department's obligations to protect privacy and civil rights and civil liberties.

Regarding the Administrative Site Visit and Verification Program (ASVVP), DHS explained in the proposed rule how USCIS collects information on the costs associated with ASVVP and assigns the distinct costs for these site visits to Forms I–129, I–360, Petition for Amerasian, Widow(er), or Special Immigrant, and I–829, Petition by Investor to Remove Conditions on Permanent Resident Status. *See* 88 FR 402, 496 (Jan. 4, 2023). Those costs are not paid directly from premium processing revenue.

Therefore, DHS has determined that the commenters misunderstand the nature of FDNS in USCIS. FDNS efforts are integral to determining an applicant's eligibility for a benefit, and to maintain the integrity of the immigration system. DHS makes no changes to these final fees as a result.

### 1. Background and Fee Review History

*Comment:* Many commenters requested that DHS formally withdraw the previously enjoined 2020 fee rule to ensure that USCIS fees and policies would default to the current fee schedule rather than the 2020 fee structure, should the proposed rule be found unlawful. Many commenters stated that USCIS should sever the 2020 fee rule from the remainder of the currently proposed rule to not jeopardize the withdrawal. Other commenters requested that DHS formally withdraw the 2020 fee rule, reasoning that the current proposal reflects a considered policy judgment on the part of USCIS that those features of the 2020 Fee Schedule are undesirable as a policy matter and are inconsistent with the goals of Federal immigration laws.

*Response:* DHS understands the concerns of the commenters because the fees in the 2020 fee rule have been codified for at least 2 years. However, as explained in the proposed rule, DHS is operating under two preliminary injunctions related to the 2020 fee rule. *See* 88 FR 402, 420 (Jan. 4, 2023). DHS continues to comply with the terms of

those orders and is not enforcing the regulatory changes set out in the 2020 fee rule. There is also a separate injunction related to fee waiver changes in 2019. *Id.* USCIS continues to accept the fees that were in place before October 2, 2020, and to follow the fee waiver guidance in place before October 25, 2019. DHS and the parties in *Immigrant Legal Resource Center* v. *Wolf, NWIRP, City of Seattle,* and the related cases agreed to, and the courts have approved, a stay of those cases while the agency undertook this fee review and prepared the proposed rule. These rulings did not vacate the 2020 fee rule as having been codified in contravention of the law; they only preliminarily enjoin them. Thus, to remove the 2020 fees from the Code of Federal Regulations, DHS must engage in notice and comment rulemaking. Because, as stated in this rule, DHS needs a new USCIS fee schedule forthwith, we have determined that it was more efficient to focus on replacing and revising the 2020 fee regulations than to expend the additional effort required to revert the 2020 fees back to the October 1, 2020, fees in a separate rulemaking. DHS makes no changes to the rule based on these comments.

*Comment:* Commenters stated that USCIS' pattern of doubling the percentage increase of previous rules in each subsequent fee rule is not sustainable.[151] They stated that fees have already been raised enough and there should be a ceiling to USCIS' previous, current, or proposed fee structures. One commenter stated that USCIS filing fees continue to increase over time and there is no stopgap or ceiling in mind to maintain the affordability of these benefits.

*Response:* DHS examined each fee in the proposed rule and the proposed fees represent DHS's best effort to balance access, affordability, equity, and the national interest while providing USCIS with the funding necessary to maintain adequate services. As the cost of employees, services, buildings, and supplies increase, so must our fees. However, several public comments stated that the proposed fee increases greatly exceeded the rate of inflation, and others wrote that they could understand the need for USCIS to keep up with inflation.[152] After considering

---

[151] One commenter compared the weighted average increase in the proposed rule with prior fee rules (in 2010 and 2016) and stated that these double every fee rule.

[152] Notwithstanding these comments, as discussed later in this preamble, other commenters wrote that they opposed DHS codifying authority to adjust fees based on the amount of inflation as

the applicable comments, DHS has decided to reduce many fees in this rule from what were proposed and adopt the recommendations of commenters to increase the current fees only by the amount of inflation since the date those fees were established.

As stated in this rule and the proposed rule, DHS has generally adhered to ABC and cost reallocation to determine USCIS fees and has not adjusted IEFA non-premium fees by inflation since 2005. *See* Adjustment of the Immigration Benefit Application Fee Schedule, 70 FR 56182 (Sept. 26, 2005). After considering public comments, the amount inflation since the FY 2016/ 2017 fee rule, and the size of the fee increases, DHS has decided that adjusting certain fees by the rate of inflation strikes a balance between the need to increase revenue to recover USCIS costs and maintain affordability for some immigration benefit requests.[153]

### 2. Fee-Setting Approach

*Comment:* A commenter stated that recovering costs should not include USCIS having a "carryover balance" that exceeded the revenue necessary to adjudicate petitions.

*Response:* USCIS is primarily fee-funded, which means it must use carryover, or the unobligated or unexpended fee revenue accumulated from previous fiscal years, to continue operating at the beginning of each fiscal year or when costs otherwise exceed revenue. The INA authorizes DHS to set fees at a level to recover "the full costs" of providing "all" "adjudication and naturalization services," and "the administration of the fees collected." 8 U.S.C. 1356(m). Many USCIS administered immigration benefit requests, such as H–2B and H–1B petitions, see significant seasonal fluctuations in filings, which can result in seasonal fluctuations in USCIS revenue and spending. As GAO acknowledges, fee-funded agencies may need to designate funds as operating reserves to weather periods when

---

measured by the difference in the CPI–U. 8 CFR 106.2(d).

[153] DHS used June 2023 as the end date for the period of inflation to be consistent with the 2023 premium processing fee inflation adjustments. 88 FR 88 FR 89539 (Dec. 28, 2023). DHS acknowledges that inflation will likely change from the June 2023 CPI–U before the fees in this rule take effect. The time and effort required to calculate the fees for this rule, draft comment responses, prepare supporting documents, perform the regulatory impact analysis, small entity impact analysis, and clear the rule through the necessary channels requires that a reasonable endpoint be selected on which to base the required calculations and move the final rule forward without continuous updates.

HR-1 FRN 2025 AR-000061

**Appx-000086**

revenue collections are lower than costs.[154]

The proposed rule explained how USCIS uses and estimates carryover balances. *See* 88 FR 402, 417, 426–427 (Jan. 4, 2023); *see also* IEFA Non-Premium Carryover Projections in the supporting documentation included in the docket to this rulemaking. Most Federal programs are financed by discretionary appropriations that receive an annual Treasury warrant, which establishes a cash balance in their accounts after enactment of appropriations.[155] USCIS' IEFA has permanent or indefinite warrant authority that allows for immediate access to carryover balances and revenue collections subject to the annual spending limits established by Congress. *Id.*

Carryover balances give USCIS and other fee-funded agencies flexibility throughout the fiscal year if costs exceed revenues. Historically, fee revenue in the first quarter of the fiscal year is low due to seasonal filing patterns. Therefore, USCIS requires carryover funds to pay Federal salaries and award certain contracts at the beginning of the fiscal year. USCIS manages its fee accounts to ensure that adequate carryover balances are generated and retained to:

• Cover the cost of processing immigration benefit requests that are pending adjudication at the end of the fiscal year.

• Serve as contingency funding in the event of an unexpected decline in fee collections.

• Cover the start-up costs of new or expanded programs before sufficient fee revenues from such programs are collected (if a fee is to be collected).

• Cover other valid contingencies.

DHS declines to make changes based on this comment, except for budget and operational changes described elsewhere in this final rule, which may affect the forecast for carryover balances.

### D. FY 2022/2023 IEFA Fee Review

#### 1. Projected Costs, and Revenue

*Comment:* A commenter asked USCIS to explain and justify how the percentage increase or change for each fee was calculated. Another commenter stated that the proposed rule provided

no data point(s) on the cost of resource usage about each form category and reasoned that without establishing effort estimates, an increase in fees would be arbitrary. A few commenters wrote that USCIS' projected costs and revenue are not credible.

*Response:* In the proposed rule, DHS provided information on how it calculated the budget and revenue and estimated costs for the fee review. *See* 88 FR 402, 426–432 (Jan. 4, 2023). DHS described the methodology it uses to assign those estimated costs in an ABC model. *See* 88 FR 402, 432–451 (Jan. 4, 2023); *see also* FY 2022/2023 IEFA Fee Review Supporting Documentation (supporting documentation), and FY 2022/2023 IEFA Fee Schedule Documentation (fee schedule documentation) both included in the docket as numbers USCIS–2021–0010–0028 and USCIS–2021–0010–0029 respectively for review and comment. DHS described how it assesses and proposed fees based on the ABC model results or policy decisions to maintain some current fees or limit some fee increases. *See* 88 402, FR 450–451. DHS describes changes to the fee review budget in sections II.C. and II.F. of this preamble.

Throughout the proposed rule, DHS referenced ABC model results, often called the model output, when discussing proposed fees. *See, e.g.,* 88 FR 402, 485–487, 503, 515–516 (Jan. 4, 2023). DHS included supplemental information associated with the FY 2022/2023 fee review results and corresponding proposed rule in the docket. The supporting documentation provided a functional overview of the fee review process and results. It includes estimated total cost and unit costs for each immigration benefit request in the fee review.[156] USCIS also demonstrated the ABC model software used for the fee review during the public comment period.[157]

DHS provides revised versions of the supplemental documents based on budget, staffing, or operational changes described elsewhere in this preamble but declines to make any other changes based on these comments.

DHS notes that fees do not merely cover the cost of adjudication time because USCIS incurs costs that are not directly associated with adjudication. The fees also cover the resources

required for intake of immigration benefit requests, customer support, fraud detection, accounting, human capital, legal counsel, training, and other administrative requirements.[158]

#### 2. Methodology

Many commenters wrote with general concerns that the proposed increases to fees lack substantive support and transparency on how the agency calculates fee amounts based on workload and metrics used to review and adjust fees. More detailed comments on the methodology are in the following subsections.

##### a. Completion Rates (Average Hours per Adjudication of an Immigration Benefit Request)

*Comment:* Commenters expressed concern with growing adjudication times and increases in completion rates for forms and certain applications. Some commenters divided current or proposed fees by completion rates (average hours per adjudication of an immigration benefit request) to calculate hourly rates for immigration benefits. Commenters expressed concern with increasing hourly rates of their own determination, citing various forms. Commenters stated:

• USCIS' data shows a significant increase in completion rates without any corresponding change in statutory or regulatory requirements.

• Many forms have an increase in completion rates from 49 percent to 218 percent, despite the lack of statutory or regulatory changes.

• Many forms with increased completion rates show substantial proposed fee increases.

• They are concerned about completion rates for selected forms and suggested that USCIS work to eliminate or reduce inefficiencies.

• USCIS notes that they used pre-pandemic values for some, but not all, of the data used to project completion rates, and the lack of clarity on these differences raises questions about the validity of the data used in the ABC model.

• Most of the Form I–129F, Petition for Alien Fiancé(e), filings do not require applicant interviews or otherwise take up extreme officer

---

[154] *See* GAO, "Federal User Fees: Fee Design Options and Implications for Managing Revenue Instability," (Sept. 30, 2013), *https://www.gao.gov/assets/gao-13-820.pdf* (last visited May 3, 2023).

[155] *See generally* U.S. Department of the Treasury, Bureau of the Fiscal Service, "Treasury Financial Manual," "Chapter 2000." Available at *https://tfm.fiscal.treasury.gov/v1/p2/c200* (last viewed Aug. 27, 2023).

[156] For example, see Appendix Table 3: Projected Total Cost by Immigration Benefit Request in the supporting documentation for the proposed rule available at *https://www.regulations.gov/document/USCIS-2021-0010-0028.*

[157] A transcript of the software demonstration is available at *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[158] In the supporting documentation for the proposed rule, see appendix tables 4–7 for details on how DHS proposed fees based on the ABC model results and results by fee review activity. Pages 10–12 define the activities in the appendix tables. *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, *FY 2022/2023 IEFA Fee Review Supporting Documentation* (Jan. 2023), *https://www.regulations.gov/document/USCIS-2021-0010-0028.*

HR-1 FRN 2025 AR-000062

**Appx-000087**

resources that would justify this substantial of an increase.

• Touch times for Form I–539 have increased even though USCIS has reinstated concurrent processing of H1/H4/Employment Authorization Document (EAD) and L1/L2/EAD applications, which should result in gains in process efficiency.

• Changes brought about by recent litigation should have reduced touch times for many forms, but instead touch times have increased.

• How touch time would be tracked and calculated using the costing model and if USCIS includes FDNS activity in its calculation of touch time.

• Increased form length is a major reason why USCIS adjudicators are spending 3.3 million additional hours reviewing petitions and USCIS must stop requiring unnecessary renewals of work permits.

• Commenters provided recommendations for reducing completion rates.

• Some applicants are paying "over $1,000+/hour" despite an adjudication burden of only a few hours for completion.

• USCIS' "effective hourly rate" is four times the prevailing wage for an attorney.

*Response:* USCIS used the best completion rate data available at the time to conduct the FY 2022/2023 fee review. In its last four fee rules, DHS has used USCIS completion rates to assign costs from the Make Determination activity to individual cost objects (*i.e.*, forms). USCIS continued this approach in the FY 2022/2023 fee review. As explained in the proposed rule, USCIS relied on completion rates before the pandemic to remove this effect from the fee review. *See* 88 FR 402, 446. USCIS used online filing data that included pandemic months. *See* 88 FR 402, 490. The mix of two time periods for two different data points should not affect the results of the ABC model. When online filing is available, USCIS often uses the same case management system to adjudicate both online and paper filings. As such, USCIS used the same completion rates for both online and paper filings.

DHS limited many of the proposed fee increases (*i.e.*, adoption-related form fees, Forms I–290B, Notice of Appeal or Motion, I–360, Petition for Amerasian, Widow(er), or Special Immigrant, N–400, Application for Naturalization, etc.), as done in previous fee rules. *See* 88 FR 402, 450–451 (Jan. 4, 2023). In other cases, DHS proposed to maintain the current fee (*i.e.*, Forms I–90 when filing online, I–131A, N–565, etc.). *See* 88 FR 402, 451 (Jan. 4, 2023). Some

other fees do not use completion rates (*i.e.*, I–131A, H–1B Registration Fee, USCIS Immigrant Fee, etc.). *See* 88 FR 402, 446–447 (Jan. 4, 2023). As explained elsewhere in this rule, many of the final fees are lower than in the proposed rule. For example, DHS limits the fee increase to inflation since the 2016 rule for Forms I–130, Petition for Alien Relative, I–485, Application to Register Permanent Residence or Adjust Status, I–765, Application for Employment Authorization, etc.

DHS appreciates the commenters' concerns about increased form length, timely service, and higher fees. USCIS continually strives to minimize the burden on requesters, meet timely adjudication goals while balancing security, eligibility analysis, and integrity in the immigration system. The proposed rule highlighted areas where USCIS may be able to increase efficiency or reduce adjudication time or staffing. *See* 88 FR 402, 529 (Jan. 4, 2023). However, it may be too early for USCIS to see results from these planned changes or recently implemented changes. Future fee rules may use more recent completion rates, which may include efficiencies or reduced adjudication times. As noted previously, fees do not merely cover the cost of adjudication time because USCIS incurs costs that are not directly associated with adjudication. The hourly adjudication rates calculated by some commenters must fund the cost of relevant administrative costs, technical and technological facilitation, and similar services provided at no or reduced charge that are not recovered from other fees. By limiting many of the final fees to an inflation-based adjustment of the current fee, rather than one calculated based on a completion rate, DHS addresses the concerns of the commenters who disagree with fees being based on completion rates and the relative complexity of the adjudication. With this approach, USCIS may continue to improve efficiency and adjudication times without overburdening customers with fees that are higher than inflation for family-based and humanitarian workloads, in most cases.

b. Other Comments on Methodology (*e.g.*, ABC Software/Models, Age of Data)

*Comment:* Multiple commenters also stated that the ABC model is flawed, or the documentation is insufficient for the following reasons:

• Documentation of the fee review methodology and inputs does not provide a comprehensive understanding of the study's execution.

• USCIS chose not to use actual cost values and instead relied on projections, and it could not identify information in the documentation that either explained with specificity how the projected values were determined or addressed potential observational errors that may have impacted cost projections.

• Documents provided to the public did not provide the insight necessary to ascertain how the data in the model was compared across the FYs that USCIS examined.

• The ABC model has underestimated the number of petitions that will be filed and therefore underestimated the impact on small and seasonal American businesses, farmers, and the public.

• Because USCIS is proposing that employment-based applications cover the cost for other benefits, underestimation of H–2B and H–2A filings shows that other employment filings are also off, and the proposed fees and cost offsets need to be further reviewed with more adequate data.

• USCIS should be more transparent on USCIS' ABC model and into calculation and review of fee levels.

• USCIS should provide a public forum whereby it describes to stakeholders how the methodology and data used in the ABC model allowed it to reach its conclusions.

• USCIS does not provide the public with the information that went into the ABC model and consequently the public cannot determine whether its conclusions are justified or reasonable.

*Response:* The INA authorizes DHS to recover the costs of USCIS by collecting fees and the CFO Act requires us to do a fee review every 2 years. Neither statute requires use of any particular methodology. As stated in the proposed rule and this rule, DHS strives to follow OMB Circular A–25, as appropriate for the programs we administer. In doing so, DHS strives to allocate fees using activity-based costing, adjust fees using considerations of public policy, interests served, and other relevant facts, and consider the recommendations of GAO regarding beneficiary-pays and ability-to-pay principles to shift costs and set our final fees. Our adopted methodology results in some requests paying no fee, others paying more, and others paying less. DHS tries to be fair, precise, transparent, and thoughtful within reasonable margins of accuracy and precision. Nonetheless, the commenter's assertion that our calculations or fee determination is incorrect is misplaced. DHS explains in the supporting documentation in the docket for this rule how each fee in the proposed rule and this rule were calculated. DHS

HR-1 FRN 2025 AR-000063

engages in discretionary cost shifting and adjusts before arriving at a final fee schedule. DHS outlined how the ABC model works in the proposed rule preamble and supporting documentation, consistent with previous fee rules. In addition, it shared model and fee schedule documentation in the docket. USCIS also provided a demonstration of the model, as requested, and placed a transcript of the demonstration in the docket.[159] During the demonstration, USCIS often referred to information in the docket to show how the model uses it. The information used to calculate specific fees is the best and most complete information available at the time of the fee review. Requests that were only developed or authorized relatively recently (*e.g.*, separate fees for Form I–129; Employment Based Immigrant Visa, Fifth Preference (EB–5) workloads; Asylum Processing IFR costs) may have limited data, not be fully implemented, or require assumptions for the new fees. USCIS will be able to refine this data in the future as programs mature or data collection begins, which will be used for future fee reviews. Some fee changes in the proposed rule and this final rule are outside of the ABC model, as discussed in the preamble and fee schedule documentation. *See, e.g.,* 88 FR 402, 450–454 (Jan. 4, 2023).

Information provided in the ABC model includes the cost projections, volume, and completion rates discussed in the preamble. *See, e.g.,* 88 FR 402, 426–452 (Jan. 4, 2023). The supporting documentation discussed additional information, such as staffing levels, fee review activities, and a functional overview of ABC in general and the USCIS ABC model. The model documentation provided functional and technical details on how the model works. It included diagrams, screenshots, lists, and tables for various aspects of the ABC model. Thus, DHS believes that we have explained and justified our calculations of the fees in this final rule.

As for the filing volume estimates, USCIS uses a volume projection committee (VPC) with statistical and analytical experts who systematically examine filing volumes to produce forecasts used in fee studies. The VPC examines past trends, forecasts, and varying models, and USCIS has found that the VPC reliably minimizes forecast errors that might occur if forecasting were left to self-interested parties. The

VPC projects filing volume several years ahead. USCIS has reviewed the comments from H–2A and H–2B employers that misunderstood the 25 named beneficiaries per petition requirement as a limit on the overall number of beneficiaries and argued the ratio of initial to continuing requests to be a superior basis for modeling annual growth of at least 15 percent in both H–2A and H–2B volumes, in perpetuity. USCIS agrees with one commenter that nature is unpredictable and demand for seasonal agricultural workers is volatile but disagrees with unsupported arguments that higher H–2A and H–2B volumes and thus revenues are self-evident. In the event less likely volumes did occur, commenters overlook that this would cause changes in the activities driving ABC model estimates of average costs and impact the revenue the fee would generate. Thus, USCIS must take care to neither over nor underestimate future, unknowable volumes without bias.

3. TPS and DACA (*e.g.,* Exclusion From Cost Model, I–821, I–765 Exemption for Certain TPS Applicants, and DACA Rulemaking)

*Comment:* Commenters provided the following comments on how the proposed rule would affect DACA requests, fees, and grantees:

• Increased fees would create hardship for DACA students required to renew their paperwork every 2 years.

• Higher fees increase the vulnerability of DACA recipients by raising the costs to maintain their documentation.

• USCIS should set DACA application fees at current or lower levels to address financial disparities faced by immigrant communities and working families.

• DACA recipients already pay a filing fee that other protected groups do not, and fee waivers are not a solution to the proposed increase.

• Maintain current DACA fees because DACA recipients were not considered in the financial modeling for the proposed rule.

• Some disagreed with the exclusion of DACA recipients from filing fee relief regardless of their potential financial hardship.

• The DACA program diverts agency resources from lawful immigrant programs, resulting in fee increases and longer processing times for applicants to other visa programs.

• USCIS should increase processing fees for DACA because the fee is lower than other requests, yet the burden is higher.

• DACA requestors broke the law so their fees should be punitive.

• DACA recipients should be able to request advance parole based on any grounds and be allowed to request a fee waiver.

*Response:* This rule makes no changes to DACA, the validity period for approved DACA renewals or how often DACA must be renewed, policies regarding DACA recipients' ability to request advance parole, or any DACA-specific fees. As explained in the proposed rule, DACA is a temporary act of enforcement discretion, may be terminated at any time, and thus it is a source of revenue on which DHS does not want the fiscal condition of USCIS to depend. *See* 88 FR 402, 454–455 (Jan. 4, 2023).

To request DACA, an individual must file Form I–821D, Consideration of Deferred Action for Childhood Arrivals, which has an $85 filing fee. The applicant must also file Form I–765, Application for Employment Authorization, together with Form I–821D for the DACA request to be complete. Form I–765 is a general form used by millions outside of the DACA population. It has a filing fee of $410, which increases in this final rule to $470 when filed online or $520 when filed on paper. All Form I–765 applicants pay the same fee, unless they are fee exempt or request a fee waiver. DHS found no differences in the burden of adjudicating Form I–765 for DACA than for any other Form I–765 and we have no policy reasons for capping their fee at a lower amount. In DHS's 2022 DACA rule, the total fee to submit a DACA request of $495 ($85 plus $410) was a reasonable proxy for the Government's costs of processing these forms. *See* 87 FR 53152, 53278 (Aug. 30, 2022).[160] However, that rule also stated that DHS planned to propose new USCIS fees in a separate rulemaking, and that the fee for Form I–765, may need to be adjusted because it has not changed since 2016. *Id.*

In DHS's 2022 DACA rule, DHS considered allowing fee waivers or fee exemptions for DACA requestors. *See* 87 FR 53152, 53237–53238. In that rule DHS recognized that some DACA

---

[159] *See* USCIS, "USCIS Fee Rule Software Demonstration," Mar. 1, 2023, available at *https://www.regulations.gov/comment/USCIS-2021-0010-4141.*

[160] On Sept. 13, 2023, the U.S. District Court for the Southern District of Texas issued a decision finding the DACA rule unlawful and expanding the original July 16, 2021 injunction and order of vacatur to cover the final rule. *See Texas* v. *United States,* No. 1:18–CV–00068 (S.D. Tex. Sept. 13, 2023), *appeal pending,* No. 23–40653 (5th Cir. filed Nov. 9, 2023); *see also* USCIS, "Important Update on Deferred Action for Childhood Arrivals," available at *https://www.uscis.gov/newsroom/alerts/important-update-on-deferred-action-for-childhood-arrivals* (last reviewed/updated Sept. 18, 2023).

**6252**     Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

requestors may face economic hardship that affects their ability to pay the required fees. However, it noted that DACA, as an exercise of prosecutorial discretion that allows DHS to focus limited resources on higher priority cases, is not an immigration benefit or associated filing for which DHS is required to allow a request for a fee waiver under INA sec. 245(l)(7), 8 U.S.C. 1255(l)(7), and that it is appropriate for beneficiaries of this enforcement discretion to cover the cost of adjudication. *Id.* DHS declines to reverse that decision in this rule. This final rule sets fees for Form I–765 that are increased only by the rate of inflation since they were last established, and less than the proposed fees, as explained elsewhere in in section II.C.8 of this rule's preamble.

*Comment:* A commenter wrote that USCIS could allocate more resources to TPS based on how much an applicant paid in fees, and that TPS could receive faster processing if they paid more.

*Response:* As explained in the proposed rule, DHS excludes projected revenue from expiring or temporary programs in setting the fees required to support baseline operations due to the uncertainty associated with such programs. *See* 88 FR 402, 454 (Jan. 4, 2023). DHS realizes that USCIS has processing backlogs for Form I–821, Application for Temporary Protected Status, and we are working to reduce those backlogs and approve requests quickly. DHS is precluded from charging more for faster processing of the Form I–821 by INA sec. 244(c)(1)(B), 8 U.S.C. 1254a(c)(1)(B), which caps the TPS registration fee at $50. While USCIS has implemented premium processing for some Form I–765 categories in March 2023, a TPS related Form I–765 was not one of them.[161] USCIS may offer premium processing for TPS-related Form I–765 filings as provided in 8 CFR 106.4 in the future as we develop more capacity to offer premium service to more requests. Meanwhile, DHS makes no changes to this rule based on this comment.

### 4. Processing Time Outlook and Backlogs

*Comment:* Many of the commenters opposed fee increases because of delays in processing times and dissatisfaction

with customer service. Commenters wrote:

• Conditional support for the fee increases if such increases will improve or not cause any backlogs and only if USCIS can process cases quickly or accelerate processing.

• USCIS should improve efficiency and achieve long term structural improvements without increasing fees, should focus first on improving efficiency and service provision as opposed to raising fees, include a processing time guarantee, establish a "binding" processing timeframe with each fee increase, reverse the fee increases if USCIS fails to meet specific processing times, and USCIS has no accountability with maintaining regular processing times and has not demonstrated the ability to reduce these timelines. Commenters questioned what mechanisms would help USCIS to higher efficiency standards.

• USCIS should clear the backlog and decrease processing times, the current backlog and long processing times are not reasonable, processing times are getting longer without any justifying policy or legal changes, USCIS has "record-high" processing delays and backlogs and is not meeting legal guidelines for processing times, processing times increased over the last 6 years by as much as 218 percent.

• USCIS has no accountability with maintaining regular processing times and has not demonstrated the ability to reduce these timelines. Commenters stated the growing length of USCIS forms is a "major contributor" to the backlog.

• Applicants are not responsible for the backlog and should not carry its burden, the backlog is harmful for low-income applicants awaiting permanent residency or naturalization, and immigrant and nonimmigrant fees should bear the burden of cost for the backlog rather than U.S. citizens or noncitizen relatives.

• The backlog has a negative impact on many non-immigrant workers, DACA recipients, TPS holders, and other EAD applicants seeking to maintain their employment status in their current jobs and seeking USCIS services, and applicants from higher education seeking employment or other opportunities.

• Raising fees and hiring additional staff would be a "band-aid" solution to a flawed processing model that has created the current backlog crisis.

• Processing delays may deter many touring artists from performing in the United States and processing delays force some petitioners to pay the premium fees for international artists,

particularly given the specific timing demands of performing arts schedules.

• USCIS should improve processing so fewer applicants need to pay for premium processing.

• USCIS requires some dependents of long-term temporary workers to file extensions of status separate from the worker, contributing to the backlog.

• USCIS should reduce Requests for Evidence (RFE) as unnecessary complications that cause delays in processing, publish RFE issuance rates by adjudicator, and establish stricter requirements for responding to evidence and issuing RFEs.

• Recent RFE reductions by USCIS should be considered in the proposed filing fees.

• In response to the statement in the proposed rule that part of the 2022 congressional appropriations would be used to reduce current backlogs and delays, USCIS has not shown the capacity to quickly address developing backlogs and USCIS should not rely solely on yearly appropriations.

• Recommendations of several means of reducing backlog, including requesting annual appropriations if needed and adjusting fees annually based on staffing factors.

• The processing times and backlogs for the Form I–600A and I–600 series and Form I–800A and I–800 series should be reduced, and adjudication of adoption cases should be prioritized.

• Concerns about specific forms, including Form I–129 processing times are three to five times longer than mandated by statute for L–1 petitions.

• Form I–539 processing times have ballooned despite process changes that should have streamlined adjudication, for Form I–485, USCIS should promise a period of fewer than 6 months to process the form and its underlying petitions; applicants must file concurrent Forms I–485, I–131, and Form I–765, given the increasing processing times.

• These delays increase backlogs for Form I–129F. Because the processing time has increased in recent years, USCIS should not propose to significantly increase fees for the fiancé and spousal applications.

• Lengthy processing times for Form I–131, result in increased congressional inquiries, Ombudsman's inquiries, and expedite requests, all of which create greater inefficiencies.

• Further, processing delays make it difficult for students to anticipate their start dates on their applications and are not warranted given that the Form I–765 duplicates information that USCIS has already collected.

---

[161] USCIS, "USCIS Announces Premium Processing; New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions," available at *https://www.uscis.gov/newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last reviewed/updated Mar. 6, 2023).

HR-1 FRN 2025 AR-000065

• For Form I–824, the simple purpose of this form should not necessitate processing times of 2–4 years.

• Form N–400 commenters recommended a case processing goal of 4–6 months and stated that increased vetting policies have increased processing times, despite stable rates of approval of applications.

• USCIS has a 1-to-3-month processing time for O–1 petitions (although the statutory requirement for adjudication is 14 days), so USCIS should refund the filing fee if processing takes longer.

• For K–1 visa holders applying for Adjustment of Status, processing time varies greatly depending on the applicant's location of residency and review of interim benefit requests for such applicants should be shorter given that those applicants' relationships and backgrounds have already been reviewed.

• Processing delays for F–1 student visas impede registrations from international students, which can diminish the students' contribution to U.S. innovation and limits revenue streams for U.S. colleges and universities.

• Lengthy J–1 waiver approval processing has caused interruptions in income or necessitated priority processing.

• DHS should avoid any Form N–400 fee increase by pursuing greater efficiencies and cost savings using technology.

• USCIS should refund the higher proposed fees if the agency does not process the following forms within its processing time goal: I–290B, I–800A, I–824, I–140, N–400, I–526, I–102, I–130, I–129F, I–360, I–129, I–90, I–539, I–131, I–765, I–485.

• Increased processing times and the need to hire new employees are problems of USCIS' own making through unnecessary RFEs, biometrics, in-person interviews, site visits, audits, and failure to take advantage of technological advances that could lead to more streamlined and cost-effective procedures. It is prudent for USCIS to increase fees because it has been 6 years since the last increase and the United States is experiencing widespread inflation, but USCIS should ensure that any increase improve the efficiency of its services and customer support.

*Response:* USCIS appreciates that its processing backlogs have a negative impact on many stakeholders who submit and rely on immigration benefit requests. USCIS is committed to timely processing goals and reducing its backlog. DHS acknowledges that since it last adjusted fees in FY 2016, USCIS has

experienced elevated processing times compared to the goals established in the 2007 fee rule. *See* 72 FR 29858–29859. Processing delays have contributed to case processing backlogs. USCIS total pending caseload has grown from approximately 4.7 million cases in December 2016, when DHS last adjusted IEFA non-premium fees, to approximately 8.9 million cases at the end of June 2023.[162] On top of these preexisting strains on USCIS, the COVID–19 pandemic constrained USCIS adjudication capacity by limiting the ability of USCIS to schedule normal volumes of interviews and biometrics appointments while maintaining social distancing standards. *See* 88 FR 402, 455 (Jan. 4, 2023). COVID flexibilities likely increased the time to respond to an RFE, as well as processing times.[163] Further, USCIS believes that the growing complexity of case adjudications in past years, including prior increases in the number of interviews required and RFE volumes, at the time contributed to higher completion rates and growing backlogs. *Id.*

USCIS is making progress reducing backlogs and processing times. For example, USCIS committed to new cycle time goals in March 2022.[164] These goals are internal metrics that guide the backlog reduction efforts of the USCIS workforce and affect how long it takes the agency to process cases. As cycle times improve, processing times will follow, and requestors will receive decisions on their cases more quickly. USCIS has continued to increase capacity, improve technology, and expand staffing in an effort to achieve these goals by the end of FY 2023. DHS automatically extended some EADs to help prevent renewal applicants from experiencing a lapse in employment authorization or documentation while their applications

remain pending. *See* 87 FR 26614 (May 4, 2022). Automatic extension of employment authorization or documentation allows some immigrants, including asylees, refugees, and TPS holders, to maintain their employment status in their current jobs. *Id* at 26615–26617. To highlight other efforts toward reducing the backlog and processing times, USCIS published a progress report to demonstrate both how backlog reduction and humanitarian services were successfully supported by appropriations by Congress in FY 2022.[165] USCIS reduced the backlog for naturalization and the wait time for employment authorization, while expanding humanitarian efforts.[166] USCIS already delivered on one of the commitments in the progress report by implementing premium processing for all employer Form I–140 petitions for immigrant workers.[167] Since publishing the report, USCIS also announced that premium processing is available for certain students seeking Optional Practical Training (OPT) or Science, Technology, Engineering, and Mathematics (STEM) OPT extensions, as well as certain changes or extensions of nonimmigrant status.[168]

DHS appreciates the operational suggestions submitted by commenters regarding interviews, RFEs, online filing, prioritization of certain requests, USCIS office staffing, and other steps to address the USCIS processing backlog. As explained in the proposed rule, USCIS is reviewing its adjudication and administrative policies to find

---

[162] *See* USCIS, "Number of Service-wide Forms by Fiscal Year to Date, Quarter and Form Status 2017," available at *https://www.uscis.gov/sites/default/files/document/data/ECN_1893_-_Quarterly_-_All_Forms_FY17Q1_Final.pdf* (last visited Sep. 29, 2023). USCIS, "Number of Service-wide Forms By Quarter, Form Status, and Processing Time, April 1, 2023—June 30, 2023," available at *https://www.uscis.gov/sites/default/files/document/data/quarterly_all_forms_fy2023_q3.pdf* (last visited Sep. 29, 2023).

[163] *See, e.g.,* USCIS, "USCIS Extends COVID–19-related Flexibilities" available at *https://www.uscis.gov/newsroom/alerts/uscis-extends-covid-19-related-flexibilities-1* (last revised/updated Jan. 24, 2023).

[164] See USCIS, "USCIS Announces New Actions to Reduce Backlogs, Expand Premium Processing, and Provide Relief to Work Permit Holders," *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work* (last visited Feb. 8, 2023).

[165] See USCIS, "USCIS Releases New Data on Effective Reduction of Backlogs, Support for Humanitarian Missions, and Fiscal Responsibility," *https://www.uscis.gov/newsroom/news-releases/uscis-releases-new-data-on-effective-reduction-of-backlogs-support-for-humanitarian-missions-and* (last visited Feb. 7, 2023).

[166] See USCIS, "Fiscal Year 2022 Progress Report," Dec. 2022, available at *https://www.uscis.gov/sites/default/files/document/reports/OPA_ProgressReport.pdf* (last visited Feb. 8, 2023).

[167] See USCIS, "USCIS Announces Final Phase of Premium Processing Expansion for EB–1 and EB–2 Form I–140 Petitions and Future Expansion for F–1 Students Seeking OPT and Certain Student and Exchange Visitors," *https://www.uscis.gov/newsroom/alerts/uscis-announces-final-phase-of-premium-processing-expansion-for-eb-1-and-eb-2-form-i-140-petitions* (last visited Feb. 7, 2023).

[168] See USCIS, "USCIS Announces Premium Processing; New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions," *https://www.uscis.gov/newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last visited Mar. 6, 2023); USCIS, "USCIS Expands Premium Processing for Applicants Seeking to Change into F, M, or J Nonimmigrant Status," *https://www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status* (last visited June 12, 2023).

HR-1 FRN 2025 AR-000066

**Appx-000091**

efficiencies, while strengthening the integrity of the immigration system. *See* 88 FR 402, 455 (Jan. 4, 2023). This entails evaluating the utility of interview requirements, biometrics submission requirements, RFEs, deference to previous decisions, and other efforts that USCIS believes may, when implemented, reduce the amount of adjudication officer time required, on average, per case. *Id.* Any improvements in these completion rates would, all else equal, reduce the number of staff and financial resources USCIS requires. Furthermore, USCIS is actively striving to use its existing workforce more efficiently, by investigating ways to devote a greater share of adjudication officer time to adjudications, rather than administrative work. All else being equal, increasing the average share of an officer's time spent on adjudication (that is, utilization rate) would increase the number of adjudications completed per officer and reduce USCIS' overall staffing and resource requirements.

USCIS based its fee review largely on existing data that do not presume the outcome of these efficiency initiatives. USCIS cannot assume significant efficiency gains in this rule in advance of such efficiency gains being measurably realized. Establishing more limited fees to account for estimated future efficiency could result in deficient funding, and USCIS would not be able to meet its operational requirements. USCIS also cannot refund fees if it does not meet its processing time goals as commenters suggest without incurring significant harm to its fiscal position, which would in turn only exacerbate backlogs. In contrast, if USCIS ultimately receives the resources identified in this rule and subsequently achieves significant efficiency gains, this could result in backlog reductions and shorter processing times. Those efficiency improvements would then be considered in future fee reviews, as indicated in the proposed rule. *See* 88 FR 402, 529–530 (Jan. 4, 2023).

Finally, regarding the current USCIS processing time for O–1 petitions, and the commenter's suggestion that USCIS should refund filing fees for O–1 petitions that take more than 14 days to adjudicate, DHS disagrees with the commenter's assertion that there is a generally applicable requirement to process O–1 petitions within 14 days. Rather, the statute and regulations refer to a non-binding 14-day processing time, after USCIS receives an advisory opinion, in the limited context where USCIS requests an advisory opinion from an appropriate labor organization. *See* 8 U.S.C. 1184(c)(6)(D); 8 CFR 214.2(o)(5)(i)(F). DHS will not adopt the

commenter's suggestion to refund O–1 petition filing fees in cases that take longer than 14 days to adjudicate. As with other filing fees, the O–1 petition filing fee is due at time of filing and is nonrefundable.

In sum, DHS understands the need for timely service, system improvements, and customer support. USCIS continually strives to meet timely adjudication goals while balancing security, eligibility analysis, and integrity in the immigration system. Fees have not been adjusted since 2016. Meanwhile, USCIS expanded its humanitarian efforts, often without appropriations or revenue to offset the additional cost.[169] This fee rule is intended to address such shortfalls and provide resources necessary to ensure adequate service. USCIS would be unable to adequately perform its mission if DHS allowed fee levels to remain insufficient while USCIS continued to explore and implement options for additional efficiencies.

*Comment:* Many of the commenters suggested operational improvements which they felt would reduce processing times or improve customer service. Commenters wrote:
• USCIS should add more electronic filing.
• USCIS should use interview waivers, evidence of employment authorization, the creation of a trusted filer program, remote interviews, phone appearances, grandfathering, penalty fees, extend validity periods of visas, and recapture and issue Green Card numbers that have gone unused to reduce costs and the backlog.
• Applicants should be given the name and email of their adjudicator to establish more transparent and efficient communication.
• USCIS should increase adjudicator hiring rates and training, and provide better training combined with managerial oversight and review of adjudications.
• USCIS should transparently include planned process improvements in its costing model.
• Form I–130, commenters recommended a simplified registration system to prevent USCIS from spending resources managing applications during lengthy waiting periods.
• USCIS should stop requiring unnecessary renewals of work permits, citing research that such renewals compose 20 percent of the case backlog.

---

[169] For example, as described in section III.C. DHS established new parole processes for certain Cubans, Haitians, Nicaraguans, and Venezuelans, and new family reunification parole processes for certain Colombians, Salvadorans, Guatemalans, and Hondurans.

• USCIS should stop printing Green Cards, and EAD cards for applicants who already have a Green Card.
• DHS should offer premium processing fees to alleviate long processing times for VAWA applicants coming from difficult situations.
• Combining the forms, fees, and adjudications for Forms N–400 and N–600 would save both families and USCIS considerable time and money.
• Effort to process Form I–751 has fallen by 11 percent over the past 6 years but processing time is increasing dramatically and does not comply with statutory timeframes. Fees for I–751 filers should be used to improve I–751 processing times and not for other higher priority forms.

*Response:* DHS appreciates the operational suggestions submitted by commenters regarding processing times, process improvement, customer service, interviews, streamlined filings, online filing, prioritization of certain requests, training, and other steps to address the USCIS processing backlog. As explained in the proposed rule, USCIS is reviewing its adjudication and administrative policies to find efficiencies, while strengthening the integrity of the immigration system. *See* 88 FR 402, 455 (Jan. 4, 2023). DHS considered these recommendations but declines to make changes in this rule. DHS may consider these changes again in future rulemakings.

*E. Fee Waivers*

1. General Comments

*Comment:* Multiple commenters expressed general support for the fee waiver provisions in the proposed rule, some without explanation and others for the following reasons:
• Fee waivers are important for immigration relief because they help families improve their stability, financially support themselves, and fully integrate into the workforce.
• The proposed rule would replace the enjoined 2019/2020 changes, which severely limited immigrants' access to fee waivers including the reduced fee option for low-income naturalization applicants. The proposed rule would revert to the inability to pay model for establishing eligibility for fee waivers, and avoid other issues in prior proposed fees.
• Many individuals apply for naturalization or a Certificate of Citizenship with a fee waiver.
• The proposed rule continues to allow fee waivers for forms associated with certain types of humanitarian benefits. The United States has a moral and legal obligation to protect persons fleeing persecution.

HR-1 FRN 2025 AR-000067

Appx-000092

• The proposed rule would preserve existing fee waiver eligibility for low-income and vulnerable populations and ensure that the fee changes would not disproportionately impact people who are struggling financially. Fee waivers provide an opportunity for low-income individuals to become citizens of the United States and participate in the democratic process. Without fee waivers, many low-income individuals would not have an equal opportunity to access the pathway to citizenship.

• Many of the changes DHS proposed will prevent meritorious fee waiver requests from being denied on arbitrary bases, as is often now the case.

• Strengthening of fee waivers supports union efforts to uplift the rights and status of those in need of increased agency in the labor market.

*Response:* DHS agrees with commenters regarding the importance of fee waivers and will maintain their availability as explained in the proposed rule.

2. Eligible Categories and Forms

*Comment:* Several commenters asked USCIS to balance fee increases by significantly expanding fee waiver eligibility. One commenter stated that DHS should expand the categories of applications eligible for fee waivers without specifying which additional categories should receive fee waivers. Another commenter encouraged USCIS to expand fee waivers to further ensure that all vulnerable noncitizens who cannot afford to pay filing fees are able to obtain a fee waiver and access immigration benefits without unreasonable delay or undue difficulty. Another commenter requested that USCIS allow for individual determinations as to whether a fee waiver should be granted for all applications. The commenter reasoned that categorical restrictions placed on fee waivers for certain applications combined with the increase in fees proposed will pose obstacles for many immigrants, resulting in the delay of immigrants' ability to apply for immigration relief.

*Response:* DHS acknowledges the importance of ensuring that individuals who cannot afford filing fees have access to fee waivers. DHS has primarily sought to ease the burden of fee increases by significantly expanding the number of forms that are now fee exempt. *See* 8 CFR 106.3(b); Table 5B. DHS believes that these expanded fee exemptions offer more certainty to those who are unable to pay application fees and create less burden because they do not require filing or processing of a fee waiver request. In addition, DHS is

maintaining the household income level for assessing a requestor's ability to pay at 150 percent of the FPG instead of the 2019/2020 fee rule's lower threshold of 125 percent of the FPG. 8 CFR 106.3(a)(1)(i)(B). This fee rule also retains the authority for the Director of USCIS to provide exemptions from or waive any fee for a case or specific class of cases, if the Director determines that such action would be in the public interest and the action is consistent with other applicable law. *See* 8 CFR 106.3(c). DHS believes it has provided fee waivers for the appropriate forms and categories by emphasizing humanitarian, victim-based, and citizenship-related benefits. Additional fee waivers would limit USCIS' ability to fund necessary activities and would lead to additional backlogs and delays. Otherwise, USCIS would need to increase fees for other forms and requestors to compensate for fewer requests paying fees. DHS has sought to balance the need for the fee waivers and the need to ensure sufficient revenue and does not believe additional fee waivers are appropriate.

*Comment:* Multiple commenters wrote that USCIS should make additional family-related immigration benefits eligible for fee waivers. One commenter expressed concern that some Form I–129F petitioners and beneficiaries would have to go into debt to get married and recommended that DHS allow low-income individuals to request a waiver of the Form I–129F. Another commenter expressed opposition to the rule because fees cannot be waived for Forms I–130 and I–751.

*Response:* Contrary to the commenter's assertion, the fee for Form I–751, Petition to Remove Conditions on Residence, can be waived. 8 CFR 106.3(a)(3)(i)(C). In general, however, DHS does not consider Form I–129F, Petition for Alien Fiancé(e), and Form I–130, Petition for Alien Relative, appropriate for fee waivers because the petitioning U.S. citizen or LPR relative is statutorily required to demonstrate their ability to financially support the noncitizen beneficiary at the time of their admission as an LPR. *See* INA secs. 212(a)(4)(C)(ii) and 213A, 8 U.S.C. 1182(a)(4)(C)(ii) and 1183a. DHS does not believe that these USCIS fees represent an inordinate financial burden compared to the financial commitment required to fully support an immigrant relative.

*Comment:* A commenter expressed concern that the fee for Form I–539 is not waivable for T and U nonimmigrants when the form is filed concurrently with Form I–485. The

commenter remarked that this would cause significant financial burden to victims filing U-visa and T-visa based Form I–485 applications, who often cannot hire a private attorney to help them file an I–485 in timely fashion, and the additional I–539 fee would further delay the ability of survivors in this situation to reconcile their expired status with the filing of a *nunc pro tunc* Form I–539 and Form I–485 application.

*Response:* In the proposed rule, DHS proposed to fully exempt the fee for a Form I–539, Applicant to Extend/Change Nonimmigrant Status, filed by applicants who have been granted T nonimmigrant status or are seeking to adjust status under INA sec. 245(l), 8 U.S.C. 1255, regardless of whether the form is filed before or concurrently with Form I–485, Application to Register Permanent Residence or Adjust Status. *See* 88 FR 402, 594 (Jan. 4, 2023) (proposed 8 CFR 106.3(b)(2)(vi)). DHS has maintained this fee exemption in the final rule. 8 CFR 106.3(b)(2)(vi); Table 5C. Furthermore, in response to comments, DHS has decided to extend the fee exemption for Form I–539 to include applicants who have been granted U nonimmigrant status or are seeking to adjust status under INA sec. 245(m), 8 U.S.C. 1255(m), regardless of whether the form is filed before or concurrently with Form I–485. 8 CFR 106.3(b)(5)(vi). That limited, additional fee exemption did not increase the fees for other fee payers. As explained elsewhere, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. These fee exemptions will enable the vulnerable population of U nonimmigrants to maintain their nonimmigrant status while applying to adjust to LPR status.

*Comment:* A commenter stated that fee waivers and exemptions should be extended to other critical forms for asylees, reasoning that asylees are just as vulnerable and meet the same legal definition as refugees. The commenter did not identify specific forms that should be eligible for a fee waiver but asserted that the following forms should be fee exempt: Form I–485 for asylees, Form I–765 renewal and replacement for asylees and asylum applicants, and Form I–290B for asylees and refugees when filed for Forms I–730 or I–485.

*Response:* All the forms identified by this commenter are eligible for a fee waiver. 8 CFR 106.3(a)(3)(ii)(D), (F), (iv)(C); Table 5B. Comments concerning fee exemptions are addressed later in the Section IV.F of this preamble.

*Comment:* Commenters stated that the proposed fee changes would unfairly categorize athletes as a classification

HR-1 FRN 2025 AR-000068

that can afford the fee increases and requested that a broader spectrum of forms, including the Form I–129 and Form I–140 when not filed by an employer, be eligible for fee waivers or reductions. Another commenter encouraged USCIS to consider a waiver option for O and P petitions, combined with a tiered structure (possibly based on maximum planned venue size), which the commenter reasoned would benefit all interests without jeopardizing potential U.S. revenue streams and the socioeconomic contributions of small- and medium-sized artists.

*Response:* DHS recognizes commenters' concerns regarding the affordability of Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Workers, and that not all athletes or artists are wealthy. As further discussed in Section II. C of this preamble, in response to public comments and stakeholder feedback, DHS is codifying a discounted Form I–129 fee for small employer and nonprofit filers in this final rule. 8 CFR 106.2(a)(3)(ix). However, while DHS recognizes the economic and cultural contributions made by O and P nonimmigrants and I–140 self-petitioners, DHS does not believe that these factors justify fee-waiver eligibility or fee exemptions for Form I–129 and Form I–140 petitions. USCIS can only allow a limited number of forms to be eligible for fee waivers, or else it would require even further increases in fees to offset lost revenue. DHS has chosen to prioritize fee waivers for humanitarian and protection-related immigration forms where the beneficiary may not have a reliable income or their safety or health is an issue, and naturalization and citizenship-related forms to make naturalization accessible to all eligible individuals.[170] DHS notes that the process for assessing fee-waiver eligibility is generally designed for individuals, not organizational petitioners for O and P nonimmigrants because their ability to pay cannot be assessed under those guidelines (*e.g.,* receipt of a means-tested benefit, or household income below 150% of the FPG). *See* 8 CFR 106.3(a)(1)(i).

*Comment:* A commenter expressed concerns about the increasing frequency of fee waivers because it is possible for some applicants to obtain fee waivers through different forms and multiple filings. The commenter also asserted that applicants abuse fee waivers, reasoning that some individuals file multiple application types and request a fee waiver for each application to avoid

paying fees. Considering these concerns, the commenter recommended that no fee waivers be given for Forms N–400 and N–600.

*Response:* DHS believes the commenter's concern is unfounded. As discussed in Section IV.E.7 of this preamble, fees waiver requests, approvals, and foregone revenue have remained consistent over the last 10 years, and they are currently well below levels in FY 2015–17. *See* Table 6. DHS disagrees that an applicant seeking multiple fee waivers for different applications constitutes "abuse" because each subsequent form is required to be accompanied by its own fee waiver request, and each fee waiver request is considered on its own merits. Multiple fee waiver requests may reflect an ongoing inability to pay due to legitimate reasons such as low income or disability, which must be documented in each request.

*Comment:* A commenter stated that fee waivers should not be available for naturalization-related applications because U.S. citizenship is a privilege, not a right.

*Response:* DHS disagrees with the premise of this comment. The INA provides for the statutory, nondiscretionary right to apply for naturalization. *See* INA secs. 316, 319, 328, and 329; 8 U.S.C. 1427, 1430, 1439, and 1440. DHS acknowledges the advantages that new citizens obtain with naturalization, but also recognizes the significant benefits that the United States obtains from the naturalization of new citizens.[171] In maintaining fee waivers and reduced fees for naturalization-related applications, DHS seeks to promote naturalization and immigrant integration.[172] Because applicants may be unable to pay at the time of naturalization, USCIS believes that continuing to allow naturalization applicants to request fee waivers is in the best interest of the program and consistent with the statute.

*Comment:* One commenter stated there should be no full fee waivers for individuals who are not asylum, VAWA, T visa, or U visa-based requesters. The commenter expressed support for reduced fees but reasoned that it would cause USCIS to continue dedicating extra time and resources to verify and review the request for reduced fees. The commenter suggested that, if USCIS must keep fee waiver options for forms like the N–400 then it

should temporarily cancel the option for 1 year to see if it results in a decrease in filings. The commenter reasoned that, if there were a decrease, this would allow USCIS time to adjudicate current backlogs and recoup the full amount of fees for all new filings, and if there was a minimal decrease, it would inform future discussion of minimizing fee waivers.

*Response:* DHS disagrees with the commenter's proposal to limit full fee waivers to certain humanitarian categories and exclude others. DHS believes that there are equally deserving humanitarian categories, including refugees, Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act (HRIFA) adjustment applicants, Special Immigrant Afghans and Iraqis, SIJs, and TPS recipients. Furthermore, in recognition of the benefits that the United States receives when immigrants naturalize, DHS believes that waived and reduced fees should be available to all naturalization applicants regardless of class of admission. DHS disagrees with the commenter's rationale for temporarily suspending Form N–400, Application for Naturalization, fee waivers because this would arbitrarily burden immigrants who have recently become eligible for naturalization but do not have the funds to pay the fee. In FY 2021, USCIS waived 39,738 fees for Form N–400s and approved 2,606 reduced-fee requests, so DHS anticipates that a similar number of applicants would be prevented from applying for naturalization were it to temporarily suspend fee waivers and reductions for the Form N–400. Instead of limiting fee waivers for Form N–400, DHS has decided to raise the income threshold to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). As for the commenter's assertion that suspending fee waivers and reductions would allow USCIS to decrease its backlog, we believe this would only result in a surge of Form N–400 filings once fee waivers and reductions were reinstituted. The commenter is correct that USCIS dedicates time and resources to review requests for fee waivers or reduced fees, but that effort is necessary and valuable for enabling low-income applicants to access immigration benefits, while also ensuring that only those who meet the requirements have their fees waived. On March 29, 2022, USCIS announced new actions to reduce backlogs, and announced that the Form N–400 cycle time goal is 6 months.[173] In FY 2023,

---

[170] *See* E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

[171] *See* Holly Straut-Eppsteiner, Cong. Research Servs., R43366, "U.S. Naturalization Policy," (May 2021), *https://crsreports.congress.gov/product/pdf/R/R43366.*

[172] This is also consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

[173] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Announces New Actions to Reduce Backlogs, Expand Premium

HR-1 FRN 2025 AR-000069

**Appx-000094**

USCIS greatly improved Form N–400 processing times to 6.3 months from 11.5 months in FY 2021.[174]

### 3. Eligibility

### a. Means-Tested Benefits

*Comment:* Noting that the proposed rule would accept a child's receipt of public housing assistance as evidence of the parent's eligibility for a fee waiver when the parent resides in the same residence, commenters wrote that the proposal is limiting and requested that USCIS include a child's receipt of other means-tested benefits, including Medicaid, Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF), and Supplemental Security Income (SSI) as acceptable evidence. A couple of these commenters stated that all other qualifying means-tested benefits programs similarly screen for financial hardship and inquire about assets and income for the applicant's household, and therefore any household member's receipt of a means-tested benefits should have the same probative value as a child's receipt of public housing assistance for fee waiver eligibility. One commenter said broadening the criteria for fee-waiver eligibility based on means-tested benefits will save USCIS time and effort adjudicating fee waiver requests and training staff, as evidence of receipt of means-tested benefits is often simpler to review than evidence of an entire household's income or financial hardship. Another commenter concluded that DHS has not provided a reasoned explanation of its choice to treat various public benefits differently. One commenter stated that in many cases only the applicant's child meets the criteria for a public benefit.

*Response:* After considering the comments on the proposed rule, DHS has decided to modify the instructions for Form I–912 to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. That would entail public housing assistance, Medicaid, SNAP, TANF, and SSI, although DHS is not codifying specific means-tested benefits

and will implement those as examples in guidance through the updated Form I–912 instructions. DHS has decided to limit this policy to household spouses and children because other household members' eligibility for certain means-tested benefits may not reflect the financial need of the fee waiver requestor. For example, for SSI purposes an individual's deemed income only includes the income of their spouse and parents with whom they live and their Form I–864 sponsor.[175] USCIS retains the discretion to determine whether any requestor is eligible for a fee waiver, including whether the means tested benefit qualifies as provided in 8 CFR 106.1(f) and the Form I–912 form instructions.

*Comment:* A commenter recommended that USCIS expand evidence of receipt of means-tested benefits to include a benefits card, in lieu of the current requirements for a formal letter, notice, or other official documents. The commenter said this change would alleviate the administrative burden to those who would have to otherwise spend hours struggling to obtain a formal notice of receipt.

*Response:* DHS already accepts a benefits card as evidence of a means-tested benefit if the card shows the name of the benefit recipient, the name of the agency granting the public benefit, the type of benefit, and that the benefit is currently being received.[176] While it is unfortunate that not all benefit cards provide information about dates of receipt for the benefit, DHS believes that without this information a benefits card is not sufficient evidence that the fee waiver requestor currently receives the benefit.

### b. Household Income at or Below 150 Percent FPG, and Suggested Income Levels

*Comment:* Some commenters wrote that they supported that DHS will continue to use the FPG to determine income thresholds for fee waiver purposes because it is a recognized national standard also used by other Federal programs.

*Response:* DHS appreciates the support and will continue to use the FPG as one means of assessing inability to pay.

*Comment:* Some commenters generally stated that the income eligibility limit for a fee waiver at 150 percent of FPG is too low or should be reconsidered. Multiple commenters suggested that USCIS increase the income threshold to establish an inability to pay to at or below 200 percent of the FPG, with some providing the following rationale:

• This would expand eligibility for those who earn too much to qualify for a fee waiver but too little to be able to afford the proposed fees.

• This would more accurately reflect the realities of low-income individuals, particularly as this rule seeks significant increases for fees for integral applications, such as employment authorization, permanent residence, and family petitions.

• This would impact a significant portion of the community of low-income immigrants. In 2019, immigrants who were at 150 percent to 199 percent of the Federal poverty level constituted one-third, or 4,503,000, of all low-income immigrants in the country.

• This would take into consideration applicants in states such as California, where cost of living and the poverty threshold for public benefit programs are higher.

• Survivors of domestic violence, sexual assault, and human trafficking may have a household income that puts them over 150 percent of the FPG, but they may face economic obstacles due to their victimization that impede their ability to pay immigration filing fees.

• This would be consistent with the income guidelines that federally funded legal aid agencies use per the Legal Services Corporation's regulations.

Other commenters recommended that DHS increase the eligibility threshold to at or below at least 300 percent of FPG. The commenters said there are people who would not qualify under the proposed rule's criteria and examples for "financial hardship" and are excluded from waived or reduced fees because they make a little more than 200 percent of FPG, despite their

---

[175] Soc. Sec. Admin., "Understanding Supplemental Security Income, What Is Income?" (2023), *https://www.ssa.gov/ssi/text-income-ussi.htm* (last visited Aug. 21, 2023).

[176] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Fee Waiver," *https://www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-fee-waiver* (last updated Oct. 31, 2023); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Policy Memorandum, PM–602–0011.1, "Fee Waiver Guidelines as Established by the final rule of the USCIS Fee Schedule; Revisions to Adjudicator's Field Manual (AFM) Chapter 10.9, AFM Update AD11–26" (Mar. 13, 2011), *https://www.uscis.gov/sites/default/files/document/memos/FeeWaiverGuidelines_Established_by_the_Final%20Rule_USCISFeeSchedule.pdf*; U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Instructions for Request for Fee Waiver 5 (Sept. 3, 2021), *https://www.uscis.gov/sites/default/files/document/forms/i-912instr.pdf*.

Processing, and Provide Relief to Work Permit Holders" Mar. 29, 2022, *https://www.uscis.gov/newsroom/news-releases/uscis-announces-new-actions-to-reduce-backlogs-expand-premium-processing-and-provide-relief-to-work.*

[174] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Historical National Median Processing Time (in Months) for All USCIS Offices for Select Forms By Fiscal Year," *https://egov.uscis.gov/processing-times/historic-pt* (last visited Aug. 18, 2023).

**6258**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

economic struggles and bona fide "inability to pay" for current immigration fees, let alone the proposed fee increases for citizenship, adjustment of status, and other benefit requests.

*Response:* DHS acknowledges that certain individuals may continue to face difficulty paying immigration fees despite having a household income that is above 150 percent of the FPG. However, DHS declines to further raise the income limit for fee waivers because increasing the number of requests that do not pay fees would require even greater fee increases for other fee-paying individuals, many of whom already face significant increases in fees with this new rule. Otherwise, USCIS' ability to maintain services and improve backlogs would be limited. However, DHS notes that the current fee rule contains several provisions that lessen the burdens for low-income filers. First, there are other ways of demonstrating inability to pay besides household income. An individual may demonstrate inability to pay if they or their spouse or child living in the same household are currently receiving a means-tested benefit, despite having household income over 150 percent of the FPG. *See* 8 CFR 106.3(a)(1)(i)(A). DHS fee waiver guidance provides that USCIS will accept Federal, State, or locally funded mean-tested benefits. Income limits for certain means-tested benefits vary by State and account for different costs of living.[177] DHS also accepts various forms of financial hardship as evidence of inability to pay. *See* 8 CFR 106.3(a)(1)(i)(C). In addition, DHS has significantly expanded the forms that are now fee exempt, which includes benefits for victims of trafficking, violent crimes, and domestic violence. *See* Table 5B. These requestors will not be required to request a fee waiver for certain forms. Finally, as explained in section II.C.13 of this preamble, DHS has significantly expanded the income limit under which N–400 applicants qualify for a reduced fee from the originally proposed 200 percent limit to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii).

*Comment:* Some commenters recommended adopting the Department of Housing and Urban Development (HUD)'s measure of Median Family Income (MFI) instead of the FPG to assess fee waiver eligibility based on household income. The commenters said HUD's approach is more realistic and equitable in determining who has

an inability to pay because it considers how an individual's geographic location impacts their cost of living, whether they live in real poverty, and, ultimately, their ability to afford an immigration benefit. The commenters disagreed with DHS's rationales for using the FPG: (1) having a consistent national standard, (2) maintaining consistency between fee waiver eligibility and other Federal programs, and (3) avoiding confusion. Commenters asserted that having a consistent national standard "is not a justification but instead a reason for questioning its use;" that the MFI is consistent with HUD's Federal programs and benefits; that receipt of means-tested HUD benefits can demonstrate inability to pay under DHS's other criteria; and that any potential confusion of switching to MFI could be addressed through training and public education campaigns.

Other commenters did not specifically advocate for MFI, but generally stated that USCIS should assess inability to pay based on a requestor's location and the high cost of living in certain areas of the country. Another commenter stated that USCIS should use more accurate means-tested standards without identifying why the current standards are inaccurate or recommending specific alternative standards.

*Response:* DHS recognizes that the cost of living in certain areas of the country is greater than in others, and therefore people with equal household incomes may face varying difficulty paying immigration fees due to their geographic location. However, DHS believes that this concern is mitigated by allowing receipt of a means-tested benefit to show inability to pay since, as commenters note, the income thresholds for some means-tested benefits vary by State and locality. Therefore, individuals who qualify for a means-tested benefit due to their higher cost of living may still qualify for a fee waiver, even if their household income is above 150 percent of the FPG. This concern is also mitigated for residents of Alaska and Hawaii, who have unique FPG charts.[178]

DHS believes that the benefits of using FPG outweigh those of HUD's median family income (MFI) when assessing an individual's ability to pay. Despite comments to the contrary, DHS believes it is important to have a consistent national standard for the

income threshold. Relying on a single, uniform standard reduces administrative costs in comparison to HUD's MFI, which would require requestors, legal service providers, and adjudicators to calculate fee waiver eligibility based on geographic area. Requestors often change their geographic location between filing for immigration benefits, and a consistent national standard would avoid potentially complicated inquiries into which geographic location is more appropriate in assessing their ability to pay. A consistent national standard also removes the incentive to misrepresent one's address to obtain a fee waiver. While DHS recognizes that MFI is used effectively for administering HUD's Federal programs and benefits, Department of Health and Human Services' (HHS) FPG is used more broadly throughout the Federal Government.[179] Using FPG also promotes internal consistency within USCIS since this measure is statutorily required for other eligibility determinations. *See* INA secs. 204(f)(4)(A)(ii) and 213A(h), 8 U.S.C. 1154(f)(4)(A)(ii) and 1183a(h). While DHS acknowledges that it is possible to mitigate confusion through training and public engagement, a more complicated legal determination will still tend to result in a higher rate of erroneous or lengthy filings and adjudications. Noting that many low-income requestors may lack access to legal assistance and face additional barriers to properly filing immigration forms, DHS believes that this population is better served by keeping the fee waiver process simple by using the FPG. Finally, DHS notes that using HUD MFI by State or county would not guarantee equitable results, since the cost of living can vary greatly within individual States and counties.

*Comment:* A commenter asked USCIS to begin using the Supplemental Poverty Measure (SPM) instead of the Federal Poverty Level (FPL) to determine who qualifies for a fee waiver, without explaining why the SPM is preferable. The commenter recommended that fee waivers be made available to any household earning less than 200 percent of the SPM.

*Response:* DHS declines to adopt the SPM for assessing eligibility for fee waivers because the SPM was not designed as a tool for assessing individual eligibility for public benefits. "The SPM is considered a research

---

[177] *See, e.g.,* Am. Council on Aging, "Medicaid Eligibility Income Chart by State", July 2023, *https://www.medicaidplanningassistance.org/ medicaid-eligibility-income-chart/* (last updated July 10, 2023).

[178] U.S. Dept of Health & Human Servs., "HHS Poverty Guidelines for 2023," *https://aspe.hhs.gov/ topics/poverty-economic-mobility/poverty- guidelines* (last visited Aug. 21, 2023).

[179] *See, e.g.,* Inst. for Research on Poverty, "What Are Poverty Thresholds And Poverty Guidelines?," *https://www.irp.wisc.edu/resources/what-are- poverty-thresholds-and-poverty-guidelines/* (last visited Aug. 14, 2023).

HR-1 FRN 2025 AR-000071

**Appx-000096**

measure, because it is designed to be updated as techniques to quantify poverty and data sources improve over time, and because it was not intended to replace either official poverty statistics or eligibility criteria for anti-poverty assistance programs." [180] Determining whether a particular individual falls above or below the SPM would require a complex calculation of numerous factors that would increase administrative costs and be susceptible to error.[181]

*Comment:* A commenter noted that even though there is no requirement that an individual submit their taxes, USCIS routinely denies fee waivers based on applicants' statements, where taxes are unavailable, or where the taxes indicate the applicant is under the poverty threshold. Another commenter similarly stated that, in practice, fee waivers are mostly denied when sending in pay stubs or W–2 forms. The commenter further remarked that fee waiver adjudicators routinely request only a tax return be submitted to establish income. The commenter stated that the rule should more explicitly clarify that there is no requirement to submit a tax return to document fee waiver eligibility.

*Response:* DHS declines to modify the rule as recommended by the commenter because it is unnecessary. Per the revisions to Form I–912 published with this rule, an individual requesting a fee waiver may establish their household income through different forms of documentation, including Federal income tax returns, a W–2, or paystubs. USCIS denies fee waiver requests that are incomplete and does not issue RFEs for Form I–912. In FY 2022, USCIS approved 84 percent of fee waiver requests (448,702 out of 532,417). *See* Table 6.

c. Financial Hardship

*Comment:* A commenter remarked that fee waivers are "almost impossible" to obtain based on hardship, regardless of the quality or amount of documentation submitted to support such a request. Another commenter stated that requests for fee waivers

based on "financial hardship" for low-income and no-income individuals have been universally denied, without clarity provided as to the specific reasons for denial or what evidence would be considered sufficient.

*Response:* Although USCIS does not have approval or rejection data related to the specific criteria for fee waivers, DHS notes that in FY 2022, USCIS approved 84 percent of fee waiver requests (448,702 out of 532,417). *See* Table 6. To help prevent erroneous denials of fee waiver requests based on financial hardship, the revised Form I–912 contains a non-exhaustive list of examples of causes of financial hardship. DHS intends to issue guidance clarifying that the burden of proof for inability to pay is a preponderance of the evidence, and that an officer may grant a request for fee waiver so long as the available documentation supports that the requestor is more likely than not unable to pay the fee. USCIS regularly trains its staff to avoid erroneous denials of fee waiver requests.

*Comment:* A commenter supported the proposal to provide USCIS officers a larger, non-exhaustive list of circumstances that may constitute a financial hardship. The commenter stated that its staff often receive fee waiver denials despite having provided evidence that clearly points to a significant financial hardship. The commenter said that, by adding such obvious forms of hardship as "significant loss of work hours and wages," "natural disaster," and "victimization," DHS will provide much-needed guidance to both applicants and USCIS officers. In addition, the commenter stated that the proposal to include a catch-all category of hardship for "[s]ituations that could not normally be expected in the regular course of life events" will also provide applicants a more reliable basis on which to demonstrate that a particular event has led to hardship.

Another commenter also supported the proposed rule's suggested evidence of financial hardship, including an affidavit from a religious institution, nonprofit, hospital, or community-based organization verifying the person is currently receiving some benefit or support from that entity and attesting to the requestor's financial situation. The commenter recommended that such affidavits include those from legal aid agencies serving low-income populations, documenting their assessment that a requestor is low-income with minimal assets and consequently eligible for their free legal services. In addition, the commenter

said the term "support services" should be understood to include such legal services, as many legal aid agencies provide holistic services, which include helping clients access public benefits, health care, and housing. Moreover, the commenter said including legal services as "support services" would lead to more consistent adjudication of fee waiver requests for low-income applicants.

*Response:* DHS notes that, the current, proposed, and final instructions for Form I–912 permit that an affidavit describing the person's financial situation from a legal aid agency serving low-income populations may be acceptable evidence of a requestor's financial situation if they lack income. *See* 88 FR 402, 458 (Jan. 4, 2023) ("If the requestor is receiving support services, an affidavit from a religious institution, nonprofit, hospital, or community-based organization verifying the person is currently receiving some benefit or support from that entity and attesting to the requestor's financial situation.").

*Comment:* One commenter suggested that mental or physical illness impacting an applicant's ability to work and pay the filing fee be explicitly included as a factor or incorporated into the proposed factors of "victimization" or "situations that could not normally be expected in the regular course of life events." Otherwise, the rule could be read to exclude illnesses causing serious financial hardship and inability to pay filing fees if they are not an "emergency or catastrophic."

*Response:* Upon further review, DHS has incorporated this recommendation into the revised Form I–912 instructions. DHS believes that a mental or physical illness that impacts an individual's ability to work may amount to a similar level of financial hardship (depending on the individual's household income, financial assets, and other factors) as other examples listed in the form instructions, and therefore may qualify as a financial hardship with documentation of inability to work and information on income.

d. Other/General Comments on Criteria and Burden of Proof

*Comment:* Several commenters stated that there are many people who do not qualify for fee waivers and do not have the financial means to afford the fees. Another commenter said, at a minimum, USCIS should offset the proposed fee increases by raising the eligibility threshold for fee waivers, and then provide means-tested fee waivers. Additionally, an individual commenter stated that underprivileged families

---

[180] Joseph Dalaker, Cong. Research Serv., R45031, "The Supplemental Poverty Measure: Its Core Concepts, Development, and Use," (July 19, 2022), *https://crsreports.congress.gov/product/pdf/R/ R45031#:~:text=The%20Supplemental%20 Poverty%20Measure%20(SPM,a%20specified %20standard%20of%20living.*

[181] *See generally* Joseph Dalaker, Cong. Research Serv., R45031, "The Supplemental Poverty Measure: Its Core Concepts, Development, and Use," (July 19, 2022), *https:// crsreports.congress.gov/product/pdf/R/R45031#:~: text=The%20Supplemental%20Poverty%20 Measure%20(SPM,a%20specified%20standard%20 of%20living.*

HR-1 FRN 2025 AR-000072

should only have to pay a reduced fee or be given a fee waiver.

*Response:* DHS acknowledges commenters' concerns and believes that this final rule contains multiple provisions that increase the availability of fee waivers and reductions for those unable to pay. The rule codifies DHS policy guidance that a requestor will generally be found unable to pay if they receive a means-tested benefit, have a household income below 150 percent of the FPG, or are experiencing financial hardship. *See* 8 CFR 106.3(a)(1)(i). As discussed above, this rule broadens the ways that a requestor can establish eligibility through a fee waiver by allowing a household child's receipt of certain means-tested public benefits to demonstrate the parent's inability to pay. The final rule reduces the N–400 fee for applicants whose household income is less than or equal to 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). The revised Form I–912 offers additional guidance on the types of evidence of financial hardship, which DHS believes will provide flexibility and reduce the burden for individuals seeking fee waivers. The form also clarifies when certain household members' income will not be considered in assessing whether a requestor is unable to pay. The final rule further addresses individuals' inability to pay by increasing the number of forms that are fee exempt. *See* Table 5B.

*Comment:* A couple of commenters supported DHS continuing to base inability to pay on a "range of evidentiary standards," including means-tested benefits, household income using the FPG, or financial hardship, but said such standards should not be applied categorically and must come with adequate guidance. The commenters said the current regulation provides insufficient guidance regarding evidence, given that many applicants for fee waivers are unlikely to have significant evidence, or the type of evidence USCIS requests to prove lack of income (as proving lack of income involves proving a negative). They said DHS should continue to allow officers to grant a request for a fee waiver in the absence of some of this documentation so long as the available documentation supports that the requestor is more likely than not unable to pay the fee, as allowed under the preponderance of the evidence standard. One of these commenters said more guidance should be provided regarding documentation, including training officers in the types of situations that, while they may not lend to written evidence that can be submitted to USCIS, support the need for a fee waiver as well as the

underlying humanitarian claim. The commenter said DHS should not only provide a list of possible evidence that includes both common proofs of financial need, such as taxes, pay stubs, and bills, but also informal types of acceptable evidence, such as written letters from roommates, affidavits from social or legal services organizations that condition services on lack of income, handwritten bills, and the like. Moreover, the commenter said DHS should also provide clear instructions that an officer can or should waive a fee upon a sworn statement from the applicant that they are a victim of abuse or exploitation. Another commenter said the rule should specify preferred and alternative types of evidence rather than mandatory evidence. Another commenter suggested USCIS clarify in the form instructions and guidance that these documents are non-exhaustive and that USCIS will consider other relevant evidence. A commenter stated fee waivers should be readily accessible with reasonable documentary requirements but did not specify what requirements they recommend.

*Response:* Under the current fee rule and USCIS policy, no type of evidence is categorically required to show eligibility for a fee waiver. The rule provides three different means of establishing inability to pay, *see* 8 CFR 106.3(a)(1)(i), and the Form I–912 instructions offer multiple examples of evidence that can be submitted in support of a fee waiver request. USCIS guidance will clarify that individuals seeking a fee waiver only have to establish eligibility by a preponderance of the evidence. *See* 88 FR 402, 458 (Jan. 4, 2023). However, DHS declines to adopt the commenter's recommended language that certain required documents are non-exhaustive, as this would be inappropriate for certain ways of proving inability to pay. For example, to confirm receipt of a means-tested benefit, a requestor is required to submit documentation that they are currently receiving a means-tested benefit that includes their name, the agency granting the benefit, type of benefit, and indication that the benefit is currently being received.

*Comment:* A couple of commenters wrote that they supported the implementation of more descriptive guidelines for the information collection requirements for the Form I–912. One commenter remarked that the new requirements are more realistic and flexible for applicants, reasoning that lower income applicants run into challenges when collecting documentation to support their fee waiver, for example by lacking a safe

place to store confidential information. The commenter further remarked that, coupled with the preponderance of the evidence standard, evidentiary guidance will also help potential applicants understand upfront whether they qualify for a fee waiver. Another commenter agreed with DHS broadening the list of documents that are sufficient to show that a person does not have any income—a circumstance that is frequently difficult to document— because it will reduce the documentary burden on applicants in the most precarious financial situations, while also reducing the burden on USCIS to review repeated fee waiver requests after denials.

*Response:* DHS appreciates the commenters' feedback.

*Comment:* A commenter stated that, while USCIS may waive the fee for certain immigration benefit requests when the individual requesting the benefit is unable to pay the fee, the rules provide no certainty even when the applicant provides the very types of inability-to-pay information identified in the regulations—applicants are merely "eligible" for a fee waiver if they meet the criteria. The commenter asked USCIS to modify the rule to clarify that "evidence of any of the three grounds is conclusive proof of eligibility for a fee waiver."

*Response:* DHS understands that the commenter wants more certainty for when a requestor will or will not have their fee waived, but we decline to adopt the commenter's proposal to treat any evidence of one of the three grounds as conclusive proof.

Even though the fee statute does not mention fee waivers, DHS has interpreted the discretion it vests in the agency to allow fee exemptions or waivers subject to certain conditions or criteria. Section 245(l)(7) of the INA requires DHS to permit certain requestors (those applying "for relief through final adjudication of the adjustment of status for a VAWA self-petitioner and for relief under sections 1101(a)(15)(T), 1101(a)(15)(U), 1105a, 1229b(b)(2), and 1254a(a)(3) of [Title 8]") to "*apply for*" fee waivers. 8 U.S.C. 1255(l)(7) (emphasis added). The statute, however, does not specify any standard for approving applications for such discretionary waivers.

In this rule, discretionary waivers of fees are limited to situations where the party requesting the benefit is unable to pay the prescribed fee. 8 CFR 106.3(a)(1)(i). A person can demonstrate an inability to pay the fee by establishing receipt of a means-tested benefit at the time of filing, household income at or below 150 percent of the

FPG at the time of filing, or extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee. 8 CFR 106.3(a)(1)(i). Finally, a person must submit a request for a fee waiver on the form prescribed by USCIS in accordance with the instructions on the form. 8 CFR 106.3(a)(2).

USCIS generally applies a burden of proof of preponderance of the evidence for the information provided with immigration benefit requests.[182] While DHS has increased the availability of fee waivers and clarified their requirements in this rule, it remains the requestor's burden to establish that they are more likely than not eligible for a fee waiver. *See* 88 FR 458. Because the fee statute does not specify any standard for approving applications for such discretionary waivers, DHS will retain the ability to determine that an individual who meets the eligibility requirements for a fee waiver does not merit a waiver in the exercise of discretion. *See* 8 CFR 106.3(a).

*Comment:* Commenters stated that DHS should modify its rules so that a fee waiver request would be automatically approved if not decided within 45 days.

*Response:* DHS declines to impose the commenter's deadline on USCIS adjudication of fee waiver requests. Imposing an arbitrary deadline on fee waiver reviews would require USCIS to allocate limited resources to prioritize fee waiver requests above most other adjudicative actions to prevent lost revenue and risk its ability to maintain adequate service levels. USCIS must retain the flexibility to assign resources where they are needed. Although USCIS received 532,417 fee waivers in FY 2022, an average of over 2,000 per workday, most fee waivers are adjudicated within 8 to 10 days at the Lockboxes and 90 percent are completed within 15 days. DHS acknowledges that some fee waiver requests took longer to adjudicate during the COVID–19 pandemic, but DHS is working diligently to deliver timely service.

*Comment:* Multiple commenters said fee waiver eligibility based on the stipulated bases should be incorporated into the regulatory text. A commenter said the preamble recites the current three grounds for fee waivers since 2010 but the actual proposed code section

only refers to inability to pay and does not specify these specific grounds. To prevent future confusion or interpretations, the commenter said the three grounds should be mentioned in the code itself since the preamble is not legally enforceable. Likewise, another commenter recommended that USCIS include the standards in the final rule so that they are codified and less susceptible to being modified by a future administration. The commenter said doing so would also formalize the adoption of such standards, which have been in use for over a decade. A commenter asked USCIS to incorporate the eligibility criteria into the Policy Manual at Volume 1, Part B, Chapter 4, as well as the proposed regulations.

*Response:* After considering the public comments, DHS has decided to codify the three means of demonstrating eligibility for a fee waiver at 8 CFR 106.3(a)(1)(i). USCIS intends to update the Policy Manual to reflect this when the final rule takes effect. However, while meeting any of the three criteria will make a requestor presumptively eligible for a fee waiver, USCIS will still retain the discretion to approve or deny a fee waiver. Denial of a fee waiver will result in rejection of a benefit request and neither the fee waiver denial nor the rejection may be appealed.

*Comment:* A commenter suggested that USCIS include receipt of financial aid through the Free Application for Federal Student Aid (FAFSA) as an additional way to prove eligibility for a fee waiver.

*Response:* DHS declines to adopt the commenter's proposal because there are many types of student financial aid obtainable by filing the FAFSA that do not reflect significant financial need and may not meet the definition of means-tested benefit as stated in this final rule, *see* 8 CFR 106.1(f)(3), such as grants, merit scholarships, and student loans.[183]

*Comment:* Multiple commenters recommended that USCIS adopt an appeals or formal review process for fee waiver denials.

*Response:* DHS also declines to adopt an appeals process for fee waiver denials because this would compound the time and costs of adjudicating fee-waivers and require that additional costs be transferred to fee-paying requestors. Those who believe that their fee waiver request was wrongfully denied may refile their request.

### 4. Authority

*Comment:* One commenter recommended that USCIS limit the Director of USCIS' discretion to authorize additional fee waivers, as put forth in the 2019/2020 fee rule. The commenter remarked that limiting such discretion is necessary to limit "politically motivated abuse" of fee waiver eligibility policies and protect fee-paying applicants from unfair cost increases to cover such abuse.

*Response:* This rule retains the feature of the prior 2019/2020 fee rule that permits the USCIS Director to delegate the discretionary fee waiver authority only to the USCIS Deputy Director.[184] USCIS declines to adopt the additional restrictions on discretionary waiver authority that were contained in the 2019/2020 fee rule. The commenter did not cite any past examples of "politically motivated abuse" of this discretionary authority. DHS believes that maintaining the authority for this extraordinary relief with the leaders of USCIS, coupled with the requirement that the authority only be exercised when consistent with the law, will ensure that it is administered consistently, timely, and responsibly.

### 5. Requiring Submission of Form I–912

*Comment:* Multiple commenters expressed concern that requiring the Form I–912 and not allowing applicants to make the request for a fee waiver via a written request would create an additional burden for applicants. One commenter requested that fee waivers remain expansive such that any written requests remain permitted. Some commenters asserted that, if an individual can successfully demonstrate the need for the fee waiver via a written request, USCIS should continue to accept them, and that requiring Form I–912 reduces flexibility for applicants with special circumstances. One commenter asserted that there would be a substantial time burden to complete the Form I–912 in lieu of an affidavit regarding their client's income and expenses, while another commented referred to fee waiver process as long and difficult." Another commenter said that printing, translating, completing, and sending the form requires additional costs that applicants who are in financial need likely do not have. Another commenter added that certain requestors may lack access to printers, internet services, or other infrastructure. The commenter also stated that the proposed Form I–912 is a complex nine-page form, with eleven pages of

---

[182] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Policy Manual," Vol. 1, "General Policies and Procedures," Part E, "Adjudications," Chp. 4, "Burdens and Standards of Proof," *https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-4* (last updated Nov. 8, 2023).

[183] *See* U.S. Dep't of Educ., "Federal Student Aid, Types of Financial Aid: Loans, Grants, and Work-Study Programs," *https://studentaid.gov/understand-aid/types* (last visited Aug. 15, 2023).

[184] *Compare* 8 CFR 106.3(c), *with* 8 CFR 106.3(b) (Oct. 2, 2020).

HR-1 FRN 2025 AR-000074

instructions, and several of the form's questions may not apply to the requestor or require significant additional explanation that is better suited for an affidavit. The commenter added that requiring Form I–912 creates an unnecessary burden on pro se survivors, survivors with limited English proficiency, and high caseload service providers. A different commenter said the proposal places an undue burden especially on the most vulnerable groups who would otherwise qualify for immigration benefits. Other commenters said that requiring Form I–912 would disproportionally affect pro se applicants and those with limit English skills, and therefore allowing fee waiver requests without Form I–912 would align more closely with the "inability to pay" standard. Another commenter predicted that the proposed rule would require USCIS to scan and review extra pages of the Form I–912, and that USCIS would incur significant mailing costs due to rejections resulting from confusion around the complex form. One commenter asserted that allowing individuals to request a fee waiver via written request instead of Form I–912 would address the burden of COVID–19 on undocumented and immigrant communities that require access to forms to receive USCIS benefits.

*Response:* After considering public comments in response to the proposed requirement to submit Form I–912, DHS will continue to allow written statements in lieu of submitting Form I–912. DHS acknowledges that requiring submission of Form I–912 could create an additional burden on certain requestors, particularly those struggling financially. *See* 88 FR 402, 458 (Jan. 4, 2023).

DHS also recognizes that some requestors may experience an extra burden due to that printing, translating, completing, and sending the form requires additional costs that applicants, particularly those who are struggling financially. DHS also recognizes these applicants may need additional flexibilities, which may improve access to immigration benefits consistent with E.O. 14012, 86 FR 8277 (Feb. 5, 2021). Because less than one percent of fee waivers currently are requested by written request instead of Form I–912, it is unlikely that continuing to allow written requests will significantly impact USCIS operations. *See* 88 FR 402, 458 (Jan. 4, 2023). For these reasons, this final rule maintains the current effective regulation that allows requestors to obtain a fee waiver by written request without filing Form I–912.

*Comment:* In response to the proposed rule's statement that more than 99 percent of fee waiver requested are submitted with Form I–912, multiple commenters stated it is preferable that the remaining requestors receive an RFE instead of a denial. These commenters suggested that these RFEs be accompanied by information related to the Form I–912 "as a means of proactively addressing potential confusion" regarding eligibility criteria. The commenters stated that this would be more consistent with E.O. 14012 and better facilitate access to immigration benefits.

*Response:* For the reasons noted previously, this final rule allows submission of fee waiver requests via written request instead of using Form I–912. However, DHS will not issue RFEs in response to insufficient fee waiver requests. Holding and monitoring cases where an RFE was sent for a timely response would add burden to what is an already burdensome process for USCIS. USCIS will continue to review training and decision notices to improve adjudications of fee waivers and provide additional information for requestors.[185]

*Comment:* Multiple commenters recommended improvements to the Form I–912. One commenter stated that the form is inefficient and suggested reducing the number of unused pages by making them attachments rather than sections. Another commenter recommended that USCIS eliminate questions on the Form I–912 that are not relevant to fee waiver eligibility and ensure that supporting documentation is considered liberally. For example, the commenter suggested two questions be eliminated: Part 1, Question 2, which requests the applicant's immigrant or non-immigrant status; and Part 2, Question 6, which requests the applicant's Social Security number.

*Response:* DHS appreciates commenters' feedback regarding the length of Form I–912, Request for Fee Waiver. Depending on their ground of eligibility, as indicated on the form and instructions, requestors do not need to fill out every section of Form I–912. However, DHS does not believe that these unused sections, which can be easily skipped, create a substantial paperwork burden for requestors. Requiring requestors to locate and attach a separate addendum depending on their ground of eligibility could create a greater paperwork burden. DHS

notes that immigration status is relevant to eligibility because, for example, some fee waivers are specific to the requestor's immigration status. USCIS is revising the USCIS Form I–912 to reduce the time and cost burden to respondents. The Social Security number data field will be removed as part of those edits. DHS believes that a requestor's Social Security number no longer serves a purpose because Internal Revenue Service (IRS) tax return and tax account transcripts redact the filer's Social Security number. For further information on compliance with the Paperwork Reduction Act, see Section V.J of this preamble.

*Comment:* Another commenter wrote that low-income naturalization applicants who currently require a fee waiver are barred from applying for naturalization online because the Form I–912 cannot be filed online. The commenter stated as a matter of equity, both online and paper filings should be available to everyone, regardless of their income status. The commenter concluded that without an option for online filing of the Form I–912, paper filings for the Form N–400 would continue to cause inefficiencies.

*Response:* USCIS continues to work on incorporating Form I–912 and all forms into its online filing platforms.

*Comment:* A commenter stated that the Form I–912 is not statutorily required. The commenter further remarked that USCIS does not point to evidence that requiring Form I–912 for fee waiver requests produce more consistent results or relevant evidence in assisting fee waiver determinations.

*Response:* For the reasons noted previously, this final rule allows submission of fee waiver requests via written request instead of using Form I–912. With regards to the assertions made by the commenter, DHS notes the following: The INA authorizes the Secretary to "prescribe such forms of [...] papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority." INA sec. 103(a)(3), 8 U.S.C. 1103(a)(3). The Form I–912 and other USCIS forms are used to solicit information relevant to benefit requests and facilitate standardized adjudication in a timely manner. As previously indicated, most requestors submit Form I–912 to request fee waivers. A 2019 paper showed that standardization of the fee waiver for citizenship applications in 2010 raised naturalization rates among low-income immigrants, and these gains were particularly sizable among those

---

[185] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Reduced Fee Request," *https://www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-reduced-fee-request* (last updated Oct. 31, 2023).

immigrants who typically face higher hurdles to accessing citizenship.[186]

*Comment:* A commenter recognized the need to create a more uniform policy for adjudicating requests for fee waivers. However, the commenter expressed concern that the list of expenses outlined in the Form I–912 fails to take into consideration necessary expenses often incurred by their clients and does not fairly represent their "inability to pay" the filing fees required. The commenter did not indicate what additional expenses should be included on the form.

*Response:* DHS interpreters this comment to refer to Part 6, Item 3 ("Total Monthly Expenses and Liabilities") of Form I–912. DHS notes that the list of expenses includes a check box for "other," and additional lines where requestors can list expenses not included in the list. Requestors can also include additional information about expenses in Part 11 ("Additional Information").

6. Evidence for VAWA, T, and U Requestors

*Comment:* Multiple commenters wrote in support of fee waivers for VAWA self-petitioners, as well as for T and U nonimmigrant status requestors. One commenter wrote that fee waivers help remove forms of coercion and control by human traffickers and abusive individuals by providing life-saving opportunities for victims of crime to escape these situations and access long-term stability. The commenter remarked that these benefits allow victims of crime to support law enforcement investigations that help prevent and punish serious crimes. Another commenter stated the importance of fee waivers as a tool for survivors to recover from financial abuse and that fee waivers make it possible for survivors to ensure their

safety or necessities when applying for immigration relief.

*Response:* DHS agrees that the availability of fee waivers and fee exemptions for vulnerable populations is important. DHS remains committed to the goals of its humanitarian programs and to providing fee waivers and fee exemptions for these populations as outlined in this final rule. *See* 8 CFR 106.3.

*Comment:* One commenter expressed support for USCIS' proposed clarification that an applicant is eligible for a fee waiver where they demonstrate inability to pay by a preponderance of the evidence. However, the commenter asked USCIS to adjudicate fee waiver requests for immigration benefits associated with or based on a pending or approved petition or application for VAWA benefits or T or U nonimmigrant status under the "any credible evidence" standard. The commenter concluded that the evidentiary standard for receipt of a fee waiver should not be more stringent than the evidentiary standard for the legal protections Congress created for survivors under VAWA and the Victims of Trafficking and Violence Protection Act of 2000 (VTVPA).

*Response:* DHS acknowledges the difficulties that VAWA, T, and U requestors may face in obtaining evidence in support of fee waiver requests, which is why DHS has increased the number of fee-exempt forms for these groups in the final rule. *See* Table 5B; 8 CFR 106.3(b). For these fee-exempt requests, VAWA, T, and U requestors do not need to sustain any burden of proof to avoid paying a fee, which is consistent with the VTVPA. However, DHS believes that "preponderance of the evidence" remains the appropriate standard for adjudicating other fee waiver requests by VAWA, T, and U requestors. Most USCIS fee waiver requests involve naturalization and citizenship-based applications (N-Forms), which are filed multiple years after the requestor has received their protection-based form of relief and obtained LPR status. Mindful

of the difficulties that victim-based categories may continue to face in obtaining evidence to support fee waiver requests, DHS has provided flexibilities for VAWA, T, and U populations in requesting fee waivers. For example, the revised Form I–912 instructions issued with this rule provide that if a household member is an abuser or human trafficker, then their income will not be included in measuring the requestor's household income. In addition, the instructions also list victimization as an example of financial hardship causing a requestor to be unable to pay. Further, if a VAWA, T, or U requestor is unable to obtain documentation, they can explain why and submit other evidence to demonstrate their eligibility as provided in the Form I–912 instructions. However, the burden of proof remains on the individual who is requesting a fee waiver and DHS will not presume that a benefit request that is not already exempt from a fee should automatically receive a fee waiver.

7. Cost of Fee Waivers

*Comment:* One commenter stated that, in recent years, USCIS has transferred significant costs to fee-paying applicants and beneficiaries as the result of an overbroad fee waiver policy, and estimated foregone revenue has increased significantly. The commenter said that, in this proposed rule, DHS did not report how much revenue USCIS anticipates foregoing because of fee waiver projections.

*Response:* DHS believes that continued fee waivers for certain populations provides a crucial avenue for those who would have otherwise not been able to submit a request. Table 6 below summarizes historical fee waiver volume. Contrary to the commenter's assertion, waived fees as a proportion of IEFA revenue has been stable over time, and current levels are significantly below those in FYs 2015–2017. This does not demonstrate an overbroad fee waiver policy where waived fees have increased significantly.

---

[186] Vasil Yasenov, et al., "Standardizing the fee-waiver application increased naturalization rates of low-income immigrants," 116 (34) Proc. Nat'l Acad. Sci. U.S. 16768 (2019).

Table 6. USCIS Fee Waiver Request Receipts, Approvals, and Denials, FY 2013 – FY 2022.[187]

| FY | Receipts | Approvals | Denials | Waived Fees Estimate[188] | Percentage of IEFA Revenue |
|---|---|---|---|---|---|
| 2013 | 541,329 | 403,227 | 138,063 | $222,833,915 | 9% |
| 2014 | 572,835 | 457,576 | 115,163 | $248,726,775 | 10% |
| 2015 | 638,793 | 518,777 | 119,935 | $283,162,095 | 10% |
| 2016 | 753,402 | 627,959 | 125,118 | $344,293,760 | 12% |
| 2017 | 684,675 | 588,732 | 95,200 | $367,914,465 | 11% |
| 2018 | 535,412 | 460,821 | 74,616 | $293,494,715 | 9% |
| 2019 | 481,068 | 410,485 | 70,583 | $254,200,885 | 8% |
| 2020 | 406,112 | 329,571 | 76,543 | $207,677,895 | 6% |
| 2021 | 441,184 | 369,948 | 71,241 | $229,415,245 | 6% |
| 2022 | 532,417 | 448,702 | 83,616 | $246,603,960 | 7% |

*Comment:* A commenter requested that USCIS ensure that fee-paying applicants do not bear the costs of immigration benefit requests where fee waivers are inappropriate or unnecessary. The commenter recommended that USCIS adopt a different approach, consistent with the "beneficiary-pays" principle, that considers whether a fee waiver is either statutorily required or otherwise appropriate given the nature of the immigration benefit sought, particularly whether such beneficiaries are subject to the public charge ground of inadmissibility. The commenter wrote that INA sec. 286(m), 8 U.S.C. 1356(m), does not require that DHS provide any services without charge, but that the

TVPRA requires DHS to permit fee waivers for certain applications. The commenter stated that USCIS should limit fee waivers to immigration benefits for which USCIS is required by law to consider a fee waiver, as was put forth in the 2019/2020 fee rule. They added that USCIS could allow fee waivers for humanitarian programs and applicants not subject to the public charge ground of inadmissibility or affidavit of support requirements under INA sec. 213A, 8 U.S.C. 1183a, including petitioners and recipients of Special Immigrant Juvenile (SIJ) classification and those classified as Special Immigrants based on an approved Form I–360. The commenter stated that USCIS should continue to preclude fee waivers from individuals that are required to have financial means for the status or benefit sought. Another commenter asserted that it is unfair that one out of eight petitions receive a fee exemption or waiver, and that humanitarian goals should be funded by Congress or DHS general appropriations rather than shifting lost revenue to other program fees.

*Response:* For reasons discussed in the proposed rule, *see* 88 FR 402, 424–426 (Jan. 4, 2023), and in section IV.C.4 of this preamble, DHS has decided to shift away from the beneficiary-pays model that was the primary objective of the 2019/2020 fee rule, and more toward the ability-to-pay approach that has historically guided USCIS fee schedules. While INA sec. 286(m), 8 U.S.C. 1356(m), does not require that DHS provide any services without charge, the statute contemplates that DHS would

regularly do so for asylees and similarly situated classes of applicants. DHS considers this to be the more equitable approach in setting fees. In deciding which forms should be eligible for a fee waiver, DHS considered whether each waiver is statutorily required or otherwise appropriate given the nature of the immigration benefit sought, including whether the requestor would be subject to the public charge ground of inadmissibility. A fee waiver is unavailable in the case of immigration benefit requests that require demonstration of the applicant's ability to support themself, or that are based on a substantial financial investment by the petitioner.[189] Most fee-waivable forms involve humanitarian immigration categories in recognition of the financial difficulties faced by members of these groups.[190] DHS has generally made citizenship and naturalization forms eligible for waived and reduced fees in recognition of the social and economic benefits that the United States receives from new citizens.

---

[187] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Use of Fee Waivers, Fiscal Year 2023 Report to Congress" (June 20, 2023), *https://www.dhs.gov/sites/default/files/2023-08/23_0727_uscis_use_of_fee_waivers_q1.pdf.* Not all fee waiver applications are adjudicated in the same fiscal year that they are received. Likewise, not all approvals and denials occur in the same fiscal year in which a fee waiver request is filed. Thus, the number of approvals and denials does not equal fee waiver request receipts.

[188] Note that the budgetary impact of fee waivers is less than the total amount of waived fees, as it would be unreasonable to expect the same volume of filings absent the availability of fee waivers. Available USCIS fee waiver data lack the granularity necessary to delineate waived fees in cases of forms with multiple filing fees. The higher fee is assumed to estimate the waived fees. Additionally, the fee schedule change in December 2016 and the timing of fee waiver approvals may slightly skew FY 2017 waived fee estimates because of fee waiver adjudication timeframes (see footnote 16). Finally, automatic biometric services fee waivers associated with underlying forms that require biometrics are not captured adequately and are underreported.

[189] In 2007, regulations considerably limited which application types could apply for fee waivers from almost all of them to roughly one-third of them. *See* 72 FR 29851, 29874 (May 30, 2007). DHS made no changes to the types of applications that could apply for fee waivers in the 2010 and 2016 fee rules.

[190] While fee waivers are not generally available in employment-based cases, due to the unique circumstances present in the CNMI, an exception is Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, for an employer to petition on behalf of CW–1 nonimmigrant beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI). *See* 74 FR 55094, 55098 (Oct. 27, 2009).

HR-1 FRN 2025 AR-000077

Appx-000102

8. Other Comments on Fee Waivers

*Comment:* A few commenters stated that the fee waiver process is lengthy or difficult. One commenter said that DHS should simplify the process for obtaining fee waivers to remove unnecessary barriers, without specifying how the process should be simplified or what barriers should be removed. Another commenter stated that the process of obtaining the requisite documentation to file a fee waiver request is difficult and delays the process of submitting applications by weeks or months. They also wrote that ability to work is often contingent upon obtaining certain immigration benefits, which creates financial hardship for applicants. Another commenter stated that fee waivers are not automatic and often add more time to an application, which negatively impacts immigrants in desperate situations.

*Response:* DHS acknowledges that obtaining a fee waiver requires the submission of evidence demonstrating the inability to pay that some requestors may find burdensome. Nevertheless, approving fee waivers without evidence of inability to pay would pose a fiscal risk to USCIS. Thus, DHS has decided that it will not approve fee waivers without determining the applicant is eligible under the fee waiver regulations. In this final rule, DHS has provided additional fee exemptions, *see* Table 5B, and updates to the Form I–912 for additional efficiencies and to minimize its burden, *see* 88 FR 402, 458 (Jan. 4, 2023). Form I–912 has an estimated time completion of one hour and ten minutes. USCIS strives to continually improve its case processing so that fee waivers can be adjudicated in a timely, effective manner while balancing access, affordability, and financial sustainability.

*Comment:* Multiple comments expressed concerns about the effect of denied fee waiver requests on application filing dates. One commenter recommended that USCIS treat the date that forms are received together with a fee waiver request as the official filing date "for the Motion, Appeal or Case." The commenter asserted that current procedures and practices can result in denial of due process to indigent and low-income immigrants who seek fee waivers and recommended that USCIS should allow the applicant to recapture the initial filing date if they pay the required fee within 30 days of a fee waiver denial, which is similar to State courts' approach in civil or family cases. The commenter asserted that the USCIS' current approach violates VAWA confidentiality protections under 8

U.S.C. 1367 for immigrant crime victims because their cases are not logged as protected cases in USCIS systems until their fee waiver is granted. Another comment stated that USCIS' policy of not retaining a filing date for an application with a rejected fee waiver leads to low-income individuals facing difficult situations in which the only way to ensure an application will be filed before a relevant deadline is to pay a fee that they are financially unable to afford. Some commenters stated that denied Form I–730 petitioners often file the Form I–290B to seek reconsideration of erroneous denials. If the fee waiver for the Form I–290B is denied and the individual is unable to pay the fee, the individual is effectively denied the opportunity to contest the denial of the Form I–730, and the delay in process may result in the petitioner losing the option to resubmit the Form I–730 within the 2-year deadline.

*Response:* DHS considered all the suggestions made by these commenters but declines to adopt a policy of treating a denied fee waiver request as establishing a filing date for the underlying form for similar reasons that it does not accept an improperly filed Form I–130 or I–140 as establishing a priority date. *See* 8 CFR 204.1(b), 204.5(d). Were DHS to adopt such a policy, it would encourage the early filing of improperly completed forms to capture an advantageous filing or priority date. DHS regulations provide that the receipt date is the actual date of physical receipt at the location designated for filing such benefit request, with proper fee or approvable fee waiver request. 8 CFR 103.2(a)(7)(i). DHS disagrees that the regulation violates due process or 8 U.S.C. 1367 for a denied fee waiver request. In this final rule, DHS has further expanded the number of VAWA, T, and U-related forms that are fee exempt, *see* Table 5B, for which there will be no delay in applying protections under 8 U.S.C. 1367. For the remainder of VAWA, T, and U-related requests, the requestor should already be listed in USCIS systems as protected under 8 U.S.C. 1367. In the case of a Motion to Reopen for a denied Form I–730, Refugee/Asylee Relative Petition, if the original, timely-filed Form I–290B, Notice of Appeal or Motion, is rejected due to a denied fee waiver request, USCIS may exercise its discretion to accept a subsequent, untimely Motion to Reopen. *See* 8 CFR 103.5(a)(1)(i). However, in the case of a Motion to Reconsider for a denied Form I–730, if the original, timely-filed Form I–290B is rejected due to a denied fee waiver request, USCIS

lacks discretion to accept a subsequent, untimely Motion to Reconsider. *See* 8 CFR 103.5(a)(1)(i).

*Comment:* Several commenters expressed concern over USCIS fee waiver denials, stating the following:

• Denials generally give no specific information as to why the applicant's evidence was deemed insufficient and is accompanied by boilerplate lists of evidence that may be submitted, even when the individual has submitted such evidence.

• Clearer fee waiver denials would decrease the volume of fee waiver requests and help with backlog and efficiency.

• Regulations should require fee waiver denials to provide some reasoning to specifically describe why the submitted evidence was not considered sufficient and what additional evidence would be deemed adequate for the application.

• Denials task the applicant with the impossibility of proving a negative by reiterating that tax filings and paystubs are proof of income, yet individuals with no income may have no income tax filings due to earning less than the IRS income tax filing threshold, nor paystubs during the period of unemployment.

*Response:* DHS acknowledges commenters' concerns that fee waiver denials do not receive a detailed, individualized denial letter. However, DHS must weigh this against the additional costs of individualized fee waiver denials and has decided to limit this cost in favor of the general expansion of fee exemptions and waivers contained in this rule. *See* Table 5B. As stated previously, USCIS receives over 2,000 fee waiver requests per workday and approves 84 percent of them. The current Form I–912 instructions allow requestors to provide evidence of lack of income by describing the situation that qualifies them for a fee waiver. The instructions also state that, if available, requestors may submit affidavits (*e.g.,* from religious institutions, nonprofits, community-based organizations, or similarly recognized organizations) indicating that the requestor is currently receiving some benefit or support from the organization verifying (or attesting) to their situation. DHS will continue to review the fee waiver process for areas that may be improved. In general, if a fee waiver request is denied, the form may be resubmitted without prejudice with additional documentation in support of the fee waiver or with the fees.

*Comment:* A few commenters said there is a lack of knowledge around fee

HR-1 FRN 2025 AR-000078

waiver eligibility and around the existence of fee waivers as a possibility for low-income individuals, which presents a barrier for those who are interested in applying for immigration benefits. The commenters stated that USCIS should accompany the proposed rule with public education efforts aimed at prospective applicants with clear, culturally sensitive, and multilingual information on fee waivers and the grounds for eligibility. The commenters further suggested USCIS include efforts used in the Interagency Strategy for Promoting Naturalization that was developed in E.O. 14012. Another commenter stated that creating more categories and avenues by which one can show proof for fee waivers does little if basic access and understanding on how to navigate forms is not there for the communities that need it most.

*Response:* DHS agrees that it is important to alert potential requestors to the existence of fee waivers. Every form instruction for which a fee waiver is possible notifies the requestor of their ability to request a fee waiver. USCIS is removing the option for a written request in this rule for the reasons stated earlier. However, USCIS will continue to provide information about fee waivers for all its forms and the reduced fee for Form N–400 on our website,[191] at stakeholder and public engagements and using other public education efforts. For example, USCIS routinely hosts local and virtual engagements on naturalization, in which we discuss fee waivers and the reduced N–400 fee.[192] The Form G–1055, Fee Schedule, also identifies which USCIS forms are eligible for a fee waiver.

*Comment:* A commenter asked USCIS to discontinue the different treatment of applications submitted with fees and with fee waivers. The commenter reasoned that their clients who request fee waivers often must wait noticeably longer than applicants who pay the filing fees to receive the receipt notices for their application. Moreover, the commenter stated, the delays in receipt notices has impeded their ability to

timely seek prosecutorial discretion for clients in removal proceedings based on their pending applications for relief before USCIS. The commenter concluded that this different treatment causes harm to their most vulnerable clients.

*Response:* USCIS strives to issue receipt notices in a timely manner for all forms. As discussed earlier in Section IV.E.4. of this preamble, USCIS adjudicates most fee waiver requests within days of receipt. However, it takes longer to issue a receipt for a form that is accompanied by a fee waiver request because fee payments clear almost immediately, while adjudicating the fee waiver request requires additional time to review the waiver request. This different treatment of fee waiver requests is justified by the additional processing steps that they require.

*Comment:* Commenters stated that USCIS should improve the fee waiver process by training adjudicators on fee waivers and otherwise addressing erroneous rejections and delays in issuing receipts.

*Response:* USCIS currently provides guidance and training to its officers on fee waivers. USCIS strives to continuously improve its training to reduce erroneous rejections and delays in receipts. DHS believes that codifying the rules for fee waiver eligibility and modifying the Form I–912 instructions will help to reduce erroneous rejections and delays.

*F. Fee Exemptions*

As discussed in the Changes from the Proposed Rule section, many commenters requested that DHS provide more fee exemptions and free services for humanitarian related benefit requests and DHS is providing more fee exemptions in the final rule. A summary of the current and new exemptions is provided above in Table 5A, 5B, and 5C.

1. Codification of Benefit Categories/ Classifications With Exemptions/No Fees

*Comment:* In the proposed rule DHS proposed to include several fee exemptions that are provided in guidance or form instructions or statute in the Code of Federal Regulations, although that action was not necessary for the exemptions to continue in effect. A couple of commenters generally expressed support for USCIS' proposal to codify fee exemptions in regulations without providing rationale to support this position. Another commenter wrote that the proposed codification of benefit requests with no fees and exemptions is in line with DHS's "best effort" to include the "benefits to the national

interest" when considering the fee schedule changes. Another commenter stated that codifying exemptions promotes stability and ease of access for applicants. One commenter further expressed appreciation for Tables 13A, B, and C in the proposed rule and suggested they be included in the final rule.

Some commenters welcomed the proposal to codify the fee exemption of Form I–360 for SIJs. The commenters reasoned that this population is particularly vulnerable, has no ability to work, and, therefore, lacks the financial means to pay fees for immigration benefit applications. The commenters further remarked that this codification would align with Congress' goal to protect vulnerable children when it created the SIJ classification.

A few commenters welcomed the codification of longstanding fee exemptions for those seeking humanitarian relief, including those applying for asylum, asylees, and refugees. Other commenters said the proposal to codify exemptions for these groups would be consistent with U.S. humanitarian values, as well as legal obligations under U.S. and international law to protect persons fleeing persecution. Multiple commenters welcomed DHS's proposal to codify in the regulations that there is no fee for Form I–589, Application for Asylum and for Withholding of Removal. A commenter wrote that they support the proposed codification, reasoning that it recognizes the importance of access to the asylum system, regardless of a person's financial situation. A couple of commenters stated that the codification would ensure that the United States remains among most parties to the 1951 Refugee Convention and 1967 Refugee protocol who do not charge a fee to apply for asylum. A few commenters wrote that the codification was welcome after the proposal to introduce a $50 asylum fee in the 2020 fee rule. A commenter stated that the previously proposed fee would have deterred those seeking protections afforded by Congress while creating vulnerabilities to trafficking and exploitation.

*Response:* DHS appreciates the commenters' support of the codification of fee exemptions in regulations and did not make any changes in this final rule based on these comments.

*Comment:* Several commenters welcomed DHS's plan to continue to provide a fee exemption for the initial filing of Form I–765 for asylees and those with pending asylum applications. One commenter agreed with DHS's determination that requiring a fee for the initial employment

---

[191] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Additional Information on Filing a Fee Waiver," *https:// www.uscis.gov/forms/filing-fees/additional-information-on-filing-a-fee-waiver* (last updated Oct. 31, 2023); U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Fact Sheet: Request for Fee Waivers for Form N–400," *https:// www.uscis.gov/sites/default/files/document/fact-sheets/FactSheetI-912RequestforFeeWaiver ForFormN-400.pdf* (last visited Oct. 10, 2023).

[192] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Past Training Seminars," *https://www.uscis.gov/citizenship/ resources-for-educational-programs/register-for-training/uscis-past-training-seminars* (last updated Sept. 20, 2023).

HR-1 FRN 2025 AR-000079

**Appx-000104**

authorization application would be unduly burdensome and would prevent some asylum seekers from obtaining lawful employment. Another commenter further reasoned that this approach aligns with the 1951 Convention Relating to the Status of Refugees, which requires "sympathetic consideration to assimilating the rights of all refugees with regard to wage-earning employment to those of nationals . . . ." This commenter additionally wrote that providing fee-exempt access to employment authorization affords asylum seekers crucial opportunities to recover from trauma, pay for future immigration benefit fees, and access identification for physical and economic mobility. Another commenter further reasoned that access to employment authorization promotes children's health and well-being by providing protection from unsafe working conditions and exploitation as well as access to basic services.

Similarly, a couple of commenters expressed support for continued fee exemptions for persons admitted or paroled as refugees, including the proposed exemptions for EAD renewal and replacement, Form I–131, Application for Travel Document, and Form I–590, Registration for Classification as Refugee. One of the commenters agreed with DHS's reasoning that continuing to facilitate access to employment authorization and travel documents for those admitted or paroled as refugees is consistent with the 1951 Convention and 1967 Protocol. The commenter further reasoned that making travel documents accessible, which is not an overly costly or burdensome process for USCIS, reflects the reality of refugees who have a need to travel outside the United States for work or other purposes that support U.S. interests, but cannot do so if they unable to obtain a passport from the country from which they sought refuge.

*Response:* DHS appreciates the commenters' support of the codification of fee exemptions for refugee and asylees in regulation in this final rule.

*Comment:* A commenter wrote that Form G–1055 contains a typographical error that, if left uncorrected, would lead U nonimmigrants to erroneously believe they are fee exempt from an initial Form I–765 based on a concurrently filed or pending Form I–485. Specifically, the proposed Form G–1055 states that U nonimmigrants seeking to adjust status under INA sec. 245(m) will pay a $0 fee for an initial Form I–765 under category (c)(9), which the commenter said does not reflect the proposed regulation and preamble.

*Response:* Principal U nonimmigrants who are in the United States are exempt from fees associated with employment authorization when it is issued incident to status, and they are not required to file Form I–765, Application for Employment Authorization, to receive an EAD. *See* 88 FR 460; 8 CFR 214.14(c)(7). Principal U nonimmigrants who are outside the United States are fee exempt for fees associated with employment authorization issued incident to status once they enter the United States and file Form I–765 (initial request under 8 CFR 274a.12(a)(19) and (20)). *See* 88 FR 460. In the proposed rule, DHS proposed to expand fee exemptions for persons seeking or granted U nonimmigrant status for all forms filed before filing Form I–485, Application to Register Permanent Residence or Adjust Status. *See* 88 FR 460–461. As explained in section II.C.9 of this rule's preamble, DHS further expands fee exemptions in this final rule for persons seeking or granted U nonimmigrant status for all forms related to the U nonimmigrant status or adjustment of status under INA sec. 245(l), 8 U.S.C. 1255(l), including an initial Form I–765 for an EAD based on having a pending Form I–485. *See* 8 CFR 106.3(b)(5); Table 5B. DHS believes that these additional fee exemptions, as well as the publication of a final rule Form G–1055 Fee Schedule, mitigate the commenter's concerns.

*Comment:* A commenter discussed the current economic benefits of TPS, such as the tax revenue generated by TPS holders, and commended codifying the exemption for Form I–821 to secure the continuation of those benefits.

*Response:* DHS appreciates the commenter's support of the codification of the fee exemption for Form I–821, Application for Temporary Protected Status, when filed by a TPS holder seeking re-registration, *see* 8 CFR 106.2(a)(50)(ii), and did not make any changes in this final rule based on these comments.

## 2. Proposed Fee Exemptions

### a. General Support of Proposed Exemptions

*Comment:* Some commenters expressed general support for the proposed expansion of fee exemptions for certain humanitarian programs without further rationale.

*Response:* DHS maintains the fee exemptions as listed in the proposed rule and provides additional fee exemptions for certain humanitarian populations in this final rule. *See* Table 5B.

*Comment:* Many commenters expressed broad support for the various proposed fee exemptions for VAWA self-petitioners, U nonimmigrant status petitioners and T nonimmigrant status applicants, petitioners for SIJ classification, and other vulnerable populations. One commenter reasoned that the proposed exemptions would increase access to immigration relief for low-income survivors, and thus more completely achieve the goals of humanitarian programs to provide stability and safety from abuse.

Another commenter agreed with USCIS' assessment in the proposed rule that survivors of violence often experience financial abuse and have limited resources, even once they flee from their abusers. The commenter went on to cite research from DOJ, the Bureau of Justice Statistics (BJS), the Borgen Project, and others describing the relationship between domestic violence and financial hardship. Another commenter similarly cited research on the mental, psychological, financial, and legal challenges that survivors of violence face and stated that ensuring survivors' access to immigration benefits is essential to help them escape abusive situations and gain self-sufficiency following victimization.

Citing the INA and the legislative history of VAWA and T and U nonimmigrant status, a commenter said the expanded fee exemptions would align with legislative trends and congressional intent in creating protections for certain victims of crime. The commenter added that expanded access to fee exemptions is consistent with E.O. 14012. Another commenter wrote that the proposed exemptions would align with congressional intent while citing an October 11, 2000, statement from Senator Hatch and TVPRA. Another commenter similarly suggested that the proposed exemptions would align with congressional actions to protect victims of trafficking and abuse and asked USCIS to retain the exemptions in the final rule.

*Response:* DHS agrees that these populations are particularly vulnerable as victims of abuse or violence, and that, because of this victimization, many will lack the financial resources or employment authorization needed to pay for fees related to immigration benefits. DHS has maintained the proposed fee exemptions and provided additional fee exemptions for certain humanitarian populations in this final rule. *See* 8 CFR 106.3(b); Table 5B.

*Comment:* Numerous commenters agreed that expanded fee exemptions would eliminate the need for groups that disproportionately experience

HR-1 FRN 2025 AR-000080

financial hardship, and therefore already require a fee waiver, to apply for such waivers. One commenter added that the proposed exemptions would reduce the length of time that applicants for survivor-specific forms of relief would have to wait for a fee waiver to be adjudicated and a receipt notice issued.

Many commenters further reasoned that applying for fee waivers places undue burdens on vulnerable and pro se applicants to produce evidence and meet the filing requirements to obtain a favorable decision and access protections. For example, one commenter stated that many T nonimmigrant applicants lack evidence to support their fee waiver application, including tax forms, pay stubs, and bills in their own name. The commenter also described the harms for victims associated with waiver denials for failing to file proper forms or submit the desired evidence. Another commenter wrote that SIJs without LPR status do not qualify for means-tested benefits, and obtaining proper documentation of the receipt of benefits can be challenging for non-English-speaking populations navigating complex systems. The commenter added that, while fee waiver applications cost legal services providers time and resources to prepare and resubmit when needed, exemptions free up capacity for legal practitioners to prepare the merits of the immigration benefit case and assist more individuals seeking protections. Another commenter further stated that, particularly for vulnerable children who are almost always found eligible for a fee waiver, requesting a fee waiver is an unnecessary step that adds uncertainty to the application process. Another commenter reasoned that fee exemptions would ensure that vulnerable noncitizens do not forgo the opportunity to apply for humanitarian forms of relief.

One commenter, citing a 2016 Citizenship and Immigration Services (CIS) Ombudsman report on inconsistent fee waiver adjudications, said that the exemptions would avoid "arbitrary" fee waiver decisions that disproportionately affect vulnerable immigrant populations. Another commenter wrote that, in addition to reducing burdens associated with fee waivers, fee exemptions provide clarity for applicants and their families and allow them to better anticipate the costs of applying for protections. Multiple commenters wrote that eliminating the need to apply for a fee waiver through exemptions would in turn reduce administrative burdens and resources expended for USCIS to adjudicate

applications or engage in litigation arising from waiver rejections. Some commenters suggested that these efficiencies would allow USCIS to redirect staff resources away from processing and reviewing fee waiver requests toward adjudicating applications for humanitarian protection, and the resulting decrease in administrative burden to USCIS would mitigate erroneous denials and subsequent delays for survivors.

*Response:* DHS notes that this final rule maintains and codifies the 2011 Fee Waiver Policy criteria that USCIS may grant a request for fee waiver if the requestor demonstrates an inability to pay based on receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship. *See* 8 CFR 106.3(a)(3). While not a change to fee waiver eligibility criteria, DHS believes that codifying these criteria in this final rule will provide consistency and transparency that is responsive to the commenters' concerns.

DHS agrees that there are costs to USCIS in adjudicating fee waivers beyond foregone revenue (*i.e.*, the total fees that fee-waived or fee-exempt requestors would have paid if they had paid the fees). DHS believes that replacing fee waivers with additional fee exemptions removes barriers for applicants who are similarly situated in terms of financial resources and employment prospects. In the proposed rule, DHS proposed fee exemptions for humanitarian populations, including VAWA self-petitioners and requestors for T and U nonimmigrant status, without reducing fee waiver availability. In this final rule, DHS provides additional fee exemptions for these populations as explained in section II.C.9.b. of this preamble.

DHS likewise expects a decrease in administrative burden associated with the processing of requests for fee waivers for categories of requestors that would no longer require a fee waiver because they will be fee exempt. DHS has not quantified the cost savings to USCIS associated with processing fee waiver requests, namely Form I–912. Furthermore, DHS's Regulatory Impact Analysis (RIA) estimates that the fee exemptions and reduction in fee waiver requests will result in quantifiable annual transfer payments from USCIS to the public and opportunity cost savings to the public from not completing and submitting a fee waiver request. *See* Regulatory Impact Analysis 3.P.

In general, where DHS has determined that immigration fees would inequitably impact the ability of those who may be less able to afford the

proposed fees to seek an immigration benefit for which they may be eligible, DHS has maintained fee exemptions, waivers, and reduced fees, and provided new fee exemptions to address accessibility and affordability. *See* 88 FR 402, 460–81 (Jan. 4, 2023).

b. T Nonimmigrants

*Comment:* A few commenters expressed support for the proposed change to exempt fees for all forms for T visa applicants, T nonimmigrants, and their derivatives through adjustment of status. One commenter agreed with USCIS' assessment that the proposal would help more victims of trafficking pursue immigration relief afforded to them by Congress. Another commenter wrote that the proposed rule would align with congressional intent under the TVPRA and international obligations under the Palermo Protocol.

*Response:* DHS appreciates the commenters' support of the proposed fee exemptions for T visa applicants, T nonimmigrants, and their derivatives, and finalizes these fee exemptions in this final rule. *See* 8 CFR 106.3(b)(2); Table 5C.

c. U Nonimmigrants

*Comment:* Commenters expressed support for expanded fee exemptions for petitioners for U nonimmigrant status because the combined associated fees to obtain protection prohibit many otherwise eligible petitioners from pursuing U nonimmigrant status. The commenters said the proposed rule would allow petitioners to pursue U nonimmigrant status more expeditiously while saving nonprofit agencies' time.

Other commenters wrote that they had concerns about the effects on U-nonimmigrants, specifically:

• U-nonimmigrants applying for adjustment of status should also be eligible for the same fee exemptions as T and VAWA adjustment applicants.

• U nonimmigrants are similarly situated to T nonimmigrants and VAWA self-petitioners because U nonimmigrants are vulnerable and have suffered similar harm and abuse, which impacts their physical, mental, and financial health due to ongoing trauma. The increased I–485 fee will be even more difficult for U nonimmigrants to cover.

• The higher volume of petitioners for U nonimmigrant status did not justify fewer fee exemptions because both groups remain vulnerable populations, and there are many more refugees than either U visa petitioners or T visa applicants, and it undermines DHS's ability-to-pay philosophy and

perpetuates barriers for vulnerable applicants for humanitarian relief.

• The fees would be prohibitively expensive for U nonimmigrants and VAWA self-petitioners, and total filing fees (I–485, I–765, and I–131) for a family of four would be more than 25 percent of the median annual household income ($44,666), not counting the cost of medical exams or attorney fees.

• Requiring U nonimmigrants and VAWA self-petitioners to pay the filing fees or submit fee waiver requests would be a significant drain on USCIS' limited staff and resources. Providing additional fee exemptions only for certain categories of vulnerable populations is "arbitrary" or "unjustified."

• A maximum of 10,000 U–1 nonimmigrants become eligible to file Form I–485 each year, and therefore fee exemptions for U nonimmigrant adjustment of status applications would have a minimal impact when considering all the fee generating cases filed each year with USCIS.

• The longer period of employment authorization available to U nonimmigrants compared to T nonimmigrants did not justify their disparate treatment because U nonimmigrants may be unable to work because of trauma and physical injuries.

• USCIS should provide further explanation as to why U nonimmigrants would be treated differently than T nonimmigrants and VAWA self-petitioners with regards to adjustment of status fees.

• DHS has not provided information on the level of the costs that would need to be shifted to other paying applicants if Form I–485 were fee exempted for U nonimmigrants, or the policy considerations counseling against such a shift of costs.

• U nonimmigrants who are victims of domestic abuse may lack income or savings after leaving the abusive situation and may only be able to obtain employment in low-wage positions with no benefits due to language barriers, lack of education and work experience, and the impact of trauma.

• Most petitioners for U nonimmigrant status cannot afford the Form I–485 filing fee despite a bona fide determination (BFD) or a grant of U nonimmigrant status, particularly those adjusting as whole family groups (U–1 and derivatives).

• Not all U nonimmigrant petitioners receive employment authorization through the BFD process, and the absence of a BFD process for T nonimmigrant status applicants, contrary to the T nonimmigrant status regulations, does not support the failure

to extend similar fee exemptions to U nonimmigrants.

• T visa holders may qualify for "continuous presence," which allows for employment authorization, and they may receive refugee services from resettlement agencies.

• Even after obtaining employment authorization, U visa victims experience barriers to securing long term employment and earning capacity to pay for adjustment of status fees, and that the criminal proceedings tied to a U visa holder's victimization may not be completed within the 15-year wait between the receipt of employment authorization and the ability to adjust status. Participation in the labor force does not guarantee a rise out of poverty, according to a 2022 study from the Migration Policy Institute finding that more than half of the low-income immigrants of prime working age who worked full-time, year-round earned less than $25,000 a year in 2019.

• Fee waivers are an insufficient substitute for fee exemptions because the small amount of money saved by USCIS limiting fee exemptions in this respect would not be worth the harm imposed on applicants. U nonimmigrant applicants will also lack the evidence needed for fee waivers. Fee waivers will endanger victims and their children by delaying access to the confidentiality protections victims receive when cases are considered filed and given an 8 U.S.C. 1367 flag in the Central Index System, which does not occur until the fee waiver has been adjudicated.

• Requiring U nonimmigrants to file a fee waiver increases the time that pro bono attorneys must dedicate to their cases.

• Adjudicating fee waivers increases administrative burden on USCIS, and fee waivers for U nonimmigrants and their children applying for adjustment of status ignores dynamics of domestic violence, sexual assault, coercion, and child abuse.

• Victims experience physical, economic, and psychological abuse years after leaving their abuser, including during the adjustment of status stage.

*Response:* DHS acknowledges that T and U nonimmigrants are both vulnerable populations that merit special consideration. After considering the comments, comparing these two victim populations, and weighing options to recover the costs of USCIS, DHS has decided to no longer treat T and U nonimmigrants differently with regard to fee exemptions in this final rule. In addition, DHS has expanded fee exemptions for U petitioners and U nonimmigrants to include Forms I–131,

I–192, I–193, I–290B, I–485, I–539, I–601, I–765 (adding renewal and replacement requests), I–824, and I–929. *See* 8 CFR 106.3(b)(5); Table 5B.

Although U nonimmigrants may possess employment authorization for a longer time than T nonimmigrants (88 FR 402, 461, Jan. 4, 2023) the impact of victimization can be lasting and far-reaching, even after the events giving rise to U nonimmigrant status eligibility have concluded.[193] Due to victimization, T and U nonimmigrants face similar employment and financial challenges, which justify similar fee exemptions. Expanding fee exemptions for U nonimmigrants could have resulted in higher fees to other fee payers because of the large number of U nonimmigrants who file Form I–485 and related forms.[194] However, rather than increase fees further than in the proposed rule, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. DHS has determined that the humanitarian nature of these programs warrants special consideration when weighed against the transfer of costs to other petitioners and applicants. DHS acknowledges the administrative burden placed on U petitioners and U nonimmigrants, as well as USCIS, by requiring fee waiver requests for this sizeable population, of whom a significant portion may be eligible for fee waivers but struggle to produce supporting documentation due to circumstances resulting from victimization.[195] The changes made in this final rule account for the similar financial circumstances of T and U nonimmigrants, the likelihood that U nonimmigrants would qualify for fee waivers, and the burden reduction in providing fee exemptions to U

---

[193] However, DHS disagrees with the commenter's characterization of the results of the 2022 study from the Migration Policy Institute (MPI). The commenter wrote that in 2019 more than half of the low-income immigrants of prime working age who worked full-time, year-round earned less than $25,000 a year. However, the MPI report showed that 20 percent of full-time, year-round working immigrants made less than $25,000 a year. *See* Gelatt, et. al, "A Profile of Low-Income Immigrants in the United States," Figure 11, Migration Policy Institute (Nov. 2022) available at *https://www.migrationpolicy.org/sites/default/files/publications/mpi_low-income-immigrants-factsheet_final.pdf.*

[194] The fiscal year limit of 10,000 U visas only applies to U–1 principals and not to derivatives. *See* INA sec. 214(p)(2)(B), 8 U.S.C. 1184(p)(2)(B).

[195] However, with regards to certain forms, such as Form I–485, DHS disagrees that fee waivers may delay confidentiality protections for victims of crimes, since the applicant's protection will already be recognized in USCIS systems following approval of their Form I–918, Petition for U Nonimmigrant Status, or Form I–929.

HR-1 FRN 2025 AR-000082

**Appx-000107**

nonimmigrants for Form I–485 and related forms.

d. VAWA Self-Petitioners

*Comment:* A commenter expressed support for maintaining fee waivers for survivors seeking adjustment of status such as VAWA self-petitioners who are not filing concurrent I–360s and I–485s and conditional residents seeking waivers of joint filing requirements based on battery or extreme cruelty. Similarly, another commenter expressed support for streamlining the application process for vulnerable populations by providing fee exemptions.

Commenters expressed support for DHS's proposal to exempt certain VAWA-related application fees. A commenter expressed support for the expanded fee exemptions for VAWA self-petitioners for all forms associated with the Form I–360 filing through final adjudication of the adjustment of status application. The commenter said this proposal would allow more abused spouses to obtain LPR status. Another commenter expressed support for the expanded fee exemptions for VAWA self-petitioners for all forms associated with the Form I–360 filing through final adjudication of the adjustment of status application. The commenter said this proposal would allow more abused spouses to obtain LPR status.

However, some commenters wrote of concerns about fee exemptions and waivers for VAWA-based applications as follows:

• USCIS should exempt VAWA applicants from all fees through adjustment of status, regardless of whether Form I–485 was filed concurrently with Form I–360.

• USCIS should provide consistent fee exemptions for Forms I–485, I–212, I–601, and I–131 because this would reduce the significant burden on immigrant survivors who may face risks in having to gather the documents needed to support fee waivers.

• The proposed categories of exemptions were arbitrary and would create confusion, especially amongst pro se applicants who may be unaware of their ability to file concurrently.

• The proposed I–485 fees would be prohibitively expensive for VAWA self-petitioners who file their I–485 separately, and paying the fees could leave them vulnerable to debt and victimization.

• Some VAWA self-petitioners are ineligible to file their I–485 concurrently with the I–360, including self-petitioning spouses and children of LPRs who do not have current priority dates. As a result, this population of self-petitioners would be unable to access a fee exemption for the I–485.

• Other situations exist where a VAWA self-petitioner may be unable to file or face difficulty filing their I–485 concurrently, including certain noncitizens who are in removal proceedings or have an outstanding order of removal; those with derivative children who will age out soon; those who need to file the I–360 quickly to obtain financial independence; or those whose I–130 was converted to a I–360 self-petition.

• It "strains logic" to deny fee exemptions and instead require fee waivers for VAWA self-petitioners where most will qualify for fee waivers.

• VAWA self-petitioners, VAWA cancellation of removal applicants, and battered spouse waiver applicants are amongst the victim cases that receive the most fee waivers and the fewest exemptions, and VAWA self-petitioner and derivative children should receive the same access to fee exemptions as SIJ children.

• Foreign-born spouses and children experience higher rates of abuse when the abuser is a U.S. citizen or LPR.

• Requiring some VAWA self-petitioners to pay the filing fees or submit fee waiver requests for form I–485 would drain USCIS' limited resources to investigate the status of the underlying I–360 to determine whether each form I–485 is fee exempt or if the application includes the proper filing fee or a fee waiver request.

*Response:* DHS acknowledges that VAWA self-petitioners are a particularly vulnerable population as victims of abuse who may not have the financial resources or access to their finances needed to pay for fees when initially filing for immigrant classification, adjustment of status, and associated forms.

DHS also acknowledges that for some VAWA self-petitioners, the ability to file Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant, and Form I–485 concurrently is beyond their control. As noted by the commenters, some VAWA self-petitioners are limited by visa priority dates, some are in removal proceedings or have an outstanding order of removal, and some may be the beneficiary of a Form I–130, Petition for Alien Relative, petition that was converted to a Form I–360 self-petition. DHS also acknowledges that in some situations the individual's need for safety puts them in a difficult position of deciding whether to pursue immigration benefits when they may not qualify for a fee exemption because they are not able to file Form I–360 and Form I–485 concurrently. Additionally,

VAWA self-petitioners may face challenges in obtaining evidence in support of fee waiver requests, adding a greater burden to the requestor in filing Form I–912. This burden to requestors, combined with the administrative burden to USCIS in processing a high volume of requests for these individuals, many of whom would qualify for a fee waiver, justify exempting VAWA self-petitioners from fees. Considering the benefit to VAWA self-petitioners and USCIS, as well as the humanitarian nature of this program, DHS has codified the fee exemptions in the proposed rule and incorporated additional fee exemptions in the final rule to include applications for adjustment of status and associated ancillary forms, regardless of whether they are filed concurrently with the VAWA Form I–360 self-petition. *See* 106.3(b)(6); Table 5B.

*Comment:* A commenter expressed concern that, under the new regulation, there would be no fee exemption for Form I–765s filed by a VAWA I–485 applicant. The commenter stated that, under current Form I–360 processing times, VAWA self-petitioners would have to wait 2 years and 8 months to obtain a fee exempt EAD. The commenter emphasized that these documents are often essential for a domestic violence survivor's recovery and future.

*Response:* DHS acknowledges the commenter's concerns regarding the availability employment authorization. For reasons discussed earlier, DHS has provided additional fee exemptions for VAWA self-petitioners in this final rule, including Form I–765 renewal and replacement requests after Form I–485 is filed. *See* 8 CFR 106.3(b)(6); Table 5B.

*Comment:* One commenter raised concerns that a fee exemption for Form I–601 Waiver of Inadmissibility in VAWA cases would only be available if the form is filed concurrently with Form I–485.

*Response:* DHS acknowledges the commenter's concerns regarding the availability of a fee exemption for Form I–601 for VAWA self-petitioners. As explained in section II.C.9 of this preamble, DHS expands fee exemptions in this final rule for VAWA self-petitioners to include Form I–601 filed by individuals who did not concurrently file Form I–360 and Form I–485. *See* 8 CFR 106.3(b)(6); Table 5B.

e. Iraqi and Afghan Special Immigrants

*Comment:* A commenter wrote that they supported fee exemptions for Iraqi and Afghan special immigrant visa (SIV) and military applicants. Another commenter welcomed the expanded fee

exemptions for Special Immigrant Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF to all forms associated with filings from initial status filing through final adjudication of the adjustment of status application. The commenter reasoned that Afghans face financial hardships that prevent them from accessing the benefits that Congress intended to provide this population. The commenter further wrote that the exemptions would reduce the burdens on those who support Afghans, including military, veteran, faith, and other communities.

*Response:* DHS appreciates the support for fee exemptions for Iraqi and Afghan SIV and military applicants. As explained in section II.C.9 DHS further notes that in this final rule it has expanded fee exemptions for this group to include Form I–765 (renewal, and replacement request); Form I–290B (only if filed for any benefit request filed before adjusting status or for Form I–485 and in associated ancillary forms) and Form I–824. *See* Table 5B and 8 CFR 106.3(b)(3).

On August 29, 2021, President Biden directed the DHS to lead implementation of ongoing efforts across the government to support vulnerable Afghan nationals, including those who worked alongside the U.S. government in Afghanistan for the past two decades, as they safely resettle in the United States. These coordinated efforts are known as OAW, now transitioning to Operation Enduring Welcome (OEW). CBP has exercised its discretion to parole many Afghan nationals, on a case-by-case basis, into the United States for urgent humanitarian reasons. Further, the Department of State (DOS) continues to coordinate the travel of Afghan nationals to the United States. Many Afghan nationals are also applying to USCIS for immigration benefits such as parole, employment authorization, Afghan special immigrant status, lawful permanent residence, waivers of inadmissibility, asylum, TPS, and family-based petitions.

As we transition into OEW, helping Afghan nationals who are now U.S. citizens and LPRs bring their family members who are still in grave danger in Afghanistan out and into safety is an Administration priority. USCIS will continue to support family reunification by exempting certain fees and using the funds Congress appropriated for efforts under OAW and OEW.

Form I–824 is used to request further action on a previously approved application or petition. A spouse or unmarried child younger than 21 years following to join a principal immigrant may receive the same special immigrant classification as a principal Afghan special immigrant. Some the Afghan LPRs who adjusted status as Afghan special immigrant (SIV LPRs) under the OAW effort are now seeking follow-to-join immigration benefits for their spouse and eligible children outside the United States. To permit a spouse and eligible children to apply for an immigrant visa with DOS, an Afghan SIV LPR must file a Form I–824 asking USCIS to notify DOS of the principal Afghan special immigrant's adjustment of status in the United States.

USCIS is legally required to exempt this fee for Afghan SIVs under section 602(b)(4)(C) of the Afghan Allies Protection Act (8 U.S.C. 1101 note), which prohibits any fees "in connection with an application for, or issuance of, an [Afghan SIV]." DHS believes allowing a fee exemption for all Afghan SIV LPRs' Form I–824 filing fee will also help the continuing resettlement efforts and reunite separated family members under OAW and OEW.

### f. Special Immigrant Juveniles (SIJs)

*Comment:* A few commenters expressed support for the proposed exemptions for all forms associated with SIJ classification through final adjudication of the adjustment of status application. Citing obligations under international agreements, one commenter concluded that the proposed exemptions would represent a crucial step toward upholding international best practices related to neglected, abused, or exploited children who lack the necessary permanence, benefits, and protections to thrive. Another commenter wrote that SIJs are court-dependent; that they have experienced abuse, neglect, or abandonment; and that such exemptions would help youth achieve stability and self-sufficiency. Finally, the commenter recommended that USCIS make it clear that the rule would eliminate SIJs' application fees for any forms filed by SIJ petitioners or recipients before adjustment of status, in the event of future changes to immigration law and policy.

*Response:* DHS appreciates the support for fee exemptions for SIJs. As DHS explains in section II.C.9, it has expanded fee exemptions for this group to include Form I–290B (if filed for any ancillary forms associated with Form I–485). *See* Table 5B; 8 CFR 106.3(b)(3). DHS believes these regulations as written address the commenter's

concerns, but we note that this rule does not preclude any future changes to immigration law and regulations. This rule therefore also does not prevent changes based on future changes in law or regulations.

*Comment:* Multiple commenters expressed support for the proposed fee exemptions for SIJ petitioners and SIJ classified noncitizens, but also recommended extending the fee exemption to any Form I–765 filed by an SIJ petitioner, even if not associated with a pending application to adjust status. The commenters stated that this would help children who have been granted SIJ-based deferred action who apply for or renew employment authorization under the (c)(14) category while awaiting visa availability. A commenter also stated that this would help mitigate delays and reduce burden on USCIS.

*Response:* DHS appreciates commenters' feedback regarding the rule's fee exemptions for those seeking or granted SIJ classification, but believes these comments are based on a misreading of the proposed rule. The proposed and final rule exempts fees for any Form I–765 filed by a person seeking or granted SIJ classification, regardless of whether they have filed a Form I–485. *Compare* 8 CFR 106.3(b)(1)(v), *with* proposed 8 CFR 106.3(b)(1)(v). DHS believes that the rule, as drafted, makes this sufficiently clear and has therefore not made any changes in this final rule.

### g. Asylees and Refugees

*Comment:* Commenters expressed appreciation for the proposed fee exemptions for refugees submitting Form I–131 and for refugees submitting Form I–765 to renew or replace their EAD because such exemptions are consistent with the 1951 Refugee Convention and Congress's recognition that refugees are more likely than other immigrant populations to lack economic security and require support on their path to self-sufficiency. Another commenter similarly expressed support for USCIS' proposed fee exemptions for Form I–131 for persons admitted or paroled as refugees. Another commenter wrote that the cost burden should not be shifted to account for additional exemptions, and DHS should eliminate the refugee fee exemption for Form I–131, because a refugee with an ability to travel internationally can pay for Form I–131. The commenter also wrote that there is less justification for the I–131 fee exemption for refugees because those who possess the means to travel internationally should be able to pay the I–131 fee.

HR-1 FRN 2025 AR-000084

*Response:* DHS makes no changes in the final rule based on these comments. Consistent with congressional intent to provide refugees with support and assistance on their path to self-sufficiency, DHS has a long history of offering refugee travel documents at reduced cost. *See* 75 FR 58972; *see also* INA sec. 207(c)(3) (public charge ground of inadmissibility in INA sec. 212(a)(4) does not apply to refugees); *see also* INA sec. 412, 8 U.S.C. 1522 (authorizing a variety of benefits and services for refugees). DHS aligns with this long-standing policy in providing a fee exemption for refugees filing Form I–131. Furthermore, as explained in the proposed rule, the increase in other fees resulting from exempting refugees from paying the fee for Form I–131 is marginal. *See* 88 FR 495.

*Comment:* Regarding fees for asylum applicants and asylees, commenters wrote the following:

• Add fee exemption for asylum-based Form I–765 renewal and replacement requests.

• Add fee exemption for refugees and asylees for Form I–290B when filed in connection with Form I–730. Form I–730 is the only vehicle for family reunification for asylees and refugees. I–730 petitioners have motion rights via the I–290B but no appellate rights and can only challenge a denied family reunification petition with an I–290B filed within 33 days of a denial. I–730 petitioners must file within two years of arrival as a refugee or grant of asylum and as a result are new arrivals to the United States and are categorically economically disadvantaged. The form I–730 itself is fee exempt. Most I–730 petitioners are likely to be fee waiver eligible, and so the I–290B form should be exempt from a fee in this category. Fee waiver eligibility for the I–290B is not sufficient because the asylee or refugee petitioner whose fee waiver application is denied is then time-barred from motioning to reopen or reconsider the I–730, since the rejection of an application for an insufficient fee or fee waiver application takes more than the 33-day period within which a petitioner can challenge the denial of the I–730. Considering that the proposed rule would make form I–290B fee exempt for every other humanitarian category of noncitizen contemplated in the proposed rule, adding fee exemptions for asylees and refugees for these benefits in the final rule would constitute a logical outgrowth of the proposed regulation.

• Add fee exemption for refugees and asylees for Form I–290B when filed in connection with Form I–485.

• Extend fee exemption for Form I–131 for asylees.

• Eliminate proposed fee exemption for refugees filing Form I–131.

• Asylees should not be treated differently from their humanitarian counterparts with respect to fee exemptions.

• DHS should exempt fees for all asylum-related benefits through adjustment of status.

• Add a fee exemption for Form I–485 for Asylum-based applicants. The same legal definition of a refugee applies to asylees, and that both vulnerable populations who face economic hardship, are eligible for public assistance, and are not subject to the public charge ground of inadmissibility. The proposed rule justifies new fee exemptions for refugees because refugees are not subject to the public charge ground of inadmissibility and because refugees have access to federally funded assistance. However, the same is true of asylees, and DHS does not explain why these justifications should not also lead to new fee exemptions for asylees.

• Justification for exempting fees related to humanitarian classifications—that the underlying status is fee-exempt and such applicants face economic hardships—apply equally to asylees.

• The proposed I–485 fee, along with the cost of a medical exam, would be prohibitively expensive.

• The rule "disingenuously" frames the I–589 fee exemption as a new benefit for asylum seekers even though this does not differ from the current fee schedule.

• Disagree that refugees are distinguishable from asylees because refugees are required to adjust status within one year while asylees are not required to do so, stating that most refugees do not in fact apply for adjustment one year after their admission.

• Asylees seek to adjust status as soon as possible to obtain stability for themselves and their family members.

• It is unfair to expect asylees to delay filing certain applications given the harmful impact that such delays will have on their ability to achieve stability, security, and family reunification; neither asylees nor refugees have gained sufficient financial security in their first year in such status in the United States to be able to afford the adjustment application fee.

• Asylum seekers often have little or no resources and experience ongoing financial hardship after a grant of asylum.

• Disagree that the large number of asylees justifies the differences in fee

exemptions between refugees and asylees because the large number of asylees demonstrates a need to reduce barriers to permanent resident status for this vulnerable population.

• Providing fee exemptions for asylee I–485s could improve efficiency, since under the current rules some families can only afford to file one application at a time. This can cause derivatives to file *nunc pro tunc* I–589s before adjusting status if the principal asylee naturalizes or the derivatives ceases to meet the definition of a spouse or child before they adjust status.

• USCIS should reverse the 2020 rule and eliminate the asylum fee in the proposed rule which avoids the issues caused by prior proposed rules.

• DHS should codify fee exemptions for all forms filed by asylees through adjustment and family reunification because asylum seekers and recent asylees are vulnerable to exploitation and trafficking.

• DHS should exempt asylees from fees for a refugee travel document and that, if the I–131 fee was truly linked to the DOS fee for a U.S. passport, it would be one-tenth of the price because, unlike a ten-year passport, a refugee travel document is only valid for one year.

• Exempting fees for renewal Forms I–765 would benefit asylees and their communities through the ability to maintain employment and unexpired identity documents.

*Response:* Form I–589, Application for Asylum and for Withholding of Removal is fee exempt for all filers. *See* 8 CFR 106.2(a)(28). Asylees are exempted from the fees for Form I–602, Application by Refugee for Waiver of Inadmissibility Grounds, Form I–730, Refugee/Asylee Relative Petition and Form I–765, Application for Employment Authorization (initial request by asylees and initial request by asylum applicants). Most forms used by asylum applicants or asylees are already fee exempt or fee-waiver eligible. 8 CFR 106.3(b). DHS considered the views of the commenters, and the number of asylum-based filings made each year and decided that the transfer of the costs of such filings to other petitions and applications would result in an excessive shift to other fee payers. DHS acknowledges that additional fee exemptions for asylees could reduce financial burden on these applicants. DHS will continue to exempt the initial Form I–765 fee for persons with pending asylum applications. *See* 8 CFR 106.2(a)(43)(iii)(D) and (G).[196] DHS will

---

[196] Except for individuals applying under special procedures under the settlement agreement reached in *American Baptist Churches* v. *Thornburgh,* 760 F. Supp. 796 (N.D. Cal. 1991).

HR-1 FRN 2025 AR-000085

Appx-000110

also fee exempt applicants who have applied for asylum or withholding of removal before EOIR (defensive asylum) or filed Form I–589 with USCIS (affirmative asylum) for initial filings of Form I–765. *See* proposed 8 CFR 106.2(a)(43)(iii)(D) and (G).

DHS has decided to not exempt asylees from paying the fee for Form I–131 for refugee travel documents or advance parole (although at the lower passport fee level) [197] and Form I–485 for adjustment of status. Although asylees and refugees are in some respects similarly situated populations, refugees are required to apply to adjust status after they have been physically present in the United States for at least one year, while asylees are not required to apply for adjustment of status within a certain period. Therefore, DHS decided to not shift the costs of adjudicating requests from asylees for adjustment of status, refugee travel documents and advance parole to all or certain other fee payers. Asylees filing Forms I–485 and I–131 have the option to either pay the fees or request a fee waiver. DHS disagrees that the sole considerations for providing a fee exemption are that the underlying status is fee exempt and the requestors historically face economic hardships. As explained throughout this preamble, DHS exercises its discretionary authority to provide fee exemptions for benefits and services based on numerous factors, including balancing beneficiary-pays and ability-to-pay principles, burden to the requestor and to USCIS, as well as humanitarian considerations and other policy objectives as supported by data. Though DHS may consider the similar circumstances of different categories of requestors in providing a fee exemption, as with VAWA, T nonimmigrant status, and U nonimmigrant status, whether the benefit request is submitted by populations with similar characteristics is not solely determinative of whether DHS provides a fee exemption. DHS disagrees that refugees and asylees should be provided the same fee exemptions simply because the two groups share similar characteristics. There are distinguishing characteristics between refugees and asylees. *See* INA 209, 8 U.S.C. 1159. Also, the population of asylees has far outnumbered the population of refugees in recent

years.[198] DHS believes that these differences in circumstance, in conjunction with the transfer of costs to other fee-paying benefit requestors, justifies providing certain fee exemptions for refugees and not for asylees because, overall, asylees are better able to time the filing of Form I–485 or an associated benefit request with their ability to pay the fees or request a fee waiver. DHS maintains this position in this final rule.

DHS disagrees that any potential decrease in *nunc pro tunc* filings of Form I–589 would reduce burdens to USCIS to such a degree that would justify the cost of this fee exemption. In FY 2022, of the total 41,160 Form I–589 filings, approximately 92 applications (0.2 percent) were filed *nunc pro tunc*. In the same year, Form I–485s filed by asylees accounted for 57,029 of the annual total of 608,734 Form I–485s filed (9 percent). Considering the 5-year annual averages of total Form I–485 filings (551,594) and fee-paying Form I–485 filings (471,625), on average, 85 percent of all Form I–485s are fee-paying. While not a direct comparison, the commenter's suggestion would result in additional forgone revenue on tens of thousands of Form I–485s to reduce *nunc pro tunc* I–589 filings that number less than 100 annually. Thus, the commenter's assertion that the additional fee exemption would reduce burden to USCIS is not supported by data and DHS declines to adopt the commenter's suggestion.

DHS does not adopt the commenters' recommendation to add new fee exemption to the final rule for Form I–290B when filed by refugees and asylees in connection with Form I–730. DHS recognizes that we are providing a fee exemption for a Form I–290B filed by other populations in this final rule that have characteristics that resemble the population that files Form I–730. However, USCIS Form I–290B fee payment data indicates that affordability or accessibility has not generally been a problem for this population. Most individuals filing Form I–290B in association with a Form I–730 during FY 2019 through FY 2022 paid the filing fee. During this period, USCIS received a total of 376 Form I–290Bs filed in association with a Form I–730. Of those, only 57 (15 percent) were fee waived

while 269 (72 percent) paid the full fee. Additionally, rejections were low and decreased over time. Of the 376 total filings, 50 (13 percent) were rejected, with no rejections occurring in FY 2021 and only two occurring in FY 2022. The demonstrably low demand for fee waivers, combined with the low incidence of rejection, does not support the need for a fee exemption for this population. Additionally, DHS addresses the public's concerns regarding fee waiver adjudication as discussed earlier in this preamble by codifying eligibility requirements and providing clarifying guidance.

DHS does not adopt the commenters' recommendation to add new fee exemption to the final rule for Form I–290B when filed by refugees and asylees in connection with Form I–485. The commenters did not provide any explanation as to why specifically form I–485 filed by a refugee or asylee should be entitled to a fee-exempt I–290B. Refugee-based I–485s are fee exempt and asylum-based I–485s are eligible for fee waiver, such that re-filing does not pose economic obstacles to economically disadvantaged refugee and asylee adjustment applicants.

DHS does not adopt the commenter's recommendation that the fee for asylees filing Form I–131 be prorated in accordance with the validity period of the refugee travel document relative to the 10-year passport. Consistent with U.S. treaty obligations, DHS does not charge a fee for a Refugee Travel Document that is greater than the fee charged for a U.S. passport.[199] This final rule sets the fee for Refugee Travel Documents using Form I–131, Application for Travel Document, at an amount which is far less than the Refugee Travel Document fee-paying unit cost [200] and equivalent to the current U.S. passport fee.[201] The requirement to match the fees is not related to the effective period that a requestor may use either document. In

---

[197] The fee for refugee travel documents is set at the same level as the fee for a U.S. passport consistent with U.S. obligations under Article 28 of the 1951 Convention relating to the Status of Refugees, as adopted by reference in the 1967 Protocol relating to the Status of Refugees. *See* 8 CFR 106.2(a)(7)(i) and (ii).

[198] For example, in fiscal years 2019–2021, 48,888, 30,964, and 17,692 individuals respectively received asylum status, whereas 29,916, 11,840, and 11,454 individuals were admitted as refugees. *See* U.S. Dep't of Homeland Security, Office of Immigration Statistics, Annual Flow Report, Refugees and Asylees: 2021, available at *https://www.dhs.gov/sites/default/files/2023-03/2022_0920_plcy_refugees_and_asylees_fy2021_v2.pdf.*

[199] *See* Article 28 of the 1951 Convention relating to the Status of Refugees, as adopted by reference in the 1967 Protocol relating to the Status of Refugees; 8 CFR 106.2(a)(7)(i) and (ii).

[200] *Compare* Table 1, *with* Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4. The fee-paying unit cost for I–131 Refugee Travel Document is $535.

[201] At the time of this rulemaking, the DOS passport fees for a U.S. Passport Book consist of a $130 application fee and a $35 execution (acceptance) fee, for a total of $165. Children under 16 applying for a U.S. Passport Book pay a $100 application fee and a $35 execution (acceptance) fee, for a total of $135. *See* U.S. Department of State—Bureau of Consular Affairs, "U.S. Passports," "Passport Fees," available at *https://travel.state.gov/content/travel/en/passports/how-apply/fees.html* (last viewed Sept. 15, 2023).

HR-1 FRN 2025 AR-000086

general, DHS does not set fees to reflect an estimated monetary value of a benefit during its validity period. As explained earlier in this preamble, DHS charges fees at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants."[202] In this final rule, DHS maintains that the fee for asylees filing Form I–131 to request a refugee travel document will be kept below cost and consistent with the U.S. passport fee, increasing from $135 to $165. *See* Table 1.

h. TPS

*Comment:* Commenters asked USCIS to retain the fee exemption for Form I–765 filed by initial TPS applicants under age 14 and over age 65 because:
• An EAD might be the only identification available to an unaccompanied child and it plays a vital role in securing critical support.
• Increasing fees on children and retired or disabled adults is inconsistent with the balancing of equities cited throughout the proposed rule.
• These applicants would be required to seek a fee waiver with each application.
*Response:* DHS recognizes commenters' concerns but believes that our rationale in the proposed rule remains valid and not retaining the Form I–765 fee exemption for TPS applicants below age 14 and above age 65 is the best policy choice. There continues to be no fee for Form I–821 TPS re-registration and fee waivers are available for Form I–765 and initial Form I–821 for eligible applicants. *See* 8 CFR 106.3(a)(3).

As explained in the proposed rule, USCIS no longer requires TPS applicants to file Form I–765 for information collection purposes, and only requires it if the TPS applicant wants an EAD. Persons applying for TPS who do not wish to request employment authorization need only file Form I–821. The reason that the INS fee exempted a Form I–765 filed by initial TPS applicants under age 14 and over age 65 from a fee no longer exists. *See* 88 FR 463. Thus, DHS will maintain that all TPS applicants requesting employment authorization must pay the filing fee for Form I–765 or request a fee waiver.

---

[202] *See* INA sec. 286(m), 8 U.S.C. 1356(m). The longstanding interpretation of DHS is that the "including" clause in section 286(m) does not constrain DHS's fee authority under the statute. The "including" clause offers only a non-exhaustive list of some of the costs that DHS may consider part of the full costs of providing adjudication and naturalization services. *See* 8 U.S.C. 1356(m); 84 FR 23930, 23932 n.1 (May 23, 2019); 81 FR 26903, 26906 n.10 (May 4, 2016).

i. Requests for Additional Fee Exemptions

*Comment:* Multiple commenters recommended that USCIS exempt fees for all survivor or victim-based applications because poverty and barriers to financial resources are felt across all survivor-based immigration categories. The commenter also stated that immigrant survivors often face additional financial burdens and safety risks when they try to gather documents needed to support fee waivers that might be controlled by abusers or exploitative employers.

One commenter recommended that DHS should exempt application fees for all forms of humanitarian relief through adjustment of status, since these populations face similar obstacles. The commenter added that DHS should provide a fee exemption for I–765 renewal and replacement applications for all humanitarian relief holders, including those based on a pending application for adjustment of status. The commenter stated that gaps in employment authorization can result in job loss. The commenter said that exempting humanitarian applicants from paying these fees would streamline the volume of fee waiver requests to adjudicate, lower personnel cost, and help ensure the continued economic independence of survivors.

*Response:* DHS acknowledges the commenters' concerns regarding the financial burden to individuals seeking survivor or victim-based immigration benefits. DHS weighed these considerations given the commenters' feedback against the number of VAWA-, T-, and U-related filings it receives each year and the transfer of costs to other petitions and applications if these filings were fee exempt through final adjudication of the adjustment of status application and emphasizes the benefit to survivors in providing additional fee exemptions, as well as the humanitarian nature of these programs, in this final rule. As a result, DHS provides additional fee exemptions in the final rule for VAWA, T nonimmigrant, and U nonimmigrant populations to include adjustment of status and associated forms. *See* 106.3(b)(6); *see also* Table 5B.

DHS declines to provide fee exemptions for all humanitarian categories of requestors for all forms filed through adjustment of status, as suggested by the commenter. DHS also notes that requests for humanitarian relief such as asylum (Form I–589), T nonimmigrant (Form I–914), U nonimmigrant (Form I–918), or VAWA self-petition (Form I–360), are fee

exempt. In this final rule DHS provides fee exemptions and fee waiver eligibility for forms filed through adjustment and associated ancillary forms by certain humanitarian categories of requestors consistent with our fee-setting approach as explained in this preamble.

DHS disagrees with the commenter's characterization of the provision of additional fee exemptions for certain humanitarian categories as "arbitrary" or "unjustified" as it applies to the proposed rule and this final rule. As described throughout this preamble, DHS maintains fee waivers, reduces fees, and provides new fee exemptions to address accessibility and affordability where DHS has determined that a different approach would inequitably impact the ability of those who may be less able to afford the fees to seek an immigration benefit for which they may be eligible. DHS believes this final rule represents our best effort to balance access, affordability, equity, and national interest while providing USCIS with the funding necessary to maintain adequate services.

*Comment:* One commenter stated that DHS should make I–765 applications filed under category (c)(14) fee exempt for victims and witnesses of workplace exploitation. The commenter said that applicants requesting employment authorization under this category will have either suffered or witnessed workplace abuse and will be at risk of termination or retaliation by their abusive employers, and some may also have recently lost their jobs or may be owed back wages. The commenter added that, because this basis for requesting deferred action and employment authorization is new, the anticipated volume of these requests will be low and will not materially burden USCIS if the fees for these Form I–765s are exempted.

*Response:* On October 12, 2021, DHS issued a Policy Statement in support of the worksite enforcement efforts being conducted by the Department of Labor (DOL) in conjunction with other government agencies. The goal of DHS's policy is to ensure that we maximize the impact through policy and practices that will reduce the demand for illegal employment and help noncitizens navigate the USCIS process. Noncitizens who fall within the scope of a labor agency investigation and have been granted deferred action may be eligible for deferred action-based employment authorization (Form I–765 (C14). However, the C14 employment classification is not unique to these applicants. For this reason, DHS declines to fee exempt the C14 classification for Form I–765. However,

HR-1 FRN 2025 AR-000087

DHS has expanded the availability of fee waivers to ensure that the most vulnerable applicants are able to access the relief that they need. *See* 8 CFR 106.3.(a)(3)(ii)(E).[203]

*Comment:* Some commenters stated that it is unclear if Form I–824 would be fee exempt for certain humanitarian categories, and USCIS should make it exempt for SIVs, U, T, VAWA, asylees, and refugees. Other commenters said that Form I–824 should be free because it is used when USCIS has made a mistake.

*Response:* DHS appreciates the commenters' concern that the proposed fee exemptions for Form I–824 lacked clarity. In this final rule, DHS provides a fee exemption for T visa applicants and T nonimmigrants, U visa petitioners and U nonimmigrants, VAWA, abused spouses and children categories, and SIVs for Form I–824. *See* 8 CFR 106.3(b); Table 5B. DHS declines to provide a fee exemption for Form I–824 for asylees and refugees as these populations may not use this form.

*Comment:* One commenter stated that for immigrant victims of crime and abuse eligible for humanitarian immigration relief, including T nonimmigrant status, U nonimmigrant status, relief under VAWA (including Form I–751s), CAA, HRIFA, and the Nicaraguan Adjustment and Central American Relief Act (NACARA), VAWA cancellation of removal, VAWA suspension of deportation, and SIJ classification, the Form I—290B should be fee exempt. The commenter explained that requiring indigent immigrants to file a fee waiver for this form highlights the problematic approach USCIS has historically taken to fee waiver requests that impedes due process and cuts off low-income immigrant crime victims from immigration relief they would otherwise be able to receive. Similarly, other commenters expressed concern with the exclusion of Form I–290B appeals of U-based adjustment of status from the fee exemption provisions. Another commenter stated that limiting fee exemptions for VAWA self-petitioners filing I–290Bs to when the I–485 and I–360 are concurrently filed limits due process and access to justice solely based on administrative technicality.

Multiple commenters stated that the Form I–290B should be exempt for refugees and asylees to the same extent that it is for other humanitarian immigration categories, though some also stated that Form I–290B need not be fee exempt for every benefit sought by an asylee or refugee. Commenters asserted that Form I–290B should be fee exempt when filed in connection Form I–730. One commenter emphasized that the I–730 is the only vehicle for family reunification for asylees and refugees, while another said that the lack of a fee exemption would result in numerous petitioners each year suffering the devastating consequences of family separation.

Additional commenters stated that adding fee exemptions for I–290Bs filed by asylees and refugees would constitute a logical outgrowth of the proposed regulation, which eases the fee burden on most humanitarian categories of requestors. The comments said that DHS should offset the cost of the I–290B fee exemption for refugees and asylees when filed in connection with the I–730 by retaining the fee requirement for I–131s filed by refugees because refugees with an ability to travel internationally presumably have an ability to pay for the I–131 and do not have the "presumptive" economic hardship that justifies other fee exemptions for this population.

*Response:* In this final rule, DHS provides a fee exemption for Form I–290B if it is filed for a motion or appeal of a denial of any benefit request before adjusting status or for Form I–485 and associated ancillary forms for the following humanitarian categories: T and U nonimmigrant status, VAWA, abused spouses and children adjusting status under CAA and HRIFA, SIV, and SIJ. *See* 8 CFR 106.3(b); Table 5B. DHS declines to provide additional fee exemptions for asylees and refugees in this final rule for the reasons discussed elsewhere in this preamble.

*Comment:* Some commenters recommended that DHS create fee exemptions for Form N–400s in certain situations, specifically:

• There should be an automatic fee waiver for all Form N–400 applicants with Form N–648 that meets the requirements for the medical certificate for disability exceptions.

• DHS should also provide fee exemptions for naturalization applications filed by refugees because the Refugee Convention calls on participants to facilitate the assimilation and naturalization of refugees as far as possible, and that DHS is obligated to ensure that the increased naturalization fees do not hinder the naturalization of refugees.

*Response:* DHS appreciates that many applicants filing Form N–648, Medical Certification for Disability Exceptions, may be unable to pay the Form N–400, Application for Naturalization, filing fee but declines to provide a general fee exemption in this situation. Fee-exemption eligibility must be determined at the time a form is received by USCIS. The adjudication of Form N–648 is performed at the time of the N–400 interview after an Immigration Services Officer (ISO) has verified that the N–648 relates to the applicant.[204] USCIS would be unable to determine whether the Form N–648 meets the requirements before exempting the Form N–400 fee. Furthermore, were USCIS to adjudicate Form N–648 at the time of receipt, before Form N–400, this would still require a full review of the applicant's A-file.[205] Because the ISO adjudicating the N–400 would be required to perform another full review of the applicant's A-file,[206] this would result in an inefficient duplication of USCIS efforts. In addition, not all applicants filing Form N–648 are unable to pay the Form N–400 fee. Form N–648 does not have any fee and applicants can still request a fee waiver or reduced-fee Form N–400 ($380) if they are unable to pay the online filing fee of $710, a $50 savings over the paper-based filing fee of $760.

Currently, refugees are provided fee exemptions for their immediate needs upon arrival and generally would not be eligible for naturalization until 5 years after entry into the United States. DHS believes that at the time refugees are for applying for naturalization they may be employed and able to pay fees. Additionally, the Refugee Convention calls on States to facilitate the assimilation and naturalization of refugees; however, fee exemptions are not a requirement under the Convention. Article 34 of the Refugee Convention states in part that States shall make every effort to reduce the cost of naturalization proceedings.[207]

[203] *See* DHS, "Policy Statement 065–06: Worksite Enforcement: The strategy to Protect the American Labor Market, the Conditions of the American Worksite, and the Dignity of the Individual," available at *https://www.dhs.gov/sites/default/files/publications/memo_from_secretary_mayorkas_on_worksite_enforcement.pdf* (last viewed Sept. 1, 2023).

[204] *See* USCIS, "USCIS Policy Manual," Vol. 12, "Citizenship & Naturalization," Part E, "English & Civics Testing & Exceptions," Chp. 3, "Medical Disability Exception (Form N–648)" [12 USCIS–PM E.3], available at *https://www.uscis.gov/policy-manual/volume-12-part-e-chapter-3* (last visited Aug. 25, 2023).

[205] *Id.*

[206] USCIS, "USCIS Policy Manual," Vol. 12, "Citizenship & Naturalization," Part B, "Naturalization Examination," Chp. 3, "Naturalization Interview," Section B, "Preliminary Review of Application" [12 USCIS–PM B.3(B)], available at *https://www.uscis.gov/policy-manual/volume-12-part-b-chapter-3* (last visited Aug. 25, 2023).

[207] While the United States is not a party to the 1951 Refugee Convention, it is party to the 1967

Continued

**6276**    Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

Although DHS has decided not to extend fee exemptions for naturalization to refugees, USCIS offers reduced fee options, and some applicants may be eligible for fee waivers.

*G. Fee Changes by Benefit Category*

1. General Fee Provisions

a. Fee Payment and Receipt Requirements

*Comment:* A commenter stated that applicants should retain the right to request credit card refunds, stating that this is one of the few means of recourse applicants have when facing apparently non-responsive government services. They stated that barring credit card disputes would diminish government transparency. A commenter stated that, where USCIS error prejudices individuals, filing fees should be refunded. A commenter wrote that the USCIS fee structure may confuse applicants and recommended that USCIS send a follow-up invoice rather than reject applications submitted with incomplete fees.

*Response:* USCIS is committed to meeting its processing time goals and reducing the immigration benefit request processing backlog. USCIS acknowledges that since it last adjusted fees in FY 2016, USCIS has experienced elevated processing times compared to the goals established in the 2007 fee rule. *See* 72 FR 29851, 29858–29859 (May 30, 2007). Processing delays have contributed to case processing backlogs. However, with the high volume of submissions that USCIS continues to experience, steps that may delay adjudication of a request or require special handling, such as holding cases while USCIS bills for unpaid or partially unpaid fees, would only exacerbate backlogs. Therefore, USCIS fees generally are non-refundable and must be paid when the benefit request is filed. *See* 8 CFR 103.2(a).

As explained in the proposed rule, credit card disputes are generally filed by requestors whose requests have been denied, who have changed their mind about their requests, or who have asserted that the service was not provided or was unreasonably delayed. *See* 88 FR 402, 483–484 (Jan. 4, 2023). USCIS makes its no-refund policy clear on its website.[208] Filing and biometric service fees are final and non-refundable, regardless of any action

USCIS takes on an application, petition, or request, or if requestors withdraw a request. However, when USCIS receives a payment in error, it may refund it. For example, USCIS refunds fees for Form I–131, Application for Travel Document, when erroneously paid for humanitarian parole on behalf of a beneficiary who is a Ukrainian citizen.[209] USCIS provides other examples on its website.[210] Often, USCIS has processed the request to completion and performed the work for which the fee was charged when the credit card dispute is lodged. DHS understands that no one wants to be determined ineligible and denied when they complete, submit, and pay for an immigration benefit request. However, DHS is authorized to charge fees to cover the cost of adjudicating requests and paying a fee is not a guarantee of a particular outcome.

USCIS also has fee payments withdrawn due to credit card disputes after the request is approved. When certain benefit request fee payments are dishonored or declined, or where an approved applicant successfully disputes their USCIS fee payment with their credit or debit card company, USCIS may send the requester an invoice for the unpaid fee. However, USCIS will generally send the requester a notice of intent to revoke (NOIR) the approval for the payment deficiency. The NOIR usually results in the amount due being paid, but if not, USCIS may revoke the approved benefit request. *See* 8 CFR 103.7(a)(2)(iii).

USCIS data indicates that the credit card dispute process defaults to the consumer, and it has become a popular method for credit card holders whose immigration benefit requests are denied and delayed getting their money back. When USCIS performs services for which a fee has not been paid, such as when a chargeback of the fee payment occurs, the costs incurred result in a drain on IEFA reserves that are meant for other uses. Longstanding DHS regulations at 8 CFR 103.2(a)(1) provide that fees paid to USCIS for immigration benefit requests will not be refunded regardless of the result of the benefit

request or how much time the adjudication requires. Consistent with that limitation, DHS proposed that fees paid to USCIS using a credit or debit card are not subject to dispute by the cardholder or charge-back by the issuing financial institution. *See* 8 CFR 106.1(e). USCIS is almost entirely fee funded. If every customer who experiences delays or is denied a benefit would be able to successfully dispute their USCIS fee payment with their credit card company, it could impose significant financial harm on USCIS. As stated elsewhere in this preamble, USCIS is working to reduce processing delays, and we have reduced the budget to be recovered by fees in this final rule as a result of increased efficiencies. DHS declines to make any changes to the final rule in response to these comments.

In addition, DHS is adding a clarifying provision to its regulations at 8 CFR 103.2(a)(7) governing the submission of benefit requests to ameliorate the risks that may result from the changes being made in the final rule. DHS is adding several fee discounts, fee waiver eligibility and fee exemptions in this final rule to address the concerns of commenters about the negative impacts of the new fees on low income, small employer, nonprofit, military, elderly, and young requestors. *See* 8 CFR 106.3(b) (new exemptions); 8 CFR 106.2(a)(3), (4), (11), and (c)(13) (discounts for small employers and nonprofits); 8 CFR 106.2(a)(3) & (4) (Form I–129 fee discounts); 8 CFR 106.2(a)(20)(ii) (child's fee for Form I–485, Application to Register Permanent Residence or Adjust Status); 8 CFR 106.2(b)(3)(ii) (discount for Form N–400, Application for Naturalization); 8 CFR 106.2(a)(32) and (46) (adoption fee exemptions); 8 CFR 106.2(b)(7)(ii) and (8) (adoption fee exemptions). USCIS will review the filing to determine if the requestor qualifies for a fee waiver, fee exemption, or lower fee when the request is received. However, to protect USCIS from requestors that may submit a lower fee for which they may not qualify and that USCIS may not catch at intake, DHS provides that if USCIS accepts a benefit request and determines later that the request was not accompanied with the correct fee, USCIS may deny the request. 8 CFR 103.2(a)(7)(ii)(D)(1); *see also* 88 FR 402, 481–482. Further, because USCIS may adjudicate certain requests in a few days, if the benefit request was approved before USCIS determines the correct fee was not paid, the approval may be revoked upon notice. *Id.*

*Comment:* Commenters opposed the proposal to allow USCIS to require that

---

Refugee Protocol, under which States agree to apply articles 2 through 34 of the Convention. *See* Protocol relating to the Status of Refugees art. 1, Dec. 16, 1966, 19 U.S.T. 6223.

[208] *See* USCIS, Filing Fees, available at *https://www.uscis.gov/forms/paying-uscis-fees* (last viewed on Sept. 22, 2022).

[209] *See* USCIS, Uniting for Ukraine, *https://www.uscis.gov/ukraine* (last reviewed/updated: June 1, 2023).

[210] *E.g.,* USCIS, USCIS Removes Biometrics Requirement for Form I–526E, Immigrant Petition by Regional Center Investor, petitioners, *https://www.uscis.gov/newsroom/alerts/uscis-removes-biometrics-requirement-for-form-i-526e-petitioners* (last reviewed/updated: Mar. 15, 2023); USCIS, Certain Petitioners for U Nonimmigrant Status May Receive a Refund for Applications for Employment Authorization Submitted Before Sept. 30, 2021, *https://www.uscis.gov/newsroom/alerts/certain-petitioners-for-u-nonimmigrant-status-may-receive-a-refund-for-applications-for-employment* (last reviewed/updated: Nov. 22, 2021).

certain fees be paid using a certain payment method or that certain fees cannot be paid using a particular method. *See* 8 CFR 106.1(b). The commenters stated that this could disallow payment methods such as cashier's checks or money orders, to the detriment of low-income applicants and petitioners who may not have internet access, U.S. bank accounts, established credit-scores, or access to reloadable debit cards necessary for some forms of payment. The commenters requested that USCIS accept cashier's checks and money orders as methods of payment for all applications, petitions, and requests. Some stated that access to internet and prepaid debit cards is limited for low-income applicants. Some stated that USCIS should not rely on public libraries to meet the need for internet access because of libraries' under-utilization. A commenter requested that any changes to acceptable payment methods should be accompanied with a widespread notice to the public of this change and a grace period to facilitate smooth processing and promote overall fairness.

A commenter stated that Form G–1450 payments are often improperly rejected even when all the information supplied is correct and legible and USCIS should allow submission of cashier's checks and money orders. Commenters also requested that Form I–140 and I–907 fees be payable from outside of the United States. A commenter suggested that a single check or money order be sufficient for all fees related to a single application to simplify returning funds from a money order.

*Response:* In this final rule, DHS does not restrict the method of payment for any immigration benefit request. This final rule clarifies the authority for DHS to prescribe certain types of payments for specific immigration benefits or methods of submission. DHS does not have data specific to USCIS benefit requestors' access to the internet or banking but understands that populations submitting requests may have attributes that make access to a bank account challenging. DHS acknowledges that some requestors may not use banks or use them on a limited basis for several reasons. It appears, however, that a person can alternatively purchase a pre-paid debit card, cashier check or money order that can be used to pay their benefit request fee.[211] In

addition, since 2018, requesters have been able to use a credit card to pay for a USCIS form filing fee that gets sent to and processed by one of the USCIS lockboxes or, for credit card transactions that do not exceed the limits set forth in the Treasury Financial Manual, split the fees between more than one credit card.[212] More recently, USCIS expanded a pilot program that allows credit card payments for service center filings.[213] The credit card used does not have to be the applicant's; however, the person who is the owner of the credit card must authorize use of his or her credit card. In addition, comments that libraries are underused indicate they remain available for free online services, access to information and computers that the public may use to read, complete, print or submit benefit requests. Nevertheless, in evaluating future changes to acceptable means of payment for each immigration benefit request, DHS will consider the availability of internet access and different means of payment to the affected populations.

Regarding public notice, proposed changes to USCIS forms and instructions are typically published in the **Federal Register** for notice and comment. When USCIS finalizes a revised form, there is typically a grace period or advance notice before customers are required to use a revised version of the form. USCIS announces these changes on its website. When DHS expands or limits acceptable instruments locally, nationwide, or for certain USCIS benefit requests, it issues multiple communications and provides sufficient advance public notice to minimize adverse effects on any person who may have plans to pay using methods that may no longer be accepted.[214] Nevertheless, in response to the public comments and to provide more certainty to stakeholders, DHS has codified a 30-day advance public notification requirement before a

payment method will be changed. 8 CFR 106.1(b).

b. Biometric Services

*Comment:* A few commenters wrote support for eliminating the separation of biometrics fees from the fee associated with their underlying application. Commenters wrote:
• Combining fees would reduce confusion and promote efficiency.
• They supported including biometric fees but disagreed that doing so would lower fees overall.
• A commenter requested an online scheduling system for biometric appointments.
• They recommended reusing immutable or persistent biometrics, especially for highly iterative applications with shorter grant periods biometrics to mitigate administrative burdens.
• No fee should be paid when biometrics are reused.

A few commenters opposed absorbing the biometric services fee into other fees, stating:
• Not everyone is required to submit biometrics and people should not be required to pay for something that is not needed.
• It is disingenuous to suggest that integrating the biometrics fee into the required filing fee reduces fee burdens while simultaneously seeking to double the fees an individual would pay to adjust status.
• USCIS should eliminate the biometrics requirements for O–3 applicants, consistent with H and L applications to reduce confusion and streamline the application process because there is no reason to require biometrics information from O–3 applicants.
• USCIS could lower its costs by improving its communications with EOIR, especially for the purposes of coordinating asylum and I–94 grants.

*Response:* DHS agrees with the comments in favor of incorporating the cost of biometric services into the underlying immigration benefit request fees. This approach aims to simplify the fee structure, create a more user-friendly experience, reduce rejections of benefit requests for failure to include a separate biometric services fee, and better reflect how USCIS uses biometric information. As explained in the proposed rule, the biometric services information used to calculate the proposed fees included when USCIS may reuse information it already collected. *See* 88 FR at 484–485 (Jan. 4, 2023). As explained elsewhere in this rule, DHS limited the fee increases for some immigration benefit requests by inflation or a lower

---

[211] DHS understands that some commenters are concerned about the hidden fees of certain prepaid debit cards; however, many cards exist with no fees. *See, e.g.,* CardRates.com, 6 Best Prepaid Debit Cards with No Fees (Oct. 2023), available at *https://*

*www.cardrates.com/advice/best-prepaid-debit-cards-with-no-fees/* (last viewed Oct. 20, 2023).

[212] *See* USCIS Expands Credit Card Payment Option for Fees, *https://www.uscis.gov/news/news-releases/uscis-expands-credit-card-payment-option-fees* (last reviewed/updated Feb. 14, 2018).

[213] *See* USCIS Service Center Expands Credit Card Payment Pilot Program to Most Forms, available at *https://www.uscis.gov/newsroom/alerts/uscis-service-center-expands-credit-card-payment-pilot-program-to-most-forms* (last reviewed/updated Mar. 30, 2022).

[214] *See, e.g.,* USCIS Service Center Expands Credit Card Payment Pilot Program to Most Forms, available at *https://www.uscis.gov/newsroom/alerts/uscis-service-center-expands-credit-card-payment-pilot-program-to-most-forms* (last reviewed/updated Mar. 30, 2022); USCIS Updates Fee Payment System Used in Field Offices, available at *https://www.uscis.gov/news/news-releases/uscis-updates-fee-payment-system-used-field-offices* (last reviewed/updated Mar. 7, 2019).

HR-1 FRN 2025 AR-000090

percentage from the proposed rule. This includes benefit requests that typically require biometric services, such as Form I–90, Application to Replace Permanent Resident Card, Form I–485, and Form N–400. As such, the final fee for these forms is sometimes less than in the proposed rule.

The INA provides DHS with the specific authority to collect or require submission of biometrics in several sections. *See, e.g.,* INA section 235(d)(3), 8 U.S.C. 1225(d)(3) ("to take and consider evidence of or from any person touching the privilege of any alien or person he believes or suspects to be an alien to enter, reenter, transit through, or reside in the United States or concerning any matter which is material and relevant to the enforcement of this chapter and the administration of the Service"); INA section 287(b), 8 U.S.C. 1357(b) (powers of immigration officers and employees to administer oaths and take evidence); INA sections 333 and 335, 8 U.S.C. 1444 (requirement to furnish photographs for naturalization) and 1446 (investigation and examination of applicants for naturalization); INA section 262(a), 8 U.S.C. 1302(a) (requirement for noncitizens to register and be fingerprinted); INA section 264(a), 8 U.S.C. 1304(a) (authority to prescribe contents of forms required for alien registration); *see also* INA section 103(a)(3), 8 U.S.C. 1103(a)(3) (conferring broad authority on the Secretary to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the" immigration laws). DHS regulations at 8 CFR 103.2(b)(9) accordingly provide that USCIS may require any applicant, petitioner, sponsor, beneficiary, or individual filing a benefit request, to submit biometrics, and pay the biometric services fee.

As USCIS has tried to adjust its biometrics policies over the years, it has been stymied by the separate fee requirement and how it would be collected. In addition, the separate fee results in many requests being rejected for failure of the preparer to accurately calculate the impact of the biometric services fee on the amount owed. This rule will provide DHS flexibility in its biometrics submission practices and policies to ensure that necessary adjustments can be made to meet emerging needs, conduct biometrics-based background checks, produce documents, and verify identities, while reducing filing rejections.

In June 2023, USCIS launched a new tool which allows customers to reschedule most biometric appointments before the date of the appointment.[215] USCIS periodically changes policies related to biometric collection, such as the forms requiring biometric services.[216] Removing the biometrics services fee as a separate requirement will streamline the ability of DHS and USCIS to change biometrics polices and need and workload dictates. However, those changes may be beyond the scope of the fee rule.

c. Online/Electronic Filing

*Comment:* Many comments were received on the proposed changes to online and electronic filing. The commenters who were opposed to the different fees for online and paper filing wrote:

• They opposed having separate fees for online filing and paper filings without providing additional rationale.

• Paper filing fees should not differ from online filing because it would result in financial and digital inequities, contravene the objectives of E.O. 14012, burden applicants with low financial inclusion, discriminate against individuals with lower income, certain disabilities, low literacy, inability to use technology, people living in rural or remote areas, who lack access to broadband and computers; citing a 2021 Pew Research Center research on race and access to internet and computers, and a 2022 study showing that one-in-five U.S. households including many racial and ethnic minority households are not connected to the internet.

• 2020 study on the "Digital Divide" during the COVID–19 pandemic; a 2020 DHS study on poverty and internet access indicating that one in six people living in poverty in the United States have no internet access, multiple sources on internet access in various locations, a 2021 Pew Research study of which older Americans seldom use the internet, and a 2022 publication on low rates of smartphone ownership among seniors.

• The fees would result in chaos and confusion for unrepresented people, including missed deadlines, rejected cases, and delays.

• Applicants should not be punished for being unable to file online.

---

[215] USCIS, USCIS Launches Online Rescheduling of Biometrics Appointments, available at *https://www.uscis.gov/newsroom/news-releases/uscis-launches-online-rescheduling-of-biometrics-appointments* (last reviewed/updated July 6, 2023).

[216] *See, e.g.,* USCIS, USCIS Extends Temporary Suspension of Biometrics Submission for Certain Form I–539 Applicants, available at *https://www.uscis.gov/newsroom/alerts/uscis-extends-temporary-suspension-of-biometrics-submission-for-certain-form-i-539-applicants* (last reviewed/updated Apr. 19, 2023).

• Many applicants cannot file online due to language barriers, lack of computer skills, as well as access and resources to submit online.

• The proposal would subject applicants with low tech literacy, such as seniors and people with lower education, to scams claiming to assist in digital filing.

• The proposal would disadvantage survivors of domestic violence, human trafficking, and other serious crimes who are not able to file applications for protected case types online.

• People with disabilities may require assistive technologies that they do not have access to, especially if they are survivors of violent crimes and research indicates higher rates of disabilities, varying needs, and the impact of violent crimes and abuse on persons with disabilities.

• Applicants who are most vulnerable and in need of assistance, such as lower income and the elderly who do not have the technology or savvy to handle a finicky electronic system, would be penalized.

• The system often is not compatible with immigration software used by attorneys to file for clients.

• Lower fees for online applications would discourage immigrants from seeking assistance from attorneys and legal representatives. Instead, applicants would try to complete the applications on their own eventually leading to errors.

• Low-income individuals may not be able to access representation to help them apply online for immigration benefits.

• USCIS should not rely on library access to provide for digital filing needs, citing a 2016 Pew Research Center study on underutilization in libraries and information security issues related to library computer reliance. USCIS did not account for varying resources and library computer availability, providing citations on different staffing issues and applicant needs that libraries may face.

• All online application forms should provide for fee waivers and exemptions. Because Form I–912 is not available online, many applicants must file paper and the proposal would impose an undue burden on low-income applicants.

• They do not support a tiered payment structure until online filing options were available to all applicants and forms.

• Expressed concerns for the equity impacts of the proposed electronic filing discount but supported the possible efficiency of using electronic filing.

• Paper filing costs no more than $20 more than electronic filing.

HR-1 FRN 2025 AR-000091

• To charge less for an application or petition filed online is inappropriate, because USCIS' online filing system does not function properly and would only hinder proper filings and increase the backlog.

• The online filing system does not work properly, is difficult to use, and is not user-friendly.

• Recommended allowing applicants and their attorneys to log-in with the same account rather than using two separate computers and having separate logins, and that password reset, or lockout resolutions be simplified.

• Attorneys should be able to submit filings on behalf of their clients that the system should allow the use of Application Programming Interfaces.

• A glitch requires them to obtain a new USCIS attorney account for every filing they initiate.

• Expressed skepticism regarding how online filing would ensure that supporting documentation is properly received. They would prefer to file online, but that they cannot successfully do so as often information that is entered and submitted in the system is later lost or riddled with errors.

• Due to issues with the online system, they advise clients not to use it.

• Provided examples of how the system is not user friendly, prone to errors, and that USCIS' online account and filing software must be seriously improved.

• Form N–400 has exhibited poor data integrity when filed online.

• Filings, such as Form I–589, that require significant amounts of documentation organized in a particular manner are difficult to organize digitally rather than by an applicant's counsel.

• Recommended that USCIS provide both instructions and the "online forms for discounted only benefit applications" in several common foreign languages.

• USCIS should provide instructions and the online forms in at least several common foreign languages, and the proposal falls short of USCIS' own Language Access Plan. Many of the applications impacted under USCIS' proposed rule have not been translated into Chinese, Vietnamese, Tagalog, or Korean, or other languages.

• Expressed concern for the security of online filing and urged USCIS to ensure that applicants are not forced to use an unsafe system.

• Disagreed with fee increases without increases in service or efficiency and suggested improved and increased online-filing options.

• USCIS must explain an operational benefit to charging more for online filing, whether doing so would hasten a transition to online filing, and clearly explain the goal of the fee differential before proceeding with the proposal.

• Digital filing would increase processing time and cost any but the most complex applications.

• Because fees are higher for some of the online applications and that separate applications must be made for each family member, and that not all services are readily available online (such as rescheduling biometrics appointments) these are examples of an inefficient system.

• USCIS' platform cannot save data for more than 30 days and thus it is a poor site to enter data into.

• Allow Form I–485 to be filed online.

Commenters who supported different fees for online and paper filings wrote:

• Expressed support for a secure online filing portal that would enable online filings of all documents and forms so both USCIS and submitters could view and verify documents submitted and issued.

• Supported expanding online filing to reduce costs associated with H–2A filings.

• Supported the proposed online filing discount to support the transition to digital filing and related cost-savings.

• Expressed support for USCIS' current H–1B registration system and recommended that similar technological advancements be made for Form I–130 petitions.

• Improve the responsiveness of the e-Request tool to improve operational efficiency and address problem of principals separated from derivative applicants; handling requests to link family members together for more efficient adjudication; enabling counsel and applicants to address priority date issues, including inter-filing requests; and expediting requests.

• Make all filings available online and improve the USCIS online filing system, expand online filing to all immigrant and nonimmigrant benefits because this would improve efficiency.

Commenters requested online filing options for the following forms:

• All Form I–765 categories and applicants, especially those granted withholding of removal, T Nonimmigrants, U Nonimmigrants, VAWA self-petitioners, and people under an order of supervision.

• Form I–129.

• Form G–28. USCIS should update the G–28 to allow for electronic notifications and eliminate mailing of notices.

• Forms I–912 and I–942.

• Form I–485.

• Form I–539.

Commenters that wrote about USCIS online filing without commenting about the specific fees in the proposed rule, wrote:

• USCIS should improve its management of online accounts for immigration attorneys.

• USCIS should permit online filings for fee-waived and reduced N–400s.

• USCIS' digitization efforts have lagged those of other agencies and described ways that mail processing can be inefficient, including via erroneous rejections.

• The proposed incentives for digital filing are insufficient and recommended that USCIS develop an Application Programming Interface to facilitate a direct system-to-system data exchange with large volume filers.

• They hope for a fully digitized filing platform for every form that is fully compatible with attorney case management systems and capable of accepting attorney-filed forms.

• They recommend a system to accept scanned or uploaded application materials, to be funded by "a dedicated funding stream" separate from a fee increase.

• They recommend that USCIS install computers and scanners at USCIS Field Offices to assist applicants trying to electronically file applications and petitions.

• USCIS should confirm its continued provision to applicants of an option to use paper filing, and paper notices, especially Receipt Notices, RFEs, Notices of Intent to Deny (NOID), decisions and biometrics to ensure that applicants with temporary internet access are able to receive communications.

• They recommend that USCIS use email more often to provide notices as a cost-saving measure, and communicate via phone call, and video teleconference more often to improve operations, and to reduce delays and mistakes and ensure individuals receive the service they pay for.

• They request that USCIS adopt electronic signature technology to reduce administrative burdens on employers.

• USCIS should engage with stakeholders on a listening session to receive feedback on the online filing process and consult with immigration lawyers to determine how to improve electronic filing systems.

*Response:* DHS understands some commenters' desire for expansion of electronic filing. USCIS is actively planning the expansion of its online electronic filing platform for the submission and adjudication of immigration benefits. As of the end of

6280    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

FY 2022, approximately 20 percent of USCIS intake was processed through online filing, and we are striving to increase that level. USCIS continues to improve the availability and user experience of online filing. The benefits of digital tools are not limited to customers that file online. Every submission completed online rather than through paper provides cost savings and operational efficiencies to both USCIS and our customers. USCIS scans some applications, petitions, and requests received on paper so that we can process them electronically. USCIS offers recommendations to avoid delays when filing paper; if more documents were filed electronically, it would reduce the time spent on scanning paper documents and free up more time for adjudication rather than administrative tasks.[217]

These benefits accrue throughout the immigration lifecycle of the individual and with the broader use of online filing. As such, DHS believes it should encourage online filing through discounted fees.

In response to comments, DHS reevaluated the difference between online and paper fees, as discussed earlier in this preamble. In this final rule, DHS provides that online filing fees will be $50 less than the paper filing fee as additional forms are made available for online filing, unless otherwise noted. *See* 8 CFR 106.1(g).

d. Premium Processing (*e.g.,* Business Days, Combined Payment, I–907, Expansion, Emergency Stopgap USCIS Stabilization Act)

*Comment:* DHS received the following comments on the proposed changes to premium processing:
- Many applicants need to use premium processing to avoid processing delays in standard processing services.
- Support for USCIS' goals of addressing backlog and processing delays with premium processing.
- They recommended providing expanded premium processing options because this change would both increase revenue and expedite processing.
- They described the proposed rule's approach as not sustainable and that it has caused standard processing delays.
- Premium processing email service is generally quite effective and more effective than the general USCIS E-request and telephone system.

- USCIS is creating an artificial backlog to generate more money off premium processing fees.

On the proposed change of premium processing times from calendar days to business days, commenters wrote:
- They support the change but also recommended clarifying the definition of business days as days on when USCIS service centers are open.
- The purpose and advantage of premium processing is its predictability, and it is appropriate to amend the 15-calendar day timeline to exclude predictable discrete events such as Federal holidays and weekends, but not unpredictable and unknown events such as building or weather-related closures, or "other days the Federal Government chooses to close its offices." If USCIS chooses to finalize a change to business days it should only exclude weekends and Federal holidays from the timeline, rather than also excluding weather emergencies and other regional or unanticipated closures.
- Changing premium processing from calendar days to business days is reasonable because it is unreasonable to expect USCIS to work weekends and holidays.
- The proposed change would violate Federal regulations requiring the use of calendar days for required actions.
- USCIS' new position that the original USCIS interpretation of "calendar day" was incorrect is inconsistent with decades of USCIS practice and other Federal agencies' interpretations of "day." USCIS' original interpretation of "day" as "calendar day" was not incorrect, and USCIS does not have legal support for the proposed change to a 15-business day processing timeframe.
- Congress did not change USCIS' use of calendar days for premium processing, which it could have done if that had been the congressional intent.
- The proposed change would mean processing would generally be completed after the 14-day timeframe required by statute.
- The longer timeframe would decrease the value of the premium service compared to standard processing.
- USCIS has proven it can successfully complete premium processing adjudications within 15 calendar days.
- The number of Federal holidays at the end of the year would complicate processing during one of the most active periods of the year for many U.S. arts agencies.
- The change to business days would reflect on DHS' inability to

accommodate a quick service for a substantial fee.
- The proposed change would reward inefficiency and shows a lack of appetite to improve service.
- The change would impose a burden on petitioners, and individuals and make it difficult to secure visas.
- O and P petitioners often must apply for visas at the last minute and the proposed change would make it very difficult to complete the process in a workable period.
- Tight employment processing timelines with the Department of Labor (DOL) leave no spare time for lengthening the premium processing timeframe.
- A concern with the existing practice of resetting the premium processing timeframe whenever a RFE or NOID is issued and recommendation that instead the timeframe be tolled until the applicant responds to RFEs and NOIDs because this approach would promote efficiency, accountability, and align with congressional intent.
- They recommended that USCIS define how notices would be provided to petitioners, consider electronic notices, and review internal procedures and policies to ensure efficient adjudication, predictability, and reliability for petitioners.
- USCIS needs to move resources during peak filing times for certain visa categories, especially for H–2B visas as they have unique scheduling time pressures.
- The premium processing fee should be decreased considering the decreased value of the premium processing service, given the proposed longer processing period of business days.
- Premium processing fees have been increased in the past without any improvement in processing times.
- The Form I–907 fee is unreasonable.
- Premium processing should be offered and maintained without the service interruptions that have been problematic in the past.
- USCIS should respond promptly to requests for premium processing and criticized RFEs as the first responses from USCIS.
- Physician National Interest Waiver (PNIW) petitions should be adjudicated within the 15-day timeframe rather than the 45-day timeframe.
- Premium processing should be maintained without service interruptions for Form I–539 applications and Form I–129 petitions.

*Response:* DHS disagrees that adjusting the timeframe for adjudicative action on a petition for which premium processing service has been requested from 15 calendar days to 15 business

---

[217] USCIS offers recommendations to avoid delays when filing paper. *See* USCIS, Recommendations for Paper Filings to Avoid Scanning Delays, *https://www.uscis.gov/newsroom/alerts/recommendations-for-paper-filings-to-avoid-scanning-delays* (last visited Feb. 7, 2023).

HR-1 FRN 2025 AR-000093

Appx-000118

days would meaningfully harm petitioning entities.[218]

DHS is adjusting the timeframe for premium processing for multiple reasons. The current timeframe does not consider the days on which government offices are closed and USCIS staff are unavailable to adjudicate cases, such as a Federal holiday. Therefore, a surge in applications may coincide with a period when USCIS staff have substantially less than 15 working days to receive and adjudicate a petition with premium processing. In the past, there have been instances when USCIS was unable to adjudicate all the petitions for which petitioners requested premium processing within the 15-calendar day timeframe. This led USCIS to refund the premium processing fee for petitions that were not adjudicated within 15 calendar days and to temporarily suspend premium processing service. DHS believes that extending the premium processing timeframe from 15 calendar days to 15 business days will allow USCIS adequate time to take adjudicative action on petitions and will provide petitioners with a consistent and predictable experience.

DHS understands that sometimes a petitioning employer needs USCIS to take quick adjudicative action. DHS appreciates that some regular petitioners for foreign workers have built in the current 15-calendar day processing into their planning for projects and we have fully considered the impacts on such firms in making this change. As stated in the proposed rule and Regulatory Impact Analysis, DHS believes that changing from calendar days to business days may reduce the need for USCIS to suspend premium processing for applications and petitions during peak seasons, and thus impacts only a very small number of applications and petitions whose Form I–907, Request for Premium Processing Service, could not be processed within the 15-calendar day timeframe. This may permit USCIS to offer premium processing to more applicants and petitioning businesses each year. The change will only increase the maximum time USCIS has to complete the adjudication, and the average time for well-prepared requests may not increase as a result. However, DHS believes the possibility that a petitioner requesting premium

processing service may need to wait a few additional days for adjudicative action is a small cost to impose for being able to expand premium processing to more requests and reduce the likelihood of a refund or for future suspensions of premium processing service.

*Comment:* Commenters stated that premium processing should be expanded. A commenter recommended USCIS expand it to all applications across all categories. Other commenters recommended extending it to the following benefit requests:
• Form I–526 petitions.
• Form I–485 (asylum/refugee based).
• EADs and Form I–765 filings.
• Asylum seekers, to receive an interview and adjudication in a shorter period.
• Family-based immigration cases and all employment authorization applications.
• Naturalization interviews to recover costs.

*Response:* USCIS is working to expand premium processing services to all categories of Form I–539, Application to Extend/Change Nonimmigrant Status, and Form I–765, Application for Employment Authorization, by the end of FY 2025. *See* 87 FR 18227, 18228, 18235 (Mar. 30, 2022). In March 2023, USCIS began accepting premium processing requests for some students who had a pending Form I–765.[219] In June 2023, USCIS announced it would expand premium processing to some categories of Form I–539.[220] USCIS may expand premium processing service to other form types in future rulemakings. However, USCIS is also working to reduce processing times without the need for an additional premium processing service fee. *See* section III.D.4 of this preamble and 88 FR 402, 529–530 (Jan. 4, 2023). DHS has made no changes based on these comments.

### e. Adjusting Fees for Inflation, Proposed 8 CFR 106.2(c)

*Comment:* Commenters discussed adjusting fees for inflation and the DHS proposed rule to codify the authority at 8 CFR 106.2(d) to increase fees using the

Consumer Price Index (CPI–U). Commenters wrote:
• While some fees need to increase due to normal inflation, there is no reason that applications should increase so significantly.
• Fees should not be raised more than the current rate of inflation or cost-of-living.
• The fee increases should be tied to 7 percent inflation instead of the proposed increases.
• USCIS should not use inflation to further increase fees before 2025.
• USCIS should reconsider automatically increasing fees based on inflation.
• Increasing the fee regularly establishes a "moving target" for applicants and imposes a financial burden on low-income, survivor applicants, and applicants in need of assistance.
• They supported a mechanism to allow for nominal increases in fees in between the biennial fee reviews.
• Adjusting for inflation can provide more predictable and moderate fee increases than those included in the proposed rule.
• Because total inflation since January 2016 was 26.28 percent. Any fee with an increase less than this amount is operating at a relative discount.
• Providing for regular fee increases would remove consideration of "ability to pay" in fee setting.
• Regular fee increases would decrease USCIS' incentive to reduce the immigration backlog and improve administrative efficiency.

*Response:* After reviewing the public comments on the subject, DHS has decided to retain a provision that provides that DHS may adjust IEFA non-premium fees by the rate of inflation. *See* 88 FR 402, 516–517 (Jan. 4, 2023); 8 CFR 106.2(d). While the CFO Act, 31 U.S.C. 901–03, requires agencies to review their fees on a biennial basis and recommend changes, fee changes can be delayed by competing policy consideration and other deliberative matters, whereas a fee increase that is based on a precise mathematical inflation formula might avoid such a delay. An adjustment that is based on inflation would allow DHS to keep USCIS IEFA revenue in pace with costs more regularly. In addition, if DHS can adjust USCIS fees on a timelier basis to match inflation, the fees will be more incremental and more predictable than larger increases every few years. 88 FR 402, 516. As a result, regular inflation rate increases using a basic mathematical calculation are expected to result in smoother fee increases and less sticker shock from new fee rules.

---

[218] DHS did not propose any changes in premium processing fees. Premium processing fees were established by law and in other rulemakings. *See* Public Law 116–159, secs. 4101 and 4102, 134 Stat. 739 (Oct. 1, 2020); 8 U.S.C. 1356(u); Implementation of the Emergency Stopgap USCIS Stabilization Act, 87 FR 18227 (Mar. 30, 2022); Adjustment to Premium Processing Fees, 88 FR 89539 (Dec. 28, 2023).

[219] *See* USCIS, USCIS Announces Premium Processing; New Online-Filing Procedures for Certain F–1 Students Seeking OPT or STEM OPT Extensions, available at *https://www.uscis.gov/ newsroom/news-releases/uscis-announces-premium-processing-new-online-filing-procedures-for-certain-f-1-students-seeking-opt* (last reviewed/ updated Mar. 6, 2023).

[220] *See* USCIS, USCIS Expands Premium Processing for Applicants Seeking to Change into F, M, or J Nonimmigrant Status, available at *https:// www.uscis.gov/newsroom/alerts/uscis-expands-premium-processing-for-applicants-seeking-to-change-into-f-m-or-j-nonimmigrant-status* (last reviewed/updated 6/12/2023).

Nevertheless, in this final rule, DHS is revising proposed 8 CFR 106.2(d)(2) to provide that the inflation adjustment would affect all fees that are not set by statute. In response to comments that requested DHS adjust fees by inflation instead of using the proposed fees, DHS decided to limit some fees to the lesser of either the proposed fee or the current fee adjusted for inflation. *See* section II.C. Changes from the Proposed Rule of this preamble.

2. Employment and Immigrant Investors

a. Asylum Program Fee

*Comment:* Many commenters submitted comments on the Asylum Program Fee and proposed 8 CFR 106.2(c)(13). Some commenters supported the proposed Asylum Program Fee and funding the asylum process through employment petition fees. Other commenters stated that, although this fee will apply to Form I–129 petitions for H–2A workers, it does not raise the same concerns that they included in their comment letter about worker mobility because it applies equally to all applications and therefore does not disincentivize hiring of H–2A workers already in the United States. Other commenters suggesting that the proposed fee be increased to eliminate the backlogs in other humanitarian fee-exempt programs. Others wrote that they supported cost shifting provided that a greater share is covered by employer petitions as a means of ensuring asylum seekers and other vulnerable groups are not harmed by DHS's funding structure, by shifting asylum costs to those applicants who are more likely to be in a financial position to afford to pay. Other commenters supported the proposed Asylum Program Fee until congressional funding is secured for such purposes.

Most commenters on the subject wrote that they opposed the proposed Asylum Program Fee. DHS summarizes the commenters as follows:

• Raising fees on employment-based applicants to subsidize asylum applicants would be unfair.

• The surcharge would exacerbate the costs borne by employers, nonprofits, and small businesses in particular, while decreasing demand for employment-based visas.

• The fee would have a chilling or deterrent effect on employment stakeholders regarding hiring foreign nationals.

• The decrease in demand for employment-based visas could lead to less revenue, or a lack of funding necessary to adjudicate benefits and facilitate a long-term solution to case backlogs.

• The negative impact of the Asylum Program Fee on businesses would have a downstream impact on consumers that they cannot afford while battling historic inflation."

• International touring artists and American businesses are still recovering from the worldwide pandemic shutdown and cannot bear the burden of funding of the asylum program.

• The proposed fee is well beyond a cost-of-living increase or even today's inflation rate.

• The fee would have a disproportionately onerous effect on small businesses who are seeking relief from the financially detrimental effects of COVID–19 followed by a labor shortage.

• Employers or petitioners should not bear the burden for a program that is not connected or relevant to employment benefits.

• The asylum program should not be funded by taxing or on the backs of other petitioners who are already struggling financially, such as agricultural employers, academic institutions, or international musicians. Commenters assert that USCIS acknowledges this issue in the rule, but it fails to offer a response to this anticipated objection, while the primary reason for charging separate fees for Forms I–485, I–765, and I–131 in adjustment of status applications is to prevent this same imbalance.

• DHS should adopt a consistent approach and properly weigh the burden of the cost of the asylum program on I–129 and I–140 petitioners. Instead, they seem to allow for petitioners to bear the cost of unrelated programs only when it means an increase to USCIS revenue.

• This proposal will have a materially adverse and arguably discriminatory impact on petitioners that are already bearing the largest burden in the proposed rule while USCIS is suffering unprecedented processing backlogs and inefficiencies. Asking these stakeholders to incur significant additional costs for unrelated services without any commitment to address their specific concerns sends a message of disregard that will discourage businesses from developing or expanding operations in the United States.

• USCIS arguing that it is necessary to impose this surcharge so that USCIS can limit fee increases on other filings provides requester's no real option and either requires paying the Asylum Program Fee or not filing a petition.

• USCIS could request appropriated funds or use premium processing program revenue to subsidize much of the $425 million cost of the asylum program.

• Subjecting H–2A petitioners to multiple asylum program fees for a single job order is not fair or reasonable.

• These additional fees will significantly impact IT and engineering staffing firms, which file Form I–129 for extensions of stay or status changes like a new job site more often than other employers. This commenter provided detailed information about the cost impacts to its members.

• Employers with limited resources will be less likely to cover visa fees for a worker's spouse or dependents, affecting a foreign worker's willingness or ability to take on employment in the United States.

• Such drastic increases in fees may suppress wage growth in industries where foreign workers are legitimately needed to supplement the domestic workforce. Employers who hire foreign workers should incur higher costs than they would for hiring U.S. workers, but these costs should come in the form of higher pay proffered to both U.S. and foreign workers and not petition fees.

• The proposal does not consider religious entities, many of which are small with limited budgets. Nonprofits and religious organizations provide significant benefit to the United States and asylees through outreach programs.

• Many health care providers and hospitals in medically underserved areas will not be able to sponsor needed physicians, nurses, and other health care professionals.

• The Asylum Program Fee would have a negative impact on the higher education community. Many universities with limited funds would no longer be able to sponsor specialized international researchers and other diverse faculty and staff.

• The ability to pay principle does not recognize the impact that an extra fee will have on U.S. higher education and related nonprofits with limited funding, such as public funds and specific, limited research grants.

• Because of the financial ecosystem of some institutes of higher education, they would be challenged by the fee, because of funding inequity between departments, lack of large endowments or high tuition rates, and reliance on Federal grants. A university is composed of numerous, smaller departments and units, each of which has a budget and is responsible for bearing the cost of immigration filings for its international employees.

• The Asylum Program Fee would penalize employers for utilizing legal avenues to hire foreign workers.

• Regarding H–2A employers:

○ There are already more employment costs for H–2A employers from increased administration and costs to achieve compliance.

○ Employers hiring H–2A workers are already facing increased input costs with no commensurate market price increase from purchasers.

○ The Asylum Program Fee would be penalizing small and seasonal American businesses for trying to hire a legal workforce.

○ Farmers in the H–2A program face extraordinary cost and burdens for the requirements of a legal guest worker program.

○ The fact that many individuals living in foreign lands see the land of the free and the home of the brave as a safe and secure shelter to the too often unspeakable horror they may face at home is a testament to the beacon that the United States represents. However, taxing agricultural employers to fund the mechanisms for providing secure shelter is arbitrary and capricious and an abuse of discretion.

○ The DHS statement that H–2A employers have more ability to pay is arbitrary and completely inaccurate according to the U.S. Department of Agriculture (USDA) Economic Research Service report on Farm Household Well-being. Many households report negative farm income.

○ USDA data on the H–2A program indicates that the Asylum Program Fee increases the financial burden of the employer with no ability to recover these added costs.

○ Questioning the factual basis behind the ability to pay presumption, a commenter said many of the other visa classifications included in the proposed rule are for voluntary travel, but the use of H–2A workers is a necessary part of business.

○ The outlook for 2023 does not indicate that farmers will have income to pay additional fees.

○ USCIS should not put the U.S. food supply in jeopardy by requiring agricultural worker visas to include an unnecessary asylum fee.

○ Farm employers are having a very difficult time staying in business and this fee will create a financial burden upon the H–2A program that they rely upon for most of their labor resource.

○ The Asylum Program Fee is unreasonable and overburdensome and USCIS must realize that the program is what keeps labor-intensive agriculture afloat.

• When an international artist applies for an O or P visa they plan on touring and therefore are not reimbursed for visa costs. This change signals to the international arts community that their

contribution to cultural influence is not welcome.

• The Asylum Program Fee would have a potentially discriminatory impact on beneficiaries from countries with severely backlogged immigrant visa quotas, such as India. The fee would have a disparate impact on individuals who are on the path to lawful permanent residence but are required to maintain nonimmigrant status for decades because of the lack of immigrant visa availability. Other commenters expressed similar concerns about the disparate treatment of foreign nationals, and their employers, from certain countries that are disproportionately affected by the visa backlog, like India and China, as employers must file more Form I–129 and Form I–140 petitions for the employee than for similarly situated individuals in order to maintain their status while they wait for an immigrant visa to become available.

• The Asylum Program Fee shows a lack of understanding and reinforces the stereotype that the arts, extraordinary ability, and business communities can afford such fee increases.

• The fee should be spread around all the applications, not just targeting what DHS seems to view as the most lucrative applications.

• DHS' ability to pay determination is conclusory and unsubstantiated, and therefore primed to be found arbitrary and capricious.

• The rule does not transfer the cost of asylum to all other fee-paying applicants but to business petitioners only, with the greatest impact on small businesses, nonprofits, start-ups, and religious organizations while also ignoring the ability to pay methodology announced in this rule.

• While it may be true that businesses in general have more ability to pay compared to asylum seekers, this fee increase is disproportionately burdensome to U.S. small and seasonal businesses.

• The Asylum Program Fee is arbitrary because it is based on an estimate, and USCIS failed to provide actual historical data on asylum claims and associated workload that the public can evaluate to determine if DHS's proposed fee amount and allocation of the fee on certain petition filers is warranted or reasonable.

• The added burden on business immigration applicants is unjustified because USCIS relied on a statistically insignificant sample to measure ability-to-pay. Forms I–129 and I–140 account for just 10 percent of fee-paying receipts, but would bear the burden of

asylum case processing, along with other fee increases.

• Table 11 of the proposed rule provides estimated costs for FY 2022 and FY 2023; the proposed rule does not explain how it arrived at its total estimated costs since there is no list of itemized expenses. Without specific program cost data, the commenter said the $600 fee has no basis in fact.

• USCIS' Small Entity Analysis (SEA) of nonprofit institutions relies on unsupported assumptions about the burden to nonprofits and is silent on the benefits of nonprofits to the nation. The analysis does not fully discuss the impact on distributing asylum fees across all application types, so it is difficult to accept these assumptions without reviewing the impact for comparison.

• Until DHS acknowledges the distinction between for profit and nonprofit employers, DHS is asking nonprofit employers to fund what the U.S. Congress is unwilling to do.

• There is no justification for asking employers to pay an additional fee that may curb H–2B program participation at the very time that the administration seeks to expand pathways to legal employment for migrants. The premise that H–2B employers can absorb the cost of funding the asylum program and other processing activities is entirely flawed. The rule assumes, without evidence, that all H–2B employers have an ability to pay fees that are 200 percent higher than the current fees.

• There is no evidence in the record showing that companies currently using H–1B visas can more easily afford this fee than family-based petitioners.

• The fee does not take into consideration true ability to pay, particularly for H–1B employers.

• USCIS regulations require some Form I–129 fees, like the H–1B fees, to be paid by the employer rather than the beneficiary, so there is no leeway for the affected parties to negotiate among themselves on who is better able to pay the fee.

• Imposing a flat fee tied solely to asylum seekers suggests that such individuals are the sole factor in USCIS' challenges in processing employment-based applications, rather than challenges that USCIS faces because of policies instituted under the prior administration, increased volumes of applications, delays in staffing and staff retention, legislative inaction, and longstanding backlogs.

• It is unfair to impose costs on employers and workers that USCIS creates, as well as unnecessary since USCIS can reduce costs at any time.

HR-1 FRN 2025 AR-000096

**Appx-000121**

• DHS should direct the limited pool of USCIS fees toward core adjudicative functions needed to keep it more efficient, rather than toward a flawed new asylum program whose truncated timeline deprives asylum seekers of a fair opportunity to present their cases.

• Congress did not provide DHS with the discretion to set fees based on the agency's apparent political agenda.

• Imposing a $600 surcharge on Form I–129 and Form I–140 petitioners is the wrong approach to funding this important national obligation, as well as an extraordinary and unparalleled overreach of authority by USCIS. Section 286(m) of the INA provides a statutory basis to recover the costs of the asylum program by setting adjudication and naturalization fees at a level sufficient to recover the costs of the asylum program, but never in the history of USCIS has there been a decision to impose a surcharge on a discrete group of filers to fund services to another discrete and distinct group of filers. This is a distortion of the statute and the ability to pay concept, upon which USCIS primarily justifies this decision.

• This fee is a gross overreach of authority and USCIS has never imposed a surcharge as significant as this upon a distinct population of stakeholders for the sole benefit of another group of stakeholders.

• The INA does not authorize the creation of new fee categories, nor is there ambiguity in INA section 286, 8 U.S.C. 1356 that would allow such a regulatory invention. Creation of the new proposed fee category would require a statutory authority, and the agency is on a path that courts will likely find impermissible.

• The current $30–$85 charges per asylum applicant paid into IEFA is all that is allowed per treaty. Depositing fees into IEFA does not convert it to funds to adjudicate asylum cases. Using IEFA to adjudicate asylum will overwhelm the purpose of the IEFA.

• The fee is unjustified and USCIS should secure congressional funding to efficiently adjudicate asylum applications.

• The costs for any asylum program should be paid out of the Treasury instead of using a rulemaking undertaken by the Executive Branch.

• Congressional appropriations with a reduction in enforcement, detention, and deterrence costs, should be the priority.

Commenters suggested that the following entities be exempted from an Asylum Program Fee:

• U.S. higher education and related nonprofits (*e.g.*, cap-exempt employers)

following the same logic of exempting U.S. higher education and related nonprofit organizations from the ACWIA Training Fee.

• Government research organizations, also consistent with precedent afforded by ACWIA.

 • Nonprofit entities.
 • Religious organizations.
 • Individual employers that cannot pay the fee.
 • Certain small businesses.
 • Healthcare facilities.
 • H–2A and H–2B petitioners.

Other commenters suggested alternatives to the proposed Asylum Program Fee. Those commenters wrote:

• Instead of the proposed $600 fee, a small stipend toward asylum cases ($50 per case) would seem conscionable to help with the border crisis. Another commenter suggested a $200 fee.

• USCIS should distribute the asylum fee across all form types or fee payers.

• The Asylum Program Fee should be based on the size or revenue of the employer filing the petition.

• The asylum program should be supplemented by businesses that operate within the multimillion-dollar range.

• USCIS should use a sliding scale for employers based on net revenues and/or number of employees.

• USCIS should instead charge a fee to asylum applicants or their sponsors. Asylum seekers hire lawyers and other services to arrive in the United States, so they should be able to afford an additional fee.

• USCIS should adopt a model like the H–1B program, whereby asylum seekers would be required to obtain a U.S. sponsor, who would pay a small application or program fee.

• Many commenters suggested that, if the Asylum Program Fee must remain, employers should only be required to pay the fee one time.

• The Asylum Program Fee should only be assessed for the initial petition filed by an employer, like the Fraud Prevention and Detection and Public Law 114–113 fees, and not subsequent transfers, extensions, renewals, and changes of status.

• A $100 fee could be assessed once, like the H–1B Prevention and Detection Fee.

• The fee could be structured like the Fraud Fee, required once at a higher education institution when filing Form I–129.

• USCIS should implement a premium processing program for asylum interviews to recover case processing costs, reduced asylum division staffing, or fees for non-USCIS-certified immigration attorneys representing

asylum seekers or use premium processing fees to finance free asylum applications.

• USCIS should consider other funds in addressing asylum processing including premium processing fees.

• USCIS should take a more balanced approach to accommodate the costs of humanitarian processing, including by (1) considering projections for premium processing revenues in setting fees, and (2) expanding opportunities for employment authorization for migrants and asylum seekers on parole in the United States.

• The asylum fee should be divided between the Forms I–129, I–485, N–400, and Form I–90, which would decrease the Asylum Program Fee per application/petition to a more manageable $155.

• USCIS could implement a registration fee to provide an initial stream of revenue, like the H–1B Registration Fee.

• If asylum filings will be increasing, USCIS should consider implementing an "after you have been settled" filing fee for all asylum cases (like the Form I–751 for marriage-based Green Card cases) to recoup some of the costs from asylees.

To mitigate the impact of the Asylum Program Fee on small entities commenters suggested the following alternatives:

• USCIS should also reduce the amount for other small business entities like how the ACWIA fee is currently assessed.

• DHS should establish tiers of fee pricing based on revenue, number of employees, type of visa, or number of workers per petition.

• DHS should limit the frequency of asylum fee payments by small entities (*e.g.*, to once or twice per employee for H–1B, or once per worker per season for H–2A/H–2B). Meaning, the Asylum Program Fee would only apply to initial petitions. It would not apply to amendments or extensions using Form I–129, similar to ACWIA.

• DHS should establish a lower tier of fee pricing for small nonprofits, exempt nonprofits, or limit the frequency of paying this fee to once per worker category.

• USCIS should phase-in the new fee over at least 2–3 years.

• Should the number of people seeking asylum suddenly drop the NPRM indicates the Department will nonetheless continue to collect the fees. The Department instead should describe what fee will be charged based on different asylum workload levels.

• DHS should explain how the estimated costs were calculated and

HR-1 FRN 2025 AR-000097

**Appx-000122**

how the potential impact on the employer community was assessed, including the potential of fees to decrease should the system become less burdened by asylum seekers. Commenters asserted that USCIS must explain how it has calculated this fee amount and inform the business community of the cadence and metrics by which the agency will review the fee, to determine whether it should decrease over a prescribed period, exist in perpetuity, or sunset on a specific date, or end if the asylum crisis ends.

• Regarding USCIS' statement that it will re-evaluate the Asylum Program Fee based on the status of the Asylum Processing IFR and any funding appropriated for it when DHS develops its final fee rule, commenters supported the agency's humanitarian mission and encouraged USCIS to provide additional details regarding how it will determine the final fee amount and any future adjustments.

• Because DHS will re-evaluate the Asylum Program Fee based on the status of the Asylum Processing IFR and funding appropriated for it in the final fee rule, the fee should be delayed until the funding is more certain and can be recalculated.

• USCIS should consider reviewing this fee more frequently than the others because of the variability of migration patterns and whether the fee should be distributed more uniformly amongst those seeking immigration benefits.

• The USCIS fee schedule proposal was published several weeks before DHS and DOJ published its Circumvention of Lawful Pathways proposed rule, thus USCIS' assumptions regarding future asylee flows will need to be reconsidered.

*Response:* As explained in the proposed rule, DHS calculated the Asylum Program Fee by dividing estimated annual costs by forecasted workload. *See* 88 FR 402, 451–454 (Jan. 4, 2023). The Asylum Program Fee may be used to fund part of the costs of administering the entire asylum program and would be due in addition to the fee those petitioners would pay using USCIS' standard costing and fee calculation methodologies. *See* 88 FR 402, 451 (Jan. 4, 2023). DHS did not propose this Asylum Program Fee without having carefully considered its implications and effects, as discussed in the proposed rule and the SEA. *See* 88 FR 402, 453–454 (Jan. 4, 2023).

By law, USCIS is required to conduct a fee review every 2 years. Therefore, all fees, including the Asylum Program Fee, will be reviewed biennially. DHS is authorized to set fees at a level that will ensure full recovery of the costs of providing services, including the costs of services provided without charge to asylum applicants or other immigrants. *See* INA sec. 286(m), 8 U.S.C. 1356(m). Consistent with other immigration benefit requests where fees are waived or held below the cost of providing the service, the cost of the Asylum Program has always been incorporated into and spread across other immigration benefit requests for which a fee is paid. DHS considered the impact of spreading the cost of the Asylum Program across various requests, including Forms I–485 and I–765. However, DHS decided to assign these costs only to Form I–129, Petition for a Nonimmigrant Worker, and Form I–140, Immigrant Petition for Alien Workers, as explained in the proposed rule. *See* 88 FR 402, 451–454 (Jan. 4, 2023). DHS requested $375.4 million in appropriated funding for USCIS asylum adjudications in FY 2023.[221] However, USCIS did not receive the funding. In the absence of appropriations, USCIS must fund the asylum program through fee revenue.

As explained in section II.C. Changes from Proposed Rule of this preamble, after considering the public comments, DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 full-time equivalent (FTE) employees.

USCIS considered the various concerns raised by commenters that suggested that the $600 Asylum Program Fee would cause indirect secondary, tertiary, and downstream economic impacts on many facets of the U.S. Examples cited by the commenters included exacerbating the effects on consumers of inflation and the COVID–19 pandemic, increasing costs for already unprofitable farmers, reducing the food supply, harming information technology and engineering firms, harming religious entities, impacting health care providers, exacerbating the plight of nationals of certain countries such as India and China, and generally writing that DHS failed to analyze the effects of the new fee. DHS has accounted for the direct costs of the Asylum Program fee, and our data indicates that the Asylum Program Fee will not have the deleterious effects on multiple parts of U.S. economy that the commenters state that it will. Nevertheless, as requested by commenters and described in section II.C. of this preamble, DHS is providing

relief to nonprofits and small employers in this final rule.

*Comment:* Multiple commenters, including a business association and a professional association, suggested USCIS create tiered levels for different types of fees. For example, a business association recommended tiered fee levels for the proposed asylum fee where smaller companies would pay a lesser amount for the asylum fee. The association further proposed tiered asylum fees that would apply to more immigration benefit requests aside from Forms I–129 and I–140, thus not placing this cost burden entirely on the business community. Additionally, the commenter requested a set limit on the number of times an entity must pay the asylum program fee for a specific beneficiary.

*Response:* As explained elsewhere in this final rule, DHS creates lower fees for certain small employers and nonprofits in this rule. Businesses with 25 or fewer FTE employees will pay a $300 Asylum Program Fee instead of $600, and half of the full fee for Form I–129. Non-profits will pay $0. DHS carefully considered the implications and effects of the Asylum Program Fee, as discussed in the proposed rule and the SEA. *See* 88 FR 402, 453–454 (Jan. 4, 2023). As explained above and in the RIA, DHS revised the USCIS budget to accommodate the revenue generated by the fees and volumes in this final rule. In this final rule, DHS implements lower fees for certain small businesses and nonprofits using Form I–129. DHS believes this tiered approach accommodates these commenter's concerns by offering lower fees for some small employers and nonprofits. DHS considered the suggestion but declines to limit the number of times an entity must pay the Asylum Program Fee for a specific beneficiary because determining if the fee exemption applied at intake would require a check of systems to determine if the beneficiary had a fee paid for them in the past, and that would delay intake and processing and add to USCIS cost.

b. EB–5 Program and Fees (I–526/526E, I–829, I–956/956F/956G), Reform and Integrity Act (Not Related to Small Entities/RFA/Quantitative Impacts)

*Comment:* Many commenters submitted comments on the EB–5 Program and fees. Some commenters expressed support for increasing the EB–5 investment visa's filing fee reasoning the fee hike could rule out unqualified investors as well as ensure integrity and quality in applicants to a highly demanded visa. Others disapproved of the investor filing fees

---

[221] DHS, Budget-in-Brief Fiscal Year 2023 at 77, available from *https://www.dhs.gov/publication/fy-2023-budget-brief* (last updated Mar. 28, 2022).

HR-1 FRN 2025 AR-000098

**Appx-000123**

but wrote that the proposed increase in fees for Regional Centers is arguably reasonable given the due diligence requirements imposed by new laws.

Many commenters wrote that they did not support the proposed EB–5 program fees including Forms I–956, I–956G, I–526E, and I–829. Those comments are summarized as follows:

• The increase in fees for EB–5 visas would make legal immigration to the United States more difficult, particularly the ability for investors to sponsor temporary workers.

• The fee increases associated with the EB–5 Immigrant Investor categories would have a chilling effect on an invaluable, job-creating visa category and would not provide adequate assurances for improved service or shorter processing timelines.

• The proposed rule will cause EB–5 program related applicants to shoulder an unsustainably high financial burden that could threaten the reputation and longevity of the program.

• Stakeholders might support the proposed fee increases for the EB–5 program if they were accompanied by improved case processing times.

• USCIS does not anticipate using the additional fees to provide additional resources or staff for EB–5 program related filing despite exceptionally high processing times.

• Before modifying fees for EB–5 services, USCIS must first conduct a fee study compliant with statutory provisions of the Reform and Integrity Act. Because the fee study has not been conducted, the proposed EB–5 program fees in the rule are premature and should therefore be withdrawn from the final rule, and EB–5 program fees must be set at levels that ensure full cost recovery of only the costs of providing its services.

• The proposed increase is unjustified for Form I–829 because it does not require a considerable number of staff.

• USCIS should retain the fee on the Form I–829 for investors who have already filed their Form I–526 petitions because they had not budgeted for a 154 percent fee increase when deciding to permanently move to the United States.

• The proposed fee for the Form I–526 increased despite a reduction in the Form I–526 adjudication burden, and USCIS does not claim to track adjudication times on Form I–526.

• The idea that a higher fee for Form I–526 may reduce adjudication times is not supported by historical precedent. Processing times for EB–5 related filings have increased year after year since 2016, without measurable increases to productivity.

• USCIS should institute expedited processing, specifically, for the Form I–526 to reduce the legal burden on investors and to avoid delaying positive impacts to the economy.

• The proposed fee increases for Form I–526 and Form I–526E should only apply in cases where petitions can be processed within 12 years or the proposed fee for these forms should reduce by at least 50 percent.

• Because filing Form I–526E does not require adjudication of the underlying project, its fee should be lower than the fee for Form I–526.

• The proposed fee for the first time filing a Form I–956 would be excessive if USCIS cannot guarantee adjudication time will be less than a year.

• USCIS should make a distinction between a Form I–956 filed for the first time for a Regional Center designation and a Form I–956 filed for amendments such as reporting a name or ownership change. The proposed fee would be more understandable for new designations but would be excessive for amendments. Requiring Form I–956 for making amendments to Regional Center Designation and requiring annual renewal of designation status contribute to a heightened overall filing volume for such form.

• The proposed rule relies on inaccurate inputs and inappropriately forecasts a small number of incoming EB–5 receipts to cover the cost.

• Prior fee increases did not improve processing speeds; commenters are concerned that this increase would not augment staffing levels sufficiently to create any change.

• Delayed processing can cause investors to lose their investment; adjudication times should be 3–6 months for Form I–956 applications and 1–2 years for Forms I–526, I–526E, and I–829 petitions.

Some commenters wrote in support of the proposed EB–5 program fees or provided additional suggestions. Those comments are summarized as follows:

• The price increase should lead to improved efficiencies, such as processing timelines of less than one year. USCIS should hire more staff to accelerate processing and decisions on Form I–829.

• The increase for Form I–526 is a fair cost for the adjudication required the first time USCIS processes an EB–5 investment project.

• USCIS should publish reduced adjudication timelines for the Form I–526 given its proposed filing bifurcation and the proposed increase in its fee.

*Response:* DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration

adjudication and naturalization services. Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable to sustain an adequate level of service, let alone invest in program improvements. Full cost recovery means not only that fee-paying applicants and petitioners must pay their proportionate share of costs, but also that at least some fee-paying applicants and petitioners must pay a share of the immigration adjudication and naturalization services that DHS provides on a fee-exempt, fee-reduced, or fee-waived basis. DHS is therefore mindful to adhere to the standard USCIS fee methodology as much as possible, and to avoid overuse of DHS's discretion to eliminate or reduce fees for special groups of beneficiaries.

DHS disagrees with commenters who suggest that the EB–5 Reform and Integrity Act of 2022 precludes DHS from adjusting EB–5 program fees in this rule. As mentioned in the proposed rule and acknowledged by many commenters, the EB–5 Reform and Integrity Act of 2022 requires DHS to complete a fee study not later than 1 year after the date of the law's enactment; and then, not later than 60 days after the completion of the study, set fees for EB–5 related immigration benefit requests to recover the costs of providing such services and completing the adjudications, on average, within certain time frames. DHS realizes that the EB–5 Reform and Integrity Act of 2022 instructs DHS to complete the required fee study within one year, but that law requires a fee calculation method that is different from what DHS generally uses, *see* INA 286(m), 8 U.S.C. 1356(m), OMB Circular A–25 suggests, and most agencies follow. 88 FR 402, 471 (discussing full cost recovery and relevant guidance). In its fee rulemakings DHS has set USCIS immigration benefit requests generally with the goal of improving or achieving reasonable processing times, but not with the relatively short and precise processing times aspired to in the EB–5 Reform and Integrity Act of 2022. *See, e.g.,* 72 FR at 29858–59 (discussing USCIS plans to reduce processing times for certain request by twenty percent by the end of FY 2009); 81 FR at 26910 (discussing the rule's goal to achieve processing times that are in line with the commitments in the FY 2007 Fee Rule). The EB–5 Reform and Integrity Act of 2022, on the other hand, requires DHS to set the fees at a level that will provide USCIS with the resources necessary to process EB–5 benefit

HR-1 FRN 2025 AR-000099

requests within certain time parameters, that are generally shorter than what USCIS currently achieves. The EB–5 Reform and Integrity Act of 2022 also differs from INA section 286(m), 8 U.S.C. 1356(m), in that it limits the costs of free or discounted USCIS immigration benefit requests that can be transferred or funded by the EB–5 fees.[222] DHS is actively engaged in the work required to determine the fees under that law. Meanwhile, DHS has not adjusted its fees since 2016, is obligated under the CFO Act to review is fees and is authorized by the INA to set fees to recover USCIS costs.

As DHS stated in the proposed rule, the EB–5 Reform and Integrity Act of 2022 provides that the fee study required by 106(a) does not require DHS to adjust USCIS fees in the interim. *See* 88 FR 402, 420, 508–511 (Jan. 4, 2023); *see also* Public Law 117–103, sec. 106(f). No legislative history exists to explain how that provision should be read in conjunction with section 106(a). More importantly, the statute does not *prohibit* the modification of fees under INA 286(m), 8 U.S.C. 1356(m), prior to the completion of the fee study and rulemaking contemplated by section 106. Stated differently, by suggesting that the section need not be construed to require modification of the fees before completion of the study, section 106(f) necessarily implies that fees may be modified (*i.e.,* what is not required is permitted). Therefore, DHS interprets the provision to mean that the provisions of the law are not effective until DHS takes the steps it requires to be implemented; and that any requirement for DHS to set fees to achieve the processing time goals under section 106(b) of the EB–5 Reform and Integrity Act of 2022 are dependent on completion of the fee study and rulemaking contemplated by section 106. A different interpretation would prevent DHS from adjusting fees to recover the costs of normal processing until the fee study and rulemaking under section 106 is complete, a result that would be inconsistent with the broad purpose of section 106, which is to accelerate adjudications. Accordingly, DHS interprets "[N]otwithstanding" in section 106(b) of the EB–5 Reform and Integrity Act of 2022 to mean that section 106 requires DHS to establish fees to achieve the processing time goals set out in section 106(b), but that authority and its

separate study requirements exist separately from (or "notwithstanding") INA section 286(m), 8 U.S.C. 1356(m), and therefore do not preclude USCIS from instituting new EB–5 program fees while that effort is undertaken. The fees that DHS sets in accordance with section 106 will go beyond normal cost recovery and effectively supersede section 286(m), 1356(m), to achieve processing time goals. Meanwhile, DHS establishes new fees for the EB–5 program forms in this rule using the same full cost recovery model used to calculate EB–5 fees since the program's inception and not the parameters required by the EB–5 Reform and Integrity Act of 2022. *See* 88 FR 402, 420 (Jan. 4, 2023). Accordingly, DHS will collect the fees established in this rule under INA sec. 286(m), 8 U.S.C. 1356(m), for the EB–5 program until the fees established under section 106(a) of the EB–5 Reform and Integrity Act of 2022 are codified and take effect.

Regarding concerns raised about processing times, DHS appreciates that USCIS is experiencing considerable backlogs in the processing of EB–5 related forms. USCIS is committed to adjudicate cases and reduce processing times, and USCIS continues to look for efficiencies in the EB–5 program, especially now as we implement the new legislation efficiently and effectively. Across our agency, we are working diligently to fill vacancies and IPO is no exception. While many of these positions remain unfilled due to attrition, prior budget constraints, and the prior hiring freeze, we are working to increase our staffing levels to support the mission. It is important to note too that in addition to adjudicating cases, IPO requires the time and subject matter expertise of our adjudications staff to address other necessary efforts, including implementation of the new legislation, litigation response, FOIA requests, public inquiries, and others.

USCIS understands the desire to receive prompt service, and the agency strives to provide the best level of service possible. USCIS also recognizes that lengthy processing times place a strain on EB–5 investors who are awaiting the adjudication of their immigration benefits. DHS proposed higher fees to fund additional USCIS staff generally and for EB–5 workload specifically, and other reasons identified in the proposed rule. *See, e.g.,* 88 FR 402, 417–419, 509–510 (Jan. 4, 2023). USCIS cannot commit to across-the-board processing time reductions as adjudications involve case-by-case review of complex applications and related supplementary information.

*Comment:* Commenters expressed the following concerns with EB–5 completion rates:
• USCIS' completion rates for processes related to the EB–5 classification are based on questionable data and are an inaccurate measure for proposing fees.
• USCIS officials have admitted under oath that the time to adjudicate Form I–526 is not actually tracked and instead based on assumed metrics, which calls into question many other adjudication figures cited by USCIS.
• Even assuming these adjudication figures are available and accurate, it is difficult to justify such a substantial increase in completion rates from FY 2017 to FY 2023 for some forms, including Forms I–526 and I–829, given no substantial changes in EB–5 regulations across that period.
• Commenters expressed confusion about the methodology used to determine the proposed fee increase for Form I–526 filings, given recent procedural changes and the lack of adjudication tracking for this form.
• A commenter asked the basis for the adjudication time for Form I–526 increasing by 240 percent, considering the reduced adjudication burdens after the shift of work from Form I–526 to other forms.
• A commenter stated that the manhours the proposed rule stated that officers spent on each application is nonsensical and that, if accurate, there would be no backlog.
• USCIS has not provided any statistics on the adjudication of Form I–956 and it is difficult to justify a completion rate significantly higher than the rate for Form I–924.
• USCIS should pursue a comprehensive study of the overall fee structure for EB–5 forms.
*Response:* DHS strives to make its fee schedules equitable, balancing the ability to pay and beneficiary pays principles, using the best information available. DHS is not required to precisely calculate the amount of time required to process all requests or the burden of one immigration benefit request or program relative to the entire realm of USCIS responsibilities. However, DHS follows OMB Circular A–25 to the extent possible and uses subject-matter expertise to estimate completion rates for the EB–5 program forms. The completion rates are estimates developed by Office of Performance Quality, using data and subject matter expert input from the Field Operations Directorate's (FOD's) IPO. Additionally, USCIS estimated the completion rates of the EB–5 forms by extrapolating from similarly complex

---

[222] EB–5 Reform and Integrity Act of 2022, Pub. L. 117–103, section 106(c)(1) (providing that the EB–5 fees may exceed the levels determined necessary in an amount equal to the amount paid by all other fee-paying requests to cover the costs of requests charged no or reduced fees).

**6288**    **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

adjudications, and by surveying personnel who were experts on EB–5 request processing. While INA section 286(m), 8 U.S.C. 1356(m), requires USCIS fees to be based on the total costs for USCIS to carry out adjudication and naturalization services, which could be affected by the amount of time required to process requests, it does not require that each specific USCIS fee be based on the costs of the service provided compared to the burden of all other services, or perceived market rates and values. DHS has investigated the concerns of the commenters and believes the estimates used to determine the fees for Forms I–526, I–829, I–956, and other EB–5 workloads are reasonable.

c. H–1B Registration Fee

Numerous commenters expressed support for the proposed fee increase for H–1B registration. Commenters wrote:

• Employers should be willing to sponsor an employee with any reasonable fee.

• The fee increase would give more opportunities to talented foreign students in STEM fields; assist small and mid-size U.S. companies; and improve USCIS efficiencies and adjudicator wellbeing.

• The proposed increase of the H–1B pre-registration fee would help address ongoing H–1B lottery abuse, whereby companies can submit multiple, frivolous registrations for a single candidate.

• With H–1B lottery abuse and a 57-percent increase in registrations from 2020 to 2023, the fee increase would cover USCIS' operation costs and help to avoid false cap registrations. False registrations harm the legal rights of other applicants who are hired through standard processes and who later apply for the H–1B visa to continue working for the same company.

• The increased registration fee would discourage companies from enrolling potential employees in the lottery before they accept an offer or start working, which disadvantages existing employees.

• USCIS should raise the fee further to mitigate abuse and other related concerns to stop lottery abuse, suggesting fees ranging from $500 to $3,000.

• The increase in the H–1B fee to $215 is too low because if an employer sincerely wants to recruit highly skilled foreign nationals, they should be willing to pay more. A higher fee would fund USCIS operations and reduce abusive petitions.

• General agreement with the fee increase, but the proposed fee would not help to mitigate abuse.

• USCIS should consider duplicate registrations based on SSNs or passport IDs.

Multiple commenters expressed opposition to the proposed fee increase for H–1B pre-registration. Those comments are summarized as follows:

• The rule would negatively impact employers and small businesses.

• The registration fee would disincentivize registration, creating a chilling effect on recruitment and stifling technological innovation.

• The increase in filing fees would create an unequal system whereby small businesses would be unable to hire and retain H–1B workers, unlike Fortune 500 companies that can afford the higher fees.

• USCIS should foster a healthy and even-handed competition between small and large businesses that are interested in hiring H–1B workers.

• USCIS should consider a smaller, 100-percent increase to $20 instead of the proposed increase.

• The registration fee increase is unfair, unreasonable, or unjustified. The electronic registration program was designed to reduce costs and increase efficiencies in the H–1B process. If USCIS knew soon after the program's creation that it was not sufficiently recuperating costs, it should not have proceeded with implementation.

• The fee increase is in direct opposition to the justifications DHS lists in the **Federal Register** for the changes to the fee structure. The commenters provided the following reasoning:

○ The proposal is contrary to law and fails to meet the intended goal of the electronic H–1B registration program to eliminate unnecessary costs and mitigate the inefficient use of both government and petitioner resources.

○ The proposed H–1B registration fee is contrary to the implementing regulation, which stated that the registration fee was to be nominal. The proposed fee defies this stated goal and exceeds the amount necessary to run the annual selection process. The proposed fee is unlawful.

○ Increasing user fees rarely deter alleged misuse of a program, and instead adds unnecessary burdens to the legitimate use of the H–1B program. The fee would not likely dissuade any who may attempt to increase the odds, but instead would price some companies out of the market.

○ The proposed 2,050-percent increase to the H–1B registration fee is one of the only processing fees that does not cover processing, as DHS

specifically confirms that there are no costs associated with adjudicating an H–1B registration.

○ The proposal would not reduce barriers and promote accessibility but would amount to an unjustifiable mechanism for generating revenue without providing benefits to most companies paying the fee.

• The fee is unjustifiable and arbitrary, and DHS should conduct its promised review to calculate H–1B registration costs, beyond the vague existing references to costs to inform the public and conduct management and oversight before raising registration fees by more than 2,000 percent.

• DHS should provide additional transparency regarding how it arrives at a final fee amount and how it will allocate the additional funding to benefit the H–1B registration process.

• USCIS should reference activity costs for a) informing the public, and b) management and oversight with more specificity, and clarify the justification for the $129 component of the H–1B fee allocated to Management and Oversight.

• The registration fee is only slightly less than substantive Form I–129 ($147) and Form N–400 ($150) fees despite this being an automated, computer-generated selection with no adjudication involved.

• No fee should be required for informing the public and for management and oversight, because the activity is conducted online at effectively zero cost or only occurs during a short period of the year. Even if fees are required, the fees should drop when the number of registrations increases. The fee is unjustified and should be rescinded.

• USCIS is taking a narrow view in presuming employers can pay the increased registration fee because the H–1B registration system is a lottery and increasing the fee by over 2,000 percent would be unfair.

• USCIS has not considered the cumulative costs to employers or the actual budgets of a company. While companies may appear to have a high net income, the fee increase is substantial enough to affect whether a company can employ or continue to employ a foreign national.

• The proposed fee would not eliminate multiple registrations; USCIS should consider disregarding H–1B registrations from different organizations filed for the same candidate.

• USCIS should raise the registration fee for each additional entry, suggesting $200 for the first entry, $400 for the second, $800 for the third, and $1,600 for the fourth.

HR-1 FRN 2025 AR-000101

Appx-000126

• Petitioners engaging in lottery abuse should face penalties.
• USCIS should not use fees as a mechanism to deter multiple entries in the H–1B lottery pool, because a higher fee would not assist in this effort. Instead, USCIS should keep fees low to encourage employers to sponsor international talent and place a cap on multiple (two to three) entries with the same passport number.
• USCIS should evaluate this fee carefully to promote fairness and efficiency in the lottery system. If selected, the applicant's registration fee should be counted toward the Form I–129 filing fee to reduce burdens for small businesses.
• USCIS must revise the *my.uscis.gov* website to allow registrants, applicants, and petitioners to pay filing fees directly and submit filings prepared by attorneys. The new fee coupled with the current system would yield unworkable results, such as credit card company penalties that would block large-scale registrations and unduly prejudice potential beneficiaries.
• USCIS should clarify the timeline for implementing the proposed H–1B registration fee, because it is unclear if the fee would go into effect before the next H–1B cap lottery.
• Reliance on application fees such as the one for the H–1B registration generates perverse incentives. Because the H–1B lottery is random, many large firms sponsor more migrants than they need, and these factors cause the H–1B visa program to subsidize other areas of the immigration process. Because USCIS lacks the funding to promptly review applications, that distortion is tolerable since the H–1B visas are profitable.

*Response:* When DHS established the current $10 fee, USCIS lacked sufficient data to precisely estimate the costs of the registration process, but we implemented the $10 fee as a measure to provide an initial stream of revenue to fund part of the costs to USCIS of operating the registration program. *See* 84 FR 60307 (Nov. 8, 2019). The electronic registration program has made the H–1B selection process more efficient, both for H–1B petitioners and USCIS, by no longer requiring the preparation and submission of Form I–129 for all petitioners before they knew it would be adjudicated. Form I–129 now need only be filed by petitioners with selected registrations who wish to petition for an H–1B worker. The implementing regulation specifically anticipated that this temporary, nominal fee would ultimately increase based on new data, stating, "Following implementation of the registration fee provided for in this rule, USCIS will

gather data on the costs and burdens of administering the registration process in its next biennial fee review to determine whether a fee adjustment is necessary to ensure full cost recovery." *See* 84 FR 888 (Jan. 31, 2019); *see also* 84 FR 60307, 60309 (Nov. 8, 2019). Given that $10 was an intentionally low and temporary fee, DHS disagrees with some commenters' characterization that the proposed fee should not increase substantially. DHS clearly explained in the proposed rule that the proposed $215 H–1B registration fee was based on empirical cost estimates, as anticipated in the implementing regulation. *See* 88 FR 402, 500–501 (Jan. 4, 2023). DHS based the proposed fee on the activity costs for two activities: Inform the Public and Management and Oversight. *Id.* The fee review supporting documentation provides definitions of these activities. Inform the Public involves receiving and responding to inquiries through telephone calls, written correspondence, and walk-in inquiries. It also involves public engagement and stakeholder outreach initiatives. As explained in the supporting documentation, Inform the Public includes the offices responsible for public affairs, legislative affairs, and customer service at USCIS. Management and Oversight involves activities in all offices that provide broad, high-level operational support and leadership necessary to deliver on the USCIS mission and achieve its strategic goals. The proposed rule stated that the registration selection was automated, but that does not mean that USCIS incurs no costs in operating and maintaining the system or that registration fees should not fund some of the costs of services provided without charge as permitted by the INA.

As explained in the proposed rule, DHS is authorized to fund all USCIS operating costs and absent other funding mechanisms we must adjust fees to maintain an adequate level of USCIS service. *See* 88 FR 402, 417–419 (Jan. 4, 2023). DHS does not establish the H–1B Registration Fee at $215 without having carefully considered the implications and effects of such an increase. DHS understands that the beneficiaries of H–1B petitions help the U.S. lead the world in science, technology, and innovation. At the same time, DHS is charged with establishing a fee schedule that will fund USCIS using authorized, available, and appropriate means. Faced with the imperative of adequately funding USCIS to ensure the fair and efficient functioning of the legal immigration system, DHS has determined that increasing the H–1B

Registration Fee to recover the costs of the registration system is the option that minimizes burden for the most individuals and entities overall.

DHS has limited data with which to estimate the impact of the increased H–1B Registration Fee upon the number of H–1B registrations. The Price Elasticity section of this rule's RIA shows H–1B petitioners did not reduce requests for H–1B workers in response to the 2016 Fee Rule's 42-percent increase of the Form I–129 fee from $325 to $460. In October of 2021, Congress increased the fee for premium processing of H–1B petitions from $1,440 to $2,500. In reports to Congress submitted before and after the $1,060 (74 percent) increase, although suspension of premium processing may have impacted pre-FY 2020 levels, USCIS observes the percentage of initial Form I–129 H–1B petitions requesting premium processing increased from 37 percent to 47 percent in the first year of higher fees and to 53 percent in FY 2022.[223] In addition to premium processing, the median H–1B registrant demonstrates the continued ability to pay for the assistance of an accredited representative as well as median annual compensation to beneficiaries of $118,000 in FY 2022 and benefits. In contrast to affordability concerns raised in public comments, USCIS observes the quantity of registrants and registrations increasing, including a constant share of small entities (as measured across SEAs for the FY10, FY16, FY20 and current rule), despite these cost increases that would be applicable when filing the subsequent petition. The price elasticity section of the RIA further describes that the registration fee increase comprises less than a 1-percent increase in the total cost to an H–1B employer, relative to the total costs of compensation, benefits, technical assistance, and premium processing fees. Lastly, the Final Regulatory Flexibility Act for this rule (and the separate more detailed SEA) describes the impacts on Forms I–129 for all classifications, I–140, I–360, I–910, genealogy forms, and immigrant investor forms in this final rule to minimize the magnitude and scope of adverse impacts to small entities, including the many small businesses

---

[223] *See* Characteristics of H–1B Specialty Occupation Workers FY22 Annual Report to Congress (Mar. 13, 2023), at *https://www.uscis.gov/ sites/default/files/document/data/OLA_Signed_H-1B_Characteristics_Congressional_Report_ FY2022.pdf* and FY20 Annual Report to Congress (Feb. 17, 2021), at *https://www.uscis.gov/sites/ default/files/document/reports/Characteristics_of_ Specialty_Occupation_Workers_H-1B_Fiscal_Year_ 2020.pdf* (last accessed Aug. 30, 2023).

that register and petition for H–1B workers.

A comment about fee increases "chilling demand" for H–1B workers cited since-published NBER research showing that winning the opportunity to file a cap-subject H–1B petition was associated with improved chances of winning a patent, improved chances of obtaining additional external funding, and improved chances of a successful initial public offering over the subsequent five years.[224] USCIS reviewed this research and agrees the findings underscore that the H–1B lottery facilitates employer access to highly valued foreign workers. The study's impacts are measured against many firms that registered for H–1B workers and were selected zero times. In conducting the Small Entity Analysis (SEA) for this final rule, USCIS observed that while some Small Business Administration (SBA)-classified small entities file hundreds of H–1B registrations to be selected to petition for a cap-subject visa, more than ten times that number had only one or two H–1B petitions. While it is not possible to know how each small entity may respond to the combined price increase of the H–1B Registration Fee, Form I–129 H–1B Fees, and the Asylum Program Fee, any such price response might reasonably be most pronounced among those small entities with the greatest number of valid H–1B workers and registrations. A direct impact of any reduction to the number of registrations submitted would be reducing the number of registrations that any one potential petitioner would need to submit for that petitioner's registrations to be selected and for them to be able to hire the same quantities of H–1B workers. Thus, small businesses that submit fewer H–1B registrations would see marginally increased likelihood of their registration being selected in the lottery, and roughly 85 percent of H–1B petitioners are also small entities.

DHS emphasizes that the H–1B Registration Fee is set at $215 to recover the costs of USCIS administering the legal immigration system. As stated in the proposed rule and multiple sections of this final rule, DHS appreciates the significant contributions of immigrants to the U.S., and this final rule is not intended to impede, reduce, limit, or preclude immigration for any specific population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and

[224] *See* Dimmock, S.G, et al (2021) Give Me Your Tired, Your Poor, Your High-Skilled Labor: H–1B Lottery Outcomes and Entrepreneurial Success. Management Science 68(9):6950–6970. *https://doi.org/10.1287/mnsc.2021.4152.*

contribute to the economy. DHS considered the comments that suggested that the $215 fee would result in far fewer registrations being submitted and those that wrote that the fee should be much higher fee than $215 to deter fraud. As stated in the proposed rule, USCIS's ability to generate the necessary revenue through this rule depends on the volumes of forms that pay fees not falling short of the total projected. 88 FR 402, 528 (Jan. 4, 2023). DHS notes the estimated burden of H–1B registration is 0.5 hours plus 0.17 hours for account creation and that this burden is 4.67 hours less than the full petition burden of 2.34 hours for Form I–129, 2 hours for the H Classification Supplement, and 1 hour for the H–1B and H–1B1 Data Collection and Filing Fee Exemption Supplement. Although this rule's RIA depicts a baseline with registration requirement at unchanged fees, DHS recognizes many employers seek assistance from outsourced attorneys who, at $196.85 per hour loaded wage, would cost $919 more if the random lottery selections were made on full petitions rather than registrations. Future fee rules will reconsider the H–1B registration fee and other rulemakings may consider operational changes to the H–1B registration process. In this final rule, DHS has decided to establish the H–1B Registration fee at a level needed to fund the costs of the registration system, but not at such a high dollar amount to present serious risk of disincentivizing valid registrations or chilling valid participation in the H–1B program, including by small businesses.

d. I–129 Nonimmigrant Workers, Separate Fees (Not Related to Asylum Program Fee)

*Comment:* Many commenters expressed general opposition to Form I–129 fee increases. Commenters wrote:
• USCIS should reconsider the proposed Form I–129 fees.
• The fee increases would have an adverse effect on cultural life in the United States, higher education institutions, nonprofits, non-major-league athletes, the agricultural community, highly skilled foreign workers and U.S. employers.
• The increase and separation of Form I–129 fees would compound confusion and lead to rejections.
• The proposed separation of forms, processes, and fees based on nonimmigrant classifications was overly complicated and USCIS should instead simplify these processes.
• They opposed all separate Form I–129 fee increases of over 7 percent, because employment-based immigration

offers a substantial source of revenue for the United States.
• The many changes proposed for Form I–129 petitions would have dire consequences for large and small businesses and firms, would deter recruitment of foreign talent, repel entrepreneurship, exacerbate labor shortages, lead to retaliatory actions from other countries, and amount to millions of dollars in additional costs for multiple large multinational firms.
• The fee increases are unprecedented with significant disparities among categories. For example, comments questioned the difference between H–1B and TN fees.
• H–2A and H–2B completion rates are based on the first six months of FY 2021, and it is not clear whether this is based on actual data collected or estimates of future projections.
• The proposed fees would disproportionately affect the hiring of Mexican citizens, for whom TN petitions are mandatory.
• The increased fees would incentivize employers to challenge RFEs and denials and litigate in Federal court to bypass the appeals process.
• Given the magnitude of the proposed fee increases, USCIS should consider whether it is accurately calculating the funding needed to adjudicate immigration benefit requests without imposing an unreasonable burden on employers.

*Response:* In this rule, DHS implements the fees for all types of Form I–129, as described in the proposed rule. *See* 88 FR 402, 495–500 (Jan. 4, 2023). DHS proposed different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries.

The fees established by this rule better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. Part of the proposed fee was based on the adjudication hours and completion rates for various Form I–129 categories. As explained in the proposed rule, USCIS does not have separate completion rates for the TN classification. *See* 88 FR 402, 499 (Jan. 4, 2023). Currently, USCIS adjudicators report TN hours on these classifications in a catch-all Form I–129 category. *Id.* However, USCIS adjudicators report hours for H–1B petitions separately. As such, DHS proposed separate fees for TN applications than H–1B petitions using different hours information, despite commenters' statements on the

similarities between the two workloads. If USCIS has more detailed information to further distinguish between Form I–129 categories in the future, then DHS may use it in establishing fees in subsequent fee rules. As explained in the proposed rule, USCIS began tracking Form I–129 adjudication hours by petitions for H–2A and H–2B petitions involving named or unnamed beneficiaries in FY 2021. *See* FR 402, 498 (Jan. 4, 2023). The FY 2022/2023 fee review considered the first 6 months of that data because it was the most recent available at the time of the FY 2022/2023 fee review. *Id.* DHS believes this 6 months of data is still reasonable to use. Future fee reviews will use a full year of information if it is available.

DHS does not believe that the fee increases implemented in this final rule will impose unreasonable burdens on petitioners. However, DHS is implementing lower Form I–129 fees for small employers and nonprofits, as described in section II. C. *See* 8 CFR 106.2(a)(3). These lower fees should alleviate some of the concerns raised by commenters, such as the effect on nonprofits and small businesses. We broadly address concerns on other petitioners, such as agricultural or cultural employers, in section IV.B.2.e of this preamble.

Should a petitioner wish to appeal a decision after a denial, they may file Form I–290B. As explained in the proposed rule, DHS limited the proposed fee for Form I–290B, consistent with past fee rules, 88 FR 402, 450–451, and adopts the proposed fee for Form I–290B in this final rule.

DHS does not separate Form I–129 into different forms for different classifications in this rule. DHS disagrees with commenters that separate Form I–129 fees will create confusion and delays. Some petitioners or applicants already pay different fee amounts based on whether statutory fees apply or the services they choose. In some cases, certain petitioners must pay statutory fees in addition to a base filing fee. For example, several statutory fees exist for H and L nonimmigrant workers.[225] H–2B and R nonimmigrant classifications have a different premium processing fee from all other nonimmigrant classifications. USCIS provides several optional checklists to help navigate the specific requirements

of some nonimmigrant classifications. DHS makes no changes to this rule based on these comments.

*Comment:* Commenters raised the following concerns with the proposed fees and their effects on small businesses and nonprofits:
• The unnecessary and unjustified proposal would disproportionately increase economic burdens on small businesses.
• Small organizations and nonprofits that cannot absorb the fee increases would ultimately limit petitions submitted on behalf of foreign workers, which they said would result in the loss of a critical resource across various industries and decrease U.S. competitiveness.
• USCIS should reduce the proposed fees for ACWIA petitioners so that public institutions can better allocate limited funds to STEM professionals needed for patient care or health care research.
• USCIS should consider a tiered fee for the Form I–129 based on business size as a solution in the absence of comprehensive immigration reforms.
○ The increased fee for H–2A petitions with named beneficiaries makes sense, but USCIS should keep the fee for unnamed beneficiaries at $460 per petition.

Commenters wrote that USCIS should exempt Form I–129 petitions from a fee for the following types of petitioners:
• Governmental research organizations.
    • Nonprofit institutions.
    • Academic institutions.
    • Religious institutions.
    • Cap-exempt employers.
    • Nonprofit organizations.
    • Higher education institutions.
    • Small businesses.
    • Agricultural employers.
    • If the beneficiary is a currently on a student work visa, an artist, or a performer.

*Response:* In response to these comments, DHS implements lower Form I–129 fees for qualifying petitioners. *See* section II.C of this preamble. To qualify for the lower fee, petitioners must be a nonprofit organization or a small employer of 25 or fewer FTE employees. *See new* 8 CFR 106.1(f). In many cases, these lower I–129 fees are approximately half of the proposed fee. *See* 8 CFR 106.2(a)(3). In some cases, DHS maintains the current $460 fee. *Id.* These lower fees are in addition to the lower Asylum Program Fee described earlier in this rule. DHS has reviewed the comments and has decided not to provide any fee exemptions for Form I–129 because the petitioner would generally need to have

the capacity to employ the beneficiary and pay any applicable wages and benefits at the time of their admission or upon a grant of status based on the petition approval. Meaning, if an employer cannot afford USCIS fees, then it is unlikely that they would be able to afford to employ the beneficiary of their petition.

DHS considered the volume and content of the comments on this subject, many pointing out the cultural, economic, and scientific benefits that inure to the United States from the ability of institutions being able to hire talented foreign nationals to assist them in their pursuits. DHS agrees with the commenters and has decided that some accommodation should be made for Form I–129 petitioners, such as cultural or scientific employers, that may have very little revenue or profit or lack budgetary flexibility such that they would benefit from some relief from the increased fees. Therefore, DHS has decided to provide a reduced Form I–129 fee for small employers and nonprofits. DHS broadly addresses other comments from employers in section IV.B.2.e of this preamble.

*Comment:* Many commenters expressed opposition to the proposal to cap the number of beneficiaries on Form I–129 petitions at 25 beneficiaries. Comments in opposition to the proposal to limit petitions to 25 beneficiaries stated the following:
• They would have a serious adverse effect on O and P filings, increase the work of USCIS officers, and raising questions as to how O–2 and P petitions should be filed and will be adjudicated, based on the regulatory requirements.
• This proposal was based on an audit of H–2 petitions, and there is no evidence to suggest that this proposed rule would be equitable for the O or P classification or those who have only a few beneficiaries.
• The proposal would require numerous petitions for large ensembles, imposing additional financial burdens on nonprofits and performing arts groups.
• The proposed cap would negatively impact Australia's creative imports to the United States.
• The increase in fees would have a chilling effect on growers' ability to afford to transfer workers as allowed by the regulation.
• The proposal would penalize employers who have developed longstanding relationships with H–2 workers.
• Employers with few beneficiaries or employers that submit multiple petitions, would subsidize the costs of

---

[225] Various statutory fees apply to H and L nonimmigrants. For more information on the fees and statutory authority, see USCIS, "H and L Filing Fees for Form I–129, Petition for a Nonimmigrant Worker," available at *https://www.uscis.gov/forms/all-forms/h-and-l-filing-fees-for-form-i-129-petition-for-a-nonimmigrant-worker (last updated/reviewed Feb. 2, 2018).*

HR-1 FRN 2025 AR-000104

large employers with many beneficiaries.

• In the O–2 and P context, groups must include more beneficiaries than what may be needed for U.S. performances, and theatrical groups cannot perform with a limited subset of performers or crew.

• Limiting petitions to 25 named beneficiaries does not align with DHS's goal of accurately reflecting differing burdens of adjudication and adjudicating petitions more effectively. It is less efficient for USCIS to review multiple petitions, as opposed to reviewing one.

• The proposal generates unnecessary burdens and confusion for entities to file multiple petitions.

• The need to file multiple petitions would create complications with respect to meeting the requirement that 75 percent of the members of a group applying for a P–1B visa must have belonged to the group for at least 1 year.

• Confusion could lead to mistakes when applying with the Department of State due to individuals using the incorrect receipt number.

• A large group of individuals covered by various petitions may not be able to identify which petition number applies to them upon arriving at a consular office to obtain their visas.

• The proposal introduces increased risk of inconsistent adjudication and delays, and would create logistical problems such as one employer's petitions moving at different speeds or with different outcomes.

• This raises various questions around union consultations and principal petitions, and the increased separation of petitions from the principal petition could result in more RFEs.

• This is arbitrary and the fee structure impermissibly discriminates against employers with fewer workers on named petitions.

• DHS failed to provide the public with data regarding the number of names typically listed on named petitions.

• DHS has not afforded the public sufficient opportunity to comment on the rationale for limiting petitions to 25 named beneficiaries.

• USCIS should continue to process P petitions based on current practices, and instead consider an audit of the O and P classification to better determine the need or feasibility of increased fees or separation of petitions based on beneficiary numbers.

• USCIS should use a sliding scale for petitions with more than 40 beneficiaries.

• USCIS should determine a fee structure that allows all named beneficiaries to remain on a single petition, such as a cost per beneficiary or per group fee structure.

• Instead of capping petitions at 25 beneficiaries, USCIS should require a higher fee for petitions involving more than 25 workers on a per-worker basis as Department of Labor (DOL) does for H–2A fees.

• The new fees are arbitrary and capricious because it would have perverse consequences for returning workers who have been previously vetted by USCIS while petitioners recruiting new unnamed workers would pay lower USCIS fees to hire workers that were not previously vetted.

• USCIS is creating a substantial incentive for employers to submit petitions with unnamed beneficiaries.

• USCIS' reference to background checks as justification for higher fees for named beneficiaries is misplaced because visa applicants are already subject to background checks at consulates abroad.

• DHS fails to explain why it performs background checks on named beneficiaries listed in a petition and fails to consider the alternative to rely on DOS to conduct background checks or take public comment on such a proposal.

• Charging fees based on whether H–2A beneficiaries are named or unnamed is not necessary to address the disparity in resources required for processing petitions because unnamed beneficiaries are less resource intensive for USCIS to process.

• A disparity in government resources needed should not be dispositive in setting fees.

• The proposed fee structure already adopts the OIG's recommended solution to the resource disparity and places a cap on the number of beneficiaries that an employer may name in a single petition.

• USCIS could tie the fee to the number of workers requested—whether named or unnamed—to ensure small employers do not bear a disproportionate share of processing costs imposed by large employers.

• The proposed separation of fees for unnamed beneficiaries is unfair to H–2B users who are requesting returning workers through the H–2B supplemental cap allocation process that USCIS created, which requires naming workers.

*Response:* DHS disagrees with the commenters that stated a limit on the number of named beneficiaries would harm most petitioners. As explained in the proposed rule, a report by the DHS

Office of Inspector General (OIG) reviewed whether the fee structure associated with the filing of H–2 petitions is equitable and effective.[226] It made three recommendations. DHS adopts the first recommendation by implementing fees based on the time necessary to adjudication a petition. DHS adopts the second recommendation by implementing separate fees for petitions with named workers. We explained the cost differences in the proposed rule, how petitioners filing petitions with low named beneficiary counts subsidize the cost of petitioners filing petitions with high named beneficiary counts, and how the limit on the number of named beneficiaries results in a more equitable fee schedule. 88 FR 402, 498 (Jan. 4, 2023). We explained that USCIS would perform background checks on named workers. DHS agrees with commenters that DOS will perform background checks for the programs that DOS administers, in accordance with DOS's own policies. As explained in the proposed rule, DHS is expanding the limit to named workers to other Form I–129 petitions, such as the O classification, to make the fee structure more equitable like the OIG report recommended for H–2 petitions. 88 FR 402, 498–499.

DHS declines to implement a fee per named worker as an alternative to the 25 named beneficiary limit, as some commenters suggested. Creating and maintaining such as system would be administratively burdensome. DHS does not require additional per beneficiary fees for other multi-beneficiary benefit requests, such as Form I–539. Such a system would complicate intake and adjudication by requiring USCIS to determine the correct fee was paid for the number of beneficiaries requested.

Regarding the assertion that it is unfair to H–2B petitioners for returning workers through the H–2B supplemental cap allocation process to require naming beneficiaries in the supplemental process, naming beneficiaries on petitions has been required under the statutory cap exemption that was last in effect for FY 2016. Subsequent H–2B supplemental caps have permitted returning workers to be requested as unnamed beneficiaries in all iterations that have included this requirement, with eligibility of such workers determined by DOS in the visa application process. Thus, the limit on named beneficiaries in this rule will not

---

[226] DHS OIG, "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors" (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf.*

have the effect the commenter suggested it will.

Commenters did not provide data to refute that petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. As shown in the RIA for this final rule, many petitions with named beneficiaries request 1–25 named beneficiaries. For example, 99.7 percent of O petitions from FY 2018 to FY 2022 requested 1–25 named beneficiaries. In the same timeframe, 98 percent P petitions requested 1–25 named beneficiaries. Meaning, the vast majority of these petitioners will only need to file one petition despite the limit on the named beneficiaries implemented in this rule. No changes were made based on these comments, except for the small employer discounts discussed earlier in this preamble. See section II.C. Changes from the Proposed Rule.

*Comment:* Many commenters in opposition to the proposal to limit petitions to 25 beneficiaries suggested policy or operational changes. Commenters stated the following:

• USCIS should create an online beneficiary submission option on a secure site where the petitioner would list each beneficiary's information and upon submission of the full list, would receive a confirmation page included with the petition filed with USCIS.

• DHS should review whether it is necessary to conduct a background check of named beneficiaries on every petition, given that in every extension or transfer request the named beneficiaries will have already cleared a background check and been admitted to the United States.

• If USCIS raises the fees for named workers, it must stop unnecessarily requiring naming in the supplemental process.

• USCIS should automatically approve unnamed petitions without a fee, and not raise fees for named beneficiaries, which would save employers time and money, preserve agency resources, and reduce the usual H–2 filing fees.

• USCIS should require DOL to certify H–2A and H–2B recurring jobs for up to 3 years to provide more visas under the H–2B annual cap, reduce unauthorized immigration, and foster employment and economic growth.

• The proposed fee changes for named beneficiaries would hinder H–2 worker mobility by discouraging U.S. employers from hiring H–2 workers already present in the United States and seeking to change employers. A 2015–2017 analysis of human trafficking on temporary work visas, a Farmworker

Justice report on worker abuse, and a survey of returned H–2A workers in Mexico, indicate that this lack of mobility would amplify existing power imbalances between employers and workers and lead to coercion, intimidation, legal violations, trafficking, and forced labor.

• USCIS should abandon its proposal to increase the Form I–129 fee for named beneficiaries to benefit H–2 workers by empowering them to leave unhealthy or illegal work environments and incentivize H–2 employers to provide competitive working conditions and wages.

• The lack of worker mobility is a core flaw of the H–2A program by tying workers to a single employer, and the proposed rule would create another obstacle for workers seeking other employment in the United States.

*Response:* DHS appreciates the commenters' suggestions for policy and process improvements. We fully considered them and may implement them through future guidance or rulemaking. For example, DHS proposed changes to H–2 program which may address some comments on worker mobility, if adopted in a future final rule. *See* 88 FR 65040 (Sept. 20, 2023). However, DHS declines to make any of these H–2-specific policy and procedure changes in this final fee rule. USCIS's fee study determined the agency's costs of processing petitions for named H–2 workers are greater than the costs of processing petitions for unnamed H–2 workers. While comments allege that studies indicated a causal link between DHS filing fees, lack of mobility and abuse, USCIS reviewed these studies and found that they contain no specific references to the fees set in this rule. While worker violations, including serious reports of trafficking of H–2 workers do occur, neither DHS nor the commenters can prescribe here what improvements in worker mobility reasonably would be achieved per dollar of subsidized named H–2 fee.

(1) H–1B Classification

*Comment:* Multiple commenters expressed general opposition to the proposed H–1B fee increases, with many citing impacts to U.S. companies, workers, and the economy. Commenters stated that increases in the H–1B fee would be detrimental to various U.S. employers, such as educational institutions, health care institutions, and technology companies limiting their ability to bring in foreign students and hire healthcare workers, professors, researchers, and other important

workers, thereby stifling innovation. Commenters wrote:

• The fee increase for H–1B visas would make legal immigration more difficult.

• The increased filing fees for H–1B visas would result in dire consequences for thousands of international students seeking employment in the United States and discourage small firms from hiring individuals on F–1 visas.

• USCIS should exclude petitions for H–1B workers from the proposed fee increases altogether, because high processing and legal fees make it difficult for applicants to find new employers.

• USCIS should further increase H–1B fees because H–1B jobs are generally much higher paying jobs than the H–2A or H–2B and are for a longer duration.

• USCIS should waive the H–1B requirement for individuals with an approved Form I–140 petition.

• USCIS should raise the cap on H–1B visas to increase revenue.

*Response:* DHS acknowledges that a higher fee may affect certain employers from hiring H–1B workers, but we have analyzed the impacts of the new fees (RIA and SEA) and there is no evidence that the H–1B fees in this rule are increased to the extent that U.S. industries and the U.S. economy may lose some the skilled workforce this program provides.[227] DHS acknowledges that some petitioners may incur additional legal fees. The economic analysis does not describe every immigrant's situation. Rather, DHS presents our best estimates of the effect of the rule. As stated earlier, USCIS is almost entirely fee funded, meaning that tax revenues from the salaries of H–1B workers do not indirectly provide funding for USCIS. As such, DHS sets USCIS fees without consideration for tax revenues from H–1B workers. In any event, an adjustment in immigration and naturalization benefit request fees is necessary because USCIS cannot maintain adequate service levels, at its current level of spending, without lasting impacts on operations. The new fee schedule was calculated by benefit request, as explained elsewhere. As explained throughout this preamble, DHS exercises its discretionary authority to set fees for benefits and services based on numerous factors, including balancing beneficiary-pays and ability-to-pay principles, burden to

---

[227] *See* USCIS, FY 2022–2023 Fee Review Regulatory Impact Analysis (RIA), *https://www.regulations.gov/document/USCIS-2021-0010-0031; see also* USCIS, FY 2022–2023 Fee Rule Price Elasticity Regression Analysis, *https://www.regulations.gov/document/USCIS-2021-0010-0033.*

HR-1 FRN 2025 AR-000106

**Appx-000131**

the requestor and to USCIS. The price elasticity analysis for Form I–129 indicated that after the last fee increase, I–129 volumes increased when the fee increased and remained around the same level in the following years. While counterintuitive to conventional theory that quantities demanded decrease in response to price increases, DHS believes this data supports that H–1B petitioners will be willing to pay the higher fees set in this rule.

In this final rule, for nonprofits and businesses with 25 or fewer FTE employees (including any affiliates and subsidiaries) filing Form I–129 for the applicable nonimmigrant classification, DHS is setting the fee at either the current $460 fee or half of the new fee whichever is higher. *See* 8 CFR 106.2(a)(3)(i).

DHS declines to make the other changes suggested by these commenters.

*Comment:* Some commenters expressed support for the proposed H–1B fee increases. Commenters wrote:

• They supported the proposed increase in H–1B filing fees because the proposed fee increase would help USCIS process cases faster and hire more employees.

• The fee increase would be nominal relative to applicants' salaries, and any additional expense would not be noticeable as it would be spread over the duration of the visa status.

*Response:* DHS appreciates that some commenters support the proposed fees. DHS agrees with commenters that the fee increases may allow USCIS to hire more adjudicators. DHS believes that the final fees for H–1B petitions should remain affordable for employers.

(2) H–2 Classifications

*Comment:* Commenters stated that fee increases would particularly impact farms that rely on the H–2A program. Commenters stated:

• The fee will have a negative impact on agricultural employers, the food supply system, future generations of farmers, small businesses and hinder the ability of employers to move forward with capital improvements and hire additional workers.

• The H–2A fee increases fees above the pay that applicants receive for their labor.

• The significant added costs for H–2A workers in the rule would jeopardize the sustainability of U.S. farms and ranches.

• The 1,470-percent increase in fees is a cost agricultural employers would never be able to recover.

• Agriculture continues to absorb unpredictable costs outside of their control, including those associated with

inflation, input costs, and depressed farm income. According to USDA data, compared to 2022, labor costs in 2023 will rise by 7 percent, and farm and ranch production expenses are expected to rise by 4 percent–24 percent and 18 percent higher than a decade ago, respectively.

*Response:* DHS understands the need for nonimmigrant workers to meet seasonal or agricultural demands, or both, in the United States and is mindful of the costs for employers involved in doing so. DHS appreciated the important role of farmers and ranches in our food supply system. However, the commenters did not supply any data to quantify how increased fees will jeopardize the U.S. food supply system for future generations of farmers and ranchers. As such, the filing fee for unnamed H–2A workers will be increasing from $460 to $530 per petition (15 percent increase from current fee) and the filing fee for named H–2A workers will be increasing from $460 to $1,090 per petition (137 percent increase from current fee), with a maximum of 25 named workers per each H–2A petition. The change in these filing fees, as provided in this final rule, is consistent with the proposed rule. A report by the DHS OIG [228] reviewed whether the fee structure associated with the filing of H–2 petitions is equitable and effective, and recommended separate fees for petitions with named workers, which, due to the need to verify eligibility of individually named workers, is more costly to USCIS than the costs associated with adjudicating petitions filed on behalf of unnamed workers. However, after considering the comments on the proposed rule, DHS has decided to provide lower fees to accommodate petitioners with 25 or fewer employees and nonprofits, as explained elsewhere in this rule. *See new* 8 CFR 106.1(f). Depending on the nonimmigrant classification for which it is filed, Form I–129 fees will be the proposed fee, $460, or half of the proposed fee. *See* 8 CFR 106.2(a)(3). These lower fees are in addition to the lower Asylum Program Fee described earlier in this rule.

*Comment:* Additional comments on the H–2A and H–2B fee increases are as follows:

○ The proposed H–2B fee increases would price travel businesses out of the program entirely and employers would abandon the program due to increasing complexity and burdens. Thus, the

program is likely to be used less, diminishing the fees collected by USCIS for visa services, as USCIS articulates in the proposed rule.

○ Based on a 2011 study on immigration and U.S. jobs, the proposed fees would reduce operations and services for businesses who cannot meet their workforce needs, particularly for seasonal operations. Instead of raising fees, USCIS should modernize its procedures for H–2B processing, adjudication, and job postings to reduce costs associated with compliance and application.

○ If small and seasonal businesses continue to experience rising costs, U.S. consumers would be left to foot the costs, leading to more inflation.

*Response:* DHS' prepared a price elasticity analysis for both the proposed and final rules and placed it in this rule's docket for the public to review and comment on. That analysis indicates that the proposed fees in the rule may not reduce program participation or affect an H–2B petitioner's ability to meet their workforce needs.[229] Nevertheless, to address the commenters' concerns, as described earlier in this rule, DHS implements lower fees for Form I–129 for petitioners with 25 or fewer employers and nonprofit organizations from what were in the proposed rule. *See new* 8 CFR 106.1(f) and 106.2(a)(3). DHS maintains the current fee for H–2A and H–2B petitions with only unnamed beneficiaries for petitioners with 25 or fewer employers and nonprofit organizations. *See* 8 CFR 106.2(a)(3)(iii) and 106.2(a)(3)(v).

DHS appreciates the suggestions of commenters for modernization and integration of the U.S. Department of Labor, DHS, and U.S. Department of State processes for requesting and issuing visas but most of the suggestions are not within DHS's statutory authority or this fee schedule rulemaking. DHS is working toward online filing for H–2B petitions, which we agree would benefit the agency and program users alike. However, such an enhancement may not result in the significant cost reductions that commenters assert will occur, particularly when it requires systems development and programming. When online filing becomes available for H–2B petitions, this rule provides that an "online filing discount" of $50 would generally apply. In addition, the

---

[228] DHS OIG, "H–2 Petition Fee Structure Is Inequitable and Contributes to Processing Errors" (Mar. 6, 2017), available at *https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-42-Mar17.pdf.*

[229] See USCIS, FY 2022–2023 Fee Review Regulatory Impact Analysis (RIA), *https://www.regulations.gov/document/USCIS-2021-0010-0031.* See also USCIS, FY 2022–2023 Fee Rule Price Elasticity Regression Analysis, *https://www.regulations.gov/document/USCIS-2021-0010-0033.*

reduced Form I–129 filing fee for small employers addresses most of the concerns about the impact on hospitality, amusement, recreation, and other seasonal industries.

*Comment:* Comments on the H–2 ABC model results were as follows:

• The estimates USCIS used for the H–2B program are vastly different than publicly available data. USCIS underestimated the H–2A and H–2B volumes. USCIS should update its ABC model with proper numbers and consider ways to reduce the cost of employers who are seeking to hire a legal workforce amid U.S. labor shortages. At a minimum, the H–2B fees should not exceed the revised ABC model's cost to perform the H–2B functions.

• The H–2A and H–2B program fees should not exceed the revised ABC model's cost.

*Response:* As explained in the proposed rule, DHS proposed H–2A and H–2B fees that are higher than the ABC model output to offset limited fee increases for some other benefits requests and workloads without fees. *See* 88 FR 402, 451 (Jan. 4, 2023).

Regarding comments on H–2A and H–2B volumes, USCIS used the best information available at the time of the fee review. The average annual estimates for the FY 2022/2023 Fee Review may be more or less than actual receipts in those years. The H–2B program may periodically receive supplemental visas based on joint rulemakings by DHS and DOL.[230] Those increases are temporary. As explained in the proposed rule, DHS excludes projected revenue from expiring or temporary programs in setting USCIS fees due to the uncertainty associated with such programs. *See* 88 FR 402, 454 (Jan. 4, 2023). While TPS designations and DACA are the largest such programs, the same rationale may apply to temporary increases in H–2B visas. DHS will evaluate these fees, volume forecasts and ABC model results in future fee reviews using all available data at that time.

(3) L Classification

*Comment:* Commenters on the L-classification fee increases wrote the following:

• The fee increase for the L nonimmigrant worker petition cannot be

justified, because the same immigration benefit costs five times as much in the United States as it does in Canada. An increase of this magnitude runs contrary to the intent and spirit of free trade agreements between the United States and foreign countries.

• For intracompany transferees under the L–1 program, petitioners may prioritize applications administered by the DOS over USCIS.

• The burden of fee increases may divert limited resources of small- to medium-sized companies away from research and development initiatives, job growth, and other investments.

• They questioned whether the fee increase for L–1 petitions would allow USCIS to render decisions within 30 days in alignment with INA section 214(c)(2)(C), or whether petitioners would have to pay a premium processing fee to have petitions adjudicated within "a reasonable amount of time."

• USCIS should partner with CBP to return to allowing L–1 extensions at the port of entry for Canadian citizens. Before 2019, Canadian citizens could obtain a renewed L–1 at a U.S. port of entry, but CBP stopped processing such applications after a policy change by DHS. Reverting to the policy of allowing CBP to handle such applications would reduce the volume of Form I–129 applications.

*Response:* DHS disagrees with commenters that it did not provide justification for the proposed fee for L petitions using Form I–129. DHS provided the rationale in the proposed rule. *See* 88 FR 402, 495–496. DHS data relating to past fee increases and the small entity impact analysis that accompanies this rule indicate that the moderate fee increases in this rule will not appreciably affect the research, development, employee expansion, and investment budgets of the affected petitioners. *See* Small Entity Analysis, Section 4.C. DHS adjudicates all L-nonimmigrant petitions as expeditiously as possible, and the new fees provided in this rule will allow us to maintain or improve current service levels. In response to comments, DHS provides that L petitions filed by nonprofits and businesses with 25 or fewer employees will pay a $695 Form I–129 fee which is approximately half of the full fee of $1,385 for other L petitions. *See* 8 CFR 106.2(a)(3)(vi) and (ix). DHS has no control over the fees that Canada may charge for similar services. DHS appreciates the commenters' suggestions for policy and process improvements, such as partnering with CBP to allow L–1 extensions for Canadians. We fully considered them and may implement

them through future guidance or a rulemaking. DHS declines to make any other changes to this rule based on these comments.

(4) O and P Classifications

Many commenters submitted comments about the increase in fees for O and P visas. The commenters oppose the fee increases, stating the following:

• The proposed fee increases would impose financial impacts on the arts, entertainment, and non-major-league sports industries while deterring companies and nonprofits from recruiting foreign talent to the United States.

• The proposed fee increases would deter foreign workers and artists from coming to the United States.

• The proposal would be mutually damaging to the United States and its foreign counterparts, as it would result in increased prices for U.S. audiences and foregone cultural, diplomatic, and economic opportunities. Furthermore, deterring foreign talent would stifle USCIS revenue.

• The negative ripple effect of the proposed fee increases would extend to U.S. cities and businesses that depend on the revenue generated by performances. Based on a 2021 study by Oxford Economics, in 2019 live entertainment supported 913,000 U.S. jobs and increased GDP by more than $130 billion. Furthermore, out-of-town visitors who attend local concerts spent more than $30 billion in U.S. communities in the same year.

• The proposal runs counter to the Administration's September 30, 2022, E.O. on "Promoting the Arts, the Humanities, and Museum and Library Services', which pledged to, "strengthen America's creative and cultural economy, including by enhancing and expanding opportunities for artists, humanities scholars, students, educators, and cultural heritage practitioners, as well as the museums, libraries, archives, historic sites, colleges and universities, and other institutions that support their work."

• The proposed rule contradicts the White House Fact Sheet issued on January 21, 2022, which states the belief that "one of America's greatest strengths is our ability to attract foreign talent."

• The proposed fee increases would be cruel, unjust, or arbitrary as they apply to orchestras and artists.

• The proposed fees would result in a system whereby O and P visas would only be accessible to the highest earners among international performers, venues, and performing arts companies.

• USCIS misapplied the ability-to-pay principle and fails to recognize that O

---

[230] *See, e.g.,* USCIS, USCIS Reaches H–2B Cap for Second Half of FY 2023 and Announces Filing Dates for the Second Half of FY 2023 Supplemental Visas, available from *https://www.uscis.gov/ newsroom/alerts/uscis-reaches-h-2b-cap-for-second-half-of-fy-2023-and-announces-filing-dates-for-the-second-half-of* (last reviewed/updated Mar. 2, 2023).

HR-1 FRN 2025 AR-000108

and P petitioners are not necessarily employers, and in the case of the arts, the foreign national or group often pays the USCIS fees.

• The increased fees would be coupled with additional financial and administrative burdens, such as legal fees, RFEs, premium processing, and the cost of touring, itself. Furthermore, in some itinerary-based professions, the O visa is only granted for a short period, and extensions are costly.

• The O and P fee increases would result in a retaliatory increase in fees by other countries such as Canada and the U.K., generating negative impacts on U.S. artists and performers.

• The fees would limit the international touring industry with broad impacts on the U.S. economy, including decreased Federal and State tax revenue and decreased patronization of businesses by artists and audiences.

• The fee increases do not respect the USCIS-approved Reciprocal Exchange Agreement, covering the reciprocal exchange of U.S. and Canadian artists across respective borders.

• Most touring artists are engaged to perform in small venues, and the proposed increase in fees would block such venues from engaging international artists, leaving only larger employers, venues, and acts with access to cross-border diversity in programming.

• The proposed fees would compound the economic risks associated with inconsistent application processing times, uneven interpretation and implementation of the statute, and unwarranted requests for additional evidence.

• The increase in fees would compound the complexity of an already unpredictable petition process, making the process of petitioning for foreign artists beyond the reach of small- and mid-size organizations, which are most likely to serve communities of color and other marginalized groups.

• The Average Impact Percentage of the fee increase on P visa applicants was not realistically assessed and would likely exceed the estimate USCIS provided in Table 32 of the proposed rule. The Impact Percentage would represent 20.6 percent of the work completed with a P–2 visa. Unlike O visas, P visas are shorter in duration, generate less income, and are usually requested by self-employed artists or smaller organizations.

• The USCIS' SEA underestimated the impact of the proposed fees increase on nonprofit organizations and did not include any performing arts organization (North American Industry Classification System (NAICS) code 711).

• The impact on nonprofit performing arts organizations would be unconscionable should the fees increase to the proposed levels for O and P classifications coupled with the proposed cap on the number of beneficiaries on Form I–129 petitions.

Considering the above concerns related to O and P petition fees, several commenters offered alternatives to the proposed changes, including:

• Conduct an economic assessment of the impact of O and P petition fee increases on the music and entertainment industry before finalizing the rule.

• Postpone implementation of the new fees or give petitioners time to adapt to the change in fees to accommodate the time-sensitive nature of performing arts planning.

• Increase fees based on annual revenue, the number of visas requested, or the number of employees working at a petitioning company, so that larger companies would pay for the extra expenses covered by USCIS fees.

• Implement a tiered structure—based on revenue, length of stay, or venue size, or for individuals who are active in more lucrative industries—to increase accessibility and stability for lower-income applicants.

• Significantly reduce the proposed O and P visa fees such as at $500 or less or increase them by no more than $40 or 1 to 5 percent.

• USCIS should not assign ASVVP costs to H–3, P, or Q petitions when they do not require site visits.

• In the SEA, USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by Employer Identification Number (EIN) and revenue. Only one entity had an EIN that overlapped in both samples; this was a large entity that submitted three Form I–129 petitions and a single Form I–140 petition. The commenter suggested this was not reflective of the experience of the commenter, which filed roughly 100 Form I–129 petitions, all for O and P status, between October 1, 2019, and September 30, 2020.

Numerous commenters objected to or expressed concern with the proposed fees and suggested corresponding policy or operational changes, including:

• U.S. stakeholders have already provided USCIS with detailed plans for improvements to USCIS processing of Form I–129 petitions for O and P visas, as outlined in its "Recommendations for Performing Arts Visa Policy."

• The unique nature of scheduling international guest artists requires that the visa process be efficient, affordable, and reliable so that U.S. audiences may experience artistic and cultural events.

Congress affirmed the time-sensitive nature of arts events when writing the 1991 Federal law regarding O and P visas, in which USCIS was instructed to process visas in 14 days.

• The requirement for P petitions that there be no gap in work of more than 1 month would require multiple filings, which further increases the fees paid by the foreign group to come to the United States. The maximum allowed gap of 5–6 months for O–1B petitions and a 1-year maximum classification period for P nonimmigrants would have a similar effect.

• USCIS should separate the P petition from the miscellaneous H–3, P, Q and R classifications, as the proposed combination includes 14 possible requested nonimmigrant classifications, 10 of which are P classifications. USCIS should separate the P classification for purposes of this proposal or add it to the O classification proposal.

• Keeping the O and P together, or separating the P classification out, would allow for better training of USCIS officers on the specific nuances of the O and P classifications given the similarities in the regulatory requirements for the two classifications (*i.e.,* advisory opinions from applicable union/labor organizations, agents as petitioners, etc.).

• Extend the 3-year authorized period of stay for O and P nonimmigrants to at least 5 years or lower processing fees in exchange for a shorter, 3-month validity period of stay for O an P nonimmigrants.

• Eliminate the unnecessary P visa requirement for Canadian musicians to save USCIS resources and mirror the Canadian policy for visiting U.S. musicians or adopt a system like the UK's Certificate of Sponsorship for performers from Visa Waiver Program countries.

• USCIS should retain information on file for those groups who tour the United States regularly to reduce the need to begin the visa application process anew each time.

• The United States should maintain and prolong the 48-month extension to the Interview Waiver Program, up to 4 years, to alleviate the burden of the visa process.

• USCIS' practice is to deny requests for expedited processing of O and P petitions, which leads to worthy organizations facing prohibitive and obscene filing fees.

• The proposed changes do not adequately address the underlying concerns related to USCIS processing of O and P petitions.

*Response:* DHS agrees with the commenters' views that the arts,

HR-1 FRN 2025 AR-000109

Appx-000134

entertainment, and sports industries are vitally important and beneficial. However, DHS reiterates that the fees established in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services. DHS does not intend to deter or unduly burden petitioners requesting workers in these, or other, industries but any preferential treatment provided to these petitioners is borne by other petitioners, applicants, and requestors.

USCIS conducted a comprehensive fee review and determined that its costs have increased considerably since its previous fee adjustment. As explained in the proposed rule, the fees for Form I–129 were calculated to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker. *See* 402, 495–500. At its current level of spending, USCIS cannot maintain adequate service levels without lasting impacts on operations. *See* 88 FR 402, 426–430, 528; *see also* section IV.D.4 of this preamble. Therefore, DHS needs to adjust fees. Nevertheless, after considering the comments from petitioners for O and P nonimmigrant workers who wrote that they are a small organization with few or no employees, or they are a nonprofit, DHS has decided to lower the fee for a Form I–129 and the Asylum Program Fee filed by either an employer with 25 or fewer employees or one that is a nonprofit entity. 8 CFR 106.2(a)(3) and 106.2(c)(13). As stated elsewhere in this rule, as with any free service or reduced fee provided in this rule, this change requires that DHS shift some of the costs of an employer with 25 or fewer employees or a nonprofit entity petitioning for O and P nonimmigrant workers to other applicants and petitioners.

DHS respectfully disagrees that an increase in fees contradicts the White House's January 21, 2022, Fact Sheet, would be mutually damaging to the United States and its foreign counterparts, or would lead to an increase in the complexities of the petition process. Nevertheless, the lower Form I–129 fees for small employers and nonprofits, as described earlier may alleviate this concern from some commenters.

DHS appreciates the commenters' suggestions for policy and process improvements. We fully considered them and may implement them through guidance or a future rulemaking.

(5) R Classification

*Comment:* Multiple commenters provided feedback in opposition to the proposed fee increases for R–1 workers. These commenters wrote:

• R–1 workers offer substantial benefits to the United States in the form of service, outreach, and diverse cultural perspectives and experiences. Considering existing financial barriers for R–1 workers, sponsoring religious organizations and nonprofits would struggle to retain these workers if the proposed fees were implemented.

• The proposed rule fails to recognize the unique role of clergy in society as essential workers and the impact that such fee increases would have on the ability of U.S. religious organizations to fill needed positions with foreign clergy. Based on data from the Bureau of Labor Statistics, 48 percent of U.S. clergy were at least 55 years old, and, between 2018 and 2016, growth in clergy employment opportunities would see an 8-percent growth.

• The fee increases for R–1 petitions would have a chilling effect on U.S. religious organizations and prevent them from carrying out their religious and social mission. The Religious Worker Visa Program is important for providing critical services and addressing the specific needs of ethnic groups, including the Hispanic, Asian, and African communities, as well as the needs of vulnerable populations. The program also assists religious organizations that face obstacles in using traditional employment-related categories, which historically have not fit their situations.

• The fees would disproportionately affect small religious organizations, parishes, and communities that share a charitable function in the United States.

• The proposal departs from prior practice by treating this category like other employment categories. The commenter wrote that fee adjustments for religious workers should weigh the nonprofit nature of the sponsor.

• USCIS should not increase the fee for R–1 visa petitions because the volume of R–1 petitions is low compared to other visa categories and the fee increase would not generate substantial revenue for USCIS but would hurt U.S. nonprofit religious organizations.

• USCIS grouped R–1 visas with the same increase in fees as E–2s (investors), P–1s (professional athletes and performers), and TNs (Mexican/Canadian professionals), but R–1 petitions are filed by nonprofit organizations on behalf of religious workers and neither the organizations nor workers can absorb the proposed increased costs.

• A 2- to 5-percent increase in R immigrant worker fees would be more

understandable than the proposed increase from $460 to about $1,000.

*Response:* As explained in the proposed rule, DHS proposed a Form I–129 fee that included the cost of religious workers and other visa classifications. *See* 88 FR 402, 499 (Jan. 4, 2023). Past DHS rulemakings resulted in no decrease in the number of Form I–129 filings for any nonimmigrant classification, and our analysis for this rule indicates that the fees established will not result in any detectable effect on the number of petitioners who choose to petition for nonimmigrant religious workers. DHS has no data, and the commenters provide none, that supports their assertion that the fee increases implemented in this final rule will impose unreasonable burdens on petitioners, churches, religious organizations, or small entities who wish to petition for a nonimmigrant religious worker. However, as many commenters noted, many petitioners for religious workers may be nonprofit organizations. Therefore, as explained more fully elsewhere in section II.C. of this preamble, after considering the comments, and, to alleviate any potential burden on nonprofit religious entities, DHS implements a lower Form I–129 fees for nonprofits in this rule. *See* 8 CFR 106.2(a)(3)(ix). DHS also exempts nonprofits from the Asylum Program Fee. *See* 8 CFR 106.2(c)(13)(i).

(6) H–3, E, Q, and TN Classifications

Several commenters expressed opposition to the fee increases for E and TN classifications. Commenters wrote:

• The fee increases would be antithetical to the special designation afforded to North American Free Trade Agreement countries and Australia.

• The fee for TN when filed with CBP is only $50 while a TN filed with USCIS is over $1,000.

*Response:* DHS recognizes that the E and TN nonimmigrant classifications are available to foreign nationals from certain countries with which the United States has entered into an international agreement, or with which the United States maintains a qualifying treaty of commerce and navigation. Typically, the opportunities accorded to certain noncitizens to obtain these visas are based insofar as practicable on the treatment accorded to U.S. nationals in similar classifications. While U.S. obligations under the international agreements or treaties, as implemented by the United States, permit qualifying nationals of the signatory countries to seek admission to the United States for a temporary period, the agreements do not include provisions that limit the U.S. government from recouping the full

HR-1 FRN 2025 AR-000110

Appx-000135

**6298**   **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

cost of administering the E and TN programs. Furthermore, no provisions finalized in this rule would alter the existing general eligibility criteria for either the E or TN classifications, thus maintaining the special designations afforded to these countries.

The Form I–129 fees finalized in this rule are based on USCIS costs and not CBP costs. Although CBP charges fees for some services, most CBP funding comes from appropriations instead of fees, unlike USCIS. For example, CBP's FY 2021 enacted budget totaled approximately $16.3 billion, of which $14.7 billion came from discretionary appropriations.[231] The remaining approximate $1.6 billion or 10 percent came from a mix of discretionary and mandatory fee accounts. As such, CBP fees may not necessarily need to recover the full cost. DHS declines to make any changes to this rule based on these comments.

e. I–140 Immigrant Petition for Alien Worker (Not Related to Asylum Program Fee)

*Comment:* Commenters suggested process changes to Form I–140. A commenter, citing a USCIS memo, encouraged USCIS to issue an EAD after Form I–140 approval, reasoning that such an approach would advance efforts toward "continuous improvement at USCIS." A commenter expressed concern that some Form I–140 applications may be "duplicate" filings in cases where an applicant is downgrading from an EB–2 to an EB–3 classification due to changing visa availability. The commenter suggested creating a new form for a "request to transfer underlying basis of classification" wherein an applicant may provide proof of EB–2 approval to downgrade their employment visa classification to EB–3, to reduce overall receipt volumes for Form I–140.

*Response:* DHS may consider these comments in future rules or policy changes but declines to address these comments with changes in this rule. These comments focus on changes to the immigration process that are out of scope of this fee rule.

f. I–765 Employment Authorization/ EAD (Not Related to Other Bins/ Exemptions)

(1) General

Comments submitted regarding Form I–765 stated:

[231] *See* DHS, U.S. Customs and Border Protection Budget Overview Fiscal Year 2023 Congressional Justification available at *https://www.dhs.gov/sites/ default/files/2022-03/U.S.%20Customs%20and %20Border%20Protection_Remediated.pdf* (last visited Sep. 20, 2023).

• EAD applicants are not employed, and they will struggle to afford the increase.

• USCIS should explain Form I–765 fee increase.

• Increasing costs for EAD renewal will disrupt employment for workers waiting to have their asylum case adjudicated.

• The proposed fee increase for Form I–765 will delay employment authorization for applicants, restricting their economic and civic participation.

• The fee would negatively impact families, international students, and low-income noncitizens who may be ineligible for public benefits and fee waivers.

• Increasing the fee for Form I–765 will exacerbate the current labor shortage.

• USCIS should continue the 180-day EAD status extension and apply the automatic extension to spouses of high-skilled workers.

• If DHS increases the I–765 fee, all EADs should have at minimum a 2-year validity period.

• DHS should issue an EAD to adjustment of status applicants for a period of 4–5 years or longer to reduce the need to adjudicate benefits.

• For humanitarian category applicants, USCIS should provide EADs more quickly and offer a fee waiver or a reduced fee option.

• The settlement agreement in *Edakunni* v. *Mayorkas* requires USCIS to grant an automatic extension to H–4 nonimmigrants who filed their H–4-based EAD renewal on time and extend employment authorization opportunities for L–2 nonimmigrants with valid nonimmigrant status.

• Employment authorization should be provided to J–2 spouses.

• USCIS should not require derivative applicants seeking an extension of status to request employment authorization separate from the principal's H–1B petition.

• USCIS should allow filing of Form I–765 by an approved Form I–140 beneficiary, because allowing noncitizens with approved immigrant petitions to work is an approach endorsed by Congress and statute and would reduce the number of H–1B renewals, saving USCIS time.

• USCIS should issue employment authorization cards without a formal expiration date. Instead, the card should say the application is pending and provide a link or QR code to check its status.

• USCIS should automatically issue EADs to adjustment of status applicants because the information required should already be on file or permit a Form I–

797C receipt notice to serve as an employment authorization.

• Increasing the Form I–765 fee while increasing fees for other employment related benefits forms will impose a disproportionate burden on the employer community because Form I–765 is fundamental to their feasibility to preserve jobs and livelihoods.

• The increased fee may deter eligible workers from utilizing USCIS' new Labor Agency Investigation-Based Deferred Action because of finances.

• Increasing the Form I–765 fee would burden nonimmigrant workers who need to maintain lawful employment and enjoy full labor rights.

• It is notable that there is a fee reduction in online filing for Form I–765 compared to paper filing, however, USCIS needs to improve its online system.

*Response:* DHS is sympathetic to the financial needs of low-income individuals. Thus, this rule maintains all existing fee waivers policies, including those for Form I–765. Individuals or families that meet specific criteria, including receiving a means-tested benefit, are eligible to request a fee waiver. USCIS is working on making the fee waiver process available online, but at this time, Form I–912, Request for Fee Waiver, must be mailed, along with the completed USCIS application or petition and supporting documentation, and cannot be submitted online. As explained elsewhere in this rule, DHS expands fee exemptions for certain populations, including some Form I–765 applicants. DHS notes that there is no fee for an initial Form I–765 filed by an asylum applicant, *see* 8 CFR 106.2(a)(44)(ii)(G), and the renewal fee requests can be waived for applicants who can demonstrate that they are unable to pay, *see* 8 CFR 106.2(a)(3)(ii)(E).

While the proposed rule did not have a specific section on Form I–765, it explained the general methodology for assessing proposed fees, including the proposed fee for Form I–765. *See* 88 FR 402, 450–451 (Jan. 4, 2023). However, the final rule uses a different approach for the Form I–765 implemented in this rule. As explained earlier, in this final rule DHS limits the increase for many fees by inflation and rounds to the nearest $5. The current fee is $410. When adjusted for inflation, it would be $518.[232] As such, DHS is setting the

[232] DHS calculated inflation by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (1 + (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent. The current $410 fee

HR-1 FRN 2025 AR-000111

paper filing fee at $520, a 27 percent increase from the current $410 fee. *See* 8 CFR 106.2(a)(44). As explained earlier, DHS is implementing a $50 discount for online filing in most cases. *See* 8 CFR 106.1(g). Therefore, DHS is setting the online filing fee Form I–765 at $470, only $60 more than the current fee of $410. In addition, as explained in the proposed rule and later in this rule, DHS is setting separate filing fees for Form I–765 when filed concurrently with Form I–485 or as benefit requests based on a pending Form I–485 filed on or after the effective date of this rule. DHS is setting the filing fee for a Form I–765 filed concurrently with Form I–485 after the effective date at $260. *See* 8 CFR 106.2(a)(44)(i). Applicants will pay the same fee to renew their EAD while their Form I–485 is pending. *Id.*

DHS declines to codify a new validity period of employment authorization for any category in this rule because the length of EAD validity is not directly related to USCIS fees and the other changes proposed. In addition, 8 CFR 274a.12(a) and (c) provide that USCIS may, in its discretion, determine the validity period assigned to any EAD or document issued evidencing a noncitizen's authorization to work in the United States, thus EAD validity periods are generally not codified in regulations such as those being published by this rule. In 2023, USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.

DHS believes limiting the Form I–765 fee increase to the change in inflation, lowering fees for online filing or when filing with Form I–485, continuing to offer fee waivers, and expanding fee exemptions addresses concerns raised by commenters.

(2) Students

*Comment:* Increased fees would create hardships for foreign students, in part because they tend to be low-income and have difficulties finding sponsors.

*Response:* The commenters have not provided evidence that indicates foreign students tend to be low-income individuals or that increased fees would create hardships for foreign students, specifically. In addition, as explained throughout this rule, USCIS is fee funded, and absent another source of revenue to finance its operations, it must charge fees. When lower fees, fee waivers and exemptions are provided

---

multiplied by 126.37 percent is $518.12. DHS rounds all USCIS fees to the nearest $5 increment.

for a population, the cost of the immigration benefit request for which the fee is lowered must either be recovered in the form of higher fees for another group, or USCIS' limited funding reserves must be depleted to cover those costs. DHS declines to provide discounts to Form I–765 on the basis that the applicant is a student. However, as explained elsewhere in this preamble, DHS is limiting the fee increase for Form I–765 to the change in inflation since the last fee rule. DHS also is setting an online filing fee for Form I–765 that is $50 less than the paper filing fee. Generally, students are eligible for online filing. These changes from the proposed rule will benefit students and all other Form I–765 applicants that will pay the new fee.

(3) DACA

*Comment:* DACA recipients should receive an exemption to the I–765 fee increase because DACA fees and costs were not considered in the fee model so the exemption should be granted without needing to alter USCIS' financial analysis. The fee would hinder DACA recipients from renewing their employment authorizations and exacerbate the burden of DACA status renewal fees and other costs for those with uncertain status.

*Response:* DHS does not believe the $520 fee will hinder DACA recipients from renewing their EADs that have allowed them to earn income in lawful employment in the United States. In addition, as DHS stated in the DACA rule, DHS believes that maintaining the existing fee structure with limited fee exemptions strikes the appropriate balance and declined to modify the rule to extend fee waivers or exemptions for DACA-related I–765s. 87 FR 53152, 53237 (Aug. 30, 2022). Likewise, DHS declines to make any changes based on these comments in this rule.

g. Other/General Comments on Employment-Based Benefits

Commenters on employment-based benefits generally stated:

• They are opposed to any increase in fees for employment-based visa holders and their employers because costs and timeline burdens are already high for this population.

• USCIS employment-based benefit request fees should be used to process H–1B and H–4 visas, rather than other visa categories.

• USCIS should commit to deciding normal applications in 1 month. RFEs and delays are tactics to generate more revenue. USCIS should commit to delivering a certain number of employment-based benefit request decisions each day.

• USCIS should increase the fees for family and humanitarian-based petitions and not for employment-based petitions. USCIS should allocate its resources to process each form according to how much revenue it generates.

• These fee increases will burden the business community rather than improve upon services render or save costs.

• Increased fees for employment-based petitions would further burden academic research employees whose grants specify a salary budget that includes visa costs. USCIS fees are an ineffective use of public grant funds aimed at research.

• USCIS should allow applicants awaiting an employment-based benefit decision to pay a one-time fee, suggesting $5,000 per applicant, and file for adjustment of status along with an EAD and travel documentation to provide stability for those who have been waiting in the queue for a decade or more.

• USCIS should restrict the EB–1C category because fraud is preventing researchers and scientists from moving to the United States.

• USCIS should not waste any Green Cards for employment-based categories because providing Green Cards increases the backlog.

• USCIS should reimplement the known employer program because the agency should possess sufficient information and data to establish a permanent program. The program could lower costs and increase efficiency for employers, particularly those who frequently file petitions in large volumes.

• USCIS should continue development and implementation of a trusted employer program that allows established and well-known employers to file their petitions more easily. USCIS expected a trusted employer program would promote simplicity and efficiency in the benefit application process for employers, while allowing USCIS to further protect benefit integrity, ensure consistency with respect to adjudications, and reduce the need for fraud detection at the individual level for such employers.

*Response:* DHS discusses processing times, backlog reduction, family-based fees versus employment-based fees, and the uses of fee revenue elsewhere in this rule. The other comments summarized above are about changes to programs and policies and not directly about the fees or changes that were proposed in the proposed rule; thus, DHS declines to make any changes based on these comments.

HR-1 FRN 2025 AR-000112

**6300**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

3. Citizenship and Naturalization

a. N–400 Application for Naturalization

*Comment:* Some commenters expressed support for the fee increase for Form N–400, writing:
- The fee increase was justified given inflation.
- The increase was minimal.
- The Form N–400 application should remain accessible based on applicants' ability to pay, which the proposed rule would accomplish.

*Response:* DHS appreciates commenters' feedback and has made no changes in the final rule based on these comments. DHS sets the Form N–400 fee as in the proposed rule, except that the final fee schedule now includes $50 discount for online filing.

*Comment:* Multiple commenters expressed opposition to the increased fee for Form N–400. Commenters indicated that increasing the Form N–400 fees would price out many immigrants who are often low-income or below the Federal poverty level. Some added that the increase would impact many applicants who face difficulty affording the current fee but do not qualify for a fee waiver or reduced fee. Several commenters reasoned that the fee increase would discourage immigrants from becoming citizens and contributing more to the country. Many commenters similarly urged USCIS to incentivize naturalization and make processing fees more affordable. The commenters added that naturalization increases earning potential and security so applicants can more fully participate in civic life.

*Response:* DHS appreciates these commenters' concerns regarding the affordability of naturalization and recognizes the benefits of naturalization for new citizens and the United States. However, DHS has only increased the fee for Form N–400 with biometrics by $35 (4.8 percent increase), which is substantially below the rate of inflation since the last fee increase (approximately 26 percent as of June 2023). Previously, most applicants had to pay a separate $85 fee for biometrics. The final rule also incorporates a $50 discount for online filing ($710), *see* 8 CFR 106.1(g), which is *below* the prior fee for a Form N–400 with biometrics. In addition, fee waivers are available to all naturalization applicants who are receiving means-tested public benefits, whose household incomes are at or below 150 percent of the Federal Poverty Guidelines (FPG), or who are experiencing extreme financial hardship such as unexpected medical bills or emergencies. *See* 8 CFR 106.3(a)(1)(i).

Nevertheless, in response to commenters' concerns about the affordability of applying for naturalization, DHS has broadened the availability of a reduced fee N–400 to applicants whose household incomes fall at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). Considering this change along with those accommodations already made for Applications for Naturalization, DHS does not believe that the new N–400 fee will prevent or discourage eligible noncitizens from applying for naturalization.

*Comment:* While expressing appreciation for the limited fee increase for Form N–400, a commenter stated that DHS should seeks ways to make Form N–400 more affordable and included as an example offering a discount for families who jointly file two or more Form N–400s. The commenter stated that eligible Green Card holders may opt to renew their status instead of naturalizing if application fees become unaffordable.

*Response:* DHS declines to adopt the commenter's recommended discount for family members who file N–400s simultaneously because joint N–400 filings would result in minimal, if any, processing efficiencies for USCIS. Unlike an application for adjustment of status, where the principal applicant's spouse and children may derive eligibility through the principal, *see* INA section 203(d), 8 U.S.C. 1153(d), every naturalization applicant must independently establish their eligibility for U.S. citizenship. *See* 8 CFR 316.2(b). Although each family member is required to submit their own Form N–400, fee waivers and the additional reduced-fee eligibility for household income less than or equal to 400 percent of the FPG should provide sufficient relief from the cost of fees for those who are unable to pay. *See* 8 CFR 106.2(b)(3)(ii), 106.3(a)(3)(i)(I). In addition, USCIS now extends Green Cards up to 24 months from expiration for those applicants who file Form N–400.[233] Therefore, DHS does not believe that the limited fee increase for Form N–400 will cause a significant number of naturalization-eligible applicants to renew their Green Cards instead of applying to naturalize.

*Comment:* Multiple commenters expressed concerns with the fact that the Form N–400 fee would be below full cost recovery. A research organization

stated that this would shift naturalization costs to visa applicants and reasoned that this would negatively impact integration since a Green Card is a prerequisite for naturalization and a non-immigrant visa is often itself a prerequisite for a Green Card. Another commenter urged USCIS to stop subsidizing the Form N–400 process by charging a fee that is below the cost of the benefit. The commenter stated that U.S. citizenship is a privilege with great value. The commenter also stated that immigrants do not need additional incentive to naturalize, and that by eliminating this subsidy USCIS could improve case processing for other stakeholders such as highly skilled workers, students with advanced degrees, or doctors and other work critical to the U.S. economy. The commenter also asserted that this "subsidy" is paid more by immigrants who have stayed in the country longer and must renew their visas multiple times, such as employment-based immigrants from China and India.

*Response:* DHS acknowledges these commenters' concerns but believes they are outweighed by the importance of naturalization to individual beneficiaries and the United States as a whole. Naturalization facilitates integration of immigrants into American society. Upon naturalizing, new citizens can vote in public elections, participate in jury duty, and run for elected office where citizenship is required. Moreover, there are proven, beneficial economic and civic outcomes for immigrants who become citizens, which include increased earnings and homeownership. These earning gains from naturalization may translate to greater city, State, and Federal tax revenues.[234] E.O. 14012 instructed DHS to "make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee." E.O. 14012, 86 FR 8277 (Feb. 5, 2021). DHS has held the fee for Form N–400 below the estimated cost to USCIS of adjudicating the form since 2010, as explained in the proposed rule. *See* 88 FR 402, 487 (Jan. 4, 2023). DHS has determined that shifting costs of naturalization to other applicants in this manner is desirable given the significant value that the United States obtains from the naturalization of new citizens. Many commenters on the 2020 fee rule stated that the fee would deter eligible applicants and cost can be a prohibitive

---

[233] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, PA2022–26 Policy Alert, "Extension of Permanent Resident Card for Naturalization Applicants" (Dec. 9, 2022), *https:// www.uscis.gov/sites/default/files/document/policy-manual-updates/20221209-ExtendingPRC.pdf.*

[234] *See* Holly Straut-Eppsteiner, Cong. Research Serv., R43366, "U.S. Naturalization Policy" (May 2021), at 2–3, *https://crsreports.congress.gov/ product/pdf/R/R43366.*

HR-1 FRN 2025 AR-000113

Appx-000138

barrier for would-be naturalization applicants. *See* 85 FR 46788, 46855 (Aug. 3, 2020). DHS is committed to promoting naturalization and immigrant integration and making sure that naturalization is readily accessible. For these reasons, DHS will continue to provide fees for naturalization applications on Form N–400 at an amount less than its estimated costs and recover some of its costs from other fee payers using the cost reallocation methodology.[235]

*Comment:* Multiple commenters wrote that USCIS should increase the income limitations for Form N–400 fee waivers to include more low-income applicants. By contrast, a different commenter asserted that fee waivers should not be available for Form N–400, since becoming a U.S. citizen is a privilege.

*Response:* DHS acknowledges commenters' concerns regarding the affordability of naturalization but believes that this fee schedule makes naturalization practically available to all eligible low-income applicants. Applicants whose household income is at or below 150 percent of the FPG, who are receiving a means-tested public benefit, or who are experiencing extreme financial hardship are eligible for a full waiver of the N–400 fee. *See* 8 CFR 106.3(a)(1)(i). Furthermore, the reduced N–400 fee ($320) will be available to applicants whose household income is at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). So, for example, members of a four-person household would qualify for the reduced fee if their household income was at or below $120,000 per year, which is greater than the median income for a household of four in most states.[236] Online N–400 filers are also eligible for a $50 discount. *See* 8 CFR 106.1(g). DHS believes that these measures are sufficient to ensure that naturalization is financially feasible for all eligible applicants. DHS disagrees with the assertion that fee waivers should not be available to naturalization applicants. DHS acknowledges that naturalization is a significant

immigration benefit, but, as noted earlier, believes that the United States also benefits significantly from newly naturalized citizens.

*Comment:* Many commenters expressed opposition to the increased fees for those filing a Form N–400 who do not need to provide biometrics, reasoning that this would burden elderly applicants. Another commenter likewise asserted that the fee increase would disproportionately impact the elderly and further urged USCIS to lower the cost for filing a reduced-fee Form N–400 without biometrics for the same reason.

*Response:* DHS disagrees that the N–400 fee increase disproportionately burdens elderly applicants because, since 2017, all naturalization applicants have been required to provide biometrics regardless of their age, unless they qualify for a fingerprint waiver due to certain medical conditions.[237] DHS acknowledges that commenters' concerns regarding Form N–400 fee increases may apply to applicants who do not require biometrics due to certain medical conditions. However, as discussed in the proposed rule, DHS believes that incorporating biometric service fees into immigration benefit requests will simplify the fee structure, reduce application rejections for failure to pay the correct fees, and better reflect how USCIS uses biometric information. *See* 88 FR 402, 484 (Jan. 4, 2023). These efficiencies will enable USCIS to maintain lower immigration benefit fees for applicants in general. In addition, the commenter presumes that being elderly equates with poor financial condition. Applicants who are low-income, receiving a means-tested public benefit, or experiencing extreme financial hardship are eligible for a waived or reduced N–400 fee. *See* 8 CFR 106.3(a)(1)(i), 106.2(b)(3)(ii). Also, the fee increase for applicants who do not require biometrics (19 percent) is less than the rate of inflation since the last fee increase (26 percent as of June 2023), and that this increase is mitigated for applicants who file online. *See* 8 CFR 106.1(g).

b. Reduced Fee N–400, Reversal of 2020 Rule's Removal of the Reduced Fee N–400

*Comment:* Multiple commenters expressed support for a reduced fee for Form N–400, under which qualifying applicants requiring biometric services would pay $25 less than under the previous fee schedule. However, multiple commenters recommended that USCIS increase the income limit for a reduced fee. A commenter wrote that many of its clients would not qualify for a waived or reduced fee or be able to afford the fee for Form N–400. Other commenters stated USCIS should consider increasing the percentage multiplier threshold for a reduced fee because the current poverty guidelines are outdated. A commenter opposed the 19 percent increase to the reduced fee for applicants who do not require biometric services.

*Response:* In response to public comments and additional stakeholder feedback, and in recognition of the enormous benefits that the United States obtains from new naturalized citizens, DHS has raised the income limits for a reduced fee Form N–400 to include applicants whose household income is at or below 400 percent of the FPG. *See* 8 CFR 106.2(b)(3)(ii). This change, coupled with the fee waiver for those who are unable to pay the Form N–400 fee, will make naturalization more available to all eligible applicants. The FPG are updated yearly by the U.S. Department of Health and Human Services (HHS).[238] And the fee increase for those who do not require biometric services applies to a small portion of Form N–400 filers since, as stated earlier, Form N–400 applicants require biometrics services regardless of age. Applicants who do not require biometrics due to a medical condition may also qualify for a full fee waiver if they are low income and receive a means-tested benefit due to their medical condition. *See* 8 CFR 106.3(a)(1)(i)(A).

c. N–600/600K

*Comment:* While one commenter expressed general support for increasing fees for Forms N–600 and N–600K, many commenters expressed strong opposition to these fee increases, reasoning that existing fees are already too high and that the increases may impose an undue burden on parents seeking evidence of citizenship or naturalization for their children.

---

[235] Based on filing volume trends in recent years, USCIS forecasts an increase of 62,165 Form N–400 applications, nearly a 10 percent increase from the FY 2016/2017 fee rule forecast. *See* Table 7, Workload Volume Comparison.

[236] *Compare* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form I–864P, "2023 HHS Poverty Guidelines for Affidavit of Support," *https://www.uscis.gov/i-864p* (last updated Mar. 1, 2023), *with* U.S. Dep't of Justice, "Census Bureau Median Family Income By Family Size, Cases Filed Between May 15, 2022 and Oct 31, 2022," *https://www.justice.gov/ust/eo/bapcpa/20220515/bci_data/median_income_table.htm* (last visited Aug. 21, 2023).

[237] See U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, PA–2017–03, Policy Alert, "Biometrics Requirements for Naturalization" (July 26, 2017), *https://www.uscis.gov/sites/default/files/document/policy-manual-updates/20170726-NaturalizationBiometrics.pdf*; U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Policy Manual", Vol. 12, "Citizenship & Naturalization", Part B, "Naturalization Examination", Chp. 2, "Background and Security Checks", Sec. B, "Fingerprints" [12 USCIS–PM B.2(B)], *https://www.uscis.gov/policy-manual/volume-12-part-b-chapter-2* (last updated Nov. 8, 2023).

[238] *See* U.S. Dep't of Health & Human Servs, HHS Poverty Guidelines for 2023, *https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines* (last visited Aug. 21, 2023).

HR-1 FRN 2025 AR-000114

**Appx-000139**

Another commenter stated that the fee increase for Forms N–600 and N–600K would have a significant negative impact on farmworkers, who are an economically disadvantaged segment of the population. A couple of commenters reasoned that the proposed fees would deter families from obtaining the documentation needed to prove the U.S. citizenship of foreign-born individuals.

*Response:* DHS recognizes commenters' concerns about the fee increases for Forms N–600, Application for Certificate of Citizenship, and N–600K, Application for Citizenship and Issuance of Certificate Under Section 322. However, the Form N–600 fee remains significantly below its estimated cost under the USCIS ABC model. For example, had DHS proposed to recover full cost on Form N–600, the fee would have been $1,835 when filed online and $2,080 when filed on paper. *See* 88 FR 402, 489 (Jan. 4, 2023). The current fee increases for both forms are slightly less than the rate of inflation since the last fee schedule. Applicants may request a waiver of the Form N–600 and N–600K fees. *See* 8 CFR 106.3(a)(3)(i)(L), (M). Approximately 47 percent of Form N–600 filers and 26 percent of Form N–600K filers receive such fee waivers. *See* 88 FR 402, 488 (Jan. 4, 2023). Children of U.S. citizens may obtain evidence of citizenship by applying for a U.S. passport, which is a less expensive alternative to applying for a Certificate of Citizenship through Form N–600. Therefore, DHS maintains the Form N–600 and N–600K fees at the amounts that were proposed. 8 CFR 106.2(b)(7), (8).

For a discussion on fee exemptions for Form N–600 and Form N–600K for certain adoptees see section IV.G.5.d. of this preamble.

*Comment:* A couple of commenters expressed concern that the cost of a Certificate of Citizenship will be nearly twice the cost to apply for naturalization. Another commenter suggested that the fee amounts for Form N–600 should not exceed those for Form N–400 and the two fees should be reversed. A religious organization likewise suggested that the fee for Form N–600 be made comparable to the reduced fee for Form N–400, adding that Form N–600 should be reasonably affordable such that applicants do not have to struggle financially to obtain proof of citizenship.

*Response:* DHS appreciates these commenters' concerns but believes that the difference in fees for Forms N–400 and N–600 is justified by multiple factors. First, there is a significant difference in the fee-paying unit cost between Form N–400 ($1,150) and Form

N–600 ($1,429).[239] Also, the fee difference is justified by the difference in urgency between these two groups of applicants. Individuals who derive citizenship from their parents are legally U.S. citizens and may access the benefits of citizenship without filing Form N–600. Such individuals may obtain proof of citizenship through less expensive means such as applying for a U.S. passport. By contrast, an applicant for naturalization cannot access the benefits of citizenship until their Form N–400 has been adjudicated and they have taken the oath of allegiance. Given the different stakes for these groups of applicants, it makes sense for DHS to lower barriers to filing Form N–400. As noted earlier, because of the importance of naturalization to individual applicants and American society, DHS has sought to keep the Form N–400 fee at an affordable level that is below full cost recovery. Finally, maintaining a low Form N–400 fee is consistent with E.O. 14012's goal to "make the naturalization process more accessible to all eligible individuals, including through a potential reduction of the naturalization fee." E.O. 14012, 86 FR 8277 (Feb. 5, 2021).

*Comment:* Another commenter suggested that, as an alternative to the current fee waiver policy, USCIS create a fee exemption for Form N–600 and N–600K applicants who can verify they lack access to a birth certificate. The commenter stated that applicants who qualify for the waiver would often be children, who would otherwise apply for a passport if they possessed a birth certificate.

*Response:* DHS declines to adopt the commenter's proposal because it would diverge from both the ability-to-pay and the beneficiary-pays principles and these forms are currently eligible for fee waivers. DHS recognizes that some Form N–600 and N–600K applicants may be unable to afford the application fees due to the same reasons that they lack birth certificates, for example, because they were admitted to the United States as refugees. However, some applicants may still possess the means to pay these filing fees despite their lack of a birth certificate. The existing fee waiver criteria (receipt of a means-tested benefit, household income at or below 150 percent of the FPG, or extreme financial hardship) are more directly related to an applicant's ability to pay. *See* 8 CFR 106.3(a)(1)(i).

d. Other/General Comments on Fees, and Limiting Fee Increases (N–300, N–336, N–470, N–565)

*Comment:* An individual commenter suggested that, in comparison to Form N–600, the Form N–565 fee should be increased as applicants tend to lose, laminate, or give the original document to a different agency or entity that never give it back.

*Response:* DHS believes that the current fee structure satisfies the commenter's concerns. The final fee for Form N–565, Application for Replacement Naturalization/Citizenship Document, ($505 online, $555 paper) recovers more than the full fee-paying unit cost of the application ($453), while the Form N–600 fee ($1,335 online, $1,385 paper) recovers less than the fee-paying unit cost ($1,429).[240] DHS believes that further increases to the Form N–565 fee would be excessively burdensome for applicants who need to obtain a new Certificate of Naturalization or Citizenship, Declaration of Intention, or Repatriation Certificate.

*Comment:* One commenter stated that USCIS should consider reducing the fee for Form N–565. The commenter said that a replacement naturalization certificate should be affordable, since an accurate and up-to-date certificate is necessary for accessing important government services. Multiple commenters stated that the fee for Form N–565 is unfair in comparison to the fees that U.S. born citizens pay for a replacement birth certificate. One of these commenters asserted that the Form N–565 fee treats naturalized citizens as "second class citizens," and, without evidence, that naturalization certificates and birth certificates include the same safeguards and features against unlawful duplication. Finally, one commenter wrote that they supported the Form N–565 fee remaining the same without providing additional rationale.

*Response:* DHS acknowledges commenters' concerns about the affordability of Form N–565. Although DHS will maintain the proposed Form N–565 filing fee for paper applications, DHS will now offer a $50 discount for Form N–565 when filed online. DHS also notes that the paper-filed Form N–565 is now less expensive in terms of real dollars since the FY 2016/2017 fee rule, given the rate of inflation since then.[241] While DHS recognizes that

---

[239] *See* Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

[240] For fee-paying unit costs in this final rule, see Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table 4.

[241] Inflating the current N–565 fee of $555 from December 2016 to June 2023 would raise the fee to $700 (rounded to the nearest $5).

having an up-to-date citizenship document is helpful for accessing government services, DHS believes it is also important for individuals to be able to access naturalization or proof of citizenship in the first place, which is why Forms N–400, N–600, and N–600K are priced less expensively relative to their fee-paying unit costs. As explained in the proposed rule, DHS decided to hold the current fee for Form N–565 to allow this form to fund some of the costs of other forms and limit the fee increase for other forms. *See* 88 FR 402, 450 (Jan. 4, 2023). Furthermore, DHS notes the number of Form N–565 filings is limited, applicants may request a fee waiver, and there is no fee when seeking to correct a certificate due to USCIS error. *See* 8 CFR 106.3(a)(3)(i)(K); 8 CFR 106.2(b)(6). Some new citizens may also possess other, less expensive means of obtaining proof of citizenship such as applying for a U.S. passport. DHS considers the cost for obtaining a replacement U.S. birth certificate irrelevant to the cost of filing Form N–565, as the primary purposes of these two forms are fundamentally different. Also, Certificates of Naturalization and Citizenship contain many security features that may not appear on birth certificates, making Certificates of Naturalization and Citizenship less susceptible to fraud.[242] Issuance of a replacement certificate of citizenship or naturalization may also require that the applicant appear for an interview or provide biometrics.[243] DHS will retain the proposed fee for a paper filing of Form N–565 of $555. Consistent with the general initiative to encourage online filing, DHS will reduce the fee for an electronically filed N–565 by $50, to $505. *See* 8 CFR 106.1(g).

*Comment:* A few commenters wrote that they opposed increasing the fee for Form N–336 because:

• It would impose a barrier for low-income and working-class applicants to appeal or obtain a hearing if USCIS denies their naturalization application.

• It could deter applicants from pursuing legitimate challenges to denials of their naturalization applications.

• It would limit access to appeals for these applicants, which is counter to USCIS' FY 2023–2026 Strategic Plan goals for promoting quality adjudications and reducing undue barriers to naturalization.

*Response:* DHS acknowledges commenters' concerns regarding the fee increase for Form N–336, Request for a Hearing on a Decision in Naturalization Proceedings (Under Section 336 of the INA), but the Department does not believe that the new filing fee would deter Form N–336 filings. The 19 percent fee increase is reasonable because it is below the 26 percent rate of inflation since the last fee rule. DHS has reduced the increase for some filers by including the N–336 amongst the benefits that receive a $50 discount for online filing. *See* 8 CFR 106.1(g). Applicants who are unable to pay the Form N–336 fee may request that it be waived. *See* 8 CFR 106.3(a)(3)(i)(H). Depending on the circumstances of their cases, some applicants may choose to refile Form N–400 at the reduced filing fee rather than file Form N–336. Also, N–336 filers may benefit from the other fees for naturalization-related forms, which received lower increases to reduce barriers for naturalization applicants in general.

*Comment:* A commenter agreed with the proposed fee increase for Form N–336 because higher naturalization fees will prevent those who need public assistance from seeking citizenship, preventing strain on U.S. public assistance systems.

*Response:* DHS appreciates the support for the N–336 fee. However, DHS disagrees with the commenter's premise that naturalization fees should be set at a level that limits access to public assistance and does not believe the increased fee for Form N–336 will further that goal. Applicants who receive a means-tested benefit are eligible for a waiver of the fees for naturalization-related forms. *See* 8 CFR 106.3(a)(1)(i)(A), (a)(3).

### 4. Humanitarian

#### a. NACARA

*Comment:* A commenter wrote that Guatemalans and Salvadorans who are eligible for NACARA rely on Form I–881 and therefore the proposal to increase fees would impose financial

burdens on Latino immigrants. Furthermore, while acknowledging the proposed reduction of fees for Form I–881 applications for families, the commenter said this reduction would not affect the significant number of Form I–881 applicants who are individuals.

*Response:* As explained in the proposed rule, the IEFA fees for Form I–881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)), have not changed since 2005. *See* 88 FR 402, 515–516 (Jan. 4, 2023). DHS proposed to limit the fee increase for Form I–881, like adoption-related or naturalization fees. *See* 88 FR 402, 450–451 (Jan. 4, 2023). This rule combines the current individual and family tiered fee schedule into a single Form I–881 fee because there is no cost data to support limiting the amount charged to a family. Additionally, the new fee of $340 is less than the cost to adjudicate the form (approximately 14 percent of the cost of adjudication), and at a 19 percent increase to individual filers, the fee increase is below the CPI–U of 26.37 percent.[244] DHS is not setting any fees in this rule to deter requests from families, specific nationalities, or any immigrants based on their financial or family situation or demographics from accessing immigrant benefits and we have no evidence or experience in setting fees that indicates that the fees would have such an unintended effect. DHS acknowledges the commenter's concerns regarding the increased fee for Form I–881 for an individual adjudicated by DHS ($285 to $340). This fee in the final rule reflects a 19 percent increase in the filing fee for Form I–881 for an individual adjudicated by DHS, which is below the rate of inflation since the current IEFA fees for Form I–881 were last changed in 2005. All other IEFA fees for Form I–881 decreased, when compared to the current total fees including the fee for biometric services.

The proposed rule included a provision that would eliminate the separate biometric service fee requirement in most cases. *See* 88 FR 402, 484–485 (Jan. 4, 2023). For a family, the fee for Form I–881 adjudicated by EOIR remains at $165 (0 percent increase); for an individual, the fee for Form I–881 adjudicated by DHS with biometric services is 8 percent

---

[242] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Commonly Used Immigration Documents", *https://www.uscis.gov/ save/commonly-used-immigration-documents* (last updated Mar. 23, 2023); *cf.* Office of Inspector General, U.S. Dep't of Health & Human Servs., "Birth Certificate Fraud" (Sept. 2000), *https:// oig.hhs.gov/oei/reports/oei-07-99-00570.pdf* (noting over 14,000 different versions of birth certificates in circulation, and varying security features among vital records offices).

[243] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Form N–565, Instructions for Application for Replacement Naturalization/Citizenship Document (Dec. 8, 2021), *https://www.uscis.gov/sites/default/files/ document/forms/n-565instr.pdf*; *cf.* Office of Inspector General, U.S. Dep't of Health & Human Servs., "Birth Certificate Fraud" (Sept. 2000), *https://oig.hhs.gov/oei/reports/oei-07-99-00570.pdf* (noting that 85–90% for birth certificate fraud encountered by former INS and passport services is the result of genuine birth certificates held by imposters).

[244] DHS calculated this by subtracting the December 2016 CPI–U (241.432) from the June 2023 CPI–U (305.109), then dividing the result (63.677) by the December 2016 CPI–U (241.432). Calculation: (305.109 − 241.432)/241.432 = .2637 × 100 = 26.37 percent. *See* 88 FR 402, 515 (Jan. 4, 2023); Table 1.

lower; for a family, the fee for Form I–881 adjudicated by DHS is 40 percent lower; and for two people, the fee for Form I–881 adjudicated by DHS with biometric services is 54 percent lower in this rule. *See* 88 FR 402, 408–409 (Jan. 4, 2023). Furthermore, DHS recognizes that abused spouses and children under NACARA must file for VAWA benefits while in immigration proceedings, and they are a particularly vulnerable population. Therefore, DHS provides a fee exemption for abused spouses and children under NACARA filing Form I–881, as well as ancillary Form I–765 (submitted under 8 CFR 274a.12(c)(10)). *See* 8 CFR 106.3(b)(7). For other applicants who are unable to pay the fee, Form I–881 is also eligible for a fee waiver. *See* 8 CFR 106.3(a)(3)(i)(F).

b. Qualifying Family Member of a U–1 Nonimmigrant

*Comment:* Commenters wrote that USCIS' proposal to increase the fees for relief for family members of a U-visa petitioner would undermine the rights of survivors of crimes and the U.S. criminal legal system. Commenters requested that DHS keep derivative petitions for U-visa petitioners affordable to incentivize individuals to report when they have been a victim of crime and to prioritize public safety and family unity.

*Response:* DHS is committed to the goals of our humanitarian programs. In this final rule, DHS provides additional fee exemptions for petitioners for U nonimmigrant status because of the humanitarian nature of the program and the likelihood that individuals who would file requests in this category would qualify for fee waivers. *See* 8 CFR 106.3(b)(5). For example, DHS provides a fee exemption for Form I–929, Petition for Qualifying Family Member of a U–1 Nonimmigrant. DHS believes it is an important policy decision to provide a fee exemption for the Form I–929 to continue to provide for this vulnerable population and promote family unity in line with other humanitarian status requestors. Furthermore, a fee exemption for Form I–929 is consistent with the fee exemptions provided for most forms associated with U nonimmigrant status. *See* 8 CFR 106.3(b).

c. Other/General Comments on Humanitarian Benefits

*Comment:* A commenter stated that DHS should impose a fee for Form I–589, Application for Asylum and for Withholding of Removal. The commenter recommends that the fee represent the costs associated with an asylum application. They believe the

INA authorizes fees "for the consideration of an asylum application, for employment authorization, and adjustment of status under section 209(b), not to exceed the costs in adjudicating the applications." A commenter generally supported USCIS' proposal to keep humanitarian fees the same.

*Response:* The enjoined 2020 rule included a $50 fee for Form I–589, Application for Asylum and for Withholding of Removal, despite opposition from many commenters. *See* 85 FR 46788 (Aug. 3, 2020). DHS acknowledges the commenters' concerns about asylum seekers' inability to pay the fees and humanitarian plight of legitimate asylum seekers. In recognition of the circumstances, the proposed rule withdraws the $50 fee imposed in the 2020 rule. DHS will continue to accept Form I–589, Application for Asylum and for Withholding of Removal with no fee. Furthermore, the initial filing of the applicant's Form I–765, Application for Employment Authorization, has no fee. *See* 88 FR 402, 464 (Jan. 4, 2023); 8 CFR 106.2(a)(44). Asylum seekers often come to the United States with limited economic resources and are dependent on family and charitable organizations for survival. DHS believes that these fee exemptions will eliminate the additional financial burden for asylum seekers and maintain accessibility of the affirmative asylum program, which provides eligible applicants critical humanitarian protection from return to persecution. DHS data indicates that this population would be eligible for fee waivers and requiring a fee for asylum applications and their Form I–765, but permitting fee waivers, would be costly and inefficient in creating a fee for asylum applicants who are not eligible for an EAD until their application has been pending for 150 days. *See* 8 CFR 208.7(a)(1). DHS declines to make any changes based on this comment.

5. Family-Based

a. Alien Fiancé

*Comment:* A commenter stated that the fee increases would force more U.S. citizens to travel to other countries and get married out of sheer desperation. One commenter also said that employers are more able to bear rising immigration costs than families. Another commenter stated after the pandemic, many have lost their jobs and find it difficult to pay rent, and that raising the cost of the fiancée visa goes against USCIS's humanitarian mission and the mission to reunite families.

*Response:* USCIS understands the economic situation that many families face today. DHS is authorized to set fees at a level that ensures recovery of the full cost of providing the adjudication services for the programs USCIS administers. *See* INA sec. 286(m), 8 U.S.C. 1356(m). Because USCIS relies almost entirely on fee revenue, in the absence of a fee schedule that ensures full cost recovery, USCIS would be unable able to sustain an adequate level of service. USCIS has not had a fee increase in the I–129F since 2016 to fund the processing of these applications. As noted earlier in Section I.D. of this preamble, DHS will raise the fee for Form I–129F, Petition for Alien Fiancé(e) from $535 to $675 (26 percent), which amounts to a decrease of $45 (6 percent) from the original proposed fee. *Compare* 8 CFR 106.2(a)(5) and Table 1, *with* 88 FR 402, 409 (Jan. 4, 2023). The final increase is consistent with a 26 percent rate of inflation since the last fee increase in December 2016, as of June 2023. The fee for the Form I–129F resulted from application of the standard USCIS fee methodology. DHS values its role in assisting U.S. citizens who wish to bring a foreign national fiancé to the United States to marry and is sensitive to the extra burden that the increased filing fee may impose. DHS understands that being separated from loved ones and having to wait to start a life together may be frustrating. However, DHS does not believe that the I–129F fee increase will encourage out-of-country marriages, since, if the couple marries abroad, instead of paying $675 to file the I–129F for their fiancé to immigrate, the petitioner would need to file Form I–130, Petition for Alien Relative, for their spouse to immigrate. This final rule increases the fee for online I–130 filings to $625 and paper filings to $675; therefore, out-of-country marriage would not result in a significant cost savings. *See* 8 CFR 106.2(a)(6), and 8 CFR 204.1; Table 1. Also, as a general matter, DHS does not waive fees where the petitioner will eventually need to complete an affidavit of support in order for the beneficiary to obtain LPR status. To adjust status, a K-visa applicant must demonstrate that they are not likely to become a public charge, *see* INA section 212(a)(4), 8 U.S.C. 1182(a)(4), which requires an affidavit of support from the petitioning spouse, *see* INA sections 212(a)(4)(C) and 213A, 8 U.S.C. 1182(a)(4)(C) and 1183A. Applicants may file a fee waiver request for Form I–751, Petition to Remove Conditions on Residence, *see* 8 CFR 106.3(a)(3)(c), which is required for most fiancé(e)s

after adjustment of status in order to remove the conditional basis of their LPR status, *see* INA section 216 and 245(d), 8 U.S.C. 1186a and 1255(d). However, because a fee waiver would be inconsistent with the financial support requirement and public charge ground of inadmissibility. Therefore, fee waivers for the Form I–129F will not be provided.

b. Petition for Alien Relative

*Comment:* Multiple comments expressed concern about the cost of the proposed fee increase for the Form I–130. Commenters wrote:
• The fee threatens to violate the right to family enshrined in the Universal Declaration of Human Rights and other human rights standards that the United States has agreed to uphold.
• The proposed Form I–130 fee would exclude immigrants from our workforce and our broader community.
• The fee increase could split families by forcing some petitioners to file for one family members at a time, which would further undermine family unity.
• Absence of fee waivers for I–130 petitions would worsen these effects.

*Response:* DHS appreciates the concerns of commenters but reiterates that USCIS is funded almost exclusively by fees, *see* INA section 286(m), 8 U.S.C. 1356(m), and without proper funding, USCIS will lack the resources to keep pace with incoming benefit requests. The increase in the I–130 fee is necessary to provide the resources required to do the work associated with such filings. The Form I–130 fee increase (electronically filed), from $535 to $625 (17 percent), has been reduced by $45 (6 percent) from the proposed rule. See 8 CFR 106.2(a)(6).

USCIS understands the importance of facilitating family unity, as well as the advantages that LPR status provide to new immigrants. However, by statute, Form I–130 petitioners must have access to sufficient financial resources to support all beneficiaries, in addition to the petitioner's entire household, for the beneficiary to obtain LPR status. *See* INA sections 1182(a)(4)(C) and 213A, 8 U.S.C. 1183(a)(4)(C) and 1183A. A petitioner seeking to file for several family members, may lack the financial resources for all the family members to adjust at the same time, forcing the petitioner to bring one beneficiary over at a time. However, the I–864, Affidavit of Support Under Section 213A of the INA, allows the petitioner to count the income and assets of members of the household who are related by birth, marriage or adoption, and allows the beneficiary to provide a joint sponsor to meet the minimum income

requirement.[245] As previously mentioned, USCIS's humanitarian mission is to provide protection to individuals in need of shelter or aid from disasters, oppression, emergency medical issues and other urgent circumstances as provided through specific humanitarian programs.[246] Although the 1948 Universal Declaration of Human Rights (UDHR) speaks to the right to marry, the UDHR does not prohibit fees for family-based visa petitions and, in any event, is only a nonbinding, aspirational document.[247] USCIS, moreover, is not limiting individuals' right to marry or build a family. USCIS also disagrees that an increase in the fee disrupts USCIS' humanitarian efforts under this rule.

DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede, reduce, limit, or preclude immigration for any specific population, industry, or group. DHS agrees that immigrants are an important source of labor in the United States and contribute to the economy. Acknowledging that downward adjustments for some groups may result in upward adjustments for other groups, DHS saw no decreases in benefit requests which it can attribute to the fee adjustments in 2016 and has no data that would indicate that the fees for family-based benefit requests in this final rule would prevent applicants from submitting petitions[248] While DHS shifts some of the costs of humanitarian programs in this rule to other benefit requests based on the ability to pay, there are many benefit requests that are used by families and low-income individuals, and shifting all family-based benefit request costs to non-

[245] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Affidavit of Support web page, *https://www.uscis.gov/green-card/green-card-processes-and-procedures/affidavit-of-support* (last updated Mar. 19, 2021).

[246] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Humanitarian web page, *https://www.uscis.gov/humanitarian* (last visited Aug. 22, 2023).

[247] *See* United Nations, "Universal Declaration of Human Rights," *https://www.un.org/en/about-us/universal-declaration-of-human-rights* (last visited Aug. 22, 2023). The Declaration is only a resolution of the U.N. General Assembly and thus is only a non-binding, aspirational document. *See Sosa* v. *Alvarez-Machain*, 542 U.S. 692, 734 (2004) (observing that declarations like the UDHR are merely aspirational and that "do[ ] not of [their] own force impose obligations as a matter of international law," and thus are of "little utility" in discerning norms of customary international law).

[248] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "2020 USCIS Statistical Annual Report," *https://www.uscis.gov/sites/default/files/document/reports/2020-USCIS-Statistical-Annual-Report.pdf* (last visited Aug. 22, 2023).

family-based requests would increase non-family based fees to the point of being unbalanced and unsustainable. DHS recognizes the burden that fee increases may impose on some families and low-income individuals. As a general matter, DHS does not waive fees for petitions that require the petitioners to demonstrate that they will be able to support their beneficiary financially, or that eventually require the beneficiary to file of an affidavit of support. In order to consular process or adjust status, the Form I–130 beneficiary must submit Form I–864, Affidavit of Support Under Section 213A of the INA with their visa petitions or adjustment of status applications, to document the petitioner's or joint sponsor's ability to financially support the noncitizen beneficiary. A fee waiver would be inconsistent with this financial support requirement; therefore, DHS declines to allow fee waivers for the Form I–130. With that context in mind, and following review of the public comments received, DHS has determined that the final fee for Form I–130 is not inordinately high.

DHS acknowledges that it allows fee waivers for Form I–751, Petition to Remove Conditions on Residence, even though in most cases the petitioning relative's obligation to support the conditional permanent resident (CPR) will still exist when the CPR files Form I–751. However, there are multiple differences between these forms that justify the difference in fee-waiver availability. First, having a sufficient level of financial support is not a legal requirement for removal of conditions on residence, whereas it is a legal requirement for admission as a lawful permanent resident under a family-based visa category. *Compare* INA 216, 8 U.S.C. 1186a, *with* INA 212(a)(4)(C), 8 U.S.C. 1182(a)(4)(C). Although the sponsor of Form I–864, Affidavit of Support Under Section 213A of the INA, has an ongoing responsibility to support the CPR, their inability or unwillingness to do so has no legal bearing on the CPR's eligibility to have their conditions removed. Also, there may be intervening circumstances after a noncitizen obtains CPR status that would make it impossible or impractical for them to obtain financial support from sponsor(s) of their Form I–864 (*e.g.,* death or divorce). Second, Form I–130 receipts are significantly larger than I–751 receipts. In fact, Form I–130 was the most common form received by USCIS in FY 2022.[249] For these reasons,

[249] *See* U.S. Citizenship and Immigr. Servs, U.S. Dep't of Homeland Security, "Number of Service-
Continued

**6306** Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

allowing a fee waiver for Form I–130 would likely result in a much higher level of uncollected fees that would have to be transferred to other fee payers. Finally, petitioners have greater flexibility in deciding when to file Form I–130, whereas in general Form I–751 must be filed within a specific 90-day window. *See* INA 216(d)(2)(A), 8 U.S.C. 1186a(d)(2)(A). Therefore, Form I–130 petitioners possess greater flexibility in accumulating funds to pay the fee for the petition. For these reasons, DHS makes Form I–751 eligible for a fee waiver but does not do so for Form I–130.

*Comment:* Another commenter stated that the proposed I–130 fee increase was disproportionate and that the fee should be kept at its current level, without providing further explanation.

*Response:* Fees do not merely cover the cost of adjudication time. The fees also cover the resources required for intake of immigration benefit requests, customer support, and administrative requirements. DHS recognizes that fees impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate. At the same time, absent an alternative source of revenue, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing. As noted in the final rule, the fee increases for an electronically filed Form I–130 has been reduced to $625 (17 percent increase). *See* Table 1; 8 CFR 106.2(a)(6).

*Comment:* Another comment said that an equitable way of raising revenue would be to increase the cost for Forms I–130 filed by an LPR and decrease the cost for Forms I–130 filed by citizens.

*Response:* Creating a separate fee schedule within the I–130 form based on the filer's status would create additional burden on processing time to validate the filer's status. In addition, the fee schedule suggested would be more regressive in nature since many LPR filers who seek to file for family members already have a longer wait time for the visa to become available than their U.S. citizen counterparts where an immediate relative under INA 201(b)(2)(A)(i), 8 U.S.C. 1151(b)(2)(A)(i), would have a visa immediately available.[250] Placing additional financial

burden on LPR filers would be regressive because it may delay their ability to file and, together with the longer wait for visa availability for LPR filers, has the potential to extend the amount of time it will take to reunite with family members. Therefore, DHS declines to make any changes based on this comment.

c. Remove Conditions on Residence

Several commenters discussed the proposed fee increase for Form I–751. Those comments are summarized as follows:
• The proposed fee increase would create burdens for low-income individuals, immigrants, and their families, and particularly be a burden on applicants seeking to file Form I–751 on the grounds of divorce who are ineligible for fee waivers.
• The fee is cruel because an applicant must apply before the 2-year anniversary of their marriage to protect against deportation and separation from their spouse.
• The fee would be a barrier for victims of domestic violence who need to file Form I–751 on their own.
• The fee for Form I–751 along with other proposed fee increases undermines the rule's objective to balance the competing beneficiary-pays and ability-to-pay models, promote immigrant integration, and reduce barriers to immigration benefits.
• The fee would be a barrier to citizenship and lawful permanent residence.
• There is no rational basis for a fee increase that is 73 percent higher than the last proposed increase.
• The I–751 fee is unreasonable because applicants have already proven their eligibility for permanent residence and only must demonstrate that their family relationship has continued.
• A large fee increase is unreasonable because Form I–751 is only a reapproval of a previously successful application and is redundant when applicants are shortly afterwards applying for naturalization, and yet it requires USCIS an average of 18 months to complete.
• The proposed fee increase for Form I–751 is much greater than for other forms requiring similar levels of effort to adjudicate.
• The increase in the I–751 fee is too large and creates a large burden on petitioners.
• USCIS should extend the validity of conditional marriage-based Green Cards from 24 months to 36 months to streamline the Green Card process,

allow applicants to skip unnecessary paperwork required for the removal of conditions by directly applying for naturalization, and eliminate unnecessary work for USCIS and fees on families.

*Response:* DHS acknowledges the increased Form I–751 fee will render the process of removing conditions on residence more expensive and has considered the comments. As previously mentioned, USCIS is primarily fee based and therefore must recover operating costs through fees, including the cost of fee waived or exempt workloads. DHS acknowledges commenters' concerns about the proposed fee increase for the Form I–751 and has decreased the form fee from the proposed $1,195 to $750, capping it at approximately 26 percent for inflation. *See* 8 CFR 106.2(a)(43). Fees are created to cover the resources required for intake of immigration benefit requests, customer support, fraud detection, background checks, administrative processing, and the Form I–751 interview by an officer if it is not waived. DHS offers fee waivers for Form I–751 petitioners who are unable to pay and there is no filing fee for conditional permanent residents seeking to remove conditions on their status by filing for battery or extreme cruelty waivers under INA section 216(c)(4). *See* 8 CFR 106.3(a)(3)(i)(C); 8 CFR 106.2(a)(43). In addition, DHS has recently reduced the financial burden on Form I–751 petitioners by automatically extending the validity period of conditional Green Cards for 48 months beyond the card's expiration date when the Form I–751 is properly filed.[251] This reduces potential fees for filing a Form I–90, Application to Replace Permanent Resident Card, ($415 online) while an applicant's Form I–751 is pending. DHS believes this policy addresses most of the commenter's concerns and declines to make any further changes.

*Comment:* Some commenters wrote that the Form I–751 fee should be less than the fee for Form I–130, Petition for Alien Relative. One commenter stated that Form I–751 is redundant, and the proposed fee is disproportionately expensive relative to the time that it takes to adjudicate Forms I–751 and I–130. Another commenter suggested that if the cost of filing the form is based on the level of effort required by DHS to process the form, then filing the form

wide Forms By Quarter, Form Status, and Processing Time, July 1, 2022—September 30, 2022", available at *https://www.uscis.gov/sites/default/files/document/data/Quarterly_All_Forms_FY2022_Q4.pdf* (last updated Oct. 2022) (In FY 2022, USCIS received 873,073 Form I–130s, but only 122,803 Form I–751s.).

250 See Bureau of Consular Affairs, U.S. Dep't of State, "Travel.State.Gov., The Visa Bulletin,"

*https://travel.state.gov/content/travel/en/legal/visa-law0/visa-bulletin.html* (last visited Sept. 8, 2023).

251 *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Extends Green Card Validity for Conditional Permanent Residents with a Pending Form I–751 or Form I–829" (Jan. 23, 2023), *https://www.uscis.gov/newsroom/alerts/uscis-extends-green-card-validity-for-conditional-permanent-residents-with-a-pending-form-i-751-or.*

HR-1 FRN 2025 AR-000119

**Appx-000144**

**Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations   **6307**

should only cost 28 percent more than Form I–130, rather than the proposed 41 percent difference.

*Response:* In passing the Immigration Fraud Amendments of 1986, Public Law 99–639, 100 Stat. 3537, Congress recognized short-duration marriages as presenting a higher risk for immigration fraud and requiring additional scrutiny.[252] The higher proposed fee for Form I–751 than Form I–130 was based in part on completion time for Form I–751 (1.54 hours) in comparison Form I–130 (1.11 hours).[253] As previously mentioned, DHS acknowledges commenters' concerns about the Form I–751 fee and has decreased the proposed $1,195 fee to $750, capping it at 26 percent for inflation; likewise, the Form I–130 paper-based filing has also

---

[252] *See generally* INA section 216, 8 U.S.C. 1186a.
[253] *See* 88 FR 402, 448, Table 10 (Jan. 4, 2023).

been capped at 26 percent ($675) and the discounted rate for online filing is $625 (17 percent). *See* 8 CFR 106.2(a)(6), 106.2(a)(43); Table 1. DHS notes that it limits most fees by inflation and offers a $50 online filing fee discount in most cases, as explained elsewhere in this rule.

d. Adoption-Related Forms

Some commenters requested that DHS provide more fee exemptions and free services for adoption related benefit requests. In response to the public comments, DHS reexamined the fees for adoptions and decided that some services could be provided for free. Consistent with past fee rules, DHS proposed to limit the increase of adoption-related fees. *See* 88 FR 503; 81 FR 73298. DHS reduces fee burdens on adoptive families by covering some of the costs attributable to the adjudication

of certain adoption-related requests with fees collected from other immigration benefit requests. *Id.* In this rule, that includes a free first and second extension or change in country or a request for a duplicate notice. A summary of the new exemptions is listed in Table 8 below. Although other forms may not need to be filed by adoptees, fee waivers are available for adoptees for Forms I–90, N–400, N–336, N–565, N–600,[254] N–600K.

**BILLING CODE 9111–97–P**

---

[254] USCIS issues a Certificate of Citizenship to adopted children who are admitted to the United States with an IR–3 visa (visa category for children from non-Hague Adoption Convention countries adopted abroad by U.S. citizens) or an IH–3 visa (visa category for children from Hague Adoption Convention countries adopted abroad by U.S. citizens) without the filing of a Form N–600, Application for Certificate of Citizenship, and fee, if the child meets all requirements of section 320 of the Act, 8 U.S.C. 1431.

HR-1 FRN 2025 AR-000120

| Table 7: Adoption Fees | | | |
|---|---|---|---|
| **Immigration Benefit Request** | **Current Fee** | **Proposed Rule Fee** | **Final Fee** |
| • I-600 Petition to Classify Orphan as an Immediate Relative [255] | $775 ($860 with biometric services for one adult) | $920 (with all biometric) (19% increase) | $920 |
| ○ First Form I-600 with approved and valid Form I-600A | $0 | $0 | $0 |
| ○ If more than one Form I-600 is filed based on an approved and valid Form I-600A for children who are birth siblings before the proposed adoption | $0 | $0 | $0 |
| ○ If more than one Form I-600 is filed based on an approved and valid Form I-600A for children who are not birth siblings | $775 (for each additional petition) | $920 | $920 |

| | | | |
|---|---|---|---|
| before the proposed adoption | | | |
| ○ Form I-600 combination filing exemption: Change in marital status while Form I-600 combination filing suitability determination is pending | $0 | $0 | $0 |
| ○ Form I-600 combination filing change in marital status after suitability approval | $775 ($860 with biometrics services for one adult) | $920 (19% increase) | $920 |
| • I-600A Application for Advance Processing of an Orphan Petition | $775 ($860 with biometric services for one adult) | $920 (18% increase) | $920 |
| ○ Change in marital status while Form I-600A is pending | $0 | $0 | $0 |
| ○ Change in marital status after Form I-600A approval | $775 ($860 with biometric services) | $920 (18% increase) | $920 |
| • Form I-600A/I-600 Supplement 1 (Listing of Adult Member of the Household) | $0 | $0 | $0 |
| • Form I-600A/I-600 Supplement 2 (Consent to Disclose Information) | $0 | $0 | $0 |

HR-1 FRN 2025 AR-000122

| | | | |
|---|---|---|---|
| • Form I-600A/I-600 Supplement 3 (Request for Action on Approved Form I-600A/I-600) | (N/A)[256] | $455 | $455 |
| ○ First extension of Form I-600A approval or first change of country | (N/A) | $455 | $0 |
| ○ Second extension of Form I-600A Approval | (N/A – must file a new Form I-600A with fee of $775 plus biometrics) | $455 | $0 |
| ○ Second change of country | (N/A - must use the Form I-824 with $465 fee) | $455 | $0 |
| ○ Third and subsequent extension of Form I-600A Approval | (N/A – must file a new Form I-600A with fee of $775 plus biometrics) | $455 | $455 |
| ○ Third and subsequent change of country | (N/A - must use the Form I-824 with $465 fee) | $455 | $455 |

| | | | |
|---|---|---|---|
| Significant change and updated home study and there is no request for a first or second extension of Form I-600A approval or a first or second change of non-Hague Adoption Convention country on the same Supplement 3.[257] | (N/A)[258] | $455[259] | $455[260] |
| Duplicate Approval Notice | (N/A – must use the Form I-824 with $465 fee) | $455 | $0 |
| • Form I-800 Petition to Classify Convention Adoptee as an Immediate Relative | $775 | $920 (19% increase) | $920 |
| ○ First Form I-800 with an approved and valid Form I-800A. | $0 | $0 | $0 |
| ○ If more than one Form I- | $0 | $0 | $0 |

HR-1 FRN 2025 AR-000124

**Appx-000149**

| | | | |
|---|---|---|---|
| 800 is filed for an approved and valid Form I-800A for children who are birth siblings before the proposed adoption | | | |
| ○ If more than one Form I-800 is filed based on an approved and valid Form I-800A for children who are not birth siblings before the proposed adoption | $755 (for each additional petition) | $920 | $920 |
| ○ Form I-800 Supplement 1, Consent to Disclose Information. | $0 | $0 | $0 |
| • Form I-800A Application for Determination of Suitability to Adopt a Child from a Convention Country | $775 ($860 with biometrics for one adult) | $920 (includes biometric fee) (18% increase) | $920 |
| ○ Change in marital status while Form I-800A is pending | $0 | $0 | $0 |
| ○ Change in marital status after approval of Form I-800A | $775 ($860 with biometrics services for one adult) | $920 (19% increase) | $920 |
| • Form I-800A Supplement 1 | $0 | $0 | $0 |

| | | | |
|---|---|---|---|
| Listing of Adult Member of the Household | | | |
| • Form I-800A Supplement 2, Consent to Disclose Information. | $0 | $0 | $0 |
| • Form I-800A Supplement 3 (Request for Action on Approved Form I-800A)<br>○ First extension of the approval of Form I-800A<br>○ First change in Convention country after the approval of Form I-800A | $0 | $0 | $0 |
| ○ Second extension of the approval of Form I-800A<br>○ Second change in Convention country after the approval of Form I-800A | $385<br><br>($470 with biometrics fee for 1) | $455 | $0 |
| ○ Third or subsequent extension of Form I-800A approval<br>○ Third or subsequent change in Convention country after the approval | $385<br>($470 with biometrics fee for 1) | $455 | $455 |

| | | | |
|---|---|---|---|
| of Form I-800A | | | |
| • Request for duplicate approval notice | $385 | $455 | $0 |
| • Significant change and updated home study and there is no request for a first or second extension of Form I-800A approval or first or second change of Hague Adoption Convention country on the same Supplement 3[261] | $385[262] | $455[263] | $455[264] |
| Form N-600, Application for Certificate of Citizenship<br>• For certain adoptees | $1,170 | $1385 $1335 (online filing) | $0 |
| Form N-600K, Application for Citizenship and Issuance of | $1,170 | $1385 $1335 (online filing) | $0 |

| | | | |
|---|---|---|---|
| Certificate Under Section 322<br>• For certain adoptees | | | |

**BILLING CODE 9111–97–C**

[255] A biometric services fee is required for each petitioner, spouse, and any adult household member aged 18 or older unless you filed Form I-600A and any adult members of your household are within the 15-month biometric services validity period.

[256] Currently being submitted through a written request.

[257] The petitioner would be seeking a reissuance of the approval notice after the adjudication and review of the significant change and updated home study.

[258] Currently being submitted through written request.

[259] In the proposed rule, DHS proposed to require the $455 Supplement 3 fee unless the prospective adoptive parent is also filing a first request for an extension of Form I-600A approval or first change of country request.

HR-1 FRN 2025 AR-000127

**Appx-000152**

The final rule also addresses the omission of concurrent filings under 8 CFR 204.3(d)(3) in two places. First, the final rule addresses a discrepancy between current 8 CFR 204.3(h)(13), which provides that an orphan petition will be denied if filed after the advanced processing application approval has expired, and current 8 CFR 204.3(d)(3), which permits concurrent filing of an orphan petition with an advanced processing application. Under current practice, concurrent filing is permitted even if a prior advanced processing application expired. Therefore, DHS is revising 8 CFR 204.3(h)(13) to clarify that an orphan petition filed after approval of the advanced processing application has expired will not be denied on that basis if the petition is a concurrent filing under 8 CFR 204.3(d)(3) with a new advanced processing application. Second, the final rule adds a reference to concurrent filing at 8 CFR 204.3(h)(14), acknowledging that after a Form I–600 petition is revoked, a new Form I–600A may be filed rather than a Form I–600 combination filing. See 8 CFR 204.3(h)(14)(iii).

*Comment:* Multiple commenters expressed opposition to the proposed fees for adoption-related Forms I–600A, I–600, I–800A, and I–800, indicating that the fees are an additional expense without an increase in services or efficiencies. Some commenters stated that adopted children should be considered vulnerable populations and granted fee exemptions just like other groups DHS considered vulnerable populations meriting fee exemptions. A few commenters suggested that DHS provide an additional fee exemption for non-related children being adopted by the same family. Some commenters

agreed with DHS' conclusion that by incorporating biometrics fees into filing fees most households would experience a slight cost savings in their application filings, but still had overall concerns with perceived fee increases.

*Response:* DHS has included additional fee exemptions in this final rule as discussed above. DHS notes that the proposed fees and final fees for adoption forms limit the increase of adoption-related fees in this rule consistent with previous fee rules. This fee increase is in part a result of inflation and being implemented with the intent to maintain current services. The average two-parent adoptive family will generally pay less for filing Form I–600A, Application for Advanced Processing of an Orphan Petition, Form I–600, Form I–800A, Application for Determination of Suitability to Adopt a Child from a Convention Country, and Form I–800 than they pay now because the biometrics services fees will be incorporated into the filing fee. This continues the DHS policy of reducing the fee burden on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications through the fees collected from other immigration benefit requests. To reduce the burden on adoptive families, DHS applied the reduced weighted average increase of 18 percent, which may vary slightly because of rounding fees to the nearest $5. *See* 88 FR 402, 450–451 (Jan. 4, 2023).

If DHS used the estimated fee-paying unit cost from the ABC model, the Form I–600A, would have a fee of at least $1,333 in this final rule.[265] Applying the reduced weighted average of 18 percent to the current fee of $775 increases the main filing fee by just $145 to $920 for Forms I–600, I–600A, I–800 and I–800A. However, because the biometrics will be incorporated in the filing fee, most applicant households will experience a cost savings in their application filings. A two-parent household pays $945 under the current fee structure (for a suitability application, biometric services fees, and a petition for a child filed while the suitability approval is still valid). The $920 proposed fee with biometrics incorporated would be $25 less than the current fee of $775 plus two separate $85 biometrics fees for such household.

In addition, DHS already provides, and will continue to provide, the

following fee exemptions for Forms I–600A, I–600, I–800A, and I–800:

• First beneficiary for a Form I–600 or Form I–800 petition (provided it is filed while the Form I–600A or Form I–800A suitability approval is still valid).

• Birth siblings for a Form I–600 or Form I–800 petition (provided it is filed while the Form I–600A or Form I–800A suitability approval is still valid).

• Filing fee for a new I–600A, I–800A, or I–600 combination filing because the marital status of the applicant changed while their request for a suitability determination was pending.

The proposed rule and final rule approach of providing a fee exemption for birth siblings, but not for non-birth siblings, is consistent with the special treatment afforded in the INA to "natural siblings." The INA allows a Form I–600 or Form I–800 petition to be filed for a child up to age 18, rather than up to age 16, only if the beneficiary is the "natural sibling" of another foreign-born child who has immigrated (or will immigrate) based on adoption by the same adoptive parents. *See* sections 101(b)(1)(F)(ii) and (G)(iii) of the INA; 8 U.S.C. 1101(b)(1)(F)(ii) and (G)(iii). While the INA uses the term "natural sibling," DHS generally uses the term "birth sibling" synonymously, which includes half-siblings but does not include adoptive siblings. The INA does not afford special treatment to non-birth siblings, and the proposed and final rule are consistent with the spirit of the INA. The adjudication of an adoption petition is extensive and unique to the circumstance of the child. The adjudication of an adoption petition is not less extensive for unrelated children because they are being adopted by the same adoptive parents and therefore a fee is required to recover costs. Otherwise, even more costs of adoption adjudications would have to be shifted to people applying for other immigration benefits.

Although DHS will not provide additional fee exemptions for the main Forms I–600A, I–600, I–800A or I–800, DHS will provide additional fee exemptions for:

• Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600 (in certain scenarios).

• Form I–800A, Supplement 3, Request for Action on Approved Form I–800A.

• Form N–600, Application for Certificate of Citizenship (for certain adoptees).

• Form N–600K, Application for Citizenship and Issuance of Certificate (for adopted children).

---

[260] In the final rule, the $455 Supplement 3 fee is required unless the prospective adoptive parent is also filing a first or second request for an extension of Form I-600A approval or first or second change of country request.

[261] The petitioner would be seeking the issuance of an updated approval notice after the adjudication and review of the significant change and updated home study.

[262] Prospective adoptive parents currently must pay the $385 Supplement 3 fee to request a new approval notice unless they are also filing a first-time request for an extension of Form I-800A approval or change of country on the same Supplement 3.

[263] In the proposed rule, DHS proposed to require the $455 Supplement 3 fee unless the prospective adoptive parent is also filing a first request for an extension of Form I-800A approval or first change of country request on the same Supplement 3.

[264] In the final rule, the $455 Supplement 3 fee is required unless the prospective adoptive parent is also filing a first or second request for an extension of Form I-800A approval or first or second change of country request on the same Supplement 3.

[265] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, Immigration Examinations Fee Account, Fee Review Supporting Documentation with Addendum, Nov. 2023, Appendix Table **4**.

HR-1 FRN 2025 AR-000128

**Appx-000153**

We address these new few exemptions in the following discussion on specific adoption-related comments.

*Comment:* Commenters opposed the proposed Form I–600A/I–600 Supplement 3 fee for certain requests for action on suitability applications for the orphan process combined with the proposed reduction to suitability approval validity time on Form I–600A from 18 months to 15 months. Commenters disagreed with DHS's rationale that shortening the validity period would reduce the burden on adoptive parents and service providers who must deal with multiple expiration dates, reasoning that this would instead create a burden and that DHS should instead align all validity periods to an 18-month timeframe. Although some commenters agreed with DHS's conclusion that by incorporating biometrics fees into filing fees most households would experience a slight cost savings in their application filings, they stated that shortened suitability approval timeframes (from 18 months to 15 months) for orphan cases would impact the number of needed additional extensions and therefore fees. However, commenters expressed support for the proposed fee exemption for the initial extension, reasoning that it appropriately recognizes applicants' additional paperwork and the lighter workload of such cases.

*Response:* The proposed rule and the final rule create some efficiencies for the orphan process like efficiencies already in place for Hague Adoption Convention cases. The rule aligns the suitability approval validity periods for both Orphan and Hague adoptions to the suitability approval, therefore, limiting to only one date to review both for applicants and USCIS. It also creates a dedicated supplement (Form I–600A/ Form I–600 Supplement 3) for requests for action on suitability applications so that adoptive parents do not have to draft their own written correspondence or use Form I–824, Application for Action on an Approved Application or Petition. The fee exemption has been expanded to the second extension as well.

Although this rule creates a new supplemental form for the orphan process, having a fee for certain requests for action on suitability applications will not be new. The proposed fee structure will be the same type of process and will be the same as the existing fee structure for the Hague Adoption Convention process. Adoptive parents have been required to use Form I–824 for certain requests for action for the orphan process, for which they paid a current fee of $465, and would have paid the new $590 fee for Form I–824 set in this final rule. In comparison, the new Supplement 3 fee of $455 is $10 less than the current fee for Form I–824.

Under the proposed rule, the only scenario where adoptive families would have paid more was if they requested a new suitability determination separately from a first-time extension or a change of country request. Petitioners would have paid less under the proposed rule for many scenarios where they request action on a suitability application for the orphan process.

The proposed fees would have been a reduction in fees for petitioners for change of country requests for the orphan process. There would have been a $0 change in fee for a first-time change of county request because those have been, and would have continued to be, fee exempt. Petitioners would have paid $10 less for subsequent change of country requests.

The proposed fees would have also been a reduction in fees for petitioners for duplicate approval notices for the orphan process. Petitioners would have paid $10 less. The proposed fees would have also been a reduction in fees for extension requests. Even with reducing the validity period from 18 months to 15 months for the orphan process, provided petitioners filed their Form I–600 petition within 2.5 years (30 months) of their Form I–600A approval, they would not have had any extension fees. This is because USCIS does not require petitioners to continue to file extensions of their suitability application approval after they file the petition. Petitioners would also have paid less for a subsequent suitability approval. Currently, after a prospective adoptive parent has used the one-time, no fee extension, the prospective adoptive parent cannot further extend the orphan suitability approval and must begin with a new suitability application or combination filing, with a current fee of $775 plus a biometric services fee. Under the proposed process with the new Supplement 3, they would have the option to pay $320 less for a second extension ($455 to extend via new supplement instead of having to file a new Form I–600A with full fee of $775 plus the biometric services fee).

As explained in the section II.C. Changes from the Proposed Rule, DHS is providing additional fee exemptions for adoptive families in this final rule. Specifically, DHS will also provide fee exemptions for:
• Second extensions.
• Second change of country requests.
• Duplicate approval notices for both the orphan and the Hague process.

*Comment:* Some commenters stated that DHS should not place limitations on using the Supplement 3 to extend Form I–600A approval to use the orphan process when countries transition to the Hague Adoption Convention process.

*Response:* Generally, other countries have requested that DHS limit the ability of transition cases to continue indefinitely to limit the confusion that having two simultaneously running adoption processes causes to its administrative bodies and judicial systems. The DHS proposal and Final Rule allows adoptive parents who have taken certain steps to begin the intercountry adoption process with a country before the Convention entered into force additional time to complete the adoption process under the non-Hague process. The final rule will also permit adoptive parents to use the Supplement 3 to request an increase in the number of children they are approved to adopt from a transition country, but only if the additional child is a birth sibling of a child they have already adopted or are in the process of adopting as a transition case and the birth sibling is identified and petitioned for before the Form I–600A approval expires, unless the Convention country prohibits such birth sibling cases from proceeding as transition cases. However, DHS reasonably limits the ability of adoptive parents to indefinitely request extensions of the validity period of the Form I–600A approval, the ability of adoptive parents to request an increase in the number of non-birth sibling children they are approved to adopt, and the processing of transition cases under the non-Hague process. DHS will maintain the provision as proposed.

*Comment:* A commenter opposed removing the regulation that provides for DHS to extend suitability approvals under the orphan process without the prospective adoptive parents requesting one in certain scenarios.

*Response:* DHS is responsible for ensuring adoptive parents are suitable throughout the intercountry adoption process, and therefore does not believe we should extend approvals without determining whether the prospective adoptive parents remain suitable. Furthermore, DHS does not have such a provision for the Hague Adoption Convention process. Removing this provision for the orphan process will help further align the orphan process with the Hague Adoption Convention process, a process which is designed to provide safeguards for all parties to an adoption.

HR-1 FRN 2025 AR-000129

f. Other Comments on Family-Based Benefits

*Comment:* Commenters stated that raising the fees for family-based applications will make it more difficult to reunite with family members abroad. The fee increases would undermine the well-being of immigrants and family unity, force families to choose between the peace, unity, and security that family-based immigration was created to support, and paying for more immediate necessities like food, housing, and healthcare. USCIS should distinguish between single and family applicants because family applications take more effort to process, and individual applications should be less expensive. Applicants should be made aware of how long the maximum wait time could be.

*Response:* DHS acknowledges the difficulties that come with being separated from family members abroad. However, case processing backlogs make it difficult for all family members to reunite. USCIS is funded by fees and it cannot make progress in alleviating backlogs without raising fees to at least keep up with the rate of inflation and recovering the costs to process applications with approved fee waivers. Additionally, creating and maintaining a new system of tiered pricing would be administratively complex and may require even higher costs than outlined in the proposed rule as well as delay intake and exacerbate backlogs. The fee increases for many family-based petitions (Forms I–129F, I–130, and all adoption-related petitioners/ applications) are limited to inflation or less. *See* 8 CFR 106.2.

6. Adjustment of Status and Waivers

a. I–485: Application To Register Permanent Residence or Adjust Status

(1) Form I–485 and Separate Form I–131 and I–765 Fees

*Comment:* Many comments were submitted about the proposed fee increases for Forms I–485, I–765, and I–131 and the separation of fees for Forms I–131 and I–765 when filed with Form I–485. Many commenters expressed concern that the increased fees for Form I–485 and unbundled interim benefits would be unduly burdensome and render these benefits unaffordable to many eligible applicants, including those who are low or middle income or working class. Specifically, commenters stated the following:

• The Form I–485 fee is not waivable in most cases that do not involve humanitarian exemptions or exemptions from public charge inadmissibility.

• The fee changes run counter to the ability-to-pay principal and the President's directive to reduce barriers to immigration.

• The proposed fees would impede family unity and harm the public interest by forcing families to either exclude certain members (most likely children) from applying with the entire family, by delaying or foregoing applying altogether.

• The higher fees would force some adjustment of status applicants to forego or delay filing Form I–765, which would prevent them from working and supporting themselves, paying for basic human needs such as food, housing, medical care, and transportation, obtaining other government-issued documents (such as a driver's license, State identification card, or a Social Security number), or accessing public benefits and community services.

• Adjustment of status applicants who forego an EAD would be more likely to rely on public benefits or charity while their Form I–485 is pending, or pursue unauthorized employment where they would be vulnerable to exploitation.

• Without an EAD, employed adjustment of status applicants would have to endure the stress of potentially losing their job.

• Higher fees would result in more Form I–485 applicants being unable to afford legal representation, which would increase processing times and administrative costs due to RFEs, and in more applicants turning to unscrupulous lending institutions or relying on credit cards or other high-interest mechanisms to pay their expenses and benefit fees.

*Response:* DHS acknowledges the difficulty some individuals and families encounter in balancing paying for the rising costs of basic needs and benefits, and that employment authorization is often key to the success of immigrants in the United States. However, DHS believes that we have balanced the filing options with separate costs and discounts in this final rule to further mitigate the cost burden to applicants. *See* 8 CFR 106.2(a)(7), (21), (44). The new separate fees represent DHS's best effort to reduce barriers to immigration through balancing affordability, benefits, family unity, and ability to pay, while maintaining adequate services.[266]

DHS is not codifying the proposed fees about which the commenters are commenting, and the separate fees are only increased by inflation or less

---

[266] *See* 88 FR 402, 492, Table 16 (Jan. 4, 2023); 88 FR 402, 433–442, 491–495.

(which is less than the full cost of adjudicating these applications). DHS disagrees that an increase in fees proportionate to the level of inflation would necessarily result in more Form I–485 applicants being unable to afford legal representation. The inflation-only increase means that the Form I–485 fee is the same in real dollars as the current fee was when it was last updated in 2016. Thus, assuming that attorneys' fees increased consistent with inflation, an applicant who could have afforded to hire an attorney in 2016 would generally be able to afford an attorney today, all other things remaining equal. Furthermore, USCIS designs its forms with the goal of making them usable by the general public without the need to hire counsel. USCIS also continues to make efforts to reduce the frequency of RFEs, including revising forms and instructions using plain language to reduce the burden of information collections, and through rulemakings that clarify and modernize ambiguous definitions or inconsistent adjudication. Therefore, DHS disagrees that the fee increase for Form I–485 would directly result in an inability to pay for legal representation when necessary or borrowing from unscrupulous lenders, and finds no evidence to support commenters' contention that fewer applicants choosing to pay for legal representation would result in quantifiable impacts to RFEs or processing times. Currently, Form I–485 and interim benefits are separated and adjudicated by different units. USCIS's practice of adjudicating these forms is not expected to change with the separation of these benefits; therefore, it is not expected that requests will have any additional impact on processing times or administrative costs.

Based on the comments and further review of the fees, DHS has decided to:

• Reduce the fee for Form I–485 from $1,540 in the proposed rule to $1,440 in the final rule.

• Limit the Form I–765 fee for those who filed USCIS Form I–485 after the effective date of this rule to $260, half the cost for filing Form I–765 on paper.

• Provide a $490 discount for applicants (principal or derivative) under age 14 when they file Form I–485 concurrently with a parent.

• Continue to charge Form I–485 applicants who want an advance parole document a full fee for Form I–131 ($630).

*See* 8 CFR 106.2(a)(21); 8 CFR 106.2(a)(44)(i); 8 CFR 106.2(a)(7)(iii) and (iv).

DHS has determined that unbundling the forms will assist USCIS making processing times more efficient by

HR-1 FRN 2025 AR-000130

**6318** **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

eliminating Form I–765s filed for individuals who are not in need of employment authorization or Form I–131s for individuals who have no intention of traveling outside the United States. Bundling Forms I–765, I–131, and I–485 transfers the cost of fees not paid by these applicants and results in other applicants paying for forms in a bundle they may not need. Applicants who are unable to pay the fee and exempt from the public charge ground of inadmissibility may apply for a waiver of the fee for Form I–485. *See* 8 CFR 106.3(a)(3)(iv)(C). Many humanitarian and protection-based classifications pay no fee for Form I–485. *See* 8 CFR 106.3(b); Table 5C. DHS believes the discounted Form I–765 fee may limit burden for low, middle-income, or working-class members. DHS also notes that the fee for Form I–765 is waivable for any I–485 applicant who is unable to pay the fee, *see* 8 CFR 106.3(a)(3)(ii)(F), and Forms I–131 and I–765 are fee exempt for certain categories of applicants, *see* 8 CFR 106.3(b); Table 5C.

*Comment:* Commenters also expressed concerns that adjustment of status applicants would forego or delay filing Form I–131. Specifically, commenters stated the following:

• Some wrote that these Form I–485 applicants would be trapped in the United States while their adjustment of status applications were pending, and be unable to travel to see family or leave the United States temporarily if they faced urgent issues.

• A commenter wrote that DHS should end the requirement that I–485 applicants obtain advance parole before travel if they possess lawful nonimmigrant status.

• A commenter said that advance parole is more critical than ever given increased Form I–485 processing times.

• Another stated it was "borderline extortion" to require Form I–485 applicants to pay for travel authorization given the long wait time for Form I–485.

• A commenter said the adjustment process is "illusory" because adjustment applications require several years for adjudication and associated applications for travel and employment authorization require over 15 months.

• Travel authorization would alleviate family separation for adjustment of status applicants who have been unable to travel outside the United States for many years.

• Unbundling of interim benefits would force more I–485 applicants to seek emergency travel requests if emergencies arose, which would put additional strain on USCIS field offices.

• USCIS should drop the requirement for lawful nonimmigrants to apply for advance parole.

• USCIS could better manage the process of providing advance parole by dropping the requirement for lawful nonimmigrants to apply for and receive advance parole incident to the filing of Form I–485, allowing for travel with a pending Form I–485, extending the validity of Advance Parole Documents (APDs) for individuals with a pending Form I–485 until USCIS can render a decision or to coincide with current processing times.

• Employment and travel authorization is important given long processing times for Form I–485, and the I–131 and I–765 should not be separated from the I–485 fee, as this will increase the filing costs and may make adjustment of status unattainable for some.

• Some I–485 applicants wait long periods of time to have their applications adjudicated due to processing times, backlogs, and visa retrogression, and these applicants must pay for I–765 and I–131 renewals.

• The proposed Form I–485 fee increases were unjustified considering USCIS backlogs and processing delays. Commenters said that, to justify the fee increases, USCIS would need to improve its processing of Form I–485 and related applications so that they are adjudicated within a reasonable timeframe.

*Response:* It is correct that some applicants must obtain advance parole before departing the United States with a pending Form I–485 to avoid abandoning the adjustment of status application. *See* 8 CFR 245.2(a)(4)(ii)(A). The advance parole document is generally issued for one year to allow for the processing of an applicant's Form I–485. USCIS does not have the ability to administratively track all Form I–131 applicants continually to determine whether the Form I–485, is still pending, has been abandoned, or denied. Therefore, USCIS cannot extend an Advance Parole Document validity to coincide with a pending Form I–485.

Separating the Form I–131 fee from the Form I–485 fee does not alter what has always been true—noncitizens requesting the benefit of advance parole are generally required to pay a fee to USCIS for the adjudication of the benefit request. While recovering the costs for the adjudication of that benefit request was previously accomplished through a bundled fee, the fee was still present. Separating the fees ensures that noncitizens are only paying for the benefits that they want or need. If an applicant has no need for an advance

parole document, they would no longer be required to pay a bundled fee which includes a benefit they do not want or need. Continuing to provide the Form I–131, Application for Travel Document, with no fee increases I–131 processing times by creating incentive to apply for a benefit that an applicant may not need, leading to longer wait times to those who are truly in need and may be unable to leave. The approach taken by DHS in this final rule ensures that only those noncitizens who want or need advance parole pay the associated fee. Separating the fees and ensuring that only those who want or need the benefit pay the fee would not prevent individuals from traveling. It will provide an adequate cost recovery mechanism for USCIS and reduce unnecessary fee burdens on applicants who do not seek travel authorization. DHS strongly rejects the commenter's suggestion that charging a fee in association with the adjudication of a benefit request is "extortion," as USCIS has the statutory authority to establish and charge fees to ensure recovery of the full cost of providing services. *See* INA section 286(m) and 8 U.S.C. 1356(m). DHS declines to adopt the proposal not to require advance parole for Form I–485 applicants who possess nonimmigrant status, which could result in excessive continuances of Form I–485s for applicants who can freely travel outside the country while their applications are pending and who for good cause find themselves unable to return in time for their interview[267] DHS disagrees with the characterization of the adjustment process as "illusory," noting that USCIS adjudicated 608,734 Form I–485s in FY 2022.[268]

*Comment:* Commenters expressed concern for the effect that the increased fees for Forms I–485, I–765, and I–131 would have on certain groups, including:

• Asylees and other vulnerable groups, who tend to be low income or have limited financial resources, and require a refugee travel document to travel internationally and an EAD to obtain a REAL ID compliant form of identification.

• Victims of sexual and domestic violence and trafficking who do not pursue, or are ineligible for, survivor-

---

[267] *See* 8 CFR 103.2(b)(9)(ii), (13)(ii) (allowing interview continuances for good cause).

[268] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Number of Service-wide Forms By Quarter, Form Status, and Processing Time, July 1, 2022—September 30, 2022," *https://www.uscis.gov/sites/default/files/document/data/Quarterly_All_Forms_FY2022_Q4.pdf* (last updated Oct. 2022).

HR-1 FRN 2025 AR-000131

Appx-000156

specific adjustment of status or do not qualify for a fee exemption.

• Afghan applicants and their families, many of whom served alongside U.S. troops and have been paroled into the United States, whose adjustment of status and interim benefit fees would not be waived.

• Student applicants with limited financial resources.

• International religious workers.

• K–1 fiancé(e)s, who have already gone through a long review process before entry.

• Conflicts with DHS's goal of treating all who apply for interim benefits the same and conflicts with the INA, which "states a clear preference for family-based immigration by completely eliminating quotas for select family-based categories."

• Proposed fees for Form I–485 and interim benefits were unjustified or unreasonable.

• Many commenters expressed concern with the size of the fee increases, which some characterized as "exorbitant," particularly when filing Forms I–485, I–765, and I–131 together.

• Fee increases significantly outpace the rate of inflation since the last fee increase in 2016.

• Fees are already set at a level sufficient to cover the cost of adjudicating the Forms I–131 and I–765 filed with them.

• Filers are "shouldering the burden" of fee waivers and exemptions for other immigration forms.

*Response:* Although fee increases may impact individuals differently, DHS believes that it has balanced the new fee schedule by providing a reduced fee for Form I–765 when filed with Form I–485 and separating the fee for Form I–131, which some people may not need. As indicated in the proposed rule, continuing to combine the fees together would increase the fees dramatically. DHS in its fee review did not target specific groups and recognizes that fees impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing.

*Comment:* One commenter stated that, if Congress were to pass the Dream Act, *see* S. 264, 117th Cong. (2021), or similar legislation, the Act's beneficiaries would have to pay these additional fees to obtain permanent resident status.

*Response:* As the commenter indicated, Congress has not passed the Dream Act and therefore DHS has not made any changes based on this comment. Congress may choose to provide for specific fees in the Dream Act or similar legislation.

*Comment:* One commenter alleged that the new fees were "clear punishment" for employment-based applicants from India who filed Form I–485s during fiscal years 2021–22 but who have not been approved due to visa retrogression. Some commenters said that expecting employment-based adjustment applicants to pay a fee every time they renew their Form I–765 or Form I–131 is unfair because as they are stuck in this limbo due to visa date or retrogression and for no fault of their own. Others expressed concern that individuals who filed Forms I–485, I–765, and I–131 before the effective date of the fee change would be subject to additional fees for Forms I–765 and I–131 renewals as a result of the unbundling.

*Response:* DHS disagrees that this fee is a punishment for any specific groups who have not been approved due to visa retrogression or membership in a class of individual and recognizes that many individuals of various nationalities filing the Form I–485 have experienced long wait times to be reunited with family. Congress determines the policy on visa limitations, and eliminating quotas is outside the purview of this rulemaking. DHS notes again that individuals who filed a Form I–485 after July 30, 2007 (the FY 2008/2009 fee rule), and before this change takes effect will continue to be able to file Form I–765 and Form I–131 without additional fees while their Form I–485 is pending. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

*Comment:* A commenter wrote that USCIS was passing along the costs of mismanagement from prior administrations to current and future Form I–485 applicants. Another wrote that, by separating the Form I–485 from interim benefit fees, USCIS was getting extra income from its processing backlogs. Commenters questioned the rationale and assumptions underlying DHS's justification for unbundling the fees for Forms I–485, I–765, and I–131. Some asserted that these forms are usually filed concurrently, so the combined fee increase for those forms is more important than the increase for Form I–485 alone. Another commenter stated that raising the Form I–485 fee would bring no financial benefit to USCIS because adjustment applicants are relatively low compared to other visas and immigration applications.

*Response:* USCIS did not realize the operational efficiencies that DHS envisioned when it combined fees for Form I–485 and interim benefits, which was implemented to address the same commenter accusation of a revenue incentive.[269] In fiscal year 2022, USCIS received 599,802 Form I–485s. USCIS has no data to indicate that it takes less time to adjudicate interim benefits bundled with a Form I–485 than it does to adjudicate standalone Form I–131 and I–765 filings. Individuals applying for adjustment of status are not required to request a travel document or employment authorization. With combined interim benefit fees, individuals may have requested interim benefits that they did not intend to use because it was already included in the bundled price. Unbundling allows individuals to pay for only the services requested. Thus, many individuals may not pay the full combined price for Forms I–485, I–131, and I–765. DHS recently increased the maximum validity period to 5 years for initial and renewal Employment Authorization Documents (EADs) for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[270] This new policy could reduce the number of EAD extensions an applicant might need to file, further reducing an applicant's financial burden.[271]

*Comment:* A commenter asserted that applicants should not have to pay for an EAD or Advance Parole when they are entitled to them because of their pending Form I–485, while another stated that it makes no sense to charge separate fees for Form I–485 and interim benefits if they are all being processed as part of the same package.

*Response:* DHS notes that an EAD, when issued in connection with a pending I–485, and Advance Parole are discretionary benefits, and as such there is no "entitlement" to them under the statute or regulations. *See* 8 CFR 223.2(e); 8 CFR 274a.13(a)(1). Although applicants may submit forms together in one envelope or online, each receipt and adjudication have a different process and associated cost as they are separate

---

[269] *See* Adjustment of the Immigration and Naturalization Benefit Application and Petition Fee Schedule, 72 FR 4888, 4894 (Feb. 1, 2007) (stating, "This creates the perception that USCIS gains by processing cases slowly.").

[270] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https:// www.uscis.gov/newsroom/alerts/uscis-increases-employment-authorization-document-validity-period-for-certain-categories* (last updated Sept. 27, 2023).

[271] *See* Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Renewal Applicants, 87 FR 26614 (May 4, 2022).

HR-1 FRN 2025 AR-000132

**Appx-000157**

benefits and have separate eligibility requirements. To improve efficiency and reduce Form I–765 processing times for Form I–485 applicants, USCIS may decouple Form I–765s from Form I–131s filed at the same time. Since February 1, 2022, when possible, USCIS adjudicates an applicant's Form I–765 first. If approved, USCIS will issue an EAD without any notation about advance parole. Form I–131s are adjudicated separately and if approved, USCIS will issue an advance parole document.[272]

*Comment:* Some commenters stated that the DHS's rationale for the current fee increases conflict with is rationale for originally bundling the forms in 2007. Some said that DHS raised the Form I–485 fee in 2007 to include fees for Forms I–765 and I–131, yet DHS is now raising the fee for the Form I–485 while unbundling the other benefits. One commenter stated that DHS originally justified bundling these forms to allow applicants to work and travel during the long Form I–485 processing times, but these processing times are even longer now.

*Response:* In the FY 2008/2009 fee rule, the decision was made to allow applicants who properly file and pay for the Form I–485 to file for interim benefits for no additional fee. During the 2016/2017 fee review, DHS reviewed the cost of bundling the benefits with the Form I–485. *See* 81 FR 26903, 26918 (May 4, 2016). However, USCIS has determined that continuing the practice of bundling will further contribute to backlogs by incentivizing unnecessary filings, increase the cost of the Form I–485 for all filers, and increase the cost of Forms I–765 and I–131 for other filers. *See* 88 CFR 491–495.

By continuing to bundle the forms, the weighted average fee increases for Form I–485 and interim benefits would have been 51 percent. Therefore, applicants would have paid much more to bundle Forms I–485, I–131 and I–765. DHS is separating fees for interim benefit applications and Form I–485 applications to keep the fees lower for most the greatest number of applicants.

Based on the data and comments, DHS will provide for separate fees for each form to account for people who may not file for all three forms. However, DHS understands that most people would request an EAD with their Form I–485 filing and therefore has provided for a lower fee for Form I–765

[272] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland, "I–765, Application for Employment Authorization" *https://www.uscis.gov/ i-765* (last updated Mar. 8, 2022).

that is concurrently filed with Form I–485.

*Comment:* Commenters claimed that maintaining a bundled fee for Forms I–485, I–765, and I–131 would be more efficient. A commenter claimed that DHS had not specified how a separate fee for the Forms I–765 and I–131 would decrease processing times. Another commenter stated that, by requiring separate benefit requests for interim benefits, the changes will increase processing times and result in inconsistent adjudications. Another commenter said that unbundling Forms I–485, I–765, and I–131 will cause applicants to file these forms at different times as needed, which reduces early, systematic processing of packets systematically in mail rooms and service centers. A commenter wrote that unbundling would require adjustment applicants to submit multiple individual applications, which would increase work and costs for USCIS and potentially negate the benefits sought by USCIS. A commenter asserted that keeping Forms I–485, I–765, and I–131 bundled would incentivize USCIS to process Form I–485s in a timely manner to avoid Forms I–131 and I–765 renewals, while another stated that separate fees would create a perverse incentive for USCIS to delay adjudication of benefits and Form I–485 applications as a financial reward for inefficiency.

*Response:* DHS maintains that the unbundling of Forms I–485, I–765, and I–131 would help decrease processing times. Currently, some applicants file all three forms without needing the benefits of advance parole or employment authorization while they await the adjudication of their adjustment of status application because of the one-fee model. This results in the adjudication of benefits that applicants may not otherwise want or need. By unbundling the forms, DHS is trying to limit the cost for certain benefits for those who do not need them. By limiting the number of individuals applying for unnecessary benefits, DHS will also decrease the total number of applications filed, direct resources toward adjudicating those benefit requests that are needed and decrease overall processing times for advance parole and employment authorization. DHS notes that separating the fees for Forms I–485, I–765, and I–131 would not prevent applicants from submitting these forms concurrently. DHS agrees that, in some cases, applicants may choose to file Forms I–765 or I–131 at different times as needed, which aligns with DHS's goal for applicants to only apply for those benefits they want or need without

having other fee-paying applicants subsidize those benefits. DHS disagrees that this will reduce orderly, systematic processing of these applications. Applicants are already required to submit individual forms for the different benefits of adjustment of status, employment authorization, and advance parole.

DHS disagrees that unbundling the Forms I–485, I–765, and I–131 creates an incentive for DHS to increase processing times. Rather, the fees listed in this rule reflect the cost of adjudication of the specific benefits requests, accounting for increased costs to USCIS since the publication of the last fee rule and limiting fees for those applicants who do not need certain ancillary benefits.

*Comment:* Some commenters said that the new unbundled fees would confuse applicants. One said that separating the fees would impact nonprofit organizations that help applicants by requiring them to retrain staff to adapt to the change.

*Response:* DHS understands changes in fees impact organizations that help applicants file forms and new fees may be confusing. Form G–1055 will provide a list of all fees, fee exemptions, reduced fees, and fee waiver eligible forms which should clarify all the fee provisions for applicants and nonprofit organizations. As previously indicated, DHS generally reviews fees every two years, as required by the CFO Act, 31 U.S.C. 901–03, but has not been able to increase fees since 2016 to keep up with increased costs. DHS did not make any changes based on this comment.

*Comment:* Commenters expressed concern that the increased fees for Forms I–485 and I–765 would adversely affect the U.S. workforce and economy. Commenters said it would cause fewer individuals to work, which would reduce tax revenues and otherwise harm the U.S. economy. A commenter stated that this could lead to more individuals working without authorization and decreased economic gains for the United States. Another commenter predicted that increased cost for these applications would encourage individuals to move to other countries and lead to brain drain. Another stated that the Form I–485 fee increase would hurt businesses' ability to sponsor highly skilled workers who are crucial to STEM-related sectors. More generally, one commenter cited research showing the economic gains and poverty reduction when migrants obtain LPR status.

*Response:* DHS understands the vital role our immigrant communities play in the workforce and economy. DHS

appreciates the comments and data provided which cited research depicting economic gains and poverty reduction when LPR status is obtained; however, there was no analysis or discussion provided by commentors how individuals and businesses make difficult trade-offs to afford valuable immigration benefits. DHS is aware of research suggesting that employment authorization, LPR status, and citizenship are associated with higher incomes despite little consensus concerning how much of these differences remain after controlling for abilities and other factors. DHS continues to follow research on high-skill migration but finds no basis supporting commenters' claims that fee increases under this rule could be reasonably expected to result in a "brain drain."

Before the FY 2008/2009 fee rule, applicants paid separate fees for Forms I–765 and I–131 benefits while waiting for their Form I–485 to be adjudicated. The 2008/2009 fee rule allowed applicants to pay for the I–485 and file the interim benefits at no additional cost. Due to inflation and the enjoined 2020 fee rule, USCIS recognized that the fee was insufficient to recover costs associated with these filings. In addition, with no filing fees for the interim benefits, it provided adverse incentive for filers who may not need the benefits and contributed to longer processing times. For these reasons, USCIS has calculated the fee for the Form I–485 to allow applicants to file and pay the interim benefits separately and as needed. In 2023, USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[273]

*Comment:* Commenters stated that the increased fees for adjustment of status and interim benefits undermine USCIS' goal of promoting naturalization by preventing or delaying people from obtaining permanent residency. Some commenters suggested that the increased fees for Forms I–485, I–765, and I–131 were intended to discourage immigration and naturalization. A commenter wrote that obtaining LPR status also facilitates deeper integration

and allows migrants to more fully participate in civic life, and therefore fees for lawful permanent residence should be as low as possible. A commenter stated that, by delaying or preventing individuals from filing applications, the fee increases would negatively impact USCIS, which is primarily funded by application fees.

*Response:* DHS does not believe that the new fees undermine the goals of promoting naturalization or prevent people from obtaining lawful permanent residence. As previously indicated, USCIS is mostly dependent on form fees without appropriations. DHS must balance increased costs and burdens to applicants but does not intend to discourage immigration or naturalization. After recent fee increases, USCIS did not see a decrease in filings that it can attribute to fee increases. DHS notes that it continues to set the fee for Form N–400 below full cost recovery to promote naturalization and immigrant integration. *See* 88 FR 402, 487 (Jan. 4, 2023).

*Comment:* A few commenters expressed frustration with situations where the I–485 is adjudicated before the I–765 or I–131, potentially resulting in wasted applications fees if the applications are unbundled, and asked whether fees would be refunded in these situations.

*Response:* DHS understands that an applicant may receive the final notice that their Form I–765 or I–131 has been adjudicated after receiving a decision on their Form I–485; however, costs associated with each application begin at intake and continue through final adjudication. In this final rule, DHS has revised 8 CFR 103.2(a)(1) to provided that filing fees generally are non-refundable regardless of the outcome of the benefit request, or how much time the adjudication requires, and any decision to refund a fee is at the discretion of USCIS.[274]

In general, USCIS does not refund a fee or application once it has made it through intake regardless of the decision on the application.[275] There are only a few exceptions, such as refund of the premium processing service fee under 8 CFR 106.4(f)(4), when USCIS made an error which resulted in the application being filed inappropriately, or when an incorrect fee was collected. DHS

proposed to revise 8 CFR 103.2(a)(1) to provide that fees are "generally" not refunded. This would address concerns that the current regulatory text does not explicitly permit refunds at DHS discretion.

DHS declines to make further policy changes based on these comments.

*Comment:* Instead of the proposed fees for Form I–485 and interim benefits, commenters proposed the following alternatives:
- Maintain the current policy of allowing applicants to file their I–485 with applications for interim benefits at no additional cost.
- Automatically grant employment authorization and advance parole to applicants for adjustment of status, which USCIS already allows in different situations.
- Issue automatic interim EADs in times of processing delays.
- Restore the fee for Form I–485 to the true cost of processing the form.
- Set the fee for Form I–485 with interim benefits and biometrics fees at $1,540, which is a 35 percent difference from current fees of $1,140.
- Offer a discounted fee and streamlined approval processes for Forms I–765 and I–131 that are concurrently filed with Form I–485.
- Exempt fees for Forms I–765 and I–131 renewals while Form I–485 is pending.
- Maintain the bundled fees for the initial I–765 and I–131, and only charge separate fees for renewals; or at least allow the initial I–765 to remain bundled.
- Apply the fee increases only to I–485 applicants who had not filed their underlying petitions before the effective date.
- Extend EAD and Advance Parole validity periods to the compensate for increased fees for interim benefits.
- Cap the amount of fees paid by immediate family members applying together.
- Waive or reduce fees for Form I–485 and associated interim benefits for family-based petitions.
- Automatically grant interim benefits to K–1 fiancé(e)s.

*Response:* DHS has reviewed the proposals and determined that providing a lower fee for Form I–765 filed with Form I–485 and maintaining the full Form I–131 fee is appropriate and balances the cost to Form I–485 applicants who wish to also file Forms I–765 and I–131, while limiting the cost burden. Although work is authorized for some individuals because of their immigration status or circumstances, for example, asylees, parolees or U nonimmigrants, USCIS does not provide

---

[273] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https://www.uscis.gov/newsroom/alerts/uscis-increases-employment-authorization-document-validity-period-for-certain-categories* (last/updated Sept. 27, 2023).

[274] The entirety of 8 CFR 103.2(a)(1) is republished for ease of editing and context but only the fourth sentence in 8 CFR 103.2(a)(1) is revised.

[275] When USCIS rejects an immigration benefit request as required by 8 CFR 103.2(a)(7) the fee is returned to the requestor. DHS does not consider the act of returning a fee for a rejected request that is not provided a receipt number as a "refund" because the requestor's payment is not processed.

HR-1 FRN 2025 AR-000134

**6322** **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

automatic EAD cards to Form I–485 applicants.[276] However, DHS is providing the following changes to mitigate some of the financial burden to applicants:

• DHS is providing a 50 percent filing discount on the Form I–765 when the I–485 is filed with a fee and the Form I–485 is still pending. *See* 8 CFR 106.2(a)(44)(i).

• Applicants who filed their Form I–485 on or after July 30, 2007, and before the effective date of the rule will not be subject to the new fees for interim benefits. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A).

• USCIS increased the maximum validity period to 5 years for initial and renewal EADs for applicants for asylum or withholding of removal, adjustment of status under INA 245, and suspension of deportation or cancellation of removal, among other categories.[277]

DHS believes that these changes mitigate the proposed fee increases. DHS declines to make any further adjustments based on these comments.

(2) Fees for Children Under 14 Filing With Parent

*Comment:* Multiple commenters expressed opposition to the elimination of the lower filing fee for derivative children under 14 filing concurrently with a parent. Some commenters disagreed with the DHS's rationale for eliminating the lower fee for Form I–485 applicants under the age of 14. Commenters stated that:

• The increased fee would be significant and overly burdensome, with some remarking that the fee would more than double.

• Given the uncoupled fees for interim benefits and the inclusion of biometrics costs, applicants under 14 would be paying more for less benefits.

• The fee increase for a child's application in addition to unbundling the employment authorization and advance parole document request would

[276] *See* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Employment Authorization Document," *https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document* (last updated Feb. 11, 2022); *see also* U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "Certain Afghan and Ukrainian Parolees Are Employment Authorized Incident to Parole," *https://www.uscis.gov/newsroom/alerts/certain-afghan-and-ukrainian-parolees-are-employment-authorized-incident-to-parole* (last updated Nov. 21, 2022).

[277] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, "USCIS Increases Employment Authorization Document Validity Period for Certain Categories," *https://www.uscis.gov/newsroom/alerts/uscis-increases-employment-authorization-document-validity-period-for-certain-categories* (last updated Sept. 27, 2023).

make adjustment of status unaffordable to some applicants.

• The fee increase would impede family reunification and runs contrary to other policy objectives.

• The fee increase would force some families to stagger or delay I–485 applications for certain family members.

• Fee changes for applicants under 14 would impose and increase burdens on groups or price out applicants who are low-income or experiencing poverty.

• A fee increase would threaten children's health, education, safety, security, and future.

• They disagreed that there is no cost basis for different I–485 fees for adults and derivative children.

• USCIS' failure to track the difference in adjudication times for I–485s based on the age of the applicant did not justify the assumption that there was no difference in adjudication time based on age.

• DHS failed to consider that young children are less likely to have inadmissibility and discretionary issues that would delay adjudications, such as immigration violations, criminal history, and misrepresentation.

• DHS did not address potential efficiencies in adjudicating two related I–485s submitted concurrently by family members.

• It should take less time to process a child's application after the agency has processed the parents concurrently filed one.

• The fee increase included unnecessary costs for biometrics services since children under 14 are exempt from these requirements.

• They disagreed with DHS' rationale that only a small percentage of adjustment applicants are children.

• DHS's rationale ignored the effects of the fee increase on other family members.

• The increased fee would reduce applications for adjustment of status by children.

• This would undermine DHS's goals of encouraging naturalization and family integration.

• The fee increase would undercut the social and economic benefits of family-based immigration.

*Response:* DHS agrees with many of the points made by commenters, including that the increased fee may be burdensome to filers and affect family reunification, and that there may be a cost basis for distinguishing a Form I–485 filed by a child in conjunction with a parent from other Form I–485s. After reviewing the comments, DHS is reducing the fee for applicants under age 14 who file concurrently with a parent to $950 (27 percent increase over

the current fee). Additionally, children under 14 who have properly filed the Form I–485 with a fee on or after July 30, 2007, and before the effective date of the final rule are not required to pay additional fees for interim benefits. *See* 8 CFR 106.2(a)(7)(iv), (44)(ii)(A). A child filing Form I–485 after the effective date of the final rule, concurrently with a parent or as a standalone, will pay $260 for Form I–765 (50 percent discount) and $630 for an advance parole document, if requested (10 percent increase). *See* 8 CFR 106.2(a)(44)(i); 8 CFR 106.2(a)(7)(iii). Furthermore, applicants who are unable to pay the fee for Form I–485 and who are exempt from the public charge ground of inadmissibility may apply for a waiver of the fee. *See* 8 CFR 106.3(a)(3)(iv)(C).

(3) INA Sec. 245(i) Statutory Sum Clarification

*Comment:* Another commenter wrote that the penalty fee under INA section 245(i), 8 U.S.C. 1255(i), should be increased to $2,000, but acknowledged that this would require congressional action.

*Response:* The commenter correctly notes that the additional fee for adjustment of status under INA 245(i), 8 U.S.C. 1255(i), is determined by statute, and so can only be changed by Congress. *See* INA 245(i)(1), 8 U.S.C. 1255(i)(1).

(4) Other Comments on Form I–485 Fees

*Comment:* One commenter stated that the fee increase was inconsistent with E.O. 14091 because it did not consider the disproportionate impact the change would have on lower income applicants of color, particularly larger families coming from Central and South America.

*Response:* DHS believes that this rule is consistent with E.O. 14091. DHS recognizes that fees may impose a burden on individuals seeking benefits, and it takes steps to mitigate the cost as appropriate consistent with the ability-to-pay principle. At the same time, DHS must recover the full costs of the services that USCIS provides, or else risk reductions in service quality, including potential delays in processing. The proposed rule included a $1,540 fee for Form I–485. *See* 88 FR 402, 407 (Jan. 4, 2023). In recognition of comments and the impacts on applicants, DHS has decreased the filing fee to $1,440, limiting the fee increase to the change in inflation as of June 2023 (26 percent). To further mitigate the cost burden, the final rule will also continue to provide a discount for children aged 14 and under who concurrently file with a parent, which

will assist larger families seeking to adjust. *See* 8 CFR 106.2(a)(21)(ii). Under the final rule, applicants who are unable to pay the fee and who are exempt from the public charge ground of inadmissibility may apply for a waiver of the fee. *See* 8 CFR 106.3(a)(3)(iv)(C). USCIS has also proposed additional fee exemptions for certain applicants seeking to adjust under humanitarian and protection-based immigration categories. *See* 8 CFR 106.3(b). DHS acknowledges that many applicants for adjustment of status are not eligible for fee waivers or exemptions. At the same time, various INA provisions contemplate that most adjustment of status applicants will have means of support. *See, e.g.,* INA section 212(a)(4), 8 U.S.C. 1182(a)(4); INA section 213A, 8 U.S.C. 1183a; *see also* E.O. 14019, 11(b) ("This order shall be implemented consistent with applicable law and subject to the availability of appropriations.").

*Comment:* Asylee families would be particularly hurt if forced to stagger their Form I–485 filings due to the increase in fees, since the principal asylee would have to delay naturalization until the remaining family members adjust status, otherwise some derivative applicants would become ineligible to adjust status.

*Response:* DHS recognizes the potential difficulties that result when certain asylee family members decide to adjust and naturalize before others, which requires the remaining unadjusted family members to file *nunc pro tunc* asylum applications. However, DHS notes that the fee for Forms I–485 and I–765 may be waived for asylees (who are exempt from the public charge ground of inadmissibility) who are unable to pay. *See* 8 CFR 106.3(a)(iv)(C), (ii)(F). Therefore, asylee families who are unable to pay the fees for these forms should not have to stagger the adjustment applications of different family members. DHS has considered the comments regarding the Form I–485 and reduced the proposed fee to a 26 percent increase in the filing fee for Form I–485, *see* Table 1, and maintained a lower filing fee for children under the age of 14 filing concurrently with a parent, 8 CFR 106.2(a)(21)(ii). DHS has limited the Form I–485 fee increase by requiring fees for concurrently filed requests for interim benefits (Forms I–765 and I–131) but limited the fee for the Form I–765 while a Form I–485 is pending to $260. 8 CFR 106.2(a)(7), (21) & (44)(i). DHS believes that these changes in the final rule will limit staggering of Form I–485s for asylee families and *nunc pro tunc* asylum applications.

*Comment:* A commenter recommended narrowing and adding a fee for Supplement J when filed after Form I–485, such that Supplement J would not be required for re-assigning classifications on a pending Form I–485 and would not "restart the clock" for Form I–485 portability.

*Response:* DHS considered the commenter's suggestions concerning the use of Form I–485, Supplement J, Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), and the potential for charging a fee in a new context as described. USCIS has generally not required applicants to pay a fee for many forms that are supplemental in nature, for example, Form I–130A, Supplemental Information for Spouse Beneficiary. The Form I–485, Supplement J, is to confirm a bona fide job offer or transfer the underlying basis of their adjustment of status application to a different petition. Requesting applicants to pay a new fee to port to a new job would present a new financial burden for the applicant that could prevent some intending immigrants from being able to take advantage of the portability provisions in the American Competitiveness in the Twenty-First Century Act of 2000 (AC21). *See* INA section 204(j), 8 U.S.C. 1154(j). The commenter's other suggestions are outside the scope of this rulemaking; therefore, DHS makes no changes based on this comment.

b. Inadmissibility Waivers

*Comment:* Commenters opposed the proposed fee increase for Forms I–192, I–212, and I–601, writing:

• Fees for these forms are already high relative to other immigration fees.

• These forms are often used by individuals with criminal or immigration violations, the higher fees could exacerbate racial and economic inequities within the criminal and immigration systems.

• Increasing the Form I–192 fee could deter individuals from applying, including Canadian applicants who would continue to reside in Canada but contribute to the U.S. economy if not for the fee increase.

• Raising the fee for Form I–192 could cause many families who do not qualify for a fee waiver to not be able to apply due to limited resources.

• USCIS proposed fee increases for Form I–212 will harm mid- to low-income applicants and survivors of sexual violence and human trafficking.

• Increases in fees for Forms I–212 and I–192 are unreasonable due to the existing delays in processing and the

fees applicants must pay for other forms.

*Response:* As stated elsewhere, DHS examined each fee in the proposed rule and the fees proposed represent DHS's best effort to balance access, affordability, equity, and benefits to the national interest while providing USCIS with the funding necessary to maintain adequate services. DHS notes that the increased fees for Form I–192, Application for Advance Permission to Enter as a Nonimmigrant and Form I–601 are only $170 (18 percent increase) and $120 (13 percent increase), respectively, which are below the rate of inflation since the last fee increase (approximately 26 percent). For these forms, the fee increases (18 percent and 13 percent) remain below that for other benefits.

DHS acknowledges that some proposed fees are significantly higher than the current fees. This is the case for Form I–212, Application for Permission to Reapply for Admission into the United States After Deportation or Removal, because DHS proposes to not limit the fee increase as it has done in the past, for policy reasons. *See* 81 FR 26904, 26915–26916 (May 4, 2016). In the FY 2016/2017 fee rule, DHS stopped limiting the fee increase for inadmissibility waivers like Forms I–212 and I–601. *See* 81 FR 73292, 73306–73307 (Oct. 24, 2016). DHS is not proposing to limit the fee increase for Form I–212 because other proposed fees would have to increase to recover the full costs. Additionally, DHS already provides fee exemptions for vulnerable populations, including survivors of sexual violence and human trafficking, for all forms filed through final adjudication for adjustment of status to LPR, including Form I–485 and associated forms. *See* 8 CFR 106.3(b); *see also* Preamble, Table 5C. For example, abused spouses and children filing under CAA and HRIFA are fee exempt for Form I–485 and associated forms, including Form I–212, as they file for VAWA benefits on Form I–485. *See* 8 CFR 106.3(b)(4).

c. Form I–601A, Application for Provisional Unlawful Presence Waiver

*Comment:* The comments received on the proposed fee for the Form I–601A, are as follows:

• In the absence of legislation, Form I–601A is imperative for mixed-status families to remain together. While a fee adjustment may be appropriate DHS should reconsider and reduce the proposed 75 percent increase.

• The proposed fee increase for Form I–601A is inappropriate given the current processing times and backlog.

HR-1 FRN 2025 AR-000136

• DHS failed to justify why Form I–601A warrants such a high fee because the number of cases and completion rates have decreased.

• The proposed fee increase for Form I–601A would discourage and delay individuals from consular processing and undermine the purpose of the provisional waiver.

• A 75-percent fee increase for Form I–601A is too high because applicants who need a Form I–601A also must pay fees for Form I–130, Form I–485, and consular processing.

• Because Form I–601A requires a demonstration of extreme hardship DHS should treat it like other humanitarian applications and raise its fee only 19 percent.

• The Form I–601A proposed fee increase would disproportionately impact minority communities, because BIPOC individuals are more affected by racial inequities in the immigration justice systems.

*Response:* DHS acknowledges the increased Form I–601A, Application for Provisional Unlawful Presence Waiver, fee would increase the costs for applicants and has considered the comments. As previously mentioned, USCIS is primarily fee-based and therefore must recover operating costs through fees which must incorporate cost to process forms which have fee waivers or exemptions. DHS notes that applicants filing Form I–601A are only consular processing and are not filing Form I–485 for adjustment of status. DHS does not have data indicating that the new Form I–601A fees would disproportionately impact BIPOC communities, and commenters offered no evidence indicating the form is disproportionately used by BIPOC communities. However, DHS has considered comments regarding the Form I–601A and reduced the proposed fee to the amount of inflation as described in section I.C. of this preamble. DHS agrees that Form I–601A is important for family unity and needed by certain noncitizens who have resided in the United States for a long time to normalize their status. DHS also recognizes that Form I–601A applicants tend to lack employment authorization and so may possess less means to pay a significant fee increase. Therefore, DHS proposes a 26 percent increase in the filing fee for Form I–601A to $795, which limits the fee increase to the change in inflation between December 2016 and June 2023.

7. Genealogy and Records Request Fees, Forms G–1041, Genealogy Index Search Request, G–1041A, Genealogy Records Requests, and G–1566, Request for a Certificate of Non-Existence

*Comment:* Numerous commenters generally opposed increasing fees for genealogy search and records requests. Some individual commenters expressed opposition to the proposed fees for genealogy records, without providing further rationale. Other commenters, many identifying themselves as professional genealogists or individual genealogists, opposed the proposed increased fees, stating that they oppose the fee increase for the following reasons:

• Current fees are already cost-prohibitive without further increase.

• They opposed the 2020 fee increase and they oppose the new proposed rule.

• The proposed fee increase would create a burden on or entirely deter individuals and amateur researchers seeking to learn more about their family histories.

• The proposed fees are too high or would otherwise be beyond the means of most Americans.

• The USCIS genealogy program is an illegal interpretation of the Freedom of Information Act (FOIA).

• USCIS has not demonstrated the need for its proposed increased fees on genealogy forms with information about the adjudication, other data, or its fee increase methodology.

• The proposed fee does not reflect the cost to USCIS of finding and providing a record or would otherwise effectively serve to shift the costs of other USCIS services to this program to help USCIS meet its budget shortfall.

• USCIS' estimated costs for the genealogy program are incorrect based on the commenter's own analysis and USCIS should provide clarification of the USCIS estimates.

• USCIS should reduce the proposed fee increases based on an hourly rate, in line with other agencies.

• USCIS should provide information on its records management processes and clarify which records have been digitized, the effort required to search the MiDAS system and the reasoning behind wait times for its genealogy records program.

• Commenters supported the proposed fee increase if it would reduce wait times for genealogical record requests.

• USCIS should not raise fees on genealogy records requests until it demonstrates an improvement in services.

• A commenter supported a smaller fee increases to account for inflation and staffing shortages.

• How will individuals who placed index orders before the implementation of the rule be charged for the actual records if they do not receive their index searches until after the rule has been implemented.

• The new fees would disproportionately burden professional genealogical and historical researcher communities, in some cases prevent them from doing their work entirely, harm genealogical businesses because of the high cost and long wait times.

• USCIS records are also important for accessing records in the homeland of an immigrant.

• The proposed fee increase in addition to long wait times would impact the repatriation of veterans' remains by limiting the ability of the U.S. military-hired genealogists to access documents related to kinship that are vital to the process and have a disproportionate impact on immigrant veterans.

• The fee increases would harm citizens seeking dual citizenship because foreign ministries require documents from USCIS. Individuals who cannot afford the fee would be unable to have their legal rights recognized in foreign countries.

• Many individuals undertaking genealogy research for legal purposes are financially constrained thus the proposed fee increases would block access to the records.

• The fee increase would interfere with access to records for kinship and lineage judgments in settling estates.

• Genealogy records are increasingly important in fields such as law and medicine, for racial justice projects, and for law enforcement forensic purposes.

• Moving the program to the National Records Center (NRC) has not helped, hampered efficiency, and added steps to obtain records not located at the NRC, such as for certain C-Files.

• Genealogy Index Search results are often filled with errors in need of correcting, due to inadequate staff training.

*Response:* DHS recognizes commenters' concerns regarding the scope of the fee increases for Form G–1041, Genealogy Index Search Request, and Form G–1041A, Genealogy Records Request, in the proposed rule. The proposed increase reflected changes in USCIS' methodology for estimating the costs of the genealogy program to improve the accuracy of its estimates. *See* 88 FR 402, 512 (Jan. 4, 2023).

The INA authorizes DHS to set the genealogy fee for providing genealogy

research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. *See* INA section 286(t)(1), 8 U.S.C. 1356(t)(1). The INA is different and separate from the FOIA. USCIS must estimate the costs of the genealogy program because it does not have a discrete genealogy program operating budget, as explained in the proposed rule. *See* 88 FR 402, 512 (Jan. 4, 2023). USCIS does not discretely identify and track genealogy program expenditures. The same office that researches genealogy requests, the National Records Center, also performs other functions, such as FOIA operations, retrieving, storing, and moving files. In the FY 2016/2017 fee rule, DHS estimated the costs of the genealogy program indirectly using projected volumes and other information. At that time, the projected costs included a portion of lockbox costs and of other costs related to the division that handles genealogy, FOIA, and similar USCIS workloads. *See* 81 FR 26903, 26919 (May 4, 2016). The estimation methodology underestimated the total cost to USCIS of processing genealogy requests by not fully recognizing costs associated with the staff required to process genealogical requests. *See* 88 FR 402, 512. Therefore, other fees have been funding a portion of the costs of the genealogy program, and DHS proposed correcting that in this rule. USCIS estimates that there are approximately 6 genealogy positions out of the total 24,266 positions in the fee review. *Id.*

In the proposed rule and in the 2020 rule, USCIS incorporated a new activity in the ABC model, Research Genealogy, to estimate the cost of the program at the National Records Center (NRC). *See* 88 FR 402, 512. This change enabled USCIS to revise its cost estimation methodology to incorporate a proportional share of the NRC's operating costs based on the staffing devoted to the genealogy program. DHS estimated the costs of the genealogy program using this methodology and subsequently proposed to base the fees for Forms G–1041 and G–1041A on these revised cost estimates. *Id.* As explained in the proposed rule, the revised fees and regulations may allow some customers to file a single search request with a single fee and still receive the genealogy information that they requested. *See* 88 FR 402, 511–512. The proposal to include pre-existing digital records, if they exist, via email in response to the initial search request

would also be more efficient than the current process. *Id.*

As explained earlier, DHS limits many of the fee increases in this final rule by inflation, and after considering the above comments, we are including the fees for Forms G–1041 and G–1041A in that group of requests. DHS used the approximate 26 percent inflation between December 2016, the effective month of the FY 2016/2017 fee rule, and June 2023 to increase the current $65 fees. When adjusted for inflation, the fees would be $82.[278] DHS rounded inflation adjusted fees to the nearest $5 dollar increment, consistent with other fees, making them $80. Some online filing fees are $50 less than paper filing fees, as explained earlier in this rule. As such, DHS establishes the fee for Form G–1041, Genealogy Index Search Request, when filed online as $30, the fee for a paper filed G–1041 as $80, the fee for Form G–1041A, Genealogy Records Request, when filed online as $30, and the fee for a paper filed G–1041A as $80. Therefore, DHS is setting the fees at less than the proposed fees, meaning they do not recover the relative cost to USCIS for operating the genealogy program as calculated in the proposed rule, and less than we are authorized to charge under INA section 286(t)(1), 8 U.S.C. 1356(t). The online Form G–1041 and G–1041A filing fees are less than the current fees, which means they do not recover full cost under the methodology that DHS used to calculate them in the FY 2016/2017 fee rule. As such, other immigration benefit request fees will continue to subsidize the genealogy program. DHS declines to make other changes in this final rule in response to these comments.

*Comment:* Commenters opposed the new records fees, currently stating the Request for a Certificate of Non-Existence is untimely, obtaining the required information often requires multiple requests, and there is no verifiable justification for these proposed increases and fee implementation.

*Response:* In the proposed rule, DHS proposed a new fee for Form G–1566, Request for a Certificate of Non-Existence. *See* 88 FR 402, 513. Individuals often use this service to gather genealogical records that allow them to claim the citizenship of another nation. Previously, USCIS operated the Certificate of Non-Existence request

process informally and at no cost to individuals requesting a certificate. DHS calculated the fee to recover the estimated full cost of processing these requests as $330. *Id.* The proposed fee for a request for a Certificate of Non-Existence is based on the same ABC model used to calculate the other proposed fees. USCIS created a new activity for this workload, called Certify Nonexistence, in the ABC model. *Id.* Previous fee reviews captured this work as part of the Records Management activity. See the supporting documentation accompanying this rule for more information on the activities in the ABC model.

DHS has reviewed our calculations in response to the public comments and determined that this fee is consistent with the full cost recovery model used for this rule to generate revenue to mitigate the need for other fee payers to fund the costs of providing certificates, as explained in the proposed rule. *See* 88 FR 402, 513 (Jan. 4, 2023). DHS appreciates the public's feedback the Form G–1566, Request for a Certificate of Non-Existence fee, but DHS declines to make changes in this final rule in response to these comments. DHS sets the fee for Form G–1566 at $330. *See* 8 CFR 106.2(c)(12).

*Comment:* Some commenters claimed that taxpayers have already paid to acquire, manage, and store these records. Some commenters felt that taxpayers already support the government substantially and should not be charged for access to records. Many commenters expressed opposition to paying any fees to access genealogical records, because the service is already funded by taxpayers, should be funded by taxpayers, or that the records already "belong to the American people."

*Response:* DHS understands the commenters' concerns regarding the potential for duplicative payment. However, as explained in the proposed rule, USCIS is primarily funded by fees. *See* 88 FR 402, 415–417, 512 (Jan. 4, 2023). USCIS does not receive taxpayer funds for the genealogy program, nor do taxes pay for the acquisition, management, or storage of records in USCIS' custody. Therefore, DHS must recover the estimated full cost of the genealogy and records programs through USCIS' fees. DHS has explicit authority to recover the costs of providing genealogical services via genealogy fees. *See* INA section 286(t), 8 U.S.C. 1356(t). As explained earlier, the fees for Forms G–1041 and G–1041A will not recover their full cost, but other USCIS fees will offset their cost.

*Comment:* Numerous commenters discussed turning the records over to

---

[278] DHS calculated the difference between December 2016 CPI–U (241.432) and June 2023 CPI–U (305.109), as 63.677 or 26.37 percent as explained earlier. Multiplying the current fees ($65) by 26.37 percent equals $82.14. Calculation: $65 *1.2637 = 82.1405.

HR-1 FRN 2025 AR-000138

Appx-000163

the National Archives and Records Administration (NARA) so the public can access them for free or at a lesser cost. Some of these commenters elaborated further, and we summarize these comments as follows:

• NARA has demonstrated its ability to efficiently respond to records requests, much more quickly and at a lower cost.

• NARA could manage records more efficiently, access them more freely, and reproduce them more economically, as preserving and providing access to historical records of the Federal Government is one of NARA's core missions and areas of expertise.

• Transferring genealogy records to NARA would be a straightforward solution to USCIS' stated reason for raising fees on genealogy records requests, namely that the agency incurs overhead costs associated with storing and managing the records. The commenter additionally recommended that, where applicable, records disposition agreements should be updated to allow the transfer of records to NARA.

• USCIS needs to comply with its own retention schedules and send appropriate records to NARA.

• USCIS should develop a plan to ensure all A-Files are added to USCIS' Central Index System (CIS) to make them eligible for transfer to NARA. Similarly, USCIS records should be adjusted to meet NARA's specifications.

• By not transferring required files to NARA, USCIS is not only hurting individuals requesting documents, but also other Federal Government agencies.

• Commenters indicated general confusion as to why genealogical records are treated differently depending on when a citizen was naturalized, with older records being handled by NARA and newer records by USCIS.

• In addition to transferring additional records to NARA, USCIS has a restriction in place on some records currently possessed by NARA, such as Alien Registration forms, which the commenters recommended that the agency lift.

• NARA's fees are too expensive, without specifying any NARA fee amount.

*Response:* On June 3, 2009, USCIS signed an agreement to transfer records to NARA.[279] NARA's holdings of A-

Files will grow as USCIS continues to transfer records, as allowable under current retention schedules. USCIS strives to adhere to its records retention schedules and transfer files to NARA expeditiously when records are eligible for transfer. Unfortunately, issues such as incomplete or non-existent file indices and other operational difficulties may inhibit and delay such transfers. DHS agrees that NARA is the appropriate repository for permanently retained records as USCIS has deemed necessary. DHS declines to make any changes in this final rule in response to these comments. NARA is not operated or fully funded by USCIS. Therefore, fees and policy associated with NARA are out of scope in this rulemaking.

*Comment:* Some commenters opined on the relationship between the USCIS genealogy program and the FOIA. Commenters wrote that USCIS' genealogy program was instituted to reduce burdens on FOIA and speed up the records request process, but the genealogy program has failed in its effort and instead delays processing and increased fees. Others wrote that if USCIS considers genealogy records requests to be FOIA requests, they should not carry fees higher than standard FOIA fees. Commenters similarly wrote that USCIS' practices were inefficient because the genealogy program was created to alleviate burdens on FOIA staff, but still relies on FOIA staff to review requests, which results in increased wait times. A commenter wrote that if the genealogy program is intended to serve as an alternative to the standard FOIA process, USCIS should cease subjecting genealogy records requests to FOIA reviews.

Commenters stated that some of USCIS' record requests should be subject to the standard process for FOIA requests, but that instead, USCIS denies FOIA requests to collect revenue from the records requests. Commenters expressed concern that some A-Files are relegated to the genealogy program, where requestors are required to pay a fee for files created before May 1, 1951, while individuals requesting files after that date are not. The commenters added that USCIS places requestors in arbitrary categories and as a result, its processes are inconsistent with FOIA requirements. Similarly, a commenter stated that many genealogy program fees are not authorized by statute and that USCIS cannot force requesters to pay a fee for records that should be available under FOIA. The commenter added that USCIS' genealogy program was illegal on these grounds.

*Response:* There is no conflict between FOIA and DHS' operation of the USCIS genealogical program, nor is USCIS constrained in establishing fees for its genealogical services to the levels established under FOIA. As stated earlier, USCIS genealogy fees use specific legal authority separate from the FOIA. The INA authorizes DHS to set the genealogy fee for providing genealogy research and information services at a level that will ensure the recovery of the costs of providing genealogy services separate from other adjudication and naturalization service's fees. *See* INA section 286(t)(1), 8 U.S.C. 1356(t)(1).

USCIS formerly processed requests for historical records under FOIA or Privacy Act programs but the demand for historical records grew dramatically. USCIS determined a genealogy request would be a more suitable process as historical records requested through FOIA were usually released in full because the subjects of the requested documents are deceased and therefore no FOIA exemptions applied to withhold the information. *See* 71 FR 20357, 20368 (Apr. 20, 2006). As authorized by law, the USCIS genealogy program was established to relieve the FOIA and Privacy Act programs from burdensome requests that require no FOIA or Privacy Act expertise, place requesters and the Genealogy staff in direct communication, provide a dedicated queue and point of contact for genealogists and other researchers seeking access to historical records, cover expenses through fees for the program, and reduce the time to respond to requests. *Id.* at 20364.

DHS appreciates the commenters' concerns regarding differences between the FOIA process and the genealogical index search and records request processes. Before 2017, the USCIS staff who processed FOIA requests also processed some genealogical records requests, particularly records from 1951 or later. However, USCIS moved the genealogical program to the NRC in 2017. Since that time, dedicated USCIS genealogical staff process all genealogical records requests. Commenters are mistaken in stating that the genealogy program sends appropriately filed genealogy requests through the FOIA process. DHS acknowledges that both FOIA requests and genealogical records requests are subject to review under the Privacy Act of 1974 to ensure that USCIS does not inappropriately release information to third parties. However, USCIS' genealogy program is distinct from the FOIA program and the fees that DHS establishes for Forms G–1041 and G–

[279] *See* National Archives, Alien Files (A-Files) page, available at *https://www.archives.gov/research/immigration/aliens#:~:text=The%20United%20States%20Citizenship%20and%20Immigration%20Service%20%28USCIS%29, 100%20years%20after%20the%20immigrant%27s%20year%20of%20birth* (last viewed on Aug. 22, 2023).

1041A are authorized by the INA, not FOIA. DHS declines to make changes in this final rule in response to these comments.

*Comment:* Multiple commenters stated that the proposed fee increases for record requests seems to be a punishment for citizens who want access to ancestors' records. Multiple commenters stated that records would be "held hostage" by demanding exorbitant and unjustified fees to access documents on immigration ancestors. The commenters wrote that these records should already be publicly accessible under the law.

*Response:* DHS rejects the characterization of the proposed fees to punish or hold hostage individuals who seek records related to their ancestors via the USCIS genealogy program. Rather, and as explained earlier in this section, the fees for Forms G–1041 and G–1041A established by this rule will be set at a level lower than what it costs USCIS to administer them and lower than the INA authorizes. In addition, online filing fees will be less than the current fees. As such, users of these forms will continue to have access to USCIS records.

*Comment:* Many commenters stated that implementation of increased fees should not occur without careful explanation and discussion of alternatives. Commenters generally recommended digitizing and making genealogy records available free online or at conveniently located government offices. One commenter suggested making a public version of USCIS genealogy records and added that it would result in thousands of saved hours for USCIS and NARA employees. The commenter also stated that privacy concerns associated with USCIS transferring records to NARA are not based on any real risks. A different commenter stated that there is no reason to significantly redact information on such old immigration genealogy records.

A couple of commenters suggested licensing the digitization of these records to a repository, such as Ancestry.com, for the benefit of genealogists if the records must be monetized. A couple of commenters recommended making USCIS genealogy records available according to the same rules as those of the U.S. Census, in that the records can be released without review if they are 72 years old or older.

Multiple other commenters recommended allowing genealogy groups or companies to volunteer to digitize and upload USCIS' records to be made available for free online, or to otherwise rely on genealogists to digitize and publish the records for

USCIS. A commenter recommended hiring additional staff to help respond to records requests more efficiently, such as archivists and librarians, or otherwise recruit volunteers to help respond to requests.

*Response:* DHS agrees with the commenters' reasoning that filing index search requests and records request online increases efficiency and, all else equal, reduces the cost to USCIS of providing the associated services. As explained earlier, DHS limited the fee increases for Forms G–1041 and G–1041A to inflation since the FY 2016/2016 fee rule. There is also $50 difference between the fee for a form filed online and a form filed on paper. DHS appreciates the alternatives suggested by commenters such as licensing the digitization of records, hiring librarians or archivists, or recruiting volunteers to help manage the requests. DHS may consider these alternatives in the future but declines to make any changes to the final rule in response to these comments.

*Comment:* Some commenters focused on genealogy request processing times. Many stated that USCIS should clear the backlog of genealogy requests or reduce processing times. A commenter stated that genealogists are only asking for fair and reasonable processing times, not expedited ones. Others stated that USCIS should offer specific data on processing times for this form and explain how it plans to reduce the backlog. Numerous commenters addressed frustrations with genealogy wait times and expressed concern for a fee increase without a commitment to service improvements. Other comments on the processing time for genealogical records include the following:

• The backlog is a huge burden on elderly Japanese Americans seeking to recover genealogical records that could explain their families' histories during WWII internment.

• The delays are harmful to the livelihoods of professional genealogists and to the projects of serious researchers.

• The genealogy backlog is because USCIS is tasking itself with a mission outside its purview.

• The longer time to process records during COVID would now become the new standard for service.

• Requestors cannot afford to request records when they do not have clarity of the wait times or process involved.

• Processing delays are unreasonably longer than the current processing times for Alien Files (A-Files) FOIA requests numbered above 8 million, particularly given that the genealogical records are shorter.

• Quicker processing time for A-File requests is court-mandated, leaving fewer USCIS resources available to process non-A-file FOIA requests, thus creating further backlog for those requests. Those backlogs violate FOIA requirements, and the commenter plans to litigate the violation.

*Response:* In addition to the proposed fee increase, the proposed rule proposes changes to genealogy processing. *See* 88 FR 402, 511–512 (Jan. 4, 2023). Ultimately, DHS expects these changes may allow USCIS to provide genealogy search results and historic records more quickly when pre-existing digital records exist. Currently, the genealogy process consists of two separate forms. When requestors submit Form G–1041, Genealogy Index Search Request, on paper or electronically, USCIS searches for available records. If no record is found, then USCIS notifies the requestor by mail or email. If USCIS identifies available records, then USCIS provides details on the available records, but does not provide the copies of the actual records. Under current regulations, a requestor must file Form G–1041A, Genealogy Records Request, with a fee for each file requested, before USCIS provides any records that it found because of the search request. As such, USCIS staff must search for the records previously identified in an index search to complete a records request. Under the proposed process, USCIS would provide requestors with preexisting digital records, if they exist, in response to a Form G–1041, Genealogy Index Search Request. *Id.* The USCIS process and regulations changes may decrease the time an applicant has to wait for records. For approximately 70 percent of index searches, USCIS may provide electronic copies of digital records, USCIS may not identify any records, or customers may not follow-up with a records request for hardcopies. *See* 88 FR 402, 512 (Jan. 4, 2023). USCIS anticipates that these changes will help to reduce processing times and reduce the backlog of genealogy requests. DHS declines to make any changes to the final rule in response to these comments.

8. Other Fees

a. Form I–90 Replace Permanent Resident Card

*Comment:* Commenters said that the proposed rule further discouraged naturalization by proposing a Form N–400 fee that is higher than the Form I–90 fee. Similarly, a commenter said fees for Forms I–90 and N–400 should be comparable instead of the proposed $295–305 difference between the two

HR-1 FRN 2025 AR-000140

**6328**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

fees. The commenter stated that potential applicants might decide which benefit to pursue based on fees, particularly those unable to qualify for a fee waiver or reduced fee request. The commenter added that making the Form N–400 fee comparable to the Form I–90 fee would also reduce financial barriers to naturalization. Another commenter expressed concern that, as fees increase over time, renewing permanent residency status is becoming more burdensome for long-term permanent residents.

*Response:* DHS acknowledges that this final rule establishes a Form N–400 fee which is higher than the Form I–90 fees. DHS does not intend to discourage naturalization and seeks to achieve full cost recovery. As explained in the proposed rule, DHS used its discretion to limit fee increases for certain immigration benefit request fees that would be overly burdensome on applicants, petitioners, and requestors if set at ABC model output levels. *See* 88 FR 402, 450–451 (Jan. 4, 2023). In the case of Form I–90 when filed online, DHS maintained the current fee to some forms and limits the fee increase for those other forms. *See* 88 FR 402, 451 (Jan. 4, 2023). One of the forms with a limited fee increase is Form N–400. As such, if an applicant chooses to renew their permanent residence card, commonly called a Green Card, some part of their fee helps maintain a more affordable Form N–400 fee for others.[280] By keeping Form I–90 fees lower than Form N–400 fees, DHS avoids passing an additional burden to LPRs that may never wish to naturalize. Form N–400 also requires more adjudication time than Form I–90. Additionally, an LPR may need to pay the fee for Form I–90 every 10 years to renew their Green Card, whereas a naturalization applicant may only need to pay the fee once. DHS believes maintaining separate fees for both Forms I–90 and N–400 allows applicants to pay only the fee for the benefit they request. By limiting the fee for Form N–400, but allowing it to be higher than Form I–90, DHS believes it strikes the right balance of both the beneficiary pays and ability-to-pay

principles. DHS declines to make any changes in this final rule in response to these comments.

*Comment:* A commenter commended USCIS for extending permanent residence cards for 2 years for LPRs who file Form N–400, thus avoiding the extra expense of filing Form I–90.[281] However, they urged USCIS to implement an automatic extension to all expiring Green Cards with a pending Form N–400, stating that this would improve efficiency in processing Forms N–400 and I–90. A commenter strongly encouraged USCIS to remove the proposed fee increase and eliminate the requirement to renew a Green Card.

*Response:* In December 2022, USCIS announced an automatic two-year extension of Green Cards for LPRs who have applied for naturalization.[282] The extension applies to all applicants who filed Form N–400 on or after December 12, 2022. LPRs who filed for naturalization before December 12, 2022, will not receive a Form N–400 receipt notice with the extension. If their Green Card expires, they generally must still file Form I–90 or receive an Alien Documentary Identification and Telecommunication (ADIT) stamp in their passport, to maintain valid evidence of their LPR status. While this was not retroactive and it does not apply to LPRs who did not apply for naturalization, DHS agrees that it improved efficiency in processing Forms N–400 and I–90 for LPRs who wish to naturalize.

DHS declines to automatically extend all Green Cards for an additional 2 years. LPRs who lose their Green Card generally must still file Form I–90, even if they have applied for naturalization and received the automatic extension under this updated policy. The INA requires that noncitizens carry within their personal possession proof of registration, such as the Green Card and any evidence of extensions or they may be subject to criminal prosecution. *See* INA sec. 264(e), 8 U.S.C. 1304(e).

DHS observes that a Green Card generally does not expire until 10 years after it is issued to the LPR. For individuals who are familiar with the

regulatory requirements,[283] this should be sufficient time for the applicant to take appropriate action, including renewing the card or naturalizing before the card expires.[284] Generally, LPRs become eligible to naturalize after 5 years of obtaining LPR status. *See, e.g.,* INA sec. 316(a), 8 U.S.C. 1427(a); 8 CFR 316.2(a)(3).

b. Form I–131, Application for Travel Document, Form I–131A, Request for Carrier Documentation

*Comment:* USCIS should charge sponsorship fees for the parole programs for additional revenue that USCIS could use to process EADs.

*Response:* DHS proposed no changes to the various parole programs which use Form I–131 and makes no changes based on these comments. DHS finalizes the fee exemption for Form I–134A, Online Request to be a Supporter and Declaration of Financial Support, used to request to be a supporter and agree to provide financial support to a beneficiary and undergo background checks as part of certain special parole processes. *See* 8 CFR 106.2(a)(10). As indicated elsewhere in this preamble, DHS does not generally waive or exempt fees where the petitioner must demonstrate the ability to support a beneficiary. However, DHS has previously provided fee exemptions for humanitarian programs and DHS considers these new parole programs humanitarian programs. While being approved as a supporter requires a certain level of financial means, the objective is to establish the supporter for the parolee which is separate from the application. In addition, Form I–134A does not result in an immigration status. In the case of recently instituted FRP processes, the Form I–134A petitioner has already paid the full fee to file Form I–130 on behalf of the beneficiary. *See, e.g.,* 88 FR 43611, 43616 (July 10, 2023). Thus, DHS has decided to maintain a fee exemption for Form I–134A. If a fee becomes necessary, DHS will establish one in a future rulemaking.

---

[280] To reduce the risk of fraud and counterfeiting, USCIS redesigns the Permanent Resident Card every three to five years. Introduction of new card designs does not mean that cards with previous designs are invalid. Both current and previous cards remain valid until the expiration date shown on the card (unless otherwise noted, such as through an automatic extension of the validity period of a Permanent Resident Card as indicated on a Form I–797, Notice of Action, or in a **Federal Register** notice). These cards are also known as "Green Cards." We will use the term Green Cards when referring to Permanent Resident Cards throughout this rule because it may be clearer to the public.

[281] *See* USCIS, "USCIS Updates Policy to Automatically Extend Green Cards for Naturalization Applicants," available at *https://www.uscis.gov/newsroom/alerts/uscis-updates-policy-to-automatically-extend-green-cards-for-naturalization-applicants* (last updated Dec. 9, 2022).

[282] *See* USCIS, "USCIS Updates Policy to Automatically Extend Green Cards for Naturalization Applicants," available at *https://www.uscis.gov/newsroom/alerts/uscis-updates-policy-to-automatically-extend-green-cards-for-naturalization-applicants* (last updated Dec. 9, 2022).

[283] USCIS also provides educational products and resources to welcome immigrants, promote English language learning, educate on rights and responsibilities of citizenship, and prepare immigrants for naturalization and civic participation. In addition, USCIS provides grants, materials and technical assistance to organizations that prepare immigrants for citizenship. The USCIS Citizenship Resource Center helps users better understand the citizenship process and gain the necessary skills required to be successful during the naturalization interview and test. *See https://www.uscis.gov/citizenship.*

[284] *See* USCIS, *https://www.uscis.gov/green-card/after-green-card-granted/renew-green-card.*

HR-1 FRN 2025 AR-000141

Appx-000166

## c. Form I–290B, Notice of Appeal or Motion

*Comment:* A commenter encouraged DHS to maintain the current fee for Form I–290B. They stated that that individuals should not have to pay a higher fee to resolve USCIS errors. They stated that USCIS retains the revenue whether the appeal or motion to reopen succeeds.

*Response:* DHS appreciates the concerns of the commenters and does not intend to hinder applicants, petitioners, or requestors from receiving benefits for which they are eligible. At the same time, DHS must recover the full costs of the services that USCIS provides. In this case, DHS proposed to limit the fee increase for Form I–290B, Notice of Appeal or Motion, as explained in the proposed rule. *See* 88 FR 402, 450–451 (Jan. 4, 2023). The formula DHS used for the Form I–290B proposed fee was the same as other limited fee increases, such as Form N–400. *Id.* The proposed fee was $800, $125 or 19 percent higher than the current fee of $675. While DHS did not propose the fee based on inflation, the proposed rule noted that the fee increases were less than inflation when discussing the proposed fee for Form N–400. *See* 88 FR 402, 486–487 (Jan. 4, 2023). Because DHS used the same formula to propose fees for Forms I–290B and N–400, the comparison applies here as well.

There is only one fee for Form I–290B regardless of the underlying petition, application, or request. In addition, the final rule has provided a fee exemption for Form I–290B for certain humanitarian forms, and fee waivers are available to some Form I–290B applicants who are receiving a means-tested public benefit, whose household incomes are at or below 150 percent of the FPG, or who are experiencing extreme financial hardship. *See* 8 CFR 106.3(a)(ii)(C) and 8 CFR 106.3(b). USCIS uses the fees to fund adjudication services regardless of whether the petition or application is approved. This applies to all forms and not just Form I–290B.

## d. Form I–360 Petition for Amerasian, Widow(er) or Special Immigrant

*Comment:* Commenters stated that the increase in fees for Form I–360 would discourage individuals who are facing life-threatening events from seeking security and force victims to remain in abusive relationships.

*Response:* DHS notes that Form I–360, Petition for Amerasian, Widow(er) or Special Immigrant, currently has no fees for noncitizens self-petitioning as a

battered or abused spouse, parent, or child of a U.S. citizen or LPR, SIJ, or Iraqi or Afghan national who worked for or on behalf of the U.S. Government in Iraq or Afghanistan. Therefore, DHS does not believe that victims seeking safety would be impacted by the fees as they are already exempt from the fees. *See* 8 CFR 106.3.

## e. Form I–539 Extend/Change Nonimmigrant Status

*Comment:* Several commenters provided input on the proposed fee change for Form I–539. The commenters wrote:
• Form I–539 fee increases would negatively impact international students.
• USCIS should encourage international students to choose the United States for their studies, rather than potentially deter them with higher fees.
• Form I–539 fee increases are fair but suggested USCIS open this form to online filing.
• The Form I–539 application process is already confusing.
• USCIS should consider alternative proposed fees, such that the burden of increases would be shared more equitably among affected individuals.

*Response:* DHS recognizes the importance of encouraging international students and that attending school in the U.S. can be financially burdensome on students. In addition, DHS recognizes the need for flexibility in allowing other classes of nonimmigrants to change their status. For these reasons, this Final Rule lowers the proposed Form I–539 fee from $620 to $470 for paper filings, and from $525 to $470 for online filings. These final increases (27% paper, 14% online) are near or below the rate of inflation since the last fee increase (26% as of June 2023), and are consistent with one commenter's alternative proposal that all fees be raised by a minimum amount to ensure that everyone's costs have kept up with inflation.

However, before obtaining an F–1 visa, the student must provide documentary evidence of their ability to pay for their course of study and living expenses while enrolled.[285] The new fees include the biometric fees where applicable and the online application process is making filing less complicated with online payment option available.

*Comment:* An individual commenter said the Form I–539 fee increases are

fair. However, this commenter stated that Form I–539 cannot be filed online if it includes a Form I–539A, and that USCIS should allow these to be filed online.

*Response:* USCIS continues to improve the availability and user experience of online filing. However, recommended changes to USCIS's internal systems for form processing are outside the scope of this rulemaking.

*Comment:* USCIS should allow appeals of denials of extensions of stay for T and U nonimmigrants.

*Response:* The Form I–539 is outside the jurisdiction of the AAO and therefore applicants are not able to file an appeal the denials of Form I–539. However, applicants may file a motion to reopen or reconsider the decision within 30 days (33 days if the decision was mailed). Changes to this policy are outside the scope of this rulemaking.

## f. Military-Related Benefits

*Comment:* One commenter asserted that there should be a fee exemption for all applications filed by children, and their mothers, who were fathered in East Asia by U.S. personnel during the Vietnam and Korean Wars, and that the costs for these applications should be charged to the Department of Defense. The commenter said that there should be similar fee exemptions for all children of U.S. military personnel born or conceived during deployment.

*Response:* Amerasians (born after Dec. 31, 1950, and before Oct. 23, 1982) may file Form I–360. Congress enacted the Amerasian Homecoming Act on October 22, 1982, to allow a person born in Korea, Vietnam, Laos, Kampuchea (Cambodia), or Thailand after December 31, 1950, and before October 22, 1982, and fathered by a U.S. citizen, to seek admission to the United States and adjustment of status to LPR. There is currently no fee for petitioners seeking classification as an Amerasian. *See* 8 CFR 106.2(a)(17)(i). Those who qualify under the Amerasian Homecoming Act, who are not subject to the public charge ground of inadmissibility,[286] may also request a waiver of the Form I–485 fee if they are unable to pay. *See* 8 CFR 106.3(a)(iv)(C). Other Amerasians remain subject to the public charge ground of inadmissibility,[287] however, so DHS cannot exempt or waive their I–485 fee. Policy changes relating to

---

[285] *See* 22 CFR 41.61(b)(1)(ii); 9 FAM 402.5–5(G), Adequate Financial Resources (last updated Oct. 17, 2023); *see also* 8 CFR 214.2((f)(1)(i)(B).

[286] *See* USCIS Policy Manual, Vol. 7, Adjustment of Status, Part P, Other Adjustment Programs, Chp. 9, Amerasian Immigrants [7 USCIS–PM P.9], available at *https://www.uscis.gov/policy-manual/volume-7-part-p-chapter-9* (last visited Sept. 8, 2023).

[287] *Id.*

HR-1 FRN 2025 AR-000142

eligibility are outside the scope of this rulemaking.

9. Republished Conforming Amendments

As stated in the proposed rule at 88 FR 421, DHS proposed to retain many provisions that were codified in the 2020 fee rule although enjoined. No comments were received on those proposed changes. Thus, this rule codifies them as proposed. In addition, for clarity and to avoid unnecessary length in this rule, DHS is not repeating the amendatory instructions and regulatory text for certain changes that were made by the 2020 fee rule if the provision is ministerial, procedural, or otherwise non-substantive, such as a regulation cross reference, form number or form name.

*H. Statutory and Regulatory Requirements*

1. Administrative Procedure Act

*Comment:* A commenter requested that USCIS ensure that implementation of any fee increase, and processing changes take place with adequate advance notice—months rather than days—to petitioners and provide for sufficient time for related adjudicator training. The commenter stated that, in the weeks surrounding the previous fee increases, petitions submitted with the appropriate fee were erroneously rejected by USCIS service centers, jeopardizing time-sensitive performing arts events. The commenter concluded that appropriate steps that must be taken to ensure that fee increases do not result in unwarranted petition rejections. One commenter asked for a postponement of the rulemaking to allow further analysis from the public and better justification from the agency. Another commenter said USCIS should also revise the proposed fee schedule rule so that it does not move away from the notice of public rulemaking and comment process, under APA. Another commenter said USCIS should not change immigration application fees outside of the Administrative Procedure Act (APA) notice of public rulemaking and public comment processes, and removing the public process from fee adjustment would subject USCIS to legal vulnerabilities.

*Response:* This final rule complies with the APA. DHS issued a proposed rule in the **Federal Register** on January 4, 2023, and accepted public comments on the proposed rule through March 13, 2023. DHS provided a comprehensive explanation in the proposed rule for why the new fees are required and the rationale for the fee adjustment. DHS

fully considered the issues raised in the public comments and made some adjustments in response, as detailed in responses throughout this final rule. DHS is unaware of petitions submitted with the appropriate fee being erroneously rejected by USCIS service centers when fees were previously changed. This final rule is effective 60 days from date of publication in the **Federal Register**, consistent with 5 U.S.C. 553(d) and 801(a)(3)(A)(ii), which should provide sufficient notice of the new fees before they are due. Any application, petition, or request postmarked on or after this rule's effective date must be accompanied with the fees established by this final rule.

*Comment:* Multiple commenters voiced concern that basing future fee increases on the CPI–U while forgoing the comment and rulemaking process would violate the APA and requested that USCIS remove this provision (Section VII, T. Adjusting Fees for Inflation) from the final rule.

*Response:* USCIS believes that reestablishing 8 CFR 103.7(b)(3) (Oct. 1, 2020), which was removed by the 2020 fee rule, is not in violation of the APA. As described in the proposed rule and reiterated in this final rule, an inflation-adjustment provision was part of the regulations for many years before the 2020 fee rule and, because the 2020 fee rule has been preliminarily enjoined, an inflation-adjustment provision is currently in effect, 8 CFR 103.7(b)(3) (Oct. 1, 2020). In this rule, USCIS is requiring that such future fee changes would be made in a final rule that would document the rate of inflation to be applied and how the new fees are calculated. 8 CFR 106.2(d).

DHS disagrees that applying an inflation adjustment violates the APA. While raising a fee is arguably something the public would want to comment on, the public has had that chance to comment on the method and use of an inflation adjustment in the proposed rule. Notice and comment on future inflation-based adjustments would be unnecessary because DHS's actions would be limited to issuing a final rule that follows a mathematical calculation of an increase in costs and not policy considerations. Inflation affects the entire economy and effectively decreases USCIS's revenue by the rate of inflation for whatever period DHS does not adjust fees for CPI–U.

In this final rule, DHS has revised 8 CFR 106.2(d) to provide that all USCIS fees that DHS has the authority to adjust under the INA (those not fixed by statute) must be adjusted by the rate of

inflation. That is, DHS would not shift costs from one payor to another for policy reasons by adjusting only some fees and not others, for instance. Such adjustments would simply use basic math to maintain the value of our revenue dollar and would be procedural, thus not requiring notice and comment.

*Comment:* Another commenter stated that, if DHS cannot credibly establish the amount of time required to process petitions according to the number of named beneficiaries on the petition, then DHS lacks a rational basis upon which to assign specific fees associated with processing various petitions. The commenter said DHS's assignment of costs and associated fees for petitions is, by definition, arbitrary and capricious in violation of the APA. The commenter also said USCIS does not provide the public with the information that went into the ABC model and consequently the public cannot determine whether DHS's conclusions are justified or reasonable.

*Response:* DHS is not required to precisely calculate the amount of time required to process petitions according to the number of named beneficiaries on the petition. As stated in the proposed rule, OMB Circular A–25 reflects that activity-based costing (ABC) methodology is a best practice to develop government agency fee schedules, and DHS established a model for assigning costs to specific benefit requests in a manner reasonably consistent with A–25. 88 FR 402, 418 (Jan. 4, 2023). While DHS follows OMB Circular A–25 to the extent possible, INA sec. 286(m), 8 U.S.C. 1356(m), authorizes DHS to charge fees for adjudication and naturalization services at a level to ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants. Those costs may be affected by the amount of time required to process requests but the law does not require that each specific USCIS fee be based on the costs of the service provided compared to the burden of all other services, or the perceived market rates and values of such services. DHS strives to make its fee schedules equitable, using the best information available, and USCIS will continue to monitor the time spent on specific adjudications to refine the fee setting model for future fee rules. However, while DHS tries to follow ABC (*i.e.,* assign USCIS costs through fees based on where its resources are expended), we do not assert that each of the fees in this rule precisely reflects the

relative time spent, nor are we required to do so.

DHS disagrees that it did not provide information used in the ABC model. As the commenter notes, USCIS used 6 months of FY 2021 adjudication hours in the completion rates that it provided. *See* 88 FR 402, 498 (Jan. 4, 2023). These are actual hours from FY 2021, the first year where USCIS began tracking Form I–129, Petition for Nonimmigrant Worker, adjudication hours by petitions for named or unnamed beneficiaries. *Id.* As explained in the proposed rule, USCIS requires most employees who adjudicate immigration benefit requests to report adjudication hours and case completions by benefit type. *See* 88 FR 402, 446 (Jan. 4, 2023). USCIS used these reported actual hours from FY 2021 as a forecast for FY 2022 and FY 2023 because it was the best information available at the time of the fee review.

*Comment:* A commenter wrote that the administrative record for the rule is incomplete, and the rule does not contain sufficient data to allow informed comments. The commenter said the charts and tables included in the proposed rule's supporting documents are not illuminating on the need for the proposed fee increase, and a meaningful commentary is impossible without access to the true data the agency relied upon. The commenter also noted that the phone number referenced in the rule to call and make an appointment to view the data was never answered, and the only other number listed was incorrect. The commenter stated that, only after threats of litigation was an appointment gained, and even then, the commenter did not have access to the system, but were essentially limited to an "infomercial" on the system's features. The commenter concluded that the agency's conduct raises serious questions about the legitimacy of the data on which it claims to rely.

*Response:* DHS has posted all public comments and supporting documents for the proposed rule in the public docket for review, scrutiny, and comment. USCIS also used a software program and spreadsheets to perform certain calculations, and offered the public a chance to review the software, as we have historically done as a courtesy for fee rules.

It is unfortunate that a commenter had difficulty arranging an appointment to review the fee model. Despite those issues, DHS understands that the appointment with this specific commenter was still arranged, and the meeting occurred as requested. During the software demonstration, USCIS often asked whether there were any questions or whether anything was unclear.[288] USCIS received very few questions during the meeting and demonstrated both how the ABC model software works and how it uses or produces the information in the docket. At one point, according to the transcript of the meeting in the docket, the attendees stated that "So far everything is clearer than what we were expecting." USCIS cannot grant the public access to its USCIS financial systems directly including the USCIS ABC model software. USCIS pays for a limited license of the software and additional capacity for external stakeholder access would increase the cost of the software licenses, the number of servers required, and require additional support for managing access and security. Those costs would be paid from USCIS fee revenue, further increasing fees. Regardless, the software is highly technical, so public access may not be meaningful. DHS believes that the presentation provided on how USCIS uses the software, the model documentation and other supporting documentation available in the docket, and the explanations provided in the proposed rule and this rule, provide sufficient transparency for the public to review and comment on how USCIS fees are established.

The commenter's second assertion— that the proposed rule's supporting documents do not explain the need for the proposed fee increase—does not appear to be supported by the facts or the record. The operating budget of USCIS, as reflected in the supporting documents, the President's annual budget and the annual DHS appropriation bills, reflect that USCIS needs more money. The commenter may disagree with or not understand how the USCIS budget will be allocated among immigration benefit requests for which a fee will be paid, but how the USCIS budget will be funded by the total fee-paying requests is left to DHS discretion. While that discretion must be exercised in a rational manner as required by the APA, DHS has clearly explained in the proposed rule, and this final rule, how we have assigned and shifted USCIS operating costs based on relative complexity of the adjudication and value judgments about the specific benefit request.

*Comment:* A commenter stated that in the proposed rule, USCIS did not propose an increase to the current $85 filing fee for form I–821D. The commenter stated that, if USCIS increases this fee in the final rule, DHS must engage in a new rulemaking and comment period because such a change would not be a logical outgrowth of the current proposed rule to satisfy the APA notice requirement.

*Response:* DHS has not changed the fee for Form I–821D, Consideration of Deferred Action for Childhood Arrivals, in this rule. *See* 8 CFR 106.2(a)(51).

## 2. Impacts and Benefits (E.O. 12866 and 13563)

### a. Costs/Transfers

### (1) Impacts on Applicants

*Comment:* A commenter stated that the increased fees would have a detrimental impact on their large immigrant population already struggling with the effect of the COVID–19 pandemic. One commenter stated the recent increases in rents (upwards of 10.6 percent year over year) and the rise in inflation and prices (consumer prices up 9.1 percent over the year ended June 2022) while salaries have not increased at the same rate or in some cases not at all (the federal minimum wage has remained stagnant at $7.25 since 2009 and a survey of U.S. companies reported an overall average salary increase of 3.4 percent in 2022). The commenter reported that it is unfair to immigrant applicants who are more financially burdened than they have been in the past to confront significant fee increases. It is especially unreasonable to expect that immigrants who do not currently have employment authorization would have the means to pay these heightened fees when they are unable to legally earn wages in the United States.

*Response:* DHS understands that inflation has had a profound effect on the U.S. economy and on the finances of immigrant populations and has carefully considered it throughout the final rule, especially when setting fees. Additionally, DHS understands that the federal minimum wage has been at $7.25 per hour since 2009. Nevertheless, many states also have minimum wage laws and in cases where an employee is subject to both state and federal minimum wage laws, the employee is entitled to the higher of the two minimum wages.[289] In the final rule, DHS will set USCIS fees at the level required to recover the full cost of providing immigration adjudication and naturalization services, as permitted or required by law, with adjustments to

---

[288] For a transcript of the meeting, see *Regulations.gov*, Comment Submitted by USCIS, available at *https://www.regulations.gov/comment/ USCIS-2021-0010-4141* (Mar. 2, 2023).

[289] DOL, "Minimum Wage," available at *https:// www.dol.gov/general/topic/wages/minimumwage* (last visited Sept. 21, 2023).

**6332    Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

provide certain fee exemptions and waivers for low-income immigrants. The final rule also provides for many requests that an applicant whose income is less than 150 percent of the FPG may request that their fee be waived. Furthermore, DHS is implementing new fee structures to mitigate some of the costs, making employment authorization more attainable. For example, DHS is providing a $50 discount for the Form I–765, Application for Employment Authorization, when filed online for most EAD classifications. Additionally, applicants who file Form I–485, Application to Register Permanent Residence or Adjust Status, will pay $260 (half of the regular Form I–765 fee) for their Form I–765 to request employment authorization when filed concurrently with their Form I–485 or while the Form I–485 is pending.

*Comment:* One commenter stated that the proposed fee structure potentially reinforces rather than eliminates barriers facing Denver's immigrant and refugee communities, particularly those who wish to apply for adjustment of status or naturalization. The commenter stated that Denver's immigrant and refugee communities work hard to navigate the immigration and naturalization processes, but often fall short due to numerous barriers, including the high cost of filing fees, where most of the nearly 60 processes USCIS listed fees for are over $400.00. This cost remains significant for many individuals who live on a fixed income and often must choose between caring for themselves, their families, or maintaining expenses. Seventeen percent of Denver's immigrant and refugee families were living below the federal poverty level in 2019. Denver's immigrant and refugee residents are still recovering financially from the COVID–19 pandemic, making the high cost of immigration paperwork and filing fees inaccessible to many.

*Response:* DHS is aware of the potential impact of fee increases on certain populations including low-income individuals and is sympathetic to these concerns. As a result, DHS not only offers fee waivers and fee exemptions, but also uses its fee-setting discretion to adjust certain immigration benefit request fees down if USCIS believes they may be overly burdensome on applicants, petitioners, and requestors (*e.g.,* Form N–400, Application for Naturalization, and the adoptions forms as discussed previously). As discussed in the final rule and consistent with past practice, USCIS will limit fee adjustments for certain benefit requests to a set

percentage increase above current fees and many other fees are adjusted only by the amount of inflation.

*Comment:* Citing research from the Cato Institute, a commenter wrote that the increase in fees will have a disproportionately harmful effect on communities and students of color, many of whom are already facing issues of food insecurity and homelessness.

*Response:* DHS recognizes that the fee increases may create an economic hardship for some families. Furthermore, DHS acknowledges the studies and data cited suggesting that many families struggle to afford healthcare and face other financial challenges relating to food and shelter. In the final rule, after considering public comments, DHS has increased the availability of fee waivers, has added fee exemptions, and has limited the fee increases for certain immigration benefit requests that we have determined may be overly burdensome.

(2) Impacts on Employers/Sponsors

*Comment:* A trade association wrote that accumulated costs from filing repeated petitions for workers and their families would harm U.S. businesses. Citing statistics from the 2023 Envoy Immigration Trends Report, the commenter wrote that increased fees may cause U.S. companies to rethink their strategic planning and investment forecasts with respect to their U.S.-based operations and moved some of their operations offshore, which could hurt the U.S. economy.

*Response:* On page 31 of the cited report, the following question was presented to U.S. companies in the survey: "In January 2023, the U.S. government proposed fee increases for several common immigration applications (H–1B, Adjustment of Status, etc.). What changes do you plan to make to your company's global immigration strategy in response to the planned increase in U.S. immigration filing fees?" Seventy-two percent of respondents said they plan to reduce immigration-related costs for employees; 67 percent plan to look abroad to hire, transfer, or relocate foreign national employees; 48 percent plan to hire fewer employees requiring sponsorship; 23 percent had not assessed changes to company policies; and 23 percent reported no impact. The responses to this direct question do not clearly indicate that U.S. businesses will increase offshoring as a direct result of changes in the USCIS fee schedule. Further, the survey did not ask the financial burden that U.S. companies would experience from changes in the fee schedule. Thus, the survey does not

clearly indicate that the new fee schedule would have any negative impacts on U.S. companies. Additionally, DHS has determined that adjusting the fee schedule is necessary to fully recover costs. Adjustments are necessary for administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and fairly adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values. DHS adopted methodology results in some requests paying no fee, others paying more, and others paying less. DHS tries to be fair, precise, transparent, and thoughtful within reasonable margins of accuracy and precision.

*Comment:* A commenter wrote that the proposal to cap the number of beneficiaries on Form I–129 petitions to 25 beneficiaries, based on USCIS data from March 2023, would increase costs on H–2 employers by $30.1 million annually. The 25 named worker cap and the 2023 DOL rule requiring employers to file separately for each type of worker could increase that amount to over $40 million. Many employers, often small businesses, cannot pass these costs onto customers because of consumer preferences and the competition from employers that hire unauthorized labor.

*Response:* DHS acknowledges that the higher Form I–129 fees must be paid by U.S. companies that hire foreign nationals. However, USCIS must fund itself through fees unless DHS receives a congressional appropriation to do so. In the final rule, DHS sets the fees in this final rule for all nonimmigrant classifications petitioned for using Form I–129 after considering comments provided on the proposed rule based on the average cost of adjudication for the relevant visa classes. DHS data indicate (see RIA Section 3H, tables 23 through 25 and SEA, tables 6 through 9) that the limit of 25 named beneficiaries per petition established in this final rule will significantly limit the amount of cross-subsidization between petitions with few named workers and many named workers. Previously a single petition might contain a single named worker or hundreds of named workers, meaning that the fees paid for petitions for a few employees were covering the processing costs for petitions for many employees. Given the disparity between the cost of adjudicating a petition with a single named worker and the cost of adjudicating a petition with hundreds of named workers, limiting the number of named beneficiaries per petition to 25 effectively limits the amount of cross-subsidization per petition, and overall cost of adjudications between petitions.

HR-1 FRN 2025 AR-000145

Nevertheless, as described in section II.C, DHS is reducing the fees for Form I–129 for small employers and nonprofits in this final rule.

*Comment:* Commenters cited statistics, including a study from the USDA, demonstrating that the rise in H–2A fees would exacerbate the shift of agricultural production to foreign countries.

*Response:* While imports of fruits and vegetables have generally increased since the year 2000, no data directly or indirectly links immigration fees, such as for H–2A workers, to this rise. It is even more uncertain how the current fees would contribute to this rise, given many other factors in play, such as U.S. consumer demand for year-round availability of fresh fruits and vegetables and free trade agreements that provide access to increased supplies of fresh fruit and vegetables.[290]

*Comment:* Commenters involved in the agricultural industry wrote that the proposed rule does not account for already high costs of operation, including from new DOL regulations, that would be exacerbated by increased fees.

*Response:* DHS understands that farm production expenditures have generally increased in recent years and that farmers face numerous challenges in managing the costs of operations. Similarly, USCIS needs to manage its own operating expenditures and needs to adjust the fee schedule as necessary to fully recover increasing costs and maintain adequate service.

*Comment:* An advocacy group wrote that the fees would create barriers for research institutions to hire workers in STEM fields. The commenter cited studies to demonstrate the importance of foreign workers to STEM research in the United States.

*Response:* DHS recognizes that immigrants and international students make significant contributions to the U.S. technology industry and appreciates the concern that the fees might create hiring barriers. However, we do not believe there is an established causal relationship between higher fees and a decline in highly skilled foreign-born scientific researchers in academia. The SEA details the economic impact of the fees by classification, 25 or fewer, 25 or more FTE, non-profits, and by NAICS code, see Discussion on of Impact Section 4(C)(I–IV) tables 6 through 18.

[290] Davis, Wilma and Gary Lucier, Vegetable and Pulses Outlook: April 2021, VGS–366, U.S. Department of Agriculture, Economic Research Service, April 16, 2021. Kenner, Bart, Statistic: Macroeconomics & Agriculture, Amber Waves Magazine, U.S. Department of Agriculture, Economic Research Service, September 1, 2020.

### 3. Paperwork Reduction Act

*Comment:* USCIS received approximately 34 comments requesting a reduction in form length and reduced frequency of form revision changes. One commenter wrote that USCIS should return forms to their streamlined lengths, avoid collecting unnecessary quantities of information, and eliminate redundancies.

*Response:* As part of the proposed rule, USCIS proposed removing fee, fee waiver, fee exemption, and fee payment information from the individual information collection (IC) instructions by consolidating it into the USCIS Form G–1055, Fee Schedule, and placing it online on the USCIS website *www.uscis.gov/*. This proposed consolidation of information into USCIS Form G–1055 and the reduction in individual IC instruction content, reduces the number of IC revisions related to content, reduces the administrative burden of processing those Paperwork Reduction Act (PRA) actions, eliminates duplication and management of information across multiple resources, and reduces the time burden for all impacted information collections. Outside of this rule, USCIS continually analyzes all its collections of information to minimize the time and cost burden to respondents, confirms the utility of the content and requirements, and ensures compliance with the regulations, statutes, and policies that govern the benefit. Only the information needed to adjudicate the benefit properly and efficiently is collected. An imbalance of information collection has negative effects on both the applicant and adjudicators. USCIS information collections are analyzed on a scheduled basis, as technologies evolve, and as laws change. USCIS makes attempts to consolidate as many changes as possible into a single Paperwork Reduction Act of 1995 (PRA) action to limit the number of editions published. When a new edition is published—unless the new version is required immediately, for example, by statute or regulation— USCIS generally allows time for the previous edition of a request form submitted or in-transit to process, before enforcing a no prior edition rejection.

*Comment:* USCIS received three comments requesting fee waiver, reduced fee, and fee exemption information be retained in the individual information collection instructions.

*Response:* As part of the proposed rule, USCIS proposed removing fee, fee waiver, fee exemption, and fee payment information from the individual IC

instructions by consolidating it into the USCIS Form G–1055, Fee Schedule. This proposed consolidation of information into USCIS Form G–1055 and the reduction in individual IC instruction content, reduces the number of IC revisions related to content, reduces the administrative burden of processing those PRA actions, eliminates duplication and management of information across multiple resources, and reduces the time burden for all impacted information collections. The USCIS Form G–1055 provides a centralized resource of information, accessible information, and promotes the use of innovative tools like the Fee Calculator for an enhanced user experience. DHS realizes that this change will require requestors to either have the current printed version of Form G–1055 or access to *www.uscis.gov/* to determine the fee for their request and if it is eligible for a fee waiver. However, all USCIS forms must either be accessed via the internet, or a paper version ordered by calling the USCIS Contact Center, including a paper Form G–1055.

*Comment:* USCIS received several comments requesting changes to content contained in specific ICs.

*Response:* The changes that USCIS is making to forms or instructions in conjunction with this final rule are limited to those that are related to this rulemaking. Changes to USCIS immigration benefit request forms requested by commenters that are outside of the scope of this rule will not be made at this time, but they may be considered for future form revisions.

### 4. Alternatives

*Comment:* A commenter stated that USCIS is increasing fees in a thoughtful manner but requested that USCIS earmark fee increases for H–1B and EB–5 applications to increase staffing for review of the backlog.

*Response:* As explained in the proposed rule, the FY 2022/2023 fee review budget does not include separate line items budgeted directly for backlog reduction. *See* 88 FR 402, 416 (Jan. 4, 2023). USCIS uses the premium processing revenue to fund backlog reduction, in addition to any appropriations for backlog reduction that may be provided, such as in FY 2022. *Id.* DHS is aware of the problems that our backlog presents, and we are making a concerted effort to address them, but we make no changes to the rule in response to these comments.

*Comment:* A commenter requested that USCIS consider significant alternatives that would provide it with the funding it needs to operate

efficiently. The commenter stated the regulatory analyses needs to be republished by USCIS and provide stakeholders with both notice of revisions in their analysis and an opportunity for public comment on those revisions.

*Response:* DHS addressed planned increases in efficiency in the proposed rule and other alternatives to increasing fees. *See* 88 FR 402, 529 (Jan. 4, 2023). In this preamble, DHS addresses similar comments to this in section IV.D.4. DHS makes no changes to this final rule based on these comments.

*Comment:* A commenter stated that USCIS did not consider more modest alternatives at its disposal in developing the proposed rule. While citing case law, the commenter reasoned that agencies are required to "examine the relevant data and articulate a satisfactory explanation for [the] action, including a 'rational connection between the facts found and the choice made.'" The commenter went on to list several alternatives to the rule, such as allowing O–1B visa portability, modifying the O–1B visa validity period, allowing visa waiver requests, and allowing B–1 visa exceptions for promotional appearances and unscripted programming.

*Response:* The commenter's suggestions are beyond the scope of this fee rule or would be overly administratively burdensome to implement and would exacerbate costs and backlogs. As discussed previously, DHS prepared a fee study, analyzed all the relevant data, and has clearly articulated a rational basis for adjusting USCIS fees in this rule. However, as discussed elsewhere in this final rule, DHS sets lower fees for Form I–129 and the Asylum Program Fee that may reduce the burden for small businesses and nonprofits. DHS declines to make any other changes based on this comment.

*Comment:* Many commenters wrote that DHS should consider seeking appropriations for USCIS. Commenters opined that appropriations could reduce backlogs, subsidize costly fees, fund asylum processing, and generally support processing humanitarian applications. Similar comments about Federal appropriations as an alternative to increased fees include:

• Congress should fix USCIS operations and financial standing, funding backlog reduction efforts, hiring officers, and officer training.

• The biennial review process provides an important opportunity for Congress to review the IEFA.

• Transfer funding to USCIS from the budgets of other DHS components, like CBP.

• Redirect DoD funds to USCIS.

• Provide appropriations for the USCIS genealogy program.

• DHS should avoid any Form N–400 fee increase by seeking congressional appropriations for naturalization processing.

Similarly, commenters stated that USCIS should cut costs before proposing increased fees.

*Response:* DHS agrees that added congressional appropriation would lower USCIS fees. However, USCIS is currently mostly a fee-funded agency. Recent congressional appropriations for USCIS were limited to specific programs such as grants for promotion and education related to U.S. citizenship or E-Verify. DHS will continue seeking congressional appropriations where appropriate. In the meantime, DHS needs to establish fees for the continued operations of the USCIS. DHS believes that increased USCIS fees are necessary for it to effectively achieve its mission and fulfil statutory mandates. USCIS faithfully adheres to the immigration laws and carefully considers the pros, cons, costs, and ramifications of all policy initiatives it undertakes. In its FY 2022/2023 fee review, USCIS estimated total costs to the agency of providing immigration adjudication and naturalization services. As explained earlier in this preamble, DHS reduced the fee review budget but there is still a significant difference between revenue with current fees and estimated future costs. As such, DHS adjusts fees as explained in this rule.

*Comment:* Many commenters suggested alternative approaches to the proposed fee changes. Several commenters requested that USCIS consider phasing in fee increases over time, because the proposed fee changes would negatively impact artists and performing arts organizations. For example, a business association requested a phased-in approach for H–1B and O–1 applicants over the course of the next 3 to 5 years. Other commenters suggested that USCIS implement a progressive or "sliding scale" fee structure, including reduced fees for smaller, independent entities. A commenter suggested the genealogy fees increases be implemented over a 3-year period, reducing shock and impact to the genealogical community. The commenter went onto further suggest after a 3-year period establish a standard annual increase in the fees to cover increased operation costs.

*Response:* DHS understands the concept of rate shock, and we agree that

not having adjusted fees in 7 years makes the impact seem more severe. However, USCIS is risking a revenue deficit, and gradually adjusting the USCIS fee schedule over multiple years would ensure that USCIS would not recover full cost and would be unable to fully fund its operational requirements. DHS is addressing this concern in part by codifying the inflation adjustment provision in 8 CFR 106.2(d) so we can adjust USCIS fees on a timelier basis to match cost and provide smoother fee increases. In addition, because of the volume of requests that USCIS receives, intake must be automated and programming the system to search for multiple fees indexed based on varying characteristics (a sliding scale) would add delays and costs to USCIS intake of requests. Nevertheless, as stated earlier and as requested by these commenters, DHS has decided to provide a lower fee for Forms I–129, I–140, Immigrant Petition for Alien Workers, and Asylum Program Fee for small employers and nonprofit entities. In addition, DHS considered other reasonable alternatives to this final rule in response to comments, but we decline to make more changes in this final rule.

*Comment:* A few commenters suggested fee changes for musical artists be calculated by generated revenue, reasoning that higher income artists could afford the fees compared to independent artists. Similarly, an individual commenter proposed to raise the percentage of income taxes on higher earning workers; in the case of performing artists with major foreign corporate backing, the commenter said an additional fee or restrictions could be applied, such as a percentage guaranteed from the promoter or corporate entity in exchange for allowing operations or artists to enter the United States. Additionally, a company suggested, instead of increasing the visa fees, that USCIS collect fees on the back end by charging foreign bands a small percentage of their earnings, which would be withheld by the venues and sent to the government. Many commenters requested a minimum fee increase instead of the suggested increases, with the suggested amounts ranging from a 50 percent increase to a 10 percent increase or less.

*Response:* In this section we are responding to comments about the effects of the fees on different nonimmigrant categories. However, these comments may be addressed by the responses that we provided in section IV.G.2.d of this preamble where we address comments on the Form I–129 fees in general. DHS considered the commenters' suggestions for sliding

Appx-000172

scales based on income, revenue, etc., and what would provide the relief requested by commenters without adding costs to USCIS, additional burden to petitioners, or causing delays in intake and processing of the submitted requests. USCIS intake must be automated and whether the petitioner meets the criteria for a fee must be instantaneously determined. Too complex of a sliding scale would add delays and costs to USCIS intake of requests. Therefore, as explained earlier in this preamble, DHS has decided to provide a reduced Form I–129 fee for small employer and nonprofits. *See* 8 CFR 106.1(f); 8 CFR 106.2(a)(3)(ix). In addition, this final rule exempts the Asylum Program Fee for nonprofit petitioners and reduces it by half for small employers. *See* 8 CFR 106.2(c)(13).

*Comment:* To minimize fee increases, a commenter suggested including the additional funds generated from premium processing and requested that USCIS consider all available and anticipated funds when determining final filing fees.

Many commenters wrote about the Emergency Stopgap USCIS Stabilization Act and USCIS premium processing fees. Commenters wrote:

• USCIS has not made a complete analysis of the revenue available to fund operations when setting fee levels, premium processing revenue must be included in the analysis.

• USCIS should consider more premium processing fees before adopting steep fee increases.

• USCIS has recently expanded premium processing and thus has greater resources to consider.

• USCIS should use revenue from premium processing to maintain the premium processing program before using it for other programs.

• Regarding USCIS' position that future revenues from premium processing are too attenuated to incorporate into the fee study requires that USCIS specify plans for such revenues once they are received.

• The USCIS Stabilization Act was passed during a unique point of congressional interaction with USCIS, and that the congressional intent was to avoid destabilization in the agency, such as the difference in the levels of service and processing times experienced between the applicants who can afford premium processing fees and the low-income applicants who cannot.

• USCIS should consider ways to use premium processing revenue to create a more equitable model.

• Revenues and data received from premium processing expansions in recent years provide USCIS sufficient certainty to include these revenues in fee determinations.

• DHS should delay the final rulemaking and fee determinations until it uses all potential streams of premium processing revenue and revenue predictions will be more stable.

• USCIS should use revenue generated by the premium processing program to maintain the program at its current levels of service and processing times.

• Commenters are encouraged that USCIS recognizes the exclusion and left open the possibility that USCIS will apply premium processing revenue to non-premium fees in the final rule.

• USCIS should reject modeling based on premium processing because it favors business immigration.

*Response:* DHS considered premium processing fees and revenue in the FY 2022/2023 fee review. DHS has determined that premium processing revenue was not sufficient to appreciably affect non-premium fees when it proposed fees. *See* 88 FR 402, 419 (Jan. 4, 2023). As shown in the supporting documentation for the proposed rule, the enacted premium processing budget was approximately $648 million in FY 2019 and approximately $658 million in FY 2020.[291] However, Table 6 of the proposed rule showed that the projected cost and revenue differential was approximately $1,868 million, significantly more than the enacted premium processing budget in FY 2019 or FY 2020. USCIS uses the premium processing revenue to fund backlog reduction, in addition to any appropriations for backlog reduction in FY 2022. *See* 88 FR 402, 416 (Jan. 4, 2023). However, DHS revised the fee review budget in this final rule by transferring additional costs to premium processing revenue, as described earlier in this preamble. See section II.C.1. Reduced Costs and Fees.

*Comment:* Commenters suggested that USCIS incorporate recommendations from a June 2022 Office of the Ombudsman report into the final rule.

*Response:* The commenters are likely referring to the Citizenship and Immigration Services Ombudsman 2022 Annual Report to Congress.[292] USCIS

responses to the Ombudsman's annual reports are available online.[293] DHS notes that this final rule implements one recommendation from the 2022 report by adjusting fees for inflation. The CIS Ombudsman's 2023 Annual Report to Congress noted that an inflation-adjustment provision was part of the proposed rule.[294] DHS greatly appreciates the insight offered by the Citizenship and Immigration Services Ombudsman. USCIS works closely with the Ombudsman's office in addressing their concerns and improving our services, and we will consider including recommendations from that office in future rulemakings.

*Comment:* A couple of commenters requested that USCIS create a streamlined process for musician visas and suggested reducing the cost of reoccurring visas for musicians who have previously been granted a visa in the United States. One commenter suggested that USCIS review both O and P visas with the aim of establishing a new reciprocal arrangement between music exporting nations by creating a specific trade agreement that promotes an affordable and efficient system, that fosters access, and increases the mobility of touring musicians, crew, and industry professionals to work between Australia and the United States. Another commenter recommended that USCIS work with stakeholder groups, including immigration advocacy organizations, to develop fair and sustainable funding solutions. One commenter requested that USCIS create an international arts parole application. Others suggested an option for a 3-year visa be offered based on travel history and security profile for those artists who are in high demand reasoning that this would lower the administrative burden on USCIS and lower the overall cost for the artist.

*Response:* As we stated earlier, DHS greatly appreciates the contributions made to the U.S. by O and P nonimmigrants and we have made changes in the final rule to address comments from the O and P visa stakeholder community. However, the changes that these commenters suggest

[291] U.S. Citizenship and Immigr. Servs., U.S. Dep't of Homeland Security, IEFA Fee Review Supporting Documentation (Jan. 2023), Appendix Table 1: FY 2019–2020 Enacted IEFA by Program/Activity at page 29, available from *https://www.regulations.gov/document/USCIS-2021-0010-0028.*

[292] For this and other CIS Ombudsman annual reports, see DHS, Citizenship and Immigration

Services Ombudsman Annual Reports, available at *https://www.dhs.gov/publication/ombudsman-annual-reports* (last updated July 6, 2023).

[293] USCIS, USCIS Responses to Annual Reports to Congress, available at *https://www.uscis.gov/tools/ombudsman-liaison/uscis-responses-to-annual-reports-to-congress* (last reviewed/updated May 5, 2023).

[294] CIS Ombudsman, Annual Report 2023, available at *https://www.dhs.gov/sites/default/files/2023-07/2023%20Annual%20Report%20to%20Congress_0.pdf* (June 30, 2023) at page 103 (page 113 of the PDF).

HR-1 FRN 2025 AR-000148

are largely beyond the scope of a USCIS fee rule. DHS may consider these suggestions in a future rulemaking but declines to make any changes in this final rule based on these comments.

*Comment:* To overcome budget shortfalls, an individual commenter recommended that USCIS increase visa fees for skilled international workers who earn over $100,000 annually.

*Response:* As discussed in multiple places in this final rule, DHS is increasing the fees for Forms I–129, I–140 and H–1B Registration from their current amounts in this rule and establishing an Asylum Program Fee, while providing discounts for small employers and nonprofits. DHS declines to base the fees on the salary of the beneficiary because doing so would be very difficult to administer.

### I. Out of Scope

*Comment:* Commenters submitted several comments that suggested changes to immigration laws, policies, programs, and practices that are not related to fees or relevant to any changes proposed in the proposed rule. Thus, they are outside the scope of the rulemaking. The commenters stated:

• DHS should implement effective deterrence policies to enforce Federal law and reduce costs associated with mass undocumented immigration, rather than raise fees for U.S. businesses.

• Policies that deter mass undocumented immigration and related-mass asylum fraud will positively impact USCIS' budget and reduce the scale at which fee-paying applicants and petitioners must pay to support USCIS' asylum program.

• USCIS should broaden eligibility for EADs or reintroduce the automatic grant of EADs during case processing delays.

• USCIS should extend the validity date of benefits to address the financial burdens of renewals (*e.g.,* extending the validity period for EADs and advance parole to 3 years); USCIS should update their records so that FOIA requests or congressional reporting may provide accurate information on fee waiver grant rates for these humanitarian categories.

• DHS should eliminate the rule that adjustment of status applications is considered abandoned if an applicant leaves the country without obtaining advance parole, which contributes significantly to the backlog of advance parole applications.

• It is an ineffective use of USCIS resources to review each I–765 and I–131 petition filed by adjustment applicants as if they are independent applications.

• USCIS should implement simpler language in the Form N–400.

• USCIS should combine Forms N–400 and N–600 to reduce adjudication time and save costs.

• USCIS should adopt remote interviews for naturalization and adjustment applications and oath ceremonies to reduce expenses, delays, and difficulties for applicants.

• DHS should provide clear guidance to adjudicators and in policy that reflects the breadth of its interpretation of the TVPRA and update its records to reflect this for purposes of FOIA requests or congressional reporting.

• With regards to Systematic Alien Verification of Entitlements program fees, that leveraging State resources to fill the gap for agencies seeking to comply with Federal law places the states in the difficult position of satisfying a mandate in the absence of Federal appropriations.

• On Form I–485, question 61, regarding public charges, be changed such that, if an applicant has, or has had, an exempt status, they are not subject to the public charge rule, and allow such applicants to skip to question 69; additionally, the commenter recommended that the instructions be updated to include a list of exempt statuses.

• Change adjustment of status abandonment provisions to only apply to applicants who are not under exclusion, deportation, or removal proceedings.

• USCIS should stop requiring extensions of status when not legally required for dependents of temporary workers and should admit them to the end of the validity of principal applicants' extension as long as the qualifying relationship exists. USCIS already automatically terminates dependent children's status when they reach 21 years of age, and spouses can independently alert USCIS if a marriage ends.

• USCIS should reduce barriers to travel and improve the process of providing APDs and not consider a pending Form I–131 for advance parole to be abandoned by travel abroad.

• Waivers of filing fees should not be interpreted as a public charge admission because not everyone can raise funding for filing fees given that wages are not keeping up with the rate of inflation.

*Response:* DHS fully considered the comments in this rule and whether their suggestions could be adopted. The comments above request changes that go beyond fees and require either analysis of their impacts or public comment on their effects so that they exceed what DHS can include in this final rule under the APA. DHS may consider the points raised by commenters in future policy changes or rulemakings.

### V. Statutory and Regulatory Requirements

*A. Executive Order 12866 (Regulatory Planning and Review), Executive Order 13563 (Improving Regulation and Regulatory Review) and Executive Order 14094 (Modernizing Regulatory Review)*

E.O. 12866, as amended by Executive Order 14094, and E.O. 13563 direct agencies to assess the costs and benefits of available regulatory alternatives and, if a regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). E.O. 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility. The Office of Management and Budget (OMB) has designated this rule a ''significant regulatory action'' as defined under section 3(f)(1) of E.O. 12866, as amended by Executive Order 14094, because its annual effects on the economy exceed $200 million in any year of the analysis. Accordingly, OMB has reviewed this rule.

The fee adjustments, as well as changes to the forms and fee structures used by USCIS, will result in net costs, benefits, and transfer payments. For the 10-year period of analysis of the rule (FY 2024 through FY 2033), DHS estimates the annualized net costs to the public will be $157,005,952 discounted at 3 and 7 percent. Estimated total net costs over 10 years will be $1,339,292,617 discounted at 3-percent and $1,102,744,106 discounted at 7-percent.

The changes in the final rule will also provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees in future regulations. The primary benefits to the applicants/petitioners include reduced fee processing errors, increased efficiency in the adjudicative process, the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, and for many applicants, limited fee increases and additional fee exemptions to reduce fee burdens.

HR-1 FRN 2025 AR-000149

Appx-000174

Fee increases will result in annualized transfer payments from applicants/petitioners to USCIS of approximately $887,571,832 discounted at 3 and 7 percent. The total 10-year transfer payments from applicants/petitioners to USCIS will be $7,571,167,759 at a 3-percent discount rate and $6,233,933,135 at a 7-percent discount rate.

Reduced fees and expanded fee exemptions will result in annualized transfer payments from USCIS to applicants/petitioners of approximately $241,346,879 discounted at both 3-percent and 7-percent. The total 10-year transfer payments from USCIS to applicants/petitioners will be $2,058,737,832 at a 3-percent discount rate and $1,695,119,484 at a 7-percent discount rate.

The annualized transfer payments from the Department of Defense (DoD) to USCIS for Form N–400, Application for Naturalization, filed by military members will be approximately $197,260 at both 3- and 7-percent discount rates. The total 10-year transfer payments from DoD to USCIS will be $1,682,668 at a 3-percent discount rate and $1,385,472 at a 7-percent discount rate.

Adding annualized transfer payments from fee paying applicants/petitioners to USCIS ($887,571,832) and transfer payments from DoD to USCIS ($197,260), then subtracting transfer payments from USCIS to applicants/petitioners ($241,346,879) yields estimated net transfer payments to USCIS of $646,422,213 at both 3 and 7-percent discount rates, an approximation of additional annual revenue to USCIS from this rule.

DHS has prepared a full analysis according to E.O. 12866 and E.O. 13563, which can be found in the docket for this rulemaking. Table 9 presents the accounting statement showing the transfers, costs, and benefits associated with this regulation as required by OMB Circular A–4.

OMB A–4 Accounting Statement

**BILLING CODE 9111–97–P**

**Table 9. OMB A-4 Accounting Statement - ($ in millions, 2022; period of analysis: FY 2024 through FY 2033)**

| Category | Primary Estimate | Minimum Estimate | Maximum Estimate | Source Citation |
|---|---|---|---|---|
| **BENEFITS** | | | | |
| Annualized Monetized Benefits over 10 years | N/A | N/A | N/A | |
| | N/A | N/A | N/A | |
| Annualized quantified, but un-monetized, benefits Unquantified Benefits | The changes in the final rule will provide several benefits to DHS and applicants/petitioners seeking immigration benefits. For the government, the primary benefits include reduced administrative burdens and fee processing errors, increased efficiency in the adjudicative process, and the ability to better assess the cost of providing services, which allows for better aligned fees. Using the CPI-U as the inflation index for fee schedule adjustments between comprehensive USCIS fee rules will allow DHS to publish timely fee adjustments that insure the real value of USCIS fee revenue dollars against future inflation.<br><br>The primary benefits to applicants/petitioners include the simplification of the fee payment process for some forms, elimination of the $30 returned check fee, expansion of the electronic filing system to include Form G-1041 and Form G-1041A, reduced fees for electronic filings, reduced reapplications for premium processing and for many applicants, limited fee increases and additional fee exemptions and fee waivers to reduce fee burdens.<br><br>Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request.<br><br>DHS also expects a decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. | | | RIA |
| **COSTS** | | | | |
| Annualized monetized costs over 10 years | (3% and 7%)<br><br>$157 | | | RIA |
| Annualized quantified, but un-monetized, costs | N/A | | | |
| Qualitative (unquantified) costs | Expanding the population of applicants using eligible for N-400 reduced fees and applicants eligible for fee waivers and exemptions will increase the administrative burden on the agency | | | |

HR-1 FRN 2025 AR-000151

Appx-000176

| | | |
|---|---|---|
| | to process these forms. | |
| **TRANSFERS** | | |
| Annualized monetized transfers: From the applicants/ petitioners to USCIS | (3% and 7%) $888 | RIA |
| Annualized monetized transfers: From USCIS to applicants/petitioners | (3% and 7%) $241 | RIA |
| Annualized monetized transfers: From DoD to USCIS | (3% and 7%) $0.20 | RIA |
| *Miscellaneous Analyses/Category* | *Effects* | |
| *Effects on state, local, and/or tribal governments* | *None* | Preamble |
| *Effects on small businesses* | DHS does not believe that the increase in fees in the rule will have a significant economic impact on a substantial number of small entities that file Forms I-129, I-140, I-910, or I-360. DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file Form I-956 (formerly I–924) or Form I-956G (formerly I-924A). DHS also does not have sufficient data on the requestors that file genealogy forms, Forms G–1041 and G–1041A, to determine whether such filings were made by entities or individuals and thus is unable to determine if the fee increase for genealogy searches is likely to have a significant economic impact on a substantial number of small entities. | Final Regulatory Flexibility Analysis (FRFA) and Small Entity Analysis (SEA) |
| *Effects on wages* | *None* | None |
| *Effects on Growth* | *None* | None |

Quantified Annual Economic Impacts of
the Fee Schedule: NPRM vs Final Rule

HR-1 FRN 2025 AR-000152

**Appx-000177**

**Table 10. Quantified Annual Economic Impacts of the Fee Schedule: NPRM vs Final Rule**

| Category | NPRM | Final Rule | Difference | Percent Difference |
|---|---|---|---|---|
| | Undiscounted | Undiscounted | | |
| Total Costs to Applicants/Petitioners | $575,100,190 | $302,692,154 | -$272,408,036 | -47% |
| Total Cost Savings to Applicants/Petitioners | $42,721,052 | $145,686,202 | $102,965,150 | 241% |
| **Net Costs** | **$532,379,138** | **$157,005,952** | **-$375,373,186** | -71% |
| **Transfer Payments from applicants/petitioners to USCIS (fee increases)** | **$1,612,127,862** | **$887,571,832** | **-$724,556,030** | -45% |
| **Transfer Payments from USCIS to applicants/petitioners (exemptions, waivers, discounts, reduced fees)** | **$116,372,429** | **$241,346,879** | **$124,974,450** | 107% |
| **Transfer Payments from DoD to USCIS (Military N-400 reimbursements)** | **$222,145** | **$197,260** | **-$24,885** | -11% |
| **Net Transfer Payments to USCIS** | **$1,495,977,578** | **$646,422,213** | **-$849,555,365** | -57% |
| Source: USCIS Analysis | | | | |

Table 10 above shows that total costs were reduced by 47 percent in the final rule. This is mainly a result of the discounted fees given to Form I–129 and I–140 petitioners who are employers with 25 or fewer full-time equivalent (FTE) workers or non-profit entities. There was a significant increase in cost savings mainly because of the lower fees for filing forms electronically as well as lower fees for filing Forms I–90 and I–131. Mainly because of the increase in cost savings, net costs were reduced by 71 percent in the final rule. Transfer payments from applicants/petitioners to USCIS were reduced by 45 percent mainly because of the lower fees for Form I–485 applicants concurrently filing a Form I–765, lower fees for applicant under the age of 14 years filing Form I–485 with a parent and lower fees for the online filing of forms. Transfer payments from USCIS to applicants/petitioners increased significantly by 107 percent. This increase is mainly attributable to changes to fee exemptions (see Table 48 in standalone RIA for additional information). Transfer payments from USCIS to applicants/petitioners as a result of fee exemptions increased by 70-percent ($181,225,564) from the NPRM estimates ($106,821,450). Transfer payments from DoD to USCIS were reduced by 11 percent. Finally, net transfer payments to USCIS were reduced by 57 percent in the final rule, from NPRM estimates. DHS notes that the variation in costs, cost savings and transfer payments from the proposed rule to the final rule is also influenced by the change in annual average populations used throughout the economic analysis. In the proposed rule, DHS generally used 5-year annual averages from FY 2016 through 2020 and in the final rule DHS uses 5-year annual averages from FY 2018 through 2022.

Summary Table of the Economic Impacts of the Final Fee Schedule

Table 11 provides a detailed summary of the final rule and its impacts.

HR-1 FRN 2025 AR-000153

Appx-000178

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| 1. **Resubmission of Dishonored or Returned Payments, Fee Payment Method, and Non-Refundability** | If a check or other financial instrument used to pay a fee is dishonored or returned because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time.<br>• If the instrument used to pay a fee is dishonored or returned a second time, USCIS may reject or deny the filing. Financial instruments dishonored or declined or returned for any reason other than insufficient funds, will not be resubmitted, and such filings may be rejected or denied. Credit cards that are declined for any reason will not be resubmitted.<br><br>• DHS may reject a request that is accompanied by a check or other financial instrument that is dated more than one year before the request is received. | Quantitative: Applicants-<br>• An increase in transfer payments from applicants/petitioners to USCIS of approximately $658,396 (annual average amount USCIS refunds to applicants/petitioners) due to nonrefundable fees.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants<br>• None.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Clarifying dishonored or returned payment resubmission and non-refundability policies, limiting the age of checks to be presented and limiting payment options will reduce administrative burdens and fee processing errors for USCIS.<br><br>• USCIS will be able to invoice the responsible party (applicant, petitioner, or requestor) and pursue collection of the unpaid fees when banks that issue credit cards rescind payment.<br><br>• USCIS will lose fewer credit card disputes. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • Will codify authority to limit payment options so that USCIS may require certain fees be paid using a specific payment method.<br><br>• Clarifies that fees are generally nonrefundable regardless of the result of the request or how much time the request requires to be adjudicated.<br><br>• Clarifies that fees paid to USCIS using a credit or debit card cannot be disputed. | | |
| 2. **Eliminate $30 Returned Check Fee** | • Eliminate the $30 charge for dishonored payments. | Quantitative: Applicants<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• There may be an increase in insufficient payments by applicants because the $30 fee may serve as a deterrent for submitting a deficient payment. | Quantitative: Applicants –<br>• DHS estimates the annual cost savings to applicants/petitioners will be $414,150.<br><br>Qualitative: Applicants –<br>• Applicants who submit bad checks will no longer have to pay a fee.<br><br>DHS/USCIS –<br>• This change will provide additional cost savings to USCIS as it spends more than $30 to collect the $30 returned payment charges. USCIS hires a financial service provider to provide fee collection services to pursue and collect the $30 fee. |

HR-1 FRN 2025 AR-000155

Appx-000180

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| 3. **Changes to Biometric Services Fee** | • For nearly all benefit types, DHS will incorporate the biometric services cost into the underlying immigration benefit request fees for which biometric services are applicable.<br><br>• Retain a separate biometric services fee of $30 for initial applications and re-registrations for Temporary Protected Status (TPS). | Quantitative: Applicants<br>• As a result of the $55 reduction in the biometric services fee, TPS and the Executive Office for Immigration Review (EOIR) applicants will experience a total of $10,007,965 in reduced fees annually. This represents transfer payments from USCIS to the fee payers as USCIS will now incur the indirect costs of providing the biometric services.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None | Quantitative: Applicants –<br>• None.<br><br>Qualitative:<br>Applicants –<br>• Incorporating the biometric services fee into the underlying benefit request filing fee will benefit applicants by simplifying the payment process.<br><br>• May also reduce the probability of applicants submitting incorrect fees and consequently have their benefit requests rejected for failure to include a separate biometric services fee.<br><br>DHS/USCIS –<br>• Eliminating the separate payment of the biometric services fee will decrease the administrative burdens required to process both a filing fee and biometric services fee for a single benefit request. |
| 4. **Naturalization and Citizenship Related Forms** | • Limit the increase of Form N-400 fees to $760 for paper filers and $710 for online filers.<br>• Increase fees to Forms N-300, N-336, N-400, N-470, N-600 and N-600K.<br><br>• Increase the Form N-400 reduced fee to $380.<br><br>• Make the request for a reduced fee available to applicants with incomes under 400 | Quantitative:<br>Applicants<br>• Increase in fees to Forms N-300, N-336, N-400 (paper), N-470, N-565 (paper), N-600 and N-600K will result in an increase in transfer payments from the fee-paying applicants to USCIS of $30,182,790 annually.<br><br>• Increase in transfer payments from USCIS to Form N-400 reduced fee | Qualitative: Applicants-<br><br>• Limited fee increases allow more residents, especially those with financial and income constraints to seek citizenship.<br><br>• Cost savings of $5,981,330 to applicants filing Forms N-400 and N-565 online.<br><br>• Expanding the eligible population of N-400 reduced fee applicants will benefit an unknown number of applicants who could not afford the full fee, but can |

HR-1 FRN 2025 AR-000156

Appx-000181

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | percent of the FPG instead of only applicants that fall within the range of 150 to 200 percent of the FPG.<br><br>• Keep the existing statutory fee exemptions for military members and veterans who file Forms N-400 and N-600. | applicants of $46,088,170 due to the change in reduced fee eligibility criteria to applicants with incomes under 400 percent of the FPG.<br><br>• Increase in transfer payments from DoD to USCIS of $197,260 annually for N-400 (military only) reimbursements.<br><br>Qualitative:<br>Applicants –<br>   • None<br><br>DHS/USCIS –<br>• Expanding the population of N-400 reduced fee applicants will increase the administrative burden on the agency to process these additional forms with 50 percent less in fees. | now pay 50 percent less in fees. |
| 5.   **Fees for Filing Online** | • Lower fees for online filings of immigration benefit requests for which both paper and online filing options are available. The forms include Form I-90, Form I-130, Form I-539, Form I-765, Form N-336, Form N-400, Form N-565, Form N-600, Form N-600K, Form G-1041, and Form G-1041A. | Quantitative:<br>Petitioners<br>• Increase in transfer payments of $17,706,510 from Form I-130 online filers to USCIS.<br><br>DHS/USCIS-<br>• None.<br><br>Qualitative:<br>Petitioners –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Petitioners-<br><br>• Cost savings of $56,796,180 to applicants filing Forms I-90, I-539 and I-765 online.<br><br>Qualitative:<br><br>Petitioners-<br>• Encourages electronic processing and adjudications which helps streamline USCIS processes. This could reduce costs and could speed adjudication of cases.<br><br>DHS/USCIS – |

HR-1 FRN 2025 AR-000157

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | | | • USCIS will save in reduced intake and storage costs at the USCIS lockbox or other intake facilities.<br><br>• Decrease the risk of mishandled, misplaced, damaged files or lost paper files because electronic records will not be physically moved around to different adjudication offices.<br><br>• Increased access to administrative records. USCIS could easily redistribute electronic files among adjudications offices located in different regions, for better management of workload activities. |
| 6. **Form I-485, Application to Register Permanent Residence or Adjust Status** | • Increase Form I-485 fees for adults and children under the age of 14 concurrently filing with a parent.<br><br>• Charge separate filing fees for applicants filing Form I-765 and Form I-131 concurrently with Form I-485 or after USCIS accepts their Form I-485 and while it is still pending. | Quantitative: Applicants-<br>• Total increase in transfer payments from applicants filing Form I-485 to USCIS of $391,920,525.<br><br>This includes the following:<br>• The increase in the Form I-485 fees will result in approximately $18,273,710 in transfer payments annually from applicants filing I-485 (only) to USCIS.<br><br>• Separate filing fees for applicants filing I-765 and I-131 interim benefits with Form I-485 will result in transfer payments from applicants to USCIS of $367,192,615 annually.<br><br>• Transfer payments from applicants to | Quantitative: Applicants-<br>• Not estimated.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Unbundling the fee for Form I-485 from Forms I-131 and I-765 will better reflect the cost of adjudication. |

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | USCIS of $6,454,200 annually for children under the age of 14 years concurrently filing Form I-485 with a parent.<br><br>Qualitative: Applicants –<br><br>• None.<br><br>DHS/USCIS –<br>• None. | |
| 7. **Form I-131A, Application for Travel Document (Carrier Documentation) Changes** | • Separate the fee for Form I-131A from other travel document fees. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Allows USCIS to assess the cost of providing services for this immigration benefit and better align fees in future fee reviews. |
| 8. **Separate Fees for Form I-129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted to 25 Named Beneficiaries per Petition** | • Charge different fees for Form I-129, based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition and in some cases, according to whether the petition includes named or unnamed beneficiaries.<br>• Increase H-1B registration fees from $10 to $215<br><br>• Limit to 25 the number of named beneficiaries that may be included on a single petition for H-2A, H-2B, O, H-3, P, Q and R workers. | Quantitative: Applicants –<br>• Increase in transfer payments from Form I-129/I-129CW petitioners to USCIS of $217,571,880. This includes transfer payments from H-1B registrants to USCIS of $71,428,355.<br><br>• Costs of $254,764,500 to Form I-129/I-129CW petitioners due to the new Asylum Program fees.<br><br>DHS/USCIS –<br>• Not estimated.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS – | Quantitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• A benefit of the different fees for the Form I-129 classifications is that it will allow USCIS to further refine its fee model and better reflect the cost to adjudicate each specific nonimmigrant classification.<br><br>• Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. |

HR-1 FRN 2025 AR-000159

Appx-000184

Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations    6347

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | • Charge a new Asylum Program fee to Form I-129/I-129CW petitioners.<br><br>• Provide reduced Form I-129/I-129CW fees and Asylum Program fees for businesses with 25 or less full-time equivalent employees and nonprofit businesses.<br><br>• The Asylum Program Fee is $0 for nonprofits, $300 for businesses that have 25 or fewer full-time equivalent employees, and $600 for all other I-129 filers. | • None. | |
| 9. **Adjustments to Premium Processing** | • Change the premium processing timeframe from 15 calendar days to 15 business days for the immigration benefit request types with a premium processing service.<br><br>• Permit combined payments of the premium processing service fee with the remittance of other filing fees. | Quantitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Qualitative:<br>Applicants –<br>• The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS and thereby increase the applications adjudicated.<br><br>DHS/USCIS –<br>• The additional days will increase the time frame to adjudicate which in turn might reduce the refunds issued by USCIS.<br><br>• USCIS will have additional business days to process petitions when premium processing request volumes are high and the 15 calendar days include multiple non-business days such as weekends and holidays.<br><br>• USCIS will be able to make premium processing more consistently available and expand this service to the |

HR-1 FRN 2025 AR-000160

Appx-000185

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | | newly designated classifications and categories allowed by the USCIS Stabilization Act.<br><br>Qualitative:<br>Applicants and DHS/USCIS –<br>• Allowing combined payments reduces unnecessary burdens on petitioners, applicants, and DHS. |
| **10. Intercountry Adoptions** | • Clarify and align regulations with current practice regarding when prospective adoptive parents are not required to pay the Form I-600 or Form I-800 filing fee for multiple Form I-600 or Form I-800 petitions.<br><br>• DHS is altering the validity period for Forms I-600A and I-800A approvals in an orphan case from 18 to 15 months to remove inconsistencies between Forms I-600A and I-800A approval periods and validity of the U.S. Federal Bureau of Investigation (FBI) background check.<br><br>• Create a new form called Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600.<br><br>• Provide fee exemptions for some applicants who file Form I-600A/I-600 | Quantitative: Applicants-<br>• DHS estimates that the filing fee and the time to complete and submit Form I-600A/I-600 Supplement 3 will cost $146,954 annually.<br><br>• The increase to the current fees for Forms I-600/600A/800/800A will result in transfer payments from applicants to USCIS of approximately $265,440 annually.<br><br>• Transfer payments from USCIS to the public of $4,023,570 due to fee exemptions to Form I-600A/I-600 Supplement 3, Form I-800A Supplement 3 and adoption-based Forms N-600 and N-600K.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS-<br>• None. | Quantitative: Applicants –<br>• None.<br><br>Quantitative: Petitioners-<br><br>• Cost savings of $3,375 to applicants filing Form I-800A Supplement 3 due to a reduction in fees.<br><br>Qualitative:<br>Applicants –<br>• Limiting the fee increase helps to reduce the fee burdens on adoptive families by covering some of the costs attributable to the adjudication of certain adoption-related petitions and applications.<br><br>• The uniform 15-month validity period will also alleviate the burden on prospective adoptive parents and adoption service providers to monitor multiple expiration dates.<br><br>• These changes also clarify the process for applicants who would like to request an extension of Form I-600A/I-600 and/or certain types of updates or changes to their approval.<br><br>• Accepting the Form I-800A Supplement 3 extension requests will make subsequent suitability and eligibility adjudication process faster, for |

HR-1 FRN 2025 AR-000161

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | Supplement 3, Form I-800A Supplement 3, Form N-600 or Form N-600K for newly adopted children. | | prospective adoptive parents seeking an extension of their Form I-800A approval.<br><br>DHS/USCIS –<br>• Standardizes USCIS process and provides for the ability to collect a fee.<br><br>• Improve and align the USCIS adjudication and approval processes for adoptions of children from countries that are party to the Hague Adoption Convention and from countries that are not. |
| **11. Immigrant Investors** | • DHS will increase fees to Forms I-526/I-526E[295], I-829, I-956 (formerly I-924), I-956G (formerly I-924A) and I-956F associated with the Employment-Based Immigrant Visa, Fifth Preference (EB-5) program. | Quantitative: Applicants-<br>• Annual transfer payments from EB-5 investors and regional centers to USCIS will be approximately $44,746,040.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. |
| **12. Changes to Genealogy Search and Records Requests** | • Revise genealogy regulations to encourage requestors to use the online portal to submit electronic versions of Form G-1041.<br><br>• Change the index search request process so that USCIS may provide requesters with digital records via | Quantitative: Applicants-<br>• Annual transfer payments from fee paying applicants to USCIS of $813,900 due to increased fees.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• Cost savings of $380,415 to applicants filing Forms G-1041, G-1041A online.<br>Qualitative: Applicants –<br>• Streamlining the genealogy search and records request process increases accuracy due to reduced human error from manual data entry.<br><br>DHS/USCIS –<br>• Reduce costs for mailing, records processing, and |

HR-1 FRN 2025 AR-000162

Appx-000187

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | email in response to the initial search request.<br><br>• Lower the fees for the online filing of Forms G-1041 and G-1041A, from $65 to $30 to reflect the lower marginal costs to USCIS from online filing.<br><br>• For requestors who choose to submit via mail option, DHS will increase the fee from $65 to $80, for G-1041 and G-1041A.<br><br>• Charge a fee of $330 for requests for a Certificate of Non-Existence. | | storage costs because electronic versions of records requests will reduce the administrative burden on USCIS.<br><br>• Streamlining the genealogy search and records request process increases accuracy. |
| 13.  **Fees Shared by CBP and USCIS** | • Increase fees for the following immigration benefit requests it adjudicates with U.S. Customs and Border Protection (CBP): Form I-192, Form I-193, Form I-212, and Form I-824. | Quantitative: Applicants-<br>• Increase in annual transfer payments of $11,826,730 from fee payers to USCIS and CBP.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• A single fee for each shared form will reduce confusion for individuals interacting with CBP and USCIS.<br><br>DHS/USCIS –<br>• None. |
| 14.  **Form I-881, Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105-100 [NACARA]** | • Adjust the fee for Form I-881 and combine the current multiple fees charged for an individual or family into a single fee of $340 for each filing of Form I-881. | Quantitative: Applicants-<br>• Transfer payments of $18,260 annually from I-881 individual filers to USCIS.<br><br>• Transfer payments from USCIS to I-881 family applicants of $1,610 since this fee is less than the cost to adjudicate the application. | Quantitative: Applicants-<br>• None.<br><br>Qualitative: Applicants –<br>• None.<br><br>DHS/USCIS –<br>• Combining the two Immigration Examinations Fee Account (IEFA) fees into a single fee will streamline the revenue collections and reporting. |

HR-1 FRN 2025 AR-000163

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| | | Qualitative: Applicants – <br>• None.<br><br>DHS/USCIS – <br>• None. | • A single Form I-881 fee may help reduce the administrative and adjudication process for USCIS more efficient. |
| **15. Fee Waivers** | • Expand the categories of requestors and related forms eligible for a fee waiver.<br><br>• Codify the existing criteria in USCIS guidance regarding eligibility requirements for a fee waiver. | Quantitative: Applicants – <br>• None.<br><br>DHS/USCIS – <br>• None.<br><br><br>Qualitative: Applicants – <br>• None.<br><br>DHS/USCIS – <br>• None. | Quantitative: Applicants – <br>• None.<br><br>DHS/USCIS – <br>• None.<br><br>Qualitative: Applicants – <br>• More simplified and streamlined system to process fee waivers.<br><br>DHS/USCIS – <br>• None |
| **16. Fee Exemptions** | • Will provide fee exemptions for additional benefit requests filed by the following humanitarian-based immigration beneficiaries[296]:<br>• Victims of Severe Form of Trafficking (T Nonimmigrants)<br>• Victims of Qualifying Criminal Activity (U Nonimmigrants)<br>• Violence Against Women Act (VAWA) Form I-360 Self-Petitioners and Derivatives<br>• Conditional Permanent Residents Filing a Waiver of the Joint Filing Requirement Based on Battery or Extreme Cruelty<br>• Abused Spouses and Children Adjusting Status under the | Quantitative: Applicants- <br>• Transfer payments of approximately $181,225,564 annually from USCIS to the public.<br><br>Qualitative: Applicants – <br>• None.<br><br>DHS/USCIS – <br>• None. | Quantitative: Applicants- <br>• Cost savings of about $40,184,477 to the public for no longer having to complete and submit Form I-912.<br><br>Qualitative: Applicants – <br>• Individuals who are unable to afford immigration benefit request fees will benefit from filing a request with no fees.<br><br>DHS/USCIS – <br>• Decrease in administrative burden associated with the processing of the Form I-912 (fee waiver) for categories of requestors that will no longer require a fee waiver because they will be fee exempt. |

HR-1 FRN 2025 AR-000164

| Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits | | | |
|---|---|---|---|
| **Final Rule Provisions** | **Description of Changes** | **Estimated Annual Costs and/or Transfer Payments** | **Estimated Annual Cost Savings and/or Benefits** |
| | Cuban Adjustment Act (CAA) and Haitian Refugee Immigration Fairness Act (HRIFA)<br>• Abused Spouses and Children Seeking Benefits under Nicaraguan Adjustment and Central American Relief Act (NACARA)<br>• Abused Spouses and Children of lawful permanent residents (LPRs) or U.S. Citizens under the Immigration and Nationality Act (INA) Section 240A(b)(2)<br>• Special Immigrant Afghan or Iraqi Translators or Interpreters, Iraqi Nationals Employed by or on Behalf of the U.S. Government, or Afghan Nationals Employed by or on Behalf of the U.S. Government or Employed by the International Security Assistance Forces (ISAF) (SI1 and SI2)<br>• Special Immigrant Juveniles (SIJs)<br>• Temporary Protected Status (TPS)<br>• Asylees<br>• Refugees<br>• Persons Who Served Honorably on Active Duty in The U.S. Armed Forces Filing Under INA Section 101(A)(27)(K) | | |

HR-1 FRN 2025 AR-000165

**Table 11. Summary of Final rule Provisions and Other Fee Adjustments – Costs, Cost Savings, Transfer Payments and Benefits**

| Final Rule Provisions | Description of Changes | Estimated Annual Costs and/or Transfer Payments | Estimated Annual Cost Savings and/or Benefits |
|---|---|---|---|
| 17. Additional Fee Adjustments | DHS will increase fees for the following forms:<br>• I-90 (paper)<br>• I-102<br>• I-130 (paper)<br>• I-131<br>• I-140<br>• I-601<br>• I-612<br>• I-290B<br>• I-360<br>• I-539 (paper)<br>• I-601A<br>• I-687/I-690/I-694<br>• I-751<br>• I-765 (paper)<br>• I-817<br>• I-910<br>• I-929 | Quantitative:<br>Applicants-<br>• An increase in transfer payments from fee payers to USCIS of approximately $171,861,361 annually.<br><br>• Costs of $47,780,700 for Form I-140 petitioners due to the new Asylum Program fees.<br><br>Qualitative:<br>Applicants –<br>• None. | Quantitative:<br>Applicants-<br>• Cost savings of $41,926,275 to applicants filing Forms I-90 and I-131 as a result of lower fees.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. |
| 18. Adjusting USCIS Fees for Inflation | • DHS to use the CPI-U as the inflation index for fee adjustments between comprehensive fee rules. The actual impacts of such adjustments will be analyzed in a future rule should DHS exercise this authority. | Quantitative:<br>Applicants-<br>• None.<br><br>Qualitative:<br>Applicants –<br>• None.<br><br>DHS/USCIS –<br>• None. | Qualitative: Applicants<br><br>• None.<br><br>Qualitative:<br><br>DHS/USCIS –<br><br>• Allows DHS to publish timely fee schedule adjustments to insure the real value of USCIS fee revenue dollars against future inflation. |

Source: USCIS analysis.
Note: The dollar amounts in this table are undiscounted.

BILLING CODE 9111–97–C

295 Combines both Forms I–526, Immigrant Petition by Standalone Investor and I–526E, Immigrant Petition by Regional Center Investor. USCIS revised Form I–526 and created Form I–526E as a result of the EB–5 Reform and Integrity Act of 2022.

296 These fee exemptions do not impact eligibility for any particular form or when an individual may file the form. They are in addition to the forms listed under 8 CFR 106.2 for which DHS to codify that there is no fee.

## B. Regulatory Flexibility Act—Final Regulatory Flexibility Analysis (FRFA)

### 1. Changes From the Proposed Rule's IRFA

Since the IRFA, the major changes made in the final rule that could affect entities are as follows:

• The Asylum Program Fee is $0 for nonprofits, $300 for employers with 25 or fewer full-time equivalent (FTE) workers, and $600 for all other Form I–129, I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and those filing Form I–140, Immigrant Petition for Alien Workers. The proposed rule stated that the Asylum Program Fee would be $600 for all such filers.

• Employers with 25 or fewer FTE workers and nonprofits receive a discount on fees for Form I–129, Petition for Nonimmigrant Worker and Form I–129CW.

• A $50 reduced fee for forms filed online, except in limited circumstances,

HR-1 FRN 2025 AR-000166

Appx-000191

such as when the form fee is already provided at a substantial discount or USCIS is prohibited by law from charging a full cost recovery level fee. The proposed rule provided various reduced fees for each form filed online.

2. Overview of the FRFA

The Regulatory Flexibility Act of 1980 (RFA), as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires Federal agencies to consider the potential impact of regulations on small businesses, small governmental jurisdictions, and small organizations during the development of their rules. In accordance with the RFA, USCIS has prepared a FRFA that examines the impacts of the interim final rule on small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000. In addition, the courts have held that the RFA requires an agency to perform a FRFA of small entity impacts only when a rule directly regulates small entities. The complete detailed SEA [297] is available in the rulemaking docket at *http://www.regulations.gov.*

Individuals, rather than small entities, submit most of the immigration and naturalization benefit applications and petitions. The final rule would affect small entities that file and pay fees for certain immigration benefit requests. Consequently, there are six categories of USCIS benefits that are subject to a small entity analysis for this final rule: Petition for a Nonimmigrant Worker, Form I–129; Immigrant Petition for an Alien Worker, Form I–140; Civil Surgeon Designation, Form I–910; Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; and the Application for Regional Center Designation Under the Immigrant Investor Program, Form I–956 (formerly Form I–924), Application for Approval of an Investment in a Commercial Enterprise, Form I–956F (formerly Form I–924 amendment) and the Regional Center Annual Statement, Form I–956G (formerly Form I–924A).

This FRFA contains the following:
• A statement of the need for, and objectives of, the rule.
• A statement of the significant issues raised by the public comments in response to the initial regulatory

flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule because of such comments.
• The response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule based on the comments.
• A description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available.
• A description of the projected reporting, recordkeeping, and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record.
• A description of the steps the agency has taken to minimize significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

DHS is publishing this FRFA to respond to public comments and provide further information on the likely impact of this rule on small entities. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA and refers the reader to these analyses where additional detail is available.

a. Summary Findings of the FRFA

• The increase in fees may have a significant economic impact (greater than 1 percent) on some small entities that file I–129, I–140, I–910, or I–360.

During the FRFA, DHS found no comments that provided additional data for the forms below:
• For Forms I–956, I–956F and I–956G, DHS does not have sufficient data on the revenue collected through administrative fees by regional centers to definitively determine the economic impact on small entities that may file these forms.
• For the genealogy forms, DHS also does not have sufficient data on the requestors that file Forms G–1041, Index Search Request and Form G–1041A, Genealogy Records Request, to determine whether such filings were made by entities or individuals. Thus,

DHS is unable to determine if the fee increases for genealogy searches are likely to have a significant economic impact on small entities.

**Form I–129 Small Entities**

• *Form I–129 Small Entities with More than 25 Full-Time Equivalent (FTE) Employees*
○ 302 of the 1,643 matched small entities searched were small entities with more than 25 employees.
○ Among the 302 small entities, 275 (91.0 percent) experienced an economic impact of less than 1 percent and 27 (9.0 percent) experienced an economic impact greater than 1 percent.
○ The small entities with greater than 1 percent impact were mostly H–1B filers (18 of 327) that filed multiple petitions.
○ The greatest economic impact imposed by the fee changes was 7.06 percent and the smallest was 0.002 percent.
○ The average economic impact from the H–1B registration and petition fee increase on all 241 filers was 0.06 percent; the greatest economic impact was 1.35 percent and the smallest was 0.0004 percent.
• *Form I–129 Small Entities with 25 or Fewer Full-Time Equivalent (FTE) Employees*
○ 876 of the 1,643 entities searched, were small entities with 25 or fewer FTE employees.
○ Among the 876 small entities, 781 (89.2 percent) experienced an economic impact of less than 1 percent and 95 (10.8 percent) experienced an economic impact greater than 1 percent.
○ The small entities with greater than 1 percent economic impact were mostly H–1B filers (91 of 95) that mostly filed multiple petitions.
○ The greatest economic impact imposed by the fee changes was 4.21 percent and the smallest was 0.003 percent.
○ The average economic impact from the H–1B registration and petition fee increase on all 682 filers was 0.19 percent; the greatest economic impact was 1.79 percent and the smallest was 0.001 percent.
• *Form I–129 Nonprofit Small Entities*
○ 14 of the 1,643 entities searched were nonprofit small entities. All 14 of these nonprofit small entities petitioned for H–1B workers.
○ All 14 nonprofits small entities experienced an economic impact of less than 1 percent.
○ The greatest economic impact imposed by the fee changes was 0.82 percent and the smallest was 0.003 percent.
○ The average economic impact from the registration and petition fee

_____
[297] DHS, USCIS SEA for the USCIS Fee Schedule Final Rule.

increases on all H–1B filers was 0.13 percent; the greatest economic impact was 0.6 percent and the smallest was 0.003 percent.

**Form I–140 Small Entities**

• DHS identified 126 small entities with reported revenue data in the sample.

• Of the 126 small entities, 46 had more than 25 FTE employees and 80 had 25 or fewer FTE employees. There were no nonprofit small entities with reported revenue data in the sample.

• All 46 small entities with more than 25 FTE employees experienced an economic impact of less than 1 percent. The greatest economic impact imposed by the fees was 0.25 percent and the smallest was 0.0001 percent.

• For the 80 small entities with 25 or fewer FTE employees, 79 of them experienced an economic impact of less than 1 percent. The other entity experienced an economic impact of 1.002 percent. The smallest economic impact imposed by the fee increase was 0.002 percent.

Form I–910 Small Entities

• 179 matched entities with reported revenues were considered small entities.

• All 179 small entities experienced an economic impact of less than 1 percent.

• The greatest economic impact of the increased fees on small entities was 0.91 percent and the smallest was 0.001 percent.

Form I–360 Small Entities

• 174 entities with reported revenues were considered small entities.

• All 174 small entities experienced an economic impact below 1 percent.

• The greatest economic impact of the increased fees on small entities was 0.08 percent and the smallest was 0.001 percent.

b. A Statement of Need for, and Objectives of the Rule

DHS issues the final rule consistent with INA sec. 286(m),[298] which authorizes DHS to charge fees for adjudication and naturalization services at a level to "ensure recovery of the full costs of providing all such services, including the costs of similar services provided without charge to asylum applicants or other immigrants," and the CFO Act,[299] which requires each agency's CFO to review, on a biennial basis, the fees imposed by the agency for services it provides, and to recommend changes to the agency's fees. DHS is

adjusting the fee schedule for DHS immigration and naturalization benefit applications after conducting a comprehensive fee review for the FY 2022/2023 biennial period and determining that current fees do not recover the full costs of services provided. DHS has determined that adjusting the fee schedule is necessary to fully recover costs. Adjustments are necessary for administering the nation's lawful immigration system, safeguarding its integrity and promise by efficiently and adjudicating requests for immigration benefits while protecting Americans, securing the homeland, and honoring our values.

c. A Statement of the Significant Issues Raised by the Public Comments in Response to the Initial Regulatory Flexibility Analysis, A Statement of the Assessment of the Agency of Such Issues, and A Statement of Any Changes Made in the Proposed Rule as a Result of Such Comments

DHS published the proposed rule along with the IRFA on January 4, 2023, with the comment period ending March 13, 2023. During the comment period, DHS received approximately 260 submissions from interested individuals and organizations on the proposed rule's impacts on small entities regarding the RFA. The comments did result in one major revision to the small entity analysis in the final rule that is relevant to the effects on small businesses, small organizations, and small governmental jurisdictions presented in this FRFA. More specifically, DHS agreed that the random sample size for Form I–129 could be larger due to the size of this population and expanded the sample from 650 entities to 4,746 entities in the FRFA. DHS summarizes and responds to the public comments in this Final Rule.

*Comment:* Numerous commenters generally opposed the rule on the grounds that it would negatively impact the U.S. economy.

*Response:* DHS knows that immigrants make significant contributions to the U.S. economy, and this final rule is in no way intended to impede or limit legal immigration. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, 2016, and 2020 and has no data that would indicate that

the fees for family-based benefit requests, lawful permanent residence, and naturalization in this final rule would prevent applicants from filing.

DHS agrees that immigrants are crucial for agriculture, construction, healthcare, hospitality, and almost all industries. Immigrants are a source of future U.S. labor growth, many immigrants are successful entrepreneurs, and welcoming new citizens helps the U.S. economy. DHS acknowledges in its analyses accompanying this rule that the higher fees must be paid by U.S. companies that hire foreign nationals, but DHS has no data that indicate that higher fees will affect the supply of lower skilled laborers, impede immigration to the detriment of the labor force, result in noncitizens being unable to work, cause employers to lay off employees, undermine the jobs and wages of domestic workers with limited education performing low-skill jobs, or increase unemployment among immigrant workers. DHS knows that immigrants make important contributions in research and science. However, we have no data that support the assertion that the increased fees would result in many fewer residents accessing a desired immigration status for which they are eligible.

*Comment:* One commenter stated that businesses would pass costs to consumers, contributing to inflation.

*Response:* DHS recognizes that some businesses may pass on these increased fees to their customers but cannot determine the exact impact this would have on overall inflation in the United States.

*Comment:* One commenter wrote that the proposed rule would create barriers to naturalization, which would limit the ability of immigrants to contribute to the economy.

*Response:* In recognition of the importance of naturalization and integration of new citizens in the U.S., since 2010 DHS has held the fee for Form N–400, Application for Naturalization, below the estimated cost to USCIS of adjudicating the form. DHS recognizes the importance of naturalization to new citizens and the U.S. economy. DHS also understands that the fee increase for the naturalization application may affect those applying. However, DHS continues to offer fee waivers to naturalization applicants who are unable to pay their fee. Additionally, in this rule DHS increases eligibility for the reduced fee N–400 from 200 percent to 400 percent of the FPG. Therefore, DHS does not believe that the fee

---

[298] See 8 U.S.C. 1356(m).

[299] See 31 U.S.C. 901–03.

HR-1 FRN 2025 AR-000168

Appx-000193

increase to Form N–400 will create barriers to naturalization.

*Comment:* Several commenters generally opposed the rule on the grounds that it would negatively impact employers. Other commenters wrote that the proposed rule would have negative effects on the labor market by discouraging employers from hiring foreign workers. A trade association stated that most significant cost increases for various immigration benefits are targeted at American companies of all sizes and across all industries, and that the exorbitant fee increases would have a profoundly negative impact on the U.S. economy. The commenter adds that the fee hikes will exacerbate their current inability to adequately meet their workforce needs and hinder their ability to compete in the marketplace. The commenter also stated that USCIS failed to comply with the RFA requirements because it did not consider significant alternatives to the proposed rule that would have lessened the negative impact on the business community. The commenter adds that USCIS failed to properly analyze the employer data for companies that filed Form I–129 for needed workers by using a very small random sample.

*Response:* DHS acknowledges that immigrants are an important source of labor in the United States and contribute to the economy. DHS does not have data that would indicate that the fees in this rule would make a U.S. employer that is unable to find a worker in the United States forego filling a vacant position rather than submitting a petition for a foreign worker with USCIS. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, and 2016. Therefore, DHS has no data from previous fee schedules that would indicate that the fees would discourage employers from hiring foreign workers, which would negatively impact the labor market.

DHS disagrees that it failed to comply with the RFA requirements because DHS considered significant alternatives in the proposed rule. In terms of the random sample size for Form I–129, DHS agrees that the sample size could be larger due to the size of this population and for the final rule we have expanded the sample from 650 entities to 4,746 entities. DHS used a 95 percent confidence level and a 2 percent confidence level (margin of error) for the Form I–129 sample size. In the proposed rule, DHS used a 95 percent confidence level and a 5 percent confidence level. The impacts on small entities are discussed in detail in section d of the FRFA.

*Comment:* Several commenters wrote that the rule would create problems specifically for the labor pool in retail, agriculture, construction, manufacturing, and hospitality. Other commenters stated that the proposed fee increases would negatively impact small businesses by further increasing labor costs associated with hiring immigrants.

*Response:* DHS agrees that immigrants are crucial for many industries including retail, agriculture, construction, manufacturing, and hospitality. DHS does not believe the fees established in this rule will reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals, and that some businesses may pass on these increased fees to their customers. However, DHS must fund USCIS through fees. More importantly, DHS saw no significant or limited decreases in the number of I–129 benefit requests submitted, including H–2A and H–2B after its fee adjustments in 2010, and 2016 and has no data that indicate that increased fees will affect the supply of laborers in these industries. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA (see Section 4) and refer the reader to these analyses that are posted for public review as supporting documents in the rulemaking docket. In the SEA (see Table 7), DHS calculated the estimated economic impact of the fee increase on a sample of small entities. Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [300] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities.[301] Among the sample of 1,192 small entities that submitted benefit requests (Form I–129) and had reported revenue data, 80 percent experienced an economic impact of less than 1 percent. Therefore, DHS data indicate that the fees in this rule would not create problems for a significant number of small entities that file Form I–129 petitions to employ foreign nationals.

---

[300] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed December 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[301] DHS has used this same measure of impact in previous fee rules. *See* FR 73318 Vol. 81, No. 205 (Oct. 23, 2016); FR 46900 Vol. 85, No. 149 (Aug. 3, 2020).

*Comment:* A couple of commenters stated that fees would be an added burden to nonprofits serving immigrant communities.

*Response:* DHS recognizes the value of the various groups including nonprofits, which assist individuals to navigate its regulations and immigration benefit requests. As previously stated, DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services. Nonetheless, DHS understands the importance of maintaining access to immigration benefit requests for individuals and organizations. DHS further notes that this final rule expands the availability of fee exemptions for humanitarian and protection-based immigration categories and fee waivers for individuals who are unable to pay request fees, which should reduce the burden on non-profits that assist individuals who are applying for humanitarian or protection-based status or who are low-income. *See* Tables 4B, 4C.

### Comments on Form I–129 (H–1B)

*Comment:* Several commenters stated that increases in the H–1B fee would be detrimental to employers like medical centers, universities, and technology companies as follows:

• The fees will limit their ability to bring in foreign students and hire healthcare workers, professors, researchers, and other important workers, creating an economic burden for those institutions and stifling innovation.

• The fee increases could have a significant impact on small businesses, nonprofit healthcare facilities, and educational institutions that hire employees on H–1B specialty occupation visas because these entities are not generally able to absorb these enormous increases.

• The fee increases would stifle innovation and hurt start-ups and small businesses, citing data from the U.S. Bureau of Labor Statistics demonstrating that these entities rely on immigrant workers due to labor shortages in the United States.

• The increased fees will decrease the demand for the H–1, O, E–3, and TN visas and create a financial hardship for its performing arts centers.

• The fee increases will make hiring highly skilled workers unaffordable.

• USCIS did not account for funding differences between a venture capital start-up and a university basic science lab in its SEA.

• DHS did not analyze impacts to government research organizations in the SEA for the proposed rule.

HR-1 FRN 2025 AR-000169

Additional analyses on the number of nonimmigrant petitions filed by these organizations would help USCIS better understand the rule's impact on other government organizations.

*Response:* DHS acknowledges that immigrants are an important source of labor in the United States and contribute to the economy. DHS also acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals. DHS saw no or limited decreases in the number of benefit requests submitted after its fee adjustments in 2010, and 2016 and has no data that would indicate that the fees would limit employers' ability to hire foreign workers, which would negatively impact the labor market. In fact, H–1B receipts have grown by over 225,000 from FY 2010 through FY 2022. USCIS has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA and refer the reader to these analyses where additional detail is available. DHS calculated the estimated economic impact of the fee increase on a sample of small entities including nonprofits that submitted benefit requests (Form I–129). Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [302] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities.[303] Among the sample of 1,192 [304] small entities that submitted benefit requests (Form I–129) and had reported revenue data, 80 percent experienced an economic impact of less than 1 percent. Therefore, DHS data indicate that the fees in this rule would not create an economic burden and stifle innovation for a significant number of small entities that file H–1B benefit requests to employ foreign nationals.

*Comments on Form I–129 (O and P Nonimmigrants and Their Petitioners)*

*Comment:* Numerous commenters, mostly individuals, said the increase in fees for touring artists would have detrimental effects on the performing arts industry and the U.S. economy, including negative impacts to

employment within the music industry and financial losses for businesses that benefit from live performances. Commenters stated that music venues, record labels, and booking agencies would suffer financially, and increased fees for touring artists would increase the costs of tickets and merchandise. The proposed fee increases would have a negative impact on U.S. culture and diversity, by harming the performing arts sector. Many commenters expressed support of the arts without stating a position on the rule, requested that DHS keep prices affordable for artists, or structure fee increases in a way that benefits Americans and international artists.

*Response:* DHS acknowledges that the arts are important and beneficial to the economy. Nevertheless, the fees DHS establishes in this final rule are intended to recover the estimated full cost to USCIS of providing immigration adjudication and naturalization services. Any preferential treatment provided to petitioners for performers and musicians would mean that the costs for their petitions are borne by other petitioners, applicants, and requestors.

For Form I–129 (O and P visa classifications), among the 48 small entities with reported revenue data identified in the SEA, 45 (94 percent) experienced an economic impact of considerably less than 1 percent of revenue in the analysis.[305] While DHS sympathizes with touring artists, small traveling musicians, and other entities in the performing arts industry, our analysis indicates that the additional fee imposed by this rule does not represent a significant economic impact on most of these types of small entities. Therefore, DHS has no data that would indicate that the fees in this rule would have a negative impact on U.S. culture and diversity by harming the performing arts sector.

*Comments on Form I–129 (H–2A)*

*Comment:* Some commenters stated that fee increases would impact farms that rely on the H–2A program. Another commenter stated that USCIS does not properly account for small farms in their analysis of costs on livestock producers. A couple of commenters stated that the proposed changes were unfair to farmers and expressed concern with the proposed use of a business's total revenue as the determining factor in how much a business or farm must pay in fees. The commenters added that the practice is "devoid of economic basis"

because some farms have little to no profit despite high total revenue.

*Response:* As noted previously, DHS is authorized to set fees at a level that ensures recovery of the full costs of providing immigration adjudication and naturalization services. DHS respectfully disagrees with the commenter who stated that USCIS did not properly account for small farms in their analysis of costs on livestock producers. DHS used recent data to examine the direct impacts to small entities for Forms I–129 and has discussed related issues in depth in the supplemental RIA (see Section 5: Price Elasticity) and SEA (see Section 4) and refer the reader to these analyses where additional detail is available. DHS calculated the estimated economic impact of the fee increase on a sample of small entities who file for H–2A visas. To determine if a final rule would have a significant economic impact on affected small entities, SBA suggests 1 percent of revenue as a measure for determining economic impacts.[306] DHS believes this measure is the most useful for the FRFA, based on the available data for the relevant small entities. All 36 small entities that submitted Form I–129 petitions for H–2A nonimmigrant workers and reported revenue data experienced an economic impact of less than 1 percent.[307] Therefore, the data that DHS has indicate that the fees in this rule would not create problems for a significant number of small entities that file Form I–129 for H–2A temporary agricultural employees.

*Comment:* Multiple commenters said the regulatory flexibility analysis is flawed because it does not distinguish between petitions for named and unnamed H–2B nonimmigrants in assessing the impact on small entities and it did not consider the 25 named worker limitation in calculating the regulatory impact.

*Response:* The commenter is correct that the IRFA did not capture the full fee increases to small entities that file for named beneficiaries because DHS did not consider the 25 named worker limitation in its analysis. DHS apologizes for this error. We have incorporated the full estimated fee increases to small entities in the FRFA. The full detailed analysis is found in the

---

[302] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed December 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[303] DHS has used this same measure of impact in previous fee rules. *See* FR 73318 Vol. 81, No. 205 (Oct. 23, 2016); FR 46900 Vol. 85, No. 149 (Aug. 3, 2020).

[304] H–1Bs accounted for about 79% of the entities in the random sample.

[305] The average economic impact on these 45 small entities was 0.11 percent.

[306] SBA Office of Advocacy: A Guide for Government Agencies, How to Comply with the RFA, pg. 19, SBA provides a variety of measures for agencies to determine the impacts of regulatory changes. The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[307] The average economic impact on these 36 small entities was 0.20 percent.

**6358**   **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

stand-alone SEA in the docket of this final rulemaking, tables 6 through 10 for all I–129 classifications impacts.

*Comment:* A commenter stated that the proposed fees will have a significant impact on small businesses and DHS incorrectly calculated impacts to small entities because:

• It used gross income of filers as reported on Forms I–129 and I–140 instead of net income.

• It does not consider the impact of additional fees that can be accumulated from premium processing or hiring temporary workers for seasonal jobs.

• Fees would impede small or nonprofit entities' ability to compete with larger entities, hiring and economic growth.

• Many small employers pay for immigration fees of the family members of workers.

• Small businesses will have to file multiple H–1B petitions for workers that move outside of a Metropolitan Statistical Area.

*Response:* DHS disagrees that its calculations to estimate the economic impacts of the fee increases on small entities are incorrect. Guidelines provided by the SBA allows for the use of 1 percent of gross revenues in a particular industry [308] as one of the many ways an agency can determine if the final rule would have a significant economic impact on affected small entities. [309] [310] DHS believes this measure is the most useful for the FRFA, based on the available revenue data for the relevant small entities. Additionally, DHS has no data that would indicate that the fees in this rule would impede small or nonprofit entities' ability to compete with larger entities in their hiring and economic growth and the commenter provided no study or empirical data to support that assertion.

*Comment:* Several commenters opposing the proposed Asylum Program Fee wrote:

○ USCIS' analysis of the cumulative effect of the increased fees for the Form I–129 and Form I–140 on small

businesses in Section X.B of the rule was done specifically in the context of small entities, and it does not assess the full scope of the cumulative effects of the proposed fee increases, which the commenter interpreted as a punitive effect on employers who file both forms.

○ Small businesses are less able to pay these fees than large firms, but this fee increase relies mostly on fees levied to small businesses, which contradicts the premise of the program by shifting the burden to those who cannot afford these new costs.

○ Many small businesses would not have the ability to pay for all the petitions they need to file to meet their workforce needs.

○ The Asylum Program Fee disproportionately impacts small and medium sized businesses that may experience staffing shortfalls, for which Congress designed temporary and permanent worker programs to fill.

○ Passing asylum program expenses to other immigrants would only reduce demand for immigration benefits. This would result in a decrease in funding sufficient to provide a long-term solution to the asylum backlog. Additionally, increasing fees will result in fewer immigrants with the necessary resources to obtain or rectify their status.

○ USCIS ignores the impact this fee would have on small businesses who will pay this fee, and thus risks creating an arbitrary and capricious rule.

○ DHS fails to address differences between large petitioners and smaller employers and relies on a false presumption that employers of all sizes are equally situated to bear the financial burden of the fee increases.

○ The proposal is arbitrary and capricious and an unreasonable action without consideration of the facts.

○ Small businesses are already struggling to support their immigrant employees and they may be unable to pay these filing fees, which in turn may raise questions related to hiring discrimination.

*Response:* DHS's rule in no way is intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS does not have data that would indicate that the fees in this rule would result in fewer immigrants being able to obtain or rectify their status. However, as explained in the preamble responding to comments specific to Forms I–129 and I–140, and the Asylum Program Fee, DHS has reduced fees for Forms I–129 and reduced the Asylum Program Fee for small employers and nonprofit entities. See 8 CFR 106.

c. The Response of the Agency to Any Comments Filed by the Chief Counsel for Advocacy of the Small Business Administration in Response to the Proposed Rule, and a Detailed Statement of Any Change Made to the Proposed Rule in the Final Rule as a Result of the Comments.

A comment was submitted by the Chief Counsel for Advocacy of the U.S. Small Business Administration (Advocacy). Advocacy outlined several concerns and recommendations in its public comment:

• The IRFA erroneously states that small entities will not have significant costs from this rule. The IRFA is deficient and underestimates the economic impact of this rule on small entities, as the rule will be detrimental to thousands of small businesses, undermining their sustainability and competitiveness.

• The IRFA incorrectly averages all industries within a visa category and should identify and individually analyze the top industries that use the H–2B visa by six-digit NAICS code, such as landscaping, hotel, restaurant, and forestry industries. Advocacy further suggested that USCIS breakdown these industries by firm size to assess the impact of the rule on different sized small entities.

• The sample size used in the IRFA to analyze small businesses is too small and is not a representative sample across affected entities by industry. Further, the sample should be randomized based on clear stratification sectors. Advocacy also suggested that USCIS use publicly available economic data of small entities in affected industries from the U.S. Census Bureau to supplement its analysis.

• The number of small nonprofit entities is underestimated. Advocacy suggested that there are many more NAICS codes that could be used, which may include small nonprofits, including theater companies, dance companies, and performing arts.

• USCIS' economic analysis underestimates the compliance costs from the proposed rule, stating that small businesses are less able to pay the fees for temporary visas and the Asylum Program Fee, but the proposed fee increases rely mostly on fees levied to the small business community.

• An RFA analysis requires a detailed categorization of economic impacts by different sizes of small businesses within affected industries, but USCIS used average revenues of all small entities, which underestimates the impact of the proposed rule on the smallest businesses and nonprofits.

---

[308] A Guide for Government Agencies: How to Comply with the Regulatory Flexibility Act—SBA's Office of Advocacy, p. 19 (last accessed Dec. 14, 2023). The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis. The impact could be significant if costs exceed 1% of gross revenue.

[309] DHS has used this same measure of impact in previous fee rules. *See* 81 FR 73292 (Oct. 24, 2016); 85 FR 46900 (Aug. 3, 2020).

[310] SBA Office of Advocacy: A Guide for Government Agencies, How to Comply with the RFA, pg. 19. SBA provides a variety of measures for agencies to determine the impacts of regulatory changes. The SEA available in the rulemaking docket fully explains the measures DHS uses in its analysis.

HR-1 FRN 2025 AR-000171

○ The proposed fees will be significant for smaller farm operations that rely upon the H–2A visa as their primary workforce.

○ Small seasonal H–2B employers with low revenues and profit margins will be unable to afford the proposed fees.

○ The proposed rule would hinder innovative start-ups that use the H–1B visa from obtaining needed staff in niche areas where there are few American workers.

○ Small nonprofit employers, such as arts groups, do not have the discretionary funds to pay the proposed fees and Asylum Program Fee surcharge.

• The cost estimates in the IRFA are underestimated because the proposed limit of 25 named workers per petition was not incorporated. For example, an H–2B employer who currently files one petition for 150 named workers would need to file 6 petitions in the proposed rule. The entity would also be paying the Asylum Program Fee surcharge six times.

○ The IRFA underestimates the number of petitions that H–2A visa employers could file including (a) additional petitions due to the 25 named workers limit, (b) duplicate fees for the same group of workers in the same season, (c) continuing yearly costs for employers, and (d) the impact of the conflicting recent DOL final rule on Adverse Effect Wage Rates [311] that would separate H–2A visa jobs and potentially require small farms and ranches to submit more petitions.

○ Small businesses utilizing the H–2B visa would be facing increased costs if they (a) file multiple petitions because of the lottery process, (b) filed for an extension of a few weeks for these workers, (c) obtain supplemental visa petitions to obtain returning workers, and (d) transfer workers between winter and summer seasons.

○ The cost estimates of the registration fee for the H–1B visa lottery are underestimated in the IRFA. USCIS does not adjudicate registrations received through the H–1B registration process because it is automated and the IRFA only estimated the registration costs for small businesses if they obtain a visa. However, the lottery selection rate was 26 percent in FY2023.

○ The IRFA fails to capture the cumulative yearly costs for an employer filing an H–1B petition for a worker because the petition allows a stay for up to 3 years and can be extended another

3 years with another petition. Further, an employer would face increased costs if it were to amend the employment terms of the worker or petition the same worker to stay permanently with an I–140 petition.

○ USCIS has failed to analyze the numbers of entities and economic impacts of this rule on O & P visa small employers and nonprofits. The proposed rule would significantly multiply the number and costs of obtaining these visas and shut out these small entities from international talent.

• The IRFA does not consider regulatory alternatives as required by the RFA sec. 603(c).

• USCIS should consider establishing tiered general fees and asylum fees, which can be based on revenue size or employees, to minimize the economic impact of the proposed rule on the smallest businesses.

• USCIS should consider limiting the frequency and number of asylum fee payments, particularly for the same worker.

• USCIS should consider establishing a lower tier of pricing for general fees and asylum fees for small nonprofit entities.

• For small employers utilizing the H–2A, H–2B, O, and P visas, USCIS should consider increasing the limit on the number of workers per petition to 50 instead of 25.

*Response:* DHS respectfully disagrees with Advocacy, that we failed to comply with the RFA requirements and should publish a Supplemental Initial Regulatory Flexibility Analysis. DHS emphasizes that it has followed the written requirements of the RFA when conducting both the IRFA and FRFA and also reviewed the guidelines [312] provided by the SBA Office of Advocacy to complete both the IRFA and FRFA. The RFA does not require highly prescriptive quantitative analysis. For example, when conducting an IRFA, the RFA simply requires "a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule [313]. . .". In addition, the RFA does not require quantification of impacts when preparing an IRFA or FRFA when the preparing agency believes such quantification is not practicable or reliable,[314] although DHS did provide such quantification when possible. DHS acknowledges that the higher fees must be paid by U.S. companies that hire foreign nationals. DHS also acknowledges in this FRFA and supplemental SEA that the rule will

have a significant economic impact on some small entities. DHS analyzed and updated the FRFA using the same methodology as the IFRA, to analyze the economic impact of fee changes made in the final rule on small entities, for all I–129 classifications and forms listed above. DHS presented evidence through its IRFA analysis, in the NPRM by sampling and estimating the impacts compared to the threshold of 1 percent of revenue, to determine if the final rule will have a significant economic impact on affected small entities. DHS has no evidence, nor has Advocacy provided any evidence to show that this rule will be detrimental to thousands of small businesses by making it cost prohibitive for small businesses and small nonprofits to hire necessary staff, shut them out of vital immigration programs, or undermine their sustainability and competitiveness. DHS has discussed related issues in-depth in both the supplemental RIA (price elasticity) and the comprehensive economic impacts relating to the various fees in SEA and we refer Advocacy to these analyses where a detailed analysis is available. DHS's rule is not intended to reduce, limit, or preclude immigration for any specific immigration benefit request, population, industry, or group. DHS is changing USCIS fees to recover the costs of administering its adjudication and naturalization services because USCIS must fund itself through fees unless it receives a congressional appropriation to do so.

DHS disagrees with Advocacy that USCIS' IRFA failed to identify affected small business industries, underestimates the number of small nonprofit entities, underestimates the economic impact of this rule and that it did not consider regulatory alternatives that minimize the impact of this rule on small entities. DHS respectfully points Advocacy to the detailed SEA that clearly illustrates that DHS identified affected small businesses by NAICS code in its analysis. In the IRFA, USCIS used a statistically valid sample size that drew a large enough population to observe the impacts to small entities/industries with the associated fee increases. The statistically valid sample that DHS conducted (see SEA, Section 3—Source and Methodology) used business and open-access databases to match from NAICS code, revenue, and employee count for each entity in the sample. As a result of the Advocacy comments, USCIS increased the sample sizes to address concerns the IRFA samples were too small. A list of NAICS codes for each entity matched in Forms I–129, I–140, I–910 and I–360 can be

---

[311] U.S. Department of Labor, Adverse Effect Wage Rate Methodology for the Temporary Employment of H–2A Nonimmigrants in Non-Range Occupations in the United States, 88 FR 12760 (Feb. 28, 2023).

[312] SBA Guide How to Comply with the RFA.
[313] See Section 603(b)(4) of the RFA.
[314] See Section 607 of the RFA.

HR-1 FRN 2025 AR-000172

**6360**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

found in Appendix A, along with the SBA small entity threshold for each industry cluster.[315]

To determine an entity's size, DHS first classified each entity by its NAICS code, and then used the SBA size standards to compare the requisite revenue or employee count threshold for each entity. Based on the NAICS code, some entities are classified as small based on their annual revenue, and some based on the number of employees. In cases where the matched entity was a direct subsidiary, DHS recorded data for the parent organization. In cases where the entity was a single-location franchise, DHS recorded the single location's data. Once entities were matched, those that had relevant data were compared to the size standards provided by the SBA to determine whether they were small or not. Those that could not be matched or compared were assumed to be small under the presumption that non-small entities would have been identified by one of the databases at some point in their existence. As detailed in the proposed rule preamble, and IRFA section, USCIS stated alternatives to the proposed fees, and the likely impacts to applicant, petitioners, and to USCIS.

Based on public comments including Advocacy's, DHS has taken steps to further improve its analyses and has made changes to the final rule within the FRFA and SEA. DHS has increased (tripled) the sample size for the Form I–129 analysis. This expanded sample size will encompass even more small entities and nonprofits in the various visa classifications including H–2A, H–2B, H–3, O, P, L, Q, R, E, TN, and CW, in addition to the H–1B classification. DHS has also updated the Form I–129 section of the SEA by categorizing the economic impacts of small businesses within industries for the various visa classifications. In doing so, USCIS has identified the top industries that use the various visas by six-digit NAICS code. Additionally, DHS has revised the FRFA to incorporate the full estimated fee increases to small entities that file Form I–129 by accurately counting the number of petitions filed for petitions with named beneficiaries. The full analysis is found in the stand-alone SEA in the docket of the final rulemaking. The results of the final rule's SEA with a larger sample size are like the results of the proposed rule's SEA. In general, the fee increases are not economically significant to a substantial number of

small entities. However, DHS does recognize and acknowledges that the fee increases may affect some small entities.

USCIS considered the various concerns raised by Advocacy that suggested that the new fees in this rule would cause indirect secondary, tertiary and downstream economic impacts on many facets of the U.S. that were not accounted for in the analysis of the proposed rule. Advocacy repeated the concerns of many other commenters about the fees exacerbating the effects of inflation on consumers and the COVID–19 pandemic, increasing costs for farmers, reducing the food supply, harming information technology and engineering firms, harming religious entities, impacting health care providers, and exacerbating the plight of nationals of certain countries such as India and China. DHS analyzed the effects of the new fees and accounted for the direct costs of the fees as required by the RFA and applicable Executive Orders and our data indicates that the fees will not have the deleterious effects on multiple parts of U.S. economy that Advocacy and commenters state that it will. Nevertheless, as requested by commenters and described in section II.C. of this preamble, DHS is providing relief to nonprofits and small employers in this final rule.

d. A Description of and an Estimate of the Number of Small Entities To Which the Rule Will Apply or an Explanation of Why No Such Estimate is Available

Below is a summary of the SEA. The complete detailed SEA is available in the rulemaking docket at *https://www.regulations.gov*. The SEA has a full analysis of small entities sampled for each form described below, in the FRFA.

Entities affected by the final rule are those that file and pay fees for certain immigration benefit requests on behalf of a foreign national. These petitions/applications include Form I–129, Petition for a Nonimmigrant Worker; Form I–140, Immigrant Petition for an Alien Worker; Form I–910, Civil Surgeon Designation; Form I–360, Petition for Amerasian, Widow(er), or Special Immigrant; Genealogy Forms G–1041 and G–1041A, Index Search and Records Requests; Form I–956 (formerly Form I–924), Application for Regional Center Designation Under the EB–5 Regional Pilot Program, Form I–956F, Application for Approval of an Investment in a Commercial Enterprise (formerly Form I–924 amendment) and Form I–956G (formerly Form I–924A), Regional Center Annual Statement. Annual numeric estimates of the small entities impacted by this fee increase

total (in parentheses): Form I–129 (84,814 entities), Form I–140 (14,440 entities), Form I–910 (500 entities), and Form I–360 (1,566 entities).[316] DHS was not able to determine the numbers of regional centers or genealogy requestors that would be considered small entities and therefore, does not provide numeric estimates for Form I–956, Form I–956G, or Forms G–1041 and G–1041A.[317]

The rule applies to small entities, including businesses, nonprofit organizations, and governmental jurisdictions filing for the above benefits. Forms I–129 and I–140 would see a few industry clusters impacted by this rule (see Appendix B through E of the SEA for a list of impacted industry codes for Forms I–129, I–140, I–910, and I–360). The fee for civil surgeon designation would apply to physicians requesting such designation. Any entity petitioning on behalf of a religious worker and filing Form I–360 would pay a fee. Finally, DHS is creating new forms as stated above, as part of the EB–5 Reform and Integrity Act of 2022. Since Form I–956/I–956F/I–956G will be new forms and historical data does not exist; therefore, DHS will use historical data of the previous Form I–924, Application for Regional Center Designation Under the Immigrant Investor Program, and Form I–924A, Annual Certification of Regional Center, as a proxy for the analysis. The Form I–956 would impact any entity seeking designation as a regional center under the Immigrant Investor Program or filing an amendment to an approved regional center application. Captured in the dataset for Form I–956 is also Form I–956F and Form I–956G. I–956F regional centers must file to obtain approval of an Investment in a Commercial Enterprise. Approved regional centers must file I–956G annually to establish continued eligibility for regional center designation.

DHS does not have sufficient data on the requestors for the genealogy forms, Forms G–1041 and G–1041A, to determine if entities or individuals submitted these requests. DHS has previously determined that requests for historical records are usually made by individuals.[318] If professional genealogists and researchers submitted

---

[315] SBA size standards effective May 2, 2022, located at *https://www.sba.gov/sites/default/files/2022-05/Table%20of%20Size%20Standards_Effective%20May%202%202022_Final.pdf* (last visited Oct. 1, 2023).

[316] Calculation: 100,135 Form I–129 × 84.7% = 84,814 small entities; 27,093 Form I–140 × 54.3% = 14,440 small entities; 500 Form I–910 × 100% = 500 small entities; 1,648 Form I–360 × 95.0% = 1,566 small entities.

[317] Small entity estimates are calculated by multiplying the population (total annual receipts for the USCIS form) by the percentage of small entities, which are presented in subsequent sections of this analysis.

[318] *See* "Establishment of a Genealogy Program," 73 FR 28026 (May 15, 2008).

HR-1 FRN 2025 AR-000173

**Appx-000198**

**Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations **6361**

such requests in the past, they did not identify themselves as commercial requestors and thus could not be segregated in the data. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS does not currently have sufficient data to definitively assess the estimate of small entities for these requests.

(1) Petition for a Nonimmigrant Worker, Form I–129 Funding the Asylum Program With Additional Fee To Be Paid by Form I–129 Requestors

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file either a Form I–129, Petition for a Nonimmigrant Worker, or Form I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker. However, if a small entity employs 25 or fewer FTE workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[319] The Asylum Program Fee will be used to fund the costs to USCIS of administering the asylum program and would be due in addition to the benefit request fee requestors must pay under USCIS standard costing and fee collection methodologies for their Form I–129 and Form I–140 benefit requests.

DHS will have different fees for Form I–129 based on the nonimmigrant classification being requested in the petition, the number of beneficiaries on the petition, and, in some cases, according to whether the petition includes named or unnamed beneficiaries. Using this single form, requestors can file petitions or applications for many different types of nonimmigrant workers. DHS will have separate H–2A and H–2B fees for petitions with named workers and unnamed workers. DHS will limit the number of named beneficiaries that may be included on a single petition for H–2A, H–2B, O, H–3, P, Q and R workers to 25. Limiting the number of named beneficiaries to 25 per petition simplifies and optimizes the adjudication of these petitions, which can lead to reduced average processing times for a petition. Because USCIS completes a background check for each named beneficiary, petitions with more named beneficiaries require more time and resources to adjudicate than petitions with fewer named beneficiaries. This means the cost to adjudicate a petition increases with each additional named beneficiary. Thus, limiting the number of named beneficiaries may ameliorate the inequity of petitioners filing petitions with fewer beneficiaries who effectively subsidize the cost of petitioners filing petitions with more beneficiaries. USCIS data indicate that it requires less time and resources to adjudicate a petition with unnamed workers than one with named workers. Therefore, the establishment of different fees will better reflect the cost to USCIS to adjudicate each specific nonimmigrant classification.

DHS will charge Form I–129 petitioners a form fee, registration fee (H–1B only), CNMI Educational Fund fee (I–129 CW only)[320] and an Asylum Program Fee. A summary of the fees in the final rule is shown in Table 12a,b below. DHS will establish new fees to be paid by employers who file either a Form I–129 or Form I–129CW based on the number of FTE workers the small entity employs and its nonprofit status. Small entities will pay the associated fee for the visa classification benefit request according to whether it is a:

(1) Small entity with greater than 25 FTE employees,

(2) Small entity with 25 or fewer FTE employees, or

(3) Nonprofit small entity.

| Table 12a. Form I-129 Entities by Visa Classifications (Matched and Unmatched) | | | | | |
|---|---|---|---|---|---|
| Visa Classification Immigration Benefit Request | Entities with 25 or fewer FTE Employees | Entities with more than 25 FTE Employees | Entities with Unknown Employees | Total Number of Entities | Total Nonprofit Entities |
| H-1B | 949 | 556 | 1,362 | 2,867 | 107 |
| H-2A | 43 | 2 | 106 | 151 | 1 |
| H-2B | 13 | 6 | 26 | 45 | 0 |
| O | 57 | 41 | 113 | 211 | 9 |
| L-1A / L-1B / LZ | 86 | 102 | 238 | 426 | 2 |
| H-3/P/Q/R/HSC/E/TN/CW | 92 | 69 | 161 | 322 | 7 |
| Total Number of Entities | 1,240 | 776 | 2,006 | 4,022 | 126 |

Source: USCIS Analysis

Note:
Matched entities have reported revenue and employment data, while unmatched entities have no reported revenue or employment data.

[319] *See* 8 CFR 106.2(c)(13).

[320] Employers must pay this fee for every beneficiary that they seek to employ as a CNMI-only transitional worker. The fee is a recurring fee that petitioners must pay every year at the time the petition is filed. USCIS transfers the revenue from the CNMI education funding fee to the treasury of the Commonwealth Government to use for vocational education, apprenticeships, or other training programs for United States workers.

HR-1 FRN 2025 AR-000174

Appx-000199

**6362** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

Each H–1B registration will require a $215 registration fee.[321] Petitioners filing H–1B petitions that are not subject to the annual H–1B numerical allocations (*e.g.,* extension petitions or cap-exempt filer petitions) would not have to submit a registration and thus would not pay the registration fee. The Asylum Program Fee ($0 for nonprofits, $300 for small employers with 25 or fewer employees, and $600 for all others filing Forms I–129, Petition for a Nonimmigration Worker, I–129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker, and I–140, Immigrant Petition for Alien Workers) will be included with each Form I–129 classification (if applicable) and will apply to all fee-paying receipts for Forms I–129 and I–129CW. For example, it will apply to all initial petitions, changes of status, and extensions of stay that use Form I–129.

| Table 12b. Fee Summary Table for Form I-129 Petitioners (Matched Only) | | | | |
|---|---|---|---|---|
| **Visa Classification Immigration Benefit Request** | **Small Entities with more than 25 FTE Employees** | **Small Entities with 25 or Fewer FTE Employees** | **Nonprofit Small Entities** | **Registration fee for cap-subject H-1B visas** |
| *Number of entities in impact analyses with reported revenue and employment data* | 302 | 876 | 14 | |
| H-1B | $995* | $675* | $675* | $215 |
| H-2A – Named Beneficiaries | $1,090 | $545 | $545 | |
| H-2B – Named Beneficiaries | $1,080 | $540 | $540 | |
| H-2A – Unnamed Beneficiaries | $530 | $460 | $460 | |
| H-2B – Unnamed Beneficiaries | $580 | $460 | $460 | |
| O-1/O-2 | $1,055 | $530 | $530 | |
| L-1A/L-1B/LZ Blanket | $1,385 | $695 | $695 | |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,015 | $510 | $510 | |
| Asylum Program Fee | $600 | $300 | $0 | |
| Note: *The H-1B fee includes the antecedent $215 registration fee that is paid before filing the Form I-129 for cap-subject H-1B visas. This H-1B Registration fee is separate from the I-129H-1B form fee. Note: The CW fee includes a $30 CNMI Educational Fund fee; however, the fee is not included in this analysis because the five entities in the sample that petitioned for a CW nonimmigrant worker visa had no reported revenue data and thus an economic impact could not be estimated. Note: Asylum Program Fee applies to all Form I-129 petition visa classifications. | | | | |

The fees are calculated below to better reflect the costs associated with processing the benefit requests for the various categories of nonimmigrant worker by small entity size and nonprofit status.

(1) Small Entities With More Than 25 FTE Employees

DHS will increase the fees paid for all worker types for small entities with more than 25 FTE employees filing Form I–129 from the current filing fee of $460. For H–1B petitions, the registration fee ($215) is added to the base form fee ($780) to make $995. The Asylum Program Fee of $600 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall fee for cap-subject H–1B classification petitions of $1,595 ($995+ $600). The fee adjustments and percentage increases are summarized in Table 13.

---

[321] USCIS in this SEA used the H–1B I–129, Petition for a Nonimmigrant Worker fee of $995. This fee includes the $780 proposed fee for H–1B Classification and the $215 fee for H–1B Registration (current $10 to $215; $205 dollar increase). This registration fee of $215 is for each registration, each registration is for a single beneficiary. Registrants or their representative are required to pay the $215 non-refundable H–1B registration fee for each beneficiary before being eligible to submit a registration for that beneficiary for the H–1B cap. The fee will not be refunded if the registration is not selected, withdrawn, or invalidated. H–1B cap-exempt petitions are not subject to registration and are not required to pay the registration fee of $215; therefore, those petitioners would only pay the $780 fee. *See* 84 FR 60307 (Nov. 8, 2019); Regulatory Impact Analysis in the docket on *regulations.gov*, Section (3)(H) Separate Fees for Form I–129, Petition for a Nonimmigrant Worker, by Nonimmigrant Classification and Limit Petitions Where Multiple Beneficiaries are Permitted up to 25 Named Beneficiaries per Petition, Tables 22 and 23, for further detail on the cap and non-cap H–1B petitions. The H–1B registration applies to small entities and non-profits with no difference on employee size.

HR-1 FRN 2025 AR-000175

**Table 13. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with More than 25 FTE Employees**

| Visa Classification Immigration Benefit Request | A Current Fee | B Final Fee | C Asylum Program Fee | D Total Final Fee | E Difference in Fee Increase | F Percent Change |
|---|---|---|---|---|---|---|
| | | | | D=B+C | E=D-A | F=(D–A)/A |
| H-1B | $470 | $995 | $600 | $1,595 | $1,125 | 239.4% |
| H-2A – Named Beneficiaries | $460 | $1,090 | $600 | $1,690 | $1,230 | 267.4% |
| H-2B – Named Beneficiaries | $460 | $1,080 | $600 | $1,680 | $1,220 | 265.2% |
| H-2A – Unnamed Beneficiaries | $460 | $530 | $600 | $1,130 | $670 | 145.7% |
| H-2B – Unnamed Beneficiaries | $460 | $580 | $600 | $1,180 | $720 | 156.5% |
| O-1/O-2 | $460 | $1,055 | $600 | $1,655 | $1,195 | 259.8% |
| L-1A/L-1B/LZ Blanket | $460 | $1,385 | $600 | $1,985 | $1,525 | 331.5% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $1,015 | $600 | $1,615 | $1,155 | 251.1% |

Source: USCIS FY 2022/2023 Fee Schedule (*see* preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B final fee includes a $780 base fee and a $215 registration fee ($780 + $215 = $995).

To calculate the economic impact of the fee adjustments, DHS estimated the total costs associated with the final fee increase for each small entity with more than 25 FTE employees and divided that amount by the reported sales revenue of that entity.[322] H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee increase ($205) is added to the base form fee increase ($780) and results in an overall increase for H–1B classification petitioners of $995. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity.

DHS determined that 302 of the 1,643 matched small entities searched, were small entities with more than 25 FTE employees.[323] Depending on the immigration benefit request, the average economic impact on these 302 small entities with revenue and employment data ranges from 0.01 to 0.59 percent as shown in Table 14a. Among the 302 small entities with reported revenue and employment data, 275 (91.0 percent) experienced an economic impact of less than 1 percent and 27 (9.0 percent) experienced an economic impact greater than 1 percent. Table 14b shows the count of small entities with more than 25 FTE employees by Form I–129 Classification and their economic impacts. Those small entities with

greater than 1 percent impact were mostly H–1B filers (18 of 27) that filed multiple petitions and collectively had well below average reported revenues compared to the average revenue for all 302 small entities.[324] The average economic impact from the registration fee on all 241 H–1B filers was 0.06 percent; the greatest economic impact was 1.35 percent, and the smallest was 0.0004 percent. The average impact on the 302 small entities with revenue data were 0.33 percent. The greatest economic impact imposed by the fee changes on all 302 small entities with more than 25 FTE employees was 7.06 percent and the smallest was 0.002 percent per entity.

---

[322] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[323] Entities in the population without complete or with no EIN information (such as incomplete

employee data or revenue information), were removed before the sample was selected for this analysis.

[324] The number of H–1B petitions filed by these 18 entities ranged from 4 to 411. The average annual revenue reported by these 18 entities was $4.9 million whereas the average annual revenue

for all 302 entities in the sample was $11.9 million. Thus, the increase in the H–1B registration fee had a more pronounced economic impact on those 18 entities that filed multiple petitions.

HR-1 FRN 2025 AR-000176

**Table 14a: Form I-129 Classifications Economic Impacts on Small Entities with More than 25 FTE Employees with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $995 | 0.31% |
| H-2A – Named Beneficiaries | $1,230 | 0.02% |
| H-2B – Named Beneficiaries | $1,220 | 0.32% |
| H-2A – Unnamed Beneficiaries | $670 | 0.01% |
| H-2B – Unnamed Beneficiaries | $720 | 0.18% |
| L-1A/L-1B/LZ Blanket | $1,195 | 0.29% |
| O-1/O-2 | $1,525 | 0.38% |
| CW, H-3, HSC, E, TN, Q, P, and R | $1,155 | 0.59% |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $780 base fee increase and a $205 registration fee increase ($780 + $205 = $995).

**Table 14b: Count of Small Entities with More than 25 FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact.**

| Visa Classification Immigration Benefit Request | Economic Impact Less than 1 percent | Economic Impact Greater than 1 percent | Total |
|---|---|---|---|
| H-1B | 223 | 18 | 241 |
| H-2A – Named Beneficiaries | 1 | 0 | 1 |
| H-2B – Named Beneficiaries | 3 | 1 | 4 |
| L-1A/L-1B/LZ Blanket | 23 | 3 | 26 |
| O-1/O-2 | 11 | 2 | 13 |
| CW, H-3, HSC, E, TN, Q, P, and R | 14 | 3 | 17 |
| **Total** | **275** | **27** | **302** |

Source: USCIS analysis.

(2) Small Entities With 25 or Fewer FTE Employees

DHS will increase the base form fee filed for all worker types for small entities with 25 or fewer FTE employees filing Form I–129 from the current base filing fee of $460, apart from H–1B, H–2A-Unnamed Beneficiaries, and H–2B-Unnamed Beneficiaries. For H–1B petitions, the registration fee ($215) is added to the base form fee ($460), totaling $675. The Asylum Program Fee of $300 will be added to each petition filed regardless of worker type. The addition of the Asylum Program Fee results in an overall increase for cap-subject H–1B classification petitions of $975 ($675 + $300). The fee adjustments and percentage increases are summarized, shown in Table 15.

HR-1 FRN 2025 AR-000177

Appx-000202

**Table 15. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Small Entities with 25 or Fewer FTE Employees**

| Visa Classification Immigration Benefit Request | A<br>Current Fee | B<br>Final Fee | C<br>Asylum Program Fee | D<br>Total Final Fee | E<br>Difference in Fee Increase | F<br>Percent Change |
|---|---|---|---|---|---|---|
| | | | | D=B+C | E=D-A | F=(D–A)/A |
| H-1B | $470 | $675 | $300 | $975 | $505 | 107.4% |
| H-2A – Named Beneficiaries | $460 | $545 | $300 | $845 | $385 | 83.7% |
| H-2B – Named Beneficiaries | $460 | $540 | $300 | $840 | $380 | 82.6% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $300 | $760 | $300 | 65.2% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $300 | $830 | $370 | 80.4% |
| O-1/O-2 | $460 | $695 | $300 | $995 | $535 | 116.3% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $300 | $810 | $350 | 76.1% |

Source: USCIS FY 2022/2023 Fee Schedule (see preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increases, DHS estimated the total costs associated with the final fee increase for each small entity with 25 or fewer FTE employees and divided that amount by the sales revenue of that entity.[325] H–1B classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. This registration fee is added to the fee increase and results in an overall fee for H–1B classification petitions of $505 ($300 + $205). Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 876 of the 1,643 entities searched, were small entities with fewer than 25 FTE employees.[326]

**Table 16a: Form I-129 Classifications Economic Impacts on Small Entities with 25 or Fewer FTE Employees with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $505 | 0.45% |
| H-2A – Named Beneficiaries | $385 | 0.21% |
| H-2B – Named Beneficiaries | $380 | 0.08% |
| H-2A – Unnamed Beneficiaries | $300 | 0.16% |
| H-2B – Unnamed Beneficiaries | $300 | 0.06% |
| L-1A/L-1B/LZ Blanket | $370 | 0.16% |
| O-1/O-2 | $535 | 0.21% |
| CW, H-3, HSC, E, TN, Q, P, and R | $350 | 0.14% |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase includes a $300 base fee increase and a $205 registration fee increase ($300 + $205 = $505).

Depending on the immigration benefit request, the average economic impact on the 876 small entities with revenue and employment data ranges from 0.06 to 0.45 percent as shown in Table 16a. The average economic impact on all 876 small entities was 0.39 percent. Table 16b shows that among the 876 small entities, 781 (89.2 percent) experienced an economic impact of less than 1 percent and 195 (10.8 percent) experienced an economic impact greater than 1 percent. Those small entities with greater than 1 percent economic impact were mostly H–1B filers (91 of 195) that mostly filed multiple petitions and collectively had well below average reported revenues compared to the

---

[325] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

[326] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

average revenue for all 876 small entities.[327] The average economic impact from the registration fee on all 682 H–1B filers was 0.19 percent; the greatest economic impact was 1.79 percent and the smallest was 0.001 percent. The greatest economic impact imposed by the fee changes on all 876 small entities with 25 or fewer FTE employees was 4.21 percent, and the smallest was 0.003 percent per entity.

**Table 16b: Count of Small Entities with 25 or Fewer FTE Employees with Revenue Data by Form I-129 Classification and Economic Impact.**

| Visa Classification Immigration Benefit Request | Economic Impact Less than 1 percent | Economic Impact Greater than 1 percent | Total |
|---|---|---|---|
| H-1B | 591 | 91 | 682 |
| H-2A – Named Beneficiaries | 35 | 0 | 35 |
| H-2B – Named Beneficiaries | 12 | 0 | 12 |
| L-1A/L-1B/LZ Blanket | 51 | 2 | 53 |
| O-1/O-2 | 31 | 1 | 32 |
| CW, H-3, HSC, E, TN, Q, P, and R | 61 | 1 | 62 |
| Total | 781 | 95 | 876 |
| Source: USCIS analysis. | | | |

(3) Nonprofit Small Entities

DHS will increase the base fee filed for all worker types for nonprofit small entities filing Form I–129 from the current base filing fee of $460, except for H–1B, H–2A-Unnamed Beneficiaries, and H–2B-Unnamed Beneficiaries.[328] For H–1B petitions, the registration fee ($215) is added to the base fee ($460) and results in an overall fee for cap-subject H–1B classification petitions of $675. Nonprofit small entities are exempt from paying the Asylum Program Fee. The fee adjustments and percentage increases are summarized, shown in Table 17.

**Table 17. USCIS Final Fees for Form I-129 Petition for Nonimmigrant Worker by Classification, for Nonprofit Small Entities**

| Visa Classification Immigration Benefit Request | A<br>Current Fee | B<br>Final Fee | C<br>Asylum Program Fee | D<br>Total Final Fee | E<br>Difference in Fee Increase | F<br>Percent Change |
|---|---|---|---|---|---|---|
| | | | | D=B+C | E=D-A | F=(D–A)/A |
| H-1B | $470 | $675 | $0 | $675 | $305 | 43.6% |
| H-2A – Named Beneficiaries | $460 | $545 | $0 | $545 | $85 | 18.5% |
| H-2B – Named Beneficiaries | $460 | $540 | $0 | $540 | $80 | 17.4% |
| H-2A – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| H-2B – Unnamed Beneficiaries | $460 | $460 | $0 | $460 | $0 | 0.0% |
| L-1A/L-1B/LZ Blanket | $460 | $530 | $0 | $530 | $70 | 15.2% |
| O-1/O-2 | $460 | $695 | $0 | $695 | $235 | 51.1% |
| CW, H-3, HSC, E, TN, Q, P, and R | $460 | $510 | $0 | $510 | $50 | 10.9% |

Source: USCIS FY 2022/2023 Fee Schedule (see preamble Section (I)(D)).
Note: Employers may apply using Form I-129 also for P–1, P–1S, P–2, P–2S, P–3, P–3S, R1, E–1, E–2, E–3.
Note: The H-1B final fee includes a $460 base fee and a $215 registration fee ($460 + $215 = $675).

To calculate the economic impact of the fee increase, DHS estimated the total costs associated with the final fee increase for each nonprofit small entity and divided that amount by the sales revenue of that entity.[329] H–1B

---

[327] The number of H–1B petitions filed by these 91 entities ranged from 1 to 60 (86 of 91 entities filed five or more H–1B petition). The average annual revenue reported by these 91 entities was $0.6 million whereas the average annual revenue for all 876 entities in the sample was $2.5 million. Thus, the increase in the H–1B registration fee had a more pronounced economic impact on those 91 entities.

[328] Nonprofits in this analysis include entities that identify with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business Associations), and 813930 (Labor Unions and Similar Labor Organizations).

[329] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase) /Entity Sales Revenue. DHS used the lower end of the sales revenue range for those entities where ranges were provided.

classification cap-subject petitions will include a $215 registration fee, an increase of $205 from the original $10 fee. Since there was no increase in the H–1B form fee for nonprofit small entities, the $205 registration fee is the only increase for these petitioners. Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. DHS determined that 14 of the 1,643 entities searched were nonprofit small entities.[330]

All 14 of these nonprofit small entities petitioned for H–1B workers; there were no recorded petitions for the other classifications. Table 18 shows that the average economic impact on the 14 entities was 0.23 percent. All 14 nonprofit small entities experienced an economic impact of less than 1 percent. The average economic impact from the registration fee on all 14 H–1B filers was 0.13 percent; the greatest economic impact was 0.6 percent and the smallest was 0.003 percent. The greatest economic impact imposed by the fee changes on all 14 nonprofit small entities was 0.82 percent and the smallest was 0.003 percent per entity.

**Table 18: Form I-129 Classifications Economic Impacts on Nonprofit Small Entities with Revenue Data.**

| Visa Classification Immigration Benefit Request | Fee Increase | Average Economic Impact Percentage* |
|---|---|---|
| H-1B | $205 | 0.23% |
| H-2A – Named Beneficiaries | $85 | N/A |
| H-2B – Named Beneficiaries | $80 | N/A |
| H-2A – Unnamed Beneficiaries | $0 | N/A |
| H-2B – Unnamed Beneficiaries | $0 | N/A |
| L-1A/L-1B/LZ Blanket | $70 | N/A |
| O-1/O-2 | $235 | N/A |
| CW, H-3, HSC, E, TN, Q, P, and R | $50 | N/A |

Source: USCIS calculation.
*These figures are percentages, not proportions.
Note: Employers may apply using Form I-129 also for P-1, P-1S, P-2, P-2S, P-3, P-3S, R1, E-1, E-2, E-3.
Note: The H-1B fee increase only includes the $205 registration fee increase because the base fee was unchanged.

(4) Impacts by NAICS Code

DHS analyzed the average economic impact imposed by the fee increases on the 1,643 small entities with reported sales revenue data by NAICS code. Table 19 shows the top 10 NAICS industries that use the Form I–129 for all classifications by the number of petitions filed during FY 2022 and the average impact on those entities. All the top 10 NAICS industries that use Form I–129 experienced an economic impact of less than 1.0 percent of revenue.

---

[330] Entities in the population without complete or with no EIN information (such as incomplete employee data or revenue information), were removed before the sample was selected for this analysis.

HR-1 FRN 2025 AR-000180

**Appx-000205**

| Table 19. Top 10 Industries that Use the Form I-129 by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 541618-Other Management Consulting Services | 303 | 0.87% |
| 541211-Offices of Certified Public Accountants | 748 | 0.82% |
| 541512-Computer Systems Design Services | 260 | 0.60% |
| 541511-Custom Computer Programming Services | 1,880 | 0.50% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 306 | 0.49% |
| 541611-Administrative Management and General Management Consulting Services | 227 | 0.35% |
| 541612-Human Resources Consulting Services | 422 | 0.35% |
| 518210-Computing Infrastructure Providers, Data Processing, Web Hosting, and Related Services | 258 | 0.26% |
| 513210-Software Publishers | 1,721 | 0.22% |
| 541330-Engineering Services | 309 | 0.17% |
| Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) database (Jan. 31, 2023). | | |

The top NAICS industries that utilize the Form I–129 for H–1B [331] classification experienced an economic impact of less than 1.0 percent of revenue in the analysis (Table 20).

[331] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Sec., "H–1B Specialty Occupations, DOD Cooperative Research and Development Project Workers, and Fashion Models," https:// www.uscis.gov/working-in-the-united-states/h-1b-specialty-occupations (last updated Sept. 15, 2023).

HR-1 FRN 2025 AR-000181

Appx-000206

**Table 20. Top 10 Industries that Use the Form I-129 for H-1B by Six-Digit NAICS Code.**

| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
|---|---|---|
| 621111-Offices of Physicians (except Mental Health Specialists) | 15 | 0.38% |
| 541612-Human Resources Consulting Services | 7 | 0.29% |
| 541511-Custom Computer Programming Services | 28 | 0.20% |
| 541600-Management, Scientific, and Technical Consulting Services | 9 | 0.14% |
| 541330-Engineering Services | 20 | 0.11% |
| 541990-All Other Professional, Scientific and Technical Services | 6 | 0.06% |
| 621210-Offices of Dentists | 6 | 0.06% |
| 561400-Business Support Services | 17 | 0.05% |
| 541618-Other Management Consulting Services | 6 | 0.04% |
| 513210-Software Publishers | 9 | 0.02% |

Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

The top NAICS industries that use Form I–129 H–2A [332] classification for named beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 21).

**Table 21. Top Industries that Use the Form I-129 H-2A for Named Beneficiaries by Six-Digit NAICS Code.**

| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
|---|---|---|
| 445230-Fruit and Vegetable Retailers | 3 | 0.35% |
| 111998-All Other Miscellaneous Crop Farming | 26 | 0.30% |
| 112111-Beef Cattle Ranching and Farming | 4 | 0.15% |
| 111991-Sugar Beet Farming | 2 | 0.10% |
| 112990-All Other Animal Production | 1 | 0.08% |
| 115111-Cotton Ginning | 4 | 0.02% |
| 115113-Crop Harvesting, Primarily by Machine | 3 | 0.02% |

Source: USCIS, OP&S, PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023).

Most of the top NAICS industries that use the Form I–129 H–2B [333] classification for named beneficiaries experienced an economic impact of considerably less than 1.0 percent of revenue (Table 22). One of the top NAICS industries experienced an impact of greater than 1.0 percent.

---

[332] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H–2A Temporary Agricultural Workers," available *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers* (last updated Nov. U.S. Dep't of Homeland

Security, "H–2A Temporary Agricultural Workers," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2a-temporary-agricultural-workers* (last updated Nov. 8, 2023).

[333] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "H–2B Temporary Non-

Agricultural Workers," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/h-2b-temporary-non-agricultural-workers* (last updated Jan. 12, 2024).

| **Table 22. Top Industries that Use the Form I-129 H-2B for Named Beneficiaries by Six-Digit NAICS Code.** | | |
|---|---|---|
| **NAICS Industry** | **Number of Petitions in Sample** | **Average Impact Percentage** |
| 713930-Marinas | 3 | 1.14% |
| 112512-Shellfish Farming | 1 | 0.31% |
| 111421-Nursery and Tree Production | 2 | 0.26% |
| 541940-Veterinary Services | 1 | 0.05% |
| 561730-Landscaping Services | 11 | 0.06% |
| 236220-Commercial and Institutional Building Construction | 4 | 0.03% |
| 444240-Nursery, Garden Center, and Farm Supply Retailers | 1 | 0.01% |
| 561400-Specialized Design Services | 1 | 0.01% |
| 484110-General Freight Trucking, Local | 1 | 0.01% |
| Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023). | | |

For Form I–129 (O[334] and P[335] classifications), among the 1,643 small entities with reported revenue data identified in the SEA, most of the top industries by NAICS code experienced an economic impact of considerably less than 1.0 percent of revenue in the analysis. Three of the top NAICS industries experienced an impact of greater than 1.0 percent (Table 23).

[334] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "O–1 Visa: Individuals with Extraordinary Ability or Achievement," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/o-1-visa-individuals-with-extraordinary-ability-or-achievement* (last updated Mar. 3, 2023).

[335] U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–1A Athlete," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1a-athlete* (last updated Mar.

26, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–1B A Member of an Internationally Recognized Entertainment Group," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-1b-a-member-of-an-internationally-recognized-entertainment-group* (July 19, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–2 Individual Performer or Part of a Group Entering to Perform Under a Reciprocal Exchange Program," *https://www.uscis.gov/working-in-the-united-states/*

*temporary-workers/p-2-individual-performer-or-part-of-a-group-entering-to-perform-under-a-reciprocal-exchange-program* (Feb. 24, 2021); U.S. Citizenship & Immigr. Servs., U.S. Dep't of Homeland Security, "P–3 Artist or Entertainer Coming to Be Part of a Culturally Unique Program," *https://www.uscis.gov/working-in-the-united-states/temporary-workers/p-3-artist-or-entertainer-coming-to-be-part-of-a-culturally-unique-program* (last visited Feb. 24, 2021).

HR-1 FRN 2025 AR-000183

| Table 23. Top Industries that Use the Form I-129 (O&P) by Six-Digit NAICS Code. | | |
|---|---|---|
| NAICS Industry | Number of Petitions in Sample | Average Impact Percentage |
| 721310-Rooming and Boarding Houses, Dormitories, and Workers' Camps | 35 | 1.73% |
| 112120-Dairy Cattle and Milk Production | 6 | 1.55% |
| 541890-Other Services Related to Advertising | 4 | 1.05% |
| 236115-New Single-family Housing Construction (Except For-Sale Builders) | 18 | 0.54% |
| 622210-Psychiatric and Substance Abuse Hospitals | 7 | 0.37% |
| 621511-Medical Laboratories | 8 | 0.34% |
| 621111-Offices of Physicians (except Mental Health Specialists) | 23 | 0.24% |
| 516120-Television Broadcasting Stations | 5 | 0.15% |
| 621493-Freestanding Ambulatory Surgical and Emergency Centers | 6 | 0.09% |
| 523940-Portfolio Management and Investment Advice | 5 | 0.08% |
| Source: USCIS, OP&S PRD, Computer-Linked Application Information Management System (CLAIMS) 3 and Electronic Immigration System (ELIS) databases (Jan. 31, 2023). | | |

*Small Entity Classifications*

With an aggregated total of 4,022 small entities out of a sample size of 4,746 entities, DHS inferred that 84.7 percent of the entities filing Form I–129 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), 813110 (Religious Organizations), 813311 (Human Rights Organizations), 813312 (Environment, Conservation and Wildlife Organizations), 813319 (Other Social Advocacy Organizations), 813910 (Business Associations), and 813930 (Labor Unions and Similar Labor Organizations) were not-for-profit. Most of the sample consisted of small businesses when looked at by type of small entity. There are 4 small governmental jurisdictions in the sample and 126 small not-for-profits.

(2) Immigrant Petition for an Alien Worker, Form I–140

*a. Funding the Asylum Program With Form I–140 Petition Fees*

In the final rule, DHS will establish a new Asylum Program Fee of $600 to be paid by employers who file a Form I–140, Immigrant Petition for Alien Worker. However, if a small entity employs 25 or fewer FTE workers, it will pay a $300 Asylum Program Fee. Additionally, firms that are approved by the IRS as nonprofit entities will not be required to pay the Asylum Program Fee.[336] The Asylum Program Fee will be used to fund the costs to USCIS of administering the asylum program and would be due in addition to the fee those petitioners would pay under USCIS standard costing and fee collection methodologies for their Form I–129 and Form I–140 benefit requests.

DHS will increase fees for Form I–140 from $700 to $715, an increase of 2 percent ($15). The total fees for each entity in the analysis will include the I–140 form fee and the relevant Asylum Program Fee. The Asylum Program Fee will be dependent on the number of FTE employees and nonprofit status of the entity. Hence, calculation of fees in this analysis will be as follows:

• The total fee for small entities that employ more than 25 FTE workers will include the $600 Asylum Program Fee

for a total of $1,315 ($715 + $600). This is an overall increase of $615 (88 percent) per petition, from current costs of $700.

• The total fee for small entities that employ 25 or fewer FTE employees will include the $300 Asylum Program Fee for a total of $1,015 ($715 + $300), an overall increase of $315 (45 percent) per petition, from current costs of $700.

• The total fee for nonprofit small entities will consist of only the I–140 form fee as there are no Asylum Program Fees to be paid by nonprofit entities. Total fees will be $715, an increase of $15 (2 percent).

To calculate the economic impact of the final rule fees, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[337] Because entities can file multiple petitions, the analysis considers the number of petitions submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. DHS identified 126 small entities with reported revenue data in the sample. Of the 126 small entities, 46 had greater than 25 FTE employees and 80 had 25 or fewer FTE

---

[336] *See* 8 CFR 106.2(c)(13).

[337] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/Entity Sales Revenue. USCIS used the lower end of sales revenue range for those entities where ranges were provided.

HR-1 FRN 2025 AR-000184

Appx-000209

employees. There were no nonprofit small entities with reported revenue data in the sample. All 46 small entities with greater than 25 FTE employees experienced an economic impact of less than 1 percent. The average impact on these 46 entities was 0.03 percent. The greatest economic impact imposed by the fees in the final rule was 0.25 percent and the smallest was 0.0001 percent.

For the 80 small entities with 25 or fewer FTE employees, 79 of them experienced an economic impact of less than 1 percent. The other entity experienced an economic impact of 1.002 percent, which was the greatest economic impact imposed by the fees in the final rule. The smallest economic impact imposed by the fee increase was 0.002 percent.

a. Small Entity Classification

With an aggregated total of 299 out of a sample size of 550, DHS inferred that most, or 54.3 percent, of the entities filing Form I–140 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form, DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611110 (Elementary and Secondary Schools), 611310 (Colleges, Universities and Professional Schools), 712110 (Museums), 813319 (Other Social Advocacy Organizations), 813410 (Civic and Social Organizations), 813910 (Business Associations), and 813940 (Political Organizations) were not-for-profit. The sample of Form I–140 consisted mainly of small businesses, with no small governmental jurisdictions in the sample and 13 small not-for-profits.

b. Cumulative Impact of Form I–129 and Form I–140 Petitions

In addition to the individual Form I–129 and Form I–140 analyses, USCIS analyzed any cumulative impacts of these form types to determine the economic impacts to small entities when analyzed together. Based on the samples in the individual analyses, USCIS isolated those entities that overlapped in both samples of Forms I–129 and I–140 by EIN and revenue. Ninety entities had an EIN that overlapped in both samples; there were

59 large entities and 31 small entities that submitted both Form I–129 petitions and Form I–140 petitions.[338] Of the 31 small entities, 8 entities had revenue data reported in databases Data Axle, *Manta.com, Cortera.com, or Guidestar.org.*

Three of the 8 overlapping sample entities with revenue data had Form I–129 economic impacts of greater than 1 percent. Of the sample entities that overlapped, 3 entities had Form I–129 economic impacts of 1.95 percent, 6.62 percent, and 6.92 percent, respectively. All 8 overlapping sample entities had Form I–140 economic impacts of less than 1 percent. Although 3 overlapping small entities had Form I–129 economic impacts of greater than 1 percent, USCIS does not expect the combined impacts of Form I–129 and Form I–140 to be an economically significant burden on most small entities. This is due to little overlap in entities in the samples and the mostly minor economic impacts from the Forms I–129 and I–140 fee increases and Asylum Program Fees.

(3) Application for Civil Surgeon Designation, Form I–910

USCIS will increase fees for Form I–910 to $990. This is an increase of 26 percent ($205) from the current fee of $785. To calculate the economic impact of this increase, USCIS estimated the total costs associated with the fee increase for each entity and divided that amount by the sales revenue of that entity.[339] Because entities can file multiple requests, the analysis considers the number of requests submitted by each entity. Entities that were considered small based on employee count with missing revenue data were excluded. In the sample, 179 matched entities with reported revenues were considered small entities. All 179 small entities experienced an economic impact of less than 1 percent. The greatest economic impact of the increased fee was 0.91 percent, and the smallest was 0.001 percent per entity. The average impact on all 179 small entities with revenue data was 0.05 percent.

a. Small Entity Classification

With an aggregated total of 300 out of a sample size of 300, DHS inferred that most, or 100.0 percent, of the entities filing Form I–910 requests were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 611310 (Colleges, Universities and Professional Schools), 624190 (Other Individual and Family Services), and 813990 (Other Similar Organizations (except Business, Professional, Labor, and Political Organizations)) were not-for-profit. The sample of Form I–910 consisted of all small businesses, with no small governmental jurisdictions in the sample and no small not-for-profits.

(4) Petition for Amerasian, Widow(er), or Special Immigrant, Form I–360

DHS will increase the fees for entities that file Form I–360 from $435 to $515, an increase of $80 (18.4 percent). Using the business provider databases, DHS determined that 174 entities matched and were considered small entities. To calculate the economic impact of the increase for each entity, DHS divided the costs associated with the fee increase by the sales revenue of that entity.[340] The results indicated that all 174 small entities with reported revenue data experienced an economic impact well below 1 percent. The greatest economic impact imposed by this final fee change was 0.08 percent and the smallest was 0.001 percent per entity. The average impact on all 174 small entities with revenue data was 0.01 percent.

DHS also analyzed the costs of the final rule on the petitioning small entities relative to the costs of the typical employee's salary. The SBA

---

[338] Total Impact to Entity = (Number of Petitions Submitted per Entity × Fee Increase)/Entity Sales Revenue. USCIS used the lower end of sales revenue range for those entities where ranges were provided.

[339] Total Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/Entity Sales Revenue.

[340] Total Economic Impact to Entity = (Number of Petitions Submitted per Entity × $ Fee Increase)/ Entity Sales Revenue. USCIS used the lower end of the sales revenue range for those entities where ranges were provided.

Guidelines provide that the impact of a rule could be significant if the cost of the regulation exceeds 5 percent of the labor costs of the small entities in the sector.[341] According to the Bureau of Labor Statistics (BLS), the mean annual salary is $60,180 for clergy,[342] $60,540 for directors of religious activities and education,[343] and $45,420 for other religious workers.[344] Based on an average of 1.29 religious workers [345] petitioned-for per entity, the additional average annual cost will be $103.20 per small entity.[346] The additional costs per small entity in this final rule represents only 0.17 percent of the average annual salary for clergy, 0.17 percent of the average annual salary for directors of religious activities and education, and

0.23 percent of the average annual salary for all other religious workers.[347]

a. Small Entity Classification

With an aggregated total of 399 out of a sample size of 420, DHS inferred that most, or 95 percent, of the entities filing Form I–360 petitions were small entities. Small entities filing petitions could be for-profit businesses or not-for-profit entities. To understand the extent to which not-for-profits were included in the samples selected for each form DHS categorized entities as for-profit or not-for-profit. The business data provider databases do not distinguish if entities are for-profit or not-for-profit, so DHS used the assumption that entities with NAICS codes 813110 (Religious Organizations), 813410 (Civic and Social Organizations), 813920 (Professional Organizations), and 813990 (Other Similar Organizations except Business, Professional, Labor, and Political Organizations) were not-for-profit. The sample population of Form I–360 consisted mainly of small businesses. There were no small governmental jurisdictions in the sample and 145 small not-for-profits primarily composed of religious institutions.

(5) Genealogy Requests—Genealogy Index Search Request, Form G–1041, Genealogy Records Request, Form G–1041A and Certificate of Non-Existence, Form G–1566

In the final rule, DHS increased the fee for the Genealogy Index Search

Request, Form G–1041 and Form G–1041A, from $65 to $80, an increase of $15 (23 percent) for those who mail in this request on paper. The fee for requestors who use the online electronic Form G–1041 or G–1041A version decreased from $65 to $30, a decrease of $35 (−54 percent). DHS will also establish a fee of $330 for individuals submitting a Form G–1566, Request for a Certificate of Non-Existence, once approved by OMB.[348]

The affected population includes individuals who use Form G–1041 to request a search of USCIS historical indices, individuals who use Form G–1041A to obtain copies of USCIS historical records found through an index request, and individuals who request a Certificate of Non-Existence to document that USCIS has no records indicating that an individual became a naturalized citizen of the United States. DHS estimates that an annual average of 6,755 Form G–1041 index search requests and 4,608 Form G–1041A records requests were received during FY 2018 through FY 2022 as shown in Table 24. For both forms, more than 90 percent of the requests were submitted electronically. DHS estimates that an annual average of 2,443 receipts for Form G–1566 will be made.

---

[341] Office of Advocacy, SBA, "A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act," p. 19 *https://advocacy.sba.gov/wp-content/uploads/2019/07/How-to-Comply-with-the-RFA-WEB.pdf* (last visited Aug. 22, 2023).

[342] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Clergy," *https://www.bls.gov/oes/2022/may/oes212011.htm* (last visited Aug. 22, 2023).

[343] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Directors of Religious Activities and Education," *https://www.bls.gov/oes/2022/may/oes212021.htm* (last visited Aug. 22, 2023).

[344] BLS, U.S. Department of Labor, "Occupational Employment Statistics, May 2022, "Religious Workers, All Other," *https://www.bls.gov/oes/2022/may/oes212099.htm* (last visited Aug. 22, 2023).

[345] USCIS calculated the average filing per small entity of 1.29 petitions, from the Form I–360 Sample with Petition Totals in Appendix E of this analysis. Calculation: (total number of petitions from each sample id)/(total number of sample Form I–360 petitions) = 224/174 = 1.29 average petitions filed per small entity. Note, this calculation includes only small entities with reported revenue data, *i.e.,* matched small entities.

[346] Calculation: 1.29 average petitions per small entity × $80 increase in petition fees = approximately $103.20 additional total cost per small entity.

[347] Calculation: ($103.20 additional cost per small entity/$60,180 clergy salary) × 100 = 0.17 percent; ($103.20 additional cost per small entity/$60,540 directors of religious activities and education) × 100 = 0.17 percent; ($103.20 additional cost per small entity/$45,420 other religious workers) × 100 = 0.23 percent.

[348] The fee will be established in the FY 2022/2023 rule and will be required with the submission of Form G–1566 if it is approved by OIRA before this rule takes effect. If the form is not approved before the rule takes effect, the fee will be due with the submission of a non-form request until the form is prescribed by DHS as provided in 8 CFR 299.1.

HR-1 FRN 2025 AR-000186

**Appx-000211**

**6374** **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

**Table 24. Receipts of Form G-1041, Genealogy Index Search Request, Form G-1041A, Genealogy Records Request and Form G-1566, Request for a Certificate of Non-Existence for FY 2018 through FY 2022**

| Fiscal Year | Form G-1041 (Paper Filing) | Form G-1041 (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2018 | 228 | 3,602 | 3,830 | 94% |
| 2019 | 218 | 5,295 | 5,513 | 96% |
| 2020 | 318 | 7,764 | 8,082 | 96% |
| 2021 | 207 | 7,220 | 7,427 | 97% |
| 2022 | 124 | 8,901 | 9,025 | 99% |
| **5-year Total** | **1,095** | **32,782** | **33,877** | |
| **5-year Annual Average** | **219** | **6,556** | **6,775** | **97%** |

| Fiscal Year | Form G-1041A (Paper Filing) | Form G-1041A (Online Filing) | Total | Percentage Filed Online |
|---|---|---|---|---|
| 2018 | 298 | 2,645 | 2,943 | 90% |
| 2019 | 333 | 3,407 | 3,740 | 99% |
| 2020 | 344 | 4,895 | 5,239 | 93% |
| 2021 | 309 | 5,451 | 5,760 | 95% |
| 2022 | 190 | 5,168 | 5,358 | 96% |
| **5-year Total** | **1,474** | **21,566** | **23,040** | |
| **5-year Annual Average** | **295** | **4,313** | **4,608** | **94%** |

| Fiscal Year | Certificate of Non-Existence Form G-1566 |
|---|---|
| 2018 | 1,442 |
| 2019 | 1,516 |
| 2020 | 1,784 |
| 2021 | 2,948 |
| 2022 | 4,527 |
| **5-year Total** | **12,217** |
| **5-year Annual Average** | **2,443** |

Source: USCIS, Immigration Records and Identity Services (IRIS) Directorate, Records Information Systems Branch (RISB). Feb. 2, 2023.
Note: IRIS tracks the online percentage of index searches and records requests.

DHS has previously determined that requests for historical records are usually made by individuals.[349] If professional genealogists and researchers submitted such requests in the past, they did not identify themselves as commercial requestors and, therefore, DHS could not separate these data from the dataset. Genealogists typically advise clients on how to submit their own requests. For those who submit requests on behalf of clients, DHS does not know the extent to which they can pass along the fee increases to their individual clients. DHS currently does not have sufficient data to definitively assess the impact on small entities for these requests. DHS

asked for comment on this in the proposed rule and received no comments or data. DHS recognizes that some small entities may be impacted by the increased fees but cannot determine how many or the exact impact.

(6) Application for Regional Center Designation Under the EB–5 Regional Center Pilot Program, Form I–956 (Formerly Form I–924), Application for Approval of an Investment in a Commercial Enterprise, Form I–956F (Formerly Form I–924 Amendment) and I–956G (Formerly Form I–924A)

Congress created the EB–5 program in 1990 to stimulate the U.S. economy through job creation and capital investment by immigrant investors. The EB–5 regional center program was later

added in 1992 by the Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1993. Public Law 102–395, sec. 610, 106 Stat 1828 (Oct. 6, 1992). As amended, the EB–5 program makes approximately 10,000 visas available annually to foreign nationals (and their dependents) who invest at least $1,050,000 or a discounted amount of $800,000 if the investment is in a targeted employment area (TEA) (which includes certain rural areas and areas of high unemployment) or infrastructure project in a U.S. business that will create at least 10 full-time jobs in the United States for qualifying employees. *See* INA sec. 203(b)(5), 8 U.S.C. 1153(b)(5). Such investment amounts are not necessarily

---

[349] *See* 73 FR 28026 (May 15, 2008).

HR-1 FRN 2025 AR-000187

Appx-000212

indicative of whether the regional center is characterized appropriately as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

On March 5, 2022, the President signed the EB–5 Reform and Integrity Act of 2022, Div. BB of the Consolidated Appropriations Act, 2022 (Pub. L. 117–103). The EB–5 Reform and Integrity Act of 2022, which repealed the Regional Center Pilot Program and authorized a new EB–5 Regional Center Program.[350] See 88 FR 402, 420 (Jan. 4, 2023). (EB–5 stands for Employment-Based Immigrant Visa, Fifth Preference.) The EB–5 Reform and Integrity Act of 2022 requires DHS to conduct a fee study not later than 1 year after the date of the enactment of this Act and, not later than 60 days after the completion of the study, set fees for EB–5 program related immigration benefit requests at a level sufficient to recover the costs of providing such services, and complete the adjudications within certain time frames. See Public Law 117–103, sec. 106(b). DHS has begun the fee study required by the EB–5 Reform and Integrity Act of 2022 and has initiated a working group to begin drafting the rule. However, that effort is still in its early stages. How the EB–5 Reform and Integrity Act of 2022 and the fee study it requires relate to this rule and the fees it sets are explained in section IV.G.2.b. of this preamble in responses to comments on those fees and related polices.

The various program fees and changes as a result of the EB–5 Reform Integrity Act of 2022 will be discussed in a separate future EB–5 rulemaking.

Despite the changes in the law and program, DHS' final fees are based on the currently projected staffing needs to meet the adjudicative and administrative burden of the IPO pending the fee study required by section 106(a) of the EB–5 Reform and Integrity Act of 2022.

The fee for Form I–956 (formerly Form I–924) and Form I–956F [351] (formerly Form I–924 Amendment) is $47,695, a $29,900 or 168-percent increase from the current $17,795 fee. The fee for Form I–956G (formerly Form I–924A) is $4,470, a $1,435 or 47 percent increase from the current $3,035 fee. During the 5-year period from FY 2018 through FY 2022, USCIS received a total of 249 annual Form I–956 (formerly Form I–924) regional centers applications and 3,260 Form I–956G (formerly Form I–924A) annual statements, with annual averages 62 and 652 respectively (see Table 25).

The annual filing volume projections in this rule are based on historical volumes and trends. Section 105(a) of the EB–5 Reform and Integrity Act of 2022 directs USCIS to conduct a study of the fees charged in the administration of the EB–5 program. Form I–956F and other changes are too new for DHS to accurately estimate impacts on filing volumes. DHS will address these additional impacts resulting from the EB–5 Reform and Integrity Act of 2022 in a future rulemaking.[352]

**Table 25. Annual Receipts for Form I-956, Application for Regional Center Designation under the Immigrant Investor Program, and Form I-956G, Annual Statements of Regional Center, for FY 2018 through FY 2022**

| Fiscal Year | Form I-956 | Form I-956G |
|---|---|---|
| 2018 | 122 | 787 |
| 2019 | 79 | 808 |
| 2020 | 34 | 702 |
| 2021 | 14 | 434 |
| 2022 | 0[353] | 529 |
| **5-year Total** | **249** | **3,260** |
| **5-year Annual Average** | **62** | **652** |
| Source: USCIS, Office of Policy and Strategy (OP&S), Policy Research Division, CLAIMS 3 database, Consolidated/ELIS, PAS-SQL Dashboard, Updated Sept. 25, 2023. | | |
| Note: I-956G are the annual statements to be submitted by these approved regional centers. For Form I-956, DHS used a 4-year annual average. | | |

Regional centers are difficult to assess because there is a lack of official USCIS data on employment, income, and industry classification for these entities. It is difficult to determine the small entity status of regional centers without such data. Such a determination is also difficult because regional centers can be structured in a variety of different ways, and can involve multiple business and financial activities, some of which may play a direct or indirect role in linking

---

[350] Consolidated Appropriations Act, 2022, Public Law 117–103, Div. BB.

[351] See EB–5 Reform and Integrity Act of 2022, Public Law 117–103, Sec. 106(a) (Mar. 15, 2022) (authorizing the same fee for Form I–956F as Form I–956).

[352] DHS may reevaluate EB–5 fees to meet the additional fee guidelines of EB–5 Reform and

Integrity Act of 2022 sec. 106(c). Under the ability-to-pay principle, those who are more capable of bearing the burden of fees should pay more for a service than those with less ability to pay. The requirements of immigrant investor program indicate that immigrant investors and regional centers have the ability-to-pay more than most USCIS customers.

[353] Zero reported receipts in FY2022 were due to EB–5 program and database system changes. DHS acknowledges that these changes may result in slightly lower annual average estimates for this form. There is a separate rulemaking pertaining to the EB–5 program that is currently being drafted and will elaborate more on the populations and various programs changes with the Eb–5 Integrity Act, volume projections and new forms.

investor funds to NCEs [354] and job-creating projects or entities. Regional centers also pose a challenge for analysis as their structure is often complex and can involve many related business and financial activities not directly involved with EB–5 activities. Regional centers can be made up of several layers of business and financial activities that focus on matching foreign investor funds to development projects to capture above-market return differentials.

While DHS attempted to treat regional centers like the other entities in this analysis, DHS was not able to identify most of the entities in any of the public or private online databases. Furthermore, while regional centers are an integral component of the EB–5 program, DHS does not collect data on the administrative fees the regional centers charge to the foreign investors who are investing in one of their projects. DHS did not focus on the bundled capital investment amounts (either a discounted $800,000 if the investment is in a TEA project(s) which includes certain rural areas and areas of high unemployment, or $1,050,000 for a non-TEA project per investor, in a U.S. business that will create or, in certain circumstances, preserve at least 10 full-time jobs in the United States for qualifying employees) [355] that get invested into an NCE. Such investment amounts are not necessarily indicative of whether the regional center is appropriately characterized as a small entity for purposes of the RFA. Due to the lack of regional center revenue data, DHS assumes regional centers collect revenue primarily through the administrative fees charged to investors.

DHS did consider the information provided by regional center applicants as part of the Forms I–956 (formerly Form I–924), I–956F (formerly Form I–924 Amendment), and I–956G (formerly Form I–924A); however, it does not include adequate data to allow DHS to reliably identify the small entity status of individual applicants. Although regional center applicants typically report the NAICS codes associated with the sectors they plan to direct investor funds toward, these codes do not necessarily apply to the regional centers themselves. In addition, information

provided to DHS concerning regional centers generally does not include regional center revenues or employment.

DHS was able to obtain some information under some specific assumptions to analyze the small entity status of regional centers. In the DHS proposed rule "EB–5 Immigrant Investor Program Modernization," DHS analyzed estimated administrative fees and revenue amounts for regional centers.[356] DHS found both the mean and median for administrative fees to be $50,000 and the median revenue amount to be $1,250,000 over the period FY 2017 through FY 2020. DHS does not know the extent to which these regional centers can pass along the fee increases to the individual investors. Passing along the costs from this Final Rule can reduce or eliminate the economic impacts to the regional centers. While DHS cannot definitively claim there is no significant economic impact to these small entities based on existing information, DHS would assume existing regional centers with revenues equal to or less than $447,000 per year (some of which DHS assumes would be derived from administrative fees charged to individual investors) could experience a significant economic impact if DHS assumes a fee increase that represents 1 percent of annual revenue is a "significant" economic burden under the RFA.[357]

e. A Description of the Projected Reporting, Recordkeeping and Other Compliance Requirements of the Rule, Including an Estimate of the Classes of Small Entities Which Will Be Subject to the Requirement and the Type of Professional Skills Necessary For Preparation of the Report or Record

The final rule does not directly impose any new or additional "reporting" or "recordkeeping" requirements on filers of Form I–129, I–140, I–910, I–360, G–1041, G–1041A, I–956 (formerly Form I–924), or I–956G (formerly I–924A). This final rule does not require any new professional skills for reporting.

f. A Description of the Steps the Agency has Taken To Minimize the Significant Economic Impact on Small Entities Consistent With the Stated Objectives of Applicable Statutes, Including a Statement of the Factual, Policy, and Legal Reasons for Selecting the Alternative Adopted in the Final Rule and Why Each One of the Other Significant Alternatives to the Rule Considered by the Agency Which Affect the Impact on Small Entities was Rejected

The INA provides for the collection of fees at a level that will ensure recovery of the full costs of providing adjudication and naturalization services, including services provided without charge to asylum applicants and certain other applicants. In addition, DHS must fund the costs of providing services without charge by using a portion of the filing fees collected for other immigration benefits. Without an increase in fees, DHS will not be able to maintain the level of service for immigration and naturalization benefits that it now provides.

DHS has considered the alternative of maintaining fees at the current level with reduced services and increased processing times but has determined that this will not be in the interest of applicants and petitioners. Therefore, this alternative was rejected. While most immigration benefit fees apply to individuals, as described previously, some also apply to small entities. DHS seeks to minimize the impact on all parties, small entities in particular.

Another alternative to the increased economic burden of the fee adjustment is to maintain fees at their current level for small entities. The strength of this alternative is that it assures that no additional fee-burden is placed on small entities; however, small entities will experience negative effects due to the service reductions that will result in the absence of the fee adjustments in this final rule. Without the fee adjustments provided in this final rule, significant operational changes to USCIS would be necessary. Given current filing volume considerations, DHS requires additional revenue to prevent immediate and significant cuts in planned spending. These spending cuts would include reductions in areas such as Federal and contract staff, infrastructure spending on IT and facilities, and training. Depending on the actual level of workload received, these operational changes could result in longer processing times, a degradation in customer service, and reduced efficiency over time. These cuts would

---

[354] A "new commercial enterprise" is "any for-profit organization formed in the United States for the ongoing conduct of lawful business . . . that receives, or is established to receive, capital investment from [employment-based immigrant] investors." INA sec. 203(b)(5)(D)(vi), 8 U.S.C. 1153(b)(5)(D)(vi).

[355] *See* 84 FR 35750, 35808 (July 24, 2019). This amount by investor is determined between a designated Targeted Employment Area and non-Targeted Employment Area.

[356] *Id.*

[357] Calculation: 1% of $447,000 = $4,470 (the new fee for Form I–956G; formerly Form I–924A).

HR-1 FRN 2025 AR-000189

**Appx-000214**

ultimately represent an increased cost to small entities by causing delays in benefit processing and reductions in customer service. In the final rule, DHS will provide reduced fees for Form I–129 nonprofit entities and entities with 25 or less FTE workers. DHS will also reduce Asylum Program fees for Form I–129 and I–140 nonprofit entities and entities with 25 or less FTE workers. While making accommodations in the final rule for small employers and nonprofit entities, DHS is not codifying any exemption from coverage of the rule, or any part thereof, for small entities as that term is defined by the SBA. Determining if the petitioner would be "small" under the SBA definition would require USCIS to track many NAICS codes, review revenue, and require an adjudication of the fee discount eligibility before intake. DHS decided to define small employers as employers with 25 or fewer FTE workers because INA sec. 214(c)(9)(B), 8 U.S.C. 1184(c)(9)(B), provides that the American Competitiveness and Workforce Improvement Act (ACWIA fee is reduced by half for any employer with not more than 25 FTE employees who are employed in the United States (determined by including any affiliate or subsidiary of such employer). SBA has determined in accordance with 13 CFR 121.903(a) that the size standard adopted in this rule appropriate. Therefore, for the reasons explained more fully elsewhere in the preamble to the final rule, DHS chose this approach.

*C. Small Business Regulatory Enforcement Fairness Act of 1996 (Congressional Review Act)*

The Congressional Review Act (CRA) was included as part of the Small Business Regulatory Enforcement Fairness Act of 1996 (SBREFA) by section 804 of SBREFA, Public Law 104–121, 110 Stat. 847, 868, *et seq.* This final rule is covered by the definition provided in section 804 of SBREFA. *See* 5 U.S.C. 804(2)(A).

*D. Unfunded Mandates Reform Act*

Unfunded Mandates Reform Act of 1995 (UMRA) is intended, among other things, to curb the practice of imposing unfunded Federal mandates on state, local, and tribal governments. Title II of UMRA requires each Federal agency to prepare a written statement assessing the effects of any Federal mandate in a proposed rule, or final rule for which the agency published a proposed rule that includes any Federal mandate that may result in a $100 million or more expenditure (adjusted annually for inflation) in any one year by state, local, and tribal governments, in the aggregate,

or by the private sector.[358] This final rule is not expected to exceed the $100 million expenditure in any one year when adjusted for inflation ($192 million in 2022 dollars), based on the CPI–U.[359] DHS does not believe this proposed rule would impose any unfunded Federal mandates on state, local, and tribal governments, in the aggregate, or on the private sector. This final rule does not contain a Federal mandate as the term is defined under UMRA.[360] The requirements of Title II of UMRA, therefore, do not apply, and DHS has not prepared a statement under UMRA.

*E. E.O. 12132 (Federalism)*

E.O. 13132 was issued to ensure the appropriate division of policymaking authority between the States and the Federal Government and to further the policies of the Unfunded Mandates Act. This final rule will not have substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of E.O. 13132, it is determined that this final rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. E.O. 12988 (Civil Justice Reform)*

This final rule was drafted and reviewed in accordance with E.O. 12988, Civil Justice Reform. This final rule was written to provide a clear legal standard for affected conduct and was carefully reviewed to eliminate drafting errors and ambiguities to minimize litigation and undue burden on the Federal court system. DHS has determined that this final rule meets the applicable standards provided in section 3(a) and 3(b)(2) of E.O. 12988.

---

[358] *See* 2 U.S.C. 1532(a).

[359] *See* BLS, "Historical Consumer Price Index for All Urban Consumers (CPI–U): U.S. city average, all items, by month," available at *https://www.bls.gov/cpi/tables/supplemental-files/historical-cpi-u-202212.pdf* (last visited Jan. 19, 2023). Calculation of inflation: (1) Calculate the average monthly CPI–U for the reference year (1995) and the current year (2022); (2) Subtract reference year CPI–U from current year CPI–U; (3) Divide the difference of the reference year CPI–U and current year CPI–U by the reference year CPI–U; (4) Multiply by 100 = [(Average monthly CPI–U for 2022 − Average monthly CPI–U for 1995)/(Average monthly CPI–U for 1995)] * 100 = [(292.655 − 152.383)/152.383] * 100 = (140.272/152.383) * 100 = 0.92052263 * 100 = 92.05% = 92%(rounded). Calculation of inflation-adjusted value: $100 million in 1995 dollars * 1.92 = $192 million in 2022 dollars.

[360] The term "Federal mandate" means a Federal intergovernmental mandate or a Federal private sector mandate. *See* 2 U.S.C. 1502(1), 658(6).

*G. E.O. 13175 (Consultation and Coordination with Tribal Governments)*

This final rule will not have "Tribal implications" under E.O. 13175, Consultation and Coordination with Indian Tribal Governments, because it does not have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. Accordingly, E.O. 13175, Consultation and Coordination with Indian Tribal Governments, requires no further agency action or analysis.

*H. Family Assessment*

DHS has reviewed this final rule in line with the requirements of section 654 of the Treasury and General Government Appropriations Act, 1999,[361] enacted as part of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999.[362] DHS has systematically reviewed the criteria specified in section 654(c)(1) of that act, by evaluating whether this proposed regulatory action: (1) impacts the stability or safety of the family, particularly in terms of marital commitment; (2) impacts the authority of parents in the education, nurture, and supervision of their children; (3) helps the family perform its functions; (4) affects disposable income or poverty of families and children; (5) only financially impacts families, if at all, to the extent such impacts are justified; (6) may be carried out by state or local government or by the family; or (7) establishes a policy concerning the relationship between the behavior and personal responsibility of youth and the norms of society. If the agency determines the regulation may negatively affect family well-being, then the agency must provide an adequate rationale for its implementation.

By increasing immigration benefit request fees, this action will impose a slightly higher financial burden on some families that petition for family members to join them in the United States. On the other hand, the rule will provide USCIS with the funds necessary to carry out adjudication and naturalization services and provide similar services for free to disadvantaged populations, including asylees, refugees, individuals with TPS, and victims of human trafficking. DHS also limits the fee increases in this rule to inflation for all fees submitted by

---

[361] See 5 U.S.C. 601 note.

[362] Public Law 105–277, 112 Stat. 2681 (1998).

HR-1 FRN 2025 AR-000190

**Appx-000215**

individuals and sets fees for adoption and naturalization related forms at below their relative cost to USCIS. DHS has no data that indicate that this final rule will have any impacts on disposable income or the poverty of certain families and children, including U.S. citizen children. DHS has also added several fee exemptions in this final rule to what was proposed, and the rule contains a process to waive fees for immigration benefits when the person submitting the request is unable to pay the fee. DHS believes that the benefits of the new fees justify the financial impact on the family, that this rulemaking's impact is justified, and no further actions are required. DHS also determined that this rule will not have any impact on the autonomy or integrity of the family as an institution.

I. National Environmental Policy Act

DHS and its components analyze proposed actions to determine whether the National Environmental Policy Act (NEPA), applies to them and, if so, what degree of analysis is required. DHS's "Implementation of the National Environmental Policy Act," Directive 023–01, Revision 01 (Directive 023–01)[363] and "Instruction Manual 023–01–001–01 Revision 01, Implementation of the National Environmental Policy Act" (Instruction Manual)[364] establish the policies and procedures that DHS and its components use to comply with NEPA and the Council on Environmental Quality (CEQ)

regulations for implementing NEPA, 40 CFR parts 1500 through 1508.

The CEQ regulations allow Federal agencies to establish, with CEQ review and concurrence, categories of actions ("Categorical Exclusions") which experience has shown do not individually or cumulatively have a significant effect on the human environment and, therefore, do not require the preparation of an Environmental Assessment or Environmental Impact Statement. 40 CFR 1501.4, 1507.3(e)(2)(ii), 1508.1(d).

The Instruction Manual, Appendix A, Table 1 lists Categorical Exclusions that DHS has found to have no such effect. Under DHS NEPA implementing procedures, for an action to be categorically excluded, it must satisfy each of the following three conditions: (1) the entire action clearly fits within one or more of the Categorical Exclusions; (2) the action is not a piece of a larger action; and (3) no extraordinary circumstances exist that create the potential for a significant environmental effect.[365]

This final rule implements the authority in the INA to establish fees to fund immigration and naturalization services of USCIS. DHS is not aware of any significant impact on the environment, or any change in environmental effect that will result from this final rule. DHS finds promulgation of the rule clearly fits within categorical exclusion A3,

established in the Department's NEPA implementing procedures.

This final rule is a standalone regulatory action and is not part of any larger action. In accordance with its NEPA implementing procedures, DHS has determined that the final rule would not result in any major Federal action that would significantly affect the quality of the human environment, nor any extraordinary circumstances exist that would create the potential for significant environmental effects requiring further analysis and review. Therefore, this final rule is categorically excluded and no further NEPA analysis or documentation is required.

J. Paperwork Reduction Act

Under the PRA, 44 U.S.C. 3501–12, DHS must submit to OMB, for review and approval, any reporting requirements inherent in a rule, unless they are exempt. In compliance with the PRA, DHS published an NPRM on January 4, 2023, in which comments on the revisions to the information collections associated with this rulemaking were requested. Any comments received on information collection activities were related to the fees being established within the rulemaking. DHS responded to those comments in Section III. of this final rule. The Information Collection table below shows the summary of forms that are part of this rulemaking.
**BILLING CODE 9111–97–P**

| Table 26: Information Collection | | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0096 | G-1041 | Genealogy Index Search Request | Revision of a Currently Approved Collection |
| | G-1041A | Genealogy Records Request (For each microfilm or hard copy file) | |
| 1615-0156 | G-1566 | Request for a Certificate of Non-Existence | Revision of a Currently Approved Collection |
| 1615-0079 | I-102 | Application for Replacement/Initial Nonimmigrant Arrival-Departure Document | Revision of a Currently Approved Collection |
| 1615-0009 | I-129 | Petition for a Nonimmigrant Worker | Revision of a Currently Approved Collection |

---

[363] *See* DHS, "Implementation of the National Environmental Policy Act," Directive 023–01, Revision 01, Oct. 31, 2014, available at *https://www.dhs.gov/sites/default/files/publications/DHS_Directive%2023-01%20Rev%2001_508compliantversion.pdf.*

[364] *See* DHS, "Instruction Manual 023–01–001–01, Revision 01, Implementation of the National Environmental Policy Act (NEPA)," Nov. 6, 2014, available at *https://www.dhs.gov/sites/default/files/publications/DHS_Instruction%20Manual%2023-*

*01-001-01%20Rev%2001_508%20Admin%20Rev.pdf.*

[365] Instruction Manual 023–01–001–01, Revision 1, at V.B(2)(a) through (c).

HR-1 FRN 2025 AR-000191

Appx-000216

| | Table 26: Information Collection | | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0111 | I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Revision of a Currently Approved Collection |
| | I-129CWR | Semiannual Report for CW-1 Worker | |
| 1615-0001 | I-129F | Petition for Alien Fiancé(e) | Revision of a Currently Approved Collection |
| 1615-0010 | I-129S | Nonimmigrant Petition Based on Blanket L Petition | Revision of a Currently Approved Collection |
| 1615-0012 | I-130 | Petition for Alien Relative | Revision of a Currently Approved Collection |
| | I-130A | Supplemental Information for Spouse Beneficiary | |
| 1615-0013 | I-131 | Application for Travel Document | Revision of a Currently Approved Collection |
| 1615-0135 | I-131A | Application for Travel Document (Carrier Documentation) | Revision of a Currently Approved Collection |
| 1615-0015 | I-140 | Immigrant Petition for Alien Worker | Revision of a Currently Approved Collection |
| 1615-0016 | I-191 | Application for Relief Under Former Section 212(c) of the INA | Revision of a Currently Approved Collection |
| 1615-0017 | I-192 | Application for Advance Permission to Enter as Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0018 | I-212 | Application for Permission to Reapply for Admission into the United States After Deportation or Removal | Revision of a Currently Approved Collection |
| 1615-0095 | I-290B | Notice of Appeal or Motion | Revision of a Currently Approved Collection |
| 1615-0020 | I-360 | Petition for Amerasian, Widow(er), or Special Immigrant | Revision of a Currently Approved Collection |
| 1615-0023 | I-485 | Application to Register Permanent Residence or Adjust Status | Revision of a Currently Approved Collection |
| | I-485A | Supplement A to Form I-485, Adjustment of Status Under Section 245(i) | |
| | I-485J | Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j) | |
| 1615-0026 | I-526 | Immigrant Petition by Standalone Investor | Revision of a Currently Approved Collection |
| | I-526E | Immigrant Petition by Regional Center Investor | |
| 1615-0003 | I-539 | Application to Extend/Change Nonimmigrant Status | Revision of a Currently Approved Collection |
| 1615-0027 | I-566 | Interagency Record of Request – A, G or NATO Dependent Employment Authorization or Change/Adjustment to/from A, G or NATO Status | Revision of a Currently Approved Collection |

| OMB Number | Form Number | Form Name | Type of PRA Action |
|---|---|---|---|
| 1615-0028 | I-600 | Petition to Classify Orphan as an Immediate Relative | Revision of a Currently Approved Collection |
| | I-600A | Application for Advance Processing of an Orphan Petition | |
| | I-600A/I-600 Supp1 | Form I-600A/I-600 Supplement 1, Listing of Adult Member of the Household | |
| | I-600A/I-600 Supp 2 | Form I-600A/I-600 Supplement 2, Consent to Disclose Information | |
| | I-600A/I-600 Supp 3 | Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600 | |
| 1615-0029 | I-601 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0123 | I-601A | Application for Provisional Unlawful Presence Waiver | Revision of a Currently Approved Collection |
| 1615-0069 | I-602 | Application by Refugee for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0030 | I-612 | Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended) | Revision of a Currently Approved Collection |
| 1615-0032 | I-690 | Application for Waiver of Grounds of Inadmissibility | Revision of a Currently Approved Collection |
| 1615-0035 | I-698 | Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA) | Revision of a Currently Approved Collection |
| 1615-0038 | I-751 | Petition to Remove Conditions on Residence | Revision of a Currently Approved Collection |
| 1615-0040 | I-765 | Application for Employment Authorization | Revision of a Currently Approved Collection |
| 1615-0137 | I-765V | Application for Employment Authorization for Abused Nonimmigrant Spouse | Revision of a Currently Approved Collection |
| 1615-0005 | I-817 | Application for Family Unity Benefits | Revision of a Currently Approved Collection |
| 1615-0043 | I-821 | Application for Temporary Protected Status | Revision of a Currently Approved Collection |
| 1615-0124 | I-821D | Consideration of Deferred Action for Childhood Arrivals | Revision of a Currently Approved Collection |
| 1615-0044 | I-824 | Application for Action on an Approved Application or Petition | Revision of a Currently Approved Collection |
| 1615-0045 | I-829 | Petition by Investor to Remove Conditions on Permanent Resident Status | Revision of a Currently Approved Collection |
| 1615-0046 | I-854A | Inter-Agency Alien Witness and Informant Record | No material or non-substantive change to a currently approved collection |

HR-1 FRN 2025 AR-000193

Appx-000218

| | | **Table 26: Information Collection** | |
|---|---|---|---|
| **OMB Number** | **Form Number** | **Form Name** | **Type of PRA Action** |
| 1615-0072 | I-881 | Application for Suspension of Deportation or Special Rule Cancellation of Removal | Revision of a Currently Approved Collection |
| 1615-0082 | I-90 | Application to Replace Permanent Resident Card | Revision of a Currently Approved Collection |
| 1615-0048 | I-907 | Request for Premium Processing Service | Revision of a Currently Approved Collection |
| 1615-0114 | I-910 | Application for Civil Surgeon Designation | Revision of a Currently Approved Collection |
| 1615-0116 | I-912 | Application for Fee Waiver | Revision of a Currently Approved Collection |
| 1615-0099 | I-914 | Application for T nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0104 | I-918 | Petition for U nonimmigrant status | Revision of a Currently Approved Collection |
| 1615-0106 | I-929 | Petition for Qualifying Family Member of a U-1 Nonimmigrant | Revision of a Currently Approved Collection |
| 1615-0136 | I-941 | Application for Entrepreneur Parole | Revision of a Currently Approved Collection |
| 1615-0159 | I-956 | Application for Regional Center Designation | Revision of a Currently Approved Collection |
| | I-956F | Application for Approval of an Investment in a Commercial Enterprise | |
| | I-956G | Regional Center Annual Statement | |
| | I-956H | Bona Fides of Persons Involved with Regional Center Program | |
| | I-956K | Registration for Direct and Third-Party Promoters | |
| 1615-0050 | N-336 | Request for a Hearing on a Decision in Naturalization Proceedings | Revision of a Currently Approved Collection |
| 1615-0052 | N-400 | Application for Naturalization | Revision of a Currently Approved Collection |
| 1615-0056 | N-470 | Application to Preserve Residence for Naturalization Purposes | Revision of a Currently Approved Collection |
| 1615-0091 | N-565 | Application for Replacement of Naturalization/Citizenship Document | Revision of a Currently Approved Collection |
| 1615-0057 | N-600 | Application for Certificate of Citizenship | Revision of a Currently Approved Collection |
| 1615-0087 | N-600K | Application for Citizenship and Issuance of Certificate under Section 322. | Revision of a Currently Approved Collection |
| 1615-0144 | OMB-64 | H-1B Registration Tool | Revision of a Currently Approved Collection |

BILLING CODE 9111-97-C

This final rule requires additional changes to the following OMB control numbers to collect information necessary to determine fees, fee waivers, and fee exemptions. These changes include updating instructions and data collections. Please see the accompanying PRA documentation for the full analysis. The table below shows

HR-1 FRN 2025 AR-000194

**Appx-000219**

the summary of forms that required additional changes based on this rulemaking.

| Table 27: Information Collections Impacted by Final Rule | | | |
|---|---|---|---|
| OMB Number | Form Number | Form Name | Type of PRA Action |
| 1615-0009 | I-129 | Petition for a Nonimmigrant Worker | Revision of a Currently Approved Collection |
| 1615-0111 | I-129CW | Petition for a CNMI-Only Nonimmigrant Transitional Worker | Revision of a Currently Approved Collection |
| | I-129CWR | Semiannual Report for CW-1 Worker | |
| 1615-0015 | I-140 | Immigrant Petition for Alien Worker | Revision of a Currently Approved Collection |
| 1615-0028 | I-600 | Petition to Classify Orphan as an Immediate Relative | Revision of a Currently Approved Collection |
| | I-600A | Application for Advance Processing of an Orphan Petition | |
| | I-600/A Supp1 | Form I-600A/I-600 Supplement 1, Listing of Adult Member of the Household | |
| | I-600/A Supp 2 | Form I-600A/I-600 Supplement 2, Consent to Disclose Information | |
| | I-600/A Supp 3 | Form I-600A/I-600 Supplement 3, Request for Action on Approved Form I-600A/I-600 | |
| 1615-0116 | I-912 | Application for Fee Waiver | Revision of a Currently Approved Collection |

*Petition for a Nonimmigrant Worker, Form I–129*

USCIS received some comments on the Petition for a Nonimmigrant Worker, Form I–129 filing fee and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 FTE employees. As a result of these changes, DHS has made changes to the Form I–129 form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–129 as part of this final rule. These changes required a reassessment of the Form I–129's the time burden.

*Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW*

USCIS received some comments on the CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW

filing fee and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final rule to alleviate the effects of the fee on nonprofit entities and employers with fewer than 25 FTE employees. As a result of these changes, DHS has made changes to the Form I–129CW form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–129CW as part of this final rule. These changes required a reassessment of the Form I–129CW's the time burden.

*Immigrant Petition for Alien Workers, Form I–140*

USCIS received some comments on the Immigrant Petition for Alien Workers, Form I–140 and the assigned Asylum Program Fee. DHS responded to those comments in Section III. of this final rule. DHS has decided to change the Asylum Program Fee in the final

rule to alleviate the effects of the fee on nonprofit entities and employers with 25 or fewer FTE employees. As a result of these changes, DHS has made changes to the Form I–140 form and instructions. To identify the impacted respondents and apply the appropriate fee amount, additional data collection elements, instructions and evidence requirements were added to the Form I–140 as part of this final rule. These changes required a reassessment of the Form I–140's the time burden.

*Petition To Classify Orphan as an Immediate Relative, Form I–600 and Application for Advance Processing of Orphan Petition, Form I–600A*

USCIS received some comments on the Petition to Classify Orphan as an Immediate Relative, Form I–600 and Application for Advance Processing of Orphan Petition, Form I–600A filling fee. DHS responded to those comments in Section III. of this final rule. In response to the public comments, DHS reexamined the fees for adoptions and decided that some services could be

HR-1 FRN 2025 AR-000195

Appx-000220

provided for free. As a result of these changes, DHS has made changes to the Forms I–600 and I–600A, and Form I–600A/I–600, Supplement 3, Request for Action on Approved Form I–600A/I–600 form and instructions. To identify the impacted respondents and apply the appropriate fee amount; additional data collection elements and instructions were added to the Form I–600, I–600A and I–600A/I–600, Supplement 3 as part of this final rule. These changes required a reassessment of the Form I–600 and I–600A's the time burden. There was no impact to and I–600A/I–600, Supplement 3's time burden. Form I–600A/I–600 Supplement 1, Listing of Adult Member of the Household and Form I–600A/I–600 Supplement 2, Consent to Disclose Information.

*Request for Fee Waiver, Form I–912*

DHS proposed 8 CFR 106.3(a)(2) to require that a request for a fee waiver be submitted on the form prescribed by USCIS in accordance with the instructions on the form. In the final rule, USCIS will maintain the status quo of accepting either Form I–912, Request for Fee Waiver, or a written request, and revert to the current effective language at 8 CFR 103.7(c)(2) (Oct. 1, 2020). Additionally, USCIS received some comments on the Application for Fee Waiver, Form I–912 requesting that USCIS expand the types of means-tested benefits received by a child as evidence for a fee waiver. DHS responded to those comments in Section III. of this final rule. After considering the comments on the proposed rule, DHS has decided to accept evidence of receipt of a means-tested benefit by a household child as evidence of the parent's inability to pay because eligibility for these means-tested benefits is dependent on household income. DHS has made changes to the I–912 instructions. DHS also made changes to the Forms I–912 form and instructions to streamline data collection and clarifying instruction contents as part of this final rule. These changes required a reassessment of the Form I–912's the time burden.

USCIS is consolidating all information related to Form fees, fee exemptions, and how to submit fee payments into Form G–1055, Fee Schedule. Most fee-related language, including language from sections *What is the Filing Fee*, *How to Check If the Fees Are Correct*, *Fee Waiver*, and *Premium Processing* content is being removed from individual Form Instructions documents, which results in a per-response hour burden reduction for many USCIS information collections and an overall total hour burden

reduction for the USCIS information collection inventory. In accordance with the PRA, DHS included an information collection notice in the proposed rule and each of the proposed, revised information collection instruments were posted for public comment.

Differences in information collection request respondent volume and fee model filing volume projections.

DHS notes that the estimates of annual filing volume in the PRA section of this preamble are not the same as those used in the model used to calculate the fee amounts in this final rule. For example, the fee calculation model projects 1,666,500 Form I–765 filings while the estimated total number of respondents for the information collection I–765 is 2,179,494. As stated in section V.B.1.a of this preamble, the Volume Projection Committee forecasts USCIS workload volume based on short- and long-term volume trends and time series models, historical receipts data, patterns (such as level, trend, and seasonality), changes in policies, economic conditions, or correlations with historical events to forecast receipts. Workload volume is used to determine the USCIS resources needed to process benefit requests and is the primary cost driver for assigning activity costs to immigration benefits and biometric services in the USCIS ABC model. DHS uses a different method for estimating the average annual number of respondents for the information collection over the 3-year OMB approval of the control number, generally basing the estimate on the average filing volumes in the previous 3 or 5-year period, with less consideration of the volume effects on planned or past policy changes. Although the RIA uses similar historic average volumes, RIAs isolate the impacts of proposed policy using models that may use different periods of analysis and often make simplifying assumptions about costs such as information collection burdens not caused by the regulation. When the information collection request is nearing expiration USCIS will update the estimates of annual respondents based on actual results in the submission to OMB. The PRA burden estimates are generally updated at least every 3 years. Thus, DHS expects that the PRA estimated annual respondents will be updated to reflect the actual effects of this rule within a relatively short period after a final rule takes effect.

**List of Subjects**

*8 CFR Part 103*

Administrative practice and procedure, Authority delegations

(Government agencies), Fees, Freedom of information, Immigration, Privacy, Reporting and recordkeeping requirements, Surety bonds.

*8 CFR Part 106*

Citizenship and naturalization, Fees, Immigration.

*8 CFR Part 204*

Administrative practice and procedure, Adoption and foster care, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 212*

Administrative practice and procedure, Aliens, Immigration, Passports and visas, Reporting and recordkeeping requirements.

*8 CFR Part 214*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Foreign officials, Health professions, Reporting and recordkeeping requirements, Students.

*8 CFR Part 240*

Administrative practice and procedure, Aliens.

*8 CFR Part 244*

Administrative practice and procedure, Immigration.

*8 CFR Part 245*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 245a*

Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 264*

Aliens, Reporting and recordkeeping requirements.

*8 CFR Part 274a*

Administrative practice and procedure, Aliens, Cultural exchange program, Employment, Penalties, Reporting and recordkeeping requirements, Students.

Accordingly, DHS amends chapter I of title 8 of the Code of Federal Regulations as follows:

**PART 103–IMMIGRATION BENEFIT REQUESTS; USCIS FILING REQUIREMENTS; BIOMETRIC REQUIREMENTS; AVAILABILITY OF RECORDS**

■ 1. The authority citation for part 103 is revised to read as follows:

**Authority:** 5 U.S.C. 301, 552, 552a; 8 U.S.C. 1101, 1103, 1304, 1356, 1356b, 1372; 31 U.S.C. 9701; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 *et seq.*); Pub. L. 112–54, 125

**6384**    Federal Register / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

Stat 550 (8 U.S.C. 1185 note); E.O. 12356, 47 FR 14874, 15557, 3 CFR, 1982 Comp., p. 166; 8 CFR part 2; Pub. L. 112–54; 125 Stat. 550; 31 CFR part 223.

■ 2. Section 103.2 is amended by revising and republishing paragraphs (a)(1), (a)(7), and (b)(19)(iii)(A) to read as follows:

### § 103.2  Submission and adjudication of benefit requests.

(a) * * *

(1) *Preparation and submission.* Every form, benefit request, or other document must be submitted to DHS and executed in accordance with the form instructions regardless of a provision of 8 CFR chapter I to the contrary. Each form, benefit request, or other document must be filed with the fee(s) required by regulation. Filing fees generally are non-refundable regardless of the outcome of the benefit request, or how much time the adjudication requires, and any decision to refund a fee is at the discretion of USCIS. Except as otherwise provided in this chapter I, fees must be paid when the request is filed or submitted.

* * * * *

(7) *Benefit requests submitted.* (i) USCIS will consider a benefit request received and will record the receipt date as of the actual date of receipt at the location designated for filing such benefit request whether electronically or in paper format.

(ii) A benefit request which is rejected will not retain a filing date. A benefit request will be rejected if it is not:

(A) Signed with valid signature;

(B) Executed;

(C) Filed in compliance with the regulations governing the filing of the specific application, petition, form, or request; and

(D) Submitted with the correct fee(s). Every form, benefit request, or other document that requires a fee payment must be submitted with the correct fee(s).

(*1*) If USCIS accepts a benefit request and determines later that the request was not accompanied by the correct fee, USCIS may reject or deny the request. If the benefit request was approved when USCIS determines the correct fee was not paid, the approval may be revoked upon notice.

(*2*) If a check or other financial instrument used to pay a fee is dishonored, declined, or returned because of insufficient funds, USCIS will resubmit the payment to the remitter institution one time. If the instrument used to pay a fee is dishonored, declined, or returned a second time, the filing may be rejected or denied.

(*3*) Financial instruments dishonored, declined, or returned for any reason other than insufficient funds, including but not limited to when an applicant, petitioner, or requestor places a stop payment on a financial instrument will not be resubmitted, and any immigration benefit request or request for action filed with USCIS may be rejected or denied regardless of whether USCIS has begun processing the request or already taken action on a case. Credit cards that are declined for any reason will not be resubmitted.

(*4*) If a check or other financial instrument used to pay a fee is dated more than one year before the request is received, the payment and request may be rejected.

(iii) A rejection of a filing with USCIS may not be appealed.

(iv) Unless otherwise provided in this title, only one of the same benefit request as defined in 8 CFR 1.2 may be submitted at a time or while the same request is pending. If more than one materially identical requests are submitted, USCIS may reject one at its discretion. For purposes of this section, a motion to reopen or reconsider and an appeal that is filed on the same decision will be considered a duplicate request.

(b) * * *

(19) * * *

(iii) * * *

(A) USCIS will send secure identification documents, such as a Permanent Resident Card or Employment Authorization Document, only to the applicant or self-petitioner unless the applicant or self-petitioner specifically consents to having his or her secure identification document sent to a designated agent or their attorney or accredited representative of record, as specified on the form instructions.

* * * * *

■ 3. Section 103.3 is amended by revising paragraph (a)(2)(ii) to read as follows:

### § 103.3  Denials, appeals, and precedent decisions.

(a) * * *

(2) * * *

(ii) *Reviewing official.* The official who made the unfavorable decision being appealed shall review the appeal unless the affected party moves to a new jurisdiction. In that instance, the official who has jurisdiction over such a proceeding in that geographic location shall review it. In the case of a fee waived or exempt appeal under 8 CFR 106.3, USCIS may forward the appeal for adjudication without requiring a review by the official who made the unfavorable decision.

* * * * *

■ 4. Section 103.7 is revised and republished to read as follows:

### § 103.7  Fees.

(a) *Department of Justice (DOJ) fees.* Fees for proceedings before immigration judges and the Board of Immigration Appeals are described in 8 CFR 1003.8, 1003.24, and 1103.7.

(1) *USCIS may accept DOJ fees.* Except as provided in 8 CFR 1003.8, or as the Attorney General otherwise may provide by regulation, any fee relating to any EOIR proceeding may be paid to USCIS. Payment of a fee under this section does not constitute filing of the document with the Board or with the immigration court. DHS will provide the payer with a receipt for a fee and return any documents submitted with the fee relating to any immigration court proceeding.

(2) *DHS–EOIR biometric services fee.* Fees paid to and accepted by DHS relating to any immigration proceeding as provided in 8 CFR 1103.7(a) must include an additional $30 for DHS to collect, store, and use biometric information.

(3) *Waiver of immigration court fees.* An immigration judge may waive any fees prescribed under this chapter for cases under their jurisdiction to the extent provided in 8 CFR 1003.8, 1003.24, and 1103.7.

(b) *USCIS fees.* USCIS fees will be required as provided in 8 CFR part 106.

(c) *Remittances.* Remittances to the Board of Immigration Appeals must be made payable to the "United States Department of Justice," in accordance with 8 CFR 1003.8.

(d) *Non-USCIS DHS immigration fees.* The following fees are applicable to one or more of the immigration components of DHS:

(1) *DCL system costs fee.* For use of a Dedicated Commuter Lane (DCL) located at specific U.S. ports-of-entry by an approved participant in a designated vehicle:

(i) $80.00; or

(ii) $160.00 for a family (applicant, spouse and minor children); plus,

(iii) $42 for each additional vehicle enrolled.

(iv) The fee is due after approval of the application but before use of the DCL.

(v) This fee is non-refundable but may be waived by DHS.

(2) *Petition for Approval of School for Attendance by Nonimmigrant Student (Form I–17).* (i) For filing a petition for school certification: $3,000 plus, a site visit fee of $655 for each location required to be listed on the form.

(ii) For filing a petition for school recertification: $1,250, plus a site visit

HR-1 FRN 2025 AR-000197

fee of $655 for each new location required to be listed on the form.

(3) *Form I–68.* For application for issuance of the Canadian Border Boat Landing Permit under section 235 of the Act:

(i) $16.00; or

(ii) $32 for a family (applicant, spouse, and unmarried children under 21 years of age, and parents of either spouse).

(4) *Form I–94.* For issuance of Arrival/Departure Record at a land border port-of-entry: $6.00.

(5) *Form I–94W.* For issuance of Nonimmigrant Visa Waiver Arrival/Departure Form at a land border port-of-entry under section 217 of the Act: $6.00.

(6) *Form I–246.* For filing application for stay of deportation under 8 CFR part 243: $155.00. The application fee may be waived by DHS.

(7) *Form I–823.* For application to a PORTPASS program under section 286 of the Act:

(i) $25.00; or

(ii) $50.00 for a family (applicant, spouse, and minor children).

(iii) The application fee may be waived by DHS.

(iv) If fingerprints are required, the inspector will inform the applicant of the current Federal Bureau of Investigation fee for conducting fingerprint checks before accepting the application fee.

(v) The application fee (if not waived) and fingerprint fee must be paid to CBP before the application will be processed. The fingerprint fee may not be waived.

(vi) For replacement of PORTPASS documentation during the participation period: $25.00.

(8) *Fee Remittance for F, J, and M Nonimmigrants (Form I–901).* The fee for Form I–901 is:

(i) For F and M students: $350.

(ii) For J–1 au pairs, camp counselors, and participants in a summer work or travel program: $35.

(iii) For all other J exchange visitors (except those participating in a program sponsored by the Federal Government): $220.

(iv) There is no Form I–901 fee for J exchange visitors in federally funded programs with a program identifier designation prefix that begins with G–1, G–2, G–3, or G–7.

(9) *Special statistical tabulations.* The DHS cost of the work involved.

(10) *Monthly, semiannual, or annual "Passenger Travel Reports via Sea and Air" tables.*

(i) For the years 1975 and before: $7.00.

(ii) For after 1975: Contact: U.S. Department of Transportation,

Transportation Systems Center, Kendall Square, Cambridge, MA 02142.

(11) *Request for Classification of a citizen of Canada to engage in professional business activities under section 214(e) of the Act (Chapter 16 of the North American Free Trade Agreement).* $50.00.

(12) *Request for authorization for parole of an alien into the United States.* $65.00.

(13) *Global Entry.* Application for Global Entry: $100.

(14) *U.S. Asia-Pacific Economic Cooperation (APEC) Business Travel Card.* Application fee: $70.

(15) *Notice of Appeal or Motion (Form I–290B) filed with ICE SEVP.* For a Form I–290B filed with the Student and Exchange Visitor Program (SEVP): $675.

■ 5. Section 103.17 is revised and republished to read as follows:

### § 103.17  Biometric services fee.

DHS may charge a fee to collect biometric information, to provide biometric collection services, to conduct required national security and criminal history background checks, to verify an individual's identity, and to store and maintain this biometric information for reuse to support other benefit requests. When a biometric services fee is required, USCIS may reject a benefit request submitted without the correct biometric services fee.

■ 6. Section 103.40 is revised and republished to read as follows:

### § 103.40  Genealogical research requests.

(a) *Nature of requests.* Genealogy requests are requests for searches and/or copies of historical records relating to a deceased person, usually for genealogy and family history research purposes.

(b) *Forms.* USCIS provides on its website at *https://www.uscis.gov/records/genealogy* the required forms in electronic versions: Genealogy Index Search Request or Genealogy Records Request.

(c) *Required information.* Genealogical research requests may be submitted to request one or more separate records relating to an individual. A separate request must be submitted for everyone searched. All requests for records or index searches must include the individual's:

(1) Full name (including variant spellings of the name and/or aliases, if any).

(2) Date of birth, at least as specific as a year.

(3) Place of birth, at least as specific as a country and the country name at the time of the individual's immigration or naturalization if known.

(d) *Optional information.* To better ensure a successful search, a genealogical research request may include everyone's:

(1) Date of arrival in the United States.

(2) Residence address at time of naturalization.

(3) Names of parents, spouse, and children if applicable and available.

(e) *Additional information required to retrieve records.* For a Genealogy Records Request, requests for copies of historical records or files must identify the record by number or other specific data used by the Genealogy Program Office to retrieve the record as follows:

(1) C-Files must be identified by a naturalization certificate number.

(2) Forms AR–2 and A-Files numbered below 8 million must be identified by Alien Registration Number.

(3) Visa Files must be identified by the Visa File Number. Registry Files must be identified by the Registry File Number (for example, R–12345).

(f) *Information required for release of records.* (1) Documentary evidence must be attached to a Genealogy Records Request or submitted in accordance with the instructions on the Genealogy Records Request form.

(2) Search subjects will be presumed deceased if their birth dates are more than 100 years before the date of the request. In other cases, the subject is presumed to be living until the requestor establishes to the satisfaction of USCIS that the subject is deceased.

(3) Documentary evidence of the subject's death is required (including but not limited to death records, published obituaries or eulogies, published death notices, church or bible records, photographs of gravestones, and/or copies of official documents relating to payment of death benefits).

(g) *Index search.* Requestors who are unsure whether USCIS has any record of their ancestor, or who suspect a record exists but cannot identify that record by number, may submit a request for index search. An index search will determine the existence of responsive historical records. If no record is found, USCIS will notify the requestor accordingly. If records are found, USCIS will give the requestor electronic copies of records stored in digital format for no additional fee. For records found that are stored in paper format, USCIS will give the requestor the search results, including the type of record found and the file number or other information identifying the record. The requestor can use index search results to submit a Genealogy Records Request.

(h) *Processing of paper record copy requests.* This service is designed for

HR-1 FRN 2025 AR-000198

requestors who can identify a specific record or file to be retrieved, copied, reviewed, and released. Requestors may identify one or more files in a single request.

■ 7. Part 106 is revised and republished to read as follows:

## PART 106—USCIS FEE SCHEDULE

Sec.
106.1  Fee requirements.
106.2  Fees.
106.3  Fee waivers and exemptions.
106.4  Premium processing service.
106.5  Authority to certify records.
106.6  DHS severability.

**Authority:** 8 U.S.C. 1101, 1103, 1254a, 1254b, 1304, 1356; Pub. L. 107–609; 48 U.S.C. 1806; Pub. L. 107–296, 116 Stat. 2135 (6 U.S.C. 101 note); Pub. L. 115–218, 132 Stat. 1547; Pub. L. 116–159, 134 Stat. 709.

### § 106.1  Fee requirements.

(a) *General.* Fees must be submitted with any USCIS request in the amount and subject to the conditions provided in this part and remitted in the manner prescribed in the relevant form instructions, on the USCIS website, or in a **Federal Register** document. The fees established in this part are associated with the benefit, the adjudication, or the type of request and not solely determined by the form number listed in § 106.2.

(b) *Remittance source and method.* Fees must be remitted from a bank or other institution located in the United States and payable in U.S. currency. The fee must be paid using the method that USCIS prescribes for the request, office, filing method, or filing location. USCIS will provide at least a 30-day public notice before amending the payment method required for a fee.

(c) *Dishonored payments.* If a remittance in payment of a fee or any other matter is not honored by the bank or financial institution on which it is drawn:

(1) The provisions of 8 CFR 103.2(a)(7)(ii) apply, no receipt will be issued, and if a receipt was issued, it is void and the benefit request loses its receipt date; and

(2) If the benefit request was approved, the approval may be revoked upon notice, rescinded, or canceled subject to statutory and regulatory requirements applicable to the immigration benefit request. If the approved benefit request requires multiple fees, this paragraph (c) would apply if any fee submitted is not honored, including a fee to request premium processing under § 106.4. Other fees that were paid for a benefit request that is revoked upon notice under this paragraph (c) will be retained

and not refunded. A revocation of an approval because the fee submitted is not honored may be appealed in accordance with 8 CFR 103.3, the applicable form instructions, and other statutes or regulations that may apply.

(d) *Expired payments.* DHS is not responsible for financial instruments that expire before they are deposited. USCIS may reject any filing for which required payment cannot be processed due to expiration of the financial instrument.

(e) *Credit and debit card disputes.* Fees paid to USCIS using a credit or debit card are not subject to dispute, chargeback, forced refund, or return to the cardholder for any reason except at the discretion of USCIS.

(f) *Definitions.* For the purposes of this part, the term:

(1) Small employer means a firm or individual that has 25 or fewer full-time equivalent employees in the United States, including any affiliates and subsidiaries.

(2) Nonprofit means organizations organized as tax exempt under the Internal Revenue Code of 1986, section 501(c)(3), 26 U.S.C. 501(c)(3), or governmental research organizations as defined under 8 CFR 214.2(h)(19)(iii)(C).

(3) Means tested benefit means, as determined by USCIS, a public benefit where the agency granting the benefit considers income and resources. Means-tested benefits may be federally, state, or locally funded. In general, for a benefit that was granted based on income, USCIS considers it a means-tested benefit.

(4) Federal Poverty Guidelines means the poverty guidelines updated periodically in the **Federal Register** by the U.S. Department of Health and Human Services under the authority of 42 U.S.C. 9902(2).

(g) *Online filing discount.* Unless otherwise provided in this part, the fee for forms filed online with USCIS, using the electronic system prescribed by USCIS, will be an amount that is $50 lower than the fee prescribed in § 106.2.

### § 106.2  Fees.

(a) *I Forms*—(1) *Application to Replace Permanent Resident Card, Form I–90.* For filing an application for a Permanent Resident Card, Form I–551, to replace an obsolete card or to replace one lost, mutilated, or destroyed, or for a change in name $465.

(i) If the applicant was issued a card but never received it: No fee.

(ii) If the applicant's card was issued with incorrect information because of DHS error and the applicant is filing for a replacement: No fee.

(iii) If the applicant has reached their 14th birthday and their existing card will expire after their 16th birthday: No fee.

(2) *Application for Replacement/Initial Nonimmigrant Arrival-Departure Document, Form I–102.* For filing an application for Arrival/Departure Record Form I–94, or Crewman's Landing Permit Form I–95, to replace one lost, mutilated, or destroyed: $560.

(i) For nonimmigrant member of the U.S. armed forces: No fee for initial filing;

(ii) For a nonimmigrant member of the North Atlantic Treaty Organization (NATO) armed forces or civil component: No fee for initial filing;

(iii) For nonimmigrant member of the Partnership for Peace military program under the Status of Forces Agreement (SOFA): No fee for initial filing; and

(iv) For replacement for DHS error: No fee.

(3) *Petition or Application for a Nonimmigrant Worker, Form I–129.* For filing a petition or application for a nonimmigrant worker:

(i) Petition for H–1B Nonimmigrant Worker or H–1B1 Free Trade Nonimmigrant Worker: $780. For small employers and nonprofits: $460.

(ii) Petition for H–2A Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,090.

(iii) Petition for H–2A Nonimmigrant Worker with only unnamed beneficiaries: $530. For small employers and nonprofits: $460.

(iv) Petition for H–2B Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,080.

(v) Petition for H–2B Nonimmigrant Worker with only unnamed beneficiaries: $580. For small employers and nonprofits: $460.

(vi) Petition for L Nonimmigrant Worker: $1,385.

(vii) Petition for O Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,055.

(viii) Petition or Application for E, H–3, P, Q, R, or TN Nonimmigrant Worker with 1 to 25 named beneficiaries: $1,015.

(ix) For small employers and nonprofits as defined in § 106.1(f), the fees in paragraphs (a)(3)(ii), (a)(3)(iv), (a)(3)(vi), (a)(3)(vii), and (a)(3)(viii) of this section will be one-half the amount in those paragraphs rounded to the nearest $5 increment.

(x) Additional fees in paragraph (c) of this section may apply.

(4) *Petition for a CNMI-Only Nonimmigrant Transitional Worker, Form I–129CW.*

(i) For an employer to petition on behalf of CW–1 nonimmigrant

HR-1 FRN 2025 AR-000199

Appx-000224

beneficiaries in the Commonwealth of the Northern Mariana Islands (CNMI): $1,015.

(ii) For small employers and nonprofits: $460. For the Semiannual Report for CW–1 Employers (Form I–129CWR): No fee.

(iii) Additional fees in paragraph (c) of this section may apply.

(5) *Petition for Alien Fiancé(e), Form I–129F.* (i) For filing a petition to classify a nonimmigrant as a fiancée or fiancé under section 214(d) of the Act: $675.

(ii) For a K–3 spouse as designated in 8 CFR 214.1(a)(2) who is the beneficiary of an immigrant petition filed by a U.S. citizen on a Petition for Alien Relative, Form I–130: No fee.

(6) *Petition for Alien Relative, Form I–130.* For filing a petition to classify status of a foreign national relative for issuance of an immigrant visa under section 204(a) of the Act. $675.

(7) *Application for Travel Document, Form I–131.* (i) Refugee Travel Document for asylee and lawful permanent resident who obtained such status as an asylee 16 years or older: $165.

(ii) Refugee Travel Document for asylee or lawful permanent resident who obtained such status as an asylee under the age of 16: $135.

(iii) Advance Parole, Reentry Permit, and other travel documents: $630.

(iv) There is no fee for a travel document for applicants who filed USCIS Form I–485 on or after July 30, 2007, and before April 1, 2024, and paid the Form I–485 fee, while the I–485 remains pending.

(v) There is no fee for parole requests from current or former U.S. armed forces service members.

(vi) The discount in section 106.1(g) does not apply to paragraphs (a)(7)(i) and (ii) of this section.

(8) *Application for Carrier Documentation, Form I–131A.* For filing an application to allow an individual who loses their approved travel document to apply for a travel document (carrier documentation) to board an airline or other transportation carrier to return to the United States: $575.

(9) *Declaration of Financial Support, Form I–134.* To provide financial support to a beneficiary of certain immigration benefits for the duration of their temporary stay in the United States. No fee.

(10) *Online Request to be a Supporter and Declaration of Financial Support, Form I–134A.* To request to be a supporter and agree to provide financial support to a beneficiary and undergo

background checks as part of certain special parole processes. No fee.

(11) *Immigrant Petition for Alien Worker, Form I–140.* For filing a petition to classify preference status of an alien based on profession or occupation under section 204(a) of the Act: $715.

(12) *Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (INA), Form I–191.* For filing an application for discretionary relief under section 212(c) of the Act: $930.

(13) *Application for Advance Permission to Enter as a Nonimmigrant, Form I–192.* For filing an application for discretionary relief under section 212(d)(3), (13), or (14) of the Act, except in an emergency case or where the approval of the application is in the interest of the U.S. Government: $1,100. The online filing discount in § 106.1(g) applies when this form is submitted to USCIS but does not apply to this paragraph when the form is submitted to CBP.

(14) *Application for Waiver of Passport and/or Visa, Form I–193.* For filing an application for waiver of passport and/or visa: $695. The discount in § 106.1(g) does not apply to this section when the form is submitted to CBP.

(15) *Application for Permission to Reapply for Admission into the United States After Deportation or Removal, Form I–212.* For filing an application for permission to reapply for admission by an excluded, deported, or removed alien; an alien who has fallen into distress; an alien who has been removed as an alien enemy; or an alien who has been removed at Government expense: $1,175. The online filing discount in § 106.1(g) does not apply to this section when the form is submitted to CBP.

(16) *Notice of Appeal or Motion, Form I–290B.* For appealing a decision under the immigration laws in any type of proceeding over which the Board of Immigration Appeals does not have appellate jurisdiction, and for filing a motion to reopen or reconsider a USCIS decision: $800.

(i) The fee will be the same for appeal of or motion on a denial of a benefit request with one or multiple beneficiaries.

(ii) There is no fee for conditional permanent residents who filed a waiver of the joint filing requirement based on battery or extreme cruelty and filed a Notice of Appeal or Motion (Form I–290B) when their Petition to Remove the Conditions on Residence (Form I–751) was denied.

(17) *Petition for Amerasian, Widow(er), or Special Immigrant, Form*

*I–360:* $515. There is no fee for the following:

(i) A petition seeking classification as an Amerasian;

(ii) A petition seeking immigrant classification as a Violence Against Women Act (VAWA) self-petitioner;

(iii) A petition for Special Immigrant Juvenile classification;

(iv) A petition seeking special immigrant classification as Afghan or Iraqi translator or interpreter, Iraqi national employed by or on behalf of the U.S. Government, or Afghan national employed by or on behalf of the U.S. Government or employed by the International Security Assistance Force (ISAF); or a surviving spouse or child of such a person; or

(v) A petition for a person who served honorably on active duty in the U.S. armed forces filing under section 101(a)(27)(K) of the Act.

(18) *Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–361.* Filed in support of Form I–360, Petition to Classify Public Law 97–359 Amerasian as the Child, Son, or Daughter of a United States Citizen. No fee.

(19) *Request to Enforce Affidavit of Financial Support and Intent to Petition for Legal Custody for Public Law 97–359 Amerasian, Form I–363.* For a beneficiary of a petition for a Public Law 97–359 Amerasian to request enforcement of the guarantee of financial support and legal custody executed by the beneficiary's sponsor. No fee.

(20) *Record of Abandonment of Lawful Permanent Resident Status, Form I–407.* To voluntarily abandon status as a lawful permanent resident. No fee.

(21) *Application to Register Permanent Residence or Adjust Status, Form I–485.* For filing an application for permanent resident status or creation of a record of lawful permanent residence:

(i) $1,440 for an applicant 14 years of age or older; or

(ii) $950 for an applicant under the age of 14 years who submits the application concurrently with the Form I–485 of a parent.

(iii) There is no fee for the following:

(A) An applicant who is in deportation, exclusion, or removal proceedings before an immigration judge, and the court waives the application fee.

(B) An applicant who served honorably on active duty in the U.S. armed forces who is filing under section 101(a)(27)(K) of the Act.

(22) *Application to Adjust Status under Section 245(i) of the Act, Form I–*

**6388**    **Federal Register** / Vol. 89, No. 21 / Wednesday, January 31, 2024 / Rules and Regulations

*485 Supplement A.* Supplement A to Form I–485 for persons seeking to adjust status under the provisions of section 245(i) of the Act a sum of $1,000 be paid while the applicant's, "Application to Register Permanent Residence or Adjust Status," is pending, unless payment of the additional sum is not required under section 245(i) of the Act, including:

(i) If applicant is unmarried and under 17 years of age: No fee.

(ii) If the applicant is the spouse or unmarried child under 21 years of age of a legalized alien and attaches a copy of a USCIS receipt or approval notice for a properly filed Form I–817, Application for Family Unity Benefits: No fee.

(23) *Confirmation of Bona Fide Job Offer or Request for Job Portability Under INA Section 204(j), Form I–485J.* To confirm that the job offered in Form I–140, Immigrant Petition for Alien Workers, remains a bona fide job offer that the beneficiary intends to accept once we approve the Form I–485, Application to Register Permanent Residence or Adjust Status, or request job portability under INA section 204(j) to a new, full-time, permanent job offer that the beneficiary intends to accept once we approve the Form I–485. No fee.

(24) *Request for Waiver of Certain Rights, Privileges, Exemptions, and Immunities, Form I–508.* To waive certain diplomatic rights privileges, exemptions, and immunities associated with your occupational status. No fee.

(25) *Immigrant Petition by Standalone or Regional Center Investor, Forms I–526 and I–526E.* To petition USCIS for status as an immigrant to the United States under section 203(b)(5) of the Act.

(i) Immigrant Petition by Standalone Investor, Form I–526: $11,160.

(ii) Immigrant Petition by Regional Center Investor, Form I–526E: $11,160.

(26) *Application To Extend/Change Nonimmigrant Status, Form I–539.* For certain nonimmigrants to extend their stay or change to another nonimmigrant status, CNMI residents applying for an initial grant of status, F and M nonimmigrants applying for reinstatement, and persons seeking V nonimmigrant status or an extension of stay as a V nonimmigrant. $470. There is no fee for Nonimmigrant A, G, and NATO.

(27) *Interagency Record of Request— A, G, or NATO Dependent Employment Authorization or Change/Adjustment To/From A, G, or NATO Status, Form I– 566.* For dependent employment authorization as an eligible A–1, A–2, G–1, G–3, G–4, or NATO 1–6 dependent; or change or adjustment of

status to, or from, A, G or NATO status. No fee.

(28) *Application for Asylum and Withholding of Removal, Form I–589.* To apply for asylum and withholding of removal. No fee.

(29) *Registration for Classification as a Refugee, Form I–590.* To determine eligibility for refugee classification and resettlement in the United States. No fee.

(30) *Petition to Classify Orphan as an Immediate Relative, Form I–600.* For filing a petition to classify an orphan as an immediate relative: $920.

(i) There is no fee for the first Form I–600 filed for a child based on an approved *Application for Advance Processing of an Orphan Petition,* Form I–600A, during the Form I–600A approval period.

(ii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiaries who are birth siblings, no additional fee is required.

(iii) If more than one Form I–600 is filed during the Form I–600A approval period on behalf of beneficiaries who are not birth siblings, the fee is $920 for the second and each subsequent Form I– 600 petition submitted.

(iv) This filing fee is not charged if a new Form I–600 combination filing is filed due to a change in marital status while the prior Form I–600A or Form I– 600 combination filing is pending.

(v) This filing fee is charged if a new Form I–600 combination filing is filed due to a change in marital status after the Form I–600A or Form I–600 combination filing suitability determined is approved.

(31) *Application for Advance Processing of an Orphan Petition, Form I–600A.* For filing an application for determination of suitability and eligibility to adopt an orphan: $920.

(i) This filing fee is not charged if a new Form I–600A is filed due to a change in marital status while the prior Form I–600A is pending.

(ii) This filing fee is charged if a new Form I–600A is filed due to a change in marital status after the Form I–600A is approved.

(32) *Request for Action on Approved Form I–600A/I–600, Form I–600A/I–600 Supplement 3.* To request an extension of a suitability determination; updated suitability determination; change of non-Convention country; or a duplicate approval notice. $455. This filing fee:

(i) Is not charged to obtain a first or second extension of the approval of Form I–600A, or to obtain a first or second change of non-Hague Adoption Convention country during the Form I– 600A approval period.

(ii) Is not charged for a request for a duplicate approval notice.

(iii) Is charged to request a new approval notice based on a significant change and updated home study unless there is also a request for a first or second extension of the Form I–600A approval, or a first or second change of non-Hague Adoption Convention country on the same Supplement 3.

(iv) Is charged for third or subsequent extensions of the approval of the Form I–600A and third or subsequent changes of non-Hague Adoption Convention country.

(33) *Application for Waiver of Ground of Inadmissibility, Form I–601.* To seek a waiver of grounds of inadmissibility if you are inadmissible to the United States and are seeking an immigrant visa, adjustment of status, certain nonimmigrant statuses, or certain other immigration benefits. $1,050. For applicants for adjustment of status of Indochina refugees under Public Law 95–145. No fee.

(34) *Application for Provisional Unlawful Presence Waiver, Form I– 601A.* To request a provisional waiver of the unlawful presence grounds of inadmissibility under section 212(a)(9)(B) of the Act. $795.

(35) *Application by Refugee for Waiver of Grounds of Inadmissibility, Form I–602.* For a refugee who has been found inadmissible to the United States to apply for a waiver of inadmissibility for humanitarian reasons, family unity, or national interest. No fee.

(36) *Application for Waiver of the Foreign Residence Requirement (under Section 212(e) of the Immigration and Nationality Act, as Amended), Form I– 612.* For J–1 and J–2 visas holders and their families to apply for a waiver of the two-year foreign residence requirement. $1,100.

(37) *Application for Status as a Temporary Resident under Section 245A of the Immigration and Nationality Act, Form I–687.* To apply for a waiver of inadmissibility for an applicant for adjustment of status under section 245A or 210 of the Act. $1,240.

(38) *Application for Waiver of Grounds of Inadmissibility, Form I–690.* For filing an application for waiver of a ground of inadmissibility under section 212(a) of the Act as amended, in conjunction with the application under section 210 or 245A of the Act: $905.

(39) *Report of Immigration Medical Examination and Vaccination Record (Form I–693).* For adjustment of status applicants to establish they are not inadmissible to the United States on health-related grounds. No fee.

(40) *Notice of Appeal of Decision under Sections 245A or 210 of the*

HR-1 FRN 2025 AR-000201

**Appx-000226**

*Immigration and Nationality Act, Form I–694.* For appealing the denial of an application under section 210 or 245A of the Act, or a petition under section 210A of the Act: $1,125.

(41) *Application to Adjust Status from Temporary to Permanent Resident (Under Section 245A of the INA), Form I–698.* For filing an application to adjust status from temporary to permanent resident (under section 245A of Pub. L. 99–603): $1,670.

(42) *Refugee/Asylee Relative Petition, Form I–730.* For a refugee to request a spouse and unmarried child be approved to join them in the United States. No fee.

(43) *Petition to Remove Conditions on Residence, Form I–751.* For filing a petition to remove the conditions on residence based on marriage: $750. There is no fee for a conditional permanent resident spouse or child who files a waiver of the joint filing requirement based on battery or extreme cruelty.

(44) *Application for Employment Authorization, Form I–765.* To request employment authorization and/or an Employment Authorization Document (EAD). $520.

(i) For an applicant who filed USCIS Form I–485 with a fee after April 1, 2024, and their Form I–485 is still pending: $260. The online filing discount in § 106.1(g) does not apply to this paragraph.

(ii) There is no fee for an initial Employment Authorization Document for the following:

(A) An applicant who filed USCIS Form I–485 on or after July 30, 2007, and before April 1, 2024, and paid the Form I–485 fee;

(B) Dependents of certain government and international organizations or NATO personnel;

(C) N–8 (Parent of alien classed as SK3) and N–9 (Child of N–8) nonimmigrants;

(D) Persons granted asylee status (AS1, AS6);

(E) Citizen of Micronesia, Marshall Islands, or Palau;

(F) Persons granted Withholding of Deportation or Removal;

(G) Applicant for Asylum and Withholding of Deportation or Removal including derivatives;

(H) Taiwanese dependents of Taipei Economic and Cultural Representative Office (TECRO) E–1 employees; and

(I) Current or former U.S. armed forces service members.

(iii) Request for replacement Employment Authorization Document based on USCIS error: No fee.

(iv) There is no fee for a renewal or replacement Employment Authorization Document for the following:

(A) Any current Adjustment of Status or Registry applicant who filed for adjustment of status on or after July 30, 2007, and before April 1, 2024, and paid the appropriate Form I–485 filing fee;

(B) Dependent of certain foreign government, international organization, or NATO personnel;

(C) Citizen of Micronesia, Marshall Islands, or Palau; and

(D) Persons granted withholding of deportation or removal.

(45) *Application for Employment Authorization for Abused Nonimmigrant Spouse, Form I–765V.* Used for certain abused nonimmigrant spouses to request an employment authorization document (EAD). No fee.

(46) *Petition to Classify Convention Adoptee as an Immediate Relative, Form I–800.* For filing a petition to classify a Convention adoptee as an immediate relative:

(i) There is no fee for the first Form I–800 filed for a child based on an approved *Application for Determination of Suitability to Adopt a Child from a Convention Country,* Form I–800A, during the Form I–800A approval period.

(ii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiaries who are birth siblings, no additional fee is required.

(iii) If more than one Form I–800 is filed during the Form I–800A approval period on behalf of beneficiaries who are not birth siblings, the fee is $920 for the second and each subsequent Form I–800 petition submitted.

(47) *Application for Determination of Suitability to Adopt a Child from a Convention Country, Form I–800A.* For filing an application for determination of suitability and eligibility to adopt a child from a Hague Adoption Convention country: $920.

(i) This filing fee is not charged if a new Form I–800A is filed due to a change in marital status while the prior Form I–800A is pending.

(ii) This filing fee is charged if a new Form I–800A is filed due to a change in marital status after the Form I–800A is approved.

(48) *Request for Action on Approved Form I–800A, Form I–800A Supplement 3.* To request an extension of a suitability determination; updated suitability determination; change in Convention country; or a request for a duplicate approval notice. $455. This filing fee:

(i) Is not charged to obtain a first or second extension of the approval of Form I–800A, or to obtain a first or second change of Hague Adoption Convention country during the Form I–800A approval period.

(ii) Is not charged for a request for a duplicate approval notice.

(iii) Is charged to request a new approval notice based on a significant change and updated home study unless there is a request for a first or second extension of the Form I–800A approval, or a first or second change of Hague Adoption Convention country on the same Supplement 3.

(iv) Is charged for third or subsequent extensions of the Form I–800A approval and third or subsequent changes of Hague Adoption Convention country.

(49) *Application for Family Unity Benefits, Form I–817.* For filing an application for voluntary departure under the Family Unity Program: $760.

(50) *Application for Temporary Protected Status, Form I–821.* For an eligible national of a designated country or a person without nationality who last habitually resided in the designated country to apply for Temporary Protected Status (TPS).

(i) For first time applicants: $50 or the maximum permitted by section 244(c)(1)(B) of the Act.

(ii) There is no fee for re-registration.

(iii) A Temporary Protected Status (TPS) applicant or re-registrant must pay $30 for biometric services.

(iv) The online filing discount in § 106.1(g) does not apply to paragraphs (a)(50)(i) and (a)(50)(ii) of this section.

(51) *Consideration of Deferred Action for Childhood Arrivals, Form I–821D.* To request that USCIS consider granting or renewing deferred action under 8 CFR 236.21–236.25. $85. The online filing discount in § 106.1(g) does not apply to this section.

(52) *Application for Action on an Approved Application or Petition, Form I–824.* To request additional action on a previously approved benefit request. $590.

(53) *Petition by Investor to Remove Conditions on Permanent Resident Status, Form I–829.* For a conditional permanent resident who obtained status through qualified investment to remove the conditions on their residence. $9,525.

(54) *Inter-Agency Alien Witness and Informant Record, Form I–854.* To request an alien witness and/or informant receive classification as an S nonimmigrant. No fee.

(55) *Affidavit of Support Under Section 213A of the INA, Form I–864.* For immigrants to show they have adequate means of financial support and are not likely to rely on the U.S. government for financial support. No fee.

HR-1 FRN 2025 AR-000202

Appx-000227

(i) *Contract Between Sponsor and Household Member, Form I–864A.* For a household member to promise to support sponsored immigrants. No fee.

(ii) *Affidavit of Support Under Section 213A of the INA, Form I–864EZ.* To show that the applying immigrant has adequate means of financial support and is not likely to rely on the U.S. government for financial support. No fee.

(iii) *Request for Exemption for Intending Immigrant's Affidavit of Support, Form I–864W.* To establish that an applicant is exempt from the Form I–864 requirements. No fee.

(iv) *Sponsor's Notice of Change of Address, Form I–865.* To report a sponsor's new address and/or residence. No fee.

(56) *Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Pub. L. 105–100), Form I–881.* To apply for suspension of deportation or special rule cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act.

(i) $340 for adjudication by DHS.

(ii) $165 for adjudication by EOIR. If the Form I–881 is referred to the immigration court by DHS: No fee.

(iii) If filing Form I–881 as a VAWA self-petitioner, including derivatives, as defined under section 101(a)(51)(F) of the Act: No fee.

(57) *Application for Authorization to Issue Certification for Health Care Workers, Form I–905.* For an organization to apply for authorization to issue certificates to health care workers. $230.

(58) *Request for Premium Processing Service, Form I–907.* The Request for Premium Processing Service fee will be as provided in § 106.4. The online filing discount in § 106.1(g) does not apply to a request for premium processing.

(59) *Request for Civil Surgeon Designation, Form I–910.* To apply for civil surgeon designation. $990.

(60) *Request for Fee Waiver, Form I–912.* To request a fee waiver. No fee.

(61) *Application for T Nonimmigrant Status, Form I–914.* To request temporary immigration benefits for a victim of a severe form of trafficking in persons, also known as human trafficking. No fee.

(i) *Supplement A to Form I–914, Application for Immigrant Family Member of a T–1 Recipient.* To request temporary immigration benefits for eligible family members of a victim of a severe form of trafficking in persons. No fee.

(ii) *Supplement B to Form I–914, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons.* For a law enforcement agency to certify that a trafficking victim is being helpful to law enforcement during the detection, investigation, or prosecution of the trafficking. No fee.

(62) *Petition for U Nonimmigrant Status, Form I–918.* For a victim of qualifying criminal activity to petition for temporary immigration benefits. No fee.

(i) *Supplement A to Form I–918, Petition for Qualifying Family Member of U–1 Recipient.* To request temporary immigration benefits for qualifying family members of a victim of qualifying criminal activity. No fee.

(ii) *Supplement B to Form I–918, U Nonimmigrant Status Certification.* For a law enforcement agency to certify that an individual is a victim of qualifying criminal activity and has been, is being, or is likely to be helpful to law enforcement in the detection, investigation, or prosecution of the qualifying criminal activity. No fee.

(63) *Petition for Qualifying Family Member of a U–1 Nonimmigrant, Form I–929.* For a principal U–1 nonimmigrant to request immigration benefits on behalf of a qualifying family member who has never held U nonimmigrant status. No fee.

(64) *Application for Entrepreneur Parole, Form I–941.* For filing an application for parole for an entrepreneur. $1,200.

(65) *Application for Regional Center Designation, Form I–956.* To request designation as a regional center or to request an amendment to an approved regional center. $47,695.

(66) *Application for Approval of Investment in a Commercial Enterprise, Form I–956F.* To request approval of each particular investment offering through an associated new commercial enterprise. $47,695.

(67) *Regional Center Annual Statement, Form I–956G.* To provide updated information and certify that a Regional Center under the Immigrant Investor Program has maintained its eligibility. $4,470.

(68) *Bona Fides of Persons Involved with Regional Center Program, Form I–956H.* For each person involved with a regional center to attest to their compliance with section 203(b)(5)(H) of the Act. No fee.

(69) *Registration for Direct and Third-Party Promoters, Form I–956K.* For each person acting as a direct or third-party promoter (including migration agents) of a regional center, any new commercial enterprises, an affiliated job-creating entity, or an issuer of securities intended to be offered to immigrant investors in connection with a particular capital investment project. No fee.

(b) *N Forms.* (1) *Application to File Declaration of Intention, Form N–300.* For a permanent resident to declare their intent to become a U.S. citizen. $320.

(2) *Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336, Form N–336.* To request a hearing before an immigration officer on the denial of Form N–400, Application for Naturalization. $830. There is no fee for an applicant who has filed an *Application for Naturalization* under section 328 or 329 of the Act with respect to military service and whose application has been denied.

(3) *Application for Naturalization, Form N–400.* To apply for U.S. citizenship. $760. The following exceptions apply:

(i) No fee is charged an applicant who meets the requirements of section 328 or 329 of the Act with respect to military service.

(ii) The fee for an applicant whose documented household income is less than or equal to 400 percent of the Federal Poverty Guidelines: $380. The discount in section 106.1(g) does not apply to this section.

(4) *Request for Certification of Military or Naval Service, Form N–426.* To request that the Department of Defense verify military or naval service. No fee.

(5) *Application to Preserve Residence for Naturalization Purposes, Form N–470.* Application for a lawful permanent resident who must leave the United States to preserve their residence to pursue naturalization. $420.

(6) *Application for Replacement Naturalization/Citizenship Document, Form N–565.* To apply for a replacement Declaration of Intention; Naturalization Certificate; Certificate of Citizenship; or Repatriation Certificate; or to apply for a special certificate of naturalization as a U.S. citizen to be recognized by a foreign country. $555. There is no fee when this application is submitted under 8 CFR 338.5(a) to request correction of a certificate that contains an error.

(7) *Application for Certificate of Citizenship, Form N–600.* To apply for a Certificate of Citizenship. $1,385.

(i) There is no fee for any application filed by a current or former member of any branch of the U.S. armed forces on their own behalf.

(ii) There is no fee for an application filed on behalf of an individual who is the subject of a final adoption for immigration purposes and meets (or met before age 18) the definition of child

HR-1 FRN 2025 AR-000203

Appx-000228

under section 101(b)(1)(E), (F), or (G) of the Act.

(8) *Application for Citizenship and Issuance of Certificate Under Section 322, Form N–600K.* Application for children who regularly reside outside the United States to apply for citizenship based on a U.S. citizen parent. $1,385. There is no fee for an application filed on behalf of a child who is the subject of a final adoption for immigration purposes and meets the definition of child under section 101(b)(1)(E), (F), or (G) of the Act.

(9) *Application for Posthumous Citizenship, Form N–644.* To request citizenship for someone who died because of injury or disease incurred in or aggravated by service in an active-duty status with the U.S. armed forces during a specified period of military hostilities. No fee.

(10) *Medical Certification for Disability Exceptions, Form N–648.* For a naturalization applicant to request an exception to the English and civics testing requirements for naturalization because of physical or developmental disability or mental impairment. No fee.

(c) *G Forms, statutory fees, and non-form fees*—(1) *Genealogy Index Search Request, Form G–1041.* The fee is due regardless of the search results. $80.

(2) *Genealogy Records Request, Form G–1041A.* USCIS will refund the records request fee when it cannot find any file previously identified in response to the index search request. $80.

(3) *USCIS immigrant fee.* For DHS domestic processing and issuance of required documents after an immigrant visa is issued by the U.S. Department of State: $235.

(4) *American Competitiveness and Workforce Improvement Act (ACWIA) fee.* For filing certain H–1B petitions as described in 8 CFR 214.2(h)(19) and USCIS form instructions: $1,500 or $750.

(5) *Fraud detection and prevention fee.* (i) For filing certain H–1B and L petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $500.

(ii) For filing H–2B petitions as described in 8 U.S.C. 1184(c) and USCIS form instructions: $150.

(6) *Fraud detection and prevention fee for Form I–129CW.* For filing certain CW–1 petitions as described in Public Law 115–218 and USCIS form instructions: $50.

(7) *CNMI education funding fee.* For filing certain CW–1 petitions as described in Public Law 115–218 and USCIS form instructions. The fee amount will be as prescribed in the form instructions and:

(i) The employer must pay the fee for each beneficiary and for each year or partial year of requested validity; and

(ii) Beginning in FY 2020, the $200 fee may be adjusted once per year by notice in the **Federal Register** based on the amount of inflation according to the Consumer Price Index for All Urban Consumers (CPI–U).

(8) *9–11 response and biometric entry-exit fee for H–1B Visa.* For certain petitioners who employ 50 or more employees in the United States if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,000. Collection of this fee is scheduled to end on September 30, 2027.

(9) *9–11 response and biometric entry-exit fee for L–1 Visa.* For certain petitioners who employ 50 or more employees in the United States, if more than 50 percent of the petitioner's employees are in H–1B, L–1A, or L–1B nonimmigrant status: $4,500. Collection of this fee is scheduled to end on September 30, 2027.

(10) *Claimant under section 289 of the Act.* For American Indians who are born in Canada and possess at least 50 percent American Indian blood to request lawful permanent resident status. No fee.

(11) *Registration requirement for petitioners seeking to file H–1B petitions on behalf of cap-subject aliens.* For each registration submitted to register for the H–1B cap or advanced degree exemption selection process: $215.

(iii) This fee is not subject to the online discount provided in § 106.1(g).

(12) *Request for Certificate of Non-Existence, G–1566.* For a certification of non-existence of a naturalization record. $330.

(13) *Asylum Program Fee.* In addition to the fees required by § 106.2(a)(3), (a)(4) and (a)(11), to fund the asylum program, the Asylum Program Fee must be paid by any petitioner filing a *Petition for a Nonimmigrant Worker,* Form I–129 under 8 CFR 214.2, *Petition for a CNMI-Only Nonimmigrant Transitional Worker,* Form I–129CW under 8 CFR 214.2(w), or an *Immigrant Petition for Alien Worker,* Form I–140 under 8 CFR 204.1(a). $600. For petitions:

(i) Filed by a nonprofit as defined in § 106.1(f): No fee.

(ii) Filed by a small employer as defined in § 106.1(f): $300.

(iii) The online filing discount provided in § 106.1(g) does not apply to this fee.

(d) *Inflationary adjustment.* The fees prescribed in this section that are not set or limited by statute may be adjusted, but not more often than once per year,

by publication of a rule in the **Federal Register** that:

(1) Is based on the amount of inflation as measured by the difference in the CPI–U as published by the U.S. Department of Labor, U.S. Bureau of Labor Statistics in April of the year of the last fee rule and the year of the adjustment under this section.

(2) Adjusts all fees that are not set by statute based on the amount of inflation.

(3) Rounds the fees calculated by the amount of inflation to the nearest $5 increment.

## § 106.3   Fee waivers and exemptions.

(a) *Waiver of fees.* (1) *Eligibility.* The party requesting the benefit must be unable to pay the prescribed fee. A person demonstrates an inability to pay the fee by establishing at least one of the following criteria:

(i) Receipt of a means-tested benefit as defined in § 106.1(f)(3) at the time of filing;

(ii) Household income at or below 150 percent of the Federal Poverty Guidelines at the time of filing; or

(iii) Extreme financial hardship due to extraordinary expenses or other circumstances that render the individual unable to pay the fee.

(2) *Requesting a fee waiver.* To request a fee waiver, a person requesting an immigration benefit must submit a written request for permission to have their request processed without payment of a fee with their benefit request. The request must state the person's belief that he or she is entitled to or deserving of the benefit requested, the reasons for his or her inability to pay, and evidence to support the reasons indicated. There is no appeal of the denial of a fee waiver request.

(3) *USCIS fees that may be waived.* Only the following fees may be waived:

(i) The following fees for the following forms may be waived without condition:

(A) Application to Replace Permanent Resident Card (Form I–90);

(B) Application for Relief Under Former Section 212(c) of the Immigration and Nationality Act (Form I–191);

(C) Petition to Remove the Conditions of Residence (Form I–751);

(D) Application for Family Unity Benefits (Form I–817);

(E) Application for Temporary Protected Status (Form I–821);

(F) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Form I–881) (under section 203 of Pub. L. 105–110);

(G) Application to File Declaration of Intention (Form N–300);

HR-1 FRN 2025 AR-000204

**6392**    **Federal Register**/Vol. 89, No. 21/Wednesday, January 31, 2024/Rules and Regulations

(H) Request for a Hearing on a Decision in Naturalization Proceedings Under Section 336 (Form N–336);

(I) Application for Naturalization (Form N–400);

(J) Application to Preserve Residence for Naturalization Purposes (N–470);

(K) Application for Replacement Naturalization/Citizenship Document (N–565);

(L) Application for Certificate of Citizenship (N–600); and

(M) Application for Citizenship and Issuance of Certificate under section 322 of the Act (N–600K).

(ii) The following form fees may be waived based on the conditions described in paragraphs (a)(3)(ii)(A) through (F) of this section:

(A) Petition for a CNMI-Only Nonimmigrant Transitional Worker (Form I–129CW) for a E–2 CNMI investor. Waiver of the fee for Form I–129CW does not waive the requirement for a E–2 CNMI investor to pay any fees in § 106.2(c) that may apply.

(B) An Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of a noncitizen applying for CW–2 nonimmigrant status;

(C) Application for Travel Document (Form I–131), when filed to request humanitarian parole;

(D) Notice of Appeal or Motion (Form I–290B), when there is no fee for the underlying application or petition or that fee may be waived;

(E) Notice of Appeal of Decision Under Sections 245A or 210 of the Immigration and Nationality Act (Form I–694), if the underlying application or petition was fee exempt, the filing fee was waived, or was eligible for a fee waiver;

(F) Application for Employment Authorization (Form I–765), except persons filing under category (c)(33), Deferred Action for Childhood Arrivals; and

(G) Petition for Nonimmigrant Worker (Form I–129) or Application to Extend/Change Nonimmigrant Status (Form I–539), only in the case of a noncitizen applying for E–2 CNMI Investor for an extension of stay.

(iii) Any fees associated with the filing of any benefit request under 8 U.S.C. 1101(a)(51) and those otherwise self-petitioning under 8 U.S.C. 1154(a)(1) (VAWA self-petitioners), 8 U.S.C. 1101(a)(15)(T) (T nonimmigrant status), 8 U.S.C. 1101(a)(15)(U) (U nonimmigrant status), 8 U.S.C. 1105a (battered spouses of A, G, E–3, or H nonimmigrants), 8 U.S.C. 1229(b)(2) (special rule cancellation for battered spouse or child), and 8 U.S.C. 1254a(a) (Temporary Protected Status).

(iv) The following fees may be waived only if the person is exempt from the public charge grounds of inadmissibility under section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4):

(A) Application for Advance Permission to Enter as Nonimmigrant (Form I–192);

(B) Application for Waiver for Passport and/or Visa (Form I–193);

(C) Application to Register Permanent Residence or Adjust Status (Form I–485); and

(D) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(4) *Immigration Court fees.* The provisions relating to the authority of the immigration judges or the Board to waive fees prescribed in paragraph (b) of this section in cases under their jurisdiction can be found at 8 CFR 1003.8 and 1003.24.

(b) *Humanitarian fee exemptions.* Persons in the following categories are exempt from paying certain fees as follows:

(1) Persons seeking or granted Special Immigrant Juvenile classification who file the following forms related to the Special Immigrant Juvenile classification or adjustment of status under section 245(h) of the Act, 8 U.S.C. 1255(h):

(i) Application for Travel Document (Form I–131).

(ii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iii) Application to Register Permanent Residence or Adjust Status (Form I–485).

(iv) Application for Waiver of Ground of Inadmissibility (Form I–601).

(v) Application for Employment Authorization (Form I–765).

(vi) Application for Action on an Approved Application or Petition (Form I–824).

(2) Persons seeking or granted T nonimmigrant status who file the following forms related to T nonimmigrant status or adjustment of status under INA section 245(l), 8 U.S.C. 1255(l):

(i) Application for Travel Document (Form I–131).

(ii) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(iii) Application for Waiver of Passport and/or Visa (Form I–193).

(iv) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion or appeal filed for an

Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(v) Application to Register Permanent Residence or Adjust Status (Form I–485).

(vi) Application to Extend/Change Nonimmigrant Status (Form I–539).

(vii) Application for Waiver of Ground of Inadmissibility (Form I–601).

(viii) Application for Employment Authorization (Form I–765).

(ix) Application for Action on an Approved Application or Petition (Form I–824). (3) Persons seeking or granted special immigrant visa or status as Afghan or Iraqi translators or interpreters, Iraqi nationals employed by or on behalf of the U.S. Government, or Afghan nationals employed by or on behalf of the U.S. Government or employed by the ISAF and their derivative beneficiaries, who file the following forms related to the Special Immigrant classification or adjustment of status under such classification:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for initial Employment Authorization (Form I–765).

(vii) Application for Action on an Approved Application or Petition (Form I–824).

(4) Persons seeking or granted adjustment of status as abused spouses and children under the Cuban Adjustment Act (CAA) and the Haitian Refugee Immigration Fairness Act (HRIFA) are exempt from paying the following fees for forms related to those benefits:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust

HR-1 FRN 2025 AR-000205

**Appx-000230**

Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Ground of Inadmissibility (Form I–601).

(vi) Application for Employment Authorization (Form I–765).

(vii) Application for Action on an Approved Application or Petition (Form I–824).

(5) Persons seeking or granted U nonimmigrant status who file the following forms related to U nonimmigrant status or adjustment of status under INA section 245(m), 8 U.S.C. 1255(m):

(i) Application for Travel Document (Form I–131).

(ii) Application for Advance Permission to Enter as a Nonimmigrant (Form I–192).

(iii) Application for Waiver of Passport and/or Visa (Form I–193).

(iv) Notice of Appeal or Motion (Form I–290B), if filed for any benefit request filed before adjustment of status or a motion or appeal filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(v) Application to Register Permanent Residence or Adjust Status (Form I–485).

(vi) Application to Extend/Change Nonimmigrant Status (Form I–539).

(vii) Application for Waiver of Ground of Inadmissibility (Form I–601).

(viii) Application for Employment Authorization (Form I–765).

(ix) Application for Action on an Approved Application or Petition (Form I–824).

(x) Petition for Qualifying Family Member of a U–1 Nonimmigrant (Form I–929).

(6) Persons seeking or granted immigrant classification as VAWA self-petitioners and derivatives as defined in section 101(a)(51)(A) and (B) of the Act or those otherwise self-petitioning for immigrant classification under section 204(a)(1) of the Act, 8 U.S.C. 1154(a)(1), are exempt from paying the following fees for forms related to the benefit:

(i) Application for Travel Document (Form I–131).

(ii) Application for Permission to Reapply for Admission into the U.S. After Deportation or Removal (Form I–212).

(iii) Notice of Appeal or Motion (Form I–290B) if filed for any benefit request filed before adjustment of status or a motion filed for an Application to Register Permanent Residence or Adjust Status (Form I–485) or an associated ancillary form.

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(v) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(vi) Application for Provisional Unlawful Presence Waiver (Form I–601A).

(vii) Application for Employment Authorization (Form I–765) for initial, renewal, and replacement requests submitted under 8 CFR 274a.12(c)(9) and (14) and section 204(a)(1)(K) of the Act.

(viii) Application for Action on an Approved Application or Petition (Form I–824).

(7) Abused spouses and children applying for benefits under the Nicaraguan Adjustment and Central American Relief Act (NACARA) are exempt from paying the following fees for forms related to the benefit:

(i) Application for Suspension of Deportation or Special Rule Cancellation of Removal (Pursuant to Section 203 of Public Law 105–100 (NACARA)) (Form I–881).

(ii) Application for Waiver of Grounds of Inadmissibility (Form I–601).

(iii) Application for Employment Authorization (Form I–765) submitted under 8 CFR 274a.12(c)(10).

(iv) Application for Action on an Approved Application or Petition (Form I–824).

(8) Battered spouses and children of a lawful permanent resident or U.S. citizen applying for cancellation of removal and adjustment of status under section 240A(b)(2) of the Act are exempt from paying the following fees for forms related to the benefit:

(i) Application for Employment Authorization (Form I–765) for their initial request under 8 CFR 274a.12(c)(10).

(ii) Application for Action on an Approved Application or Petition (Form I–824).

(9) Refugees, persons paroled as refugees, or lawful permanent residents who obtained such status as refugees in the United States are exempt from paying the following fees:

(i) Application for Travel Document (Form I–131).

(ii) Application for Carrier Documentation (Form I–131A).

(iii) Application for Employment Authorization (Form I–765).

(iv) Application to Register Permanent Residence or Adjust Status (Form I–485).

(c) *Director's waiver or exemption exception.* The Director of USCIS may authorize the waiver of or exemption from, in whole or in part, a form fee required by § 106.2 that is not otherwise waivable or exempt under this section, if the Director determines that such action is in the public interest and consistent with the applicable law. This discretionary authority may be delegated only to the USCIS Deputy Director.

### § 106.4  Premium processing service.

(a) *General.* A person may submit a request to USCIS for premium processing of certain immigration benefit requests, subject to processing timeframes and fees, as described in this section.

(b) *Submitting a request.* A request must be submitted on the form and in the manner prescribed by USCIS in the form instructions. If the request for premium processing is submitted together with the underlying immigration benefit request, all required fees in the correct amount must be paid. The fee to request premium processing service may not be waived and must be paid in addition to other filing fees. USCIS may require the premium processing service fee be paid in a separate remittance from other filing fees and preclude combined payments in the applicable form instructions.

(c) *Designated benefit requests and fee amounts.* Benefit requests designated for premium processing and the corresponding fees to request premium processing service are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the Act: $2,805.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the Act or section 222(a) of the Immigration Act of 1990, Public Law 101–649: $2,805.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the Act: $1,685.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the Act: $2,805.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the Act: $2,805.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the Act: $2,805.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the Act: $2,805.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the Act: $2,805.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the Act: $1,685.

(10) Application for classification of a nonimmigrant described in section 214(e) of the Act: $2,805.

HR-1 FRN 2025 AR-000206

Appx-000231

(11) Petition for classification under section 203(b)(1)(A) of the Act: $2,805.

(12) Petition for classification under section 203(b)(1)(B) of the Act: $2,805.

(13) Petition for classification under section 203(b)(2)(A) of the Act not involving a waiver under section 203(b)(2)(B) of the Act: $2,805.

(14) Petition for classification under section 203(b)(3)(A)(i) of the Act: $2,805.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the Act: $2,805.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the Act: $2,805.

(17) Petition for classification under section 203(b)(1)(C) of the Act: $2,805.

(18) Petition for classification under section 203(b)(2) of the Act, involving a waiver under section 203(b)(2)(B) of the Act: $2,805.

(19) Application under section 248 of the Act to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the Act: $1,965.

(20) Application under section 248 of the Act to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the Act, or to extend stay in such classification: $1,965.

(21) Application for employment authorization: $1,685.

(d) *Fee adjustments.* The fee to request premium processing service may be adjusted by notification in the **Federal Register** on a biennial basis based on the percentage by which the Consumer Price Index for All Urban Consumers for the month of June preceding the date on which such adjustment takes effect exceeds the Consumer Price Index for All Urban Consumers for the same month of the second preceding calendar year.

(e) *Processing timeframes.* The processing timeframes for a request for premium processing are as follows:

(1) Application for classification of a nonimmigrant described in section 101(a)(15)(E)(i), (ii), or (iii) of the Act: 15 business days.

(2) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(i)(b) of the Act or section 222(a) of the Immigration Act of 1990, Public Law 101–649: 15 business days.

(3) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(ii)(b) of the Act: 15 business days.

(4) Petition for classification of a nonimmigrant described in section 101(a)(15)(H)(iii) of the Act: 15 business days.

(5) Petition for classification of a nonimmigrant described in section 101(a)(15)(L) of the Act: 15 business days.

(6) Petition for classification of a nonimmigrant described in section 101(a)(15)(O)(i) or (ii) of the Act: 15 business days.

(7) Petition for classification of a nonimmigrant described in section 101(a)(15)(P)(i), (ii), or (iii) of the Act: 15 business days.

(8) Petition for classification of a nonimmigrant described in section 101(a)(15)(Q) of the Act: 15 business days.

(9) Petition for classification of a nonimmigrant described in section 101(a)(15)(R) of the Act: 15 business days.

(10) Application for classification of a nonimmigrant described in section 214(e) of the Act: 15 business days.

(11) Petition for classification under section 203(b)(1)(A) of the Act: 15 business days.

(12) Petition for classification under section 203(b)(1)(B) of the Act: 15 business days.

(13) Petition for classification under section 203(b)(2)(A) of the Act not involving a waiver under section 203(b)(2)(B) of the Act: 15 business days.

(14) Petition for classification under section 203(b)(3)(A)(i) of the Act: 15 business days.

(15) Petition for classification under section 203(b)(3)(A)(ii) of the Act: 15 business days.

(16) Petition for classification under section 203(b)(3)(A)(iii) of the Act: 15 business days.

(17) Petition for classification under section 203(b)(1)(C) of the Act: 45 business days.

(18) Petition for classification under section 203(b)(2) of the Act involving a waiver under section 203(b)(2)(B) of the Act: 45 business days.

(19) Application under section 248 of the Act to change status to a classification described in section 101(a)(15)(F), (J), or (M) of the Act: 30 business days.

(20) Application under section 248 of the Act I to change status to be classified as a dependent of a nonimmigrant described in section 101(a)(15)(E), (H), (L), (O), (P), or (R) of the Act, or to extend stay in such classification: 30 business days.

(21) Application for employment authorization: 30 business days.

(22) For the purpose of this section a business day is a day that the Federal Government is open for business, and does not include weekends, federally observed holidays, or days on which Federal Government offices are closed, such as for weather-related or other reasons. The closure may be nationwide or in the region where the adjudication of the benefit for which premium processing is sought will take place.

(f) *Processing requirements and refunds.* (1) USCIS will issue an approval notice, denial notice, a notice of intent to deny, or a request for evidence within the premium processing timeframe.

(2) Premium processing timeframes will commence:

(i) For those benefits described in paragraphs (e)(1) through (16) of this section, on the date the form prescribed by USCIS, together with the required fee(s), are received by USCIS.

(ii) For those benefits described in paragraphs (e)(17) through (21) of this section, on the date that all prerequisites for adjudication, the form prescribed by USCIS, and fee(s) are received by USCIS.

(3) In the event USCIS issues a notice of intent to deny or a request for evidence of the premium processing timeframe will stop and will recommence with a new timeframe as specified in paragraphs (e)(1) through (21) of this section on the date that USCIS receives a response to the notice of intent to deny or the request for evidence.

(4) Except as provided in paragraph (f)(5) of this section, USCIS will refund the premium processing service fee but continue to process the case if USCIS does not take adjudicative action described in paragraph (f)(1) of this section within the applicable processing timeframe as required in paragraph (e) of this section.

(5) USCIS may retain the premium processing fee and not take an adjudicative action described in paragraph (f)(1) of this section on the request within the applicable processing timeframe, and not notify the person who filed the request, if USCIS opens an investigation for fraud or misrepresentation relating to the immigration benefit request.

(g) *Availability.* (1) USCIS will announce by its official internet website, currently *https://www.uscis.gov,* the benefit requests described in paragraph (c) of this section for which premium processing may be requested, the dates upon which such availability commences or ends, or any conditions that may apply.

(2) USCIS may suspend the availability of premium processing for immigration benefit requests designated for premium processing if circumstances prevent the completion of processing of a significant number of

such requests within the applicable processing timeframe.

### § 106.5   Authority to certify records.

The Director of USCIS, or such officials as he or she may designate, may certify records when authorized under 5 U.S.C. 552 or any other law to provide such records.

### § 106.6   DHS severability.

The provisions of this part are separate and severable from one another. If any provision is stayed or determined to be invalid, or held unenforceable as to any person or circumstance, the remaining provisions and applications will continue in effect.

## PART 204—IMMIGRANT PETITIONS

■ 7. The authority citation for part 204 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1151, 1153, 1154, 1182, 1184, 1186a, 1255, 1324a, 1641; 8 CFR part 2.

■ 8. Section 204.3 is amended by:
■ a. Revising and republishing the definitions of "Advanced processing application" and "Orphan petition" in paragraph (b);
■ b. Revising and republishing paragraph (d) introductory text; and
■ c. Revising paragraphs (h)(3), (7), (13), and (14).

The revisions and republications read as follows:

### § 204.3   Orphan cases under section 101(b)(1)(F) of the Act (non-Hague Adoption Convention cases).

\*    \*    \*    \*    \*

(b) \* \* \*

*Advanced processing application* means Form I–600A (Application for Advance Processing of an Orphan Petition) completed in accordance with the form's instructions and submitted with the required supporting documentation and the fee as required in 8 CFR 106.2. The application must be signed in accordance with the form's instructions by the married petitioner and spouse, or by the unmarried petitioner.

\*    \*    \*    \*    \*

*Orphan petition* means Form I–600 (Petition to Classify Orphan as an Immediate Relative). The petition must be completed in accordance with the form's instructions and submitted with the required supporting documentation and, if there is not a pending, or currently valid and approved advanced processing application, the fee as required in 8 CFR 106.2. The petition must be signed in accordance with the form's instructions by the married

petitioner and spouse, or the unmarried petitioner.

\*    \*    \*    \*    \*

(d) *Supporting documentation for a petition for an identified orphan.* Any document not in the English language must be accompanied by a certified English translation. If an orphan has been identified for adoption and the advanced processing application is pending, the prospective adoptive parents may file the orphan petition at the USCIS office where the application is pending. The prospective adoptive parents who have an approved advanced processing application must file an orphan petition and all supporting documents within 15 months of the date of the approval of the advanced processing application. If the prospective adoptive parents fail to file the orphan petition within the approval validity period of the advanced processing application, the advanced processing application will be deemed abandoned under paragraph (h)(7) of this section. If the prospective adoptive parents file the orphan petition after the approval period of the advanced processing application has expired, the petition will be denied under paragraph (h)(13) of this section. Prospective adoptive parents who do not have an advanced processing application approved or pending may file the application and petition concurrently on one Form I–600 if they have identified an orphan for adoption. An orphan petition must be accompanied by full documentation as follows:

\*    \*    \*    \*    \*

(h) \* \* \*

(3) *Advanced processing application approved.* If the advanced processing application is approved:

(i) The prospective adoptive parents will be advised in writing. A notice of approval expires 15 months after the approval date.

(ii) USCIS may extend the validity period for the approval of a Form I–600A if requested in accordance with 8 CFR 106.2(a)(32). Form I–600A/I–600 Supplement 3 cannot be used to:

(A) Seek extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–600A approval but must be filed on or before the date on which the validity period expires if the applicant seeks an extension.

(B) Extend eligibility to proceed as a Hague Adoption Convention transition case beyond the first extension once the Convention enters into force for the new Convention country.

(C) Request a change of country to a Hague Adoption Convention transition

country for purposes of becoming a transition case if another country was already designated on the Form I–600A or the applicant previously changed countries.

(iii) Form I–600A/I–600 Supplement 3 may only be used to request an increase in the number of children the applicant/petitioner is approved to adopt from a transition country if: the additional child is a birth sibling of a child whom the applicant/petitioner has adopted or is in the process of adopting, as a transition case, and is identified and petitioned for while the Form I–600A approval is valid, unless the new Convention country prohibits such birth sibling cases from proceeding as transition cases.

(iv) If the Form I–600A approval is for more than one orphan, the prospective adoptive parents may file a petition for each of the additional children, to the maximum number approved.

(v) It does not guarantee that the orphan petition will be approved.

\*    \*    \*    \*    \*

(7) *Advanced processing application deemed abandoned for failure to file orphan petition within the approval validity period of the advanced processing application.* If an orphan petition is not properly filed within the validity period of the advanced processing application:

(i) The application will be deemed abandoned;

(ii) Supporting documentation will be returned to the prospective adoptive parents, except for documentation submitted by a third party which will be returned to the third party, and documentation relating to the biometric checks;

(iii) The director will dispose of documentation relating to biometrics checks in accordance with current policy; and

(iv) Such abandonment will be without prejudice to a new filing at any time with fee.

\*    \*    \*    \*    \*

(13) *Orphan petition denied: petitioner files orphan petition after the approval of the advanced processing application has expired.* If the petitioner files the orphan petition after the advanced processing application has expired, the petition will be denied unless it is filed concurrently with a new advanced processing application under 8 CFR 204.3(d)(3). This action will be without prejudice to a new filing at any time with fee.

(14) *Revocation.* (i) The approval of an advanced processing application or an orphan petition shall be automatically revoked in accordance with 8 CFR 205.1

if an applicable reason exists. The approval of an advanced processing application or an orphan petition shall be revoked if the director becomes aware of information that would have resulted in denial had it been known at the time of adjudication. Such a revocation or any other revocation on notice shall be made in accordance with 8 CFR 205.2.

(ii) The approval of a Form I–600A or Form I–600 combination filing is automatically revoked if before the final decision on a beneficiary's application for admission with an immigrant visa or for adjustment of status:

(A) The marriage of the applicant terminates; or

(B) An unmarried applicant marries.

(iii) Revocation is without prejudice to the filing of a new Form I–600A or Form I–600 combination filing, with fee, accompanied by a new or updated home study, reflecting the change in marital status. If a Form I–600 had already been filed based on the approval of the prior Form I–600A and a new Form I–600A is filed under this paragraph (h)(14) rather than a Form I–600 combination filing, then a new Form I–600 must also be filed. The new Form I–600 will be adjudicated only if the new Form I–600A is approved.

\* \* \* \* \*

■ 9. Section 204.5 is amended by revising and republishing paragraph (p)(4) to read as follows:

### § 204.5 Petitions for employment-based immigrants.

\* \* \* \* \*

(p) \* \* \*

(4) *Application for employment authorization.* (i) To request employment authorization, an eligible applicant described in paragraph (p)(1), (2), or (3) of this section must:

(A) File an application for employment authorization with USCIS, in accordance with 8 CFR 274a.13(a) and the form instructions.

(B) Submit biometric information in accordance with the applicable form instructions.

(ii) Employment authorization under this paragraph may be granted solely in 1-year increments.

\* \* \* \* \*

■ 10. Section 204.312 is amended by revising and republishing paragraphs (e)(1) and (e)(3) to read as follows:

### § 204.312 Adjudication of the Form I–800A.

\* \* \* \* \*

(e) \* \* \*

(1) A notice of approval expires 15 months after the date of the approval, unless approval is revoked. USCIS may

extend the validity period for the approval of a Form I–800A only as provided in paragraph (e)(3) of this section.

\* \* \* \* \*

(3)(i) If the validity period for a Form I–800A approval is about to expire, the applicant:

(A) May file Form I–800A Supplement 3 as described in 8 CFR 106.2(a)(48) to request an extension.

(B) May not file a Form I–800A Supplement 3 seeking extension of an approval notice more than 90 days before the expiration of the validity period for the Form I–800A approval but must do so on or before the date on which the validity period expires if the applicant seeks an extension.

(ii) Any Form I–800A Supplement 3 that is filed to obtain an extension or update of the approval of a Form I–800A or to request a change of Hague Convention countries must be accompanied by:

(A) A statement, signed by the applicant under penalty of perjury, detailing any changes to the answers given to the questions on the original Form I–800A;

(B) An updated or amended home study as required under 8 CFR 204.311(u); and

(C) A photocopy of the Form I–800A approval notice.

(iii) If USCIS continues to be satisfied that the applicant remains suitable as the adoptive parent of a Convention adoptee, USCIS will extend the approval of the Form I–800A for the same period of validity as the initial filing.

(iv) There is no limit to the number of extensions that may be requested and granted under this section, so long as each request is supported by an updated or amended home study that continues to recommend approval of the applicant for intercountry adoption and USCIS continues to find that the applicant remain suitable as the adoptive parent(s) of a Convention adoptee.

■ 11. Section 204.313 is amended by revising and republishing paragraph (a) to read as follows:

### § 204.313 Filing and adjudication of a Form I–800.

(a) *When to file.* Once a Form I–800A has been approved and the Central Authority has proposed placing a child for adoption by the petitioner, the petitioner may file the Form I–800. The petitioner must complete the Form I–800 in accordance with the instructions that accompany the Form I–800 and sign the Form I–800 personally. In the case of a married petitioner, one spouse cannot sign for the other, even under a

power of attorney or similar agency arrangement. The petitioner may then file the Form I–800 with the stateside or overseas USCIS office or the visa issuing post that has jurisdiction under § 204.308(b) to adjudicate the Form I–800, together with the evidence specified in this section and the filing fee specified in 8 CFR 106.2, if more than one Form I–800 is filed for children who are not birth siblings.

\* \* \* \* \*

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

■ 12. The authority citation for part 212 is revised to read as follows:

**Authority:** 6 U.S.C. 111, 202(4) and 271; 8 U.S.C. 1101 and note, 1102, 1103, 1182 and note, 1184, 1185 note (sec. 7209, Pub. L. 108–458, 118 Stat. 3638), 1187, 1223, 1225, 1226, 1227, 1255, 1359; 8 CFR part 2. Section 212.1(q) also issued under sec. 702, Pub. L. 110–229, 122 Stat. 754, 854.

■ 13. Section 212.19 is amended by revising and republishing paragraphs (b)(1), (c)(1), (e), (h)(1), and (j) to read as follows:

### § 212.19 Parole for entrepreneurs.

\* \* \* \* \*

(b) \* \* \*

(1) *Filing of initial parole request form.* An alien seeking an initial grant of parole as an entrepreneur of a start-up entity must file Form I–941, Application for Entrepreneur Parole, with USCIS, with the required fee, and supporting documentary evidence in accordance with this section and the form instructions, demonstrating eligibility as provided in paragraph (b)(2) of this section.

\* \* \* \* \*

(c) \* \* \*

(1) *Filing of re-parole request form.* Before expiration of the initial period of parole, an entrepreneur parolee may request an additional period of parole based on the same start-up entity that formed the basis for his or her initial period of parole granted under this section. To request such parole, an entrepreneur parolee must timely file an application for entrepreneur parole with USCIS on the form prescribed by USCIS with the required fee and supporting documentation in accordance with the form instructions, demonstrating eligibility as provided in paragraph (c)(2) of this section.

\* \* \* \* \*

(e) *Collection of biometric information.* An alien seeking an initial grant of parole or re-parole will be

HR-1 FRN 2025 AR-000209

Appx-000234

required to submit biometric information.

* * * * *

(h) * * *

(1) The entrepreneur's spouse and children who are seeking parole as derivatives of such entrepreneur must individually file Form I–131, Application for Travel Document. Such application must also include evidence that the derivative has a qualifying relationship to the entrepreneur and otherwise merits a grant of parole in the exercise of discretion. Such spouse or child will be required to appear for collection of biometrics in accordance with the form instructions or upon request.

* * * * *

(j) *Reporting of material changes*. An alien granted parole under this section must immediately report any material change(s) to USCIS. If the entrepreneur will continue to be employed by the start-up entity and maintain a qualifying ownership interest in the start-up entity, the entrepreneur must submit a form prescribed by USCIS, with any applicable fee in accordance with the form instructions to notify USCIS of the material change(s). The entrepreneur parolee must immediately notify USCIS in writing if they will no longer be employed by the start-up entity or ceases to possess a qualifying ownership stake in the start-up entity.

* * * * *

## PART 214—NONIMMIGRANT CLASSES

■ 14. The authority citation for part 214 continues to read as follows:

**Authority:** 6 U.S.C. 202, 236; 8 U.S.C. 1101, 1102, 1103, 1182, 1184, 1186a, 1187, 1221, 1281, 1282, 1301–1305, 1357, and 1372; sec. 643, Pub. L. 104–208, 110 Stat. 3009–708; Pub. L. 106–386, 114 Stat. 1477–1480; section 141 of the Compacts of Free Association with the Federated States of Micronesia and the Republic of the Marshall Islands, and with the Government of Palau, 48 U.S.C. 1901 note and 1931 note, respectively; 48 U.S.C. 1806; 8 CFR part 2; Pub. L. 115–218, 132 Stat. 1547 (48 U.S.C. 1806).

■ 15. Section 214.1 is amended by republishing paragraph (c)(5) to read as follows:

### § 214.1  Requirements for admission, extension, and maintenance of status.

* * * * *

(c) * * *

(5) *Decision on application for extension or change of status*. Where an applicant or petitioner demonstrates eligibility for a requested extension, it may be granted at the discretion of USCIS. The denial of an application for extension of stay may not be appealed.

* * * * *

■ 16. Section 214.2 is amended by:
■ a. Revising and republishing paragraphs (e)(8)(iii) through (v), (e)(23)(viii), (h)(2)(i)(A), (h)(2)(ii), (h)(5)(i)(B), and (h)(19)(i) introductory text;
■ b. Revising paragraph (m)(14)(ii) introductory text;
■ c. Revising and republishing paragraphs (o)(2)(iv)(F), (p)(2)(iv)(F), and (q)(5)(ii);
■ d. Republishing the definition for "Petition" in paragraph (r)(3);
■ e. Revising paragraph (r)(5);
■ f. Republishing paragraph (w)(5) and (w)(15)(iii); and
■ g. Revising paragraph (w)(16).

The revisions and republications read as follows:

### § 214.2  Special requirements for admission, extension, and maintenance of status.

* * * * *

(e) * * *

(8) * * *

(iii) *Substantive changes*. Approval of USCIS must be obtained where there will be a substantive change in the terms or conditions of E status. The treaty alien must file a new application in accordance with the instructions on the form prescribed by USCIS requesting extension of stay in the United States, plus evidence of continued eligibility for E classification in the new capacity. Or the alien may obtain a visa reflecting the new terms and conditions and subsequently apply for admission at a port-of-entry. USCIS will deem there to have been a substantive change necessitating the filing of a new application where there has been a fundamental change in the employing entity's basic characteristics, such as a merger, acquisition, or sale of the division where the alien is employed.

(iv) *Non-substantive changes*. Neither prior approval nor a new application is required if there is no substantive, or fundamental, change in the terms or conditions of the alien's employment that would affect the alien's eligibility for E classification. Further, prior approval is not required if corporate changes occur which do not affect the previously approved employment relationship or are otherwise non-substantive. To facilitate admission, the alien may:

(A) Present a letter from the treaty-qualifying company through which the alien attained E classification explaining the nature of the change;

(B) Request a new approval notice reflecting the non-substantive change by filing an application with a description of the change; or

(C) Apply directly to Department of State for a new E visa reflecting the change. An alien who does not elect one of the three options contained in paragraphs (e)(8)(iv)(A) through (C) of this section, is not precluded from demonstrating to the satisfaction of the immigration officer at the port-of-entry in some other manner, his or her admissibility under section 101(a)(15)(E) of the Act.

(v) *Advice*. To request advice from USCIS as to whether a change is substantive, an alien may file an application with a complete description of the change. In cases involving multiple employees, an alien may request that USCIS determine if a merger or other corporate restructuring requires the filing of separate applications by filing a single application and attaching a list of the related receipt numbers for the employees involved and an explanation of the change or changes.

* * * * *

(23) * * *

(viii) *Information for background checks*. USCIS may require an applicant for E–2 CNMI Investor status, including but not limited to any applicant for derivative status as a spouse or child, to submit biometrics as required under 8 CFR 103.16.

* * * * *

(h) * * *

(2) * * *

(i) * * *

(A) *General*. A United States employer seeking to classify an alien as an H–1B, H–2A, H–2B, or H–3 temporary employee must file a petition on the form prescribed by USCIS in accordance with the form instructions.

* * * * *

(ii) *Multiple beneficiaries*. Up to 25 named beneficiaries may be included in an H–1C, H–2A, H–2B, or H–3 petition if the beneficiaries will be performing the same service, or receiving the same training, for the same period, and in the same location. If more than 25 named beneficiaries are being petitioned for, an additional petition is required. Petitions for H–2A and H–2B workers from countries not designated in accordance with paragraph (h)(6)(i)(E) of this section must be filed separately.

* * * * *

(5) * * *

(i) * * *

(B) *Multiple beneficiaries*. The total number of beneficiaries of a petition or series of petitions based on the same

HR-1 FRN 2025 AR-000210

Appx-000235

temporary labor certification may not exceed the number of workers indicated on that document. A single petition can include more than one named beneficiary if the total number is 25 or fewer and does not exceed the number of positions indicated on the relating temporary labor certification.

\*    \*    \*    \*    \*

(19) \* \* \*

(i) A United States employer (other than an exempt employer defined in paragraph (h)(19)(iii) of this section, or an employer filing a petition described in paragraph (h)(19)(v) of this section) who files a petition or application must include the additional American Competitiveness and Workforce Improvement Act (ACWIA) fee referenced in 8 CFR 106.2, if the petition is filed for any of the following purposes:

\*    \*    \*    \*    \*

(m) \* \* \*

(14) \* \* \*

(ii) *Application.* An M–1 student must apply for permission to accept employment for practical training on Form I–765, with fee as contained in 8 CFR part 106, accompanied by a properly endorsed Form I–20 by the designated school official for practical training. The application must be submitted before the program end date listed on the student's Form I–20 but not more than 90 days before the program end date. The designated school official must certify on Form I–538 that:

\*    \*    \*    \*    \*

(o) \* \* \*

(2) \* \* \*

(iv) \* \* \*

(F) *Multiple beneficiaries.* More than one O–2 accompanying alien may be included on a petition if they are assisting the same O–1 alien for the same events or performances, during the same period, and in the same location. Up to 25 named beneficiaries may be included per petition.

\*    \*    \*    \*    \*

(p) \* \* \*

(2) \* \* \*

(iv) \* \* \*

(F) *Multiple beneficiaries.* More than one beneficiary may be included in a P petition if they are members of a team or group, or if they will provide essential support to P–1, P–2, or P–3 beneficiaries performing in the same location and in the same occupation. Up to 25 named beneficiaries may be included per petition.

\*    \*    \*    \*    \*

(q) \* \* \*

(5) \* \* \*

(ii) *Petition for multiple participants.* The petitioner may include up to 25 named participants on a petition. The petitioner shall include the name, date of birth, nationality, and other identifying information required on the petition for each participant. The petitioner must also indicate the United States consulate at which each participant will apply for a Q–1 visa. For participants who are visa-exempt under 8 CFR 212.1(a), the petitioner must indicate the port of entry at which each participant will apply for admission to the United States.

\*    \*    \*    \*    \*

(r) \* \* \*

(3) \* \* \*

*Petition* means the form or as may be prescribed by USCIS, a supplement containing attestations required by this section, and the supporting evidence required by this part.

\*    \*    \*    \*    \*

(5) *Extension of stay or readmission.* An R–1 alien who is maintaining status or is seeking readmission and who satisfies the eligibility requirements of this section may be granted an extension of R–1 stay or readmission in R–1 status for the validity period of the petition, up to 30 months, provided the total period spent in R–1 status does not exceed a maximum of 5 years. A Petition for a Nonimmigrant Worker to request an extension of R–1 status must be filed by the employer with a supplement prescribed by USCIS containing attestations required by this section, the fee specified in 8 CFR part 106, and the supporting evidence, in accordance with the applicable form instructions.

\*    \*    \*    \*    \*

(w) \* \* \*

(5) *Petition requirements.* An employer who seeks to classify an alien as a CW–1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education funding fee and the fraud prevention and detection fee as prescribed in the form instructions and 8 CFR part 106. If the beneficiary will perform services for more than one employer, each employer must file a separate petition with fees with USCIS.

\*    \*    \*    \*    \*

(15) \* \* \*

(iii) If the eligible spouse and/or minor child(ren) are present in the CNMI, the spouse or child(ren) may apply for CW–2 dependent status on Form I–539 (or such alternative form as USCIS may designate) in accordance with the form instructions. The CW–2 status may not be approved until approval of the CW–1 petition.

(16) *Biometrics and other information.* The beneficiary of a CW–1 petition or the spouse or child applying for a grant or extension of CW–2 status, or a change of status to CW–2 status, must submit biometric information as requested by USCIS.

\*    \*    \*    \*    \*

■ 17. Section 214.14 is amended by revising and republishing paragraph (c)(1) introductory text to read as follows:

### § 214.14    Alien victims of certain qualifying criminal activity.

\*    \*    \*    \*    \*

(c) \* \* \*

(1) *Filing a petition.* USCIS has sole jurisdiction over all petitions for U nonimmigrant status. An alien seeking U–1 nonimmigrant status must submit a Petition for U Nonimmigrant Status on the form prescribed by USCIS, and initial evidence to USCIS in accordance with this paragraph (c)(1) and the form instructions. A petitioner who received interim relief is not required to submit initial evidence with a Petition for U Nonimmigrant Status if he or she is relying on the law enforcement certification and other evidence that was submitted with the request for interim relief.

\*    \*    \*    \*    \*

## PART 240—VOLUNTARY DEPARTURE, SUSPENSION OF DEPORTATION AND SPECIAL RULE CANCELLATION OF REMOVAL

■ 18. The authority citation for part 240 continues to read as follows:

**Authority:** 8 U.S.C. 1103; 1182, 1186a, 1224, 1225, 1226, 1227, 1251, 1252 note, 1252a, 1252b, 1362; secs. 202 and 203, Pub. L. 105–100 (111 Stat. 2160, 2193); sec. 902, Pub. L. 105–277 (112 Stat. 2681); 8 CFR part 2.

■ 19. Section 240.63 is amended by revising and republishing paragraph (a) to read as follows:

### § 240.63    Application process.

(a) *Form and fees.* Except as provided in paragraph (b) of this section, the application must be made on the form prescribed by USCIS for this program and filed in accordance with the instructions for that form. An applicant who submitted to EOIR a completed, Application for Suspension of Deportation, before the effective date of the form prescribed by USCIS may apply with USCIS by submitting the completed Application for Suspension of Deportation attached to a completed first page of the application. Each application must be filed with the required fees as provided in 8 CFR 106.2.

\*    \*    \*    \*    \*

## PART 244—TEMPORARY PROTECTED STATUS FOR NATIONALS OF DESIGNATED STATES

■ 20. The authority citation for part 244 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1254, 1254a note, 8 CFR part 2.

■ 21. Section 244.6 is revised and republished to read as follows:

### § 244.6   Application.

(a) An application for Temporary Protected Status (TPS) must be submitted in accordance with the form instructions, the applicable country-specific **Federal Register** notice that announces the procedures for TPS registration or re-registration and, except as otherwise provided in this section, with the appropriate fees as described in 8 CFR part 106.

(b) An applicant for TPS may also request an employment authorization document under 8 CFR part 274a by filing an Application for Employment Authorization in accordance with the form instructions and in accordance with 8 CFR 106.2 and 106.3.

■ 22. Section 244.17 is amended by republishing paragraph (a) to read as follows:

### § 244.17   Periodic registration.

(a) Aliens granted Temporary Protected Status must re-register periodically in accordance with USCIS instructions. Such registration applies to nationals of those foreign states designated for more than one year by DHS or where a designation has been extended for a year or more. Applicants for re-registration must apply during the period provided by USCIS. Re-registration applicants do not need to pay the fee that was required for initial registration except the biometric services fee, unless that fee is waived in the applicable form instructions, and if requesting an employment authorization document, the application fee for an Application for Employment Authorization. By completing the application, applicants attest to their continuing eligibility. Such applicants do not need to submit additional supporting documents unless USCIS requests that they do so.

*     *     *     *     *

## PART 245—ADJUSTMENT OF STATUS TO THAT OF PERSON ADMITTED FOR PERMANENT RESIDENCE

■ 23. The authority citation for part 245 is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1182, 1252, 1255; Pub. L. 105–100, section 202, 111 Stat. 2160, 2193; Pub. L. 105–277, section 902, 112 Stat. 2681; Pub. L. 110–229, tit. VII, 122 Stat. 754; 8 CFR part 2.

■ 24. Section 245.1 is amended by:
■ a. Revising paragraph (f); and
■ b. Removing the parenthetical authority citation at the end of the section.

The revision reads as follows:

### § 245.1   Eligibility.

*     *     *     *     *

(f) *Concurrent applications to overcome grounds of inadmissibility.* Except as provided in 8 CFR parts 235 and 249, an application under this part shall be the sole method of requesting the exercise of discretion under sections 212(g), (h), (i), and (k) of the Act, as they relate to the inadmissibility of an alien in the United States.

*     *     *     *     *

## PART 245a—ADJUSTMENT OF STATUS TO THAT OF PERSONS ADMITTED FOR TEMPORARY OR PERMANENT RESIDENT STATUS UNDER SECTION 245A OF THE IMMIGRATION AND NATIONALITY ACT

■ 25. The authority citation for part 245a continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1255a and 1255a note.

■ 26. Section 245a.2 is amended by republishing paragraph (e)(3) to read as follows:

### § 245a.2   Application for temporary residence.

*     *     *     *     *

(e) * * *

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

*     *     *     *     *

■ 27. Section 245a.3 is amended by republishing paragraph (d)(3) to read as follows:

### § 245a.3   Application for adjustment from temporary to permanent resident status.

*     *     *     *     *

(d) * * *

(3) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

*     *     *     *     *

■ 28. Section 245a.4 is amended by republishing paragraph (b)(5)(iii) to read as follows:

### § 245a.4   Adjustment to lawful resident status of certain nationals of countries for which extended voluntary departure has been made available.

*     *     *     *     *

(b) * * *

(5) * * *

(iii) A separate application must be filed by each applicant with the fees required by 8 CFR 106.2.

*     *     *     *     *

■ 29. Section 245a.12 is amended by republishing paragraph (d) introductory text to read as follows:

### § 245a.12   Filing and applications.

*     *     *     *     *

(d) *Application and supporting documentation.* Each applicant for LIFE Legalization adjustment of status must submit the form prescribed by USCIS completed in accordance with the form instructions accompanied by the required evidence.

*     *     *     *     *

## PART 264—REGISTRATION AND FINGERPRINTING OF ALIENS IN THE UNITED STATES

■ 30. The authority citation for part 264 continues to read as follows:

**Authority:** 8 U.S.C. 1103, 1201, 1303–1305; 8 CFR part 2.

■ 31. Section 264.5 is amended by revising paragraph (a) to read as follows:

### § 264.5   Application for a replacement Permanent Resident Card.

(a) *Filing instructions.* A request to replace a Permanent Resident Card must be filed in accordance with the appropriate form instructions and with the fee specified in 8 CFR 106.2.

*     *     *     *     *

## PART 274a—CONTROL OF EMPLOYMENT OF ALIENS

■ 32. The authority citation for part 274a is revised to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1324a; 48 U.S.C. 1806; Pub. L. 101–410, 104 Stat. 890 (28 U.S.C. 2461 note); Pub. L. 114–74, 129 Stat. 599 (28 U.S.C. 2461 note); 8 CFR part 2.

■ 33. Section 274a.12 is amended by revising and republishing paragraphs (b)(9), (13), and (14) to read as follows:

### § 274a.12   Classes of aliens authorized to accept employment.

*     *     *     *     *

(b) * * *

(9) A temporary worker or trainee (H–1, H–2A, H–2B, or H–3), under 8 CFR 214.2(h), or a nonimmigrant specialty occupation worker under section 101(a)(15)(H)(i)(b)(1) of the Act. An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional H–2B athlete who is traded from one organization to another

organization, employment authorization for the player will automatically continue for a period of 30 days after acquisition by the new organization, within which time the new organization is expected to file a new petition for H–2B classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease. In the case of a nonimmigrant with H–1B status, employment authorization will automatically continue upon the filing of a qualifying petition under 8 CFR 214.2(h)(2)(i)(H) until such petition is adjudicated, in accordance with section 214(n) of the Act and 8 CFR 214.2(h)(2)(i)(H).

\*      \*      \*      \*      \*

(13) An alien having extraordinary ability in the sciences, arts, education, business, or athletics (O–1), and an accompanying alien (O–2), under 8 CFR 214.2(o). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional O–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for O nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

(14) An athlete, artist, or entertainer (P–1, P–2, or P–3), under 8 CFR 214.2(p). An alien in this status may be employed only by the petitioner through whom the status was obtained. In the case of a professional P–1 athlete who is traded from one organization to another organization, employment authorization for the player will automatically continue for a period of 30 days after the acquisition by the new organization, within which time the new organization is expected to file a new petition for P–1 nonimmigrant classification. If a new petition is not filed within 30 days, employment authorization will cease. If a new petition is filed within 30 days, the professional athlete's employment authorization will continue until the petition is adjudicated. If the new petition is denied, employment authorization will cease.

\*      \*      \*      \*      \*

**Alejandro N. Mayorkas,**
*Secretary, U.S. Department of Homeland Security.*
[FR Doc. 2024–01427 Filed 1–30–24; 4:15 am]
**BILLING CODE 9111–97–P**

HR-1 FRN 2025 AR-000213




U.S. Department of Homeland Security
Washington, DC 20528

# Homeland Security

February 11, 2022

MEMORANDUM FOR EMPLOYEES OF:
     U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT
     U.S. CUSTOMS AND BORDER PROTECTION
     U.S. CITIZENSHIP AND IMMIGRATION SERVICES

FROM:     Tae D. Johnson
               Acting Director
               U.S. Immigration and Customs Enforcement

               Chris Magnus
               Commissioner
               U.S. Customs and Border Protection

               Ur M. Jaddou
               Director
               U.S. Citizenship and Immigration Services

SUBJECT:    **Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States**

---

### Purpose

This guidance provides policy and operational instructions and defines DHS agency and office roles in accepting and considering requests for parole from noncitizen current and former military service members and their qualifying family members who are outside of the United States.[1]

In recognition of the profound commitment and sacrifice that current and former military service members and their families make and have made to the United States, the U.S. Department of Homeland Security (DHS) will accept and consider, on a case-by-case basis, parole requests under section 212(d)(5) of the Immigration and Nationality Act (INA)[2] from certain noncitizen current and former military service members and qualifying family members of current and

---

[1] *See* 8 C.F.R. §§ 2.1, 212.5; *see also* Memorandum of Agreement Between United States Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP) For the purpose of Coordinating the Concurrent Exercise by USCIS, ICE, and CBP, of the Secretary's Parole Authority under INA § 212(d)(5)(A) with Respect to Certain Aliens Located Outside of the United States (Sept. 29, 2008) (DHS Parole MOA).
[2] 8 U.S.C. § 1182(d)(5).

FOR OFFICIAL USE ONLY

HR-1 FRN 2025 AR-000214

**Appx-000239**

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 2

former military service members who are outside the United States, so that they may seek return to the United States to better avail themselves of U.S. legal counsel and systems and gain access to certain veterans' benefits.

The July 2, 2021 DHS Component Memorandum for the Secretary of Homeland Security states, in pertinent part, that DHS Components will:

> Use DHS's prosecutorial discretion and other legal authorities to receive and review requests from certain previously removed former noncitizen service members and immediate family members of service members to return to the United States to facilitate better access to appropriate Veterans Affairs (VA) benefits, legal counsel, and the U.S. legal system for purposes of requesting post-conviction relief or reopening of removal proceedings, if warranted. We will develop a Department-wide approach to reviewing requests for relief from removal by previously removed noncitizen service members and immediate family members of service members to support humane and consistent outcomes.[3]

### Background

Throughout U.S. history, noncitizens have honorably served in the U.S. Armed Forces. Although the INA contains specific provisions allowing noncitizen service members to apply for naturalization,[4] some noncitizen current and former service members may not have applied for naturalization or may have been denied naturalization and became subject to civil immigration enforcement and removal due to several possible factors, including criminal behavior. However, prior removal, or certain criminal behavior, does not automatically disqualify some individuals from naturalization or other immigration benefits. Additionally, prior removal or criminal behavior does not automatically disqualify former service members from benefits administered by the VA based on their prior service. Allowing certain individuals to return to the United States to apply for and fully access these benefits will yield a significant public benefit by fulfilling our obligation to support the men and women who defend our Nation and to care for them and their families.

Military personnel are commonly exposed to health-harming conditions during their service, resulting in higher rates of physical and mental health conditions compared with the general population.[5] Studies have shown that military veterans report higher rates of many health conditions compared with the general population, including physical health symptoms (e.g., pain, fatigue), chronic conditions (e.g., diabetes), mental health disorders (e.g., post-traumatic stress disorder, depression) and harmful substance use. In many cases, barring a former service member from entering the United States limits their access to VA health services to which they

---

[3] See DHS's Commitment to Supporting Noncitizen Service Members, Veterans, and Immediate Family Members of Service Members Memorandum (July 2, 2021).

[4] INA § 329, 8 U.S.C. § 1440.

[5] Horyniak D., et al., *Deportation of Non-Citizen Military Veterans: A Critical Analysis of Implications for the Right to Health*, Global Public Health (Dec. 15, 2017), available at https://pubmed.ncbi.nlm.nih.gov/29243564/.

FOR OFFICIAL USE ONLY

**Appx-000240**

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and
Qualifying Family Members of Current and Former Service Members Seeking to Return to the
United States
Page 3

may otherwise be entitled. Availability of, and access to, healthcare while living outside of the
United States may be limited for reasons including barriers to enrolling in public insurance plans,
challenges navigating unfamiliar health systems, and stigma and discrimination towards deported
former service members. Additionally, the quality of available care may be sub-optimal due to
limited expertise in service-related health issues and lack of evidence-based treatment for some
health conditions (e.g., substance use dependence).

**Justification for Considering Parole Requests from Current and Former Military Members
and Their Families**

The Secretary of Homeland Security, in his discretion, may parole an individual "into the United
States temporarily under such conditions as he may prescribe only on a case-by-case basis for
urgent humanitarian reasons or significant public benefit."[6] The Secretary may set the duration
of the parole based on the purpose for granting the parole request. Parole is neither an
immigration status nor an admission to the United States,[7] and individuals who may be otherwise
inadmissible may be paroled into the United States. DHS may terminate the parole at any time
and the individual's case shall continue "in the same manner as that of any other applicant for
admission to the United States."[8]

Parole for noncitizen current and former military service members and their families outside the
United States (to include those who were removed from the United States) generally would
provide a significant public benefit to the United States by recognizing the profound
commitment and sacrifice that military service members and their families have made to the
United States. A grant of parole may promote family unity among military service members or
assist former military service members (and their family members) who may be eligible for
naturalization or other immigration benefits or post-conviction relief. In certain cases, there also
may be an urgent humanitarian reason to permit former service members (or their family
members) to return to the United States to receive medical treatment and access VA benefits,
including care for physical and mental health conditions arising from their service, that may only
be available in the United States. The decision whether to grant a parole request will be
determined on a case-by-case basis and upon a thorough review of the request and other relevant
information related to the noncitizen.

**Jurisdiction Over Parole Requests from Current and Former Military Members and Their
Families.**

Under current DHS guidelines, ICE generally has jurisdiction over parole requests for
individuals who are in removal proceedings, have final orders of removal or have been removed,
and individuals granted deferred action by ICE at any point after the commencement of removal
proceedings.[9] Parole requests from previously removed service members and certain qualifying

---

[6] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).
[7] INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).
[8] Id.; see also 8 C.F.R. § 212.5(c)-(e).
[9] See DHS Parole MOA (Sept. 29, 2008).

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 4

family members will therefore generally fall under ICE jurisdiction. For other individuals who do not fall under ICE's jurisdiction, USCIS will generally have jurisdiction to adjudicate the parole request. CBP has jurisdiction over all parole requests at the port of entry regardless of the applicant having pending removal proceedings or having previously been removed and does not require advance filing of a Form I-131, *Application for Travel Document*. The Component that adjudicates the parole requests for these individuals should also adjudicate the requests of any derivative family members, whether accompanying the principal or following to join later.

Certain current and former service members and their qualifying family members residing outside the United States, as described in this policy, may file a Form I-131 to request parole into the United States from USCIS or ICE. All Form I-131 filings will continue to be filed with a USCIS Lockbox. If the parole applicant falls under ICE jurisdiction as described above, USCIS will direct the case to, or coordinate with ICE, as appropriate. If the Form I-131 is approved by USCIS or ICE, the individual may be issued an Advance Parole Document that allows the individual to request parole at a port of entry where a CBP officer inspects the individual and determines whether to authorize parole and the length of their parole period.

### Specialized Training for DHS Officers Considering Parole Requests from Current and Former Military Members and Their Families

Considering the unique circumstances and significant U.S. equities in supporting current and former members of the military and their families, any officer who is assigned to review Form I-131 parole requests under this guidance must receive specialized training developed in coordination with the VA.

### Expedited Handling and Supervisory Level Review

All parole requests that fall within these guidelines will be reviewed expeditiously and must receive a supervisory review at the level determined by the component having jurisdiction over the case, prior to issuing a final decision. When the component with jurisdiction for the request completes its review, the case will be forwarded to the supervisor for concurrence. The component will report decisions to the Immigrant Military Members and Veterans Initiative (IMMVI) Interagency Group for tracking and reporting purposes.[10]

If a final decision cannot be reached within 90 days of receipt at the reviewing office, the reviewing office will provide progress updates to the IMMVI Interagency Group at 60-day intervals until a final determination is made. The IMMVI Interagency Group will have a strictly consultative and coordinating role and will not provide a binding or determinative opinion or recommendation.

---

[10] The Immigrant Military Members and Veterans Initiative (IMMVI) is an interagency working group made up of representatives from USCIS, ICE and CBP, the VA, and Department of Defense.

FOR OFFICIAL USE ONLY

HR-1 FRN 2025 AR-000217

Appx-000242

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and
Qualifying Family Members of Current and Former Service Members Seeking to Return to the
United States
Page 5

**Fees**

The USCIS Director will exercise the authority under 8 CFR 103.7(d) to approve exemptions
from any fee required by 8 CFR 103.7(b)(1)(i) for the initial Form I-131 and the initial
Form I-765, *Application for Work Authorization,* (if applicable), as it is in the public interest and
consistent with other applicable policy related to current and former members of the military.
Family members must submit the appropriate fees with the forms or accompanying fee waiver
request, using Form I-912, *Request for Fee Waiver.*

**Demonstrating Current and Former Service Membership and Military Service**

It is the applicant's burden to establish that they are a current or former service member or are a
qualifying family member under this policy and is responsible for providing evidence to meet
their burden. Documentation that supports military service include the Certificate of Release or
Discharge from Active Duty (DD Form 214), National Guard Report of Separation and Record
of Service (NGB Form 22), or other official service or discharge document.

**Qualifying Familial Relationship**

Military service sacrifice is not limited to the noncitizen current or former service member alone.
To recognize that sacrifice and promote family unity, this guidance applies to certain family
members of current and former service members.  Qualifying family members are:

- A current spouse,[11] child,[12] or unmarried son or daughter and their unmarried children
  who are under 21, of a current or former service member.
- Any current legal guardian[13] or surrogate of a current or former service member when the
  guardian or surrogate files a Form I-131 to request parole concurrently with the service
  member's application for naturalization using Form N-400, *Application for
  Naturalization.*

There is generally a significant public benefit to the parole of the qualifying family member due
to family unity considerations and to recognize their sacrifice as a family member of a current or
former service member.

Each qualifying family member may file Form I-131 independently and must be individually
eligible for parole, such that there are urgent humanitarian reasons or a significant public benefit
for their parole, and that the family member merits a favorable exercise of discretion.  A
qualifying family member must provide all the required documentation to establish their family

---

[11] An individual is a spouse of the service member if the marriage was a valid marriage by the law of the place
where the marriage was celebrated not contrary to U.S. public policy and is a bona fide marriage.
[12] *See* INA 101(b) and INA 101(c).
[13] A legal guardian or surrogate is a person designated by a court to exercise legal authority over the service
member's affairs.

FOR OFFICIAL USE ONLY

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 6

member's military service and a qualifying familial relationship, which may include a birth certificate, marriage certificate and prior divorce decrees, and court documentation of legal guardianship or surrogacy as applicable.

**Exercise of Discretion**

In evaluating parole requests on a case-by-case basis, DHS weighs all relevant considerations, including the significant public benefit interest and urgent humanitarian reasons for facilitating parole of current and former U.S. military members and qualifying family members residing outside the United States. Absent significant negative factors, including any factors indicating that the applicant poses a national security[14] or current public safety threat,[15] parole would generally be an appropriate exercise of discretion for certain current and former U.S. military service members and the qualifying family members described above. The applicant has the burden of establishing that he or she warrants a favorable exercise of discretion, and every application will be adjudicated and considered on a case-by-case basis, based on the totality of the facts and circumstances.

*Additional Factors to Consider*

The qualifying individual's military service or their qualifying family member's military service ordinarily weighs heavily in favor of parole, but this may be overcome if there is significant derogatory information indicating that the applicant poses a national security or current public safety threat. Officers should refer to the DHS Guidelines for the Enforcement of Civil Immigration Law when assessing the totality of the circumstances on a case-by-case basis, which include the following examples:[16]

- the gravity of the offense of conviction and the sentence imposed;
- the nature and degree of harm caused by the criminal offense;
- the sophistication of the criminal offense;
- use or threatened use of a firearm or dangerous weapon;
- a serious prior criminal record;
- advanced or tender age;
- lengthy presence in the United States;
- a mental condition that may have contributed to the criminal conduct, or a physical or mental condition requiring care or treatment;
- status as a victim of crime or victim, witness, or party in legal proceedings;
- the impact of removal on family in the United States, such as loss of provider or caregiver;

---

[14] DHS will determine whether a noncitizen poses a threat to United States sovereignty, territorial integrity, national interests, or institutions. General criminal activity does not amount to a national security threat.
[15] *See* Guidelines for the Enforcement of Civil Immigration Law. (Sept. 30, 2021).
[16] *Id.*

**FOR OFFICIAL USE ONLY**

HR-1 FRN 2025 AR-000219

Appx-000244

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and Qualifying Family Members of Current and Former Service Members Seeking to Return to the United States
Page 7

- whether the noncitizen may be eligible for humanitarian protection or other immigration relief;
- military or other public service of the noncitizen or their immediate family;
- time since an offense and evidence of rehabilitation; and,
- conviction was vacated or expunged.

Additional factors to consider that apply to certain current and former U.S. military members and qualifying family members, include:

- pathway to naturalization or other immigration status;
- a need to access the U.S. legal system to assist with appeals of criminal convictions, discharge upgrade requests, and reopening removal proceedings, if appropriate;[17]
- medical conditions related to military service; and,
- a need for medical services with the VA that can only be accessed in the United States.

In evaluating parole requests, DHS will consider, as an exceptionally strong favorable factor, the fact that an applicant, or the qualifying family member of such an applicant, has filed a Form N-400 and appears to be prima facie eligible for naturalization under INA § 329.[18]

If the current or former service member or their family member does not appear eligible for naturalization, or other immigration status, DHS will not consider this a strong negative factor.

---

[17] Evidence, such as an affidavit, that addresses the former service member's access to counsel at the time of any prior removal proceeding or whether counsel at the time of any prior criminal plea provided accurate information about the possible immigration consequences of all charges is now required for the plea to be constitutionally sufficient under *Padilla v Kentucky*, 559 U.S. 356 (2010). However, *Padilla*'s requirement that counsel advise a defendant of a guilty plea's immigration consequences does not apply retroactively to convictions that became final prior to the issuance of the *Padilla* decision on March 31, 2010. *Chaidez v. United States*, 568 U.S. 342, 358 (2013). In some circuits, however, the *Chaidez* holding on retroactivity of *Padilla* does not apply to cases in which counsel had engaged in a material misrepresentation of the federal immigration consequences of the criminal plea, *see, e.g., United States v. Castro-Taveras*, 841 F.3d 34 (1st Cir. 2016); *United States v. Chan*, 792 F.3d 1151 (9th Cir. 2015); whereas other circuit courts have held that *Chaidez* extends to attorney misadvice claims, *see, e.g., Chavarria v. United States*, 739 F.3d 360 (7th Cir. 2014). State courts have varying rules on the retroactive applicability of *Padilla*. If there is substantial and probative evidence that *Padilla* was violated or there was a material misrepresentation by counsel concerning the immigration consequences of a criminal plea, such evidence may tend to show that the applicant may benefit from improved access to the U.S. legal system to appeal a criminal conviction and thus may be considered a positive discretionary factor in the parole adjudication.

[18] See USCIS Policy Manual, Volume 12, Citizenship and Naturalization, Part I Military Members and their Families, Chapter 3, Military Service during Hostilities (INA 329) [12 USCIS-PMI.3] and Chapter 5, Application and Filing for Service Members (INA 328 and 329) [12 USCIS-PM I.5].

FOR OFFICIAL USE ONLY

HR-1 FRN 2025 AR-000220

Appx-000245

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and
Qualifying Family Members of Current and Former Service Members Seeking to Return to the
United States
Page 8

**Documentation**

It is the applicant's burden to establish that they are a current or former service member or are a
qualifying family member under this policy and that they warrant a favorable exercise of
discretion. [19] The applicant is responsible for providing evidence to meet their burden.

**Parole Period and Re-Parole Requests**

If discretion to grant parole is favorably exercised, the responsible DHS component should
authorize parole for a period of up to 12 months with the option for additional periods of
authorized parole, also known as re-parole, in increments of up to 12 months, as appropriate.
When determining the initial period of parole, factors to be considered include the estimated time
needed for proper medical treatment, family unity, the complicated nature of post-conviction
relief, or processing time delays with the Executive Office for Immigration Review and USCIS,
as applicable to the individual's case. DHS also may prescribe reasonable terms and conditions
for the parole of any individual, including issuing parole for multiple entries, the giving of a
bond, or periodic reporting of whereabouts. [20]

**Employment Authorization**

Recipients of parole under this policy may apply for employment authorization. [21] The favorable
exercise of discretion to grant parole to these beneficiaries generally should lead to approving
employment authorization. If approved, the employment authorization document should
generally be issued to cover the same period as the parole.

**Advance Parole Documents to Facilitate Return to the United States after Temporary
Travel Abroad**

If a beneficiary of this policy needs to travel outside the United States and return, the
individual must file with USCIS a Form I-131 to request an Advance Parole Document
prior to departing the United States. Advance Parole may be issued for single or multiple
entries.

**Parole in Place for Family Members of Current and Former U.S. Military Members**

This memorandum does not replace or change current USCIS policy guidance related to parole-
in-place for certain family members of current and former U.S. military members inside the
United States.

---

[19] See INA 291; 8 U.S.C. 1361
[20] *See* INA § 212(d)(5)(A); 8 C.F.R. § 212.5(c).
[21] 8 C.F.R. § 274a.12(c)(11).

FOR OFFICIAL USE ONLY

HR-1 FRN 2025 AR-000221

Appx-000246

Supplemental Parole Guidance for Certain Noncitizen Current and Former Service Members and
Qualifying Family Members of Current and Former Service Members Seeking to Return to the
United States
Page 9

**No Private Rights Created**

This memorandum is not intended to, does not, and should not be construed to create, modify, or
destroy any right or benefit, substantive or procedural, enforceable at law or in equity by any
party against the United States, its departments, agencies, or entities, its officers, employees, or
agents, or any other person.

FOR OFFICIAL USE ONLY

HR-1 FRN 2025 AR-000222

Appx-000247


**U.S. Citizenship and Immigration Services**

MENU

Home > Humanitarian > Refugees and Asylum > Asylum > American Baptist Churches v. Thornburgh (ABC) Settlement Agreement

# American Baptist Churches v. Thornburgh (ABC) Settlement Agreement

**Q: What Is the ABC Settlement Agreement?**

A:  In 1985, a group of organizations (including American Baptist Churches) filed a lawsuit against the government. They claimed that the government discriminated against certain Guatemalans and Salvadorans who had filed for asylum. In 1990, the attorneys on both sides of the lawsuit agreed to settle the case outside of court. The agreement they made is commonly known as the "ABC Settlement Agreement." The ABC Settlement Agreement provided some immigration benefits for certain Guatemalans and Salvadorans.

**Q: What Are the Benefits of the ABC Settlement Agreement?**

A: Guatemalans and Salvadorans who are eligible for benefits of the settlement agreement are entitled to the following benefits:

- **Stay of Deportation (Removal)**

  No eligible class member may be deported (or removed) until he or she has had an opportunity to obtain the benefits of the Settlement Agreement.

- **A New Asylum Interview and Decision**

  Individuals who meet the ABC requirements may receive a new asylum interview and a new decision. The new decision does not have to rely on or follow any previous decision.

- **Detention Restrictions**

  Individuals who meet the ABC requirements may only be detained under the following circumstances:

    - The class member has been convicted of a "crime involving moral turpitude" and received a jail sentence of more than 6 months

    - The class member poses a national security risk

    - The class member poses a threat to public safety.

There are certain exceptions to these detention restrictions. For example, if an individual is likely to flee, we may require him or her to report to us twice a year.  Also, there are certain situations in which the law may require detention of individuals, even if they meet the ABC requirements.

**Need Help?**
**Chat with Emma™**

Employment Authorization: An individual who meets the ABC requirements may also be eligible to receive a work permit (Employment Authorization).

**Q: Who Is Eligible for ABC Benefits?**

A: To be eligible for ABC benefits, you must meet three requirements:

- be a class member

- have registered for ABC benefits at the right time

- have applied for asylum before the required date

You may not be eligible for ABC benefits even if you meet these requirements if you were convicted of an aggravated felony or were apprehended at the time of entry after December 19, 1990.

**Q: Who Is an ABC Class Member?**

A:  Class members are defined by nationality and date of entry into the United States.

- If you are Guatemalan, you must have entered the United States on or before October 1, 1990.

- If you are Salvadoran, you must have entered the United States on or before September 19, 1990.

- You are not required to have been in the United States continuously; you may qualify even if you left the United States after entering.

**Q: What Is ABC Registration?**

A:  To be eligible for ABC benefits, an individual must have sent an ABC registration form to the USCIS ABC Project post office box in Washington, D.C. by the required date.

You must have sent an ABC registration form to the Washington D.C. post office box by the following dates:

- On or before December 31, 1991, if you are Guatemalan; or

- On or before October 31, 1991, if you are Salvadoran.o Salvadorans are also considered ABC registered if you applied for Temporary Protected Status (TPS) by the required date.

**Q: What Were the Deadlines for Applying for Asylum under the ABC Settlement?**

A: To be eligible for ABC benefits, an individual must have applied for asylum within a specified period of time.  Again, the dates depend on nationality:

- If you are Guatemalan, you must have filed an asylum application on or before January 3, 1995.

- If you are Salvadoran, must have applied for asylum on or before February 16, 1996 (for processing purposes), or within 90 days from issuance of a Notice 5.

**Q: What is a Notice 5?**

A:  The ABC Settlement Agreement required the government to give notice of the agreement to certain individuals. This notice is referred to as Notice 5 and was sent at the end of July 1995.

Notice 5 informed Salvadoran class members who applied for TPS that:

- They had a right to new asylum adjudications.

- In order to remain eligible for ABC benefits, they must apply for asylum by January 31, 1996, if an asylum application was not already on file with USCIS or EOIR.

- They had the right to file a new application, even if they had an asylum application pending before USCIS or EOIR, but were not required to do so.

If you received a Notice 5, you have 90 days from the date of notice to apply for asylum under the ABC settlement agreement.

**Q:  Are There Any Bars to Eligibility for ABC Benefits?**
A: Yes.  Even if you meet all of the other requirements, you are barred from receiving ABC Benefits if:

- You were convicted of an aggravated felony.

- After December 19, 1990, you were apprehended at the time of entry into the United States.

**Q:  If I Am Eligible for ABC Benefits, Are My Spouse and Children Eligible Too?**
A:  Not necessarily.  Each person must establish his or her own eligibility for ABC benefits.  This means that your spouse or child may be eligible for ABC benefits only if he or she

- Is a class member.

- Has registered for ABC.

- Has met the applicable deadline for applying for asylum.

Your spouse or child can meet the last requirement (filing for asylum by the applicable deadline) if you included them in your asylum application by the applicable deadline or by filing his or her own application by the filing deadline.

**Q: What if My Spouse or Child Is No Longer Eligible to Be Included on My Asylum Application?**
A:  A spouse or child who is no longer eligible to be included on your asylum application may still be eligible for ABC benefits if he or she is a registered ABC class member who you listed on your asylum application prior to the filing deadline.  To keep the ABC benefits, your family member must file his or her own asylum application within 90 days after USCIS notified him or her that they are no longer eligible to be included on your application.

Last Reviewed/Updated: 09/03/2009

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC  20529-2000



**U.S. Citizenship
and Immigration
Services**

November 23, 2016                                        **PM-602-0114**

# Policy Memorandum

SUBJECT:     Discretionary Options for Designated Spouses, Parents, and Sons and Daughters
             of Certain Military Personnel, Veterans, and Enlistees

**Purpose**

This policy memorandum (PM) clarifies and supplements guidance issued by U.S. Citizenship and Immigration Services (USCIS) in 2013 ("the 2013 PM")[1] with respect to designated family members of certain military personnel and veterans.  Specifically, this PM provides additional guidance on discretionary options for:  (a) certain alien family members of individuals serving on active duty in the U.S. Armed Forces or in the Selected Reserve of the Ready Reserve; (b) certain alien family members of those who previously served on active duty or in the Selected Reserve of the Ready Reserve (whether living or deceased) and were not dishonorably discharged; and (c) enlistees in the Department of Defense (DoD) Delayed Entry Program (DEP).  This PM amends Chapter 21.1(c) of the Adjudicator's Field Manual (AFM) to:

- Clarify that individuals who previously served in the military include those who are now deceased but do not include those who were dishonorably discharged;

- Change all references to "children" to "sons and daughters";

- Provide guidance on deferred action for certain nonimmigrant and other alien recruits (including enlistees in the Military Accessions Vital to the National Interest (MAVNI) program) whose authorized periods of stay expire during the enlistment process, including the time they are in the DEP;

- Provide guidance on deferred action for certain MAVNI and other DEP enlistees' family members who are present in the United States without authorized periods of stay; and

- Provide guidance on deferred action for certain military family members who would be eligible for parole under the guidelines in the 2013 PM but for the fact that they have already been admitted.

---

[1] See USCIS Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act 212(a)(6)(A)(i)* (Nov. 15, 2013), http://www.uscis.gov/sites/default/files/USCIS/Laws/Memoranda/2013/2013-1115_Parole_in_Place_Memo_.pdf.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 2

**Scope**

This PM applies to all U.S. Citizenship and Immigration Services (USCIS) employees.

**Authority**

Immigration and Nationality Act (INA) §§ 103(a)(1), 103(a)(3), 212(d)(5)(A), 235(a), and 245(a), (c);
8 U.S.C. §§ 1103(a)(1), 1103(a)(3), 1182(d)(5)(A), 1225(a), and 1255(a), (c); 6 U.S.C. § 202(5).

**Background**

On November 15, 2013, pursuant to the authority conferred upon the Secretary of Homeland
Security by INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), USCIS issued a PM guiding the exercise
of discretion with respect to applications for parole by designated family members of certain U.S.
military personnel and veterans.  On November 20, 2014, the Secretary directed USCIS to expand on
these policies, including by issuing new policies on the use of both parole and deferred action for
certain family members of military personnel, veterans, and DEP enlistees.[2]  These new policies are
intended to support the DoD in several ways, including by:

- Elaborating on general USCIS deferred action policies by identifying factors that are of
  particular relevance to discretionary determinations involving military personnel, veterans,
  DEP enlistees, and their families;

- Building on existing USCIS and DoD initiatives and policies designed to assist military
  personnel, veterans, DEP enlistees, and their families in navigating our immigration
  system;

- Facilitating military morale and readiness and supporting DoD recruitment policies by
  considering temporarily deferring the removal of certain military family members;

- Furthering the goal of the MAVNI program to recruit certain foreign nationals whose skills
  are considered vital to the national interest and critical to military services; and

- Ensuring consistent support for our military personnel and veterans who have served and
  sacrificed for our nation, and their families.

*DoD Delayed Entry Program (DEP)*

The DoD receives approximately 250,000 individuals into the all-volunteer force each year.  To
effectively sustain this large volunteer force, DoD uses the DEP to manage and predictably meet the
accession requirements of the military services.  Individuals who have no previous military
experience and are seeking to enlist in the U.S. military must sign a contract by which they enter into
the DEP for a period of up to 365 days while awaiting Basic Training.  This waiting period allows
DoD to better anticipate and meet the needs of the various service components.  The DEP is a
cornerstone of the U.S. military enlistment process.

Individuals who enlist in the military through the MAVNI program may also enter the DEP.  The
MAVNI program allows certain nonimmigrants and other aliens to enlist in the military to fill

---

[2] Secretary of Homeland Security Memorandum, *Families of U.S. Armed Forces Members and Enlistees* (Nov. 20,
2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 3

positions requiring skills for which there are critical shortages of enlistees.[3] The program is currently open to individuals with certain health care skills and individuals fluent in certain foreign languages.

**Policy**

I.   Parole in Place for Families of Certain Military Personnel and Veterans

USCIS has authority to grant parole to noncitizen applicants for admission, including those residing in the United States (through "parole in place"),[4] on a case-by-case basis for urgent humanitarian reasons or significant public benefit.  INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A).  The 2013 PM provides guidance on granting parole, on a discretionary case-by-case basis, for certain spouses, children, and parents of, among others, individuals who "previously" served on active duty or in the Selected Reserve of the Ready Reserve.  This PM clarifies that such language in the 2013 PM is meant to include former designated military personnel (who were not dishonorably discharged) whether they are living or deceased.  The close family members of such individuals, who served and sacrificed for our Nation, are deserving of consideration for a favorable exercise of discretion on a case-by-case basis in accordance with the 2013 PM.  This is true regardless of whether the former military service members are living or deceased.

In addition, the 2013 PM contains multiple references to the "children" of current or former military personnel.  Under the INA, the term "child" is limited to individuals who are unmarried and under the age of 21.  See INA § 101(b)(1), 8 U.S.C. § 1101(b)(1).  This PM seeks to expand on the provisions in the 2013 PM by replacing all references to "children" in the 2013 PM (and the corresponding provisions in the AFM) with the term "sons and daughters."  This change would further expand the provisions in the 2013 PM to the adult and married sons and daughters of covered military personnel and veterans.  Because covered military personnel and veterans generally will be U.S. citizens or lawful permanent residents (or, in the case of MAVNI, soon-to-be U.S. citizens or lawful permanent residents), their sons and daughters will often be on paths to lawful permanent resident status and eventual citizenship.  See INA § 203(a), 8 U.S.C. § 1153(a).  Parole in place or deferred action would therefore serve as a temporary bridge for such sons and daughters while they apply for and await adjudication of their applications for lawful permanent resident status.  Moreover, important family relationships continue to exist even after children turn 21 or marry.  The same morale, deservedness, and preparedness rationales articulated in the 2013 PM with respect to military personnel and their children continue to apply when such children turn 21 or marry.

II.   Deferred Action Requests by DEP Enlistees and the Families of Military Personnel, Veterans, and DEP Enlistees

As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence.  In doing so, USCIS will weigh and balance all relevant considerations, both positive and negative.  Certain factors are of particular relevance to the exercise of that discretion when deferred action requests are submitted by DEP enlistees or by the family

---

[3] The MAVNI program is authorized by 10 U.S.C. § 504(b)(2).  For further details, see DoD Instruction 1304.26.  "Qualifications for Enlistment, Appointment and Induction." For information about the DoD MAVNI program, see the DoD MAVNI fact sheet, http://www.defense.gov/news/mavni-fact-sheet.pdf.

[4] The parole authority is most frequently used to permit aliens who are outside the United States to come into U.S. territory, but aliens who are already physically present in the United States without having been admitted are also eligible for parole.  See INA §§ 212(d)(5)(A), 235(a)(1). This latter use of parole is called "parole in place."

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 4

members of military personnel, veterans, or DEP enlistees.  Particularly strong positive factors specific to such requests include, but are not limited to:

- Being a DEP enlistee, including through the MAVNI program (even if the enlistee's authorized period of stay expires or terminates while in the DEP);

- Being the spouse, parent, son, or daughter of a MAVNI or other DEP enlistee (even if present in the United States without an authorized status); and

- Being an individual who would be eligible for parole under the 2013 PM, as clarified and amended by the present PM, but for the fact that such individual has already been admitted.

The presence of one or more of the preceding factors does not guarantee a grant of deferred action, which constitutes only a favorable exercise of immigration enforcement discretion, but may be considered a strong positive factor weighing in favor of granting deferred action as a matter of discretion.  The ultimate decision rests on whether, based on the totality of the facts of the individual case, USCIS finds that the positive factors outweigh any negative factors that may be present and that a favorable exercise of enforcement discretion is warranted.

If an individual described in any of the three bullets above is approved for deferred action in the exercise of discretion, the period of deferred action should be authorized in two-year increments; USCIS may consider requests for renewal of deferred action as appropriate.

III. Petition for Alien Relative and Work Authorization

USCIS encourages applicants to continue on a path toward lawful permanent resident status whenever applicable.  In cases where it is applicable, USCIS encourages the filing of a Form I-130, Petition for Alien Relative, or Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant. In some cases where subsequent parole in place or a renewal of deferred action is requested, such filing may be required (see AFM 21.1(c)(3)(A) below).  In addition, individuals who have obtained parole in place or deferred action are eligible to apply for work authorization for the period of parole or deferred action if they can demonstrate economic necessity.[5]

**Implementation**

The Adjudicator's Field Manual (AFM) Chapter 21.1, General Information About Relative Visa Petitions, is amended as follows.

1. **Section 21.1(c) is revised by:**

- Redesignating current section "(c)" as subsection "(1)";

- Inserting new section "(c)" heading "Special Parole and Deferred Action Considerations.";

- Inserting, at the beginning of section (c):

On November 15, 2013, USCIS, pursuant to the authority conferred upon the Secretary of Homeland Security by INA § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A), issued a Policy Memorandum guiding the exercise of discretion with respect to applications for parole by

---

[5] See 8 CFR 274a.12(c)(11), (14).  See Form I-765, Application for Employment Authorization.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 5

designated family members of U.S. military personnel and veterans. On November 20, 2014, the Secretary directed USCIS to issue new policies on the use of both parole in place and deferred action for certain family members of certain military personnel, veterans, and individuals who are seeking to enlist in the U.S. military. See Secretary of Homeland Security Memorandum, "Families of U.S. Armed Forces Members and Enlistees" (Nov. 20, 2014), http://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole_in_place.pdf

These new policies support the Department of Defense (DoD) in several ways, including by:

- Elaborating on general USCIS deferred action policies by identifying factors that are of particular relevance to discretionary determinations involving military personnel, veterans, and their families;

- Building on existing USCIS and DoD initiatives and policies designed to assist military members, veterans, and their families in navigating our complex immigration system;

- Facilitating military morale and readiness and supporting DoD recruitment policies by considering temporarily deferring the removal of certain military family members;

- Furthering the goal of the Military Accessions Vital to the National Interest (MAVNI) program to recruit certain foreign nationals whose skills are considered vital to the national interest and critical to military services; and

- Ensuring consistent support for our military personnel and veterans, who have served and sacrificed for our nation, and their families.

For guidance on parole in place for certain family members of military personnel and veterans, see AFM Chapter 21.1(c)(1). For guidance on deferred action for certain enlistees and certain family members of military personnel and veterans, see AFM Chapter 21.1(c)(2).

- Revising new subsection 21.1(c)(1) by:
    - Striking "Spouses, Children and Parents" and inserting "Spouses, Parents, Sons, and Daughters" in the heading;
    - Striking "spouse, child or parent" and inserting "spouse, parent, son, or daughter" in the sentence that begins with "The fact that the individual";
    - Inserting "(whether still living or deceased)" in the following places: in the heading, after the word "who"; and in the bullet point that begins with "Evidence that the alien's family member", after the word "who";
    - Inserting "on active duty" in the following places: in the heading, after the word "served"; in the sentence that begins with "The fact that the individual", after the

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 6

word "served"; and in the bullet point that begins with "Evidence that the alien's
family member", after the word "served";

- o Inserting "and Were Not Dishonorably Discharged" at the end of the heading;

- o Inserting "(if the former service member was not dishonorably discharged and either
is living or died while the family member was residing in the United States)" in the
sentence that begins with "The fact that the individual", after the second instance of
the word "Ready Reserve";

- o Inserting "(this may include proof of filing a petition in certain cases – see AFM
21.1(c)(3) below);" at the end of the bullet point that begins with "Evidence of the
family relationship";

- o Inserting "(in the case of family members of veterans (whether still living or
deceased), the service member must not have received a dishonorable discharge upon
separation from the military)" after "(DD Form 1173)" in the bullet point that begins
with "Evidence that the alien's family member";

- o Inserting "In the case of surviving family members, proof of residence in the United
States at the time of the service member's death;" in a new bullet point after the bullet
point that begins with "Evidence that the alien's family member"; and

- o Inserting the following new paragraphs after the bullet points: "Individuals who have
obtained parole in place are eligible to apply for work authorization for the period of
parole if they can demonstrate economic necessity.  See 8 CFR 274a.12(c)(11), (14).
See Form I-765, Application for Employment Authorization.

  Parole in place may be granted only to individuals who are present without admission
  and are therefore applicants for admission.  Individuals who were admitted to the
  United States but are currently present in the United States beyond their periods of
  authorized stay are not eligible for parole in place, as they are no longer applicants for
  admission."

**2.  A new subsection (2) is added to Chapter 21.1(c) to read as follows:**

(2) <u>Deferred Action Consideration for Spouses, Parents, and Sons and Daughters of Active
Duty Military Personnel, Individuals in the Selected Reserve of the Ready Reserve, and
Individuals Who (Whether Still Living or Deceased) Previously Served on Active Duty in the
U.S. Military or the Selected Reserve of the Ready Reserve and Were Not Dishonorably
Discharged; and for MAVNI and other Enlistees in the Delayed Entry Program and their
Spouses, Parents, and Sons and Daughters.</u>

(A) <u>Deferred Action for DoD Delayed Entry Program Enlistees (Including MAVNI Recruits)
and Certain Family Members.</u>

Individuals who have no previous military experience and are seeking to enlist in the U.S.
Armed Forces must sign a contract by which they enter into the Delayed Entry Program
(DEP) for a maximum of 365 days while awaiting Basic Training.  While in the DEP, there
can be delays in starting active duty for the Active Components or initial active duty for
training for the Reserve Components.

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 7

Individuals who enlist in the military through the Military Accessions Vital to the National Interest (MAVNI) program may also enter the DEP.  The MAVNI program allows certain foreign nationals to enlist in the military to fill positions where there are critical shortages in health care and foreign language skills.  See the DoD MAVNI program fact sheet for further details: http://www.defense.gov/news/mavni-fact-sheet.pdf.

Most MAVNI recruits are in a lawful nonimmigrant status at the time that they enlist.  For example, it is common for a J-1 foreign exchange visitor or F-1 foreign student to enlist in the U.S. military through MAVNI.  Through no fault of their own, MAVNI recruits in the DEP may fall out of their lawful status while waiting to enter Basic Training.  This may occur, for example, in cases where an F-1 foreign student completes his or her program of study while waiting to enter Basic Training in the DEP.  In the same way, the family members of such recruits often lose their lawful statuses because their statuses depend on those of the recruits.  In addition, family members might lack status either because they are present without being admitted or paroled, or because they were admitted or paroled but overstayed their authorized periods of stay even before their MAVNI or other DEP family member entered the DEP.

As in all deferred action determinations, USCIS will make case-by-case, discretionary judgments based on the totality of the evidence.  In doing so, USCIS will weigh and balance all relevant considerations, both positive and negative.  Certain factors, however, are of particular relevance to the exercise of that discretion when deferred action requests are submitted by individuals in DEP and their family members.  Particularly strong positive factors specific to such requests include, but are not limited to:

- Being a DEP enlistee, including through the MAVNI program (even if the enlistee's authorized period of stay expires while in the DEP); and

- Being the spouse, parent, son, or daughter of a MAVNI recruit or other individual in the DEP (even if present in the United States without an authorized status).

The presence of one or more of the preceding factors does not guarantee a grant of deferred action but may be considered a strong positive factor weighing in favor of granting deferred action.  The ultimate decision rests on whether, based on the totality of the facts of the individual case, USCIS finds that the positive factors outweigh any negative factors that may be present.

If an individual described in either of the two bullets above is granted deferred action in the exercise of discretion, the period of deferred action should be authorized in two-year increments; USCIS may consider requests for renewal of deferred action as appropriate.  If the individual withdraws from the DEP or becomes disqualified from joining the military, any period of deferred action for the family member may be terminated.

See AFM Chapter 21.1(c)(2)(C) for guidance on filing requests for deferred action.  See AFM Chapter 21.1(c)(1) for guidance on parole in place.

(B) <u>Deferred Action for Certain Family Members of Active Duty Members of the U.S. Military, Individuals in the Selected Reserve of the Ready Reserve, or Individuals Who</u>

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 8

(Whether Still Living or Deceased) Previously Served on Active Duty in the U.S. Military
or in the Selected Reserve of the Ready Reserve and Were Not Dishonorably
Discharged.

As in all deferred action determinations, USCIS will make case-by-case, discretionary
judgments based on the totality of the evidence.  In doing so, USCIS will weigh and
balance all relevant considerations, both positive and negative.  Certain factors, however,
are of particular relevance to the exercise of that discretion when deferred action requests
are submitted by the family members of military personnel and veterans.  One particularly
strong positive factor specific to such requests is that the person has been admitted and
is the spouse, parent, son, or daughter of an individual who is serving, or has previously
served on active duty in the U.S. military or in the Selected Reserve of the Ready
Reserve (if the former service member was not dishonorably discharged and either is
living or died while the family member was residing in the United States).  Such an
individual ordinarily fits the guidelines for parole under section 21.1(c)(1) above, except
for being statutorily ineligible solely because of his or her prior admission.  See INA §§
212(d)(5)(A), 235(a)(1), 8 U.S.C. §§ 1182(d)(5)(A), 1225(a)(1).

The presence of the preceding factor does not guarantee a grant of deferred action but
may be considered a strong positive factor weighing in favor of granting deferred action.
The ultimate decision rests on whether, based on the totality of the facts of the individual
case, USCIS finds that the positive factors outweigh any negative factors that may be
present.  If USCIS grants deferred action in the exercise of discretion, the period of
deferred action should be authorized in two-year increments; USCIS may consider
requests for renewal of deferred action as appropriate.

(C) Filing Request for Deferred Action.

To request deferred action, one must submit the following to the director of the USCIS
office with jurisdiction over the requestor's place of residence:

- Letter stating basis for the deferred action request [See AFM 21.1(c)(2)(A) and
  (c)(2)(B)];

- Evidence supporting a favorable exercise of discretion in the form of deferred
  action as elaborated in AFM 21.1(c)(2)(A) and (c)(2)(B) – (e.g., evidence of family
  member's current or previous military service, or alien's or family member's
  enlistment in the DEP; note that in the case of family members of veterans,
  whether still living or deceased, the service member must not have received a
  dishonorable discharge upon separation from the military);

- Proof of family relationship, if applying based on family relationship to military
  member, veteran, or enlistee (this may include proof of filing a petition in certain
  cases - see section below);

- In the case of surviving family members, proof of residence in the United States at
  the time of the service member's death;

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 9

- Proof of identity and nationality (including a birth certificate, a passport and/or identification card, driver's license, notarized affidavit(s), etc.);

- If applicable, any document the alien used to lawfully enter the United States (including, but not limited to, Form I-94, Arrival/Departure Record, passport with visa and/or admission stamp, and any other documents issued by other components of DHS or legacy INS);

- Form G-325A, Biographic Information;

- Two identical, color, passport style photographs; and

- Evidence of any additional discretionary factors that the requestor would like USCIS to consider.

Individuals who have obtained deferred action are eligible to apply for work authorization for the period of deferred action if they can demonstrate economic necessity. See 8 CFR 274a.12(c)(11), (14). See Form I-765, Application for Employment Authorization.

A requestor who has legal representation must submit a properly completed Form G-28, Notice of Entry as Attorney or Accredited Representative.

**3. A new subsection (3) is added to Chapter 21.1(c) to read as follows:**

**(3) <u>Petition Filing Requirement for Certain Parole or Deferred Action Requests</u>.**

USCIS encourages applicants to continue on a path toward lawful permanent resident status whenever applicable. In cases where it is applicable, USCIS encourages the filing of a Form I-130, Petition for Alien Relative (or Form I-360, Petition for Amerasian, Widow(er), or Special Immigrant) to allow USCIS to use an established process in evaluating the bona fides of the pertinent family relationship. In some cases where subsequent parole in place or renewal of deferred action is requested, such filing may be required (see AFM 21.1(c)(3)(A) below). USCIS checks the bona fides of the qualifying family relationship in all parole in place and deferred action requests regardless of whether the Form I-130 (or Form I-360) has been filed.

In all cases where a Form I-130 or Form I-360 has been filed, USCIS may grant either parole in place, as provided in AFM 21.1(c)(1), or deferred action, as provided in AFM 21.1.(c)(2), as long as the applicant's Form I-130 (or Form I-360) is pending or approved (and still valid). Even in cases where the Form I-130 or Form I-360 is required, it does not need to be approved prior to a grant of either parole in place or deferred action. Upon receiving the receipt notice for the Form I-130 or Form I-360, the alien may file the request for either parole in place or deferred action with the USCIS office with jurisdiction over the alien's place of residence. The request for either parole in place or deferred action must include documentation to establish an eligible family relationship. Such evidence may include a previously approved petition.

<u>Note</u>: Proof of filing the Form I-130 or Form I-360 is not required, even in applicable cases,

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 10

for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2).  See AFM 21.1(c)(3)(B).

(A) <u>Petition Required for Request for Subsequent Parole in Place or Renewal of Deferred Action</u>.

Active Duty military members, individuals in the Selected Reserve of the Ready Reserve, individuals who have previously served on active duty in the U.S. military or in the Selected Reserve of the Ready Reserve, and DEP enlistees, if eligible to file a Form I-130 on behalf of a family member requesting subsequent parole in place or renewal of deferred action as provided under AFM 21.1(c)(1) or (c)(2), <u>must</u> submit a completed Form I-130 for the family member, with fee and according to the instructions on the form, prior to filing the request for subsequent parole in place or renewal of deferred action, as applicable. (See Form I-130 instructions for more information on who may file.)

Surviving spouses, parents, sons, and daughters of deceased service members and veterans (described above) who were residing in the United States at the time of the service member's death and who are eligible to file Form I-360 on their own behalf must submit a completed Form I-360, with fee and according to the instructions on the form, prior to filing the request for subsequent parole in place or renewal of deferred action, as applicable. (See Form I-360 instructions for more information on who may file. See also the USCIS web site at: http://www.uscis.gov/military/family-based-survivor-benefits/survivor-benefits-relatives-us-citizen-military-members.)

The Form I-130 (or Form I-360) filing requirement for requests for subsequent parole in place or renewal of deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2) applies only to requests that are submitted  on or after November 23, 2017 (one year after publication of this memorandum).

(B) <u>Cases where Petition is Not Required at Any Time</u>.

Individuals who are ineligible to file a Form I-130 or a Form I-360 are not required to do so; they may still request parole in place or deferred action, as applicable.  In particular, MAVNI recruits in the DEP are not eligible to file Form I-130 and therefore not required to do so. MAVNI recruits may, however, become eligible for naturalization under INA § 329(a) upon entering active duty. Recruits typically must wait until they naturalize before filing a Form I-130 for any eligible family members.

Proof of filing the Form I-130 (or Form I-360) also is not required, even in applicable cases, for initial requests for parole in place or deferred action as provided under AFM 21.1(c)(1) and AFM 21.1(c)(2).

**4.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical order, to read:**

| AFM Update (11/23/2016) | Chapter 21.1 | This PM amends AFM Chapter 21.1(c) to address discretionary options for designated spouses, parents, and sons and daughters of certain military personnel, veterans, and enlistees. |
|---|---|---|

HR-1 FRN 2025 AR-000235

PM-602-0114: Discretionary Options for Designated Spouses, Parents, and Sons and
Daughters of Certain Military Personnel, Veterans, and Enlistees
Page 11

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official
duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit,
substantive or procedural, enforceable at law or by any individual or other party in removal
proceedings, in litigation with the United States, or in any other form or manner.

**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the
Field Operations Directorate or Office of Policy & Strategy.

The Wayback Machine - https://web.archive.org/web/20250530023455/https://www.uscis.gov/forms/filing-fees



**U.S. Citizenship and Immigration Services**

MENU

Home > Forms > Filing Fees

# Filing Fees

A filing fee is required for many immigration forms. If you do not submit the correct fee, we will reject your form.

↙ Close All    ↗ Open All

## Our Fees    ⌃

We periodically adjust our fees. For a complete list of all USCIS fees, see our Fee Schedule.

You can use our Fee Calculator to determine the exact filing and, if applicable, biometric services fees for any form processed at a USCIS Lockbox facility.

## How to Pay USCIS Filing Fees    ⌃

How you pay your USCIS filing fees (including biometric services fees and other fees, if applicable) will depend on whether you are inside or outside of the United States.

**If you live outside the United States or its territories**

If you live outside the United States or its territories and you want to file your application, petition, or request where you live, go to the Forms section of our website to determine if you can file your form at an international office. We do not accept all forms of payment abroad. Check the appropriate International USCIS office webpage or contact the U.S. Embassy or Consulate for information on how to pay USCIS fees.

**If you are inside the United States**

Depending on the form you are submitting, you may pay your fees:

- Online using a card or bank withdrawal; or
- By mail with a card, check, bank draft, or money order.

When filing Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Record, directly with a USCIS field office to request emergency advance parole, you may pay only by card, personal check, or business check. Refer to the USCIS Emergency Travel page for more information.

HR-1 FRN 2025 AR-000237

**Appx-000262**

For more information on filing your specific form, go to the USCIS All Forms page. Please see our News page for the latest updates.

**Multiple Applications or Methods of Payment**

If you are submitting **multiple forms**, pay each filing fee separately. We are transitioning to electronically processing immigration benefit requests, which requires us to use multiple systems to process your package. We may reject your entire package if you submit a single, combined payment for multiple forms. For example, when filing Form I-539, Application to Extend/Change Nonimmigrant Status; Form I-765, Application for Employment Authorization; and/or Form I-824, Application for Action on an Approved Application or Petition, together with a Form I-129, Petition for a Nonimmigrant Worker, you must provide separate payments for each form. If you combine the payments for these forms, we may reject the entire package.

You must pay for **each** application, petition, or request you submit using a **single payment method** (check, bank draft, money order, or card) and not a combination of payment methods. For example, if you file Form I-765, Application for Employment Authorization, you cannot pay for half the fee with a personal check and half the fee with credit card.

**Pay with a Check**

You may pay fees with bank drafts, cashier's checks, certified checks, personal or business checks (made payable to U.S. Department of Homeland Security), and money orders that are drawn on U.S. financial institutions and payable in U.S. funds. If filing Form I-131 directly with a domestic USCIS field office to request emergency advance parole, you can only pay by personal or business check (or card).

You must mail your check, bank draft, or money order together with your benefit request form. Refer to the form instructions for more information. Please see our News page for the latest updates.

If you are paying your fees by check, please be aware of the following:

- ***Authorization for an Electronic Funds Transfer***: By submitting your check, you authorize us to convert your check into an electronic fund transfer. We will use the account information from your check to make an electronic fund transfer from your checking account for the amount of the check. If the transfer cannot occur for technical reasons, you authorize us to process the copy of your original check through normal paper check procedures.

- ***Insufficient Funds***: The electronic fund transfer from your account can occur faster than normal processing for a paper check. If your check or other financial instrument is returned as unpayable, we will resubmit the payment one time. If it is returned as unpayable a second time, we will reject your filing.

- If your check is not dated within the previous 365 days, we will reject the filing.

## How to Write Your Check ⌃

Personal checks must be preprinted with your name and your bank's name. Your address and phone number must be preprinted, typed, or written in ink.



1. Write the date you are completing the check. Use the U.S. style of month/day/year. (Example: Jan. 4, 2017, or 1/4/17, but not 4/1/17 or 4 JAN 2017.)

2. On the "Pay to the Order of" line, write "U.S. Department of Homeland Security" (not "USDHS" or "DHS").

3. Use numerals to show the exact dollar amount of the fee for the service you are requesting. In the example, the amount is "$760.00."

4. Spell out the exact dollar amount of the fee and write the "cents" portion of the amount as a fraction over 100. In this example, the amount is "Seven hundred sixty and 00/100."

5. Write a brief description of the purpose of your payment. In this example, it is "N-400 application." Include the applicant's name on the memo line if it is not on the check itself (for example, if you are paying the fee for your child).

6. Sign the check in ink using your legal name.

7. If your check is not dated within the previous 365 days, we will reject the filing.

## Pay with a Credit or Debit Card ⌃

If paying by credit or debit card, you must pay each filing fee separately for each application, petition, or request you submit.

You may pay filing and any other applicable fees with a credit or debit card issued by a U.S. bank if you are filing:

- An application, petition, or request with a USCIS lockbox; or
- An application, petition, or request with the USCIS service centers.

There is no additional cost if you pay by credit or debit card. We cannot accept a credit or debit card issued by a foreign bank.

**Acceptable Credit or Debit Cards**

You may use Visa, MasterCard, American Express, Discover, and prepaid cards from the same card networks. Make sure the card's credit limit can cover the fee. We will reject your application, petition, or request if the card is declined, and we will not attempt to process your credit card payment a second time.

We do **not** support payment by **gift cards**.

**How to Pay with a Card When Filing by Mail**

To pay with a card, follow these two steps:

1. Complete and sign Form G-1450, Authorization for Credit Card Transactions.
2. Place the form on top of your application, petition, or request when you file it.

When filing Form G-1450 with a Lockbox or Service Center, you may split the payment for **one form** across multiple credit, debit, or prepaid cards that add up the correct total. Complete one Form G-1450 for each card. However, you may use only one Form G-1450 when requesting emergency advance parole from a USCIS field Office. In all cases, the credit, debit, or prepaid card must be from a financial institution located in the United States.

If we accept your filing, we will charge your card for the proper amount and destroy your Form G-1450 to protect your card information. (We will destroy it even if we reject your filing and do not process your payment.)

You will see a charge from USCIS on your credit card statement.

There is a daily transaction limit for credit cards of $24,999.99 per credit card per day set by the Department of the Treasury. We allow an exemption to this limit of up to $99,999.99 for H-1B registrations and petitions submitted online using one credit card.

**Security**

We use the U.S. Department of the Treasury's Pay.gov Trusted Collections Service to process your credit card payment. Trusted Collections Service is a web-based application that allows government agencies to process debit or credit card payments. You cannot pay the fee directly to Pay.gov.

The Department of the Treasury ensures that Pay.gov is Payment Card Industry Data Security Standard compliant. This security standard is a set of requirements designed to ensure all companies processing, storing, or transmitting credit card information maintain a secure environment.

For your security, we will destroy your Form G-1450 after processing it, regardless of whether we accept or reject your application, petition, or request.

**Third-Party Payments**

Anyone authorized to use a credit card may pay for your application, petition, or request. The cardholder must complete Form G-1450, sign it, and give it to you to submit with your filing.

**Declined Credit Cards**

If a credit card is declined, we will not attempt to process the credit card payment again. We will reject your application, petition, or request for lack of payment.

**Rejection Notices**

If we reject your filing, we will send you a notice explaining why we rejected it.

If you file a corrected application, petition, or request, and wish to pay again by credit card, you will need to include a new Form G-1450.

**Avoid Immigration Scams**

Learn how to protect yourself from common immigration services scams, and where to report suspected fraud, at Avoid Scams.

And remember, the current versions of all USCIS forms are always available for free at uscis.gov/forms.

## If You File Online ⌃

If you file your form online, the system will guide you through the process of paying your fees with a credit, debit, or prepaid card. Bank account withdrawals are also available when paying online. Once you are ready to submit your form, the system will automatically direct you to the secure Department of the Treasury site, pay.gov, to pay your fees online.

We only use pay.gov to process fees. Always check the website address before you pay. Beware of scam websites and scammers who may pretend to be a USCIS website.

## If You File by Mail ⌃

If you mail your form to a USCIS Lockbox facility, you may pay your fees with a debit, credit, or prepaid card. To do so, follow these steps:

1. Complete and sign Form G-1450, Authorization for Credit Card Transactions.
2. Place the form on top of your application, petition, or request.
3. Mail the entire package to the appropriate USCIS Lockbox.

If we accept your filing, we will:

- Charge your card for the proper amount; and
- Destroy your Form G-1450 to protect your credit information (we will destroy it even if we reject your filing and do not process your payment).

You will see a charge from USCIS on your card statement.

For general filing information, see the Form Filing Tips webpage.

## Unfunded or Dishonored Payments

If we approve your petition, application, or request and the payment has not been properly funded or you subsequently dispute payment of the fee, we may revoke, rescind, or cancel the approval with notice (for example, by issuing a Notice of Intent to Revoke). We will not separately bill you for the unpaid fee. If you receive a Notice of Intent to Revoke, you may respond with payment of the correct fee amount.

## Refund Policy

When you send a payment, you agree to pay for a government service. Filing and biometric service fees are final and nonrefundable, regardless of any action we take on your application, petition, or request, or if you withdraw your request. Please refer to the form you filed for additional information, or you may call the USCIS Contact Center at 800-375-5283 (for people who are deaf, hard of hearing, or have a speech disability: TTY 800-767-1833).

## Fee Waiver Guidance

We are funded largely by application and petition fees. Recognizing that some applicants cannot pay the filing fees, we established a fee waiver process for certain forms and benefit types. We will approve a fee waiver only if you clearly demonstrate that you are unable to pay the filing fees. We carefully consider the merits of each fee waiver request before making a decision. Visit the Additional Information on Filing a Fee Waiver page to learn more.

⤨ Close All    ⤢ Open All

Last Reviewed/Updated: 05/28/2025



# Application for Travel Documents, Parole Documents, and Arrival/Departure Records

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-131**
OMB No. 1615-0013
Expires 06/30/2027

| For USCIS Use Only | Receipt | Action Block | To Be Completed by an *Attorney/ Representative,* if any. |
|---|---|---|---|

**For USCIS Use Only**

☐ **Document Hand Delivered**

By: _____  Date: _____ / _____ / _____

**Document Issued**

☐ Re-entry Permit *(Update "Mail To" Section)*   ☐ Refugee Travel Document *(Update "Mail To" Section)*

☐ Single Advance Parole   ☐ Multiple Advance Parole
*Valid Until:* _____ / _____ / _____

☐ TPS Travel Authorization Documentation
*Valid Until:* _____ / _____ / _____

☐ Fill in box if G-28 is attached to represent the applicant.

**Mail To** *(Reentry Permit and Refugee Travel Document Only)*

☐ Address in **Part 2.**
☐ U.S. Embassy, U.S. Consulate, or USCIS international field office at:
_____

▶ **START HERE - Type or print in black ink.**

## Part 1. Application Type

Select the application type below.

### *Reentry Permit*

**1.**  ☐  I am a lawful permanent resident or conditional permanent resident of the United States, and I am applying for a reentry permit.

### *Refugee Travel Document*

**2.**  ☐  I now hold refugee or asylee status in the United States, and I am applying for a Refugee Travel Document.

**3.**  ☐  I am a lawful permanent resident as a direct result of refugee or asylee status, and I am applying for a Refugee Travel Document.

### *Travel Authorization Document (for Temporary Protected Status (TPS) beneficiaries who are inside the United States)*

**4.**  ☐  I am a TPS beneficiary in the United States, and I am applying for a TPS Travel Authorization Document under the Immigration and Nationality Act (INA) section 244(f)(3) to allow me to seek admission under TPS upon my return from abroad. The receipt number for my last **approved** Form I-821, Application for Temporary Protected Status, is:

_____

### *Advance Parole Document (for aliens who are inside the United States) and Advance Permission to Travel for Commonwealth of Northern Mariana Islands (CNMI) Long-Term Residents*

**5.**  I am located **inside** the United States, and I am applying for an Advance Parole Document to allow me to seek parole into the United States under INA section 212(d)(5)(A) upon my return from abroad based on:

**A.**  ☐  A pending Form I-485, Application to Register Permanent Residence or Adjust Status, receipt number if you are filing this form separately from your Form I-485:

_____

Appx-000268

## Part 1. Application Type (continued)

**B.** ☐ A pending Form I-589, Application for Asylum and for Withholding of Removal, receipt number:

**C.** ☐ A pending initial Form I-821, Application for Temporary Protected Status, receipt number:

**D.** ☐ Deferred Enforced Departure.

**E.** ☐ Approved Form I-821D, Consideration of Deferred Action for Childhood Arrivals, receipt number:

**F.** ☐ An approved Form I-914, Application for T Nonimmigrant Status, or Form I-914, Supplement A, Application for Family Member of T-1 Recipient, receipt number:

**G.** ☐ An approved Form I-918, Petition for U Nonimmigrant Status, or Form I-918, Supplement A, Petition for Qualifying Family Member of U-1 Recipient, receipt number:

**H.** ☐ Being a current parolee under INA section 212(d)(5), under class of admission:

**I.** ☐ An approved Form I-817, Application for Family Unity Benefits, receipt number:

**J.** ☐ A pending Form I-687, Application for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act, receipt number:

**K.** ☐ An approved V Nonimmigrant Status, receipt number:

**L.** ☐ CNMI long-term residence, receipt number:

**M.** ☐ Other (provide explanation):

## Initial Parole Document (for aliens who are currently outside the United States)

6. I am applying for a parole document under INA section 212(d)(5)(A) on my own behalf and I am **outside** the United States, or I am applying on behalf of someone else who is **outside** the United States, for the first time (initial application) under one of the following specific parole programs or processes:

**A.** ☐ Filipino World War II Veterans Parole (FWVP) Program, Form I-130 receipt number:

## Part 1. Application Type (continued)

**B.** ☐ Immigrant Military Members and Veterans Initiative (IMMVI)

    **(1)** ☐ A current or former service member.

    **(2)** ☐ A current spouse, child, or unmarried son or daughter (or their child under 21 years of age) of a current or former service member.

    **(3)** ☐ Current legal guardian or surrogate of a current or former service member.

**C.** ☐ Intergovernmental Parole Referral

U.S. Federal Executive Branch Government Agency:

U.S. Federal Government Agency Representative Official Email Address:

**D.** ☐ Family Reunification Task Force (FRTF) Process; Task Force Registration Number:

**E.** ☐ Other: (List specific parole program or process)

**7.** ☐ I am applying for a parole document under INA section 212(d)(5)(A) for myself and I am **outside** the United States, or I am applying for a parole document under INA section 212(d)(5)(A) on behalf of someone else who is **outside** the United States for the first time (initial application), **but not under a specific parole program or process**.

### Initial Request for Arrival/Departure Record for Parole In Place (for aliens who are inside the United States)

**8.** I am applying for an initial period of parole in place under INA section 212(d)(5)(A) and I am **inside** the United States, or I am applying for an initial period of parole in place under INA section 212(d)(5)(A) on behalf of someone else who is **inside** the United States, under:

**A.** ☐ Military Parole in Place (PIP), only on my own behalf, and I am a:

    **(1)** ☐ A current or former service member.

    **(2)** ☐ A spouse, parent, son, or daughter of a current or former service member.

**B.** ☐ Family Reunification Task Force (FRTF) Process; Task Force Registration Number:

**C.** ☐ Other: (List specific program or process)

**9.** ☐ I am applying for an initial period of parole in place under INA section 212(d)(5)(A) and I am **inside** the United States, but **not under** a specific program or process, or I am applying for an initial period of parole in place under INA section 212(d)(5)(A) for someone else who is **inside** the United States, but **not under** a specific program or process.

Appx-000270

## Part 1. Application Type (continued)

### *Arrival/Departure Records for Re-parole for Aliens Who Are Requesting a New Period of Parole (from inside the United States)*

10. I was initially paroled into the United States or granted parole in place under INA section 212(d)(5)(A) under one of the following programs or processes and I am requesting a new period of parole, or I am applying for a new period of parole on behalf of someone else who was initially paroled into the United States under one of the following programs or processes:

    **A.** ☐ Family Reunification Parole Process

    **B.** ☐ Certain Afghans Paroled Into the United States After July 31, 2021 (See form Instructions)

    **C.** ☐ Re-parole Process for certain Ukrainian Citizens and Their Immediate Family Members Paroled Into the United States on or After February 11, 2022 (See form Instructions)

    **D.** ☐ Filipino World War II Veterans Parole (FWVP) Program

    **E.** ☐ Immigrant Military Members and Veterans Initiative (IMMVI)

        **(1)** ☐ A current or former service member.

        **(2)** ☐ A current spouse, child, or unmarried son or daughter (or their child under 21 years of age) of a current or former service member.

        **(3)** ☐ Current legal guardian or surrogate of a current or former service member.

    **F.** ☐ Central American Minors (CAM) Program

    **G.** ☐ Family Reunification Task Force (FRTF) Process

    **H.** ☐ Military Parole in Place (Military PIP)

        **(1)** ☐ A current or former service member.

        **(2)** ☐ A spouse, parent, son, or daughter of a current or former service member.

    **I.** ☐ Other Program or Process (List specific program or process):

    [                                                                                    ]

11. ☐ I was initially paroled into the United States or granted parole in place under INA section 212(d)(5)(A) and I am requesting a new period of parole, but **not under** a specific program or process, or I am requesting a new period of parole on behalf of someone else who was initially paroled into the United States or granted parole in place, but **not under** a specific program or process.

12. If you selected one of the boxes in **Item Numbers 10.** or **11.**, list the Admit
Until Date/Parole shown on Form I-94: (mm/dd/yyyy) [                    ]

### *Refugee Status*

13. Do you hold status as a refugee, were you paroled as a refugee, or are you a lawful permanent resident as a direct result of being a refugee? ☐ Yes ☐ No

## Part 2. Information About You

1. Your Full Name

| Family Name (Last Name) | Given Name (First Name) | Middle Name (if applicable) |
|---|---|---|
| | | |

Appx-000271

## Part 2. Information About You (continued)

**2.** Other Names Used (if applicable)

| Family Name (Last Name) | Given Name (First Name) | Middle Name (if applicable) |
|---|---|---|
| | | |
| | | |
| | | |

**3.** Current Mailing Address or Safe Address (if applicable)

In Care Of Name (if any)

Street Number and Name          Apt. Ste. Flr. ☐ ☐ ☐   Number

City or Town          State    ZIP Code

Province          Postal Code          Country

**4.** Current Physical Address (if different from the above address)

In Care Of Name (if any)

Street Number and Name          Apt. Ste. Flr. ☐ ☐ ☐   Number

City or Town          State    ZIP Code

Province          Postal Code          Country

### Other Information

**5.** Alien Registration Number (A-Number) (if any)   **6.** Country of Birth

▶ A-

**7.** Country of Citizenship or Nationality   **8.** Sex

☐ Male   ☐ Female

**9.** Date of Birth (mm/dd/yyyy)   **10.** U.S. Social Security Number (if any)

▶

**11.** USCIS Online Account Number (if any)

▶

If you are physically present in the United States, **and** you are seeking a Temporary Protected Status (TPS) travel authorization document, advance parole, a renewed period of parole (re-parole), or parole in place, (**Part 1.**, **Item Numbers 4.**, **5.**, **8.**, **9.**, **10.**, or **11.**) complete the following:

**12.** Class of Admission (COA) (if any)   **13.** Most Recent Form I-94 Arrival/Departure Record Number (if any)

Appx-000272

## Part 2. Information About You (continued)

**14.** Expiration Date of Authorized Stay Shown on Form I-94 (if any) (mm/dd/yyyy)

**15.** eMedical U.S. Parolee ID (USPID) (if any)

### Information About Them (Complete this section only if you are applying on behalf of someone else.)

If you are requesting parole on behalf of someone other than yourself, provide the following information about that person in **Item Numbers 16. - 27.**  Do not complete this section if filing for yourself.

**16.** Family Name (Last Name)    Given Name (First Name)    Middle Name (if applicable)

**17.** Their Other Names Used (if applicable)

Family Name (Last Name)    Given Name (First Name)    Middle Name (if applicable)

**18.** Date of Birth (mm/dd/yyyy)    **19.** Country of Birth

**20.** Country of Citizenship or Nationality    **21.** Daytime Phone Number

**22.** Email Address (if any)    **23.** Alien Registration Number (A-Number) (if any)

▶ A-

**24.** Their Current Mailing Address

In Care Of Name (if any)

Street Number and Name    Apt. Ste. Flr. ☐ ☐ ☐    Number

City or Town    State    ZIP Code

Province    Postal Code    Country

**25.** Their Current Physical Address

In Care Of Name (if any)

Street Number and Name    Apt. Ste. Flr. ☐ ☐ ☐    Number

City or Town    State    ZIP Code

Province    Postal Code    Country

Appx-000273

## Part 2. Information About You (continued)

### Their Other Information

**26.** Class of Admission (COA) (if any)

**27.** Most Recent Form I-94 Arrival/Departure Record Number (if any)

## Part 3. Biographic Information of the Person Who Will Receive the Travel Document, Parole Document, or Arrival/Departure Record

**1.** Ethnicity (Select **only one** box)

☐ Hispanic or Latino    ☐ Not Hispanic or Latino

**2.** Race (Select **all applicable** boxes)

☐ American Indian or Alaska Native    ☐ Asian    ☐ Black or African American    ☐ Native Hawaiian or Other Pacific Islander    ☐ White

**3.** Height    Feet [ ]    Inches [ ]    **4.** Weight    Pounds [ ][ ][ ]

**5.** Eye Color (Select **only one** box)

☐ Black    ☐ Blue    ☐ Brown    ☐ Gray    ☐ Green    ☐ Hazel    ☐ Maroon    ☐ Pink    ☐ Unknown/Other

**6.** Hair Color (Select **only one** box)

☐ Bald (No Hair)    ☐ Black    ☐ Blond    ☐ Brown    ☐ Gray    ☐ Red    ☐ Sandy    ☐ White    ☐ Unknown/Other

## Part 4. Processing Information

**1.** Has the person who will receive the travel document, parole document, or Arrival/Departure Record, if approved, been in any exclusion, deportation, removal, or rescision proceedings?    ☐ Yes    ☐ No

**2.a.** Have you **EVER** before been issued a Reentry Permit or Refugee Travel Document? (If you answered "Yes," provide the information in **Item Numbers 2.b. - 2.c.** for the last document issued to you.)    ☐ Yes    ☐ No

**2.b.** Date Issued (mm/dd/yyyy)

**2.c.** Disposition (attached, lost, stolen, damaged/destroyed, still in my possession, etc.):

**3.a.** Have you **EVER** been issued an Advance Parole Document? (If you answered "Yes," please provide the information in **Item Numbers 3.b. - 3.c.** for the last document issued to you.)    ☐ Yes    ☐ No

**3.b.** Date Issued (mm/dd/yyyy)

**3.c.** Disposition (attached, lost, stolen, damaged/destroyed, still in my possession, etc.):

If you are requesting **parole from outside the United States, parole in place, or re-parole from inside the United States, SKIP to Part 8.**

**4.** Are you requesting a **replacement** Reentry Permit, Refugee Travel Document, Advance Parole Document, or TPS Travel Authorization Document?    ☐ Yes    ☐ No

## Part 4. Processing Information (continued)

5.    If you answered "Yes," select one of the following boxes and complete **Item Numbers 6.a. - 6.b.** If you answered "No," you can skip to **Item Number 7.a.**

☐  My document was issued, but I did not receive it.

☐  I received my document, but then it was lost, stolen, or damaged.

☐  I received my document, but it has incorrect information because of an error caused by me or because my information has changed.

☐  I received my document, but it has incorrect information because of an error not caused by me (such as a U.S. Citizenship and Immigration Services (USCIS) error).

6.a.    If you are replacing your Reentry Permit, Refugee Travel Document, Advance Parole Document, or TPS Travel Authorization Document because it has incorrect information, please select the applicable box(es) indicating the information that needs to be corrected and then provide any additional information in the text box that helps USCIS confirm the correction needed.

☐  Name

☐  A-Number

☐  Country of Birth/Citizenship

☐  Terms and Conditions

☐  Date of Birth

☐  Sex

☐  Validity Date

☐  Photo

Provide an explanation of what is incorrect on your current document to support your request for a correction and attach copies of any documents supporting your request.

6.b.    Provide the receipt number for the Form I-131 related to the Reentry Permit, Refugee Travel Document, Advance Parole Document, or TPS Travel Authorization Document that you are seeking to replace:

**If you are applying for an Advance Parole Document, SKIP to Part 7.**

**You must complete the rest of Part 4. if you are requesting a Reentry Permit or Refugee Travel Document.**

Where do you want your Reentry Permit or Refugee Travel Document sent? Please note that if you want your Reentry Permit or Refugee Travel Document sent to another country, you will need to pick it up at a U.S. Embassy, U.S. Consulate, or USCIS international field office. (Select one)

7.a.  ☐  To the U.S. address shown in **Part 2., Item Number 3.** of this application.

7.b.  ☐  To a U.S. Embassy, U.S. Consulate, USCIS international field office, or Department of Homeland Security (DHS) office overseas at:

City or Town                       Country

Appx-000275

## Part 4. Processing Information (continued)

If you are requesting that the Reentry Permit or Refugee Travel Document be sent to a U.S. Embassy, U.S. Consulate, or USCIS international field office, where should the **notification** to pick up the travel document be sent?

**8.a.** ☐ To the address shown in **Part 2.**, **Item Number 3.** of this application.

**8.b.** ☐ To the address shown below in **Part 4.**, **Item Number 9.a.** of this application.

**9.a.** In Care Of Name (if any)

Street Number and Name    Apt. Ste. Flr.  Number
☐ ☐ ☐

City or Town    State    ZIP Code

Province    Postal Code    Country

**9.b.** Daytime Phone Number    **9.c.** Email Address

## Part 5. Complete Only If Applying for a Reentry Permit (Part 1., Item Number 1.)

**1.** Since becoming a permanent resident of the United States (or during the past 5 years, whichever is less), how much total time have you spent outside the United States?

☐ Less Than 6 Months
☐ 6 Months to 1 Year
☐ 1 to 2 Years
☐ 2 to 3 Years
☐ 3 to 4 Years
☐ More Than 4 Years

## Part 6. Complete Only If Applying for a Refugee Travel Document (Part 1., Item Number 2. or 3.)

**1.** Country from which you are a refugee or asylee:

**If you answer "Yes" to Item Numbers 2. - 6.c. below,** use the space provided in **Part 13. Additional Information** to provide an explanation.

**2.** Do you plan to travel to the country named above in **Item Number 1.**?    ☐ Yes ☐ No

Since you were admitted to the United States as a refugee or granted asylee status, have you **EVER**:

**3.a.** Returned to the country named above in **Item Number 1.**?    ☐ Yes ☐ No

**3.b.** Applied for and/or obtained a national passport, passport renewal, or entry permit from the country in **Item Number 1.**?    ☐ Yes ☐ No

**3.c.** Applied for and/or received any benefit from the country named in **Item Number 1.** (for example, health insurance benefits)?    ☐ Yes ☐ No

Appx-000276

## Part 6. Complete Only If Applying for a Refugee Travel Document (Part 1., Item Number 2. or 3.) (continued)

Since you were admitted to the United States as a refugee or granted asylee status in the United States, have you, by any legal procedure or voluntary act:

**4.a.**  Reacquired the nationality of the country named above in **Item Number 1.**?   ☐ Yes   ☐ No

**4.b.**  Acquired a new nationality?   ☐ Yes   ☐ No

**4.c.**  Been granted refugee or asylee status in any other country?   ☐ Yes   ☐ No

**5.**  Are you filing for a Refugee Travel Document before departing the United States?   ☐ Yes   ☐ No

If you answered "Yes" to **Item Number 5.**, because you are filing for a Refugee Travel Document before departing the United States, you may skip **Item Numbers 6.a. - 6.c.**

If you answered "No" to **Item Number 5.**, you must answer **Item Number 6.a. - 6.c.**

**6.a.**  Are you currently outside the United States?   ☐ Yes   ☐ No

**6.b.**  If you answered "Yes," what is your current location (City or Town and Country)?

**6.c.**  If you answered "Yes," what other countries have you traveled to since leaving the United States?

## Part 7. Information About Your Proposed Travel (Complete only if you are applying for an Advance Parole Document (Part 1., Item Number 5.).)

**1.**  Date of Intended Departure   (mm/dd/yyyy)

**2.**  Purpose of trip. (If you need extra space to complete this section, use the space provided in **Part 13. Additional Information**.)

**3.**  List the countries you intend to visit. (If you need extra space to complete this section, use the space provided in **Part 13. Additional Information**.)

**4.**  How many trips do you intend to use this document?

☐ One Trip   ☐ More than one trip

**5.**  Expected Length of Trip (in days)

Appx-000277

**Part 8. Complete Only If Applying for an Initial Parole Document, Parole In Place, or Re-parole (Part 1., Item Numbers 6. - 11.)**

1. Explain how you qualify for parole, parole in place, or re-parole. (If you need extra space to complete this section, use the space provided in **Part 13. Additional Information**.) Include copies of any supporting documents or evidence you wish considered. (See Instructions.)

2. Expected Length of Stay in the United States

If the person intended to receive the parole document is outside the United States, complete the following **Item Numbers**:

**3.a.** Date of Intended Arrival to the United States    (mm/dd/yyyy)

**3.b.** Location (City or Town and Country) of the U.S. Embassy, U.S. Consulate, or the USCIS international field office that you want us to notify.

City or Town

Country

**Part 9. Employment Authorization For New Period of Parole (Re-parole) (Part 1., Item Number 10. or 11.)**

1. ☐ I am requesting an Employment Authorization Document (EAD) upon approval of my new period of parole (re-parole) selected under **Part 1., Item Number 10. or 11.**

**Part 10. Applicant's Contact Information, Certification, and Signature (Read the information on penalties and travel warnings in the form Instructions before completing this Part 10.)**

*Applicant's Contact Information*

Provide your daytime telephone number, mobile telephone number (if any), and email address (if any).

1. Applicant's Daytime Telephone Number

2. Applicant Mobile Telephone Number (if any)

3. Applicant's Email Address (if any)

*Applicant's Certification and Signature*

I certify, under penalty of perjury, that I provided or authorized all of the responses and information contained in and submitted with my application, I read and understand or, if interpreted to me in a language in which I am fluent by the interpreter listed in **Part 11.**, understood, all of the responses and information contained in, and submitted with, my application (as explained to me by the interpreter), and that all of the responses and the information are complete, true, and correct. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for an immigration request and to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

4. Applicant's Signature

Date of Signature (mm/dd/yyyy)

Appx-000278

**Part 11. Interpreter's Contact Information, Certification, and Signature (if applicable) (If no interpreter was used, skip to Part 12.)**

### Interpreter's Full Name

1. Interpreter's Family Name (Last Name)

2. Interpreter's Business or Organization Name (if any)

Interpreter's Given Name (First Name)

### Interpreter's Contact Information

3. Interpreter's Daytime Telephone Number

4. Interpreter's Mobile Telephone Number (if any)

5. Interpreter's Email Address (if any)

### Interpreter's Certification and Signature

I certify, under penalty of perjury, that I am fluent in English and _____, and I have interpreted every question on the application and Instructions and interpreted the applicant's answers to the questions in that language, and the applicant informed me that he or she understood every instruction, question, and answer on the application.

6. Interpreter's Signature

Date of Signature (mm/dd/yyyy)

## Part 12. Contact Information, Certification, and Signature of the Person Preparing this Application, if Other Than the Applicant

### Preparer's Full Name

1.  Preparer's Family Name (Last Name)

Preparer's Given Name (First Name)

2.  Preparer's Business or Organization Name

### Preparer's Contact Information

3.  Preparer's Daytime Telephone Number

4.  Preparer's Mobile Telephone Number (if any)

5.  Preparer's Email Address (if any)

### Preparer's Certification and Signature

I certify, under penalty of perjury, that I prepared this application for the applicant at his or her request and with express consent and that all the responses and information contained in and submitted with the application are complete, true, and correct and reflects only information provided by the applicant. The applicant reviewed the responses and information and informed me that he or she understands the responses and information in or submitted with the application.

6.  Preparer's Signature

Date of Signature (mm/dd/yyyy)

## Part 13. Additional Information

If you need extra space to provide any additional information within this application, use the space below. If you need more space than what is provided, make copies of this page to complete and file with this application or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which the answer refers; and sign and date each sheet.

1. Family Name (Last Name)        Given Name (First Name)        Middle Name

2. A-Number (if any)  ▶  A-

3. Page Number     Part Number     Item Number

4. Page Number     Part Number     Item Number

5. Page Number     Part Number     Item Number

6. Page Number     Part Number     Item Number

7. Page Number     Part Number     Item Number



# Petition for Amerasian, Widow(er), or Special Immigrant

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-360**
OMB No. 1615-0020
Expires 03/31/2027

| For USCIS Use Only | Fee Stamp | Action Block |
|---|---|---|
| **Returned** | | |
| **Resubmitted** | | |
| **Relocated** / **Received** | | |
| **Sent** | | |

**Remarks:**
☐ Petitioner/Applicant Interviewed
☐ Interviewed Beneficiary Interviewed
☐ I-485 Filed Concurrently
☐ Bene "A" File Reviewed

**Classification**

**Consulate**

**Priority Date**

| To be completed by an Attorney or Accredited Representative (if any). | ☐ Select this box if Form G-28 or G-28I is attached. | Attorney State Bar Number (if applicable) | Attorney or Accredited Representative USCIS Online Account Number (if any) |
|---|---|---|---|

► **START HERE - Type or print in black ink.**

## Part 1. Information About Person or Organization Filing This Petition

**NOTE:** You must complete **Part 1.** as the petitioner if you are filing this petition on behalf of another person. If you are a Violence Against Women Act (VAWA) self-petitioner or special immigrant juvenile, skip to **Part 1.**, **Item Number 7.**

**1.** Your Full Name

Family Name (Last Name)

Given Name (First Name)

Middle Name

**2.** USCIS Online Account Number (if any)

**3.** U.S. Social Security Number (if any)

**4.** Alien Registration Number (A-Number) (if any)    ► A-

**5.** Individual IRS Tax Number (if any)

**6.** Mailing Address

In Care Of Name (if any)

Organization Name (if applicable)

Street Number and Name

Apt. Ste. Flr. ☐ ☐ ☐   Number

City or Town

State

ZIP Code

Province

Postal Code

Country

Appx-000282

## Part 1.  Information About Person or Organization Filing This Petition (continued)

7.    Alternate and/or Safe Mailing Address

If you are a VAWA self-petitioning spouse, child, parent, or a special immigrant juvenile and do not want U.S. Citizenship and Immigration Services (USCIS) to send notices about this petition to your home, you may provide an alternate and/or safe mailing address.

In Care Of Name (if any)

Street Number and Name                                          Apt. Ste. Flr.    Number
☐ ☐ ☐

City or Town                                          State    ZIP Code

Province                    Postal Code              Country

## Part 2.  Classification Requested

Select **only one** box.

1.    **A.** ☐  Amerasian

**B.** ☐  Widow(er) of a U.S. citizen

**C.** ☐  Special Immigrant Juvenile

**D.** ☐  Special Immigrant Religious Worker

**(1)** Will the beneficiary be working as a minister?   ☐ Yes   ☐ No

**E.** ☐  Special Immigrant based on employment with the Panama Canal Company, Canal Zone Government, or U.S. Government in the Canal Zone

**F.** ☐  Special Immigrant Physician

**G.** ☐  Special Immigrant G-4 International Organization Employee or Family Member or NATO-6 Employee or Family Member

**H.** ☐  Special Immigrant Armed Forces Member

**I.** ☐  Self-Petitioning Spouse of Abusive U.S. citizen or Lawful Permanent Resident

**J.** ☐  Self-Petitioning Child of Abusive U.S. citizen or Lawful Permanent Resident

**K.** ☐  VAWA Self-Petitioning Parent of a U.S. citizen son or daughter

**L.** ☐  Special Immigrant Afghanistan or Iraq National who worked with the U.S. Armed Forces as a translator

**M.** ☐  Special Immigrant Iraq National who was employed by or on behalf of the U.S. Government

**N.** ☐  Special Immigrant Afghanistan National who was employed by or on behalf of the U.S. Government or the International Security Assistance Force (ISAF) in Afghanistan

**O.** ☐  Broadcasters

**P.** ☐  Other

Provide the name of the classification below.

**Appx-000283**

## Part 3.  Information About the Person for Whom This Petition Is Being Filed

**NOTE:**  On this petition, the "beneficiary" or "self-petitioner" means the person for whom this petition is being filed.  If you provided an alternate and/or safe mailing address above, you must also complete **Part 3.**

1.  Your Full Name

Family Name (Last Name)        Given Name (First Name)        Middle Name

2.  Mailing Address

In Care Of Name (if any)

Street Number and Name        Apt. Ste. Flr.  Number

City or Town        State    ZIP Code

Province        Postal Code        Country

### Other Information

3.  Date of Birth  (mm/dd/yyyy)        4.  Country of Birth

5.  U.S. Social Security Number (if any)        6.  A-Number (if any)
    ▶        ▶  A-

7.  Marital Status    ☐ Single    ☐ Married    ☐ Divorced    ☐ Widowed

Complete **Item Numbers 8. - 15.** if this person is in the United States.  If an item number is not applicable or the answer is "none," leave the space blank.  Provide information below for the passport or other document used at the time of last arrival to the United States.

8.  Date of Last Arrival (mm/dd/yyyy)        9.  Form I-94 Number or I-95 Crewman's Landing Permit
    ▶

10.  Passport Number        11.  Travel Document Number

12.  Country of Issuance for Passport or Travel Document        13.  Expiration Date for Passport or Travel Document (mm/dd/yyyy)

14.  Current Nonimmigrant Status        15.  Date current status expired, or will expire, as shown on Form I-94 or I-95 (mm/dd/yyyy)

## Part 4.  Processing Information

1.  If the person listed in **Part 3.** is outside the U.S., is ineligible to adjust status in the U.S., or does not wish to adjust status in the U.S., provide the following information about the U.S. Consulate at which the person prefers to apply for an immigrant visa.

    **U.S. Consulate**

    A.  City or Town

    B.  Country

Appx-000284

## Part 4. Processing Information (continued)

2.  If a U.S. address was provided in **Part 3.**, type or print the person's foreign address below.  If he or she does not maintain a foreign address, list the city or town and country of last foreign residence.  If his or her native alphabet does not use Roman letters, type or print his or her name and foreign address in the native alphabet.

A.  Your Full Name

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

B.  Mailing Address

Street Number and Name    Apt. Ste. Flr.    Number

☐ ☐ ☐

City or Town

| Province | Postal Code | Country |
|---|---|---|
| | | |

3.  Sex of the beneficiary:    ☐ Male    ☐ Female

4.  A.  Are you filing any other petitions or applications with this one?    ☐ Yes    ☐ No

B.  If you answered "Yes" to **Item A.** in **Item Number 4.**, how many?

If you answer "Yes" to **Item Numbers 5. - 6.**, provide an explanation in the space provided in **Part 15. Additional Information**.

5.  Is the beneficiary in removal proceedings?    ☐ Yes    ☐ No

6.  Has the beneficiary ever worked in the U.S. without permission?  (If you are applying for a special immigrant juvenile status, you are not required to answer this item number.)    ☐ Yes    ☐ No

7.  Is an application for adjustment of status attached to this petition?    ☐ Yes    ☐ No

## Part 5. Information About the Spouse and Children of the Person for Whom This Petition Is Being Filed

**NOTE:**  Depending on the classification you seek, you can either file this petition for another person or for yourself.  On this petition, the "beneficiary" or "self-petitioner" means the person for whom this petition is being filed, whether that person is yourself or another person.

1.  If you are filing as a self-petitioning spouse, have any of your children filed separate self-petitions?    ☐ Yes    ☐ No

2.  **Person 1**

| Family Name (Last Name) | Given Name (First Name) | Middle Name |
|---|---|---|
| | | |

Date of Birth  (mm/dd/yyyy)    Country of Birth

Relationship    A-Number (if any)

☐ Spouse    ☐ Child    ► A-

## Part 5.  Information About the Spouse and Children of the Beneficiary (continued)

**3.   Person 2**

Family Name (Last Name) | Given Name (First Name) | Middle Name

Date of Birth  (mm/dd/yyyy) | Country of Birth

Relationship      A-Number (if any)

☐ Child      ►  **A-**

**4.   Person 3**

Family Name (Last Name) | Given Name (First Name) | Middle Name

Date of Birth  (mm/dd/yyyy) | Country of Birth

Relationship      A-Number (if any)

☐ Child      ►  **A-**

**5.   Person 4**

Family Name (Last Name) | Given Name (First Name) | Middle Name

Date of Birth  (mm/dd/yyyy) | Country of Birth

Relationship      A-Number (if any)

☐ Child      ►  **A-**

**6.   Person 5**

Family Name (Last Name) | Given Name (First Name) | Middle Name

Date of Birth  (mm/dd/yyyy) | Country of Birth

Relationship      A-Number (if any)

☐ Child      ►  **A-**

**7.   Person 6**

Family Name (Last Name) | Given Name (First Name) | Middle Name

Date of Birth  (mm/dd/yyyy) | Country of Birth

Relationship      A-Number (if any)

☐ Child      ►  **A-**

Appx-000286

## Part 5.  Information About the Spouse and Children of the Beneficiary (continued)

**8.    Person 7**

Family Name (Last Name)          Given Name (First Name)          Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship     A-Number (if any)

☐ Child         ► A-

**9.    Person 8**

Family Name (Last Name)          Given Name (First Name)          Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship     A-Number (if any)

☐ Child         ► A-

**10.   Person 9**

Family Name (Last Name)          Given Name (First Name)          Middle Name

Date of Birth  (mm/dd/yyyy)          Country of Birth

Relationship     A-Number (if any)

☐ Child         ► A-

## Part 6.  Complete Only If Filing for an Amerasian

### Information About the Mother of the Amerasian

**1.**   Mother's Full Name

Family Name (Last Name)          Given Name (First Name)          Middle Name

**2.**   **A.**   Is the mother still alive?          ☐ Unknown    ☐ Yes    ☐ No

**B.**   If you answered "Yes" to **Item A**. in **Item Number 2.**, provide her address below.

In Care Of Name (if any)

Street Number and Name                    Apt. Ste. Flr.  Number
                                          ☐  ☐  ☐

City or Town                    State    ZIP Code

Province          Postal Code     Country

Appx-000287

## Part 6.  Complete Only If Filing for an Amerasian (continued)

**C.**  If you answered "No" to **Item A.** in **Item Number 2.**, provide her date of death (mm/dd/yyyy).

### Information About the Father of the Amerasian

If possible, attach a notarized statement from the father regarding parentage.  If there is a question you cannot fully answer in the space provided on this petition, use the space provided in **Part 15. Additional Information**.

**3.**  Father's Full Name

Family Name (Last Name)

Given Name (First Name)

Middle Name

**4.**  Date of Birth  (mm/dd/yyyy)     **5.**  Country of Birth

**6.**  **A.**  Is the father still alive?     ☐ Unknown  ☐ Yes  ☐ No

**B.**  If you answered "Yes" to **Item A.** in **Item Number 6.**, provide his address below.

In Care Of Name (if any)

Street Number and Name     Apt. Ste. Flr.  Number

☐ ☐ ☐

City or Town     State  ZIP Code

Province     Postal Code     Country

**C.**  If you answered "No" to **Item A.** in **Item Number 6.**, provide his date of death (mm/dd/yyyy).

**D.**  Daytime Telephone Number (if any)     **E.**  Work Telephone Number (if any)

At the time the Amerasian was conceived:

**7.**  **A.**  The father was in the military (indicate branch of service below).

☐ Army  ☐ Air Force  ☐ Navy  ☐ Marine Corps  ☐ Coast Guard

**B.**  Provide the father's service number:

**C.**  ☐ The father was not in the military and was not a civilian employed abroad.  (Attach a full explanation of the circumstances.)

## Part 7.  Complete Only If Filing as a Widow/Widower

**1.**  Full Name of U.S. Citizen Spouse Who Died

Family Name (Last Name)

Given Name (First Name)

Middle Name

**2.**  Date of Birth (mm/dd/yyyy)     **3.**  Country of Birth     **4.**  Date of Death (mm/dd/yyyy)

Appx-000288

## Part 7.  Complete Only If Filing as a Widow/Widower (continued)

**5.**   At time of death, your spouse was a (Select **only one**):

**A.**  ☐  U.S. citizen born in the United States

**B.**  ☐  U.S. citizen born abroad to U.S. citizen parents

**C.**  ☐  U.S. citizen through naturalization

   **(1)**  Provide A-Number (if any)  ►  **A-** ☐☐☐☐☐☐☐☐☐

**D.**  ☐  Other (Explain)

[ ]

**6.**   How many times have you been married? [ ]

**7.**   How many times was your spouse married? [ ]

**8.**   **A.**  When did you and your spouse get married (mm/dd/yyyy)? [ ]

   **B.**  Where did you and your spouse get married? [ ]

**9.**   **A.**  Did you remarry after the death of your spouse? ☐ Yes  ☐ No

   **B.**  If you answered "Yes" to **Item A.** in **Item Number 9.**, provide the date that you remarried (mm/dd/yyyy). [ ]

**10.**  If you are filing as a widow(er), were you legally separated at the time of the U.S. citizen's death? ☐ Yes  ☐ No

**NOTE:**  If you answered "Yes" to **Item Number 10.**, provide an explanation in the space provided in **Part 15. Additional Information**.

## Part 8.  Complete Only If Filing for a Special Immigrant Juvenile

### Information About the Juvenile

**1.**   List any other names used:

**A.**  Family Name (Last Name) [ ]   Given Name (First Name) [ ]   Middle Name [ ]

**B.**  Family Name (Last Name) [ ]   Given Name (First Name) [ ]   Middle Name [ ]

Answer the following questions regarding the person for whom the petition is being filed.  If you answer "No" to **Item A.** in **Item Number 2.**, provide an explanation in the space provided in **Part 15. Additional Information**.

**2.**   **A.**  Have you been declared dependent on a juvenile court in the United States OR has a juvenile court legally committed you to, or placed you under the custody of, an agency, department of a state, or an individual or entity? ☐ Yes  ☐ No

   **B.**  Provide the name of the state agency, department, or court-appointed organization or individual with which you are placed below.

   [ ]

   **C.**  Are you currently under the jurisdiction of the juvenile court that made your placement or custody determination identified in **Item B.** in **Item Number 2.** above? ☐ Yes  ☐ No

Appx-000289

## Part 8.   Complete Only If Filing for a Special Immigrant Juvenile (continued)

3.  **A.**  If you answered "Yes" to **Item C.** in **Item Number 2.** above, are you currently residing in your court-ordered placement?  ☐ Yes  ☐ No

**B.**  If you answered "No" to **Item C.** in **Item Number 2.** above, select your reason below.

☐  You were adopted or placed in a permanent guardianship or another permanent living arrangement (other than reunification with the abusive parents).

☐  You aged-out of the juvenile court's jurisdiction and the order was terminated based on age.

☐  Other.  (If you selected "Other," provide an explanation in the space provided in **Part 15. Additional Information**.)

4.  **A.**  A juvenile court has determined that reunification with  ☐ one or  ☐ both of my parents is not viable due to:

☐ Abuse   ☐ Neglect   ☐ Abandonment

☐ Similar basis under state law (specify): _____

**B.**  If you selected "one" in **Item A.** in **Item Number 4.**, provide the name of that parent below.

_____

5.  Has it been determined in judicial or administrative proceedings that it would not be in your best interest to be returned to your or your parent's country of citizenship or nationality or last habitual residence?  ☐ Yes  ☐ No

6.  **A.**  Are you currently or were you previously in the custody of the U.S. Department of Health and Human Services (HHS)?  ☐ Yes  ☐ No

**B.**  If you answered "Yes" to **Item A.** in **Item Number 6.**, and you are in HHS custody, did the juvenile court order determine or alter your custody status or placement?  ☐ Yes  ☐ No

## Part 9.   Complete Only If Filing a Special Immigrant Religious Worker Petition

### Prospective Employer Attestation

1.  Provide the following information about the prospective employer.

**A.**  Number of members of the prospective employer's organization _____

**B.**  Number of employees working at the same location where the beneficiary will be employed _____

**C.**  Number of aliens holding special immigrant or nonimmigrant religious worker status who are currently employed or were employed within the past five years _____

**D.**  Number of Special Immigrant Religious Worker (Form I-360) and Nonimmigrant Religious Worker (Form I-129) petitions submitted by the prospective employer within the past five years _____

**E.**  Number of Special Immigrant Religious Worker (Form I-360) petitions submitted by the beneficiary during the last five years _____

2.  Has the beneficiary or have any of the beneficiary's dependent family members previously been admitted to the United States for a period of stay in the Religious Worker (R) classification during the last five years?  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 2.**, provide the beneficiary's and any dependent family member's prior periods of stay in the R classification in the United States during the last five years.  Be sure to provide only those periods when the beneficiary and/or family members were actually in the United States in the R classification.  Provide the beneficiary's information in **Item Number 3.** below.  For dependent family members, use the space provided in **Part 15. Additional Information.**

NOTE:  Submit photocopies of Form I-94 Arrival-Departure Record, Form I-797 (Notice of Action), and/or other USCIS documents identifying these periods of stay in the R classification.  If you need extra space to complete this section, use the space provided in **Part 15. Additional Information.**

Appx-000290

## Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition (continued)

3.  Beneficiary

Family Name (Last Name)

Given Name (First Name)

Middle Name

Period of Stay

From (mm/dd/yyyy)

To (mm/dd/yyyy)

4.  Provide a summary of the type of responsibilities of those employees, other than the beneficiary, who work at the same location where the beneficiary will be employed.  If you need extra space to complete this section, use the space provided in **Part 15. Additional Information**.

Position

Summary of the Type of Responsibilities for That Position

5.  Describe the relationship, if any, between the religious organization in the United States and the organization abroad of which the beneficiary is a member.

6.  Provide the following information about the prospective employment.  If you need extra space to complete this section, use the space provided in **Part 15. Additional Information**.

A.  Title of position offered

B.  The beneficiary will be working (select one of the following):

☐  As a minister

☐  In a religious vocation

☐  In a religious occupation

C.  Detailed description of the beneficiary's proposed daily duties

D.  Description of the beneficiary's qualifications for the position offered

E.  Description of the proposed salaried and/or non-salaried compensation

F.  Provide the specific addresses or locations where the beneficiary will be working

Company Name

Street Number and Name

Apt. Ste. Flr.    Number

☐ ☐ ☐

City or Town

State

ZIP Code

Province

Postal Code

Country

Appx-000291

## Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition (continued)

Answer **Item Numbers 7. - 13.** about the prospective employer.  If you answer "No" for **Item Numbers 7. - 13.**, provide an explanation in the space provided in **Part 15. Additional Information**.

7.  The prospective employer is a bona fide non-profit religious organization or a bona fide organization that is affiliated with the religious denomination and is tax exempt as described in section 501(c)(3) of the Internal Revenue Code of 1986, subsequent amendment, or equivalent sections of prior enactments of the Internal Revenue Code.  If the prospective employer is affiliated with the religious denomination, complete the Religious Denomination Certification included in this petition. ☐ Yes ☐ No

If you answered "Yes," select the applicable box and attach the appropriate documentation to the petition.

**A.** ☐  A currently valid determination letter from the Internal Revenue Service (IRS) establishing that the organization is a tax-exempt organization;

**B.** ☐  A currently valid determination letter from the IRS establishing that the organization is recognized as tax-exempt under a group tax exemption; or

**C.** ☐  If you are claiming that the prospective employer is a bona fide organization that is affiliated with the religious denomination, provide the following:

**(1)** ☐  A currently valid determination letter from the IRS establishing that the organization is a tax-exempt organization;

**(2)** ☐  Documentation that establishes the religious nature and purpose of the organization, such as a copy of the organizing instrument of the organization that specifies the purposes of the organization;

**(3)** ☐  Organizational literature, such as books, articles, brochures, calendars, flyers, and other literature describing the religious purpose and nature of the activities of the organization; and

**(4)** ☐  A completed religious denomination certification, signed and dated, certifying that the petitioning organization is affiliated with the religious denomination.

8.  The prospective employer is willing and able to provide salaried and/or non-salaried compensation at a level that the beneficiary and any dependents will not become a public charge. ☐ Yes ☐ No

9.  The funds to pay the beneficiary's compensation do not include any monies obtained from the beneficiary, excluding reasonable donations or tithing to the religious organization. ☐ Yes ☐ No

10.  The beneficiary will not engage in secular employment, and the prospective employer will provide salaried and/or non-salaried compensation. ☐ Yes ☐ No

11.  The offered position is full time, requiring at least an average of 35 hours of work per week. ☐ Yes ☐ No

12.  The beneficiary has been a religious worker for at least two years immediately before Form I-360 was filed and is otherwise qualified for the position offered. ☐ Yes ☐ No

13.  The beneficiary has been a member of the prospective employer's denomination for at least two years immediately before Form I-360 was filed. ☐ Yes ☐ No

### *Prospective Employer Attestation* (must be completed by the prospective employer even if the beneficiary is filing on his or her own behalf)

**I certify or attest under penalty of perjury under the laws of the United States of America that the contents of this attestation, and the evidence submitted, are true and correct.**

14.  Signature of an Authorized Official of the Prospective Employer (sign in ink)     Date of Signature (mm/dd/yyyy)

Appx-000292

## Part 9. Complete Only If Filing a Special Immigrant Religious Worker Petition (continued)

### Printed Name and Title of Signatory for Prospective Employer

**15.** Family Name (Last Name)    Given Name (First Name)    Middle Name

**16.** Title of the Signatory

### Mailing Address

**17.** Employer/Organization Name

Street Number and Name    Apt. Ste. Flr.  □ □ □    Number

City or Town    State    ZIP Code

### Contact Information

**18.** Daytime Telephone Number

**19.** Fax Number (if any)

**20.** Email Address (if any)

### Religious Denomination Certification (to be completed only if the prospective employer is affiliated with a religious denomination)

**I certify under penalty of perjury, that** the prospective employer, _____ ,

is affiliated with this Religious Denomination, _____ , and that the attesting religious organization within the religious denomination is tax-exempt as described in section 501(c)(3) of the Internal Revenue Code of 1986, or equivalent sections of prior enactments of the Internal Revenue Code.  The contents of this certification are true and correct to the best of my knowledge.

**21.** Signature of the Authorized Representative of the Religious Denomination (sign in ink)    Date of Signature (mm/dd/yyyy)

### Printed Name and Title of the Signatory of the Religious Denomination

**22.** Family Name (Last Name)    Given Name (First Name)    Middle Name

**23.** Title of the Signatory

Appx-000293

## Part 9.  Complete Only If Filing a Special Immigrant Religious Worker Petition (continued)

### Information About the Attesting Religious Organization Within the Religious Denomination

**24.** Name of Attesting Religious Organization Within the Religious Denomination

**25.** Street Number and Name

Apt. Ste. Flr.  ☐ ☐ ☐  Number

City or Town

State

ZIP Code

**26.** Daytime Telephone Number

**27.** Fax Number (if any)

**28.** Email Address (if any)

**29.** IRS Tax Number of the Attesting Religious Organization

## Part 10.  Complete Only If Filing as a VAWA Self-Petitioning Spouse or Child of a U.S. Citizen or Lawful Permanent Resident or a VAWA Self-Petitioning Parent of a U.S. Citizen Son or Daughter

**NOTE:  For the safety and protection of all VAWA self-petitioners, information regarding a filing will only be provided to the self-petitioner or his or her designated attorney or representative with a valid Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative.**

**1.** Full Name of U.S. citizen or Lawful Permanent Resident Abuser

Family Name (Last Name)

Given Name (First Name)

Middle Name

**2.** Date of Birth (mm/dd/yyyy)

**3.** Country of Birth

**4.** Date of Death (mm/dd/yyyy)

**5.** Your abuser is now, or was, a (Select one):

**A.** ☐ U.S. citizen born in the United States

**B.** ☐ U.S. citizen born abroad to U.S. citizen parents

**C.** ☐ U.S. citizen through naturalization

**(1)** Provide A-Number (if known)  ► **A-** ☐☐☐☐☐☐☐☐☐

**D.** ☐ U.S. Lawful Permanent Resident

**(1)** Provide A-Number (if any)  ► **A-** ☐☐☐☐☐☐☐☐☐

**E.** ☐ Other (Explain)

**6.** How many times have you been married?  ►

**7.** How many times was your abuser married (if known)?  ►

**Part 10.  Complete Only If Filing as a VAWA Self-Petitioning Spouse or Child of a U.S. Citizen or Lawful Permanent Resident or a VAWA Self-Petitioning Parent of a U.S. Citizen Son or Daughter** (continued)

8.    **A.**    When did you and your abuser get married?  (If you are a self-petitioning child or self-petitioning parent, type or print "N/A.")
         (mm/dd/yyyy)

**B.**    Where did you and your abuser get married?  (If you are a self-petitioning child or self-petitioning parent, type or print "N/A.")

9.    When did you live with your abuser?

From (mm/dd/yyyy)                    To (mm/dd/yyyy)

Include any other dates you have lived off/on with your abuser in the space provided in **Part 15. Additional Information**.

10.    Provide the last address at which you lived together with your abuser.

Street Number and Name                                                          Apt. Ste. Flr.   Number
☐ ☐ ☐

City or Town                                                          State    ZIP Code

Province                          Postal Code              Country

11.    Provide the last date that you lived together with your abuser at this address.

From (mm/dd/yyyy)                    To (mm/dd/yyyy)

12.    I am currently residing in the United States and I request an Employment Authorization Document.    ☐ Yes    ☐ No

**Part 11.  Petitioner's Statement, Contact Information, Declaration, and Signature** (Individual)

**IMPORTANT:**  Complete this section **ONLY** if you are an individual filing this petition for yourself.  If you are filing Form I-360 to petition for another person or as an authorized signatory of an organization, complete **Part 12. Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory.**

**NOTE:**  Read the **Penalties** section of the Form I-360 Instructions before completing this part.

*Petitioner's Statement*

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

1.    Petitioner's Statement Regarding the Interpreter
      **A.**  ☐  I can read and understand English, and I have read and understand every question and instruction on this petition and my answer to every question.
      **B.**  ☐  The interpreter named in **Part 13.** read to me every question and instruction on this petition and my answer to every question in _____,
              a language in which I am fluent.  I understand all of this information as interpreted.

2.    Petitioner's Statement Regarding the Preparer
      ☐  At my request, the preparer named in **Part 14.**, _____,
         prepared this petition for me based only upon information I provided or authorized.

Appx-000295

## Part 11. Petitioner's Statement, Contact Information, Declaration, and Signature (Individual) (continued)

### Petitioner's Contact Information

**3.**   Petitioner's Daytime Telephone Number

**4.**   Petitioner's Mobile Telephone Number (if any)

**5.**   Petitioner's Email Address (if any)

### Petitioner's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this petition, in supporting documents, and in my USCIS records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

1)  I provided or authorized all of the information contained in, and submitted with, my petition;

2)  I reviewed and understood all of the information in, and submitted with, my petition; and

3)  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my petition and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my petition, and that all of this information is complete, true, and correct.

### Petitioner's Signature

**6.**   Petitioner's Signature

Date of Signature (mm/dd/yyyy)

**NOTE TO ALL PETITIONERS:**  If you do not completely fill out this petition or fail to submit required documents listed in the Instructions, USCIS may deny your petition.

## Part 12.  Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory

**IMPORTANT:**  Complete this section **ONLY** if you are filing Form I-360 to petition for another person or as an authorized signatory of an organization.  If you are an individual filing this petition for yourself, complete **Part 11. Petitioner's Statement, Contact Information, Declaration, and Signature (Individual).**

**NOTE:**  Read the **Penalties** section of the Form I-360 Instructions before completing this part.

### Petitioner's or Authorized Signatory's Statement

**NOTE:**  Select the box for either **Item A.** or **B.** in **Item Number 1.**  If applicable, select the box for **Item Number 2.**

**1.**   Petitioner's Statement Regarding the Interpreter

**A.**   ☐   I can read and understand English, and I have read and understand every question and instruction on this petition and my answer to every question.

**B.**   ☐   The interpreter named in **Part 13.** read to me every question and instruction on this petition and my answer to every question in _____ , a language in which I am fluent.  I understand all of this information as interpreted.

**Appx-000296**

## Part 12.  Statement, Contact Information, Declaration, and Signature of the Petitioner or Authorized Signatory (continued)

**2.**    Petitioner's Statement Regarding the Preparer

☐    At my request, the preparer named in **Part 14.**, [                              ],

prepared this petition for me based only upon information I provided or authorized.

### *Authorized Signatory's Contact Information*

**3.**    Authorized Signatory's Family Name (Last Name)          Authorized Signatory's Given Name (First Name)

**4.**    Authorized Signatory's Title          **5.**    Authorized Signatory's Daytime Telephone Number

**6.**    Authorized Signatory's Mobile Telephone Number (if any)    **7.**    Authorized Signatory's Email Address (if any)

### *Petitioner's or Authorized Signatory's Declaration and Certification*

Copies of any documents submitted are exact photocopies of unaltered, original documents, and I understand that, as the petitioner, I may be required to submit original documents to USCIS at a later date.

I authorize the release of any information from my records, or from the petitioning organization's records, to USCIS or other entities and persons where necessary to determine eligibility for the immigration benefit sought or where authorized by law.  I recognize the authority of USCIS to conduct audits of this petition using publicly available open source information.  I also recognize that any supporting evidence submitted in support of this petition may be verified by USCIS through any means determined appropriate by USCIS, including but not limited to, on-site compliance reviews.

If filing this petition on behalf of an organization, I certify that I am authorized to do so by the organization.

I certify, under penalty of perjury, that I have reviewed this petition, I understand all of the information contained in, and submitted with, my petition, and all of this information is complete, true, and correct.

### *Petitioner's or Authorized Signatory's Signature*

**8.**    Petitioner's or Authorized Signatory's Signature          Date of Signature (mm/dd/yyyy)

➡

**NOTE TO ALL PETITIONERS AND AUTHORIZED SIGNATORIES:**  If you do not completely fill out this petition or fail to submit required documents listed in the Instructions, USCIS may delay a decision on or deny your petition.

Appx-000297

## Part 13.  Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### *Interpreter's Full Name*

1. Interpreter's Family Name (Last Name)        Interpreter's Given Name (First Name)

2. Interpreter's Business or Organization Name (if any)

### *Interpreter's Mailing Address*

3. Street Number and Name                               Apt. Ste. Flr.    Number

   ☐ ☐ ☐

   City or Town                                         State    ZIP Code

   Province                 Postal Code         Country

### *Interpreter's Contact Information*

4. Interpreter's Daytime Telephone Number        5. Interpreter's Mobile Telephone Number (if any)

6. Interpreter's Email Address (if any)

### *Interpreter's Certification*

I certify, under penalty of perjury, that:

I am fluent in English and _____, which is the same language specified in **Part 11.**, **Item B.** in **Item Number 1.**, or in **Part 12.**, **Item B.** in **Item Number 1.**, and I have read to this petitioner or the authorized signatory in the identified language every question and instruction on this petition and his or her answer to every question.  The petitioner or authorized signatory informed me that he or she understands every instruction, question, and answer on the petition, including the **Petitioner's Declaration and Certification**, or **Petitioner's or Authorized Signatory's Declaration and Certification,** and has verified the accuracy of every answer.

### *Interpreter's Signature*

7. Interpreter's Signature (sign in ink)                Date of Signature (mm/dd/yyyy)

Appx-000298

## Part 14.  Contact Information, Declaration, and Signature of the Person Preparing this Petition, if Other Than the Petitioner

Provide the following information about the preparer.

### Preparer's Full Name

**1.**  Preparer's Family Name (Last Name)

Preparer's Given Name (First Name)

**2.**  Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.**  Street Number and Name

Apt. Ste. Flr.  Number

☐ ☐ ☐

City or Town

State

ZIP Code

Province

Postal Code

Country

### Preparer's Contact Information

**4.**  Preparer's Daytime Telephone Number

**5.**  Preparer's Mobile Number

**6.**  Preparer's Email Address (if any)

### Preparer's Statement

**7.**  **A.**  ☐  I am not an attorney or accredited representative but have prepared this petition on behalf of the petitioner and with the petitioner's consent.

**B.**  ☐  I am an attorney or accredited representative and my representation of the petitioner in this case
☐ extends  ☐ does not extend beyond the preparation of this petition.

**NOTE:**  If you are an attorney or accredited representative whose representation extends beyond preparation of this petition, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States, with this petition.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this petition at the request of the petitioner or authorized signatory. The petitioner has reviewed this completed petition, including the **Petitioner's Declaration and Certification**, or **Petitioner's or Authorized Signatory's Declaration and Certification,** and informed me that all of this information in the form and in the supporting documents is complete, true, and correct.

### Preparer's Signature

**8.**  Preparer's Signature (sign in ink)

Date of Signature (mm/dd/yyyy)

## Part 15.  Additional Information

If you need extra space to provide any additional information within this petition, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this petition or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

1.  Family Name (Last Name)          Given Name (First Name)          Middle Name

2.  A-Number (if any)  ▶  A-

3.  **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

4.  **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

5.  **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

6.  **A.** Page Number    **B.** Part Number    **C.** Item Number

    **D.**

Appx-000300



# Application for Asylum and for Withholding of Removal

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-589**
OMB No. 1615-0067
Expires 09/30/2027

**START HERE - Type or print in black ink. See the instructions for information about eligibility and how to complete and file this application. There is no filing fee for this application.**

**NOTE:** ☐ Check this box if you also want to apply for withholding of removal under the Convention Against Torture.

## Part A.I.  Information About You

**1.** Alien Registration Number(s) (A-Number) *(if any)* | **2.** U.S. Social Security Number *(if any)* | **3.** USCIS Online Account Number *(if any)*

**4.** Complete Last Name | **5.** First Name | **6.** Middle Name

**7.** What other names have you used *(include maiden name and aliases)?*

**8.** Residence in the U.S. *(where you physically reside)*

Street Number and Name | Apt. Number

City | State | Zip Code | Telephone Number ( )

**(NOTE:** *You must be residing in the United States to submit this form.***)**

**9.** Mailing Address in the U.S. *(if different than the address in Item Number 8)*

In Care Of *(if applicable):* | Telephone Number ( )

Street Number and Name | Apt. Number

City | State | Zip Code

**10.** Sex ☐ Male ☐ Female | **11.** Marital Status: ☐ Single ☐ Married ☐ Divorced ☐ Widowed

**12.** Date of Birth *(mm/dd/yyyy)* | **13.** City and Country of Birth

**14.** Present Nationality *(Citizenship)* | **15.** Nationality at Birth | **16.** Race, Ethnic, or Tribal Group | **17.** Religion

**18.** *Check the box, a through c, that applies:* **a.** ☐ I have never been in Immigration Court proceedings.

**b.** ☐ I am now in Immigration Court proceedings. **c.** ☐ I am **not** now in Immigration Court proceedings, but I have been in the past.

**19.** *Complete 19 a through c.*

**a.** When did you last leave your country? *(mm/dd/yyyy)* _____ **b.** What is your current I-94 Number, if any? _____

**c.** List each entry into the U.S. beginning with your most recent entry. *List date (mm/dd/yyyy), place, and your status for each entry.* *(Attach additional sheets as needed.)*

Date _____ Place _____ Status _____ Date Status Expires _____

Date _____ Place _____ Status _____

Date _____ Place _____ Status _____

**20.** What country issued your last passport or travel document? | **21.** Passport Number / Travel Document Number | **22.** Expiration Date *(mm/dd/yyyy)*

**23.** What is your native language *(include dialect, if applicable)?* | **24.** Are you fluent in English? ☐ Yes ☐ No | **25.** What other languages do you speak fluently?

## Part A.II. Information About Your Spouse and Children

| For EOIR use only. | For USCIS use only. | Action:<br>Interview Date: _____<br>Asylum Officer ID No.: _____ | Decision:<br>Approval Date: _____<br>Denial Date: _____<br>Referral Date: _____ |
|---|---|---|---|

**Your spouse**      ☐ I am not married. (Skip to **Your Children** below.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Date of Birth (mm/dd/yyyy) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Other names used (include maiden name and aliases) |

| 9. Date of Marriage (mm/dd/yyyy) | 10. Place of Marriage | 11. City and Country of Birth |
|---|---|---|

| 12. Nationality (Citizenship) | 13. Race, Ethnic, or Tribal Group | 14. Sex    ☐ Male    ☐ Female |
|---|---|---|

**15. Is this person in the U.S.?**

☐ Yes (Complete Blocks 16 to 24.)    ☐ No (Specify location): _____

| 16. Place of last entry into the U.S. | 17. Date of last entry into the U.S. (mm/dd/yyyy) | 18. I-94 Number (if any) | 19. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 20. What is your spouse's current status? | 21. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 22. Is your spouse in Immigration Court proceedings?    ☐ Yes    ☐ No | 23. If previously in the U.S., date of previous arrival (mm/dd/yyyy) |

**24. If in the U.S., is your spouse to be included in this application?** (Check the appropriate box.)

☐ Yes

☐ No

**Your Children.** List **all** of your children, regardless of age, location, or marital status.

☐ I do not have any children. (Skip to Part A.III., Information about your background.)

☐ I have children.    Total number of children: _____ .

(**NOTE:** Use Form I-589 Supplement A or attach additional sheets of paper and documentation if you have more than four children.)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Sex    ☐ Male    ☐ Female |

**13. Is this child in the U.S. ?**    ☐ Yes (Complete Blocks 14 to 21.)    ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (if any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings?    ☐ Yes    ☐ No | |

**21. If in the U.S., is this child to be included in this application?** (Check the appropriate box.)

☐ Yes

☐ No

## Part A.II. Information About Your Spouse and Children (continued)

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Sex ☐ Male ☐ Female |

**13.** Is this child in the U.S. ? ☐ Yes (Complete Blocks 14 to 21.) ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (if any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

**21.** If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes
☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Sex ☐ Male ☐ Female |

**13.** Is this child in the U.S. ? ☐ Yes (Complete Blocks 14 to 21.) ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (if any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

**21.** If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes
☐ No

| 1. Alien Registration Number (A-Number) (if any) | 2. Passport/ID Card Number (if any) | 3. Marital Status (Married, Single, Divorced, Widowed) | 4. U.S. Social Security Number (if any) |
|---|---|---|---|
| 5. Complete Last Name | 6. First Name | 7. Middle Name | 8. Date of Birth (mm/dd/yyyy) |
| 9. City and Country of Birth | 10. Nationality (Citizenship) | 11. Race, Ethnic, or Tribal Group | 12. Sex ☐ Male ☐ Female |

**13.** Is this child in the U.S. ? ☐ Yes (Complete Blocks 14 to 21.) ☐ No (Specify location): _____

| 14. Place of last entry into the U.S. | 15. Date of last entry into the U.S. (mm/dd/yyyy) | 16. I-94 Number (if any) | 17. Status when last admitted (Visa type, if any) |
|---|---|---|---|
| 18. What is your child's current status? | 19. What is the expiration date of his/her authorized stay, if any? (mm/dd/yyyy) | 20. Is your child in Immigration Court proceedings? ☐ Yes ☐ No | |

**21.** If in the U.S., is this child to be included in this application? (Check the appropriate box.)
☐ Yes
☐ No

## Part A.III. Information About Your Background

1. List your last address where you lived before coming to the United States. If this is not the country where you fear persecution, also list the last address in the country where you fear persecution. *(List Address, City/Town, Department, Province, or State and Country.)*
   (**NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street *(Provide if available)* | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |

2. Provide the following information about your residences during the past 5 years.  List your present address first.
   (**NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Number and Street | City/Town | Department, Province, or State | Country | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

3. Provide the following information about your education, beginning with the most recent school that you attended.
   (**NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name of School | Type of School | Location *(Address)* | Attended From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

4. Provide the following information about your employment during the past 5 years.  List your present employment first.
   (**NOTE:** *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Name and Address of Employer | Your Occupation | Dates From *(Mo/Yr)* | To *(Mo/Yr)* |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

5. Provide the following information about your parents and siblings (brothers and sisters). Check the box if the person is deceased.
   (**NOTE**: *Use Form I-589 Supplement B, or additional sheets of paper, if necessary.)*

| Full Name | City/Town and Country of Birth | Current Location |
|---|---|---|
| *Mother* |  | ☐ Deceased |
| *Father* |  | ☐ Deceased |
| *Sibling* |  | ☐ Deceased |
| *Sibling* |  | ☐ Deceased |
| *Sibling* |  | ☐ Deceased |
| *Sibling* |  | ☐ Deceased |

Appx-000304

## Part B. Information About Your Application

*(**NOTE:** Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part B.)*

When answering the following questions about your asylum or other protection claim (withholding of removal under 241(b)(3) of the INA or withholding of removal under the Convention Against Torture), you must provide a detailed and specific account of the basis of your claim to asylum or other protection. To the best of your ability, provide specific dates, places, and descriptions about each event or action described. You must attach documents evidencing the general conditions in the country from which you are seeking asylum or other protection and the specific facts on which you are relying to support your claim. If this documentation is unavailable or you are not providing this documentation with your application, explain why in your responses to the following questions.

Refer to Instructions, Part 1: Filing Instructions, Section II, "Basis of Eligibility," Parts A - D, Section V, Completing the Form," Part B, and Section VII, "Additional Evidence That You Should Submit," for more information on completing this section of the form.

1. Why are you applying for asylum or withholding of removal under section 241(b)(3) of the INA, or for withholding of removal under the Convention Against Torture? Check the appropriate box(es) below and then provide detailed answers to questions A and B below.

   I am seeking asylum or withholding of removal based on:

   ☐ Race                    ☐ Political opinion

   ☐ Religion                ☐ Membership in a particular social group

   ☐ Nationality             ☐ Torture Convention

**A.** Have you, your family, or close friends or colleagues ever experienced harm or mistreatment or threats in the past by anyone?

   ☐ No            ☐ Yes

   If "Yes," explain in detail:
   1. What happened;
   2. When the harm or mistreatment or threats occurred;
   3. Who caused the harm or mistreatment or threats; and
   4. Why you believe the harm or mistreatment or threats occurred.

**B.** Do you fear harm or mistreatment if you return to your home country?

   ☐ No            ☐ Yes

   If "Yes," explain in detail:
   1. What harm or mistreatment you fear;
   2. Who you believe would harm or mistreat you; and
   3. Why you believe you would or could be harmed or mistreated.

Appx-000305

## Part B. Information About Your Application (continued)

**2.** Have you or your family members ever been accused, charged, arrested, detained, interrogated, convicted and sentenced, or imprisoned in any country other than the United States (including for an immigration law violation)?

☐ No          ☐ Yes

If "Yes," explain the circumstances and reasons for the action.

**3.A.** Have you or your family members ever belonged to or been associated with any organizations or groups in your home country, such as, but not limited to, a political party, student group, labor union, religious organization, military or paramilitary group, civil patrol, guerrilla organization, ethnic group, human rights group, or the press or media?

☐ No          ☐ Yes

If "Yes," describe for each person the level of participation, any leadership or other positions held, and the length of time you or your family members were involved in each organization or activity.

**3.B.** Do you or your family members continue to participate in any way in these organizations or groups?

☐ No          ☐ Yes

If "Yes," describe for each person your or your family members' current level of participation, any leadership or other positions currently held, and the length of time you or your family members have been involved in each organization or group.

**4.** Are you afraid of being subjected to torture in your home country or any other country to which you may be returned?

☐ No          ☐ Yes

If "Yes," explain why you are afraid and describe the nature of torture you fear, by whom, and why it would be inflicted.

Form I-589   Edition  01/20/25

Appx-000306

## Part C. Additional Information About Your Application

(**NOTE:** *Use Form I-589 Supplement B, or attach additional sheets of paper as needed to complete your responses to the questions contained in Part C.*)

1.  Have you, your spouse, your child(ren), your parents or your siblings ever applied to the U.S. Government for refugee status, asylum, or withholding of removal?

    ☐ No          ☐ Yes

    If "Yes," explain the decision and what happened to any status you, your spouse, your child(ren), your parents, or your siblings received as a result of that decision.  Indicate whether or not you were included in a parent or spouse's application.  If so, include your parent or spouse's A-number in your response.  If you have been denied asylum by an immigration judge or the Board of Immigration Appeals, describe any change(s) in conditions in your country or your own personal circumstances since the date of the denial that may affect your eligibility for asylum.

2.A.  After leaving the country from which you are claiming asylum, did you or your spouse or child(ren) who are now in the United States travel through or reside in any other country before entering the United States?

    ☐ No          ☐ Yes

2.B.  Have you, your spouse, your child(ren), or other family members, such as your parents or siblings, ever applied for or received any lawful status in any country other than the one from which you are now claiming asylum?

    ☐ No          ☐ Yes

    If "Yes" to either or both questions (2A and/or 2B), provide for each person the following: the name of each country and the length of stay, the person's status while there, the reasons for leaving, whether or not the person is entitled to return for lawful residence purposes, and whether the person applied for refugee status or for asylum while there, and if not, why he or she did not do so.

3.  Have you, your spouse or your child(ren) ever ordered, incited, assisted or otherwise participated in causing harm or suffering to any person because of his or her race, religion, nationality, membership in a particular social group or belief in a particular political opinion?

    ☐ No          ☐ Yes

    If "Yes," describe in detail each such incident and your own, your spouse's, or your child(ren)'s involvement.

## Part C. Additional Information About Your Application (continued)

**4.** After you left the country where you were harmed or fear harm, did you return to that country?

☐ No          ☐ Yes

If "Yes," describe in detail the circumstances of your visit(s) (for example, the date(s) of the trip(s), the purpose(s) of the trip(s), and the length of time you remained in that country for the visit(s).)

**5.** Are you filing this application more than 1 year after your last arrival in the United States?

☐ No          ☐ Yes

If "Yes," explain why you did not file within the first year after you arrived. You must be prepared to explain at your interview or hearing why you did not file your asylum application within the first year after you arrived. For guidance in answering this question, see Instructions, Part 1: Filing Instructions, Section V. "Completing the Form," Part C.

**6.** Have you or any member of your family included in the application ever committed any crime and/or been arrested, charged, convicted, or sentenced for any crimes in the United States (including for an immigration law violation)?

☐ No          ☐ Yes

If "Yes," for each instance, specify in your response: what occurred and the circumstances, dates, length of sentence received, location, the duration of the detention or imprisonment, reason(s) for the detention or conviction, any formal charges that were lodged against you or your relatives included in your application, and the reason(s) for release. Attach documents referring to these incidents, if they are available, or an explanation of why documents are not available.

Appx-000308

## Part D. Your Signature

I certify, under penalty of perjury under the laws of the United States of America, that this application and the evidence submitted with it are all true and correct.  Title 18, United States Code, Section 1546(a), provides in part: Whoever knowingly makes under oath, or as permitted under penalty of perjury under Section 1746 of Title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document containing any such false statement or which fails to contain any reasonable basis in law or fact - shall be fined in accordance with this title or imprisoned for up to 25 years.  I certify that I am physically present in the United States or seeking admission at a Port of Entry when I execute this application.  I authorize the release of any information from my immigration record that U.S. Citizenship and Immigration Services (USCIS) needs to determine eligibility for the benefit I am seeking.

**WARNING:  Applicants who are in the United States unlawfully are subject to removal if their asylum or withholding claims are not granted by an asylum officer or an immigration judge.  Any information provided in completing this application may be used as a basis for the institution of, or as evidence in, removal proceedings even if the application is later withdrawn.  Applicants determined to have knowingly made a frivolous application for asylum will be permanently ineligible for any benefits under the Immigration and Nationality Act.  You may not avoid a frivolous finding simply because someone advised you to provide false information in your asylum application.  If filing with USCIS, unexcused failure to appear for an appointment to provide biometrics (such as fingerprints) and your biographical information within the time allowed may result in an asylum officer dismissing your asylum application or referring it to an immigration judge.  Failure without good cause to provide DHS with biometrics or other biographical information while in removal proceedings may result in your application being found abandoned by the immigration judge.  See sections 208(d)(5)(A) and 208(d)(6) of the INA and 8 CFR sections 208.10, 1208.10, 208.20, 1003.47(d) and 1208.20.**

| Print your complete name. | Write your name in your native alphabet. |
|---|---|
|  |  |

Did your spouse, parent, or child(ren) assist you in completing this application?  ☐ No  ☐ Yes *(if "Yes," list the name and relationship.)*

_____  _____     _____  _____
         *(Name)*                    *(Relationship)*                    *(Name)*                    *(Relationship)*

Did someone other than your spouse, parent, or child(ren) prepare this application?     ☐ No   ☐ Yes *(if "Yes," complete Part E.)*

Asylum applicants may be represented by counsel.  Have you been provided with a list of persons who may be available to assist you, at little or no cost, with your asylum claim?     ☐ No   ☐ Yes

Signature of Applicant *(The person in Part. A.I.)*

➡ [ _____ ]          _____
         Sign your name so it all appears within the brackets                      Date (mm/dd/yyyy)

## Part E.  Declaration of Person Preparing Form, if Other Than Applicant, Spouse, Parent, or Child

I declare that I have prepared this application at the request of the person named in Part D, that the responses provided are based on all information of which I have knowledge, or which was provided to me by the applicant, and that the completed application was read to the applicant in his or her native language or a language he or she understands for verification before he or she signed the application in my presence. I am aware that the knowing placement of false information on the Form I-589 may also subject me to civil penalties under 8 U.S.C. 1324c and/or criminal penalties under 18 U.S.C. 1546(a).

| Signature of Preparer | Print Complete Name of Preparer | | |
|---|---|---|---|
| Daytime Telephone Number<br>(       ) | Address of Preparer: Street Number and Name | | |
| Apt. Number | City | State | Zip Code |

| **To be completed by an attorney or accredited representative** (if any). | ☐ **Select this box if Form G-28 is attached.** | **Attorney State Bar Number** (if applicable) | **Attorney or Accredited Representative USCIS Online Account Number** (if any) |
|---|---|---|---|
|  |  |  |  |

HR-1 FRN 2025 AR-000284

Appx-000309

## Part F. To Be Completed at Asylum Interview, if Applicable

**NOTE:** *You will be asked to complete this part when you appear for examination before an asylum officer of the Department of Homeland Security, U.S. Citizenship and Immigration Services (USCIS).*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered _____ to _____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Asylum Officer

## Part G. To Be Completed at Removal Hearing, if Applicable

**NOTE:** *You will be asked to complete this Part when you appear before an immigration judge of the U.S. Department of Justice, Executive Office for Immigration Review (EOIR), for a hearing.*

I swear (affirm) that I know the contents of this application that I am signing, including the attached documents and supplements, that they are ☐ all true or ☐ not all true to the best of my knowledge and that correction(s) numbered _____ to _____ were made by me or at my request. Furthermore, I am aware that if I am determined to have knowingly made a frivolous application for asylum I will be permanently ineligible for any benefits under the Immigration and Nationality Act, and that I may not avoid a frivolous finding simply because someone advised me to provide false information in my asylum application.

Signed and sworn to before me by the above named applicant on:

_____
Signature of Applicant

_____
Date *(mm/dd/yyyy)*

_____
Write Your Name in Your Native Alphabet

_____
Signature of Immigration Judge

Appx-000310



# Application for Asylum and for
# Withholding of Removal Supplement A

### Department of Homeland Security
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-589**
OMB No. 1615-0069
Expires 09/30/2027

| A-Number *(if available)* | Date |
|---|---|
| Applicant's Name | Applicant's Signature |

## List All of Your Children, Regardless of Age or Marital Status
*(NOTE: Use this form and attach additional pages and documentation as needed, if you have more than four children)*

| **1.** Alien Registration Number (A-Number) *(if any)* | **2.** Passport/ID Card Number *(if any)* | **3.** Marital Status *(Married, Single, Divorced, Widowed)* | **4.** U.S. Social Security Number *(if any)* |
|---|---|---|---|
| **5.** Complete Last Name | **6.** First Name | **7.** Middle Name | **8.** Date of Birth *(mm/dd/yyyy)* |
| **9.** City and Country of Birth | **10.** Nationality *(Citizenship)* | **11.** Race, Ethnic, or Tribal Group | **12.** Sex  ☐ Male  ☐ Female |

**13.** Is this child in the U.S. ? ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location):*

| **14.** Place of last entry into the U.S. | **15.** Date of last entry into the U.S. *(mm/dd/yyyy)* | **16.** I-94 Number *(if any)* | **17.** Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| **18.** What is your child's current status? | **19.** What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | **20.** Is your child in Immigration Court proceedings? ☐ Yes  ☐ No | |

**21.** If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes
☐ No

| **1.** Alien Registration Number (A-Number) *(if any)* | **2.** Passport/ID Card Number *(if any)* | **3.** Marital Status *(Married, Single, Divorced, Widowed)* | **4.** U.S. Social Security Number *(if any)* |
|---|---|---|---|
| **5.** Complete Last Name | **6.** First Name | **7.** Middle Name | **8.** Date of Birth *(mm/dd/yyyy)* |
| **9.** City and Country of Birth | **10.** Nationality *(Citizenship)* | **11.** Race, Ethnic, or Tribal Group | **12.** Sex  ☐ Male  ☐ Female |

**13.** Is this child in the U.S. ? ☐ Yes *(Complete Blocks 14 to 21.)*  ☐ No *(Specify location):*

| **14.** Place of last entry into the U.S. | **15.** Date of last entry into the U.S. *(mm/dd/yyyy)* | **16.** I-94 Number *(if any)* | **17.** Status when last admitted *(Visa type, if any)* |
|---|---|---|---|
| **18.** What is your child's current status? | **19.** What is the expiration date of his/her authorized stay, if any? *(mm/dd/yyyy)* | **20.** Is your child in Immigration Court proceedings? ☐ Yes  ☐ No | |

**21.** If in the U.S., is this child to be included in this application? *(Check the appropriate box.)*
☐ Yes
☐ No



# Application for Asylum and for
# Withholding of Removal Supplement B

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-589**
OMB No. 1615-0069
Expires 09/30/2027

## Additional Information About Your Claim to Asylum

| A-Number *(if available)* | Date |
|---|---|
| Applicant's Name | Applicant's Signature |

**NOTE:** *Use this as a continuation page for any additional information requested. Copy and complete as needed.*

**Part** _____

**Question** _____

HR-1 FRN 2025 AR-000287

**Appx-000312**



# Application For Employment Authorization

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-765**
OMB No. 1615-0040
Expires 09/30/2027

| For USCIS Use Only | ☐ Authorization/Extension Valid From _____  ☐ Authorization/Extension Valid Through _____ | Fee Stamp | Action Block |
|---|---|---|---|
| | **Alien Registration Number**  A- ☐☐☐☐☐☐☐☐☐ | | |
| | **Remarks** | | |

| **To be completed by an attorney or Board of Immigration Appeals (BIA)-accredited representative** (if any). | ☐ Select this box if Form G-28 is attached. | **Attorney or Accredited Representative USCIS Online Account Number** (if any) ☐☐☐☐☐☐☐☐☐☐☐☐☐ |
|---|---|---|

▶ **START HERE - Type or print in black ink.**

## Part 1.  Reason for Applying

**I am applying for** (select **only one** box):

**1.a.** ☐ Initial permission to accept employment.

**1.b.** ☐ Replacement of lost, stolen, or damaged employment authorization document, or correction of my employment authorization document **NOT DUE** to U.S. Citizenship and Immigration Services (USCIS) error.

**NOTE:** Replacement (correction) of an employment authorization document due to USCIS error does not require a new Form I-765 and filing fee.  Refer to **Replacement for Card Error** in the **What is the Filing Fee** section of the Form I-765 Instructions for further details.

**1.c.** ☐ Renewal of my permission to accept employment. (Attach a copy of your previous employment authorization document.)

## Part 2.  Information About You

### Your Full Legal Name

**1.a.** Family Name (Last Name) _____

**1.b.** Given Name (First Name) _____

**1.c.** Middle Name _____

### Other Names Used

Provide all other names you have ever used, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 6. Additional Information**.

**2.a.** Family Name (Last Name) _____

**2.b.** Given Name (First Name) _____

**2.c.** Middle Name _____

**3.a.** Family Name (Last Name) _____

**3.b.** Given Name (First Name) _____

**3.c.** Middle Name _____

**4.a.** Family Name (Last Name) _____

**4.b.** Given Name (First Name) _____

**4.c.** Middle Name _____

Appx-000313

## Part 2.  Information About You (continued)

### Your U.S. Mailing Address

**5.a.** In Care Of Name (if any)

**5.b.** Street Number and Name

**5.c.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**5.d.** City or Town

**5.e.** State [    ]   **5.f.** ZIP Code

**6.** Is your current mailing address the same as your physical address?   ☐ Yes   ☐ No

**NOTE:** If you answered "No" to **Item Number 6.**, provide your physical address below.

### U.S. Physical Address

**7.a.** Street Number and Name

**7.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**7.c.** City or Town

**7.d.** State [    ]   **7.e.** ZIP Code

### Other Information

**8.** Alien Registration Number (A-Number) (if any)

▶ A-

**9.** USCIS Online Account Number (if any)

▶

**10.** Sex   ☐ Male   ☐ Female

**11.** Marital Status
☐ Single   ☐ Married   ☐ Divorced   ☐ Widowed

**12.** Have you previously filed Form I-765?   ☐ Yes   ☐ No

**13.a.** Has the Social Security Administration (SSA) ever officially issued a Social Security card to you?   ☐ Yes   ☐ No

**NOTE:** If you answered "No" to **Item Number 13.a.**, skip to **Item Number 14.** If you answered "Yes" to **Item Number 13.a.**, provide the information requested in **Item Number 13.b.**

**13.b.** Provide your Social Security number (SSN) (if known).

▶

**14.** Do you want the SSA to issue you a Social Security card? (You must also answer "Yes" to **Item Number 15.**, **Consent for Disclosure**, to receive a card.)   ☐ Yes   ☐ No

**NOTE:** If you answered "No" to **Item Number 14.**, skip to **Part 2.**, **Item Number 18.a.** If you answered "Yes" to **Item Number 14.**, you must also answer "Yes" to **Item Number 15.**

**15.** **Consent for Disclosure:** I authorize disclosure of information from this application to the SSA as required for the purpose of assigning me an SSN and issuing me a Social Security card.   ☐ Yes   ☐ No

**NOTE:** If you answered "Yes" to **Item Numbers 14. - 15.**, provide the information requested in **Item Numbers 16.a. - 17.b.**

### Father's Name

Provide your father's birth name.

**16.a.** Family Name (Last Name)

**16.b.** Given Name (First Name)

### Mother's Name

Provide your mother's birth name.

**17.a.** Family Name (Last Name)

**17.b.** Given Name (First Name)

### Your Country or Countries of Citizenship or Nationality

List all countries where you are currently a citizen or national. If you need extra space to complete this item, use the space provided in **Part 6. Additional Information**.

**18.a.** Country

**18.b.** Country

## Part 2. Information About You (continued)

### Place of Birth

List the city/town/village, state/province, and country where you were born.

**19.a.** City/Town/Village of Birth

**19.b.** State/Province of Birth

**19.c.** Country of Birth

**20.** Date of Birth (mm/dd/yyyy)

### Information About Your Last Arrival in the United States

**21.a.** Form I-94 Arrival-Departure Record Number (if any)
▶

**21.b.** Passport Number of Your Most Recently Issued Passport

**21.c.** Travel Document Number (if any)

**21.d.** Country That Issued Your Passport or Travel Document

**21.e.** Expiration Date for Passport or Travel Document (mm/dd/yyyy)

**22.** Date of Your Last Arrival Into the United States, On or About (mm/dd/yyyy)

**23.** Place of Your Last Arrival Into the United States

**24.** Immigration Status at Your Last Arrival (for example, B-2 visitor, F-1 student, or no status)

**25.** Your Current Immigration Status or Category (for example, B-2 visitor, F-1 student, parolee, deferred action, or no status or category)

**26.** Student and Exchange Visitor Information System (SEVIS) Number (if any)
▶ N-

## Information About Your Eligibility Category

**27.** **Eligibility Category.** Refer to the **Who May File Form I-765** section of the Form I-765 Instructions to determine the appropriate eligibility category for this application. Enter the appropriate letter and number for your eligibility category below (for example, (a)(8), (c)(17)(iii)).
( ) ( ) ( )

**28.** **(c)(3)(C) STEM OPT Eligibility Category.** If you entered the eligibility category **(c)(3)(C)** in **Item Number 27.**, provide the information requested in **Item Numbers 28.a - 28.c.**

**28.a.** Degree

**28.b.** Employer's Name as Listed in E-Verify

**28.c.** Employer's E-Verify Company Identification Number or a Valid E-Verify Client Company Identification Number

**29.** **(c)(26) Eligibility Category.** If you entered the eligibility category (c)(26) in **Item Number 27.**, provide the receipt number of your H-1B spouse's most recent Form I-797 Notice for Form I-129, Petition for a Nonimmigrant Worker.
▶

**30.** **(c)(8) Eligibility Category.** If you entered the eligibility category (c)(8) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime?
☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 30.**, refer to **Special Filing Instructions for Those With Pending Asylum Applications (c)(8)** in the **Required Documentation** section of the Form I-765 Instructions for information about providing court dispositions.

**31.a.** **(c)(35) and (c)(36) Eligibility Category.** If you entered the eligibility category (c)(35) in **Item Number 27.**, please provide the receipt number of your Form I-797 Notice for Form I-140, Immigrant Petition for Alien Worker. If you entered the eligibility category (c)(36) in **Item Number 27.**, please provide the receipt number of your spouse's or parent's Form I-797 Notice for Form I-140.
▶

**31.b.** If you entered the eligibility category (c)(35) or (c)(36) in **Item Number 27.**, have you **EVER** been arrested for and/or convicted of any crime?
☐ Yes ☐ No

**NOTE:** If you answered "Yes" to **Item Number 31.b.**, refer to **Employment-Based Nonimmigrant Categories**, **Items 8. - 9.**, in the **Who May File Form I-765** section of the Form I-765 Instructions for information about providing court dispositions.

## Part 3. Applicant's Statement, Contact Information, Declaration, Certification, and Signature

**NOTE:** Read the **Penalties** section of the Form I-765 Instructions before completing this section. You must file Form I-765 while in the United States.

### Applicant's Statement

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.** If applicable, select the box for **Item Number 2.**

**1.a.** ☐ I can read and understand English, and I have read and understand every question and instruction on this application and my answer to every question.

**1.b.** ☐ The interpreter named in **Part 4.** read to me every question and instruction on this application and my answer to every question in

[_____],

a language in which I am fluent, and I understood everything.

**2.** ☐ At my request, the preparer named in **Part 5.**,

[_____],

prepared this application for me based only upon information I provided or authorized.

### Applicant's Contact Information

**3.** Applicant's Daytime Telephone Number

[_____]

**4.** Applicant's Mobile Telephone Number (if any)

[_____]

**5.** Applicant's Email Address (if any)

[_____]

**6.** ☐ Select this box if you are a Salvadoran or Guatemalan national eligible for benefits under the ABC settlement agreement.

### Applicant's Declaration and Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for the immigration benefit that I seek.

I furthermore authorize release of information contained in this application, in supporting documents, and in my USCIS records, to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, if I am required to provide biometrics, I will be required to sign an oath reaffirming that:

1) I reviewed and understood all of the information contained in, and submitted with, my application; and

2) All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that all of the information in my application and any document submitted with it were provided or authorized by me, that I reviewed and understand all of the information contained in, and submitted with, my application and that all of this information is complete, true, and correct.

### Applicant's Signature

**7.a.** Applicant's Signature

➡ [_____]

**7.b.** Date of Signature (mm/dd/yyyy)  [_____]

**NOTE TO ALL APPLICANTS:** If you do not completely fill out this application or fail to submit required documents listed in the Instructions, USCIS may deny your application.

## Part 4. Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### Interpreter's Full Name

**1.a.** Interpreter's Family Name (Last Name)

[_____]

**1.b.** Interpreter's Given Name (First Name)

[_____]

**2.** Interpreter's Business or Organization Name (if any)

[_____]

HR-1 FRN 2025 AR-000291

Appx-000316

## Part 4. Interpreter's Contact Information, Certification, and Signature

### Interpreter's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**3.c.** City or Town

**3.d.** State

**3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Interpreter's Contact Information

**4.** Interpreter's Daytime Telephone Number

**5.** Interpreter's Mobile Telephone Number (if any)

**6.** Interpreter's Email Address (if any)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and _____, which is the same language specified in **Part 3.**, **Item Number 1.b.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question. The applicant informed me that he or she understands every instruction, question, and answer on the application, including the **Applicant's Declaration and Certification**, and has verified the accuracy of every answer.

### Interpreter's Signature

**7.a.** Interpreter's Signature

**7.b.** Date of Signature (mm/dd/yyyy)

## Part 5. Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.** Preparer's Family Name (Last Name)

**1.b.** Preparer's Given Name (First Name)

**2.** Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.a.** Street Number and Name

**3.b.** ☐ Apt. ☐ Ste. ☐ Flr.

**3.c.** City or Town

**3.d.** State

**3.e.** ZIP Code

**3.f.** Province

**3.g.** Postal Code

**3.h.** Country

### Preparer's Contact Information

**4.** Preparer's Daytime Telephone Number

**5.** Preparer's Mobile Telephone Number (if any)

**6.** Preparer's Email Address (if any)

---

Form I-765   Edition   01/20/25

HR-1 FRN 2025 AR-000292

Page 5 of 7

Appx-000317

## Part 5.  Contact Information, Declaration, and Signature of the Person Preparing this Application, If Other Than the Applicant (continued)

### Preparer's Statement

7.a. ☐ I am not an attorney or accredited representative but have prepared this application on behalf of the applicant and with the applicant's consent.

7.b. ☐ I am an attorney or accredited representative and my representation of the applicant in this case ☐ extends ☐ does not extend beyond the preparation of this application.

   **NOTE:**  If you are an attorney or accredited representative, you may need to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, with this application.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant.  The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Declaration and Certification**, and that all of this information is complete, true, and correct.  I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

### Preparer's Signature

8.a. Preparer's Signature

8.b. Date of Signature (mm/dd/yyyy)

**Appx-000318**

## Part 6. Additional Information

If you need extra space to provide any additional information within this application, use the space below. If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper. Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name (Last Name)

**1.b.** Given Name (First Name)

**1.c.** Middle Name

**2.** A-Number (if any) ▶ A-

**3.a.** Page Number

**3.b.** Part Number

**3.c.** Item Number

**3.d.**

**4.a.** Page Number

**4.b.** Part Number

**4.c.** Item Number

**4.d.**

**5.a.** Page Number

**5.b.** Part Number

**5.c.** Item Number

**5.d.**

**6.a.** Page Number

**6.b.** Part Number

**6.c.** Item Number

**6.d.**

**7.a.** Page Number

**7.b.** Part Number

**7.c.** Item Number

**7.d.**

Appx-000319



# Application for Temporary Protected Status

**Department of Homeland Security**
U.S. Citizenship and Immigration Services

**USCIS**
**Form I-821**
OMB No. 1615-0043
Expires 02/28/2027

| For USCIS Use Only | | |
|---|---|---|
| **Receipt** | **Action Block** | **Case ID:** |
| | | **A-Number:** |
| | | **Returned:** |
| | | **Resubmitted:** |
| | | **Relocated:** |
| **Remarks** | | **Received:** |
| | | **Sent:** |

| To be completed by an Attorney or Accredited Representative (if any). | ☐ Select this box if Form G-28 or G-28I is attached. | Attorney State Bar Number (if applicable) | Attorney or Accredited Representative USCIS Online Account Number (if any) |
|---|---|---|---|

► **START HERE - Type or print in black ink.**

## Part 1.  Type of Application (select one)

**NOTE:** Select the box for **Item Number 1.a.**, **1.b.**, or **2.** If applicable, select the box for **Item Number 3.a.** or **3.b.** For **Item Number 4.**, enter the name of the designated TPS country.

**1.a.** ☐ This is my initial (first time) application for Temporary Protected Status (TPS).  I do not currently have TPS.

**1.b.** ☐ This is my re-registration application for TPS.  I currently have TPS, and am applying to re-register.

    **NOTE:** If you have previously applied or have a pending application for TPS, but do not currently have TPS, select **Item Number 1.a.** and describe each time that you previously applied, including the receipt number (if available) and the outcome (if any) of each application.  If you currently have a pending TPS application, please also describe when you filed it and the application receipt number (if available) in **Part 11. Additional Information**.  If you do not recall or have incomplete information on your prior TPS applications, please provide the information you can, even if incomplete.

**2.** If you selected **Item Number 1.b.**, please indicate who granted you TPS.

    ☐ USCIS

    ☐ Immigration Judge/Board of Immigration Appeals

**Are you also filing a request for employment authorization?**

**3.a.** ☐ Yes, I am requesting an Employment Authorization Document (EAD), and I am filing Form I-765, Application for Employment Authorization, together with my Form I-821.

**3.b.** ☐ No, I am not currently requesting an EAD.

**4.** Name of designated TPS country under which you are applying.

## Part 2.  Information About You

### Your Full Name

**1.a.** Family Name (Last Name)

**1.b.** Given Name (First Name)

**1.c.** Middle Name

HR-1 FRN 2025 AR-000295

**Appx-000320**

## Part 2.  Information About You (continued)

### Other Names Used

Provide all other names you have used since birth, including aliases, maiden name, and nicknames.  If you need extra space to complete this section, use the space provided in **Part 11. Additional Information**.

**2.a.** Family Name (Last Name)

**2.b.** Given Name (First Name)

**2.c.** Middle Name

**3.a.** Family Name (Last Name)

**3.b.** Given Name (First Name)

**3.c.** Middle Name

### U.S. Mailing Address

**4.a.** In Care Of Name

**4.b.** Street Number and Name

**4.c.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**4.d.** City or Town

**4.e.** State

**4.f.** ZIP Code

**5.** Is your current mailing address the same as your physical address (where you live)?   ☐ Yes   ☐ No

If you answered "No" to **Item Number 5.**, please provide your physical address below.

### U.S. Physical Address

**6.a.** Street Number and Name

**6.b.** ☐ Apt.   ☐ Ste.   ☐ Flr.

**6.c.** City or Town

**6.d.** State

**6.e.** ZIP Code

### Other Information

**7.** Alien Registration Number (A-Number) (if any)
► A-

**8.** USCIS Online Account Number (if any)
►

**9.** U.S. Social Security Number (if any)
►

**10.** Date of Birth (mm/dd/yyyy)

### Other Dates of Birth Used (if any)

Provide all other dates of birth you have ever used.  If you need extra space to complete this section, use the space provided in **Part 11. Additional Information**.

**11.a.** Other Date of Birth (mm/dd/yyyy)

**11.b.** Other Date of Birth (mm/dd/yyyy)

**12.** Sex   ☐ Male   ☐ Female

**13.** City/Town/Village of Birth

**14.** Country of Birth

Countries of Residence (Before entering the U.S.)

**15.a.**

**15.b.**

**15.c.**

**15.d.**

Country or Countries of Citizenship or Nationality (if any) (List all countries that apply.)

**16.a.**

**16.b.**

**16.c.**

**16.d.**

### Your Marital Information

**17.** Current Marital Status (Select **only one** box)

☐ Single, Never Married   ☐ Married

☐ Divorced   ☐ Widowed

☐ Separated   ☐ Marriage Annulled

☐ Other

Appx-000321

## Part 2. Information About You (continued)

**18.** Date of Current Marriage (if currently married) (mm/dd/yyyy)

### U.S. Entry Information

**19.** Date of Last Entry into the United States (mm/dd/yyyy)

**20.** Immigration Status (or Lack of Status) When You Last Entered the United States (for example, visitor, student, no status)

Place of Last Entry into the United States

**21.** U.S. Port of Entry (if any)

**22.a.** City or Town

**22.b.** State

**23.** Form I-94 Arrival-Departure Record Number (if any)

▶

**24.** Date Your Authorized Period of Stay in the United States Expired or Will Expire (as shown on Form I-94 or Crewman's Landing Permit (Form I-95)) (mm/dd/yyyy or duration of status (D/S)

**25.** Passport Number (most recent passport) (if any) (If you have other expired or valid passports, please list all of them and provide all information requested below about each passport.)

**26.** Travel Document Number (if any)

**27.** Additional Passport or Travel Document Number

**28.** Additional Passport or Travel Document Number

**29.** Country of Issuance for most recent Passport or Travel Document

**30.** Expiration Date for most recent Passport or Travel Document (mm/dd/yyyy)

### Your Current Immigration Status

**31.** Current Immigration Status or Lack of Status

**32.** Are you now or were you **EVER** in immigration proceedings?  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 32.**, provide the following information.

Type of Proceedings (Select all boxes that apply):

**33.a.** ☐ Immigration Court (before an Immigration Judge)

**33.b.** ☐ Board of Immigration Appeals (BIA)

**33.c.** ☐ I am no longer in Department of Justice (DOJ) or Department of Homeland Security (DHS) immigration proceedings, but I am or was in Federal court proceedings regarding immigration issues.

**34.** Locations Where Your DOJ and/or DHS Proceedings were Held (or are currently being held) (if applicable)

**35.** Locations Where Your Federal Court Proceedings Regarding Immigration Issues were Held (or are currently being held) (if applicable)

Dates for Your Proceedings

**NOTE:** If your proceedings are ongoing, leave the "To" date blank. If you have been in more than one type of proceedings, or in Federal Court, list dates for each time period.

**36.a.** From (mm/dd/yyyy)

**36.b.** To (mm/dd/yyyy)

**36.c.** ☐ Present

## Part 3. Biographic Information

**1.** Ethnicity (Select **only one** box)

☐ Hispanic or Latino

☐ Not Hispanic or Latino

**2.** Race (Select **all applicable** boxes)

☐ White

☐ Asian

☐ Black or African American

☐ American Indian or Alaska Native

☐ Native Hawaiian or Other Pacific Islander

**Appx-000322**

## Part 3.  Biographic Information (continued)

3.    Height    Feet [    ]    Inches [    ]

4.    Weight    Pounds [  ][  ][  ]

5.    Eye Color (Select **only one** box)

☐ Black    ☐ Blue    ☐ Brown

☐ Gray    ☐ Green    ☐ Hazel

☐ Maroon    ☐ Pink

☐ Unknown/Other

6.    Hair Color (Select **only one** box)

☐ Bald (No hair)    ☐ Black    ☐ Blond

☐ Brown    ☐ Gray    ☐ Red

☐ Sandy    ☐ White

☐ Unknown/Other

## Part 4.  Information About Your Current Spouse (if any)

Complete this section only if you are filing a **late initial** application for TPS.  See the form instructions for information on requirements for late initial filing for TPS.  If you need extra space to complete this section on all former spouses and all of your children, please use the space provided in **Part 11. Additional Information**.

Provide the following information about your current spouse (if married).

1.    USCIS Online Account Number (if any and if known)

▶ [                    ]

2.    A-Number (if any and if known)

▶ A- [                ]

3.a.    Family Name (Last Name) [                ]

3.b.    Given Name (First Name) [                ]

3.c.    Middle Name [                ]

## Mailing Address of Spouse

4.a.    Street Number and Name [                ]

4.b.    ☐ Apt.    ☐ Ste.    ☐ Flr. [                ]

4.c.    City or Town [                ]

4.d.    State [    ]    4.e.    ZIP Code [                ]

4.f.    Province [                ]

4.g.    Postal Code [                ]

4.h.    Country [                ]

## Other Information About Your Current Spouse

5.    Your Spouse's Date of Birth (mm/dd/yyyy) [                ]

6.    Date of Marriage to Your Current Spouse (mm/dd/yyyy) [                ]

7.    Place of Marriage to Your Current Spouse [                ]

8.a.    City or Town [                ]

8.b.    State [    ]

8.c.    Province (if any) [                ]

8.d.    Country [                ]

9.    If you know, has your current spouse **EVER** had TPS?

☐ Yes    ☐ No

If yes, what dates did he or she have TPS?

10.a.    From (mm/dd/yyyy) [                ]

10.b.    To (mm/dd/yyyy) [                ]

10.c.    ☐ Present

10.d.    ☐ I do not know the dates

11.    Is your spouse's TPS still valid? (if known)

☐ Yes    ☐ No    ☐ I Do Not Know

Appx-000323

## Part 5. Information About Your Former Spouses (if any)

Complete this section only if you are filing a **late initial** application for TPS. See the form instructions for information on requirements for late initial filing for TPS. If you need extra space to complete this section on all former spouses or all of your children, please use the space provided in **Part 11. Additional Information.**

### Names of All Your Former Spouses (if any)

**First Marriage**

**1.a.** Family Name (Last Name)

**1.b.** Given Name (First Name)

**1.c.** Middle Name

**2.** Nationalities of Former Spouse

**3.** A-Number of Former Spouse (if any and if known)

▶ A-

**4.** Date of Birth of Former Spouse (mm/dd/yyyy)

**5.** Date of Death if Former Spouse Deceased (mm/dd/yyyy)

Dates of Marriage to Former Spouse

**6.a.** From (mm/dd/yyyy)

**6.b.** To (mm/dd/yyyy)

**7.** How Marriage Ended (for example, divorce, widowed, annulled)

**8.** Did or does this former spouse have TPS (if known)?
☐ Yes  ☐ No  ☐ I Do Not Know

If yes, what dates did he or she have TPS (if known)?

**9.a.** From (mm/dd/yyyy)

**9.b.** To (mm/dd/yyyy)

**9.c.** ☐ Present

**9.d.** ☐ I do not know the dates

**10.** Is this former spouse currently applying for or re-registering for TPS (if known)?
☐ Yes  ☐ No  ☐ I Do Not Know

**Second Marriage**

**11.a.** Family Name (Last Name)

**11.b.** Given Name (First Name)

**11.c.** Middle Name

**12.** Nationalities of Former Spouse

**13.** A-Number of Former Spouse (if any and if known)

A-

**14.** Date of Birth of Former Spouse (mm/dd/yyyy)

**15.** Date of Death if Former Spouse Deceased (mm/dd/yyyy)

Dates of Marriage to Former Spouse

**16.a.** From (mm/dd/yyyy)

**16.b.** To (mm/dd/yyyy)

**17.** How Marriage Ended (for example, divorce, widowed, annulled)

**18.** Did or does this former spouse have TPS (if known)?
☐ Yes  ☐ No  ☐ I Do Not Know

If yes, what dates did he or she have TPS (if known)?

**19.a.** From (mm/dd/yyyy)

**19.b.** To (mm/dd/yyyy)

**19.c.** ☐ Present

**19.d.** ☐ I do not know the dates

**20.** Is this former spouse currently applying for or re-registering for TPS (if known)?
☐ Yes  ☐ No  ☐ I Do Not Know

## Part 6. Information About Your Children (if any)

Complete this section only if you are filing a **late initial** application for TPS. See the form instructions for information on requirements for late initial filing for TPS. If you need extra space to complete this section on all former spouses or all of your children, please use the space provided in **Part 11. Additional Information**.

Provide the following information about each of your children (if any). If you need extra space to complete this section, use the space provided in **Part 11. Additional Information**.

**Child 1**

1.a.  Family Name (Last Name)

1.b.  Given Name (First Name)

1.c.  Middle Name

2.  USCIS Online Account Number (if any and if known)
    ▶

3.  Alien Registration Number (A-Number) (if any and if known)
    ▶ A-

4.  Date of Birth (mm/dd/yyyy)

### Mailing Address

5.a.  Street Number and Name

5.b.  ☐ Apt.  ☐ Ste.  ☐ Flr.

5.c.  City or Town

5.d.  State          5.e.  ZIP Code

5.f.  Province

5.g.  Postal Code

5.h.  Country

If this child has or had TPS, please provide the dates of his or her TPS (if known).

6.a.  From (mm/dd/yyyy)

6.b.  To (mm/dd/yyyy)

7.  If you know, is this child currently applying for or re-registering for TPS (if known)?    ☐ Yes  ☐ No

**Child 2**

8.a.  Family Name (Last Name)

8.b.  Given Name (First Name)

8.c.  Middle Name

9.  USCIS Online Account Number (if any and if known)
    ▶

10.  Alien Registration Number (A-Number) (if any and if known)
    ▶ A-

11.  Date of Birth (mm/dd/yyyy)

### Mailing Address

12.a.  Street Number and Name

12.b.  ☐ Apt.  ☐ Ste.  ☐ Flr.

12.c.  City or Town

12.d.  State          12.e.  ZIP Code

12.f.  Province

12.g.  Postal Code

12.h.  Country

If this child has or had TPS, please provide the dates of his or her TPS (if known).

13.a.  From (mm/dd/yyyy)

13.b.  To (mm/dd/yyyy)

14.  If you know, is this child currently applying for or re-registering for TPS (if known)?    ☐ Yes  ☐ No

## Part 7. Eligibility Standards

### Basis for Eligibility

Provide the following information:

1.a.  I am a national of (or a person having no nationality who last habitually resided in the country of):

Appx-000325

## Part 7. Eligibility Standards) (continued)

**1.b.** I entered the United States on the following date, and have resided in the United States since that time.

(mm/dd/yyyy) [_____]

**1.c.** Have you **EVER** traveled to and entered another country, other than the one listed in **Item Number 1.a.** before you last entered the United States?  ☐ Yes  ☐ No

If you answered "Yes" to **Item Number 1.c.**, provide the information requested in **Item Numbers 2. - 5.** for **EACH** country you traveled to and entered prior to entering the United States. If you need extra space to complete this section, use the space provided in **Part 11. Additional Information**.

**2.** Name of All the Other Countries to Which You Traveled and Entered Prior to Entering the United States

[_____]

Dates That You Were in the Other Country or Countries

**3.a.** From (mm/dd/yyyy) [_____]

**3.b.** To (mm/dd/yyyy) [_____]

**4.** Your Immigration Status, if Any, in the Other Country (for example, citizen, legal permanent resident, refugee, asylee, visitor, student, temporary resident, or no status)

[_____]

**5.** Have you **EVER** been offered any immigration status by another country that you did not accept?  ☐ Yes  ☐ No

**6.** If you answered "Yes" to **Item Number 5.**, please describe the country or countries, the nature of the immigration status you were offered, and the dates when it was offered.

**7.** If you answered "Yes" to **Item Number 5.**, please describe why you chose not to accept the immigration status offered to you by the other country or countries.

## Your Immigration and Criminal History

To be eligible for TPS, you must be **admissible** as an immigrant to the United States, with certain exceptions. The questions below and your responses to these questions will help USCIS determine if you are eligible for TPS. See the **Who Is Eligible for TPS** section of the Instructions for additional information on admissibility and available waivers.

If any of the questions apply to you, please provide information about the events, including the places and dates of occurrence. Provide a full explanation of the circumstances related to the specific event. If you need additional space to respond to a question, use the space provided in **Part 11. Additional Information**.

## Criminal Offenses

If you were **EVER** arrested or detained for an offense, you must provide information about the event regardless of the country where the event occurred. If you were arrested, charged, or convicted for an offense, you must provide certified court dispositions showing the court proceedings' outcome wherever possible. You also must provide copies of arrest reports, statements of charges, indictment information, or any other charging document issued against you. If you were not charged with any crime or offense, provide a statement or other documentation from the arresting authority or prosecutor's office to show that you were not charged with any crime or offense.

**NOTE:** If you are not able to provide the documentation requested above, provide a signed statement as to why you cannot provide such documentation. USCIS usually needs supporting documentation, however, we do recognize that country conditions in certain TPS-designated countries may not allow an applicant to obtain the documents. Each statement will be carefully reviewed by USCIS, and we may need to ask you for additional information.

Please carefully read **Item 6.** in the **General Requirements** section of the Instructions for additional information that you must provide if official documents regarding your criminal history are not available to you.

## Human Rights Violations

If you have ever engaged in, ordered, incited, assisted, or otherwise participated in any human rights violations, you must provide information about the events, including the place and date, and a description of the event regardless of the country where the events occurred.

Have you **EVER** been convicted of:

**8.a.** Any felony committed in the United States?  ☐ Yes  ☐ No

**8.b.** Any misdemeanor committed in the United States?  ☐ Yes  ☐ No

Appx-000326

## Part 7. Eligibility Standards (continued)

**8.c.** Any particularly serious crime committed either in or outside the United States? ☐ Yes ☐ No

**9.a.** Have you **EVER** ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion? ☐ Yes ☐ No

**9.b.** Have you **EVER** committed serious nonpolitical crimes outside of the United States prior to your arrival in the United States? ☐ Yes ☐ No

**9.c.** Have you **EVER** or are you **NOW** engaged in activities that could be reasonable grounds for concluding that you are a danger to the security of the United States? ☐ Yes ☐ No

Have you **EVER** been convicted of or have you **EVER** committed acts which constitute the essential elements of:

**10.a.** A crime (other than a purely political offense)? ☐ Yes ☐ No

**10.b.** A violation of any law relating to a controlled substance as defined in section 102 of the Controlled Substances Act? ☐ Yes ☐ No

**10.c.** A conspiracy to violate any law relating to a controlled substance as defined in section 102 of the Controlled Substances Act? ☐ Yes ☐ No

**11.** Have you **EVER** been convicted of two or more criminal offenses (other than purely political offenses) for which you received sentences to confinement that, when combined, total five years or more? ☐ Yes ☐ No

**12.a.** Have you **EVER** trafficked in or are you **NOW** trafficking in any controlled substance? ☐ Yes ☐ No

**12.b.** Are you **NOW** or have you **EVER** knowingly assisted, abetted, conspired, or colluded with others in the unlawful trafficking of any controlled substance? ☐ Yes ☐ No

**12.c.** Are you the spouse or child of an alien who unlawfully trafficked in any controlled substance? ☐ Yes ☐ No

**12.d.** Are you the spouse or child of an alien who assisted, abetted, conspired, or colluded with others in the unlawful trafficking of any controlled substance? ☐ Yes ☐ No

**12.e.** Within the previous five years, have you **EVER** obtained any financial or other benefit from the unlawful activity of your spouse (including former spouses) or parents, and you knew, or reasonably should have known, that the financial or other benefit was the product of such illicit activity? ☐ Yes ☐ No

Have you **EVER** engaged, or do you plan to engage, solely, principally, or incidentally, in any of the following:

**13.a.** Any activity to violate any law of the United States relating to espionage or sabotage? ☐ Yes ☐ No

**13.b.** Any activity to violate or evade any law prohibiting the export from the United States of goods, technology, or sensitive information? ☐ Yes ☐ No

**13.c.** Any other unlawful activity in the United States? ☐ Yes ☐ No

**13.d.** Any activity in which a purpose is to oppose, control, or overthrow the Government of the United States by force, violence, or other unlawful means, including but not limited to participating in such activities, giving support to others involved in such activities, or being a member or representative of a terrorist organization? ☐ Yes ☐ No

**14.a.** Have you **EVER** or are you **NOW** engaged in terrorist activities? ☐ Yes ☐ No

**14.b.** Have you **EVER** or are you **NOW** engaged in or plan to engage in activities in the United States that would have potentially serious adverse foreign policy consequences for the United States? ☐ Yes ☐ No

**14.c.** Have you **EVER** been or are you **NOW** a member of the Communist or other totalitarian party, except when membership was involuntary? ☐ Yes ☐ No

**14.d.** Have you **EVER** participated in Nazi persecution or genocide? ☐ Yes ☐ No

Have you **EVER, whether in the United States or any other country** been:

**15.a.** Arrested, for breaking or violating any law or ordinance, excluding minor traffic violations? ☐ Yes ☐ No

**15.b.** Cited, charged, or indicted, for breaking or violating any law or ordinance, excluding minor traffic violations? ☐ Yes ☐ No

**15.c.** Been convicted, fined, imprisoned, placed on probation, received a suspended sentence or deferral of adjudication for breaking or violating any law or ordinance, excluding minor traffic violations? ☐ Yes ☐ No

Appx-000327

## Part 7. Eligibility Standards (continued)

**16.** Have you **EVER** been the beneficiary of a pardon, amnesty, rehabilitation decree, other act of clemency, or similar action? ☐ Yes ☐ No

**17.** Have you **EVER** committed a serious criminal offense in the United States and asserted immunity from prosecution? ☐ Yes ☐ No

**18.a.** Have you **EVER,** within the past 10 years, or are you **NOW** engaged in prostitution or procurement of prostitution? ☐ Yes ☐ No

**18.b.** Have you **EVER**, within the past 10 years (either directly or indirectly) procured or attempted to procure or import prostitutes or persons for the purpose of prostitution? ☐ Yes ☐ No

**18.c.** Have you **EVER**, within the past 10 years, received, in whole or in part, the proceeds of prostitution? ☐ Yes ☐ No

**19.** Have you **EVER** been or do you intend to be involved in any other commercial vice? ☐ Yes ☐ No

**20.a.** Have you **EVER** been ordered removed, and been deported from the United States? ☐ Yes ☐ No

**20.b.** Have you **EVER** voluntarily departed the United States under an order of removal? ☐ Yes ☐ No

**20.c.** If you answered "Yes" to either **Item Number 20.a.** or **20.b.** above, have you re-entered the United States unlawfully at any time after you were deported or you voluntarily departed? ☐ Yes ☐ No

**20.d.** If you answered "Yes" to **Item Number 20.c.** above, has DHS reinstated your prior order of removal? ☐ Yes ☐ No ☐ I Do Not Know

**20.e.** Have you **EVER** failed to attend or remain in attendance at any immigration proceedings to determine your admissibility or deportability? ☐ Yes ☐ No

**21.** Have you **EVER**, by fraud or willfully misrepresenting a material fact, sought to obtain a visa or other documentation, admission to the United States, or any other immigration benefit? ☐ Yes ☐ No

**22.** Have you **EVER** assisted any other person to enter the United States in violation of the law? ☐ Yes ☐ No

**23.a.** Do you **NOW** have a communicable disease of public health significance? ☐ Yes ☐ No

**23.b.** Do you **NOW** have or have you **EVER** had a physical or mental disorder and behavior (or a history of behavior that is likely to recur) associated with the disorder which has posed or may pose a threat to the property, safety, or welfare of yourself or others? ☐ Yes ☐ No

**23.c.** Are you **NOW** or have you **EVER** been a drug abuser or drug addict? ☐ Yes ☐ No

**24.** Have you **EVER** entered the United States as a stowaway? ☐ Yes ☐ No

**25.** Did the former Immigration and Naturalization Service (INS) **EVER** impose, or has DHS **EVER** imposed, civil monetary penalties on you for producing or using false documentation to obtain an immigration benefit? ☐ Yes ☐ No

**26.** Are you **NOW** subject to a final order for violation of section 274C (producing and/or using false documentation to unlawfully satisfy a requirement of the Immigration and Nationality Act)? ☐ Yes ☐ No

**27.** Do you **NOW** practice polygamy? ☐ Yes ☐ No

**28.** Are you **NOW** the guardian of, and are you accompanying, another individual who has been found to be inadmissible and who has been certified by a medical examiner to be helpless due to sickness, physical or mental disability, or infancy? ☐ Yes ☐ No

**29.** Have you **EVER** detained, retained, or withheld the custody of a child having a lawful claim to U.S. citizenship, outside the United States, from a U.S. citizen granted custody? ☐ Yes ☐ No

Have you **EVER** ordered, incited, called for, committed, assisted, helped with, or otherwise participated in any of the following:

**30.a.** Acts involving torture or genocide? ☐ Yes ☐ No

**30.b.** Killing any person? ☐ Yes ☐ No

**30.c.** Intentionally and severely injuring any person? ☐ Yes ☐ No

**30.d.** Engaging in any kind of sexual contact or relations with any person who was being forced or threatened? ☐ Yes ☐ No

**30.e.** Limiting or denying any person's ability to exercise religious beliefs? ☐ Yes ☐ No

Form I-821   Edition   01/20/25    HR-1 FRN 2025 AR-000303    Page 9 of 13

Appx-000328

## Part 7. Eligibility Standards (continued)

Have you **EVER:**

**31.a.** Served in, been a member of, assisted in, or participated in any military unit, paramilitary unit, police unit, self-defense unit, vigilante unit, rebel group, guerrilla group, militia, or insurgent organization? ☐ Yes ☐ No

**31.b.** Served or worked in any prison, jail, prison camp, detention facility, labor camp, or any other situation that involved detaining persons? ☐ Yes ☐ No

**32.** Have you **EVER** been a member of, assisted in, or participated in any group, unit, or organization of any kind in which you or other persons used any type of weapon against any person or threatened to do so? ☐ Yes ☐ No

**33.** Have you **EVER** assisted with or participated in selling or providing weapons to any person who to your knowledge used them against another person, or in transporting weapons to any person who to your knowledge used them against another person? ☐ Yes ☐ No

**34.** Have you **EVER** received any type of military, paramilitary, or weapons training? ☐ Yes ☐ No

**35.** Have you **EVER** unlawfully voted in a United States Federal, state, or local election? ☐ Yes ☐ No

**36.** Have you **EVER** claimed to be a U. S. citizen (in writing or in any other way)? ☐ Yes ☐ No

**37.a.** Have you **EVER** recruited, enlisted, conscripted, or used any person under 15 years of age to serve in or help an armed force or group? ☐ Yes ☐ No

**37.b.** Have you **EVER** used any person under 15 years of age to take part in hostilities or to help or provide services to people in combat? ☐ Yes ☐ No

**38.a.** Have you **EVER** committed or conspired to commit human trafficking offenses, as defined in the section 103 of the Victims of Trafficking and Violence Protection Act of 2000, in the United States or outside the United States? ☐ Yes ☐ No

**38.b.** Have you **EVER** knowingly aided, abetted, assisted, conspired, or colluded with a human trafficker? ☐ Yes ☐ No

**38.c.** Are you **NOW** the spouse or child of an alien who committed or conspired to commit human trafficking offenses? ☐ Yes ☐ No

**38.d.** Are you **NOW** the spouse or child of, or are you yourself, an alien who knowingly aided, abetted, assisted, conspired, or colluded with a human trafficker? ☐ Yes ☐ No

**38.e.** Within the previous five years, have you **EVER** obtained any financial or other benefit from the human trafficking activity of your spouse (including former spouses) or parents, **and you** knew, or reasonably should have known, that the financial or other benefit that you received resulted from such human trafficking? ☐ Yes ☐ No

**39.a.** Are you **NOW** or have you **EVER** engaged in money laundering as described in section 1956 or 1957 of Title 18, United States Code? ☐ Yes ☐ No

**39.b.** Are you **NOW** or have you **EVER** been a knowing aider, abettor, assister, conspirator, or colluder with others in money laundering? ☐ Yes ☐ No

**40.** Have you **EVER** been responsible for or directly carried out particularly severe violations of religious freedom, as defined in section 3 of the International Religious Freedom Act of 1998 (22 U.S.C. section 6402) while serving as a foreign government official? ☐ Yes ☐ No

**41.** Has an immigration judge or the Board of Immigration Appeals **EVER** determined that you filed a frivolous asylum application in the past? ☐ Yes ☐ No

## Part 8. Applicant's Statement, Contact Information, Certification, and Signature

**NOTE:** Read the **Penalties** section of the Form I-821 Instructions before completing this part. You must file Form I-821 while in the United States.

### Applicant's Statement

**NOTE:** Select the box for either **Item Number 1.a.** or **1.b.** If applicable, select the box for **Item Number 2.**

**1.a.** ☐ I can read and understand English, and I have read and understand every question and instruction on this application and my answer to every question.

**1.b.** ☐ The interpreter named in **Part 9.** read to me every question and instruction on this application and my answer to every question in _____ a language in which I am fluent, and I understood everything.

**2.** ☐ At my request, the preparer named in **Part 10.**, _____ prepared this application for me based only upon information I provided or authorized.

Appx-000329

## Part 8. Applicant's Statement, Contact Information, Certification, and Signature (continued)

### Applicant's Contact Information

3.  Applicant's Daytime Telephone Number

4.  Applicant's Mobile Telephone Number (if any)

5.  Applicant's Email Address (if any)

### Applicant's Certification

Copies of any documents I have submitted are exact photocopies of unaltered, original documents, and I understand that USCIS may require that I submit original documents to USCIS at a later date. Furthermore, I authorize the release of any information from any of my records that USCIS may need to determine my eligibility for the immigration benefit I seek.

I further authorize release of information contained in this application, in supporting documents, and in my USCIS records to other entities and persons where necessary for the administration and enforcement of U.S. immigration laws.

I understand that USCIS may require me to appear for an appointment to take my biometrics (fingerprints, photograph, and/or signature) and, at that time, I will be required to sign an oath reaffirming that:

1)  I reviewed and provided or authorized all of the information in my application;

2)  I understood all of the information contained in, and submitted with, my application; and

3)  All of this information was complete, true, and correct at the time of filing.

I certify, under penalty of perjury, that I provided or authorized all of the information in my application, I understand all of the information contained in, and submitted with, my application, and that all of this information is complete, true, and correct.

### Applicant's Signature

6.a.  Applicant's Signature

➡

6.b.  Date of Signature (mm/dd/yyyy)

**NOTE TO ALL APPLICANTS:** If you do not completely fill out this application or fail to submit required documents listed in the Instructions, USCIS may deny your application.

## Part 9. Interpreter's Contact Information, Certification, and Signature

Provide the following information about the interpreter.

### Interpreter's Full Name

1.a.  Interpreter's Family Name (Last Name)

1.b.  Interpreter's Given Name (First Name)

2.  Interpreter's Business or Organization Name (if any)

### Interpreter's Mailing Address

3.a.  Street Number and Name

3.b.  ☐ Apt.  ☐ Ste.  ☐ Flr.

3.c.  City or Town

3.d.  State       3.e.  ZIP Code

3.f.  Province

3.g.  Postal Code

3.h.  Country

### Interpreter's Contact Information

4.  Interpreter's Daytime Telephone Number

5.  Interpreter's Mobile Telephone Number (if any)

6.  Interpreter's Email Address (if any)

### Interpreter's Certification

I certify, under penalty of perjury, that:

I am fluent in English and                              ,

which is the same language specified in **Part 8., Item Number 1.b.**, and I have read to this applicant in the identified language every question and instruction on this application and his or her answer to every question. The applicant informed me that he or she understands every instruction, question and answer on the application, including the **Applicant's Certification**, and has verified the accuracy of every answer.

Appx-000330

## Part 9. Interpreter's Contact Information, Certification, and Signature (continued)

### Interpreter's Signature

**7.a.**   Interpreter's Signature

**7.b.**   Date of Signature (mm/dd/yyyy)

## Part 10. Contact Information, Declaration, and Signature of the Person Preparing this Application, if Other Than the Applicant

Provide the following information about the preparer.

### Preparer's Full Name

**1.a.**   Preparer's Family Name (Last Name)

**1.b.**   Preparer's Given Name (First Name)

**2.**   Preparer's Business or Organization Name (if any)

### Preparer's Mailing Address

**3.a.**   Street Number and Name

**3.b.**   ☐ Apt.   ☐ Ste.   ☐ Flr.

**3.c.**   City or Town

**3.d.**   State

**3.e.**   ZIP Code

**3.f.**   Province

**3.g.**   Postal Code

**3.h.**   Country

### Preparer's Contact Information

**4.**   Preparer's Daytime Telephone Number

**5.**   Preparer's Mobile Telephone Number (if any)

**6.**   Preparer's Email Address (if any)

### Preparer's Statement

**7.a.**   ☐ I am not an attorney or accredited representative but have prepared this application on behalf of the applicant and with the applicant's consent.

**7.b.**   ☐ I am an attorney or accredited representative and my representation of the applicant in this case ☐ extends ☐ does not extend beyond the preparation of this application.

**NOTE:** If you are an attorney or accredited representative whose representation extends beyond preparation of this application, you may be obliged to submit a completed Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, or G-28I, Notice of Entry of Appearance as Attorney In Matters Outside the Geographical Confines of the United States with this application.

### Preparer's Certification

By my signature, I certify, under penalty of perjury, that I prepared this application at the request of the applicant. The applicant then reviewed this completed application and informed me that he or she understands all of the information contained in, and submitted with, his or her application, including the **Applicant's Certification**, and that all of this information is complete, true and correct. I completed this application based only on information that the applicant provided to me or authorized me to obtain or use.

### Preparer's Signature

**8.a.**   Preparer's Signature

**8.b.**   Date of Signature (mm/dd/yyyy)

Appx-000331

## Part 11.  Additional Information

If you need extra space to provide any additional information within this application, use the space below.  If you need more space than what is provided, you may make copies of this page to complete and file with this application or attach a separate sheet of paper.  Type or print your name and A-Number (if any) at the top of each sheet; indicate the **Page Number**, **Part Number**, and **Item Number** to which your answer refers; and sign and date each sheet.

**1.a.** Family Name
(Last Name)

**1.b.** Given Name
(First Name)

**1.c.** Middle Name

**2.** A-Number (if any) ▶ A-

**3.a.** Page Number    **3.b.** Part Number    **3.c.** Item Number

**3.d.**

**4.a.** Page Number    **4.b.** Part Number    **4.c.** Item Number

**4.d.**

**5.a.** Page Number    **5.b.** Part Number    **5.c.** Item Number

**5.d.**

**6.a.** Page Number    **6.b.** Part Number    **6.c.** Item Number

**6.d.**

**7.a.** Page Number    **7.b.** Part Number    **7.c.** Item Number

**7.d.**

Form I-821   Edition   01/20/25

HR-1 FRN 2025 AR-000307
Page 13 of 13

Appx-000332



HR-1 FRN 2025 AR-000308

The Wayback Machine - https://web.archive.org/web/20250714143548/https://www.uscis.gov/g-1055

 **U.S. Citizenship and Immigration Services**

MENU

Home > Forms > Filing Fees > Fee Schedule

# G-1055, Fee Schedule

> **ⓘ ALERT:** USCIS will soon begin to collect new fees for certain immigration benefit requests. We will provide details on the implementation of these fee changes in the coming days.

> **ⓘ ALERT:** On April 15, 2025, we published a new edition of Form G-1055, Fee Schedule. The new edition, 04/15/25:
> - Adds filing category for United Nations Mission Observer for Form I-539, Application to Extend/Change Nonimmigrant Status; and
>
> - Adds filing fee to Form I-612, Application for Waiver of the Foreign Residence Requirement (Under Section 212(e) of the INA, as Amended).

Use this form to verify fee information for immigration forms.

Each application, petition, or request must be accompanied by the correct fee(s) unless you are exempt from paying the fee(s) or are eligible for a fee waiver.  If the fee is incorrect, your application, petition, or request will be rejected.

**Fee Exemptions.** Fee-exempt forms and filing categories list $0 as the Filing Fee. You do not need to file Form I-912, Request for Fee Waiver, or make a formal request to qualify for a fee exemption. However, the fee exemptions in this schedule only indicate that the form is free to file. They do not indicate eligibility to file those benefit requests in all circumstances. Eligibility to file a particular benefit request is set forth in the applicable regulations and form instructions.

 ## Edition Date

04/15/25. You can find the edition date at the bottom of the page of Form G-1055, Fee Schedule.

## Downloads

Need Help?
pregúntale a
Emma™

HR-1 FRN 2025 AR-000309

**Appx-000334**

USCIS Fee Schedule

If you need help downloading and printing forms, read our instructions.

## Select a Form for Fee Information

▼

Last Reviewed/Updated: 07/11/2025

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**



U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services
*Office of the Director* (MS 2000)
Washington, DC 20529-2000

**U.S. Citizenship and Immigration Services**

November 15, 2013                                    PM-602-0091

# Policy Memorandum

SUBJECT:   Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)

## Purpose

This policy memorandum (PM) amends Chapter 21.1 of the Adjudicator's Field Manual (AFM) to ensure consistent adjudication of parole requests made on behalf of aliens who are present without admission or parole and who are spouses, children and parents of those serving on active duty in the U.S. Armed Forces, in the Selected Reserve of the Ready Reserve or who previously served in the U.S. Armed Forces or Selected Reserve of the Ready Reserve.

This PM also amends AFM Chapter 40.6 concerning the effects of parole on an alien's inadmissibility under Immigration and Nationality Act (INA) § 212(a)(6)(A)(i).  This amendment to AFM chapter 40.6 applies to any paroled alien, not only to the family members of Armed Forces personnel.

## Scope

This PM applies to and is binding on all U.S. Citizenship and Immigration Services (USCIS) employees.

## Authority

INA §§ 212(a)(6)(A)(i), 212(d)(5)(A), 235(a), and 245(a), (c); 8 U.S.C. §§ 1182(a)(6)(A)(i), 1182(d)(5)(A), 1225(a), and 1255(a), (c)

## Background

### Parole of Spouses, children and parents of Armed Forces personnel

- In partnership with the Department of Defense (DoD), USCIS has launched a number of initiatives to assist military members, veterans, and their families to navigate our complex immigration system and apply for naturalization and other immigration services and benefits.
- This PM builds on these important initiatives as there is concern within DoD that some active members of the U.S. Armed Services, individuals serving in the Selected Reserve of the Ready Reserve and individuals who have previously served in the U.S. Armed Forces or Selected Reserve

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 2

- of the Ready Reserve face stress and anxiety because of the immigration status of their family members in the United States.
- Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children.
- Similarly, our veterans, who have served and sacrificed for our nation, can face stress and anxiety because of the immigration status of their family members in the United States.  We as a nation have made a commitment to our veterans, to support and care for them.  It is a commitment that begins at enlistment, and continues as they become veterans.
- Responding to these and similar concerns by several Members of Congress about soldiers and veterans, the Secretary of Homeland Security on August 30, 2010 emphasized the Department's commitment to assisting military families.  The Secretary identified several of the discretionary tools that the Department utilizes "to help military dependents secure permanent immigration status in the United States as soon as possible."  Among the tools listed was "parole … to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are the spouses, parents and children of military members."[1]
- INA § 212(d)(5)(A) gives the Secretary the discretion, on a case-by-case basis, to "parole" for "urgent humanitarian reasons or significant public benefit" an alien applying for admission to the United States.  Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission.  This latter use of parole is sometimes called "parole in place."  The legal authority for granting parole in place was formally recognized by the then-Immigration and Naturalization Service (INS) General Counsel in a 1998 opinion.[2]  That opinion was endorsed the following year in a memorandum by the then-INS Commissioner.[3]  In 2007, the then-DHS General Counsel concurred with the 1998 INS General Counsel's opinion in relevant part.[4]  The basic authority for parole in place is INA § 212(d)(5)(A), which expressly grants discretion to parole "any alien applying for admission to the United States."  INA § 235(a)(1), in turn, expressly defines an applicant for admission to include "an alien present in the United States who has not been admitted."

---

[1] See Letter from Hon. Janet Napolitano, Sec. of Homeland Security, to Hon. Zoe Lofgren, U.S. House of Representatives (Aug. 30, 2010).
[2] Memorandum from Paul W. Virtue, INS General Counsel, to INS officials, "Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens," Legal Op. 98-10 (Aug. 21, 1998), 1998 WL 1806685.
[3] Memorandum from Doris Meissner, INS Commissioner, to INS officials, "Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a designated Port-of-Entry" (Apr. 19, 1999), reprinted in 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999).
[4] Memorandum from Gus P. Coldebella, DHS General Counsel, to DHS officials, "Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act" (Sept. 28, 2007). The same DHS General Counsel's opinion rejected a conclusion that Mr. Virtue had reached on a separate issue related to release from detention under  INA § 236(a)(2)(B) (so-called "conditional parole"), *see Matter of Castillo-Padilla*, 25 I&N Dec. 257 (BIA 2010) (agreeing with DHS that "conditional parole" under INA § 236(a)(2)(B) does not constitute parole under INA § 212(d)(5)(A)).

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 3

- This PM addresses two related issues.  The first is a policy question:  Should parole in place be granted to certain family members of active duty members of the U.S. Armed Forces, individuals in the Selected Reserve of the Ready Reserve, or individuals who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve?  The second is a legal question: Does parole in place (for military family members or anyone else) affect whether an alien is inadmissible under INA § 212(a)(6)(A)(i)?  That provision is discussed below and is critical to determining the alien's eligibility for adjustment of status under INA § 245.

**A. Parole in Place for Spouses, Children and Parents of Active Members of the U.S. Armed Forces, Individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve**

As noted above, the decision whether to grant parole under INA § 212(d)(5)(A) is discretionary. Generally, parole in place is to be granted only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS[5] decides to grant parole in that situation, the parole should be authorized in one-year increments, with re-parole as appropriate.

**B. Effect of Parole on Inadmissibility under INA § 212(a)(6)(A)(i) and Adjustment of Status under INA § 245**

INA § 212(a)(6)(A)(i) contains two closely related inadmissibility grounds.  The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).  Aliens who have entered the United States without inspection, while not "arriving aliens" as defined in 8 C.F.R. § 1001.1(q), are eligible for parole because they remain applicants for admission.[6]

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]." Where the first inadmissibility ground leaves off, this one picks up.  Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.  As is true throughout section 212(a), the choice of tense ("arrives") is clearly deliberate.  In enacting the various inadmissibility grounds in section 212(a), Congress was very specific as to whether the

---

[5] ICE and CBP also have parole authority.  "Memorandum of Agreement between USCIS, ICE, and CBP for the purpose of coordinating the concurrent exercise by USCIS, ICE, and CBP of the Secretary's Parole Authority Under INA § 212(d)(5)(A) with respect to certain aliens located outside of the United States," Addendum I (September 2008).  Their decisions whether to grant parole are outside the scope of the present PM.
[6] INA § 235(a)(1).

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 4

individual grounds cover past, present, or future events, or some combination thereof.[7]  In particular, when Congress intended that a ground cover both past and present events, it said so explicitly.[8]  In contrast, in the second prong of section 212(a)(6)(A)(i), Congress used only the present tense.  Moreover, if "arrives" were read as if it said "arrives or previously arrived," so as to cover any alien who had ever entered at an undesignated time or place, then the first prong of section 212(a)(6)(A)(i) would be practically superfluous.  Ordinarily, the only way for an alien to be present in the United States without admission or parole, as the first prong requires, is to have entered without inspection at some point in the past.[9]  Those individuals would already be covered by the second prong if "arrives" were read to mean "arrives or previously arrived."

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

Reading "arrives" as if it said "arrives or has previously arrived"[10] would also produce at least two anomalies.  First, as noted, it would render the first prong of section 212(a)(6)(A)(i) practically superfluous.  Second, in combination with another inadmissibility ground, section 212(a)(9)(B)(i), reading "arrives" as "arrives or has previously arrived" would lead to results that Congress could not possibly have intended.  The latter ground renders inadmissible any alien who has ever been unlawfully present in the United States for more than 180 days and then departs, but it limits the inadmissibility to either 3 years or 10 years, depending on the duration of the unlawful presence.  If the second inadmissibility ground in section 212(a)(6)(A)(i) were interpreted to mean that any prior entry

---

[7] Some inadmissibility grounds, like the second prong of 212(a)(6)(A)(i), cover only present conduct.  *See, e.g.*, sections 212(a)(1)(A)(i) (determined "to *have* a communicable disease of public health significance")(emphasis added); 212(a)(1)(A)(iv) ("determined … to *be* a drug addict") (emphasis added); 212(a)(6)(D) ("*is* a stowaway") (emphasis added).  Other grounds cover only events that have occurred in the past (up to and including the present time).  *See, e.g.*, sections 212(a)(3)(B)(i) ("*has engaged* in a terrorist activity) (emphasis added); 212(a)(3)(E)(ii) ("ordered, incited, assisted, or otherwise participated in genocide"); 212(a)(6)(E) ("knowingly *has encouraged, induced, assisted, abetted, or aided* any other alien to enter or to try to enter the United States in violation of law") (emphasis added).  Still others cover only predictions of future activity.  *See, e.g.*, sections 212(a)(4)(A) ("is likely at any time to become a public charge"); 212(a)(10)(A) ("coming to the United States to practice polygamy").

[8] *See, e.g.*, sections 212(a)(2)(D)(ii) ("procures or attempts to procure, or [less than ten years earlier] procured or attempted to procure … prostitutes"); 212(a)(3)(D)(i) ("is or has been a member of or affiliated with the Communist … party"); 212(a)(6)(C)(i) (fraudulently "seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States or other benefit …"); 212(a)(6)(C)(ii) ("falsely represents, or has falsely represented, himself or herself" to be a U.S. citizen).

[9] There is one scenario in which the first prong of section 212(a)(6)(A)(i) would capture an alien who does not fall within even the more expansive interpretation of the second prong.  If the alien seeks admission at a designated port of entry, is denied admission, is detained, escapes from detention, and then makes his or her way into the interior, he or she would be inadmissible under the first ground but not the second one.  It would be far-fetched, however, to assume that this was the only intended use of the first ground in 212(a)(6)(A)(i) (present without admission or parole).

[10] Former AFM section 40.6.2(a)(3)(ii) had stated that "[i]nadmissibility does not continue after the alien has departed the United States."  But if this language were interpreted to imply the converse – i.e., that inadmissibility *does* continue even after the alien has long since arrived in the United States (and terminates *only* upon departure) – the assumption would have to be that "arrives" means "arrives or, if the person has not departed, has arrived."  There is no apparent legal basis or policy reason to interpret "arrives" in that way.

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 5

without inspection renders the alien inadmissible, then both the 180-day threshold and the 3-year and 10-year limitations on inadmissibility under section 212(a)(9)(B)(i) would be meaningless.  One who enters without inspection and remains for less than 180 days – even one day, for that matter – and then leaves, is not inadmissible at all under section 212(a)(9)(B)(i), but it would not matter, because that person would be inadmissible for life under the more expansive reading of section 212(a)(6)(A)(i). Further, the alien who enters without inspection, remains for 8 months, and then leaves, is inadmissible under section 212(a)(9)(B)(i), but only for 3 years.  That 3-year limitation would be meaningless, however, if section 212(a)(6)(A)(i) were interpreted to bar the person for life for the very same prior entry.[11]

The above considerations all come into play when an alien who entered without inspection subsequently receives parole.  Such an alien will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without having been admitted or paroled), because the alien has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable (even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place.  It is not a question of *parole* curing or erasing the second inadmissibility ground.  Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground.

Interpreting the explicit statutory language exactly as it is written therefore avoids all these anomalies. An alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).[12]

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status.  First, adjustment of status requires that the person be "admissible."  INA § 245(a)(2).  As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i).  Second, adjustment of status requires that the alien have been "inspected and admitted or paroled."  INA § 245(a).  The grant of parole under INA § 212(d)(5)(A) overcomes that obstacle as well.  The alien must still, however, satisfy all the other requirements for adjustment of status.  One of those requirements is that, except for immediate

---

[11] The only apparent counter-point is that, even if the language of the second prong ("arrives") were read to mean "arrives or has ever arrived," the limitations built into section 212(a)(9)(B)(i) would still be meaningful with respect to overstays (as opposed to those who entered without inspection).  Nothing in the legislative history of section 212(a)(9)(B)(i), however, suggests a specific congressional focus on overstays, or a desire to distinguish between the two groups of undocumented aliens, or an intent to subject an alien to lifelong inadmissibility for having once before entered without inspection. Moreover, if a prior entry without inspection were enough to bar a person for life, then INA § 212(a)(9)(C), which prescribes that result only when the entry without inspection follows either one year of unlawful presence or a removal order, would be superfluous.

[12] This analysis pertains exclusively to INA § 212(a)(6)(A)(i).  It does not and is not intended to disturb the long-standing principles that an alien granted parole remains an applicant for admission who is considered to be constructively standing at the border, *see* INA § 101(a)(13)(B); *Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958); *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d Cir. 2008); and that "an application for admission [is] a continuing one," *Matter of Valenzuela-Felix*, 26 I&N Dec. 53, 56 (BIA 2012) (parole for criminal prosecution).

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 6

relatives of United States citizens and certain other individuals,[13] the person has to have "maintain[ed] continuously a lawful status since entry into the United States."  INA § 245(c)(2).  Parole does not erase any periods of prior unlawful status.  Thus, an alien who entered without inspection will remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions.  Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

This PM supersedes any previous USCIS guidance on these issues, including the Memorandum to Field Leadership (AD07-18) at 5-6 (March 3, 2009).

**Implementation**

AFM Chapters 21.1 and 40.6 (AFM Update AD 12-30) are updated as follows.

☞    1. A new section 21.1(c) is added to read:

### 21.1   General Information About Relative Petitions

* * * * *

(c) <u>Special Parole Consideration for Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces</u>, <u>individuals in the Selected Reserve of the Ready Reserve or Individuals Who Previously Served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve</u>.  The decision whether to grant parole under INA § 212(d)(5)(A) is discretionary.  Generally, USCIS grants parole <u>in place</u> only sparingly.  The fact that the individual is a spouse, child or parent of an Active Duty member of the U.S. Armed Forces, an individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve of the Ready Reserve, however, ordinarily weighs heavily in favor of parole in place.  Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion for such an individual.  If USCIS decides to grant parole in that situation, the parole should be authorized in one-year increments, with extensions of parole as appropriate.

To request parole, the alien must submit to the director of the USCIS office with jurisdiction over the alien's place of residence:

o   Completed Form I-131, Application for Travel Document (The USCIS Director has determined that in this situation the Form I-131 may be filed without fee, per 8 CFR 103.7(d));

o   Evidence of the family relationship;

---

[13] INA § 245(c)(2) also exempts certain employment-based immigrants whose unlawful presence was for 180 days or less, in accordance with INA § 245(k)(2); aliens who were unlawfully present only in the past, without "fault" or for "technical reasons;" and  certain subcategories of "special immigrant" described in INA § 101(a)(27)(H), (I), (J), or (K).

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 7

- o  Evidence that the alien's family member is an Active Duty member of the U.S. Armed Forces, individual in the Selected Reserve of the Ready Reserve or an individual who previously served in the U.S. Armed Forces or the Selected Reserve or the Ready Reserve such as a photocopy of both the front and back of the service member's military identification card (DD Form 1173);

- o  Two identical, color, passport style photographs; and

- o  Evidence of any additional favorable discretionary factors that the requestor wishes considered.

☞    2. Chapter 40.6.2(a) of the AFM is revised:
  a.  By amending Chapter 40.6.2(a)(1);
  b.  By deleting Chapter 40.6.2(a)(3)(ii);
  c.  By deleting Chapter 40.6.2(a)(4)(ii) and redesignating Chapter 40.6.2(a)(4)(iii) as Chapter 40.6.2(a)(4)(ii); and
  d.  By amending the redesignated Chapter 40.6.2(a)(4)(ii).

The revisions read as follows:

**40.6.2 Individual Grounds of Inadmissibility Under INA Section 212(a)(6)**

**(a) INA Section 212(a)(6)(A):  Alien Present Without Admission or Parole or Who Arrives at Undesignated Time or Place**

(1) General.  INA section 212(a)(6)(A)(i) contains two closely related inadmissibility grounds. The first ground relates to the alien who is "present in the United States without being admitted or paroled."  This inadmissibility ground generally covers those who entered the United States without inspection (and are still in the United States).

The second inadmissibility ground in section 212(a)(6)(A)(i) relates to the alien "who arrives in the United States at any time or place other than as designated by the [Secretary of Homeland Security]."  Where the first inadmissibility ground leaves off, this one picks up. Using the present tense ("arrives"), it covers the alien who is in the process of entering U.S. territory without inspection.

The two inadmissibility grounds contained within section 212(a)(6)(A)(i) are thus complementary.  Together, they capture aliens who have already achieved entry without inspection and those who are in the process of attempting such entry.

*Parole.*  An alien who is paroled under INA section 212(d)(5)(A) will no longer be inadmissible under the first ground in section 212(a)(6)(A)(i) (present without being admitted or paroled), because the person has been paroled.  And since that alien arrived in the United States only in the past, the second inadmissibility ground in section 212(a)(6)(A)(i) is already inapplicable

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual. Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091: Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)
Page 8

(even without the parole), because the alien is not one who "arrives" (present tense) at an undesignated time or place. It is not a question of *parole* curing or erasing the second inadmissibility ground. Rather, the alien who arrived in the past is already outside the ambit of that second ground; past arrivals are the subject of the first ground. Thus, an alien who entered the United States without inspection, but subsequently receives parole, is not inadmissible under either of the two inadmissibility grounds contained in section 212(a)(6)(A)(i).

For an alien who entered without inspection, a grant of parole under INA § 212(d)(5)(A) affects at least two of the eligibility requirements for adjustment of status. First, adjustment of status requires that the person be "admissible." INA § 245(a)(2). As discussed above, parole eliminates one ground of inadmissibility, section 212(a)(6)(A)(i). Second, adjustment of status requires that the alien have been "inspected and admitted or paroled." INA § 245(a). The grant of parole overcomes that obstacle as well. The alien must still, however, satisfy all the other requirements for adjustment of status. One of those requirements is that, except for immediate relatives of United States citizens and certain other exempt categories listed in INA section 245(c)(2), the person has to have "maintain[ed] continuously a lawful status since entry into the United States." Parole does not erase any periods of prior unlawful status or any other applicable grounds of inadmissibility. An alien who entered without inspection will therefore remain ineligible for adjustment, even after a grant of parole, unless he or she is an immediate relative or falls within one of the other designated exemptions. Moreover, even an alien who satisfies all the statutory prerequisites for adjustment of status additionally requires the favorable exercise of discretion.

* * * * *

(4) Exemptions and Waivers

* * * * *

(ii) Waivers. There are no waivers available to applicants inadmissible under INA section 212(a)(6)(A)(i) other than the waivers (or inapplicabilities) described in AFM Chapter 40.6.1(b) or (c). As stated in AFM Chapter 40.6.2(a)(1), however, an alien paroled under INA section 212(d)(5)(A) is not inadmissible under INA section 212(a)(6)(A)(i).

* * * * *

**IMPORTANT: This policy memo has been partially or fully superseded by the USCIS Policy Manual.
Please visit www.uscis.gov/policymanual for effective policy.**

PM-602-0091:  Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed
Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or
Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration
and Nationality Act § 212(a)(6)(A)(i)
Page 9


☞      3.  The AFM Transmittal Memorandum button is revised by adding a new entry, in numerical
order, to read:

| AFM Update AD12-30 11/15/2013 | **Chapter 21.1(c)** **Chapter 40.6.2(a)** | This PM adds new **Chapter 21.1(c)** and amends **Chapter 40.6.2(a)** of the AFM. |
|---|---|---|

**Use**

This PM is intended solely for the guidance of USCIS personnel in the performance of their official
duties.  It is not intended to, does not, and may not be relied upon to create any right or benefit,
substantive or procedural, enforceable at law or by any individual or other party in removal
proceedings, in litigation with the United States, or in any other form or manner.


**Contact Information**

Questions or suggestions regarding this PM should be addressed through appropriate channels to the
Field Operations Directorate.

| | |
|---|---|
| *Ms. L.*, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>*U.S. Immigration and Customs Enforcement,* et al.,<br><br>Defendants. | Case No. 18-cv-00428<br><br><br><br>SETTLEMENT AGREEMENT |

## I.  <u>Definitions</u>

A.  **"Action"** or ***"Ms. L."*** The lawsuit captioned *Ms. L., et al. v. U.S. Immigration and Customs Enforcement, et al.*, Case No. 18-cv-00428 (S.D. Cal.).

B.  **"Class Counsel."** The American Civil Liberties Union Foundation ("ACLU") and the ACLU of San Diego & Imperial Counties.

C.  **"Defendants."** The Defendants in *Ms. L.*:[1] U.S. Department of Homeland Security ("DHS"); U.S. Immigration and Customs Enforcement ("ICE"); U.S. Customs and Border Protection ("CBP"); U.S. Department of Health and Human Services ("HHS"); Office of Refugee Resettlement ("ORR"); Patrick J. Lechleitner, Deputy Director and Senior Official Performing the Duties of the Director of ICE; Jamison Matuszewski, ICE San Diego Field Office Director; Mark Paramo, Luis Casillas, and Joseph Suazo, ICE San Diego Assistant Field Office Directors for the Otay Mesa Detention Center; Mary De Anda-Ybarra, ICE El Paso Field Office Director; ICE El Paso Assistant Field Office Director for the West Texas Detention Facility;[2] Alejandro Mayorkas, Secretary of Homeland Security; Merrick Garland, Attorney General of the United States; Ur M. Jaddou, Director of U.S. Citizenship and Immigration Services ("USCIS"); Troy A. Miller, Senior Official Performing the Duties of the Commissioner of CBP; Sidney Aki, Director, San Diego Field Office, CBP; Hector A. Mancha Jr., Director, El Paso Field Office, CBP; Xavier Becerra, Secretary of the Department of Health and Human Services; Robin Dunn Marcos, Director of the Office of Refugee Resettlement.

D.  **"Effective Date."** The Effective Date of this Settlement Agreement will be the date on which the Court enters a final approval order for the Settlement Agreement following notice to the class and a fairness hearing in accordance with Federal Rule of Civil Procedure 23.

---

[1] The names of the successors for the originally named Defendants who were sued in their official capacities have been automatically substituted here pursuant to the operation of Fed. R. Civ. P. 25(d).

[2] ICE is not currently using the West Texas Detention Facility. Therefore, no AFOD is assigned to it.

HR-1 FRN 2025 AR-000320

**Appx-000345**

E.  **"Family Reunification Task Force"** or **"FRTF."** The task force created by Executive Order 14011 (E.O. 14011), *Establishment of Interagency Task Force on the Reunification of Families*, on February 2, 2021.

F.  **"Family Reunification Task Force Research Committee"** or **"FRTF Research Committee."**  The research committee created within the Family Reunification Task Force to evaluate claims of class membership.

G.  **"Final Registration Date."** The latest date that a *Ms. L.* Settlement Class member may register in together.gov or juntos.gov to be considered for relief under this Settlement Agreement, which is three years after the Effective Date.

H.  **"Final Services Date."** The latest date that a *Ms. L.* Settlement Class member may begin receiving services under the Settlement Agreement, which is four years after the Effective Date.

I.  **"Legal Guardian."** Legal Guardian means a person vested with legal custody of a child or vested with legal authority to act on or make decisions on the child's behalf.

J.  **"*Ms. L.* Settlement Class."** Individuals included in the class for purposes of this Settlement Agreement as defined in Section II below, and as determined in accordance with the procedures in Section III below.

K.  **"Parties."** Plaintiffs (including the named Plaintiffs along with all members of the *Ms. L.* Settlement Class) and Defendants.

L.  **"Qualifying Additional Family Member."** An additional family member who (1) is part of a *Ms. L.* Settlement Class member's immediate household; or (2) can demonstrate one of the below familial relationships. If the Qualifying Additional Family Member is seeking return to the United States, the government will only pay for the return of Qualifying Additional Family Members who the FRTF Research Committee determines are necessary for reunification as described in Section IV.C.1. below.

1.  To be considered a member of the immediate household the additional family member must occupy the same housing unit as the *Ms. L.* Settlement Class member or show that they would occupy the same housing unit but for the detention of the *Ms. L.* Settlement Class member.

2.  Individuals who can show one of the below familial relationships with a *Ms. L.* Settlement Class member will be considered Qualifying Additional Family Members even if they cannot show that they are a member of the *Ms. L.* Settlement Class member's immediate household:

a.  A spouse (including a common law spouse) of a *Ms. L.* Settlement Class member;

b.  An unmarried child under the age of 21 of a *Ms. L.* Settlement Class member;

c.  A separated child's biological sibling who is unmarried and under the age of 21;

HR-1 FRN 2025 AR-000321

**Appx-000346**

   d.   A separated child's non-separated parent, stepparent, or legal guardian;

   e.   A separated parent or legal guardian's parent who is the primary caregiver for:

      i.   a minor child of a separated parent/legal guardian; or

     ii.   a separated child; and

   f.   A separated child's stepparent's biological unmarried children under the age of 21.

M. **"Settlement Agreement."** This settlement agreement between the Parties in the Action.

N. "**Settlement Class Member Confirmation Date.**" The date that the FRTF Research Committee accepts an individual as a *Ms. L.* Settlement Class member and sends the case to receive services under this Settlement Agreement. If an individual was determined to be a *Ms. L.* Settlement Class member prior to the Effective Date of this Settlement Agreement, then their "Settlement Class Member Confirmation Date" will be the Effective Date.

O. **"Termination Date."** Six years after the Effective Date.

P. **"Termination Date – Future Separations."** Eight years after the Effective Date.

Q. **"Unfiled Notice to Appear" or "Unfiled NTA."** A Notice to Appear (NTA), Form I-862, that has been issued by a DHS component but not filed and docketed with the Executive Office for Immigration Review (EOIR).

## II. The *Ms. L.* Settlement Class

The **"*Ms. L.* Settlement Class"** consists of:

A. **Current *Ms. L.* Class Members:** All members of the class certified by the Court and identified by the Parties as class members in the course of the litigation. *See* Order Granting in Part Plaintiffs' Motion for Class Certification, ECF No. 82 (June 26, 2018); Order Granting Plaintiffs' Motion to Modify Class Definition, ECF No. 386 (Mar. 8, 2019). Prior to Settlement Approval Defendants shall provide Plaintiffs with the list of class members who meet the definition of this paragraph.

B. **All Separated Children of Class Members:** The Parties will amend the certified class to include in the *Ms. L.* Settlement Class any child who was separated from a parent or Legal Guardian who is either a Current *Ms. L.* Class Member or who becomes a member of the *Ms. L.* Settlement Class through the provisions of this Section.

C. **Certain Children of Parents Excluded from the Class:** The Parties also agree that Defendants will provide some limited relief as detailed below in Section IV.B.2.a. to children who were separated from their parent or Legal Guardian after January 20, 2017 and prior to June 26, 2018, and who would otherwise be *Ms. L* Settlement Class members, but who are excluded from the class based on the criminal history of their parent or Legal Guardian.

HR-1 FRN 2025 AR-000322

**Appx-000347**

D. **Individuals Falling within the Expanded Date Range:** The Parties will amend the certified class to include in the *Ms. L.* Settlement Class all individuals who otherwise meet the definitions set forth in this Section, and who were separated from their children at any time between January 20, 2017 and July 1, 2017. The complete date range of the *Ms. L.* Settlement Class will therefore be January 20, 2017 through January 20, 2021, subject to any limitations contained elsewhere in this Settlement Agreement.

E. **Legal Guardians:** The Parties will amend the certified class to include in the *Ms. L.* Settlement Class, subject to the same parameters for inclusion and exclusion of parents described elsewhere in this Section, any individual who can establish that he or she was separated from a child at any time between January 20, 2017 and January 20, 2021, and who can provide official documentation, including documentation from indigenous or tribal authorities, that the individual was in fact the Legal Guardian of that child, as defined above, at the time of separation under the appropriate law.

1. For purposes of establishing legal guardianship, "nunc pro tunc" documents that are official and verifiable from a competent legal authority that establish that legal guardianship existed at the time of the separation would be acceptable.

2. Generally, a birth certificate or legally amended birth certificate is accepted as presumptive evidence of parentage. If, for some reason, there is conflicting evidence in the record of who is the parent, the individual can submit evidence from a competent legal authority that establishes the individual was the child's Legal Guardian at the time of separation.

F. **Parentage.** An adult who was separated from a child on the basis that he or she was determined not to be the parent of the child will be considered a member of the *Ms. L.* Settlement class if the adult can show that he or she is, in fact, the parent of the separated child. Where the separation was based on a belief that the adult was not the child's parent, Defendants will accept all available evidence as a means to verify parentage, including consultations with the consulate, HHS acknowledgement of a parent-child relationship, and DNA testing.

G. **Families Where the Separated Child is a U.S. Citizen:** The parties will amend the certified class to include in the *Ms. L.* Settlement Class, subject to the same parameters for inclusion and exclusion of parents described elsewhere in this Section, parents or Legal Guardians who were separated from their child at any time between January 20, 2017 and January 20, 2021, where the separated child is a U.S. citizen and therefore was not sent to ORR custody. The Parties agree that this Settlement Agreement does not create any obligation on the part of Defendants to identify or notify individuals in any particular manner or timeframe who fall under this subsection of the *Ms. L.* Settlement Class. However, the Defendants agree that they will meet and confer at Plaintiffs' request every three months until the Final Registration Date to evaluate methods by which Defendants may identify *Ms. L.* Settlement Class members who fall in this category, and the Defendants agree that when they identify U.S. citizen children who may be *Ms. L.* Settlement Class members, Defendants will provide the name and any contact information in Defendants' possession of such parents, Legal Guardians, and children to Class Counsel under the protective order.

4

HR-1 FRN 2025 AR-000323

**Appx-000348**

H. **Separations Where the Noncitizen Child Was Not Sent to ORR**: With the exception of cases where the child was a U.S. citizen and therefore could not be sent to ORR, there is a presumption that if a parent or Legal Guardian and child entered CBP custody together, and the child was never sent to ORR custody, then the parent or Legal Guardian and his or her child are not class members. However, if a parent or Legal Guardian and noncitizen child entered CBP custody together and the parent or Legal Guardian and noncitizen child were separated, and the parent or Legal Guardian was referred for prosecution under 8 U.S.C. § 1325 or 8 U.S.C. § 1326(a) after January 20, 2017, and on or before June 26, 2018, then the parent or Legal Guardian and noncitizen child will be considered class members for the purposes of this Settlement Agreement, even if the parent or Legal Guardian and noncitizen child were reunified before leaving CBP custody. Any such inclusion determination will be subject to the other provisions of this Section.

I. **Individuals Separated for Medical Reasons, Because of an Active Warrant, or Due to Concerns about Fitness or Dangerousness**: The Parties agree that, in the following situations, the separation of a parent or Legal Guardian and child after January 20, 2017 and before January 20, 2021, may have been appropriate under the terms of the Court's preliminary injunction:

1. medical reasons that required outside care;

2. mental health concerns that required placement on suicide watch;

3. transfer to criminal custody based on an active warrant and confirmation from the issuing jurisdiction that the parent or Legal Guardian would be extradited; and

4. objective reasons to be concerned that the parent or Legal Guardian may have been unfit or posed a danger to the child.

In all of the cases identified in Sections II.I.1 through II.I.4 above, the government was obliged to reunify a parent or Legal Guardian and child if and when the basis for separation was resolved. In recognition of the fact that the Court's preliminary injunction required that such reunifications occur in an expedited fashion, the Parties agree that individuals separated for the reasons above will be eligible for the relief available to the *Ms. L.* Settlement Class under the following conditions:

- Any parent or Legal Guardian and child separated for the reasons identified in Sections II.I.1 through II.I.4 after January 20, 2017, and on or before June 26, 2018, will be included in the *Ms. L.* Settlement Class unless the parent or Legal Guardian would otherwise be excluded from the class on the basis of his or her criminal history as described in Section II.J.

- Any parent or Legal Guardian and child separated after June 26, 2018, and before January 20, 2021, for the reasons identified in Sections II.II.1 through II.I.3, will presumptively remain excluded from the *Ms. L* Settlement Class. However, a parent or Legal Guardian identified in Sections II.I.1 through II.I.3 who does not have a criminal history that would exclude him or her from the *Ms. L.* Settlement Class may establish a right to be included in the *Ms. L.* Settlement Class if he or she can show that when the medical reason that required outside care of the parent or Legal Guardian had ended, or

HR-1 FRN 2025 AR-000324
**Appx-000349**

when the parent or Legal Guardian was released from criminal custody, he or she was not reunified in accordance with the "streamlined" procedures identified by the Court that provided for reunification upon a determination that: (1) he or she was the parent or Legal Guardian of the child; and (2) there was no information that raised a concern about the welfare of the child. *See* ECF No. 101 at 2-3.

- Any parent or Legal Guardian who was separated from his or her child after June 26, 2018 and before January 20, 2021 for the reasons identified in Section II.I.4 will presumptively be included in the *Ms. L* Settlement Class unless (a) the parent or Legal Guardian would otherwise be excluded from the class on the basis of his or her criminal history as described in Section II.J, or (b) the government provides evidence that the parent or Legal Guardian and child were promptly reunified immediately after any and all objective reasons to be concerned that the parent or Legal Guardian may have been unfit or posed a danger to the child were favorably resolved.

J. **Exclusions for Criminal History**: The Parties agree that those with the following criminal convictions at the time of the separation, or whose separation was the result of a prosecution and subsequent conviction for one of the following criminal convictions (excluding a separation as a result of a prosecution and subsequent conviction for a violation of 8 U.S.C. § 1325 or § 1326(a)), shall presumptively not be *Ms. L.* Settlement Class members, and that this presumption will be evaluated, on a case-by-case basis, and may be rebutted according to the process laid out below and in Section III.

1. Persons with one or more felony criminal conviction(s) in the United States, other than a single conviction for a felony violation of 8 U.S.C. § 1325 or § 1326(a);

2. Persons with one or more conviction(s) in the United States or an analogous conviction abroad for:

    a. a crime involving sexual abuse or exploitation of a minor, as defined in Application Note 1 of § 2G2.2 of the U.S. Sentencing Guidelines and also including trafficking in, or possession of, child pornography; or

    b. a crime involving prohibited sexual conduct, as defined in Application Note 1 of § 2A3.1 of the U.S. Sentencing Guidelines, provided, however, that it shall not be a basis for exclusion if:

        i. the crime arose from the fact that the person engaged in prostitution, or loitering for prostitution: or

        ii. if convicted in the United States, the person served a sentence of six months or less of incarceration; or

        iii. if convicted in a foreign country, the offense carried a penalty of six months or less of incarceration; or

    c. a crime of domestic violence, stalking, and child abuse, as defined in 8 U.S.C. § 1227(a)(2)(E)(i);

6

or:

3. Persons with a felony criminal conviction(s) in a foreign country where the conviction was for a crime analogous to a crime enumerated in 18 U.S.C. § 3559(c)(2)(F) or (c)(2)(H).

"Conviction" means a final judgment of conviction by a criminal court as governed by the jurisdiction of conviction's criminal laws. It does not include, for example, dispositions that are vacated, expunged, pardoned, or dismissed upon completion of rehabilitative programs. The FRTF Research Committee may examine deferred or withheld adjudications to ascertain whether such adjudications resulted in a conviction as of the time of separation. Class Counsel may provide the FRTF Research Committee with any information available to Class Counsel indicating that a conviction is not a final judgment of conviction at the time of separation.

As part of the process set forth in Section III below, the FRTF Research Committee will evaluate whether an individual has rebutted the presumption that he or she is not a member of the *Ms. L.* Settlement Class despite his or her convictions at the time of separation for an offense set forth above. The FRTF Research Committee will review the information provided by Class Counsel, as well as the record of criminal convictions at the time of separation, to make this determination. In its use of any foreign databases, the FRTF Research Committee shall consider only convictions for offenses described in subsections II.J.2 and II.J.3 above. Where the FRTF Research Committee considers information from foreign databases it shall, as in all cases, also consider any countervailing information provided on the individual's behalf.

To make case-by-case determinations of class membership for individuals presumed not to be *Ms. L.* Settlement Class members because of criminal convictions described in Sections II.J.1 through II.J.3 above, the FRTF Research Committee will be guided by the following considerations:

- Whether the criminal conviction(s) demonstrate a threat to national security or public safety. Factors that point to a public safety threat, or to the absence of such a threat, include whether the conduct at issue poses a danger of violence toward, or abuse or exploitation of, others; the number of criminal convictions; the length of time since the offense date of the most recent criminal conviction that falls within subsections II.J.1-3 above, at the time of the separation; and the nature of the injury to another resulting from the conduct related to the conviction(s), and

- The seriousness of the criminal conviction(s).

Information presented by Class Counsel and other mitigating information will also be considered in the review, including any explanation of or justification for the criminal activity (e.g., issues related to poverty, self-defense, or persecution of the individual by authorities), the age and maturity of the individual at the time of the conviction, evidence of rehabilitation, humanitarian factors about the individual or their family, and other relevant information about the individual's circumstances.

HR-1 FRN 2025 AR-000326

**Appx-000351**

### III. Procedure for Determining Membership in the *Ms. L.* Settlement Class

This procedure will be used to resolve all issues regarding inclusion in the *Ms. L.* Settlement Class, including the submission of any documentation necessary for resolving such disputes. Parents or Legal Guardians who were separated from their child(ren) at the U.S.-Mexico border between January 20, 2017 and January 20, 2021, may seek inclusion in the *Ms. L.* Settlement Class and/or seek certain benefits available to the *Ms. L.* Settlement Class by presenting their information to the FRTF via the website together.gov or juntos.gov. By registering on the website, registrants are identifying themselves as current or potential class members. In order to be considered for relief under this Settlement Agreement, all potential *Ms. L.* Settlement Class members must register via the website together.gov or juntos.gov no later than the Final Registration Date.

If the individual has not already been included in the *Ms. L.* Settlement Class, the FRTF Research Committee will review the information a registrant provides to together.gov or juntos.gov, as well as DHS databases and National Criminal Information Center holdings, to determine if the individual is a member of the *Ms. L.* Settlement Class.

If the individual is *not* determined to be a member of the *Ms. L.* Settlement Class, including because of the individual's criminal history, Class Counsel and the individual will be notified of that fact by the FRTF Research Committee within 20 business days of registration on together.gov or juntos.gov. The written notification will explain the FRTF Research Committee's determination and include information and a copy of any document(s) that support the basis for the FRTF Research Committee's determination that the individual does not appear to be a presumptive member of the *Ms. L.* Settlement Class. If the FRTF Research Committee is legally prohibited from sharing a copy of the document(s), or if national security concerns would prohibit disclosure, then a summary of those documents shall suffice, as appropriate. Class Counsel will then have 60 business days to provide the FRTF Research Committee information to guide its case-by-case review; this 60-day period may be extended for up to 90 additional business days when Class Counsel notifies the FRTF Research Committee that such additional time is required. The FRTF Research Committee will then review the additional information provided by the Class Counsel and issue a decision as soon as practicable but not later than within 45 business days.

The FRTF Research Committee will promptly notify Class Counsel of the results of its case-by-case review. If the FRTF Research Committee determines that the individual should be part of the *Ms. L.* Settlement Class, the individual will be added to the list of *Ms. L.* Settlement Class members. If the FRTF Research Committee determines that the individual should not be part of the *Ms. L.* Settlement Class after reviewing the additional information, Class Counsel may appeal that decision to an independent adjudicator within thirty days of the FRTF Research Committee's decision. Class Counsel may seek one extension of the appeal deadline for up to 30 days, which shall be granted sparingly based on a showing of good cause at the discretion of the independent adjudicator. The parties will identify, agree to, and stipulate to the Court for appointment of an individual to serve as independent adjudicator. The independent adjudicator will review the FRTF Research Committee's decision, government documents the adjudicator deems relevant, and any submissions by Class Counsel, to determine *de novo* whether the preponderance of evidence supports the determination. The independent adjudicator will issue an order as to who pays the costs for any adjudication brought to him or her. Costs generally will be

8

paid by the losing party unless the independent adjudicator determines that the appeal, though unsuccessful, was reasonable and based on non-frivolous claims of error.

## IV. Relief Available to the *Ms. L.* Settlement Class

### A. Opportunity to Reunify for *Ms. L.* Settlement Class Members

Defendants will establish processes to provide the opportunity for all *Ms. L.* Settlement Class members to be able to reunify with their separated parent, Legal Guardian, or child. Defendants will also provide a process by which Qualifying Additional Family Members can similarly be provided an opportunity to live with the reunified parent or Legal Guardian and child in the United States. Defendants will return to the United States *Ms. L.* Settlement Class members and certain Qualifying Additional Family Members that the FRTF Research Committee determines are necessary for reunification at the government's expense, including the costs of travel and related support, to include travel support that is necessary to facilitate return and reunification. These processes are set forth in Section IV.C.1. of the Settlement Agreement.

### B. Support for *Ms. L.* Settlement Class Members Inside the United States

1.     The government will provide support and services to *Ms. L.* Settlement Class members already in the United States, or who have returned to the United States, as detailed below. The Parties agree that this support and services are necessary to facilitate successful reunifications and/or to prevent any ongoing harm caused by the initial separation. All services provided to *Ms. L.* Settlement Class members under this Section must begin no later than the Final Services Date.

2.     To facilitate the provision of the below support and services, the government will, consistent with applicable contract and grant requirements, expeditiously contract with, or enter into grants with, a third-party to provide benefit administration services for the housing benefits and will provide information to *Ms. L.* Settlement Class members concerning how to access the behavioral health and legal services described below. The provision of these services and benefits are subject to the availability of federal appropriations. The federal defendants may enter into an Economy Act Agreement among themselves under which one agency may award grants on their behalf to carry out the services provided under this Settlement Agreement. The government shall inform Class Counsel of the name of the selected contractor or grantee(s). A government contractor or grantee(s) will establish contact with the *Ms. L.* Settlement Class members to inform them of these services.

   a.   Behavioral Health Services: To facilitate the successful reunification of families and/or prevent ongoing harm caused by the initial separation of *Ms. L.* Settlement Class members, Defendants will make behavioral health services available to *Ms. L.* Settlement Class members from the Effective Date until one year after the Termination Date. In addition, HHS may, at its discretion, allow its contractor to extend behavioral health services to other immediate family members of class members if HHS determines that providing such services will assist class members in their successful reunification. Any individual *Ms. L.* Settlement Class member will be eligible to receive up to three years of such services. This is the only form of relief that will be available to separated children

9

HR-1 FRN 2025 AR-000328

**Appx-000353**

defined in Section II.C. above, who are members of the *Ms. L.* Settlement Class but whose parents or Legal Guardians are excluded from the *Ms. L.* Settlement Class on the basis of their criminal history. The behavioral health services to be provided under this provision of the Settlement Agreement include a continuation of the same child-centered pre-reunification counseling, clinical treatment services, behavioral health case management, psychoeducation, and parenting support that are being provided under an existing contract.

b.  <u>Assistance with Certain Medical Costs</u>: To support the successful reunification of *Ms. L.* Settlement Class member families who have returned and are returning to the United States for reunification, Defendants will make assistance available in paying the copayments incurred by *Ms. L.* Settlement Class members when receiving medical services at Federally Qualified Health Centers during a 12-month eligibility period.

- *Ms. L.* Settlement Class members in the United States who are registered in together.gov and confirmed as *Ms. L.* Settlement Class members as of the Effective Date have 12 months from the Effective Date to initiate their 12-month eligibility period;

- *Ms. L.* Settlement Class members in the United States who are not registered in together.gov or confirmed as *Ms. L.* Settlement Class members as of the Effective Date have 12 months from their Settlement Class Member Confirmation Date to initiate their 12-month eligibility period; and

- *Ms. L.* Settlement Class members not in the United States at the time of the settlement would be notified of the availability of the copayment assistance upon receiving confirmation that they are a *Ms. L.* Settlement Class member, and would have 12 months from the date they arrive in the United States to initiate their 12-month eligibility period.

c.  <u>Immigration Legal Services</u>: Defendants, with EOIR, will provide legal access and orientation as detailed below to specifically focus on *Ms. L.* Settlement Class members. The services will include:

i.  *Legal Access Services for Reunified Families*

(a) In addition to the group information sessions, individual information sessions, and self-help workshops that EOIR's Immigration Court Helpdesk Program (ICH) currently offers, EOIR, through ICH or a separate similar program ("Program"), shall also provide assistance to *Ms. L.* Settlement Class members, short of full representation, including:
- legal advice, such as individualized consultations and counseling about relief for which *Ms. L.* Settlement Class members may be eligible, and the steps necessary to apply for such relief, as well as preparation for any interviews before USCIS;
- assistance with document preparation, including preparing immigration-related legal documents for submission to DHS (including

10

HR-1 FRN 2025 AR-000329
**Appx-000354**

USCIS), and EOIR pursuant to EOIR's limited appearance regulations; and

- Friend of the Court services, where allowed by the immigration court, to facilitate the flow of information in the courtroom, including informing noncitizens of their rights and obligations and calling attention to law or facts that may be helpful to the immigration court. Where permitted by the immigration court, EOIR will facilitate remote or in-person access for Friend of Court services as appropriate given language needs or location of the participating family and legal services provider.
- The Program shall also provide transportation stipends for in-person legal services court appearance for families for whom remote services are inappropriate given language needs or disability.
- EOIR will provide trauma-informed interpretation for *Ms. L.* Settlement Class members receiving Program services.
- This Program will be available through at least eight regional offices.

(b) The Program will ensure that, in addition to providing the services listed above at existing ICH locations, and in person where possible, the Program will provide these services via remote technology to *Ms. L.* Settlement Class members who (1) live outside the ICH's geographic regions, or (2) are otherwise unable to obtain ICH services.

(c) The Program will create new resources and orientation presentations tailored to address the particular needs of *Ms. L.* Settlement Class members. The orientations will address, at a minimum, the immigration court process, any forms of relief that may allow the families to remain in the United States, and questions about family reunification and humanitarian parole. The Program will also develop written materials as resources for the families, to include self-help guides, videos, and more. The Program will offer additional tailored pro se workshops to assist *Ms. L.* Settlement Class members prepare any applications for relief, as needed, and will create guidance documents to explain any changes in the law or settlement processes that may impact *Ms. L.* Settlement Class members. The materials will be offered in the best language of the *Ms. L.* Settlement Class member.

(d) Defendants will ensure that the Program is adequately resourced and funded to provide services for all unrepresented *Ms. L.* Settlement Class members, with the ability to increase funding to meet projected needs as determined by Defendants, taking into account information about needs provided by Plaintiffs. EOIR will not decrease funding for its current legal access programs (ICH, LOPC, LOP, CCI/NQRP) in order to fund legal services under this Settlement.

HR-1 FRN 2025 AR-000330
**Appx-000355**

    ii.    *Program to Place Cases with Pro Bono Representatives*

        (a) EOIR cannot ensure that it can find a pro bono representative for every family. However, the Program will leverage its existing pro bono referral efforts, and provide additional funding, to recruit, train, mentor, and match pro bono attorneys to represent *Ms. L.* Settlement Class members. EOIR will facilitate Model Hearing Programs in connection with provider training for new pro bono representatives, where available.

        (b) The Program would identify cases for pro bono placement through in-depth individualized consultations of *Ms. L.* Settlement Class members. These cases would then be placed on an online pro bono platform to help match potential pro bono representatives with reunified families. The Program will provide pro bono attorneys with mentors to advise and consult with them throughout the case.

        (c) All pro bono attorneys to whom *Ms. L.* Settlement Class members are referred through EOIR will be notified that pro bono psychological evaluations will be made available through the existing HHS behavioral health contract with Seneca Family of Agencies.

        (d) The Program will create a library of written and recorded training materials to help pro bono attorneys and legal service providers to best assist *Ms. L.* Settlement Class members. The trainings will cover substantive and procedural immigration law issues, education on working with vulnerable populations, trauma-informed care, and child protection. Additionally, webinars/video trainings will also be provided on immigration-related topics to help with effective representation.

    iii.    *Assistance Outside EOIR Proceedings*

        (a) To ensure *Ms. L.* Settlement Class members have the ability to reunify through the process set out in Section IV.C.1, and as part of the governmental assistance to Qualifying Additional Family Members in Section IV.C.1., Defendants will continue to contract with an independent contractor to communicate with *Ms. L.* Settlement Class members and assist *Ms. L.* Settlement Class members and Qualifying Additional Family Members with necessary parole and employment authorization applications.

        (b) Defendants will, under the Protective Order, ensure that contact information of *Ms. L.* Settlement Class members is provided to the contractor, and establish links between the contractor and other organizations that work

HR-1 FRN 2025 AR-000331

**Appx-000356**

with, or have potential access to, *Ms. L.* Settlement Class members to facilitate referrals to the Program. This would include a call center (e.g., 'hotline' or telephonic help desk) that will conduct affirmative outreach to identify and screen people and refer them to services.

(c) The contractor will be authorized to coordinate with Class Counsel and the designated provider organization to ensure that *Ms. L.* Settlement Class members and Qualifying Additional Family Members are aware of legal services, to maintain continuity of services, and to assist where necessary to ensure reunification.

d. <u>Housing Support</u>: To support the successful reunification of families who have returned and are returning to the United States for reunification, Defendants will make housing assistance available to *Ms. L.* Settlement Class members in meeting housing needs, as determined necessary by a benefits administration contractor or grantee during a 12-month eligibility period. This may include assistance in locating housing; paying costs necessary to attain housing, e.g., security deposit and first and last month's rent; and assistance to avoid eviction and meet other emergency housing needs during the 12-month eligibility period. Payments would typically be made to landlords and not in the form of cash to the *Ms. L.* Settlement Class member, and would be for no more than a total of 6 months during the 12-month eligibility period absent extraordinary circumstances.

   i.    *If the housing assistance is available as of the Effective Date:*

(a) *Ms. L.* Settlement Class members in the United States who are registered in together.gov and confirmed to be a *Ms. L.* Settlement Class member as of the Effective Date would have 12 months from the Effective Date to initiate their 12-month eligibility period;

(b) *Ms. L.* Settlement Class members in the United States who are not registered in together.gov or not yet confirmed as a *Ms. L.* Settlement Class member as of the Effective Date would have 12 months after their Settlement Class Member Confirmation Date to initiate their 12-month eligibility period; and

(c) *Ms. L.* Settlement Class members not in the United States at the time of the Effective Date would be notified of the availability of the housing assistance upon receiving confirmation that they are a *Ms. L.* Settlement Class member, and would have 12 months from their arrival in the United States to initiate their 12-month eligibility period.

   ii.   *If the housing assistance becomes available after the Effective Date,* then a *Ms. L.* Settlement Class member will have one year from the date that all three of the following conditions are met to initiate their eligibility period: (1) the *Ms. L.* Settlement Class member is inside the United States; (2) he or she is confirmed to be a *Ms. L.* Settlement Class member; and (3) he or she is notified of the availability of the housing assistance benefit.

13

C. **Immigration Processing**

1. *Thirty-six months of Parole and Employment Authorization*

Certain *Ms. L.* Settlement Class members and Qualifying Additional Family Members, as defined in Section I.L., will have the opportunity to apply for parole pursuant to section 212(d)(5) of the Immigration and Nationality Act (INA) with USCIS. This opportunity will extend to *Ms. L.* Settlement Class members and Qualifying Additional Family Members who are not currently in the United States, as well as those present in the United States who upon their last entry were not admitted. *Ms. L.* Settlement Class members and Qualifying Additional Family Members who are in removal proceedings, or who have a final order of removal or an order granting voluntary departure, can apply for parole with USCIS under this process. Parole for individuals already present in the United States is sometimes referred to as "parole in place" ("PIP"). Parole applications will be adjudicated on a case-by-case basis and approval of the request for parole is not guaranteed based on this Settlement Agreement. DHS retains its existing discretion to grant or deny applications for parole, as well as its existing discretion to grant or deny parole at the time of inspection at a port of entry.

*Ms. L.* Settlement Class members who wish to request parole under this process must register on together.gov or juntos.gov. They may then file a parole application with USCIS on Form I-131, *Application for Travel Document*,[3] following the instructions set forth in the applicable FRTF Parole Filing Guidelines.[4] *Ms. L.* Settlement Class members will not be required to submit proof of financial support with their parole requests.

Individuals seeking parole as Qualifying Additional Family Members must submit evidence of the familial relationship with, or membership in the immediate household of, a *Ms. L.* Settlement Class member, and an urgent humanitarian reason for consideration for parole. The Qualifying Additional Family Members must also follow the FRTF Parole Filing Guides. If the Qualifying Additional Family Member lives in the same country as the *Ms. L.* Settlement Class member, the parole requests must be filed at the same time as the request of the *Ms. L.* Settlement Class member, absent exceptional circumstances. If the Qualifying Additional Family Member is living in a different country from the *Ms. L.* Settlement Class member, they may file at different times, although concurrent filing is preferred.

USCIS will exempt the filing fee for the Form I-131, *Application for Travel Document* (parole application), for all *Ms. L.* Settlement Class members' and Qualifying Additional Family Members' parole requests submitted in compliance with the FRTF Parole Filing Guides. Requests for parole will be adjudicated on a case-by-case basis and parole is not guaranteed based on this Settlement Agreement. For evidentiary support, USCIS will accept and consider any relevant

---

[3] This includes successor versions of Form I-131.

[4] "Guide for Completing a Form I-131, *Application for Travel Document*, and Filing an Initial Parole Request under the Family Reunification Task Force (FRTF) Process on behalf of Individuals Outside the United States" or the "Guide for Completing a Form I-131, *Application for Travel Document*, and Filing an Initial Parole-in-Place (PIP) Request under the Family Reunification Task Force (FRTF) Process" or their replacements (collectively, FRTF Parole Filing Guides).

14

credible evidence, including a declaration from the applicant or the applicant's family member, or any other individual with direct personal knowledge of the relevant facts or circumstances of the qualifying relationship.

If the parole request is approved, USCIS will issue a travel document authorizing parole for a period of 36 months from the date the individual is paroled at the port of entry (for individuals outside the United States) or a Form I-94, *Arrival/Departure Record* valid for 36 months from the date parole is approved (for requests for parole in place). CBP has final authority to grant parole at the port of entry. The *Ms. L.* Settlement Class member or Qualifying Additional Family Member may apply for employment authorization pursuant to 8 C.F.R. § 274a.12(c)(11) once he or she is paroled into the United States. An initial Form I-765, *Application for Employment Authorization* (EAD application), will be accepted and adjudicated without a fee or a fee waiver required and, if approved, the time frame for employment authorization will align with the duration of parole.

*Ms. L.* Settlement Class members and Qualifying Additional Family Members who are in removal proceedings pursuant to Section 240 of the INA will not be required to obtain dismissal, termination, administrative closure, or continuances of their removal proceedings before requesting parole from USCIS.

The government's preference is that *Ms. L.* Settlement Class members and Qualifying Additional Family Members in the United States, who receive parole from USCIS as described in this section and are in INA § 240 removal proceedings or withholding-only proceedings before an Immigration Judge request, by contacting the applicable ICE Office of the Principal Legal Advisor (ICE OPLA) field location, that DHS agree to the filing of a joint motion to dismiss their removal proceedings without prejudice, or alternatively, to not oppose a motion for administrative closure of their removal proceedings, where permitted by law, with the immigration court. DHS will review such requests on a case-by-case basis, including whether dismissal or administrative closure of the case is warranted as a matter of prosecutorial discretion. DHS will consider membership in the *Ms. L.* Settlement Class, designation as a Qualifying Additional Family Member, and the grant of parole, as factors in determining whether to exercise prosecutorial discretion. DHS's agreement or non-opposition to the filing of such motions will also be contingent on the *Ms. L.* Settlement Class member or Qualifying Additional Family Member being neither potentially subject to nor been found to be subject to a statutory bar to asylum pursuant to 8 U.S.C. § 1158(b)(2)(A)(i)-(v), INA § 208(b)(2)(A)(i)-(v). An immigration judge's grant of a joint motion to dismiss or terminate removal proceedings shall not reflect an adjudication on the merits of the *Ms. L.* Settlement Class member's or Qualifying Additional Family Member's removability. In cases in which a *Ms. L.* Settlement Class member's or Qualifying Additional Family Member's INA § 240 removal proceedings have been administratively closed pursuant to this Settlement Agreement, either party may move to recalendar those proceedings through the filing of a motion to recalendar with the immigration court. *Ms. L.* Settlement Class members' or Qualifying Additional Family Members' receipt of parole shall not be conditioned on their taking any action to delay or dismiss their pending INA § 240 removal proceedings.  The FRTF will communicate the A-numbers of individuals approved for parole to ICE Enforcement and Removal Operations (ERO) and ICE OPLA to ensure those DHS components remain fully informed.

HR-1 FRN 2025 AR-000334
**Appx-000359**

*Ms. L.* Settlement Class members and Qualifying Additional Family Members who are in INA § 240 removal proceedings, or are in expedited removal proceedings, or are in withholding only proceedings, or have an expedited removal order with a pending credible fear interview (CFI), or have a reinstated order of removal with a pending reasonable fear interview (RFI), may request parole from USCIS under this Section; however, certain procedural steps must occur depending on the proceeding.

For *Ms. L.* Settlement Class members and Qualifying Additional Family Members in INA § 240 removal proceedings or withholding-only proceedings before an immigration judge:

a.  If USCIS denies the *Ms. L.* Settlement Class member's or Qualifying Additional Family Member's parole application, and the individual's INA § 240 or withholding-only proceedings have not been terminated, dismissed, or administratively closed, the proceedings will move forward until completion. If INA § 240 removal proceedings or withholding-only proceedings were administratively closed, DHS may move to recalendar the case.

b.  If USCIS approves the parole application and the *Ms. L.* Settlement Class member's or Qualifying Additional Family Member's INA § 240 removal proceedings have not been administratively closed, the individual may submit a request to ICE OPLA that it agree to the filing of a joint motion to dismiss, or not oppose a motion to administratively close his or her proceedings.  The request must be submitted on or before one year after USCIS approves the parole application. This request deadline does not abrogate or shorten any potentially applicable deadlines set forth in Section IV.C.3., *infra.* The request must also contain, at minimum, evidence that the individual is a *Ms. L.* Settlement Class member or Qualifying Additional Family Member, including but not limited to USCIS' grant of parole, and the authorized period of parole must not have expired or been terminated. DHS will review properly submitted requests on a case-by-case basis within 90 days of the next scheduled hearing, or as soon as practicable if no hearing is scheduled, and agree to the filing of a joint motion for dismissal without prejudice or to not oppose a motion for administrative closure if DHS determines that such action is appropriate as a matter of prosecutorial discretion. DHS will consider membership in the *Ms. L.* Settlement Class and the grant of parole as factors in determining whether to exercise prosecutorial discretion. DHS's agreement to the filing of such motions will also be contingent on the *Ms. L.* Settlement Class member or Qualifying Additional Family Member being neither potentially subject to nor been found to be subject to a statutory bar to asylum pursuant to 8 U.S.C. § 1158(b)(2)(A)(i)-(v), INA § 208(b)(2)(A)(i)-(v) due to information unknown to USCIS at the time of adjudication or actions since the individual was granted parole by USCIS.  The immigration judge's grant of a joint motion to dismiss or terminate shall not reflect an adjudication on the merits of the *Ms. L.* Settlement Class member's or Qualifying Additional Family Member's removability.

*Ms. L.* Settlement Class members and Qualifying Additional Family Members in INA § 240 removal proceedings or withholding-only proceedings before an immigration judge who have properly filed a parole request with USCIS and were issued a Form I-797, Notice of Action, reflecting USCIS receipt of their Form I-131 and a copy of their properly filed Form I-131, may

HR-1 FRN 2025 AR-000335

**Appx-000360**

submit a request to the applicable ICE OPLA field location for DHS to join or not oppose a motion for a continuance of the proceeding at any time but no later than one  year after USCIS issues the Form I-797. DHS will review the request on a case-by-case basis, including whether a continuance is warranted as a matter of prosecutorial discretion, within 90 days of the scheduled hearing. DHS will also respond to any inquiries by the FRTF regarding its review of or decision on the motion for a continuance. ICE OPLA will consider membership in the *Ms. L.* Settlement Class and designation as a Qualifying Additional Family Member as factors in determining whether to exercise prosecutorial discretion.

For *Ms. L.* Settlement Class members and Qualifying Additional Family Members who have expedited removal or reinstatement orders, are in expedited removal proceedings with a pending CFI, or have a reinstated order of removal with a pending RFI:

   a. The expedited removal order or reinstated order does not need to be cancelled in order to request parole.

   b. The underlying expedited removal order or reinstated order cannot be executed because of the pending CFI or RFI.

   c. USCIS may authorize a new parole period through this process if the individual was previously paroled by ICE or CBP for purposes of a CFI or RFI.

*Ms. L.* Settlement Class members and Qualifying Additional Family Members who have final orders of removal received in INA § 240 proceedings, and/or who have pending motions to reopen and petitions for review of such orders, may request parole in place without requesting reopening of the final removal order.

*Ms. L.* Settlement Class members with an Unfiled NTA, may request parole under this Section.

When considering whether to approve a request for parole by a *Ms. L.* Settlement Class member or a Qualifying Additional Family Member with prior conditions of release imposed by ICE or CBP, USCIS may consult with ICE or CBP regarding whether CBP or ICE intend to lift or modify the prior conditions of release following a USCIS parole approval. Decisions on conditions of release from custody are discretionary and this agreement does not guarantee that DHS will agree to lift or modify such conditions.

*Ms. L.* Settlement Class members and Qualifying Additional Family Members who are in the United States may request additional parole periods (i.e., re-parole) with USCIS prior to the expiration of their authorized parole period and prior to the Termination Date if there is a continued need to promote family well-being and unity or to continue behavioral health services under this Settlement Agreement.  This showing of continued need may be based on the same or similar evidence that supported the initial application but must demonstrate that the need is ongoing. If approved for re-parole, the authorized period of parole will be for the period needed to achieve the stated purpose, up to an additional thirty-six months. *Ms. L.* Settlement Class members and Qualifying Additional Family Members requesting re-parole will not be required to pay the parole

HR-1 FRN 2025 AR-000336
**Appx-000361**

application fee. Requests for re-parole will be determined on a case-by-case basis and parole is not guaranteed based on this Settlement Agreement. If the *Ms. L.* Settlement Class member or Qualifying Additional Family Member's re-parole request is approved, the applicant may apply for employment authorization pursuant to 8 C.F.R. § 274a.12(c)(11) to align with the period of re-parole. USCIS will also exempt the filing fee for one Form I-765 renewal application for employment authorization, with no fee waiver application required, based on a period of re-parole granted under this settlement for *Ms. L.* Settlement Class members and Qualifying Additional Family Members.

In cases where *Ms. L.* Settlement Class members' and Qualifying Additional Family Members' parole applications pursuant to this Settlement Agreement are denied by USCIS, USCIS will not use the denial of the parole application as the sole basis for referring the case for any enforcement action or issuance of an NTA. In all cases, USCIS will exercise its discretion on a case-by-case basis to determine whether issuance of an NTA or referral for enforcement action is necessary, weighing all aggravating and mitigating factors, including the harm caused by family separation.

2. *Further Immigration Relief*

DHS will create a single dedicated email inbox overseen by the Family Reunification Task Force, where certain immigration related requests can be sent, unless otherwise noted in the Settlement Agreement or in filing instructions provided by DHS.

a. Procedures for *Ms. L.* Settlement Class Members in the United States to Apply for Asylum with USCIS

The government will provide the opportunity for *Ms. L.* Settlement Class members who are in the United States to file affirmative asylum applications with USCIS and have those applications adjudicated or have preexisting affirmative asylum applications already filed with USCIS adjudicated, according to the following terms. USCIS will provide filing instructions for *Ms. L.* Settlement Class members consistent with the terms of this Settlement Agreement. *Ms. L.* Settlement Class members must comply with any such filing guidance and other procedures provided by USCIS. Asylum applications will be adjudicated on a case-by-case basis and approval of the application is not guaranteed based on this Settlement Agreement. USCIS retains its discretion to grant, deny, dismiss, or refer applications to EOIR under 8 U.S.C. § 1158, INA § 208; 8 C.F.R. § 208.14.

All properly filed and complete asylum applications filed by *Ms. L.* Settlement Class members with USCIS on or before the deadlines specified in Section IV.C.3., shall qualify for an extraordinary circumstances exception under 8 U.S.C. § 1158(a)(2)(D), INA § 208(a)(2)(D); 8 C.F.R. §§ 208.4(a)(5), 1208.4(a)(5) and will be found to have been filed within a reasonable period given the circumstances under 8 C.F.R. §§ 208.4(a)(5), 1208.4(a)(5) for purposes of the statutory one-year filing deadline requirement under 8 U.S.C. § 1158(a)(2)(B), INA § 208(a)(2)(B). The date USCIS receives the properly filed and complete asylum application is considered the date the asylum application is filed. 8 C.F.R. § 208.4(a)(2)(ii).

18

Appx-000362

*Ms. L.* Settlement Class members may submit written requests for expedited processing of their asylum applications to the asylum office with jurisdiction over their asylum application, consistent with the guidance for making expedite requests for an asylum application at https://www.uscis.gov/forms/filing-guidance/how-to-make-an-expedite-request and https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/affirmative-asylum-interview-scheduling. Requests for expedited processing are considered on a case-by-case basis and in light of workload priorities.  DHS will instruct the asylum offices to consider membership in the *Ms. L.* Settlement Class as a favorable factor in any requests to expedite the interview.

USCIS will provide training to all relevant Asylum Division staff, including Asylum Officers, Training Officers, Supervisory Asylum Officers (SAOs), and relevant operational staff, on the *Ms. L.* litigation and the terms of this Settlement Agreement, and will remind officers of the relevant lesson plans to consult on issues potentially specific or germane to *Ms. L.* Settlement Class members. Among other topics, this training will address the unique and continuing effects of the trauma of forced family separation, which may affect *Ms. L.* Settlement Class members' demeanor and/or the ability to recall traumatic facts during an asylum interview, CFI/RFI, and/or immigration court hearing. The guidance shall instruct that Asylum Officers should account for the unique trauma of family separation when assessing matters such as credibility and the level of detail and consistency it is reasonable to expect in an applicant's testimony.

The training will also include a summary of asylum statutes, regulations, and case law that may be relevant to potential *Ms. L.* Settlement Class members' claims, including those claims involving a fear of persecution connected to forced family separation by the U.S. Government through the Zero Tolerance Policy and its associated policies and practices.  The training will include a reminder to officers that *Ms. L.* Settlement Class members may present claims based on any of the five statutorily protected grounds, including membership in a particular social group (PSG). Whether *Ms. L.* Settlement Class members can establish past persecution or a well-founded fear of future persecution on account of membership in a PSG will depend on the factual circumstances that exist in the *Ms. L.* Settlement Class member's country of citizenship and the *Ms. L.* Settlement Class member's specific circumstances.  Consistent with asylum law, the determination of whether a *Ms. L.* Settlement Class member has been persecuted or has a well-founded fear of future persecution on account of membership in a PSG must be conducted on an individualized basis, based on the particular facts presented in each case.

Within 75 days of the filing of the motion for preliminary approval of the Settlement Agreement, USCIS will share the non-privileged portions of the training materials with Class Counsel, under any necessary protective orders. Class Counsel will then have 21 days to return comments and feedback on the training to the government. USCIS will take Class Counsel's comments and feedback into consideration in finalizing the training and will share a final copy of the non-privileged portions of the training materials with Class Counsel.

*Ms. L.* Settlement Class members' affirmative asylum applications will be reviewed by a centralized group of SAOs or Asylum Officers detailed as SAOs, prior to any denial or referral to EOIR. Such officers will receive the training described above. In addition, USCIS Asylum Division Headquarters will conduct randomized pre-service review on a subset of *Ms. L.* Settlement Class members' asylum application decisions (grants, denials, dismissals, and referrals

HR-1 FRN 2025 AR-000338

**Appx-000363**

to EOIR) on a rolling basis and offer additional guidance and calibration sessions to the field as deemed appropriate following review of such cases.

USCIS will identify the affirmative asylum applications filed by *Ms. L.* Settlement Class members pending before USCIS as of the final approval of the settlement, including affirmative applications filed by *Ms. L.* Settlement Class members over whom USCIS has initial jurisdiction as an Unaccompanied Child pursuant to 8 U.S.C. § 1158(b)(3)(C), INA § 208(b)(3)(C). Adjudication of such pending asylum applications will be governed by the procedures for USCIS asylum adjudications set forth in the Settlement Agreement.

If USCIS denied or referred to EOIR a *Ms. L.* Settlement Class member's affirmative asylum application prior to the Effective Date, USCIS will reopen the asylum application following the *Ms. L.* Settlement Class member's request, subject to the deadlines specified in Section IV.C.3., and adjudicate the asylum application pursuant to the procedures for asylum adjudications set forth in this Settlement Agreement. This requirement does not apply to subsequent denials or referrals to EOIR of a *Ms. L.* Settlement Class member's affirmative asylum application if the application was adjudicated pursuant to the procedures set forth in this Settlement Agreement. This paragraph includes Unfiled NTAs; see further information in Section IV.C.2.e. below. If the NTA was filed and docketed with the immigration court, the procedures set forth in Section IV.C.2.b. below will apply; USCIS will reopen and adjudicate such an asylum application after the *Ms. L.* Settlement Class member requests reopening from USCIS only if EOIR has dismissed or terminated the INA § 240 removal proceedings, consistent with Section IV.C.2.c, below. Additional and specific provisions concerning *Ms. L.* Settlement Class members in particular removal postures are set forth below.

     b.   Dismissal or Termination, Recalendaring/Dismissal or Termination, and Reopening/Dismissal or Termination of INA § 240 Removal Proceedings for *Ms. L.* Settlement Class Members

All requests for DHS to join or, where applicable, non-oppose motions or appeals discussed in this subsection will be adjudicated on a case-by-case basis. DHS's decision whether to join or not oppose a motion may be influenced by information unknown to USCIS at the time of the parole adjudication or by the *Ms. L.* Settlement Class member's actions after he or she was granted parole by USCIS, if applicable. DHS will ensure that the email addresses or mailboxes to be used for the submission of requests for DHS to join or not oppose motions discussed in this subsection are posted on its public facing page on ICE.gov, and will reference the required information to be included when submitting such requests (e.g., identifying in the subject line that the noncitizen is a *Ms. L.* Settlement Class member). DHS will endeavor to prioritize its review and handling of any properly submitted request, subject to any staffing or resource constraints.

*Ms. L.* Settlement Class members requesting that USCIS reopen a previously denied or referred asylum application who are in INA § 240 removal proceedings, whose removal proceedings were not previously dismissed or terminated, may submit a request to the applicable ICE OPLA field location that DHS agree to the filing of a joint motion to dismiss or terminate or a joint motion to recalendar and dismiss or terminate the removal proceedings before the immigration judge or the Board of Immigration Appeals (BIA), where applicable. DHS will review

HR-1 FRN 2025 AR-000339
**Appx-000364**

properly submitted requests on a case-by-case basis and agree to the filing of a joint motion to dismiss or terminate, or a joint motion to reopen and dismiss or terminate the INA § 240 proceedings without prejudice if DHS determines that such action is appropriate as a matter of prosecutorial discretion. When determining if prosecutorial discretion is appropriate, DHS will take into consideration the fact that the individual is a *Ms. L.* Settlement Class member and was granted parole. DHS's agreement to the filing of such motions will also be contingent on the *Ms. L.* Settlement Class member being neither potentially subject to nor having been found to be subject to a statutory bar to asylum pursuant to 8 U.S.C. § 1158(b)(2)(A)(i)-(v), INA § 208(b)(2)(A)(i)-(v) due to information unknown to USCIS at the time of the parole adjudication or by the *Ms. L.* Settlement Class member's actions after he or she was granted parole by USCIS. The immigration judge's grant of a joint motion to dismiss or terminate shall not reflect an adjudication on the merits of the *Ms. L.* Settlement Class member's removability.

For *Ms. L.* Settlement Class members who are in consolidated INA § 240 removal proceedings with Qualifying Additional Family Members, the request submitted to DHS that it agree to the filing of a joint motion to dismiss or terminate, a non-opposition or joint motion to recalendar and dismiss or terminate, or a joint motion to reopen and dismiss or terminate INA § 240 removal proceedings without prejudice may include Qualified Additional Family Members who are in the consolidated INA § 240 removal proceeding with the *Ms. L.* Settlement Class member. Any filings submitted to the Immigration Court must comply with EOIR, Imm Ct. Practice Manual, Ch. 5.1(a). To the extent the *Ms. L.* Settlement Class member's INA § 240 proceedings have a hearing date docketed before the immigration court before the deadlines set forth in Section IV.C.3, *infra*, DHS will review requests submitted no earlier than 90 days prior to the *Ms. L.* Settlement Class member's scheduled master calendar or merits hearing on a case-by-case basis. DHS will review requests submitted by all other *Ms. L.* Settlement Class members as soon as practicable. DHS will agree to join or not oppose the filing of a motion to dismiss or terminate, or a motion to recalendar and dismiss or terminate, or a motion to reopen and dismiss or terminate that includes the *Ms. L.* Settlement Class members' Qualifying Additional Family Members if DHS determines such action is appropriate as a matter of prosecutorial discretion. DHS's agreement or non-opposition to the filing of such motions will also be contingent on the *Ms. L.* Settlement Class member and Qualifying Additional Family Member being neither potentially subject to nor having been found to be subject to a statutory bar to asylum pursuant to 8 U.S.C. § 1158(b)(2)(A)(i)-(v), INA § 208(b)(2)(A)(i)-(v) due to information unknown to USCIS at the time of adjudication of the parole application or by the *Ms. L.* Settlement Class member's or Qualified Additional Family Member's actions after he or she was granted parole by USCIS. The immigration judge's grant of a joint motion to dismiss or terminate shall not reflect an adjudication on the merits of the *Ms. L.* Settlement Class member's or Qualifying Additional Family Member's removability.

The Immigration Court (or, in some instances, the BIA) has sole discretion whether to grant or deny such motions. The motion should explain that it is not in DHS's interest to continue the case, because the individual is a *Ms. L.* Settlement Class member, and that dismissal or termination is being sought under this Settlement Agreement. Should an immigration judge deny a motion to dismiss or terminate or reopen an order under this provision, DHS will consider, on a case-by-case basis, joining or not opposing a motion to the Immigration Court to reconsider the denial and/or filing a statement of non-opposition in any appeal to the BIA of such a denial. EOIR will advise

HR-1 FRN 2025 AR-000340
**Appx-000365**

adjudicators about the terms of this Settlement Agreement as it concerns EOIR and in a manner that is consistent with the independent judgment and discretion exercised by immigration judges and appellate immigration judges.

*Ms. L.* Settlement Class members described in this Section who have a pending petition for review of their INA § 240 proceedings orders under 8 U.S.C. § 1252, INA § 242, should coordinate with Class Counsel and the Department of Justice ("DOJ") attorney assigned to the petition for review, to ensure that the relevant circuit courts of appeals can enter appropriate orders remanding or dismissing the petitions. The Government's expectation is that, absent unusual circumstances, DOJ will agree to a motion for remand or dismissal, if requested by the *Ms. L.* Settlement Class member.

Requests to DHS to join motions to dismiss or terminate, reopen and dismiss or terminate, or remand from the BIA and dismiss or terminate INA § 240 proceedings under this Settlement Agreement must be submitted in accordance with the deadlines specified in Section IV.C.3.

    c.   Procedures for *Ms. L.* Settlement Class Members with Terminated or Dismissed INA § 240 Removal Proceedings Who Filed a Prior Asylum Application

For those *Ms. L.* Settlement Class members:

    i.    Whose INA § 240 proceedings are terminated or dismissed;

    ii.   Who already filed an asylum application directly with EOIR or with USCIS that USCIS then referred or sent to EOIR (both referred to as a "prior asylum application"); and

   iii.   Who subsequently properly file a new complete asylum application with USCIS or request that USCIS reopen their prior asylum application subject to the deadlines specified in Section IV.C.3:

USCIS agrees:

- To use the initial filing date of the prior asylum application, as defined above, for purposes of affirmative asylum interview scheduling, and will apply the scheduling priorities in place at the time of scheduling.
- To use the initial filing date of the prior asylum application, as defined above, for adjudicating EAD applications filed under 8 C.F.R. § 274a.12(c)(8) (pending asylum applications), if the *Ms. L.* Settlement Class member seeks an initial or renewal (c)(8) EAD after the new asylum application has been completed and properly filed with USCIS or reopened by USCIS.
- To inform EOIR that the individual is a *Ms. L.* Settlement Class member and is entitled to any applicable relief under this Settlement Agreement when subsequently referring *Ms. L.* Settlement Class members' asylum applications to EOIR for adjudication in INA § 240 proceedings, if applicable.

HR-1 FRN 2025 AR-000341
**Appx-000366**

*Ms. L.* Settlement Class members described in this subsection must comply with any specific filing guidance or reopening procedures provided by USCIS for both the asylum application and EAD application.

For purposes of this subsection, Section IV.C.2.c, the date USCIS receives the subsequent properly filed and complete asylum application or receives the request to reopen the prior asylum application is considered the date the asylum application is filed, or the date reopening is requested.

For purposes of verifying immigration status information for benefit-granting agencies, and notwithstanding USCIS's agreement above, the USCIS Systematic Alien Verification for Entitlements Program (SAVE) will not reflect that an asylum application is pending if a benefits-granting agency queries SAVE during the period between dismissal or termination of INA § 240 proceedings and the date when the *Ms. L.* Settlement Class member properly files or requests reopening of an asylum application with USCIS pursuant to this Settlement Agreement.

d. <u>Procedures For *Ms. L.* Settlement Class Members Who Are in Expedited Removal or Reinstatement Proceedings or Have Expedited or Reinstated Removal Orders</u>

Following the Effective Date, *Ms. L.* Settlement Class members who have:

    i.    Pending expedited removal proceedings or reinstatement proceedings (including those pending a credible fear determination or a reasonable fear determination from USCIS, and those in withholding-only proceedings under 8 C.F.R. § 1208.2(c)(2)(i)); or

    ii.    Final expedited removal orders or reinstated orders of removal (including those with a negative credible fear determination or negative reasonable fear determination from USCIS or such determination that was affirmed by EOIR)

may request the DHS component that issued the charging document or removal order to exercise its prosecutorial discretion to cancel the pending proceeding or rescind the removal order. DHS, upon conducting an individualized review, will grant the request if it determines that such action is appropriate as a matter of discretion and the *Ms. L.* Settlement Class member is neither potentially subject to nor been found to be subject to a statutory bar to asylum pursuant to 8 U.S.C. § 1158(b)(2)(A)(i)-(v), INA § 208(b)(2)(A)(i)-(v). DHS will ensure that the email addresses or mailboxes to be used for the submission of such requests are posted on its public facing websites, and will reference the required information to be included when submitting such requests (e.g., identifying in the subject line of the email that the noncitizen is a *Ms. L.* Settlement Class member). DHS will endeavor to prioritize its review and handling of any properly submitted requests, subject to any staffing or resource constraints.

For those *Ms. L.* Settlement Class members in withholding-only proceedings, upon rescission of the *Ms. L.* Settlement Class member's reinstatement order, DHS will file, not oppose, or join a motion to terminate such proceedings before the Immigration Court or BIA.

Upon rescission of the unexecuted reinstatement or expedited removal order, and, if applicable, termination of withholding-only proceedings, the *Ms. L.* Settlement Class member shall

HR-1 FRN 2025 AR-000342

**Appx-000367**

have the opportunity to apply for asylum with USCIS pursuant to Section IV.C.2.a., above. *Ms. L.* Settlement Class members whose reinstated orders of removal have been rescinded may request that DHS join or not oppose a properly filed motion to reopen the prior removal order that served as the basis for the reinstated order and dismiss the removal proceeding in which that order was originally entered  where: (1) the *Ms. L.* Settlement Class member was previously denied asylum in INA § 240 removal proceedings; (2) the *Ms. L.* Settlement Class member was not found to be subject to a statutory bar to asylum pursuant to 8 U.S.C. § 1158(b)(2)(A)(i)-(v), INA § 208(b)(2)(A)(i)-(v); (3) the prior asylum application was denied after the separation that renders the noncitizen a *Ms. L.* Settlement Class member occurred; and (4) DHS determines such action is appropriate as a matter of prosecutorial discretion. Requests will be adjudicated on a case-by-case basis, and approval or agreement may by affected due to information unknown to USCIS at the time of parole adjudication or actions since the individual was granted parole by USCIS.

e.   Procedures for *Ms. L.* Settlement Class Members with an Unfiled NTA

USCIS will adjudicate asylum applications for *Ms. L.* Settlement Class members filed pursuant to the terms of this Settlement Agreement if USCIS has jurisdiction over the application pursuant to 8 C.F.R. § 208.2(a), notwithstanding the existence of an Unfiled NTA. However, *Ms. L.* Settlement Class members with an Unfiled NTA as of the Effective Date of the Settlement Agreement may request that the DHS component that issued the NTA exercise its prosecutorial discretion to cancel the NTA. The DHS component, upon conducting an individualized review, will grant the request and cancel the NTA if it determines that such action is appropriate as a matter of discretion and that the *Ms. L.* Settlement Class member is neither potentially subject to nor been found to be subject to a statutory bar to asylum pursuant to 8 U.S.C. § 1158(b)(2)(A)(i)-(v), INA § 208(b)(2)(A)(i)-(v). Cancellation of the NTA is not guaranteed and may be affected due to information unknown to USCIS at the time of parole adjudication under the terms of this Settlement Agreement or actions since the individual was granted parole, if at all, by USCIS.

f.   Provision of Procedural Protections for *Ms. L.* Settlement Class Members in Pending 240 Removal Proceedings

EOIR will be advised concerning the rights of *Ms. L.* Settlement Class members under this Settlement Agreement as they pertain to EOIR. For *Ms. L.* Settlement Class members in INA § 240 removal proceedings who elect to proceed with their asylum claims in immigration court in lieu of seeking termination or dismissal of their removal proceedings under this Settlement Agreement, and who have pending asylum applications that were properly filed with the immigration court on or before the two years after their Settlement Class Member Confirmation Date, shall qualify for an extraordinary circumstances exception under 8 U.S.C. § 1158(a)(2)(D), INA § 208(a)(2)(D); 8 C.F.R. §§ 208.4(a)(5), 1208.4(a)(5) and will be found to have filed their asylum applications within a reasonable period given the circumstances under 8 C.F.R. §§ 208.4(a)(5), 1208.4(a)(5) for purposes of the statutory one-year filing deadline requirement under 8 U.S.C. § 1158(a)(2)(B), INA § 208(a)(2)(B).

HR-1 FRN 2025 AR-000343
**Appx-000368**

3. _Deadlines for Seeking Relief Under this Settlement Agreement_

    a.   <u>Deadline for Submission of Requests to Join or Non-oppose Motions to Dismiss or Terminate, Reopen and Dismiss or Terminate, or Remand and Dismiss or Terminate Removal Proceedings, Requests to Cancel Pending Expedited Removal and Reinstatement Proceedings, Requests to Rescind Expedited Removal and Reinstated Orders of Removal, and Requests to Cancel Unfiled NTAs</u>

_Ms. L._ Settlement Class members seeking dismissal, administrative closure, continuance, termination, or reopening and dismissal or termination of their INA § 240 removal proceedings pursuant to Section IV.C.2.b. must submit their request to join or non-oppose their motion to ICE OPLA for consideration no later than two years after their Settlement Class Member Confirmation Date. _Ms. L._ Settlement Class members seeking cancellation of expedited removal or reinstatement proceedings, rescission of expedited removal or reinstated orders of removal, or cancellation of an Unfiled NTA pursuant to the provisions of this Settlement Agreement must submit their motion or request no later than two years after their Settlement Class Member Confirmation Date.

    b.   <u>Deadlines for Submission of Asylum Application with USCIS or to Request Reopening of a Prior Asylum Application</u>

To obtain benefits pursuant to this Section IV.C.2.:

    i.   _Ms. L._ Settlement Class members who are filing motions to dismiss, terminate, or reopen and dismiss removal proceedings before EOIR pursuant to Section IV.C.2.b. must properly file a complete asylum application with USCIS or request that USCIS reopen their prior asylum application no later than one year after the date EOIR dismisses or terminates the _Ms. L._ Settlement Class member's removal proceedings;

    ii.   _Ms. L._ Settlement Class members who are submitting requests to DHS to cancel pending expedited removal or reinstatement proceedings, or rescind a reinstatement or expedited removal order, pursuant to Section IV.C.2.d., must properly file a complete asylum application with USCIS or request that USCIS reopen a prior asylum application no later than one year after the date DHS cancels the pending expedited removal or reinstatement proceedings, or rescinds the expedited removal or reinstatement order;

    iii.   _Ms. L._ Settlement Class members whose prior asylum application was denied by USCIS prior to the Effective Date must request that USCIS reopen their prior asylum application no later than one year after their Settlement Class Member Confirmation Date. This requirement does not apply to subsequent denials or referrals to EOIR of a _Ms. L._ Settlement Class member's affirmative asylum application if the application was adjudicated pursuant to the procedures set forth in this Settlement Agreement; and

    iv.   _Ms. L._ Settlement Class members who do not require further action by DHS or EOIR before they can apply affirmatively for asylum before USCIS (e.g., they are not subject to INA § 240 removal proceedings, expedited removal or reinstatement proceedings, an expedited removal order or reinstated order of

HR-1 FRN 2025 AR-000344
**Appx-000369**

removal, or are unaccompanied children filing pursuant to 8 U.S.C. § 1158(b)(3)(C), INA § 208(b)(3)(C), over whom USCIS has initial jurisdiction), including *Ms. L.* Settlement Class members who have an Unfiled NTA or whose removal orders have been executed and they subsequently returned to United States via parole or were admitted in a lawful status, must properly file a complete asylum application with USCIS no later than one year after their Settlement Class Member Confirmation Date.

    v.    For *Ms. L.* Settlement Class members who are outside the United States as of the time of their Settlement Class Member Confirmation Date, in order to have their asylum application adjudicated under the terms of this section, the *Ms. L.* Settlement Class member must properly file a complete asylum application with USCIS no later than one year after the date of their parole or lawful admission to the United States or before the Termination Date, whichever is earlier.

A *Ms. L.* Settlement Class member's asylum application that is filed with USCIS by the deadlines specified in this section will continue to be governed by procedures set forth in Section IV.C.2.a., even if the asylum application is pending on the Termination Date. Subsequent asylum applications filed by *Ms. L.* Settlement Class members will not be governed by this Settlement Agreement.

For purposes of this Settlement Agreement, the date USCIS receives the properly filed and complete asylum application or receives the request to reopen the prior asylum application is considered the date the asylum application is filed, or the date reopening is requested.

## V. Future Separations

A. This Section (Future Separations) will apply only to noncitizen parents and Legal Guardians who are apprehended or encountered at the Border, and whose minor noncitizen children are separated from them and held in ORR or DHS custody after the Effective Date. The Reunification provisions of this Section will also govern separations that occurred between January 20, 2021 and the Effective Date where the noncitizen parent or Legal Guardian has not been reunified with their noncitizen child(ren) before the Effective Date. This Settlement Agreement does not apply to noncitizen parents and Legal Guardians who are apprehended by DHS in the interior of the United States.

B. DHS is committed to protecting family unity by ensuring that noncitizen children in DHS custody are not separated from their accompanying noncitizen parent or Legal Guardian, except in limited permissible circumstances as detailed below. CBP will not transfer a family to ICE and ICE will not seek or complete a transfer for the purpose of effectuating a separation that could not otherwise be carried out under this Settlement Agreement. If a family is transferred from CBP to ICE for processing, ICE shall not separate the family in any manner that would be inconsistent with the terms of this Settlement Agreement if it had been done by CBP, and will create the documentation regarding the separation as set forth in Section V.K.1.a below.

HR-1 FRN 2025 AR-000345
**Appx-000370**

C. The limited permissible circumstances for separation are the following:

1. CBP determines that the child or accompanying parent or Legal Guardian presents a public safety or national security risk to the United States as defined in Section V.D. below, and indicates the reason for separation is national security or public safety at the time of separation, if permitted;
2. the parent or Legal Guardian is taken into custody by another law enforcement entity to serve as a material witness in circumstances that make it impossible or unsafe for the child to remain with the parent or Legal Guardian;
3. the parent or Legal Guardian poses a threat to the safety of the child, as defined in Section V.H. below, and CBP documents that risk at the time of separation;
4. the parent or Legal Guardian is the subject of an active federal, state, or local warrant, for which the relevant authority takes active steps to extradite the parent or Legal Guardian;
5. the parent or Legal Guardian is referred for prosecution for a felony (other than for immigration related prosecution based on illegal reentry or prior removals). Where no other permissible circumstances for separation are present, CBP will not refer an adult for prosecution solely under 8 U.S.C. § 1325(a) if the adult is traveling with a minor, is the minor's parent or Legal Guardian, and is the only parent or Legal Guardian traveling with the child;
6. the parent, Legal Guardian, or the child requires hospitalization or outside medical care;
7. or when otherwise required by law.

D. National security and public safety risks shall be determined in relation to the specific circumstances of the individual. They will include, but are not limited to, an individual: who is determined to have engaged in or is suspected of terrorism, espionage, or terrorism-related or espionage-related activities; has been convicted of a violent felony and is deemed to pose an ongoing threat to public safety; or where a determination has been made that the parent or Legal Guardian is subject to a mandatory detention statute prohibiting release because of terrorism grounds or a criminal offense such as INA §§ 236(c) or 241(a)(2). Where national security and/or public safety risks are the basis of separation, CBP shall document that the reason for separation is national security and/or public safety at the time of separation or within a reasonable time afterward, to the extent such documentation does not require disclosing national security or sensitive information prohibited from disclosure by law.

E. When criminal history is the basis for separation and the individual is not subject to mandatory detention as described in Section V.D., CBP will consider the length of time since the arrest or conviction before separating a parent or legal guardian from the child. This does not apply to national security concerns.

F. When considering information from foreign databases as the basis for separation, CBP will also consider any countervailing information provided on the individual's behalf.

G. In material witness determinations, DOJ shall, in cooperation with other agencies and where practicable, make every effort to seek to avoid detention of a parent or Legal

27

HR-1 FRN 2025 AR-000346

Guardian who is alleged to be a material witness if such detention would result in separating them from their child.

H. A threat to the safety of a child shall be defined as a threat to life or health to the extent that injury or harm may be likely if the child were returned to or left in the custody of his or her parent or Legal Guardian. CBP shall evaluate any threat to the safety of a child on a case-by-case basis and may not employ a presumption of a threat to the safety of a child, based on a parent or Legal Guardian's past criminal or immigration history.

I. After consultation with HHS, CBP will develop standardized guidance and ensure that agents and officers follow the guidance when determining whether the parent or Legal Guardian poses a risk to the safety of the child. This guidance will be developed in coordination with and subject to the approval of the DHS Chief Medical Officer.

J. Training and guidance will be provided to all CBP agents and officers and supervisors who may be involved in separating a parent or Legal Guardian from their child which fully explains the new requirements in this settlement and makes clear that a parent or Legal Guardian shall not be separated from his/her/their child based solely on the parent or Legal Guardian's immigration history, including prior removals.

K. Defendants shall employ the following processes and procedures to ensure that family unity is maintained to the greatest extent possible when a parent or Legal Guardian and his or her child are separated. To the extent possible, information provided to the parent, Legal Guardian, or child under this section pertaining to the reason for the separation, the process for contesting the separation, or communication between the parent or Legal Guardian and the child shall be communicated in the language that the parent, Legal Guardian, or child best understands, using an interpreter or translation if necessary:

1. *Procedures at Initial Separation*

   a. Initial internal documentation

   CBP shall document the separation in its electronic systems of records. Such documentation shall include the fact of separation, the reason for separation, including facts specific to the separated individual which, in the discretion of the agency, explain the separation, to the extent such documentation does not require disclosing national security or sensitive information prohibited from disclosure by law, and known biographic (including A numbers) and location information of the separated parent(s) or Legal Guardian(s) and separated child(ren). CBP will include relevant documents supporting the decision to separate in the A-file of the separated child(ren) and separated parent or Legal Guardian.

   b. Information disclosures to separated parents, Legal Guardians, and children

      i. At the time of a separation, CBP shall provide a written explanation to the parent or Legal Guardian of what is occurring, and next steps, including the

28

reason(s) for the separation, including facts specific to the separated individual, which in the discretion of the agency, explain the separation, to the extent such documentation does not require disclosing national security or sensitive information prohibited from disclosure by law. The written explanation must also include information on how the parent or Legal Guardian can submit additional information to ICE regarding their separation using the Family Separation Supplemental Information Form (FSSIF) or successor forms, see Section V.K.3.c.i., or to HHS where relevant to parentage determinations, see Section V.K.3.d.ii, as well as contact information for making a complaint to the DHS Office for Civil Rights and Civil Liberties and the DHS and DOJ Offices of the Inspector General. DHS shall provide the parent with a copy of the FSSIF. The FRTF will also post the FSSIF on its DHS website. The FSSIF shall not require a parent or Legal Guardian to provide the reason they were separated.

ii.    If a U.S. citizen child accompanies a noncitizen parent or Legal Guardian who enters CBP's custody at the Border and CBP refers the child to a state or local agency, CBP will endeavor to inform the noncitizen parent of the state and local entity where the child went and any known contact information for the agency. CBP will endeavor to inform any state or local agency, at the time that the child is referred, that the child was separated from their parent.

iii.    HHS will create a one-pager explanation for CBP to provide to the separated parent or Legal Guardian and separated child at the time of separation. The one-pager will include notice that the child will be placed with an ORR care provider until reunification with the parent or Legal Guardian or release to another relative or other approved sponsor; that the child will be referred for the appointment of a child advocate; that the child will receive a Know Your Rights presentation and legal screening within 10 business days of entering ORR custody; and that federal agencies shall facilitate communication between children and their separated parent or Legal Guardian while the child is in ORR custody. HHS will ensure that the one-page explanation is age-appropriate for the child.

2.    *Government information sharing related to any separation of a parent or Legal Guardian from his or her child*

a.    CBP shall work with HHS and ICE to ensure that, consistent with information sharing agreements and legal obligations, HHS and ICE are provided the documents needed for operational purposes (e.g., criminal records, conviction documents, identity documents).

b.    Defendants will ensure that the information specified in Sections V.K.2.(c) through (e) below is available to agencies identified in those Sections that may take custody of a separated parent, Legal Guardian, or child (whether it is made available through a shared database or other method of information exchange between agencies), so

HR-1 FRN 2025 AR-000348
**Appx-000373**

that each agency has the information it needs to track a parent or Legal Guardian and his or her separated child, to identify when reunification is appropriate, and to facilitate such reunification.

c.  Information that will be made available to ORR

The following information shall be provided or made available to ORR at the time of the child's transfer or, in extraordinary circumstances, no later than three business days after the child's transfer. Within three business days after receiving the following information, ORR shall provide such information to the facility where the child is being held; the child's attorney of record and/or accredited representative as defined in 8 C.F.R. § 1292.1(a)(4), who has submitted Form L-3, Notice of Attorney Representation, to ORR, and to any Child Advocate appointed under 8 U.S.C. § 1232(c)(6). ORR shall provide information made available to ORR under this Section to an ORR contracted legal service provider who is not the child's attorney of record if ORR determines that the child does not have an attorney or accredited representative of record:

    i.  The fact that a child transferred to ORR custody was separated from a parent or Legal Guardian, as set out in Section V.K.1.a;

    ii.  The location to which the parent or Legal Guardian was initially transferred, and updates within 72 hours of the parent or Legal Guardian's transfer to another location;

    iii.  The reason for the separation, including facts specific to the separated individual which, in the discretion of the agency, explain the separation, to the extent such documentation does not require disclosing national security or sensitive information prohibited from disclosure by law;

    iv.  Any available contact information for the parent or Legal Guardian, including any contact information to reach the parent or Legal Guardian at their current detention facility, updated 72 hours after they are transferred to a new facility; and

    v.  DHS and HHS shall work together to ensure that HHS has information needed for HHS operations, including information about a trusted third party, if a parent or Legal Guardian chooses to designate such a trusted third party to receive information about their location and their child's location, see Section V.K.1.g.

d.  Information that will be provided or made available to ICE

    i.  The fact that a parent or Legal Guardian transferred to ICE custody was separated from his or her child;

    ii.  Known biographical information for the separated parent or Legal Guardian and the separated child;

HR-1 FRN 2025 AR-000349
**Appx-000374**

    iii.    The reason for the separation, including facts specific to the separated individual which, in the discretion of the agency, explain the separation, to the extent such documentation does not require disclosing national security or sensitive information prohibited from disclosure by law; and

    iv.    The location where the child is being held if the child is in ORR custody, including updated location information within 24 hours of any transfer of the child within ORR custody, and information on how the parent or Legal Guardian may contact the child, including contact information for the child's assigned case manager, the child's attorney of record and/or accredited representative as defined in 8 C.F.R. § 1292.1(a)(4) who has submitted Form L-3, Notice of Attorney Representation, to ORR, and any Child Advocate appointed under 8 U.S.C. § 1232(c)(6). ORR shall provide the contact information for an ORR contracted legal service provider who is not the child's attorney of record if ORR determines that the child does not have an attorney or accredited representative of record.

e.    <u>In cases in which a separated parent or Legal Guardian is referred to the custody of the U.S. Marshals Service (USMS), information that will be provided or made available to USMS</u>

    i.    The fact that a parent or Legal Guardian transferred to USMS custody was separated from his or her child;

    ii.    The reason for the separation; and

    iii.    The location where the child is being held if the child is in ORR custody, including updated location information within 24 hours of any transfer of the child within ORR custody, and information on how the parent or Legal Guardian may contact the child including contact information for the child's assigned case manager, the child's attorney of record and/or accredited representative as defined in 8 C.F.R. § 1292.1(a)(4) who has submitted Form L-3, Notice of Attorney Representation, to ORR, and any Child Advocate appointed under 8 U.S.C. § 1232(c)(6). ORR shall provide the contact information for an ORR contracted legal service provider who is not the child's attorney of record if ORR determines that the child does not have an attorney or accredited representative of record.

f.    <u>In cases in which a separated parent or Legal Guardian is in the custody of a state or local agency, information that CBP will endeavor to provide or make available to that agency:</u>

    i.    The fact that a parent or Legal Guardian transferred to that agency's custody was separated from their child; and

31

    ii.    If the child is in ORR custody, information on how the parent or Legal Guardian may contact the child.

g. HHS and ICE shall develop procedures by which a parent or Legal Guardian may make a singular notification designating one trusted third-party individual, who is not in ICE custody, to be kept updated promptly by HHS and ICE, as appropriate, any time the location of the separated parent or Legal Guardian or the separated child changes while in ICE or HHS custody, respectively. For a parent or Legal Guardian in ICE custody, ICE will notify the third-party individual regarding changes in the location of custody of the parent or Legal Guardian. For a child in ORR custody, ORR will update the third-party individual regarding changes in the location of the child if ORR has current contact information for the third-party individual.

3. _Additional Procedures following the Initial Separation_

a. Outside of lawful seizures of fraudulent documents or other evidence of criminal activity, in no circumstance shall any employee of DHS confiscate and fail to return a parent, Legal Guardian, or child's documents that might be relevant to showing the family relationship. DHS shall make reasonable efforts, in a manner within its discretion, to authenticate presented documents prior to separation and shall ensure the prompt return of documents believed not to be fraudulent upon confirmation of parentage.

b. HHS will determine what information provided by DHS about the separation can be provided to the child in an age-appropriate and trauma-informed way. HHS will refer every separated child admitted to ORR custody for appointment of a child advocate, who will have been alerted that the child was separated from a parent or Legal Guardian pursuant to Section V.K.2.c.

c. _Submission of additional information to ICE and processes for facilitating contact with children_:

    i.    A separated parent or Legal Guardian in ICE custody can submit additional information to ICE regarding their separation using the FSSIF. FSSIFs will be made available to ICE detainees in all detainee housing units and the FRTF will post the FSSIF on its DHS website. ICE ERO Field Offices will collect completed FSSIFs, and any supporting documentation, in the same manner as a traditional Detainee Request Form. ICE officers are required to email the FSSIFs and supporting documentation to a dedicated email address specific to this process as soon as practicable, but in any event within 7 business days. A separated parent or Legal Guardian may submit subsequent FSSIFs if they are providing new information.

    ii.    A separated child can submit additional information to ORR regarding their separation and ORR will update the child's ORR case file with that information.

HR-1 FRN 2025 AR-000351
**Appx-000376**

ORR will also provide the updated information to the child's attorney of record and/or accredited representative as defined in 8 C.F.R. § 1292.1(a)(4), who has submitted Form L-3, Notice of Attorney Representation to ORR, or to an ORR contracted legal service provider who is not the child's attorney of record if ORR determines that the child does not have an attorney or accredited representative of record; and to any Child Advocate appointed under 8 U.S.C. § 1232(c)(6). Any update provided by the child may be conveyed to ICE by the child's attorney of record or, in the absence of an attorney of record, the contracted legal services provider if the child consents. If the child is not represented by an attorney of record, then the child advocate may provide updates to ICE when the child advocate determines that sharing such information with ICE would be in the child's best interest and the child consents.

iii. ICE shall post fliers in all of its detention facilities to explain how parents and Legal Guardians can request to contact their children or provide supplemental information regarding the basis of their separation, or submit a complaint to the DHS Office for Civil Rights and Civil Liberties and/or the DHS Office of the Inspector General, or contact Class Counsel by mail.

iv. ICE shall maintain a direct email inbox for legal representatives of separated parents or legal guardians in ICE or USMS custody to provide the FSSIF directly to ICE. The FRTF will post the FSSIF on its DHS website along with the email address. For individuals in ICE custody, ICE shall respond to inquiries within 72 hours. Individuals who submit the form while in USMS custody may be asked to re-submit the form if transferred to ICE custody.

v. The USMS and ORR will enter into a Memorandum of Understanding (MOU) to establish an internal tracking system and procedures between the agencies to facilitate communication and reunification between a separated parent or Legal Guardian in USMS custody and their child(ren) who are in ORR custody. That MOU shall include a requirement that the USMS will alert ORR when a separated parent or Legal Guardian transfers out of USMS custody and, upon transfer, the location to which the parent or Legal Guardian has been transferred, unless restricted from doing so for detainee safety, security, or other related concerns. In no case shall a parent or Legal Guardian's transfer out of USMS custody be delayed because of this notification requirement.

d. *Separations due to non-parentage*

DHS must justify the separation of a child and adult on the basis that the adult is not the parent or Legal Guardian of the child and must investigate and verify the non-parental relationship before any separation, which may include contacting the relevant consulate for the child and adult. Where DHS believes the adult is not the child's biological parent, it must offer to conduct a DNA test, with the consent of the adult, and receive and communicate the results to the parent prior to any separation. If any adult believes that DHS's determination that he or she is not the parent or

33

Legal Guardian of a separated child was in error, he or she can challenge the determination as follows:

    i.    If the adult is in ICE custody, he or she can submit additional information to ICE using the procedure in Section V.K.3.c.i. ICE must consider and respond to such additional information, and communicate its response to the separated parent or Legal Guardian, within 14 business days. If it is determined that the adult is the parent or Legal Guardian of the child and there is no other basis for continued separation, then ICE will coordinate with HHS to facilitate reunification if the child remains in HHS custody, under the streamlined *Ms. L.* process. Should HHS decline to facilitate reunification due to an alleged substantial child safety risk or alleged incapacity of the parent or Legal Guardian, HHS must provide the parent or Legal Guardian or his or her representative with a Notification of Denial letter (as laid out in ORR Policy Guide Section 2.7.7 (Notification of Denial)) and instructions on the appeal process pursuant to ORR Policy Guide Section 2.7.8 (Appeal of Release Denial). If the child is released from ORR custody to a sponsor, ICE will consider alternatives to detention for the parent or Legal Guardian to facilitate reunification. At the time of the child's release to a sponsor, ORR will also provide the sponsor information to the parent in ICE's legal custody. If parentage is determined after the child has been released from ORR custody and the parent is still in ICE custody, ORR will provide information at that time to the parent, for the purpose of facilitating reunification, concerning the sponsor to whom the child was released. If parentage is determined after the parent is no longer in ICE custody, and the parent contacts ORR, ORR will provide information at that time to the parent concerning the sponsor to whom the child was released. A copy of this information will also be sent to the parent's attorney (if ORR has the attorney's contact information) and the child's attorney (if they have one) or legal services provider (LSP).

    ii.    If the adult is not in ICE custody, he or she can submit evidence of parentage to HHS in the manner described in the written explanation provided to the adult upon separation, see Section V.K.1.b.i. If HHS determines that the adult is the parent or Legal Guardian of the child, then HHS shall facilitate reunification under the streamlined *Ms. L.* process unless there exists a child safety risk as defined in Section V.H., or the child or the parent or Legal Guardian is unavailable due to criminal custody or incapacity, is not physically present in the United States, or declines reunification. Should HHS decline to facilitate reunification due to an alleged substantial child safety risk or alleged incapacity of the parent or Legal Guardian, HHS must provide the parent or Legal Guardian or his or her representative with a Notification of Denial letter (as laid out in ORR Policy Guide Section 2.7.7 (Notification of Denial)) and instructions on the appeal process pursuant to ORR Policy Guide Section 2.7.8 (Appeal of Release Denial).

HR-1 FRN 2025 AR-000353

**Appx-000378**

e. *Separations due to the transfer of the parent or Legal Guardian to criminal custody based on an active warrant or because the individual is being held as a material witness*:

   i. If a parent or Legal Guardian is transferred to criminal custody based on an active warrant or because the individual is being held as a material witness, as described in Section V.G. above, the child will be transferred to HHS. Absent an independent basis for separation, a parent or Legal Guardian who is returned to DHS custody at the end of their criminal custody shall be reunified with his or her child.

   ii. In such cases HHS shall facilitate reunification of the child under the streamlined *Ms. L.* process unless there exists a child safety risk as defined in Section V.H. or the child or the parent or Legal Guardian is unavailable due to incapacity, is not physically present in the United States, or declines reunification. Should HHS decline to facilitate reunification due to an alleged substantial child safety risk or alleged incapacity of the parent or Legal Guardian, HHS must provide the parent or Legal Guardian or his or her representative with a Notification of Denial letter (as laid out in ORR Policy Guide Section 2.7.7 (Notification of Denial)) and instructions on the appeal process pursuant to ORR Policy Guide Section 2.7.8 (Appeal of Release Denial).

f. *Separations due to hospitalization or outside medical care*

If a parent or Legal Guardian is separated from his or her child due to the hospitalization or need for outside medical care of a parent, Legal Guardian, and/or child, and there are no other grounds for separation, the parent or Legal Guardian will be entitled to reunification with his or her child once the family member is released from the hospital. Any decision that the child(ren) and parent or Legal Guardian cannot remain together shall be based on the needs, policies, and/or restrictions of the hospital or other care facility where the parent, Legal Guardian, and/or child is receiving care.  Any separated child shall be placed in an ORR facility as close as possible to where the parent or Legal Guardian is receiving medical care if ORR has sufficient beds available within the demographic area to accommodate the child. When the family member is released from medical care, DHS and HHS will work to facilitate reunification under the streamlined *Ms. L.* process if the child is in ORR custody and the parent or Legal Guardian is in DHS custody, absent an independent reason to separate. Should HHS decline to facilitate reunification due to an alleged substantial child safety risk or alleged incapacity of the parent or Legal Guardian, HHS must provide the parent or Legal Guardian or his or her representative with a Notification of Denial letter (as laid out in ORR Policy Guide Section 2.7.7 (Notification of Denial)) and instructions on the appeal process pursuant to ORR Policy Guide Section 2.7.8 (Appeal of Release Denial). If the child will be released from ORR custody to an approved sponsor before the parent is released from DHS custody, ORR shall notify the hospitalized parent of the child's intended sponsor and plans for release and reunification with the sponsor, as well as the sponsor's address and contact information.

HR-1 FRN 2025 AR-000354

**Appx-000379**

g. *Separations for any other reason that does not preclude future eligibility for reunification*

If DHS determines that continued separation of a previously-separated parent or Legal Guardian who is in DHS custody is no longer warranted, DHS will coordinate with HHS to facilitate reunification under the streamlined *Ms. L.* process if the child remains in HHS custody. Should HHS decline to facilitate reunification due to an alleged substantial child safety risk or alleged incapacity of the parent or Legal Guardian, HHS must provide the parent or Legal Guardian or his or her representative with a Notification of Denial letter (as laid out in ORR Policy Guide Section 2.7.7 (Notification of Denial)) and instructions on the appeal process pursuant to ORR Policy Guide Section 2.7.8 (Appeal of Release Denial).

h. *Removal*

If a separated parent or Legal Guardian who has been in custody throughout the pendency of their removal proceedings has not been reunified with his or her separated child at the time he or she is being removed from the United States, and there are no legal prohibitions or risk to the child as defined in Section V.H., ICE shall offer the parent or Legal Guardian the opportunity to be removed with his or her child as set forth below.

i.   ICE will provide the Notice of Potential Rights Form, or its successor forms, to the separated parent or Legal Guardian when he or she enters ICE custody. If reunification is requested, ICE shall notify HHS, through a dedicated ORR mailbox, of the request as soon as is operationally feasible and, in any event, within three business days of when the separated parent signs the form and informs ICE of the decision.  If the separated parent or Legal Guardian is released from ICE custody after he or she signs the Notice of Potential Rights Form, ICE shall notify HHS of the release, and the procedures in this subsection (h) (Removal) will no longer apply and ICE will follow its normal policies and procedures.

ii.  If the child is in HHS custody, then HHS shall notify any attorney for the child or legal services provider at the child's shelter and any appointed child advocate within one business day of receiving the request for reunification. Within seven business days of receiving that request, the child will notify HHS through their representative, and HHS will notify ICE within one business day, whether the child prefers to be removed with their parent or Legal Guardian, objects to removal with their parent or Legal Guardian, or needs more time to make the decision. If the child needs more time to make a decision, including any discussion with the parent or Legal Guardian, the child shall be provided an additional seven business days in which to make their decision. Unless operationally infeasible, ICE shall not remove the parent or Legal Guardian prior to expiration of the relevant time period specified here. Where the child makes or changes their decision after the relevant time period but before removal and a delay in removal will not result, ICE, in its discretion, may, but will have no obligation to, consider such decision.

HR-1 FRN 2025 AR-000355
**Appx-000380**

iii. Where the child has been released from HHS custody, HHS shall notify any attorney for the child on record with ORR and any appointed child advocate within one business day of being notified of the pending removal. If the child is no longer in HHS custody, the child may make any objection to removal to their attorney of record or appointed child advocate. Within seven business days of receiving notice, the attorney or child advocate may convey that the child agrees to removal, objects to removal, or needs more time to make the decision. If the child needs more time, the child shall be provided an additional seven business days in which to make their decision. Unless operationally infeasible, ICE shall not remove the parent or Legal Guardian prior to expiration of the relevant time period specified here. Where the child makes or changes their decision after the relevant time period but before removal and a delay in removal will not result, ICE, in its discretion, may, but will have no obligation to, consider such decision.

iv. If the child in ORR custody elects to be removed with the parent or Legal Guardian, ICE shall expeditiously coordinate with HHS to accomplish the reunification of the parent or Legal Guardian and child as is operationally feasible prior to the removal of the parent or Legal Guardian and child, as described above.

4. <u>Communication between a separated parent or Legal Guardian and their child</u>

a. The government will take the following steps to facilitate communication between a separated parent or Legal Guardian and their child:

i. When the parent or Legal Guardian is in ICE custody and the child is in HHS custody, designated ICE field office points of contact will help facilitate communication between parent(s) or Legal Guardian(s) and children with the ORR case managers. If the child is in the custody of a state or local agency, designated ICE field office points of contact will attempt to facilitate communication between the child and parent(s) or Legal Guardian(s) when practical and legally permissible.

ii. When the parent or Legal Guardian is in USMS custody and the child is in HHS custody, designated USMS field office points of contact will help facilitate communication between parent(s) or Legal Guardian(s) and children with the ORR case managers. If the child is in the custody of a state or local agency, USMS will endeavor to assist the parent or Legal Guardian to facilitate communication with their child, consistent with federal, state, or local laws and policies that govern the facility where the parent or Legal Guardian is detained, and subject to operational or administrative feasibility.

iii. When the parent or Legal Guardian is in the custody of a state or local agency and the child is in HHS custody, designated HHS points of contact will help

HR-1 FRN 2025 AR-000356

**Appx-000381**

attempt to facilitate communication between children and parent(s) or Legal Guardian(s).

    iv.    ICE and USMS shall offer separated parents or Legal Guardians information about how to request telephone contact with their separated child(ren).

    v.    ORR shall offer separated children information about how to request telephone contact with their parent or Legal Guardian.

    vi.    Contact between parents or Legal Guardians and their children shall be free of cost, meaning that in no case shall contact be denied because the separated parent or Legal Guardian lacks funds in their account to make calls.

    vii.    ICE and ORR shall coordinate to facilitate contact between a parent or Legal Guardian and their child within 48 hours of the child arriving to the ORR care provider. USMS shall coordinate with ORR to facilitate contact between a parent or Legal Guardian and their child upon the parent or Legal Guardian arriving in USMS custody. The frequency and mode of communication will be coordinated between the facility where the parent or Legal Guardian is being held and ORR based on the availability of the parent or Legal Guardian and the availability of resources at the facility where they are being detained. Alternative means of communication shall be explored and implemented whenever the parent, Legal Guardian, or child is unable to communicate effectively by verbal interaction alone. Facilities will endeavor to make such telephone or video contact available for a minimum of 20 minutes for each communication, subject to facility-wide protocols impacting all detainees.

L.    Nothing in this Section shall prohibit ICE from exercising its discretion to make safety-based housing decisions concerning families in its custody.

## VI. <u>Notice and Reporting</u>

### A.    Notice to *Ms. L.* Settlement Class Members

1.    NOTICE UPON PRELIMINARY APPROVAL: The Preliminary Class Notice is attached hereto in English as Exhibit A to this Settlement Agreement. Once the Preliminary Class Notice is approved by the Court, the Parties will translate it into Spanish. Within 30 days of preliminary approval of this Settlement, the Parties will distribute the Preliminary Class Notice to *Ms. L.* Settlement Class members as follows:

    a.   Online/Electronic Notice
       i.   Defendants shall post a copy of the Preliminary Class Notice in English and Spanish in a reasonably accessible location on the websites of HHS and EOIR.
      ii.   Defendants shall post a copy of the Preliminary Class Notice on the Together.gov/Juntos.gov web site in English and Spanish

HR-1 FRN 2025 AR-000357
**Appx-000382**

iii.    Class Counsel shall post a copy of the Preliminary Class Notice in English and Spanish in a reasonably accessible location on the websites of the National ACLU.

b.    Nothing in this paragraph or this Settlement Agreement shall prevent Class Counsel from further disseminating the Preliminary Class Notice to, inter alia, other non-profit organizations, legal services providers, or advocates working with separated families. Additionally, nothing in this paragraph or this Settlement Agreement shall prevent Class Counsel from issuing any press release regarding this Settlement Agreement or otherwise obtaining press attention for the Settlement Agreement.

c.    Receipt of a Preliminary Class Notice is not a determination that an individual is a *Ms. L.* Settlement Class Member.

2.    NOTICE UPON FINAL APPROVAL: The Parties will meet and confer within seven days of Final Approval to update the language of the Preliminary Class Notice as appropriate (in English and Spanish), in order to reflect the final settlement agreement (the Final Class Notice). Within seven days after the Final Class Notice is agreed upon by the Parties, the Parties shall provide the Final Class Notice to the *Ms. L.* Settlement Class members by the following means:

a.    Within 30 days posting the Final Class Notice (in English and Spanish), in or at the same websites as set forth above;

b.    The Parties agree to negotiate in good faith to amend the Class Notices and these agreed-upon notice procedures if required to obtain final Court approval of the Settlement.

c.    Defendants will work with Class Counsel to ensure that reasonable efforts are taken to contact all *Ms. L.* Settlement Class members and provide them with the Final Class Notice to the extent necessary to ensure that they are provided all benefits owed to them under the Settlement. Reasonable efforts to contact *Ms. L.* Settlement Class members include:

i.    Defendants will identify parents and Legal Guardians and their separated child(ren) who may meet the definition of a *Ms. L.* Settlement Class member. Defendants will share this information with Class Counsel, under the protective order, and provide notice as described in this settlement agreement to those individuals.

ii.    Defendants will provide available e-mail, mailing, and phone contact information under the protective order for all those who have registered with together.gov/juntos.gov, and the same available information for any attorneys or preparers who are listed on a together.gov/juntos.gov registration.

HR-1 FRN 2025 AR-000358
**Appx-000383**

iii.    Defendants will maintain the existing registration website (together.gov/juntos.gov) until the Termination Date, but potential *Ms. L.* Settlement Class members must register on together.gov or juntos.gov prior to the Final Registration Date.

iv.    Defendants will fund a third-party managed outreach campaign until the Final Registration Date, to contact *Ms. L.* Settlement Class members and potential *Ms. L.* Settlement Class members both in the United States and abroad, including outreach to *Ms. L.* Settlement Class members who speak indigenous languages, and to explain reunification support, social services and benefits, and how to register on together.gov/juntos.gov. Defendants will also fund a helpdesk to field inquiries from *Ms. L.* Settlement Class members and potential *Ms. L.* Settlement Class members until the Termination Date.

3. Defendants will provide updates every 60 days identifying any new *Ms. L.* Settlement Class members, along with contact information from government records, which includes contact information for any attorneys for the *Ms. L.* Settlement Class members.

4. On a quarterly basis from the Effective Date until the Final Registration Date, Class Counsel will provide to Defendants a list of identified *Ms. L.* Settlement Class members whom Class Counsel have not been able to contact. No later than 60 days after such list is provided, Defendants will search relevant HHS, DHS, and DOJ databases that may contain new or updated address or contact information or attorney contact information for those *Ms. L.* Settlement Class members and any sponsors of *Ms. L.* Settlement Class members, and will share such information with Class Counsel for those *Ms. L.* Settlement Class members identified for that quarter, except as prohibited by law or any applicable privilege.

5. Until the Final Registration Date, Defendants will provide quarterly reports to Class Counsel of their contact efforts. Class Counsel will provide quarterly reports to Defendants detailing progress made in contact efforts, estimates on the remaining efforts to contact *Ms. L.* Settlement Class members, challenges experienced in their contact efforts, and recommendations to improve contact efforts.

## B. Reporting Provisions

1. Defendants will provide reports, subject to an appropriate protective order, to Class Counsel to allow Class Counsel to track progress and identify any problems or delays in providing benefits of this settlement to *Ms. L.* Settlement Class members and their Qualifying Additional Family Members. The Parties may modify the categories of information Defendants provide by mutual agreement, in writing, and may submit any disputes for resolution by the Court. The Defendants' reports shall include, at a minimum, the following information:

HR-1 FRN 2025 AR-000359

**Appx-000384**

a. <u>Parole Reporting (Including Parole in Place)</u>

   i.   Every 60 days, the government will provide a report that provides updates on progress toward obtaining parole for *Ms. L.* Settlement Class members and Qualifying Additional Family Members as follows:

      (a) identifying *Ms. L.* Settlement Class members who have submitted applications for parole from within the United States (or "parole in place"), and, separately, those who have submitted applications for parole from outside the United States, whether the *Ms. L.* Settlement Class member has received or been denied parole, dates they applied for and received parole or were denied; and

      (b) providing aggregate numbers of Qualifying Additional Family Members who have submitted applications for parole in place or parole from outside the United States, and how many have received parole or have been denied.

   ii.   Reporting shall also make clear in which cases the DHS contractor is assisting the *Ms. L.* Settlement Class members and their Qualifying Additional Family Members with parole applications.

   iii.   Any further data points that have been exchanged to date – as of the Effective Date – until the Termination Date.

b. <u>Humanitarian Services Reporting</u>

   i.   Every 90 days, Defendants will provide a report that includes the aggregate numbers of *Ms. L.* Settlement Class members who are receiving behavioral health services.

   ii.   Every 90 days, Defendants will provide a report that includes the aggregate numbers of *Ms. L.* Settlement Class members who are receiving housing services.

c. <u>Ongoing Separations</u>

Defendants shall provide monthly reports to Class Counsel concerning ongoing separations for one year after the Effective Date. Defendants shall provide quarterly reports to Class Counsel concerning ongoing separations for two additional years. The government will report the information in the same manner that it has been reported throughout the litigation.

C.  Except as otherwise specified herein, all reporting requirements will terminate on the Termination Date.

HR-1 FRN 2025 AR-000360
**Appx-000385**

## VII.    Dispute Resolution

A.  The terms of the Settlement Agreement shall be incorporated into the Order of the Court approving the Settlement Agreement. The Order shall constitute the final judgement of the Court with regard to the Action. The Order shall include a statement that the Order of the Court and all obligations of the Parties under the Settlement Agreement will terminate on the Termination Date except that:

1. Defendants' obligations under Section V (Future Separations) will terminate on the Termination Date – Future Separations; and

2.  Defendants will continue to provide Behavioral Health Services as described in Section IV.B.2.a. above for one year following the Termination Date.

B.  From the Effective Date until the Termination Date, the Court will retain jurisdiction over the Action only for the purpose of enforcing the terms of the Settlement Agreement, except that the Court shall retain jurisdiction over Section V (Future Separations) until the "Termination Date – Future Separations," and shall retain jurisdiction to resolve disputes regarding the provision of Mental Health Services as described in Section IV.B.2.a. above for one year following the Termination Date; and shall retain jurisdiction to resolve disputes concerning any applications for relief filed pursuant to this Settlement Agreement that remain pending as of the Termination Date.

C.      The Parties agree that they will apply the following dispute resolution mechanisms before seeking enforcement from the Court:

1.  Should counsel for either party believe in good faith that the other party has failed to implement or comply with a specific term of this Settlement Agreement, counsel shall, within 7 days of learning of the alleged noncompliance, notify counsel for the opposing side, in writing, of the specific grounds upon which non-compliance is alleged. Disagreement with a sole individual discretionary decision or final adjudicative determination provided for in the Settlement Agreement is not a valid basis for alleging non-compliance.

2.  Any allegations of violations of this Settlement Agreement must be substantiated with specific detailed information about the violations sufficient to enable the responding party to investigate and respond.

3.  The responding party shall respond in writing within a reasonable period, but no later than thirty (30) calendar days following the receipt of notice of the alleged failure to comply, and provide the responding party's position and any action it has taken or intends to take to address the alleged non-compliance. The Parties shall negotiate in good faith in an effort to resolve any remaining disputes. The Parties agree to make good faith attempts to resolve the issues informally, including a good faith attempt to agree on a reasonable date by which to cure instances of non-compliance.

4.  If the Parties have exhausted the process set out in the preceding paragraphs and the complaining Party believes that the alleged instances of non-compliance have not been remedied, the Parties may (1) jointly refer any unresolved dispute to a mediator agreed upon by the Parties; or, alternatively, (2) seek relief before the Court in the *Ms. L.* case.

42

HR-1 FRN 2025 AR-000361
**Appx-000386**

5. Any request or communication to a mediator or potential mediator to begin the mediation process must be a joint request or communication from both Parties. The Parties agree that the mediation process described in this Section shall be conducted confidentially and that no public disclosure shall be made regarding the mediation process at any time before, during, or after the mediation process, except that the final result of the mediation may be disclosed. Plaintiffs retain the right to share information obtained via the mediation process—subject to the Protective Order in this case—with outside stakeholders or organizations that brought the dispute to Plaintiffs' attention, or any other stakeholders or organizations with relevant information or expertise Plaintiffs wish to consult with regarding issues raised in the mediation process. Any documents or information disclosed by either party during the mediation process shall not be admissible in any judicial proceeding. All statements or conclusions of the mediator shall not be admissible in any subsequent judicial proceeding.

6. If the Parties do not reach resolution under the procedures of Paragraphs 1-6, either party may file a motion requesting that the Court resolve the dispute.

7. If Plaintiff has a good faith belief that immediate, irreparable harm to a *Ms. L.* Settlement Class member who is eligible for benefits under this Agreement is imminent and cannot be resolved within the time frames specified in this Section, Plaintiffs may make an immediate application for relief to the Court in the *Ms. L.* case, after providing notice of such harm to Defendants' Counsel.

D. The Parties agree that any action or proceeding to enforce the terms of this Agreement shall be brought exclusively to the Court in the *Ms. L.* case. The Court shall have the power to award such relief and issue such judgments as the Court deems necessary for enforcement of the Settlement Agreement.

E. The Parties will endeavor to avoid using the dispute resolution process set forth in this Section to address allegations of temporary or de minimis breaches of the Settlement Agreement. This paragraph does not prevent Plaintiffs from raising individual and case-specific instances of violations of the Settlement Agreement for resolution.

## VIII.   Fees and Expenses

Defendants agree that they will pay reasonable fees and other expenses incurred by Class Counsel in the litigation of this Action, in accordance with the Equal Access to Justice Act, 28 U.S.C. § 2412(d). Defendants reserve their right to raise defenses related to the reasonableness of Class Counsel's request for fees and expenses, but otherwise waive their available defenses to a claim brought by Class Counsel under 28 U.S.C. § 2412(d) for the litigation of this Action through the Effective Date of the Settlement Agreement. No later than 60 days following the Effective Date Plaintiffs will serve a fee demand on Defendants, and the Parties will then enter into negotiations to determine the amount of reasonable fees and expenses to be paid by Defendants. If the Parties cannot reach agreement on the amount of reasonable fees and expenses to be paid, then they will submit the issue to the Court in the *Ms. L.* case for binding resolution. This Section does not affect or waive any party's rights or defenses concerning any requests for fees or expenses incurred more than 60 days after the Effective Date related to enforcement of this Settlement Agreement.

HR-1 FRN 2025 AR-000362

**Appx-000387**

## IX. Additional Provisions

A.  By entering into this Settlement Agreement, Plaintiffs and all *Ms. L.* Settlement Class members waive and release all Defendants in their individual and official capacities, the United States, and past, present, or future department or component heads, inferior officers, employees, agents, representatives, or contractors from all Released Claims. The Released Claims are all claims, demands, rights, liabilities and causes of action for declaratory or injunctive relief, known or unknown, arising from or related to the alleged separation of any *Ms. L.* Settlement Class member from his or her parent, Legal Guardian, or child, where such claims existed prior to the Effective Date of this Settlement Agreement and were or could have been alleged in the Action based on the same common nucleus of operative facts alleged by Plaintiffs in their pleadings and the arguments made in the Action. The Released Claims under this Settlement Agreement do not include claims for damages.

B.  This Settlement Agreement and its exhibits constitute the entire agreement among the Parties hereto concerning the settlement of the Action, and no representations, warranties, or inducements have been made by any party hereto other than those contained and memorialized in such documents.

C.  Other than as set forth herein, this Settlement Agreement shall not be construed to waive, reduce, or otherwise diminish the authority of the Defendants to enforce the laws of the United States against *Ms. L.* Settlement Class members, consistent with the Constitution and laws of the United States, and applicable regulations.

D.  This Settlement Agreement shall not be offered or received against the Defendants or the United States as evidence of, or construed as or deemed to be evidence of, any presumption, concession, or admission by any of the Defendants or the United States of the truth of any fact alleged by the Plaintiffs or the validity of any claim that had been or could have been asserted in the Action or in any litigation, or the deficiency of any defense that has been or could have been asserted in the Action, or of any liability, negligence, fault, or wrongdoing of the Defendants or the United States or its employees, officers, or agents; or any admission by the Defendants or the United States or its employees, officers, or agents of any violations of, or failure to comply with, the Constitution, laws or regulations.

E.  The Settlement Agreement shall not be offered or received against the Defendants or the United States as evidence of a presumption, concession, or admission of any liability, negligence, fault, or wrongdoing, nor shall it create any substantive rights or causes of action against Defendants or the United States, in any other civil, criminal, or administrative action or proceeding, other than such proceedings as may be necessary to enforce the provisions of this Settlement Agreement.

F.  This Settlement Agreement may not be modified or amended, nor may any of its provisions be waived, except by a writing signed by all Parties hereto or their successors-in-interest.

HR-1 FRN 2025 AR-000363
**Appx-000388**

G. All deadlines in this Settlement Agreement will be calculated in accordance with the guidelines set forth in Federal Rule of Civil Procedure 6(a) unless otherwise provided in the Settlement Agreement.

H. This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument provided that counsel for the Parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

I. This Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the Parties hereto.

J. The waiver by one party of any breach of this Settlement Agreement by any other party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement Agreement.

K. All counsel and any other person executing this Settlement Agreement and any of the exhibits hereto, or any related settlement documents, warrant and represent that they have the full authority to do so and that they have the authority to take appropriate action required or permitted to be taken under the Settlement Agreement to effectuate its terms.

L. Class Counsel and Defendants' Counsel agree to cooperate fully with one another in seeking Court approval of this Settlement Agreement and to promptly agree upon and execute all such other documentation as may be reasonably required to obtain final approval by the Court of the Settlement Agreement.

HR-1 FRN 2025 AR-000364
**Appx-000389**

DATED: October 13, 2023

Lee Gelernt  /DG

Digitally signed by Lee Gelernt  /DG
Date: 2023.10.16 10:59:40 -04'00'

_____

Lee Gelernt*
Judy Rabinovitz*
Anand Balakrishnan*
Daniel A. Galindo (SBN 292854)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
T:  (212) 549-2660
F:  (212) 549-2654
lgelernt@aclu.org
jrabinovitz@aclu.org
abalakrishnan@aclu.org
dgalindo@aclu.org

Stephen B. Kang (SBN 292280)
Spencer E. Amdur (SBN 320069)
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
39 Drumm Street
San Francisco, CA 94111
T:  (415) 343-1198
F:  (415) 395-0950
skang@aclu.org
samdur@aclu.org

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice*

Respectfully submitted,


BRIAN BOYNTON
Principal Deputy Assistant Attorney General

CHRISTOPHER P. TENORIO
Deputy Assistant Attorney General

WILLIAM C. PEACHEY
Director

WILLIAM C. SILVIS
Assistant Director

SARAH FABIAN

Digitally signed by SARAH FABIAN
Date: 2023.10.13 19:08:48 -04'00'

_____

SARAH B. FABIAN
Senior Litigation Counsel
FIZZA BATOOL
Trial Attorney
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
(202) 532-4824
(202) 616-8962 (facsimile)
Sarah.B.Fabian@usdoj.gov

*Attorneys for Defendants*

HR-1 FRN 2025 AR-000365

**Appx-000390**